## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **Voter Reference Foundation, LLC,** | ) | |
| | ) | **CASE NO: 22-cv-222** |
| and | ) | |
| | ) | |
| **Holly Steinberg,** | ) | |
| | ) | |
| Plaintiffs, | ) | **VERIFIED COMPLAINT FOR** |
| **v.** | ) | **DECLARATORY AND** |
| | ) | **INJUNCTIVE RELIEF** |
| | ) | |
| **Hector Balderas**, in his official capacity as | ) | |
| New Mexico Attorney General, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **Maggie Toulouse Oliver,** in her official | ) | |
| capacity as New Mexico Secretary of State, | ) | |
| | ) | |
| **Defendants.** | ) | |

### VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Come now Plaintiffs Voter Reference Foundation, LLC ("VRF") and Holly Steinberg, by and through undersigned counsel, and state as follows:

1.     Plaintiffs VRF and Steinberg are dedicated to increasing voter participation in elections while protecting election integrity. In service of those goals, VRF files requests with state officials to obtain data showing who has voted in recent elections, and then makes that data available to the public on its website. Until recently, this meant that interested citizens in New Mexico who verified they were not using the data for commercial purposes—citizens like Holly Steinberg—could search public records of voting histories to determine who votes, where, and when. Recently, Defendant Secretary of State Maggie Toulouse Oliver opined that this conduct

was criminal, and referred the matter to Defendant Hector Balderas, New Mexico Attorney General. Secretary Oliver cited N.M. Stat. § 1-4-5.5, which controls the use of voter data. The unlawful use of voter data can be criminally prosecuted under N.M. Stat. § 1-4-5.6. Because their First Amendment rights to use and disclose the voter data for purposes of encouraging voter participation and protecting election integrity are being chilled, Plaintiffs sue the Defendants in their official capacities to obtain a declaration that their conduct is lawful and to enjoin Defendants from enforcing any statute in violation of Plaintiffs' rights.

## STATEMENT OF THE CASE

2.      Under New Mexico law, voter data is publicly available to requestors to use for "governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." § 1-4-5.5(C).

3.      The unlawful use of voter data "consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." N.M. Stat. § 1-4-5.6(A). A person or organization who unlawfully uses voter data is guilty of a fourth-degree felony and upon conviction shall be fined one hundred dollars ($100) for each and every line of voter information that was unlawfully used. § 1-4-5.6(B). A fourth-degree felony is punishable by up to 18 months imprisonment. § 31-18-15(A)(13).

4.      The statutory scheme, which limits the use and distribution of critical data regarding New Mexico's elections, is unconstitutional on its face and as applied to Plaintiffs, unlawfully and unjustifiably restricts Plaintiffs' speech rights in violation of the First Amendment, and operates as an unconstitutional prior restraint on speech.

5.      Additionally, the vagueness and overbreadth of the statute's restrictions violate the First and Fifth Amendments because the statute fails to give notice as to what uses are permissible

and which are prohibited, encourages arbitrary enforcement, and regulates substantially more protected speech than can be justified in relation to its plainly legitimate sweep

6.      On March 7, 2022, ProPublica published an article criticizing VRF's efforts to provide transparency and increase voter participation through its campaign of publishing voter information across the nation (the "Article"). A copy of that article is attached hereto as Exhibit A and is incorporated by reference. *See* **Ex. A**, "Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques" available at: https://www.propublica.org/article/voter-ref-foundation.

7.      The Article attributes several statements to Secretary Oliver. Most notably:

In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is not an allowable use of voter data. By state law, she said, the rolls can only be used for governmental or campaign purposes.

"Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said.

8.      The Article twice states that Secretary Oliver has referred Plaintiff VRF's use of the voter data to the Attorney General's office for criminal investigation and possible prosecution. Thus, Plaintiff VRF faces a credible threat of prosecution by the Defendants if it continues to use and disseminate voter information to encourage transparency and voter participation. Plaintiff Steinberg fears she will be similarly prosecuted if she uses the voter information disseminated by VRF or uses voter information for the same purposes as VRF.

9.      Plaintiffs seek relief from this Court to protect their First Amendment rights.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this case pursuant to each of the following:

a.     28 U.S.C. § 1331, as the action arises under the First, Fifth, and Fourteenth Amendments to the United States Constitution;

b.     28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution;

c.     28 U.S.C. § 1343(a)(4), in that it seeks to recover nominal damages and secure equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights; and,

d.     28 U.S.C. § 2201(a), in that it seeks to secure declaratory relief; and 28 U.S.C. § 2202 in that it seeks to secure preliminary and permanent injunctive relief.

11.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) in that Defendants are situated within this judicial district.

## PARTIES

12.     Plaintiff Voter Reference Foundation, LLC ("VRF") is an nonpartisan Ohio nonprofit limited liability company and subsidiary of Restoration Action, Inc., a 501(c)(4) social welfare organization. VRF operates the website VoteRef.com (the "Website"). VRF is dedicated to ensuring transparent, accurate, and fair elections in the United States of America and does so, in part, by making state voter registration information available on the Website. The purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls. The public dissemination of this information is intended to increase voter participation and make the state's election processes more transparent. A close review of the data can show that it is wrong or was entered incorrectly. VRF encourages users of the Website to report these errors directly to the appropriate Secretary of State or clerk. This

transparency fosters confidence in the integrity of the election system and thereby encourages voter participation. VRF desires to post, distribute, and otherwise share voter data available under N.M. Stat. § 1-4-5.5 on the Website so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls. VRF intends to post this information for the public to access and view free of charge. VRF believes this use would be for one of the purposes permitted by statute ("governmental or election and election campaign"). *See* § 1-4-5.5(C).

