**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **Voter Reference Foundation, LLC,** | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **Holly Steinberg,** | ) | **CASE NO: 22-cv-222-JHR-KK** |
| | ) | |
| Plaintiffs, | ) | |
| **v.** | ) | **PLAINTIFFS' SUGGESTIONS IN** |
| | ) | **SUPPORT OF MOTION FOR** |
| | ) | **PRELIMINARY INJUNCTION** |
| **Hector Balderas**, in his official capacity as | ) | |
| New Mexico Attorney General, | ) | |
| | ) | |
| and | ) | **EXPEDITED CONSIDERATION &** |
| | ) | **ORAL ARGUMENT REQUESTED** |
| **Maggie Toulouse Oliver,** in her official | ) | |
| capacity as New Mexico Secretary of State, | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' SUGGESTIONS IN SUPPORT OF**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iv

INTRODUCTION ................................................................1

STATEMENT OF FACTS ................................................................1

    a.    Plaintiffs ................................................................1

        i.    Voter Reference Foundation ................................................................1

        ii.    Holly Steinberg ................................................................2

    b.    Defendants Secretary of State Oliver & Attorney General Balderas ................2

    c.    Speech that disseminates and uses the voter information is prohibited for all but a few very limited purposes under New Mexico Law ................................................................4

    d.    Plaintiff VRF's past and intended future use of voter information. ................5

    e.    Plaintiff Steinberg's intended use of New Mexico Voter information. ................9

    f.    The Secretary's declaration to the media that VRF is unlawfully using voter information. ................................................................10

        i.    The Secretary's demonstrated hostility towards perceived partisan opponents who request voter data. ................11

    g.    The Use Restrictions prohibit dissemination and use of voter information for most purposes, including purposes protected by the First Amendment. ................................................................13

    h.    Plaintiffs have experienced, and will continue to experience, irreparable harm because the Use Restrictions have and will continue to prevent Plaintiffs from engaging in speech protected by the First Amendment. ................................................................13

ARGUMENT ................................................................14

    I.    Standard for preliminary relief in First Amendment cases ................14

    II.    The preliminary injunction should be granted allowing Plaintiffs to engage in protected speech regarding the New Mexico voter information. ................14

A.  Plaintiffs are likely to succeed on the merits of their First Amendment claims, eliminating the need for the Court to consider the remaining factors ................................................................14

 1.  The Use Restrictions, which prohibit the dissemination of voter information for all but a few state-approved purposes, constitute direct restrictions on speech which cannot survive strict scrutiny. ................................................14

 2.  The Use Restrictions are presumptively invalid prior restraints. ................................................16

 3.  The Use Restrictions are overbroad and deter significantly more conduct than can be justified under the First Amendment. ................................................18

 4.  The Use Restrictions are void for vagueness. ................................20

B.  If the Court does consider the other three factors beyond likelihood of the success on the merits, they weigh in favor of granting a preliminary injunction ................................................22

 1.  The loss of First Amendment freedoms for any period of time constitutes irreparable harm ................................................22

 2.  The public interest factors weigh in favor of granting an injunction ................................................23

C.  Conclusion ................................................23

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Free Speech Coalition,*
    535 U.S. 234, 244 (2002) .................................................................................. 18

*Bartnicki v. Vopper,*
    532 U.S. 514, 527 (2001) .................................................................................. 15

*Broadrick v. Oklahoma,*
    413 U.S. 601, 615 (1973) .................................................................................. 19

*Capital Cities Media, Inc. v. Toole,*
    463 U.S. 1303, 1305 (1983) .............................................................................. 16

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310, 340 (2010) .................................................................................. 16

*City of Chicago v. Morales,*
    527 U.S. 41, 52 (1999) ................................................................................. 20, 21

*Connally v. General Construction Co.,*
    269 U.S. 385, 391 (1926) .................................................................................. 20

*Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.,*
    447 U.S. 530, 538 (1980) .................................................................................. 21

*Dombrowski v. Pfister,*
    380 U.S. 479, 494 (1965) .................................................................................. 19

*Elrod v. Burns,*
    427 U.S. 347, 373 (1976) .................................................................................. 23

*Forsyth Ctay., Ga. v. Nationalist Movement,*
    505 U.S. 123, 130 (1992) .................................................................................. 16

*Gentile v. State Bar of Nevada,*
    501 U.S. 1030, 1034 (1991) ...................................................................... 15, 18, 23

*Giaccio v. Pennsylvania,*
    382 U.S. 399, 402-403 (1966) ........................................................................... 21

*Kolender v. Lawson,*
    461 U.S. 352, 357 (1983) .................................................................................. 20

*Landmark Commc'ns, Inc. v. Virginia,*
    435 U.S. 829, 838 (1978) .................................................................. 15, 17, 23

*Lanzetta v. New Jersey,*
    306 U.S. 451, 453 (1939) .................................................................. 21

*Martin V. City of Struthers, Ohio,*
    319 U.S. 141, 143 (1943) .................................................................. 12

*Mills v. Alabama,*
    384 U.S. 214, 218 (1966) .................................................................. 14

*Near v. Minnesota ex rel. Olson,*
    283 U.S. 697, 51 (1931) .................................................................. 16, 17

