**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

|  |  |  |
|---|---|---|
| **VOTER REFERENCE FOUNDATION,** | ) | |
| **LLC** and **HOLLY STEINBERG** | ) | **CASE NO: 1:22-cv-00222-JB-KK** |
| | ) | |
| Plaintiffs, | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **HECTOR BALDERAS**, in his official | ) | **PLAINTIFFS' PROPOSED** |
| capacity as New Mexico Attorney General, and | ) | **FINDINGS OF FACT AND** |
| **MAGGIE TOULOUSE OLIVER,** in her | ) | **CONCLUSIONS OF LAW** |
| Official capacity as New Mexico | ) | |
| Secretary of State, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Plaintiffs Voter Reference Foundation LLC ("VRF") and Holly Steinberg respectfully submit these proposed findings of fact and conclusions of law supporting the entry of a preliminary injunction against Defendants.

Respectfully submitted this 29th day of June 2022.

**HARRISON, HART & DAVIS, LLC**
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

**GRAVES GARRETT, LLC**
Edward D. Greim
*Admitted Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, MO 64105
Tel: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Counsel for Plaintiffs VRF and
Holly Steinberg*

## TABLE OF CONTENTS

[Proposed] Memorandum and Order .................................................................................1

Procedural History ...........................................................................................................2

Findings of Fact ...............................................................................................................3

    I.    New Mexico makes certain voter registration data publicly available
          through a process administered by the Secretary of State. .................................3

    II.   New Mexico regulates the use of voter data and criminalizes unlawful use. .........4

    III.  VRF shares New Mexico voter registration online. ..............................................8

    IV.  VRF reaches out to the Secretary of State to discuss its analysis. ......................12

    V.   Plaintiff Steinberg wants to access and use the Website to aid in VRF's
          "crowdsourcing" project. ...................................................................................15

    VI.  Outreach from ProPublica sparks the Defendants' interest
          in VRF and the Website. ....................................................................................16

    VII.  The Secretary of State is hostile to VRF's use of voter registration
          information and has referred it for criminal prosecution. ...................................21

    VIII. VRF's February 2022 voter data request goes unanswered as the New Mexico
          Secretary of State decides to not respond to any VRF requests. .........................26

    IX.  Plaintiffs filed this lawsuit to challenge the restrictions imposed
          by Defendants. ...................................................................................................28

    X.   New Mexico continues to seek recourse against VRF, including
          through coordination with other state and federal enforcement. .........................31

    XI.  The Defendants' response to a number of hypotheticals at the
          June 15th hearing demonstrates the breadth of the Data Sharing
          Ban and some ad hoc exceptions to the same. ..................................................32

    XII.  VRF sends additional records requests in May promising not to
          post voter information online without a court order, but the Secretary
          of State refuses to respond to those requests as well. ........................................33

Conclusions of Law ................................................................................... 36

I.     Jurisdiction and Venue ...................................................... 36

II.    Article III Standing ........................................................... 38

       a.  Injury in Fact ............................................................ 39

       b.  Causation and Redressability .................................... 41

       c.  Standing in First Amendment Overbreadth Cases. .. 42

       d.  The Court can grant relief from the incorrect interpretation and enforcement of a state law which gives rise to a federal constitutional injury .................................................. 43

III.   The Request for Preliminary Injunction ............................ 50

       a.  The Preliminary Injunction Standard ........................ 50

       b.  Plaintiffs are substantially likely to succeed on the merits of their First Amendment claims. ..................... 50

              1.  Plaintiffs' Challenge Based on Overbreadth ........... 51

              2.  Plaintiffs' Challenge Based on Content and Viewpoint-Based Discrimination ................................ 57

              3.  Plaintiffs' Vagueness Challenge ............................. 73

              4.  Plaintiffs' challenge to the Secretary of State's voter data request process as a de facto licensing system and prior restraint on speech. ...................................... 76

       c.  The Remaining Factors Favor Injunctive Relief. ....... 79

              1.  The Plaintiffs have and will continue to experience irreparable harm from the violation of their constitutional rights. ........................................... 79

              2.  The balance of equities and public interest favor injunctive relief. .................................................. 81

[Proposed] Order and Injunction ................................................. 84

**[PROPOSED] MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Plaintiffs Voter Reference Foundation's ("VRF") and Holly Steinberg's Motion for Preliminary Injunction, filed March 28, 2022 (Doc. 3) ("PI Motion"). The Court held two hearings on the Motion, the first on May 17th and the second on June 15th. *See* Clerk's Minutes, filed May 27, 2022 (Doc38); Notice of Motion Hearing, filed June 2, 2022 (Doc. 40).

Plaintiffs seek to enjoin the State Defendants, Secretary of State Maggie Toulouse Oliver and Attorney General Hector Balderas, from prosecuting Plaintiffs for alleged violations of certain New Mexico statutes related to the use and distribution of voter data. The primary issues before the Court at this time are: (i) whether Plaintiffs have demonstrated a likelihood of success on the merits on their various First and Fourteenth Amendment claims and, if they have, (ii) whether the remaining factors favor a grant of injunctive relief.

After review of the briefing, the evidence, and the argument of counsel, the Court concludes that: (i) Plaintiffs are substantially likely to succeed on the merits of each of their First and Fourteenth Amendment claims, as each theory of potential criminal liability espoused by the State Defendants suffers from distinct but related infirmities under the First and Fourteenth Amendments to the United States Constitution; and (ii) Plaintiffs are entitled to a preliminary injunction enjoining the Defendants from enforcing the restrictions at issue against Plaintiffs in a manner which violates Plaintiffs' First and Fourteenth Amendment rights. For the reasons stated below, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction consistent with this opinion and order.

## PROCEDURAL HISTORY

On March 28, 2022, Plaintiffs Voter Reference Foundation, LLC ("VRF") and Holly Steinberg filed their Complaint (Doc. 1) against Defendants Secretary of State Maggie Toulouse Oliver and Attorney General Hector Balderas (in their official capacities) seeking declaratory and injunctive relief under 42 U.S.C. §1983. In their Complaint Plaintiffs have asserted that certain provisions of New Mexico law regulating the use and distribution of voter data violate their rights under the First and Fourteenth Amendments to the United States Constitution. Doc. 1. On the same day they filed their Complaint, Plaintiffs filed a Motion for Preliminary Injunction (Doc. 3) and brief in support (Doc. 4). Defendants filed an opposition brief on April 14, 2022 (Doc. 13), to which Plaintiffs filed a reply on April 28, 2022. Doc. 18.

The Court held two hearings on Plaintiffs' Motion. The first was held in person on May 17, 2022. Doc. 38. The second hearing was held via Zoom at the request of the parties on June 15, 2022. The two hearings combined lasted for nearly nine hours. The Court heard testimony from four witnesses: VRF Executive Director Gina Swoboda, Plaintiff Holly Steinberg, New Mexico Director of Elections Mandy Vigil, and New Mexico Deputy Secretary of State Sharon Pino. Approximately 35 exhibits were either admitted by the Court or stipulated to by the parties. Doc. 44. Following the conclusion of the June 15th hearing, the parties agreed to submit proposed findings of fact and conclusions of law to the Court within fourteen days.

This [proposed] opinion and order follows.

**FINDINGS OF FACT**

"'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" *Herrera v. Santa Fe Pub. Sch.*, 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.)(quoting *Attorney Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 776 (10th Cir. 2009))(alteration in *Herrera v. Santa Fe Public Schools* only). *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505*, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.). The United States Court of Appeals for the Tenth Circuit notes that "when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." *Heideman*, 348 F.3d at 1188. Thus, while the Court does the best it can to make findings from the record that it has and in the short time that it has to make findings, these findings of fact are only to determine whether to issue a preliminary injunction. These facts do not bind the Court or the parties at trial. Accordingly, the Court find as follows.

I.      **New Mexico makes certain voter registration data publicly available through a process administered by the Secretary of State.**

1.      New Mexico makes certain voter registration data available to requestors for limited purposes through a process administered by the Secretary of State. § 1-4-5.5(A). County clerks also have the authority to process requests for voter data, *id.*, though no such request was made to a clerk relevant to this case.

2.     "The county clerk or secretary of state shall furnish voter data…only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section;" NMSA § 1-4-5.5(A). A voter's social security number, day and month of birth, phone number, and data indicating agencies where the voter registered is not made public if prohibited by the voter. NMSA § 1-4-5.5(B).

3.     Importantly, "all requesters shall be treated equally in regard to the charges and the furnishing of the materials." NMSA § 1-4-5.5(A).

4.     The voter's name, residential address, political party affiliation, year of birth, and voting history is made available. **Transcript of May 17 Hearing ("May 17 Tr.") at 40:5-14; Ex. P3**.

5.     By statute, the voter data may only be used for certain enumerated purposes— including "governmental or election and election campaign purposes" —while all other uses are prohibited and unlawful. NMSA § 1-4-5.5(B)-(C).

6.     The statutory scheme includes definitions for the relevant terms governing the information and how it may be used:

> (1) "election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;
> (2) "governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;
> …
> (5) "voter data" means selected information derived from the voter file.

NMSA § 1-4-5.5(E). The terms "election" and "election purposes" are undefined.

## II.    New Mexico regulates the use of voter data and criminalizes unlawful use.

7.     Pursuant to NMSA § 1-4-5.5, the Secretary of State requires that each requester of voter data sign an affidavit, with specific language prescribed by the Secretary of State, in

which the requester must affirm that the requester will use the voter data for lawful purposes only and that the data shall not be made available or used for unlawful purposes. NMSA § 1-4-5.5(C)-(D); **Joint Exhibits ("JE") H, I, J; May 17 Tr. at 34:24-35:3.**

8.      The Secretary of State's office claims that it only processes requests accompanied by the form promulgated by the office, the Voter Information Authorization form. **Transcript of June 15 Hearing ("June 15 Tr.") at 47:10-50:8.**

9.      The Voter Information Authorization form has changed several times, particularly in recent months, though the Secretary's Office maintains that even older forms are still accepted. **See JE H, I, J.; June 17 Tr. at89:16-20.**

10.      On March 29, 2021, Mike Lippert of Local Labs signed the Voter Data Authorization form for the data which Local Labs eventually acquired for VRF. **JE A**. On that version of the form, the requester had the option to choose from one of three purposes for the request: Governmental Use, Campaign Use, and Election Related Use. *Id.* This comports with those uses permitted under NMSA § 1-4-5.5. Lippert selected "Election Related." **JE A.** He identified his name and that he was making the request on behalf of Local Labs. *Id.* The bottom of the form contains an attestation which states:

>   Unlawful use of the information requested on this for shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplication, or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).
>
>   I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

*Id.*

11.      Lippert signed on the "Signature of Requestor" line just below this authorization. *Id.* No narrative or explanation of how the data was to be used was required by the form that

Lippert signed. The Secretary's Office issued Local Labs a payment receipt, showing that it paid $5,378.12 for the data. **JE B.**

12.     The Voter Information Authorization form was changed at least twice after the Lippert Request (**JE A**). Both changes occurred after key events in this case that are discussed more fully below: an article by the nonprofit organization ProPublica, and the Defendant Secretary's criminal referral of VRF's use of voter data to the Defendant Attorney General.

13.     The form was revised by the Secretary of State on February 10, 2022. **JE I**. In that revision the Secretary's Office removed the ability to select "Election Related" as the purpose of the request, leaving "Governmental Use" or "Campaign Use" as the only options to be selected. *Id.* The authorization at the bottom of the form was also substantially changed to state:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).
>
> I hereby swear that the requestor will not: (INITIAL EACH)
> _____ sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.
> _____ alter voter information received as a result of this request.
> _____ use voter information for any purpose other than those authorized on this form.
> _____ use voter information for any commercial purposes.

*Id.*

14.     The second change, the new authorization, requires the requestor to initial each of four statements agreeing that the requester would not use the information in certain ways. *Id.* No such requirement existed on the Lippert/Local Labs form or other earlier versions of the form. See **JE H** (authorization identical to Local Labs form).

15.     Specifically, whereas the earlier forms only required the requestor to swear that he would "not use or make available to others to use the requested material for purposes other

than governmental, election, research and campaign purposes," under the new version of the form the requestor must agree that he will not, among other things, (i) sell, loan, provide access to, or otherwise surrender voter information received as a result of this request or (ii) use the information except as authorized by the form itself. *Id.*

16.     Notably, in the new form, the first restriction on providing access to the information is a complete restriction on providing access; it lacks any qualification, as in the earlier form, that sharing is only prohibited if it is for an unlawful purpose. Compare **JE I** to **JE B**. The new form also requires the requestor to agree to be bound to the terms of the *form*, rather than merely agreeing to engage in conduct which is permitted, or refrain from engaging in conduct which is prohibited, under *state statute*.

17.     Just four days after this first change, on February 14, 2022, the Secretary changed the form again. **See JE J**. In addition to the revised authorization like that in JE I, the February 14th form (which is the most current form as of the date of this order) now requires that the requestor provide a narrative explanation of how the requested information will be used.

18.     The Secretary of State's office maintains that although the changes to the forms were made to clarify the law, **June 17 Tr. at 80:6-24**, and bring the form into compliance with the statute, **June 17 Tr. at 82:12-15**, the office will accept a request regardless of which form is used, even if it is an earlier version, such as the one that Local Labs signed. **June 17 Tr. at 89:16-20.**

19.     The changes to the Voter Information Authorization form have eliminated the ability of a requestor to receive data if a requestor's intended use is solely "election" purposes.

20.     Though the parties dispute what renders the "use" of voter data unlawful, it is undisputed that the unlawful use of voter data is a fourth-degree felony under New Mexico law. § 1-4-5.6(B).

21.     "Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." § 1-4-5.6(A). Each and every unlawful use of voter data is a separate offense, § 1-4-5.6(C), and a person who commits unlawful use of voter data "shall be" fined one hundred dollars for each and every line of voter information unlawfully used. § 1-4-5.6(B).

### III.     VRF shares New Mexico voter registration online.

22.     Plaintiff VRF is a nonpartisan, nonprofit subsidiary of Restoration Action, Inc., a 501(c)(4) social welfare organization. **Verified Complaint (Doc. 1) ("VC") ¶ 29; May 17 Tr. at 21:17-19.** VRF's mission is to increase voter participation and transparency in elections at all levels so that the public can become and remain informed regarding electoral processes and ensure the integrity of elections across the country. **May 17 Tr. at 53:14-19; VC ¶ 30.**

23.     VRF contends that its efforts highlight the need to ensure accurate voter rolls are being maintained, and to provide the public access to these rolls so that they may continually search the data and report errors to election officials. **May 17 Tr. at 71:18-72:5; VC ¶ 34.** Among other things, VRF believes that full transparency of election records and results is needed to restore faith in electoral processes, which in turn, will lead more people to vote as a result of their renewed confidence in the system. **May 17 Tr. at 54:1-6, 61:4-11.**

24.     VRF's mission is accomplished through two distinct but related projects.

25.     The first project seeks to fulfill the idea of citizen oversight of elections as envisioned by the National Voter Registration Act, 52 U.S.C. §§20501-20511. **May 17 Tr. at**

**56:1-5**. The NVRA requires that states "shall make available for public inspection…all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i)(1). To accomplish this goal, VRF endeavors to publicize voter registration information in every state so that citizens can verify the accuracy of the information by "crowdsourcing" its review. **May 17 Tr. at 71:16-72:5**.

26.     If a citizen notices that information about a voter is incorrect, they are empowered to contact the relevant Secretary of State or election official to remedy the error.

27.     To accomplish this first project, VRF operates the website VoteRef.com (the "Website"). The Website is dedicated to ensuring transparent, accurate and fair elections in the United States of America. **VC ¶ 32; May 17 Tr. at 56:1-11.** VRF's intended purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states. **VC ¶ 33**.

