**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **VOTER REFERENCE FOUNDATION,** | ) | |
| **LLC** and **HOLLY STEINBERG** | ) | **CASE NO: 1:22-cv-00222-JB-KK** |
| | ) | |
| Plaintiffs, | ) | |
| **v.** | ) | |
| | ) | |
| **HECTOR BALDERAS**, in his official | ) | |
| capacity as New Mexico Attorney General, and | ) | |
| **MAGGIE TOULOUSE OLIVER,** in her | ) | |
| Official capacity as New Mexico | ) | |
| Secretary of State, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW**

COME NOW Defendants Secretary of State Maggie Toulouse Oliver and Attorney General

Hector Balderas, by and through counsel, and hereby submit the following proposed findings of

fact and conclusions of law regarding Plaintiffs' *Motion for Preliminary Injunction*:

**FINDINGS OF FACT**

1.  On March 29, 2021, one David Michael Lippert, an apparent employee or agent of Local

Labs, LLC ("Local Labs"), submitted a Voter Information Authorization form to the New Mexico

Secretary of State's Office ("SOS") requesting the name, physical address, mailing address, year

of birth, party affiliation, precinct assignment, jurisdiction, registrant ID number, associated

districts, voting history, and method of voting for each registered voter in the State of New Mexico

("Voter Data"). (Doc. 44, Joint Exhibit A)

2.  Local Labs is a commercial entity that provides public records request services, among

others. (Doc. 13, Exhibit 3; 05/17/2022 Tr. ("Tr. Vol. 1"), at 66).

3.   Local Labs' March 29, 2021 request was submitted pursuant to a contract with VRF. (Tr. Vol. 1, at 74).

4.   Prior to contracting with Local Labs, VRF's legal team reviewed relevant New Mexico statutes. (Tr. Vol. 1, at 74-75)

5.   The Voter Data was compiled by SOS on April 13, 2021. (Doc. 44, Plaintiffs' Exhibit 2)

6.   On April 14, 2021, Local Labs paid SOS $5,378.12 for the Voter Data. (Doc. 44, Joint Exhibit B).

7.   VRF paid Local Labs $15,000 for its services, including the Voter Data. (Tr. Vol. 1, at 73-74)

8.   The Court finds that Local Labs requested the Voter Data for a commercial purpose.

9.   Gina Swoboda is VRF's Executive Director. (Tr. Vol. 1, at 52)

10. According to Ms. Swoboda, "the National Voter Registration Act public disclosure provision says the public has oversight of voter list maintenance." (Tr. Vol. 1, at 53)

11. VRF aims to publish the voter rolls of every state on its website VoteRef.com for free forever. (Tr. Vol. 1, at 53, 55) VRF's work in this regard is "unprecedented" and "the first of its kind." (Tr. Vol. 1, at 91) Ms. Swoboda's "hope here is that [registered voters] will take ownership of their voter registration record, the people in their family, and do their oversight that they are required to do under the National Voter Registration Act," (Tr. Vol. 1, at 56), will "review[ ] their voter registration records," (Tr. Vol. 1, at 70), and will "report [any] errors to the county clerk or to the election official," (Tr. Vol. 1, at 72).

12. Ms. Swoboda testified that she "want[s] to update [the voter data on VRF's website] every quarter going forward." (Tr. Vol. 1, at 55) She intends to do so by submitting "FOIAs." *Id.*

13. There is no evidence in the record that Ms. Swoboda or VRF submitted a "FOIA" or any other information request to SOS to update the Voter Data. SOS records for all voter data requests between January 2021 and April 29, 2022 do not reflect a request from VRF. (Doc. 44, Joint Exhibit K; Tr. Vol. 1, at 83).

14. There is evidence that VRF sent an email to sos.elections@state.nm.us on February 15, 2022, asking for "the total count . . . of any registered voters who cast a ballot in the November 3, 2020 [election] who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021." (Doc. 44, Plaintiffs' Exhibit 4, p. 2) The Court finds that the information so requested would not update the Voter Data.

15. The Court finds that VRF has never attempted to update the Voter Data.

16. As of the time of the hearing on Plaintiffs' motion, the Voter Data was over fourteen months old. (Tr. Vol. 2, at 107). As such, the Voter Data is no longer accurate. (Tr. Vol. 2, at 111)

17. There is no evidence that any of the voter data on VoteRef.com is up to date. For example, the voter data from Colorado is dated March 29, 2021. (Doc. 44, State's Exhibit 8).

18. Plaintiff Holly Steinberg is a volunteer with her local ward for the Republican Party. (Tr. Vol. 1, at 114)

19. Both Ms. Steinberg and her husband were able to check their own voter data on the SOS website, and neither of them found any errors. (Tr. Vol. 1, at 116, 123-24)

20. Ms. Steinberg has never requested any voter data from SOS or any county clerk, does not intend to request such data, and does not have the means to pay for it. (Tr. Vol. 1, at 119-120)

21. Ms. Steinberg does not have any New Mexico voter data in her possession. (Tr. Vol. 1, at 121-22) As such, she is incapable of selling, loaning, providing access to or otherwise surrendering New Mexico voter data. (Tr. Vol. 1, at 122-23)

22. Starting with the 2020 General Election, VRF also "want[s] to know the total ballots cast as reported by the election officials [of each state] compared to the total voters in the vote history file [it has for that state] with credit for having voted." (Tr. Vol. 1, at 55). This simple calculation is done by VRF staff. (Tr. Vol. 1, at 71) The public does not have access to this data. (Tr. Vol. 1, at 72) Ms. Swoboda's "personal hope on that is that there is a public policy discussion about the chief election official being required to reconcile those underlying data files[.]" (Tr. Vol. 1, at 56)

