# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

VOTER REFERENCE FOUNDATION, LLC,
and HOLLY STEINBERG,

       Plaintiffs,

vs.                                                                        No. CIV 22-0222 JB/KK

HECTOR BALDERAS, in his official capacity
as New Mexico Attorney General, and
MAGGIE TOULOUSE OLIVER, in her official
capacity as New Mexico Secretary of State,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiffs' Motion for Preliminary Injunction, filed March 28, 2022 (Doc. 3)("PI Motion"), and Plaintiff's Suggestions in Support of Motion for Preliminary Injunction, filed March 28, 2022 (Doc. 4)("PI Memo."). The Court held hearings on the PI Motion on May 17, 2022, <u>see</u> Clerk's Minutes at 1, filed May 17, 2022 (Doc. 38), and June 15, 2022, <u>see</u> Clerk's Minutes at 1, filed June 15, 2022 (Doc. 42). The primary issues are: (i) whether the Defendant Secretary of State Maggie Toulouse Oliver's interpretation of the New Mexico Election Code is correct; (ii) whether the Plaintiffs Voter Reference Foundation, LLC ("Voter Reference"), and Holly Steinberg have standing; and (iii) whether the Court should grant a preliminary injunction ("PI") enjoining the Defendant Attorney General Hector Balderas and the Secretary of State from prohibiting the Plaintiffs "from disseminating or using voter information available under New Mexico election law for purposes related to election integrity, election transparency, and increasing voter participation" or prosecuting, or punishing the Plaintiffs under N.M.S.A. §§ 1-4-5.5 or 1.4-5.6 "as a result of Plaintiffs' use of the voter information." PI Motion

at 2.  The Court concludes that: (i) it disagrees with the Secretary of State's interpretation of the New Mexico Election Code; (ii) Voter Reference has standing to pursue its claims but Steinberg does not have standing to pursue her claims; (iii) Voter Reference is entitled to a PI, because, although Voter Reference seeks a disfavored injunction, Voter Reference is likely to succeed on the merits of part of its viewpoint discrimination and prior restraint claims, and Voter Reference shows that it will suffer irreparable injury absent a PI; and (iv) the Court will not require Voter Reference to secure a bond.  Accordingly, the Court will grant in part the PI Motion.

## FINDINGS OF FACT

The Court takes its findings of fact from the Verified Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief, filed March 28, 2022 (Doc. 1)("Complaint"), the May 17, 2022 Hearing, the June 15, 2022 Hearing, the Plaintiffs' Proposed Findings of Fact and Conclusions of Law, filed June 29, 2022 (Doc. 47)("Pl. FOF"), and the Defendants' Proposed Findings of Fact and Conclusions of Law, filed June 29, 2022 (Doc. 48)("Def. FOF").  "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.)(quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools only).  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.");  Firebird Structures, LCC v. United Bhd. of Carpenters and Joiners of Am., Local Union No. 1505, 252 F. Supp. 3d 1132, 1140 (D.N.M. 2017)(Browning, J.).  The United States Court of

Appeals for the Tenth Circuit notes that "when a district court holds a hearing on a motion for preliminary injunction it is not conducting a trial on the merits." Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003). Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings." Heideman v. S. Salt Lake City, 348 F.3d at 1188. Thus, while the Court does the best it can to make findings from the record that it has and in the short time that it has to make findings, these findings of fact are only to determine whether to issue a PI. These facts do not bind the Court or the parties at trial. Accordingly, the Court finds as follows:

      1.     **The Parties.**

      1.     Voter Reference is an "Ohio nonprofit limited liability company and subsidiary of Restoration Action, Inc., a 501(c)(4) social welfare organization." Complaint ¶ 12, at 4.

      2.     Voter Reference "operates the website VoteRef.com." Complaint ¶ 12, at 4.

      3.     VoteRef.com states:

> VoteRef.com is dedicated to ensuring transparent, accurate and fair elections in the United States of America. The purpose of this website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states.
>
> Our system of government is based upon citizen participation. We believe the people, in effect, own this data and have a legal right to see it in an understandable and transparent form. Let freedom ring.

VoteRef.com, Welcome to VoteRef.com, https://voteref.com/ (last visited May 12, 2022). See Complaint ¶ 12, at 4.

      4.     The purpose of VoteRef.com "is to provide public access to official government data pertaining to elections, including voter registration rolls" and to "increase voter participation and make the state's election processes more transparent." Complaint ¶ 12, at 4.

5.      Voter Reference "encourages users" of VoteRef.com to report "data . . . that . . . is wrong or was entered incorrectly" "directly to the appropriate Secretary of State or clerk." Complaint ¶ 12, at 4.

6.      Voter Reference seeks to "post, distribute, and otherwise share voter data available under N.M. Stat. § 1-4-5.5 on [VoteRef.com] so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls."  Complaint ¶ 12, at 5.

7.      Voter Reference has "collected voter registration information for at least fourteen states (Alaska, Colorado, Connecticut, Georgia, Idaho, Michigan, Montana, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, Virginia, and Wisconsin)," and aims to collect data for all fifty states by the end of 2022.  Complaint ¶ 37, at 10.

8.      Gina Swoboda is the Executive Director of Voter Reference Foundation, see May Tr. at 52:18-19 (Swoboda), and her duties include "manag[ing] the operations staff and the data staff, and . . . talk[ing] about the data," May Tr. at 52:21-22 (Swoboda).

9.      Swoboda served "under two different administrations in the Arizona Secretary of State's Office," is "a certified deputy registrar with Maricopa County," and "was the state director of election day operations in the 2020 campaign for President Trump."  May Tr. at 52:25-53:5 (Swoboda).

10.     Swoboda joined Voter Reference on May 17, 2021, after receiving a recruitment telephone call.  See May Tr. at 53:7-9 (Greim, Swoboda).

11.     Plaintiff Holly Steinberg is a New Mexico resident, who "worked and continues to work with grassroots organizations advocating for, among other things, transparency in New

- 4 -

Mexico's elections both to increase voter participation and to ensure the integrity of the election process."  Complaint ¶ 13, at 5.

12.     "Steinberg wishes to use the New Mexico data that VRF had posted and intends to post on its Website in order to accomplish these twin aims, as the cost to purchase the data for her personal use is unreasonably high."  Complaint ¶ 13, at 5.

13.     Under the New Mexico Secretary of State's use restrictions, Steinberg cannot use the data if she purchases it herself, because she is not using it for a political or electoral campaign. See Complaint ¶ 13, at 5.

14.     Defendant Hector Balderas is the Attorney General for the State of New Mexico. See Complaint ¶ 14, at 5.

15.     The New Mexico Attorney General is "responsible under state law for investigating and prosecuting violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6."  Complaint ¶ 14, at 5-6 (citing N.M.S.A. § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); N.M.S.A. § 1-2-2 ("The secretary of state shall . . . [D]. report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution . . . ."); N.M.S.A. § 1-1-1 ("Chapter 1 NMSA 1978 may be cited as the 'Election Code.'").

16.     Oliver is the New Mexico Secretary of State and, "in that capacity, is the chief election officer of the state."  Complaint ¶ 15, at 6 (citing N.M.S.A. § 1-2-1(A)).

17.     The Secretary of State is "responsible under state law for furnishing voter data to requesters and referring potential violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6, to the Attorney General for investigation and prosecution."  Complaint ¶ 15, at 6 (citing N.M.S.A. § 1-2-1.1(A); N.M.S.A. § 1-2-2; N.M.S.A. § 1-1-1).

**2.     The Secretary of State's Responses to 2017 Requests for Voter Data from President Trump's Advisory Commission on Election Integrity.**

18.     On June 28, 2017, Kris W. Kobach, Vice Chair of President Trump's Advisory Commission on Election Integrity, wrote to the Secretary of State to request

> the publicly-available voter roll data for New Mexico, including, if publicly available under the laws of your state, the full first and last names of all registrants, middle names or initials if available, addresses, dates of birth, political part (if recorded in your state), last four digits of social security number if available, voter history (elections voted in) from 2006 onward, active/inactive status, cancelled status, information regarding any felony convictions, information regarding voter registration in another state, information regarding military status, and overseas citizen information.

Letter from Kris W. Kobach to Maggie Toulouse Oliver, dated June 28, 2017, filed June 24, 2022 (Doc. 44-32)("June 28 2017 Request").

19.     On June 30, 2017, the Secretary of State issued a press release stating, in part:

> I will never release the personally identifiable information of New Mexico voters protected by law, including their social security number and birthdate.  Further, I will not release any other voter information like names, addresses or voting history unless and until I am convinced that the information will not be used for nefarious or unlawful purposes, and only if I am provided a clear plan for how it will be secured.

Press Release, New Mexico Secretary of State Toulouse Oliver Responds to Presidential Election Commission Request for New Mexican Voters Personal Data, dated June 30, 2017, filed March 28, 2022 (Doc. 1-3)("June 30 2017 Press Release").

20.     On July 26, 2017, Kris Kobach wrote to the Secretary of State a second time, renewing his request for voter data.  See Letter from Kris W. Kobach to Maggie Toulouse Oliver, dated July 26, 2017, filed June 24, 2022 (Doc. 44-33)("July 26 2017 Request").

On July 27, 2017, the Secretary of State issued another press release, repeating her position that she will not release New Mexico voters' data to the Advisory Commission, stating in part that, "the Commission has still not demonstrated that it the data will be used for a lawful purpose under New Mexico law, provided any plan for ensuring that voters' data will be secured, or explained how comparing insufficient data will produce any meaningful conclusions."   Press Release, New Mexico Secretary of State Toulouse Oliver Responds to Second Request by President Trump's Election Commission for New Mexico Voters' Personal Data, dated July 27, 2017, filed March 28, 2022 (Doc. 1-4)("July 27, 2017 Press Release").

**3.     VoteRef.com's Voter Registration-Related Work.**

21.     VoteRef.com "provides any information made public by the state entity charged with maintaining the voter registration database if state law allows that information to be shared," such as "a voter's . . . name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history."  Complaint ¶ 38, at 11.

22.     "Those who access [VoteRef.com] will be able to search by name or address for registered voters," and "peruse voting histories, a list of elections that voter participated in, as well as other important election data obtained via official sources."  Complaint ¶ 33, at 10.

23.     VoteRef.com users can "check their own voting status, voting history, and those of their neighbors, friends, and others, and are thereby able to 'crowd-source' the process of rectifying any errors."  Complaint ¶ 34, at 10 (no citation for quotation).

24.      Voter Reference crowd-sources finding errors in the data.  See May Tr. at 70:19-71:10 (Court, Swoboda).

25.     Voter Reference encourages the public to "review[] their voter registration records on the voter registration side," and to look for errors in the records, such as where "the first name is a comma, and the last name is the letter A, and the registration date and the date of birth are 1/1/1900."  May Tr. at 71:18-72:5 (Swoboda).

26.     Voter Reference encourages "the public . . .[to] report their errors to the county clerk or to the election official, who is the only person in power to correct them."  May Tr. at 71:18-72:5 (Swoboda).

27.     Users must agree to VoteRef.com's terms of service, which state, in part:

VoteRef.com and the services offered through VoteRef.com are only for election-related, non-commercial use.

. . . .

You may not use information on VoteRef.com for any purpose unrelated to elections. You may not use information on VoteRef.com for commercial purposes. "Commercial purposes" includes use in connection with advertising or promoting commercial products or services, or for the purpose of sale, resale, solicitation, or for any purpose in which the user can reasonably anticipate the receipt of monetary gain from direct or indirect use.  For example, you may not sell information obtained from VoteRef.com, or use it in connection with advertising or promoting commercial products or services, or solicitation.

. . . .

You may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law.  By way of example but not limitation, you may not: (a) act in a manner that negatively affects other users' ability to engage in real time exchanges; (b) alter, edit, or delete the materials on VoteRef.com, including the deletion of any trademark or copyright notices on VoteRef.com; (c) interfere with or disrupt VoteRef.com, VRF's servers, or networks (e.g., "flooding" or the sending of mass unsolicited messages) or otherwise harm VoteRef.com or other users; (d) intentionally or unintentionally violate any applicable local, state, national, or international law or any regulations having the force of law; (e) impersonate any person or entity or misrepresent your connection to any person or entity; (f) "stalk," harass, or otherwise advocate the stalking or harassing of another person; (f) collect or store personally identifiable information about other users in connection with the prohibited conduct and activities set forth herein; (h) reproduce, duplicate, copy, sell, trade, resell, or exploit for any commercial purposes, any portion of VoteRef.com; (i) attempt to override or circumvent any security measures of VoteRef.com or VRF's third party providers or access parts of VoteRef.com you are not authorized to visit; (j) engage in any unauthorized screen scraping, database scraping, or spidering, or collection of personally identifiable information, or use any other automated means to collect information from VoteRef.com; (k) use any software, tool, or other device (such as browsers, spiders, or avatars) to search VoteRef.com, other than the search functionality offered through VoteRef.com or other generally available web browsers; (l) link directly to any image hosted on VoteRef.com in a manner that would cause the image on VoteRef.com to be hosted on another web site; (m) link to VoteRef.com in such a manner that VoteRef.com or any portion thereof is "framed" on another web site; (n) attempt to reverse-engineer or decrypt any software on VoteRef.com; or (o) facilitate or encourage the violation of any of the policies set forth in these Terms.

VoteRef.com, Terms of Service, https://voteref.com/terms-of-service (last visited May 12, 2022)(no citation for quotation). See Complaint ¶ 40, at 11-12.

28.     VoteRef.com's terms and conditions are different for every State, and VoteRef.com has "a disclaimer on every single voter detail page that cites the specific language of the state with regard to protections for people that are secured voters."  May Tr. at 57:7-12 (Swoboda).

29.     Before VoteRef.com publishes a file, it "notif[ies] the chief election official" and asks whether there are any protected voters in that file so that their information may be redacted.

May Tr. at 57:22-58:5 (Swoboda).

30.     When users view "a particular voter's information, they are simultaneously shown a state-specific note regarding the data."  Complaint ¶ 39, at 11.

31.      VoteRef.com "is the first of its kind tool to search all 50 states."  May Tr. at 92:17-18 (Swoboda).

32.     "[N]o other entity has tried to publish all 50 voter registration records for all 50 states for free."  May Tr. at 93:20-22 (Swoboda).

33.

34.

**4.     VoteRef.com's Staff's Election Work.**

35.     Voter Reference's staff -- its "data director" and "assistant data director" -- aggregate voter data they receive from the Secretary of State's Office, and post that total number alongside the election "turnout number, the total ballots cast from the official records submitted to the [Election Assistance Commission ('EAC')] by the state or posted on their website or on their canvass."  May Tr. at 70:24-71:7 (Swoboda).

36.     Voter Reference "post[s] those exact two data points, and . . . post[s] the documentation it came from," but "[t]he public is not given access to that data."  May Tr. at 71:8-10 (Swoboda).

37.     "[T]he public does not have access to the discrepancy data," May Tr. at 72:6-7 (Court), "other than through [Voter Reference's] press release," May Tr. at 72:8-9 (Greim).

38.     When Swoboda finds a discrepancy, she contacts the chief election official and asks

if she can meet or have a telephone call with them to "learn about their process" and "identify where the discrepancy is coming from." May Tr. at 60:7-10 (Swoboda).

**5.    New Mexico's Voter Registration Data Laws.**

39.    New Mexico "makes certain voter registration data . . . available to requestors for limited purposes." Complaint ¶ 17, at 6.

40.    The Election Code provides:

> A.    The county clerk or secretary of state shall furnish voter data, mailing labels or special voter lists only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section; provided, however, all requesters shall be treated equally in regard to the charges and the furnishing of the materials.

> B.    In furnishing voter data, mailing labels or special voter lists, the county clerk or secretary of state shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters.

> C.    Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes.

> D.    The secretary of state shall prescribe the form of the affidavit.

N.M.S.A. § 1-4-5.5. See Complaint ¶¶ 18-20, 25, at 7-8.

41.    The Election Code includes definitions for these terms:

> (1)    "election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;

> (2)    "governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a

federal, state or local government;

(3)    "mailing labels" means prepared mailing labels of selected voters arranged in the order in which requested and providing only the name and address of the voter;

(4)    "special voter list" means a prepared list of selected voters arranged in the order in which requested; and

(5)    "voter data" means selected information derived from the voter file.

N.M.S.A. § 1-4-5.5(E).  See Complaint ¶ 21, at 7-8.

42.    The Election Code makes certain use of voter data unlawful:

A.    Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act [Chapter 1, Article 5 NMSA 1978].

B.    Any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth degree felony and upon conviction shall be fined one hundred dollars ($100) for each and every line of voter information that was unlawfully used.

C.    Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense.

N.M.S.A. § 1-4-5.6.  See Complaint ¶¶ 22-23, at 8.

43.    "A person who unlawfully copies, conveys or uses information from a certificate of registration is guilty of a fourth degree felony."  N.M.S.A. § 1-4-5(E).

**6.    The Old Request Form.**

44.    An old version of the Secretary of State's Voter Data Request Form prompts the requester to check one of five boxes indicating the data request's purpose: "Governmental Use," "Campaign Use," "Election Related," "Research Purposes," or "Other."  Voter Data Request Form

at 1, filed June 24, 2022 (Doc 44-8)("Old Request Form").

45.     The Old Request Form's signed authorization reads:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).

> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

Old Request Form at 1.

### 7.   **The 2021 Request Form.**

46.     The 2021 version of the Secretary of State's Voter Data Request Form -- which David Lippert of Local Labs used to acquire the voter data for Voter Reference -- does not contain "Research Purposes" or "Other" as options for describing the requester's purpose, Old Request Form at 1, but prompts the applicant to check one of only three boxes indicating the data request's purpose: "Governmental Use," "Campaign Use," or "Election Related," Voter Data Request Form at 18 (dated March 29, 2021), filed April 14, 2022 (Doc. 13)("2021 Request Form").

47.     The 2021 Request Form's signed authorization is the same as the Old Request Form's authorization:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).

> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

2021 Request Form at 1.

**8.**     **The Feb. 10 Request Form.**

48.     The Secretary of State revised the Voter Data Request Form on February 10, 2022, and omits the option to check the box entitled, "Election Related," and prompts applicants to check the box for either "Campaign Use" or "Governmental Use."   Voter Data Request Form at 1, admitted as Joint Exhibit I at the May 17, 2022 Hearing, filed June 24, 2022 (Doc. 44-9)("Feb. 10 Request Form").

49.     The Feb. 10 Request Form includes an authorization which requires the requester to initial and sign below the following statement:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).
>
> I hereby swear that the requestor will not: (INITIAL EACH)
>
> ____ sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.
>
> ____ alter voter information received as a result of this request.
>
> ____ use voter information for any purpose other than those authorized on this form.
>
> ____ use voter information for any commercial purposes.

Feb. 10 Request Form at 1.

**9.**     **The Feb. 14 Request Form.**

50.     Like the Feb. 10 Request Form, the Voter Data Request Form revised on February 14, 2022 "requires a requester to check one of [only] two 'purposes' behind the request, either:

- 14 -

'Campaign Use' or 'Governmental Use'.  There is no option for 'election' use."  Complaint ¶ 26, at 8-9 (quoting Voter Data Request Form at 2 (revised February 14, 2022), admitted as Joint Exhibit J at the May 17, 2022 Hearing, filed March 28, 2022 (Doc. 1-2), and filed June 24, 2022 (Doc. 44-10)("Feb. 14 Request Form").

51.     Unlike the Feb. 10 Request Form, and in addition to checking one of two boxes, the Feb. 14 Request Form prompts the applicant to "provide a description of your intended use of voter data."  Feb. 14 Request Form at 1.

52.     Like the Feb. 10 Request Form, the Feb. 14 Request Form includes an authorization which requires the requestor to initial and sign below the following statement:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).
>
> I hereby swear that the requestor will not: (INITIAL EACH)
>
> ____ sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.
>
> ____ alter voter information received as a result of this request.
>
> ____ use voter information for any purpose other than those authorized on this form.
>
> ____ use voter information for any commercial purposes.

Feb. 14 Request Form at 2.  See Complaint ¶ 27, at 9.

10.     **The Voter Data Request Log.**

53.     The Voter Records System Act, N.M.S.A. §§ 1-5-1 to 1-5-13, requires the Secretary of State to "maintain the official state voter file based on county registers" and to "provide access to the file to the county clerks."  N.M.S.A. § 1-5-3(B).

54.     The Secretary of State "shall prescribe any rules, forms and instructions necessary to implement procedures required by the Voter Records System Act and federal law," and "maintain a log, which shall be public, containing all transactions regarding requests for current registration lists of state voters."  N.M.S.A. § 1-5-3(B).

55.     "The log shall indicate the requesting party, the date of the request, the date of fulfilling the request, charges made and any other information deemed advisable by the secretary of state." N.M.S.A. § 1-5-3(B).

56.      The Secretary of State's 2021 and 2022 Voter Data Request Log shows numerous requests for voter data from political parties such as the Democratic Party of New Mexico, the Republican Party of New Mexico, the Libertarian Party of New Mexico, and from organizations such as Local Labs, Catalist, L2 Inc., Data Targeting, and i360.  See Voter Data Request Log at 1-2, filed June 24, 2022 (Doc. 44-11).

57.     Catalist submitted a request for statewide voter data and voter history on January 15, 2021.  See Voter Data Request Log at 2.

58.     Catalist is "the longest running data trust in progressive politics," and "compiles, enhances, stores and dynamically updates data on over 256 million unique voting-age individuals across all 50 states and the District of Columbia,"; it provides its "data only to Democrats and

progressives, and only for civic engagement purposes, not for commercial for-profit uses . . . without threat of this data asset being bought sold, or traded for commercial or for-profit purposes." Catalist, Who We Are, https://catalist.us/ (last visited July 6, 2022).

59.    i360 submitted a request for statewide voter data and voter history on March 16, 2021.  See Voter Data Request Log at 2.

60.    i360 "works across industry lines to bring unique data, technology, and analytics solutions to help our clients win, whether in politics or business," and "deliver[s] innovative products and services to the political and advocacy communities through the strategic use of data, software and analytics."  i360, What We Do, https://www.i-360.com/ (last visited July 6, 2022).

61.    L2 Inc. submitted a request for statewide voter data and voter history on January 25, 2021, and January 28, 2021.  See Voter Data Request Log at 2.

62.    L2 Inc. provides subscription-based data and analytics services using consumer data, voter data, and automotive data; L2 Inc. states that its "national voter file is the most accurate and frequently updated in the marketplace, and contains the largest number of file segments for traditional and digital targeting."  L2 Inc., Trusted Voter and Consumer Data At Your Fingertips, https://l2-data.com/ (last visited July 6, 2022).

63.    Data Targeting is a conservative data aggregation service.  See PI Reply at 4.

64.    The Voter Data Request Log states "N/A" in the "Total Cost for Records" column where the requester is a political party requesting statewide voter data.  Voter Data Request Log at 1-2.

65.     The Total Cost for Records listed in the Voter Data Request Log varies according to the number of records requested.  See Voter Data Request Log at 1-2.

**11.     <u>Local Labs' Acquisition of New Mexico Voter Data.</u>**

66.     Local Labs is "a leading collector and publisher of community-level public records for news publishers," "collect[s] public records from federal, state governments as well as local governments, departments, and administrations of all sizes," submits Freedom of Information Act requests, and "cleans and normalizes data for easier processing."  Local Labs, <u>What We Do</u>, https://locallabs.com (last visited July 5, 2022).

67.     On March 29, 2021, David Michael Lippert, an employee of Local Labs, requested New Mexico voter data from the Secretary of State, signed the affidavit required to obtain voter data.  <u>See</u> PI Response at 6; Lippert Request Form at 1; Voter Data Request Log at 1.

68.     Lippert's payment of the $5378.12 fee for the voter data was processed on April 14, 2021.  <u>See</u> Payment Receipt at 1 (dated April 14, 2021), admitted at the May 17, 2022 Hearing as Exhibit B, filed June 24, 2022 (Doc. 44-2).

69.     Local Labs transferred the voter data to Voter Reference on April 15, 2021.  <u>See</u> Complaint ¶ 39, at 11.

70.     Swoboda was not yet working for Voter Reference when Local Labs acquired New Mexico's voter data.  <u>See</u> May Tr. at 72:22-73:4 (Serafimova, Swoboda).

71.      Voter Reference paid Local Labs $15,000.00 to acquire New Mexico's voter data. <u>See</u> May Tr. at 73:20-22 (Swoboda).

12.     **Voter Reference's Publication and Analysis of New Mexico Voter Data.**

72.     On December 14, 2021, Swoboda emailed the Secretary of State to inform her that Voter Reference had found a discrepancy of 3,844 more ballots case in the 2020 general election, according to the "Secretary of State and County Boards of Election data," and the total number of voters who have "credit for voting."  Email from Gina Swoboda to Maggie Toulouse Oliver (dated December 14, 2021), admitted at the May 17 Hearing as Plaintiffs' Exhibit 2, filed June 24, 2022 (Doc. 44-14)("Swoboda Dec. 14 Email").

73.     Swoboda informed the Secretary of State:

> Attached is a link to the voter history and voter registration data file provided by your office on April 13, 2021.  It is our understanding that the data you have provided does not include any voter who is in the Safe At Home program.  If that is inaccurate, please let us know.

Swoboda Dec. 14 Email at 1.

74.     Swoboda did not receive a response from the Secretary of State before posting the voter data on VoteRef.com.  See May Tr. at 58:10-19 (Greim, Swoboda).

75.     VoteRef.com posted New Mexico voter data on December 14, 2021.  See Pl. FOF ¶ 52, at 19; Email from Megan O'Matz to Alex Curtas at 7-8 (dated December 14, 2021), admitted as Plaintiffs' Exhibit 7 at the June 15, 2022 Hearing, filed June 24, 2022 (Doc. 44-19)("O'Matz Dec. 14 Email").[1]

---

[1]Although Swoboda testified that she "believe[s]" that Voter Reference published New Mexico voter data on December 16, 2021, May Tr. at 66:24-25 (Swoboda), ProPublica reporter Megan O'Matz references Voter Reference's data and analysis in her email to Alex Curtas on December 14, 2021, see O'Matz Dec. 14 Email at 7-8.  The Plaintiffs seem to concede this in their Proposed Findings of Fact: "The exchange began on December 14, 2021 with the [sic] O'Matz, asking Curtas about the discrepancy (identified in the VRF Press Release, **P1**) . . . ."  Pl. FOF ¶ 52, at 19.

76.     Voter Reference issued a press release dated December 16, 2021, reporting that New Mexico has a discrepancy of 3,844 voters in the November 3, 2022 general election.  <u>See</u> Voter Reference Foundation, Press Release: VRF website VoteRef.com adds New Mexico voter rolls to nationwide database (December 16, 2021), admitted as Plaintiffs' Exhibit 2 at the May 17, 2022 Hearing, filed June 24, 2022 (Doc. 44-13)("VRF Press Release").[2]

77.     928,172 ballots were cast by New Mexico voters on November 3, 2020.  <u>See</u> May Tr. at 99:3-6 (Serafimova, Swoboda).

78.      924,328 is the number of electors whose "records still exist in the voter file as of April, 2021, who have a vote credit for casting a ballot in the November 3, 2020 general election." May Tr. at 99:7-14 (Serafimova, Swoboda).

79.     Before the New Mexico data was taken down, viewers were shown "a state specific note" which stated:

> The information on this website about this voter, including records of this voter's voting history, was provided to Voter Reference Foundation LLC ("VRF") by the New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15, 2021.  The information is publicly available here.  The information published here by VRF appears exactly as provided by the Bureau.  By publishing Bureau records verbatim, VRF does not state, represent, suggest, or imply that this voter voted or that this voter's ballot was counted or not counted.  Additionally, the registration information of any voter who is in the Safe At Home program (hereinafter referred to as a "protected voter") must be removed from the publicly available voter list by the New Mexico Secretary of State.  If you believe the information provided to VRF by the Bureau is inaccurate, or if you believe that you

_____

[2]The Court does not make a finding that the VRF Press Release was published on December 16, 2021, even though it is dated December 16, 2021, because ProPublica reporter Megan O'Matz emailed the Secretary of State about New Mexico's discrepancy -- as detailed in the VRF Press Release -- on December 14, 2021.  <u>See</u> Pl. FOF ¶ 52, at 19; O'Matz Dec. 14 Email at 7-8.

> or any person listed on VoteRef.com is a protected voter whose protected information should not appear on VoteRef.com, please immediately contact the Bureau by emailing sos.elections@state.nm.us or calling 505-827-3600.   For assistance with the process of becoming a protected voter, click here (Safe At Home program).  Upon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com.

Complaint ¶ 39, at 11 (no citation for quotation).

80.     VoteRef.com users could also see the chain of custody for the data.  See May Tr. at 67:16-69:5 (Greim, Swoboda).

81.     Swoboda published a press release about New Mexico's data on Voter Reference Foundation's website, see May Tr. at 62:16-63:2 (Greim, Swoboda), and stated that the Secretary of State did not contact her subsequently to explain the discrepancies noted in the press release, see May Tr. at 63:19-22 (Greim, Swoboda).

82.     "There is, to [Swoboda's] knowledge, no requirement that the chief election official reconcile those two data points."  May Tr. at 64:11-12 (Swoboda).

83.     Election "turnout is reported to the Elections Assistance Commission, in the [Election Administration and Voting Survey ('EAVS')] report every cycle," but "that number changes," and, so, "unless and until there is such a requirement or the chief election officials voluntarily engage in that reconciliation, the numbers are not going to match."  May Tr. at 64:13-18 (Swoboda).

84.     Swoboda submitted a Freedom of Information Act request to obtain a copy of the voter registration roll on or close to November 3, 2020, see May Tr. at 64:19-65:5 (Greim, Swoboda), and also requested a "list of cancellations so that [she] could try to reconcile and find

all the people who might have been removed because they were adjudicated incompetent or had a felony or passed away or moved out of the state," but Swoboda received no response, May Tr. at 65:5-10 (Swoboda).  See id. at 65:12-17 (Greim, Swoboda).

85.    "'VRF displayed email correspondence on its website which clearly disclosed that the data came from the Secretary of State via Local Labs.'"  PI Reply at 4 (quoting Declaration of Gina Swoboda ¶ 5, at 2-3 (executed April 28, 2022), filed May 2, 2022 (Doc. 19-1)("Swoboda Decl.")).

86.    According to data Voter Reference received from the Secretary of State's Office, 924,328 New Mexico voters' "records still exist[ed] in the voter file as of April of 2021, who have a vote credit for casting a ballot in the November 3, 2020 general election."  May Tr. at 99:7-14 (Serafimova, Swoboda).

87.    According to Voter Reference's analysis, New Mexico has a discrepancy of 3,844 voters -- the discrepancy between the number of ballots cast in the November 3, 2022 election, and the number of voters who are listed as having voted in that election.  See VRD NM Press Release at 1-2.

88.    Voter Reference does not know why there is a discrepancy between the two numbers, but asserts that the discrepancy indicates that there are "issues with recordkeeping."  May Tr. 101:24 (Swoboda).  See id. 101:18-102:2 (Serafimova, Swoboda); VRF NM Press Release at 1.

89.    Voter Reference believes that every State should keep a record of voter history data, even if that voter's file is removed from the voter rolls: "The vote history should still be there

in some form, even if the voter is no longer active, or inactive.  If you remove the voter and their

vote history, then your numbers don't reconcile."  May Tr. at 103:2-6 (Swoboda).

90.     Voter Reference asserts that voters whose registration has been cancelled due to a

felony, because they have moved to another State, or because they have passed away, for example,

should still show up on the voter rolls as cancelled voters, and not be deleted from the voter rolls.

See May Tr. at 103:19-21 (Swoboda); id. at 106:1-9 (Serafimova, Swoboda); id. at 106:17-23

(Serafimova, Swoboda).

91.     Voter Reference posts editorial comment about election data on another website,

www.VoterReferenceFoundation.com.  See May Tr. at 107:5-10 (Swoboda).

**13.     Correspondence Between ProPublica and the Secretary of State's Office.**

92.     On December 14, 2021, Megan O'Matz, a reporter for ProPublica, emailed Alex

Curtas, Communications Secretary for the Secretary of State, to ask whether the Secretary's Office

has any explanation for the discrepancy of 3,844 voters Voter Reference identified, and whether

the Secretary of State's Office had any correspondence with Voter Reference about their findings

or methodology.  See Email from Megan O'Matz to Alex Curtas at 7-8 (dated December 14, 2021),

admitted as Plaintiffs' Exhibit 7 at the June 15, 2022 Hearing, filed June 24, 2022 (Doc. 44-

19)("O'Matz Dec. 14 Email"); Pl. FOF ¶ 52, at 19 ("The exchange began on December 14, 2021

with the [sic] O'Matz, asking Curtas about the discrepancy (identified in the VRF Press Release,

**P1**) . . . .")(emphasis in Pl. FOF).

93.     Curtas responded to O'Matz on December 16, 2021, stating:

VoteRef.com is misleading the public about New Mexico's voter rolls and are
perpetuating misinformation.  They reflect a lack of understanding about how the
process of voter list maintenance works.  These attempts by political operatives to

cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country.

Email from Alex Curtas to Megan O'Matz at 6 (dated December 16, 2021), filed June 24, 2022

(Doc. 44-19)("Curtas Dec. 16 Email").

94.     In the Curtas Dec. 16 Email, Curtas explained New Mexico's discrepancy:

The "discrepancy" they are alleging stems from their misunderstanding about how voter rolls are maintained by election administrators.  The data sets they seem to be comparing were captured at two different points in time.  The voting history data from 4/15 is a reflection of the counts at that point in time and *not* of the data as it was on Election Day or on any other day.

Curtas Dec. 16 Email at 6 (emphasis in original).

95.     Curtas responded further:

Because accusations from political operatives like this are meant to impugn the integrity of our voter rolls, I'd also just want to note that our Office is confident that the processes and procedures already in place for voter list maintenance not only follow all state and federal guidelines and keep our voter rolls clean and up-to-date, but go above and beyond those requirements.

During the voter list maintenance process New Mexico's election administrators, as required by law, must maintain and update their voter rolls continually -- everything from checking obituaries, receiving monthly reports from NM Vital Statistics about deceased individuals, and suspending or reinstating felons based on conviction notices from the Department of Corrections.  This is done in conjunction with the proactive, pro-voter measures already in place in New Mexico, such as automated voter registration, all-mail special elections, and online and same day voter registration. All of these systems combine to ensure that voter information is up-to-date in New Mexico, resulting in our state having some of the "cleanest" voter records in the United States.

Curtas Dec. 16 Email at 6-7.

96.     The Secretary of State referred Voter Reference and Local Labs for investigation

on December 20, 2021.  See Re: Potential Criminal Transfer and Use Violation of Voter Data,

from Sharon Pino, Deputy Secretary of State, to Anne Kelly, Chief Deputy Attorney General,

dated December 20, 2021, filed May 17, 2022 (Doc. 32-3)("Referral Letter").

   14.   **The ProPublica Article and The Secretary of State's Public Statements About
          Voter Reference.**

   97.    On March 8, 2022, the Secretary of State tweeted from the New Mexico Secretary

of State Twitter account, sharing a link to a ProPublica article: "Important, in-depth piece from

@propublica re: coordinated cross-country attempt to impugn the integrity of our voter rolls.  This

org   posted   #NM   voter   data   online,   violating   the   Election   Code.

https://www.propublica.org/article/voter-ref-foundation.   #nmpol  #TrustedInfo2022."   Maggie

Toulouse   Oliver   (@NMSecOfState),   Twitter   (Mar.   8,   2022,   10:24   a.m.),

https://twitter.com/NMSecOfState/status/1501247481882972165.  See Complaint ¶ 54, at 15.

   98.    The ProPublica article the Secretary of State shared via her Twitter account is

entitled, "Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud

Using Discredited Techniques" and discusses Voter Reference.  Megan O'Matz, Billionaire-

Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited

Techniques, ProPublica (March 7, 2022, 11:15 a.m.), https://www.propublica.org/article/voter-

ref-foundation.  See Maggie Toulouse Oliver (@NMSecOfState), Twitter (Mar. 8, 2022, 10:24

a.m.), https://twitter.com/NMSecOfState/status/1501247481882972165; Complaint ¶ 54, at 15.

   99.    The ProPublica article states: "The New Mexico Secretary of State believes

posting data about individual voters online is not a permissible use under state law and has referred

the matter to the state attorney general for criminal investigation."  O'Matz, Billionaire-Backed

Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques.

   100.   The ProPublica article states:

In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is not an allowable use of voter data. By state law, she said, the rolls can only be used for governmental or campaign purposes.

"Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said.  In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

O'Matz, Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques.

101.     Voter Reference "removed [New Mexico's voter] data from its website on March 28, 2022 -- . . . out of fear that it would be prosecuted."  Complaint ¶ 42, at 12.

102.      Voter Reference "removed [New Mexico's voter] data from its website on March 28, 2022."  Complaint ¶ 42, at 12.

**15.     Voter Reference's Direct Voter Data Requests.**

103.     On February 15, 2022, Voter Reference emailed the Secretary of State's Office to ask for

the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021.

Email from Voter Reference to the Secretary of State's Office at 7 (dated February 15, 2022), filed June 24, 2022 (Doc. 44-22)("Feb. 15 Request").

104.     Voter Reference's February 15, 2022, request does not include a signed affidavit, which N.M.S.A. § 1-4-5.5 requires.  See Transcript of Hearing at 80:1-25 (Serafimova, Swoboda)(taken May 17, 2022), filed May 27, 2022 (Doc. 35)("May Tr.").

105.     The Attorney General's Office recommended that the Secretary of State not respond to Swoboda's February 15, 2022, request.  See June 15 Tr. at 51:14-54:21 (Greim, Vigil).

106.     According to the Secretary of State, the February 15, 2022, request is not a formal request.  See June 15 Tr. at 55:8-10 (Vigil).

107.     The Secretary of State has not responded to February 15, 2022, request, because "there was a general determination that this was neither a . . . formal public records request nor a normal voter data request."  June 15 Tr. at 49:16-18 (Vigil).

108.     The Secretary of State "determined that [it was] not going to provide data" to Voter Reference, "[b]ecause [it] had already referred their use of the data to a law enforcement agency." Tr. at 49:22-25 (Vigil).

109.     The Secretary of State does not have a "goal to ignore someone who communicates with our office."  Tr. at 49:11-12 (Vigil).

110.     On March 10, 2022, Voter Reference emailed the Secretary of State's Office to ask for a status update on its Feb. 15 Request.  See Email from Voter Reference to the Secretary of State's Office at 6 (dated March 10, 2022), filed June 24, 2022 (Doc. 44-22)("Mar. 10 Request").

111.     On March 11, 2022, Patrick Rostock, Records Custodian for the Secretary of State's Office, emailed Mandy Vigil and Sharon Pino:

> Per Dylan's contact with the AG, we are not fulfilling records requests from VoteRef.  Any information on how to proceed with this would be appreciated.  I am also happy to forward this to the AG but I'm unsure what contact we have who is handling this. The request is clearly trying to create an aggregate picture of the voter rolls on election day 2020, which lends credence to the idea that VoteRef and Erin Clements/New Mexico Audit Force are working in concert.

- 27 -

Email from Patrick Rostock to Sharon Pino and Mandy Vigil at 6 (dated March 11, 2022), filed June 24, 2022 (Doc. 44-22).

112.    On May 27, 2022, Swoboda submitted a Voter Data Request Form to the Secretary of State's Office on Voter Reference's behalf.  <u>See</u> Voter Data Request Form at 8 (dated May 27, 2022), entered as Plaintiff's Exhibit 10 at the June 15, 2022 Hearing, filed June 24, 2022 (Doc. 44-22)("VRF Request Form").

113.    Voter Reference "is willing and ready to execute the same affidavit that Local Labs executed."  June 15 Tr. at 53:14-16 (Greim).

114.    The Secretary of State has not responded to Swoboda's May 27, 2022, request, because the request "provide[s] information as to this information again being published online," which, in the Secretary of State's interpretation, is unlawful.  June 15 Tr. at 54:22-25 (Vigil).

115.    When the Secretary of State responds to Swoboda's May 27, 2022, request, it will state that the Secretary of State will not provide the data, because the Secretary of State believes that Voter Reference intends to publish the data.  <u>See</u> June 15 Tr. at 54:19-21 (Greim, Vigil)("Q: And the response is going to be: No, because VRF says it will publish; correct?" A: "Correct.").

116.    In its May 27, 2022, request, Voter Reference states that it "intends to publish [current voter registration data] information online for election-related purposes, but it will only publish the personal information of voters online if [Voter Reference] is granted relief here."  June 15 Tr. at 55:22-56:1 (Greim).

117.    The Secretary of State maintains on the advice of counsel, that providing voters' personal information online would violate N.M.S.A. § 1-4-5.6.   See June 15 Tr. at 59:15-28 (Vigil).

118.    The only reason that the Secretary of State states that she will deny Swoboda's May 27, 2022, request is because "the information is going to be published."   June 15 Tr. at 68:9-13 (Vigil, Greim).

119.    The Secretary of State "has not followed up [with Voter Reference] to try to learn any details about [its] projects or share its concerns about publication with" Voter Reference.   June 15 Tr. at 68:14-18 (Greim, Vigil).

120.    The Secretary of State will not grant Voter Reference's May 27, 2022, data request, because the Secretary of State believes that Voter Reference will publish the data, even when Voter Reference says it will not publish voters' personal information without a Court order.   See June 15 Tr. at 55:20-56:9 (Greim, Vigil).

**16.    The New Mexico Secretary of State's Voter Information Portal.**

121.    The New Mexico Secretary of State operates a Voter Information Portal where voters can register to vote and view their registration information online.   See New Mexico Secretary of State, Voter Information Portal, https://www.sos.state.nm.us/voting-and-elections/voter-information-portal/ (last visited July 4, 2022).

122.    Website users can click on the "Find My Registration & Election Information" link, enter their name, date of birth, and county, and view that user's voter registration information, voting locations, voting history, sample ballot, absentee application and ballot status, and that the relevant county clerk's contact information.   See New Mexico Secretary of State, My Registration

*Information*, https://voterportal.servis.sos.state.nm.us/WhereToVote.aspx (last visited July 4, 2022); May Tr. at 123:13-24 (Serafimova, Steinberg).

123.    The <u>My Registration Portal</u> webpage does not list "voting history" as information that is available; however, once a user's information is entered, the user can click on another link to view the user's voting history.  <u>See</u> New Mexico Secretary of State, <u>My Registration Information</u>, https://voterportal.servis.sos.state.nm.us/WhereToVote.aspx.

124.    Steinberg checked her own and her husband's voting information on the Secretary of State's website.  <u>See</u> May Tr. at 123:13-124:7 (Serafimova, Steinberg).

**17.    <u>The Secretary of State's Changes to Voter Data Request Forms</u>.**

125.     Mandy Vigil is the State Elections Director for New Mexico.  <u>See</u> May Tr. at 125:15-16 (Greim, Vigil).

126.    Vigil "oversee[s] the administration of the Bureau of Elections," which is "responsible for assisting county clerks, election administrators across the state with adhering to the Election Code."  May Tr. at 125:18-21 (Vigil).

127.    Vigil reports to the Deputy Secretary of State, Sharon Pino, and to the Secretary of State.  <u>See</u> May Tr. at 126:4-8 (Greim, Vigil).

128.    The Secretary of State's office is "responsible for providing an administrative process to access [voter] data," May Tr. at 127:3-4 (Vigil), and Vigil oversees applications for voter data, <u>see</u> May Tr. at 126:9-11 (Greim, Vigil).

129.    The Election Code provides the Secretary of State's Office "with an opportunity to refer" their "concern[s] with how that data is being used" "to a law enforcement agency."  May Tr. at 127:4-8 (Vigil).

130.    The Secretary of State makes informal guidance about election laws available to the public on its website.  See May Tr. at 127:11-128:4 (Greim, Vigil).

131.    The Secretary of State's Office has never rejected an affidavit -- a signed Voter Data Request Form, see May Tr. at 128:16-18 (Greim, Vigil), and does not investigate voter data requesters, as long as the application is complete, see May Tr. at 129:6-7 (Vigil).

132.    The Secretary of State's Office referred Local Labs and Voter Reference to the Attorney General's Office for investigation due to their "concerns with the data being made available online."  May Tr. at 129:14-16 (Vigil).

133.    The Secretary of State's Office has not made a determination whether Voter Reference and the Otero County audit group are connected.  May Tr. at 130:5-8 (Greim, Vigil).

134.    Staff members in the New Mexico Bureau of Elections design the Voter Data Request Forms, see May Tr. at 131:25-132:2 (Greim, Vigil), and Vigil participates in approving the Voter Data Request Forms, "along with a legal review, usually done by our general counsel or our Deputy Secretary of State," May Tr. at 132:4-6 (Vigil).

135.    The Secretary of State's office "ma[d]e a correction to that affidavit once [it was] made aware that it [allegedly] need[s] to more strictly align to the statute."  May Tr. at 132:20-23 (Vigil).

136.    The records custodian, Raina Trujillo, made Vigil aware in early 2021 that the affidavit needed to be corrected.  See May Tr. at 133:1-8 (Vigil).

137.    Vigil construes Article 4 so that "election related" use is "redundant," because uses of voter data that are either "governmental use" or "election campaign purposes" fall under the "umbrella of election related."  May Tr. at 135:9-14 (Vigil).

138.    The Secretary of State's Office took "election related" off the Voter Data Request Form to "provide clarity to the requesters, to anyone using the form, including our state county clerks who would like clear, bright lines" and updated the form to reflect "what the legislature intended . . . that provided for the two defined specific purposes."  May Tr. at 136:14-23 (Vigil).

139.    Trujillo advised that the check boxes for "[r]esearch" and "[o]ther" be removed from the Old Data Request Form in early 2021, just before Lippert signed the 2021 Request Form. May Tr. at 138:1-19 (Vigil).

140.    The Secretary of State maintains that it was an oversight for the Secretary of State's Office not to remove the word, "research" from the affidavit portion of the 2021 Request Form, and that word was removed in the subsequent form's version -- the Feb. 10 Request Form.  May Tr. at 139:8 (Greim).  See id. at 139:5-14 (Greim, Vigil); id. at 140:2-4 (Greim, Vigil).

141.    The Secretary of State receives feedback from "external customers, our partners, which are stakeholders, [and] county clerks," May Tr. at 139:18-21 (Vigil).

142.    The changes made to the Feb. 10 Request Form "came out of a conversation mainly with . . . the Otero County Clerk," May Tr. at 140:8-15 (Vigil), because the Otero County Clerk's

Office is "inundated with records requests at this point in that time, you know, along with interest in the 2020 election," May Tr. at 140:19-21 (Vigil).

143.    The Otero County Clerk "reached out" to the Secretary of State's Office "based on a forensic audit that was being approved by her county commission, and she had a very long list of public records[;] [o]ne of those items was a request for voter rolls," and the Otero County Clerk was "using a form that was not the prescribed form."  May Tr. at 141:4-10 (Vigil).

144.    The Secretary of State would have provided voter data to Voter Reference directly, if Voter Reference was "simply going to analyze it, and then publish this information about the discrepancy," May Tr. at 142:13-15 (Greim), if Voter Reference was not going to distribute the data further, see May Tr. at 142:5-25 (Greim, Vigil).

145.    The Secretary of State's Office contends that "putting [voter data] online for the world to access is not a lawful use, and it raises security concerns."  May Tr. at 143:4-6 (Vigil).

146.    The Secretary of State's Office contends that, if, a requestor does any of the four bullet points on the Feb. 14 Request Form that a requester has to initial, including "'sell, loan, provide access to, or otherwise surrender voter information received as a result of this request,'" then the requester is breaking New Mexico law, regardless of "why they do it."  May Tr. at 149:3-13 (Greim, Vigil)(quoting Feb. 14 Request Form at 2).

147.    The Secretary of State will still accept old versions of the form, such as the 2021 Request Form.  See Transcript of Hearing at 4:19-22 (Greim,Vigil)(taken June 15, 2022), filed June 24, 2022 (Doc. 35)("June Tr.").

148.    The Secretary of State's website states that "SERVIS (State Elections Registration

and Voting Integrity System) data may be purchased for government and campaign purposes only. This data includes each voter's name, address, telephone # (with voter's consent), year of birth, party affiliation, and registration data such as county, precinct, and district information."  New Mexico Secretary of State, State of New Mexico Voter Data Information Request, https://www.sos.state.nm.us/voting-and-elections/data-and-maps/ (last visited July 8, 2022).  See June Tr. at 8:1-4 (Greim, Vigil); New Mexico Secretary of State, State of New Mexico Voter Data Information Request at 2, admitted as Plaintiffs' Exhibit 3 at the June 15, 2022 Hearing, filed June 24, 2022  (Doc. 44-15)("SOS Data Information Webpage").

149.    The SOS Data Information Webpage informs the public that "[a]nyone who purchases SERVIS data must sign an Authorization Form (PDF Format), swearing the data will not be made available for or used for commercial or unlawful purposes."  SOS Data Information Webpage at 2.

150.    The Secretary of State's Office takes the position that data may only be shared within an organization that properly requests the data.  See June Tr. at 9:14-10:2 (Greim, Vigil).

### 18.    The Otero County Audit.

151.     The Secretary of State issued a press release on March 2, 2022, "reminding New Mexican voters about their rights to privacy after problematic reports have emerged as a third-party election 'audit' is being conducted in Otero County."  Press Release, Secretary of State and Attorney General Issue Voter Risk Advisory After Problematic Reports Emerge About Otero County Election Audit; Hotline Available to Voters at 2 (dated March 2, 202), admitted as Joint Exhibit G, filed June 24, 2022 (Doc. 44-7)("Mar. 2 Press Release")(no citation for quotation).  See June Tr. at 12:16-25 (Greim, Vigil).

- 34 -

152.     The Mar. 2 Press Release states in part:

Through limited publicly available voter data, it is possible to tell your party affiliation (or lack thereof) and if you voted in a particular election. This data can only be obtained by certain groups, like academic organizations and political parties[.]  The New Mexico Audit Force is not one of these specified groups and has not obtained New Mexico voter data from our office[.]  But, again, your specific ballot choices are always secret.

Mar. 2 Press Release at 2-3.  <u>See</u> June Tr. at 13:18-14:3 (Greim, Vigil).

153.     New Mexico Audit Force did not obtain voter data for its canvassing of voters directly from the Secretary of State's Office; Vigil does not know from where New Mexico Audit Force got the data.  <u>See</u> June Tr. at 14:25-15:3 (Vigil).

154.     The Secretary of State's Office referred New Mexico Audit Force for criminal prosecution, because it did not obtain voter data from the Secretary of State's Office, and because the Office received complaints that canvassers were intimidating voters.  <u>See</u> June Tr. at 14:20-15:5 (Greim, Vigil).

155.     Members of New Mexico Audit Force were canvassing voters in Otero County and asking "if this person voted, how they voted, who they voted for, information that was not required of the voter, and was being presented as if it was a requirement to answer these individuals, because they were representing a government entity."  June Tr. at 16:8-13 (Vigil).

156.     According to the Secretary of State, "as long as it doesn't rise to the level of intimidating the voter, there is not a prohibition on using the data to interact with voters."  June Tr. at 20:10-13 (Vigil).

157.     Vigil draws a distinction between an organization interacting with one voter -- and disclosing voter data about that voter to the voter in question -- and "handing over [data from] a

list of all voters."  June Tr. at 21:4-10 (Vigil).

**PROCEDURAL HISTORY**

On March 28, 2022, Voter Reference filed the Complaint and its PI Motion.  See Complaint at 1; PI Motion at 1.  On April 14, 2022, the Defendants filed the Defendants' Response to Plaintiffs' Motion for Preliminary Injunction at 1 (Doc. 13)("PI Response"), and on April 21, 2022, the Defendants filed their answer to the Complaint, see Defendants' Answer at 1, filed April 21, 2022 (Doc. 16)("Answer").  On May 2, 2022, the Plaintiffs filed the Plaintiffs' Reply in Support of Motion for Preliminary Injunction, filed May 2, 2022 (Doc. 19)("PI Reply").  The Court held hearings on May 17, 2022, see Clerk's Minutes at 1, filed May 17, 2022 (Doc. 38), and on June 15, 2022, see Clerk's Minutes at 1, filed June 15, 2022 (Doc. 42).

1.      **The Complaint.**

In its Complaint, Voter Reference brings claims against the Defendants on five counts, for violations of the First and Fifth Amendments to the Constitution of the United States of America, U.S. Const. amends. I, V, pursuant to 42 U.S.C. § 1983, and for Declaratory Judgment pursuant to 28 U.S.C. § 2201.  See Complaint ¶¶ 72-129, at 19-31.  First, Voter Reference asserts that publishing information constitutes protected speech under the First Amendment, see Complaint ¶ 75, at 20 (citing Sorrell v. IMS Health Inc., 564 U.S. 552, 570 (2011)), and that the "ability to receive information is also a fundamental First Amendment right," Complaint ¶ 76, at 20.  Voter Reference contends that "a law imposing criminal penalties on protected speech is a stark example of speech suppression," Complaint ¶ 77, at 21, and that "[s]peech sharing non-confidential information about the voting history of New Mexico voters . . . sits at the zenith of First Amendment protection," Complaint ¶ 78, at 21.  Voter Reference contends that New Mexico's use

- 36 -

restrictions on voter data "cannot stand unless they survive strict scrutiny," Complaint ¶ 79, at 21, and that "'speech restrictions based on the identity of the speaker are all too often simply a means to control content,'" Complaint ¶ 80, at 21 (citing and quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340-41 (2010)("Citizens United")).

Voter Reference asserts that it is too difficult and expensive for individuals like Steinberg to get the same access to voter data as political campaigns without Voter Reference obtaining and disseminating the information. See Complaint ¶ 81, at 22. By "criminalizing the dissemination of voter information, including via the Internet, the Use Restrictions do not leave open ample, comparable, and effective alternative channels for communication." Complaint ¶ 83, at 22.

Second, Voter Reference alleges that the use restrictions' "wholesale prohibition on distributing voter data and information except for very limited purposes preordained by the State operates as a presumptively invalid prior restraint on speech," Complaint ¶ 89, at 23, and that the State bears a heavy burden to justify prior restraints, Complaint ¶ 91, at 24 (citing Capital Cities Media, Inc. v. Toole, 463 U.S. 1303, 1305 (1983)). Voter Reference argues that the use restrictions "operate as a de facto licensing system," and that the Secretary of State is exercising improper discretion in granting or denying use requests, particularly when the State knows the identity of who is requesting the data. Complaint ¶ 92, at 24. Voter Reference asserts that prior restraints on disseminating information "relevant to -- and perhaps critical of -- government activity is a core concern of the First Amendment." Complaint ¶ 94, at 25 (citing Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 838 (1978)). Voter Reference asserts that New Mexico "cannot demonstrate that the Use Restrictions are justified without reference to the content of the prohibited

speech," because they "only apply if the voter data is being shared with the public."  Complaint ¶ 95, at 25.  Voter Reference argues that New Mexico cannot demonstrate that the use restrictions "serve a compelling governmental interest," Complaint ¶ 96, at 26, and that, if the State exercises discretion based on the identity of the requester and that requester's political ideology, it "engages in viewpoint discrimination,"  Complaint ¶ 97, at 26.

Third, Voter Reference asserts that the use restrictions -- including criminal penalties for unlawful use of voter data -- are "impermissibly vague both as written and as interpreted and enforced by the Secretary of State."  Complaint ¶ 108, at 28.  Voter Reference argues that its intended use of voter data falls under the Election Code's term, "'election' purposes," but that the Secretary of State understands the category of "election" purposes too narrowly, as being a subcategory of "election campaign purposes."  Complaint ¶ 109, at 28 (no citation for quotation). Furthermore, Voter Reference notes that "'election' lacks any definition within the statute." Complaint ¶ 109, at 28 (no citation for quotation), and argues that "the uncertain meanings and interpretations of the state fail to provide sufficient guidelines for Plaintiffs and others to know what conduct is permissible and what is prohibited," resulting in a chilling effect on speech. Complaint ¶¶ 110-111, at 28-29.

Fourth, Voter Reference argues that the use restrictions are "overbroad in that they regulate and prohibit substantially more protected speech than is necessary to accomplish any legitimate government interest[] furthered by the restrictions."  Complaint ¶ 115, at 29.  Voter Reference argues that this concern is "especially strong where, as here, the statute imposes criminal sanctions."  Complaint ¶ 117, at 29 (citing <u>Virginia v. Hicks</u>, 539 U.S. 113, 119 (2003)).   Voter

Reference contends that the criminal sanctions cause speakers "to remain silent rather than communicate even arguably unlawful words, ideas, and images." Complaint ¶ 117, at 30 (citing Dombrowski v. Pfister, 380 U.S. 479, 494 (1965)). Fifth, Voter Reference asks the Court to issue declaratory judgment in its favor, declaring the use restrictions to be in violation of the First Amendment, invalid prior restraints on speech, and unconstitutionally vague and overbroad. See Complaint ¶¶ 125-128, at 31. Voter Reference states that it seeks a PI and permanent injunction "enjoining Defendants and all of their agents and employees from enforcing the Use Restrictions against Plaintiffs in violation of their constitutional rights." Complaint ¶ 129, at 31.

## 2.   **The PI Motion**.

In the PI Motion, Voter Reference and Steinberg state that "New Mexico law prohibits the use and dissemination of voter information (who has voted, and in which elections) for all but a few limited purposes preapproved by the State," which they characterize as "a prohibition on speech." PI Motion ¶ 1, at 1. Voter Reference and Steinberg assert that they have obtained, used, and disseminated voter information for "election purposes" to "increase voter participation and provide transparency regarding New Mexico elections." PI Motion ¶ 1, at 1. The Plaintiffs ask the Court to "issue a preliminary injunction prohibiting Defendants and all persons in active concert or participation with them . . . from taking any action" to:

    a.     prohibit Plaintiffs from disseminating or using voter information available under New Mexico law for purposes related to election integrity, election transparency, and increasing voter participation; or,

    b.     cite, prosecute, punish, or otherwise enforce the use restrictions in N.M. Stat. § 1-4-5.5 or any substantially similar restrictions against Plaintiffs, including by prosecuting Plaintiffs under N.M. Stat. § 1-4-5.6, as a result of Plaintiffs' use of the voter information.

PI Motion ¶ 4, at 2-3.

**3.      The PI Memo.**

In the PI Memo., the Plaintiffs assert that, under New Mexico law, "voter information may only be used for approved purposes listed in [N.M.S.A. §§ 1-4-5.5 and 1-4-5.6] -- including 'governmental or election and election campaign purposes' -- while all other uses are prohibited and unlawful," but that New Mexico's "Use Restrictions"[3] "on using voter information for anything other than 'governmental' and 'election campaign purposes' prohibits the dissemination of and speech about the information for various constitutionally protected purposes -- including election integrity, public education, and media reporting, among others." PI Memo. at 19.  Voter Reference and Steinberg assert that their "past and intended use of the voter information is permissible under New Mexico law and protected by the First Amendment."  PI Memo. at 19. Voter Reference states that Oliver's "threat that she might deem Plaintiffs' use as nefarious or unworthy" harms it, and states that it has removed New Mexico voter information from VoteRef.com.  PI Memo. at 19.

Voter Reference and Steinberg argue that they meet the PI test's four prongs: "(1) a likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable

---

[3]Voter Reference and Steinberg define the term "Use Restrictions"  as:

(1)      restrictions on a use of the data that is not for a specific candidate or ballot measure campaign, but that is for election purposes; and

(2)      restrictions on a use of the data that is not by the government itself, but that is by a private person for the purpose of publishing, reviewing, and engaging in speech regarding the governmental operation of elections.

PI Memo. at 10.

harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and (4) the preliminary injunction is in the public interest." PI Memo. at 20 (citing Verlo v. Martinez, 820 F.3d 1113, 1126 (10th Cir. 2016)). First, the Plaintiffs assert that they are likely to succeed on the merits of their First Amendment claims, because New Mexico's Use Restrictions "constitute direct restrictions on speech which cannot survive strict scrutiny." PI Memo. at 20. The Plaintiffs argue that the First Amendment protects their proposed use of voter data, because "'a major purpose of that Amendment was to protect the free discussion of governmental affairs.'" PI Memo. at 20 (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966)). The Plaintiffs assert that Voter Reference's "creation and dissemination of information" is "speech within the meaning of the First Amendment," PI Memo. at 21 (citing Sorrell v. IMS Health Inc., 564 U.S. 552, 570 (2011), and Bartnicki v. Vopper, 532 U.S. 514, 527 (2001)), as is "Steinberg's receipt and use of that information for the same purposes," PI Memo. at 21 (citing Martin v. City of Struthers, Ohio, 319 U.S. 141, 143, (1943), Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 838 (1978), and Gentile v. State Bar of Nevada, 501 U.S. 1030, 1034 (1991)). The Plaintiffs contend that the Use Restrictions "directly restrict and criminalize this protected speech," and are, therefore, subject to strict scrutiny, "'which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" PI Memo. at 21 (quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340-41 (2010)).

Next, the Plaintiffs argue that the Use Restrictions are "presumptively invalid prior restraints" on speech, because the speech in question is "conditioned upon the prior approval of public officials." PI Memo. at 22 (citing Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546,

553 (1975)).  The Plaintiffs characterize prior restraints as "'the most serious and the least tolerable infringement on First Amendment rights,'" PI Memo. at 22 (quoting New Mexico Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976)), and assert that the State "'carries a heavy burden of showing justification for the imposition of such a restraint,'" PI Memo. at 22 (quoting Capital Cities Media, Inc. v. Toole, 463 U.S. 1303, 1305 (1983)).  The Plaintiffs argue that "the state must demonstrate that the restraint is justified without reference to the content of the speech and is narrowly tailored to serve a compelling governmental interest."  PI Memo. at 22 (citing New Mexico Press Ass'n, 427 U.S. at 571, Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 130 (1992), and Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)).  The Plaintiffs assert that the Use Restrictions "operate as a de facto licensing system," because: (i) requestors must first "submit an application form swearing that the information will be used only for purposes preapproved by the State"; (ii) requestors must pay a fee; (iii) requestors are "subject to potential criminal prosecution" if the requestor "uses the information for a non-approved purpose"; and (iv) the application form "must be approved by a government official . . . before the information is made available."  PI Memo. at 22-23.   The Plaintiffs assert that the Secretary of State "believes there is room to exercise discretion in granting or denying a request," which is "troublesome because the state agent exercising this purported authority knows the identity of the requester (from the request form)" and its "policy views and the goals of its proposed speech, before making the decision on access." PI Memo. at 23.

The Plaintiffs argue that, even if the State is not operating a de facto licensing scheme, the Use Restrictions prohibit the "Plaintiffs from publishing and receiving information about voting

and electoral processes -- core government functions," and contend that "[a] prior restraint on disseminating information relevant to -- and perhaps critical of -- government activity is a core concern of the First Amendment."  PI Memo. at 23.   The Plaintiffs assert that "[t]he State cannot demonstrate that the Use Restrictions are justified without reference to the content of the prohibited speech," and "cannot show that the Use Restrictions are narrowly tailored to serve a compelling governmental interest."  PI Memo. at 24.   The Plaintiffs argue that, "to the extent that the State and its agents exercise their claimed discretion based on the identity of the requester, including the actual or perceived policies that the requester seeks to advance by using and disseminating the data, the State engages in viewpoint discrimination."  PI Memo. at 24.

Next, the Plaintiffs argue that the Use Restrictions are overbroad, because they "prohibit and deter substantially more speech than can be justified under the First Amendment."  PI Memo. at 24.   The Plaintiffs state that "concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions."  PI Memo. at 25 (citing Virginia v. Hicks, 539 U.S. 113, 119 (2003)).   The Plaintiffs note that "'[t]he first step in overbreadth analysis is to construe the challenged [provision]; it is impossible to determine whether a statute reaches too far without first knowing what the [provision] covers.'"  PI Memo. at 25 (quoting United States v. Williams, 553 U.S. 285, 293 (2008))(alterations in PI Memo.).  The Plaintiffs argue that the New Mexico Election Code "prohibit[s] the use or dissemination of voter information" unless it is for "'governmental or election and election campaign' purposes."  PI Memo. at 25 (quoting N.M.S.A. § 1-4-5.5(C)).   The Plaintiffs contend that, "[u]nder the plain language of the statute, use of and speech including voter information for a number of

constitutionally protected purposes is prohibited, including political speech, election integrity, public education, and media reporting, among others." PI Memo. at 25. The Plaintiffs assert that, under the Use Restrictions, "most speech that communicates the voter information to interested citizens is criminalized," and contend that the Use Restrictions are overbroad, because they "prohibit a substantial amount of protected speech both in an absolute sense and relative to the statute's plainly legitimate sweep." PI Memo. at 26.

Next, the Plaintiffs argue that the Use Restrictions are "unconstitutionally vague" and that the Plaintiffs are "left to guess as to whether their proposed uses are unlawful," because the "statute purports to allow voter data to be 'used for governmental or election and election campaign purposes,' yet 'election' appears to have no independent meaning within the statute." PI Memo. at 27 (quoting N.M.S.A. §§ 1-4-5.5). The Plaintiffs assert that, "although the definitions of 'governmental purposes' and 'election campaign purposes' are so broad that they should encompass Plaintiffs' use of the information," the Secretary of State "avers that their use is unlawful." PI Memo. at 27 (quoting N.M.S.A. §§ 1-4-5.5). The Plaintiffs argue that the "Use Restrictions are impermissibly vague because they fail to establish standards for those who enforce the order, inviting discriminatory and arbitrary enforcement based on whether the enforcer agrees with the speech or conduct at issue." PI Memo. at 27. The Plaintiffs argue that the Use Restrictions, therefore, invite the State "to select the 'permissible subjects for public debate' and thereby to 'control . . . the search for political truth.'" PI Memo. at 27 (quoting Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y., 447 U.S. 530, 538 (1980)).

The Plaintiffs argue that, because they are likely to succeed on the PI test's first prong -- likelihood of success on the merits -- "the Court need not consider the three remaining factors." PI Memo. at 28 (citing Verlo v. Martinez, 820 F.3d 1113, 1126 (10th Cir. 2016)).   As to the PI test's second prong, the Plaintiffs argue that "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'"  PI Memo. at 28-29 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).   The Plaintiffs assert that they "have experienced, and will continue to experience, irreparable harm absent injunctive relief."  PI Memo. at 29.

Regarding the PI test's third and fourth prongs -- the balance of equities is in the moving party's favor and the preliminary injunction is in the public interest -- the Plaintiffs state that the State's interest in "regulating how voter information may be used . . . does not trump the First Amendment rights of Plaintiffs and others who wish to use the voter information to engage in constitutionally protected speech."  PI Memo. at 29.  The Plaintiffs assert that "[t]he public interest almost universally favors the protection of constitutional rights," and "is served both by the exercise of First Amendment rights and the absence of infringements on those same rights."  PI Memo. at 29.  The Plaintiffs argue that "New Mexico has no legally cognizable interest in enforcing an unconstitutional law and cannot be harmed if enforcement is enjoined."  PI Memo. at 29.

### 4.  The PI Response.

The Defendants argue that the Plaintiffs do not meet the burden required to obtain a PI, particularly a "disfavored injunction that would disrupt the status quo and provide the full relief Plaintiffs could obtain on the merits."  PI Response at 2.  The Defendants summarize the voter

- 45 -

information protections in New Mexico's Voter Records System Act, N.M.S.A. §§ 1-5-1 through 1-5-31, asserting that "[b]oth the integrity and privacy of voter files are protected by law."   PI Response at 2-3.  The Defendants also contend that "the Secretary of State and county clerk offices are required to 'take measures to minimize the risk of unauthorized disclosure, unauthorized acquisition, unauthorized access or other situation that would provide access to voter registration records outside what is allowable by law,'" PI Response at 3 (quoting 1.10.35.11 NMAC), and highlight provisions which guard the confidentiality and security of online voter registration, PI Response at 3 (citing N.M.S.A. § 1-4-18.1(H)).  The Defendants assert that "employees with access to voter files are prohibited from allowing 'unauthorized access and unauthorized reproduction' of the voter files and may only provide copies to 'the secretary of state, the county clerk or their designated agents," PI Response at 4 (quoting N.M.S.A. § 1-5-21(B)), and note that anyone who "'unlawfully copies, conveys or uses information from a certificate of registration is guilty of a fourth degree felony,'" PI Response at 4 (quoting N.M.S.A. § 1-4-5(E)).

The Defendants contend that New Mexico law "provide[s] for the public disclosure of voter data," but that "such disclosures are highly limited and regulated."  PI Response at 4 (citing N.M.S.A. § 1-4-5.5(C).  The Defendants note that requesters need to make a "'written request to the county clerk or secretary of state,'" PI Response (quoting N.M.S.A. § 1-4-5.5(A)), and "'sign an affidavit that the voter data . . . shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes,'" PI Response at 4 (quoting N.M.S.A. § 1-4-5.5(C)).  The Defendants also state that "the Secretary of State is required to maintain a detailed log "containing all transactions regarding requests for current registration

lists of state voters.'"  PI Response at 4 (quoting N.M.S.A. § 1-5-3(B)).

The Defendants assert that Voter Reference "wishes to upload to its website New Mexico voter data for every registered voter in New Mexico," and that Steinberg "wishes to have free and convenient access to New Mexico voter data via VRF's website," even though neither party "submitted a request to the Secretary of State or any county clerk for any voter data."  PI Response at 6.  The Defendants note that David Lippert, "in association with an entity called Local Labs," requested the data, paid the fee, and signed the affidavit.  PI Response at 6.  The Defendants contend that, "[b]ecause VRF never submitted a request for voter data under Section 1-4-5.5, its First Amendment claim does not implicate Subsection (C)'s restrictions on the use of such data ('Use Restrictions') as preconditions to obtaining the data."  PI Response at 7.  The Defendants assert instead that, because Voter Reference already obtained the data from Local Labs, "VRF's claim falls under Section 1-4-5.6, because that section prohibits the *publication* of voter data on the VRF (or any) website -- a prohibition that does not depend on the data's intended use separate from or subsequent to publication."  PI Response at 7.  The Defendants argue that, because N.M.S.A. § 1-4-5.6 "is constitutional as applied to VRF," the Court should deny the PI.  PI Response at 7.

Turning to a PI's requirements, the Defendants assert that the Plaintiffs are requesting a disfavored injunction, because their requested PI "'changes the status quo'" and "'grants all the relief that the moving party could expect from a trial win.'"  PI Response at 8 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, Colo., 916 F.3d 792, 797 (10th Cir. 2019)).  The Defendants argue that, as a result of seeking a disfavored injunction, the Plaintiffs may not rely on

the Tenth Circuit's "'modified-likelihood-of-success-on-the-merits standard' that permits a party to make a lesser showing of likely success where the balance of harms tips in its favor."  PI Response at 8 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975-76 (10th Cir. 2004)(en banc)).  In terms of the PI test's four prongs, the Defendants argue that the Plaintiffs are unlikely to prevail on their First Amendment claims, because "VRF has no First Amendment right to publish information obtained *unlawfully* from government records."  PI Response at 9 (emphasis in original).  The Defendants reiterate that N.M.S.A. § 1-4-5.6 "prohibits both Local Labs' presumptive sale of New Mexico voter data to VRF and VRF's subsequent wholesale publication of that voter data on its website," and agree that its "'prohibition on *disclosing* [New Mexico voter data] is a direct regulation of speech.'"  PI Response at 9 (quoting Dahlstrom v. Sun-Times Media, LLC, 777 F.3d 937, 949 (7th Cir. 2015)(emphasis in Dahlstrom v. Sun-Times Media)(alteration in PI Response only).  The Defendants assert that the Court's standard of review "'hinges on whether the regulation is content based, which requires us to apply strict scrutiny, or content neutral, which demands only an intermediate level of scrutiny.'"  PI Response at 9 (quoting Dahlstrom v. Sun-Times Media, LLC, 777 F.3d at 949).

The Defendants cite a case about the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721-2725 ("DPPA"), for the proposition that "'[d]isclosures that are prohibited by virtue of the source, rather than the subject matter are easily categorized as content neutral.'" PI Response at 10 (quoting Dahlstrom v. Sun-Times Media, LLC, 777 F.3d at 949).  Analogizing voter information to motor vehicle records, the Defendants argue that, like the DPPA, N.M.S.A. § 1-4-5.6 "is content neutral because its public safety goals are unrelated to the content of the regulated expression."  PI

Response at 10.  See PI Response at 11.  The Defendants explain:

> Section 1-4-5.6's (and, by incorporation by reference, Section 1-5-22(A)'s) prohibition on disclosure of New Mexico voter data . . . only applies to voter data obtained from New Mexico's mandatory voter registration system and is completely agnostic to the dissemination of the very same information -- a voter's name, gender, address, party affiliation, voting history, etc. -- acquired from a different source, including directly from the voter.

PI Response at 11.  The Defendants contend that "[t]he New Mexico Legislature's goal of protecting voter privacy in order to foster trust in the voter registration system, thereby increasing voter registration . . . is evident from the multiple security and privacy restrictions in the Voter Records System Act" and "is completely unrelated to the actual contents of any given voter file"; consequently, the prohibition on disclosure is "unrelated to the *message* communicated by voter data." PI Response at 11 (emphasis in original).  The Defendants argue that N.M.S.A. § 1-4-5.6's limitation is content-neutral and will "'withstand First Amendment scrutiny,'" because "'it furthers an important or substantial governmental interest'" which is "'unrelated to the suppression of free expression'" and is "'no greater than is essential to the furtherance of that interest.'"  PI Response at 11 (quoting Dahlstrom v. Sun-Times Media, LLC, 777 F.3d at 952).

The Defendants assert that N.M.S.A. § 1-4-5.6 "furthers at least four important state interests" that are "unrelated to the suppression of free expression":

-   It ensures that only individuals who sign the requisite affidavit and, therefore, are made explicitly aware of the permissible uses of New Mexico voter data, have access to such data;

-   It ensures payment of reasonable fees for the production of voter data, which fees subsidize the mandatory voter registration system;

-   It encourages voter registration by ensuring voters that their voter data will only be disclosed on a need-to-know basis and under penalty of perjury,

thereby fostering trust in the registration system by protecting registered voters from unwanted solicitations, harassment, and abuse; and

- Because voter data produced at any single moment represents a "snapshot" of the voter files as of that moment, whereas voter files may change in the future, thereby rendering the produced voter data no longer accurate, disseminating voter data may lead to disinformation, which would further erode voter confidence in the voter registration system.

PI Response at 11-12.  The Defendants quote Van Allen v. Cuomo, 621 F.3d 244, 249 (2d Cir. 2010), for the proposition that "'the state has a legitimate interest in encouraging new voter registration' and participation in the electoral process," and cite R.I. Ass'n of Realtors, Inc. v. Whitehouse, 51 F. Supp. 2d 107, 113 (D.R.I. 1999)(Torres, J.), for its recognition that the State has a "legitimate and substantial interest in protecting privacy rights of citizens by establishing appropriate limitations on access to or use of personal information citizens are compelled to furnish to government agencies."  PI Response at 12.

The Defendants argue that allowing disclosure and dissemination of voter data "outside the regulatory process would (i) take the data outside the protections afforded by the mandatory affidavit; (ii) result in no fees being paid to the State; (iii) expose registered voters to potential unwanted solicitations, harassment, and abuse; and (iv) eventually result in stale information being publically [sic] available."  PI Response at 12 (citing Fusaro v. Howard, 19 F.4th 357, 370 (4th Cir. 2021)).  The Defendants argue that its restrictions are "no greater than is essential to the furtherance of these interest[s]," because "*any* dissemination of New Mexico voter data outside the legislatively prescribed process would completely frustrate each of the State's important interests."  PI Response at 13 (emphasis in original).  The Defendants assert that Voter Reference can obtain the information it seeks by "polling New Mexico residents directly," and argue that,

although it "would be less convenient than obtaining the information from the voter registration system," the First Amendment "does not protect convenience," and "the Legislature 'could decide not to give out [voter data] at all without violating the First Amendment.'"  PI Response at 13 (quoting L.A. Police Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 40 (1999)).

The Defendants argue that, even if Voter Reference seeks the same data on its own behalf, "VRF's act of obtaining such data from the Secretary of State with the intent to upload it on its website would still be illegal," because "VRF would be required to attest that it will not 'provide access to . . . voter information received as a result of this request.'"  PI Response at 13-14 (quoting Complaint ¶ 27, at 9).  The Defendants argue that, "[g]iven VRF's admitted intent to upload the data," attesting that it will not share the data with others "would be false" and, therefore, "the line of cases addressing the publication of information obtained *lawfully* does not control."  PI Response at 14 (emphasis in original).

Next, the Defendants argue that Steinberg's "First Amendment claim is premised on her desire for free and . . . more convenient access to New Mexico voter data."  PI Response at 14. The Defendants note that "Steinberg does not provide any authority that would suggest a First Amendment violation in this context," and that New Mexico law does not impose criminal liability on someone in Steinberg's position, that is, "someone who merely receives such data from a third [party] . . . but does not herself violate Section 1-4-5.6 by further distributing the data."  PI Response at 14.  The Defendants assert that Steinberg's claim is akin to an advisory opinion and is "not ripe," because she "never submitted a request for voter data," "'does not have the means or desire to independently pay for the data set,'" and does not intend to pay for the data set.  PI

Response at 14-15 (quoting PI Memo. at 9).  The Defendants argue that the Plaintiffs are unlikely to prevail on their "prior restraint, void-for-vagueness, and overbreadth" challenges, because "the Use Restrictions have no bearing on VRF's claim that it has a constitutional right to *publish* New Mexico voter data on its website."  PI Response at 15 (emphasis in original).

In terms of the PI test's remaining prongs, the Defendants assert that granting the PI "would be contrary to the public interest," because "trust in the voter registration system would be eroded" if "the voter data of each and every New Mexico registered voter [was] released on the internet." PI Response at 16.  The Defendants also contend that it would be "practically impossible" to "claw . . . back" voter information once it is released, and "[t]rust in the voter registration system would be eroded."  PI Response at 16.   The Defendants argue in conclusion that "New Mexicans' statutorily recognized right to privacy in . . . personal information they are required by law to provide as a precondition to exercising their right to vote . . . should be protected until the case is decided conclusively on the merits."  PI Response at 16-17.

5. **The Answer**.

The Defendants responded to the Complaint's allegations on April 21, 2022.  See Answer at 1.  The Defendants raise five affirmative defenses: (i) the Complaint "fails to state a claim upon which relief can be granted"; (ii) the New Mexico "statutes at issue are subject to 'rational basis' review and meet that standard"; (iii) the statutes meet the intermediate scrutiny standard; (iv) the statutes meet the strict scrutiny standard; and (v) the Plaintiffs are not entitled to attorneys' fees. Answer at 13 (no citation for quotation).  The Defendants request that the Court deny the Plaintiffs "any relief," and ask the Court for "other relief as may be just and proper."  Answer at 13.

6.     **The PI Reply**.

The Plaintiffs accuse the Defendants of "float[ing] a novel defense: that New Mexico has no content-based restrictions on sharing data, because it completely bans such sharing in the first place." PI Reply at 2. The Plaintiffs assert that, under that reading of New Mexico statutes, Voter Reference "*committed a felony* as soon as it received the data from its public records vendor, Local Labs." PI Reply at 2 (emphasis in original). The Plaintiffs counter that New Mexico statutes "do[] indeed allow sharing," but allege that this sharing is "based on the content of the speech." PI Reply at 2. The Plaintiffs assert that New Mexico law "*allows* sharing but requires that it be for a permissible use," so that "political parties, campaigns, data collection firms, and nonprofits like VRF can share voter data for governmental, campaign, and election purposes." PI Reply at 2 (emphasis in original).    The Plaintiffs suggest that the "unlawful" purposes in the statute are "commercial purposes." PI Reply at 2-3 (citing N.M.S.A § 1-4-5.5(C)). The Plaintiffs argue that the Defendants misconstrue N.M.S.A. § 1-4-5.5(C) as governing only requesters' private use and that disclosing the data beyond that private use "is a crime." PI Reply at 3. The Plaintiffs counter the Defendants' assertion that "all requesters must promise, on pain of prosecution, not to 'sell, loan provide access to, or otherwise surrender voter information received as a result of this request,' 'regardless of its intended use,'" by saying that this construction comes from the Secretary of State's "own recently reworked 'Request Form'" and not from the statutes themselves. PI Reply at 3 (quoting PI Response at 4, 8). The Plaintiffs accuse the Defendants of making a key error: reading N.M.S.A. § 1-5-22(A) as applying to "requesters like VRF and political parties," when "it applies only to disclosures 'by' particular categories of individuals: state and county workers, and 'data processors'[] (certain government contractors)." PI Reply at 3

(quoting N.M.S.A. § 1-5-22(A), and citing N.M.S.A. § 1-5-2(D)).   The Plaintiffs contend that N.M.S.A. § 1-4-5.6(A) "simply states that the mere violation of a code section . . . is not 'unlawful' unless it is knowing and willful," and that "VRF cannot have broken this law."   PI Reply at 3 (quoting N.M.S.A. § 1-4-5.6(A)).

Turning to the Defendants' asserted facts, the Plaintiffs accuse the Defendants of "misstat[ing] the material facts; the Defendants state that 'VRF displayed email correspondence on its website which clearly disclosed that the data came from the Secretary of State via Local Labs.'"   PI Reply at 4 (quoting Declaration of Gina Swoboda ¶ 5, at 2-3 (executed April 28, 2022), filed May 2, 2022 (Doc. 19-1)("Swoboda Decl.")).   The Plaintiffs assert that "the Secretary has long made the same voter data available to many other well-known firms like Local Labs that openly gather and aggregate voter information for their own clients, typically for either progressive (Catalist) or conservative (Data Targeting, Inc.) political purposes."   PI Reply at 4 (citing 2021 Requests Spreadsheet, filed May 2, 2022 (Doc. 19-3)("2021 Requests")).

The Plaintiffs contend that Voter Reference "reviewed New Mexico law to confirm that its intended use of the data for election purposes was allowed under § 1-4-5.5(C) before asking Local Labs to obtain the data."   PI Reply at 4.   The Plaintiffs assert that Local Labs used an old version of the data request form which "tracks the Election Law," PI Reply at 4 (citing Local Labs' Voter Data Request Form at 18, filed April 14, 2022 (Doc. 13)("Local Labs Form"), and Voter Data Request Form at 2, filed May 2, 2022 (Doc. 19-4)("Old Form")), but that the Voter Data Request Form's new version does not track New Mexico's election law, see PI Reply at 4 (citing Voter Data Request Form at 2, filed March 28, 2022 (Doc. 1-2)("New Form")).   The Plaintiffs explain

that, "in the Old Form, . . . [there are] three boxes to indicate how the data will be used: 'Governmental Use,' 'Campaign Use,' or 'Election Related,'" and that these options "track[] the text of section 1-4-5.5(C) ('governmental or election and election campaign purposes')." PI Reply at 4 (quoting Old Form at 2 and N.M.S.A. § 1-4-5.5(C)). The Plaintiffs state that Local Labs checked the "'Election Related' box," PI Reply at 4 (citing Local Labs Form at 18), and note that the "New Form eliminates the third box, removing 'Election Related' as a permissible category of content for data-related speech," PI Reply at 4 (citing New Form at 2).

The Plaintiffs note other changes between the Old Form and the New Form: on the Old Form, "the Authorization stated that 'the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law,'" whereas, on the New Form, "the requester must swear that it will not 'sell, loan, provide access to, or otherwise surrender voter information received as a result of this request,' *regardless of the use*." PI Reply at 4-5 (quoting Local Labs Form at 18 and New Form at 2)(emphasis in PI Reply). The Plaintiffs emphasize that the Secretary of State created the New Form in February, 2022, after Local Labs signed the Old Form. See PI Reply at 5.

Next, the Plaintiffs turn to the merits of their argument for a PI, asserting that the Defendants injure Voter Reference by "excluding 'election-related' speech as a permissible use" of voter data. PI Reply at 5. The Plaintiffs assert that "New Mexico regulates private parties' access to, and sharing of, voter data by examining the proposed use of the data," "inhibits use of the data for commercial solicitation and harassment," but "allows for free speech in campaigns and in election-related communications by VRF and its citizen-associates like Ms. Steinberg." PI

Reply at 6.  The Plaintiffs argue that New Mexico does not ban a requester from "disclosing data to a client or other party," so long as "any such use . . . meet[s] the content-based criteria set forth in § 1-4-5.5(C)."  PI Reply at 6.  The Plaintiffs contrast their reading of the statutes with the Defendants' reading, critiquing their belief that "VRF's sharing of voter data for election-related purposes is a form of disclosure that is 'criminal.'"  PI Reply at 6 (quoting PI Response at 8).  The Plaintiffs note the Defendants' admission that "the prohibition on disclosure 'is a direct regulation of speech'" and assert that the Defendants' "ban on VRF's speech regarding the voter data" creates "no question" of "First Amendment injury."  PI Reply at 6 (quoting PI Response at 8).

The Plaintiffs next assert that Use Restrictions are content-based, because they "'target[] speech based on its communicative content.'"  PI Reply at 7 (quoting Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015)).   The Plaintiffs look to the Supreme Court of the United States of America's definition of content-based regulations in Reed v. Town of Gilbert, which requires courts to consider "'whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys,'" and whether facial distinctions are based on the speech's "'function or purpose.'"  PI Reply at 7 (quoting Reed v. Town of Gilbert, 576 U.S. at 163-64).  The Plaintiffs assert that, under Reed v. Town of Gilbert, N.M.S.A. § 1-4-5.5 is a content-based regulation, because it "uses 'function or purpose' to decide what speech is lawful," -- "data can be shared 'for **governmental** or **election** and **election campaign purposes only** and shall not be made available or used for unlawful purposes.'"  PI Reply at 7 (quoting N.M.S.A. § 1-4-5.5)(emphasis in PI Reply).  The Plaintiffs critique the Defendants' construction of the statute allowing use of voter data in an electoral campaign to "advocate for Secretary Oliver's reelection," but not allowing its

use "to criticize the Secretary's maintenance of the voter rolls."  PI Reply at 8.

The Plaintiffs accuse the Defendants of "quietly retir[ing]" the Old Form and removing "election-related" as a stated permissible use after making a criminal referral to the New Mexico Attorney General in December 2021.  PI Reply at 8.   The Plaintiffs characterize the Defendants' listed State interests as "all but admit[ting] . . . animus," because the Plaintiffs assert that the Defendants get to decide who may access the data -- "progressive for-profit firms like Catalist" or VRF --  "textbook content or viewpoint-based regulation."  PI Reply at 8-9.  The Plaintiffs argue that the State's interest in "avoiding 'disinformation' veers even more blatantly into viewpoint discrimination," and assert that the Secretary of State substitutes "the statute's three permissible content categories with her own judgment on whether the requester is destined to engage in 'nefarious' speech."   PI Reply at 9 (quoting Press Release, New Mexico Secretary of State Toulouse Oliver Responds to Presidential Election Commission Request for New Mexican Voters Personal Data at 2 (dated June 30, 2017), filed March 28, 2022 (Doc. 1-3)("June 2017 Press Release")).  The Plaintiffs argue that the Use Restrictions are "content or viewpoint based, and must therefore pass strict scrutiny."  PI Reply at 9.

Next, the Plaintiffs argue that the Use Restrictions fail strict scrutiny, because the Defendants have not shown that its interests are compelling or that the Use Restrictions are narrowly tailored.  See PI Reply at 10.   The Plaintiffs accuse the Defendants of "hid[ing] behind their false claim that VRF unlawfully obtained the information at issue and therefore no constitutional rights are implicated."  PI Reply at 10.  The Plaintiffs rebut the Defendants' four State interests justifying the "prohibition on all disclosure" of voter data by stating that: (i) the

Secretary's New Form undermines the first interest in "limiting access to those who are explicitly aware of the permissible uses of New Mexico voter data via the requisite affidavit," because it "imposes restrictions in excess of what the law allows and falsely suggests to signers that it is consistent with the law," and Voter Reference "requires its own users to agree to follow data usage restrictions"; (ii) "the generation of revenue is not a sufficiently compelling interest to impose this severe burden on Plaintiffs' First Amendment rights"; (iii) "encouraging voter registration by ensuring that voter data is disclosed only on a need to know basis under penalty of perjury" is "merely a mechanism[] to favor some speech to the detriment of others based on content or viewpoint" and N.M.S.A. § 1-5-5.6's prohibition on unlawful use already protects the information; and (iv) "avoiding 'disinformation' that might arise from the review of stale data" is also a pretext for content-based or viewpoint-based discrimination.  PI Reply at 10-11 (quoting PI Response at 11).

The Plaintiffs next turn to Steinberg's First Amendment interest in receiving voter data, asserting that the First Amendment "protects Ms. Steinberg's right to receive the information that VRF attempts to share."  PI Reply at 11 (citing Stanley v. Georgia, 394 U.S. 557, 564 (1969); Kansas Jud. Rev. v. Stout, 519 F.3d 1107, 1115 (10th Cir. 2008)).   The Plaintiffs assert that the Defendants "fail to contest the merits" of the Plaintiffs' void-for-vagueness, overbreadth, and prior restraint arguments, and counter that the Defendants "rely entirely on standing, claiming that under their errant reading of New Mexico law, Plaintiffs are subject to a total ban on disclosure under section 1-5-22, rather than the content-based Use Restrictions governing publication in section 1-4-5.5."  PI Reply at 12 (citing PI Response at 14).   The Plaintiffs criticize the Defendants for

"failing to take a position" on the PI Memo.'s key point that, "if 'election-related' speech like [Voter Reference's] is not allowed under section 1-4-5.5 and is instead criminal conduct, then that section is too vague to provide notice." PI Reply at 12. The Plaintiffs support their overbreadth arguments by accusing the Defendants of "stretch[ing] the law beyond the breaking point to criminalize even the re-selling of data to campaigns by well-known firms like Catalist and i360." PI Reply at 12. Turning to their prior restraint argument, the Plaintiffs assert that the Defendants apply "some unknown criterion" to "ban sharing by Local Labs and VRF, but not by Catalist and others who resell the data." PI Reply at 13.

In lieu of discussing the PI test's remaining prongs, the Plaintiffs assert that, "[i]n the First Amendment context, 'the likelihood of success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake," PI Reply at 13 (quoting Verlo v. Martinez, 820 F.3d 1113, 1126 (10th Cir. 2016)), and argue that the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" PI Reply at 13 (quoting Elrod v. Burns, 427 U.S. at 373). The Plaintiffs contend that "the public interest favors vindicating First Amendment freedoms." PI Reply at 13 (citing Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir.2005)). The Plaintiffs urge the Court to grant their PI should the Court agree that the Plaintiffs are "likely to prevail on any of their First Amendment theories." PI Reply at 13.

### 7.   The May Hearing.

The Court held a hearing on the PI Motion on May 17, 2022. See Clerk's Minutes at 1, filed May 17, 2022 (Doc. 38). The Court began the hearing by telling the parties its "thinking on

this," so that they had "something to shoot at this afternoon."  May Tr. at 2:24-3:1 (Court).  The Court stated that N.M.S.A. § 1-4-5.5(E)'s definitions of "election campaign purposes" and "governmental purposes" "are the most important," and they "signal[] to me that the legislature intended those terms to be defined broadly, rather than in a narrow way."  May Tr. at 3:1-12 (Court).   The Court noted that the statutes' limitation on commercial purposes is important, and that, other than the limitation on commercial uses, it reads the statutes as signaling that the New Mexico legislature does not intend for the enumerated purposes to be "defined narrowly."  May Tr. at 3:12-18 (Court).  The Court examined N.M.S.A. § 1-5-22(A), and stated that it believes that this provision is irrelevant, because it applies to "data processors" -- "those people that the Secretary of State and the counties and their clerks contract to do the work that state employees would not normally do" and "makes criminal the use by those people of misusing information that the state and the counties give."  May Tr. at 4:6-18 (Court).  The Court stated that it believes that Local Labs' and Voter Reference's use of the data is "lawful under New Mexico State law," because it "relate[es] in any way to election campaign purposes, and relat[es] in any way to governmental purposes."  May Tr. at 4:21-25 (Court).

The Court then stated its inclination not to afford deference to the Secretary of State in construing the statutes, because the Supreme Court of New Mexico in Marbob Energy Corp. v. N.M. Oil Conservation Comm'n, 2009-NMSC-013, 146 N.M. 24, 206 P.3d 135, holds that New Mexico courts "'afford little, if any, deference to the agency on issues of statutory construction.'" May Tr. at 5:13-16 (Court)(quoting Marbob Energy Corp. v. N.M. Oil Conservation Comm'n, 2009-NMSC-013, ¶ 7, 146 N.M. at 28, 206 P.3d at 139).  See id. at 5:3-12.  The Court then stated

that, as a federal court, "probably I can't enjoin the Attorney General and Secretary of State from misconstruing their own law," because "that's kind of their business," and "I probably can't stop a prosecution." May Tr. at 5:25-6:4 (Court). The Court stated that "I can give you a piece of paper that says: This is my interpretation of New Mexico law" and then the Secretary of State can "go to [her] own state court[] and attempt to persuade the state courts that I do not have the correct interpretation but that they do." May Tr. at 6:4-9 (Court).

The Court commented further that, "really the only way the plaintiff is going to get any injunction here is to . . . persuade me that . . . what the State of New Mexico is doing violates the federal constitution," and that "there is a right here that is violated." May Tr. at 6:10-15 (Court). The Court noted that, once it determines that the Defendants' interpretation of state law is incorrect, the Plaintiffs' argument has to be "some sort of selective prosecution or attempted prosecution or referral." May Tr. at 6:21-7:4 (Court). The Court continued: "[I]f you assume [the Defendants'] construction to be correct," then the Plaintiffs' second argument based on federal rights is that the statutes are "not content neural." May Tr. at 7:10-13 (Court). The Court voiced its concern with that argument, "because if you assume [the Defendants'] construction to be correct, it looks to me like it's neutral; they may not be enforcing it against everybody, but at least the plain language is neutral." May Tr. at 7:13-18 (Court).

The Court then called the Plaintiffs to argue and call witnesses in support of their PI Motion. See May Tr. at 8:2-6 (Court). The Plaintiffs informed the Court that they had agreed with the Defendants to a stipulation of facts and exhibits, which was filed that same day. See May Tr. at 8:18-19 (Greim)(citing Joint Stipulations for May 17, 2022 Hearing on Plaintiffs' Motion for

Preliminary Injunction at 1-4, filed May 17, 2022 (Doc. 32)).  The Plaintiffs presented a binder to the Court which included the stipulated exhibits, as well as the Defendants' and Plaintiffs' exhibits. See May Tr. at 8:25-9:3 (Greim).

The Court asked the Plaintiffs several questions; it first asked the Plaintiffs to "explain the kind of errors . . . that Voter Reference wants VoteRef.com users to find in the voter data to ensure . . . 'election transparency and integrity.'"  May Tr. at 10:18-22 (Court)(quoting Complaint ¶ 48, at 13).  The Plaintiffs responded that "there are some . . . basic errors with dates of birth, address, people are listed as being on the voter rolls who shouldn't be on, they've passed away," May Tr. at 11:7-10 (Greim), but also errors related to "discrepancy," which the Plaintiffs explained as the difference between "everybody who has gone and cast a ballot on election day" and "the voter rolls," which "contain a designation for each person who did vote."  May Tr. at 11:16-25 (Greim). The Plaintiffs explained that Voter Reference "wants Secretaries of State and chief election officers to make public the reconciliation of those two numbers," May Tr. at 12:3-5 (Greim) -- it wants the Secretary of State to "show[] its work," May Tr. at 12:15 (Greim).  The Court asked the Plaintiffs whether they are "asking only for the data from election day," May Tr. at 12:19-20 (Court), to which they responded "No," and explained that the first data set they received was from April 2021, five months after election day, May Tr. at 12:21-25 (Greim).

The Court next asked the Plaintiffs how Voter Reference seeks to "'rectify'" the errors that VoteRef.com users might find in the data.  May Tr. at 13:9-13 (Court)(quoting Complaint ¶ 34, at 10).  The Plaintiffs explained the process by which VoteRef.com users get into the website, then stated that a potential user might first "check your own record, make sure your own information is

correct," "[t]hen you might check your spouse and your family members."  May Tr. at 14:2-5 (Greim).

> The entire point of this is for voters to sort of take control of their own records and sort of become responsible for accuracy of their own records.  And they can contact the county clerk and say: There is a mistake.  That's a much faster and more citizen-engaged way of making sure the voter records are accurate, than just hoping that they cross-reference databases at the state level every couple of months.

May Tr. at 14:7-16 (Greim).  The Court asked the Plaintiffs what the website's users are comparing this voter registration data to, see May Tr. at 14:20-21 (Court), and the Plaintiffs responded: "[I]t's just their own knowledge . . . . [I]f it's their own record, they know where they've lived, the know what their birthday is.  If it's a relative, they know the same thing," May Tr. at 14:23-15:2 (Greim).  The Plaintiffs added that users can "do a precinct pull" and they might see that a "110-year-old person voted," and "[y]ou don't have to be some kind of specialist."  May Tr. at 15:4-17 (Greim).

The Court asked the Plaintiffs how "Voter Reference wants to crowd source its supporters to . . . use the data,"  May Tr. at 16:1-2 (Court), and the Plaintiffs responded that, if users "see a mistake" they can "report[] that to the Secretary of State."  May Tr. at 16:8-15 (Greim).  The Court returned to its question about voter rolls on election day, and asked why, "[i]f Voter Ref[erence] is concerned with voter fraud, then doesn't it need to access voter rolls as they stand on election day?"  May Tr. at 16:16-19 (Court).  The Plaintiffs responded that "[i]t's not necessarily about . . . voter fraud," but rather, "[i]t's really about transparency of the election rolls."  May Tr. at 16:20-23 (Greim).  The Plaintiffs agreed that election day data is "the most important data set" for the "reconciliation of everybody who cast a ballot versus everybody who the voter rolls shows as having voted."  May Tr. at 17:4-7 (Greim).  The Plaintiffs added that this reconciliation is "actually done by VRF staff" and noted that "individual citizens aren't looking at the whole data set,"

because they "don't have those other numbers [from] the Secretary of State" -- "Voter Refence

gets those from open records requests."  May Tr. at 17:9-13 (Greim).   The Plaintiffs asserted that

New Mexico "ignored" Voter Reference's records request.  May Tr. at 17:13-14 (Greim).  The

Plaintiffs argued that getting a "snapshot in time on election day" of voter data "would be the gold

standard," otherwise they have to "work backwards" and ask the Secretary of State to account for

who has been added and removed from the rolls.  May Tr. at 17:20-25 (Greim).  The Plaintiffs

speculated that, "if New Mexico ever starts responding to the open records request again" "[w]e

may learn that New Mexico doesn't . . . [keep a] paper trail to get us back to zero."  May Tr. at

18:6-10 (Greim).  The Plaintiffs asserted that "more disclosure is better," May Tr. at 18:14-15

(Greim), and stated that Voter Reference's approach promotes transparency -- the Plaintiffs argued

that other States like Colorado have allowed Voter Reference to have the data and make it publicly

available so that Voter Reference can "figure out what the discrepancies are," May Tr. at 18:24-

19:3 (Greim).

        The Court next asked why Voter Reference did not apply for the data itself.  See May Tr.

at 19:6-8 (Court).  The Plaintiffs responded that Local Labs "is a specialist in getting public

records," "does this all over the country," and Voter Reference decided to go to Local Labs in

early 2021 instead of "staffing up Voter Reference Foundation with lots of workers."  May Tr. at

19:9-15 (Greim).  The Plaintiffs emphasized that VoteRef.com has a "chain of custody document"

that shows how Voter Reference acquired the data.  May Tr. at 19:18-21 (Greim).  The Court asked

whether users can download the data from VoteRef.com, see May Tr. at 20:13-14 (Court), and the

Plaintiffs responded, "I think the answer is no[,] [b]ut that may be a question for one of the

witnesses," May Tr. at 20:15-16 (Greim).   The Court asked how VoteRef.com ensures that "the data is not used to harass or intimidate voters," May Tr. at 20:19-20 (Court), and the Plaintiffs responded that, "once somebody has the data, you can't actually physically stop them from doing it.  We simply make them aware of the law, and make them agree, by clicking that they agree, and that's what gives them access."  May Tr. at 21-25 (Greim).  The Plaintiffs stated that they "don't have any other way of going out and following people or tracing backwards from instances of harassment," but added that they are not aware of "anyone using the data for some other nonelection-related purpose."  May Tr. at 20:25-21:4 (Greim).  The Court asked how VoteRef.com "ensure[s] that members of the public will not use the data for commercial purposes," May Tr. at 21:5-7 (Court), and the Plaintiffs responded that it is the same disclosure "in the same way the Secretary of State just has the affidavit from the requester," May Tr. at 21:12-14 (Greim).

The Court next asked the Plaintiffs whether there is a "relationship between Restoration Action, Inc. and Restoration PAC," May Tr. at 21:19-21 (Court), to which the Plaintiffs responded that "they are under common control," May Tr. at 21:22 (Greim), and added: "I don't really know what Restoration [Action, Inc., a 501](c)(4) is doing with Restoration PAC.  But I can say a PAC has to be doing candidate-related activities.  And I can say that VRF is not engaged in candidate-related activities," May Tr. at 22:5-9 (Greim).  The Court asked "[w]hat is your strongest Supreme Court and/or Tenth Circuit case that supports a First Amendment right to public access to this data," "[a]ssuming that the State is correct [and that] they don't have to give it to you?"  May Tr. at 22:13-19 (Court).  The Plaintiffs replied that "the First Amendment theory" which they are "going to mention here . . . only goes to the denial of access," and goes to "the prosecution and the

threats for sharing the data, for using the data."  May Tr. at 23:1-6 (Greim).  The Plaintiffs
continued:

> I think that the best argument that goes to the failure to share data is not that there
> is a First Amendment right to get the data.  Rather, there is a First Amendment right
> not to be blocked from getting the data, because an official disagrees with our
> political speech.  So that would sound in retaliation, First Amendment retaliation.
>
>       And the Supreme Court case there -- and I freely [admit that] . . . this is not
> briefed -- would be . . . [Nieves v.] Bartlett, 139 S. Ct. 1715 (2019).

May Tr. at 23:11-23 (Greim).  The Plaintiffs walked through the three prongs of that case's
retaliation test, see May Tr. at 23:24-24:15 (Greim), and explained that "the First Amendment
issue is not really the sharing of the data[,] [i]t's really our . . . speaking, sharing the data with other
people," and that "[t]he retaliation is blocking us from being able to get it in the first place. Emails
go unanswered[;] [t]hey just ignore VRF, on the theory that VRF is a malicious actor," May Tr. at
24:16-22 (Greim).

The Court next asked: "[H]ow do you balance that right with an individuals' informational
privacy rights?"  May Tr. at 25:4-5 (Court).  The Plaintiffs responded that, although they had not
briefed the National Voter Registration Act, 52 U.S.C. §§ 20503-20511 ("NVRA"), or the Help
America Vote Act, 52 U.S.C. §§ 20901-21145 ("HAVA"), see May Tr. at 25:8-10 (Greim), "the
legislature, Congress, and then even New Mexico, as we look at the correct reading of these
statutes have made that balance [and] . . . declared the public policy that these records are to be
made public," May Tr. at 25:11-15 (Greim).  The Plaintiffs added: "[E]xactly how and exactly to
whom" the records "are to be made public" are "legislative questions."  May Tr. at 25:14-16
(Greim).  The Plaintiffs asserted that

there has sort of been a legislative choice that the right [to] privacy in your official

- 66 -

> act of voting -- this is not your vote; it's just the fact that you did cast a vote -- that that's an official act, and that any rights you have in privacy about whether you voted or not, or where your address is, are outweighed by the very strong interest that we have in sort of knowing about our elections and letting citizens themselves, and not just a couple of elected officials . . . police the elections.

May Tr. at 25:17-26:2 (Greim).  The Plaintiffs added that "we're not talking about Social Security numbers . . . or the types of data you have to redact from court documents" but "an address."  May Tr. at 26:6-10 (Greim).

The Court asked: "What makes this voter data different than other personal data that the government collects, but is not otherwise made public, such as motor vehicle records?"  May Tr. at 26:15-18 (Court).  The Plaintiffs responded that data about voting and elections "go[es] to the core of our democracy," unlike motor vehicle records.  May Tr. at 27:7-9 (Greim).  In response to the Court's question about whether Voter Reference is a media organization or a hybrid media organization, the Plaintiffs responded that "VRF is not just a research organization," May Tr. at 28:3-4 (Greim), but they are "a hybrid media organization in that they issue press releases," even though they do not "have a bunch of journalists working there," May Tr. at 28:14-17 (Greim).  The Plaintiffs added that Voter Reference's status -- or not -- as a media organization does not matter for the First Amendment's purposes, because "what matters is: What is the political speech that you're engaging in?" which "matters more than . . . your identity or your classification as a media organization or not."  May Tr. at 28:17-21 (Greim).  The Plaintiffs contended that Voter Reference engages in "core political speech" and "that's all that matters for the First Amendment analysis."  May Tr. at 29:6-8 (Greim).

The Plaintiffs stated that their primary position is that, "at bottom, this is a content-based regulation of VRF," May Tr. at 30:25-31:1 (Greim), because "if you look at the actual referral . . .

it's very obvious that the reason . . . that we were targeted was because of the content of our speech" and "if that's true . . . it doesn't matter that the statute itself, as they construe it, is content neutral," May Tr. 31:7-17 (Greim).  The Plaintiffs noted that <u>Reed v. Town of Gilbert</u>, 576 U.S. 155 (2015), and <u>Ward v. Rock Against Racism</u>, 491 U.S. 781 (1989), "turned on . . . ordinances . . . that were content based," but that "the court made clear both times that that's not the only route to a content or viewpoint-based finding."  May Tr. at 31:20-32:2 (Greim).  The Plaintiffs stated that their secondary position is that, if the statutes are to be construed as the Defendants argue, "then, it's grossly overbroad."  May Tr. at 32:4-6 (Greim).  The Plaintiffs asserted that banning sharing of voter data for commercial purposes is "the plainly legitimate sweep of the sharing restriction," but "ban[ning] all other sharing . . . sweeps in a political party sharing it with a campaign," and "sweeps in Catalist, the progressive data collection firm, who is sharing it with their clients."  May Tr. at 32:13-21 (Greim).  The Plaintiffs added that "most of the use that now happens with this data is actually criminal under the Secretary of State's new interpretation," which is "an overbreadth problem" and presents "the same issue as the first argument on content based [restrictions]."  May Tr. at 32:22-33:1 (Greim).  The Plaintiffs stated that the question is "[w]hat is the compelling state interest, and is the restriction narrowly tailored to meet that compelling state interest" and asserted that "the statute tells us what the state interest is" and is "not narrowly tailored."  May Tr. at 33:6-13 (Greim).  The Plaintiffs noted that their arguments on void for vagueness and prior restraint have been briefed, and stated that they would not go into those arguments at the hearing.  <u>See</u> May Tr. at 33:16-18 (Greim).

The Court next called upon the Defendants to make their opening arguments in response

to the PI Motion.  See May Tr. at 33:25-34:1 (Court).  The Court asked the Defendants to "[w]alk

us through which statutory provisions make Voter Reference's use of the data unlawful."  May Tr.

at 34:6-8 (Court).  The Defendants responded that N.M.S.A. § 1-4-5.6 "is a standalone fourth

degree felony, which incorporates by reference [N.M.S.A. §] 1-5-22 -- not in its entirety -- but the

purposes that [N.M.S.A. § 1-5-]22 prohibits," and "also incorporates by reference [N.M.S.A. §] 1-

5-23, which says that altering voter data is illegal."  May Tr. at 34:9-14 (Serafimova).  The

Defendants explained that "1-5 is . . . the Voter Records Systems Act" and is "a different article

than 1-4-5.6, which is the statute that we are under."  May Tr. at 34:15-17 (Serafimova).  The

Defendants argued that N.M.S.A. § 1-4-5.6 is a "standalone criminal provision" that incorporates

by reference the definition of "unlawful use" from Article 5.  May Tr. at 35:1-5 (Serafimova).  The

Defendants asserted that "Voter Reference has been misinterpreting the law" by connecting

§ 1-4-5.5's use of the word "purposes" with § 1-4-5.6's use of the word "purposes."  May Tr. at

35:9-14 (Serafimova).  The Defendants contended that Article 20 "creates criminal penalties for

every violation of the election code for which a standalone criminal penalty is not provided" and

that § 1-20-10 -- "defines false swearing as . . . making a false oath knowing that it is false."  May

Tr. at 35:15-21 (Serafimova).  The Defendants argued that § 1-4-5.5 is covered under Article 20's

penalty for making a false affidavit, see May Tr. at 35:25-36:2 (Serafimova), and this section

applies to Local Labs, "if we can prove that they made a false statement when they signed the

affidavit," May Tr. at 36:3-5 (Serafimova).  The Defendants explained that Local Labs, when it

provided the data to Voter Reference, and Voter Reference, when it provided the data "to the

world," "violated 1-5-5.6, which again, contains its own independent criminal penalty."  May Tr.

at 36:9-12 (Serafimova).  The Defendants argued that, to interpret 1-5-5.6 "as either being the criminal penalty for [N.M.S.A. § 1-4-]5.5 or [§ 1-]5-22, doesn't make sense[,] [b]ecause those sections have their own criminal provisions that apply to them," and because that reading "ignores the plain language of 1-4-5.6, which says 'purposes prohibited under chapter 5.'"  May Tr. at 36:12-18 (Serafimova).

The Defendants argued that the Plaintiffs do not have standing, because they have not been charged and do not show that they are under a credible threat of prosecution.  See May Tr. at 36:23-37:2 (Serafimova).  The Defendants explained that

> it is the Attorney General's position, as a party in this case, that if there is any criminal liability on the table, it is not for violating the so-called use restrictions under 1-4-5.5(c). It is for providing -- otherwise providing access or otherwise surrendering or selling or lending the voter data under 1-4-5.6.

May Tr. at 37:12-19 (Serafimova).  The Court next asked which statutory provisions the Defendants think "make Local Labs' acquisition or sharing of the data unlawful," May Tr. at 38:4-6 (Court), and the Defendants responded that "they signed an affidavit promising to use the data only for governmental or . . . election campaign purposes . . . with the knowledge that they were going to sell it to a client," and were "put on notice in the affidavit that willful selling of the data is also a violation of New Mexico law."  May Tr. at 38:10-17 (Serafimova).  The Defendants argued that, consequently, Local Labs "committed false swearing, and they have also violated 1-4-5.6 by knowingly handing over, selling, providing access to -- however we want to describe the conduct[,] the transaction between the two parties [--] . . . the data to VRF."  May Tr. at 38:19-22 (Serafimova).

The Defendants conceded that § 1-5-22's plain language applies only to a government

employee or contractor, or to a data processor.  See May Tr. at 38:23 (Court); id. at 39:1-6 (Serafimova).  The Court asked how the Defendants move language from § 1-5-22 to "covering" Article 4 provisions in light of that concession.  May Tr. at 39:9-13 (Court).    The Defendants explained that "1-4-5.6 says, '[u]nlawful use of voter data,' which under (b) is a 4th degree felony, and under (b) applies to any person or organization, not data processor, not employee of the state." May Tr. at 39:14-18 (Serafimova).  The Defendants read from § 1-4-5.6, stating: "'Unlawful use of voter data . . . consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act,'" and added that the Voter Records System Act is "Article 5 . . . where 22 resides."  May Tr. at 39:18-23 (Serafimova).

The Court asked the Defendants whether a one-time purchase of voter data from the State Elections Registration and Voting Integrity System ("SERVIS") on the Secretary of State's website includes real-time updates to the data or whether it's a snapshot, see May Tr. at 40:5-15 (Court), and the Defendants responded that it is a snapshot, see May Tr. at 41:16-17 (Serafimova). The Defendants explained that SERVIS uses "several sources," including the New Mexico Motor Vehicle Department and the New Mexico Department of Health Vital Records and Health Statistics department to "make sure that the information is as up to date as possible."  May Tr. at 41:11-15 (Serafimova).

The Court asked the Defendants whether any other States which have similar election codes to New Mexico's have not released voter data, see Tr. at 42:16-18 (Court), and the Defendants responded that "what I do know is that Pennsylvania asked Voter Ref to take down their information and Voter Ref did that, by claiming that it was unlawful for them to have it up," May

Tr. at 42:19-22 (Serafimova).  The Court asked whether the State "could prosecute individual VoteRef.com users who use the data for commercial purposes," May Tr. at 43:1-3 (Court), and the Defendants responded: "I don't believe we can[,] [a]nd that's the problem[;] [t]hat's why the State interest . . . is so significant," because "if we don't have someone who has signed an affidavit, if we don't have the affidavit, we can't limit them to the use restrictions," May Tr. at 43:4-10 (Serafimova).  The Defendants stated that "our interpretation is 1-4-5.6 is crucial to actually making the . . . other provisions of the Elections Code constitutional, because it buttresses the overall interest, which is basically to promote trust in the system."  May Tr. at 43:12-17 (Serafimova).  The Defendants argued that this data "is information that voters are required to give to us in order to exercise their fundamental right to vote," and, so, "if they don't trust that we'll keep it as confidential and as secure as possible, then they will not give it to us, they will not participate, and the whole system unravels."  May Tr. at 43:18-24 (Serafimova).

In response to the Court's question whether the Secretary of State has granted or denied access to voter data to any organizations that are similar to Voter Reference, see May Tr. at 44L1-3 (Court), the Defendants stated that neither the Deputy Secretary of State nor the Director of Elections "have heard of Catalist or i360 outside of this proceeding," but, "whenever they receive information that indicated unlawful conduct, they have referred it to the Attorney General's Office," May Tr. at 44:5-15 (Serafimova).  The Defendants stated that "this is unprecedented," and noted that, "[a]s VRF has admitted numerous times, what they're doing is unique . . . [and] happening for the first time[,] . . . [s]o we haven't seen this situation before."  May Tr. at 44:19-23 (Serafimova).

The Defendants argued that the "overarching" substantial or compelling government interest in withholding voter data from publication online "is to foster trust in the system, to encourage voters to register, and to vote."  May Tr. at 45:4-6 (Serafimova).  The Defendants asserted that "people would simply not register if they think that we will sell their data or will make it available to the world."  May Tr. at 45:8-10 (Serafimova).  The Defendants also noted that voters can "go to the Secretary of State website, enter [their] voter ID number, which . . . can [be] obtain[ed] from a different page on the website, and see [their] own voter history."  May Tr. at 45:12-15 (Serafimova).  The Defendants asserted that "[i]t is naïve for us to pretend that" peoples' "voter history or their party affiliation" "are not important privacy interests for people."  May Tr. at 45:22-25 (Serafimova).  The Defendants suggested that VoteRef.com could crowd source information by asking users to log in and share their own data with VoteRef.com, see May Tr. at 46:1-5 (Serafimova), or Voter Reference could "get mailing labels from [the Secretary of State] and then send a letter" asking voters to tell them their voter history so that they could use that information to find discrepancies.  May Tr. at 46:6-11 (Serafimova).  The Defendants predicted that, if people's private voter history is publicized online, "people will cancel their registrations to vote," May Tr. at 46:18-20 (Serafimova), if they do not want others to "know whether or not [they] voted in the last election or where [they] live or [their] age or . . . address . . . or [their] party affiliation," May Tr. at 46:24-47:3 (Serafimova).  If people cancel their registration, then, "on election day, [they] can show up at a polling place, submit an affidavit, vote, and then turn around and cancel the [registration the] very next day," which "will create an incredible burden for the Secretary of State's Office" and "increase the likelihood of errors happening ten-fold at least."

May Tr. at 47:4-9 (Serafimova).  The Court asked what the difference in terms of the State's interest between "an election campaign accessing and using this data" and "an election watchdog, such as Voter Reference," May Tr. at 47:12-15 (Court), to which the Defendants responded that "the campaign cannot put it on the website for everyone to see," but "they can . . . use it to target" potential voters.  May Tr. at 48:4-6 (Serafimova).

The Defendants objected to Voter Reference's use of a "brand-new theory of the case . . . which is First Amendment retaliation" and characterized the litigation so far as "a trial by ambush." May Tr. at 48:23-24 (Serafimova).  The Defendants emphasized that they are arguing "very important issues, [with] very important privacy interests at stake" and "they're changing their theory of the case the day of."  May Tr. at 49:1-3 (Serafimova).  The Defendants stated that this argument "should signal to the Court that they have very little likelihood of success on the merits." May Tr. at 49:4-6 (Serafimova).  The Defendants circled back to the Court's questions about data errors, and asserted that "no such errors have been found for New Mexico," noting that "over a dozen states . . . have disputed Vote Ref's methodology."  May Tr. at 49:12-14 (Serafimova).  The Defendants argued that "the discrepancy [which Voter Reference] speak[s] of is not really a discrepancy," because the number of people on the voter rolls change, for example, if a person is convicted between an election and the date of the data's snapshot.  May Tr. at 49:17-18 (Serafimova).  See id. at 49:19-24 (Serafimova).

Next, the Defendants asserted that the Secretary of State and the New Mexico Attorney General's Office have not changed their position on their interpretation of State law.  See May Tr. at 50:1-7 (Serafimova).  The Defendants responded to the Court's question about the differences

between voter data and Motor Vehicle Data, stating that "[a] lot of it is the same" and that the "distinction is my party affiliation, my voting history."  May Tr. at 50:10-14 (Serafimova).  The Defendants asserted that Voter Reference's interest in having access to that data is much less than a voter's interest in keeping that information private, particularly if the voter is not willing to give Voter Reference their data.  See May Tr. at 50:16-20 (Serafimova).

The Court next invited the Plaintiffs to put on their evidence; the Plaintiffs called Tina Swoboda as their first witness.  See May Tr. at 51:9-10 (Court); id. at 51:11 (Greim).  Swoboda testified that she is the Executive Director of Voter Reference Foundation, see May Tr. at 52:18-19 (Swoboda), and that her duties include "manag[ing] the operations staff and the data staff, and . . . talk[ing] about the data," May Tr. at 52:21-22 (Swoboda).  Swoboda testified that she served "under two different administrations in the Arizona Secretary of State's Office," is "a certified deputy registrar with Maricopa County," and "was the state director of election day operations in the 2020 campaign for President Trump."  May Tr. at 52:25-53:5 (Swoboda).  Swoboda stated that she joined Voter Reference on May 17, 2021, after receiving a recruitment telephone call.  See May Tr. at 53:7-9 (Greim, Swoboda).  Swoboda characterized Voter References as "a foundation dedicated to publishing the voter rolls online for free forever to promote transparency and get the public engaged in understanding how the process works, and to try to do their public oversight duties under the National Voter Registration Act."  May Tr. at 53:14-19 (Swoboda)(citing 52 U.S.C. § 20507(i)).  Swoboda asserted that Voter Reference does not "believe the public has meaningful access to the voter lists right now," because "[i]n many states they are prohibitively expensive," they are "huge files" and "[y]ou would have to be a database analyst to open the giant

file[s]."  May Tr. at 53:25-54:4 (Swoboda).

Swoboda testified that the voter rolls are "everything in the election," because the voter

rolls show who is "eligible" to vote and who voted.  May Tr. at 54:9-14 (Swoboda).  Swoboda

described how Voter Reference fulfills its mission:

> So we acquire the data. We map it.  So different states have different data variables
> in their data sets.  Some states give year of birth, some give the whole birthday,
> some just give age.  Some have party affiliations, some don't.  So we map those
> variables within the data file and the voter history file.  In some states there are two
> separate files. In some estates it's all in one. And then we map that up against our
> fields on our user interface on VoteRef.com. And we publish it. That's on the voter
> registration side.

May Tr. at 54:17-55:2 (Swoboda).  Swoboda testified that, "on the election side of Vote Ref we're

comparing the total ballots cast election-wide," so that Voter Reference can compare the "total

ballots cast as reported by the election officials compared to the total voters in the vote history

file" who have "credit for having voted."  May Tr. at 55:5-13 (Swoboda).  Swoboda testified that,

"on the vote registration side, the hope here is that they will take ownership of their voter

registration record, the people in their family, and do their oversight that they are required to do

under the National Voter Registration Act."  May Tr. at 56:1-5 (Swoboda).  Swoboda testified that

VoteRef.com's terms and conditions are different for every State, and that VoteRef.com has "a

disclaimer on every single voter detail page that cites the specific language of the state with regard

to protections for people that are secured voters."  May Tr. at 57:7-12 (Swoboda).  Swoboda

explained that there are "law enforcement officials, victims of domestic violence or stalking . . .

whose records are protected and redacted [and whose] addresses must not be shown."  May Tr. at

57:17-22 (Swoboda).  Swoboda stated that, before VoteRef.com publishes a file, it "notif[ies] the

chief election official" and asks whether there are any protected voters in that file so that their

information may be redacted.  May Tr. at 57:22-58:5 (Swoboda).  Swoboda asserted that, when

she emailed New Mexico's Secretary of State with that request, there was no response.  See May

Tr. at 58:10-19 (Greim, Swoboda).

Swoboda next explained Voter Reference's work reconciling discrepancies.  See May Tr.

at 58:25-59:13 (Greim, Swoboda).   She testified that, usually, a discrepancy is "a recordkeeping

issue," because "states do not run elections" -- "there is a chief designated by the Help America

Vote Act . . . in every state," but "counties run elections," and, so, "when secretaries of state or

state board of elections are certifying the data or providing access to the data, they're relying on

the uploads they get from the counties."  May Tr. at 59:8-17 (Swoboda).  She continued: "So if

some precinct wasn't uploaded by a county and then that county didn't upload it to the state, the

numbers could be off."  May Tr. at 59:18-20 (Swoboda).  She gave the example of "Nevada,

[where] they delete the record when someone moves from one county to another," and, when that

deletion happens, "they're deleting the vote history."  May Tr. at 59:21-24 (Swoboda).  Swoboda

stated that, when she finds a discrepancy, she contacts the chief election official and asks if she

can meet or have a telephone call with them to "learn about their process," and "identify where the

discrepancy is coming from."  May Tr. at 60:7-10 (Swoboda).

Swoboda testified that this process helps people to "understand how the system works" and

that "there is a great amount of concern in the public," but that "we need to do better oversight"

and "this is a process that's meant to be overseen by the public."  May Tr. at 60:24-61:5 (Swoboda).

Swoboda stated that she "want[s] people in the system to have confidence in the system, and they

do that when they have transparency."  May Tr. at 61:9-11 (Swoboda).  Swoboda testified that she

emailed the New Mexico Secretary of State after finding a discrepancy, and asked for a meeting or a call to understand their data, but got no response. See May Tr. 61:12-62:10 (Greim, Swoboda). Swoboda testified that she published a press release about New Mexico's data, see May Tr. at 62:16-63:2 (Greim, Swoboda), and stated that the Secretary of State did not contact her subsequently to explain the discrepancies noted in the press release, see May Tr. at 63:19-22 (Greim, Swoboda).   Swoboda testified that the New Mexico discrepancy points to issues with recordkeeping and transparency, see May Tr. at 64:1-10 (Greim, Swoboda), and that "[t]here is, to my knowledge, no requirement that the chief election official reconcile those two data points," May Tr. at 64:11-12 (Swoboda).  Swoboda stated that, "although the turnout is reported to the Elections Assistance Commission, in the [Election Administration and Voting Survey ('EAVS')] report every cycle, even that number changes," and, so, "unless and until there is such a requirement or the chief election officials voluntarily engage in that reconciliation, the numbers are not going to match." May Tr. at 64:13-18 (Swoboda).  Swoboda testified that she submitted a Freedom of Information Act request to obtain a copy of the voter registration roll on or close to November 3, 2020, see May Tr. at 64:19-65:5 (Greim, Swoboda), and also requested a "list of cancellations so that I could try to reconcile and find all the people who might have been removed because they were adjudicated incompetent or had a felony or passed away or moved out of the state," but received no response, May Tr. at 65:5-10 (Swoboda).  See id. at 65:12-17 (Greim, Swoboda).

Swoboda testified that she posted the data for New Mexico on December 16, 2021, see May Tr. at 66:24-25 (Swoboda), and that it was up on VoteRef.com for "three months," May Tr.

at 67:3-4 (Greim).    Swoboda explained that the New Mexico-specific terms and conditions required users "[t]o only use the records for . . . election or governmental related purposes, and that they must not be used for any commercial purpose.  And then it defines all the various things that might conceivably fall under commercial purposes."    May Tr. at 67:11-15 (Swoboda). Swoboda testified that Voter Reference thought New Mexico allows Voter Reference's use of voter data, and that users could see the chain of custody for the data.  See May Tr. at 67:16-69:5 (Greim, Swoboda).

Swoboda stated that she first learned that the Secretary of States accused Voter Reference of criminal conduct through the ProPublica article, but never contacted Voter Reference directly to understand the purpose of the website, ask questions about it, or ask the data to be removed. See May Tr at 68:13-69:1 (Greim, Swoboda).  Swoboda testified that, although Voter Reference received no contact from the Secretary of State or the Attorney General, it removed New Mexico's data from its website until it could figure out how to comply with New Mexico law.  See May Tr. at 69:2-28 (Greim, Swoboda).  Swoboda stated that she is familiar with the organization, Catalist, which "acquire[s] voter registration data," has "a particular lean in their partisan view, and they use that data to contact voters to promote policies that they wish to advance," and sells or shares that data with their clients.  May Tr. at 70:7-14 (Swoboda).

The Court asked whether Voter Reference crowd-sources finding the discrepancies, "or is that done just by trained VRF staff, and the public are just verifying individual data?"  May Tr. at 70:19-22 (Court).  Swoboda responded "it is the latter," and explained:

> My data director is the former voter registration database administrator for the Secretary of State of Arizona, and my assistant data director is the former Cochise

> County Recorder Voter Registration Director.  And they pull the data out of the
> vote history file, and we take the turnout cast from the official records submitted to
> the [Election Assistance Commission] by the state or posted on their website or on
> their canvass, when they give it to us. And we do that data, and we just post those
> exact two data points, and we post the documentation it came from. The public is
> not given access to that data.

May Tr. at 70:23-71:10 (Swoboda).  Swoboda testified that the public "reviews their voter

registration records on the voter registration side," and looks for errors in the records, such as

where "the first name is a comma, and the last name is the letter A, and the registration date and

the date of birth are 1/1/1900," and Voter Reference "hope[s] that the public will do their oversight

and report their errors to the county clerk or to the election official, who is the only person in power

to correct them."  May Tr. at 71:18-72:5 (Swoboda).  The Court confirmed with Swoboda that "the

public does not have access to the discrepancy data," May Tr. at 72:6-7 (Court), "other than

through the press release," May Tr. at 72:8-9 (Greim).

The Court then invited the Defendants to cross-examine Swoboda.  See May Tr. at 72:14-

15 (Court).  The Defendants clarified that Swoboda started with Voter Reference in May 2021,

and so was not working for Voter Reference when the transaction between Local Labs and Voter

Reference occurred.   See May Tr. at 72:22-73:4 (Serafimova, Swoboda).   The Defendants

confronted Swoboda with the Swoboda Decl., in which she stated that she is "familiar with VRF's

process of obtaining and using voter registration data made available by the New Mexico Secretary

of State's Office," May Tr. at 73:8-11 (Serafimova), and Swoboda clarified that she has "seen the

records of the transaction and the invoices that go out from the foundation," May Tr. at 73:15-17

(Swoboda).  Swoboda affirmed that Voter Reference paid Local Labs $15,000.00 for its services

per State, see May Tr. at 73:20-22 (Swoboda), and that she believed -- but could not be sure -- that

"researching and doing due diligence about what was lawful with regard to acquiring and transferring the data" was part of that service, May Tr. at 74:2-6 (Swoboda). See id. at 74:9-11 (Swoboda). Swoboda stated that Voter Reference's legal team "goes through each state and reviews the statutes . . . relevant . . . to the acquisition and publication of the data," May Tr. at 75: 15-18 (Swoboda), and believes that the legal team did that research for New Mexico, see May Tr. at 76:2-6 (Serafimova, Swoboda). Swoboda did not complete an affidavit for the Feb. 10. Request or the Mar. 10 Request. See May Tr. at 79:24-81:3 (Serafimova, Swoboda). Swoboda agreed that Voter Reference's work is "unprecedented." May Tr. at 91:15-19 (Serafimova, Swoboda). Swoboda stated that VoteRef.com "is the first of its kind tool to search all 50 states," May Tr. at 92:17-18 (Swoboda), and "no one has ever published the voter registration records for every state online, for free, for the public forever," May Tr. at 93:8-10 (Swoboda).

The Plaintiffs called their second witness, Steinberg, to testify on direct examination. See May Tr. at 113:5-118:17 (Steinberg, Miller). The Defendants then cross-examined Steinberg. See May Tr. at 118:25-124:9 (Serafimova, Steinberg). The Plaintiffs asked one question on redirect. See May Tr. at 124:16-21 (Steinberg, Miller). The Plaintiffs next called Mandy Vigil, the State Elections Director to the stand. See May Tr. at 125:5-16 (Greim, Vigil). Vigil testified on direct examination. See May Tr. at 125:12-149:15 (Greim, Vigil).

**8.**    **The June Hearing.**

The Plaintiffs continued their direct examination of Vigil. See June Tr. at 4:5-69:17 (Court, Greim, Serafimova, Vigil). The Plaintiffs concluded their direct examination and passed Vigil to the Defendants for cross-examination. See June Tr. at 70:9-71:14. (Court, Greim, Serafimova).

The Defendants cross-examined Vigil.  See June Tr. at 71:15-119:9 (Court, Greim, Serafimova, Vigil).  The Plaintiffs did not wish to conduct a redirect.  See June Tr. at 119:10-13 (Court, Greim).  The Plaintiffs then conducted their direct examination of Sharon Pino, the Deputy Secretary of State.  See June Tr. at 123:4-163:19 (Court, Greim, Pino, Serafimova).  The Defendants cross-examined Pino.  See June Tr. at 123:20-187:16 (Court, Greim, Pino, Serafimova).  The Plaintiffs conducted a redirect examination.  See June Tr. at 188:1-191:14 (Court, Greim, Pino).  The parties argued their motions for the Court.  See June Tr. at 191:20-250:16 (Court, Greim, Serafimova).  After discussing scheduling, the hearing adjourned.  See June Tr. at 250:19-254:8 (Court, Greim, Serafimova).

## LAW REGARDING STANDING

A federal court may hear cases only where the plaintiff has standing to sue.  Standing has two components.  First, standing has a constitutional component arising from Article III's requirement that federal courts hear only genuine cases or controversies.  Second, standing has a prudential component.  See Habecker v. Town of Estes Park, Colo., 518 F.3d 1217, 1224 n.7 (10th Cir. 2008)(noting that prudential standing concerns may prevent judicial resolution of a case even where constitutional standing exists).  The burden of establishing standing rests on the plaintiff.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff must "allege . . . facts essential to show jurisdiction.  If they fail to make the necessary allegations, they have no standing."  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(internal citations and quotations omitted).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless the contrary appears affirmatively from the record."  Renne v. Geary,

501 U.S. 312, 316 (1991)(quoting <u>Bender v. Williamsport Area Sch. Dist.</u>, 475 U.S. 534, 546 (1986))(internal quotation marks omitted).  "It is a long-settled principle that standing cannot be inferred argumentatively from averments in the pleadings but rather must affirmatively appear in the record."  <u>Phelps v. Hamilton</u>, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting <u>FW/PBS v. City of Dallas</u>, 493 U.S. at 231)(citations omitted)(internal quotation marks omitted).

### 1.      Article III Standing.

"Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  <u>San Juan Cty., Utah v. United States</u>, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  <u>See</u> U.S. Const. art. III, § 2.  "In general, this inquiry seeks to determine 'whether [the plaintiff has] such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination.'"  <u>Wyoming ex rel. Crank v. United States</u>, 539 F.3d 1236, 1241 (10th Cir. 2008)(quoting <u>Massachusetts v. EPA</u>, 549 U.S. 497, 539 (2007))(internal quotation marks omitted).  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  <u>San Juan Cty., Utah v. United States</u>, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) an injury in fact that is both concrete and particularized as well as actual or imminent; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  <u>Protocols, LLC v. Leavitt</u>, 549 F.3d 1294, 1298 (10th Cir. 2008)(internal quotation marks omitted).

"Standing is determined as of the time the action is brought."  <u>Smith v. U.S. Court of</u>

Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)).  In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.  484 F.3d at 1285.  The Tenth Circuit noted that the plaintiff had recently taken his state appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Systems v. Gandy, the Tenth Circuit found that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.  See 416 F.3d at 1154. Although finding standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions.  416 F.3d at 1155.  Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.  See 416 F.3d at 1155.

The mere presence on the books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege

an inhibiting effect on constitutionally protected conduct that the statute prohibits.  See Winsness

v. Yocom, 433 F.3d 727, 732 (10th Cir. 2006).  "This does not necessarily mean that a statute must

be enforced against the plaintiff before he can sue."  Winsness v. Yocom, 433 F.3d at 732 (quoting

Ward v. Utah, 321 F.3d 1263, 1267 (10th Cir. 2003)).  Where a plaintiff can show a "credible

threat of prosecution," they can sue for prospective relief against enforcement.  Winsness v.

Yocom, 433 F.3d at 732 (quoting Ward v. Utah, 321 F.3d at 1267).  Thus, to satisfy Article III,

the "plaintiff's expressive activities must be inhibited by an objectively justified fear of real

consequences, which can be satisfied by showing a credible threat of prosecution or other

consequences following from the statute's enforcement."  Winsness v. Yocom, 433 F.3d at 732

(internal quotations omitted).  See Wilson v. Stocker, 819 F.2d 943, 946 (10th Cir. 1987)(holding

that the plaintiff has standing where he suffers "an ongoing injury resulting from the statute's

chilling effect on his desire to exercise his First Amendment rights").

### 2. **Prudential Standing.**

 "Prudential standing is not jurisdictional in the same sense as Article III standing."

Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).  Prudential standing consists of "a

judicially-created set of principles that, like constitutional standing, places limits on the class of

persons who may invoke the courts' decisional and remedial powers."  Bd. of Cty. Comm'rs v.

Geringer, 297 F.3d 1108, 1112 (10th Cir. 2002)(internal quotation marks omitted).  Generally,

there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather

than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance

shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's

grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted).

Traditionally, federal courts framed the zone-of-interests test as an issue of prudential standing. The Supreme Court recently clarified that the zone-of-interests analysis "is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." Lexmark Int'l v. Static Control Components, 572 U.S. 118, 127 (2014). Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l v. Static Control Components, 572 U.S. at 127. Notably, the Supreme Court stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)). Moreover, the test "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (internal quotation marks and citations omitted). This "lenient approach" preserves the APA's flexible judicial-review provisions. Lexmark Int'l v. Static Control Components, 527 U.S. at 130.

## LAW REGARDING PRELMINARY INJUNCTIONS

"It is well settled that a preliminary injunction is an extraordinary remedy, and that it should not be issued unless the movant's right to relief is clear and unequivocal." Kikumura v. Hurley,

242 F.3d 950, 955 (10th Cir. 2001)(internal quotation marks omitted).  To show that the extreme

remedy of a preliminary injunction should issue, "[a] party seeking an injunction from a federal

court must invariably show that it does not have an adequate remedy at law."  N. Cal. Power

Agency v. Grace Geothermal Corp., 469 U.S. 1306, 1306 (1984).  Before a district court may issue

a preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure, the movant

must make four showings: (i) that the movant is likely to "suffer irreparable injury unless the

injunction issues"; (ii) that "the threatened injury" to the movant if the court does not issue the

preliminary injunction "outweighs whatever damage the proposed injunction may cause the

opposing party"; (iii) that "the injunction, if issued, would not be adverse to the public interest";

and (iv) that "there is a substantial likelihood [of success] on the merits."[4]  Resolution Trust Corp.

---

[4]The requirement that the movant show a mere "substantial likelihood" of prevailing on the merits is the only prong of the preliminary-injunction analysis that is easier to satisfy than its analogous prong in the permanent-injunction analysis; permanent injunctions, obviously, require full success on the merits. 43A C.J.S. Injunctions § 55 ("In general, the standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that, for a preliminary injunction, the plaintiff must show a likelihood of success on the merits rather than actual success.").  It is not entirely clear what a preliminary-injunction movant's burden of proof is vis-à-vis the case's merits, as "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success -- the most common being that plaintiff must demonstrate a reasonable probability of success." 11A Charles Alan Wright, Arthur R. Miller, et. al., FEDERAL PRACTICE & PROCEDURE § 2948.3 (3d. ed. 2015)(footnotes omitted).  The Tenth Circuit, however, has provided more guidance than most Courts of Appeals have, stating on three occasions -- albeit in old cases -- that the movant must make "a prima facie case showing a reasonable probability that he will ultimately be entitled to the relief sought." Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972); Crowther v. Seaborg, 415 F.2d 437, 439 (10th Cir. 1969); Continental Oil Co. v. Frontier Refining Co., 338 F.2d 780, 781 (10th Cir. 1964).

At a trial on the merits, a plaintiff bears two burdens of proof.  The first burden is the burden of production, which is sometimes called the burden of going forward.  If the plaintiff fails to carry the burden of production during his or her case-in-chief, then the court will decide the case in the defendant's favor, and the case will not go to the jury.  The second burden is the burden of persuasion, which refers to convincing the factfinder -- typically a jury -- that he or she has satisfied

v. Cruce, 972 F.2d 1195, 1198 (10th Cir. 1992). See Winter v. NRDC, Inc., 555 U.S. 7, 19

(2008)("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest." (citing Munaf

_____

the ultimate standard of proof -- usually the preponderance-of-the-evidence standard. There is also a third, even higher quantum of evidence, sometimes called the "third burden of proof," which a plaintiff carries when he or she presents evidence of such great extent and one-sidedness that he or she is entitled to a verdict as a matter of law. Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1236 n.27 (D.N.M. 2014)(Browning, J.). The third burden and the beginning burden of production are also the relevant standards applicable to summary-judgment motions by the plaintiff and by the defendant, respectively.

Moreover, satisfying the initial burden of production is known as presenting a "prima facie case." Black's Law Dictionary 1310 (9th ed. 2009)(defining "prima facie case" as "[a] party's production of enough evidence to allow the fact-trier to infer the fact at issue and rule in the party's favor"). The best way to interpret the Tenth Circuit's dictate that the movant must make "a prima facie case showing a reasonable probability that he will ultimately [prevail]" is by requiring that the movant put forth enough evidence to both: (i) satisfy the burden of production -- meaning that if the same evidence were presented at trial, it would be sufficient for a reasonable factfinder to find in the movant's favor; and (ii) make it reasonably likely -- beyond just being "not unreasonable" -- that the factfinder would in fact find for the movant, i.e., that the movant would satisfy the burden of persuasion. See 11A Wright & Miller, supra § 2948.3 ("All courts agree that plaintiff must present a prima facie case but need not show a certainty of winning." (footnotes omitted)). The movant need not show a greater-than-fifty-percent probability of satisfying the burden of persuasion, as to require such a showing would be to convert the substantial-likelihood-of-success standard into the ultimate trial standard, which the case law makes clear is not the intended result. See Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977)("The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, as in this case, may grant a stay even though its own approach may be contrary to movant's view of the merits.").

The Court will require preliminary-injunction movants to carry the burden of production at the preliminary-injunction stage in all cases, and it will never require the movant to carry the full burden of persuasion at that stage. As for where in between those two quanta of proof the Court will set the standard, it will vary in different cases, depending upon the strength of the movant's showing on the other three prongs: the irreparability of the movant's harm, the balance of harms as between the movant and the nonmovant, and the public interest. Cf. Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d at 843 ("The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors.").

- 88 -

v. Geren, 553 U.S. 674, 688-89 (2008))).  The movant bears the burden of demonstrating all four

prongs' satisfaction.  See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir.

1972).  "[A]ny modified test which relaxes one of the prongs for preliminary relief and thus

deviates from the standard test is impermissible."  Diné Citizens Against Ruining our Env't v.

Jewell, 839 F.3d 1276, 1282 (10th Cir. 2016).  "A plaintiff suffers irreparable harm 'when the

court would be unable to grant an effective remedy after a full trial because such damages would

be inadequate and difficult to ascertain.'"  Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil

Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video

Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)(citing Kikumura

v. Hurley, 242 F.3d at 963)).  "Tenth Circuit decisions have linked the 'irreparable injury' inquiry

to the 'likelihood of success' inquiry, holding that a plaintiff who cannot demonstrate a substantial

likelihood of success is not entitled to a presumption of irreparable harm."  Logan v. Pub. Emps.

Ret. Ass'n, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016)(Browning, J.)(citing Schrier v. Univ. of

Colo., 427 F.3d 1253, 1266 (10th Cir. 2005)).

        "[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative

positions of the parties until a trial on the merits can be held[.]'"  Schrier v. Univ. of Colo., 427

F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  In that vein, the Tenth Circuit

has identified the following three specifically disfavored preliminary injunctions: (i) "preliminary

injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning

injunctions that compel, rather than prohibit, activity on the enjoined party's part; and

(iii) "preliminary injunctions that afford the movant all the relief that it could recover at the

conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258 (internal

quotation marks omitted)(quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,

389 F.3d 973, 975 (10th Cir. 2004), aff'd and remanded sub nom. Gonzales v. O Centro Espirita

Beneficente Uniao do Vegetal, 546 U.S. 418 (2006)("O Centro")).  Accord Westar Energy, Inc. v.

Lake, 552 F.3d 1215, 1224 (10th Cir. 2009).   Regarding mandatory preliminary injunctions, the

Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the
> requested relief 'affirmatively require[s] the nonmovant to act in a particular way,
> and as a result . . . place[s] the issuing court in a position where it may have to
> provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"
> Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v.
> Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979).  The Tenth Circuit has
> thus disclaimed -- or at least augmented -- the simpler and more intuitive way of
> defining these terms, i.e., that a prohibitory injunction is one in which the court
> orders the enjoined party not to do something, and a mandatory injunction is one in
> which the court orders the enjoined party to do something.

Salazar v. San Juan Cnty. Det. Ctr., 2016 WL 335447, at *40.  When evaluating whether the

issuance of a requested injunction would alter the status quo between the parties, the court should

look at "the reality of the existing status and relationships between the parties, regardless of

whether the existing status and relationships may ultimately be found to be in accord or not in

accord with the parties' legal rights."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100

(10th Cir. 1991), overruled on other grounds by O Centro, 389 F.3d at 975).  "The meaning of this

category is self-evident."  Salazar v. San Juan Cty. Det. Ctr., 2016 WL 335447, at *41.  With

respect to preliminary injunctions that will change the status quo, "the movant has an even heavier

burden of showing that the four factors listed above weigh heavily and compellingly in movant's

favor before such an injunction can be issued." Salt Lake Tribune Publ'g Co. v. AT&T Corp., 320

F.3d 1081, 1099 (10th Cir. 2003)(internal quotation marks omitted)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction[.]" United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)). See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a preliminary injunction should not issue where a remedy of money damages was available). Federal courts have the inherent equitable power to issue a preliminary injunction only when it is necessary to protect a movant's entitlement to a final equitable remedy. See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING BONDS FOR PRELIMINARY INJUNCTIONS

Under rule 65(c), the Court may issue a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The United States and its officers and agencies are exempt from this requirement. See Fed. R. Civ. P. 65(c). The Court must consider whether a bond is necessary. See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable"). See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010). Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and

may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215

(10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir.

2003)).

## LAW REGARDING THE NEW MEXICO SECRETARY OF STATE'S AUTHORITY AND THE ELECTION CODE

In New Mexico, the "secretary of state is the chief election officer of the state."  N.M.S.A.

§ 1-2-1(A).  The Election Code requires that the Secretary of State "shall,"[5] "subject to the State

Rules Act," N.M.S.A. §§ 14-4-1 to 11, "make rules pursuant to the provisions of, and necessary to

carry out the purposes of, the Election Code . . . provided that no rule is adopted or amended within

the sixty-three days before a primary or a general election."  N.M.S.A. § 1-2-1(B)(2).  See

N.M.A.C. § 1.10.35.1 (providing that the Office of the Secretary of State issues regulations

governing the Voting Records System).  The Secretary of State must approve any forms or

procedures for use in elections: "No forms or procedures shall be used in any election held pursuant

to the Election Code without prior approval of the secretary of state."  N.M.S.A. § 1-2-1(C).

To obtain voter data, the Election Code requires that "[e]ach requester of voter data,

mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and

special voter lists shall be used for governmental or election[6] and election campaign purposes

---

[5]Within the Election Code, "'shall' is mandatory and 'may' is permissive."  N.M.S.A. § 1-1-3.

[6]Although the Election Code does not define "election" or "election purposes" separately from "election campaign purposes," N.M.S.A. §§ 1-5-2 and 1-4-5.5(E), the New Mexico Administrative Code defines "election" as follows: "'Election' means a statewide election that is a general election, political party primary election, local elections included in the Local Elections Act, or elections to fill vacancies in the office of United States representative," N.M.A.C. § 1.10.35.7(M).

only and shall not be made available or used for unlawful purposes." N.M.S.A. § 1-4-5.5(C). "The secretary of state shall prescribe the form of the affidavit," N.M.S.A. § 1-4-5.5(D), which all requesters of voter data must use, see N.M.A.C. § 1.10.35.10 ("All requesters of voter file data or public service requests[7] shall complete the affidavit of authorization prescribed by the secretary of state.").

The Election Code includes definitions for these terms:

    (1)    "election campaign purposes" means **relating in any way** to a campaign in an election conducted by a federal, state or local government;

    (2)    "governmental purposes" means noncommercial purposes **relating in any way** to the structure, operation or decision-making of a federal, state or local government;

    (3)    "mailing labels" means prepared mailing labels of selected voters arranged in the order in which requested and providing only the name and address of the voter;

    (4)    "special voter list" means a prepared list of selected voters arranged in the order in which requested; and

    (5)    "voter data" means selected information derived from the voter file.[8]

---

[7]"'Public service request' means information prepared for an individual or organization requesting certain information from the voter records system." N.M.A.C. § 1.10.35.7(BB).

[8]The Election Code defines "Voter file" as follows:

"Voter file" means all voter registration information required by law and by the secretary of state that has been extracted from the certificate of registration of each voter in the county, stored on data recording media and certified by the county clerk as the source of all information required by the Voter Records System Act.

N.M.S.A. § 1-5-2(N).

N.M.S.A. § 1-4-5.5(E)(emphasis added).  Article 4 provides penalties for the unlawful use of voter data:

> A.    Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act.
>
> B.    Any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth degree felony and upon conviction shall be fined one hundred dollars ($100) for each and every line of voter information that was unlawfully used.
>
> C.    Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense.

N.M.S.A. § 1-4-5.6.  Article 4 includes a standalone criminal penalty for unlawful use of voter registration data: "A person who unlawfully copies, conveys or uses information from a certificate of registration is guilty of a fourth degree felony."  N.M.S.A. § 1-4-5(E).

Part of the Election Code, the Voter Records System Act, N.M.S.A. §§ 1-5-1 to 1-5-13, requires the Secretary of State to "maintain the official state voter file based on county registers" and to "provide access to the file to the county clerks."  N.M.S.A. § 1-5-3(B).  The Secretary of State "shall prescribe any rules, forms and instructions necessary to implement procedures required by the Voter Records System Act and federal law," and "maintain a log, which shall be public, containing all transactions regarding requests for current registration lists of state voters." N.M.S.A. § 1-5-3(B).  "The log shall indicate the requesting party, the date of the request, the date of fulfilling the request, charges made and any other information deemed advisable by the secretary of state." N.M.S.A. § 1-5-3(B).  The Voter Records System Act clarifies what use of voter data is

unlawful:

Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file by a data processor[9]; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System to have possession of the file.

N.M.S.A. § 1-5-22 (A).[10]

## NEW MEXICO LAW REGARDING DEFERENCE TO AGENCIES

"When an agency that is governed by a particular statute construes or applies that statute, the court will begin by according some deference to the agency's interpretation." Morningstar Water Users Ass'n v. N.M. PUC, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 583, 904 P.2d 28, 32 ("Morningstar Water")(citing Public Serv. Co. v. New Mexico Pub. Serv. Comm'n, 1987-NMSC-124, ¶ 12, 106 N.M. 622, 625, 747 P.2d 917, 920 (1987)).  For example, "[t]he court will confer a heightened degree of deference to legal questions that 'implicate special agency expertise or the determination of fundamental policies within the scope of the agency's statutory function.'" Morningstar Water, 1995-NMSC-062, ¶ 11, 120 N.M. at 583, 904 P.2d at 32 (quoting Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co., 746 P.2d 896, 903 (Alaska 1987)).  "Statutory construction is a question of law," however, Marbob Energy Corp. v. N.M. Oil Conservation

---

[9]The Voter Records System Act defines a "'data processor'" as "a data processing facility and its associated employees and agents contracted to provide data processing services required by the Voter Records System Act." N.M.S.A. § 1-5-2(D).

[10]The Voter Records System also provides penalties for the "[u]nlawful destruction or alteration of data recording media, voter files, file maintenance lists, voter registration system software and instructions or voter lists." N.M.S.A. § 1-5-23(A).

Comm'n, 2009-NMSC-013, ¶ 7, 146 N.M. 24, 28, 206 P.3d 135, 139 ("Marbob")(citing State v.

Romero, 2006-NMSC-039, ¶ 6, 140 N.M. 299, 142 P.3d 887), and, "as such, 'the court is not

bound by the agency's interpretation [of its own statute] and may substitute its own independent

judgment for that of the agency because it is the function of the courts to interpret the law,'" and

statutory interpretation is a question of law, Marbob, 2009-NMSC-013, ¶ 7, 146 N.M. at 28, 206

P.3d at 139 (quoting Morningstar Water, 1995-NMSC-062, ¶ 11, 120 N.M. at 583, 904 P.2d at

32)(alteration in Marbob but not in Morningstar Water).  "The court should reverse if the agency's

interpretation of a law is unreasonable or unlawful."  Morningstar Water, 1995-NMSC-062, ¶ 11,

120 N.M. at 583, 904 P.2d at 32.  If statutory construction or interpretation is not within an

agency's area of expertise, the Supreme Court of New Mexico "afford[s] little, if any, deference

to the agency on issues of statutory construction."  Marbob, 2009-NMSC-013, ¶ 7, 146 N.M. at

28, 206 P.3d at 139.

The Supreme Court of New Mexico indicates that it applies Skidmore deference to an

agency's interpretive rules.  See Princeton Place v. N.M. Human Servs. Dep't, 2022-NMSC-005,

¶¶ 27-30, 503 P.3d 319, 328-30 ("Princeton Place").  Interpretive rules,

> "while not controlling upon the courts by reason of their authority, do constitute a
> body of experience and informed judgment to which courts and litigants may
> properly resort for guidance. The weight of such a judgment in a particular case
> will depend upon the thoroughness evident in its consideration, the validity of its
> reasoning, its consistency with earlier and later pronouncements, and all those
> factors which give it power to persuade, if lacking power to control."

Princeton Place, 2022-NMSC-005, ¶ 30, 503 P.3d at 329 (quoting Skidmore v. Swift & Co., 323

U.S. 134, 140 (1944).  The Supreme Court of New Mexico explains:

Interpretive rules are "issued by an agency to advise the public of the

agency's construction of the statutes and rules which it administers." Shalala [v. Guernsey Memorial Hospital, 514 U.S. 87, 99-100 (1995)] . . . . Interpretive rules do not require "notice-and-comment," which "makes the process of issuing interpretive rules comparatively easier for agencies than issuing legislative rules." Perez [v. Mortg. Bankers Ass'n], 575 U.S. [92, 97 (2015)]. However, "that convenience comes at a price: Interpretive rules do not have the force and effect of law and are not accorded that weight in the adjudicatory process." Id. (internal quotation marks and citation omitted). In contrast, "rules issued through [an official] notice-and-comment process are often referred to as legislative rules because they have the force and effect of law." Id. at 96 (internal quotation marks and citation omitted).

Princeton Place, 2022-NMSC-005, ¶ 28, 503 P.3d at 328-29. "[I]n general, 'interpretative rules have value primarily as a means of communicating to the agency's staff and affected members of the public the agency's current views with respect to the proper interpretation of its statutes and legislative rules.'" Princeton Place, 2022-NMSC-005, ¶ 30, 503 P.3d at 328-29 (quoting Richard J. Pierce, Jr., Distinguishing Legislative Rules from Interpretative Rules, 52 Admin. L. Rev. 547, 552, n.44 (2000)).

In Princeton Place, the Supreme Court of New Mexico examined whether a Department of Health screening form and instructions -- used to identify individuals with mental illness or intellectual disability to ensure that they are not placed in nursing facilities unnecessarily or without adequate support, see 2022-NMSC-005, ¶ 1, 503 P.3d at 322-23 -- "are representative of agency interpretations of the applicable regulations or are independent agency actions requiring promulgation pursuant to the State Rules Act," 2022-NMSC-005, ¶ 26, 503 P.3d at 328. The Supreme Court of New Mexico applied the Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 99-100 (1995), test to determine whether the form and instructions were legislative or interpretative rules, and concluded that the Department of Health screening form and instructions are interpretive. See Princeton Place, 2022-NMSC-005, ¶ 32, 503 P.3d at 329-30. It reasoned that

the form and instructions

> do not contain new requirements of law but rather are representative of the DOH interpretation of existing . . . regulations. *Cf. Shalala*, 514 U.S. at 100 (observing that a "rulemaking would . . . be required if [the regulatory guidance] adopted a new position inconsistent with . . . the [agency]'s existing regulations"). As such, they do not require official promulgation and also do not carry the full force of law. *See id.* at 99.  As explained by HSD, the purpose of these materials is to assist a screener, who is not required to be a medical professional, to comply with PASARR regulations.  We further determine that the purpose of the instructions for Question D-5 specifically is to advise the public and screeners regarding the agency's interpretation of the meaning of  "related condition" pursuant to 42 C.F.R. § 435.1010.

Princeton Place, 2022-NMSC-005, ¶ 32, 503 P.3d at 329-30.

## RELEVANT NEW MEXICO LAW REGARDING STATUTORY INTERPRETATION[11]

A court's central concern, in construing a particular statute, "is to determine and give effect to the intent of the legislature," State ex rel. Klineline v. Blackhurst, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988)(citation omitted), "using the plain language of the statute as the primary indicator of its intent," City of Santa Fe v. Travelers Cas. & Sur. Co., 147 N.M. 699, 702, 228 P.3d 483, 486 (2010).  Courts give "the words used in the statute their ordinary meaning unless the legislature indicates a different intent."  State ex rel. Klineline v. Blackhurst, 106 N.M. at 735, 749 P.2d at 1114 (citation omitted).  Courts "construe the entire statute as a whole so that all the

---

[11]Because the federal court is applying New Mexico law, it follows that it should apply state law as faithfully as a lower state court in New Mexico would.  Accordingly, the Court should apply the rules of statutory construction that New Mexico state courts apply, to the extent that federal and state rules of construction differ.  See United States v. Ruiz, 589 F.3d 1310, 1313 (10th Cir. 2009)("When the highest [state] court . . . has not interpreted a particular state statutory provision, . . . a federal court must examine state appellate court opinions and other authorities to predict how the [highest] court would interpret [that particular provision].  In doing so, a federal court must follow state rules of statutory construction.")(internal quotation marks and citations omitted).

provisions will be considered in relation to one another." <u>Regents of Univ. of N.M. v. N.M. Fed'n of Teachers</u>, 125 N.M. 401, 411, 962 P.2d 1236, 1246 (1998)(citing <u>N.M. Pharmaceutical Ass'n v. State</u>, 106 N.M. 73, 738 P.2d 1318 (1987)("In interpreting statutes, we should read the entire statute as a whole so that each provision may be considered in relation to every other part." (citation omitted)).  A court must construe a statute "so that no part of the statute is rendered surplusage or superfluous." <u>Matter of Rehabilitation of W. Investors Life Ins. Co.</u>, 100 N.M. 370, 373, 671 P.2d 31, 34 (1983)(citations omitted).  New Mexico courts will not, however, "read into a statute or ordinance language which is not there, particularly if it makes sense as written." <u>Regents of Univ. of N.M. v. N.M. Fed'n of Teachers</u>, 125 N.M. at 411, 962 P.2d at 1246 (quoting <u>Burroughs v. Bd. of Cnty. Com'rs of Bernalillo Cnty.</u>, 88 N.M. 303, 306, 540 P.2d 233, 236 (1975))(internal quotation marks omitted).  New Mexico courts also will "not depart from the plain wording of a statute, unless it is necessary to resolve an ambiguity, correct a mistake or an absurdity that the Legislature could not have intended, or to deal with an irreconcilable conflict among statutory provisions." <u>Regents of Univ. of N.M. v. N.M. Fed'n of Teachers</u>, 125 N.M. at 411, 962 P.2d at 1246 (citation omitted).

New Mexico courts presume that the New Mexico Legislature knows of the existing law when it enacts legislation.  See Herrera v. Quality Imports, 128 N.M. 300, 302-03, 992 P.2d 313, 315-16 (Ct. App. 1999).  New Mexico courts therefore presume that, where the New Mexico Legislature has included language in one statute but not in another statute, it is "compelling evidence that the legislature" intended to exclude the language.  Hanson v. Turney, 136 N.M. 1, 4, 94 P.3d 1, 4 (Ct. App. 2004).  See State v. Jade G., 141 N.M. 284, 290, 154 P.3d 659, 665 (2007)(stating that, when the legislature provided exceptions in one portion of the statute, but not another portion, the court "must presume these omissions were intentional").

New Mexico courts have declined to construe statutes more broadly than the plain language of the statute allows, even when the statute is one which they liberally interpret.  See Krahling v. First Trust Nat'l Ass'n, 123 N.M. 685, 689-90, 944 P.2d 914, 918-19 (Ct. App. 1997).  In Krahling v. First Trust Nat'l Ass'n, the Court of Appeals of New Mexico stated:

> Finally, Honeywell argues generally that the purpose of the Guaranty Association is to protect New Mexico residents.  As such, Honeywell urges us to liberally construe the Guaranty Law because of its humanitarian policy and to enforce coverage in this instance.  We decline to give the Guaranty Law any construction but a reasonable one since the language of the statute is clear as applied to the GICs in this case.  See United Water N.M. Inc. v. New Mexico Pub. Util. Comm'n, 121 N.M. 272, 276, 910 P.2d 906, 910 (1996) (statute should be given reasonable interpretation in accordance with the Legislature's apparent purpose); see also Unisys Corp., 943 S.W.2d at 140 (even though Texas Guaranty Act provided for liberal construction, court was not permitted to ignore statutory language excluding coverage of certain unallocated annuity contracts).  We therefore decline to construe the Guaranty Law more broadly than its plain language allows.

Krahling v. First Trust Nat'l Ass'n, 123 N.M. at 689-90, 944 P.2d at 918-19.

Similarly, in the workers' compensation context, New Mexico courts have stated that they will not use the cannon of liberal construction of a statute as a justification for disregarding the statute's plain language.  See Garcia v. N.M. State Highway Dept., 61 N.M. 156, 163, 296 P.2d 759, 763 (1956)("[W]e cannot close our eyes [to the statute's language] even under the canon of liberal construction of the compensation act to effect its remedial purposes.").  In Varela v. Mounho, 92 N.M. 147, 584 P.2d 194 (Ct. App. 1978), the Court of Appeals of New Mexico addressed whether the Workmen's Compensation Act should apply to a farm laborer employed at a commercial dairy who was injured by a cow.  See 92 N.M. at 148-49, 584 P.2d at 195-96.  The Act provided that it did not apply to employers of farm laborers.  See 92 N.M. at 149, 584 P.2d at 196.  The plaintiff contended that the farm labor exclusion was outdated and had been criticized by legal writers, and that New Mexico decisions hinted that the exclusion would not apply where the employer's activity was a commercial enterprise.  See 92 N.M. at 149, 584 P.2d at 196.  The Court of Appeals stated that the plaintiff

> asserts that unless we hold that commercial dairies do not come within [Section] 59-10-4(A), . . . our decision would be contrary to the purposes of the Workmen's Compensation Act which is "to provide a humanitarian and economical system of compensation for injured workmen". [sic] Graham v. Wheeler, [77 N.M. 455, 423 P.2d 980 (1967)].  To achieve that purpose, plaintiff asserts the statute must be liberally construed in his favor. See Schiller v. Southwest Air Rangers, Inc., 87 N.M. 476, 535 P.2d 1327 (1975).  Plaintiff also asserts there must be liberal construction in order to obtain fundamental fairness.  See Transport Indemnity Company v. Garcia, 89 N.M. 342, 552 P.2d 473 (Ct. App.1976).  Our answer is that the provisions of the Workmen's Compensation Act "may not be disregarded in the name of liberal construction." Graham v. Wheeler, supra.  The asserted unfairness to farm laborers "is a matter of legislative policy, and we are bound to interpret and apply the law as it is given us." Koger v. A. T. Woods, Inc., [38 N.M. 241, 31 P.2d 255 (1934)].

92 N.M. at 149-50, 584 P.2d at 196-97.

## LAW REGARDING THE FIRST AMENDMENT

The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  The First Amendment secures the "freedom of expression upon public questions."  New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964).  According to Justice Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary."  Whitney v. California, 274 U.S. 357, 375 (1927).  The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be the secret of liberty."  Whitney v. California, 274 U.S. at 375.  The Framers firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile."  Whitney v. California, 274 U.S. at 375.  Justice Brandeis noted that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates.  See Whitney v. California, 274 U.S. at 375.  Robust public discussion is a "political duty" and is a "fundamental principle of the American government."  Whitney v. California, 274 U.S. at 375.  Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people."  Roth v. United States, 354 U.S. 476, 484 (1957).

The First Amendment, however, is not an absolute bar on government intervention. "No law," does not actually mean "no law."  U.S. Const. amend. I.  See Dennis v. United States, 314 U.S. 494, 503 (1951)(noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to other values

and considerations"); Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)(stating

that, "'as a general matter, the First Amendment means that government has no power to restrict

expression because of its messages, its ideas, its subject matter, or its content," but "this principle,

like other First Amendment principles, is not absolute")(quoting Bolger v. Youngs Drug Products

Corp., 463 U.S. 60, 65 (1983)).  Although the First Amendment speaks in absolutist terms, courts

have long recognized that governments constitutionally can restrict speech and the press under

certain conditions.  See Holder v. Humanitarian Law Project, 561 U.S. 1, 26-29 (2010).  Justice

Oliver Wendell Holmes, Associate Justice of the Supreme Court of the United States of America,

notes in his famous example: "The most stringent protection of free speech would not protect a

man in falsely shouting fire in a theater and causing a panic."  Schenck v. United States, 249 U.S.

47, 52 (1919).  Not all speech is protected speech.  See Chaplinksy v. New Hampshire, 315 U.S.

568, 571-72 (1942)("There are certain well-defined and narrowly limited classes of speech, the

prevention and punishment of which have never been thought to raise any Constitutional

problem."); Miller v. California, 413 U.S. 15, 23 (1973)("This much has been categorically settled

by the Court, that obscene material is unprotected by the First Amendment.").  "[N]ot all speech

is of equal First Amendment importance."  Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,

472 U.S. 749, 758 (1985).  The extent to which the government may limit access to information

or restrict speech "depends on the nature of the forum."  Cornelius v. NAACP Legal Def. and

Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  See Ward v. Rock Against Racism, 491 U.S. 781,

791 (1989)(concluding that certain content-neutral time, place, and manner restrictions are

constitutional).  Moreover, the First Amendment's speech and press protections limit both state

and federal government action.  See Gitlow v. New York, 268 U.S. 652, 666 (1925); Near v.

Minnesota, 283 U.S. 697, 628 (1931).  The First Amendment regulates "government regulation of

private speech" and not government speech or purely private speech regulations.  Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009).  The First Amendment does not compel either the government or private persons to supply information.  See Shero v. City of Grove, 510 F.3d 1196 (10th Cir. 2007).  See In re Santa Fe Natural Tobacco Co. Mkting & Sales Practices and Products Liab. Litig., 388 F. Supp. 3d 1087, 1168-73 (D.N.M. Dec. 21, 2017)(Browning, J.).

　　　1.　　**Access to Court Proceedings and the First Amendment.**

　　　The First Amendment does not mention explicitly a right of access to court proceedings. See U.S. Const. amend. I.  Nevertheless, the Supreme Court has extended a public right of access to criminal trials pursuant to the First Amendment.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 602-04 (1982).  The Supreme Court states:

> [W]e have long eschewed any "narrow, literal conception" of the First Amendment's terms . . . for the Framers were concerned with broad principles, and wrote against a background of shared values and practices.  The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment Rights.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 603-04 (quoting NAACP v. Button, 371 U.S. 415, 430 (1963)).  See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 579-80, 591 n.16 (1980).  The Supreme Court has emphasized that the right of access to criminal trials is important, because "the criminal trial has historically been open to the press and general public," and because such public access "plays a particularly significant role in the functioning of the judicial process and the government as a whole."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 605-06.  Accordingly,

> Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process.  And in the

> broadest terms, public access to criminal trials permits the public to participate in
> and serve as a check upon the judicial process -- an essential component in our
> structure of self-government.  In sum, the institutional value of the open criminal
> trial is recognized in both logic and experience.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  Because one of the

First Amendment's "major purpose[s]" is to "protect the free discussion of governmental affairs,"

the Supreme Court recognizes a right of access to criminal trials.  Mills v. Alabama, 384 U.S. 214,

218 (1966).  By protecting this right, the First Amendment "serves to ensure that the individual

citizen can effectively participate in and contribute to our republican system of self-government."

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 604.  The Supreme Court

cautions, however, that, "although the right of access to criminal trials is of constitutional stature,

it is not absolute."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.

Still, the standard that the government must meet to garner closure is hefty, requiring satisfaction

of strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606-

07.

   The First Amendment does not protect an absolute right to access court documents or court

proceedings.  See Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. 1,

11-12 (1986); Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  The

right is not absolute, because, as the Supreme Court notes, it takes "little imagination to recognize

that there are some kinds of government operations that would be totally frustrated if conducted

openly."  Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8.  "[T]he

right to inspect and copy judicial records is not absolute."  Nixon v. Warner Commc'n, Inc., 435

U.S. 589, 598 (1978).  The Supreme Court states: "Every court has supervisory power over its own

records and files, and access has been denied where court files might have become a vehicle for

improper purposes." <u>Nixon v. Warner Commc'n, Inc.</u>, 435 U.S. at 598.  Consequently, there is a "qualified" "right of public access" if two "considerations of experience and logic" are met.  <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S. at 10.  First, a judicial proceeding or record must "have historically been open to the press and general public."  <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S. at 8.  Second, public access must play a "significant positive role in the functioning of the particular process in question." <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S. at 8.  The right of access is qualified, but the presumption of access may be overcome "'only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S. at 9 (quoting <u>Press-Enterprise Co v. Superior Ct. of Calif., Riverside Cnty.</u>, 464 U.S. 501, 510 (1984)).  <u>See United States v. Gonzales</u>, 150 F.3d 1246, 1256 (10th Cir. 1998)).  This test is known as the "experience and logic" test.  <u>See Lanphere & Urbaniak v. Colo.</u>, 21 F.3d 1508, 1512 (10th Cir. 1994).

The "experience and logic" test does not afford the press a special right of access to court or government documents not available to the public.  <u>See Lanphere & Urbaniak v. Colo.</u>, 21 F.3d 1511.  The United States Court of Appeals for the Tenth Circuit has twice assumed without deciding that the "experience and logic" test applies to non-criminal court records and proceedings. <u>See United States v. McVeigh</u>, 119 F.3d 806, 812 (10th Cir. 1997); <u>United States v. Gonzales</u>, 150 F.3d at 1256.  In doing so, however, the Tenth Circuit reiterated that there is "not yet any definitive Supreme Court ruling on whether there is a constitutional right of access to court documents and, if so the scope of such a right."  <u>United States v. McVeigh</u>, 119 F.3d at 812.

The "experience and logic" test does not require disclosure of a criminal defendant's

address or telephone number.  Lanphere & Urbaniak v. Colo., 21 F.3d at 1512.  In Lanphere & Urbaniak v. Colo., the Tenth Circuit concluded that a First Amendment right of access exists only in "limited situations" where a "'tradition of accessibility implies the favorable judgment of experience' . . . and where 'public access plays a significant positive role in the functioning of the particular process in question.'"  Lanphere & Ubraniak v. Colo., 21 F.3d at 1512 (quoting Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8).  Allowing access to documents that contain a defendant's "address and/or phone number," especially when those documents are sought for that reason specifically, would stretch the First Amendment's principles "well beyond their current bounds."  See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512.  The Tenth Circuit, therefore, notes specifically that it "declines" to find a First Amendment right to access to court documents which contain a criminal defendant's address or telephone number.  See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512.  See also United States v. Jager, No. CR-1531 JB, 2011 WL 13285416, at *4 (D.N.M. June 23, 2011)(Browning, J.)("[T]he 'interests of personal privacy' of the innocent third parties is 'sufficiently compelling to overcome the presumption of access.'"  United States v. Jager, No. CR-1531 JB, 2011 WL 13285416, at *4 (D.N.M. June 23, 2011)(Browning, J.)(quoting United States v. Sattar, 471 F. Supp. 2d 380, 388 (S.D.N.Y. Nov. 21, 2006)(Koeltl, J.)).

Similarly, the "experience and logic" test does not mandate press access to suppressed evidence.  United States v. McVeigh, 119 F.3d at 812-13.  Assuming without deciding that the "experience and logic" test applies beyond the criminal context, the Tenth Circuit determined that, although there is a "qualified right of access" to a suppression motion, that right "does not extend to the evidence actually ruled inadmissible in such a hearing."  United States v. McVeigh, 119 F.3d at 813.  The public's interest in understanding court proceedings is the guiding principle.  See

United States v. McVeigh, 119 F.3d at 813.  The Tenth Circuit reasoned that accessing suppressed evidence is "not necessary to understand the suppression hearing, so long as the public is able to understand the circumstances that gave rise to the decision to suppress."  United States v. McVeigh, 119 F.3d at 813.  Moreover, the Tenth Circuit noted that disclosing suppressed evidence would harm the criminal process, because it would expose the "public generally, as well as potential jurors, to incriminating evidence that the law has determined may not be used to support a conviction."  United States v. McVeigh, 119 F.3d at 813.  A district court's decision to seal only "those portions of the motion and exhibit that contain materials . . . ruled inadmissible," therefore, did not run afoul of the First Amendment, because "both the press and the public had ample opportunity to understand the circumstances surrounding" the inadmissible material.  United States v. McVeigh, 119 F.3d at 813-14.

The First Amendment does not require that the press have access to Criminal Justice Act, 18 U.S.C. § 3006A, ("CJA") materials, including "CJA-related vouchers, backup documentation, motions, orders, and hearing transcripts."  United States v. Gonzales, 150 F.3d 1246, 1253 (10th Cir. 1998).  When the Albuquerque Journal contended that it has a First Amendment right to access CJA materials, the Tenth Circuit applied the "experience and logic" test, and concluded that neither history nor logic supported the Albuquerque Journal's contention.  United States v. Gonzales, 150 F.3d at 1256-61.  First, there is "no history, experience or tradition of access" requiring the "release at any time of backup documentation, motions, orders, and hearing transcripts regarding requests for CJA assistance."  United States v. Gonzales, 150 F.3d at 1258.  Second, public access to these records does not "play a *significant role* in the functioning of the CJA process" and would, in fact, play "a *negative* role."  United States v. Gonzales, 150 F.3d at 1259 (emphasis in original).  Further, the Tenth Circuit concluded that there is no common-law right of access to CJA materials,

because the CJA statutory scheme would supersede any common-law right.  See United States v. Gonzales, 150 F.3d at 1263.

Neither the Supreme Court nor the Tenth Circuit has decided that Press-Enterprise Co's "experience and logic" test applies to civil complaints.  Moreover, if restriction on public access to a government document or record is not a complete bar, but instead resembles a "time, place, and manner" restriction, then a court does not apply strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 607 n.17.  Time, place, and manner restrictions on press access to court documents are constitutional where they are "content-neutral, narrowly tailored, and necessary to preserve the court's important interest in the fair and orderly administration of justice."  Courthouse News Serv. v. Planet, 947 F.3d 581, 585 (9th Cir. 2020). See Ward v. Rock Against Racism, 491 U.S. at 791 (concluding that content-neutral time, place, and manner restrictions are constitutional if they are narrowly tailored to serve a significant government interest, and leave open ample room for the information to be communicated other ways).

Where the "experience and logic" test is satisfied -- and, therefore, there is a First Amendment right to access -- there is a necessary "right to timely access."  Courthouse News Serv. v. Planet, 947 F.3d at 594.  The right to timely access does not swallow the entire time, place, and manner analysis.  See Courthouse News Serv. v. Planet, 947 F.3d at 594.  As a result, a right to access timely information does not entitle the press to "immediate, pre-processing access to newly filed complaints."  Courthouse News Serv. v. Planet, 947 F.3d at 594.  See Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021)(concluding that the First Amendment "does not require perfect or instantaneous access").  The qualified right "attaches when the complaint is filed," but does "not entitle the press to immediate access to those complaints."  Courthouse News

Serv. v. Planet, 947 F.3d at 585.  The Ninth Circuit states:

> Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged.  After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration.  The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

Courthouse News Serv. v. Planet, 947 F.3d at 596.  The qualified right of access does "not require perfect or instantaneous access," because it leaves room for courts to delay access when "same-day access would be impracticable."  Courthouse News Serv. v. Schaefer, 2 F.4th at 328.  Neither "inconsequential delays" nor delays caused by "extraordinary circumstances" infringe the qualified right of access.  Courthouse News Serv. v. Schaefer, 2 F.4th at 328.  Rather, the First Amendment requires newly filed civil complains be available "as expeditiously as possible."  Courthouse News Serv. v. Schaefer, 2 F.4th at 329.  For example, "overnight delay in access to complains filed during the last ninety minutes of the court's public hours" does not violate the First Amendment.  Courthouse News Serv. v. Planet, 947 F.3d at 599.

### 2.    Newsgathering and the First Amendment.

While newsgathering has some First Amendment protection, its protection does not include necessarily a right to access all news-worthy information.  The Supreme Court has noted that, although "there is an undoubted right to gather news 'from any source by means within the law,'" that right is limited, by its terms, to the ability to gather information from sources that are legally available to the public.  Houchins v. KQED, Inc., 438 U.S. 1, 10-12 (1978)(quoting Branzburg v. Hayes, 408 U.S. 665, 681-82 (1972)).  "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."  Branzburg v. Hayes, 408 U.S. at 684.  First Amendment protection of newsgathering, which

ensures that the government does not "violate the First Amendment by deterring news sources from communicating information," does not provide a right of access beyond the public's general access to a particular source.  Houchins v. KQED, Inc., 438 U.S. at 10-12 (citing Branzburg v. Hayes, 408 U.S. at 680).  Thus, there is "no basis for the claim that the First Amendment compels others -- private persons or governments -- to supply information."[12]  Houchins v. KQED, Inc., 438 U.S. at 10-11.

The Supreme Court has also found that an international passenger who asserted that the Secretary of State's refusal to validate his passport to travel to Cuba violated his First Amendment right to "travel abroad" so as to acquaint himself "first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies," had not suffered a First Amendment violation.  Zemel v. Rusk, 381 U.S. 1, 16-17 (1965).  The Supreme Court explained:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.  For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.  The right to speak and publish does not carry with it the unrestrained right to gather information.

---

[12]As the Tenth Circuit has noted:

[T]he "Supreme Court has recognized that the First Amendment guarantees access to government records pertaining to criminal proceedings if (1) there has been a tradition of access to the information and (2) public access benefits the functioning of the particular process in question.  See, e.g., Press–Enter. Co. v. Superior Court, 478 U.S. 1, 8 . . . (1986)(finding a conditional right of access to California pre-trial criminal proceedings).  Cf. Journal Pub. Co. v. Mechem, 801 F.2d 1233, 1236-37 (10th Cir.1986)(applying a similar analysis to coverage of certain aspects of a civil trial)."

Smith v. Plati,  258 F.3d 1167, 1178 n.10 (10th Cir. 2001).

Zemel v. Rusk, 381 U.S. at 16-17.  According to the Tenth Circuit, it is "well-settled that there is no general First Amendment right of access to all sources of information within governmental control."  Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)(citing Houchins v. KQED, Inc., 438 U.S. 1, 9 (1978)).  "This applies equally to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the public."  Smith v. Plati, 258 F.3d at 1178 (citing Houchins v, KQED, Inc., 438 U.S. at 11; Pell v. Procunier, 417 U.S. 817, 834 (1974); Saxbe v. Wash. Post Co., 417 U.S. 843, 850 (1974); Branzburg v. Hayes, 408 U.S. at 684-85; and Zemel v. Rusk, 381 U.S. at 17).  See Okla. Hosp. Ass'n v. Okla. Pub. Co., 748 F.2d 1421, 1425 (10th Cir. 1984)("Thus, the Supreme Court has recognized that, whatever the extent of protection warranted newsgathering, it is no greater than the right of the general public to obtain information." (citing Pell v. Procunier, 417 U.S. at 834)).

### LAW REGARDING FIRST AMENDMENT OVERBREADTH CHALLENGES

An overbreadth challenge is a facial challenge to a speech-restricting statute on First Amendment grounds, and, if successful, it results in the invalidation of the entire statute.  To succeed, the challenged statute must regulate substantially more expression than the First Amendment allows governments to regulate.  See Schad v. Borough of Mt. Ephraim, 452 U.S. 61 (1981).  The party challenging the statute need not have been engaged in constitutionally protected expression to have standing to challenge the law; even if the law is constitutional as applied to the challenging party, if the law is found to be overbroad, it is invalid in its entirety.  See Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 634 (1980)("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."

(citations omitted)).   There are, thus, two aspects of an overbreadth challenge that set it apart from other facial challenges: the substantive aspect and the standing aspect.

### 1.      The Substantive Aspect: Inverting the Usual Rule for Facial Challenges.

Outside of the First-Amendment context, for a party to succeed in facially challenging a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[13]   United States v. Salerno, 481 U.S. 739, 745 (1987).   Overbreadth is not quite

---

[13]The Tenth Circuit and leading commentators contend that the formulation in United States v. Salerno, 481 U.S. 739, 745 (1987), is neither normatively desirable nor -- more importantly for the Court's purposes -- descriptively accurate.

> [I]n City of Chicago v. Morales, [527 U.S. 41, 55 n.22 (1999),] a plurality of the Court asserted that "[t]o the extent that we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court, including Salerno itself."

> . . . .

> Salerno's language thus is accurately understood not as setting forth a test for facial challenges, but rather as describing the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.   In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the Ward test, or reasonableness review), it can no longer be constitutionally applied to anyone -- and thus there is "no set of circumstances" in which the statute would be valid.   The relevant constitutional test, however, remains the proper inquiry.

Doe v. City of Albuquerque, 667 F.3d 1111, 1125-26, 1127 (10th Cir. 2012)(emphasis in original)(referring to Ward v. Rock Against Racism, 491 U.S. 781 (1989), which held that, even in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, as long as the restrictions are narrowly tailored to serve a significant governmental interest, the restrictions leave open ample alternative channels for communicating the information, and the restrictions are justified without reference to the content of the regulated speech).   See Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 936-49 (2011)(examining empirical evidence and concluding that the Supreme Court regularly facially invalidates laws, and ignores the purported standard when it does); Richard H. Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1322-23, 1342-43 (2000); Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev 235, 239-42 (1994)("[T]he Salerno opinion cites no direct authority to support its truly draconian standard.").   If the standard in United States v. Salerno were taken seriously,

the 180-degree reverse of this standard -- which would be that a law is unconstitutional if it proscribes any constitutionally protected speech -- but instead invalidates only those laws whose "overbreadth is substantial." Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. at 574. The usual burden of proof in attacking the constitutionality of a statute is switched in the First Amendment context, so that the government "bears the burden of establishing its constitutionality," ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated, see Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012)("[A]s a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to . . . ordinances. However, this presumption does not apply when the challenged statute infringes upon First Amendment rights." (omission in original)(citations omitted)(internal quotation marks omitted)).

An example of a successful overbreadth challenge occurred in Schad v. Borough of Mt. Ephraim. In that case, a club that featured nude dancing challenged a city ordinance that purported to ban all live entertainment in commercial zones.[14] See 452 U.S. at 63-64. Although the Supreme

---

virtually no statute would ever be invalidated. A statute criminalizing male-male sexual relations would be constitutional, because it could validly be applied to nonconsensual male-male sexual relations. See Lawrence v. Texas, 539 U.S. 558 (2003)(striking down a male-male sodomy law without ever using the term "facial challenge" or reciting any recognizable standard of the same). It is not clear how this standard even could be applied to Equal Protection challenges, invidious purpose challenges, procedural rights challenges, or challenges that a law falls outside of the federal government's enumerated powers; how it can be squared with void-for-vagueness doctrine; or whether and how it affects severability analysis. See Citizens United v. Fed. Election Comm'n, 558 U.S. at 331("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

[14]The Borough of Mt. Ephraim argued that the zoning ordinance constituted a "reasonable time, place, and manner restriction." 452 U.S. at 74. The Supreme Court replied that, "[t]o be reasonable, time, place, and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication. Here, the Borough totally

Court has since determined that the First Amendment does not protect nude dancing, see Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), the ordinance banned a substantial swath of activities -- such as "plays, concerts, musicals, dance," and athletic events -- that the First Amendment protected, Schad v. Borough of Mt. Ephraim, 452 U.S. at 66. The Supreme Court did not do as they might have done in non-First Amendment settings and narrowly interpret the ordinance to ban only constitutionally unprotected speech, but rather stuck the ordinance down entirely as overbroad. See 452 U.S. at 66.

"[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973). In Broadrick v. Oklahoma, the Supreme Court upheld a state law, patterned on the federal Hatch Act of 1939, 5 U.S.C. §§ 7321-7326, that barred government employees from engaging in partisan political activities. See 413 U.S. at 615-16. On its face, the statute could be construed to ban forms of expression, like wearing partisan buttons and displaying partisan bumper stickers on vehicles, that both parties agreed the First Amendment protected.[15] See 413 U.S. at 615-16. The State Personnel Board, the body charged with enforcing the statute and disciplining noncompliant

---

excludes all live entertainment . . . ." 452 U.S. at 75-76 (citations omitted)(citing Grayned v. City of Rockford, 408 U.S. 104, 116 (1972)).

[15]Government employees do not receive the same level of First Amendment protection from adverse employment actions, e.g., firings that citizens do from adverse government action, e.g., penal or civil sanctions, discrimination on the basis of speech (content-based speech regulation), compelled speech, or the conditioning of a benefit. See Erwin Chemerinsky, Constitutional Law: Principles and Policies § 11.2.4.1, at 969; id. § 11.3.8.1, at 1112. Government employees are protected from adverse employment actions only on the basis of speech if: (i) the speech is "on a matter of public concern," Connick v. Myers, 461 U.S. 138, 146 (1983); and (ii) the government's needs, "as an employer, in promoting the efficiency of the public services it performs through its employees," Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), do not -- when balanced against the speech rights of the employee -- justify the speech restriction.

employees, had, however, internally interpreted the statute to ban only unprotected speech, and the disciplined plaintiff-employees had not been engaged in protected speech, but merely sought to invalidate the law on the basis of the theoretical unconstitutional applications. See 413 U.S. at 615-16. The Supreme Court held that the statute was "not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied." 413 U.S. at 615-16.

As to where the line is between insubstantial overbreadth and substantial overbreadth, the Supreme Court has stated:

> The concept of substantial overbreadth is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself -- the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.

> "The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine. While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation." New York v. Ferber, 458 U.S. 747, 772 (1982). In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.

Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800-01 (1984)(footnote omitted)(citations omitted).

When assessing whether an overbroad statute is likely to chill third parties from engaging in protected expression, courts should assess not only whether the number of unconstitutional potential applications of the statute is significant relative to the overall number of applications, but the level of interpretive discretion given to those in charge of its enforcement, and the likelihood

of capricious enforcement.  In <u>City of Houston v. Hill</u>, 482 U.S. 451 (1987), the Supreme Court struck down as overbroad a city ordinance making it a crime "for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty."  482 U.S. at 455 (quoting Code of Ordinances, City of Houston, Tex. § 34-11(a) (1984)).  The Supreme Court held that the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," 482 U.S. at 465, and "criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement," 482 U.S. at 466.  The Supreme Court explained:

> As the Court observed over a century ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."  <u>United States v. Reese</u>, 92 U.S. (2 Otto) 214, 221 (1876).
>
> . . . .
>
> The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals -- those chosen by the police in their unguided discretion -- are arrested.  Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," <u>NAACP v. Button</u>, 371 U.S. 415, 433 (1963), the ordinance is susceptible of regular application to protected expression.

<u>City of Houston v. Hill</u>, 482 U.S. at 465-67 (citations to the record omitted).  The Court presumes that, assuming the same level of overbreadth, the threat of criminal sanctions produces a stronger chilling effect than that of civil monetary sanctions, directions to cease and desist, or exposure to civil liability.

Some commentators have suggested that, when considering whether a statute's overbreadth is substantial, courts should take into account the importance of the protected speech being restricted or chilled.  <u>See</u> Richard Fallon, Jr., <u>Making Sense of Overbreadth</u>, 100 Yale L.J. 853, 894 (1991).  Under this view, a statute that chills a swath of political speech should be more

readily facially invalidated than one that chills sexual, frivolous, or even artistic speech -- the latter statute being more amenable to as-applied challenges.  Although the Supreme Court has not endorsed this view explicitly, it has held that "the overbreadth doctrine does not apply to commercial speech."  Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982).

### 2.        The Standing Aspect: The Near Abolition of Prudential Standing Factors.

A non-First Amendment, non-overbreadth facial challenge is always more difficult to mount than an as-applied challenge to the same statute.  See United States v. Salerno, 481 U.S. at 745.  An as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case; a facial challenge requires this showing as well[16] and also requires that there exists "no [other, theoretical] set of circumstances" in which the law could be constitutionally applied.  United States v. Salerno, 481 U.S. at 745.  A successful as-applied challenge is, thus, a necessary, but not sufficient, ingredient to a successful facial challenge.  The Supreme Court has attributed the relative difficulty of facial and as-applied challenges to the Case or Controversy Clause, U.S. Const. art. III, § 2, cl. 1, specifically its standing requirement[17]:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.  A closely related principle is that constitutional rights are personal and may not be asserted vicariously.  These principles rest on more than the fussiness of judges.  They

---

[16]A logical consequence of there being "no set of circumstances" wherein the law would be constitutional is that the manner in which the government applied the law in the challenger's case must also be unconstitutional.

[17]Standing is not the only reason that facial challenges are disfavored.  Other cases say that "[f]acial adjudication carries too much promise of 'premature interpretation of statutes' on the basis of barebones records."   Sabri v. United States, 541 U.S. 600, 609 (2004)(alterations omitted)(quoting United States v. Raines, 362 U.S. 17, 22 (1960)).

reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court.

Broadrick v. Oklahoma, 413 U.S. at 610 (citations omitted).

The relative difficulty of mounting facial and as-applied challenges is almost, but not entirely, reversed in the context of a First Amendment overbreadth challenge.  Although a successful as-applied challenge does not guarantee a victorious facial challenge -- the court could find the statute's overbreadth insubstantial -- it is not necessary to have a viable as-applied challenge to succeed on a facial challenge.  "[W]here the claim is that a statute is overly broad in violation of the First Amendment, . . . [there is] no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity."  Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 957 (1984).  Even if the challenger engaged in constitutionally unprotected, validly penalized speech, if he can establish that the statute penalizes a substantial swath of protected speech, then he will prevail in getting the statute invalidated not only as it relates to the constitutionally protected speech of others, but to his own unprotected speech as well.  For example, if a statute criminalized "demeaning, threatening, or inflammatory words," a challenger arrested for using "fighting words" in a bar -- unprotected speech which may be validly criminalized under Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) -- could challenge the law on behalf of third parties who might risk arrest for constitutionally protected demeaning or inflammatory words, see Goading v. Wilson, 405 U.S. 518 (1972)(invalidating a Georgia law making it a crime for "[a]ny person [to], without provocation, use . . . opprobrious words or abusive language, tending to cause a breach of the peace").

The relaxation of the usual standing rules in the overbreadth context goes further than simply allowing an individual to whom the law is constitutionally applied to sue on the basis of unconstitutional applications. The challenged law need not have been applied against the challenger at all; as long as the barebones requirements of Article III standing are met,[18] the elements of prudential standing are presumed satisfied in an overbreadth challenge.[19] In Secretary of State of Maryland v. Joseph H. Munson Co., the Supreme Court allowed a professional fundraising company to bring suit challenging a state statute that prohibited charities from soliciting funds unless at least seventy-five percent of their revenue was used for charitable purposes. See 467 U.S. at 949. The Supreme Court held that the plaintiff had standing, even though the law had not been and -- as the company was not a charity -- could not be applied against it:

> [T]he Secretary's most serious argument against allowing Munson to challenge the statute is that there is no showing that a charity cannot bring its own lawsuit. Although such an argument might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in

---

[18]Establishing Article III standing requires three components: (i) an injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical,"; (ii) causation between the injury in fact and the conduct complained of, such that the injury is fairly traceable to the challenged action; and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. at 560-61 (Scalia, J.)(internal quotation marks omitted)(citations omitted).

[19]A leading commentator offers a possible justification for the virtual abandonment of standing doctrine in the context of overbreadth challenges that also explains the concept of "taxpayer standing" for suits brought under the Establishment Clause: the grammar of the Constitution's text. Nicholas Q. Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev. 1209, 1250-57, 1257-63 (2010). The thrust of the argument is that, while all the other provisions of the Bill of Rights are written in passive voice, the First Amendment provides that "Congress shall make no law . . . ." U.S. Const. amend. I. See Rosenkranz, supra, at 1250. Professor Rosenkranz suggests that, while the Constitution contemplates that, for example, Fourth Amendment harm occurs at the point when an unreasonable search occurs, First Amendment injury occurs when Congress passes the infringing law. See Rosenkranz, supra, at 1255.

determining whether standing exists to challenge a statute that allegedly chills free speech. To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and "'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" Broadrick v. Oklahoma, 413 U.S. at 612 (quoting Dombrowski v. Pfister, 380 U.S. 479, 486 (1965)).

The fact that, because Munson is not a charity, there might not be a possibility that the challenged statute could restrict Munson's own First Amendment rights does not alter the analysis. Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society -- to prevent the statute from chilling the First Amendment rights of other parties not before the court. Munson's ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake. The crucial issues are whether Munson satisfies the requirement of "injury-in-fact," and whether it can be expected satisfactorily to frame the issues in the case. If so, there is no reason that Munson need also be a charity. If not, Munson could not bring this challenge even if it were a charity.

The Secretary concedes that the Art. III case-or-controversy requirement has been met and the Secretary has come forward with no reason why Munson is an inadequate advocate to assert the charities' rights. The activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents. We see no prudential reason not to allow it to challenge the statute

Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. at 957-58 (citations omitted).

In Griffin v. Bryant, No. CIV 13-0799 JB/GBW, 2014 WL 3377705 (D.N.M. June 18, 2014)(Browning, J.), the Court found that a plaintiff had standing to challenge a municipality's rule prohibiting statements criticizing the municipality's employees or governing body. Even though the plaintiff had not been penalized for violating the municipality's rule, because the rule likely affected his speech, he had suffered a sufficient injury in fact to establish standing. See Griffin v. Bryant, 2014 WL 3377705, at *28.

## <u>LAW REGARDING PRIOR RESTRAINTS ON SPEECH</u>

"[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." <u>Neb. Press Ass'n v. Stuart</u>, 427 U.S. 539, 559 (1976). "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." <u>N.Y. Times v. United States</u>, 403 U.S. 713, 714 (1971). Prior restraints are viewed as more invidious than after the fact speech restrictions, yet it can be difficult to determine: (i) when a speech restriction is a prior restraint; and (ii) what standard of judicial review judges should apply to speech restrictions once they have determined that the restriction is a prior restraint.

### 1.  <u>Prior Restraint Defined</u>.

In the abstract, prior restraints are contrasted against restrictions that provide for subsequent punishment. Dean Erwin Chemerinsky provides the following guidance in his hornbook:

> It is too broad to say that a prior restraint is a government action that prevents speech from occurring. All laws outlawing speech would constitute prior restraints by this definition. Nor is the traditional distinction between censorship before speech and after the fact punishments sufficient. All punishment for speech -- whether under prior restraints or other laws -- occurs after the expression takes place. All government actions regulating speech -- whether prior restraints or not -- exist before the speech occurs.
>
> The clearest definition of prior restraint is as an administrative system or a judicial order that prevents speech from occurring. . . .

Erwin Chemerinsky, <u>Constitutional Law: Principles and Policies</u> § 11.2.3.1, at 949-50 (3d ed. 2006).

The best way to determine whether a given speech restriction is a prior restraint is to consider the reasons for the heightened skepticism towards prior restraints in the first place and

determine whether the speech restriction in question implicates those reasons.  It is not immediately obvious why prior restraints are disfavored.  In many ways, front-end suppression of speech seems preferable to back-end penal or even monetary sanctions.  If the speech is ultimately to be restricted anyway, it seems to comport more with due process for the speaker to have the opportunity to argue his case and ascertain the legality of his speech before speaking, and prior restraints are more conducive to front-end First Amendment analyses.  Speech restrictions that provide for subsequent punishment, on the other hand, force the speaker to risk punishment to even challenge the speech restriction; if the speaker speaks and is punished, and the courts subsequently uphold the speech restriction against a First Amendment challenge, then the speaker cannot avoid punishment because the restricted speech has already been said.  The uncertainty attendant to subsequent punishment speech restrictions thus leads to a chilling effect whereby would-be speakers are intimidated from engaging in constitutionally-protected speech, because -- lacking a definitive front-end ruling from the courts -- they fear that their speech may be proscribed by the speech restriction and unprotected by the First Amendment.  See Lamont v. Postmaster Gen., 381 U.S. 301, 307-10 (1965).  The Supreme Court has recognized the dangers of speech restrictions that subsequently punish -- these considerations played a key role in the formation of the overbreadth and void-for-vagueness doctrines -- but they still reserve special suspicion for prior restraints.

Some of this animus is historical, carried over from judicial opposition to the English Crown's licensing system for publications.  See 4 William Blackstone, Commentaries *151-152 ("[T]he liberty of the press is, indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publication, and not in freedom from censure for criminal matter when published.").  Other reasons remain viable today:

A system of prior restraint is in many ways more inhibiting than a system of subsequent punishment: It is likely to bring under government scrutiny a far wider range of expression; it shuts off communication before it takes place; suppression by a stroke of the pen is more likely to be applied than suppression through a criminal process; the procedures do not require attention to the safeguards of the criminal process; the system allows less opportunity for public appraisal and criticism; the dynamics of the system drive toward excesses, as the history of all censorship shows.

Thomas Emerson, The System of Freedom of Expression 506 (1970).

Perhaps the most compelling rationale for the distinction between prior restraints and subsequent punishment is the collateral bar rule. The collateral bar rule provides that when a specific individual is restrained from expression -- as by an injunction or the denial of a permit, not through the enforcement of laws applicable to everyone in the general public -- he must challenge the restraint directly, without first violating it. The collateral bar rule appears to be based upon the conception that, while citizens need not obey an unconstitutional law, they must respect the judiciary's decision whether that law is constitutional. In Walker v. City of Birmingham, 388 U.S. 307 (1967), an Alabama state court enjoined a group of civil rights protestors, including Dr. Martin Luther King, Jr., from, "among other things, participating in or encouraging mass street parades or mass processions without a permit as required by a Birmingham ordinance." 388 U.S. at 309. The protestors defied the injunction, holding a large march on the city streets, and were arrested and convicted of contempt of court. See 388 U.S. at 311-12. Both the Supreme Court of Alabama and the Supreme Court of the United States refused to rule on the constitutionality of the Birmingham ordinance upon which the injunction was based, instead holding that the only question that mattered was whether the protestors had violated a facially valid injunction issued by a court of proper jurisdiction. 388 U.S. at 312-13, 320-21. The Supreme Court of the United States held that the protestors could not challenge the constitutionality of the ordinance, because

they had not been arrested for violation of the ordinance itself, but rather for violation of a court order fashioned to prevent violations of the ordinance.  None of the elements of contempt of court implicated the First Amendment.  See 388 U.S. at 318.  Moreover, because the prior restraint -- the injunction -- could be challenged directly at the time of its issuance without the protestors having to first violate it to gain standing, the protestors' actions evinced disrespect not only for the possibly unconstitutional ordinance, but for the judiciary's as-yet untested willingness and ability to evaluate the ordinance's constitutionality.[20]  See 388 U.S. at 316-19.  As the divided Supreme Court wrote:

> This case would arise in quite a different constitutional posture if the petitioners, before disobeying the injunction, had challenged it in the Alabama courts, and had been met with delay or frustration of their constitutional claims. But there is no showing that such would have been the fate of a timely motion to modify or dissolve the injunction.  There was an interim of two days between the issuance of the injunction and the Good Friday march.  The petitioners give absolutely no explanation of why they did not make some application to the state court during that period.  The injunction had issued ex parte; if the court had been presented with the petitioners' contentions, it might well have dissolved or at least modified its order in some respects.  If it had not done so, Alabama procedure would have provided for an expedited process of appellate review.  It cannot be presumed that the Alabama courts would have ignored the petitioners' constitutional claims. . . .
>
> . . . .
>
> The rule of law that Alabama followed in this case reflects a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion.  This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets.  One may sympathize with the petitioners' impatient commitment to

---

[20]The petitioners made their distrust of the state judiciary clear at a press conference after the injunction was issued.  "At the press conference one of the petitioners stated: 'That they had respect for the Federal Courts, or Federal Injunctions, but in the past the State Courts had favored local law enforcement, and if the police couldn't handle it, the mob would.'"  Walker v. City of Birmingham, 388 U.S. at 310 (quotation unattributed).

their cause.  But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.

Walker v. City of Birmingham, 388 U.S. at 318-19, 320-21 (footnotes omitted).

The collateral bar rule stands today.  As long as an injunction is issued pursuant to proper procedure and is not "transparently invalid or ha[ving] only a frivolous pretense to validity," it must be obeyed and challenged directly, not defied; contempt of court trials are not appropriate vehicles to challenge the statutes that underlie the violated court orders.  The Supreme Court has also applied the collateral bar rule to licensing schemes, although the rule is relaxed in this context: when a litigant has been denied a license and defies that denial by participating in the licensed expression anyway, he may challenge the licensing scheme, as a whole, as unconstitutional; but he may not challenge his particular denial or restriction as an unconstitutional application of a facially constitutional licensing scheme.  Compare Poulos v. New Hampshire, 345 U.S. 395, 409 (1953)(holding that a where a facially valid licensing scheme had resulted in the denial of a permit to perform a religious service in a public park, the denial must be attacked directly, not by way of violation and collateral attack), with Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969)(holding that where a licensing scheme is facially invalid for lack of procedural safeguards or unbridled discretion, "a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license").

The collateral bar rule cuts off citizens' ability to speak in the face of prior restraints, even if the citizen is confident and correct that the restraint is unconstitutional.  Prior restraints, thus, have the effect of absolutely suppressing speech, with no opportunity for after-the-fact vindication by the speaker, at least until they are challenged and overturned.  If the prior restraint is never

challenged -- for example, if the restrained individual lacks the resources to fight the government in court -- then it acts to permanently prevent the restricted speech from entering the marketplace of ideas.

Courts have been most likely to find that a speech restriction is a prior restraint when the collateral bar rule would apply to a violation of the restriction.  "In practice, most prior restraints involve either an administrative rule requiring some form of license or permit before one may engage in expression, or a judicial order directing an individual not to engage in expression, on pain of contempt."  Rodney Smolla, Smolla and Nimmer on Freedom of Speech § 15:1 (2014).  These two forms of prior restraint share another invidious feature, in addition to the applicability of the collateral bar rule: they are individualized decisions, in which the identity of the speaker, and often the exact content of the message, are known in advance of the creation of the prior restraint.

2.      **The Standard of Judicial Review Applicable to Prior Restraints.**

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."  Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963).  Prior restraints must be narrowly tailored to be the least restrictive means for achieving a significant government interest.  See California v. Yamasaki, 442 U.S. 682, 702 (1979); Carroll v. President & Comm'rs of Princess Ann, 393 U.S. 175, 183 (1968)("[Prior restraints] must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order.").  In evaluating the constitutionality of prior restraints, courts "must ask . . . whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest."  Madsen v. Women's Health Ctr., 512 U.S. 753, 765 (1994).  Although this standard is very close

to strict scrutiny, it does not require that the prior restraint serve a "compelling state interest," but merely a significant one.[21]  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983)(reciting the strict scrutiny standard).  This standard is the minimum scrutiny applied to all prior restraints; if the content of the restriction -- not merely its manner of enforcement as a prior restraint -- itself triggers strict scrutiny, then strict scrutiny applies.  See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 45 (holding that strict scrutiny applies to a prior restraint enforcing a content-based restriction on speech in a traditional public forum).  Holding otherwise would result in the perverse outcome that a prior restraint would be subjected to lower scrutiny than an otherwise identical speech restriction providing for subsequent punishment.

This standard, which retains the tailoring aspect of strict scrutiny while softening the government interest prong, is a sensible one to apply to prior restraints.  The concern with prior restraints is not so much with their core substantive content, but with their scope, with their preemptive nature, and with the individualized manner of their enforcement.  The requirement of narrow tailoring and least restrictive means mirrors and amplifies the standard for overbreadth challenges, which are often unavailable for prior restraints because of the collateral bar rule.  On the other hand, if a narrow, easily delineable category of speech clearly unprotected by the First Amendment is to be restricted, whether the restriction may be justified only on the basis of a compelling state interest or may be justified by any significant state interest, should not turn on whether the restriction operates before or after the speech occurs.

---

[21]The Tenth Circuit has said that significant government interests "include public safety, accommodating competing uses . . . , controlling the level and times of noise, and similar interests." First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114, 1132 (10th Cir. 2002).

The Supreme Court has elaborated on the scrutiny courts should apply to prior restraints in a few specific contexts, notably, prior restraints in the name of national security and prior restraints to protect the fairness of criminal trials.

### a.    The Troopship Exception: Restraints on News Publications Justified by National Security.

The national security context appears to be the setting in which prior restraints may be most often found constitutional, but the Supreme Court has emphasized that the courts are not to be deferential to the government merely because national security is raised as a justification.  See New York Times v. United States, 403 U.S. 713 (1971)(per curiam).  The Supreme Court first countenanced the idea of a troopship exception in Near v. Minnesota, 283 U.S. 697, 716 (1931).  That case involved a court order enjoining the publication of libelous material, but the Supreme Court, after striking down the injunction as unconstitutional, outlined the potential exception: "No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops."  283 U.S. at 716.

This exception was first analyzed in New York Times v. United States.  See 403 U.S. at 714.  In that case, the Supreme Court refused the United States of America's request for an injunction enjoining the New York Times and the Washington Post from publishing a classified government study entitled History of U.S. Decision-Making Process on Viet Nam Policy, a.k.a. the Pentagon Papers.  See 403 U.S. at 714.  The United States had argued that publication of the document would jeopardize the ongoing war efforts.  See Brief for the United States, 1971 WL 167581, at *13-20.  Although the per curiam opinion was short and fact-specific, several Justices wrote separately to outline their views on the appropriate standard for prior restraints.  The

Honorable Hugo L. Black and the Honorable William O. Douglas, Associate Justices of the

Supreme Court, concurred, strongly implying that no prior restraint on news publication would

ever be acceptable:

> I adhere to the view that the Government's case against the Washington Post should have been dismissed and that the injunction against the New York Times should have been vacated without oral argument when the cases were first presented to this Court.  I believe that every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment.  Furthermore, after oral argument, I agree completely that we must affirm the judgment of the Court of Appeals for the District of Columbia Circuit and reverse the judgment of the Court of Appeals for the Second Circuit for the reasons stated by my Brothers DOUGLAS and BRENNAN.  In my view it is unfortunate that some of my Brethren are apparently willing to hold that the publication of news may sometimes be enjoined.  Such a holding would make a shambles of the First Amendment.

> Our Government was launched in 1789 with the adoption of the Constitution.  The Bill of Rights, including the First Amendment, followed in 1791.  Now, for the first time in the 182 years since the founding of the Republic, the federal courts are asked to hold that the First Amendment does not mean what it says, but rather means that the Government can halt the publication of current news of vital importance to the people of this country.

403 U.S. at 714-15 (Black, J., concurring, joined by Douglas, J.).  Justice Douglas wrote separately

to add: "It should be noted at the outset that the First Amendment provides that 'Congress shall

make no law . . . abridging the freedom of speech, or of the press.'  That leaves, in my view, no

room for governmental restraint on the press."  403 U.S. at 720 (Douglas, J., concurring)(quoting

U.S. Const. amend. I).

The Honorable William J. Brennan, Associate Justice of the Supreme Court, was only

slightly more amenable to prior restraints, setting forth a standard of scrutiny so strict that it might

more aptly be characterized as an exception to a blanket rule against them: "[O]nly governmental

allegation and proof that publication must inevitably, directly, and immediately cause the

occurrence of an event kindred to imperiling the safety of a transport already at sea can support

even the issuance of an interim restraining order."  403 U.S. at 726-27 (Brennan, J., concurring).

The Honorable Potter Stewart, the Honorable Byron R. White, and the Honorable Thurgood

Marshall, Associate Justices of the Supreme Court, were more tepid in their categorical opposition

to prior restraints, relying heavily on the United States' lack of statutory authorization for the

injunction -- the United States' relied on the executive's inherent power to justify the injunction.

See 403 U.S. at 730-31 (White, J., concurring, joined by Stewart, J.); 403 U.S. at 740 (Marshall,

J., concurring).  Three Justices dissented, and would have allowed the injunction, and, of course,

none of the Justices from that era are on the Supreme Court today.  Given that the Supreme Court

has not returned to this issue, the Court cannot know with certainty the scope of the troopship

exception or the showing to demand from the government, except that it is safe to conclude that

the government must shoulder a heavy burden.

> **b.      Gag Orders: Prior Restraints to Protect Fair Trials for Criminal Defendants.**

The Supreme Court has outlined a three-prong test for evaluating gag orders -- injunctions

issued to prevent the press from publishing information relating to an ongoing or forthcoming

trial -- that results in their almost never being found constitutional.  See Neb. Press Ass'n v. Stuart,

427 U.S. 539 (1976).  A gag order may only be entered for the benefit of the defendant, not the

prosecution, and the defendant must show that: (i) without a prior restraint, publicity would

"impair the defendant's right to a fair trial" by irrevocably tainting the jury pool, 427 U.S. at 562-

63; (ii) "measures short of an order restraining all publication [will not] insure[] the defendant a

fair trial," 427 U.S. at 563; and (iii) it is likely that an injunction will effectively secure a fair trial

for the defendant, see 427 U.S. at 565.  Although this test does not initially appear all that rigorous,

Dean Chemerinsky writes that it is tantamount to an absolute ban on gag orders.  See Chemerinsky,

supra, § 11.2.3.3, at 962.  Attempts to satisfy the first prong are undermined by a number of high-publicity prosecutions that resulted in acquittals, including the O.J. Simpson case, the McMartin Preschool case,[22] and the rape trial of William Kennedy Smith.  See Chemerinsky, supra, § 11.2.3.3, at 962.  Satisfaction of the second prong is stymied largely by the availability of changes in venue and the conducting of extensive voir dire.  The third prong tends to catch those few cases that survive the first two, as any case in which media coverage is so extensive and invidious as to be unfixable by voir dire and change of venue would likely still be stymied by publicity from sources outside the jurisdiction of the enjoining court.  Chemerinsky, supra, § 11.2.3.3, at 962.  Dean Chemerinsky also notes that "three Justices -- Brennan, Stewart, and Marshall -- took the position that prior restraints never would be justified to protect a defendant's right to a fair trial, and a fourth, Justice White, expressed 'grave doubt' that such a prior restraint ever would be justified."  Chemerinsky, supra, § 11.2.3.3, at 962 n.183 (citations omitted).

### LAW REGARDING A STATUTE BEING VOID FOR VAGUENESS

"Facial invalidation is, manifestly, strong medicine that has been employed by the Court sparingly and only as a last resort."  Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580

---

[22]Wikipedia describes the case as follows:

The McMartin preschool trial was a day care sexual abuse case of the 1980s.  Members of the McMartin family, who operated a preschool in California, were charged with numerous acts of sexual abuse of children in their care.  Accusations were made in 1983.  Arrests and the pretrial investigation ran from 1984 to 1987, and the trial ran from 1987 to 1990.  After six years of criminal trials, no convictions were obtained, and all charges were dropped in 1990.  When the trial ended in 1990 it had been the longest and most expensive criminal trial in American history.  The case was part of day care sex abuse hysteria, a moral panic over alleged Satanic ritual abuse in the 1980s and early 1990s.

McMartin Preschool Trial, Wikipedia, http://en.wikipedia.org/wiki/McMartin_preschool_trial.

(1998)(quotation marks omitted).   "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." United States v. Williams, 553 U.S. 285, 304 (2008).   "A statute can be impermissibly vague for either of two independent reasons.   First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.   Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."   Hill v. Colorado, 530 U.S. 703, 732 (2000)(citing Chicago v. Morales, 527 U.S. 41, 56–57 (1999)). See United States v. Williams, 553 U.S. at 304 (describing a vague statute as failing "to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so standardless that it authorizes or encourages seriously discriminatory enforcement."); Mini Spas, Inc. v. South Salt Lake City Corp., 810 F.2d 939, 942 (10th Cir. 1987)("A statute violates due process if it is so vague that a person of common intelligence cannot discern what conduct is prohibited, required, or tolerated."). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." United States v. Williams, 553 U.S. at 306. The Supreme Court of the United States has noted that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." United States v. Williams, 553 U.S. at 304 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)).

"A federal court evaluating a vagueness challenge to a state law must read the statute as it is interpreted by the state's highest court." United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988)(citation omitted).  In evaluating the constitutional validity of state statutes, the Supreme Court has stated that "every presumption is to be indulged in favor of the validity of a statute [ .]" Mugler v. Kansas, 123 U.S. 623, 661 (1887). The Supreme Court of New Mexico, in discussing

the presumption of constitutional validity that attaches to acts of the New Mexico legislature, has

stated:

> A strong presumption of constitutionality underlies each legislative enactment, and we will not void a statute where a constitutional construction is reasonably supported by the statutory language. See State v. Fleming, 2006-NMCA-149, 149 P.3d 113; Ortiz v. Taxation & Revenue Dep't, 1998-NMCA-027, 954 P.2d 109. In construing a regulation or statute, "this Court has a duty to affirm the legislation's validity and constitutionality if reasonably possible." Old Abe Co. v. N.M. Mining Comm'n, 1995-NMCA-134, 908 P.2d 776, 789–90. A statute is only unconstitutional "if it is so vague that persons of common intelligence must guess at its meaning and would differ in its application." City of Albuquerque v. Sanchez, 1992-NMCA-038, 832 P.2d 412, 418. However, "absolute or mathematical certainty is not required in the framing of a statute." State ex rel. Bliss v. Dority, 1950-NMSC-066, 225 P.2d 1007, 1017.

Bishop v. Evangelical Good Samaritan Soc'y, 2009-NMSC-036, ¶ 16, 212 P.3d 361, 366-67. In

some cases, however, the Supreme Court has noted that it could not remedy a constitutionally

imprecise state statute. See Hynes v. Mayor & Council of Oradell, 425 U.S. 610, 622

(1976)("Even assuming that a more explicit limiting interpretation of the ordinance could remedy

the flaws we have pointed out—a matter on which we intimate no view—we are without power to

remedy the defects by giving the ordinance constitutionally precise content.").

In determining whether a federal statute is unconstitutionally vague, the Supreme Court

has also noted that a strong presumption of validity attaches to Congress' enactments and has

consistently construed a challenged statute narrowly rather than condemn it as unconstitutionally

vague. See Skilling v. United States, No. 08–1394, 2010 U.S. LEXIS 5259, at *91 (June 24, 2010)

("It has long been our practice, however, before striking a federal statute as impermissibly vague,

to consider whether the prescription is amenable to a limiting construction."); United States v.

Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963)(stressing, in response to a vagueness challenge,

"[t]he strong presumptive validity that attaches to an Act of Congress"). In Skilling v. United

States, the Supreme Court looked to Congress' intent in passing the honest-services doctrine, and limited the construction of the honest-services doctrine to reach bribes and kickbacks, as Congress intended, stating:

> [T]here is no doubt that Congress intended § 1346 to reach at least bribes and kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we acknowledge, would raise the due process concerns underlying the vagueness doctrine. To preserve the statute without transgressing constitutional limitations, we now hold that § 1346 criminalizes only the bribe-and-kickback core of the pre-*McNally* case law.

Skilling v. United States, 2010 U.S. LEXIS 5259, at * *96–97.

In Grayned v. City of Rockford, 408 U.S. 104 (1972), the Supreme Court stated that, when assessing whether a statute is vague, it looks to "the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." 408 U.S. at 110 (internal quotations omitted). For example, in Minority TV Project Inc. v. FCC, No. C–06–02699, 2007 U.S. Dist. LEXIS 95498 (N.D. Cal. Dec. 21, 2007), the Honorable Elizabeth D. Laporte, United States District Judge for the Northern District of California, found it premature to dismiss a facial challenge of void for vagueness until the plaintiffs introduced evidence of the Federal Communication Commission's ("FCC") enforcement decisions applying the statute in question— a prohibition against certain paid promotional advertisements. See 2007 U.S. Dist. LEXIS 95498, at * *37–38. When the plaintiffs submitted evidence of the FCC's enforcement, Judge Laporte found the statute was not unconstitutionally vague, explaining:

> Assuming that the Court may "perhaps to some degree" consider the FCC's interpretation of the statute in evaluating whether the statute is vague, see Grayned v. City of Rockford, 408 U.S. 104, 110 (1972), as Plaintiff urges the Court to do, arguable inconsistencies in a statute's application in a handful of cases do not condemn a statute. If such limited inconsistencies rendered statutes unconstitutionally vague, the majority of statutes would probably not survive a

vagueness challenge. Rather, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" California Teachers Ass'n, 271 F.3d at 1151(quoting Hill v. Colorado, 530 U.S. 703, 733 (2000)(rejecting vagueness challenge)(quotation marks omitted)). As in Grayned, the words of the statute here are marked by "flexibility and reasonable breadth, rather than meticulous specificity," and "it is clear what the ordinance as a whole prohibits." 408 U.S. at 110 (quoting Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8th Cir. 1969)).

Minority TV Project Inc. v. FCC, 649 F.Supp.2d 1025, 1047 (N .D.Cal.2009). The Supreme Court in Grayned v. City of Rockford noted: "Condemned to the use of words, we can never expect mathematical certainty from our language." 408 U.S. at 110. The Supreme Court rejected a facial vagueness challenge to an ordinance that implicated First Amendment rights and prohibited certain demonstrations "adjacent" to schools that "disturb[ ] or tend[ ] to disturb the peace or good order of such school session or class thereof," finding that it was "clear what the ordinance as a whole prohibits," even though the statute at issue did not specify the prohibited quantum of disturbance. 408 U.S. at 109-11 ("Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted.").

Numerous statutes have withstood facial vagueness challenges even though they contained arguably ambiguous language. See Hill v. Colorado, 530 U.S. at 732 (rejecting vagueness challenge to ordinance making it a crime to "approach" another person, without that person's "consent," to engage in "oral protest, education, or counseling" within specified distance of health-care facility); Boos v. Barry, 485 U.S. 312, 332 (1988)(rejecting vagueness challenge to ordinance interpreted as regulating conduct near foreign embassies "when the police reasonably believe that a threat to the security or peace of the embassy is present"); Cameron v. Johnson, 390 U.S. 611, 616 (1968)(rejecting vagueness challenge to ordinance prohibiting protests that "unreasonably

interfere" with access to public buildings); Kovacs v. Cooper, 336 U.S. 77, 79 (1949)(rejecting vagueness challenge to sound ordinance forbidding "loud and raucous" sound amplification).

## ANALYSIS

The Court will grant in part the Plaintiffs' request for a PI.   First, the Court disagrees with the Secretary of State's interpretation of the Election Code.   Second, Voter Reference but not Steinberg have standing to pursue their claims.   Third, the Court grants in part the Plaintiffs' request for a PI, because, although Voter Reference seeks a disfavored injunction, Voter Reference is likely to succeed on the merits of part of its viewpoint discrimination and prior restraint claims, Voter Reference will suffer irreparable injury absent a PI preventing viewpoint discrimination and prior restraint, and the balance of equities weigh in the Plaintiffs' favor.   Fourth, the Court will not order Voter Reference to secure a bond.

## I. THE COURT DISAGREES WITH THE SECRETARY OF STATE'S INTERPRETATION OF NEW MEXICO'S ELECTION CODE.

The Court disagrees with the Secretary of State's interpretation of the Election Code, as expressed in the Feb. 14 Request Form and at the May and June Hearings.   First, the Court accords Skidmore deference to the Secretary of State's interpretation of the Election Code, as expressed in the Feb. 14 Request Form.   See Skidmore v. Swift & Co., 323 U.S. 134 (1944).   Second, the Court concludes that the Election Code permits Voter Reference's use of voter data as a "governmental purpose[],"N.M.S.A. § 1-4-5.5(E), and, in contrast to the Secretary of State's interpretation, permits Voter Reference's publication of voter data online.   Third, the Court construes the Election Code to permit the prosecution of organizations or requesters who commit false swearing on the Voter Data Request Form, even if the Secretary of State's interpretation of the Election Code on the Voter Data Request Forms is incorrect.

A.   **THE COURT ACCORDS <u>SKIDMORE</u> DEFERENCE TO THE SECRETARY OF STATE'S INTERPRETATION OF NEW MEXICO'S ELECTION CODE.**

The Court looks to New Mexico law to determine the amount of deference it should accord the Secretary of State in construing New Mexico's Election Code. "When an agency that is governed by a particular statute construes or applies that statute, the court will begin by according some deference to the agency's interpretation." <u>Morningstar Water Users Ass'n v. N.M. PUC</u>, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 583, 904 P.2d 28, 32 (citing <u>Public Serv. Co. v. New Mexico Pub. Serv. Comm'n</u>, 1987-NMSC-124, ¶ 12, 106 N.M. 622, 625, 747 P.2d 917, 920 (1987)). "In addition, the court will confer a heightened degree of deference to the agency on legal questions that determine fundamental policies within the scope of the agency's statutory function," <u>Marbob</u>, 2009-NMSC-013, ¶ 6, 146 N.M. at 27-28, 206 P.3d at 138-39, and it will confer heightened deference to the agency on legal questions that "'implicate special agency expertise.'" <u>Morningstar Water Users Ass'n v. N.M. PUC</u>, 1995-NMSC-062, ¶ 11, 120 N.M. at 583, 904 P.2d at 32 (quoting <u>Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.</u>, 746 P.2d 896, 903 (Alaska 1987)).

Nevertheless, "[s]tatutory construction is a question of law," <u>Marbob</u>, 2009-NMSC-013, ¶ 7, 146 N.M. at 28, 206 P.3d at 139 (citing <u>State v. Romero</u>, 2006-NMSC-039, ¶ 6, 140 N.M. 299, 142 P.3d 887), and, "as such, 'the court is not bound by the agency's interpretation [of its own statute] and may substitute its own independent judgment for that of the agency because it is the function of the courts to interpret the law'" <u>Marbob</u>, 2009-NMSC-013, ¶ 7, 146 N.M. at 28, 206 P.3d at 139 (quoting <u>Morningstar Water</u>, 1995-NMSC-062, ¶ 11, 120 N.M. at 583, 904 P.2d at 32)(alteration in <u>Marbob</u> but not in <u>Morningstar Water</u>). "The court should reverse if the agency's interpretation of a law is unreasonable or unlawful." <u>Morningstar Water</u>, 1995-NMSC-

062, ¶ 11, 120 N.M. at 583, 904 P.2d at 32.  If statutory construction or interpretation is not within

an agency's area of expertise, the Supreme Court of New Mexico "afford[s] little, if any, deference

to the agency on issues of statutory construction."  Marbob, 2009-NMSC-013, ¶ 7, 146 N.M. at

28, 206 P.3d at 139.  Moreover, New Mexico courts are "less likely to defer to an agency's

interpretation of the relevant statute if the statute is clear and unambiguous."  Marbob, 2009-

NMSC-013, ¶ 7, 146 N.M. at 28, 206 P.3d at 139.

　　　　The Supreme Court of New Mexico applies Skidmore deference to an agency's interpretive

rules.  See Princeton Place v. N.M. Human Servs. Dep't, 2022-NMSC-005, ¶¶ 27-30, 503 P.3d

319, 328-30 ("Princeton Place).  Interpretive rules,

> "while not controlling upon the courts by reason of their authority, do constitute a
> body of experience and informed judgment to which courts and litigants may
> properly resort for guidance. The weight of such a judgment in a particular case
> will depend upon the thoroughness evident in its consideration, the validity of its
> reasoning, its consistency with earlier and later pronouncements, and all those
> factors which give it power to persuade, if lacking power to control."

Princeton Place, 2022-NMSC-005, ¶ 30, 503 P.3d at 329 (quoting Skidmore v. Swift & Co., 323

U.S. 134, 140 (1944).  The Supreme Court of New Mexico explains:

> 　　　Interpretive rules are "issued by an agency to advise the public of the
> agency's construction of the statutes and rules which it administers."  Shalala [v.
> Guernsey Memorial Hospital, 514 U.S. 87, 99-100 (1995)] . . . . Interpretive rules
> do not require "notice-and-comment," which "makes the process of issuing
> interpretive rules comparatively easier for agencies than issuing legislative rules."
> Perez [v. Mortg. Bankers Ass'n], 575 U.S. [92, 97 (2015)].  However, "that
> convenience comes at a price: Interpretive rules do not have the force and effect of
> law and are not accorded that weight in the adjudicatory process."  Id. (internal
> quotation marks and citation omitted).  In contrast, "rules issued through [an
> official] notice-and-comment process are often referred to as legislative rules
> because they have the force and effect of law."  Id. at 96 (internal quotation marks
> and citation omitted).

Princeton Place, 2022-NMSC-005, ¶ 28, 503 P.3d at 328-29.  "[I]n general, 'interpretative rules

have value primarily as a means of communicating to the agency's staff and affected members of

the public the agency's current views with respect to the proper interpretation of its statutes and legislative rules.'"  Princeton Place, 2022-NMSC-005, ¶ 30, 503 P.3d at 328-29 (quoting Richard J. Pierce, Jr., Distinguishing Legislative Rules from Interpretative Rules, 52 Admin. L. Rev. 547, 552, n.44 (2000)).

In Princeton Place, the Supreme Court of New Mexico examined whether a Department of Health screening form and instructions -- used to identify individuals with mental illness or intellectual disability to ensure that they are not placed in nursing facilities unnecessarily or without adequate support, see 2022-NMSC-005, ¶ 1, 503 P.3d at 322-23 -- "are representative of agency interpretations of the applicable regulations or are independent agency actions requiring promulgation pursuant to the State Rules Act," 2022-NMSC-005, ¶ 26, 503 P.3d at 328.  The Supreme Court of New Mexico applied the Shalala v. Guernsey Memorial Hospital, 514 U.S. 87, 99-100 (1995), test to determine whether the form and instructions were legislative or interpretative rules, and concluded that the Department of Health screening form and instructions are interpretive.  See Princeton Place, 2022-NMSC-005, ¶ 32, 503 P.3d at 329-30.  It reasoned that the form and instructions

> do not contain new requirements of law but rather are representative of the DOH interpretation of existing . . . regulations. Cf. Shalala, 514 U.S. at 100 (observing that a "rulemaking would . . . be required if [the regulatory guidance] adopted a new position inconsistent with . . . the [agency]'s existing regulations"). As such, they do not require official promulgation and also do not carry the full force of law. See id. at 99.  As explained by HSD, the purpose of these materials is to assist a screener, who is not required to be a medical professional, to comply with PASARR regulations.  We further determine that the purpose of the instructions for Question D-5 specifically is to advise the public and screeners regarding the agency's interpretation of the meaning of "related condition" pursuant to 42 C.F.R. § 435.1010.

Princeton Place, 2022-NMSC-005, ¶ 32, 503 P.3d at 329-30.

In deciding the level of deference the Court must apply in this case, therefore, the Court

must consider the following factors:  (i) whether the Secretary of State is construing the Election Code so as to "determine fundamental policies within the scope of the agency's statutory function," Marbob, 2009-NMSC-013, ¶ 6, 146 N.M. 24, 27-28, 206 P.3d 135, 138-39; (ii) whether the Secretary of State's construction of the Election Code "'implicate[s] special agency expertise,'" Morningstar Water Users Ass'n v. N.M. PUC, 1995-NMSC-062, ¶ 11, 120 N.M. 579, 583, 904 P.2d 28, 32; (iii) whether the Election Code's pertinent provisions are ambiguous, see Marbob, 2009-NMSC-013, ¶ 7, 146 N.M. at 28, 206 P.3d at 139; and (iv) whether the Secretary of State's interpretation of the Election Code on the Voter Data Request Authorization Forms is an interpretive rule, such that it is entitled to deference under Skidmore v Swift & Co., 323 U.S. 134 (1944).  First, the Secretary of State's construction of the Election Code seeks to determine fundamental policies within the Secretary of State's ambit, because the determination of what use of voter data is lawful or unlawful -- and why -- goes to the heart of the Election Code's purpose to "secure the secrecy of the ballot [and] the purity of elections," "guard against the abuse of the elective franchise," and "provide for efficient administration and conduct of elections."  N.M.S.A. § 1-1-1.1.  The Secretary of State is "the chief election officer of the state," N.M.S.A. § 1-2-1(A), and is statutorily required to "develop, implement, establish and supervise a voter registration electronic management system that complies with the federal Help America Vote Act of 2002 to facilitate voter registration and to provide a central database containing voter registration information for New Mexico," N.M.S.A. § 1-5-30.  According to the New Mexico Legislature, the voter registration system shall, in part, "provide security and protection for all information in the central database and monitor the central database to ensure the prevention of unauthorized entry."  N.M.S.A. § 1-5-30(B)(4).  The Secretary of State also has statutory authority to "prescribe the form of the affidavit" that voter data requesters must sign to obtain voter data.  N.M.S.A. § 1-4-

5.5(D).  <u>See</u> N.M.S.A. § 1-4-5.5(C).  <u>See</u> N.M.S.A. § 1-2-1 (C) ("No forms or procedures shall be used in any election held pursuant to the Election Code without prior approval of the secretary of state.").  The construction what is lawful and unlawful use of voter data concerns, therefore, fundamental policy issues such as facilitating voter registration, <u>see</u> N.M.S.A. § 1-5-30, keeping voter data secure, <u>see</u> N.M.S.A. § 1-5-30(B)(4), and regulating its appropriate use, <u>see</u> N.M.S.A. § 1-4-5.5.  Accordingly, <u>Marbob</u> suggests that the Secretary of State's interpretation is entitled to "a heightened degree of deference."  2009-NMSC-013, ¶ 6, 146 N.M. at 27-28, 206 P.3d at 138-39.  In <u>Marbob</u>, however, the Supreme Court of New Mexico rejected this principle of deference, insofar as it is "not the only guidepost[] we observe in determining whether an agency's interpretation of its governing statute should be accorded deference."  2009-NMSC-013, ¶ 6, 146 N.M. at 28, 206 P.3d at 138-39.

Second, there is no evidence in the record here that "statutory construction is . . . within the [Secretary of State's] expertise." <u>Marbob</u>, 2009-NMSC-013, ¶ 7, 146 N.M. 24, 28, 206 P.3d 135, 138-39.  The Court should, therefore, "afford little, if any, deference to the agency on issues of statutory construction," because they are "question[s] of law."  <u>Marbob</u>, 2009-NMSC-013, ¶ 7, 146 N.M. at 28, 206 P.3d at 139.  Third, because the Election Code is clear and unambiguous, the Court is "less likely to defer to an agency's interpretation of the relevant statute," <u>Marbob</u>, 2009-NMSC-013, ¶ 7, 146 N.M. at 28, 206 P.3d at 139.

Fourth, the Court concludes that it owes <u>Skidmore</u> deference to the Secretary of State's interpretation of the Election Code as the Voter Data Request Forms express that interpretation. The Voter Data Request Form is "'a means of communicating to . . . affected members of the public the agency's current views with respect to the proper interpretation of its statutes and legislative rules.'"  <u>Princeton Place</u>, 2022-NMSC-005, ¶ 30, 503 P.3d at 328-29.  The Court

therefore, will accord some deference to the Secretary of State's interpretation of the Election Code as the Voter Data Request Forms express that interpretation, insofar as the Court determines the Secretary of State's interpretation to be thorough, valid in its reasoning, and "consisten[t] with earlier and later pronouncements." Skidmore v. Swift & Co., 323 U.S. at 10. In conclusion, although statutory construction is not within the Secretary of State's expertise and the Election Code is not ambiguous, the Secretary of State's interpretation of the Election Code in the Voter Data Request Forms is entitled to Skidmore deference insofar as it has the power to persuade the Court by its thoroughness, reasoning, and consistency.

**B.  NEW MEXICO'S ELECTION CODE DOES NOT PROHIBIT VOTER REFERENCE'S USE AND PUBLICATION OF VOTER DATA.**

The Secretary of State contends that Articles 4 and 5 of New Mexico's Election Code prohibit Voter Reference's publication of voter data; the Court disagrees. The Election Code's Article 4 governs voter registration, see N.M.S.A. §§ 1-4-1 through 1-4-50, while Article 5 -- the Voter Records System Act -- governs the storage of voter registration data, see N.M.S.A. §§ 1-5-1 through 1-5-31. Article 1 includes definitions and general provisions for the entire Election Code, see N.M.S.A. §§ 1-1-1 through 1-1-26, and the Voter Records System Act includes its own set of definitions, see N.M.S.A. § 1-5-2. The New Mexico Office of the Secretary of State promulgates regulations governing the voter records system, see NMAC §§ 1.10.35.1 through 1.10.35.12, and this part includes a set of regulatory definitions, see NMAC § 1.10.35.7.

Under Article 4, "[n]o person shall vote at any election unless he is registered as required by the Election Code." N.M.S.A. § 1-4-1. To register to vote, New Mexico residents qualified to vote can "submit a voter registration certificate in paper form, through the online voter registration portal provided by the secretary of state, electronically when conducting an in-person transaction

at the motor vehicle division of the taxation and revenue department or as otherwise prescribed by the secretary of state." N.M.S.A. § 1-4-2.  Qualified electors[23] "may apply to a registration officer or agent for registration," N.M.S.A. § 1-4-5(A), and the "registration officer or agent or qualified elector shall fill out each of the blanks on the certificate of registration by typing or printing in ink," N.M.S.A. § 1-4-5(B), which the elector then signs or, if unable to read or write, marks, see N.M.S.A. § 1-4-5(C).  The original certificate of registration is then "presented, either in person or by mail by the qualified elector or by the registration agent or officer, to the county clerk of the county in which the qualified elector resides."  N.M.S.A. § 1-4-5(D).

The New Mexico Voter Registration Form asks applicants to supply their full name, gender, date of birth, the last four digits of their social security number or their full New Mexico driver's license number, physical address, mailing address, any previous names, political party affiliation (if the applicant wishes to vote in a primary election), telephone number, and the town or county and state of previous registration (if applicable).  See New Mexico Secretary of State of the Secretary of State, New Mexico Voter Registration Form (2019) at 1, https://portal.sos.state.nm.us/ovr/VRForms/VRFormEnglishFinal.pdf (last visited July 2, 2022)("Voter Registration Form").  The Voter Registration Form also prompts the applicant to attest that he or she is a United States citizen, is a New Mexico resident, and is qualified to vote. See Voter Registration Form at 1.

Article 4 makes sharing of certain data from the registration certificate, such as the voter's day and month of birth, unlawful:

---

[23]A "'qualified elector' means any resident of this state who is qualified to vote under the provisions of the constitution of New Mexico and the constitution of the United States and includes any qualified resident."  N.M.S.A. § 1-1-4.

It is unlawful for the qualified elector's month and day of birth or any portion of the qualified elector's social security number required on the certificate of registration to be copied, conveyed or used by anyone other than the person registering to vote, either before or after it is filed with the county clerk, and by elections administrators in their official capacity.

N.M.S.A. § 1-4-5(D).  Section 5 makes guilty of a fourth degree felony "[a] person who unlawfully copies, conveys or uses information from a certificate of registration."  N.M.S.A. § 1-4-5(E).

The registration certificate is then "processed by the county clerk."  N.M.S.A. § 1-4-2. "The county clerk, upon receipt of a proper certificate of registration within the period prescribed for registration, shall immediately enter in the proper spaces thereon the precinct of the voter," N.M.S.A. § 1-5-5(A), and all the information from the certificate of registration is "entered into the voter file" in the voter records system, N.M.S.A. § 1-5-5(B).  See NMAC § 1.10.35.7(NN), (QQ).  The "voter file" consists of

all voter information required by law and by the secretary of state that has been extracted from the certificate of registration of each voter in the county, stored on the voter records system and certified by the county clerk as the source of all information required by the Voter Records System Act.

NMAC § 1.10.35.7(NN).  The voter records system "means the statewide computerized voter registration system and database," which is "developed, implemented, established, supervised and maintained by" the Secretary of State "in compliance with the Help America Vote Act of 2002." NMAC § 1.10.35.7(QQ).

If an applicant "only provides the . . . last four digits of the voter's [social security number ('SSN')], the county clerk will first verify that the voter has a matching [Motor Vehicle Division ('MVD')] record with the provided information," but if no matching MVD record is found, "the clerk shall, within five days, email and mail the voter information with directions on how to provide their full SSN on the secure SOS portal."  NMAC § 1.10.35.8(A)(2).  Voter file processing

regulations require that "[a]ll registrant detail and statutorily required data must be entered from the certificate of registration into the voter file including: name, full social security number (SSN), physical address, DOB, and an image of the signature."  NMAC § 1.10.35.8(A)(4).

Article 4 allows for "selected information derived from the voter file" -- "voter data" -- to be pulled from voter files in the voter records system database.  N.M.S.A. § 1-4-5.5(E)(5).  See N.M.S.A. § 1-4-5.5(A)-(D).  To obtain voter data, Article 4 provides:

> The county clerk or secretary of state shall furnish voter data, mailing labels or special voter lists only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section; provided, however, all requesters shall be treated equally in regard to the charges and the furnishing of the materials.

N.M.S.A. § 1-4-5.5(A).  Although this information is stored in the voter files, the county clerk or Secretary of State "shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters."  N.M.S.A. § 1-4-5.5.

Article 4 requires that "[e]ach requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election[24] and election campaign purposes only and shall not be made available or used for unlawful purposes."  N.M.S.A. § 1-4-5.5(C).  Section 1-4-5.5 includes definitions for "election campaign purposes" and "governmental purposes," but not for "election . . . purposes":

> (1)  "election campaign purposes" means relating in any way to a

---

[24]Although the Election Code does not define "election" or "election purposes" separately from "election campaign purposes," N.M.S.A. §§ 1-5-2 and 1-4-5.5(E), the New Mexico Administrative Code defines "election" as follows: "'Election' means a statewide election that is a general election, political party primary election, local elections included in the Local Elections Act, or elections to fill vacancies in the office of United States representative," NMAC § 1.10.35.7(M).

campaign in an election conducted by a federal, state or local government;

(2)     "governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;

(3)     "mailing labels" means prepared mailing labels of selected voters arranged in the order in which requested and providing only the name and address of the voter;

(4)     "special voter list" means a prepared list of selected voters arranged in the order in which requested; and

(5)     "voter data" means selected information derived from the voter file.

N.M.S.A. § 1-4-5.5(E). "The secretary of state shall prescribe the form of the affidavit," N.M.S.A. § 1-4-5.5(D), which all requesters of voter data must use, see NMAC § 1.10.35.10 ("All requesters of voter file data or public service requests[25] shall complete the affidavit of authorization prescribed by the secretary of state.").

Article 4 provides penalties for the unlawful use of voter data:

A.     Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act.

B.     Any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth degree felony and upon conviction shall be fined one hundred dollars ($100) for each and every line of voter information that was unlawfully used.

C.     Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense.

---

[25]"'Public service request' means information prepared for an individual or organization requesting certain information from the voter records system."  NMAC § 1.10.35.7(BB).

N.M.S.A. § 1-4-5.6.

Article 4 refers to Article 5 -- the Voter Records System Act -- for authority on what "prohibited purposes" constitute "[u]nlawful use of voter data." N.M.S.A. § 1-4-5.6(A). The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act. See May Tr. at 39:14-23 (Serafimova). Sections 1-5-22 and 1-5-23 do not describe any lawful or unlawful purposes, but describe, instead, the manner in which the "disposition of voter file[s]" is unlawful:

> Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System Act [Chapter 1, Article 5 NMSA 1978] to have possession of the file.

N.M.S.A. § 1-5-22(A).

Section 1-5-22 prohibits "data processors" -- which means "data processing facilit[ies] and [their] associated employees and agents contracted to provide data processing services required by the Voter Records System Act," N.M.S.A. § 1-5-2(D) -- and also "state or county officer[s,] . . . state or county officer's deput[ies], assistant[s], employee[s] or agent[s]" from "selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file," N.M.S.A. § 1-5-22(A). Section 1-5-22 applies, then, to a specific group of people -- the State's employees and agents who work with and handle voter files in the voter records system. Section 1-5-23 is similarly inapposite, because it prohibits the unlawful destruction or alteration -- but not the use or copying of -- voter files:

> Unlawful destruction or alteration of data recording media, voter files, file maintenance lists, voter registration system software and instructions or voter lists consists of the unauthorized destruction of, the unauthorized alteration of, the erasure of information from or the rendering unusable for their lawfully intended

purpose of such media, files, software, instructions and lists or parts thereof by any person.

N.M.S.A. § 1-5-23.

Section 1-4-5.6's cross-reference to "purposes prohibited by the Voter Records System Act" makes more sense, however, when it is read with the understanding that § 1-4-5.6 -- which lists and defines the lawful purposes of "governmental or election and election campaign purposes" -- was originally located in Article 5, the Voter Records System Act. N.M.S.A. § 1-4-5.5(C). See 2005 N.M. Laws 270, 2005 N.M. Ch. 270, 2005 N.M. SB 678 (amending N.M.S.A. § 1-5-24 (1975), now located in N.M.S.A. § 1-4-5.5(C)). The New Mexico Legislature intended, then, that § 1-4-5.6 prohibits uses that fall outside of those listed in § 1-4-5.5. See N.M.S.A. §§ 1-4-5.5 and 1-4-5.6.

Whether Voter Reference's proposed use and publication of voter data -- and Steinberg's proposed use of voter data -- is lawful turns, therefore, on three main questions: (i) whether Voter Reference's proposed use of voter data to analyze the discrepancy between voter rolls and ballot counts falls within the statutory definition of "governmental or election and election campaign purposes," N.M.S.A. § 1-4-5.5(C); (ii) whether Voter Reference's proposed publication of New Mexico voter data online at VoteRef.com falls within the statutory definition of "governmental or election and election campaign purposes," N.M.S.A. § 1-4-5.5(C); and (iii) whether an organization or individual commits "false swearing" under N.M.S.A. § 1-20-10 if it does not know or cannot in good faith affirm whether members of the public -- to whom an organization makes the voter data available outside that organization -- will use the voter data lawfully. N.M.S.A. § 1-20-10.

Voter Reference uses voter data in two ways: First, on the "election side of Vote Ref,"

Voter Reference staff  "compar[e] the total ballots cast election-wide . . . as reported by the election officials," with "the total voters in the vote history file" who have "credit for having voted."  May Tr. at 55:5-13 (Swoboda).  Voter Reference staff then determine if there is a discrepancy between the two numbers, see May Tr. at 17:9-13 (Greim), and contacts the Secretary of State for each State to request an explanation for the discrepancy.  Second, "on the vote[r] registration side," May Tr. at 56:1-5 (Swoboda), Voter Reference posts the raw voter data on VoteRef.com for members of the public to verify their own and others' voting records, addresses, and political party affiliations.

### 1.   Voter Reference's Election-Related Work is a "Governmental Purpose."

Voter Reference's staff's analysis of aggregated voter data falls within Article 4's statement of lawful purposes, because it is a "governmental purpose[]."[26]  N.M.S.A.  § 1-4-5.5(E)(2).  Article 4 defines "governmental purposes" as "noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government." N.M.S.A.  § 1-4-5.5(E)(2).  This very broad definition includes the governmental oversight to which Voter Reference aspires.  Voter Reference and its staff are not using voter data to solicit business or to engage in commercial activity -- one of § 1-4-5.5's main concerns.  Rather, Voter

---

[26]In the alternative, Voter Reference's use is an "election" purpose. N.M.S.A. § 1-4-5.5(C). Although not the same statutory definition, other uses of "governmental purpose" in the New Mexico Code suggest that Voter Reference's use is not a governmental purpose.  See, e.g., N.M.S.A. § 8-4-6 (A)(7) (stating that the Secretary of State shall send copies of session laws to certain State officials if they are needed "for governmental purposes"); N.M.S.A. §45-5B-103(D) (stating that the Uniform Power of Attorney Act does not extend to a "power created on a form prescribed by a governmental or governmental subdivision, agency or instrumentality for a governmental purpose").  Here, Voter Reference's stated purpose is to assess the integrity of the State's voter rolls, which are instrumental in conducting State elections.  Accordingly, because Voter Reference is concerned with using the voter rolls as they relate to elections, Voter Reference's use is an "election" purpose under N.M.S.A. § 1-4-5.5(C).

Reference seeks to understand and to reconcile voter rolls with ballot counts, and to ensure transparency and integrity in the election process.  Voter Reference maintains that making the Secretary of State's reconciliation process public will foster greater trust in the election system. The work of Voter Reference's staff in analyzing and evaluating the Secretary of State's work relates, therefore, to the "operation . . . of a . . . state . . . government."  N.M.S.A. § 1-4-5.5(E)(2). Voter Reference is a non-profit, does not engage in commercial uses of the data, and its use "relat[es] . . . to the structure, operation or decision-making of a . . . state or local government." N.M.S.A. § 1-4-5.5(E)(2).  In sum, Voter Reference's election-related work falls within N.M.S.A. § 1-4-5.5(E)(2)'s definition of "governmental purposes."

> **2.**     **Voter Reference's Publication of Voter Data Online Relates to Governmental Purposes**.

Whether Voter Reference's Publication of individual and identifiable voter data online on a publicly-accessible website is a "governmental purpose[]" is a closer question.  N.M.S.A. § 1-4-5.5(E)(2).  While Voter Reference's analysis -- in the aggregate -- of voter data for the purposes of ensuring election integrity and transparency fits within the definition of "governmental purposes" as "noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government," N.M.S.A. § 1-4-5.5(E)(2), it is less apparent how the publication of lines of individual voter data does the same.  Taking its representations at face value, Voter Reference's crowd-sourcing work -- which encourages VoteRef.com users to check their own and others' voter data and inform the Secretary of State of any errors they find -- also falls within N.M.S.A. § 1-4-5.5(E)(2)'s broad definition of  "governmental purposes," because, like the data analysis Voter Reference's staff conduct, the crowd-sourcing project is intended as a "noncommercial purpose[]" that oversees, and therefore, "relat[es] . . . to the structure, operation

or decision-making of" the Secretary of State's Office and its Elections Bureau.  N.M.S.A. § 1-4-5.5(E)(2).  Voter Reference claims that "publishing . . . voter rolls online for free forever" fulfils its "public oversight duties under the National Voter Registration Act."  May Tr. at 53:14-19 (Swoboda)(citing 52 U.S.C. § 20507(i)).[27]

As the Court concludes above, New Mexico's Election Code does not prohibit Voter Reference -- or any organization -- from posting voter data online.  See Analysis § I, supra at 137-

---

[27]NVRA's public disclosure of voter registration activities provision states:

(1)     Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2)     The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i).  Neither the Supreme Court nor the Tenth Circuit have decided the question whether individual and identifiable voter information files are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," § 20507(i)(1), but other courts have concluded that individual and identifiable voter information files are records under § 20507(i), see Project Vote / Voting for Am., Inc. v. Long, 682 F.3d 331, 335-36 (4th Cir. 2012)(holding that registration applications are records under § 20507(i)(1)); Pub. Interest Legal Found., Inc. v. Bellows, No. CIV 20-0061 GZS, 2022 U.S. Dist. LEXIS 38875, at *13 (D. Me. Mar. 4, 2022)(Singal, J.)(holding that voter files are records under § 20507(i)(1)); Judicial Watch, Inc. v. Lamone, 399 F. Supp. 3d 425, 440 (D. Md. 2019)(Hollander, J.)(holding the same).  Whether individual and identifiable voter records are records for § 20507(i)'s purposes is not dispositive of the issue whether the Election Code permits publication of such data, however.  Furthermore, because the parties do not argue or brief this issue here, the Court does not opine on it.

59.  The Maine Legislature recently amended its Election Code to condition voter data access so that the voter data is not posted online.  See Pub. Interest Legal Found., Inc. v. Bellows, No. CIV 20-0061 GZS, 2022 U.S. Dist. LEXIS 38875, at *9 (D. Me. Mar. 4, 2022)(Singal, J.)("Through the newly created Exception J to the Maine Voter File disclosure statute, Plaintiff can now obtain . . . information previously inaccessible to it.").  The Maine amendment in question allows access to organizations or individuals for the purposes of NVRA's public disclosure provision, but conditions that access on those entities not posting voter data online:

> J.     An individual or organization that is evaluating the State's compliance with its voter list maintenance obligations may, consistent with the National Voter Registration Act of 1993, 52 United States Code, Section 20507(i) (2021), purchase a list or report of the voter information described in paragraph B from the central voter registration system by making a request to the Secretary of State and paying the fee set forth in subsection 2. A person obtaining, either directly or indirectly, voter information from the central voter registration system under this paragraph may not:
>
> (1)     Sell, transfer to another person or use the voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations; or
>
> (2)     Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

Me. Rev. Stat. 21-A, § 196-A.

Unlike Maine's Election Code, New Mexico's Election Code does not address whether voter data can be made "accessible by the general public on the Internet or through other means," nor does it address whether voter data that identifies individual voters may be made public.  Me. Rev. Stat. 21-A, § 196-A.  The closest New Mexico's Election Code comes to prohibiting the

sharing or publication of voter data -- which originates from certificates of registration -- is N.M.S.A. § 1-4-5(E): "A person who unlawfully copies, conveys or uses information from a certificate of registration is guilty of a fourth degree felony." N.M.S.A. § 1-4-5(E). However, this provision follows N.M.S.A. § 1-4-5(D), which explains that "unlawful cop[ying], convey[ing], or use[]," N.M.S.A. § 1-4-5(E), is limited to certain information:

> It is unlawful for the qualified elector's month and day of birth or any portion of the qualified elector's social security number required on the certificate of registration to be copied, conveyed or used by anyone other than the person registering to vote, either before or after it is filed with the county clerk, and by elections administrators in their official capacity.

N.M.S.A. § 1-4-5(D). Article 4's other explanation of unlawful use of voter data pertains to the purposes for which it is used, and not to the manner in which it is distributed. See N.M.S.A. § 1-4-5.5(C). So long as Voter Reference is not publishing voters' month and day of birth, or any portion of a voter's social security number, Voter Reference would not fall foul of N.M.S.A. § 1-4-5(E)'s criminal penalty. See N.M.S.A. § 1-4-5. Similarly, as discussed above, N.M.S.A. § 1-5-22(A)'s prohibition on "selling, loaning, providing access to or otherwise surrendering of the voter file" governs the disposition of voter files by "data processing facilit[ies] and [their] associated employees and agents contracted to provide data processing services required by the Voter Records System Act," N.M.S.A. § 1-5-2(D), and by "state or county officer[s,] . . . state or county officer's deput[ies], assistant[s], employee[s] or agent[s]," N.M.S.A. § 1-5-22(A), but it does not govern disposition of voter data by requesters who meet N.M.S.A. § 1-4-5.5's requirements. In conclusion, New Mexico's Election Code does not prohibit Voter Reference's publication of voter data online.

      **3.**     **An Organization or Individual May be Liable for False Swearing if it Signs the Voter Data Request Form Authorization With the Intention to Post Voter Data Online.**

The Court turns next to the Defendants' argument that Article 20 "creates criminal penalties for every violation of the election code for which a standalone criminal penalty is not provided" and that N.M.S.A. § 1-20-10's false swearing provision applies to data requests pursuant to N.M.S.A. § 1-4-5.5.  May Tr. at 35:15-21 (Serafimova).  See id. at 35:25-36:2 (Serafimova).  The Defendants assert that N.M.S.A. § 1-20-10 applies to Local Labs, "if we can prove that they made a false statement when they signed the affidavit," May Tr. at 36:3-5 (Serafimova).  According to the Election Code, "[f]alse swearing consists of taking any oath required by the Election Code with the knowledge that the thing or matter sworn to is not a true and correct statement.  Whoever falsely swears is guilty of a fourth degree felony."  N.M.S.A. § 1-20-10.  Local Labs signed the affidavit to request voter data on Voter Reference's behalf, but Local Labs is not a party to this case.  See Lippert Request Form.  While this litigation has been pending, however, Voter Reference submitted its own application for voter data, which it intends to publish on VoteRef.com.  See VRF Request Form at 8.  Swoboda signed the authorization on a version of the Voter Data Request Form that is the same as the 2021 Request Form, affirming that she will "not use or make available to others to use the requested material for purposes other than governmental, election, research, and campaign purposes under penalty of law."  VRF Request Form at 8.  By signing, she also affirms her understanding that "[u]nlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information."  VRF Request Form at 8.

Voter Reference does not argue that N.M.S.A. § 1-20-10 is unconstitutional, nor does it ask the Court to enjoin the Defendants from prosecuting Voter Reference in the future under N.M.S.A. § 1-20-10 -- only under N.M.S.A. §§ 1-4-5.5, 1-4-5.6, and 1-5-22.  See Pl. FOF at 87.  The Court determines that a requestor who signs the Voter Data Request Form authorization with

the intent to share that data with the general public on the internet may face liability for false swearing: if an individual requester or organizational requestor affirms that he or she will "not use or make available to others to use the requested material for purposes other than governmental, election, research, and campaign purposes under penalty of law," and will not "sell[], loan[], provid[e] access to or otherwise surrender[], duplicat[e] or alter[] . . . information," VRF Request Form at 8, but does so with the intent to post that data online for the general public to access, the requester must do so "with the knowledge that the thing or matter sworn to is not a true and correct statement," N.M.S.A. § 1-20-10.   Axiomatically, an individual or entity cannot post voter data online without "providing access to or otherwise surrendering, duplicating . . . [that] information." VRF Request Form at 8.  Once someone signs the Voter Data Request Form, then, he or she could commit false swearing if they make the data available outside their organization, but they could also commit false swearing if they make that data available or duplicate the data within their organization.  The Voter Data Request Form and the Data Sharing Ban prohibit more conduct than posting voter data online.  To prosecute only Voter Reference for false swearing under the Data Sharing Ban would support Voter Reference's viewpoint discrimination claim, because the Data Sharing Ban -- as expressed on the Voter Data Request Form -- does not differentiate between posting voter data online and duplicating or surrendering it within an organization.

Without knowing what degree of scienter the Attorney General would apply to the false swearing statute, it difficult to say whether requiring VoteRef.com users agree to Terms of Service limiting the voter data's use to "election-related, non-commercial" purposes,VoteRef.com, Terms of Service, would be a sufficient guarantee of the general public's use such that a requester can truthfully affirm that he or she will "not use or make available to others to use the requested material for purposes other than governmental, election, research, and campaign purposes under

penalty of law," VRF Request Form at 8.  Other than agreeing to VoteRef.com's Terms of Service,

Voter Reference has no ability to ensure that voter data is not used unlawfully, such as to harass

or intimidate voters, or to use the data for commercial purposes.  See May Tr. at 20:19-21:14

(Court, Greim).  Voter Reference concedes that, "once somebody has the data, you can't actually

physically stop them from doing it.  We simply make them aware of the law, and make them agree,

by clicking that they agree, and that's what gives them access."  May Tr. at 21-25 (Greim).  Voter

Reference "do[es not] have any other way of going out and following people or tracing backwards

from instances of harassment," but adds that it is not aware of "anyone using the data for some

other nonelection-related purpose."  May Tr. at 20:25-21:4 (Greim).  See May Tr. at 21:5-14

(Court, Greim).

Voter Reference cautions that prosecuting misuse of voter data pursuant to N.M.S.A. § 1-

20-10 would be ineffective, because "a candidate campaign worker's misuse of data that he or she

has received only after the data has already changed hands several times can[not be] reasonably

be uncovered, deterred, or prosecuted under a theory that the solitary party employee had signed a

false affidavit."  Pl. FOF ¶ 91, at 72.  In contrast, the Defendants interpret the Election Code to

prohibit sharing of voter data beyond an organization:

> SOS interprets Section 1-4-5.5 as allowing voter data obtained in compliance
> therewith to be shared within an organization such as a company or a political party,
> or a party and a candidate from the same party. (Tr. Vol. 2, at 9, 29, 90, 91, 189-
> 190). Any such internal sharing has to be for either governmental or election
> campaign purposes. (Tr. Vol. 2, at 176-177) This interpretation is reflected in each
> version of the Voter Information Authorization form, all of which include the
> option for the requester to be an organization.

Def. FOF ¶ 52, at 9.  See June Tr. at 230:1-12 (Serafimova).  This interpretation has appeal:

asserting that the Voter Data Request Form's authorization reaches only to the limits -- but not

beyond -- a requester's organization provides some contours to a requester's liability under

N.M.S.A. § 1-20-10; a requester can affirm in good faith that the data's use will be lawful if that data is being used only within and by an organization with whom the requester is familiar, and for whom the requestor acts as some kind of agent. Despite its appeal, however, the Court can find no statutory basis for this interpretation.

The Secretary of State's interpretation of the Election Code that the Defendants urge the Court to adopt as "reflected in each version of the Voter Information Request Form," Def. FOF ¶ 52, at 9, is only as good as the interpretation's "'power to persuade,'" Princeton Place, 2022-NMSC-005, ¶ 30, 503 P.3d at 329 (quoting Skidmore v. Swift & Co., 323 U.S. at 140 (1944). As discussed above, the Secretary of State's interpretation of the Election Code in the Voter Data Request Form is entitled to Skidmore deference; as such, its weight "'depend[s] upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements.'" Princeton Place, 2022-NMSC-005, ¶ 30, 503 P.3d at 329 (quoting Skidmore v. Swift & Co., 323 U.S. at 140 (1944).

Despite the fact that the Voter Data Request Form has gone through at least four different versions, each version of the Voter Data Request Form includes language from N.M.S.A. § 1-5-22: "Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978)." Old Request Form, 2021 Request Form; Feb. 10 Request Form; Feb. 14 Request Form. This consistency is persuasive, but it is countered by the Defendants' recognition that N.M.S.A. § 1-5-22(A)'s plain language applies only to data processors and not requesters, see May Tr. at 38:23 (Court); id. at 39:1-6 (Serafimova).

The Secretary of State's interpretation of the Election Code criminalizes requesters such as Catalist, i360, Data Targeting, and L2 Inc., who apply for voter data and then sell it to clients

outside their own organization.  See Voter Data Request Log at 1-2; Catalist, Who We Are, https://catalist.us/ (last visited July 6, 2022); i360, What We Do, https://www.i-360.com/ (last visited July 6, 2022); L2 Inc., Trusted Voter and Consumer Data At Your Fingertips, https://l2-data.com/ (last visited July 6, 2022).  Upon learning -- allegedly for the first time during this litigation -- about Catalist's acquisition of voter data and that it shares voter data outside its organization, Vigil made the decision to review Catalist with the Secretary of State's leadership team, implying that their use of voter data is unlawful under this interpretation of the Election Code.  See June Tr. at 45:15-46:14 (Greim, Vigil).  While the Secretary of State is entitled to interpret the Election Code in the manner she sees fit, the Court owes her interpretation little deference if it is not based in the relevant statutes, valid reasoning, and is not consistent with the Secretary of State's actual practice of whom it refers to the Attorney General for violations of the Election Code.  Under the Secretary of State's interpretation of the Election Code, a requester may be liable for False Swearing under N.M.S.A. § 1-20-10 if it signs the Voter Data Request Form's authorization with the intent to post that voter data online, or with the intent to otherwise "provid[e] access to . . . surrender[], [or] duplicat[e] . . . [that] information."  VRF Request Form at 8

## II.   VOTER REFERENCE HAS STANDING TO PURSUE ITS CLAIMS BUT STEINBERG DOES NOT.

To establish Article III standing, a plaintiff must show: (i) an injury in fact; (ii) a sufficient causal connection between the injury and the conduct of which the plaintiff complains; and (iii) a likelihood that a favorable decision will redress the injury.  See Lujan v. Defs. of Wildlife, 504 U.S. at 560-61; Seale v. Peacock, 32 F.4th 1011, 1020 (10th Cir. 2022).  First, an injury in fact is "an invasion of a legally protected interest which is" "concrete and particularized," and "'actual or imminent, not conjectural or hypothetical.'"  Lujan v. Defs. of Wildlife, 504 U.S. at 560 (quoting

Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).  The injury does not need to be tangible, because intangible injuries can be concrete.  See Seale v. Peacock, 32 F.4th at 1020.  Second, the causal connection fairly must be traceable to the defendant's challenged conduct and cannot be the result of some third party's independent actions.  See Lujan v. Defs. of Wildlife, 504 U.S. at 560. Third, it must be "likely," and not "speculative," that a favorable decision will redress the injury. Lujan v. Defs. of Wildlife, 504 U.S. at 561.  "At least one plaintiff must have standing to seek each form of relief requested in the complaint."  Town of Chester, N.Y. v. Laroe Estates, Inc., 137 S. Ct. 1645, 1652 (2017).  Unnamed plaintiffs do not need to show that they have standing.  See FOFo. Cross Disability Coal. v. Abercrombie & Fitch Co., 765 F.3d 1205, 1214 (10th Cir. 2014).

"[A] plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014)(quoting Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)). A plaintiff seeking

> prospective relief based on a "chilling effect" on speech can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so because of a credible threat that the statute will be enforced.

Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1089 (10th Cir. 2006)(no citation for quotation).  Moreover, although evidence of "past activities obviously cannot be an indispensable element -- people have a right to speak for the first time -- such evidence lends concreteness and specificity to the plaintiffs' claims, and avoids the danger that Article III requirements be reduced

to the formality of mouthing the right words." Initiative & Referendum Inst. v. Walker, 450 F.3d at 1089.

A.    VOTER REFERENCE HAS STANDING.

Voter Reference asserts that it has standing in this case, because the Secretary of State referred Voter Reference to the Attorney General for criminal prosecution for allegedly violating the Data Sharing Ban and, that therefore, Voter Reference has suffered an injury. See Pl. FOF ¶ 12, at 40; Finding of Fact ¶ 96, supra at 24 (making the factual finding that the Secretary of State has referred Voter Reference to the Attorney General for criminal prosecution). Moreover, Voter Reference asserts that it wants to continue sharing voter data online "if it obtains relief from this case." Pl. FOF ¶ 12, at 40. Voter Reference also attests that it meets the causation and redressability elements of standing, because the Secretary of State's criminal referral and threatened prosecution have caused Voter Reference's injury, and because "[i]njunctive relief will remove the threat of prosecution and again make it possible for [Voter Reference] to share voter data for their governmental and election-related purposes." Pl. FOFs ¶ 16, at 41. Voter Reference asserts, therefore, that it meets standing's three elements.

The Court concludes that Voter Reference establishes Article III standing, because the Secretary of State's referral for criminal prosecution is an injury which is fairly traceable to the Secretary of State, and which this litigation can redress. See Lujan v. Defs. of Wildlife, 504 U.S. at 560-61. First, Voter Reference asserts an injury based on the Secretary of State's referral to the Attorney General for criminal prosecution of Voter Reference. Voter Reference asserts, supported by credible evidence, that it seeks to obtain voter information from the Secretary of State and post that voter information online, which is the "type of speech affected by the challenged government action." Initiative & Referendum Inst. v. Walker, 450 F.3d at 1089. Voter Reference presents

testimony stating its desire to continue posting voter information online.  See Pl. FOF ¶ 100, at 28 ("VRF filed this action because, if it obtains a favorable ruling, it wants to resume posting, distributing, and otherwise using the available New Mexico voter data on the Website so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls." (citing May Tr. at 61:4-11 (Swodoba))); Complaint ¶ 43, at 13 ("VRF desires to post, distribute, and otherwise use publicly available New Mexico voter information on the Website in the future so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls."); Initiative & Referendum Inst. v. Walker, 450 F.3d at 1089.  Voter Reference also presents a credible claim that they are not posting the voter information data online because of the threat of criminal prosecution, because Voter Reference previously posted the data online for three months and removed it when it discovered that the Secretary of State referred it for criminal prosecution.  See Pl. FOFs ¶ 99, at 28 ("VRF removed the New Mexico data from its website on March 28, 2022, just before filing this lawsuit. It did so out of fear that VRF would be prosecuted based on the Secretary of State's interpretation of the law and her referral of VRF to the Attorney General's office for prosecution." (citing May Tr. at 69:13-18 (Swodoba))); Complaint ¶ 42, at 12 ("VRF removed this data from its website on March 28, 2022 -- just before this lawsuit was filed -- out of fear that it would be prosecuted based on the Secretary of State's interpretation of the law and her referral of VRF to the Attorney General's office for potential prosecution."); Initiative & Referendum Inst. v. Walker, 450 F.3d at 1089. Voter Reference's injury fairly is traceable to the Secretary of State's and Attorney General's conduct, because the Secretary of State referred Voter Reference to the Attorney General for criminal prosecution.  See Findings of Fact, supra ¶ 99, at 25 ("The New Mexico Secretary of State believes posting data about individual voters online is not a permissible use under state law and has referred the matter

to the state attorney general for criminal investigation."). Moreover, this litigation can redress Voter Reference's injury, because Voter Reference asks the Court to enjoin the Attorney General from prosecuting Voter Reference. See PI Motion ¶ 4, at 2-3. Consequently, Voter Reference meets the elements of Article III standing.

Next, the Court considers whether Voter Reference has prudential standing. Generally, there are three prudential-standing requirements: (i) "a plaintiff must assert his own rights, rather than those belonging to third parties"; (ii) "the plaintiff's claim must not be a generalized grievance shared in substantially equal measure by all or a large class of citizens"; and (iii) "a plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112 (internal quotation marks and citations omitted). Statutory standing "extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." Lexmark Int'l v. Static Control Components, 572 U.S. at 127. Notably, the Supreme Court stated that it "often 'conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff.'" Lexmark Int'l v. Static Control Components, 527 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 225 (2012)). Moreover, the test "'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized the plaintiff to sue." Lexmark Int'l v. Static Control Components, 572 U.S. at 130 (quoting Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. at 225).

The Court concludes that Voter Reference has prudential standing. First, Voter Reference is asserting its own rights, because it is asserting its own right to access and post voter information

on the internet, and it is asserting that the Secretary of State and Attorney General's criminal prosecution of Voter Reference violates Voter Reference's First Amendment rights.  See Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112.  Moreover, Voter Reference is not asserting a generalized grievance; Voter Reference itself seeks to post the voter information and has posted the voter information for three months, before taking it off the internet out of fear of criminal prosecution.  See Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112; Complaint ¶ 42, at 12. Finally, Voter Reference's grievance falls within the zone of interests that the First Amendment protects, because Voter Reference argues that the Secretary of State's unconstitutional interpretations of the Election Code chills its speech.  See Bd. of Cty. Comm'rs v. Geringer, 297 F.3d at 1112.  Consequently, the Court concludes that Voter Reference meets the elements of prudential standing.

### B.      STEINBERG DOES NOT HAVE STANDING.

Steinberg asserts that she has standing, because "the evidence establishe[s] that Defendants would apply the same theory of liability against her," Pl. FOF ¶ 13, at 40, and that she wishes to "continue accessing and sharing the data" on Voter Reference's website, Pl. FOF ¶ 13, at 40.  The Defendants assert, however, that the Attorney General cannot and will not prosecute Steinberg. See Defs. FOF ¶ 36, at 20 ("Plaintiff Steinberg has no voter data in her possession; as such, she cannot possibly violate Section 1-4-5.6, nor has she been referred to AGO for investigation."). The Court agrees with the Defendants that Steinberg does not face a threat of criminal prosecution for accessing the data, and thus, Steinberg's only injury is that she can no longer access the data on Voter Reference's website.  Steinberg does not have a legally protected interest in freely accessing the data if the data cannot be legitimately posted, or if it is posted, she will not be prosecuted for looking at the posted data, and she does not suffer any concrete harm from her

inability to access the data.  See Lujan v. Defs. of Wildlife, 504 U.S. at 560.  While the Secretary of State's criminal prosecution referral of Voter Reference caused Steinberg's alleged injury by causing Voter Reference to remove the data, and while a favorable decision in this litigation would allow Voter Reference to repost the data, Steinberg cannot meet the first element of Article III Standing -- injury in fact -- and, therefore, the Court concludes that Steinberg does not have Article III standing to pursue her claims.

Steinberg also brings a First Amendment overbreadth claim.  When a plaintiff brings a First Amendment overbreadth claim, the challenged law need not have been applied against the challenger at all; as long as the barebones requirements of Article III standing are met, the elements of prudential standing are presumed satisfied in an overbreadth challenge.  See Griffin v. Bryant, 30 F. Supp. 3d 1139, 1161 (D.N.M. 2014)(Browning, J.).  When a party brings a facial overbreadth challenge, the elements of prudential standing are presumed satisfied, and the party must meet only the bare bones of the Article III standing requirements.  See Griffin v. Bryant, 30 F. Supp. 3d at 1176 ("Even though the usual prudential standing considerations are presumed satisfied in an overbreadth challenge, Griffin must still establish Article III standing for his case to be justiciable in federal court.").  Here, Steinberg does not meet the barebones requirements of Article III standing, because she has not demonstrated a cognizable and redressable injury.  The injury is to Voter Reference, and if the Court does not address that injury, Steinberg has no injury; but if the Court redresses Voter Reference's injury, Steinberg can access the posted data and has no injury.  Even relaxing the prudential standing requirements, Steinberg does not establish that she has an injury and, therefore, the Court does not have jurisdiction over Steinberg's asserted overbreadth claim.  Consequently, Steinberg does not have standing to bring her First Amendment overbreadth claims.

III.   **VOTER REFERENCE IS ENTITLED TO A PI.**

Voter Reference is entitled to a PI.  To obtain a PI, a movant must show: (i) a substantial

likelihood of success on the merits; (ii) irreparable harm to the movant if the injunction is denied;

(iii) that the threatened injury outweighs the harms that the PI may cause the opposing party; and

(iv) that the injunction, if issued, will not adversely affect the public interest.  See Aposhian v.

Barr, 958 F.3d 969, 978 (10th Cir. 2020).  When the government is the opposing party, the "third

and fourth factors 'merge.'"  Aposhian v. Barr, 958 F.3d 978 (quoting Nken v. Holder, 556 U.S.

418, 435 (2009)).  A movant's entitlement to a PI must be "clear and unequivocal," because a PI

is an "extraordinary remedy."  Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d

1256, 1261 (10th Cir. 2004).  Here, it is not immediately apparent with what Voter Reference takes

issue.  In the Complaint, Voter Reference asserts that the User Restrictions violate the First

Amendment and the Fifth Amendment.  See, e.g., Complaint ¶ 71, at 19.  In its Def. FOF, however,

the Secretary of State states its new, different position.  See Def. FOF ¶ 52, at 9.  The Secretary of

State interprets N.M.S.A. § 1-4-5.5 to "allow voter data obtained in compliance therewith to be

shared within an organization such as a company or a political party, or a party and a candidate

from the same party."  Def. FOF ¶ 52, at 9.  According to the Secretary of State, N.M.S.A. § 1-4-

5.5 permits internal sharing only "for either governmental or election campaign purposes."  Def.

FOF ¶ 52, at 9.  The Secretary of State notes that its interpretation is "reflected in each version of

the Voter Authorization form" and that each version includes "the option for the requester to be

an organization."  Def. FOF ¶ 52, at 9.  The Secretary of State indicates that, under N.M.S.A. § 1-

4-5.5, individuals who are "not members of the same entity as well as different entities must each

submit a separate Voter Information Authorization form and must comply with the regulatory

process."  Def. FOF ¶ 52, at 9.  According to the Secretary of State, N.M.S.A. § 1-4-5.5's scope is

the same "regardless of the identity or viewpoint of the requester." Def. FOF ¶ 52, at 9. More precisely, the Secretary of State's position, as expressed in the Feb. 14 Request Form and in witness testimony at the May and June Hearings, prohibits the sharing of voter data in two circumstances: it prohibits the sharing of voter data: (i) with persons or entities who may or will use the voter data for an unlawful purposes as N.M.S.A. § 1-4-5.5 defines; or (ii) with individuals or entities outside the organization that requests it. In this Memorandum Opinion and Order, the Court refers to the Secretary of State's position as the "Data Sharing Ban." Voter Reference argues that the Secretary of State's interpretation of N.M.S.A. §§ 1-4-5.5, 1-4-5.6, and 1-5-22 violates the First Amendment and is void for vagueness under the Fifth Amendment. See PI Memo. at 1-27. Accordingly, the question is whether Voter Reference is entitled to a PI, because: (i) it is substantially likely that the Secretary of State's interpretation of N.M.S.A. §§ 1-4-5.5, 1-4-5.6, and 1-5-22 -- the Data Sharing Ban -- is unconstitutionally overbroad, unconstitutional viewpoint discrimination, unconstitutional prior restraint, or void for vagueness; (ii) Voter Reference will suffer irreparable harm absent a PI; and (iii) the balance of equities favor a PI and a PI is in the public interest. The Court concludes that Voter Reference is entitled to a PI enjoining the Attorney General from prosecuting Voter Reference for publishing the data it received from Local Labs under N.M.S.A §§ 1-4-5.5 and 1-4-5.6, because, although the Secretary of State constitutionally may condition voter data access on whether the requestor intends to publish it, the Secretary of State's criminal referral of Voter Reference for prosecution for publishing the data it received from Local Labs constitutes unconstitutional viewpoint discrimination and prior restraint. The Court will, therefore, grant the PI in part, and enjoin the Attorney General from prosecuting Voter Reference for posting the data it received from Local Labs.

## A.    VOTER REFEFERENCE SEEKS A DISFAVORED INJUNCTION.

Voter Reference seeks a PI that belongs to one of the three categories of disfavored injunctions: (i) "preliminary injunctions that alter the status quo"; (ii) "mandatory preliminary injunctions," meaning injunctions that compel, rather than prohibit, activity on the enjoined party's part; and (iii) "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." Schrier v. Univ. of Colo., 427 F.3d at 1258.  The first disfavored category is "mandatory preliminary injunctions."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389 F.3d at 977)(internal quotation marks omitted).  The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"  Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro, 389 F.3d at 979).  The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to act in some manner, and a mandatory injunction is one in which the court orders the enjoined party to act.  See Schrier v. Univ. of Co., 427 F.3d at 1261.  It does so, because a creative enough lawyer can present any injunction in either prohibitory or mandatory terms, depending on whether the lawyer is requesting or opposing it.  See O Centro, 389 F.3d at 1006 (Seymour, J., dissenting)("There is no doubt that determining whether an injunction is mandatory as opposed to prohibitory can be vexing.").  An injunction directing a party to act is not fundamentally different from an injunction prohibiting action -- if everyone can agree on and understand exactly what the court is ordering and exactly what conduct would violate the injunction.  On the other hand, vague injunctions enjoining parties

to "depopulate the jail system to constitutionally compliant levels," or to "perform on its promise to continue manufacturing and delivering conforming goods to the buyer," are a recipe for bogging the court down into the role of monitor.  Dine Citizens Against Ruining Our Env't v. Jewell, No. CIV 15-0209 JB/SCY, 2015 WL 4997207, at *33 (D.N.M. Aug. 14, 2015)(Browning, J.).

Voter Reference's requested injunction is prohibitory rather than mandatory.   Voter Reference asks the Court to enter an order that the

> Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with Defendants who receive actual notice of this order shall not take any steps to investigate, threaten, cite, charge, prosecute, or punish VRF, Steinberg, or their agents, employees, officers, or those in privity with them, under N.M. Stat 1-4-5.5, 1-4-5.6, or 1-5-22 for:
>
>> i.    Use or sharing of New Mexico voter data, including sharing via the Internet, so long as the purpose of the use or sharing is for a "governmental or election and election campaign purpose," which shall include, but not be limited to, engaging in or fostering communication or analysis regarding officials' conduct of New Mexico elections or regarding New Mexico's maintenance of its voter lists and election systems.

Pl. FOF at 87.  Were the Court to grant Voter Reference's request, the Defendants would not be forced to act affirmatively, but merely would have to refrain from investigating, threatening, charging, or prosecuting Voter Reference for its use and publication of voter data.  Granting the injunction would also not require the Court to extensively monitor the Defendants' compliance or require the Court's supervision.

Voter Reference's PI, however, fits into the second category, because it alters the status quo.  See Schrier v. Univ. of Colo., 427 F.3d at 1258.  The status quo is "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing." Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155.  When evaluating

- 169 -

whether the issuance of a requested injunction would alter the status quo between the parties, the court should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100 (10th Cir. 1991), overruled on other grounds by O Centro, 389 F.3d at 975.  The status quo is the "last peaceable uncontested status existing between the parties before the dispute developed." 11A Fed. Prac. & Proc. Civ. § 2948 Grounds for Granting or Denying a Preliminary Injunction, (3d ed.).

The Court agrees with the Defendants that the last uncontested status in this case "was the eight months between April and December in 2021 in which VRF had the voter data at issue in its possession but had not yet made it publically [sic] available on its website."  Def. FOF ¶ 9, at 16. More specifically, the last uncontested status was the time between April 15, 2021, when Local Labs gave Voter Reference the voter data, see Complaint ¶ 39, at 11, and December 13, 2021, the day before Voter Reference posted New Mexico voter data on VoteRef.com.  See Pl. FOF ¶ 52, at 19.  Between December 14, 2021, and March 28, 2022, when voter data was removed from the website, see Complaint ¶ 42, at 12, the Secretary of State contests Voter Reference's publication of the data as unlawful.  After Voter Reference removed the data, Voter Reference contests the legality of the Secretary of State's referral of Voter Reference to the Attorney General for criminal prosecution.  Granting a PI enjoining the Defendants from "investigat[ing], threaten[ing], cit[ing], charg[ing], prosecut[ing], or punish[ing]" Voter Reference, Pl. FOF at 87, will not return the parties to the "last peaceable uncontested status," 11A Fed. Prac. & Proc. Civ. § 2948, because doing so allows Voter Reference to post the voter data unchallenged, thus returning the parties to the altered status quo between December 14, 2021, and March 22, 2022.  Granting a PI would

alter, therefore, the status quo.  See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d at 1155.

The third and final disfavored category is "preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting O Centro, 389 F.3d at 977).  The Tenth Circuit has stated that this sort of PI is "similar to the 'Sentence first -- Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1099 (10th Cir. 1991).  See GTE Corp. v. Williams, 731 F.2d 676, 679 (10th Cir. 1984)(stating in a copyright case that, "[t]he burden on the party seeking a preliminary injunction is especially heavy when the relief sought would in effect grant plaintiff a substantial part of the relief it would obtain after a trial on the merits.").

The PI that Voter Reference seeks would not supply it with all the relief it could hope to win from a full trial.  In the Complaint, Voter Reference asks the Court to "declare that the Use Restrictions violate the First, Fifth, and Fourteenth Amendments to the United States Constitution" in addition to asking the Court to "preliminarily and permanently enjoin Defendants, their agents, employees, and all persons acting in active concert or participation with them, from enforcing the Use Restrictions against Plaintiffs, their agents, and others similarly situated."  Complaint at 32. To decide the PI Motion, the Court need not declare whether the Secretary of State's interpretation and application of the Election Code "violate[s] the First, Fifth, and Fourteenth Amendments to the United States Constitution," Complaint at 32, because the Court disagrees with the Secretary of State's interpretation of the Election Code, and concludes that, contrary to the Secretary of State's interpretation, the Election Code does not prohibit Voter Reference's conduct, see Analysis § I, supra at 137-59.

The requested PI seeks to enjoin the Defendants from "investigat[ing], threaten[ing], cit[ing], charg[ing], prosecut[ing], or punish[ing]" Voter Reference, but the PI Motion does not request any declaratory relief.  Pl. FOF at 87.  In its Complaint, Voter Reference also asks for "costs and expenses incurred in bringing this action, including their attorneys' fees" but these are incidental to the injunction as they would not exist on their own without the PI request.  Complaint at 32.  In sum, the PI Voter Reference seeks does not supply it with all the relief it could hope to win from a full trial on the merits, notably, declaratory relief.  Although the requested PI is not a mandatory injunction and does not request the full relief Voter Reference seeks in the Complaint, the PI nonetheless alters the status quo, and, so, it is a disfavored injunction that the Court will "more closely scrutinize[]" "to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course."  <u>O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft</u>, 389 F.3d at 975.

> **B.    VOTER REFERENCE LIKELY WILL SUCCEED ON THE MERITS OF PART OF THEIR VIEWPOINT DISCRIMINATION CLAIM AND PART OF THEIR PRIOR RESTRAINT CLAIM.**

First, the Court concludes that Voter Reference does not show a substantial likelihood of success on the merits of its overbreadth claim.  Second, the Court concludes that Voter Reference shows a substantial likelihood of success on the merits of its viewpoint discrimination claim.  Third, the Court concludes that Voter Reference shows a substantial likelihood of success on the merits of its prior restraint claim.  Finally, the Court concludes that Voter Reference does not show a substantial likelihood of success on the merits of its void-for-vagueness claim.

> **1.    <u>Voter Reference Is Not Likely to Succeed on the Merits of Its Overbreadth Claim</u>.**

The Plaintiffs' first claim is an overbreadth claim.  See Complaint at 29.  The Plaintiffs do not argue that the Election Code itself is unconstitutionally overbroad.  See Pl. FOF ¶ 50, at 57 ("[T]he underlying statute does not by its terms ban the sharing of voter data so long as it is for a permissible purpose."); Pl. FOF ¶ 53, at 58-59 ("Assuming for the sake of argument that these restrictions are legitimate . . . it is evident that New Mexico's statutory restrictions will likely restrict only those transmittals that are purely for a commercial purpose: for the selling of products or for other non-governmental or non-election purposes."); Pl. FOF ¶ 54, at 59 ("[T]he sharing that a correct reading of the statute would legitimately (for the sake of argument) prohibit is narrow compared to the sharing prohibited by the Data Sharing Ban[.]").  Rather, the Plaintiffs challenge the Defendants' "Data Sharing Ban," which they characterize as the Defendants' position that "no sharing is allowed at all."  Pl. FOF ¶ 51, at 57.  The Data Sharing Ban, as expressed in the Feb. 14 Request Form and in witness testimony at the May and June Hearings, prohibits the sharing of voter data in two disjunctive circumstances: it prohibits the sharing of voter data (i) with persons or entities who may or will use the voter data for an unlawful purposes as N.M.S.A. § 1-4-5.5 defines; or (ii) with individuals or entities outside the organization that requests it.  Because overbreadth challenges are mounted customarily against statutes or regulations rather than against agency forms and witness testimony, the Court frames its analysis as asking whether the Election Code as the Secretary of State interprets it is unconstitutionally overbroad.

A challenged statute is overbroad when it regulates substantially more expression than the First Amendment allows the government to regulate.  See Schad v. Borough of Mt. Ephraim, 452 U.S. at 64.  Under First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech; however, the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth

challenge.  See Bushco v. Shurtleff, 729 F.3d 1294, 1302 (10th Cir. 2013)(citing United States v. Williams 553 U.S. 285, 292 (2008)).  In a First Amendment overbreadth challenge, the government bears the burden of establishing the statute's constitutionality, see ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated, see Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973).  In United States v. Williams, 553 U.S. 285 (2008), the Supreme Court discussed the balance between competing social costs of overbreadth challenges:

> On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its applications is perfectly constitutional -- particularly a law directed at conduct so antisocial that it has been made criminal -- has obvious harmful effects.  In order to maintain an appropriate balance, we have vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep.

553 U.S. at 292.

"The first step in overbreadth analysis is to construe the challenged statute."  United States v. Williams, 553 U.S. at 293.  For the purposes of this analysis, the Court construes the Election Code as the Secretary of State interprets it in the Data Sharing Ban.  The Court will consider, therefore, whether the Secretary of State's prohibition on the sharing of voter data (i) with persons or entities who may or will use the voter data for an unlawful purpose as N.M.S.A. § 1-4-5.5 defines that term; or (ii) with individuals or entities outside the organization that requests it, is overly broad.

Second, the Court will consider whether the Data Sharing Ban proscribes "a substantial amount of protected expressive activity."   United States v. Williams, 553 U.S. at 297.   In undertaking this analysis, the Court first must consider whether Voter Reference's conduct -- taking the Secretary of State's voter data and posting it for free on the internet -- is conduct that the First Amendment protects.  Most prominently in front of the Court, then, is whether Voter Reference has a First Amendment right to access the voter data.

"There is generally no First Amendment claim based on the government's denial of access to" information in its possession.  Fusaro v. Cogan, 930 F.3d 241, 250 (4th Cir. 2019)(citing Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. 32, 40 (1999)).  For example, in Los Angeles Police Department v. United Reporting Publishing Corporation, the Supreme Court rejects a facial overbreadth challenge to a statute which, it states, amounts to "nothing more than a governmental denial of access to information in its possession," holding that "California could decide not to give out arrestee information at all without violating the First Amendment."  Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. at 40.  Additionally, in Houchins v. KQED, Inc., 438 U.S. 1 (1978), the Supreme Court notes that there is no "First Amendment guarantee of a right of access to all sources of information within government control."  Houchins v. KQED, Inc., 438 U.S. at 9.  Following Supreme Court precedent, in Dahlstrom v. Sun-Times Media, LLC, 777 F.3d 937 (7th Cir. 2015), the United States Court of Appeals for the Seventh Circuit concludes that there is no First Amendment right for the plaintiffs to obtain information from driving records.  See Dahlstrom v. Sun-Times Media, LLC, 777 F.3d at 947 (citing Travis v. Reno, 163 F.3d 1000 (7th Cir. 1998)("Peering into public records is not part of the 'freedom of speech' that the first amendment protects. 'There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy.'" (quoting

Houchins v. KQED, Inc., 438 U.S. at 14)).[28]  Most relevant to the analysis at hand here, in Fusaro

v. Cogan, 930 F.3d 241 (4th Cir. 2019), the United States Court of Appeals for the Fourth Circuit

notes that the plaintiff does not have a First Amendment right to access records of "personal

information of Maryland voters that is compiled, controlled, and maintained by the government of

Maryland."  Fusaro v. Cogan, 930 F.3d at 250.  The Fourth Circuit also notes that, once a State

chooses to provide a process allowing for the right to access voter information, there are "'limits

to its freedom to decide how that benefit will be distributed.'"  Fusaro v. Cogan, 930 F.3d at 256

(quoting Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. at 43 (Ginsburg, J.,

concurring)).  More specifically, once a State chooses to provide access to certain information, it

can control the manner in which it does so, subject to content- and viewpoint-based restrictions.

See Fusaro v. Cogan, 930 F.3d at 256-57 ("[T]he initial decision to release such information

remains, fundamentally, a policy choice. . . . And the judgment of the Maryland legislature

regarding the release of government information is entitled to substantial deference, particularly

where [the statute] is a part of a complex scheme to regulate elections.").

---

[28]In both Dahlstrohm v. Sun-Times Media, LLC and Travis v. Reno, the Seventh Circuit acknowledges that the First Amendment protects some access rights connected to judicial proceedings.  See Dahlstrohm v. Sun-Times Media, LLC, 163 F.3d at 1007; Travis v. Reno, 777 F.3d at 947.  The data at issue in this case, however, does not involve judicial proceedings.  When conducting First Amendment analyses, the Court has to determine what box of cases and analysis applies to the issue in the case, because different law applies in different areas.  For example, with judicial proceedings, so much of the analysis turns on the historical protections at the heart of the First Amendment, see Courthouse News Serv. V. N.M. Admin. Office of the Courts, 566 F. Supp. 3d 1121, 1160-61 ("The Supreme Court has emphasized that the right of access to criminal trials is important, because 'the criminal trial has historically been open to the press and general public,' and because such public access 'plays a particularly significant role in the functioning of the judicial process and the government as a whole.'" (quoting Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 605-06 (1982)), which is not the analysis for the right of access of non-judicial documents.

In accordance with both Supreme Court precedent and the Fourth Circuit's decision in Fusaro v. Cogan, the Court agrees that there is no general First Amendment right to access government information.  See Fusaro v. Cogan, 930 F.3d at 256-57.  Additionally, if there is no right to access information, a State can control the access that they provide based on policy considerations, because the greater power -- the ability to not allow anyone access to the data -- necessarily includes the lesser power -- the ability to control who receives the data.  See American Ass'n of People With Disabilities v. Herrera, 580 F. Supp. 2d 1195, 1214 (D.N.M. 2008)(Browning, J.)("In other words, the greater power -- to eliminate all third-party registration -- includes the lesser power -- to regulate extensively third-party registration.").  While a State's decision to allow access to information within its control, is accorded deference as a policy matter, it cannot be discriminatory based on content or viewpoint.  See Fsaro v. Cogan, 930 F.3d at 256-57.

The Court concludes that Voter Reference does not have a First Amendment right to access New Mexico's voter data.  Similar to Fusaro v. Cogan, where the Fourth Circuit concludes that the plaintiff did not have a First Amendment right of access to voter information, here, too, Voter Reference cannot find an access right within the First Amendment.  Subject to otherwise impermissible restrictions, such as content- and speaker-based restrictions, the Secretary of State is within its purview to curb the right of access to government information.  Here, the Secretary of State can prohibit access to voter information to a party who will share it outside of the requesting organization or that will post that data on the internet.

Having decided that there is no right to access the voter data information -- for Voter Reference or for anyone else -- the Court concludes that the Data Sharing Ban is not overbroad, because it does not proscribe any protected activity.  While the Data Sharing Ban may curb whom

the Secretary of State allows to access voter information -- namely, anyone who will not share it outside of their organization -- this restriction is within the Secretary of State's purview.  Whether the Data Sharing Ban is applied discriminatorily is a question separate from the overbreadth analysis, and hinges on whether there is viewpoint discrimination in the Data Sharing Ban's language or application.  See Analysis III(B)(2), infra at 178-185.  Because the Data Sharing Ban does not proscribe any protected activity, it necessarily is not overbroad.  Consequently, the Court concludes that the Plaintiffs are not likely to succeed on the merits of their overbreadth claim.

### 2.   Voter Reference is Likely to Succeed on the Merits of Part of its Viewpoint Discrimination Claim.

Voter Reference's second claim is a viewpoint-discrimination claim.  See Complaint ¶ 79, at 21; id. at ¶ 97, at 26.  Voter Reference asserts that, to the extent that "the State and its agents exercise their claimed discretion based on the identity of the requester, including their actual or perceived political ideology, the State engages in viewpoint discrimination."  Complaint ¶ 97, at 26.  According to Voter Reference, when the Secretary of State expresses "concern" about what Voter Reference "will say to New Mexico citizens about the quality" of the Secretary of State's "voter data system," the Secretary of State engages in unconstitutional viewpoint discrimination.  Pl. FOF ¶ 86, at 70.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828 (1995).  The First Amendment prohibits the government from regulating one form of private speech over another form of private speech.  See Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. at 828.  As a result, government discrimination against speech "because of its message is presumed to be unconstitutional."  Rosenberger v. Rector & Visitors of Univ. of Va.,

515 U.S. at 828.   "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829.   Consequently, viewpoint discrimination is a "particularly 'egregious form'" of content-based restriction.   Pahls v. Thomas, 718 F.3d 1210, 1229 (10th Cir. 2013)(quoting Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. at 829).   To succeed on a viewpoint discrimination claim in a § 1983 action, a plaintiff must show that the defendant "acted with a viewpoint discriminatory purpose."   Pahls v. Thomas, 718 F.3d at 1230.   The required viewpoint-discriminatory purpose is "demanding," Pahls v. Thomas, 718 F.3d at 1230, and "requires more than intent as volition or intent as awareness of consequences," Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).   More specifically, a plaintiff must show: (i) that a defendant's actions caused viewpoint discrimination; and (ii) that the defendant's actions were taken because of, not merely in spite of, the plaintiff's views.   See Pahls v. Thomas, 718 F.3d at 1230-31.

Voter Reference argues that, to the extent that the Defendants "exercise their claimed discretion based on the identity of the requester, predictions about what kind of speech or analysis the data will be used for, and predictions about whether the requester will or will not adhere to promises made in the request and published to this Court, the State engages in viewpoint discrimination."   Pl. FOF ¶ 119, at 82.   Although it is not immediately clear what the Plaintiffs are challenging, there are three available options.   First, the Plaintiffs might challenge the Secretary of State' Data Sharing Ban -- that is, the Secretary of State's interpretation of the New Mexico Election Code.   See Complaint ¶ 97, at 26.   Second, the Plaintiffs might be challenging the Secretary of State's lack of response to Voter Reference's request for New Mexico's voter data. See Pl. FOF ¶¶ 90-98, at 26-28.   Third, the Plaintiffs could be challenging the Secretary of State's

decision to refer Voter Reference to the Attorney General for investigation.  Complaint ¶ 42, at 12; id. ¶ 51-66, at 14-18; id. ¶ 84, at 22; id. ¶ 111, at 29.

First, to the extent the Plaintiffs facially challenge the Secretary of State's Data Sharing Ban, the Plaintiffs are not likely to succeed on the merits of their viewpoint-discrimination claim. By its terms, the Data Sharing Ban is facially neutral and applies "regardless of the identity or viewpoint of the requester."  Def. FOF ¶ 53, at 9.  While there is evidence that the Secretary of State has engaged in viewpoint discrimination by coming to this interpretation, see, e.g., May Tr. at 129:6-149:13 (Vigil, Greim), and the Court finds that the impetus for the Data Sharing Ban is hostility to Voter Reference, the Data Sharing Ban itself is viewpoint neutral on its face.

Second, to the extent the Plaintiffs challenge the Secretary of State's lack of response to Voter Reference's request for voter data, the Plaintiffs likely are to succeed on their viewpoint discrimination claim.  The Secretary of State's actions caused viewpoint discrimination.  Although Voter Reference does not have a First Amendment right of access to the voter data it seeks, once the State agrees to make its data publicly available, the State may not condition access to that data based on the requestor's viewpoint.  See Los Angeles Police Dep't v. United Reported Pub. Corp., 528 U.S. at 40; Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. at 829 (noting that, once a State opens a platform for speech, "the State must respect the lawful boundaries it has itself set"); Fusaro v. Cogan, 930 F.3d at 262.  The Secretary of State has conditioned its decision not to respond to Voter Reference's data request on Voter Reference's viewpoint -- specifically, the fear that giving the data to Voter Reference may reveal that the Secretary of State is lax about maintaining the State's voter data.  Voter Reference requested the voter data on February 15, 2022. See Feb. 15 Request; VRF Request Form.  The Secretary of State has not acted yet, however, on Voter Reference's request.  See June Tr. at 237:13-238:1 (Serafimova).  Although the Secretary

of State could have responded to Voter Reference's February 15, 2022, request, at the very least to tell Voter Reference that the request does not comply with N.M.S.A. § 1-4-5.5, the Secretary of State's indication that it will not honor Voter Reference's May 27, 2022, request, despite Voter Reference's assurances that it will not publish voter's personal information without a Court order, constitutes impermissible viewpoint discrimination.

The Secretary of State notes that it will not honor Voter Reference's May 27, 2022, request for voter data.  See June 15 Tr. at 54:19-21 (Greim, Vigil).  The Secretary of State believes that providing voters' personal information online would violate N.M.S.A. § 1-4-5.5.  See June 15 Tr. at 59:15-28 (Vigil).  The Secretary of State's justification for not honoring Voter Reference's May 27, 2022, request is that Voter Reference plans to publish voter's personal information, in violation of N.M.S.A. § 1-4-5.5.  See June 15 Tr. at 55:20-56:9 (Greim, Vigil).  The Secretary of State has no other justification.  See June 15 Tr. at 68:9-13 (Vigil, Greim).  Voter Reference, however, maintains that, although it will publish current voter registration data for election-related purposes, it will not publish voters' personal information without a Court order saying that it can publish it.  See June 15 Tr. at 55:22-56:1 (Greim).  The Secretary of State's decision not to take Voter Reference at its word that it will not use the data contrary to the Secretary of State's interpretation of N.M.S.A. § 1-4-5.5, therefore, causes impermissible viewpoint discrimination.  Because the Secretary of State offers no other justification for the denial, the Secretary of State appears to draw a distinction between Voter Reference and any other requestor who alleges that they will not use the data contrary to the Secretary of State's interpretation of N.M.S.A. § 1-4-5.5.  Absent any other reason to single out Voter Reference, the available evidence shows that the Secretary of State "acted with discriminatory purpose."  Ashcroft v. Iqbal, 556 U.S. at 676.  Voter Reference's "perspective" is the "rationale" for the Secretary of State's decision.  Rosenberger v. Rector &

Visitors of Univ. of Va., 515 U.S. at 829.  Voter Reference, therefore, is likely to succeed on the

merits of its viewpoint discrimination claim regarding the Secretary of State's decision not to

honor Voter Reference's May 27, 2022, request for voter data under N.M.S.A. § 1-4-5.5.

Third, the Plaintiffs appear to challenge the Secretary of State's decision to refer Voter

Reference to the Attorney General for investigation.  See Complaint ¶ 42, 53, 65 at 12-18; Pl. FOF

¶ 57, at 60 (proposing that the Court address the "Defendants' threatened criminal enforcement as

a content or viewpoint-based restriction on speech").  The Plaintiffs are likely to succeed in their

claim that the Secretary of State's decision to refer Voter Reference to the Attorney General's

Office for investigation, because there is sufficient evidence that the Secretary of State's actions

caused viewpoint discrimination and that the Secretary of State acted because of, not merely in

spite of, the Plaintiffs' views.  According to the Plaintiffs, the Secretary of State referred Voter

Reference to the Attorney General, because either Voter Reference's data use violates the Election

Code by not being a campaign or government use, or because the Secretary of State was concerned

that Voter Reference was putting the data online, in violation of the Election Code.  See Pl. FOF

¶ 72, at 64.  The Secretary of State maintains that the referral was because of a concern that the

data would be made available online.  See May Tr. at 129:14-16 (Vigil).

The Plaintiffs' argument is attenuated but finds support in the record.  The Secretary of

State referred Voter Reference and Local Labs for investigation on December 20, 2021.  See Re:

Potential Criminal Transfer and Use Violation of Voter Data, from Sharon Pino, Deputy Secretary

of State, to Anne Kelly, Chief Deputy Attorney General, dated December 20, 2021, filed May 17,

2022 (Doc. 32-3)("Referral Letter").  Without the ProPublica article, Voter Reference may not

have discovered that the Secretary of State referred Voter Reference to the Attorney General's

Office for investigation.  The ProPublica article was not published until March 7, 2022.  See

O'Matz, Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques, filed May 27, 2022 (Doc. 32-4)("ProPublica Article").  Had the Secretary of State never referred Voter Reference and Local Labs for investigation, Voter Reference likely would not have removed the data from its website.  See Complaint ¶ 42, at 12. The evidence suggests that the Secretary of State learned about Voter Reference's actions from the ProPublica reporter.  The Referral Letter is dated six days after O'Matz' email.  See Referral Letter at 1; O'Matz Dec. 14 Email at 1.  The Referral Letter states that the Secretary of State's office "believes the transfer and publication of this voter data is in direct violation of the Election Code."  Referral Letter at 2.  As a result of both the public comments and the Referral Letter, Voter Reference opted to take down its voter data and analysis questioning the integrity of the Secretary of State's voter rolls.  Complaint ¶ 42, at 12.  Although the causal chain is attenuated, the extant evidence suggests that the Secretary of State caused viewpoint discrimination by referring Voter Reference and Local Labs for investigation.

Moreover, the evidence suggests that the referral was because of, not merely in spite of, Voter Reference's views.  Whether or not the Secretary of State agrees with Voter Reference's views, the record supports a conclusion that the Secretary of State made the referral because of Voter Reference's views.  The Secretary of State maintains that it was out of a concern that the online publication violates the Election Code.  See May Tr. at 129:14-16 (Vigil).  The Referral Letter states:

> We believe that both VoteRef.com and Local Labs have violated the prohibited against "providing" voter data by posting New Mexican's private voting information online, or in Local Labs [sic] case, providing the data to VoteRef.com. We also believe that VoteRef.com and Local Labs have illegally "used" this data by publishing it on VoteRef.com.

Referral Letter at 2.  The combination of the referral and the public comments about it suggests that the Secretary of State had intentions beyond mere genuine concern that Voter Reference may be violating the Election Code.  Concluding that the Secretary of State's referral was because of, not merely in spite of, Voter Reference's views does not mean concluding that the weight of the evidence indicates that the Secretary of State's legal analysis and understanding of the Election Code is simple ex post posturing to justify the Secretary of State's "viewpoint discriminatory purpose."   Pahls v. Thomas, 718 F.3d at 1230.   Whether or not the Secretary of State's interpretation of the Election Code is correct, the Court will not conclude that the Secretary of State's Referral Letter must be prioritized in favor of all other evidence.  Even a genuine concern that Voter Reference may have violated State law does not indicate dispositively that there is no viewpoint discriminatory purpose.

The Plaintiffs assert that the Secretary of State's referral was also because "key decisionmakers in the Secretary of State's office" believed that Voter Reference's publication "violated the content-based 'use' criteria" in N.M.S.A. § 1-4-5.5, "not the Data Sharing Ban that some of the Secretary's witnesses and the Attorney General later claimed had motivated the referral and investigation."  Pl. FOF ¶ 71, at 64.  The Plaintiffs also argue that a concern for misinformation motivated the Secretary of State's decision, which necessarily constitutes viewpoint discrimination.  See Pl. FOF ¶¶ 72-77, at 64-66.  These assertions, grounded in the record, together support a finding of a discriminatory purpose.   These justifications taken separately do not necessarily indicate a viewpoint discriminatory purpose.  Even if the Secretary of State had multiple legal justifications, including a revised request form, for the referral, multiple legal justifications -- accurate or not -- does not necessarily transform the referral into evidence of a discriminatory purpose.  Further, a concern for misinformation does not necessarily indicate

discriminatory purpose.  Although an accusation of misinformation may, in some circumstances, be evidence of a discriminatory purpose, misinformation is a real phenomenon of real concern. See, e.g., Michael X. Delli Carpini & Scott Keeter, What Americans Know About Politics and Why It Matters 1 (1996)("[D]emocracy functions best when its citizens are political informed."); Jennifer L. Hochschild & Katherine Levine Einstein, Do Facts Matter? Information and Disinformation in American Politics (2015)(examining the dynamics and effects of misinformation's spread in the United States); Martin Gilens, Political Ignorance and Collective Policy Preferences, 95 Am. Pol. Sci. J. 379-96 (2001)(finding that, in most cases, "policy-specific facts have a substantial influence on policy preferences, even for those who are fully informed in terms of general political knowledge").  Here, however, the Secretary of State's public criticism combined with the Referral Letter grounded in a dubious interpretation of the Election Code suggest that the Secretary of State's motive is more than a routine concern of an Election Code violation.  Viewpoint discrimination "requires more than intent as volition or intent as awareness of consequences."  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  The Defendants' version of events requires drawing numerous tenuous inferences from evidence that, on its face, supports a different conclusion.  Accordingly, the Plaintiffs are likely to succeed on their claim that the Secretary of State's referral constitutes impermissible viewpoint discrimination.

   **3.    The Plaintiffs Are Likely to Succeed on the Merits of Part of Their Prior Restraint Claim.**

   The Plaintiffs are challenging: (i) the Secretary of State's referral of Voter Reference to the Attorney General for criminal prosecution under N.M.S.A. § 1-4-5.6 as a prior restraint; and (ii) the Secretary of State's voter data request process as content-based administrative licensing scheme.  First, the Plaintiffs are substantially likely to succeed on the merits of their claim that the

Secretary of State's referral of Voter Reference to the Attorney General for criminal prosecution and her public statements about the referral are an unconstitutional prior restraint on protected speech. Second, the Plaintiffs are unlikely to succeed on the merits of their claim that the Secretary of State's voter data request process is a content-based administrative licensing scheme.

> **a.    The Secretary of State's Referral of Voter Reference for Criminal Prosecution is a Prior Restraint That Does Not <u>Survive Strict Scrutiny</u>.**

The Secretary of State's referral of Voter Reference to the Attorney General for criminal prosecution -- and her public statements about this referral -- are prior restraints on protected speech that cannot survive strict scrutiny. "[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights," <u>Neb. Press Ass'n v. Stuart</u>, 427 U.S. 539, 559 (1976), and "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity," <u>N.Y. Times v. United States</u>, 403 U.S. 713, 714 (1971). Although "[p]rior restraints generally take one of two classic forms: judicial injunctions and administrative licensing schemes," <u>Taylor v. Roswell Indep. Sch. Dist.</u>, 713 F.3d 25, 42 (10th Cir. 2013)(citing Erwin Chemerinsky, Constitutional Law: Principles and Policies 978-79 (4th ed. 2011)), the Court sees no meaningful distinction between a law, regulation or judicial injunction that suppresses speech and a publicized criminal referral that does the same. "'A prior restraint on speech is a law, regulation or judicial order that suppresses speech . . . on the basis of the speech's content and in advance of its actual expression.'" <u>Taylor v. Roswell Indep. Sch. Dist.</u>, 713 F.3d at 42 (quoting <u>United States v. Quattrone</u>, 402 F.3d 304 (2d Cir. 2005)).

As the Court concludes above, there is no First Amendment right to access government information. <u>See</u> Analysis § III(B)(1), <u>supra</u> at 172-77. Once an individual or organization has obtained that information from a source other than the government, however, the publication of

that information is protected speech and any restrictions on that publication are subject to scrutiny. See Bartnicki v. Vopper, 532 U.S. 514, 527 (2001)("As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" (quoting Smith v. Daily Mail Publishing Co., 443 U.S. 97, 102 (1979)). The Supreme Court has held that the "creation and dissemination of information are speech within the meaning of the First Amendment." Sorrell v. IMS Health Inc., 564 U.S. 552, 570 (2011)(citing Bartnicki v. Vopper, 532 U.S. 514, 527 (2001). "[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct." Sorrell v. IMS Health Inc., 564 U.S. at 570 (citing Bartnicki v. Vopper, 532 U.S. at 527). "Facts," -- such as the voter rolls at issue here -- "are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." Sorrell v. IMS Health Inc., 564 U.S. at 570. For the purposes of analyzing the First Amendment protections accorded to the voter data now that Voter Reference has obtained it, the Court draws no distinction between the election-related discrepancy analysis in Voter Reference's press releases and its publication of the raw data upon which its analysis -- at least in part -- is based.

Although the Secretary of State referred Voter Reference for criminal prosecution after Voter Reference posted New Mexico voter data on VoteRef.com, and after it blogged about the discrepancy in the VRF Press Release, Voter Reference removed New Mexico's voter data from VoteRef.com after learning about the criminal referral from the ProPublica Article, and is not posting it again, because it fears criminal prosecution under N.M.S.A. § 1-4-5.6. See Pl. FOF ¶ 52, at 19; O'Matz Dec. 14 Email. "If it can be said that a threat of criminal or civil sanctions after publication 'chills' speech, prior restraint 'freezes' it at least for the time." Neb. Press Ass'n v.

Stuart, 427 U.S. 539, 559 (1976).  The Secretary of State's publicized criminal referral thus both "chills" and "freezes" speech.  Neb. Press Ass'n v. Stuart, 427 U.S. at 559.  "Whether we view [the criminal referral] as a prior restraint or as a penal sanction for publishing lawfully obtained, truthful information is not dispositive because even the latter action requires the highest form of state interest to sustain its validity."  Smith v. Daily Mail Pub. Co., 443 U.S. 97, 101-02 (1979). "[E]ven when a state attempts to punish publication after the event it must nevertheless demonstrate that its punitive action was necessary to further the state interests asserted."  Smith v. Daily Mail Pub. Co., 443 U.S. 97, 102 (1979)(citing Landmark Communications, Inc. v. Virginia, 435 U.S. 829, 843 (1978)).  When, as here, the prior restraint chills or freezes speech which involves "commentary on current events," the "damage can be particularly great."  Neb. Press Ass'n v. Stuart, 427 U.S. at 559.

Although a publicized criminal referral is not a typical type of prior restraint, such as a judicial injunction or administrative licensing scheme, see Taylor v. Roswell Indep. Sch. Dist., 713 F.3d at 42 (10th Cir. 2013), a publicized criminal referral can function as a prior restraint. Here, Voter Reference learned of the criminal referral in the ProPublica Article, which was published on March 7, 2022, and tweeted by the Secretary of State on March 8, 2022.  See O'Matz, Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques; ProPublica Tweet.  Referring to Voter Reference, the Secretary of State tweeted: "This org posted #NM voter data online, violating the Election Code."  The ProPublica article quotes the Secretary of State as saying that "[h]aving voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," and states that, "[i]n December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution."  O'Matz,

Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques (no citation for quotation).  Subsequently, Voter Reference "removed [New Mexico's voter] data from its website on March 28, 2022" out of fear that it would be prosecuted.  Complaint ¶ 42, at 12.  Although Voter Reference submitted its own data request form -- the VRF Request Form -- on May 27, 2022, it claims that it will not publish voter data on VoteRef.com without a Court order saying that it can publish it.  See June 15 Tr. at 55:22-56:1 (Greim); Feb. 15 Request at 4 ("VRF intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters online if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, . . . or in any other legal proceeding.").  See Def. FOF ¶ 34, at 20 ("From the beginning of this litigation, Defendants have maintained that, to the extent VRF is subject to criminal liability for posting New Mexico voter data on its website, that liability stems from the provisions of NMSA 1978, Section 1-4-5.6 (2011) (and *not* Section 1-4-5.5).").  Because Voter Reference is currently refraining from speech -- from publishing New Mexico's voter data that it already has in its possession -- out of fear of criminal prosecution, the criminal referral functions as a de facto prior restraint.  The Court will apply, therefore, the standard of scrutiny applied to prior restraints on speech.

The Defendants demonstrate that the State has important interests in prohibiting the publication of voter data online, but these interests do not rise to the level of compelling State interests to justify a prior restraint.  Prior restraints are presumptively invalid, and the State "'carries a heavy burden of showing justification for the imposition of such a restraint.'"  Capital Cities Media, Inc. v. Toole, 463 U.S. 1303, 1305 (1983)(quoting New York Times Co. v. United States, 403 U.S. 713, 714 (1971)).  See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)("Any system of prior restraints of expression comes to this Court bearing a heavy

presumption against its constitutional validity."). The Supreme Court has described prior restraints as requiring "the most exacting scrutiny." Smith v. Daily Mail Pub. Co., 443 U.S. 97, 102 (1979). In Nebraska Press Association v. Stuart, 427 U.S. 539 (1976), the Supreme Court weighed whether, "as Learned Hand put it, 'the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.'" Neb. Press Ass'n v. Stuart, 427 U.S. at 562 (quoting United States v. Dennis, 183 F.2d 201 (2d Cir. 1950)). Courts have found few State interests compelling enough to justify a prohibition on the publication of news. See New York Times v. United States, 403 U.S. at 714; Near v. Minnesota, 283 U.S. 697 (1931); United States v. Progressive, Inc., 467 F. Supp. 990, 996 (W.D. Wis.), dismissed, 610 F.2d 819 (7th Cir. 1979).

In the absence of a Supreme Court or Tenth Circuit case with similar facts as this case, but given the Supreme Court's admonition to apply the highest level of scrutiny to prior restraints, the individualized nature of the Secretary of State's criminal referral of Voter Reference in particular, and evidence of the Secretary of State's hostility towards Voter Reference, see Analysis § III(B)2), supra at 178-85, the Court will apply strict scrutiny to evaluate the Secretary of State's public criminal referral. The Court examines, then, whether the State has a "compelling governmental interest" in prohibiting Voter Reference's publication of the voter data it already possesses online, and whether that prohibition is "narrowly tailored to serve that interest.'" Capital Cities Media, Inc. v. Toole, 463 U.S. at 1305-06.

The Defendants put forward "at least four important state interests" to justify the Data Sharing Ban, for the violation of which the Secretary of State referred Voter Reference for possible prosecution:

-        [The Data Sharing Ban] ensures that only individuals who sign the requisite

affidavit and, therefore, are made explicitly aware of the permissible uses of New Mexico voter data, have access to such data;

-      It ensures payment of reasonable fees for the production of voter data, which fees subsidize the mandatory voter registration system;

-      It encourages voter registration by ensuring voters that their voter data will only be disclosed on a need-to-know basis and under penalty of perjury, thereby fostering trust in the registration system by protecting registered voters from unwanted solicitations, harassment, and abuse; and

-      Because voter data produced at any single moment represents a "snapshot" of the voter files as of that moment, whereas voter files may change in the future, thereby rendering the produced voter data no longer accurate, disseminating voter data may lead to disinformation, which would further erode voter confidence in the voter registration system.

PI Response at 11-12.  Among these, the State interests at play in the Secretary of State's referral of Voter Reference for posting voter data online are the first three: (i) educating the public about permissible use of voter data; (ii) ensuring fees are paid; and (iii) fostering trust in the registration system by protecting registered voters from solicitations, harassment, and abuse.  See PI Response at 11-12.  Among these, the State interests at play in the Secretary of State's referral of Voter Reference for posting voter data online are the first three: (i) educating the public about permissible use of voter data; (ii) ensuring fees are paid; and (iii) fostering trust in the registration system by protecting registered voters from solicitations, harassment, and abuse.  See PI Response at 11-12.

The Court agrees with the Plaintiffs that the first reason -- educating the public about permissible uses of voter data -- is "legitimate and important, but the State failed to present evidence that it is compelling."  Pl. FOF ¶ 90, at 71.  Although VoteRef.com users must agree to Terms of Service affirming that their use of the data will be lawful, they do not have to read and sign a printed form to access voter data.  See VoteRef.com, Terms of Service; Complaint ¶ 40, at 11-12.  While the educational value of the Voter Data Request Form which a requester has to sign

is likely greater than a long block of fine print that VoteRef.com users can skim-read and click through, see VoteRef.com, Terms of Service; Complaint ¶ 40, at 11-12, this interest is not compelling enough to overcome strict scrutiny.

As to the second State interest, the Court agrees with the Plaintiffs that "[m]ere revenue generation . . . is not a compelling interest that can only be achieved by a complete ban on the sharing of data," and notes that "[t]he State provided no evidence whatsoever with respect to this interest." Pl. FOF ¶ 94, at 73. Voter Reference did not answer with any confidence the Court's question whether voter data may be downloaded from VoteRef.com. See June Tr. at 20:12-16 (Court, Greim). Whether voter data can be downloaded as a spreadsheet from VoteRef.com has a significant bearing on the data's utility to VoteRef.com users, and, therefore, on the extent to which VoteRef.com users who may have acquired voter data directly from the Secretary of State would turn instead to VoteRef.com for access -- this consideration affects the extent to which the State's revenues would be affected by VoteRef.com's publication of voter data for free. Nevertheless, although revenue generation may be a legitimate State interest, it is not a compelling interest.

Third, the State has an important interest in fostering trust in the voter registration system and protecting voters from "solicitations, harassment, and abuse." PI Response at 12. The Court agrees that, if there is evidence that VoteRef.com's publication of voter data eroded trust in the voter registration system, led to voters cancelling their registrations, or gave rise to incidences of solicitation, harassment, or abuse, this State interest would be important. The Defendants argued at the May Hearing that

> if I don't want Mr. Greim to know whether or not I voted in the last election or where I live or my age or my address -- which I mentioned -- or my party affiliation, what I can do is I can cancel my registration. And then the day -- on election day,

- 192 -

> I can show up at a polling place, submit an affidavit, vote, and then turn around and
> cancel the very next day.  That will create an incredible burden for the Secretary of
> State's Office.  It will increase the likelihood of errors happening ten-fold at least.
> But it is my only option to keep my information private if, in fact, Voter Ref is
> allowed to put it on the website.

May Tr. at 46:24-47:11 (Serafimova).  The Defendants argued that VoteRef.com's use of data is different than a campaign's use of voter data, because political campaigns are not posting this data online.  See May Tr. at 47:19-48:13 (Court, Serafimova).  The Defendants present Pino's testimony that voters must provide their residential, physical address, and not a P.O. Box or work address, to register to vote.  See June Tr. at 118:3-18 (Serafimova, Pino).  Pino testified that, other than cancelling her voter registration, if she did not want her address and voter history posted online, she would have to apply for the "address confidentiality program," but that is not available for public officials in New Mexico.  June Tr. at 183:5-12 (Serafimova, Pino).   Pino testified further that, having voters' residential address, "in addition to the party affiliation on a public website," "could be very harmful," because it "could cause people to not want to participate in the process, if, again, they know their information, private information, is out there, and . . . [to] los[e] confidence in . . . how their data is kept."  June Tr. at 185:1-15 (Serafimova, Pino).  Pino testified that New Mexico Audit Force's Otero County audit is a "case in point," where "[v]oter files were shared, and then so-called volunteers went door to door interrogating voters about their participation in the process.  That has a chilling effect, where people don't want to participate and don't want to vote."  June Tr. at 185:16-22 (Pino).  Although email correspondence suggests that the Secretary of State's Office believes that New Mexico Audit Force and Voter Reference are potentially "working in concert," Email from Patrick Rostock to Sharon Pino and Mandy Vigil at 6, the Defendants provide no evidence that connects reports of voter harassment in Otero County with VoteRef.com's data.  Fostering trust in the voter registration system and protecting voters

from solicitations, harassment, and abuse, are important State interests, but, in the absence of any evidence that posting the voter data has or will cause such problems, these concerns do not rise to the level of compelling interests to justify a prior restraint.   The voter data was posted online for around three months, and there is no evidence in the record that posting the data caused any of the problems about which the Secretary of State is concerned.

The Defendants' important State interests may be good policy reasons to limit and condition access to voter data in the first place: the State may prohibit requesters from posting voter data online without violating the First Amendment, because there is no right of access to government data.   When, however, an individual has that voter data without getting that information by signing an affidavit or agreement with the State, the State must show compelling interests to justify a prior restraint on that data's publication by this third party.   The Defendants have not shown a compelling State interest here to prosecute Voter Reference for posting the data it has had for several months; consequently, the Plaintiffs are likely to succeed on the merits of this part of their prior restraint claim.

> **b.     The Secretary of State's Voter Data Request Process is Not a <u>Content-Based Administrative Licensing Scheme</u>.**

The Plaintiffs are not likely to succeed on the merits of their First Amendment claim that the Secretary of State is engaging in an unconstitutional content-based administrative licensing scheme.  Unlike a judicial injunction, which "forbid[s] specific speakers from specific expression," "an administrative licensing scheme does not usually target a particular speaker or instance of speech," but "requires a speaker to obtain approval before engaging in certain forms of speech in a given forum, sometimes based on the volume or scale of the intended speech."  <u>Taylor v. Roswell Indep. Sch. Dist.</u>, 713 F.3d at 42.  A typical example is "a local ordinance requir[ing] citizens to

obtain a permit before holding a parade or assembly on public property." Taylor v. Roswell Indep. Sch. Dist., 713 F.3d at 42 (citing Forsyth Cnty. v. Nationalist Movement, 505 U.S. 123, 130, (1992)).  Another typical example is a film board deciding which movies may be shown.  See Freedman v. Md., 380 U.S. 51, 57 (1965)).  The Supreme Court has recognized "that a scheme conditioning expression on a licensing body's prior approval of content 'presents peculiar dangers to constitutionally protected speech.'"  Thomas v. Chi. Park Dist., 534 U.S. 316, 321 (2002)(quoting Freedman v. Md., 380 U.S. at 57).  If a regulation of speech "defin[es] regulated speech by its function or purpose," it may be subject to strict scrutiny.  Reed v. Town of Gilbert, Ariz., 576 U.S. at 163-64.  On the other hand, "[l]icensing restrictions that are content neutral and restrict only the time, place, and manner of speech are not subjected to the most rigorous prior restraint scrutiny." Taylor v. Roswell Indep. Sch. Dist., 713 F.3d at 42-43 (citing Ward v. Rock Against Racism, 491 U.S. 781 (1989)).  "[A]ny permit scheme controlling the time, place, and manner of speech must not be based on the content of the message, must be narrowly tailored to serve a significant governmental interest, and must leave open ample alternatives for communication." Forsyth Cnty. v. Nationalist Movement, 505 U.S. at 130 (citing United States v. Grace, 461 U.S. 171, 177 (1983)).

Unlike the film board in Freedman v. Maryland, which "enjoyed authority to reject films that it considered 'obscene' or that 'tended, in the judgment of the Board, to debase or corrupt morals or incite to crimes,' characteristics defined by the statute in broad terms," Thomas v. Chi. Park Dist., 534 U.S. at 321, the Secretary of State's Election Bureau staff engage in only ministerial and cursory checks of Voter Data Request Forms to determine if a requester fills out a form completely, if the requester signed the authorization section, and if the requester paid the fee before releasing voter data to the requester.  See May Tr. at 128:16-18 (Greim, Vigil); id. at 129:4-11

(Vigil).   These ministerial checks are not content-based in the way that a licensing board's assessment of a protest, or a film board's assessment of a movie's content, are content-based.

There is no evidence that, before this litigation, Election Bureau personnel ever have denied a properly-completed Voter Data Request Form or investigated a requester or requesting organization to determine if its purported use is lawful.  See May Tr. at 128:16-129:11 (Greim, Vigil); id. at 144:12-15 (Serafimova); June Tr. at 237:17-18 (Serafimova).  The Secretary of State has fulfilled data requests from political parties on both sides of the political spectrum and fulfilled requests by both progressive and conservative data aggregation companies, such as Catalist, i360, and Data Targeting, see 2021 Request Log at 1-2.  The Secretary of State's Office represents that, before this litigation, it was unaware of who Catalist and i360 are and what they do.  See May Tr. at 44:7-8 (Serafimova).

That O'Matz, a ProPublica reporter -- and not the voter data request process -- drew the Secretary of State's attention to Voter Reference's publication of voter data online, lends credence to the Defendants' assertion that the Secretary of State was not screening requesters based on their identity, or investigating requesters' proposed use of the voter data beyond the check boxes indicating the proposed use before referring Voter Reference for criminal prosecution to the Attorney General.  See O'Matz Dec. 14 Email at 7-8.  On the other hand, the Plaintiffs argue that the

> Secretary's past statements, and the record in this case, show that in granting or denying a request, her office exercises discretion that is not otherwise explicit in the statutory scheme. As noted above, the Secretary has claimed the authority to deny a request if she determines the information would be put to a "nefarious" purpose, if she was not satisfied with the "plan" that the requester had for the information, or if she believed the requester's data analysis would not "produce any meaningful results." VC, Exs. C & D.

Pl. FOF ¶ 114, at 80 (citing June 30, 2017 Press Release; July 27, 2017 Press Release.  The

statements quoted here are from the June 30 2017 Press Release and July 27 2017 Press Release, written in response to requests for voter data from President Trump's Advisory Commission on Election Integrity. See June 28 2017 Request; July 26 2017 Request. The Plaintiffs do not argue that the Advisory Commission followed the administrative licensing scheme they challenge. Vigil testified that the Advisory Commission did not sign the requested affidavit necessary for obtaining voter data. See June Tr. at 100:9-12 (Serafimova, Vigil). Because the Plaintiffs do not show that the Advisory Committee's voter data request was submitted and screened through the voter data request process that the Plaintiffs challenge, these requests are not evidence of a content-based administrative licensing scheme.

In addition, that the Secretary of State has not responded to Voter Reference's May 27, 2022 data request pending this litigation's outcome does not support Voter Reference's assertion that the Secretary of State is exercising undue discretion and operating a content-based administrative licensing scheme. See VRF Request Form. The Secretary of State's Office is acting on the advice of counsel to not provide voter data to Voter Reference until the Court produces an opinion ordering the Secretary of State to do so; the Secretary of State's Office attests that it is not responding to the request out of fear that providing voter data to an organization which will post it online may make them liable for conspiracy to violate the Election Code. See June Tr. at 59:15-23 (Greim, Vigil); 94:23-95:21 (Serafimova, Vigil).

Although the Court concludes that prosecuting Voter Reference for publishing the voter data it has already received from Local Labs would violate the First Amendment, the Court does not conclude that a prohibition on publishing voter data received directly from the Secretary of State's Office online violates the First Amendment; consequently, the Secretary of State's decision not to release voter data to Voter Reference in response to its May 27 request, see VRF Request

Form, does not demonstrate that the scheme is facially content-based.  It describes, rather, a content-neutral prohibition on sharing voter data publicly online.  This prohibition, the Secretary of State has attested, would apply to any organization.    See June Tr. at 239:14-18 (Serafimova)("[T]he Democratic Party cannot put the [voter] data on its website.  The same as the Republican, same as the Libertarian.  No one can do that.").  These unique circumstances do not constitute evidence that the Secretary of State is engaging in a content-based administrative licensing scheme.  The Plaintiffs do not demonstrate that they are likely to succeed on the merits of their prior restraint claim that the Defendants are operating a content-based administrative licensing scheme.

> **4.**     **The Election Code and the Voter Data Request Forms Are Not Unconstitutionally Vague.**

The void-for-vagueness doctrine is embodied in the due process clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States, and is significant in two respects. U.S. Const. amends. V, XIV.  First, the doctrine guarantees that "a person of ordinary intelligence" have "fair notice" or warning of the conduct that a statute proscribes.  United States v. Williams, 553 U.S. at 304 (citing Hill v. Colorado, 530 U. S. at 732).  See Smith v. Goguen, 415 U.S. at 572 (stating that the "settled principles" of the void for vagueness doctrine "incorporate[] notions of fair notice or warning" ); Grayned v. City of Rockford, 408 U.S. at 108 (". . . because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity  to know what is prohibited, so that he may act accordingly");  Papachristou v. Jacksonville, 405 U.S. 156, 162 (1972)(stating the same.); Connally v. Gen. Constr. Co., 269 U.S. 385, 391 (1926)("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily

guess at its meaning and differ as to its application, violates the first essential of due process of law.").  A law is not unconstitutionally vague merely because the statute requires "the application of a qualitative standard . . . to real world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . to some matter of degree.'"  Johnson v. United States 576 U.S. 591, 603-04 (2015)(quoting Nash v. United States, 229 U.S. 373 (1913)).  Rather, a statute is unconstitutionally vague if its "prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." United Food & Com. Workers Union Local 1099 v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341, 358-59 (6th Cir.1998)(citing Grayned v. City of Rockford, 408 U.S. at 108).  See Giaccio v. Pennsylvania, 382 U.S. 399, 402-403 (1966)("It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle."); Doctor John's, Inc. v. City of Roy, 465 F.3d 1150, 1157 (10th Cir. 2006)("As a basic matter of due process, a law is 'void for vagueness' if it does not clearly define its prohibitions" (quoting Grayned v. City of Rockford, 408 U.S. at 108)).

Second, the doctrine guards against arbitrary or discriminatory law enforcement by prohibiting regulations that "impermissibly delegate[] basic policy matters" to policemen, judges, prosecutors, and juries for "resolution on an ad hoc and subjective basis . . . ."  Grayned v. City of Rockford, 408 U.S. at 108-09.  See Johnson v. United States, 576 U.S. at 600-01 (acknowledging that residual clauses which require courts to analyze the application of the phrase "serious potential risk" have proved "'nearly impossible to apply consistently'" (quoting Chambers v. United States, 555 U.S. 122, 133 (2009)); Koldender v. Lawson, 461 U.S. 352, 361-62 (1983)(concluding that a statute was unconstitutionally vague on its face, because police could arbitrarily deem a suspect "suspicious"); Smith v. Goguen, 415 U.S. at 575 (stating that the arbitrariness at which a vagueness

challenge takes aim is the "standardless sweep [of a statute's language, which] allows policemen, prosecutors, and juries to pursue their personal predilections").

Generally, when a statutory provision is attacked on void-for-vagueness grounds, the statute's constitutionality must be determined strictly based on the statute's application to the case's particular facts.  See United States v. Powell, 423 U.S. 87, 92 (1975)(reiterating that "'[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'")(quoting United States v. Mazurie, 419 U.S. 544, 550 (1975)); United States v. Nat'l Dairy Corp., 372 U.S. at 32-33.  When, however, a criminal statute's vagueness exerts a "chilling effect" on First Amendment liberties, the void-for-vagueness doctrine "demands a greater degree of specificity than in other contexts" and the statute is tested for vagueness on its face, and not as applied to the case's facts. Smith v. Goguen, 415 U.S. at 573.  See United States v. Nat'l Dairy Corp., 372 U.S. at 36.  Once it is determined, however, that a statute will be evaluated on its face, because of its First Amendment restrictions, the criteria for measuring the statute's validity under the vagueness doctrine are the same as in a non-First Amendment context: fair warning and adequate guidelines. See Smith v. Goguen, 415 U.S. at 573; FCC v. Fox TV Stations, Inc., 567 U.S. 239, 253-54 (2012)("When speech is involved, rigorous adherence to [a statute's] requirements is necessary to ensure that ambiguity does not chill protected speech").

Here, the Plaintiffs argue that, "[a]s a result of the vagueness of the Data Sharing Ban, the Use Restrictions, and Defendants' interpretation of them, Plaintiffs and others will likely refrain from engaging in First Amendment protected activities," and argue that "[t]he indeterminacy of exactly what uses and sharing is permissible and what will expose a person to felony charges renders the statutory scheme void for vagueness."  Pl. FOF ¶ 109, at 75.  When speech is involved,

a statute or regulation must not be vague on its face, and, thus, an agency's interpretation of a statute is generally not subject to void-for-vagueness analysis.  See Smith v. Goguen, 415 U.S. at 573; FCC v. Fox TV Stations, Inc., 567 U.S. at 253-54.   Here, the Court concludes that the Plaintiffs are not likely to succeed on the merits of their claim, because the Election Code is not so vague that the State fails to provide sufficient guidelines about what conduct is permissible and what will expose a person to felony charges.

N.M.S.A. § 1-4-5.5(C) states: "Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes."   N.M.S.A. § 1-4-5.5(C).   This is reflected in the most recent version of the Voter Data Request Form, which  mandates that a requestor swear to "not use voter information for any purpose other than those authorized on this form."  Feb. 14 Request Form. The most recent version of the form lists only two authorized uses: "Campaign Use" and "Governmental Use."  Feb. 14 Request Form.  N.M.S.A. § 1-5-2 defines these authorized uses: "'election campaign purposes' means relating in any way to a campaign in an election conducted by a federal, state or local government[,]" N.M.S.A.§ 1-5-2(F), and "'governmental purposes' means noncommercial purposes relating in any way to the structure, operation or decision making of a federal, state or local government[,]" N.M.S.A. § 1-5-2(H).  Although the Feb. 14 Request Form is potentially more restrictive than NMSA § 1-4-5.5 requires, because it excludes "election-related" purposes as a permissible use, the Court assumes for the purposes of this analysis that the Secretary of State's interpretation that election-related is an umbrella term under which use is either governmental or campaign-related, is correct.  Furthermore, an overly narrow interpretation of the statute presents the opposite problem as void-for-vagueness.  Despite the narrowness of the

Feb. 14 Request Form's interpretation of permissible uses, the statutory definitions and the Feb. 14 Request Form are not so vague that a person of common intelligence must guess whether his or her intended use qualifies as "Campaign Use" or "Governmental Use," and would thus be vulnerable to criminal penalties.  Feb. 14 Request Form.  Similarly, the Data Sharing Ban -- which prohibits the sharing of voter data: (i) with persons or entities who may or will use the voter data for an unlawful purpose as N.M.S.A. § 1-4-5.5 defines; or (ii) with individuals or entities outside the organization that requests it -- is reflected in the Feb. 14 Request Form and in N.M.S.A. § 1-4-5.5.  The Feb. 14 Request Form's first authorization line mandates that a requestor swear "not to sell, loan, provide access to, or otherwise surrender voter information received as a result of this request."  Feb. 14 Request Form.  A person of ordinary intelligence would understand that, if he or she shared voter data with individuals or entities outside their organization, then he or she has broken the promise "not to . . . provide access to . . . voter information received as a result of this request."  Feb. 14 Request Form. These words have a commonly understood meaning, such that a person of ordinary intelligence would not be left to guess whether he or she may or may not receive money in exchange for (sell), permit borrowing (loan), permit a third party to view (provide access to), or otherwise yield possession (surrender) the obtained voter information.  See Merriam-Webster, Sell, https://www.merriam-webster.com/dictionary/sell (last visited July 21, 2022); Merriam-Webster, Loan, https://www.merriam-webster.com/dictionary/loan (last visited July 21, 2022); Merriam-Webster, Provide, https://www.merriam-webster.com/dictionary/provide (last visited July 21, 2022); Merriam-Webster, Access, https://www.merriam-webster.com/dictionary/access (last visited July 21, 2022); Merriam-Webster, Surrender, https://www.merriam-webster.com/dictionary/surrender (last visited July 21, 2022).

N.M.S.A. § 1-4-5.5's words do not have such subjective or malleable meanings that a prosecutor, policeman, judge or jury could arbitrarily mold the language to apply to a factual scenario of a defendant's conduct: standards that are at risk of arbitrary enforcements are those which are left to the legal actor's subjective interpretation.  See United States v. Williams, 553 U.S. at 285 (stating that the Supreme Court has "struck down statutes that tied criminal culpability" to standards that are "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings"); United States v. Powell, 423 U.S. at 92 ("[A] statute which provides that certain oversized or heavy loads must be transported by the 'shortest practicable route" is not unconstitutionally vague, because "The carrier has been given clear notice that a reasonably ascertainable standard of conduct is mandated; it is for him to insure that his actions do not fall outside the legal limits."(quoting Sproles v. Binford, 286 U.S. 374, 393 (1932)); United States v. L. Cohen Grocery Co., 255 U.S. 81, 89 (1921)(concluding that a law prohibiting grocers from charging an "unjust or unreasonable rate" was void for vagueness, because it "forbids no specific or definite act" and "leaves open . . . the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against"); Koldender v. Lawson, 461 U.S. 352, 361-62 (1983)(concluding that a statute was unconstitutionally vague on its face, because police could arbitrarily deem a suspect "suspicious").

Here, the statute provides clear and objective definitions of conduct which would make a requester criminally liable for his or her use of the voter data.  See N.M.S.A.§ 1-4-5.5(C); N.M.S.A.§ 1-5-22(A)(defining the unlawful disposition of a voter file as "the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the

Voter Records System Act to have possession of the file."); N.M.S.A.§ 1-5-23(A)(defining the unlawful alteration of voter data as "the unauthorized destruction of, the unauthorized alteration of, the erasure of information from or the rendering unusable for their lawfully intended purpose of such media, files, software, instructions and lists or parts thereof by any person.").  Accordingly, because a person of ordinary intelligence can recognize the sort of conduct that would leave him or her vulnerable to criminal prosecution, and because the prohibited conduct as described in the Feb. 14 Request Form is not flexible enough to permit subjective and arbitrary enforcement, the Court concludes that the Plaintiffs are unlikely to succeed on their claim that the statutes or the Feb. 14 Request Form are void for vagueness.  As the Court construes the Secretary of State's interpretation of the statute, that interpretation also is not vague, even if it is incorrect.

### C.   VOTER REFERENCE WILL SUFFER IRREPARABLE HARM WITHOUT A PI.

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"  Heideman v. S. Salt Lake City, 348 F.3d at 1189 (quoting Wis. Gas Co. v. Fed. Energy Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Irreparable harm is "not harm that is 'merely serious or substantial.'"  Heideman v. S. Salt Lake City, 348 F.3d at 1189 (quoting Prairie Band of Patowatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001)).  A movant suffers irreparable injury "'when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain.'"  Planned Parenthood Ass'n of Utah v. Herbert, 828 F.3d 1245, 1263 (10th Cir. 2016)(quoting Awad v. Ziriax, 670 F.3d 1111, 1131 (10th Cir. 2012)).

Voter Reference contends that it will suffer irreparable harm without a PI, because it is "denied [its] First Amendment rights to share and receive information critical to understanding the

functioning of the government and the state's elections because of the Defendant's actions."  Pl. FOF ¶ 124, at 83.   According to the Plaintiffs, the Defendants are infringing on their First Amendment rights, and any loss of First Amendment freedoms constitutes irreparable injury.  See Pl. FOF ¶ 123, at 83.  The Defendants respond, arguing that Voter Reference is free to share its data analysis online without uploading the voter data itself to Voter Reference's website.  See Def. FOF ¶ 66, at 28.

"The loss of First Amendment freedoms, even for minimal periods of time, unquestionable constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976).  If the Plaintiffs are losing any First Amendment freedoms, therefore, they are suffering irreparable injury.  As it stands, the Plaintiffs' only deprivation of First Amendment freedom is ongoing prosecution threat for violating N.M.S.A. § 1-4-5.6 if they publish the data Voter Reference received from Local Labs.  As explained above, the Plaintiffs likely are to succeed on the merits of three claims: (i) their viewpoint discrimination claim insofar as the Plaintiffs challenge the Secretary of State's decision not to honor Voter Reference's May 27, 2022, request for voter data despite Voter Reference's assurances that it will not violate the Secretary of State's interpretation of the election code; (ii) their viewpoint discrimination claim against the Secretary of State for her criminal referral; and (iii) their prior restraint claim insofar as the Plaintiffs challenge the Secretary of State's threat of prosecution if the Plaintiffs publish voter data online.  See Analysis § III(B), supra at 172-204. Only the third results in a loss of First Amendment freedoms, however.

First, the Plaintiffs do not ask the Court to remedy the Secretary of State's decision not to honor Voter Reference's request for data.  Although the Secretary of State's decision not to honor Voter Reference's May 27, 2022, request for data constitutes impermissible viewpoint discrimination, the Plaintiffs do not ask the Court to enjoin the Secretary of State to honor their

request and, even if they did and the Court granted such an injunction, it would result in Voter Reference having two copies of almost identical data.  The Plaintiffs already have the data that they requested from the Secretary of State -- or, at least, an older version of the same data.  See Complaint ¶ 39, at 11; May Tr. at 73:20-22 (Swoboda).  There is, therefore, no harm, because there is nothing for the Court to remedy, whether the Plaintiffs ask for a remedy or not.

Second and third, however, there is a First Amendment harm that the Plaintiffs are being restrained from publishing their Local Labs data, because, although the Court concludes that Voter Reference does not have a First Amendment right to the data it seeks and the First Amendment bars the Attorney General from prosecuting or threatening to prosecute Voter Reference for engaging in speech critical of the Secretary of State or conducting discrepancy analysis, there is an imminent threat of prosecution if they publish the Local Labs data.  The initial criminal referral likely is both a form of viewpoint discrimination and a form of prior restraint.  See Analysis § III(B)(2)-(3), supra at 178-97.   The Defendants assert that there is "no credible threat of prosecution under" N.M.S.A. § 1-4-5.5 either against Voter Reference or against Steinberg, but that is not true about N.M.S.A. § 1-4-5.6. June Tr. at 223:22-23 (Sarafimova).  The Defendants maintain that, since the Referral Letter, "to the extent [that Voter Reference] is subject to criminal liability for posting New Mexico voter data on its website, that liability stems from the provisions of" N.M.S.A. § 1-4-5.6, and not from N.M.S.A. § 1-4-5.5.  Pl. FOF ¶ 34, at 20.  The Defendants do not state that Voter Reference cannot or will not be prosecuted for violating N.M.S.A. § 1-4-5.6.  Although the Secretary of State may, without running afoul of the First Amendment, condition voter data access on whether the requestor intends to publish the data, the First Amendment prohibits the Secretary of State or the Attorney General's Office from prosecuting or threatening to prosecute Voter Reference for publishing data that it already has.  See Analysis § III(B)(3),

supra at 185-97.  There is sufficient evidence that Voter Reference's constitutional right may be

infringed, because the threat of prosecution is live: "when an alleged constitutional right is

involved, most courts hold that no further showing of irreparable injury is necessary." Awad v.

Ziriax, 670 F.3d 1111, 131 (10th Cir. 2012).  To interfere with State processes like those at issue

here, there must be "exceptional circumstances and a clear showing that an injunction is necessary

in order to afford adequate protection of constitutional rights." Spielman Motor Co. v. Dodge, 295

U.S. 89, 95 (1935).   In exceptional circumstances a district court may offer declaratory or

injunctive relief to prevent a State from prosecuting someone if prosecuting would violate that

person's constitutional rights.  See Wooley v. Maynard, 430 U.S. 705, 710-13 (1977); Steffel v.

Thompson, 415 U.S. 452, 475 (1974).  Here, the combination of the Secretary of State's criminal

referral and the lack of any indication that the Attorney General will not prosecute Voter Reference

for publishing the data that it already has constitute an ongoing form of viewpoint discrimination

and prior restraint, which the First Amendment does not tolerate.  Any ongoing threat of

prosecution for publishing the data Voter Reference received from Local Labs constitutes

irreparable injury to Voter Reference's constitutional rights.  As a result, the Plaintiffs show

exceptional circumstances to justify interfering with State proceedings.  Accordingly, the Plaintiffs

will suffer irreparable injury absent a narrow PI preventing the Attorney General from prosecuting

Voter Reference for publishing the data it already has.

### D.   THE BALANCE OF EQUITIES AND THE THREATENED INJURY FAVOR A PI.

A party seeking a PI must show that the threatened injury outweighs whatever harm the

proposed PI may cause the opposing party and that the injunction, if issued, will not affect

adversely the public interest.  See Aposhian v. Barr, 958 F.3d at 978.  The harm-to-the-opposing-

party factor and public-interest factor "merge" when the opposing party is the federal government. Nken v. Holder, 556 U.S. at 435.  See Aposhian v. Barr, 958 F.3d at 978.

Voter Reference's claimed injury outweighs any harm to the public interest that a PI may cause.  "Vindicating First Amendment freedoms is clearly in the public interest."  Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005).  See Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d 1100, 1164-54 (D.N.M. 2020)(Browning, J.).  As explained above, Voter Reference will suffer irreparable injury without a PI.  See Analysis § III(C), supra at 203-07.  As a result, there is nothing to outweigh the harm to the public interest that a PI may cause.  As it stands, the State's interests are not sufficiently compelling to justify prior restraint, but the State has legitimate policy reasons supporting its decision not to make all voter data available to anyone for any reason.  The Plaintiffs stress that a PI is in the public interest, because it would vindicate Voter Reference's constitutional rights.  See Pl. FOF ¶ 131, at 85.  In addition, the Plaintiffs insist that Voter Reference publishing this data serves the public interest and, as a result, that the equities weigh in Voter Reference's favor.  See Pl. FOF ¶¶ 132-33, at 85-86.  The Plaintiffs' argument is not as strong as they suggest, however, because the public already has access to much of the information the Voter Reference wants to provide.  See New Mexico Secretary of State, Voter Information Portal, https://www.sos.state.nm.us/voting-and-elections/voter-information-portal/ (last visited July 4, 2022).  Nevertheless, that some of the information is accessible elsewhere does not ameliorate any harm to Voter Reference.  Without a narrow PI preventing the Defendants from prosecuting Voter Reference for publishing the data they already have, therefore, Voter Reference will continue to suffer a loss of constitutional rights looking ahead.  Although harm to the public interest may justify the State's decision not to make voters' voting history and personal information available to anyone at any time, it does not overcome the heightened scrutiny to satisfy

infringing on the First Amendment's prohibition on prior restraint.  While there may be harm to the public interest from posting the data online, the First Amendment injury that occurs absent a narrow PI outweighs that harm.  The requested PI would not mean "federal court supervision" of a State process, because the rest of this litigation may not play out as either party predicts.  See Morrow v. Winslow, 9 F.3d 1346, 1396 (10th Cir. 1996).  Because the narrow PI that the Court grants does not interfere unnecessarily with the State's options to decide how to proceed, protecting First Amendment rights outweighs any harm to the public interest.  The balance of equities weighs in the Plaintiffs' favor.

## IV.    VOTER REFERENCE DOES NOT NEED TO SECURE A BOND.

The Court will not require Voter Reference to secure a bond.  Under rule 65(c), the Court may grant a PI "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States, and its officers and agencies, are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The Court must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co., 825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate the imposition of the bond, its order granting a preliminary injunction is unsupportable").  See also Flood v. ClearOne Comm'ns, 618 F.3d 1110, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit "have 'wide discretion under Rule 65(c) in determining whether to require security'" and may, therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d 1203, 1215 (10th Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).

The Defendants do not request a bond from Voter Reference or Steinberg either in the PI Response or at the Hearings.  The Court nevertheless will consider whether a bond is appropriate

in this case. A bond is "not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment. Goyette v. City of Minneapolis, 338 F.R.D. 109, 121 (D. Minn. 2021)(Wilhelmina, J.). In light of the determination that the Defendants are likely to succeed on the merits of part of their prior restraint and viewpoint discrimination claims, the Defendants are not required to secure a bond to ensure that the State of New Mexico complies with the Constitution.

There is no evidence in the record that it will cost anything for the Defendants to comply with the injunction not to prosecute Voter Reference under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it received from Local Labs. The Defendants have not requested a bond and, therefore, have not quantified the cost of complying with a PI. See Requirement of Security for the Issuance of a Preliminary Injunction or Temporary Restraining Order, 11A Fed. Prac. & Proc. Civ. § 2954 n. 48 (3d ed.)("The district court cannot simply set an injunction bond at whatever high number it thinks appropriate; instead, reasons must support the number chosen so that the reviewing court can determine whether the number was within a range of options from which one could expect a reasonable trial judge to select.")(citing Starsurgical, Inc. v. Aperta, LLC, 832 F. Supp. 2d 1000, 1006 (E.D. Wis. 2011)(Adelman, J.)). Because the Defendants do not request a bond, and because the Court finds by a preponderance of the evidence that complying with the PI will not cost the Attorney General's Office, the Court will not require Voter Reference to secure a bond.

**IT IS ORDERED** that: (i) the Plaintiffs' Motion for Preliminary Injunction, filed March 28, 2022 (Doc. 3), is granted in part; and (ii) Defendant Attorney General Balderas and Defendant Secretary of State Oliver are enjoined from prosecuting Plaintiff Voter Reference Foundation, LLC, under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Carter B. Harrison IV
Harrison, Hart & Davis, LLC
Albuquerque, New Mexico

-- and --

Edward Dean Greim
Matthew Richard Mueller
Graves Garrett, LLC
Kansas City, Missouri

      _Attorneys for the Plaintiffs_

Hector H. Balderas
  New Mexico Attorney General
Olga Serafimova
  Senior Civil Counsel
New Mexico Office of the Attorney General
Santa Fe, New Mexico

      _Attorneys for the Defendants_