## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**VOTER REFERENCE FOUNDATION,** )
**LLC** and **HOLLY STEINBERG** )
)
    Plaintiffs, )
**v.** )    **CASE NO: 1:22-cv-00222-JB-KK**
)
)
**HECTOR BALDERAS**, in his official )
capacity as New Mexico Attorney General, and )
**MAGGIE TOULOUSE OLIVER,** in her )
Official capacity as New Mexico )
Secretary of State, )
)
    Defendants. )

## DEFENDANTS' MOTION TO
## STAY PRELIMINARY INJUNCTION PENDING APPEAL[1]

Defendants New Mexico Attorney General Hector Balderas ("Attorney General") and New Mexico Secretary of State Maggie Toulouse Oliver ("Secretary"), in their official capacities, hereby move pursuant to Federal Rule of Civil Procedure 62(d) to stay pending appeal the Court's July 22, 2022 order granting in part Plaintiffs' motion for preliminary injunction ("Order") (Doc. 51). A notice of appeal has been filed. (Doc. 56)

There is a strong likelihood that the Order will be reversed on appeal for three reasons: first, the Order enjoins the Attorney General from prosecuting Plaintiff Voter Reference Foundation, LLC ("VRF") for potential violations of the New Mexico Election Code, even though Plaintiffs have never alleged, and the Court did not find, that the Attorney General has violated

---

[1] This motion is opposed.

any of Plaintiffs' federal (or other) rights; second, the Order violated the Attorney General's and the Secretary's due process rights by relying in part on a novel substantive theory of liability that was never advanced by Plaintiffs—and, therefore, was never addressed by the Attorney General or the Secretary—namely, that the Secretary's publicized referral of VRF and Local Labs to the Attorney General constituted a prior restraint in violation of the First Amendment; and third, the Order erroneously concludes that the Secretary committed viewpoint discrimination in denying VRF's May 25, 2022 request for voter data.

## I.     Legal Standard for Stay of Preliminary Injunction Pending Appeal

Under Federal Rule of Civil Procedure 62(d), "[w]hile an appeal is pending from an interlocutory order … that grants . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." The decision to stay a preliminary injunction pending appeal is "'an exercise of judicial discretion,' and 'the propriety of its issue is dependent upon the circumstances of the particular case.'" *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian R. Co. v. United States*, 272 U.S. 658, 672–73 (1926)). However, this discretion "'does not mean that no legal standard governs that discretion[.]'" *Nken*, 556 U.S. at 434 (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005)). The Court's discretion, rather, should be guided by "legal principles" that "have been distilled into consideration of four factors:"

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
> (2) whether the applicant will be irreparably injured absent a stay;
> (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and
> (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

    **II.**    **The Order will Very Likely be Reversed on Appeal**

        **a.**  **The Court May Not Enjoin a Party that Has Not Violated Anyone's Rights**

       The Order enjoins "Attorney General Hector Balderas . . . from prosecuting [VRF] under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs." (Doc. 51 at 210) Yet there has been *no suggestion*—let alone a finding—that the **Attorney General** has violated VRF's (or anyone else's) rights, nor has the Court held that either Section 1-4-5.5 or 1-4-5.6 is unconstitutional. Therefore, the Order will very likely be reversed or vacated.

       Under 42 U.S.C. § 1983, this Court may enjoin "[e]very person who, under color of any statute, . . . custom, or usage, of any State . . . *subjects, or causes to be subjected*, any . . . person within the jurisdiction thereof *to the deprivation of any rights*, privileges, or immunities secured by the [federal] Constitution and laws[.]" (emphasis added) When sued in their official capacities for injunctive relief, the Secretary is one such person, and the Attorney General is a *separate* person. *See Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71 n. 10 (1989) ("[A] state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State." (internal quotation marks and citation omitted)). They are *not* the *same* person. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Id.*, 491 U.S. at 71. Because the Attorney General's Office and the Secretary of State's Office are two separate offices, *see* NMSA 1978, §8-4-1 *et seq.* and §8-5-1 *et seq.*, the Attorney General and the Secretary of State are two separate persons for purposes of Section 1983.

