**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **Voter Reference Foundation, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | **CASE NO: 22-cv-00222-JB-KK** |
| v. | ) | |
| | ) | |
| **Hector Balderas,** in his official capacity as | ) | **PLAINTIFF'S VERIFIED** |
| New Mexico Attorney General, | ) | **FIRST AMENDED COMPLAINT** |
| | ) | |
| and | ) | |
| | ) | |
| **Maggie Toulouse Oliver,** in her official | ) | |
| capacity as New Mexico Secretary of State, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S VERIFIED FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

**COMES NOW** Plaintiff Voter Reference Foundation, LLC ("VRF"), by and through undersigned counsel, and for its First Amended Complaint against the above-named defendants, states as follows:

1.      Plaintiff VRF is a nonprofit organization dedicated to increasing voter participation in elections while protecting election integrity. In service of those goals, VRF engages in political speech regarding states' maintenance of accurate voter rolls. Specifically, VRF files requests with state officials to obtain data showing who has voted in recent elections and showing how state officials are maintaining their voter lists. This data is publicly available under the National Voter Registration Act ("NVRA"). VRF then analyzes the state data, engages in political speech on its website, and makes its data available to the public on its website. This means that interested citizens in New Mexico and many other states, provided that they contract with VRF to verify they are not using the data for unlawful purposes, can search public records of voting histories on VRF's

website. This allows participants to compare state records of who has voted, where, and when, with their own sources of information. Citizen-participants can then engage in political speech with each other and with VRF concerning the accuracy and maintenance of the voter rolls, and can contact their own election officials to help correct inaccurate or outdated information.

2.     To the Defendants, this is a dangerous criminal conspiracy. On March 7, 2022, Defendant Secretary of State Maggie Toulouse Oliver publicly declared that VRF's data-sharing speech was criminal under New Mexico law. On that date, ProPublica published an article criticizing VRF's efforts to provide transparency and increase voter participation through its campaign of publishing voter information across the nation (the "Article"). A copy of the Article is attached hereto as Exhibit A and is incorporated by reference. *See* Ex. A, "Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques," available at: https://www.propublica.org/article/voter-ref-foundation.

3.     The Defendant Secretary further disclosed that in December 2021, she had referred the matter to Defendant Hector Balderas, New Mexico Attorney General. This litigation has revealed that Balderas enthusiastically began to investigate VRF, and in this very proceeding has claimed that it is his right and duty to prosecute VRF under New Mexico law.

4.     Since the inception of this case, the Defendants have taken the position that *any* sharing of voter data for *any reason* is unlawful. In New Mexico, voter data is publicly available to requestors to use for "governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." § 1-4-5.5(C). The unlawful use of voter data "consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." N.M. Stat. § 1-4-5.6(A). A person or organization who unlawfully uses voter data is guilty of a fourth-degree felony and upon conviction shall be fined one hundred dollars

($100) for each and every line of voter information that was unlawfully used. § 1-4-5.6(B). A fourth-degree felony is punishable by up to 18 months imprisonment. § 31-18-15(A)(13).

5.      Aside from referring and threating Plaintiff VRF with prosecution, Defendants have also conspired to violate the NVRA by permanently blocking Plaintiff from accessing any additional New Mexico voter data. Defendants first decided to cut off Plaintiff's access in response to a February 2022 request—a decision that Defendants kept secret until it was revealed in this litigation. Defendants also denied a May 2022 request while this action was pending. The NVRA preempts any reading of New Mexico law—like Defendants'—which impermissibly impedes the implementation and objectives of the NVRA. *See* Count I. Even absent preemption, Defendants violated the NVRA by failing to provide to Plaintiff documents it requested which are subject to the NVRA's public inspection provision. *See* Count II.

6.      Defendants' refusals to grant access to voter data also constitute retaliation against Plaintiff, a First Amendment violation, because these refusals were motivated by Plaintiff VRF's political speech and other First Amendment-protected conduct in requesting, using, speaking about, and sharing the voter data. *See* Count III.

7.      This case begins with VRF's federal statutory right under the NVRA to access the data, but its focus remains Defendants' threats to prosecute Plaintiff VRF for its political speech— its sharing of New Mexico voter data that is available to the public under the NVRA. The Defendant Secretary initially claimed that VRF's speech in sharing New Mexico data on its website was unlawful because VRF's speech was "impugning" the integrity of her voter rolls and spreading "misinformation." But after being sued in this matter, the Defendants took a new position: that *any* sharing of voter data between citizens or entities is unlawful, even if the data was legally obtained and regardless of the purpose for which the data is shared.

8.      Regardless of the theory Defendants cite to threaten Plaintiff, each violates the First Amendment. First, the Secretary's motivation in referring VRF for prosecution was retaliatory, and the Attorney General adopted the Secretary's animus. *See* Count III, Retaliation. Second, the Defendants are attempting to enforce a prior restraint. *See* Count IV. Third, even if it is not a prior restraint, a ban on VRF's political speech in sharing the data fails strict scrutiny and therefore violates the First Amendment. *See* Count V.  Fourth, a blanket ban on all sharing of voter data between entities is fatally overbroad because it regulates substantially more protected speech than can be justified in relation to its plainly legitimate sweep, and for that reason, too, it violates the First Amendment. *See* Count VI.

9.      In addition to the First Amendment, the Due Process Clause of the Fourteenth Amendment also protects VRF because Defendants' reading of New Mexico law to criminalize a private entity's speech in sharing voter data with New Mexico citizens is not apparent from the face of any statute. The statutes fail to give notice as to what uses are permissible and which are prohibited and fails to give notice that sharing the data is absolutely banned—the position taken by Defendants. The lack of notice in the statutes encourages arbitrary enforcement, and they are therefore void for vagueness to the extent they actually criminalize VRF's conduct here. *See* Count VII.

10.     Plaintiff VRF sues Defendants in their official capacities to obtain injunctive relief vindicating its federal statutory right to access voter data, and its First Amendment right to engage in political speech to share that data without threats, prior restraint, and retaliation. Plaintiff also seeks a declaration that its speech and conduct is lawful. *See* Count VIII.

## JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction over this case pursuant to each of the

following:

      a.      28 U.S.C. § 1331, as the action arises under the First and Fourteenth

      Amendments to the United States Constitution;

      b.      28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under

      color of state law, of rights, privileges, and immunities secured by the United States

      Constitution;

      c.      28 U.S.C. § 1343(a)(4), in that it seeks to recover nominal damages and

      secure equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983,

      which provides a cause of action for the protection of civil rights; and,

      d.      28 U.S.C. § 2201(a), in that it seeks to secure declaratory relief; and 28

      U.S.C. § 2202 in that it seeks to secure preliminary and permanent injunctive relief.

12.     Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) in that

Defendants are situated within this judicial district.

## PARTIES

13.     Plaintiff Voter Reference Foundation, LLC ("VRF") is a nonpartisan Ohio

nonprofit limited liability company and subsidiary of Restoration Action, Inc., a 501(c)(4) social

welfare organization. VRF operates the website VoteRef.com (the "Website"). VRF is dedicated

to ensuring transparent, accurate, and fair elections in the United States of America and does so,

in part, by making state voter registration information available on the Website. The purpose of

the Website is to provide public access to official government data pertaining to elections,

including voter registration rolls. The public dissemination of this information is intended to

increase voter participation and make the state's election processes more transparent. A close review of the data can show that it is wrong or was entered incorrectly. VRF encourages users of the Website to report these errors directly to the appropriate Secretary of State or clerk. This transparency fosters confidence in the integrity of the election system and thereby encourages voter participation. VRF desires to post, distribute, and otherwise share voter data available under N.M. Stat. § 1-4-5.5 on the Website so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls. VRF intends to post this information for the public to access and view free of charge. VRF believes this use would be for one of the purposes permitted by statute ("governmental or election and election campaign"). *See* § 1-4-5.5(C).

14.     Defendant Hector Balderas is the duly elected Attorney General for the State of New Mexico and, in that capacity, is responsible under state law for investigating and prosecuting violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6. *See* N.M. Stat. § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); N.M. Stat. § 1-2-2 ("The secretary of state shall… E. report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution…"); N.M. Stat. Ann. § 1-1-1 ("Chapter 1 NMSA 1978 may be cited as the 'Election Code.'"). Mr. Balderas is named in his official capacity only. The Attorney General is located and can be found in Santa Fe, New Mexico, which is within this District.

15.     The Attorney General's Office counseled the Secretary of State's Office and conspired with it to retaliate against Plaintiff and to refuse to fulfill Plaintiff's request for voter data in violation of the NVRA. Additionally, the Attorney General's Office investigated and, upon

information and belief, continues to investigate Plaintiff for its receipt, sharing, and use of voter data. The Attorney General's office has stated that it considers VRF's conduct to be criminal and that it is both "required and entitled" to prosecute VRF. When asked directly by the Court during the pendency of the above-captioned case whether it would refrain from prosecuting Plaintiff in the absence of an injunction, the Attorney General's office refused to provide that assurance.

16.     Defendant Maggie Toulouse Oliver is the duly elected Secretary of State for the state of New Mexico and, in that capacity, is the chief election officer of the state. N.M. Stat. § 1-2-1(A). The Secretary is responsible under state law for furnishing voter data to requesters and referring potential violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6, to the Attorney General for investigation and prosecution. *See* N.M. Stat. § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); N.M. Stat. § 1-2-2 ("The secretary of state shall… report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution…"); N.M. Stat. Ann. § 1-1-1 ("Chapter 1 NMSA 1978 may be cited as the 'Election Code.'"). Ms. Toulouse Oliver is named in her official capacity only. The Secretary of State is located and can be found in Santa Fe, New Mexico, which is within this District.