13.     Plaintiff Holly Steinberg is a resident of New Mexico. Steinberg has worked and continues to work with grassroots organizations advocating for, among other things, transparency in New Mexico's elections both to increase voter participation and to ensure the integrity of the electoral process. Steinberg wishes to use the New Mexico data that VRF had posted and intends to post on its Website in order to accomplish these twin aims, as the cost to purchase the data for her personal use is unreasonably high. If VRF removes access to the data, Steinberg cannot use it at all. If she does try to buy it for herself, the Use Restrictions, as defined herein, will keep her from using it to check the integrity of the data and increase voter participation because it won't be used to advocate for a campaign.

14.     Defendant Hector Balderas is the duly elected Attorney General for the State of New Mexico and, in that capacity, is responsible under state law for investigating and prosecuting violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6. *See* N.M. Stat. § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); N.M. Stat. § 1-2-2 ("The secretary of state shall… E. report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution…"); N.M. Stat. Ann. § 1-1-1 ("Chapter

1 NMSA 1978 may be cited as the 'Election Code.'"). Mr. Balderas is named in his official capacity only. The Attorney General is located and can be found in Santa Fe, NM which is within this District.

15.     Defendant Maggie Toulouse Oliver is the duly elected Secretary of State for the state of New Mexico and, in that capacity, is the chief election officer of the state. N.M. Stat. § 1-2-1(A). The Secretary is responsible under state law for furnishing voter data to requesters and referring potential violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6, to the Attorney General for investigation and prosecution. *See* N.M. Stat. § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); N.M. Stat. § 1-2-2 ("The secretary of state shall… E. report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution…"); N.M. Stat. Ann. § 1-1-1 ("Chapter 1 NMSA 1978 may be cited as the 'Election Code.'"). Ms. Toulouse Oliver is named in her official capacity only. The Secretary of State is located and can be found in Santa Fe, NM, which is within this District.

16.     Based on her statements to the media, Plaintiffs understand that Defendant Maggie Toulouse Oliver referred Plaintiff VRF to Defendant Hector Balderas for criminal prosecution because of its use and dissemination of voter information on the Website.

## **BACKGROUND FACTS**

**A.  New Mexico makes certain types of voter registration publicly available.**

17.     New Mexico makes certain voter registration data (other than SSN, day/month of birth, phone numbers, and data indicating agencies where voter registered) available to requestors for limited purposes.

18.     "The county clerk or secretary of state shall furnish voter data, mailing labels or special voter lists only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section; provided, however, all requesters shall be treated equally in regard to the charges and the furnishing of the materials." § 1-4-5.5(A). "In furnishing voter data, mailing labels or special voter lists, the county clerk or secretary of state shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters." § 1-4-5.5(B).

19.     The voter information may only be used for purposes listed in the statute — including "governmental or election and election campaign purposes" —while all other uses are prohibited and unlawful. Unlawful use specifically includes commercial use. For purposes of this Complaint, the "Use Restrictions" are: (1) restrictions on a use of the data that is not for a specific candidate or ballot measure campaign, but that is for election purposes; and (2) restrictions on a use of the data that is not by the government itself, but that is by a private person for the purpose of publishing, reviewing, and engaging in speech regarding the governmental operation of elections.

20.     "Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." § 1-4-5.5(C).  The Secretary of State shall prescribe the form of the affidavit. § 1-4-5.5(D).

21.     Section 1-4-5.5(E) includes definitions for the relevant terms governing the information and how it may be used:

(1) "election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;

(2) "governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;

…

(5) "voter data" means selected information derived from the voter file.

**B.  New Mexico has criminalized the unlawful use of voter data.**

22.  The unlawful use of voter data is a fourth-degree felony under New Mexico law. § 1-4-5.6(B).

23.  "Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." § 1-4-5.6(A). "Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense." § 1-4-5.6(C).

24.  "Any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth degree felony and upon conviction shall be fined one hundred dollars ($100) for each and every line of voter information that was unlawfully used." § 1-4-5.6(B).

25.  Anyone requesting New Mexico voter data must provide an attestation regarding how he or she will use the information. "Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." § 1-4-5.5(C).

26.  A copy of the request form that must be submitted to receive the voter information is attached hereto as Exhibit B and is incorporated herein by reference. The Secretary of State

designed the form. It requires a requester to check one of two "purposes" behind the request, either: "Campaign Use" or "Governmental Use". There is no option for "election" use.