*New Mexico Press Ass'n v. Stuart,*
    427 U.S. 539, 559 (1976) .................................................................. 16

*Pac. Frontier v. Pleasant Grove City,*
    414 F.3d 1221, 1237 (10th Cir. 2005) .................................................................. 23

*Republican Party of N.M.  v. King,*
    741 F.3d 1089, 1092 (10th Cir. 2013) .................................................................. 14

*Richmond Newspapers, Inc. v. Virginia,*
    448 U.S. 55, 575 (1980) .................................................................. 15

*Smith v. Goguen,*
    415 U.S. 566, 572-73 (1974) .................................................................. 20

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552, 570 (2011) .................................................................. 15, 22

*Southeastern Promotions, Ltd. v. Conrad,*
    420 U.S. 546,553 (1975) .................................................................. 16

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454, 468 (1995) .................................................................. 17

*United States v. Reese,*
    92 U.S. 214, 221 (1876) .................................................................. 22

*United States v. Stevens,*
    559 U.S. 460, 480 (2010) .................................................................. 20

*United States v. Williams,*
    553 U.S. 285 (2008) .............................................................................................. 19

*Verlo v. Martinez,*
    820 F.3d 1113, 1126 (10th Cir. 2016) ............................................................ 14, 22

*Virginia v. Hicks,*
    539 U.S. 113, 119 (2003) ...................................................................................... 18

*Ward v. Rock Against Racism,*
    491 U.S. 781, 791 (1989) ...................................................................................... 16

## Constitution

U.S. Const. Amend. 1 ............................................................................................ *passim*

## Other Authorities

N. M. Stat Ann. § 1-1-1 .............................................................................................. 3

N. M. Stat § 1-2-1.1(A) ........................................................................................... 2, 3

N. M. Stat § 1-2-2 ....................................................................................................... 3

N.M. Stat. § 1-4-5.5 ........................................................................................... *passim*

N.M. Stat § 1-4-5.6 ............................................................................................ *passim*

## INTRODUCTION

Plaintiffs are dedicated to increasing voter participation and election transparency, both of which protect election integrity. In service of those goals, VRF, a nonpartisan nonprofit group, files requests with state officials to obtain data showing who has voted in recent elections. It then engages in speech on its website, making that data available to the public and encouraging voters to review, analyze, and engage in their own political speech about the data. Until recently, this meant that interested citizens in New Mexico who verified they were not using the data for commercial purposes—citizens like Plaintiff Holly Steinberg—could search public records of voting histories to determine who votes, where, and when. Recently, Defendant Secretary of State Maggie Toulouse Oliver opined that this conduct was criminal, and referred the matter to Defendant Hector Balderas, New Mexico Attorney General. Secretary Oliver cited N.M. Stat. § 1-4-5.5, which controls the use of voter data; the unlawful use of voter data can be criminally prosecuted under N.M. Stat. § 1-4-5.6. Because their First Amendment rights to use and disclose the voter data for purposes of encouraging voter participation and protecting election integrity are being chilled, Plaintiffs sue Defendants in their official capacities to obtain a declaration that their conduct is lawful and enjoin them from enforcing any statute in violation of Plaintiffs' rights.

## STATEMENT OF FACTS

### a. Plaintiffs

#### i. Voter Reference Foundation

Plaintiff Voter Reference Foundation, LLC ("VRF") is a nonprofit limited liability company and subsidiary of Restoration Action, Inc., a 501(c)(4) social welfare organization. Verified Complaint ("VC") ¶12.  VRF operates the website VoteRef.com (the "Website"). *Id.* VRF is dedicated to ensuring transparent, accurate, and fair elections in the United States of America and does so, in part, by making state voter registration information available on the Website. *Id.*

The primary purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls. *Id.* The public dissemination of this information is intended to increase voter participation and make the state's election processes more transparent. *Id.* VRF desires to post, distribute, and otherwise share voter data available under N.M. Stat. § 1-4-5.5 on the Website so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls. *Id.* VRF intends to post this information for the public to access and view free of charge. *Id.* VRF believes this use would be for one of the purposes permitted by statute ("governmental or election and election campaign"). *Id.*; *see also* § 1-4-5.5(C).

### ii. Holly Steinberg

Plaintiff Holly Steinberg is a resident of New Mexico who has worked and continues to work with grassroots organizations advocating for, among other things, transparency in New Mexico's elections both to increase voter participation and to ensure the integrity of the electoral process. VC¶13. Steinberg wishes to use the New Mexico data that VRF had posted on its Website in order to accomplish these twin aims. *Id.* Because VRF has been forced to remove the data, she cannot access the data without incurring the unreasonably high cost of several thousand dollars to obtain her own personal copy. *Id.* But even then, she cannot build the interface that VRF uses on its Website or combine or compare it with data in other states, and New Mexico's Use Restrictions would prohibit her from using the data to check its accuracy, speak with her fellow citizens about the data, and improve election participation and election integrity. *Id.*

### b. Defendants Secretary of State Oliver & Attorney General Balderas

Defendant Oliver is the Secretary of State of New Mexico and in her official capacity is the chief election officer of the state. VC¶13; *see also* N.M. Stat. § 1-2-1(A). The Secretary is

2

responsible under state law for furnishing voter data to requesters and referring potential violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6, to the Attorney General for investigation and prosecution. *See* N.M. Stat. § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); N.M. Stat. § 1-2-2 ("The secretary of state shall… E. report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution…"); N.M. Stat. Ann. § 1-1-1 ("Chapter 1 NMSA 1978 may be cited as the 'Election Code.'").  The Secretary's interpretation of the Use Restrictions and referral of Plaintiff VRF for criminal investigation are one of the sources of Plaintiffs' injury.