28.     The Website typically provides any information made public by the state agency charged with maintaining the voter registration database, if state law allows that information to be shared. **VC ¶38**. For example, a user can typically view a voter's: name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history. **May 17 Tr. at54:15-55:2; VC ¶38.**

29.     Those who access the Website are able to search by name or address for registered voters to view a particular voter's information. ***Id.***; **May 17 Tr. at 71:16-72:5.** Citizens can check their own voting status, voting history, and those of their neighbors, friends, and others, and are thereby able to "crowd-source" the process of rectifying any

errors. **May 17 Tr. at 16:6-15** (Court, Greim)**, 70:16-71:10**. The public is further enabled to check on the validity of the data by recognizing common errors in larger data sets; for example, citizens could examine the data for their precinct and recognize many voters were given placeholder birthdates. **May 17 Tr. at 15:3-17.**

30.     This also allows citizens to encourage others to vote, increasing overall voter participation. **May 17 Tr. at 56:1-11.**

31.     VRF accomplishes its efforts to create and maintain the Website by requesting voter registration data from state agencies (either directly or through third party vendors) and then compiling and posting that data in a way that is easily accessible, searchable, and usable by the public. **May 17 Tr. at 54:17-55:2.**

32.     Before accessing this data on the Website, a user must agree to the Website's Terms of Service which state, in relevant part: (i) that  the services offered through VoteRef.com are only for election- related, non-commercial use; (ii) the information may not be used for any purpose unrelated to elections or for any commercial purpose; (iii) users may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law, including but not limited to altering data on the Website or using information to stalk or harass any person; (iv) users may not collect or store personal information; and (v) users may not reproduce, duplicate, copy, sell,  trade,  resell,  or exploit  for  any  commercial  purposes,  any  portion  of VoteRef.com. **VC ¶40.**

33.     When a user views a particular voter's information, they are simultaneously shown a state specific disclaimer regarding the data. **May 17 Tr. at 56:18-57:12**. Before the data was taken down, the New Mexico disclaimer stated:

> The information on this website about this voter, including records of this
> voter's voting history, was provided to Voter Reference Foundation LLC

("VRF") by the New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15, 2021. The information is publicly available here. The information published here by VRF appears exactly as provided by the Bureau. By publishing Bureau records verbatim, VRF does not state, represent, suggest, or imply that this voter voted or that this voter's ballot was counted or not counted. Additionally, the registration information of any voter who is in the Safe At Home program (hereinafter referred to as a "protected voter") must be removed from the publicly available voter list by the New Mexico Secretary of State. If you believe the information provided to VRF by the Bureau is inaccurate, or if you believe that you or any person listed on VoteRef.com is a protected voter whose protected information should not appear on VoteRef.com, please immediately contact the Bureau by emailing sos.elections@state.nm.us or calling 505-827-3600. For assistance with the process of becoming a protected voter, click here (Safe At Home program). Upon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com.

**VC ¶39.**

34.     The disclaimer provides the user with information regarding the data, including: (i) the source of the data, (ii) the date on which the data was produced to VRF or its vendor, (iii) information regarding removal of voters that may be protected voters, and (iv) the contact information for the relevant Secretary of State or election official who may be contacted if errors are identified.

35.     Until the New Mexico data was removed from VRF's website, it was accompanied by "chain of custody" disclosures showing who had requested VRF's data and the date it was requested; it even showed the chain of emails between Local Labs and the Secretary of State's office requesting and transmitting the data. **May 17 Tr. at 67:19-68:5**. Any user of the website could click through to see it. *Id.*

36.     Until March 28, 2022, the Website included New Mexico voter information, which VRF acquired from the Secretary of State through its third-party vendor, Local Labs. **May 17 Tr. at 65:25-66:15**. VRF paid Local Labs a flat fee for each state, including New

Mexico, to determine what data was available and how to acquire it, and to access the data. **May 17 Tr. at 66:16-22**. In doing so, VRF relied on Local Labs' expertise in managing public records requests. **May 17 Tr. at 66:10-15**.

37.     VRF, in turn, made the data publicly accessible at no charge, subject to the user's agreement to the terms outlined above. **May 17 Tr. at 66:23-67:10; VC ¶41.**

38.     VRF does not seek to disseminate or use any information prohibited from being disclosed by law, including voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters. **May 17 Tr. at 57:13-58:9; VC ¶43 (citing NMSA § 1-4-5.5(B)).**

39.     Plaintiffs' actual and proposed use is limited to that voter information which is made available under New Mexico law.

**IV.     VRF reaches out to the Secretary of State to discuss its analysis.**

40.     VRF's second project is accomplished in-house without the need to publish the data online. This second project consists of VRF election professionals comparing the total number of ballots cast in a particular election to the number of voters with a credit in their vote history file for having voted in a particular election, as reported in the voter rolls. **May 17 Tr., 70:20-71:10.**

41.     Though not necessarily indicative of fraud or any malicious activity, there are sometimes discrepancies between the two numbers. **See Ex. P1; May 17 Tr. at 58:20-59:20, 98:17-101:2.** When there are, VRF attempts to contact state election officials regarding the discrepancy and "work backwards" to determine why there might be a difference. **May 17 Tr. at 59:21-60:22.** VRF then seeks to publish this "audit trail" so that citizens can understand how and why voter registrations are removed from the voter list. **May 17 Tr. at 55:14-23, 56:6-11.**

42.     VRF Executive Director Gina Swoboda testified that through this process, they have identified discrepancies in other states and worked with state officials to explain the difference. For example, VRF originally identified a significant discrepancy in the state of Colorado but, working with the Colorado Secretary of State, they were able to reduce the discrepancy by 11,000 votes. **May 17 Tr. at 60:14-22.**

43.     On or about December 16, 2021, as part of its election integrity efforts, VRF posted New Mexico voter information on its website, VoteRef.com. **See Ex. P1** ("VRF website VoteRef.com adds New Mexico voter rolls to nationwide database"); **May 17 Tr. at 66:23-25**.

44.     In conjunction with the posting of that information, VRF issued a press release announcing the publication of the information and identifying a "discrepancy" of about 3,800 votes, reflecting a difference between the number of voters listed as having voted in the 2020 general election (according to the voter list) and the number of ballots reported being cast according to the State's official canvass and turnout reports. **Ex. P1**.

45.     VRF's press release stated: "These discrepancies don't necessary indicate fraud, but the differences between the voter list and the election canvass indicates, at the very least, issues with record keeping and points to the need to be more transparent and proactive about maintaining the voter rolls and reconciling ballots cast and voters having voted in every election." *Id.*

46.     Prior to posting the New Mexico data, VRF had emailed the Secretary of State's office to discuss the identified discrepancy in an attempt to remedy the apparent difference in numbers, as VRF had done in other states. See **Ex. P2**; **May 17 Tr. at 60:5-22** (reconciliation process reduced discrepancy by as much as 11,000 votes in Colorado). That email invited a

conversation regarding VRF's findings and methodology, including inviting the Secretary to provide feedback on the same. The email stated:

> Our team at VoteRef.com has done a comparative analysis of the total ballots cast election-wide in New Mexico in the 2020 General Election according to the certified canvasses and official turnout reports, and the voter history file provided by your office, to reconcile the total number of ballots cast with the total number of voters in a jurisdiction with credit for voting in the 2020 GE according to NM Secretary of State and County Boards of Election data.
>
> Our review indicates that there are 924,328 voters in NM with a credit for having voted in the 2020 General Election, and 928,172 total ballots cast election wide as per the official reports issued by NM SOS and County Boards of Election. This creates a discrepancy between registered voters with ballots cast (RVBC) and total ballots cast (TBC) of 3,844. This number represents more ballots cast than registered voters who have credit for voting.
>
> Please provide any feedback you have on these results, and if there is a factor or factors that we maybe unaware of that would explain the discrepancies.
>
> Attached is a link to the voter history and voter registration data file provided by your office on April 13, 2021. It is our understanding that the data you have provided does not include any voter who is in the Safe At Home program. If that is inaccurate, please let us know.
>
> We would be pleased to have a call with you or your staff if that would provide a better format to review your assessment of the results. If you have time and staff available, we would be grateful for the opportunity to meet with you by phone.

**Ex. P2.**

47.     The Secretary of State did not respond to VRF's outreach, and as of June 15, 2022, had still not responded. **May 17 Tr. at 61:21-62:10**. The circumstances of the Secretary's refusal—including her office's comments falsely accusing VRF of not trying to reach out to discuss the data—are discussed in more detail below.

**V.      Plaintiff Steinberg wants to access and use the Website to aid in VRF's "crowdsourcing" project.**

48.     Plaintiff Steinberg is a New Mexico citizen. **May 17 Tr. at113:10-11; VC ¶46.** Steinberg has a strong interest in encouraging voter participation, including by showing

voters that they can have faith in the outcome of their elections when they are conducted in a transparent manner. **May 17 Tr. at 114:23-115:3; VC ¶47.** Steinberg has been involved in several grassroots groups and movements in New Mexico in support of election transparency and integrity. **May 17 Tr. at113:19-114:22; VC ¶48.**

49.     Steinberg had started to use and desires to again use the voter information that VRF requested from the State and previously had posted on its Website. **May 17 Tr. at 115:24-116:8.** She wants to use it to identify and rectify errors in the information. **May 17 Tr. at 117:8-23**. She does not have the means or desire to pay the high cost to independently purchase the data set, which can cost upwards of $5,000 dollars. **May 17 Tr. at 116:14-18, 118:11-15, 120:3-19; VC ¶49.**

50.     Because the Secretary of State claims that these are not lawful purposes for which the voter information may be used and referred VRF to the Attorney General for prosecution, Steinberg is afraid to use the data and has ceased her efforts to use the data to increase voter participation and to advance election integrity unless and until it becomes clear that doing so will not expose her to criminal prosecution by the Defendants. **May 17 Tr. at 118:3-10; VC ¶50.**

**VI.     Outreach from ProPublica sparks the Defendants' interest in VRF and the Website.**

51.     The catalyst for this case was, at least in part, outreach from ProPublica reporter Megan O'Matz to the Secretary of State's Office for comment and background on a story she was writing. See **Exs. P7-8**. O'Matz's email exchanges and eventual phone call with Secretary Toulouse Oliver were incorporated into an article published on March 7, 2022, entitled "Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using

Discredited Techniques." **JE D**. The article focused almost entirely on VRF and its Website, generally in a critical manner. *Id.*

52.     Before publishing the article, the O'Matz exchanged emails over the course of nearly a month with Alex Curtas, Communications Director for Secretary Toulouse Oliver. See **Exs. P7-8**. The exchange began on December 14, 2021 with the O'Matz, asking Curtas about the discrepancy (identified in the VRF Press Release, **P1**), including inquiring about any potential explanations for the discrepancy and whether VRF reached out to the Secretary to discuss its methodology and findings. **Ex. P7**. After some non-substantive exchanges, Curtas responded as follows to O'Matz's inquiry:

> Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are *perpetuating misinformation*. They reflect a lack of understanding about how the process of voter list maintenance works. These attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country.

**Ex. P7** (emphasis added). The "discrepancy," Curtas charged, was simply VRF's own lack of understanding regarding how voter rolls are maintained. *Id*. **at p.6**.

53.     In response to ProPublica's question about whether VRF had reached out to the Secretary's office before publishing its statement, Curtas falsely stated that VRF had not contacted the Secretary's office, "likely because that would not serve their intended goal of spreading misinformation." *Id*; see **Ex. P2** (showing VRF contacted the Secretary's office to share its findings, ask questions, and discuss analysis on Dec. 14, 2021, two days before Curtas's email).

54.     At the hearing, when the Secretary's counsel asked her own witness, Director of Elections Mandy Vigil, why the Secretary's office had not responded to VRF, Ms. Vigil did not directly answer the question, but suggested that it was because VRF's request "kind of came in simultaneously" with ProPublica's request, and the requests caused the Secretary's office to "look

at the data." **June 15 Tr. at102:15-103:1**. It is unclear whether the Secretary's office believed that its response to ProPublica would suffice for both VRF's and ProPublica's inquiries, or whether the Defendants were attempting to offer some other reason for the failure to respond to VRF. Nonetheless, no witness from the Secretary testified that the office was unaware of the inquiry, and the Secretary did not present Mr. Curtas to explain the basis for his accusations about VRF.

55.    Curtas made other accusations against VRF as well. In responding to the O'Matz for her story on December 16, 2021, he added, "we do not have a record of this group requesting voter data from our office directly, which brings into question how they obtained this data, if the data has not been manipulated, and if they are using it for a lawful purpose." **P7, p.6.**

56.    Later testimony, however, reflected that the Defendants did not and do not have any reason to believe that VRF manipulated any voter data received from the Secretary. **June 15 Tr. at 127:25-128:15.** Further, as the Court found above, the evidence showed that, following its ordinary practice, VRF's New Mexico data tab on its Website did disclose where and when VRF obtained the data: it disclosed the email chain by which Local Labs had requested the data for VRF, and any viewer of the website could click through to see it. **See FOF ¶ 35**.

57.    The Defendants provided no evidence as to whether Mr. Curtas, who was not a witness, knew his accusations about VRF were false at the time he made them to ProPublica.

58.    In concluding his December 16 email for O'Matz's ProPublica story, Curtas defended New Mexico's voter roll maintenance process from an affront the office apparently perceived from VRF:

> Because accusations from political operatives like this are meant to impugn the integrity of our voter rolls, I'd also just want to note that our Office is confident that the processes and procedures already in place for voter list maintenance not only follow all state and federal guidelines and keep our voter rolls clean and up-to-date, but go above and beyond those requirements… All of these systems

combine to ensure that voter information is up-to-date in New Mexico, resulting in our state having some of the "cleanest" voter records in the United States.

**Ex. P7, p.6.**

59.    O'Matz followed up shortly thereafter asking, among other things: "Is there anything improper under New Mexico law about accessing the data this way or posting it all online? I appreciate any link to the relevant statute." Before Curtas could respond, O'Matz followed up again:

> Alex, I see that your law says the voter rolls can be used only for "Governmental or election and election campaign purposes only." Unlawful use of lists is a 4th degree felony.
>
> The VoteRef folks say online: "The purpose of this website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states. Our system of government is based upon citizen participation. We believe the people, in effect, own this data and have a legal right to see it in an understandable and transparent form…
>
> Is this an acceptable use under New Mexico law?

*Id.*

60.    After more non-substantive exchanges, Curtas responded on December 17th, stating:

> On the legal issue: Our office believes this publication of voter data by VoteRef.com is in direct violation of the New Mexico Election Code. We do not believe that posting New Mexican's private voting information online is legal use of this information. We will refer the use of this information by VoteRef.com to the New Mexico Attorney General for criminal investigation and prosecution.

*Id.*

61.    O'Matz responded shortly thereafter with a pointed question critical of the Secretary's position as articulated by Curtas: "Question – can you elaborate on how the publication of voter data online may violate state law? (VoteRef likely will argue that they are using it for election and research purposes.)" *Id.*

62.     Four days later, Curtas responded:

The issue relates to the transfer and publication of the voter data. *This is the crux*: "We do not believe providing this personal voter data on a private website *that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a "governmental purpose," "election related," or "election campaign purposes.*"

I've attached our referral letter which lays it all out. Let me know if I can provide any clarification on this.

*Id.* (emphasis added).

63.     Curtas again focused on the idea that "spreading misinformation" renders use of the data unlawful and focuses the analysis on the permissible purposes—governmental, election related, or election campaign related—under the statute.