23. On December 14, 2021, at 6:03 a.m., Ms. Swoboda sent an email to sos.elections@state.nm.us, stating that her team compared the Voter Data to the "total ballots cast election-wide in New Mexico in the [November 3,] 2020 General Election according to the certified canvasses and official turnout reports[.]" (Doc. 44, Plaintiffs' Exhibit 2) Per the email, the total ballots cast were 928,172, whereas the total number of registered voters included in the Voter Data "with a credit for having voted in the 2020 General Election" was 924,328. *Id.* According to Ms. Swoboda, "this creates a discrepancy between registered voters with ballots cast [ ] and total ballots cast of 3,844. This number represents more ballots cast than registered voters who have credit for voting." *Id.*

24. At the hearing, Ms. Swoboda acknowledged that the difference between the two numbers could be due to voters having moved, died, or been convicted of a felony. (Tr. Vol. 1, at 103-106)

25. The press release she issued on December 16, 2021 regarding this claimed "discrepancy" did not include any of this information. (Doc. 44, Plaintiffs' Exhibit 1)

26. Even though Ms. Swoboda acknowledged that she does not know the cause of the "discrepancy," (Tr. Vol. 1, at 100) in the press release she asserted that the difference between the two numbers "indicates, at the very least, issues with record keeping[.]" (Doc. 44, Plaintiffs' Exhibit 1)

27. VoteRef.com likewise does not include any information regarding the fact that voter data is continuously updated by the various election officials. (Tr. Vol. 1, at 107; 06/15/2022 Tr. (Tr. Vol. 2"), at 114-115)

28. The Court finds that there is no evidence of any errors in the Voter Data.

29. Ms. Swoboda's December 14, 2021 email further stated, "It is our understanding that the [Voter Data] you provided does not include any voter who is in the Safe At Home program. If that is inaccurate, please let us know." (Doc. 44, Plaintiffs' Exhibit 2)

30. At the hearing, Ms. Swoboda testified that she included this statement in order to give SOS an opportunity to ensure no protected voters were included in the Voter Data prior to uploading it to the VRF website, (Tr. Vol. 1, at 57-58, 62), and also so that she (Swoboda) "may redact them," (Tr. Vol. 1, at 58). According to Swoboda, the Safe At Home program is "very important," as it protects law enforcement officials and victims of domestic violence or stalking, whose addresses must not be shown. (Tr. Vol. 1, at 57)

31. Yet, by 2:56 p.m. the same day, December 14, 2021, the SOS Communications Director Mr. Alex Curtas received an email from one Megan O'Matz stating, "I'm a reporter with ProPublica and am looking into an organization called VoteRef.com that is posting tens of thousands of voter histories online nationwide, including New Mexico." (Doc. 44, Plaintiffs' Exhibit 7, p. 7)

32. Given Ms. O'Matz's unsolicited December 14, 2021 statements, the Court rejects Ms. Swoboda's testimony that she posted the Voter Data on December 16, 2021. (Tr. Vol. 1, at 66) The Court finds the Voter Data was made public sometime prior to Ms. O'Matz's 2:56 p.m. email on December 14, 2021.

33. In her email, Ms. O'Matz continued, "The group is alleging a 3,844 discrepancy between the number of ballots reported cast Nov. 3, 2020 in New Mexico vs the number of voters shown in the voter history. . . . The group says turnout for New Mexico Nov 3 was 928,172. But voter histories obtained by VoteRef on April 15, 2021 show 924,328 participating in that election. That is a difference of 3,844." (Doc. 44, Plaintiffs' Exhibit 7, p. 8)

34.  The Court finds that Ms. Swoboda gave SOS less than 9 hours—roughly between 6 a.m. and 3 p.m. on December 14, 2021—to respond to the email sent to sos.elections@state.nm.us prior to making both the Voter Data and VRF's claimed "discrepancy" public.

35. On December 16, 2021, at 10:55 a.m., Mr. Curtas incorrectly represented to Ms. O'Matz that SOS "has not been contacted by this group to discuss their findings[.]" (Doc. 44, Plaintiffs' Exhibit 7, p. 6). Ms. Swoboda's December 14, 2021 email was not sent to Mr. Curtas' email address. (Doc. 44, Plaintiffs' Exhibit 1). While Mr. Curtas was incorrect given that email, there is no evidence that Mr. Curtas knew his statement to the reporter was false when he made it. (Tr. Vol. 2, at 147, 174-75)

36. Ms. Mandy Vigil is the SOS Elections Director. (Tr. Vol. 1, at 125)

37. Ms. Vigil became aware of VRF's claimed "discrepancy" from Ms. O'Matz' email to Mr. Curtas. (Tr. Vol. 2, at 102). She asked staff to review the data and it was confirmed that the difference between the two numbers compared by VRF was due to routine voter list maintenance activities. (Tr. Vol. 2, at 103)

38. These routine maintenance activities include the continuous addition of new paper and electronic registrations from voters and automatic registrations and information updates from the New Mexico Motor Vehicle Department, as well as the deletion of registered voters pursuant to death notices from the New Mexico Department of Health and county clerks' review of obituaries, conviction notices from the New Mexico Department of Corrections, updates required under the National Voter Registration Act, and information received from other states about voters having moved. (Tr. Vol. 2, at 108-110)

39. As the Elections Director, Ms. Vigil oversees all administrative processes that are provided under the New Mexico Election Code, including the process for requesting and obtaining New Mexico voter data. ( Tr. Vol. 1, at 126-27)

40. The SOS website provides a high-level summary of that process. (Tr. Vol. 1, 128; Tr. Vol. 2, at 7, 9)

41. In order to obtain voter data in New Mexico, a requester has to submit a properly completed Voter Information Authorization form, which includes an affidavit required under the New Mexico Election Code. (Tr. Vol. 1, at 128, 129)