It follows that the Attorney General must be found to be separately liable under Section 1983 for an injunction against him to stand. It is a "well-established rule that federal judicial powers may be exercised only on the basis of a constitutional violation." *Rizzo v. Goode*, 423 U.S. 362, 377 (1976) (internal quotation marks and citation omitted). Where, as here, the Court has *not* found that the Attorney General "has deprived [VRF] of any rights[,] . . . this case presents no occasion for the District Court to grant equitable relief against [the Attorney General.]" *Id.* Rather, where the "uncontroverted evidence demonstrates that a [party] played no meaningful role in the [alleged violation,]" a Section 1983 claim against that party fails. *Field Day, LLC v. County of Suffolk*, 799 F. Supp. 2d 205, 214-15 (E.D.N.Y. 2011). Stated differently, to be subjected to a preliminary or other injunction, the official being sued must be "*both responsible for* a constitutional deprivation and able to implement, in their official capacity, the equitable relief requested[.]" *D'Iorio v. Delaware County*, 447 F.Supp. 229, 238 (E.D. Pa. 1978), reversed on other grounds in 529 F.2d 681 (3d Cir. 1978). On the other hand, when "nothing improper is alleged to have been done by [a party,]" as is the case with the Attorney General here, and where, as here, that party does not "have any constitutional or statutory power over the Secretary of State[,]" a Section 1983 claim against said party must be dismissed. *Janda v. State*, 388 F.Supp. 568, 571-72 (N.D. Ill. 1972). *See also Derrick v. Ward*, 91 F. App'x 57, 62 (10th Cir. 2004) (affirming dismissal of Section 1983 complaint against a person where "[t]here are no allegations that [said person] committed any violations[.]"); *Grant v. Cnty. of Los Angeles*, 765 F.Supp. 2d 1238, 1254 (C.D. Cal. 2011) (granting summary judgment in Section 1983 case premised on unlawful arrest in favor of non-arresting officers, because "[plaintiff] has not offered any authority

establishing that  non-arresting defendants can be liable for an arrest in violation of the Fourth Amendment[.]").

Again, the Court's thorough Order does not contain a single finding of a violation by the Attorney General, and despite making every effort to identify a theory of liability that would support VRF's requested relief, *see, e.g.* (Doc. 51 at 173, 180-81, 185-86), the Court has found none with respect to the Attorney General. Not only has the Attorney General not violated any of Plaintiffs' rights, but the Court has also not found that Sections 1-4-5.5 and 1-4-5.6 are unconstitutional. *See* (Doc. 51 at 172-78, 194-98, 198-204) As such, the Court has no authority to enjoin the Attorney General from prosecuting *anyone* under those Sections, including VRF.

Further, while the Order also enjoins the Secretary from prosecuting VRF under the two statutes, *see* (Doc. 51 at 210), the Secretary lacks any prosecutorial powers, and this aspect of the preliminary injunction is meaningless. *See D'Iorio*, 447 F.Supp. at 238 (to be subjected to a preliminary or other injunction, the official being sued under Section 1983 must be "*both responsible for* a constitutional deprivation *and able to implement*, in their official capacity, the equitable relief requested") (emphasis added); *see also* (Tr. Vol. 1, 129-130; Tr. Vol. 2, at 19, 127) (the Secretary is not a law enforcement agency; any suspected violations are referred to the Attorney General.). In addition, under the Eleventh Amendment and the doctrine of *Ex parte Young*, "[t]he injunctive relief requested . . . must provide prospective relief for an *ongoing* violation." *Machon v. Pennsylvania Dep't of Pub. Welfare*, 847 F.Supp. 2d 734, 744-45 (E.D. Pa. 2012) (emphasis added) (citing *Va. Office for Prot. & Advocacy v. Stewart,* 563 U.S. 247, 255 (2011). The Order contains no findings of an *ongoing* violation.

For the foregoing reasons, the Court should hold that Defendants have made the requisite "strong showing" that the Order will be reversed or vacated on appeal.

>    **b. The Court May Not Base a Preliminary Injunction on a Novel Substantive Theory of Liability Not Raised or Addressed by the Parties.**

It is a basic principle of due process that every party is entitled to notice and a reasonable opportunity to be heard. These rights are unquestionably violated where, as here, a court assumes the role of advocate for one side and grants injunctive relief on the basis of a novel substantive theory of liability *not* advanced by any party and without giving the adversely affected parties *any* opportunity to respond.

Without providing a citation to the record, the Order states that "[t]he Plaintiffs are challenging [ ] the Secretary of State's *referral* of Voter Reference to the Attorney General for criminal prosecution under N.M.S.A. § 1-4-5.6 as a prior restraint[.]" (Doc. 51 at 185) (emphasis added). The Order then proceeds to conclude that Plaintiffs are likely to succeed on the merits of this claim, because "the Court sees no meaningful distinction between a law, regulation or judicial injunction that suppresses speech and a publicized criminal referral that does the same." *Id*. at 186. In reality, Plaintiffs have ***never*** raised this claim or made any arguments that could reasonably be interpreted as advancing such a novel interpretation of the prior restraint doctrine.

In the Complaint, Plaintiffs alleged only that "the *Use Restrictions* operate as prior restraints which violate Plaintiffs' First Amendment rights[.]" (Doc. 1 at 26) (emphasis added); *see also id.* at 23 ("The Use Restrictions' wholesale prohibition on distributing voter data . . . operates as a presumptively invalid prior restraint on speech."); *id.* at 24 ("The Use Restrictions operate as a de facto licensing system."); *id.* at 25 ("Alternatively, if the Use Restrictions do not

operate through a de facto licensing, permit, or administrative scheme . . .  the Use Restrictions give rise to equally serious concerns."); *ibid.* ("The Use Restrictions specifically prohibit Plaintiffs from publishing and receiving information about voting and electoral processes . . . . A prior restraint on disseminating information . . . is a core concern of the First Amendment."). In fact, Count II of the Complaint—captioned, "Violation of First Amendment Prior Restraint,"—does not contain a single *mention* of the referral, let alone the theory of liability announced by the Court for the first time in the Order.