17.     The Secretary refused to provide voter data to Plaintiff pursuant to Plaintiff's lawful request and, in doing so, both retaliated against Plaintiff and violated the NVRA. The Secretary also referred Plaintiff to the Attorney General for investigation and potential criminal prosecution based on Plaintiff's use and sharing of voter data, activity protected by the First Amendment.

## BACKGROUND FACTS

**A. The National Voter Registration Act requires states make voter records publicly available.**

18.     The National Voter Registration Act ("NVRA") prescribes certain state actions

regarding voter records:

> (i) Public disclosure of voter registration activities
>
> > (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.
> >
> > (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507.

19.     Those "records" which must be made available pursuant to the NVRA include the

"file maintenance list" and "voter data" as those terms are defined in N.M. Stat. § 1-5-2, as well

as "voter data" as that term is used in N.M. Stat. § 1-4-5.5.

20.     The NVRA is intended to "establish procedures that will increase the number of

eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to

"enhance[ ] the participation of eligible citizens as voters in elections for Federal office," §

20501(b)(2); "to protect the integrity of the electoral process," § 20501(b)(3); and "to ensure that

accurate and current voter registration rolls are maintained." § 20501(b)(4).

21.     Pursuant to 52 U.S.C. § 20507(a)(4), the NVRA also requires states to "conduct a

general program that makes a reasonable effort to remove the names of ineligible voters from the

official lists of eligible voters by reason of — (A) the death of the registrant; or (B) a change in

8

the residence of the registrant[.]" 52 U.S.C. § 20507(a)(4)(A)-(B). Otherwise, under Section 20507(a)(3)(A)-(B), "the name of a registrant may not be removed from the official list of eligible voters except — (A) at the request of the registrant;" or "(B) as provided by State law, by reason of criminal conviction or mental incapacity."

22.     The NVRA provides for a private right of action. 52 U.S.C. § 20510(b). However, before an injured party may file suit, it must "provide written notice of the violation to the chief election official of the State involved." *Id*. § 20510(b)(1). And, the injured party may file suit only if "the violation is not corrected within 90 days after receipt of a notice" or "within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office[.]" *Id*. § 20510(b)(2). But notice need not be provided if the violation occurred "within 30 days before the date of an election for Federal office." *Id*. § 20510(b)(3).

23.     VRF fully complied with the NVRA's pre-suit notice requirements prior to filing this Amended Complaint.

**B. New Mexico makes certain types of voter registration data publicly available.**

24.     New Mexico makes certain voter registration data (other than a voter's SSN, day/month of birth, phone numbers, and data indicating agencies where the voter registered) available to requestors for limited purposes. "The county clerk or secretary of state shall furnish voter data . . . only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section;" NMSA § 1-4-5.5(A). A voter's social security number, day and month of birth, phone number, and data indicating agencies where the voter registered is not made public if prohibited by the voter. NMSA § 1-4-5.5(B).

25.     Importantly, "all requesters shall be treated equally in regard to the charges and the furnishing of the materials." NMSA § 1-4-5.5(A).

26.     The voter information may only be used for purposes listed in the statute—including "governmental or election and election campaign purposes"—while all other uses are prohibited and unlawful.

27.     "Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." § 1-4-5.5(C).  The Secretary of State shall prescribe the form of the affidavit. § 1-4-5.5(D).

28.     Section 1-4-5.5(E) includes definitions for the relevant terms governing the information and how it may be used:

> (1) "election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;
> (2) "governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;
> [. . .]
> (5) "voter data" means selected information derived from the voter file.

**C. New Mexico regulates the use of voter data and criminalizes unlawful use, including by imposing the Use Restrictions and Data Sharing Ban.**

29.     The unlawful use of voter data is a fourth-degree felony under New Mexico law. § 1-4-5.6(B).

30.     "Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." § 1-4-5.6(A). "Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense." § 1-4-5.6(C).

31.     "Any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is

guilty of a fourth-degree felony and upon conviction shall be fined one hundred dollars ($100) for each and every line of voter information that was unlawfully used." § 1-4-5.6(B).

32.     Anyone requesting New Mexico voter data must provide an attestation regarding how he or she will use the information. "Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." § 1-4-5.5(C).

33.     A true and correct copy of a previous, undated version of the request form that must be submitted to receive the voter information is attached hereto as Exhibit B and is incorporated herein by reference. The Secretary of State designed the form. It requires a requester to check one of several "purposes" behind the request: "Governmental Use," "Campaign Use," "Election Related," "Research," or "Other".

34.     The form also includes an authorization which states:

Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).

I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

Ex. B.

35.     The form calls for the requestor's signature just below this authorization.

36.     As discussed in more detail below, this form has changed over time and the form's references to "unlawful" uses has changed as well.

37.     Two specific forms of purportedly "unlawful use" are at issue here. First is the "Use Restrictions." For purposes of this Complaint, the "Use Restrictions" are: (1) restrictions on a use

of the data that is not for a specific candidate or ballot measure campaign, but that is for election purposes; and (2) restrictions on a use of the data that is not by the government itself, but that is by a private person for the purpose of publishing, reviewing, and engaging in speech regarding the governmental operation of elections.  The Use Restrictions are derived from the language of § 1-4-5.5.

38.    The second purportedly "unlawful use" at issue in this case, the Data Sharing Ban, is not found anywhere in New Mexico law, but is the position of the Defendants regardless of the lack of statutory support. For purposes of this Complaint, the "Data Sharing Ban" is the Defendants' position that the sharing, dissemination, distribution, or publication of voter data, regardless of the purpose for which the data is shared, is unlawful under New Mexico law.

**D. Local Labs acquired voter data from the Secretary of State on behalf of Voter Reference Foundation.**

39.    On March 29, 2021, Mike Lippert of Local Labs, LLC signed the then-current version of the Voter Data Authorization form for the data which Local Labs eventually acquired for VRF. A true and correct copy of that form is attached hereto as Exhibit C and is incorporated by reference.

40.    On that version of the form, the requester had the option to choose from one of three purposes for the request: Governmental Use, Campaign Use, and Election Related Use. *Id*. This comports with those uses permitted pursuant to NMSA § 1-4-5.5. Lippert selected "Election Related." EX C. He identified his name and that he was making the request on behalf of Local Labs. *Id*. The bottom of the form contains an attestation which states:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplication, or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).

> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law. *Id*.

41.     Lippert signed on the "signature of Requestor" line just below this authorization. *Id*. No narrative or explanation of how the data was to be used was required by the form that Lippert signed.

42.     The Secretary issued Local Labs a payment receipt, showing it had paid $5,378.12 for the data. A true and correct copy of that receipt is attached hereto as Exhibit D and is incorporated by reference.

43.     The Voter Information Authorization form was changed at least twice after the Lippert Request. Both changes occurred after key events in this case that are discussed more fully below: an article by the nonprofit organization ProPublica, and the Secretary's criminal referral of VRF's use of voter data to the Attorney General.

44.     The form was revised by the Secretary on February 10, 2022. A true and correct copy of the February 10th form is attached hereto as Exhibit E and is incorporated by reference.

45.     In that revision, the Secretary removed the ability to select "Election Related" as the purpose of the request, leaving only "Governmental Use" or "Campaign Use" as option to be selected. *Id*. The Secretary also changed the bottom of the form to state:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).
>
> I hereby swear that the requestor will not: (INITIAL EACH)
> _____ sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.
> _____ alter voter information received as a result of this request.
> _____ use voter information for any purpose other than those authorized on this form.
> _____ use voter information for any commercial purposes.

*Id*.

13

46.     The second change, the authorization, requires the requestor to initial each of four statements attesting the requestor would not use the information in certain ways. *Id*. No such requirement existed on the Lippert/Local Labs form (Ex. C) or other earlier versions of the form (Ex. B).

47.     Specifically, whereas the earlier forms only required the requestor to swear that he would "not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes," under the new version of the form the requester must attest he will not, among other things, (i) sell, loan, provide access to, or otherwise surrender voter information received as a result of this request or (ii) use the information except as authorized by the form itself. *Id*.

48.     Notably, in the new form, the first restriction on providing access to the information is a complete restriction on providing access; it lacks any qualification, as in the earlier form, that sharing is only prohibited if it is for an unlawful purpose. Compare Ex. C to Ex. E. The new form also requires the requestor to agree to be bound to the terms of the form, rather than merely agreeing to engage in conduct which is permitted or refrain from engaging in conduct—which is prohibited, under state statute.

49.     Just four days after this first change, the Secretary changed the form again. A true and correct copy of the February 14 for is attached hereto as Exhibit F and is incorporated by reference.

50.     In addition to the revised authorization like that in the February 10th form (Ex. E), the February 14th form (which is the most current form as of the date of this filing) now requires the requestor provide a narrative explanation of how the requested information will be used. See Ex. F.

51.     The changes to the Voter Information Authorization form have eliminated the ability of a requestor to receive data if a requestor's intended use is solely "election" purposes, rendering the use of the data for "election" purposes a fourth-degree felony pursuant to New Mexico law:

> Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act. § 1-4-5.6(A). Each and every unlawful use of voter data is a separate offense, § 1-4-5.6(C), and a person who commits unlawful use of voter data "shall be" fined one hundred dollars for each and every line of voter information unlawfully used. § 1-4-5.6(B).