27.     The form also includes an authorization which states:

Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978). I hereby swear that the requestor will not: (INITIAL EACH)

____ sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.

____ alter voter information received as a result of this request.

____ use voter information for any purpose other than those authorized on this form.

____ use voter information for any commercial purposes.

**Ex. B.**

28.     The form calls for the requestor's signature just below this authorization.

**C.  <u>VRF shares New Mexico voter registration online.</u>**

29.     VRF is a nonpartisan, nonprofit subsidiary of Restoration Action, Inc., a 501(c)(4) social welfare organization.

30.     VRF's mission is to increase voter participation and transparency in elections at all levels so that the public can remain informed regarding electoral processes and ensure the integrity of elections across the country.

31.     VRF believes that full transparency of election records and results is needed to restore faith in electoral processes, which in turn, will lead more people to vote as a result of their

renewed confidence in the system. The work being done by VRF continues to highlight the need to ensure accurate voter rolls are being maintained, and to provide the public access to these rolls so that they may search the data and report errors to election officials.

32.     Towards these ends, VRF operates the Website. The Website is dedicated to ensuring transparent, accurate and fair elections in the United States of America.

33.     The purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states. Those who access the Website will be able to search by name or address for registered voters. They also will be able to peruse voting histories, a list of elections that voter participated in, as well as other important election data obtained via official sources.

34.     Citizens can check their own voting status, voting history, and those of their neighbors, friends, and others, and are thereby able to "crowd-source" the process of rectifying any errors.

35.     VRF accomplishes this by requesting voter registration data from state agencies and then compiling and posting that data in a way that is easily accessible and searchable. VRF's purpose is to maximize the public's use of the information.

36.     Citizens can also use the Website to see if their friends and neighbors have voted and to encourage them to do so, increasing overall voter participation.

37.     To date, VRF has collected voter registration information for at least fourteen states (Alaska, Colorado, Connecticut, Georgia, Idaho, Michigan, Montana, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, Virginia, and Wisconsin). VRF's goal is to collect and post data for all 50 states by the end of 2022.

38.     The Website typically provides any information made public by the state entity charged with maintaining the voter registration database if state law allows that information to be shared. For example, a user can typically view a voter's: name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history.

39.     When a user views a particular voter's information, they are simultaneously shown a state specific note regarding the data. Before the data was taken down, the New Mexico note stated:

> The information on this website about this voter, including records of this voter's voting history, was provided to Voter Reference Foundation LLC ("VRF") by the New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15, 2021. The information is publicly available here. The information published here by VRF appears exactly as provided by the Bureau. By publishing Bureau records verbatim, VRF does not state, represent, suggest, or imply that this voter voted or that this voter's ballot was counted or not counted. Additionally, the registration information of any voter who is in the Safe At Home program (hereinafter referred to as a "protected voter") must be removed from the publicly available voter list by the New Mexico Secretary of State. If you believe the information provided to VRF by the Bureau is inaccurate, or if you believe that you or any person listed on VoteRef.com is a protected voter whose protected information should not appear on VoteRef.com, please immediately contact the Bureau by emailing sos.elections@state.nm.us or calling 505-827-3600. For assistance with the process of becoming a protected voter, click here (Safe At Home program). Upon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com.

40.     Before accessing this data on the Website, a user must agree to the Website's Terms of Service which state, in relevant part:

> VoteRef.com and the services offered through VoteRef.com are only for election-related, non-commercial use… You may not use information on VoteRef.com for any purpose unrelated to elections. You may not use information on VoteRef.com for commercial purposes. "Commercial purposes" includes use in connection with advertising or promoting commercial products or services, or for the purpose of sale, resale, solicitation, or for any purpose in which the user can reasonably anticipate the receipt of monetary gain from direct or indirect use. For example, you may not sell information obtained from VoteRef.com, or use it in connection with advertising or promoting commercial products or services, or solicitation.

…
You may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law. By way of example but not limitation, you may not: (a) act in a manner that negatively affects other users' ability to engage in real time exchanges; (b) alter, edit, or delete the materials on VoteRef.com, including the deletion of any trademark or copyright notices on VoteRef.com; (c) interfere with or disrupt VoteRef.com, VRF's servers, or networks (e.g., "flooding" or the sending of mass unsolicited messages) or otherwise harm VoteRef.com or other users; (d) intentionally or unintentionally violate any applicable local, state, national, or international law or any regulations having the force of law; (e) impersonate any person or entity or misrepresent your connection to any person or entity; (f) "stalk," harass, or otherwise advocate the stalking or harassing of another person; (f) collect or store personally identifiable information about other users in connection with the prohibited conduct and activities set forth herein; (h) reproduce, duplicate, copy, sell, trade, resell, or exploit for any commercial purposes, any portion of VoteRef.com; (i) attempt to override or circumvent any security measures of VoteRef.com or VRF's third party providers or access parts of VoteRef.com you are not authorized to visit; (j) engage in any unauthorized screen scraping, database scraping, or spidering, or collection of personally identifiable information, or use any other automated means to collect information from VoteRef.com; (k) use any software, tool, or other device (such as browsers, spiders, or avatars) to search VoteRef.com, other than the search functionality offered through VoteRef.com or other generally available web browsers; (l) link directly to any image hosted on VoteRef.com in a manner that would cause the image on VoteRef.com to be hosted on another web site; (m) link to VoteRef.com in such a manner that VoteRef.com or any portion thereof is "framed" on another web site; (n) attempt to reverse-engineer or decrypt any software on VoteRef.com; or (o) facilitate or encourage the violation of any of the policies set forth in these Terms.