Defendant Balderas is the Attorney General of New Mexico and in his official capacity is responsible under state law for investigating and prosecuting violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6. S*ee* N.M. Stat. § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); N.M. Stat. § 1-2-2 ("The secretary of state shall… E. report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution…").The Attorney General's investigation and potential prosecution of VRF is one of the sources of Plaintiffs' injury.

If the Use Restrictions are declared invalid either on their face or as applied to the types of speech in which Plaintiffs have engaged and wish to engage in the future, Plaintiffs would be free to use the voter information to further their missions related to election integrity, election

3

transparency, and voter participation without fear of reprisal, citation, or prosecution by the state. Declaratory and/or injunctive relief against the Defendants will afford Plaintiffs complete relief.

### c. Speech that disseminates and uses the voter information is prohibited for all but a few very limited purposes under New Mexico Law.

New Mexico makes certain voter registration data available to requesters for limited purposes. "The county clerk or secretary of state shall furnish voter data… only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section; provided, however, all requesters shall be treated equally in regard to the charges and the furnishing of the materials." § 1-4-5.5(A). "In furnishing voter data… the county clerk or secretary of state shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters." § 1-4-5.5(B).

The voter information may only be used for purposes listed in the statute—including "governmental or election and election campaign purposes" —while all other uses are prohibited and unlawful. Unlawful use specifically includes commercial use. Thus, the "Use Restrictions" are: (1) restrictions on a use of the data that is not for a specific candidate or ballot measure campaign, but that is for election purposes; and (2) restrictions on a use of the data that is not by the government itself, but that is by a private person for the purpose of publishing, reviewing, and engaging in speech regarding the governmental operation of elections.  VC ¶19.

"Each requester of voter data… shall sign an affidavit that the voter data… shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." § 1-4-5.5(C).  Section 1-4-5.5(E) includes definitions for the relevant terms governing the information and how it may be used:

(1) "election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;
(2) "governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;
…
(5) "voter data" means selected information derived from the voter file.

The unlawful use of voter data—defined as "the knowing and willful use of such information for purposes prohibited by the Voter Records System Act"—is a fourth-degree felony under New Mexico law and carries a fine of $100 for each and every line of voter information unlawfully used. § 1-4-5.6(A)-(B). "Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense." § 1-4-5.6(C).

Anyone requesting New Mexico voter data must provide an attestation regarding how the requester will use the information. VC¶25; *see also* § 1-4-5.5(C). The Secretary of State has created a request form that must be submitted to receive the voter information. *See* Ex. B to VC. That form requires a requester to check one of two "purposes" behind the request, either: "Campaign Use" or "Governmental Use". VC¶26. There is no option for "election" use. *Id.* The form also includes an authorization which requires the requester to agree that they will not: "sell, loan, provide access to, or otherwise surrender voter information received as a result of this request", "use voter information for any purpose other than those authorized on this form", or "use voter information for any commercial purposes." VC¶27; Ex. B to VC. The form calls for the requester's signature just below this authorization.

### d.  Plaintiff VRF's past and intended future use of voter information.

VRF is a nonprofit, nonpartisan organization whose mission is to increase voter participation and transparency in elections at all levels so that the public can remain informed regarding electoral processes and ensure the integrity of elections across the country. VC¶¶12, 30.

VRF believes that full transparency of election records is needed to restore faith in electoral processes, which in turn, will lead more people to vote as a result of their renewed confidence in the system. VC¶31. The work being done by VRF continues to highlight the need to ensure accurate voter rolls are being maintained, and to provide the public access to these rolls so that they may search the data and report errors to election officials. *Id.*

Towards these ends, VRF operates the Website (VoteRef.com) which is dedicated to ensuring transparent, accurate and fair elections in the U.S. VC¶32. The purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states. VC¶33. Those who access the Website are able to search by name or address for registered voters and peruse voting histories as well as other important election data obtained via official sources. *Id.* Citizens can check their voting status, voting history, and those of their neighbors, friends, and others and able to "crowd-source" the rectifying of any errors. VC¶¶33-34. Citizens can also use the Website to see if their friends and neighbors have voted and to encourage them to do so, increasing overall voter participation. VC¶36. A close review of the data can show that it is wrong or was entered incorrectly. VC¶13. VRF encourages users of the Website to report these errors directly to the appropriate Secretary of State or clerk. VC¶13,39. This transparency fosters confidence in the integrity of the election system and encourages voter participation. VC¶13

VRF accomplishes this by requesting voter registration data from state agencies and compiling and sharing that data in a way that is easily accessible and searchable. VC¶35. VRF's goal is to collect and post data for all 50 states by the end of 2022 and to date, VRF has collected voter information for at least fourteen states. VC¶37. The Website typically provides any information made public by the state entity charged with maintaining the voter registration

database if state law allows that information to be shared. VC¶38.  For example, a user can typically view a voter's: name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history. *Id.*