64.     This response ended the substantive email discussions between Curtas and O'Matz regarding VRF and the Secretary's position regarding its allegedly unlawful use of data. Curtas and O'Matz continued to communicate to set up a phone call with Secretary Toulouse Oliver and O'Matz to further discuss the issues involved. As discussed below, that call yielded comments from the Secretary that later appeared in the ProPublica article.

65.     When it finally appeared in March 2022, the ProPublica article attributed several quotes to the Secretary (which the parties stipulated are attributable to her, Doc. 32, ¶7) focusing on the use of the data, including:

In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is *not an allowable use of voter data*. By state law, she said, *the rolls can only be used for governmental or campaign purposes*.
…

"Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said. In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

**JE D** (emphasis added).

19

66.     Though the Defendants' position now appears to be that the sharing of the data, rather than the purpose behind the use of the data, renders VRF's conduct unlawful, the Secretary was quoted as recently as March 7th claiming that VRF's undertaking is "not an allowable use of voter data" because "the rolls can only be used for governmental or campaign purposes."

67.     Deputy Secretary of State and Chief of Staff Sharon Pino "runs the office," helps make any decisions, directs projects, oversees all directors, and reports directly to the Secretary. **June 15 Tr. at 123:12-16**. In her hearing testimony, she echoed the Secretary's March 2022 comments that VRF's use was not for governmental or campaign purposes. First, Deputy Secretary Pino testified that at the time of her written criminal referral to the Attorney General in December 2021—which, as discussed below, unequivocally accused VRF of operating "a private website that intends to spread misinformation about the 2020 General Election"—she had a factual basis for everything in the letter. **June 15 Tr. at 133:18-21, 138:4-10**. Second, Pino testified that in her view, "misinformation" is not for a "governmental purpose" (**June 15 Tr. at 135:14-136:20**) or "election purpose" (**June 15 Tr. at 137:1-138:3**).

68.     Pino had no evidence that VRF had ever manipulated voter data that it had posted but testified that in her own view and the view of her office, if data was used in such a way that it could *potentially* be manipulated, even if by a third party who is not the requestor, its use falls outside the definitions of "governmental" and "election and election campaign" use given by statute. **June 15 Tr. at 138:21-139:15**.

69.     Ms. Pino, an attorney, former prosecutor, and former general counsel for the Secretary, and the highest-ranking official to testify (**June 15 Tr. at 164:1-11**), despite numerous opportunities and a substantial friendly examination by the Defendants' own counsel, did not clearly disavow a content-based motivation for prosecution: that VRF's speech could lead to

20

misinformation, which would in turn violate the purpose-based requirements of New Mexico law. The rest of the evidence is clearer. Both Mr. Curtas's communications to Ms. O'Matz for her ProPublica story, and from the Secretary's public communications, addressed below, make clear that the Defendants' concern about "misinformation" is rooted not in a bona fide concern that the data had been altered in some way, but rather, in a disagreement regarding VRF's statements that discrepancies exist in the data or that there is a need for greater citizen insight into, and oversight of, the voter rolls. These statements show that Defendants have felt the need on multiple occasions to defend the Secretary's efforts in maintaining the rolls and have simultaneously accused VRF of "impugning" those efforts through misinformation.

## VII.    The Secretary of State is hostile to VRF's use of voter registration information and has referred it for criminal prosecution.

70.    Secretary Toulouse Oliver never raised any concerns to VRF that its use of the New Mexico voter information on its Website might violate New Mexico law. **May 17 Tr. at 68:13-19; VC ¶51.**

71.    The Defendants' position is now that the publication of the data, rather than the purpose for which it is being used, is material to determining whether the data is being used lawfully. **May 17 Tr. at 37:12-19, 147:6-15.** The Secretary contends that VRF's publication of the information on the Internet itself violates New Mexico law, regardless of the purpose for which the information was shared and if that purpose is permissible under NMSA § 1-4-5.5. **May 17 Tr. at 37:12-19.**

72.    Yet the Secretary's office and other parties have been inconsistent in explaining how VRF's use of the data violates the law. While the Attorney General's stated position during these proceedings is that VRF's criminal liability comes from how the organization shared the data (**May 17 Tr. at 37:12-19**), before Plaintiffs filed the instant lawsuit alleging content and

viewpoint-based discrimination, members of the Secretary's office explained the primary problem with VRF's use is that it does not meet the definition of appropriate use as a "governmental purpose" or "election purpose" in their own internal communications. **See Exs. P7, P8; June 15 Tr. at 140:17-142:23**.

73.     As has already been addressed some above, prior to this lawsuit the Secretary and those acting on behalf of the Secretary's office made several public statements indicating that the purpose for which the voter data is used—that is, whether it is being used for a governmental, election, or election campaign purpose—is the determining factor for whether the use if lawful.

74.     For example, the ProPublica article attributed several quotes to the Secretary (which the parties stipulated are attributable to her) focusing the theory of criminal liability on VRF's use of the data, including:

> In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is not an allowable use of voter data. By state law, she said, the rolls can only be used for governmental or campaign purposes.
> …
> "Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said. In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

**JE D**; **VC ¶52; May 17 Tr. at 68:13-16, 69:11-18.**

75.     The Secretary also made several social media posts to the same effect. On March 3, 2022, the Secretary tweeted: "Voter data in #NM is protected from malicious actors & voter data can ONLY be obtained for election campaign or govt/academic purposes by signing an affidavit & paying a fee." **JE E.** On March 8, 2022, the Secretary tweeted a link to the ProPublica, adding additional commentary: "Important, in-depth piece from @propublica re: coordinated

cross-county attempt to impugn the integrity of our voter rolls. This org posted #NM voter data online, violating the Election Code." *Id.*

76.     Likewise, the Secretary of State's website says that the data may only be made available and used for certain purposes, though it omits "election related" as one of those permitted uses:

> SERVIS (State Elections Registration and Voting Integrity System) data may be purchased for government and campaign purposes only. This data includes each voter's name, address, telephone # (with voter's consent), year of birth, party affiliation, and registration data such as county, precinct, and district information.

**Ex. P3.**

77.     And in a publication addressing the use of voter data in the audit in Otero County, the Secretary issued a press release stating:

> This data can only be obtained by certain groups, like academic organizations and political parties The New Mexico Audit Force is not one of these specified groups and has not obtained New Mexico voter data from our office But, again, your specific ballot choices are always secret.

**JE G** (emphasis added).

78.     Prior to the publication of the ProPublica Article, VRF was never informed by the Secretary of State or Attorney General that they viewed VRF's use of the voter information as unlawful or that the Secretary had made a criminal referral to the Attorney General to investigate and prosecute VRF. **May 17 Tr. at 68:13-69:18; VC ¶53.**

79.     The day after the Article was published, Secretary Toulouse Oliver shared it on her official Twitter account, @NMSecOfState, again accusing VRF of violating the election code. **JE E.** The Secretary stated VRF was participating in a "coordinated cross-country attempt to impugn the integrity of our voter rolls." **JE E.**

80.     The Secretary's forms and her public statements read the permissible uses for voter information as limited to "governmental" or "campaign" purposes. **JE H, I, J; May 17 Tr. at 134:18-136:11**. This is despite the statute's plain language that the information may be used for "for governmental *or election and election campaign purposes*." NMSA § 1-4-5.5(C) (emphasis added).

81.     Based on the statements made by the Secretary and her representatives before this case was filed, it appears that the original theory of liability was that VRF's efforts did not fall under one of the permissible uses—governmental or election and election campaign purposes. The clearest evidence is Ms. Pino's criminal referral itself, as well as Mr. Curtas's summary of that referral to ProPublica for its story:

> *This is the crux*: "We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a "governmental purpose," "election related," or "election campaign purposes."

**P7, p.6** (emphasis added).

82.     The theory of liability against VRF has been refined during this litigation, as VRF's actions in posting the data on the Website would fall under either the definition of "governmental purposes," which is broad, the undefined but allowable "election" related purpose, or "election campaign purposes."

83.     "'Governmental purposes' means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government." NMSA § 1-4-5.5(E)(2). "'Election campaign purposes' means relating in any way to a campaign in an election conducted by a federal, state or local government." NMSA § 1-4-5.5(E)(1). The statute leaves the middle term in the series, "election," undefined.

84.     Providing transparency regarding New Mexico's elections and the maintenance of its voter rolls is a purpose "relating in any way to the structure, operation or decision-making or a federal, state or local government."

85.     Though "election" related is undefined, VRF's activities are clearly related to New Mexico's elections under any logical construction of the term. VRF's activities are also "relating in any way to a campaign in an election…"

86.     Despite the breadth of these definitions, the Secretary asserts that VRF is unlawfully using voter data by posting it online in order to provide transparency, increase voter participation, and ensure election integrity.

87.     On December 20, 2021, Deputy Secretary of State Sharon Pino signed and submitted a criminal referral to the Attorney General on behalf of the Secretary of State's office based on VRF's use of the voter data it requested and obtained through Local Labs. **See JE C-1**. The referral raised concerns regarding how VRF was using the data, specifically that the use of the data amounted to "spreading misinformation." *Id.* ("Swift action is needed as voter data can quickly be manipulated and used to spread *election misinformation*…Mr. Lippert…signed a Voter Information Authorization form swearing, they "will not use or make available to others to use the requested material for *purposes other than governmental, election, research and campaign purposes* under penalty of law.") (emphasis added).

88.     The referral raised other concerns, including that the information was being shared on the internet ("We also believe that VoteRef.com and Local Labs have illegally "used' this voter data by publishing it on VoteRef.com.") and that the Secretary was uncertain about how VRF obtained the data ("We believe that this data was illegally provided by Mr. Lippert or Local Labs to VoteRef.com and is being used against New Mexico state law"). *Id.*

89.     Subsequently, on March 23, 2022, the Secretary made another referral for unlawful use of voter data, this time taking issue with a group conducting an audit in Otero County, New Mexico. **JE L-1**. Among other things, the referral stated that the Secretary's "office believes that the use of voter data information absent a signed affidavit *or contrary to legally permitted uses* is in direct violation of the Election Code." *Id.* (emphasis added). "Regardless of how she obtained it, Erin Clements is illegally using voter data information to conduct canvassing activities in Otero County, and without a properly authorized affidavit, cannot claim to have any legal authority to utilize this data for any purpose." *Id.*

**VIII.   VRF's February 2022 voter data request goes unanswered as the New Mexico Secretary of State decides to not respond to any VRF requests**.

90.     On February 15, 2022, after the ProPublica article but before this lawsuit was filed, VRF sent a request for voter data to the Secretary of State. **Ex. P4**. VRF requested the total count of voters who cast a ballot in the November 3, 2020 election and were "subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021." *Id.*

91.     VRF's request was assigned to Patrick Rostock, a paralegal and custodian of records in the Secretary's office. VRF, having not received a response, sent a follow up email on March 10, 2022 asking for a status update on the request. **Ex. P4; May 17 Tr. at 79:24-80:12; June 15 Tr. at 48:23-49:6**.

92.     Rostock forwarded that email to Mandy Vigil, Director of Elections, and Sharon Pino, Deputy Secretary of State, saying:

Hi Mandy and Sharon,

Per Dylan's contact with the AG, *we are not fulfilling records requests from VoteRef*. Any information on how to proceed with this would be appreciated. I am also happy to forward this to the AG but I'm unsure what contact we have who is handling this. *The request is clearly trying to create an aggregate picture of the voter rolls on election day 2020*…

**Ex. P4** (emphasis added).

93.     While the New Mexico Secretary of State's office did not respond to VRF, their team decided internally it would not fulfill *any* requests from VRF. **Ex. P4** ("…we are not fulfilling records requests from VoteRef**…"); June 15 Tr. at 49:7-52:9.** The Secretary's office did not communicate this decision to VRF.

94.     The Secretary of State maintained that no communication of any kind to VRF was necessary because VRF did not attach a pre-completed affidavit to its first email inquiry. **June 17 Tr. at 47:10-49:22**

95.     When asked about Rostock's statement—"Per Dylan's contact with the AG, we are not fulfilling records requests from VoteRef"—Mandy Vigil testified that: "…there was a determination that this was neither a public records request nor a normal voter data request. At this point in time we had already engaged with the law enforcement agency and so we did seek their guidance. At this point in time it was determined that we were not going to provide the data… Because we had already referred their use of the data to a law enforcement agency…" **June 15 Tr. at 49:16-25.**

96.     The Court finds that the Secretary's first reason for failing to provide an answer to VRF's email was likely pretextual; there is no logical reason why the failure to attach an affidavit would justify the complete cessation of communications with a requester. A more natural follow-up communication might, for example, inform a requester that he or she would need to sign the Secretary's form affidavit in order to complete or perfect the request. The

Secretary's witnesses never explained why they did not simply take this step, and instead decided to simply ignore VRF's emails.

97.    The Court also observes that, when given the chance to explain the decision of her office, Ms. Vigil failed to explain why the prior criminal referral provided a legal basis for the Secretary to refuse access to additional data. The Defendants provided no witness, elicited no testimony, and produced no other evidence explaining why "referral…to a law enforcement agency" justified the decision to stop providing voter data to VRF.

98.    The Court further notes that the statement– "we are not fulfilling records requests from VoteRef"—by its own terms shows that even a validly-submitted "request" would not be fulfilled. Its effect and import requires no further explanation. Additionally, it was not limited to just the February 15th request but reflected a decision that the Secretary would not produce voter data to VoteRef at all.

**IX.    Plaintiffs filed this lawsuit to challenge the restrictions imposed by Defendants.**

99.    VRF removed the New Mexico data from its website on March 28, 2022, just before filing this lawsuit. It did so out of fear that VRF would be prosecuted based on the Secretary of State's interpretation of the law and her referral of VRF to the Attorney General's office for prosecution. **May 17 Tr. at 69:13-18; VC ¶42.**

100.    VRF filed this action because, if it obtains a favorable ruling, it wants to resume posting, distributing, and otherwise using the available New Mexico voter data on the Website so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls. **May 17 Tr. at 61:4-11; VC ¶43**. VRF also plans to seek the same data from the New Mexico Secretary of State after the 2022 election this November. **VC ¶43.**

101.     On March 28, 2022, Plaintiffs filed a Verified Complaint (Doc. 1) seeking declaratory and injunctive relief against Defendants in their official capacities, alleging that the Defendants restrictions on the use of voter data and subsequent referral of VRF for prosecution violated the First Amendment.

102.     When Plaintiffs filed their Complaint, they defined the restrictions which they were challenging as the "Use Restrictions." **VC ¶19.** Per Plaintiffs' definition, those Use Restrictions are: (1) restrictions on a use of the data that is not for a specific candidate or ballot measure campaign, but that is for election purposes; and (2) restrictions on a use of the data that is not by the government itself, but that is by a private person for the purpose of publishing, reviewing, and engaging in speech regarding the governmental operation of elections. *Id.* For ease of reference, the Court adopts Plaintiffs' definition of the term "Use Restrictions."

103.     During the briefing and arguments on the Preliminary Injunction motion, it became clear that Plaintiffs' claims also encompassed a challenge to what the Court will call the Defendants' "Data Sharing Ban," that is, the Defendants' threatened enforcement of a policy, arising from Defendants' application of the Voter Data statutes, that it is unlawful for any person to share voter data with another person, even if shared for an otherwise lawful purpose.

104.     The Defendants in this case are New Mexico Secretary of State Maggie Toulouse Oliver and New Mexico Attorney General Hector Balderas. **VC, ¶¶14-15**. Both are named in their official capacities only. *Id.*

105.     Defendant Balderas is the Attorney General for the State of New Mexico and, in that capacity, is responsible under state law for investigating and prosecuting violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6. See NMSA § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide

legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); NMSA § 1-2-2 ("The secretary of state shall…E. report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution…"); NMSA § 1-1-1 ("Chapter 1 NMSA 1978 may be cited as the 'Election Code.").