42. Since 2011, when Ms. Vigil joined SOS, the Voter Information Authorization form has been updated three times. (Doc. 44, Joint Exhibits A, H, I, J) During the first update in January 2021, "research" and "other" were removed as potential purposes for a voter data request. (Tr. Vol. 1, at 134, 138; Doc. 44, Joint Exhibits A, H) During the February 2022 updates, research was also removed from the Authorization section of the form, which is the statutory affidavit, and several line items were added for each requestor to initial. (Tr. Vol. 1, at 134, 139-140; Tr. Vol. 2, at 80; Doc. 44, Joint Exhibits H, I, J)

43. None of the three updates was related in any way to VRF or this lawsuit. (Tr. Vol. 2, at 81, 86)

44. Rather, the updates were prompted by inquiries from an SOS records custodian and a county clerk, and the goal was to better align the form to the current version of Section 1-4-5.5 of the Election Code. (Tr. Vol. 1, at 132, 133, 136, 140, 141; Tr. Vol. 2, at 80, 82, 84, 85, 87-88)

45. The Court finds that there is no evidence that SOS recently changed its interpretation of Section 1-4-5.5.

46. Since at least 2011, SOS's interpretation of Section 1-4-5.6 of the Election Code as prohibiting the willful selling, loaning, providing access to or otherwise surrendering of New Mexico voter data by any person or entity has remained consistent. (Tr. Vol. 2, at 77, 154, 165-66)

47. This consistent interpretation of Section 1-4-5.6 is reflected in every version of the Voter Information Authorization form that has been in use since 2011, all of which contain an identical first sentence under the Authorization section. (Tr. Vol. 2, at 78)

48. That sentence reads:

Unlawful use of the information requested on this form shall consist of the willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).

(Doc. 44, Joint Exhibits A, H, I, J)

49. That sentence is a combination of Sections 1-4-5.6 and 1-5-22 of the Election Code. (Tr. Vol. 2, at 89, 187)

50. The Voter Information Authorization form is not intended for or used by data processors or other SOS employees. (Tr. Vol. 2, at 79) It is intended for members of the public who seek to

obtain voter data. (Tr. Vol. 2, at 79) In her 11 years with SOS, Ms. Vigil has never seen a data processor sign one of these forms. (Tr. Vol. 2, at 79)

51. The Court finds that there is no evidence that SOS recently changed its interpretation of Section 1-4-5.6.

52. SOS interprets Section 1-4-5.5 as allowing voter data obtained in compliance therewith to be shared within an organization such as a company or a political party, or a party and a candidate from the same party. (Tr. Vol. 2, at 9, 29, 90, 91, 189-190). Any such internal sharing has to be for either governmental or election campaign purposes. (Tr. Vol. 2, at 176-177) This interpretation is reflected in each version of the Voter Information Authorization form, all of which include the option for the requester to be an organization. (Doc. 44, Joint Exhibits A, H, I, J)

53. Individuals not members of the same entity as well as different entities must each submit a separate Voter Information Authorization form and must comply with the regulatory process. (Tr. Vol. 2, at 31, 32) This is true regardless of the identity or viewpoint of the requester. (Tr. Vol. 2, at 75)

54. Ms. Vigil testified that her understanding of Section 1-4-5.6 is that it prohibits the selling, loaning, providing access to or otherwise surrendering voter data; it does not prohibit discussing the data. (Tr. Vol. 2, at 21, 76)

55. SOS is not a law enforcement agency and does not have any investigators on staff. (Tr. Vol. 1, 129-130; Tr. Vol. 2, at 19) Under New Mexico law, SOS is to refer potential violations of the Election Code to the Attorney General's Office ("AGO") for investigation and potential prosecution. (Tr. Vol. 2, at 127)

56. As of the hearing in this matter, SOS had never denied a properly filled out Voter Information Authorization form, including the one submitted by Local Labs, and SOS does not investigate requesters. (Tr. Vol. 1, at 128-129; Tr. Vol. 2, at 92, 150) SOS accepts older versions of the form (Tr. Vol. 2, at 4, 92)

57. In the *Complaint* and *Motion for Preliminary Injunction*, Plaintiffs rely on two SOS press releases from 2017 as purported examples of SOS denying voter data requests. (Doc. 1, Exhibits C, D; Doc. 4, at 11-12) Neither press release was in response to a statutorily compliant request for voter data. (Tr. Vol. 2, at 97-100; Doc. 44, State's Exhibits 6, 7) The Court finds these press releases are not relevant to this matter.

58. On June 16, 2022, SOS informed VRF that it will not respond to VRF's first and only Voter Information Authorization form, which was submitted on May 27, 2022, until a final decision issues in this matter. (Doc. 44, Plaintiffs' Exhibit 15)

59. Since 2011, SOS has made two referrals to AGO involving voter data—the first concerned Local Labs and VRF, and the second concerned an entity called New Mexico Audit Force. (Tr. Vol. 2, at 173)

60. Both referrals were approved and signed by Ms. Sharon Pino, who is the Deputy Secretary of State for New Mexico. (Tr. Vol. 2, at 123, 124)

61. None of the three targets was contacted prior to SOS making its referrals in order to not hinder AGO's investigations. (Tr. Vol. 2, at 173)

62. The first referral was made on December 20, 2021, and concerned both Local Labs and VRF. (Tr. Vol. 1, at 150; Tr. Vol. 2, at 167-170; Doc. 44, Joint Exhibit C-1) Local Labs was referred because, as the voter data requestor, it potentially committed false swearing in violation of Sections 1-4-5.5 and 1-20-10. (Tr. Vol 2, at 150, 151, 168; Doc. 44, State's Exhibit 4) In

addition, Local Labs potentially violated Section 1-4-5.6 by selling or otherwise surrendering the Voter Data to VRF. (Tr. Vol 2, at 168-169)

63. With respect to VRF specifically, the issue was the distribution of the Voter Data on VoteRef.com, the fact that the Voter Data had been made public. (Tr. Vol. 1, at 142, 146; Tr. Vol. 2, at 27, 28, 127, 157, 169) SOS's concern was voter privacy, (Tr. Vol. 1, at 146), as well as the fact that the data could be misread and also manipulated, (Tr. Vol 2, at 128, 135, 144).