The same is true of the motion for preliminary injunction, *see* (Doc. 4 at 16) ("The Use Restrictions are presumptively invalid prior restraints.") and *id.* at 24 ("[T]he Use Restrictions are unconstitutional as prior restraints on core protected speech."); the arguments advanced during the hearings on the motion for preliminary injunction, s*ee* 05/17/2022 and 06/15/2022 Transcripts of Hearings (Plaintiffs do not discuss "prior restraint" claim) and *Preliminary Injunction—Plaintiffs' Argument June 15, 2022* power point presentation (Doc. 42 at 9) ("Legal Issues: Merits . . . Prior Restraint: *de facto* licensing regime); and all subsequent filings, *see Plaintiffs' Proposed Findings of Fact and Conclusions of Law* (Doc. 47 at 76) ("Plaintiffs' challenge to the Secretary of State's voter data request process as a de facto licensing system and prior restraint on speech."), *ibid.* ("the prohibition on distributing voter data, except as preapproved by the State, operates as a presumptively invalid prior restraint on speech"), *id.* 77 ("the Data Sharing Ban still allows the Secretary to reject otherwise lawful requests based on unknown, ad hoc factors. It therefore operates as a de facto licensing system"), and *id.* at 78 ("In the case of a prior restraint, strict scrutiny applies. As discussed above in the Court's analysis of Plaintiffs' challenge to the Data

Sharing Ban as having been motivated by a discriminatory animus against the content and viewpoint of Plaintiffs' speech, the Data Sharing Ban fails strict scrutiny.").

In fact, far from asserting that the publicized referral was a prior restraint, Plaintiffs have repeatedly complained that the Secretary did not inform them of the referral, essentially arguing that *more* broadcasting was in order, not less. (Doc. 1 at 15, Doc. 47 at 43, Doc. 51 at 79)

Because the Court's own theory of liability premised on a novel interpretation of the doctrine of prior restraint was disclosed for the very first time in the Order granting a preliminary injunction, the Secretary and the Attorney General never had *any* opportunity to respond to it and were denied their most fundamental due process rights to notice and an opportunity to be heard. *See generally Day v. McDonough*, 547 U.S. 198, 210 (2006) ("Of course, before acting on its own initiative, a court must accord the parties fair notice and an opportunity to present their positions."); *Brooks v. Commissioner*, 424 F.2d 116, 119 (5th Cir. 1968) ("The Tax Court based its decision on a novel theory of capitalization which was not raised, briefed or argued by either party. . . . In the usual circumstances we would reverse and remand do that . . . both parties may be given an opportunity to brief and argue the merits of this new theory."); *McKee by McKee v. Evans*, 551 A.2d 260, 272 (Pa. 1988) ("Nor may the trial court *sua sponte* interject novel theories in to the charge which have not been propounded by the parties."); *Schwegel v. Milwaukee Cnty.*, 859 N.W.2d 78, 95 (Wis. 2015) ("When a court raises an issue *sua sponte*, fairness requires that the parties have the opportunity to develop the relevant facts and to present legal arguments on the issue.") (internal quotation marks and citation omitted) (Abrahamson, C.J., dissenting). *See also Attorney's Title Guar. Fund, Inc. v. Town Bank*, 850 N.W.2d 28, 40 (Wis. 2014) (Bradley, J., dissenting) ("By raising *sua sponte* a brand new outcome-determinative issue, [a court] tends to

blur the lines between the role of the lawyer as advocate and the role of the judge as impartial

decision maker."); *Cemetery Servs., Inc. v. Wis. Dep't of Regulation & Licensing* 586 N.W.2d 191,

(Wis. App. 1998) ("We cannot serve as both advocate and court. For this reason, we generally

choose not to decide issued that are not adequately developed by the parties in their briefs.").

Because the Court denied Defendants their right to due process, the Order should be stayed, as it

will very likely be reversed on appeal.

### c. The Court Misinterpreted the Secretary's Denial of VRF's May 27, 2022 Request for Voter Data

On May 27, 2022, VRF submitted its first and only request for voter data in compliance

with Section 1-4-5.5. (Doc. 44-35 at 43) Along with the Voter Information Authorization form,

VRF's attorney in this matter submitted a letter, stating in relevant part,

> [J]ust as VRF publishes *voter data* for many other states, and as it recently
> published *voter data* in New Mexico, VRF intends to publish the requested
> information online for election related purposes, but it will only publish the
> personal information of voters online if VRF is granted relief in [this matter] or in
> any other legal proceeding.