**E.  VRF shares New Mexico voter registration data online.**

52.     VRF is a nonpartisan, nonprofit subsidiary of Restoration Action, Inc., a 501(c)(4) social welfare organization.

53.     VRF's mission is to increase voter participation and transparency in elections at all levels so that the public can remain informed regarding electoral processes and ensure the integrity of elections across the country.

54.     VRF believes that full transparency of election records and results is needed to restore faith in electoral processes, which in turn, will lead more people to vote as a result of their renewed confidence in the system. The work being done by VRF continues to highlight the need to ensure accurate voter rolls are being maintained, and to provide the public access to these rolls so that they may search the data and report errors to election officials.

55.     In furtherance of these ends, VRF operates the Website. The Website is dedicated to ensuring transparent, accurate and fair elections in the United States of America.

56.     The purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states. Those who access the Website will be able to search by name or

address for registered voters. They also will be able to peruse voting histories, a list of elections that voter participated in, as well as other important election data obtained via official sources.

57.     Citizens can check their own voting status, voting history, and those of their neighbors, friends, and others, and are thereby able to "crowd-source" the process of rectifying any errors.

58.     VRF accomplishes this by requesting voter registration data from state agencies and then compiling and posting that data in a way that is easily accessible and searchable. VRF's purpose is to maximize the public's access to and use of the information.

59.     Citizens can also use the Website to see if their friends and neighbors have voted and to encourage them to do so, increasing overall voter participation.

60.     To date, VRF has collected voter registration information for at least thirty-one states (Alabama, Alaska, Arkansas, Colorado, Connecticut, Florida, Georgia, Idaho, Iowa, Kansas, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Texas, Vermont, Washington, West Virginia, and Wisconsin) and the District of Columbia. VRF's goal is to collect and post data for all 50 states by the end of 2022.

61.     The Website typically provides any information made public by the state entity charged with maintaining the voter registration database if state law allows that information to be shared. For example, a user can typically view a voter's: name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history.

62.     Before accessing this data on the Website, a user must agree to the Website's Terms of Service which state, in relevant part:

> VoteRef.com and the services offered through VoteRef.com are only for election-related, non-commercial use… You may not use information on VoteRef.com for

16

any purpose unrelated to elections. You may not use information on VoteRef.com for commercial purposes. "Commercial purposes" includes use in connection with advertising or promoting commercial products or services, or for the purpose of sale, resale, solicitation, or for any purpose in which the user can reasonably anticipate the receipt of monetary gain from direct or indirect use. For example, you may not sell information obtained from VoteRef.com, or use it in connection with advertising or promoting commercial products or services, or solicitation.

. . .

You may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law. By way of example but not limitation, you may not: (a) act in a manner that negatively affects other users' ability to engage in real time exchanges; (b) alter, edit, or delete the materials on VoteRef.com, including the deletion of any trademark or copyright notices on VoteRef.com; (c) interfere with or disrupt VoteRef.com, VRF's servers, or networks (e.g., "flooding" or the sending of mass unsolicited messages) or otherwise harm VoteRef.com or other users; (d) intentionally or unintentionally violate any applicable local, state, national, or international law or any regulations having the force of law; (e) impersonate any person or entity or misrepresent your connection to any person or entity; (f) "stalk," harass, or otherwise advocate the stalking or harassing of another person; (f) collect or store personally identifiable information about other users in connection with the prohibited conduct and activities set forth herein; (h) reproduce, duplicate, copy, sell, trade, resell, or exploit for any commercial purposes, any portion of VoteRef.com; (i) attempt to override or circumvent any security measures of VoteRef.com or VRF's third party providers or access parts of VoteRef.com you are not authorized to visit; (j) engage in any unauthorized screen scraping, database scraping, or spidering, or collection of personally identifiable information, or use any other automated means to collect information from VoteRef.com; (k) use any software, tool, or other device (such as browsers, spiders, or avatars) to search VoteRef.com, other than the search functionality offered through VoteRef.com or other generally available web browsers; (l) link directly to any image hosted on VoteRef.com in a manner that would cause the image on VoteRef.com to be hosted on another web site; (m) link to VoteRef.com in such a manner that VoteRef.com or any portion thereof is "framed" on another web site; (n) attempt to reverse-engineer or decrypt any software on VoteRef.com; or (o) facilitate or encourage the violation of any of the policies set forth in these Terms.

63.    When a user views a particular voter's information, they are simultaneously shown

a state specific disclaimer regarding the data. The New Mexico disclaimer states:

The information on this website about this voter, including records of this voter's voting history, was provided to Voter Reference Foundation LLC ("VRF") by the New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15, 2021. The information is publicly available here. The information published here

by VRF appears exactly as provided by the Bureau. By publishing Bureau records verbatim, VRF does not state, represent, suggest, or imply that this voter voted or that this voter's ballot was counted no counted. Additionally, the registration information of any voter who is in the Safe At Home program (hereinafter referred to as a "protected voter") must be removed from the publicly available voter list by the New Mexico Secretary of State. If you believe the information provided to VRF by the Bureau is inaccurate, or if you believe that you or any person listed on VoteRef.com is a protected voter whose protected information should not appear on VoteRef.com, please immediately contact the Bureau by emailing sos.elections@state.nm.us or calling 505-827-3600. For assistance with the process of becoming a protected voter, click here (Safe At Home program). Upon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com.

64.     The disclaimer provides users with information regarding the data, including:

(i) the source of the data, (ii) the date on which the data was produced to VRF or its vendor, (iii) information regarding removal of voters that may be protected voters, and (iv) the contact information for the relevant Secretary of State or election official who may be contacted if errors are identified.

65. VRF's New Mexico data is accompanied by "chain of custody" disclosures, showing who had requested VRF's data and the date it was requested. It even shows the chain of emails between Local Labs and the Secretary regarding requesting and transmitting the data. Any user of the website can click through to see the information.

66.     The website includes New Mexico voter information, which VRF acquired from the State pursuant to § 1-4-5.5, through its third-party vender, Local Labs. VRF paid Local Labs a flat fee to determine what data was available and how to acquire it, and to access the data once acquired.

67.     VRF, in turn, has made the data publicly accessible at no charge, subject to the user's agreement to the terms outlined above.

18

**F.  VRF reaches out to the Secretary to discuss its analysis.**

68.    VRF maintains two related, but distinct projects. The first project, described above, is to share voter data online with citizens. The second project is accomplished in-house without the need to publish the data online. This second project consists of VRF election professionals comparing the total number of ballots cast in a particular election to the number of voters with a credit in their vote history file for having voted in a particular election, as reported in the voter rolls.

69.    Though not necessary indicative of fraud or any malicious activity, there are sometimes discrepancies between the two numbers. When there are, VRF attempts to contact state election officials regarding the discrepancy and "work backwards" to determine why there might be a difference. VRF then seeks to publish the "audit trail" so that citizens can understand how and why voter registrations are removed from the voter list.

70.    Through this process, VRF has identified discrepancies in other states and worked with state officials to explain the difference.

71.    On or about December 16, 2021, as part of its election integrity efforts, VRF posted New Mexico voter information on its website, VoteRef.com.

72.    In conjunction with the posting of that information, VRF issued a press release announcing the publication of the information and identifying a "discrepancy" of about 3,800 votes, reflecting a difference between the number of voters listed as having voted in the 2020 general election (according to the voter list) and the number of ballots reported being cast according to the New Mexico's official canvass and turnout reports.

73.    A true and correct copy of that press release is attached hereto as Exhibit G and is incorporated by reference.

74.     VRF's press release stated: "These discrepancies don't' necessarily indicate fraud, but the differences between the voter list and the lection canvass indicates, at the very least, issues with record keeping and points to the need to be more transparent and proactive about maintaining the voter rolls and reconciling ballots cast and voters having voted in every election." *Id*.

75.     Prior to posting the New Mexico data, VRF emailed the Secretary's office to discuss the identified discrepancy in an attempt to remedy the apparent difference in numbers, as VRF has done in other states. A true and correct copy of that email is attached hereto as Exhibit H and is incorporated by reference.

76.     That email invited a conversation regarding VRF's findings and methodology, including inviting the Secretary to provide feedback on the same. The email stated:

> Our team at VoteRef.com has done a comparative analysis of the total ballots cast election-wide in New Mexico in the 2020 General Election according to the certified canvasses and official turnout reports, and the voter history file provided by your office, to reconcile the total number of ballots cast with the total number of voters in a jurisdiction with credit for voting in the 2020 GE according to NM Secretary of State and County Boards of Election data.

> Our review indicates that there are 924,328 voters in NM with a credit for having voted in the 2020 General Election, and 928,172 total ballots cast election wide as per the official reports issued by NM SOS and County Boards of Election. This creates a discrepancy between registered voters with ballots cast (RVBC) and total ballots cast (TBC) of 3,844. This number represents more ballots cast than registered voters who have credit for voting.

> Please provide any feedback you have on these results, and if there is a factor or factors that we may be unaware of that would explain the discrepancies.

> Attached is a link to the voter history and voter registration data file provided by your office on April 13, 2021. It is our understanding that the data you have provided does not include any voter who is in the Safe At Home program. If that is inaccurate, please let us know.

> We would be pleased to have a call with you or your staff if that would provide a better format to review your assessment of the results. If you have time and staff available, we would be grateful for the opportunity to meet with you by phone.

Ex. H.

77.     The Secretary did not respond to VRF's outreach. The circumstances of the Secretary's refusal—including her Office's comments falsely accusing VRF of not trying to reach out to discuss the data—are discussed in more detail below.