41.     Until March 28, 2022, the Website included New Mexico voter information which VRF acquired from the State under § 1-4-5.5. The data was publicly accessible at no charge, subject to the user's agreement to the terms outlined above.

42.     VRF removed this data from its website on March 28, 2022 – just before this lawsuit was filed – out of fear that it would be prosecuted based on the Secretary of State's interpretation of the law and her referral of VRF to the Attorney General's office for potential prosecution.

43.     VRF desires to post, distribute, and otherwise use publicly available New Mexico voter information on the Website in the future so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls. VRF also plans to seek the same data from the New Mexico Secretary of State after the 2022 election this November but based on the Secretary's claim that VRF is committing criminal activity and "impugning" the integrity of the "voter rolls," it is clear that the Secretary will only give the data to political parties and other speakers she prefers, and not to VRF.

44.     Plaintiffs do not seek to disseminate or use any information prohibited from being disclosed by law, including voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters. N.M. Stat. § 1-4-5.5(B). Plaintiffs' actual and proposed use is limited to that voter information which is publicly available under New Mexico law.

45.     VRF believes that its past and intended future use of the New Mexico voter information is lawful under the language of the statute and protected by the First Amendment, but it will refrain from posting, sharing, making comments about, or using that information to advance its mission out of fear that the Defendants might seek to punish it for doing so.

**D.  Plaintiff Steinberg wants to access and use VRF's compilation of voter data.**

46.     Plaintiff Steinberg is an individual and citizen of New Mexico.

47.     Steinberg has a strong interest in encouraging voter participation, including by showing voters that they can have faith in the outcome of their elections when they are conducted in a transparent manner.

48.     Steinberg has been involved in several grassroots groups and movements in New Mexico in support of election transparency and integrity.

49.     To further these goals, Steinberg desires to use the voter information that VRF requested from the State and previously had posted on its Website, but does not want to pay the unreasonably high cost to independently purchase the data set, which can cost upwards of $5,000 dollars.

50.     Because the Secretary of State claims that these are not lawful purposes for which the voter information can be used and referred VRF to the Attorney General's office for prosecution, Plaintiff Steinberg is afraid to continue using the data for her desired purposes and will cease her efforts to use the data to increase voter participation and to advance election integrity unless and until it becomes clear that doing so will not expose her to criminal prosecution by the Defendants. Additionally, as a practical matter, if the Secretary and Attorney General can successfully chill VRF from posting the data, this loss of access injures Steinberg and all other citizens in New Mexico and across the country who count on being able to associate with VRF to use the data for election transparency and integrity purposes.

### E.  <u>The Secretary of State is hostile to VRF's use of voter registration information and has threatened criminal prosecution.</u>

51.     Secretary Toulouse Oliver never raised any concerns to VRF that its use of the New Mexico voter information on its Website might violate New Mexico law.

52.     However, the Secretary was more forthcoming with ProPublica, telling them that VRF's use is not a permissible one under state law and that she had referred the matter to the Attorney General months ago:

> In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is not an allowable use of voter data. By state law, she said, the rolls can only be used for governmental or campaign purposes.
>
> "Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she

said. In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

Ex. A.

53.     Prior to the publication of the Article, VRF was never informed by the Secretary of State or Attorney General that they viewed VRF's use of the voter information as unlawful or that the Secretary had made a criminal referral to the Attorney General to investigate and prosecute VRF.

54.     The day after the Article was published, Secretary Toulouse Oliver shared it on her official Twitter account, @NMSecOfState, again accusing VRF of violating the election code:



55.     The Secretary did not merely issue an educational message, but instead, made an unreasoned and irrational political attack on VRF, accusing it of a "coordinated cross-country attempt to impugn the integrity of our voter rolls."

56.     The Secretary's forms and her public statements both appear to make the same mistake, reading the permissible uses for voter information as limited to "governmental" or "campaign" purposes, despite the statute's plain language that the information may be used for "for governmental *or election and election campaign purposes*." N.M. Stat. § 1-4-5.5(C) (emphasis added).

57.     The terms "governmental purposes" and "election campaign purposes" are broadly defined. "'Governmental purposes' means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government." N.M. Stat. § 1-4-5.5(E)(2). "'Election campaign purposes' means relating in any way to a campaign in an election conducted by a federal, state or local government." N.M. Stat. § 1-4-5.5(E)(1). Yet the statutory scheme leaves the middle term in the series, "election," undefined.

58.     Despite the breadth of these definitions, the Secretary asserts that VRF is unlawfully using voter data by posting it online in order to provide transparency, increase voter participation, and ensure election integrity. Her interpretation also gives no independent meaning to the statutory term "election," rendering that term superfluous.

59.     The Secretary also apparently believes that VRF's publication of the information on the Internet itself violates New Mexico law, though the basis for such a theory remains unclear.

60.      This is not the first time that Secretary Toulouse Oliver has exhibited open hostility to a requestor that is not ideologically or politically aligned with her, despite the law's mandate that "all requesters shall be treated equally in regard to the charges and the furnishing of the materials." § 1-4-5.5(A).