When a user views a particular voter's information, they are simultaneously shown a state specific note regarding how the information may be used. In New Mexico, that note stated:

> The information on this website about this voter, including records of this voter's voting history, was provided to Voter Reference Foundation LLC ("VRF") by the New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15, 2021. The information is publicly available here. The information published here by VRF appears exactly as provided by the Bureau. By publishing Bureau records verbatim, VRF does not state, represent, suggest, or imply that this voter voted or that this voter's ballot was counted or not counted. Additionally, the registration information of any voter who is in the Safe At Home program (hereinafter referred to as a "protected voter") must be removed from the publicly available voter list by the New Mexico Secretary of State. If you believe the information provided to VRF by the Bureau is inaccurate, or if you believe that you or any person listed on VoteRef.com is a protected voter whose protected information should not appear on VoteRef.com, please immediately contact the Bureau by emailing sos.elections@state.nm.us or calling 505-827-3600. For assistance with the process of becoming a protected voter, click here (Safe At Home program). Upon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com.

VC¶39. Before accessing this data on the Website, a user is notified that "VoteRef.com is for election-related, noncommercial use and for users based in the United States only" and must agree to the Website's extensive Terms of Service which state, in part:

> VoteRef.com and the services offered through VoteRef.com are only for election-related, non-commercial use… You may not use information on VoteRef.com for any purpose unrelated to elections. You may not use information on VoteRef.com for commercial purposes. "Commercial purposes" includes use in connection with advertising or promoting commercial products or services, or for the purpose of sale, resale, solicitation, or for any purpose in which the user can reasonably anticipate the receipt of monetary gain from direct or indirect use. For example, you may not sell information obtained from VoteRef.com, or use it in connection with advertising or promoting commercial products or services, or solicitation.
> …

You may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law. By way of example but not limitation, you may not: (a) act in a manner that negatively affects other users' ability to engage in real time exchanges; (b) alter, edit, or delete the materials on VoteRef.com, including the deletion of any trademark or copyright notices on VoteRef.com; (c) interfere with or disrupt VoteRef.com, VRF's servers, or networks (e.g., "flooding" or the sending of mass unsolicited messages) or otherwise harm VoteRef.com or other users; (d) intentionally or unintentionally violate any applicable local, state, national, or international law or any regulations having the force of law; (e) impersonate any person or entity or misrepresent your connection to any person or entity; (f) "stalk," harass, or otherwise advocate the stalking or harassing of another person; (f) collect or store personally identifiable information about other users in connection with the prohibited conduct and activities set forth herein; (h) reproduce, duplicate, copy, sell, trade, resell, or exploit for any commercial purposes, any portion of VoteRef.com; (i) attempt to override or circumvent any security measures of VoteRef.com or VRF's third party providers or access parts of VoteRef.com you are not authorized to visit; (j) engage in any unauthorized screen scraping, database scraping, or spidering, or collection of personally identifiable information, or use any other automated means to collect information from VoteRef.com; (k) use any software, tool, or other device (such as browsers, spiders, or avatars) to search VoteRef.com, other than the search functionality offered through VoteRef.com or other generally available web browsers; (l) link directly to any image hosted on VoteRef.com in a manner that would cause the image on VoteRef.com to be hosted on another web site; (m) link to VoteRef.com in such a manner that VoteRef.com or any portion thereof is "framed" on another web site; (n) attempt to reverse-engineer or decrypt any software on VoteRef.com; or (o) facilitate or encourage the violation of any of the policies set forth in these Terms.

VC¶40. Until March 28, 2022, the Website included New Mexico voter information which VRF acquired under § 1-4-5.5. VC¶41. The data was publicly accessible at no charge, subject to the user's agreement to the terms outlined above. *Id.* VRF removed this data from its website on March 28, 2022 – the same day this lawsuit was filed – out of fear that it would be prosecuted based on the Secretary of State's interpretation of the law and her referral of VRF to the Attorney General's office for potential prosecution. VC¶42.

VRF desires to post, distribute, and otherwise use the publicly available New Mexico voter information on the Website in the future so that the public may become and remain informed

8

regarding New Mexico's elections and voter registration rolls. VC¶43.  VRF also plans to seek the same data from the Secretary after the November 2022 elections, but based on the Secretary's positions, it is clear that she will only give the data to political parties and other speakers she prefers, not to VRF. *Id.* VRF does not seek to disseminate or use any information prohibited from being disclosed by law, including voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters. VC¶44; *see also* N.M. Stat. § 1-4-5.5(B). Plaintiffs' actual and proposed use is limited to that voter information which is publicly available under New Mexico law. VC¶44. VRF believes that its past and intended future speech to share and analyze the New Mexico voter information is lawful, but it must self-censor, muzzling its own speech out of fear that the Defendants might seek to punish it for continuing with its mission. VC¶45.