106.    Defendant Maggie Toulouse Oliver is the duly elected Secretary of State for the state of New Mexico and, in that capacity, is the chief election officer of the state. NMSA § 1-2-1(A). The Secretary is responsible under state law for furnishing voter data to requesters and referring potential violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6, to the Attorney General for investigation and prosecution. See NMSA § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); NMSA § 1-2-2 ("The secretary of state shall… E. report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution…"); NMSA § 1-1-1 ("Chapter 1 NMSA 1978 may be cited as the 'Election Code.'").

## X.    New Mexico continues to seek recourse against VRF, including through coordination with other state and federal law enforcement.

107.    The threat of prosecution facing Plaintiffs here is both real and continued.

108.    The Secretary referred VRF to the AG for criminal investigation and potential prosecution. **JE C-1**.

109.    The Secretary has not withdrawn that referral as of June 15, 2022. **June 15 Tr. at 69:5-6.**

110.     Additionally, the Defendants have communicated and coordinated with other state and federal agencies regarding VRF.

111.     On January 26, 2022, Anna Trujillo of the New Mexico Attorney General's Office sent a copy of the VRF referral (**JE C-1**) to an email address associated with the Federal Bureau of Investigation. **Ex. P11**.

112.     On April 6, 2022, the Chief Counsel for the California Secretary of State emailed Secretary Toulouse Oliver to connect someone in the New Mexico Attorney General's Office with California Deputy Attorney General Tony O'Brien. **Ex. P6**. Secretary Toulouse Oliver connected the California authorities with Deputy Secretary of State Sharon Pino, who she said was "working directly with our AG office and can help make that connection." *Id.* Pino then provided the California authorities with the contact information for New Mexico Chief Deputy AG of Criminal Affairs, Anne Kelly. *Id.*

113.     Since this case has been filed, the New Mexico and California Attorneys General have exchanged emails and held conference calls to discuss this litigation, including sharing briefs and orders from cases upon which the Defendants then relied in their briefing. See **Exs. P12-14**.

XI.     **The Defendants' response to a number of hypotheticals at the June 15ᵗʰ hearing demonstrates the breadth of the Data Sharing Ban and reveals some ad hoc exceptions to the same.**

114.     At the preliminary injunction hearing(s), Plaintiffs' counsel propounded a number of hypotheticals to the Secretary of State's Elections Director, Mandy Vigil, and Deputy Secretary of State, Sharon Pino.

115.     Their responses to those hypotheticals revealed that the Defendants apply the Data Sharing Ban as an absolute prohibition on the sharing of voter data between a requestor and any

other person, regardless of whether the sharing is for a governmental, election, or election campaign purpose.

116.    The State admitted that the ban would apply in a vast range of circumstances. This would include sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for (**June 15 Tr. at 33:13-34:16**); sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic who wanted to question or validate the data (**June 15 Tr. at 32:6-33:9**); sharing between a political party and a candidate it supports, but who is not affiliated with the party (**June 15 Tr. at 91:1-5, 91:17-20**); sharing of a voter's information by a canvasser with close family members or other members of his or her household (**June 15 Tr. at 30:17-31:20**); sharing by a political data compilation/analysis firm and its political clients (**June 15 Tr. at 34:17-24**); and, of course, sharing via publication on the internet (**June 15 Tr. at 91:12-16**).

117.    On the other hand, a requestor could share the information with his or her spouse and even though that might violate the ban, it would not be enforced against the sharing spouses. **June 15 Tr. at 31:4-12.**

118.    Further, a voter list could be obtained by a single party official signing a single affidavit, but widely disseminated among a variety of organizations and individuals, including candidate campaign committees at all levels (so long as the candidate is affiliated with the party), candidate campaign and party workers, and perhaps even volunteers, although Director indicated she would need advice of counsel. **June 15 Tr. at 29:2-30:4.**

**XII.   VRF sends additional records requests in May promising not to post voter information online without a court order, but the Secretary refuses to respond to those requests as well.**

119.   On May 27, 2022, VRF sent a letter to Secretary Toulouse Oliver entitled "Notice of Violation of National Voter Registration Act & Request for Records." **Ex. P10**. Though no NVRA claim is presently made in this case, the first part of the letter focused on VRF's February 15, 2022 request and the Defendants' subsequent decision not to fulfill any voter data requests from VRF. See **Ex. P4**.

120.   The second part of the letter included new requests for voter data by VRF. **Ex. P10, p.4**. Those requests included one identical to the February 15th request (all voters removed between 11/3/20 and 4/13/21) and a new request for "[c]urrent voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active. *Id.*

121.   As it had at the May 17th hearing, VRF made clear in its request that its intended election use includes two projects: first, the "crowdsourcing" done by the public through the Website, and second, the internal analysis VRF conducts to identify discrepancies. *Id.*

122.   On the "crowdsourcing" side, VRF's request made clear that it intended to publish voter information online, but *only* if it received judicial relief in this or another proceeding declaring that it had a right to do so. *Id.* For its internal analysis, VRF stated that it would not publish the information online regardless of the outcome of any litigation. *Id.* The requests were accompanied by two executed Voter Information Authorization forms (one for each distinct request) signed by Executive Director Gina Swoboda. See **Ex. B to P10**. The "Election Related" box was checked on each form. *Id.*

123.   On June 15, 2022, when asked about the Office's proposed response, Ms. Vigil testified that, despite the fact that VRF did not intend to publish voter data absent relief from a court, on advice of counsel the Office would not release data to VRF. **June 15 Tr. at 57:25-59:18.**

124.   On June 16, 2022, the Secretary's office responded. **Ex. P15**. The Secretary contended that the February 15, 2022 request for changes to the voter file was not a request for records under the NVRA because it would have required the Secretary to create a new record, which is not required under the NVRA. *Id.* The Secretary likewise dismissed the identical portion of the May 27th request as requiring the creation of a new record.

125.   Though the maintenance of such a record appears to be required by law, these arguments are not before the court at this time. *See* NMSA § 1-5-14 ("At least once a month, the secretary of state shall have made from the state voter file a file maintenance report of additions, deletions and changes, if any, to each of the county registers. The file maintenance report shall indicate whether each entry listed is an addition, deletion or change to the county register.").

126.   The Secretary also denied the second part of VRF's request (for current voter registration data for all voters) based on its "position that publishing *any* New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability." *Id.*, p. 2. The Secretary claimed it was "prudent to delay production of this data at this time" stating that it will "either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal." *Id.* The Secretary also cited a New Mexico statute criminalizing any conspiracy to violate the Election Code. See *Id.* (citing NMSA 1978, § 1-20-15).

127.   These requests were denied despite the written and explicit assurances of VRF that it would not publish voter information absent a judicial decree stating that it had a right to do so.

128.   Further, VRF promised not to publish some of the data at all, even if it prevails in this Court. The Secretary's claim that it was "prudent" to deny even that request provides no explanation of any kind, nor does it cite any legal authority for refusing to honor VRF's request.

129.   The Court finds that these unreasoned refusals to provide data to VRF are more likely than not based at least in part on: (1) VRF's identity as a critic of the Secretary and as a litigant that has petitioned the Court for relief against the Defendants; and (2) VRF's plan to engage in speech regarding the data and the Secretary's maintenance of the voter rolls.

## CONCLUSIONS OF LAW

The Court has carefully reviewed: (i) all pleadings and attached documents including the Complaint (Doc. 1) and the Defendants' Answer (Doc. 16), (ii) all briefing submitted to the Court on the PI Motion, consisting of Plaintiffs' Motion (Doc. 3) and brief in support (Doc. 4), Defendants' response in opposition (Doc. 13), and Plaintiffs' Reply (Doc. 18/19), and (iii)the exhibits relevant to the PI Motion. The Court has also considered the testimony of the witnesses and arguments of counsel at both the May 17th hearing and the June 15th hearing. After review and consideration of the foregoing, the Court concludes as follows:

### I.      Jurisdiction and Venue

1.      Federal courts have limited jurisdiction, and there is a presumption against the existence of federal jurisdiction. *See Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). A federal district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. There is a federal question if the case arises under the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 1331. Whether a case arises under a federal law is determined by the "well pleaded complaint rule," *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9 (1983), specifically, when "a federal question is presented on the face of the plaintiff's properly pleaded complaint," *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)(citing *Gully v. First Nat'l Bank*, 299 U.S. 109, 112-13 (1936)). This determination is made by examining the plaintiff's complaint, "unaided by anything alleged in anticipation of avoidance of defenses which it is thought the defendant may interpose." *Franchise Tax Bd. of State of Cal.*, 463 U.S. at 10 (citing *Taylor v. Anderson*, 234 U.S. 74, 75-76 (1914)).

2.     The Supreme Court has further limited subject matter jurisdiction by requiring that the federal law relied on in the plaintiff's complaint creates a private cause of action. See *Franchise Tax Bd. of State of Cal.*, 463 U.S. at 25-26. The Supreme Court has emphasized that "the mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction." *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 813 (1986). See *Sandoval v. New Mexico Tech. Grp., L.L.C.*, 174 F. Supp. 2d 1224, 1232 n.5 (D.N.M. 2001)(Smith, M.J.)("*Merrell Dow* is the Controlling law when invoking subject matter jurisdiction" when a right under state law turns on construing federal law). District courts must exercise "prudence and restraint" when determining whether a federal question is presented by a state cause of action because "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." *Merrell Dow Pharmaceuticals, Inc.*, 478 U.S. at 810.

3.     In addition to the requirement that the federal question appear on the face of the complaint, "plaintiff's cause of action must either be (1) created by federal law, or (2) if it is a state-created cause of action, 'its resolution must necessarily turn on a substantial question of federal law.'" *Nicodemus v. Union Pac. Corp.*, 318 F.3d 1231, 1235 (10th Cir. 2003)(quoting *Rice v. Office of Servicemembers' Grp. Life Ins.*, 260 F.3d 1240, 1245 (10th Cir. 2001)). If the resolution turns on a substantial question of federal law, the federal question must also be "contested." *Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 313 (2005). Finally, the exercise of federal-question jurisdiction must also be "consistent with congressional judgment about the sound division of labor between state and federal courts governing the application of § 1331." 545 U.S. at 313. Particularly, the Court must determine whether recognition of federal-question jurisdiction will federalize a "garden variety" state-law claim that will result in the judiciary being

bombarded with cases traditionally heard in state courts. 545 U.S. at 313. *See Darr v. N.M. Dep't of Game & Fish*, 403 F. Supp. 3d 967, 1012 (D.N.M. 2019)(Browning, J.)(explaining that, to establish federal-question jurisdiction, "the federal question must also be 'actually disputed,' and its necessary to the case's resolution" (quoting *Grable & Sons Metal Prods. Inc. v. Darue Eng'g & Mfg.*, 545 U.S. at 314)).

4.      The Court has subject matter jurisdiction over this case pursuant to each of the following: (i) 42 U.S.C. § 1983, as the action is brought to remedy the deprivation of rights, privileges, or immunities secured by the Constitution; (ii) 28 U.S.C. § 1331, as the action arises under the First, Fifth, and Fourteenth Amendments to the United States Constitution; (iii) 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; and (iv) 28 U.S.C. § 2202 in that it seeks to secure preliminary and injunctive relief.

5.      Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) in that Defendants are situated within this judicial district.

## II.    Article III Standing

6.      Here, the Plaintiffs challenge Defendants' threatened enforcement of a policy, arising from Defendants' application of the Voter Data statutes, that it is unlawful for any person to share voter data with another person (the "Data Sharing Ban"). The first question is whether Plaintiffs have standing to challenge the Data Sharing Ban. For the reasons discussed below, they do.

7.      "Every plaintiff in federal court bears the burden of establishing the three elements that make up the 'irreducible constitutional minimum' of Article III standing: injury-in-fact, causation, and redressability." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). First, the

plaintiff "must have suffered an 'injury in fact' — an invasion of a legally protected interest which is (a) concrete and particularized...and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted). Second, "there must be a causal connection between the injury and the conduct complained of — the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Id*. (alterations in original) (citation omitted). Third, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id*. at 561 (citation omitted).

8.      VRF and Steinberg meet each element of this three-part test.

**(a) Injury in Fact**

9.      First, as a matter of law, an injury-in-fact is established by the credible threat of prosecution for constitutionally protected conduct in which the plaintiff intends to engage. "[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 974–75 (10th Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)(internal citations omitted).

10.     For plaintiffs seeking prospective relief based on a "chilling effect" on speech, as Plaintiffs do here, the Tenth Circuit has set forth a three-part test that, if satisfied, would establish the injury-in-fact requirement. *Aptive Env't*, 959 F.3d at 974-975 (citing *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc).

11.     Such plaintiffs satisfy the injury-in-fact requirement when they present: (1) evidence that in the past they have engaged in the type of speech affected by the challenged

government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced. *Id*.

12.     Here, the Plaintiffs presented more than sufficient evidence to meet this test. First, it is not disputed that VRF has engaged in precisely the activity the Secretary publicly claimed was criminal and criminally referred to the Attorney General, and which the threatens to prosecute: the sharing of voter data online. FOF ¶99. Second, VRF stated that it desires to continue engaging in such speech if it obtains relief from this Court. FOF ¶100. Third, VRF plausibly claimed it has no intention to make the data publicly available because of the Attorney General's credible threat of enforcement. VRF took down its data because it had learned through the media that the Secretary had made a criminal referral to the Attorney General. FOF ¶78. And the record in this case showed that the threat of prosecution is credible: the Defendant Secretary made a criminal referral and publicly stated that it is unlawful for VRF to have accessed and shared voter data (FOF ¶87); the Attorney General has an active and ongoing investigation, which has included efforts to refer the matter to the Federal Bureau of Investigation and efforts to coordinate with other states (FOF ¶111); and the Attorney General's office has stated in this very proceeding that Plaintiffs can indeed be prosecuted for sharing of voter data online (FOF ¶72).

13.     Plaintiff Steinberg has not been publicly threatened in the same way as VRF, but the evidence established that Defendants would apply the same theory of liability against her. Steinberg testified that she had just begun to access the site before VRF was forced to remove the data. FOF ¶49.  Second, she stated her desire to continue accessing and sharing the data if it is restored. FOF ¶50. Third, when specifically questioned, the Defendants recognized no exception

to its "no-sharing" enforcement policy for individuals who wish to share data with each other. FOF
¶116.

### (b) Causation and Redressability

14.     Having established an injury-in-fact, the next question is whether Plaintiffs have
established the last two elements of Article III standing, causation and redressability. They have.

15.     First, the Plaintiffs' injury-in-fact is "fairly ... trace[able] to the challenged action
of [Defendants], and not ... th[e] result [of] the independent action of some third party not before
the court.'" *Lujan*, 504 U.S. at 560–61 (internal citations omitted, alterations in original). It is
precisely the criminal referral by the Defendant Secretary, and the criminal investigation and
threatened prosecution by the Defendant Attorney General, that have caused the Plaintiffs' injury.

16.     For similar reasons, the redressability inquiry favors the Plaintiffs: it is "'likely,' as
opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id*. at
561 (citation omitted). Injunctive relief will remove the threat of prosecution and again make it
possible for the Plaintiffs to share voter data for their governmental and election-related purposes.

17.     The Defendants nevertheless argue that the Plaintiffs lack standing. According to
the Defendants, VRF committed an independently wrongful act when it received voter data from
another party, Local Labs, that had requested it directly from the Defendant Secretary. The facts
showed that Local Labs is a vendor that specializes in public data requests, and VRF hired Local
Labs for a fixed fee in each state to provide advice and data retrieval. FOF ¶36. The Defendants
assert that under their Data Sharing Ban, VRF had no right to the data in the first place, and thus
cannot bring a claim seeking to vindicate their own right to share data online.