64. The VRF referral was not related to the alleged "discrepancy." (Tr. Vol. 1, at 146-147) According to Ms. Vigil, VRF's conduct of analyzing the data was not unlawful. (Tr. Vol. 1, at 146, Tr. Vol. 2, at 28)

65. The only potential violation by VRF was the fact that it provided access to or otherwise surrendered the Voter Data by uploading it to its website. (Tr. Vol. 1, at 148; Tr. Vol. 2, at 131, 134, 150-51)

66. The crux of the first referral is in the Conclusion: "We believe that both VoteRef.com and Local Labs have violated the prohibition against providing voter data by posting New Mexicans' private voting information online, or in Local Labs' case, providing voter data to VoteRef.com." (Tr. Vol.2, at 169-70; Doc. 44, Joint Exhibit C-1, p. 2)

67. This referral was based on the facts as SOS understood them at the time with limited yet reasonable research, and was nonfrivolous and supported by probable cause. (Tr. Vol. 2, at 171)

68. VRF took the Voter Data down from its website after it learned of the referral from a ProPublica article that was published on March 7, 2022. (Tr. Vol. 1, at 69; Doc. 44, Joint Exhibit D)

69. The second referral by SOS to AGO concerned the entity New Mexico Audit Force and was based on the fact that the entity had voter data in its possession, had not itself requested this

data from SOS, and was using the voter data to intimidate voters. (Tr. Vol. 2, at 15-16). The referral was made after Ms. Vigil and others at SOS saw a video posted on social media by a voter of that voter's interaction with someone acting on behalf of New Mexico Audit Force and behaving aggressively. (Tr. Vol. 16-18 , 26)

70. Ms. Vigil and Ms. Pino both testified that SOS would refer any individual or entity believed to have unlawfully sold, lent, provided access to or otherwise surrendered New Mexico voter data to AGO for investigation and potential prosecution, regardless of the entity's or individual's identity, political affiliation, viewpoints, or purpose for having done so. (Tr. Vol 2, at 45, 170, 171, 176, 180)

71. In their pleadings, Plaintiffs assert that "well-known firms like Catalist and i360" resell New Mexico voter data. (Doc. 19, at 12) Ms. Swoboda testified that Catalist acquires voter registration data, and that she "believ[es]" they sell it to clients. (Tr. Vol. 1, at 70)

72. Ms. Vigil was not aware of Catalist or i360 prior to this lawsuit, and she does not have any knowledge about either company outside of what she has learned in these proceedings. (Tr. Vol. 2, at 35, 42-45; Doc. 44, Plaintiffs' Exhibit 5, State's Exhibit 3)

73. Ms. Vigil did not look into Catalist between the two hearings in this matter because her focus was on the primary election, which occurred during that time. (Tr. Vol. 2, at 72) She testified that SOS's interpretation of the Election Code would not change even if Catalist is in violation, (Tr. Vol. 2, 44-45), and that she would share what she has learned during these proceedings regarding Catalist with the SOS leadership team (Tr. Vol. 2, at 46) There is no evidence that Ms. Vigil intentionally avoided researching either company.

74. Ms. Pino likewise had not heard of either Catalist of i360 prior to this lawsuit, and has no knowledge of what either company's product might be. (Tr. Vol. 2, at 179-180) Ms. Pino testified

that, if she became aware that either company is violating the Election Code, she would refer them to AGO for investigation and potential prosecution. (Tr. Vol. 3, at 180)

75. SOS has never received any complaints about either entity. (Tr. Vol. 1, at 96; Tr. Vol. 2, at 45)

76. During the previous year, both Catalist and i360 submitted two Voter Information Authorizations forms each. (Tr. Vol. 2, at 100-101; Doc. 44, State's Exhibit 3) Each form was filled out properly and signed and contained no information to suggest that voter data would be used unlawfully. (Tr. Vol. 2, at 101) Each request was processed same as any other. (Tr. Vol. 2, at 101)

77. Ms. Swoboda acknowledged that, unlike Catalist and i360, VRF never submitted a Voter Information Authorization form. (Tr. Vol. 1, at 93) She acknowledged that, if VRF's February 15, 2022 email did not meet New Mexico's legal requirements for a public records request or voter data request, then SOS "would not have been required to respond." (Tr. Vol. 1, 77:19-21).

78. When VRF did submit a valid IPRA request, SOS produced the requested documents. (Doc. 44, State's Exhibit 9, p. 1)

79. The Court finds that there is no evidence that SOS has treated either Catalist or i360 more favorably than any other requester or user of New Mexico voter data, including Local Labs and VRF.

80. The Court further finds that there is no evidence that VRF has been treated less favorably than any other user or requester of New Mexico voter data.

81. In order to register to vote, New Mexicans are required to provide SOS with their residential address. (Tr. Vol. 2, at 118, 181). They may not use a P.O. Box or a business address. (Tr. Vol. 2, at 118, 181)

82. Once a registered voter's residential address and other information is uploaded to VoteRef.com, the only option to be removed from VRF's website is if that voter can prove to VRF that they are entitled to protection under the Safe At Home program. (Tr. Vol. 1, at 58; Doc. 44, State's Exhibit 8)

83. If the *Motion* is granted, a voter whose information is included in the Voter Data in VRF's possession but wishes to not have their residential address available on VoteRef.com would need to move and not re-register to vote (to account for any potential future updates to the data). (Tr. Vol. 2, 183-184)

84. For such voters, granting the relief requested under the *Motion* would constitute irreparable harm. (Tr. Vol. 2, at 182)

85. Visitors on VoteRef.com are not asked to sign the Voter Information Authorization form or any other document. (Tr. Vol. 1, at 87)

## CONCLUSIONS OF LAW

### Preliminary Injunction Standard

1.   Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal. *Planned Parenthood of Kansas v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

2.   To succeed on a typical preliminary-injunction motion, the moving party needs to prove four things: (1) that she's substantially likely to succeed on the merits, (2) that she'll suffer irreparable injury if the court denies the injunction; (3) that her threatened injury (without the injunction) outweighs the opposing party's under the injunction, and (4) that the injunction isn't adverse to the public interest." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (internal quotation marks and citations omitted).