*Id.* at 38 (emphasis added). Therefore, VRF explicitly informed the Secretary that it intends to

publish *some* voter data on its website, in direct violation of the Election Code. *See* Section 1-4-

5.6 ("Each and every unlawful use of *voter data* . . . constitutes a separate [fourth degree felony]")

(emphasis added); *see also* Section 1-4-5.5(E)(5) (defining "voter data" as "selected information

derived from the voter file"). Specifically, while the letter stated that VRF "will only publish the

personal information of voters online if VRF is granted relief [in this matter,]" (Doc. 44-35 at 38),

Section 1-4-5.6 does not merely prohibit the publication of whatever VRF determines is "the

personal information of voters."[2] Rather, it prohibits the publication of "voter data," some of which

VRF admitted it intends to publish online. (Doc. 44-35 at 38) ("just as VRF published *voter data*

for many other states, and as it recently published *voter data* in New Mexico, VRF intends to

publish *the requested information* online[.]") (emphasis added).  For this reason, in its response on

June 16, 2022, the Secretary stated in relevant part,

> As you know from [this litigation] and otherwise, it is our position that publishing
> *any* New Mexico voter data on a website is a violation of the New Mexico Election
> Code that carries criminal liability. As such, we believe it prudent to delay
> production of this data at this time; we will either fulfill the request or formally
> deny it based on the outcome [in this matter,] including any appeal. *See* NMSA
> 1978, § 1-20-15 ("Conspiracy to violate the Election Code consists of knowingly
> combining, uniting or agreeing with any other person  to omit any duty or commit
> any act, the omission of which act, or combination of such act, would by the
> provisions of the Elections Code constitute a fourth degree felony.")

(Doc. 43 at 77, Plaintiff's Exhibit 15)[3] (emphasis in original) Therefore, contrary to the Order's

conclusion, the Secretary did not decide "not to take Voter Reference at its word that it will not

use the data contrary to the Secretary of State's interpretation of [ ] § 1-4-5.5[.]" (Doc. 51 at 181)

To the contrary, the Secretary *did* take VRF at its word that it plans to upload *some* voter data on

its website—namely, all voter data VRF receives pursuant to its May 27, 2022 request that VRF

unilaterally determines does not constitute "personal information of voters." Again, the Election

Code prohibits the publication of "voter data," not "personal information of voters." *See* §§ 1-4-

5.5(E)(5) and 1-4-5.6. Therefore, the Order is premised on a misinterpretation of both the facts and

the law and will likely be reversed on appeal.

---

[2] The letter did not define "personal information of voters." (Doc. 44-35)

[3] A copy of Plaintiff's Exhibit 15 is attached hereto as Exhibit A. By apparent oversight, it was
omitted from Doc. 44, and an additional copy of State's Exhibit 9 was erroneously included in its
stead. *Compare* (Doc. 44-27 and 44-35)

### III.     The Remaining Factors All Weigh In Favor of a Stay

Defendants have made a "strong showing" that the Order will likely be reversed or vacated on appeal. *See supra*; *see also Nken*, 556 U.S. 434; *Hilton*, 481 U.S. at 776. The other crucial consideration in determining whether to stay an injunction pending appeal is any irreparable injury to the stay applicant. *Nken*, 556 U.S. 434. Indeed, the Supreme Court has characterized the likelihood-of-success factor and the irreparable harm factor as "the most critical" considerations for a court deciding a motion to stay pending appeal. *Nken*, 556 U.S. at 434.

When the government is a party, the public interest factor merges with the government's equitable interest. *See id.* at 435 (public interest factor merges with injury to government when government is party opposing the stay); *Sierra Club v. Trump*, 929 F.3d 670, 704–05 (9th Cir. 2019) (noting that in the "variant" on the situation in *Nken*, where it is the government "who seek[s] a stay, … the question of whether Defendants will be irreparably injured absent a stay, may in practical terms, merge with consideration of the public interest").

"'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)); *cf. Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006) ("We have repeatedly stated that such an invasion of tribal sovereignty can constitute irreparable injury."). This is particularly true given that the Attorney General has not committed *any* violation of law. *Cf. Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1073 (7th Cir. 2018) ("When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with the well-established rule that the Government has

traditionally been granted the widest latitude in the dispatch of its own internal affairs." (quoting *Rizzo v. Goode*, 423 U.S. 362 (1976)).

The public interest likewise weighs heavily in favor of a stay. In the Order, the Court noted,

> The Court agrees that, if there is evidence that VoteRef.com's publication of voter data eroded trust in the voter registration system, led to voters cancelling their registrations, or gave rise to incidences of solicitation, harassment, or abuse, this State interest would be important.

(Doc. 51 at 192) Since the beginning of the year, the Secretary has received 20 complaints from voters related to VRF's website—mostly from women and elderly persons—16 of which were received after VRF reposted New Mexicans' voter data on or about July 26, 2022. *See* Exhibit B.[4] Put simply, people are afraid for their safety and will cancel their voter registrations in an attempt to protect themselves and their families. *Id.* Ironically, cancelling one's registration will not result in VRF removing these individuals' names and home addresses from its website; staying the injunction would. *See* (Doc. 51 at 26, 79, 162, 189)

Since the Order was issued, the Secretary of State's Office has also received inquiries from the New Mexico Administrative Office of the Courts, the New Mexico Department of Corrections, and the United States Marshalls Services, all seeking (in vain) ways to protect the safety of their respective public servants, including judges, prosecutors, corrections officers, parole officers, and law enforcement officers.