78.     Instead of responding to VRF's letter, the Secretary, on December 20, 2021, wrote a letter to the New Mexico Attorney General referring VRF for criminal investigation and prosecution, alleging VRF unlawfully transferred and published the voter data. A true and correct copy of the Secretary's referral to the Attorney General is attached hereto as Exhibit I and is incorporated by reference.

**G. VRF gives notice of the Secretary's violation of the NVRA and makes additional requests for voter data that the Secretary refuses to fulfill.**

79.     On February 15, 2022, VRF requested "the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021." A true and correct copy of that email and the Secretary's discussion of the same is attached hereto as Exhibit J and is incorporated by reference.

80.     The Secretary has since failed to deliver the requested documents or even respond to VRF's request. Instead, the Secretary informed her office that, at the advice of the Attorney General's Office: "we are not fulfilling records requests from VoteRef." See Ex. J.

81.     On May 27, 2022, VRF sent a "Notice of Violation of National Voter Registration Act & Request for Records" (the "Notice") to the Secretary pursuant to § 20510(b)(1) ("A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved."). A true and correct copy of that Notice is attached hereto as Exhibit K and is incorporated by reference.

82.     In the Notice, VRF again apprised the Secretary of her statutory duty to make

certain voter data available for public inspection pursuant to the NVRA. The Notice stated New

Mexico's restrictions on public inspection of certain types of voter data are preempted by the

NVRA and that the Secretary's refusal to respond to VRF's February 15, 2022, request violates

the NVRA's public inspection provision.

83.     Finally, the Notice again requested the Secretary comply with the NVRA:

[P]ursuant to your obligations under the NVRA, 52 U.S.C. § 20507(i) and New
Mexico law, N.M. Stat. § 1-4-5.5, please make available to us the following records
concerning "the implementation of programs and activities conducted for the
purpose of ensuring the accuracy and currency" of New Mexico's official voter
lists:

1. A complete list, by county/precinct, of any registered voters who cast a
ballot in the November 3, 2020 General Election, who have been
subsequently placed in an inactive, canceled, deleted, removed (or any
registration status other than active) status, or any voter that has been
removed or deleted from the voter rolls between November 3, 2020 and
April 13, 2021, including total count of same.

2. Current voter registration data, including voter history, for all active, inactive,
suspended, and cancelled status voters (including any registration status other
than active.

84.     The Notice further stated that VRF intended to use the requested data for each of

its two distinct election related project. For the first project—the publication of data on the

Website—VRF assured the Secretary that it would not post the personal information of voters on

the Website unless it was granted judicial relief allowing it to do so. See Ex. K, p. 4. VRF made

clear that for the second project—the internal review and analysis of the data—no publication

would occur regardless of the outcome of any litigation. *Id.*

85.     VRF provided a completed Voter Information Authorization form for each of the

separate requests. Despite VRF's compliance with the requirements for making such a request and

22

its assurance regarding how the requested data would be used, the Secretary refused to provide the requested documents.

**H. The Secretary of State is hostile to VRF's use of voter registration information and has threatened criminal prosecution.**

86.     Secretary Toulouse Oliver never raised any concerns to VRF that its use of the New Mexico voter information on its Website might violate New Mexico law.

87.     However, the Secretary was more forthcoming with ProPublica, telling it that VRF's use is not a permissible one under state law and that she had referred the matter to the Attorney General months ago:

> In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is not an allowable use of voter data. By state law, she said, the rolls can only be used for governmental or campaign purposes.
>
> "Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said. In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

Ex. A.

88.     Prior to the publication of the Article, VRF was never informed by the Secretary of State or Attorney General that they viewed VRF's use of the voter information as unlawful or that the Secretary had made a criminal referral to the Attorney General to investigate and prosecute VRF.

89.     The day after the Article was published, Secretary Toulouse Oliver shared it on her official Twitter account, @NMSecOfState, again accusing VRF of violating the election code:



90.     The Secretary did not merely issue an educational message, but instead, made an unreasoned and irrational political attack on VRF, accusing it of a "coordinated cross-country attempt to impugn the integrity of our voter rolls."

91.     The Secretary's office communicated to at least one third party, ProPublica, that it was motivated by animus against the content of VRF's speech.

92.     Before publishing her article in ProPublica, reporter Megan O'Matz exchanged emails with Alex Curtas, Communications Director for the Secretary. True and correct copies of those emails are attached hereto as Exhibit L and are incorporated by reference.

93.     O'Matz inquired about the voter discrepancy addressed in VRF's press release, to which Curtas responded:

> Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are perpetuating misinformation. They reflect a lack of understanding about how the process of voter list maintenance works. These attempts by political

operatives to cast doubt on the 2020 elections are an affront to our democracy and
to the professionals who run our elections throughout the country.

Ex. L.

94.     In response to ProPublica's question about whether VRF had reached out to the

Secretary's office before publishing its statement, Curtas falsely stated that VRF had not contacted

the Secretary's office, "likely because that would not serve their intended goal of spreading

misinformation." See *Id*; see also Ex. G (showing VRF contacted the Secretary's office to share

its findings, ask questions, and discuss analysis on Dec. 14, 2021, two days before Curtas's email)

95.     In concluding his December 16 email for O'Matz's ProPublica story, Curtas

defended New Mexico's voter roll maintenance process from an affront the office apparently

perceived from VRF:

> Because accusations from political operatives like this are meant to impugn the
> integrity of our voter rolls, I'd also just want to note that our Office is confident
> that the processes and procedures already in place for voter list maintenance not
> only follow all state and federal guidelines and keep our voter rolls clean and up-
> to-date, but go above and beyond those requirements… All of these systems
> combine to ensure that voter information is up-to-date in New Mexico, resulting in
> our state having some of the "cleanest" voter records in the United States.

Ex. L.

96.     O'Matz responded shortly thereafter with a pointed question critical of the

Secretary's position as articulated by Curtas: "Question – can you elaborate on how the publication

of voter data online may violate state law? (VoteRef likely will argue that they are using it for

election and research purposes.)" *Id*.

97.     Four days later, Curtas responded:

> The issue relates to the transfer and publication of the voter data. This is the crux:
> "We do not believe providing this personal voter data on a private website that
> intends to spread misinformation about the 2020 General Election meets the
> definition of appropriate use as either for a "governmental purpose," "election
> related," or "election campaign purposes." I've attached our referral letter which
> lays it all out. Let me know if I can provide any clarification on this.

*Id.*

98.     Curtas again focused on the idea that "spreading misinformation" renders use of the data unlawful and focuses the analysis on the permissible purposes—governmental, election related, or election campaign related—under the statute.

99.     Deputy Secretary of State, Sharron Pino, echoed this animus in her referral of VRF to the Attorney General for prosecution. See Ex. I.

100.    On December 20, 2021, Pino sent a written criminal referral to the Attorney General which unequivocally accused VRF of operating "a private website that intends to spread misinformation about the 2020 General Election." *Id.*

101.    The comments of Curtas and Pino reflect the Secretary's clear animus towards VRF based on the perceived content of its speech, which includes criticism—or at least perceived criticism—of the Secretary's Office.

102.    This is not the first time that Secretary Toulouse Oliver has exhibited open hostility to a requestor that is not ideologically or politically aligned with her, despite the law's mandate that "all requesters shall be treated equally in regard to the charges and the furnishing of the materials." § 1-4-5.5(A).

103.    In response to a request for voter information by former President Trump's Presidential Advisory Commission on Election Integrity, which was chaired by former Vice President Pence, Secretary Toulouse Oliver issued at least two press releases.

104.    The first, published on June 30, 2017, stated:

"My office has not yet received the letter from President Trump's election commission requesting the personal information of New Mexico voters. That being said, I will never release the personally identifiable information of New Mexico voters protected by law, including their social security number and birthdate. Further, I will not release any other voter information like names, addresses or voting history unless and until I am convinced the information will not be used for

26

nefarious or unlawful purposes, and only if I am provided a clear plan for how it will be secured. As New Mexico's Chief Election Official, I will continue to ensure the integrity of our elections while protecting the voting rights and personal privacy of our voters."

Ex. M, June 30, 2017, Press Release, "New Mexico Secretary of State Toulouse Oliver Responds to Presidential Election Commission Request for New Mexican Voters Personal Data."

105.    The Secretary apparently believes that she has the right to refuse to honor an otherwise valid request for voter information if she thinks the request is made for a "nefarious" purpose, a subjective judgment call from her regarding the worthiness of the requestor and their intended use. Nothing in New Mexico law permits her to exercise that discretion and refuse a request that is for a lawful purpose, even if she believes that lawful purpose is "nefarious."

106.    In her second release, published on July 27, 2017, the Secretary maintained this position:

My office has received another request for New Mexico voters' personal data from President Trump's 'Voter Fraud Panel.' Upon review of this request, my answer is still no.

"As I've said before, I will never release the personally identifiable information of New Mexico voters protected by law, including their social security number and birthdate. Because the Commission has still not demonstrated that the data will be used for a lawful purpose under New Mexico law, provided any plan for ensuring that voters' personal data will be secured, or explained how comparing insufficient data will produce any meaningful conclusions, I won't release any New Mexicans' voter information.

Ex. N, July 27, 2017, Press Release, "Secretary of State Toulouse Oliver Responds to Second Request by President Trump's Election Commission for New Mexico Voters' Personal Data."