61.     In respons to a request for voter information by former President Trump's Presidential Advisory Commission on Election Integrity, which was chaired by former Vice President Pence, Secretary Toulouse Oliver issued at least two press releases.

62.     The first, published on June 30, 2017, stated:

"My office has not yet received the letter from President Trump's election commission requesting the personal information of New Mexico voters. That being said, I will never release the personally identifiable information of New Mexico voters protected by law, including their social security number and birthdate. Further, I will not release any other voter information like names, addresses or voting history unless and until I am convinced the information will not be used for nefarious or unlawful purposes, and only if I am provided a clear plan for how it will be secured. As New Mexico's Chief Election Official, I will continue to ensure the integrity of our elections while protecting the voting rights and personal privacy of our voters."

**Ex. C**, June 30, 2017 Press Release, "New Mexico Secretary of State Toulouse Oliver Responds to Presidential Election Commission Request for New Mexican Voters Personal Data."

63.     The Secretary apparently believes that she has the right to refuse to honor an otherwise valid request for voter information if she thinks the request is made for a "nefarious" purpose, a subjective judgment call from her regarding the worthiness of the requestor and their intended use. Nothing in New Mexico law permits her to exercise that discretion and refuse a request that is for a lawful purpose, even if she believes that lawful purpose is "nefarious."

64.     In her second release, published on July 27, 2017, the Secretary maintained this position:

My office has received another request for New Mexico voters' personal data from President Trump's 'Voter Fraud Panel.' Upon review of this request, my answer is still no.

"As I've said before, I will never release the personally identifiable information of New Mexico voters protected by law, including their social security number and birthdate. Because the Commission has still not demonstrated that the data will be used for a lawful purpose under New Mexico law, provided any plan for ensuring that voters' personal data will be secured, or explained how comparing insufficient

data will produce any meaningful conclusions, I won't release any New Mexicans'
voter information.

**Ex. D**, July 27, 2017 Press Release, "Secretary of State Toulouse Oliver Responds to Second
Request by President Trump's Election Commission for New Mexico Voters' Personal Data."

65.     The Secretary's hostility to ideological opponents in the exercise of her official
duties only magnified over the ensuing years. The 2020 presidential election significantly
increased public interest in how states run their elections and ensure their integrity, shining a
spotlight on state and local election officials. Just weeks ago, the Secretary willingly lent her voice
to an article by ProPublica, an ideologically left-wing group that has mounted a campaign against
VRF. ProPublica argues that VRF is dangerous because it allows citizens to access public data and
thereby, allegedly, contribute to an "echo chamber" of concern regarding election participation
and integrity. Rather than simply contacting VRF to understand its mission and raise her concerns,
the Secretary simply accepted ProPublica's politically charged attacks as true and made a public
criminal referral.

66.     The Secretary has once again allowed political animus to cloud her judgment.
Voter data is made public precisely to promote election transparency, integrity, and participation.
It is not a resource that can be selectively released only to those groups whose political views the
Secretary deems "not nefarious," and New Mexico's statutes should not be used to ensnare and
selectively punish those whose election and governmental uses do not meet whatever unwritten
criteria the Secretary and law enforcement apply to deem data usage "lawful."

**F.  The Use Restrictions severely burden Plaintiffs' First Amendment Rights.**

67.     The Use Restrictions effectively muzzle Plaintiffs' transparency and voter outreach
efforts and, in doing so, violate Plaintiffs' First Amendment rights.

68.     The Use Restrictions limit Plaintiffs' ability to effectively speak in furtherance of their missions by sharing relevant voter and election related information with the public. This is especially true given the Secretary's interpretation and attempted enforcement of the Use Restrictions, which reads out certain permissible uses and interjects uncertainty as to those purposes for which the information may be used.

69.     Plaintiff VRF desires to post and distribute New Mexico Voter Information online. Doing so is far more effective than sharing the same information in-person, by mail, or via any physical medium. This transparency allows ordinary citizens—not just political parties and the operatives they favor—to work together and with VRF to identify issues with voter participation and election integrity.

70.     Plaintiff Steinberg desires to use the information posted by VRF to increase voter participation and promote election integrity.

71.     However, because of the Use Restrictions and the potential penalties a violation may impose, Plaintiffs have refrained and will continue to refrain from exercising their core First Amendment political speech rights to disseminate and use the voter information out of fear of prosecution.

## COUNT I
## VIOLATION OF FIRST AMENDMENT
### (42 U.S.C. § 1983, et seq.)

72.     Plaintiffs restate and reallege the allegations in Paragraphs 1 through 71 as if fully rewritten verbatim herein.

73.     The First Amendment to the United States Constitution commands, "Congress shall make no law ... abridging the freedom of speech…" and the speech protections of the First

Amendment have been incorporated against the states. *See Gitlow v. New York*, 268 U.S. 652 (1925); *Stromberg v. California*, 283 U.S. 359 (1931).

74.     "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983).

75.     The creation and dissemination of information are speech within the meaning of the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper,* 532 U.S. 514, 527, (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.").