### e. Plaintiff Steinberg's intended use of New Mexico Voter information.

Plaintiff Steinberg is citizen of New Mexico and has been involved in several grassroots groups and movements in New Mexico whose goals include election integrity and electoral transparency. VC¶¶46,48. Steinberg has a strong interest in encouraging voter participation, including by showing voters that they can have faith in the outcome of their elections when they are conducted in a transparent manner. VC¶47. To further these goals, Steinberg desires to use the voter information that VRF requested from the State and previously had posted on its Website, but she does not have the means or desire to independently pay for the data set, which can cost upwards of $5,000 dollars. VC¶49.  Steinberg wishes to use the New Mexico data that VRF had posted and intends to post on its Website in order to accomplish these twin aims, as the cost to purchase the data for her personal use is unreasonably high. VC¶13. If VRF removes access to the data, Steinberg cannot use it at all. *Id.* If she does try to buy it for herself, the Use Restrictions, as defined below, will keep her for using it to check the integrity of the data and increase voter participation

because it won't be to advocate for a campaign. *Id.*  Because the Secretary claims that these are not lawful purposes for which the voter information can be used and referred VRF to the Attorney General's office for prosecution, Steinberg is afraid to continue using the data for her desired purposes and will cease her efforts to use the data to increase voter participation and to advance election integrity issues unless and until it becomes clear that doing so will not expose her to criminal prosecution by the Defendants. VC¶50.

> **f.  The Secretary's declaration to the media that VRF is unlawfully using voter information.**

Secretary Oliver never raised any concerns to VRF that its use of New Mexico voter information on its Website might violate New Mexico law. VC¶51.  However, the Secretary was more forthcoming with ProPublica, claiming to them that VRF's use is not a permissible one under state law and that she had already referred the matter to the Attorney General:

> In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is not an allowable use of voter data. By state law, she said, the rolls can only be used for governmental or campaign purposes.
> …
> "Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said. In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

VC¶52; Ex. A to VC. The day after the Article was published, Secretary Toulouse Oliver shared it on her official Twitter account, @NMSecOfState, again accusing VRF of violating the election code. VC¶54. Prior to the Article, VRF was never informed by the Secretary or Attorney General that they viewed VRF's use of the voter information as unlawful or that the Secretary had made a criminal referral to the Attorney General to investigate and prosecute VRF. VC¶53.

The Secretary, through both her forms and her public statements, interprets the permissible uses for voter information as limited to some unknown category of speech and analysis that she categorizes as "governmental" or "campaign" purposes. VC¶¶26-27, 52, 56; Exs. A & B to VC.

Yet the statute's plain language is broader, promising that the information may be used for "for governmental *or election* and election campaign purposes." N.M. Stat. § 1-4-5.5(C) (emphasis added). The terms "governmental purposes" and "election campaign purposes" are broadly defined, while the term "election" is undefined. "'Governmental purposes' means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government." N.M. Stat. § 1-4-5.5(E)(2). "'Election campaign purposes' means relating in any way to a campaign in an election conducted by a federal, state or local government." N.M. Stat. § 1-4-5.5(E)(1). Despite the breadth of these definitions, the Secretary asserts that VRF is unlawfully using voter data by posting it online to provide transparency, increase voter participation, and ensure election integrity, issues that are integral both to elections and to the structure and operations of all levels of government. Her interpretation gives no independent meaning to the term "election," rendering that term superfluous. The Secretary also apparently believes that VRF's publication of the information on the Internet itself violates New Mexico law, though the basis for such a theory remains unclear.

### i. The Secretary's demonstrated hostility towards perceived partisan opponents who request voter data.

This is not the first time that Secretary Oliver has exhibited open hostility to a requester that is not ideologically or politically aligned with her, despite the law's mandate that "all requesters shall be treated equally in regard to the charges and the furnishing of the materials." § 1-4-5.5(A). In response to a request for voter information by former President Trump's Presidential Advisory Commission on Election Integrity, Secretary Oliver issued at least two press releases. The first, published on June 30, 2017, stated:

> "My office has not yet received the letter from President Trump's election commission requesting the personal information of New Mexico voters. That being said, I will never release the personally identifiable information of New Mexico voters protected by law, including their social security number and birthdate.

*Further, I will not release any other voter information like names, addresses or voting history unless and until I am convinced the information will not be used for nefarious or unlawful purposes, and only if I am provided a clear plan for how it will be secured.* As New Mexico's Chief Election Official, I will continue to ensure the integrity of our elections while protecting the voting rights and personal privacy of our voters."

VC¶¶60-61; Ex. C to VC (emphasis added). The second, published on July 27, 2017, stated:

My office has received another request for New Mexico voters' personal data from President Trump's 'Voter Fraud Panel.' Upon review of this request, my answer is still no.

"As I've said before, I will never release the personally identifiable information of New Mexico voters protected by law, including their social security number and birthdate. Because the Commission has still not demonstrated that the data will be used for a lawful purpose under New Mexico law, provided any plan for ensuring that voters' personal data will be secured, or explained how comparing insufficient data will produce any meaningful conclusions, I won't release any New Mexicans' voter information

VC¶64; Ex. D to VC.