18.     Defendants' standing argument is inadequate for at least three reasons. First, as will
be noted in more detail below, the Data Sharing Ban is undeniably the policy that has been adopted

by Defendants in enforcing New Mexico law, but it is the wrong reading of New Mexico law. New Mexico law does prohibit sharing of data, but only when that sharing is not for one of the permissible purposes enumerated under NMSA § 1-4-5.5. Therefore, VRF committed no violation of state law when it received data from Local Labs, and that act is certainly insufficient to eliminate VRF's standing to petition this Court for a remedy for violation of its First Amendment rights, particularly when one of Plaintiffs' primary claims is First Amendment overbreadth.

19.     Second, it is precisely the Data Sharing Ban that VRF is challenging. Thus, to the extent that Defendant also wish to punish VRF for receiving the data from Local Labs, the Data Sharing Ban is the cause of VRF's injury (the threat of prosecution for receiving data from a third party), and VRF's injury is redressable via relief that prohibits Defendants from enforcing the Data Sharing Ban against VRF.

20.     Third, independent of the threatened prosecution for VRF's past acts, VRF is continuing to request data directly from the Secretary even during the pendency of this case. FOF ¶119. A direct request from the Secretary eliminates the Defendants' concern that VRF's initial receipt of the data from a third party would be its own independent unlawful act. VRF has made clear that it intends to share the data online if it obtains relief from this Court, but will not do so otherwise for fear of prosecution. FOF ¶122. This, too, confers standing upon VRF.

21.     In short, Plaintiffs have standing to pursue the claims at issue.

**(c) Standing in First Amendment Overbreadth Cases.**

22.     Plaintiffs' primary challenge to the Data Sharing Ban states a First Amendment overbreadth claim.

23.     A non-First Amendment, non-overbreadth facial challenge is always more difficult to mount than an as-applied challenge to the same statute. See *U.S. v. Salerno*, 481 U.S. 739, 745,

107 S.Ct. 2095, 2100 (1987). The relative difficulty of mounting facial and as-applied challenges is almost, but not entirely, reversed in the context of a First Amendment overbreadth challenge. *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1160 (D.N.M. 2014)(Browning, J.).

24.     "[W]here the claim is that a statute is overly broad in violation of the First Amendment, ... [there is] no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 957 (1984). "Even if the challenger engaged in constitutionally unprotected, validly penalized speech, if he can establish that the statute penalizes a substantial swath of protected speech, then he will prevail in getting the statute invalidated not only as it relates to the constitutionally protected speech of others, but to his own unprotected speech, as well." *Griffin*, 30 F. Supp. at 1160.

25.     "The relaxation of the usual standing rules in the overbreadth context goes further than simply allowing an individual to whom the law is constitutionally applied to sue on the basis of unconstitutional applications. The challenged law need not have been applied against the challenger at all; as long as the barebones requirements of Article III standing are met, the elements of prudential standing are presumed satisfied in an overbreadth challenge." *Id.* at 1160-61.

**(d) The Court can grant relief from the incorrect interpretation and enforcement of a state law which gives rise to a federal constitutional injury.**

26.     Before moving to the elements of Plaintiffs' request for preliminary injunction, there is one additional matter to address. It appears that the Data Sharing Ban lacks support under the plain text of the statutes that Defendants cite as justification for the Ban. That being the case, the question arises whether relief can be awarded against state officials under 42 U.S.C. § 1983

for enforcement activity that does not comply with state law. Having considered this question, the Court concludes that it can.

27.     To begin, New Mexico's statutory scheme simply does not impose a blanket ban on the sharing of voter data. Rather, it imposes two distinct requirements.

28.     First, Article 5, the Voter Records System Act, prohibits certain government officials and vendors from disclosing voter data unless that disclosure is otherwise permitted in the law:

> A. Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file **by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent** to anyone not authorized by the Voter Records System Act to have possession of the file.
>
> B. For purposes of this section, a file maintenance list shall be considered a voter file or a part of a voter file.
>
> C. Any data processor, officer, deputy, assistant, agent or employee who commits unlawful disposition of a voter file is guilty of a fourth degree felony.

NMSA § 1-5-22 (emphasis added). This disclosure prohibition clearly does not apply to private parties who are not data processors. Neither party claims that VRF or Local Labs are data processors for the state.

29.     Second, Article 4 prohibits private parties who have lawfully requested from making it available or using it for "unlawful purposes." The complete relevant section provides as follows:

> A. The county clerk or secretary of state shall furnish voter data, mailing labels or special voter lists only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section; provided, however, all requesters shall be treated equally in regard to the charges and the furnishing of the materials.

B. In furnishing voter data, mailing labels or special voter lists, the county clerk or secretary of state shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters.

C. Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists **shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes.**

D. The secretary of state shall prescribe the form of the affidavit.

E. As used in this section:

> (1) **"election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;**
>
> (2) **"governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;**
>
> (3) "mailing labels" means prepared mailing labels of selected voters arranged in the order in which requested and providing only the name and address of the voter;
>
> (4) "special voter list" means a prepared list of selected voters arranged in the order in which requested; and
>
> (5) "voter data" means selected information derived from the voter file.

NMSA § 1-4-5.5 (emphasis added to relevant sections). Nothing in this section prohibits one private party from sharing data with another private party, so long as it is not for unlawful purposes. Nor does anything in this section requires that an affidavit be executed by a private party that receives the data from another private party. Rather, the affidavit requirement is imposed only on one who makes a request for the data from the Secretary of State.

30. Defendants argue, however, that by cross-referencing two sections in two different articles, Articles 4 and 5, they can derive a third requirement: that no person—even private parties—may share the data at all. Defendants rely on subsection (B) of NMSA § 1-4-5.6. By

stating that "any person…who commits unlawful use of voter data" is subject to specific criminal penalties," Defendants claim, this statute means that NMSA § 1-5-22's prohibition on disclosure applies actors to all persons, public and private:

> A. Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act [Chapter 1, Article 5 NMSA 1978].

> B. Any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth degree felony and upon conviction shall be fined one hundred dollars ($100) for each and every line of voter information that was unlawfully used.

> C. Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense.

NMSA § 1-4-5.6.

31.     Defendants' argument cannot be sustained. First, nothing in NMSA § 1-4-5.6 indicates an intent to secretly work a dramatic change to the scope and meaning of NMSA § 1-5-22. NMSA §1-4-5.6 is a simple, straightforward criminal statute. First, subsection A defines the offense of "unlawful use of voter data, mailing labels, or special voter lists." The "unlawful use" of such items "consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." *Id*. Yet NMSA § 1-5-22, the statute which § 1-4-5.6 is supposed to dramatically expand, does not deal with "use" or "purpose." It deals only with government officials' "disposition" (that is, the sharing) of "voter files." Further, Article 5 does not at all deal with the creation, use, or disclosure of "mailing labels" or "special voter lists." NMSA § 1-5-22's stand-alone restrictions on the "disposition" of voter data by state employees and data processors already comes with its own criminal penalty (see NMSA § 1-5-22(C)). In short, the definition of "unlawful use" in § 1-4-5.6-A does not somehow sweep up § 1-5-22. That being the case, NMSA

§ 1-4-5.6(B)'s reference to "any person" simply describes all of those individuals and entities who are capable of committing "unlawful use" violations under § 1-4-5.6(B); it is not an expansion of coverage under an entirely different statute, NMSA § 1-5-22.

32.     For this reason, New Mexico's statutes do not support the Data Sharing Ban.

33.     However, the Data Sharing Ban's failure to square with state law supports rather than undermines the basis for federal jurisdiction. Federal courts retain jurisdiction to remedy First Amendment violations against state officials under 42 U.S.C. § 1983 even when state officials are mistaken about whether state law provides a justification for their actions.

34.     First, the text of Section 1983 makes clear that it applies not only to state officials' reliance on statute, but also custom and usage:

> Every person who, under color of any statute, ordinance, regulation, **custom, or usage,** of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

42 U.S.C. § 1983 (emphasis added).

35.     Section 1983 cases—including some landmark civil rights cases—have sought relief from a local official's application of "custom and usage" that may well depart from the terms of a statute or ordinance. *See, e.g., Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (white teacher was arrested on charge of "vagrancy" for sitting with her black students in a diner). As the Court explained at some length:

> Congress included customs and usages within its definition of law in S 1983 because of the persistent and widespread discriminatory practices of state officials in some areas of the post-bellum South. As Representative Garfield said: '(E)ven where the laws are just and equal on their face, yet, by a systematic maladministration of them, or a neglect or refusal to enforce their provisions, a portion of the people are denied equal protection under

47

> them.' Although not authorized by written law, such practices of state
> officials could well be so permanent and well settled as to constitute a
> 'custom or usage' with the force of law.
>
> This interpretation of custom recognizes that settled practices of state
> officials may, by imposing sanctions or withholding benefits, transform
> private predilections into compulsory rules of behavior no less than
> legislative pronouncements.

*Adickes*, 398 U.S. at 167-168 (internal citations omitted).

36.     The *Adickes* Court remanded for a new trial on the question of whether a private

party had acted under color of law. In its instructions, the Court reiterated that it did not matter

whether the express terms of a state statute commanded the unconstitutional course of conduct:

"For state action purposes it makes no difference of course whether the racially discriminatory act

by the private party is compelled by a statutory provision or by a custom having the force of law—

in either case it is the State that has commanded the result by its law." *Id*. at 171. It continued,

"First, the District Court's pretrial opinion seems to suggest that the exclusive means available to

petitioner for demonstrating that state enforcement of the custom relevant here would be by

showing that the State used its criminal trespass statute for this purpose. We disagree with the

District Court's implicit assumption that a custom can have the force of law only if it is enforced

by a state statute." *Id*. at 171-172.

37.     The Court followed the same rationale in the case of *Dombrowski v. Pfister*, 380

U.S. 479 (1965). There, individuals connected with civil rights groups (including "SCEF") had

been arrested and charged with failing to register under Louisiana's Subversive Activities and

Communist Control Law and the Communist Propaganda Control Law. *Id*. at 482. Even after a

state court had quashed arrest warrants and dismissed a criminal complaint against the defendants,

prosecutors continued to make public statements that the defendants were Communist front groups

who must register and be prosecuted. *Id*. at 488-489. When the defendants brought a Section 1983

claim against prosecutors in federal court, the district court initially dismissed the case on the grounds that future state prosecutions might find that the defendants did not fall within the terms of the statute. *Id*. The Supreme Court held that this was error:

> The District Court also erred in holding that it should abstain pending authoritative interpretation of the statutes in the state courts, which might hold that they did not apply to SCEF, or that they were unconstitutional as applied to SCEF. We hold the abstention doctrine is inappropriate for cases such as the present one where, unlike *Douglas v. City of Jeannette*, statutes are justifiably attacked on their face as abridging free expression, or as applied for the purpose of discouraging protected activities.
>
> First, appellants have attacked the good faith of the appellees in enforcing the statutes, claiming that they have invoked, and threaten to continue to invoke, criminal process without any hope of ultimate success, but only to discourage appellants' civil rights activities. If these allegations state a claim under the Civil Rights Act, 42 U.S.C. s 1983, as we believe they do, see *Beauregard v. Wingard*, 230 F.Supp. 167 (D.C.S.D.Calif.1964); *Bargainer v. Micha*l, 233 F.Supp. 270 (D.C.N.D.Ohio 1964), **the interpretation ultimately put on the statutes by the state courts is irrelevant.** For an interpretation rendering the statute inapplicable to SCEF would merely mean that appellants might ultimately prevail in the state courts. It would not alter the impropriety of appellees' invoking the statute in bad faith to impose continuing harassment in order to discourage appellants' activities, as appellees allegedly are doing and plan to continue to do.

*Id*. at 490-91. The Court also made clear that the State could not simply obtain narrowing constructions of the apparently vague and overbroad statutes on a "piecemeal" basis through serial prosecutions of various defendants. Rather, the initial burden was on the state

38.     *Adickes* and *Dombrowski* make clear that state officials cannot escape federal jurisdiction by engaging in conduct that may not be justified under the express terms of the state statute under which they purport to act. Whether this state conduct is viewed as a custom or usage, or whether it is simply the errant application of state law, a federal injury can be addressed in federal courts under Section 1983, and this Court has a duty to do so when the elements of an

Article III case and controversy are presented, as they are here. The Court will now turn to the merits of the motion for preliminary injunction.

### III.    The Request for Preliminary Injunction

#### (a) The Preliminary Injunction Standard

39.    A preliminary injunction should issue where a plaintiff can make a showing that: (1) they have a likelihood of success on the merits, (2) they will experience irreparable harm absent an injunction, (3) that the balance of equities tips in their favor, and (4) the preliminary injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

40.    This case does not present a situation where a preliminary injunction is disfavored. An injunction may be "disfavored" if "(1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 797 (10th Cir. 2019). The requested injunction does none of these things: it prohibits prosecution, maintains the status quo as it is enunciated in the statutes, and is only temporary relief where full relief requested includes permanent relief and nominal damages. Because it is not a disfavored preliminary injunction, there is no need for a heightened legal standard.

41.    Nonetheless, as discussed below, the Plaintiffs have made a strong showing on each of the required factors.

#### (b) Plaintiffs are substantially likely to succeed on the merits of their First Amendment claims.

42.    The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. Const. amend. I. The First Amendment secures the "freedom of expression upon public questions." *New York Times Co. v. Sullivan*, 376 U.S. 254,

269 (1964). According to Justice Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary." *Whitney v. California*, 274 U.S. 357, 375 (1927). The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be the secret of liberty." *Id*. The Framers firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile." *Id*. Justice Brandeis noted that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates. See *Id*. Robust public discussion is a "political duty" and is a "fundamental principle of the American government." *Id*. Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957).

43.     The First Amendment's speech and press protections limit both state and federal government action. See *Gitlow v. New York*, 268 U.S. 652, 666 (1925); *Near v. Minnesota*, 283 U.S. 697, 628 (1931).

### (1) Plaintiffs' Challenge Based on Overbreadth

44.     As an initial matter, the Defendants correctly conceded that a ban on the Plaintiffs' sharing of voter data "is a direct regulation of speech." Defs. Br. in Opp. to PI Motion (Doc. 13), at 8; *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."). Further, when information is

shared between two parties, the First Amendment protects both the sender of the information (here, VRF) and the recipient (here, VRF to the extent it received information from Local Labs, and all of VRF's users, like Plaintiff Holly Steinberg, who receive the data from VRF). *See Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143 (1943) (First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it.").

45.     Aside from Defendants' admission, the facts showed that the Plaintiffs engage in speech and association in at least two ways. First, VRF shares voter data online in order to "crowd-source" the public review of the accuracy and operation of the voter rolls. As VRF showed, this allows individuals to check not only their own voting data, but also to look for errors in other voters' records. FOF ¶29. For example, many voters know personal information about their immediate family, household, and close friends, such as when they were born, when they passed away or were burdened with a disability, moves and other major life events, and even incarceration. FOF ¶29.  The Secretary's voter files shows when and where a voter cast votes, including the voter's registered address at the time and age or date of birth. FOF ¶28.  Thus, a single citizen like Plaintiff Steinberg could potentially use VRF's shared voter data to check the accuracy of the voting data for a large network of other individuals. Aside from this, voters can search and sort the VRF data in order to check the overall accuracy of the data. FOF ¶29.  For example, they can sort birthdays to find all voters who have "placeholder" birthdays, such as "1-1-1900" typed in by clerks who failed to collect that data. *Id.* VRF users who find these sorts of issues can then share them with the Secretary, VRF, and other VRF users, all of which is additional speech. Thus, VRF shares data with users who agree to use it for election and government-related purposes (which is itself speech), and when those users then speak about what they have found with VRF, other users, or the Secretary, there is additional speech. The Data Sharing Ban eliminates this entire world of

speech, and speech about speech, by essentially allowing each individual voter to view only his or her own data on the Secretary's website.