3.   "In the First Amendment context, the likelihood of success on the merits will often be the determinative factor[.]" *Verlo v. Martinez*, 820 F.3d 1113, 1126 (10th Cir. 2016).

4.   The Tenth Circuit disfavors some injunctive relief and requires "more of the parties who request them." *Mrs. Fields Franchising*, 941 F.3d at 1258-59. There are three disfavored injunctions: (i) mandatory (rather than prohibitory) injunctions; (ii) injunctions that change the status quo; and (iii) injunctions that grant all the relief that the moving party could expect to win at trial. *Id.*, at 1232.

5.   "Movants for these injunctions need not make their showing heavily and compellingly, but the district court should more closely scrutinize to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Legacy Church v. Kunkel*, 455 F.Supp.3d 1100, 1144 (D.N.M. 2020) (Browning. J.) (internal quotation marks, alterations, and citations omitted). "A district court can determine whether a requested injunction is disfavored by looking at the relief it seeks." *Id.*

6.   In the *Motion for Preliminary Injunction*, Plaintiffs ask this Court to "issue a preliminary injunction prohibiting Defendants . . . from taking any action to prohibit Plaintiffs from disseminating . . . voter data . . . or cite, prosecute, punish, or otherwise enforce the use restrictions in N.M. Stat. § 1-4-5.5 or any substantially similar restrictions against Plaintiffs, including prosecuting Plaintiffs under N.M. Stat. § 1-4-5.6[.]" (Doc. 3, pp. 2-3)

7.   In essence, the requested injunction would allow VRF to repost the voter data at issue to its website without the threat of criminal liability. (Doc. 18, at 5) As such, the requested injunction would alter the status quo.

8.   "The status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." *Legacy Church*, 455 F.Supp.3d at 1144

(internal quotation makes and citations omitted). "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001).

9.   Here, the last uncontested status between the parties was the eight months between April and December in 2021 in which VRF had the voter data at issue in its possession but had not yet made it publically available on its website. Therefore, granting an injunction other than to return to this "last peaceable uncontested status existing between the parties before the dispute developed," *Legacy Church*, 455 F.Supp.3d at 1144 (internal quotation marks and citations omitted), would alter the status quo.

10. Plaintiffs appear to argue that the status quo should be the period between December 2021, when VRF posted the voter data on its website, and March 2022, when it voluntarily took it down right before it filed its complaint and motion for preliminary injunction. (ECF Doc. #18, at 5) That period, however, is not "the last *uncontested* status between the parties," *Dominion Video Satellite, Inc.*, 269 F.3d at 1155 (emphasis added), because SOS submitted its criminal referral to AGO mere days after VRF posted the voter data online. Further, "[a]dopting [Plaintiffs'] position would imply that any party . . . could create a new status quo immediately preceding the litigation merely by changing its conduct toward the adverse party." *Id.*   The Tenth Circuit has "declin[ed] to extend the definition of the status quo to invariably include the last status immediately before the filing for injunctive relief." *Id.*

11. The requested injunction would also supply Plaintiffs with all the relief they could hope to win from a full trial. In *Legacy Church*, this Court held that a motion for preliminary injunction "seek[ing] and Order that prohibits the [New Mexico Secretary of Health] from [ ] enforcing mass

16

gathering restrictions [under a new COVID-19 Public Health Order] on places of worship, including [the plaintiff's] four New Mexico campuses[,]" sought a disfavored injunction subject to heightened scrutiny. 455 F.Supp.3d at 1145, 1146. Similarly here, Plaintiffs seek an order prohibiting Defendants from enforcing New Mexico state law restrictions on making New Mexico voted data publically available on any website. [[[ In the *Verified Complaint*, Plaintiffs ask this Court to "preliminarily and permanently enjoin Defendants, their agents, employees, and all persons acting in active concert or participation with them, from enforcing the Use Restrictions against Plaintiffs, their agents, and others similarly situated." (Doc. 1, p. 32).

12. "Accordingly, the Court will more closely scrutinize [Plaintiffs'] case to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *Id.* at 1146.

**<u>Standing</u>**

13. "Article III of the Constitution limits the jurisdiction of the federal courts to particular cases or controversies." *D.L.S. v. Utah*, 374 F.3d 971, 974 (10th Cir. 2004) (internal quotation marks and citation omitted).

14. "To satisfy the standing requirement, a plaintiff must show that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision." *Id.* (internal quotation marks and citation omitted).

15. "The mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Winsness v. Yocom*, 433 F.3d 727, 732 (2006).

16. "When a plaintiff challenges the validity of a criminal statute under which he has not been prosecuted, he must show a real and immediate threat of his future prosecution under that statute to satisfy the injury in fact requirement." *D.L.S. v. Utah*, 374 F.3d at 974.

**Overbreadth Standing**

17. "[T]he overbreadth doctrine relaxes the usual standing rules for challenges on First Amendment grounds." *Griffin v. Bryant*, 30 F.Supp.3d 1139, 1176 (D.N.M. 2017) (Browning, J.). Nevertheless, a plaintiff "must still establish Article III standing for his case to be justiciable in federal court." *Id.*

**Section 1-4-5.5**

18. From the beginning of this litigation, Plaintiffs have assumed that SOS's referral to AGO was premised on a potential violation of NMSA 1978, Section 1-4-5.5 (2015). (Doc. 1, at 2-3)

19. Under that Section, "[e]ach requester of voter data . . . shall sign an affidavit that the voter data . . . shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." §1-4-5.5(C).