Last but certainly not least, the Order violates New Mexico public policy by depriving New Mexicans of their rights under the Confidential Substitute Address Act, NMSA 1978, §§ 40-13B-

---

[4] Undersigned counsel has redacted the complainants' identifying information to protect their safety and privacy.

1 to -9, also known as the Safe at Home program. Under that Act, participants in the program are only required to disclose their status as such to the Office of the Secretary of State and state agencies that require a resident's address. *See* NMSA 1978, §§ 40-13B-3(A) and (B), 40-13B-5(A). Because of the Order, however, any New Mexicans whose home addresses are included in the April 2021 voter data that is currently on VRF's website and who have since entered the Safe at Home program or do so in the future, in addition to being at an extreme danger, are now forced to disclose their participation in the program to VRF in order to be removed from VoteRef.com. Per the website, "[u]pon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com." (Doc. 51 at 21) VoteRed.com offers no other option for removal. VRF, however, has no legal right to demand such "official documentation," at the very least because the law requires extensive background checks and training for people who do have access to this information. *See* NMSA 1978, § 40-13B-8(C) (establishing background check and training requirements for staff with access to program related records).

For all the foregoing reasons, the public interest and irreparable harm factors weigh heavily in favor of a stay. On the other hand, VRF will not suffer any injury from a stay, as it cannot and does not have a valid interest in an unlawful injunction.

### IV. Conclusion

For the foregoing reasons, the New Mexico Secretary of State and Attorney General respectfully request that the Court stay its preliminary injunction pending appeal.

Respectfully submitted,

HECTOR H. BALDERAS
New Mexico Attorney General

By: */s/ Olga Serafimova*

Olga Serafimova
Senior Civil Counsel
Post Office Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-40
oserafimova@nmag.gov

*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 19, 2022 I served a true and correct copy of the foregoing *Defendants' Proposed Findings of Fact and Conclusions of Law* on all counsel of record via the ECF system.

*/s/ Olga Serafimova*

# EXHIBIT A

**EXHIBIT P 15**



STATE OF NEW MEXICO

**MAGGIE TOULOUSE OLIVER**

SECRETARY OF STATE

June 16, 2022

*Via Electronic Mail Only*

Edward D. Greim
1100 Main St., Ste 2700
Kansas City, MO 64105
Email: EDGreim@gravesgarrett.com

**Re:    Response to Notice of Violation of NVRA**

Mr. Griem:

On May 27, 2022, our Office received your Notice of Violation of the National Voter Registration Act ("NVRA") ("Notice"). In the *Notice*, you allege a violation of 52 U.S.C. § 20507(i)(1). You allege that Voter Reference Foundation ("VRF") made a NVRA request for records via email on February 15, 2022. *See Exhibit. A of the Notice* Specifically, the email stated:

> "Dear Election Official,
>
> Please provide us with the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021."

The February 15 email was not a request for a record that is maintained by our Office; rather, it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to be aggregated and analyzed. Such an inquiry would require our Office to conduct research, aggregate data from multiple sources, generate a report, and potentially separate protected information from such report. While under the NVRA our Office must allow for the inspection of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," this is not a requirement that compels an agency to create new records. 52 U.S.C. § 20507(i)(1). Indeed, both state and federal courts have held as such regarding records request. *See* NMSA 1978, § 14-2-8(B) ("Nothing in the Inspection of Public Records Act shall be construed to require a public body to create a public record."); *Forsham v. Harris,* 445 U.S. 169, 186 (1980) ("FOIA imposes no duty on the agency to create records.). Therefore, your assertion that we

violated the NVRA with respect to the February 15, 2022 email is incorrect.

In addition, in your *Notice* you have requested the following information:

> 1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

> 2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

As with the February 15 email referenced above, Item #1 is not a request for a record, as we do not maintain a list such as the one described therein. As such, we consider both requests closed under the NVRA and, to the extent applicable, IPRA.

With respect to Item #2 and the Affidavit you submitted as required by New Mexico law, in the *Notice*, VRF states that it "intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding." *Notice* at 4. As you know from the Federal Litigation and otherwise, it is our position that publishing *any* New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability. As such, we believe it prudent to delay production of this data at this time; we will either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal. *See* NMSA 1978, § 1-20-15 ("Conspiracy to violate the Election Code consists of knowingly combining, uniting or agreeing with any other person to omit any duty or commit any act, the omission of which duty, or combination of such act, would by the provisions of the Election Code constitute a fourth degree felony.").

Respectfully,

*/s/ Dylan K. Lange*
Dylan K. Lange
General Counsel
The Office of The New
Mexico Secretary of State

cc:   Edward Greim
      Rebekah Badell
      Carter Harrison, IV
      Sharon Pino

# EXHIBIT B

*On Jan 25, 2022 @ 11:12 pm,* ████████ *@gmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.