107.    The Secretary's hostility to ideological opponents in the exercise of her official duties only magnified over the ensuing years. The 2020 presidential election significantly increased public interest in how states run their elections and ensure their integrity, shining a spotlight on state and local election officials. Just weeks before this case was filed, the Secretary willingly lent her voice to an article by ProPublica, an ideologically left-wing group that has

mounted a campaign against VRF. ProPublica argues that VRF is dangerous because it allows citizens to access public data and thereby, allegedly, contribute to an "echo chamber" of concern regarding election participation and integrity. Rather than contacting VRF to understand its mission and raise her concerns, the Secretary simply accepted ProPublica's politically charged attacks as true and made a public criminal referral.

108.    The Secretary has once again allowed political animus to cloud her judgment. Voter data is made public precisely to promote election transparency, integrity, and participation. It is not a resource that can be selectively released only to those groups whose political views the Secretary deems "not nefarious." New Mexico's laws should not be used to ensnare and selectively punish those whose election and governmental uses do not meet whatever unwritten criteria the Secretary and law enforcement apply to deem data usage "lawful."

**I.   VRF removes New Mexico voter data from VoteRef.com.**

109.    VRF removed the New Mexico voter data from its website on March 28, 2022— just before this lawsuit was initially filed—out of fear that it would be prosecuted based on the Secretary of State's interpretation of the law and her referral of VRF to the Attorney General's office for potential prosecution.  To be clear, because VRF was unaware of the Secretary's referral until the ProPublica article as published, it was VRF's knowledge of the Secretary's criminal referral to the Attorney General, and the impending threat of investigation, which led VRF to initially remove the date from the Website, refrain from engaging in political speech, and to seek recourse from this Court.

110. On July 22, 2022, this Court issued a preliminary injunction, stating, "Defendant Attorney General Balderas and Defendant Secretary of State Oliver are enjoined from prosecuting Plaintiff Voter Reference Foundation, LLC, under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs."

28

111.    Accordingly, in reliance on this Court's issuance of the preliminary injunction, VRF since republished the New Mexico voter data it already possessed on VoteRef.com.

112.    VRF desires to access, post, distribute, and otherwise use publicly available New Mexico voter information on the Website in the future so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls. VRF has continued to seek the same data from the New Mexico Secretary of State as New Mexico's data files are updated over time and plans to continue to seek the same data from the New Mexico Secretary of State after the 2022 election this November. However, based on the Secretary's refusal (with the knowledge, advice, and agreement of the Attorney General) to grant VRF's request for access to new data while this case has been pending, and based on Defendants' claim that VRF is committing criminal activity and "impugning" the integrity of the "voter rolls," it is clear the Secretary will only give the data to political parties and other speakers she prefers, and not to VRF.

113.    Plaintiff does not seek to disseminate or use any information prohibited from being disclosed by law, including voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth, or voters' telephone numbers if prohibited by voters. N.M. Stat. § 1-4-5.5(B). Plaintiff's actual and proposed use is limited to that voter information which is publicly available under New Mexico law.

114.    VRF believes that its past and intended future use of the New Mexico voter information is lawful under the language of the statute and protected by the First Amendment, but, unless this Court enjoins Defendants from denying VRF's access and prosecuting VRF for its protected conduct, VRF will refrain from posting, sharing, making comments about, or using that information to advance its mission out of fear that the Defendants might seek to punish it for doing so.

**J. The Use Restrictions and Data Sharing Ban severely burden Plaintiff's First Amendment Rights.**

115.    The Use Restrictions and Data Sharing Ban effectively muzzle Plaintiff's transparency and voter outreach efforts and, in doing so, violate Plaintiff's First Amendment rights.

116.    The Use Restrictions and Data Sharing Ban limit Plaintiff's ability to effectively speak in furtherance of their missions by sharing relevant voter and election related information with the public. This is especially true given the Secretary's interpretation and attempted enforcement of the Use Restrictions, which reads out certain permissible uses and interjects uncertainty as to those purposes for which the information may be used.

117.    Plaintiff VRF desires to post and distribute New Mexico Voter Information online. Doing so is far more effective than sharing the same information in-person, by mail, or via any physical medium. This transparency allows ordinary citizens—not just political parties and the operatives they favor—to work together and with VRF to identify issues with voter participation and election integrity.

118.    However, because of the Data Sharing Ban and the potential penalties a violation may impose, Plaintiff has refrained and will continue to refrain from exercising its core First Amendment political speech rights to disseminate and use the voter information out of fear of prosecution.

**COUNT I**
**ACCESS BAN AND DATA SHARING BAN:**
**PREEMPTION BY THE NATIONAL VOTER REGISTRATION ACT**
**(52 U.S.C. § 205027)**

119.    Plaintiff restates and realleges the allegations in Paragraphs 1 through 118 as if fully rewritten verbatim herein.

120.    To the extent New Mexico law prevents access to and sharing of voter data, it is preempted by the National Voter Registration Act.

121.    The National Voter Registration Act ("NVRA") requires each state to maintain for at least two years and "make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official voter lists of eligible voters." 52 U.S.C. § 20507(i)(1).

122.    "Records" includes individual and identifiable voter information files. *See Project Vote / Voting for Am., Inc. v. Long*, 682 F.3d 331, 335-36 (4th Cir. 2012) (holding registration applications are records under § 20507(i)(1)); *Pub. Interest Legal Found., Inc. v. Bellows*, No. CIV 20-0061 GZS, 2022 U.S. Dist. LEXIS 38875, at 13 (D. Me. Mar. 4, 2022) (Singal, J.) (holding voter files are records under § 20507(i)(1)); *Judicial Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 440 (D. Md. 2019) (Hollander, J.).

123.    The NVRA specifically requires states to make reasonable efforts to maintain the accuracy of the rolls, including by removing the names of ineligible voters from the official lists of eligible voters due to the death of the registrant or a change in the residence of the registrant to a place outside the jurisdiction in which he or she is registered. 52 U.S.C. § 20507(a)(4). Thus, documents reflecting or related to this maintenance function are "records" which must be made available for public inspection. *See* § 50507(i)(1) (public inspection requirement applies to "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]").

124.    Those "records" which must be made available pursuant to the NVRA include the "file maintenance list" and "voter data" as those terms are defined in N.M. Stat. § 1-5-2, as well as "voter data" as that term is used in N.M. Stat. § 1-4-5.5.

125.    New Mexico imposes several restrictions on access to and dissemination of voter data which are preempted by the NVRA.

126.    First, § 1-4-5.5 does not provide any right to inspect the "file maintenance list" as that term is defined in N.M. Stat. § 1-5-2, regardless of the purpose motivating the request. The public inspection right under the NVRA is an unqualified right of access. Because New Mexico law lacks any provision for public inspection of the "file maintenance list", a "record" subject to the NVRA's public inspection requirement, it is preempted by the NVRA.

127.    Second, to the extent Defendants control access to voter data based on the Defendant Secretary's judgment regarding a requester's use of the data to engage in speech she views as "misinformation," or based on any other judgment of the Secretary about the purpose of the request, it is preempted by the NVRA's unqualified right of public access.

128.    Third, to the extent Defendants control access to voter data by requiring, as a condition of access, that requesters surrender their rights to engage in political speech or other protected speech that consists of sharing the data or discussing its contents with third parties, it is preempted by the NVRA's unqualified right of public access.

129.    Fourth, to the extent that New Mexico law actually prohibits the publication of voter data on the internet, it is preempted by the NVRA under obstacle preemption, because allowing citizens to access voter data so that they can detect fraud and error in the maintenance of voter rolls, but then prohibiting them from discussing the details of that data with each other, would manifestly defeat the purpose of allowing public access in the first place.

> Obstacle preemption is a type of conflict preemption authorized by the Supremacy Clause. It applies where state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress. This occurs where state law interferes with the *methods* by which the federal statute was designed to reach its goal.

*Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829-30 (4th Cir. 2010) (cleaned up).

130.    Congress expressly stated the NVRA has four purposes: to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance [] the participation of eligible citizens as voters in elections for Federal office," *id.* § 20501(b)(2); "to protect the integrity of the electoral process," *id.* § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(4). Section 8(i) of the NVRA provides for the disclosure of voter registrations in order to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012).

131.    The Data Share Ban clearly and harmfully contradicts Congress's stated objectives in the NVRA and creates many improper obstacles to its implementation.

132.    First, "[o]rganizations . . . have the resources and expertise that few individuals can marshal. By excluding such organizations from access to voter registrations, the State law undermines Section 8(i)'s efficacy." *Judicial Watch, Inc. v. Lamone*, 399 F.Supp.3d 425, 445 (D. Md. 2019).

133.    VRF has resources that individual citizens do not: it can purchase statewide data, which typically costs thousands of dollars per state. It can then purchase that data in multiple states so that it can be aggregated and voter behavior can be tracked across multiple jurisdictions. It also has the expertise and resources to convert the large and difficult-to-use data files produced by most

states into a format that can citizens without computer programming and data analysis skills can easily search on a website.

134.    The NVRA's objective of empowering citizens to aid states in detecting fraud and errors in voter rolls would be entirely defeated if states could require what New Mexico seems to envision: that each individual citizen wishing to analyze state data for error and fraud must invest the enormous amounts of time and money that VRF commits to obtaining and formatting statewide data.