76.     The ability to receive information is also a fundamental First Amendment right. The First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it." *Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143, (1943). It protects material disseminated over the internet as well as by the means of communication devices used prior to the high-tech era. *Reno v. ACLU,* 521 U.S. 844, 868 (1997). "[T]he right to receive publications is ... a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them." *Lamont v. Postmaster General of U.S.,* 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

77.     The government may violate this mandate in many ways, *e.g., Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819 (1995); *Keller v. State Bar of Cal.,* 496 U.S. 1 (1990), but a law imposing criminal penalties on protected speech is a stark example of speech suppression.

78.     Speech sharing non-confidential information about the voting history of New Mexico voters, particularly when used in the manner contemplated by Plaintiffs, sits at the zenith of First Amendment protection. Discussions regarding voting, elections, electoral processes, and election integrity are issues in which the public does and should have a high level of interest.

79.     The Use Restrictions are direct restrictions on speech, and therefore cannot stand unless they survive strict scrutiny. "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest…Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340–41 (internal quotations and citations omitted).

80.     "As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content. Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to

determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each." *Id.*

81.     The Use Restrictions make it more difficult, more expensive, and essentially impossible for Plaintiff VRF to disseminate information regarding New Mexico's elections. They impose a massive cost on individuals like Plaintiff Steinberg who are not affiliated with a political party or candidate or ballot measure campaign, and therefore cannot receive that campaigns' access to the data.

82.     Due to the volume of voter information which Plaintiff VRF wishes to share – including data on millions of voters – it is virtually impossible to distribute through any other non-Internet means. Additionally, Plaintiff VRF hopes that thousands or even millions of concerned citizens who share its interest in election transparency, participation, and integrity will view, analyze, and discuss the data. VRF's plan is to crowd-source the analysis of the data, so that interested citizens can associate with VRF and with each other to analyze and engage in political speech regarding the data. Yet the Secretary of State's statements imply that it is precisely the use of the Internet to bring the data to ordinary citizens and to facilitate speech among non-campaign-insiders that renders VRF's use unlawful.

83.     In criminalizing the dissemination of voter information, including via the Internet, the Use Restrictions do not leave open ample, comparable, and effective alternative channels for communication.

84.     The Use Restrictions also infringe on and abridge Plaintiffs' speech by limiting the size of the audience that can be reached, as Defendants threaten prosecution based on the theory that dissemination to the public is not a permissible use.

85.     For the reasons stated above and herein, the Use Restrictions violate Plaintiffs' First Amendment rights, including their rights to free speech, rights which are guaranteed by the First Amendment as incorporated against the State of New Mexico through the Fourteenth Amendment.

86.     As a result of the Use Restrictions, Plaintiffs and others not before the Court on whose behalf Plaintiffs act, are suffering and will continue to suffer irreparable harm, including through the chilling of their First Amendment protected speech.

87.     The Use Restrictions were enacted under the color and pretense of state law and Plaintiffs seek to enjoin Defendants, who as agents of the State of New Mexico are statutorily obligated to enforce the Use Restrictions, from enforcing them under the color and pretense of state law in deprivation of Plaintiffs' rights. 42 U.S.C. § 1983.

**COUNT II**
**VIOLATION OF FIRST AMENDMENT**
**PRIOR RESTRAINT**
**(42 U.S.C. § 1983, et seq.)**

88.      Plaintiffs restate and reallege the allegations in Paragraphs 1 through 87 as if fully rewritten verbatim herein.

89.     The Use Restrictions' wholesale prohibition on distributing voter data and information except for very limited purposes preordained by the State operates as a presumptively invalid prior restraint on speech. Before any speech actually takes place, the Use Restrictions dictate that individuals may not speak about a particular subject – voter information and data – unless that speech is for an approved purpose.

90.     Prior restraints on speech are "the most serious and the least tolerable infringement on First Amendment rights." *New Mexico Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 (1931) ("chief purpose of the (First Amendment's) guaranty [is] to prevent previous restraints upon publication").

23

91.     A system of prior restraints "bear[s] a heavy presumption against its constitutional validity," and the state "carries a heavy burden of showing justification for the imposition of such a restraint." *Capital Cities Media, Inc. v. Toole,* 463 U.S. 1303, 1305 (1983) (citation omitted). To justify a prior restraint, the state must demonstrate that the restraint is justified without reference to the content of the speech and is narrowly tailored to serve a compelling governmental interest. *See New Mexico Press Ass'n,* 427 U.S. at 571; *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989). The state cannot make that showing here.

92.     The Use Restrictions operate as a de facto licensing system. Individuals and groups (like the Plaintiffs) that want access to New Mexico voter data must first submit an application form swearing that the information will be used only for purposes preapproved by the State. The requester must pay a fee and is subjected to potential criminal prosecution if it uses the information for a non-state approved purpose. The form must be approved by a government official – either the Secretary of State or a clerk – before the information is made available. The Secretary's past statements imply that she believes there is room to exercise discretion in granting or denying a request, as she claimed the authority to deny a request if she thought the information would be put to a "nefarious" purpose or if she was not satisfied with the "plan" that the requester had for the information, though the statutes lack any such requirements or grant of discretion. See **Exs. C & D**. This is particularly troublesome because the state agent exercising this purported authority knows the identity of the requester (from the request form) before making the decision on access. This unbridled and legally unauthorized discretion encourages discriminatory decision making and fails to establish reasonable and concrete standards to be followed by the state agents exercising that discretion.