The Secretary apparently believes that she can veto an otherwise valid request for voter information if the requester does not submit a plan or she thinks the request is made for a "nefarious" purpose, a subjective judgment call regarding the worthiness of the requester and their intended use. Nothing in New Mexico law permits her to exercise that discretion and refuse a request that is for a lawful purpose. The Secretary now goes further than simply denying a request. She identified VRF, a perceived ideological opponent, and publicly stated that it is breaking the law, even referring VRF to the Attorney General for investigation and prosecution, all the while begging the question of whether VRF's use of the information is truly unlawful, or if it just doesn't pass the Secretary's subjective "nefariousness" test. Unfortunately for the Secretary, the public availability of voter data is a tool for transparency, not a weapon for her to wield against her perceived political opponents to score cheap political points.

###### g. The Use Restrictions prohibit dissemination and use of voter information for most purposes, including purposes protected by the First Amendment.

New Mexico voter information may only be used for approved purposes listed in the statute – including "governmental or election and election campaign purposes" – while all other uses are prohibited and unlawful. N.M. Stat. §§ 1-4-5.5, 1-4-5.6. The restrictions on using voter information for anything other than "governmental" and "election campaign purposes" prohibits the dissemination of and speech about the information for various constitutionally protected purposes – including election integrity, public education, and media reporting, among others.

###### h. Plaintiffs have experienced, and will continue to experience, irreparable harm because the Use Restrictions have and will continue to prevent Plaintiffs from engaging in speech protected by the First Amendment.

Plaintiffs are unable to use and disseminate voter information for First Amendment protected purposes because the Use Restrictions, the Secretary's interpretation of those restrictions, and the threat that she might deem Plaintiffs' use as nefarious or unworthy. Although Plaintiffs believe their past and intended use of the voter information is permissible under New Mexico law and protected by the First Amendment, it has become clear that the Secretary disagrees. Plaintiff VRF has already removed the New Mexico voter information from its Website because of the Use Restrictions, the lack of clarity in the Use Restrictions and the Secretary's interpretation of them, and the threat of prosecution if the information remained available online. VC¶¶41-42. Plaintiffs feel compelled to refrain from disseminating or speaking about the voter information because the Secretary believes they are engaged in unlawful acts and seeks to have them prosecuted. VC¶71.

13

## ARGUMENT

### I.      Standard for preliminary relief in First Amendment cases

A trial court may issue a preliminary injunction under FRCP 65 if the moving party demonstrates: (1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest. *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016) (citing *Republican Party of N.M. v. King,* 741 F.3d 1089, 1092 (10th Cir.2013)). In the First Amendment context, "the likelihood of success on the merits will often be the determinative factor" because of the seminal importance of the interests at stake. *Id.* (citation omitted).

### II.      The preliminary injunction should be granted allowing Plaintiffs to engage in protected speech regarding the New Mexico voter information.

The pivotal question on each count is whether Plaintiffs have established a likelihood of success on the merits of their constitutional claims. A preliminary injunction should issue because Defendants' actions and threatened enforcement of the Use Restrictions violate Plaintiffs' First and Fifth Amendment Rights.

#### A. Plaintiffs are likely to succeed on the merits of their First Amendment claims, eliminating the need for the Court to consider the remaining factors.

##### 1.   The Use Restrictions, which prohibit the dissemination of voter information for all but a few state-approved purposes, constitute direct restrictions on speech which cannot survive strict scrutiny.

Plaintiffs' proposed activities are protected by the First Amendment's guarantees of free speech and assembly. "Although First Amendment protections are not confined to the exposition of ideas, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs…" *Mills v. Alabama*, 384 U.S. 214, 218 (1966) (internal citations omitted). "These expressly guaranteed freedoms share a common core purpose

of assuring freedom of communication on matters relating to the functioning of government." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980).

VRF's publication of voter information to encourage voter participation and discussions about elections and election integrity is protected by the First Amendment, as the creation and dissemination of information are speech within the meaning of the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper,* 532 U.S. 514, 527, (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."). So too is Plaintiff Steinberg's receipt and use of that information for the same purposes. *Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143, (1943) (First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it."); *see also Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838 (1978) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."); *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment.").

However, the Use Restrictions directly restrict and criminalize this protected speech. Laws that directly burden speech are subject to strict scrutiny, which requires the State to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest. "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to

achieve that interest…Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340–41 (2010) (internal quotations and citations omitted).

### 2. The Use Restrictions are presumptively invalid prior restraints.

A "prior restraint" exists when speech is conditioned upon the prior approval of public officials. *See, e.g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975) (denial of use of public forum without procedural safeguards is unconstitutional prior restraint). Prior restraints on speech are "the most serious and the least tolerable infringement on First Amendment rights." *New Mexico Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 (1931) ("chief purpose of the (First Amendment's) guaranty [is] to prevent previous restraints upon publication"). A system of prior restraints "bear[s] a heavy presumption against its constitutional validity," and the state "carries a heavy burden of showing justification for the imposition of such a restraint." *Capital Cities Media, Inc. v. Toole,* 463 U.S. 1303, 1305 (1983) (citation omitted). To justify a prior restraint, the state must demonstrate that the restraint is justified without reference to the content of the speech and is narrowly tailored to serve a compelling governmental interest. *See New Mexico Press Ass'n,* 427 U.S. at 571; *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).