46.     VRF has a second use for the data it requests: it analyzes the data post-election to determine whether there are discrepancies between the Secretary's post-election count of the number of voters who voted, and the voter files' own record of how many individuals in the file cast votes. FOF ¶40.  Because there are usually discrepancies, VRF then works with the Secretary to determine whether the discrepancies can be accounted for by an official record of changes to the voter list in between the election and the date of the request. FOF ¶41.  VRF performs this "discrepancy analysis" in order to encourage election officials to be open about how and why they change the voter list, and to keep a public audit trail of those changes. FOF ¶41.  VRF's sharing of the results of its information is another form of speech. The Data Sharing Ban would punish VRF for having obtained the data necessary for this speech from Local Labs, its data request vendor, since the mere act of VRF having received the data from Local Labs—even for an election and election campaign purpose, or for a governmental purpose—would violate the Ban.

47.     In short, a total ban on the sharing of voter data is also a total ban on at least one form of speech. For that reason, the First Amendment overbreadth doctrine is implicated. "The constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002).

48.     In the First Amendment context, "[a] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *See United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n.6 (2008)). As in *Stevens*,

a First Amendment overbreadth analysis can sometimes expose "a criminal prohibition of alarming breadth." *Id*. at 474. The severity of criminal sanctions may well cause speakers to remain silent rather than communicate words, ideas, and images that prosecutors may construe as unlawful. *See, e.g., Dombrowski*, 380 U.S. at 494.

49.    "The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Stevens*, 559 U.S. at 474 (internal quotations omitted).

50.    Here, as discussed above, the underlying statute does not by its terms ban the sharing of voter data so long as it is for a permissible purpose. In this litigation, Defendants have taken the position that VRF's use and online sharing of the data does not violate the "permissible purpose" requirement; instead, they argue that no sharing is allowed at all. This position of Defendants about how they will apply the statute—albeit in error—is what Plaintiffs challenge as the "Data Sharing Ban." It is to the Data Sharing Ban, then, that the Court applies its overbreadth analysis.

51.    The facts showed that Defendants apply the Data Sharing Ban as an absolute prohibition on the sharing of voter data between a requester and any other person, regardless of whether the sharing is for a governmental or election purpose. FOF ¶116.  The State admitted that the ban would apply in a vast range of circumstances. This would include sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for (FOF ¶116); sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic at a different institution who wanted to use the original data set to validate the research (FOF ¶116); sharing between a political party and a candidate it supports, but who is not affiliated with the party (FOF ¶116); sharing of a voter's information by

a canvasser with close family members or other members of his or her household (FOF ¶117); sharing by a political data compilation/analysis firm and its political clients (FOF ¶116); and, of course, sharing via publication on the internet (FOF ¶116).

52.     This reach—a near total ban on speech that involves the sharing of data—is far broader than any legitimate sweep of a statute dedicated to ensuring that voter data is not used for commercial or nefarious purposes. For purposes of considering the legitimate sweep of a statute, the Court considers that part of the law that does advance legitimate purposes claimed by the State. The Court's model is *Stevens*, in which the Supreme Court applied overbreadth analysis to a federal statutory ban, backed by criminal penalties, on "any depiction" in which "a living animal is intentionally maimed, mutilated, tortured, wounded, or killed." 559 U.S. at 474 (citing 18 U.S.C. §48(C)(1)). Although the statute applied to a diverse range of speech, from hunting videos and periodicals to depictions in which an animal was merely killed or wounded, *id*. at 474-475, the Government claimed its purpose was only to criminalize "extreme cruelty," such as "crush videos," in which small animals are crushed by women in high heels, and animal fighting such as cock fights. *Id*. at 465, 478, 480. The Government promised that notwithstanding the statute's broad language, it would only enforce the law to cover such instances of extreme cruelty. *Id*. at 480. The Court's overbreadth analysis compared the Government's stated interest regarding crush videos and animal fighting, which it assumed for purposes of argument to be constitutional, to the substantial additional applications that the statute would reach under its plain text. *Id*. at 481-482. The Court will undertake the same analysis here.

53.     Here, the statute plainly does prohibit the sharing of voter data for unlawful purposes—that is, for purposes that are not governmental, or that are not for election and election campaign purposes. Assuming for the sake of argument that these restrictions are legitimate

(following the Court in *Stevens,* which assumed without deciding that the ban on videos of crushing animals and animal fighting was constitutional), it is evident that New Mexico's statutory restrictions will likely restrict only those transmittals that are purely for a commercial purpose: for the selling of products or for other non-governmental or non-election purposes. Putting aside commercial, governmental, and election and election campaign purposes, it is difficult to conceive of any other reason that a person would incur the cost of purchasing data with a specific electoral focus, and then transfer or sell them to a third party.

54.     Accordingly, the sharing that a correct reading of the statute would legitimately (for the sake of argument) prohibit is narrow compared to the sharing prohibited by the Data Sharing Ban, which is almost all conceivable sharing that is motivated by a governmental or election and election campaign-related purpose. The Data Sharing Ban is substantially overbroad and is therefore invalid under the First Amendment.

55.     The next question is the appropriate remedy. Here, the remedy sought by Plaintiffs is not the remedy that is sometimes sought in a First Amendment facial challenge to an overbroad statute, where a Court cannot rewrite the law for the legislature and may find a statute unconstitutional even though it has some constitutional applications, and even though the specific plaintiff before the Court is not engaging in constitutionally protected conduct. Here, the Plaintiffs challenge the Defendants' Data Sharing Ban as overbroad, and, as noted above, point to the terms of the statutes themselves as a narrower prohibition that will not prohibit their online sharing, but that will still advance the state's legitimate interests. In this case, the Defendants have stated that VRF would only be prosecuted under the Data Sharing Ban (May 17 Tr. at 37:3-19).

56.     Therefore, a preliminary order prohibiting Defendants from enforcing their Data Sharing Ban will not only remedy Plaintiffs' injury by allowing them to resume their speech

without the chill of threatened prosecution, it will leave intact New Mexico's statutes, which will continue under their plain text to allow sharing so long as it is for one of the specifically enumerated and defined lawful purposes.

### (2) Plaintiffs' Challenge Based on Content and Viewpoint-Based Discrimination

57.    The Court next turns to Plaintiffs' challenge to Defendants' threatened criminal enforcement as a content or viewpoint-based restriction on speech. Plaintiffs initially highlighted this challenge in their Complaint (Doc. 1) and their initial brief in support of their Motion for Preliminary Injunction (Doc. 3). At that time, Defendants had made no clear statement of the legal basis for the criminal referral and investigation of VRF. As noted above (see FOF 70 to 89), the Secretary's referral letter had been provided only to a media outlet, and public statements suggested that the Secretary's main concern with VRF was its alleged "misinformation" about the Secretary's operation of her voter data system. Only in this litigation did some of the Defendants' witnesses assert that their previous charges of "misinformation" were irrelevant. FOF ¶71. The witnesses stated that instead, a prosecution was being considered on the theory that the Attorney General viewed New Mexico's statutes as imposing a blanket ban on the sharing of data, and that VRF had violated that ban by conspiring to receive data from Local Labs, and by then sharing the data with the public. FOF ¶88. As noted above, this blanket ban, the Data Sharing Ban, is unconstitutionally overbroad. The Court now considers Plaintiffs' additional argument that regardless of the Attorney General's claim to now be considering prosecuting VRF under a Data Sharing Ban, the Defendants in fact targeted VRF for threatened prosecution based on VRF's viewpoint or on the content of VRF's speech.

58.     Government regulation of speech is content-based if a law applies to particular speech because of the topic discussed or the message expressed. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

59.     "This commonsense meaning of the phrase 'content based' requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys…Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed,* 576 U.S. at 163-4 (internal citations omitted).

60.     The Supreme Court has recognized a separate and additional category of laws that, though facially content neutral, are considered content based and subject to strict scrutiny if the law either (1) cannot be justified without reference to the content of the regulated speech or (2) was adopted by the government because of disagreement with the message the speech conveys. *Id.* at 164 (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989)).

61.     Content-based regulation of speech will only stand if they can survive strict scrutiny, "'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest…'" *Reed,* 576 U.S. at 171 (citing *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* 564 U.S. 721, 735 (2011)).

62.     Viewpoint-based discrimination against speech is an even more serious matter than content-based discrimination, and is presumptively invalid:

> When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant. See *R.A.V. v. St. Paul,* 505 U.S. 377, 391, 112 S.Ct. 2538, 2547, 120 L.Ed.2d 305 (1992). Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the

> opinion or perspective of the speaker is the rationale for the restriction.
> See *Perry Ed. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 46, 103
> S.Ct.      948,      955,      74      L.Ed.2d      794      (1983).

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

63.    Here, the Plaintiffs originally argued that they were being targeted because the Defendants had decided that VRF's speech was not for a "governmental" purpose or for an "election campaign" purpose under NMSA § 1-4-5.5. The Plaintiffs argued that this focus on the "purpose" of their speech was at the very least a content-based restriction. In response, the Defendants argued that in fact, they were applying a complete ban on sharing data, the Data Sharing Ban, which prohibited sharing regardless of content. Further, some Defendant witnesses stated that the exclusive reason VRF was subject to prosecution was its sharing of the data (May 17 Tr. at 37:3-19).

64.    Plaintiffs responded, however, that the Defendants' new position only changed the focus of the Plaintiffs' content and viewpoint-based discrimination arguments. That is because a viewpoint-based discrimination claim is still available where the restriction—here, the Data Sharing Ban—is facially neutral, but was adopted by the government because of disagreement with the message the plaintiffs' speech conveys. *Reed,* 576 U.S. at 164 (citing *Ward,* 491 U.S. at 791). Thus, Plaintiffs focused their factual showing on the question of whether the Defendants' application of the Data Sharing Ban to threaten prosecution of VRF was motivated by the Defendants' disagreement with the content or viewpoint of VRF's speech.

65.    Here, the facts showed that the Secretary initially referred the matter to the Attorney General because of a disagreement with what the Secretary claimed was VRF's "misinformation" about her operation of the state's voter data system. Further, the Attorney General, with knowledge of the Secretary's motivation, then proceeded to investigate VRF for violation of the Data Sharing

Ban. It did this even though, as noted above, the statutes cited by the Attorney General do not support a Data Sharing Ban.

66.     Additionally, VRF was (until a few months ago) the only entity that had ever been accused or investigated for a criminal violation under the Data Sharing Ban, despite the fact that numerous commercial entities that may well engage in the transfer of voter data continually and consistently request the state's voter data.

67.     Finally, the Secretary and Attorney General agree on four state interests that they claim support the Data Sharing Ban, and two of those interests do implicate content or viewpoint-based discrimination.

68.     In sum, at this early stage in the case, VRF has shown a substantial likelihood that the Defendants conceived and applied the Data Sharing Ban against VRF because of a disagreement with the content and viewpoint of VRF's speech. The basis for the Court's conclusion on this point is discussed more fully below.

69.     The facts showed that the Secretary's office was motivated to make the initial referral by a view that VRF's public statements about the data were misinformation, and that if VRF was not prosecuted, it would foster additional misinformation. The criminal referral itself asserted the theory that "We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a "governmental purpose," "election related," or "election campaign purposes."

70.     The writer, Sharon Pino, was herself a lawyer and former prosecutor. Despite the fact that a prosecution would undeniably result in punishment based on public speech, the letter urged that "Swift action is needed as voter data can quickly be manipulated and used to spread

misinformation." FOF ¶87. Pino later admitted that she had no information at the time that VRF was manipulating voter data, or was about to manipulate or was reasonably likely to manipulate voter data.  FOF ¶68.

71.     Other evidence shows that the key decisionmakers in the Secretary of State's office supported the criminal referral because VRF's publication violated the content-based "use" criteria in NMSA § 1-4-5.5, not the Data Sharing Ban that some of the Secretary's witnesses and the Attorney General later claimed had motivated the referral and investigation. The Secretary herself told ProPublica in a December interview, just after criminally referring VRF, that VRF's use on the internet "violates state law limiting use of the voter rolls solely for campaign or government purposes." FOF ¶65, 74. (citing JE D at 10).

72.     The remainder of the ProPublica article attacked VRF, stating that "Election experts say the type of work being done by VoteRef risks leading to further misinformation or being weaponized by people trying to undermine the legitimacy of the past election or give the sense that voter fraud is a more encompassing problem than it's proven to be. Or it could be used to harass or intimidate valid votes under the guise of challenging their legitimacy." JE D at 8. The article also played up VRF's "Support in GOP Circles" by noting that "Political figures with ties to Trump have been touting the efforts of VoteRef," including by holding workshops with "party loyalists" about "how they could use the VoteRef tools." JE D at 12.

73.     The Defendant Secretary tweeted out the article on her official Twitter account on March 8, 2022, telling the public that she was linking to an "Important, in-depth piece from @propublica re: coordinated cross-country attempt to impugn the integrity of our voter rolls. This org posted #NM voter data online, violating the Election Code." JE E at 2. The Secretary's contemporaneous tweets implied that her office viewed VRF as a "malicious actor" that was not

using the data "for election campaign or govt/academic purposes." JE E at 1. The Secretary's other official communications are replete with warnings about "misinformation" that questions the "integrity of our elections" and "leads people to question the outcomes of our elections." JE F at 1.

74.     The Secretary's communications director, Alex Curtas, was even more explicit in his comments at the time of the criminal referral. VRF's statements were "perpetuating misinformation" and were "attempts by political operatives to cast doubt on the 2020 elections [that] are an affront to our democracy and to the professionals who run our elections throughout the country." FOF ¶52 (Ex. P7 at 6). Foreshadowing what the Secretary would say months later, in March 2022, Curtas said that VRF's "accusations" were meant to "impugn the integrity of our voter rolls." *Id*.   Finally, when even the ProPublica reporter questioned Curtas about whether VRF's use was not, after all, for election purposes, Curtas responded with the key sentence from Pino's referral letter: "This is the crux: 'We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign purposes.'" FOF ¶81 (Ex. P7 at 2-3.).

75.     The speech to which Curtas, Pino, and the Secretary were all referring was VRF's statement of December 16, 2021, where it noted that there were various problems in the Secretary's voter file. VRF "found discrepancies between the number of voters listed as having voted in the 2020 general election (according to the voter list) and the number of ballots reported being cast according to states' official canvass and turnout reports." FOF ¶25 (citing Ex. P1 at1). It continued, "These discrepancies don't necessar[ily] indicate fraud, but the differences between the voter list and the election canvass indicates, at the very least, issues with record keeping and points to the

need to be more transparent and proactive about maintaining the voter rolls and reconciling ballots cast and voters having voted in every election." *Id*.

76.     The Secretary's reasons for referring VRF based on the content of its speech is an echo of the Secretary's previous explanations for her refusal to produce voter data requested by President Donald Trump's Presidential Advisory Commission on Election Integrity, chaired by former Vice President Pence, which asked for similar data. See Ex. C and D to VC. Although the Secretary's witnesses now claim that that the Presidential Commission's request is not a fair comparison because the requester had not yet submitted an affidavit, the Secretary's response at the time cited not the absence of an affidavit, but rather her own mistrust, as a reason to deny the request: "I will not release any other voter information… until I am convinced the information will not be used for nefarious or unlawful purposes…" *Id*. In response to a later request, instead of citing the lack of an affidavit, the Secretary claimed the President's Commission had "still not demonstrated that the data will be used for a lawful purpose," or "explained how comparing insufficient data will produce any meaningful conclusions." *Id*. The Secretary's focus on alleged "nefarious purposes," and concern that requesters will publicize misinterpretations of the data, foreshadowed her later focus on disagreements with VRF's speech as a basis to make a criminal referral.