20. Also under that Section, "voter data" is defined as "selected information derived from the voter file[,]" §1-4-5.5(E)(5); "election campaign purposes" is defined as "relating in any way to a campaign in an election conducted by a federal, state or local government[,]" §1-4-5.5(E)(1); and "governmental purposes" is defined as "noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government[,]" §1-4-5.5(E)(2).

21. Section 1-4-5.5 does not include a provision prescribing a penalty for its violation.

22. As such, Article 20 of the New Mexico Election Code, titled Offenses and Penalties, controls. *See* NMSA 1978, § 1-20-1 ("The penalties imposed by [Article 20] do not apply to offenses for which penalties are otherwise provided in the Election Code.").

23. Under NMSA 1978, Section 1-20-10(A), "[f]alse swearing consists of taking any oath required by the Election Code with the knowledge that the thing or matter sworn to is not a true and correct statement." False swearing is a fourth degree felony. *See* §1-20-10(B).

24. Thus, anyone who signs the affidavit required under Section 1-4-5.5(C) with the knowledge that voter data will not be used for governmental or election campaign purposes only, or with the knowledge that voter data will be made available or used for unlawful purposes, is guilty of false swearing under Section 1-20-10.

25. Neither Plaintiff ever signed the affidavit required under Section 1-4-5.5(C). As such, neither Plaintiff is under a credible threat of prosecution for having committed false swearing.

26. Importantly, Defendants have repeatedly asserted that neither Plaintiff is under investigation for a potential violation of Section 1-4-5.5(C). "[A] plaintiff cannot show a real threat of prosecution in the face of assurances of non-prosecution from the government[.]" *D.L.S.*, 374 F.3d at 975.

27. Therefore, Plaintiffs lack standing to challenge the constitutionality of Section 1-4-5.5(C). This includes challenges under the void-for-vagueness and prior restraint doctrines.

28. Plaintiffs also advance an overbreadth challenge to Section 1-4-5.5(C). (Doc. 1, at 29-30)

29. Given the broad definition of "governmental purposes" under Section 1-4-5.5(E)(1), the Court concludes that Plaintiffs' asserted desired uses of the voter data at issue meet this definition and, therefore, do not violate that Section.

30. Under the overbreadth doctrine, a litigant whose own activities violate a statute but are unprotected under the First Amendment "may nevertheless challenge [that] statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 634 (1980).

19

31. Here, however, the Court has found that Plaintiffs' own activities *do not* violate Section 1-4-5.5(C).

32. Because the Court concludes that Plaintiffs' asserted desired uses of the voter data at issue, including posting it on the VRF website, are not prohibited under Section 1-4-5.5(E)(1), Plaintiffs cannot demonstrate that they have suffered an injury in fact. For the same reason, declaring Section unconstitutional would not alter Plaintiffs' position and, thus, Plaintiffs cannot meet the requirement of redressability.

33. Therefore, the Court finds Plaintiffs cannot show a substantial likelihood of success on the merits with respect to their First Amendment challenges to Section 1-4-5.5.

**Section 1-4-5.6**

34. From the beginning of this litigation, Defendants have maintained that, to the extent VRF is subject to criminal liability for posting New Mexico voter data on its website, that liability stems from the provisions of NMSA 1978, Section 1-4-5.6 (2011) (and *not* Section 1-4-5.5). (Doc. 13 at 2)

35. Plaintiff VRF was referred by SOS to AGO for investigation and potential prosecution under Section 1-4-5.6. Therefore, VRF has standing to challenge the constitutionality of Section 1-4-5.6.

36. Plaintiff Steinberg has no voter data in her possession; as such, she cannot possibly violate Section 1-4-5.6, nor has she been referred to AGO for investigation. Therefore, Plaintiff Steinberg lacks standing to challenge the constitutionality of Section 1-4-5.6.

37. Under Section 1-4-5.6(B), "[a]ny person, organization or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth degree felony[.]"

20

38. Under Section 1-4-5.6(A), "[u]nlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act."

39. The Voter Records System Act is Article 5 of the New Mexico Election Code. *See* NMSA 1978, § 1-5-1 (2015) ("Chapter 1, Article 5 NMSA 1978 may be cited as the 'Voter Records System Act'.").

40. Therefore, to interpret the scope of Section 1-4-5.6(A), this Court must look to conduct *prohibited under Article 5.*

41. Under Section 1-5-22,

  A. Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering the voter file, duplicates of the file or part of the file by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System Act to have possession of the file.

B. For purposes of this section, a file maintenance list shall be considered a voter file or part of a voter file.

C. Any data processor, officer, deputy, assistant, agent or employee who commits unlawful disposition of a voter file is guilty of a fourth degree felony.

42. Under Section 1-5-23,

  A. Unlawful destruction or alteration of data recording media, voter files, file maintenance lists, voter registration system software and instructions or voter lists consists of the unauthorized destruction of, the unauthorized alteration of, the erasure of information from or the rendering unusable for their lawfully intended purpose of such media, files, software, instructions and lists or parts thereof by any person.

B. Any person who commits unlawful destruction or alteration of data recording media, voter files, file maintenance lists, voter registration system software and instructions or voter lists is guilty of a fourth degree felony.

43. By their explicit terms, Sections 1-5-22 and 1-5-23 do not apply to voter data, mailing labels, or special voter lists, and the class of defendants Section 1-5-22 applies to is limited to data processors, state or county officers, and their respective deputies, assistants, employees, or agents.