Hello my name is ████████ and I am requesting to have my name and address and private address removed from your website immediately. My physical safety is at risk having this information made public. Please address this important issue. Thank you very much.

████████

Albuquerque, NM 87109

505-████████

I did a google search of my name ████████ and on page 2 of the google search the voter website showed up: https://voteref.com/voters/████████

---

*On Jan 30, 2022 @ 06:31 pm,* ████████ *@nmsu.edu wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
To Whom It May Concern:

I am writing to you because I am concerned that addresses and partial birthdates of New Mexico voters including myself are being publicly shared online by the voteref.com, a subsidiary of a conservative pro-Republican Restoration PAC without voters' knowledge and permission. In the age of multiple concerns about continuous identity fraud and hacking by institutions and individuals who are trying to meddle in elections, it is not prudent to release voter records to partisan groups who did not notify voters of requesting and receiving their personal and political affiliation data. I would appreciate if your office would request to remove identifying data from all sites including voteref.com that display it publicly without knowledge and permission of New Mexico voters. I am including a few web links related to voteref.com and Restoration PAC. Please let me know.

Sincerely,

████

---

*On Apr 12, 2022 @ 06:31 pm,* ████████ *@gmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
If my voting information goes into the VoteRef.com database, I'll be deregistering immediately.

This email is confidential and is not to be disseminated for any purpose or in any manner.

--
████████
Licensed Clinical Social Worker
████████
Tucumcari, NM 88401
575-████
FAX: 575-████
████████.com

---

*On Jul 08, 2022 @ 11:04 am,* ▮▮▮ *@hotmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
To Whom It May Concern:

I am writing to seek your help with getting the state of Virginia's support in limiting the public distribution of voter information, including on VoteRef.com.

Disclosing the personal information of voters so publicly without consent, with disregard to maintaining accuracy is a slippery slope for the American public. Currently, the name, address, full date of birth, and voting details of registered voters are posted on VoteRef.com. While not ideal, we canceled our voter registration in VA to protect our privacy/PII. The foundation, however, still has not removed our data after a month of correspondence. Seeing that the foundation has removed New Mexico voter data temporarily due to the state's management of voter data, I'm looking for help on how to reach the appropriate people in my state. I have contacted the VA Governor and Secretary of State through their respective site, but no response has been received. As an article quoted the New Mexico Secretary of State, "[the purpose of the Voter Reference Foundation] is to intimidate voters and make folks become concerned about the security of their information, to potentially cause voters to de-register and not participate in our process." Our household are examples of these sentiments.

We are asking for your help in reaching the right people in Virginia so it takes a similar stance on the protection of voter rights and prevent any organization, such as Voter Reference Foundation, from publicly disclosing voter information.

Respectfully,

▮▮▮

*On Jul 26, 2022 @ 12:19 pm,* ▮▮▮ *@gmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
Good afternoon,

I was shocked and infuriated to read about https://news.yahoo.com/us-judge-oks-online-publication-235506359.html, and in looking in to their website I have noticed that they are not blocking non-US IP addresses from accessing their site and obtaining as much information as is available. While I reside in California, if I were a New Mexico resident, or any other state that has records visible there, I would be DEMANDING action on this.

Thanks for your attention,

▮▮▮

*On Jul 27, 2022 @ 03:23 pm,* ▮▮▮ *@montana.edu wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.

I just read the ABQ Journal article about VoteRef.com. I am registered to vote in NM but previously voted in MT. Since voter data for NM are not yet on the VoteRef.com website, I went to the MT state list and discovered that I am listed there. The data includes my full name and address (previous) as well has my voting history.

With further investigation I learned that I cannot opt-out of this database.

I find this very unethical and I hope NM will continue to resist participation in this database. I feel I could be

threatened having my full name and address listed publicly. In theory, anyone with a grievance against me could conceivably come to my home, day or night, to threaten violence on me or my family. This should be illegal, and I hope your office will work to put this organization out of this kind of business.

Thanks for your attention to this issue.

██

████████, Ph.D.

████@montana.edu

406-████████

---

On Jul 27, 2022 @ 02:52 pm, ████████ *@pm.me wrote:*

Yesterday afternoon late I saw a post online  about this company listing the names and addresses of all voters, including New Mexico. This morning I checked their listings and sure enough, my name and my husband's name and address were listed on that website. I am feeling sick to my stomach over this; it is so scary. Here is why.

A little over 3 years ago we moved from the ████████ area to ████████ for our own protection. I have a son ████████) who is almost 63 years old and he has a mental disorder for which he has been receiving treatment off and on for years. About four years ago he became violent, fired his therapists, got fired from his very lucrative job as a software engineer, and just lost control.