135.    Even if the Secretary of State's office in every state provided user-friendly portals to their data for free and performed all the work for their entire data file that VRF provides—and none do—it would still be necessary for citizens to share the data with each other to perform the NVRA's goal of allowing citizens to detect fraud and error in the voter rolls. Detecting error requires citizens to compare the state's official data with their own personal knowledge regarding friends, neighbors, relatives, and community events. Citizens are much more effective, and their knowledge grows exponentially, when they can share their analyses—and the underlying data— with each other. In contrast, if each citizen must operate in a silo, in a cone of silence that involves only that individual's isolated communications with a government election administrator's office, then citizens cannot effectively combine their knowledge, experience, and analysis, and will be relegated to occasionally providing their own confidential "tips" directly to a bureaucrat. This, too, defeats the objectives of the NVRA.

136.    Preventing organizations such as VRF from obtaining and sharing the voter data is not only in conflict with sound public policy, but also with the express objectives of the NVRA. Thus, to the extent New Mexico prohibits VRF from (a) accessing voter data; and (b) sharing it online, its policy is preempted by the NVRA.

137.     VRF complied with all pre-suit notice requirements under the NVRA.

## COUNT II
## ACCESS BAN: VIOLATION OF THE NATIONAL VOTER REGISTRATION ACT
### (52 U.S.C. § 205027)

138.     Plaintiff restates and realleges the allegations in Paragraphs 1 through 137 as if fully rewritten verbatim herein.

139.     On February 15, 2022, VRF requested "the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, election who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021."

140.     The records VRF requested are records that are subject to mandatory public disclosure under the NVRA.

141.     The Secretary failed to respond to VRF's request. Internally, staff were told, "we are not fulfilling records requests from VoteRef." This position was taken based on the advice given to the Secretary's Office by the Attorney General's Office.

142.     VRF subsequently requested the voter data again in May of 2022 and made the Secretary aware of the NVRA violation.

143.     The Secretary responded to VRF in June 2022, but still refused to make the records available.

144.     VRF complied with all pre-suit notice requirements under the NVRA.

145.     The NVRA clearly and unambiguously requires the Secretary to allow VRF to access the records.

146.     By failing or refusing to provide the requested records, the Secretary has violated the NVRA's public inspection provision.

147.   By counseling the Secretary not to respond to or produce records in response to VRF's February request, the Attorney General conspired to violate the NVRA.

**COUNT III**
**ACCESS BAN AND THREAT OF PROSECUTION:**
**FIRST AMENDMENT-RETALIATION**
**(42 U.S.C. § 1983)**

148.   Plaintiff restates and realleges the allegations in Paragraphs 1 through 147 as if fully rewritten verbatim herein.

149.   Defendants retaliated against Plaintiff based on their own animus towards Plaintiff's perceived political ideology by refusing to deliver the properly requested voter data and by threatening Plaintiff with criminal prosecution for disseminating protected speech. Consequently, Defendants chilled Plaintiff's protected speech in violation of the First Amendment.

150.   "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006). If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim. *Ibid.* (*citing Crawford-El v. Britton*, 523 U.S. 574, 593, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283–284, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

151.   Once a state agrees to make its data publicly available—or whereas here, federal law requires data be made publicly available—the state may not condition access to that data based on the requestor's viewpoint. *See Los Angeles Police Dep't v. United Reported Pub. Corp.*, 528 U.S. 32, 40 (1999).

36

152.    To succeed on a claim of unlawful retaliation, the plaintiff must show: "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from constitution to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007).

153.    The voter lists are powerful tools for political speech. They provide, among other things, the names, addresses, and party affiliations of registered voters and are provided to political groups and advocacy organizations for use in the most political sphere: elections.

154.    Accordingly, speech related to and involving state voter lists is inherently political in nature and protected by the First Amendment. *See Fusaro v. Cogan*, 930 F.3d 241, 251 (4th Cir. 2019).

155.    Defendants wrongfully retaliated against and have chilled Plaintiff's constitutionally protected speech in two ways. First, the Secretary has refused to convey voter data to Plaintiff and conditioned its decision not to respond to VRF's request based upon VRF's viewpoint and planned speech. Second, Defendants have worked in concert to threaten Plaintiff with prosecution, again based on VRF's viewpoint and planned speech.

156.    This chilling effect is both real and substantial, as VRF was forced to stop disseminating voter information and seek judicial intervention out of fear of prosecution.

157.    VRF made a request of the voter data on February 15, 2022, to which the Secretary has refused to respond. Internally, the Secretary directed her staff not to respond to VRF's request based on advice given by the Attorney General's Office.

158.    On May 27, 2022, VRF sent a letter to the Secretary notifying the Secretary of her violation of the NVRA and again requesting the voter data, promising not to post voter data online without a court order.

159.    The Secretary also refused to respond to that request.

160.    Finally, on June 16, 2022, the Secretary responded, contending the February 15, 2022, request for changes to the voter file was not a request for records pursuant to the NVRA because it would have required the Secretary to create a new record, which is not required pursuant to the NVRA. The Secretary likewise dismissed the identical portion of the May 27th request as a requiring the creation of a new record. A true and correct copy of the Secretary's June 16, 2022 letter is attached hereto as Exhibit O and is incorporated by reference.

161.    The Secretary's claim that it does not maintain the requested list is perplexing, as state law requires the Secretary to maintain a "file maintenance list," defined under statute as "any prepared listing that reflects additions, deletions or changes to the voter file." NMSA 1-5-2(G). Pursuant to NMSA § 1-5-5, that file maintenance list must be updated and maintained every time a voter's information is changed—precisely the record that VRF requested in the Notice.

162.    Importantly, Defendants, including the Attorney General, continually refuse to state they will not prosecute VRF for publishing New Mexico voter data online. The Attorney General even referred VRF to the FBI for investigation. *See* Exhibit P, January 16, 2022 Email from A. Trujillo to FBI.

163.    The Secretary openly and wrongfully accused Plaintiff of violating New Mexico law by publishing voter data on VoteRef.com, citing this (in concert with the Attorney General) as her motivation for withholding further voter data and threatening Plaintiff with prosecution. The

Secretary even falsely and publicly accused Plaintiff of "coordinat[ing a] cross-country attempt to impugn the integrity of our voter rolls."

164.    Defendants' actions are substantially motivated by Plaintiff's exercise of its First Amendment rights. The Secretary's only justification for denying VRF's requests is to draw a distinction between VRF and any other requestor who alleges they will not use voter data contrary to the Secretary's interpretation of § 1-4-5.5. This amounts to a clear discriminatory purpose.

165.    As a remedy for their retaliatory conduct, Defendants should be enjoined to provide the voter data Plaintiff has already requested, and should be enjoined from denying Plaintiff access to publicly available voter data requested under the NVRA for any reason relating to Plaintiff's past or future speech regarding the data, including Plaintiff's sharing, distribution, dissemination, or publication of the data.

**COUNT IV**
**DATA SHARING BAN AND THREAT OF PROSECUTION:**
**VIOLATION OF FIRST AMENDMENT**
**PRIOR RESTRAINT**
**(42 U.S.C. § 1983, et seq.)**

166.    Plaintiff restates and realleges the allegations in Paragraphs 1 through 165 as if fully rewritten verbatim herein.

167.    Defendants have imposed prior restraints on Plaintiff's core political speech in two distinct, but related, ways. First, Defendants' Data Sharing Ban is a prior restraint because it absolutely prohibits Plaintiff from engaging in core political speech by prohibiting the sharing and dissemination of information if it includes specific content: voter data. Second, the Secretary's referral of Plaintiff to the Attorney General for criminal investigation and prosecution, along with the Secretary's public statements that the referral had been made, operated as a prior restraint because it was intended to and did freeze Plaintiff's speech, leading it to take down New Mexico

data from the Website. Because neither version of prior restraint is justifiable, Defendants' conduct must be enjoined.

168.    Prior restraints on speech are "the most serious and the least tolerable infringement on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 51 (1931) ("chief purpose of the (First Amendment's) guaranty [is] to prevent previous restraints upon publication").

169.    A system of prior restraints "bear[s] a heavy presumption against its constitutional validity," and the state "carries a heavy burden of showing justification for the imposition of such a restraint."  *Capital Cities Media, Inc. v. Toole*, 463 U.S. 1303, 1305 (1983) (citation omitted). To justify a prior restraint, the state must demonstrate that the restraint is justified without reference to the content of the speech and is narrowly tailored to serve a compelling governmental interest. See *Neb. Press Ass'n*, 427 U.S. at 571; *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Defendants cannot make that showing here.

170.    The Data Sharing Ban's wholesale prohibition on sharing voter data and information except operates as a presumptively invalid prior restraint on core political speech. Before any speech actually takes place, the Data Sharing Ban dictates that individuals may not speak about a particular subject – voter information and data – regardless of the purpose for which the speech is made.

171.    The Data Sharing Ban specifically prohibits Plaintiff from publishing and receiving information about voting and electoral processes – core government functions. A prior restraint on disseminating information relevant to – and perhaps critical of – government activity is a core concern of the First Amendment. See *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838

(1978) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."); *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment.").

172.    The State cannot demonstrate that the Data Sharing Ban is justified without reference to the content of the prohibited speech.

173.    The State cannot demonstrate that the Data Sharing Ban is narrowly tailored to serve a compelling governmental interest.

174.    If the State's interest which purportedly justifies the Data Sharing Ban is the privacy of the citizenry and avoiding the use of voter data for commercial purposes, it has shown that it has the means to protect those interests by prohibiting the use of the information for commercial purposes or otherwise conditioning use of the information short of a complete prohibition on dissemination. For instance, New Mexico limits the dissemination of the most sensitive voter information, including social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters. N.M. Stat. § 1-4-5.5(B).