93.     Alternatively, if the Use Restrictions do not operate through a de facto licensing, permit, or administrative scheme conferring discretion to an individual to allow or disallow speech, but nevertheless prohibit categories of speech before they happen, the Use Restrictions give rise to equally serious concerns. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (holding ban on payment of honoraria to government employees violates First Amendment, even though ban was not content based). "In addition, unlike an adverse action taken in response to actual speech, this ban chills speech before it happens." *Id.* (citing *Near v. Minnesota ex rel. Olson,* 283 U.S. 697 (1931)). "For these reasons, the Government's burden is greater with respect to this statutory restriction on expression than with respect to an isolated disciplinary action." *Id.*

94.     The Use Restrictions specifically prohibit Plaintiffs from publishing and receiving information about voting and electoral processes – core government functions. A prior restraint on disseminating information relevant to – and perhaps critical of – government activity is a core concern of the First Amendment. *See Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838 (1978) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."); *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment.").

95.     The State cannot demonstrate that the Use Restrictions are justified without reference to the content of the prohibited speech. That is because the Use Restrictions only apply if the voter data is being shared with the public by VRF for purposes of improving election transparency, integrity, and participation. If the voter data is used and shared within a party

organization or campaign organization to advocate for a candidate or ballot measure within a specific electoral campaign, the Use Restrictions do not apply.

96.     The State cannot demonstrate that the Use Restrictions are narrowly tailored to serve a compelling governmental interest.

97.     To the extent that the State and its agents exercise their claimed discretion based on the identity of the requester, including their actual or perceived political ideology, the State engages in viewpoint discrimination.

98.     If the State's interest which purportedly justifies the Use Restrictions is the privacy of the citizenry and avoiding the use of voter data for commercial purposes, it has shown that it has the means to protect those interests by prohibiting the use of the information for commercial purposes or otherwise conditioning use of the information short of a complete prohibition on dissemination. For instance, New Mexico limits the dissemination of the most sensitive voter information, including social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters. N.M. Stat. § 1-4-5.5(B).

99.     For the reasons stated above and herein, the Use Restrictions operate as prior restraints which violate Plaintiffs' First Amendment rights, including their rights to free speech, rights which are guaranteed by the First Amendment as incorporated against the State of New Mexico by the Fourteenth Amendment.

100.    As a result of the Use Restrictions, Plaintiffs are suffering and will continue to suffer irreparable harm, including the chilling of their First Amendment protected speech.

101.    The Use Restrictions were enacted under the color and pretense of state law and Plaintiffs seeks to enjoin Defendants, who as agents of the State of New Mexico are statutorily

obligated to enforce the Use Restrictions, from enforcing them under the color and pretense of state law in deprivation of Plaintiffs' rights. 42 U.S.C. § 1983.

## COUNT III
### VOID FOR VAGUENESS
### FIRST AND FIFTH AMENDMENTS
### (42 U.S.C. § 1983)

102.    Plaintiffs restate and reallege the allegations in Paragraphs 1 through 101 as if fully rewritten verbatim herein.

103.    A violation of the Use Restrictions, including by using the voter data for an unapproved purpose, is a class IV felony punishable by up to 18 months in prison and a fine of $100 for each line of voter data unlawfully used. § 1-4-5.6(B); § 31-18-15(A)(13).

104.    A vague criminal statute governing speech – like the Use Restrictions – raises concerns under both the First and Fifth Amendments, with the former focused on the risk that constitutionally protected activity is chilled due to the fear of violating a vague prohibition on such activity, and the latter focused on fundamental due process concerns of fair notice and arbitrary enforcement.

105.    "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment. A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill* v. *Colorado*, 530 U. S. 703, 732 (2000)).

106.    The government violates the Fifth Amendment by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender v.*

*Lawson*, 461 U.S. 352, 357–358 (1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

107.   "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. at 285.

108.   The Use Restrictions are impermissibly vague both as written and as interpreted and enforced by the Secretary of State.

109.   The statute purports to allow voter data to be "used for governmental or election and election campaign purposes" yet "election" lacks any definition within the statute. It appears to Plaintiffs that their proposed use is for "election" purposes, but Defendants appear to maintain that the word "election" has a narrow application, or is somehow subsumed within the separate, specific term, "election campaign." Additionally, although the definitions of "governmental purposes" and "election campaign purposes" are so broad that they should encompass Plaintiffs' use of the information, the Secretary avers that their use is unlawful.

110.   As a result of the vagueness of the Use Restrictions and Defendants' interpretation of them, Plaintiffs and others have and will refrain from engaging in First Amendment protected activities because the uncertain meanings and interpretations of the state fail to provide sufficient guidelines for Plaintiffs and others to know what conduct is permissible and what is prohibited.

111.    This chilling effect is both real and substantial, as VRF has been forced to stop disseminating voter information and seek judicial intervention out of fear of prosecution. And Plaintiff Steinberg, who—after VRF's takedown—would otherwise have to pay for her own personal data set, and who has an objectively reasonable fear that she, too, would be prosecuted were she to purchase the data and share it with associates for election transparency, participation, and integrity purposes, is also chilled.

112.    The indeterminacy of exactly which uses are permissible and which will expose a person to felony charges renders the statutory scheme void for vagueness.