The Use Restrictions operate as a de facto licensing system. Individuals and groups (like the Plaintiffs) that want access to New Mexico voter data must first submit an application form swearing that the information will be used only for purposes preapproved by the State. The requester must pay a fee and is subjected to potential criminal prosecution if it uses the information

for a non-approved purpose. The form must be approved by a government official – either the Secretary of State or a clerk – before the information is made available.

The Secretary's past statements imply that she believes there is room to exercise discretion in granting or denying a request, as she claimed the authority to deny a request if she thought the information would be put to a "nefarious" purpose or if she was not satisfied with the "plan" that the requester had for the information, though the statutes lack any such requirements or grant of discretion. *See* Exs. C & D to VC. This is particularly troublesome because the state agent exercising this purported authority knows the identity of the requester (from the request form), and, therefore, its policy views and the goals of its proposed speech, before making the decision on access. This unbridled and statutorily unauthorized discretion encourages discriminatory decision making and fails to establish reasonable and concrete standards to be followed by the state agents exercising that discretion.

Alternatively, if the Use Restrictions do not operate as a de facto licensing scheme but nevertheless prohibit categories of speech before they happen, the Use Restrictions give rise to equally serious concerns. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (holding ban on payment of honoraria to government employees violates First Amendment, even though ban was not content based). "In addition, unlike an adverse action taken in response to actual speech, this ban chills speech before it happens." *Id.* (citing *Near,* 283 U.S. 697 (1931)).

The Use Restrictions specifically prohibit Plaintiffs from publishing and receiving information about voting and electoral processes – core government functions. A prior restraint on disseminating information relevant to – and perhaps critical of – government activity is a core concern of the First Amendment. *See Landmark Commc'ns*, 435 U.S. at 838 ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal

17

agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."); *Gentile,* 501 U.S. at 1034 ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment.").

The State cannot demonstrate that the Use Restrictions are justified without reference to the content of the prohibited speech. It also cannot show that the Use Restrictions are narrowly tailored to serve a compelling governmental interest. Additionally, to the extent that the State and its agents exercise their claimed discretion based on the identity of the requester, including the actual or perceived policies that the requester seeks to advance by using and disseminating the data, the State engages in viewpoint discrimination.

Thus, the Use Restrictions are unconstitutional as prior restraints on core protected speech. There are inadequate controls on the Secretary's exercise of her claimed discretion to permit or refuse a request for the voter information based on the worthiness of the cause for which the requester will use the information.

### 3. The Use Restrictions are overbroad and deter significantly more conduct than can be justified under the First Amendment.

Assuming *arguendo* that the State has some interest in regulating how voter information may be used, the Use Restrictions prohibit and deter substantially more speech than can be justified under the First Amendment. The sweeping nature of the Use Restrictions also ensure that they cannot be enforced in an evenhanded manner, opening the door to discriminatory enforcement.

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). Due to the risk that "enforcement of an overbroad law" may "deter[ ] people from engaging in constitutionally protected speech" and may "inhibit[ ] the free exchange of ideas," the courts will strike a law on its face "if it prohibits a substantial amount of protected speech" both

"in an absolute sense" and "relative to the [provision's] plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The severity of criminal sanctions may well cause speakers, including Plaintiffs, to remain silent rather than communicate even arguably unlawful words, ideas, and images. See, *e.g., Dombrowski v. Pfister,* 380 U.S. 479, 494 (1965).

"The first step in overbreadth analysis is to construe the challenged [provision]; it is impossible to determine whether a statute reaches too far without first knowing what the [provision] covers." *Williams*, 553 U.S. at 293. Here, the Use Restrictions prohibit the use or dissemination of voter information for all but a few limited purposes: "governmental or election and election campaign" purposes. § 1-4-5.5(C). A violation of the Use Restrictions is a felony. § 1-4-5.6. The Secretary, the state's chief election officer responsible for referring violations to the Attorney General, believes that Plaintiffs' use of this information to share information and have discussions about voter participation, elections, and election integrity do not qualify as permitted purposes under the statute. Under the plain language of the statute, use of and speech including voter information for a number of constitutionally protected purposes is prohibited, including political speech, election integrity, public education, and media reporting, among others.

The cumulative effect of the Use Restrictions, the Secretary's interpretation of those restrictions, and the Secretary's claimed authority to decide who can access the information and which uses are permissible prohibitions is overwhelming: First Amendment protected speech regarding the voter information cannot occur except for very limited purposes preapproved by the

State and acceptable to the Secretary. *United States v. Stevens*, 559 U.S. 460, 480 (2010) ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). Under the Use Restrictions, most speech that communicates the voter information to interested citizens is criminalized. Thus, the Use Restrictions prohibit a substantial amount of protected speech both in an absolute sense and relative to the statute's plainly legitimate sweep.  They are overbroad.

### 4.  The Use Restrictions are void for vagueness.

The Use Restrictions create an unconstitutionally vague prohibition on First Amendment activity. A law "may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). The void for vagueness doctrine arises from two distinct interests: fair notice and a requirement that the lawmaker sets "reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974); *see also Kolender v. Lawson*, 461 U.S. 352, 357 (1983)) ("[T]he void-for vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."). Both considerations are inextricably intertwined with the requirements of due process. "Due process requires that all 'be informed as to what the State commands or forbids,'…and that 'men of common intelligence' not be forced to guess at the meaning of the criminal law." *Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926) (internal citation omitted).