77.     Finally, it is significant that the Secretary's witnesses transparently attempted to minimize the animus that was apparent in the Office's early communications before VRF filed this action, and instead attempted to claim that the Secretary had always recognized a Data Sharing Ban.

78.     Although Deputy Secretary Pino's testimony appeared to shift after a break, in her early testimony, she admitted that perceived "misinformation" about a communication would

indeed be viewed by her office as a violation of NMSA § 1-4-5.5(C), as "misinformation" would not be viewed as an election or government-related use. FOF ¶67. She also admitted that others in her office believed that VRF had engaged in "misinformation" with the voter data. FOF ¶69. After the break, Pino attempted to claim that despite the clear language of her referral, "misinformation" was not a basis for the referral, and that instead, she had attempted to invoke the Data Sharing Ban later advanced in the litigation. FOF ¶67. Despite Alex Curtas's statement to a reporter that Pino's "misinformation" allegation was the "crux" of Defendants' referral, Pino later disagreed. FOF ¶81.

79.    Additionally, the Secretary's witnesses testified that the affidavit designed by the Secretary, which requesters had to sign before obtaining access to data, was required to be accurate under the law and was a key means for both educating requesters on the legal requirements for using data, and for enforcing criminal penalties against any misuse of the data. FOF ¶7.

80.    Yet in between the Secretary's December 2021 referral and the March 2022 filing of this suit, on February 10, 2022, the Secretary's office changed a key acknowledgment in the affidavit: "I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law." FOF ¶10; see also JE A (affidavit signed by Local Labs, VRF's data vendor).   The new acknowledgment has the requestor swear, in relevant part, that "the requestor will not… sell, loan, provide access to, or otherwise surrender voter information received as a result of this request." FOF ¶13 (citing JE I). The older statement signed by VRF's vendor allows sharing so long as it is for three permissible purposes; the newer statement flatly prohibits all sharing.

81.    Implausibly, the Secretary's Election Director claimed that both were consistent with New Mexico law, and that the Secretary would still accept either statement. FOF ¶18. This

cannot be true, as one statement clearly allows what another prohibits, and the newly-prohibited conduct is precisely what VRF is accused of doing here: sharing voter data, albeit for permitted purposes. The more likely explanation is that Defendants have decided to defend the case by creating a new justification—the Data Sharing Ban—for criminally referring and investigating VRF, one that they believe is content and viewpoint-neutral. But that strategy necessitated changing the Secretary's form, which otherwise permitted sharing and flatly contradicted the Data Sharing Ban. Having made that change, and the change having been detected and then raised by Plaintiffs in this litigation, the Secretary's witnesses were left to square the circle by claiming that no substantive change at all had been made, and that all the forms were consistent and equally valid.

83. Taken together, all of this—both the initial recorded motivations of the Secretary, and her witnesses' later efforts to recast the record—is substantial evidence that the content or viewpoint of VRF's speech motivated the Secretary's criminal referral.

83. The Attorney General's Office, in contrast, has claimed that regardless of the Secretary's motivation, it will only prosecute on the Data Sharing Ban theory. But for several reasons, this does not cleanse the threatened prosecution of the original content and viewpoint-based animus.

84. First, the Attorney General was well aware of the content and viewpoint-based motivation behind the Secretary's referral, as his office received Pino's letter condemning "misinformation." FOF ¶77. Second, with knowledge of the Secretary's animus, the Attorney General chose to open an investigation and to attempt to interest other agencies, including the Federal Bureau of Investigation. FOF ¶111. Third, the Attorney General advanced the Secretary's argument that a Data Sharing Ban had always existed and attempted to argue that the Data Sharing

Ban was commanded by New Mexico law, when a plain text reading of the statute shows it is not. Further, the Attorney General led the Secretary's witnesses through testimony to suggest that the forms had not been materially changed, and that they had always prohibited the sharing of data, when they transparently had not—including the form actually signed by VRF's vendor, Local Labs. The Attorney General and Secretary worked hand-in-glove in attempting to minimize the previously recorded statements by high-ranking employees of the Secretary's office, and instead crafting the Data Sharing Ban as a new theory of liability.

85.     This is not all, however. Two of Defendants' four "state interests" (Defs. Br. in Opp. to PI Motion (Doc. 13), at 11), which they jointly advance as reasons for prosecuting VRF under the Data Sharing Ban, are directly related to the suppression of certain types of content. For their second interest, both Defendants claim that their new practice ensures voters will know that disclosure will only occur on a "need-to-know" basis. This assumes, however, that VRF and its users do not "need to know," a judgment that can only be based on the identity of the speakers or the content of their speech. Put another way, Defendants believe that entire political party organizations, their numerous candidates, and their myriad workers and volunteers "need to know" and can all share the data amongst themselves. Defendants believe that private companies like Catalist, who aggregate and share data with numerous clients for a fee, "need to know" and can share the data. However, they believe that VRF and New Mexico residents like Ms. Steinberg who want to use it to ensure the integrity of data rolls, do not.

86.     If there is any doubt that this judgment is content-based, Defendants' fourth state interest veers into viewpoint-based discrimination. There, Defendants express fear that VRF's sharing of voter data in order to promote transparency and voting will instead cause "disinformation," leading voters to unjustly criticize the Secretary's voter registration system. This

fear is factually unfounded, as VRF discloses the ripeness of its data by listing the date on which the data was obtained from the state. FOF ¶34. A user of the Website is made aware of exactly how old or "stale" the data is. *Id*. Regardless, concern about what VRF will say to New Mexico citizens about the quality of their Secretary of State's voter data system is a content or viewpoint-based restriction. This is yet another echo of the Secretary's attacks on other requesters, substituting the statute's three permissible categories of content with her own standard of whether the requester seemed destined to engage in "nefarious" speech with the data. *See* VC, Exs. C-D.

87.     But perhaps most importantly, the Secretary continues to refuse to produce voter data to VRF—even where VRF promises not to release the data under any circumstances. FOF ¶128. The Attorney General has allowed the Secretary to claim she is doing this based on the Attorney General's advice, and that the Attorney General's advice is that it is concerned that based on VRF's past speech, VRF will release the data even if it promises in writing not to do so again. FOF ¶123. Accordingly, no less than the office of the Secretary when it initially referred VRF to the Attorney General, the Attorney General is taking adverse action against VRF based on the content and viewpoint of its speech. "Laws designed or intended to suppress or restrict the expression of specific speakers contradict basic First Amendment principles." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 812 (2000) (holding that Congress had singled out Playboy for restrictions based on its programming).

88.     Because Defendants' Data Sharing Ban is being applied against VRF based on the content or viewpoint of VRF's speech regarding New Mexico's maintenance and operation of its voter rolls, strict scrutiny applies. *Playboy*, 529 U.S. at 814 ("As we consider a content-based regulation, the answer should be clear: The standard is strict scrutiny."). This "'requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to

achieve that interest…'" *Reed,* 576 U.S. at 171 (citing *Bennett,* 564 U.S. at 735 ). When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals. *Playboy,* 529 U.S. at 816. Thus:

> It is rare that a regulation restricting speech because of its content will ever be permissible. Indeed, were we to give the Government the benefit of the doubt when it attempted to restrict speech, we would risk leaving regulations in place that sought to shape our unique personalities or to silence dissenting ideas. When First Amendment compliance is the point to be proved, the risk of nonpersuasion— operative in all trials—must rest with the Government, not with the citizen.

*Id.* at 818.

89.     Here, the Defendants assert four state interests to justify the "prohibition on all disclosure" of voter data: (1) limiting access to those who are explicitly aware of the permissible uses of New Mexico voter data via the requisite affidavit; (2) ensuring payment of reasonable fees for production; (3) encouraging voter registration by ensuring that voter data is disclosed only on a need to know basis under penalty of perjury; and (4) avoiding "disinformation" that might arise from the review of stale data. Defs. Br. in Opp. to PI Motion (Doc. 13), at 11. For the reasons discussed below, some of these interests are important, but others are impermissible, and a blanket ban on sharing is not close to the narrow tailoring required to advance the state's interests.

90.     The first state interest is legitimate and important, but the State failed to present evidence that it is compelling. The State simply asks the Court to assume that its interest in enforcing the underlying use restrictions—the State's true interest—is best accomplished by making requesters sign an affidavit that supposedly accurately states the law, and then limiting prosecution to those who falsely sign an affidavit. The State could instead have directly prohibited all unlawful uses of the data, and then provided for direct prosecutions of those who unlawfully use the data, however it is received. The State provided no evidence on why the less direct route

of limiting prosecutions to false affidavits, and then forcing all users to sign an affidavit, and then backing up the entire system with a blanket ban on sharing of the data, is more effective in limiting unlawful use of the data.

91.     Indeed, there is good reason to believe that the "false affidavit" method of enforcement will prove unwieldy and of little use among the entities most likely to use the data: political parties. The State claims that a single party official can obtain data with a single affidavit, and it can then be shared across a variety of individual candidate campaigns, party and candidate workers, and even volunteers—potentially dozens of separate legal entities and hundreds or thousands of individuals. FOF ¶118. A single affidavit signed by a solitary party employee will supposedly be used to keep tabs on all of these entities and individuals. But the Court fails to see how a candidate campaign worker's misuse of data that he or she has received only after the data has already changed hands several times can reasonably be uncovered, deterred, or prosecuted under a theory that the solitary party employee had signed a false affidavit.

92.     If prosecutions for false affidavits pack little punch, the State may suggest that the affidavits are more important as educational tools. But to the extent the State needs affidavits to educate requesters, the State never showed that a system of public education—or, better, a system in which all sharers of the data are forced to disclose the relevant restrictions before making it available, as VRF already does—will be less effective in conveying New Mexico law to users.

93.     To the extent the State needs affidavits to keep records of those who request and use the data so that it has a ready source of leads in the event of a future unlawful use from an unknown source—an interest the State never even raised at the hearing—the State could accomplish the same goal by requiring sharers of the data to obtain the identities of all those with whom they give access to the data. Perhaps this could be accomplished as part of the process of

informing users of the applicable statutory use restrictions. But the burden was the State's, and it never showed how this would be less effective in accomplishing its goal than the affidavit system. Indeed, the State never established evidence of any person making an actual unlawful use of the data, or of the State having difficulty in determining that person's identity without the use of affidavits. Nor did the State provide evidence of how effective the affidavit system is in practice when, as noted above, a single affidavit can support sharing within numerous entities and hundreds of individuals whose only tie is some degree of allegiance to a political party. In short, with respect to the first interest, the State failed to meet its burden of proof to provide any evidence that a complete ban on sharing voter data is the least restrictive way of meeting its goals.

94.     Second, the State urges that it must ban sharing in order to drive requesters directly to the State, who must then pay for the data, increasing State revenues. Mere revenue generation, however, is not a compelling interest that can only be achieved by a complete ban on the sharing of data. The State provided no evidence whatsoever with respect to this interest.

95.     Third, the State claims that it has an interest in assuring voters that their data is only disclosed on a "need to know" basis. The State never explains who, in its view, "needs to know" the data, but it is clear that the State would allow any person to buy and view all of the data for any governmental or election campaign purpose, and that this would include VRF's purposes. FOF ¶102. To the extent the State hopes to falsely assuage voters that their data cannot be seen by individuals outside of political campaigns or governmental entities, the interest is illegitimate because that is simply not the law; a vast range of individuals can actually see the data so long as they have a governmental, election, or election campaign purpose. No purpose is served by misleading voters about the sheer number of individuals or entities who currently buy their data from the State.

96.     Additionally, the State provides no evidence whatsoever to show that the posting of voter data online that is already publicly available, when it is posted with the additional statutory disclosures that VRF makes, has actually placed any voter in fear that those who "do not need to know" the information (whomever that is) are actually accessing their data. *See United States v. Alvarez*, 567 U.S. 709, 726 (2012) (In invalidating "stolen valor" law that criminalized false claims of military honors, applying strict scrutiny and finding that "[t]he Government points to no evidence to support its claim that the public's general perception of military awards is diluted by false claims such as those made by Alvarez."). Nor does the State provide any evidence that such voters, fearful that those "not-need-to-know" individuals are viewing their voting data, are de-registering or failing to vote.

97.     Further, to the extent the State actually intends to use the Data Sharing Ban to artificially constrict the number of people who "need to know" the data, that interest, too, may fall short of "compelling" because it is directly intended to eliminate most of VRF's intended use: sharing with citizens who wish to check the integrity of the voter rolls (not just the accuracy of their own data), and who then wish to share what they have found with each other, with other VRF users, with VRF, or with the Secretary. The State introduced evidence from a few of the Secretary's witnesses that, as public officials, they did not want their own residential addresses to be disclosed to individuals who are checking the voter rolls for accuracy. Yet the State introduced no evidence at all that there is or has been any problem with individuals falsely claiming the need to access voter data for election or governmental purposes, and then instead engaging in stalking, commercial solicitation, or other unlawful activities or unauthorized purposes that was only possible because they had accessed the data. Further, even if it had introduced such evidence, the State introduced no evidence that the problem is so serious that a total ban on data sharing is the

least restrictive means of vitiating the interest. Finally, the State never explained why it could not expand existing programs to allow state officials or others who face a demonstrably high risk of stalking or harassment from having their residential addresses excluded from voter rolls.

98.     Finally, the State claims an interest in ensuring that stale data is not viewable online, which it is concerned would create "misinformation" by raising fears that requesters' online information is current, when in fact it is not. But this interest in smothering unwanted speech is not a legitimate state interest and is itself content or viewpoint-based discrimination. Rather than completely banning data sharing, the State's interest in avoiding voter misapprehension about the effective date of the data could be accommodated by simply requiring that those who display the information make clear when and where they received it—something VRF already does. FOF ¶34. The State produced no evidence that such disclosures are ineffective. And to the extent the State is unhappy with speakers whom it believes have unfairly criticized its election administration, the better answer is its own counter-speech to explain why the criticism is unjustified. *See Alvarez*, 567 U.S. at 726-727 ("The Government has not shown, and cannot show, why counterspeech would not suffice to achieve its interest.").

99.     Normally, "[t]he remedy for speech that is false is speech that is true. This is the ordinary course in a free society. The response to the unreasoned is the rational; to the uninformed, the enlightened; to the straightout lie, the simple truth." *Id*. at 727.

100.     Indeed, the State may well exacerbate the ills of the "misinformation" of which it complains by attempting to punish and silence speech it does not like. Citizens will likely be more suspicious of the State's voter roll maintenance if they are prohibited from sharing public data with each other and are instead required to come to the Secretary alone, one at a time, only to view their own data under the threat that they must keep whatever they learned strictly siloed. As the Court

in *Alvarez* observed, "suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *Id*. at 728.

101.    *Alvarez* was a successful challenge to a law that punished a despicable lie that had little social value: that an individual had won a Congressional Medal of Honor. Interestingly, the Court proposed an alternative to punishing liars that would still "protect the integrity of the military awards system:" simply making the list of recipients publicly "accessible through the Internet." *Id*. at 729. Again, the most narrowly-tailored remedy for allegedly false speech about the voter rolls is to free the public to more easily discuss and share those parts of the database that are already publicly available.

102.    Regardless, the State has not met its difficult evidentiary burden of showing that its interest in a blanket ban on data sharing is compelling, and that there is no less restrictive alternative. The Data Sharing Ban fails strict scrutiny.