44. Since at least 2011, SOS has taken the position that the phrase "use of such information for purposes prohibited under the Voter Records System Act" in Section 1-4-5.6 must be interpreted as extending the *conduct prohibited* under Sections 1-5-22 and -23—namely, unlawful selling, loaning, providing access to, surrendering, destruction, or alteration of voter files, etc.—to "voter data, mailing labels and special voter lists" under Section 1-4-5.6(A), as well as to "any person, organization or agent, officer, representative or employee thereof" under Section 1-4-5.6(B).

45. Given Section 1-4-5.6(A)'s explicit reference to the Voter Records System Act, the Court agrees with Defendants' interpretation of that Section.

46. Plaintiffs have suggested that, because Sections 1-4-5.5 and 1-4-5.6 were previously codified under Article 5 until they were recompiled in 2011 under Article 4, Section 1-4-5.6 must be interpreted as criminalizing use of voter data that goes beyond the permitted "governmental purposes" and "election campaign purposes" under Sections 1-4-5.5(C) and (E). (Doc. 42, at 18) The Court disagrees. First, the Court may not ignore the plain language of Section 1-4-5.6(A). Second, the defined terms "governmental purposes" and "election campaign purposes" were added to Section 1-4-.5.5(E) in 2015, yet the explicit reference to the Voter Records System Act in 1-4-5.6 remains unchanged to this day. *See* §§ 1-4-5.5 (2011) and (2015), and 1-4-5.6.

47. Thus, in relevant part, Section 1-4-5.6 prohibits the willful selling, loaning, providing access to or otherwise surrendering New Mexico voter data. The first question for this Court is whether Section 1-4-5.6, so interpreted, violates the First Amendment on its face.

48. Section 1-4-5.6 is content-neutral. It proscribes only the "willful selling, loaning, providing access to or otherwise surrendering" information obtained from the voter files maintained by SOS as part of its voter registration system. *See* § 1-4-5.5(E)(5) (defining "voter data" as "selected information derived from the voter file"). "The origin of the information is thus crucial to the illegality of its publication—the statute is agnostic to the dissemination of the very same information acquired from a [different] source." *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 950 (7th Cir. 2015). "The Supreme Court has concluded that disclosures that are prohibited 'by virtue of the source, rather than the subject matter' are easily categorized as content neutral." *Id.* (quoting *Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001)). Thus, because Section 1-4-5.6 "permits publication of identical information [*i.e.*, name, address, party affiliation, etc.] so long as that information flows from a source other than [SOS voter files], it 'implicates the First Amendment rights of the restricted party [here, VRF] to a far lesser extent that would restraints on dissemination of information in a different context." *Id.* (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984)).

49. "The principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys." *Dahlstrom*, 777 F.3d at 951 (internal quotation marks, alterations, and citation omitted). Section 1-4-5.6 makes no distinction based on the contents of different voter files, the message communicated by any voter data, or the identity or viewpoints of the violator. Therefore, it is content-neutral.

50. As such, Section 1-4-5.6's prohibitions on selling, loaning, providing access to or otherwise surrendering voter data will be sustained if they "further[ ] an important or substantial governmental interest that is unrelated to the suppression of free expression and the incidental

restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 624 (1994)

51. Defendants have identified one overarching interest served by 1-4-5.6—to encourage voter participation by preserving the public's trust in the voter registration system. (Doc. 13, at 12) According to Defendants, Section 1-4-5.6 accomplishes these goals by protecting the privacy of registered voters' information, thereby protecting them from harassment and unwanted solicitations, and by preventing misinformation stemming from the dissemination of stale voter data or its manipulation or alteration. *Id.*

52. The New Mexico Legislature's goal of protecting voter privacy and preventing misinformation in order to foster trust in the voter registration system, thereby increasing voter registration, is also evident from the numerous additional security and privacy restrictions in the Election Code. (Doc. 13, at 2-5).

53. An additional interest is to ensure payment of reasonable fees for the production of voter data, which fees subsidize New Mexico's mandatory voter registration system. (Doc. 13, at 12)

54. These interests are both substantial and unrelated to the suppression of free expression. *See Dahlstrom*, 777 F.3d at 954 (recognizing that the government has a substantial interest in privacy protection); *Van Allen v. Cuomo*, 621 F.3d 244, 249 (2d Cir. 2010) (observing that "the state has a legitimate interest in encouraging new voter registration" and participation in the electoral process); *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 51 F.Supp.2d 107, 113 (D.R.I. 1999) (recognizing the state's legitimate and substantial interest in protecting privacy rights of citizens by establishing appropriate limitations on access to or use of personal information citizens are compelled to furnish to government agencies).

55. Section 1-4-5.6's ban on all "selling, loaning, providing access to, or otherwise surrendering" voter data substantially furthers these interests. Allowing any dissemination of New Mexico voter data outside the regulatory process, meaning other than in compliance with the requirements of Section 1-4-5.5 and any regulations promulgated thereunder, (i) would take New Mexico voter data outside the protections afforded by the mandatory affidavit under Section 1-4-5.5(C); (ii) would result in no fees being paid to the State; (iii) would expose registered voters to potential harassment, abuse, and unwanted solicitations; and (iv) would sooner or later result in stale information being publicly available. *See Fusaro v. Howard*, 19 F.4th 357, 370 (4th Cir. 2021) (recognizing that limiting access to a state's voter list furthers the state's interest "to promote voter registration while minimizing abuse of the [l]ist . . . . The State has determined that its citizens should not face an onslaught of communication or solicitation irrelevant to the electoral process as the price of participation in the electoral process.").

56. For the same reasons, the incidental restriction on VRF's desire to upload (unlawfully obtained, *see infra*,) New Mexico voter data on its website is no greater than is essential to the furtherance of these interests—again, *any* dissemination of New Mexico voter data outside the legislatively prescribed process would completely frustrate each of the State's important interests.