Within a few months my daughters in other states became so concerned about the things he was writing on the internet that they called the local police who came and did a wellness visit to make sure my husband and I were OK. The threats became more frequent, and we made plans to move away. While in that process, I reported his threats to the ████████ department that handles those kinds of issues against senior citizens but they did nothing. During this time frame we drove to ████████, found a house to buy and made arrangements for the move (at a significant monetary loss). We did not tell him we were leaving or where we were going. Soon after we arrived here, we were informed by his ex-wife that he was making threats to kill us, especially me. We visited a police substation here in ████ and they had a police officer come over and talk to us about what we could/should do  to protect ourselves.  Meanwhile, in ████████, he contacted his doctors' answering service and told them he was going to kill us. They notified the police and they found him in ████████, ████ (a suburb of ████████) and arrested him. They put him in a psychiatric hospital for a couple weeks and then let him out.

When that ████ police office visited us, I showed him some of the things ████ was writing online. He recommended that we needed to get some guns to protect ourselves and recommended a shop that they use and gave a brief recap of the laws regarding self protection. We did that (I cried while we were buying the guns, I was so upset that we had to do this.) We took lessons and were licensed for concealed carry. He also said not to get a restraining order because then ████ would know what city we were in.

Meantime, we stayed in touch with his ex-wife and our granddaughter in ██ but they did not know where we were. We were told how he was now living in a camping trailer, and talking bad against us. They told me that nothing much had changed, he continues to get violent, and not too long  ago destroyed more than $10,000 worth of his neighbor's property. He was arrested for that  and detained for several days until he could raise bail. I don't know if that case is settled yet.

**Then, about a week ago his ex-wife called and said that their 9 year old daughter had stayed overnight with him and he was asking her if she knew where we live.** She didn't know, then he accused me of "abusing him" when he was a child and she was upset about that and wanted to talk to me to find out if it was  true. I assured her I had never abused him, if anything I should have been tougher. She knows he has mental health issues and remembered how he literally destroyed their house before her mom and he got divorced, so she could relate.

Then yesterday, I saw that VOTEREF.COM was going to post all New Mexico voters names and addresses online and that one of the judges here, U.S. District Court Judge James Browning, has said they could do that. That really upset me, so I checked their website and sure enough, my husband and I are listed online on their website and at our current address of ███████████████████

So, we are back to being scared to death that he can find us. I have done everything I can to keep this info from him, including using a VPN on our computer and devices that shows our location as in other cities in the US. As a software engineer, ██████ has knowledge about how to deep dive into internet hiding places and I am as careful as I can be. But THIS INCIDENT WITH VOTEREF.COM has really got me and my husband scared to death, knowing that it is now easy for him to find out where we are and once he has that info, he has every intention of taking our lives. I am going to be 86 in another 6 weeks and my husband is 81; we are too old  to make another long distance move. It just takes too much out of us, and it would not be necessary if not  for this notion that everybody in this country, including insane people with a grudge, can find anybody they want to.

Respectfully,

███████████████

---

On Jul 27, 2022 @ 12:50 pm, ████████ *@comcast.net* wrote:

To whom it may concern:

We were just made aware that our personal voter information, including: Name, address, voting record and party affiliation, are available for anyone to view online via an order from Albuquerque-based U.S. District Court **Judge James Browning.**

## US judge OKs online publication of New Mexico voter records

https://www.kob.com/news/us-and-world-news/us-judge-oks-online-publication-of-new-mexico-voter-records/

**We DO NOT want such info online—for any reason EVER!**

It is **NO ONE'S BUSINESS** what our, or anyone's, **PERSONAL INFO, VOTING RECORDS OR PARTY AFFILIATIONS ARE!**

**This is an outrageous violation of voter privacy and clearly a method to try to intimidate voters!**

Kindly tell us how to OPT OUT and remove our names and all info from these databases.

Sincerely,



█████████

Santa Fe, NM

---

*On Jul 29, 2022 @ 08:13 pm,* ████████ *@gmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
Hi,

We need more protection from harassment than A GOOGLE SEARCH. I know that the records are public, but that does not mean they should be accessible from anywhere by anyone. Please act to correct this threat.

█████████

87120

Hello,

I just added my name to this critical petition demanding privacy of voter registration information. Take a look and sign your name too! https://progressnownm.actionkit.com/sign/protect-voter-privacy-now/?referring_akid=.316230.RxcJi1&source=mailto

---

*On Aug 04, 2022 @ 07:44 am* ████████ *@gmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
Good morning,
I am very concerned about the invasion of privacy publication of voter registration information could pose to voters.
It can also endanger victims and surviors of domestic violence.
It would also make it easy for groups to target and intimidate voters or potential voters.
Please pursue whatever paths are available to protect our privacy and safety.
Thank you,
█████████
Ruidoso, NM

---

8/4/2022

Phone Call: ████████. Adding to tracking sheet for awareness internally. Individual has not consented to name, contact info, or concerns being shared externally. Greetings CAP,

I am alarmed to find my name, address, party affiliation and voting precinct available, at no cost, for indiscriminate public review via VoterRef.com and in affiliation with the NM SOS website.

I'm aware this information was previously available for a fee and used by pollsters. I object to the rationale behind making this Information freely available. Even states that complained about election fraud (GA, Fl...) did not respond by releasing party affiliation. The user disclaimer that begins with the paragraph below is inadequate to prevent malpractice.