175.    At the same time, the State's Data Sharing Ban is not uniformly enforced, and it appears that the prior restraint may be susceptible to discretion in its application by the Secretary and Attorney General. The State knowingly sells New Mexico voter data to private companies who then, upon information and belief, share that data with third parties, in direct violation of the Data Sharing Ban. For example, Catalist is a private company which buys New Mexico voter data throughout the year and then, upon information and belief, packages and sells that data to paying

clients who meet Catalist's progressive ideological leanings. Those clients then use the data for political operations, including contacting voters. The State either knows this to be true, or has learned that there is a possibility that Catalist is sharing New Mexico voter data with clients, and has willfully refused to investigate or do anything to vindicate its supposed state interests in privacy and the avoidance of solicitation. Not only does this call into question the State's supposed interests, it underlines a common danger of prior restraints: they allow government officials discretion to control speech based on constitutionally impermissible considerations.

176.    For the reasons stated above and herein, the Data Sharing Ban operates as a prior restraint which violates Plaintiff's First Amendment rights, including its rights to free speech, rights which are guaranteed by the First Amendment as incorporated against the State of New Mexico by the Fourteenth Amendment.

177.    As a result of the Data Sharing Ban, Plaintiff is suffering and will continue to suffer irreparable harm, including the chilling of its First Amendment protected speech.

178.    The Data Sharing Ban is enforced under the color and pretense of state law and Plaintiff seeks to enjoin Defendants, who as agents of the State of New Mexico are statutorily obligated to enforce the Data Sharing Ban, from enforcing it under the color and pretense of state law in deprivation of Plaintiff's rights. 42 U.S.C. § 1983.

179.    Additionally, the Secretary's referral of VRF to the Attorney General for criminal investigation and prosecution, combined with the Secretary's public statements regarding this referral and the Attorney General's refusal to state he will not seek prosecution, operate as prior restraints on VRF's constitutionally protected speech.

180.    "A threat of prosecution or criminal contempt against a specific publication raises special First Amendment concerns, for it may chill protected speech much like an injunction

against speech by putting that party at an added risk of liability." *Multimedia Holdings Corp. v. Cir. Ct. of Fla., St. Johns Cnty.*, 544 U.S. 1301, 1304, 125 S. Ct. 1624, 1626, 161 L. Ed. 2d 590 (2005). In the context of an exercise of First Amendment rights, it is "deeply etched in our law [that] a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

181.    "Whether we view [the criminal referral] as a prior restraint or as a penal sanction for publishing lawfully obtained, truthful information is not dispositive because even the latter action requires the highest form of state interest to sustain its validity." *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 101-02 (1979). "[E]ven when a state attempts to punish publication after the event it must nevertheless demonstrate that its punitive action was necessary to further the state interests asserted." *Id.* (citing *Landmark Communication*, 435 U.S. at 843). When, as here, the prior restraint chills or freezes speech which involves "commentary on current events," the "damage can be particularly great." *Neb. Press Ass'n*, 427 U.S. at 559.

182.    Although the Secretary referred VRF for criminal prosecution after VRF posted New Mexico voter data online, and after it blogged about the discrepancy of voter data in a VRF press release, VRF removed New Mexico voter data from VoteRef.com after learning about the criminal referral from the ProPublica article, and VRF did not post the voter data again until this Court issued a preliminary injunction preventing Defendants from prosecuting VRF. Like most rational people, VRF "do[es] not lightly disregard public officers' thing veiled" – or here, explicit— "threats to institute criminal proceedings." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963).

183.     Because VRF refrained from speech (absent this Court's injunction), out of fear of criminal prosecution, the criminal referral functions as a de facto prior restraint, requiring application of strict scrutiny. Even if the Defendants' theory that New Mexico law bans all sharing of voter data is incorrect—which it likely is— "the improbability of successful prosecution makes the case different. The chilling effect upon the exercise of First Amendment rights may derive from the fact of the prosecution, unaffected by the prospects of its success or failure." *Dombrowski v. Pfister*, 380 U.S. 479, 487, 85 S. Ct. 1116, 1121, 14 L. Ed. 2d 22 (1965).

184.     For the reasons stated above and herein, the Secretary's criminal referral of Plaintiff to the Attorney General and the Attorney General's refusal to disclaim investigation and prosecution operates as a prior restraint which violates Plaintiff's First Amendment rights, including its rights to free speech, rights which are guaranteed by the First Amendment as incorporated against the State of New Mexico by the Fourteenth Amendment.

185.     As a result of the Secretary's referral and the Attorney General's refusal to disclaim investigation and prosecution, Plaintiff is suffering and will continue to suffer irreparable harm, including the chilling of its First Amendment protected speech.

186.     The referral was made under the color and pretense of state law and Plaintiff seeks to enjoin Defendants from engaging in conduct under the color and pretense of state law in deprivation of Plaintiff's rights. 42 U.S.C. § 1983.

**COUNT V**
**DATA SHARING BAN AND THREAT OF PROSECUTION:**
**FIRST AMENDMENT--BAN ON CORE POLITICAL SPEECH**
**(42 U.S.C. § 1983)**

187.     Plaintiff restates and realleges the allegations in Paragraphs 1 through 186 as if fully rewritten verbatim herein.

44

188.    The First Amendment to the United States Constitution commands, "Congress shall make no law [. . .] abridging the freedom of speech[.]" and the speech protections of the First Amendment have been incorporated against the states. *See Gitlow v. New York*, 268 U.S. 652 (1925); *Stromberg v. California*, 283 U.S. 359 (1931).

189.    "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983).

190.    The NVRA requires the state of New Mexico to make its voter data available, especially for the types of tasks performed by VRF and user of the Website. Because federal law requires that the data be made available, the First Amendment protects how that data may be used and shared, as the creation and dissemination of information are speech within the meaning of the First Amendment. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper,* 532 U.S. 514, 527, (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct."). The First Amendment protects speech over the internet as well as by means of communication devices used prior to the high-tech era. *Reno v. ACLU,* 521 U.S. 844, 868 (1997).

191.    The ability to receive information is also a fundamental First Amendment right. The First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it." *Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143, (1943). "[T]he right to receive publications is ... a fundamental right. The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them." *Lamont v. Postmaster General of U.S.,* 381 U.S. 301, 308 (1965) (Brennan, J., concurring).

192.    A state may violate the protections of the First Amendment in many ways, *e.g., Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819 (1995); *Keller v. State Bar of Cal.,* 496 U.S. 1 (1990), but a law imposing criminal penalties on protected speech is a stark example of speech suppression.

193.    Plaintiff's acquisition and sharing of New Mexico voter information is constitutionally protected speech. New Mexico routinely makes voter data available to political parties for inherently political means and New Mexico even conditions access to the voter data on the data being used for election purposes—a necessarily political objective. Further, New Mexico also routinely makes voter data available to companies such as Catalist who then, on information and belief, sell New Mexico voter data to clients to advance particular ideologies—in Catalist's case, progressive ideologies. Because voter data cannot be divorced from its wholly political nature, the dissemination of that data is protected under the First Amendment.

194.    Until threatened in this matter, Plaintiff posted voter data on the Website along with commentary regarding how ordinary citizens can use and review the data. The Website also included a call to action for citizens to contact state officers charged with maintaining the voter rolls if issues were identified. The Website itself, including the voter data on the Website, was and

is core political speech. That the State disagrees with Plaintiff's viewpoint or methodology does not change that characterization.

195.    Even if the Website was not itself core political speech, the State's complete ban on sharing voter data would silence core political speech by banning the sharing of the underlying data necessary to effectively engage in that speech.

196.    Speech sharing information about the voting history of New Mexico voters (that is, information that the NVRA already requires, and that New Mexico already legally allows, to be produced to requesters), particularly when used in the manner contemplated by Plaintiff, sits at the zenith of First Amendment protection. Discussions regarding voting, elections, electoral processes, and election integrity are issues in which the public does and should have a high level of interest.

197.    The Use Restrictions and Data Sharing Ban are direct restrictions on constitutionally protected, core political speech and cannot stand unless they survive strict scrutiny. "[P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest…Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United*, 558 U.S. at 340–41 (internal quotations and citations omitted).

198.    "As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content. Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to

speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each." *Id.*

199.    The Use Restrictions and Data Sharing Ban make it more difficult, more expensive, and essentially impossible for Plaintiff VRF to disseminate meaningful information regarding New Mexico's elections. They also impose massive costs on individuals who are not affiliated with a political party or candidate or ballot measure campaign, and therefore cannot receive that campaigns' access to the data.

200.    Due to the volume of voter information which Plaintiff VRF wishes to share—including data on millions of voters—it is virtually impossible to distribute through any other non-Internet means. Further, it is the very accessibility of the data on the Internet that will draw interested listeners and political associates to VRF's speech, and that will motivate them to engage in their own speech. Having the data accessible on the Internet also sends its own message: that this is the public's data, and that it is and should be transparent. Plaintiff VRF hopes that thousands or even millions of concerned citizens who share its interest in election transparency, participation, and integrity will view, analyze, and discuss the data. VRF's plan is to crowd-source the analysis of the data, so that interested citizens can associate with VRF and with each other to analyze and engage in political speech regarding the data. Yet the Secretary of State's statements imply that it is precisely the use of the Internet to bring the data to ordinary citizens and to facilitate speech among non-campaign-insiders that renders VRF's use and sharing unlawful.