113.    The Use Restrictions were enacted under the color and pretense of state law and Plaintiffs seeks to enjoin Defendants, who as agents of the State of New Mexico are statutorily obligated to enforce the Use Restrictions, from enforcing them under the color and pretense of state law in deprivation of Plaintiffs' rights. 42 U.S.C. § 1983.

**COUNT IV**
**OVERBREADTH**
**FIRST AMENDMENT**
**(42 U.S.C. § 1983)**

114.    Plaintiffs restate and reallege the allegations in Paragraphs 1 through 113 as if fully rewritten verbatim herein.

115.    The Use Restrictions are overbroad in that they regulate and prohibit substantially more protected speech than is necessary to accomplish any legitimate government interested furthered by the restrictions.

116.    "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "[T]he overbreadth of a statute must not only be real, but

substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

117.    The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The severity of criminal sanctions may well cause speakers, including Plaintiffs, to remain silent rather than communicate even arguably unlawful words, ideas, and images. See, *e.g., Dombrowski v. Pfister,* 380 U.S. 479, 494 (1965).

118.    The restrictions on using voter information for anything other than "governmental" and "election campaign purposes" prohibits the dissemination of and speech about the information for various constitutionally protected purposes – including election integrity, public education, and media reporting, among others.

119.    Because of the overbreadth of the restrictions and the uncertainty as to the boundary between that which is permissible and that which is prohibited, Plaintiffs and others like them have refrained and will refrain from engaging in speech protected by the First Amendment out of fear of prosecution.

120.    The Use Restrictions were enacted under the color and pretense of state law and Plaintiffs seeks to enjoin Defendants, who as agents of the State of New Mexico are statutorily obligated to enforce the Use Restrictions, from enforcing them under the color and pretense of state law in deprivation of Plaintiffs' rights. 42 U.S.C. § 1983.

### COUNT V
### DECLARATORY JUDGMENT
### (28 U.S.C. § 2201, et seq.)

121.    Plaintiffs restate and reallege the allegations in Paragraphs 1 through 120 as if fully rewritten verbatim herein.

122.    For the reasons stated above and herein, the Use Restrictions on their face and as applied to the Plaintiffs severely burden core political speech rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

123.    Any justification provided by the State for imposing the burdens alleged is insufficient to withstand constitutional scrutiny.

124.    The Use Restrictions operate as presumptively invalid prior restraints which cannot be justified by any legitimate state interest.

125.    The Use Restrictions are unconstitutionally vague and have a substantial chilling effect on the First Amendment rights of Plaintiffs and others not before the Court.

126.    The Use Restrictions are unconstitutionally overbroad and have a substantial chilling effect on the First Amendment rights of Plaintiffs and others not before the Court.

127.    The Use Restrictions, as written and as interpreted by the Secretary, are unconstitutionally vague and have a substantial chilling effect on the free speech rights of Plaintiffs and others not before the Court.

128.    In order to prevent further violation of Plaintiffs' federal constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. Pro. 57, declaring the Use Restrictions to be in violation of the First Amendment.

129.    Further, pursuant to 28 U.S.C. § 2202, it is appropriate and hereby requested that this Court issue preliminary and permanent injunctions enjoining Defendants and all of their agents and employees from enforcing the Use Restrictions against Plaintiffs in violation of their constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Voter Reference Foundation, LLC and Holly Steinberg respectfully pray for judgment in their favor and against Defendants and that the Court:

a.    Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Use Restrictions violate the First, Fifth, and Fourteenth Amendments to the United States Constitution.

b.    Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, preliminarily and permanently enjoin Defendants, their agents, employees, and all persons acting in active concert or participation with them, from enforcing the Use Restrictions against Plaintiffs, their agents, and others similarly situated.

c.    Pursuant to 42 U.S.C. § 1988 and other applicable law, award Plaintiffs their costs and expenses incurred in bringing this action, including their attorneys' fees.

d.    Grant all other and further relief that the Court deems equitable, just, and proper.

Respectfully submitted this 28th day of March, 2022.

Respectfully submitted,

HARRISON, HART & DAVIS, LLC

By: _____
     Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel:  (505) 369-6599
Fax:  (505) 341-9340
Email:  carter@harrisonhartlaw.com

— and —

**GRAVES GARRETT LLC**

_____
Edward D. Greim
*Pro Hac Vice* Forthcoming
Graves Garrett, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorneys for the Plaintiffs*

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Gina Swoboda, declare the following:

1. I am the Executive Director of Voter Reference Foundation, LLC and am duly authorized to act as an agent on its behalf;

2. I have personal knowledge of the matters alleged in the Complaint related to Voter Reference Foundation, LLC and could testify to the same on behalf of that organization if called as a witness in court; and

3. The allegations of which I have personal knowledge are true and accurate.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this 27th day of March, 2022.

Gina Swoboda
Executive Director, Voter Reference Foundation, LLC

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Holly Steinberg, declare the following:

1. I have personal knowledge of the matters alleged in the Complaint regarding me and my intentions and could testify to the same if called as a witness in court; and

2. The allegations of which I have personal knowledge are true and accurate.


I declare under penalty of perjury that the foregoing is true and correct.

Executed this _27_ th day of March, 2022.

Holly Steinberg