The Use Restrictions render N.M. Stat. §§ 1-4-5.5 & 1-4-5.6 impermissibly and unconstitutionally vague. Plaintiffs are left to guess as to whether their proposed uses are unlawful

or, even if technically lawful under the statute, whether the Secretary will nevertheless deem them impermissible because their cause is "nefarious" or "impugns" the "integrity of the voter rolls." Exs. C & D to VC. "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits...." *Giaccio v. Pennsylvania*, 382 U.S. 399, 402–403 (1966). The purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law, *City of Chicago*, 527 U.S. at 58, for "[n]o one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939).

The statute purports to allow voter data to be "used for governmental or election and election campaign purposes," yet "election" appears to have no independent meaning within the statute. Additionally, although the definitions of "governmental purposes" and "election campaign purposes" are so broad that they should encompass Plaintiffs' use of the information, yet the Secretary avers that their use is unlawful.

The Use Restrictions are impermissibly vague because they fail to establish standards for those who enforce the order, inviting discriminatory and arbitrary enforcement based on whether the enforcer agrees with the speech or conduct at issue. The Restrictions "necessarily entrust[] lawmaking to the moment-to-moment judgment of the policeman on his beat." *City of Chicago*, 527 U.S. at 60. Through the combined operation of the Use Restrictions and the Secretary's claimed discretion in deciding what is permissible, the State seeks to select the "permissible subjects for public debate" and thereby to "control ... the search for political truth." *Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 538 (1980). The First Amendment requires more: a standard that can be uniformly understood by those who must follow it and those who must apply it alike. The Constitution does not permit lawmakers to "set a net

large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." *United States v. Reese*, 92 U.S. 214, 221 (1876). The Use Restrictions, as written and as interpreted and enforced by Defendants, are void for vagueness.

### B. If the Court does consider the other three factors beyond likelihood of success on the merits, they weigh in favor of granting a preliminary injunction.

Because Plaintiffs have demonstrated that they are likely to succeed on the merits of their First Amendment claims, the Court need not consider the three remaining factors. *Verlo*, 820 F.3d at 1126. However, if they are considered, each remaining factor – irreparable harm to Plaintiffs, lack of harm to others, and the public interest – weigh in favor of granting the requested injunctive relief. Because Plaintiffs showed a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment for it is always in the public interest to prevent a violation of a party's constitutional rights.

### 1. The loss of First Amendment freedoms for any period of time constitutes irreparable harm.

The First Amendment to the Constitution of the United States guarantees the rights of citizens to be free from laws which "abridge[e] the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I. Plaintiffs are unable to disseminate voter information in the interest of transparency and voter participation due to the Use Restrictions. The dissemination and receipt of this information regarding a topic as fundamental to the operation of the government as its own elections is protected by the First Amendment and state-imposed restrictions on disseminating and receiving this information constitutes an ongoing loss of First Amendment freedoms. See *Sorrell*, 564 U.S. at 570; *Landmark*, 435 U.S. at 838; *Gentile*, 501 U.S. at 1034. It is well-settled that "loss of First Amendment freedoms, for even minimal periods of

time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, Plaintiffs have experienced, and will continue to experience, irreparable harm absent injunctive relief.

### 2. The public interest factors weigh in favor of granting an injunction.

Assuming the State has some interest in regulating how voter information may be used, that interest does not trump the First Amendment rights of Plaintiffs and others who wish to use the voter information to engage in constitutionally protected speech. The public interest almost universally favors the protection of constitutional rights. *See Pac. Frontier v. Pleasant Grove City,* 414 F.3d 1221, 1237 (10th Cir.2005) ("Vindicating First Amendment freedoms is clearly in the public interest."). The public interest is served both by the exercise of First Amendment rights and the absence of infringements on those same rights. Additionally, New Mexico has no legally cognizable interest in enforcing an unconstitutional law and cannot be harmed if enforcement is enjoined. The requested injunctive relief will end the ongoing injury to Plaintiffs' rights and further the public interest in seeing the Constitution upheld without harming the State.

### C.  Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and enter the requested injunctive relief.

Respectfully submitted this 28th day of March, 2022.

Respectfully submitted,

HARRISON, HART & DAVIS, LLC

By: _____

Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel:  (505) 369-6599
Fax:  (505) 341-9340
Email:  carter@harrisonhartlaw.com

— and —

**GRAVES GARRETT LLC**


Edward D. Greim
*Pro Hac Vice* Forthcoming
Graves Garrett, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Attorneys for the Plaintiffs*


## CERTIFICATE OF SERVICE

I certify that, on this 28th day of March 2022, immediately after electronically filing this Motion, I served, pursuant to Fed. R. Civ. P. 5 a electronic copy of the Motion on email addresses for both Defendant Hector Balderas (hbalderas@nmag.gov) and Defendant Maggie Toulouse Oliver (sos.elections@state.nm.us). I additionally certify that I will serve, pursuant to Rule 4, a copy of this Motion on both Defendants at the same time that I serve a copy of the Complaint and their respective Summons.

Respectfully submitted this 28th day of March, 2022.

By: _____
Carter B. Harrison IV
*Attorneys for the Plaintiffs*

24