### (3) Plaintiffs' vagueness challenge.

103.    A violation of the Data Sharing Ban, is a class IV felony punishable by a fine of $100 for each line of voter data unlawfully used. NMS § 1-4-5.6(B). Vague criminal statutes governing speech—like statues which apparently comprise the Data Sharing Ban—raise concerns under both the First and Fifth Amendments. The First Amendment concern is focused on the risk that constitutionally protected activity is chilled due to the fear of violating a vague prohibition on such activity, and the Fifth Amendment is focused on fundamental due process concerns of fair notice and arbitrary enforcement.

104.    "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment. A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill* v. *Colorado*, 530 U. S. 703, 732 (2000)). The government violates the Fifth Amendment by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–358 (1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

105.    "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. at 285.

106.    The Data Sharing Ban is impermissibly vague as interpreted and enforced by the Secretary of State. The Ban seems to admit of no exceptions, but in fact, nuance, exceptions, and surprising details abound. Based on witness testimony, these nuances can be known only when senior officials in the Secretary's office—such as her Elections Director—consult with counsel.

107.    For example, the Director testified that sharing is allowed "within entities." FOF ¶118. But the definition of what counts as an "entity" is unknown and unknowable. A political party, a distinct legal entity, is considered to be combined with the candidate campaigns of any person who claims to be a member of the party, even though for other purposes the party and various candidate campaign entities are treated as distinct entities subject to separate rules. See, e.g., NMSA 1-19-26(G) (defining "candidate"); 1-19-26(R) (separately defining "political party"); see also NMSA 1-19-1 (prohibiting "political party" from making contributions in support of "candidate" during primary).  The party-entity also apparently includes all employees and even volunteers for the party and any of its campaigns. FOF ¶118.  Yet VRF and its data collection vendor, who have contracted precisely for the purpose of obtaining data, are apparently viewed as separate entities, each of whom must separately pay for the data. FOF ¶116.  This nuance appears nowhere in statute.

108.    The Director testified that in a variety of other applications, the Data Sharing Ban had some exceptions to enforcement. See FOF ¶117. But other times, the Director was less sure, and requested clarification from counsel. See FOF ¶118.  When asked whether the Ban applied to companies who buy the data and then package it for political clients, the Director could not say whether it applied and could not say what factors would be relevant to the analysis. FOF ¶115.

109.    In short, assuming the unwritten Data Sharing Ban does exist, Defendants have failed to provide sufficient guidelines for Plaintiffs and others to know what conduct is permissible and what is prohibited. As a result of the vagueness of the Data Sharing Ban, the Use Restrictions, and Defendants' interpretation of them, Plaintiffs and others will likely refrain from engaging in First Amendment protected activities. This chilling effect is both real and substantial, as VRF has been forced to stop disseminating voter information and seek judicial intervention out of fear of

prosecution. The indeterminacy of exactly what uses and sharing is permissible and what will expose a person to felony charges renders the statutory scheme void for vagueness.

110.    The Court has already concluded that the Data Sharing Ban is overbroad and can only be enforced to prohibit sharing for uses that are not governmental or election and election campaign related. It has also concluded that the Data Sharing Ban is unenforceable against VRF because it is a restriction arising from content and viewpoint-based discrimination. Independent of these conclusions, however, the unwritten Data Sharing Ban is also unenforceable against VRF on vagueness grounds because the existing statutory scheme, coupled with Defendants' scattering of statements inside and outside of litigation, have provided inadequate notice of what conduct is prohibited.

### (4) Plaintiffs' challenge to the Secretary of State's voter data request process as a de facto licensing system and prior restraint on speech.

111.    In addition to the constitutional infirmities in the Data Sharing Ban the Court has detailed above, the prohibition on distributing voter data, except as preapproved by the State, operates as a presumptively invalid prior restraint on speech. Prior restraints on speech are "the most serious and the least tolerable infringement on First Amendment rights." *Ne. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 (1931) ("chief purpose of the (First Amendment's) guaranty [is] to prevent previous restraints upon publication").

112.    A system of prior restraints "bear[s] a heavy presumption against its constitutional validity," and the state "carries a heavy burden of showing justification for the imposition of such a restraint." *Capital Cities Media, Inc. v. Toole,* 463 U.S. 1303, 1305 (1983) (citation omitted). To justify a prior restraint, the state must demonstrate that the restraint is justified without reference to the content of the speech and is narrowly tailored to serve a compelling governmental interest.

*See Ne. Press Ass'n,* 427 U.S. at 571; *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Ward,* 491 U.S. at 791.

113.    Here, the Data Sharing Ban is not an on-off switch that bans all sharing of data, but also requires the Secretary to make the data available when an entity meets all of the statutory requirements and promises not to share the data or use it for unlawful purposes. Instead, the Data Sharing Ban still allows the Secretary to reject otherwise lawful requests based on unknown, ad hoc factors. It therefore operates as a de facto licensing system. Individuals and groups who want access to New Mexico voter data must first submit an application form swearing that the information will be used only for purposes preapproved by the State. FOF ¶13. The requester must pay a fee and is subjected to potential criminal prosecution if it uses the information for a non-state approved purpose. The application form must be approved by a government official—either the Secretary of State or a clerk—before the information is made available.

114.    The Secretary's past statements, and the record in this case, show that in granting or denying a request, her office exercises discretion that is not otherwise explicit in the statutory scheme.   As noted above, the Secretary has claimed the authority to deny a request if she determines the information would be put to a "nefarious" purpose, if she was not satisfied with the "plan" that the requester had for the information, or if she believed the requester's data analysis would not "produce any meaningful results." VC, Exs. C & D.

115.    Additionally, the Secretary and Attorney General together decided not to fulfill any requests from VRF at all after the criminal referral was made—particularly where the Secretary knew the requests were for voter list maintenance information intended to help VRF understand how the voter list had changed since election day. FOF ¶95 (citing Ex. P4 at 1 ("Per Dylan's contact with the AG, we are not fulfilling records requests from VoteRef.")). Importantly, the

Defendants were motivated to cut off VRF's access to public records not by VRF's sharing of the data, but instead, by the fact that "[t]his request is clearly trying to create an aggregate picture of the voter rolls on election day 2020, which lends credence to the idea that VoteRef and Erin Clements/New Mexico Audit Force are working in concert." *Id.*

116.    The stated reason for denying access appears nowhere in New Mexico's statutes. Instead, it appears to be both a governmental and election and election campaign-related purpose.

117.    Further, the Secretary denied a May 2022 request for voter data, even though VRF had by then sought judicial assistance—not self-help—in coping with the Secretary's restrictions and had made clear that it would (i) not disclose some of the data under any means; and (ii) only disclose other data if it could do so pursuant to an order of this Court. FOF ¶122; Ex. P15. The Secretary's rejection failed to cite any statutory or otherwise lawful factor for the rejection, simply stating that the May request required creating a new record, even though the maintenance of such a record appears to be required by law. Ex. P15.

118.     In the case of VRF, then, the Secretary of State's office has decided to use the organization's identity and its expected speech as an additional factor in exercising discretion to reject VRF's otherwise lawful requests. This unauthorized exercise discretion is devoid of reasonable and concrete standards, and is unpredictable.

119.    In the case of a prior restraint, strict scrutiny applies. As discussed above in the Court's analysis of Plaintiffs' challenge to the Data Sharing Ban as having been motivated by a discriminatory animus against the content and viewpoint of Plaintiffs' speech, the Data Sharing Ban fails strict scrutiny. The State cannot demonstrate that the Data Sharing Ban—and in particular, that element of the Ban that allow the Secretary to exercise her own judgment as a system of prior restraint—is narrowly tailored to serve a compelling governmental interest. To the

extent that the State and its agents exercise their claimed discretion based on the identity of the requester, predictions about what kind of speech or analysis the data will be used for, and predictions about whether the requester will or will not adhere to promises made in the request and published to this Court, the State engages in viewpoint discrimination.

120.    For the foregoing reasons, the Defendants may not enforce the Data Sharing Ban against Plaintiffs so long as Plaintiffs promise to use and share, and do continue to use and share, the data for governmental or election and election campaign purposes, as they have in the past.

### (c) The Remaining Factors Favor Injunctive Relief.

#### 1. The Plaintiffs have and will continue to experience irreparable harm from the violation of their constitutional rights.

121.    "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'" *Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp.*, 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001)(citing *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001)). "Tenth Circuit decisions have linked the 'irreparable injury' inquiry to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." *Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1266 (10th Cir. 2005).

122.    The Court's analysis above demonstrates that Plaintiffs' likelihood of success on the merits is high. VRF has a right to disseminate information relevant to the operation of the government, including its elections. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper*, 532 U.S. 514, 527, (2001) ("[I]f the acts of 'disclosing' and 'publishing'

information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."). This right is especially strong because VRF's speech is critical of the government, for such criticism must be protected from government infringement. *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838 (1978) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."); *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment."). Similarly, Plaintiff Steinberg has a right to receive information relevant to the government and the state's elections. *Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143 (1943) (The First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it.").

123.    The Defendants' restrictions are direct regulations on Plaintiffs' speech. The overbreadth and other legal infirmities inherent in those restrictions prevent or punish Plaintiffs' protected speech. The deprivation of Plaintiffs' First Amendment rights is itself irreparable harm. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.")).

124.    Because Plaintiffs are denied their First Amendment rights to share and receive information critical to understanding the functioning of the government and the state's elections because of the Defendant's actions, Plaintiffs have experienced and continue to experience irreparable harm.

125.    This is especially true given the indicia that this harm is being suffered by Plaintiffs both due to the content of their speech and the viewpoint they espouse. See *Griffin*, 30 F. Supp. 3d at 1188. (Browning, J.)("The available precedent on viewpoint-based speech restrictions is so hostile that the Court cannot determine if such laws are ever allowed.").

## 2.    The balance of equities and public interest favor injunctive relief.

126.    In analyzing whether a movant satisfies this factor, he or she must show that the "threatened injury outweighs any injury to [non-movants] caused by granting the injunction." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). As in the irreparable harm analysis, district courts in the Tenth Circuit must consider the likelihood of success when analyzing potential harm. *See Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1265 (10th Cir. 2016) ("The threshold, and ultimately critical, flaw in the district court's [balance of equities] analysis is that it failed to take into account [the plaintiff's] likelihood of success on the merits of its unconstitutional conditions claim and the resulting likelihood of irreparable harm to [the plaintiff].").The interests of both the Defendants—as non-moving parties—and the public are weighed here.

127.    Having already concluded that the Plaintiffs' will continue to suffer irreparable harm absent injunctive relief, the Court finds that the balance of equities also tips in favor of granting a preliminary injunction.

128.    Defendants' attempted enforcement of the asserted restrictions reflects a particularly weak interest given that several of their interpretations and applications lack support in New Mexico's statutes. While the State certainly has an interest in enforcing its valid laws, its interest in enforcing a misreading of its own laws which gives rise to a federal constitutional injury is highly attenuated, if it is a legitimate interest at all. This is especially so given that Plaintiffs'

actual and intended use of the voter information meets the definition of "governmental use" under NMSA 1-4-5.5 and, though undefined, is almost certainly "election related" as well. The harm imposed on Defendants in enjoining them from enforcing policies and restrictions which are not grounded in New Mexico law is nonexistent.

129.    The last issue to consider is whether the preliminary injunction is in the public's interest.  This factor "is another way of inquiring whether there are policy considerations that bear on whether the order should issue." 11A Fed. Prac. & Proc. Civ., § 2948.4 Grounds for Granting or Denying a Preliminary Injunction -- Public Interest, (3d ed.).

130.    The public interest weighs in favor of granting the requested injunctive relief.

131.    The public interest also favors the vindication of constitutional rights. Where a movant has demonstrated that the non-movant has violated the plaintiff's constitutional rights, *Verlo v. Martinez*, 820 F.3d 1113, 1127-28 (10th Cir. 2016), the public interest weighs in favor of granting an injunction. *Hobby Lobby Stores, Inc. v. Sebelius,* 723 F.3d 1114, 1147 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682, 134 S. Ct. 2751, 189 L. Ed. 2d 675 (2014); see also *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (stating that "'it is always in the public interest to prevent the violation of a party's constitutional rights.'"); *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005) ("Vindicating First Amendment freedoms is clearly in the public interest.").

132.    Additionally, both the New Mexico Election Code (NMSA § 1-4-5.5) and federal law (under the NVRA's public inspection requirement, 52 U.S.C. § 20507(i)(1)) contemplate that the public has a right to access information related to voter registration and elections. The New Mexico legislature has already weighed the public interest in access to this data, permitting access if it is for "governmental or election and election campaign purposes." NMSA 1-4-5.5.

133.    Defendants' primary argument is that the public's interest in the privacy of their voter information outweighs any countervailing right to share that same information. In crafting both the Election Code and the NVRA, the New Mexico legislature and Congress (respectively) were surely aware that the information being made available would include certain personal information, including name, information regarding age and addresses, and voting histories. Yet they made a policy determination that the information should be made available because access to that information is vital to the oversight and functioning of our democratic processes.

134.    Indeed, a policy debate lies just beneath the surface of this case. The Secretary's position is that the best way to encourage public confidence and participation in the electoral process is to limit public access to the details of how election officials do their work. The Secretary reasons that the public is likely to misunderstand complicated details of voter list maintenance, and that additional disclosure will only be twisted into "misinformation" that will lead to unfair criticism of her and her work. But VRF, in the spirit of the National Voter Registration Act and New Mexico's existing law, draws the opposite conclusion: voters are more likely to have confidence in, and participate in, the electoral process if there is more, not less, disclosure of the voter rolls and the way in which the Secretary maintains them. While voter addresses are disclosed, the most sensitive voter information remains confidential. The benefit is that everyone can see for themselves exactly what the state's records show about who voted and when—transparency that will either confirm the process is working as it should, or uncover problems or inefficiencies that can be corrected now, before the next election.

135.    In short, because the federal and state laws governing access to this information already take this policy debate and the related transparency and privacy considerations into

83

account, neither the Defendants nor the Court are in a position to override the legislatures' discretion.

136.    The Court finds that the balance of equities and the public interest here favor injunctive relief to prevent further violations of Plaintiffs' First Amendment rights to disseminate and receive information critical to understanding the functioning of the government.

## [PROPOSED] ORDER AND INJUNCTION

After due consideration of the evidence presented to this Court, the argument of counsel, and applicable law, it is **ORDERED** that:

(i)    Plaintiffs' Motion for Preliminary Injunction is granted, consistent with this opinion;

(ii)    Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with Defendants who receive actual notice of this order shall not take any steps to investigate, threaten, cite, charge, prosecute, or punish VRF, Steinberg, or their agents, employees, officers, or those in privity with them, under N.M. Stat 1-4-5.5, 1-4-5.6, or 1-5-22 for:

   i.  Use or sharing of New Mexico voter data, including sharing via the Internet, so long as the purpose of the use or sharing is for a "governmental or election and election campaign purpose," which shall include, but not be limited to, engaging in or fostering communication or analysis regarding officials' conduct of New Mexico elections or regarding New Mexico's maintenance of its voter lists and election systems.

Respectfully submitted this 29th day of June, 2022.

**GRAVES GARRETT, LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

**HARRISON, HART & DAVIS, LLC**
*/s/ Carter B. Harrison IV*
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Edward D. Greim, certify that on June 29, 2022, a copy of Plaintiffs' Proposed Findings of Fact and Conclusions of Law was filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following via e-mail:

Olga M. Serafimova
Senior Civil Counsel
P.O. Drawer 1508
Santa Fe, NM 87501-1508
(505) 490-4060
(505) 490-4046
oserafimova@nmag.gov

*/s/ Edward D. Greim*
Edward D. Greim
Counsel for Plaintiffs