57. VRF is free to compile any of the information contained in the voter registration system voter files from other sources, including directly from New Mexico registered voters. For example, VRF could "crowd source" such information on its website by asking visitors to enter it voluntarily into a database, or it could solicit such voluntary disclosures by sending mailers directly to voters. While either of these examples are less convenient than obtaining the information from SOS, the First Amendment does not protect convenience; after all, the New Mexico Legislature "could decide not to give out [voter data] at all without violating the First Amendment." *L.A. Police Dep't*

*v. United Reporting Publ'g Corp.*, 528 U.S. 32, 40 (1999) (upholding a state statute that placed conditions on public access to arrestees' addresses); *see also Fusaro*, 19 F.4th at 369 (the fact that a voter list is a "uniquely cheap and powerful tool" is insufficient to carry a challenge to Maryland's statute limiting the use of the list).

58. It should be noted that VRF contracted to purchase the voter data from Local Labs with the admitted knowledge of relevant New Mexico laws, which include prohibitions on selling such data. (PPFF # 4) As such, VRF's contract with Local Labs strongly appears to be a violation of NMSA 1978, § 1-20-15, *Conspiracy to Violate Election Code.* Therefore, the line of cases addressing the publication of information obtained *lawfully* does not control. *See Dahlstrom*, 777 F.4th at 950-52. The same would be true if VRF obtains voter data directly from SOS in the future with the intent to upload it on its website, as it would be required to (falsely) attest that it would not "provide access to . . . voter information received as a result of [its] request." (Doc. 44, Joint Exhibit I); *See* § 1-20-10, *False Swearing*.

59. Plaintiffs appear to argue that Section 1-4-5.6's total ban on dissemination outside the regulatory process fails the third prong of the intermediate scrutiny test, namely that the ban be "no greater than is essential to the furtherance" of the identified State interests. (Doc. 42, at 13-14); *Turner Broadcasting System, Inc.*, 512 U.S. at 624. Again, under the Election Code, any person or organization may obtain voter data under Section 1-4-5.5 by agreeing to the terms of the requisite affidavit, and such data may be shared within an organization as long as this is done for governmental or election campaign purposes. (PPFF # 52) Section 1-4-5.6 is necessary, and thus essential, to protect the data where, as in this case, the acquisition of the data is unlawful or otherwise outside the scope of Section 1-4-5.5.

60. It should also be noted that New Mexico voter data is continuously updated, including with personal information residents provide to the New Mexico Motor Vehicle Department. (PPFF # 38) Such personal information, including name and address, is protected from disclosure under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2722(a) and 2725(3). The DPPA's prohibition on disclosures of personal information obtained from motor vehicle records survived a First Amendment challenge in *Dahlstrom*, 777 F.4th 937. It would be anomalous to now hold that the same information may be disseminated with impunity when obtained from SOS instead of MVD, and Plaintiffs do not assert that *Dahlstrom* was erroneously decided.

61. For all the foregoing reasons, the Court concludes that Section 1-4-5.6 satisfies the intermediate scrutiny standard of constitutional review and is not facially invalid.

62. VRF has also argued that Section 1-4-5.6 is "vastly overbroad." (Doc. 42, at 13). However, the overbreadth doctrine "does not apply once, as here, it is displaced by another constitutional test." *Griffin*, 30 F.Supp.3d at 1189 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973)).

63. VRF also appears to argue that Section 1-4-5.6 is unconstitutional as applied to it. By uploading on its website the Voter Data it purchased from Local Labs, VRF essentially "provided access to" that Voter Data to everyone with an internet connection and arguably "surrendered" it to visitors of the website. Therefore, VRF violated Section 1-4-5.6. Nevertheless, VRF appears to argue that it has been singled out for referral by SOS for criminal investigation based on its viewpoints. (Doc. 42, at 15-16). Specifically, VRF asserts that "a large swath of current uses are criminal but unpunished and uninvestigated, while [AGO] refers VRF to the FBI." (Doc. 42, at 15)

64. The evidence in the record does not establish that VRF has been treated differently than other suspected violators of Section 1-4-5.6. First, VRF admits that it is the only entity to have

ever tried to upload to a publicly available website the voter data of each and every registered voter in New Mexico (and elsewhere in the country). Both Elections Director Vigil and Deputy Secretary Pino testified that the reason VRF was referred for investigation was this "unprecedented" action. Second, when SOS became aware that another entity or individual was disseminating New Mexico voter data it had not obtained through the regulatory process, it referred that entity and individual to AGO as well. Third, there is no evidence that SOS has been made aware of any other individuals or entities potentially violating the Election Code, but chose not to refer them to AGO.

65. For the foregoing reasons, the Court concludes that Plaintiffs are unlikely to succeed on the merits of their First Amendment challenges to Section 1-4-5.6.

66. Plaintiffs likewise fail to establish that they will suffer irreparable harm without a preliminary injunction. VRF is free to share its "discrepancy" analysis without uploading the Voter Data to its website. Also, in New Mexico registered voters are able to check the accuracy of their own voter registrations on the SOS website without the Voter Data being uploaded on VoteRef.com. Therefore, VRF's asserted interest in encouraging voters to conduct the oversight VRF believes they are required to do under the National Voter Registration Act remains unaffected.

67. On the other hand, New Mexico voters will suffer irreparable harm if their residential addresses are uploaded on VoteRef.com as VRF does not offer an option to voters who are not protected under the Safe At Home program to be taken off the website.

68. For all the foregoing reasons, the Court denies Plaintiffs' *Motion for Preliminary Injunction.*

Respectfully Submitted,

HECTOR H. BALDERAS
New Mexico Attorney General

By: */s/ Olga Serafimova*

Olga Serafimova
Senior Civil Counsel
Post Office Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-40
oserafimova@nmag.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on June 29, 2022 I served a true and correct copy of the foregoing *Defendants' Proposed Findings of Fact and Conclusions of Law* on all counsel of record via the ECF system.

*/s/ Olga Serafimova*