VoteRef.com provides on-demand public access to voter registration records collected from state and local election officials.

Our mission is to ensure fair elections by providing voters with full transparency and easy access to voting records, which historically have been difficult to obtain.

VoteRef.com is for election-related, noncommercial use and for users based in the United States only. Before accessing the site, please read our Terms of Service and agree you will abide by them by clicking on the Accept button below.

I no longer meet the Safe At Home eligibility requirements, published on the SOS website, that could afford me and my special needs daughter some protection from my abusive ex-husband. However, our need for safety and privacy will never end. As a reminder, not all victims of abuse can document their abuse with something like a court order. The process established by NM SOS to meet Safe At Home is particularly burdensome for survivors and should be abandoned. No one should have to prove they need safety. The scrutiny around this information should be placed on those requesting access to personal info, not on those who just want to be left in peace.

Additionally, Bernalillo and Los Alamos Counites have a significant portion of voters who also work for the National Labs. Safety-sensitive employment encourages anonymity in political matters. No information that could be used as leverage or used as a way to doxx or harass these kinds of employees should be made available by a government agency like the NM Secretary of State's office.

Please immediately remove my name, address and party affiliation from publication. Otherwise, I will cancel my voter registration. I resent being forced in to a tradeoff between personal safety and exercising my voting rights.

Thank you for promptly attending to this matter.

8/3/2022

Phone Call: ███████. Lifelong Republican, angry that her information is being published. Initially concerned about identity theft, also concerned about her ex-husband

8/3/2002

Phone Call: Anonymous - Why does this guy in Illinois get away with requiring public information on residents in New Mexico when his own state does not? From article on KOB,
"The foundation — backed by former GOP Senate candidate Doug Truax of Illinois — took its New Mexico records offline in response and sued the state in federal court, alleging violations of due process and free speech guarantees."

8/3/2022

Good afternoon,

Colorado has had extremists harrass citizens regarding settled elections. These extremists have intimidated citizens. Will I answer my doorbell with a cocked firearm ready to send a Fascist to their judgement? Will I be forced to use violence to ensure my right to privacy?

████████

Aztec, NM

---

7/29/20222

Phone Call – ████  ████: Voter in Hobbs, NM; does not consent for phone # to be shared beyond our office but ok with SOS Legal reaching out for clarification: 575-████  Concerned about online publication of voter records, because she is 1) a single person, a widow living alone and concerned for her safety, 2) does not want DOB, street address published, 3) "has a right for protection of all that stuff because I don't want to be a victim of intruders. I don't want people to know my street address", and 4) Personal info shouldn't be publised publicly "I don't think my date of birth, addresses, voting history, or any of that information should be public knowledge." Expressed that confidentiality is a priority, and is considering stopping voting to protect her privacy

---

07/29/2022

Phone Call – ████: Adding to tracking sheet for awareness internally. Participant has not consented to name, contact info, or concerns being shared externally. Phone Call: Returned call to ask if SAH provides or knows of funds available for relocation. While address on VoteRef is not their current residence, it is close to her current address. Based on her stalker's past behavior and the fact that VoteRef initially posted their data about a year ago, she is confident that she and her child need to relocate for their safety.

---

07/28/2022

Phone Call – ██████: Phone Call: Wants his information removed if possible - "I am an old man and I do not want people with that Cheeto puff showing up at my house with Nazi flags"

*On Aug 03, 2022 @ 08:57 pm,* ████████ *@gmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
Hello,

I know that addresses are being released onto voteref.com (https://voteref.com/) . I just recently changed my voter registration to my new address and therefore that is not on the website yet, however, I am afraid it will soon be released.

I do not qualify for the Safe at Home because although I fear for my life, I did move more than 90 days ago. Is there anything else I can do or is canceling my registration the only way?

Thank you

---

*On Aug 03, 2022 @ 07:42 pm,* ████████ *@gmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
Why are our birth years provided to voteref.com?

---

*On Aug 15, 2022 @ 09:07 am,* ████████ *@gmail.com wrote:*

CAUTION: This email originated outside of our organization. Exercise caution prior to clicking on links or opening attachments.
To our distinguished Sec. of State Maggie Toulouse Oliver:
As a senior citizen, I am personally and gravely concerned about the publication of voter registration information as described in  The Albuquerque Journal  recently, especially in view of the threat of violence against federal officers, ie) FBI, now trending.
My late husband of 57 years served as an officer of the law in ██████ Co., and we were always cautious not to have our personal information available to the public due to possible retribution on our family or home by former criminals he had arrested.
Also, I live in a  Proudly Red  neighborhood where there are already signs for Trump 2024 in some yards of our community. During the last election my Democratic signs were stolen. An elderly friend of mine had his signs stolen and car tires wrapped with barbed wire at night. I live alone.
Kudos for your continued good work in protection of voter laws and voters! Keep it up.
Respectfully Yours,
████████████
████████ .
Ruidoso, NM 88345