201.    In criminalizing the dissemination of voter information, including via the Internet, the Use Restrictions and Data Sharing Ban do not leave open ample, comparable, and effective alternative channels for communication.

202.    The Use Restrictions and Data Sharing Ban also infringe on and abridge Plaintiff's speech by limiting the size of the audience that can be reached, as Defendants threaten prosecution based on the theory that dissemination to the public is unlawful.

203.    For the reasons stated above and herein, the Use Restrictions and Data Sharing Ban violate Plaintiff's First Amendment rights, including its rights to free speech, rights which are guaranteed by the First Amendment as incorporated against the State of New Mexico through the Fourteenth Amendment.

204.    As a result of the Use Restrictions and Data Sharing Ban, Plaintiff, and others not before the Court on whose behalf Plaintiff acts, are suffering and will continue to suffer irreparable harm, including through the chilling of its First Amendment protected speech.

205.    The Use Restrictions and Data Sharing Ban are enforced under the color and pretense of state law and Plaintiff seeks to enjoin Defendants, who as agents of the State of New Mexico are statutorily obligated to enforce the Use Restrictions and Data Sharing Ban, from enforcing them under the color and pretense of state law in deprivation of Plaintiff's rights. 42 U.S.C. § 1983.

**COUNT VI**
**DATA SHARING BAN:**
**FIRST AMENDMENT-OVERBREADTH**
**(42 U.S.C. § 1983)**

206.    Plaintiff restates and realleges the allegations in Paragraphs 1 through 205 as if fully rewritten verbatim herein.

207.    The Data Sharing Ban is overbroad in that it regulates and prohibits substantially more protected speech than is necessary to accomplish any legitimate government interested furthered by the restriction.

208.    "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973).

209.    The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The severity of criminal sanctions may well cause speakers, including Plaintiff, to remain silent rather than communicate even arguably unlawful words, ideas, and images. See, *e.g., Dombrowski,* 380 U.S. at 494.

210.    The Data Sharing Ban is an absolute prohibition on the sharing of voter data between a requester and any other person, regardless of whether the sharing is for a governmental or election purpose. This would include sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for; sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic at a different institution who wanted to use the original data set to validate the research; sharing between a political party and a candidate it supports, but who is not affiliated with the party; sharing of a voter's information by a canvasser with close family members or other members of his or her household; sharing by a pollical data compilation/analysis firm and its political clients; and, of course, sharing via publication on the internet.

211.    This reach—a near total ban speech that involves the sharing of data—is far broader than any legitimate sweep of a statute dedicated to ensuring that voter data is not used for commercial or nefarious purposes.

212.    Because of the overbreadth of the restrictions and the uncertainty as to the boundary between that which is permissible and that which is prohibited, Plaintiff and others like them have refrained and will refrain from engaging in speech protected by the First Amendment out of fear of prosecution.

213.    The Data Sharing Ban is enforced under the color and pretense of state law and Plaintiff seeks to enjoin Defendants, who as agents of the State of New Mexico have undertaken the statutory obligation to enforce the Data Sharing Ban, from enforcing it under the color and pretense of state law in deprivation of Plaintiff's rights. 42 U.S.C. § 1983.

**COUNT VII**
**DATA SHARING BAN:**
**FIRST AND FOURTEENTH AMENDMENTS- VOID FOR VAGUENESS**
**(42 U.S.C. § 1983)**

214.    Plaintiff restates and realleges the allegations in Paragraphs 1 through 213 as if fully rewritten verbatim herein.

215.    A violation of the Data Sharing Ban, including by sharing and using the voter data for an unapproved purpose, is a class IV felony punishable by up to 18 months in prison and a fine of $100 for each line of voter data unlawfully used. § 1-4-5.6(B); § 31-18-15(A)(13).

216.    A vague criminal statute governing speech – like the Data Sharing Ban – raises concerns under both the First and Fourteenth Amendments, with the former focused on the risk that constitutionally protected activity is chilled due to the fear of violating a vague prohibition on such activity, and the latter focused on fundamental due process concerns of fair notice and arbitrary enforcement.

217.    "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment. A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill* v. *Colorado*, 530 U. S. 703, 732 (2000)).

218.    The government violates the Fourteenth Amendment by depriving citizens of life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–358 (1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a statute that flouts it "violates the first essential of due process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

219.    "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. at 285.

220.    The Data Sharing Ban is impermissibly vague, as no such prohibition appears anywhere in New Mexico statute, yet Defendants insist that their interpretation and attempted enforcement of the law bans all sharing.

221.    As a result of the vagueness of the Defendants' Data Sharing Ban, Plaintiff and others have and will refrain from engaging in First Amendment protected activities because the uncertain meanings and interpretations of the state fail to provide sufficient guidelines for Plaintiff and others to know what conduct is permissible and what is prohibited. This is particularly true given that the statutes themselves do not contain any such ban.

222.    Again, this chilling effect is both real and substantial, as Plaintiff fears prosecution for exercising its First Amendment rights. Defendants have refused to state they will not prosecute VRF and even communicated with other states and federal agencies to promote criminal investigation.

223.    The indeterminacy of exactly which uses and what sharing and dissemination are permissible and which will expose a person to felony charges renders the statutory scheme void for vagueness.

224.    The Data Sharing Ban was enacted under the color and pretense of state law and Plaintiff seeks to enjoin Defendants, who as agents of the State of New Mexico have undertaken the statutory obligation to enforce the Data Sharing Ban, from enforcing it under the color and pretense of state law in deprivation of Plaintiff's rights. 42 U.S.C. § 1983.

225.    To the extent Defendants believe the Data Sharing Ban, that is, Defendants' threatened enforcement of a policy arising from Defendants' application of the Voter Data statutes, that it is unlawful for any person to share voter data with another person, even if shared for an otherwise lawful purpose, that ban is unconstitutionally vague.

226.    The Data Sharing Ban does not appear in any New Mexico statute. Instead, Defendants had to selectively combine a number of provisions to arrive at the conclusion VRF

may not lawfully post voter data online. For this reason, it is impossible for a reasonable person to discern what conduct is punishable.

## COUNT VIII
## DECLARATORY JUDGMENT
### (28 U.S.C. § 2201, et seq.)

227.    Plaintiff restates and realleges the allegations in Paragraphs 1 through 226 as if fully rewritten verbatim herein.

228.    For the reasons stated above and herein, the Use Restrictions and Data Sharing Ban on their face and as applied to Plaintiff severely burden core political speech rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution.

229.    Any justification provided by the State for imposing the burdens alleged is insufficient to withstand constitutional scrutiny.

230.    The Use Restrictions and Data Sharing Ban operate as presumptively invalid prior restraints which cannot be justified by any legitimate state interest.

231.    The Data Sharing Ban is unconstitutionally vague and has a substantial chilling effect on the First Amendment rights of Plaintiff and others not before the Court.

232.    The Data Sharing Ban is unconstitutionally overbroad and has a substantial chilling effect on the First Amendment rights of Plaintiff and others not before the Court.

233.    The Use Restrictions and Data Sharing Ban unlawfully restrict an objective of the NVRA and, as such, are preempted.

234.    In order to prevent further violation of Plaintiff's federal constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. Pro. 57, declaring the Use Restrictions to be in violation of the First Amendment.

235.    Further, pursuant to 28 U.S.C. § 2202, it is appropriate and hereby requested that this Court maintain its preliminary injunction and issue a permanent injunction enjoining Defendants and all of their agents and employees from enforcing the Use Restrictions against Plaintiff in violation of its constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Voter Reference Foundation, LLC respectfully prays for judgment in its favor and against Defendants and that the Court:

a.    Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare that the Use Restrictions and Data Sharing Ban violate the First, Fifth, and Fourteenth Amendments to the United States Constitution.

b.    Pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declare the Use Restrictions and Data Sharing Ban violate the National Voter Registration Act.

c.    Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, preliminarily and permanently enjoin Defendants, their agents, employees, and all persons acting in active concert or participation with them, from enforcing the Use Restrictions and Data Sharing Ban against Plaintiff, its agents, and others similarly situated.

d.    Pursuant to 42 U.S.C. § 1988 and other applicable law, award Plaintiff its costs and expenses incurred in bringing this action, including its attorneys' fees.

e.    Grant all other and further relief that the Court deems equitable, just, and proper.

Dated: September 26, 2022.          Respectfully submitted,

                 **GRAVES GARRETT, LLC**

                */s/ Edward D. Greim*
                Edward D. Greim
                Missouri Bar No. 54034
                *Admitted Pro Hac Vice*
                GRAVES GARRETT LLC
                1100 Main Street, Suite 2700
                Kansas City, Missouri 64105
                Tel.: (816) 256-3181
                Fax: (816) 222-0534
                edgreim@gravesgarrett.com

                **HARRISON, HART & DAVIS, LLC**
                */s/ Carter B. Harrison*
                Carter B. Harrison IV
                924 Park Avenue SW, Suite E
                Albuquerque, NM 87102
                Tel: (505) 369-6599
                Fax: (505) 341-9340
                carter@harrisonhartlaw.com

                *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Edward D. Greim, certify that on September 26, 2022, a copy of Plaintiff's Verified First

Amended Complaint was filed with the Clerk of the Court using the CM/ECF system, which sent

notification to the following via e-mail:

> Erin Lecocq
> Jeff Dan Herrera
> Office of the New Mexico Attorney General
> 408 Galisteo Street
> Santa Fe, NM 87501
> elecocq@nmag.gov
> jherrera@nmag.gov

    */s/ Edward D. Greim*
    **Attorney for Plaintiff**

57