# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| **v.** | ) |
| | )   **CASE NO: 1:22-cv-00222-JB-KK** |
| | ) |
| **RAÚL TORREZ**[1]**,** in his official | ) |
| capacity as New Mexico Attorney General, | ) |
| | ) |
| And | ) |
| | ) |
| **MAGGIE TOULOUSE OLIVER,** in her | ) |
| official capacity as New Mexico | ) |
| Secretary of State, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND SUGGESTIONS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

**GRAVES GARRETT, LLC**
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

**HARRISON, HART & DAVIS, LLC**
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

*Attorneys for Plaintiff*
*Voter Reference Foundation, LLC*

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Raúl Torrez is substituted for Hector Balderas as New Mexico Attorney General.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... vi

INTRODUCTION .................................................................................................... 1

STATEMENT OF UNCONTROVERTED FACTS ("SOF") ................................ 3

    I.    Voter Reference Foundation & VoterRef.com ................................ 3

    II.   The Defendant Secretary of State ................................................ 5

    III.  The Defendant Attorney General ................................................ 6

    IV.  The Secretary Maintains and Controls New Mexico Voter Data ........ 7

    V.   Voter Data is Made Available for Public Inspection and Use under Federal and State Law ........................................................ 8

        A.  The NVRA requires states to make voter records publicly available. ........ 8

        B.  New Mexico's current regulation of voter data ................................ 8

        C.  The "Data Sharing Ban" ................................................ 10

    VI.  VRF Obtains New Mexico Voter Data and Publishes it on VoteRef.com ........ 13

        A. VRF lawfully obtained the voter data from Local Labs ................ 13

        B. VRF published the data online for governmental and election related purposes ........................................................ 14

        C. VRF conducted an internal analysis of the voter data, issued a press release about that analysis, and reached out to the Secretary to discuss the analysis ........................................ 16

    VII.  The Secretary Refers VRF to the AG for Criminal Investigation ........ 19

    VIII. The Use Restrictions ................................................................ 20

    IX.  The ProPublica Article ................................................................ 21

    X.   The Secretary Believes VRF Spreads Misinformation ................ 26

    XI.  VRF Requests Additional Voter Data from the Secretary on February 15, 2022 ................................................................ 26

XII.   **Defendants Investigate VRF, Including Through Coordination with other State and Federal Law Enforcement** ..................................27

XIII.  **VRF Removes the New Mexico Data from VoteRef.com and Files this Lawsuit** ..................................28

XIV.  **On May 27, 2022, VRF Provides Notice to the Secretary's Violation of the NVRA and Makes Additional Requests for Voter Data which the Secretary Refuses to Fulfill** ..................................29

XV.   **New Mexico Stores and Can Easily Access the Data VRF Requests** ..................34

XVI.  **VRF Again Posts New Mexico Voter Data on the Website following this Court's Issuance of a Preliminary Injunction Allowing it to do so.** ..................36

XVII. **Defendants Refused a Third Request from VRF for New Mexico Voter Data** ..................................37

XVIII.**VRF Removes New Mexico Voter Data from the Website Following the Tenth Circuit's Stay of Preliminary Injunction** ..................................39

XIX.  **Defendants Take Vague and Inconsistent Positions Regarding the Data Sharing Ban and the Scope of the Law to Single out VRF** ..................................39

XX.   **Defendants' Indifference towards Entities Actually *Selling* New Mexico Voter Data to Third Parties Persists throughout this Litigation** ..................................43

XXI.  **The State Interests Purportedly Served by the Data Sharing Ban and Use Restrictions** ..................................45

XXII. **Defendants Fail to Produce any Evidence that VRF's Publication of Voter Data has Caused Harm to Voters or the State** ..................................46

XXIII.**VRF's Future Plans Involving New Mexico Voter Data** ..................................47

**ARGUMENT** ..................................48

I.      **Summary Judgment Standard.** ..................................48

II.     **VRF has Standing to Bring its First Amendment and NVRA Claims.** ..48

III.    **VRF is Entitled to Judgment as a Matter of Law on its NVRA Claims** ..1023

a.  **The law regarding the federal right to access individual, identifiable voter information.** ..................................51

**b. New Mexico's restrictions on requesting and accessing voter records are preempted by the NVRA's Public Inspection Provision (Count 1)** .................................................. 54

    **i.**    **The law of obstacle preemption** ........................... 54

    **ii.**    **The NVRA preempts the Data Sharing Ban and Use Restrictions.** ................................. 56

**c. Regardless of preemption, the Defendants violated the NVRA by failing to produce records in response to VRF's lawful request (Count II)** ............................................. 58

    **i.**    **VRF made three lawful requests under the NVRA which the Secretary was required to fulfill.** ............... 58

    **ii.**    **The Secretary rejected all of VRF's requests.** ............ 59

    **iii.**    **The Secretary's pretextual reasons for blocking VRF's requests for voter data violate common sense and the NVRA.** .................................... 60

        **1. The alleged fear the VRF would break promises** ........ 60

        **2. The pretext that the requested records "do not exist"** ................................ 61

        **3. Ongoing litigation** .......................... 63

        **4. Failure to attach affidavits to the October 22 request** ..................................... 63

**IV. VRF is Entitled to Judgment as a Matter of Law on its First Amendment Claim Because the Data Sharing Ban and Use Restrictions Directly Restrict Core Political Speech, Impose Unconstitutional Conditions, and Fail Strict Scrutiny (Count V)** .......... 63

    **a. VRF need not show a right to access New Mexico voter data under the First Amendment, as its right of access is derived from the NVRA and state law** ....................... 64

    **b. Speech involving voter data is protected by the First Amendment, particularly when that data is required to be made available under State and Federal law.** ................... 65

c.  VRF's constitutionally protected speech is infringed by the
Use Restrictions and the Data Sharing Ban. ...........................67

    i.  Restriction of Core Political Speech ...................66

d.  The Data Sharing Ban and Use Restrictions violate the First
Amendment because they unconstitutionally condition access
to Voter Data on the Surrender of First Amendment Rights ...........69

e.  The Use Restrictions and Data Sharing Ban cannot survive
strict scrutiny. ...........................................72

    i.  Strict scrutiny applies ...............................72

    ii.  The Data Sharing Ban and Use Restrictions fail
strict scrutiny. .......................................73

        1.  Defendants must, but cannot, demonstrate that
the regulations further a compelling state interest
and are narrowly tailored towards that interest ...........73

        2.  The asserted interests which Defendants claim
justify the Data Sharing Ban and Use Restrictions
are not "compelling" ...............................73

        3.  Even if Defendants identified a compelling state
interest, the restrictions at issue are not narrowly
tailored ...........................................77

V.  VRF is Entitled to Judgment as a Matter of Law on its claim
that the Data Sharing Ban and Use Restrictions Are
Overbroad (Count VI) ...........................................78

a.  Law regarding the merits of overbreadth challenges ...........79

b.  The Data Sharing Ban is unconstitutionally overbroad ...........81

VI.  VRF is Entitled to Judgment as a Matter of Law on its Vagueness
claim (Count VII) ...........................................82

a.  Law regarding void for vagueness challenges ...........82

b.  Defendants' theory regarding the source of the Data
Sharing Ban requires illogical, incoherent, and inconsistent
statutory interpretation and is likely pretextual ...........84

    **c.**  **The Data Sharing Ban is vague** ......................................................... 86

    **d.**  **The New Mexico Legislature's Amendment of § 1-4-5.6 Supports VRF's Vagueness Claim** ................................................ 87

**VII.**  **VRF is Entitled to Judgment as a Matter of Law on its First Amendment Retaliation and Viewpoint Discrimination Claims (Count III)** ........................................................................ 89

    **a.**  **The law of First Amendment retaliation** ..................................... 89

    **b.**  **Defendants unlawfully retaliated against VRF by threatening VRF with prosecution and refusing to fulfill VRF's lawful requests for voter data.** ............................................................... 90

        **1.**  **Threat of prosecution** ........................................................ 90

        **2.**  **Refusing to fulfill VRF's request** ..................................... 91

    **c.**  **Defendants engaged in improper viewpoint discrimination.** ...... 93

        **i.**  **The law of viewpoint discrimination** ................................ 93

        **ii.**  **Refusal to produce voter data to VRF** ............................. 93

        **iii.**  **Referring VRF to the AG for investigation and prosecution** ...................................................................... 95

**VIII.**  **The Court Should Enter a Permanent Injunction** ............................ 96

    **a.**  **Standard for permanent injunctive relief.** ................................. 96

    **b.**  **VRF is entitled to a permanent injunction.** ............................... 96

        **i.**  **VRF will suffer irreparable harm absent permanent injunctive relief** .................................................................. 97

        **ii.**  **The injury to VRF outweighs any harm that may be caused to Defendants and the public interest favors an injunction** .......................................................................... 98

**CONCLUSION & REQUESTED RELIEF** ............................................... 99

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986) .................................................................................. 48

*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*,
    912 F.2d 1238 (10th Cir. 1990) ................................................................. 48

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    570 U.S. 1 (2013) ....................................................................................... 55

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) .................................................................................. 79

*Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo.*,
    744 F.2d 739 (10th Cir. 1984) ............................................................. 73, 81

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012) ................................................................. 97

*Bartnicki v. Vopper*,
    532 U.S. 514 (2001) .................................................................................. 66

*Bd. of Cnty. Commissioners of Sweetwater Cnty. v. Geringer*,
    297 F.3d 1108 (10th Cir. 2002) ........................................................... 49, 50

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
    457 U.S. 853 (1982) .................................................................................. 76

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973) .................................................................................. 79

*Butcher v. Knudsen*,
    38 F.4th 1163 (9th Cir. 2022) .................................................................... 84

*California First Amend. Coal. v. Lungren*,
    No. C 95-0440-FMS, 1995 WL 482066 (N.D. Cal. Aug. 10, 1995) .......... 77

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    408 F.3d 1349 (11th Cir. 2005) ................................................................. 55

*Chicago v. Morales*,
    527 U.S. 41 (1999) ..................................................................................... 83

*Citizens United v. Fed. Election Comm'n,*
      558 U.S. 310 (2010) ................................................................................. 66, 73

*Clark v. Community for Creative Non–Violence,*
      468 U.S. 288 (1984) ................................................................................. 76

*Cleveland v. Policy Management Systems Corp.,*
      526 U.S. 795 (1999) ................................................................................. 48

*Connick v. Myers,*
      461 U.S. 138 (1983) ................................................................................. 66, 70

*Cooper v. Dillon,*
      403 F.3d 1208 (11th Cir. 2005) .............................................................. 77

*Connally v. General Constr. Co.,*
      269 U.S. 385 (1926) ................................................................................. 83

*Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York,*
      447 U.S. 530 (1980) ................................................................................. 73

*Crawford-El v. Britton,*
      523 U.S. 574 (1998) ................................................................................. 89

*Crosby v. Nat'l Foreign Trade Council,*
      530 U.S. 363 (2000) ................................................................................. 54

*Dombrowski v. Pfister,*
      380 U.S. 479 (1965) ................................................................................. 79

*Elrod v. Burns,*
      427 U.S. 347 (1976) ................................................................................. 97

*Fusaro v. Cogan,*
      930 F.3d 241 (4th Cir. 2019) .......................................................... *passim*

*Geier v. Am. Honda Motor Co.,*
      529 U.S. 861 (2000) ................................................................................. 55

*Giaccio v. Pennsylvania,*
      382 U.S. 399 (1966) ................................................................................. 83

*Gitlow v. New York,*
      268 U.S. 652 (1925) ................................................................................. 66

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) ................................................................................ 83

*Green Party of N.Y. v. N.Y. State Bd. of Elections*,
    389 F.3d 411 (2d Cir. 2004) .................................................................... 70

*Griffin v. Bryant*,
    30 F. Supp. 3d 1139 (D.N.M. 2014) ................................................. 73, 77

*Harkless v. Brunner*,
    545 F.3d 445 (6th Cir. 2008) .................................................................. 55

*Hartman v. Moore*,
    547 U.S. 250 (2006) ............................................................................... 89

*Heideman v. S. Salt Lake City*,
    348 F.3d 1182 (10th Cir. 2003) .............................................................. 97

*Hill v. Colorado*,
    530 U.S. 703 (2000) ............................................................................... 83

*Jones v. Southpeak Interactive Corp. of De.*,
    777 F.3d 658 (4th Cir. 2015) .................................................................. 52

*Jordan v. Pugh*,
    425 F.3d 820 (10th Cir. 2005) ............................................................... 82

*Judicial Watch, Inc. v. Lamone*,
    399 F.Supp.3d 425 (D. M.D. 2019) ................................................. 51, 55

*Keller v. State Bar of Cal.*,
    496 U.S. 1 (1990) ................................................................................... 67

*Kolender v. Lawson*,
    461 U.S. 352 (1983) ............................................................................... 82

*Legacy Church, Inc. v. Kunkel*,
    455 F. Supp. 3d 1100 (D.N.M. 2020) .................................................... 98

*Los Angeles Police Dep't v. United Reporting Pub. Corp.*,
    528 U.S. 32 (1999) ........................................................................ 64, 65, 71

*Martin v. City of Struthers, Ohio*,
    319 U.S. 141 (1943) ............................................................................... 66

*McCraw v. City of Oklahoma City,*
   973 F.3d 1057 (10th Cir. 2020) ................................................................ 77

*McCullen v. Coakley,*
   573 U.S. 464 (2014) ................................................................................. 77

*Mini Spas, Inc. v. South Salt Lake City Corp.,*
   810 F.2d 939 (10th Cir. 1987) ................................................................. 83

*Mt. Healthy City Bd. of Ed. v. Doyle,*
   429 U.S. 274 (1977) ................................................................................. 89

*Meyer v. Grant,*
   486 U.S. 414 (1988) ......................................................................... 65, 68, 73

*New Hampshire Right to Life Pol. Action Comm. v. Gardner,*
   99 F.3d 8 (1st Cir. 1996) .......................................................................... 49

*Pac. Frontier v. Pleasant Grove City,*
   414 F.3d 1221 (10th Cir. 2005) ............................................................... 98

*Pahls v. Thomas,*
   718 F.3d 1210 (10th Cir. 2013) ............................................................... 93

*Perry v. Sindermann,*
   408 U.S. 593 (1972) ................................................................................. 89

*Pharm. Research and Mfrs. of Am. v. Walsh,*
   538 U.S. 644 (2003) ................................................................................. 54

*Pickering v. Board of Educ.,*
   391 U.S. 563 (1968) ................................................................................. 89

*Project Vote v. Blackwell,*
   455 F. Supp. 2d 694 (N.D. Ohio 2006) .................................................... 55

*Project Vote, Inc., v. Kemp,*
   208 F. Supp 3d 1320 (N.D.Ga 2016) ....................................................... 61

*Project Vote/Voting for Am., Inc. v. Long,*
   682 F.3d 331 (4th Cir. 2012) ............................................................. 51-53, 56

*Pub. Int. Legal Found., Inc. v. Bellows,*
   588 F.Supp.3d 124 (D. Me. 2022) ....................................................... 51, 58

*Pub. Int. Legal Found., Inc. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022) .................................................................. 51

*Reed v. Town of Gilbert, Ariz.*,
  576 U.S. 155 (2015) ............................................................................................ 76

*Reno v. ACLU*,
  521 U.S. 844 (1997) ............................................................................................ 66

*Republican Party of Minnesota v. White*,
  536 U.S. 765 (2002) ............................................................................................ 73

*Rhode Island Med. Soc. v. Whitehouse*,
  66 F. Supp. 2d 288 (D.R.I. 1999) ....................................................................... 49

*Roberts v. United States Jaycees*,
  468 U.S. 609 (1984) ............................................................................................ 73

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
  515 U.S. 819 (1995) ...................................................................................... 67, 93

*Roth v. United States*,
  354 U.S. 476 (1957) ............................................................................................ 66

*Smith v. Goguen*,
  415 U.S. 566 (1974) ............................................................................................ 83

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ............................................................................................ 66

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ..................................................................................... *passim*

*Southwest Stainless, LP v. Sappington*,
  582 F.3d 1176 (10th Cir. 2009) .......................................................................... 96

*Steffel v. Thompson*,
  415 U.S. 452 (1974) ............................................................................................ 98

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ............................................................................................ 49

*Thomas v. Collins*,
  323 U.S. 516 (1945) ............................................................................................ 79

*Turner Broadcasting System, Inc. v. FCC,*
    512 U.S. 622 (1994) ........................................................................................ 71, 73

*Universal Life Church Monastery Storehouse v. Nabors,*
    35 F.4th 1021 (6th Cir. 2022) .......................................................................... 49

*United States v. American Library Assn., Inc.,*
    539 U.S. 194 (2003) ......................................................................................... 70

*United States v. Williams,*
    553 U.S. 285 (2008) .................................................................................. 79, 80, 83

*Van Deelen v. Johnson,*
    497 F.3d 1151 (10th Cir. 2007) ....................................................................... 90

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ......................................................................................... 79

*Vitkus v. Beatrice Co.,*
    11 F.3d 1535 (10th Cir. 1993) ......................................................................... 48

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n,*
    758 F.2d 669 (D.C. Cir. 1985) ........................................................................ 97

*Wooley v. Maynard,*
    430 U.S. 705 (1977) ......................................................................................... 98

## Other Authorities

28 U.S.C. §§ 2201- 2202 ............................................................................................ 99

42 U.S.C. § 1973 ......................................................................................................... 52

42 U.S.C. § 1983 ......................................................................................................... 99

52 U.S.C. § 20507 ................................................................................................. *passim*

52 U.S.C. § 20510 ........................................................................................ 29, 50, 59, 99

Fed. R. Civ. P. 56(a) .................................................................................................. 48

Fed. R. Civ. P. 65 ....................................................................................................... 99

N.M. Stat. § 1-1-1 ........................................................................................................ 5

N.M. Stat. § 1-2-1.1(A) ................................................................................................ 5

N.M. Stat. § 1-2-2 ........................................................................................................ 5

N.M. Stat. § 1-4-5.5 .............................................................................................. *passim*

N.M. Stat. § 1-4-5.6 .............................................................................................. *passim*

N.M. Stat. § 1-5-2 ................................................................................................. *passim*

N.M. Stat. § 1-5-5.6 ................................................................................................... 11

N.M. Stat. § 1-5-14 .................................................................................................... 31

N.M. Stat. § 1-5-22 .............................................................................................. *passim*

N.M. Stat. § 1-5-23 ............................................................................................... 36, 86

N.M. Stat. § 1-20-15 ................................................................................................... 32

U.S. Const. Amend. 1 .......................................................................................... *passim*

U.S. Const. Art. I, § 4 ................................................................................................. 55

## INTRODUCTION

The Plaintiff, Voter Reference Foundation, shares the mission claimed by the Defendants Secretary of State and Attorney General: to increase voter confidence and participation in elections. It is the parties' political differences that lead them to favor different means. VRF favors educating citizens about how the system works, allowing access to voter data for those who agree to use it for lawful purposes. Interested citizens can then crowdsource the search for data errors and associate with VRF (or others) to petition the state for fixes. Defendants, in contrast, claim citizens cannot hope to understand the system; are duped by "misinformation;" and unfairly criticize officials. To protect citizens from themselves, Defendants would impose a guardianship of the public mind, controlling who sees the data, who shares it, and how they share it.

This Court need not choose one view over the other, for Congress did so long ago. In the National Voter Registration Act of 1993, which mandated nationwide rules for voter registration and voter roll maintenance, Congress chose the side of sunshine and open debate by including a Public Inspection Provision. Court after court has invalidated state laws that would limit this grant of access, whether by direct bans or by indirect regulations which unequally treat speakers, speech, or uses of the data. On the undisputed facts, the Defendants' forever-ban on VRF's access to the data, and Defendants' Data Sharing Ban and Use Restrictions that bar VRF and others from engaging in Internet speech that shares this data, violate the NVRA. See Parts II-III, below.

Next, Defendants admit that VRF's sharing of the data is speech. Defendants' policy and practice attacks this speech by: (1) banning all sharing of voter data outside of a requesting entity, including but not limited to internet speech; and (2) banning all uses (perhaps again including VRF's use) that they deem to be misinformation, or non-election, non-governmental uses. This violates the First Amendment because: (1) it completely bans VRF's main form of speech in the area of elections and politics; and (2) it is an unconstitutional condition on granting a government

1

benefit (access to the data, which is mandated under the NVRA) by forcing VRF to surrender speech rights as a condition of access, and by imposing content or viewpoint-based criteria for access. These restrictions fail strict scrutiny. *See* Part IV. Third, Defendants' Data Sharing Ban and Use Restrictions are overbroad and vague. *See* Parts V, VI.

Finally, building on its finding of viewpoint discrimination in July 2022, this Court should grant summary judgment on Plaintiff's viewpoint discrimination and retaliation claims. *See* Part VII. Since last summer, Defendants' conduct has only grown more brazen. Later in 2022, Defendants continued to block VRF's access to voter records despite VRF's open-court promise not to share them online without a court order. Stunningly, the Secretary revealed that she later retaliated against VRF *even for relying on this Court's order*. The Secretary cannot say when the "stain" of VRF's reliance on this Court's order will ever dissolve to allow VRF to regain data access. The Secretary's other supposed excuses for denying access were exposed as further pretext.

The Attorney General is intimately involved in this retaliation; his office continues to support the Secretary's blocking of access. This is despite the Attorney General's latest surprise: in a complete reversal, his office admitted it could no longer say that it supported the convoluted statutory reading that both Defendants had repeatedly told this Court constituted New Mexico's "statutory" ban on all data sharing, including online. As of today, the Defendants' story about what part of the statute VRF has violated, and how far its reach extends beyond VRF, remains in flux. The only constant is this: Defendants will profess to remain convinced that VRF engages in misinformation, and can never be trusted to receive New Mexico voter data. Defendants' dodging, weaving, and efforts to create loopholes in New Mexico law and the NVRA should now come to an end. After a year in limbo, VRF should receive access to the data and definitive protection from Defendants' retaliatory animus.

## STATEMENT OF UNCONTROVERTED FACTS ("SOF")

**I.     Voter Reference Foundation & VoteRef.com**

1.   Plaintiff Voter Reference Foundation, LLC ("VRF") is a nonpartisan nonprofit company whose mission is to increase voter participation and transparency in elections at all levels so that the public can remain informed regarding electoral processes and ensure the integrity of elections across the country. **Ex. P1, Excerpts from Transcript of May 17, 2022 Hearing on Plaintiff's Motion for Preliminary Injunction ("May 17 Tr."), 53:12-19.**

2.   VRF is dedicated to ensuring transparent, accurate, and fair elections in the United States of America and does so, in part, by making state voter registration information available on the Website. **May 17 Tr., 53:20-55:2.**

3.   VRF believes that full transparency of election records and results is needed to restore faith in electoral processes, which in turn, will lead more people to vote as a result of their renewed confidence in the system. **May 17 Tr., 60:23-61:11.**

4.   VRF's mission is accomplished through two distinct but related projects. The first project seeks to fulfill the ideal of citizen oversight of elections as envisioned by the National Voter Registration Act's ("NVRA") requirement that states "make available for public inspection…all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i)(1). To accomplish this goal, VRF endeavors to publicize voter registration information in every state so that citizens can verify the accuracy of the information by "crowdsourcing" its review. **May 17 Tr., 71:16-72:5**. If a citizen notices that information about a voter is incorrect, they are empowered to contact the relevant Secretary of State or election official to remedy the error. **Id., 71:25-72:5.**

5.   Towards these ends, VRF operates the website VoteRef.com (the "Website"). **May 17 Tr., 54:15-55:2.** The purpose of the Website is to provide public access to official government data

pertaining to elections, including voter registration rolls. ***Id.*, 55:24-56:5.** The public dissemination of this information is intended to increase voter participation and make the state's election processes more transparent. ***Id.*, 60:23-61:11.**

6.   The Website typically provides any information made public by the state agency charged with maintaining the voter registration database, if state law allows that information to be shared. **May 17 Tr., 54:15-55:2.** For example, a user can typically view a voter's: name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history. ***Id.***

7.   Those who access the Website can search by name or address for registered voters and they also will be able to peruse voting histories, a list of elections that voter participated in, as well as other important election data obtained via official sources. **May 17 Tr., 71:16-72:5.**

8.   Citizens can check their own voting status, voting history, and those of their neighbors, friends, and others, and are thereby able to "crowd-source" the process of rectifying any errors. **May 17 Tr., 16:6-15; 70:16-71:10**. The public is enabled to check on the validity of the data by recognizing common errors in larger data sets; for example, citizens could examine the data for their precinct and recognize many voters were given placeholder birthdates. ***Id.*, 15:3-17.** This also allows citizens to encourage others to vote, increasing overall voter participation. ***Id.*, 55:24-56:11.**

9.   A close review of the data can show that it is wrong or was entered incorrectly. **Plaintiff's Verified First Amended Complaint ("FAC") [Dkt. 74] ¶13; Defendants' Answer to FAC ("Answer") [Dkt. 77] ¶13** (admitted). VRF encourages users of the Website to report these errors directly to the appropriate Secretary of State or clerk. **May 17 Tr., 71:25-72:5; SOF ¶62.**

10. VRF accomplishes its efforts to create and maintain the Website by requesting voter registration data from state agencies on a quarterly basis (either directly or through third party

vendors) and then compiling and posting that data in a way that is easily accessible, searchable, and usable by the public. **May 17 Tr., 54:15-55:2; 55:3-4.**

11. After it acquires raw voter data from a state, VRF's database analysts map the data that would otherwise be unusable by the public and put the data into a searchable, understandable format for the public to review and analyze. **May 17 Tr., 53:20-54:6.**

12. In many states, access to the data is prohibitively expensive and members of the general public lack the knowledge to map the raw data in a manner that is usable. *Id.* **at 54:2-6.**

13. VRF has, and intends to, post this data for the public to access and view free of charge so that the public can fulfill its oversight duties under the NVRA. **May 17 Tr. at 53:12-19**; see also **FAC ¶67**; **Answer ¶67** (admitting no fee to access).

## II.      The Defendant Secretary of State

14. Defendant Maggie Toulouse Oliver is the duly elected Secretary of State for the state of New Mexico and, in that capacity, is the chief election officer of the state. **FAC ¶16; Answer ¶16 (admitted)**. Secretary Toulouse Oliver is named in her official capacity only. *Id.*

15. The Secretary is responsible under state law for furnishing voter data to requesters and referring potential violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6, to the Attorney General for investigation and prosecution. **FAC ¶16; Answer ¶16 (admitted);** see also N.M. Stat. § 1-2-1.1(A); § 1-2-2; § 1-1-1.

16. The Attorney General relies on the Secretary in deciding whether to investigate possible reports that voter data statutes have been violated, and does so in part because the Attorney General believes the Secretary is primarily responsible for interpreting and enforcing statutes relating to voter data. **Ex. P2, Excerpts from Transcript of 30(b)(6) Deposition of Attorney General Representative, Deputy Attorney General Joseph Dworak ("Dworak"), 16:21-17:4.**

### III.    The Defendant Attorney General

17. Defendant Raúl Torrez is the duly elected Attorney General of New Mexico ("AG") and is responsible under state law for investigating and prosecuting violations of the Election Code. **FAC ¶14; Answer ¶14 (admitted).** The AG is named in his official capacity only. ***Id.***

18. The AG has stated that it has a "duty" and is "required" to prosecute violations of the Election Code. **Ex. P3, Excerpts from August 31, 2022 Hearing on Def.'s Mtn. to Stay ("Aug 31 Tr."), 5:21-24**; ***id.*, 32:3-9** (AG "has the statutory mandate to enforce New Mexico law, including the Election Code. And if we believe that a violation is occurring—'we' meaning the Attorney General's Office--yes, we are entitled and required to prosecute.").

19. The AG has repeatedly refused to state that it will not prosecute VRF for its prior posting of voter data online. **Ex. P4, AG's 3-8-23 First Supp. Responses to VRF First Discovery at RFA 4** (admitting that AG has not declined to prosecute VRF for its use or sharing of voter data, including but not limited to the operation of the website VoteRef.com)**.**

20. By March 11, 2022, on advice from the AG, the Secretary had taken the position that it would not respond to any requests for voter data from VRF. **Ex. P5, 3-11-22 Email Exchange with Rostock, Vigil, and Pino regarding VRF 2-15-22 Request, Dkt. 44-16 filed 6/24/22.[2]**

21. ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████.

22. The AG investigated VRF for its use of voter data and the publication of that voter data on the Website. **Dworak, 84:8-18.**

---

[2] Pursuant to D.N.M.LR-Civ 10.7, Plaintiff will from time to time refer the Court to exhibits previously filed in this matter by noting the document name, docket number, and filing date following the identification of the exhibit.

23. The Attorney General has supported the position throughout this litigation that VRF has violated New Mexico law. **Dworak, 51:24-52:8.**

24. The Attorney General takes the same position as the Secretary as to the legality of VRF's actions. *Id.***, 53:18-25; 54:19-24.**

### IV. The Secretary Maintains and Controls New Mexico Voter Data

25. There is one statewide voter registration database that contains all voter registration information for New Mexico. **Ex. P6, Excerpts of Transcript of 30(b)(6) Deposition of Secretary of State Representative, Elections Director Mandy Vigil ("Vigil"), 19:22-20:4.**

26. The database has fields for demographic information, party affiliation, and "activity" on the record, including voter credits and all updates to a voter registration record, so the fact that there was an update to a voter record is tracked and "logged" within the database. *Id.***, 20:5-21:1**

27. A "voter credit" is a record in the New Mexico voter database that indicates a voter has participated in an election. **Vigil, 13:11-17.**

28. The Secretary provides an online portal to the voter registration database, and anyone with the name and birthdate of a voter can enter the information to access real-time voter information. **Vigil, 134:8-23.** The portal doesn't require any affirmation by the user that they are using the portal only to look up their own information, or that the information is not being looked up for an improper purpose. *Id.***, 135:15-136:2.** The Secretary has no way of knowing whether individuals use the database to learn others' private information. *Id.***, 135:10-14.** The Secretary is not aware of anyone using its website for an improper purpose or to stalk others. *Id.***, 134:24-135:9.**

V.    **Voter Data is Made Available for Public Inspection and Use under Federal and State Law**

A.  **The NVRA requires states to make voter records publicly available.**

29. The NVRA requires that states make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i) (the "Public Inspection Provision"). Those "records" which must be made available pursuant to the NVRA include the "file maintenance list" and "voter data" as those terms are defined in N.M. Stat. § 1-5-2, as well as "voter data" as that term is used in N.M. Stat. § 1-4-5.5.

B.  **New Mexico's current regulation of voter data**

30. The Bureau of Elections is in charge of responding to requests for data, and Mandy Vigil is the Director of Elections. **Vigil, 25:5-20.**

31. Defendants only recognize "governmental" and "election campaign" uses as permissible purposes for use of voter data. **Dworak, 19:25-20:12; Ex. P7, Feb. 14 Form, Dkt. 44-10 filed 6/24/22.**

32. Anyone requesting New Mexico voter data must provide an attestation regarding how he or she will use the information. § 1-4-5.5(C); **May 17 Tr., 34:23-35:5 (Serafimova); Exs. P8 (undated form), Dkt. 44-8 filed 6/24/22; P9 (Feb. 10 form), Dkt. 44-9 filed 6/24/22; and P7 (Feb. 14 form).**

33. The Secretary claims that it only processes requests accompanied by the form promulgated by the office, the Voter Information Authorization form. **Ex. P10, Excerpts from Transcript of June 15, 2022 Hearing on Pltfs. Mtn. for Prel. Inj. ("June 15 Tr."), 47:10-50:8.** The Voter Information Authorization form has changed several times, particularly between 2021 and 2023,

though the Secretary maintains that even older forms are still accepted. ***Id.* at 89:16-20 (Vigil); see also Exs. P8 (undated form), P9 (Feb. 10 form), and P7 (Feb 14 form).**

34. **Exhibit P7** is the most-recently updated version of the request form that must be submitted to receive the voter information, which was amended on February 14, 2022. It requires a requester to check one of two "purposes" behind the request, either: "Campaign Use" or "Governmental Use." *Id.* There is no option for "election" use. *Id.* The Secretary designed the form, which was then approved by the Elections Director, along with a legal review by the Secretary's General Counsel or the Deputy Secretary of State. **May 17 Tr., 131:23-132:6.**

35. The form includes an authorization which states:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978). I hereby swear that the requestor will not: (INITIAL EACH)
> ____ sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.
> ____ alter voter information received as a result of this request.
> ____ use voter information for any purpose other than those authorized on this form.
> ____ use voter information for any commercial purposes.

**Ex. P7 (Feb. 14 form).** The form requires the requestor's signature just below this. *Id.*

36. The version of the form signed by Local Labs permitted governmental, campaign, and election related uses, just as the statute does. **Ex. P11, Lippert Form, Dkt. 44-1 filed 6/24/22.** The latest form differs from earlier versions of the form, including the version signed by Local Labs, the entity that actually shared voter data with VRF. Earlier versions, for example, allow for additional uses of the data, such as for "research" or for "election-related" purposes. **Compare Exs. P7 and P9 with Ex. P8.**

37. The February 14th form requires, for the first time, that the requester provide a narrative of its "intended use of voter data." **Ex. P7.**

38. Earlier versions also allowed the data to be "transferred" so long as it was for a permissible purpose. **See Ex. P8, Undated Form**; **Ex. P11, Lippert Form** (same). None of those versions required the transferor to retain control over the transferee's use of the data, to stand as a guarantor of the transferee's use of the data, or to exact promises or other undertakings from the transferee to ensure the transferee used it for the intended purposes. *Id.*

### C. The "Data Sharing Ban"

39. Defendants have a policy and position that voter data cannot be shared, disseminated, distributed, published, or otherwise made available by a requestor to any third party. **May 17 Tr., 148:20-149:13**; **June 15 Tr., 91:6-20**. Plaintiff will refer to this policy as the "Data Sharing Ban."

40. At the preliminary injunction hearing(s), Plaintiff's counsel propounded a number of hypotheticals to the Secretary's Elections Director and Deputy Secretary of State. The responses to those hypotheticals revealed that the Defendants absolutely prohibit the sharing of voter data between a requestor and any other person, regardless of whether the sharing is for a governmental, election, or election campaign purpose. This would include sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for (**June 15 Tr. at 33:13-34:16**); sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic who wanted to question or validate the data (*id.* at 32:6-33:9); sharing between a political party and a candidate it supports, but who is not affiliated with the party (*id.* at 91:1-5, 91:17-20); sharing of a voter's information by a canvasser with close family members or other members of his or her household (*id.* at 30:17-31:20); sharing by a political data compilation/analysis firm and its political clients (*id.* at 34:17-24); and sharing via publication on the internet (*id.* at 91:12-16).

41. After all of this, upon the methodical direct examination by her own counsel, Olga Serafimova of the AG's Office, Vigil testified, "Yes," when asked whether she would "unequivocally" find a violation of New Mexico law if a data vendor like Catalist sold or shared New Mexico voter data files to third parties, whether for profit or based on an ideological connection. *Id.*, **73:24-74:11.**

42. Vigil continued, led by the AG's counsel, reaffirming that even one academic sharing his own voter file with another academic, regardless of the purpose or content of the papers, would be a violation of the law. *Id.*, **74:24-75:15.**

43. Defendants adhered to this view despite its odd results. Defendants maintained that a voter list could be obtained by a single party official signing a single affidavit, but widely disseminated among a variety of organizations and individuals, including candidate campaign committees at all levels (so long as the candidate is affiliated with the party), candidate campaign and party workers, and even volunteers. *Id.*, **29:2-30:4.** Defendants also allow sharing within a family, and even though that might violate the ban, it would not be enforced. *Id.*, **31:4-12.**

44. Defendants locate this prohibition within a peculiar construction of multiple statutes, reading the language of § 1-4-5.6 to incorporate by reference language from § 1-5-22 such that § 1-4-5.6 prohibits *any person*, not just government employees and data processors, from "selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file…". **May 17 Tr., 34:3-14** (admitting Defendants' theory is that 1-4-5.6 incorporates by reference § 1-5-22--not in its entirety-- but the purposes that 22 prohibits); *id.,* **34:23-35:14** ("purposes" when used in § 1-4-5.6 refers to purposes prohibited by Article 5, not "purposes"  in § 1-4-5.5); *id.*, **36:10-11** ("…Local Labs, by providing the data to VRF, and VRF by providing it to the world on the website violated § 1-5-5.6.); *id.,* **37:11-19** ("…[I]t is the Attorney General's

position, as a party in this case, that if there is any criminal liability on the table, it is not for violating the so-called use restrictions under § 1-4-5.5(c). It is for providing--otherwise providing access or otherwise surrendering or selling or lending the voter data under § 1-4-5.6); ***id.*, 50:25-51:5** (same); **June 15 Tr., 228:4-16** (§ 1-4-5.6 incorporates § 1-5-22).

45. The Defendants have agreed that § 1-5-22 on its face does not apply to VRF, as it is not a government employee, contractor, or data processor. **May 17 Tr., 38:23-39:6**.

46. Defendants repeatedly state that voter data cannot be shared, disseminated, or made available to anyone outside the requesting entity. **June 15 Tr., 230:5-12**; ***id.*, 238:21-23** ("If an organization requests the information…it can never be shared externally.").

47. Defendants took the position that their interpretation was the only way to view the law to effectively police use of the data. "But, again, the only way for 5.6 to be effective is if it prohibits all sharing outside of the regulatory process, because otherwise, it creates a gap that we cannot prosecute, we cannot control." **June 15 Tr., 235:2-5**.

48. The AG agrees with the Secretary's interpretation of § 1-4-5.6. **Aug. 31 Tr., 13:18-14:1**.

49. Defendants admit that they apply the ban to any communication of the data over the Internet, without qualification as to who could see the data or the purpose of the publication. **Ex. P12, SOS 1-19-23 Responses to VRF Second Discovery,** RFA 3 to SOS.

50. In response to such admissions, VRF argued the ban—including its purported application to online speech sharing the data—was overbroad and restricted far too much conduct. **FAC at pp. 49-51**. For example, Plaintiff showed that the ban prohibited sharing between common political data vendors and their customers and between researchers who wished to verify and test each other's studies of the data. **See ¶40, above.**

51. Sometime after the Secretary's admission in RFA 3 (see ¶49, above), Defendants changed the conduct they claimed was prohibited by the ban and their theory of what the law prohibited. See SOF ¶¶201-7 below. Both Defendants also supported the passage of HB4 to address the ambiguities raised by the issues being litigated in this case. **Dworak, 186:12-16 (**"I see this as addressing an issue that- you know, obviously we're arguing over these terms, and this would clarify, to help avoid that ambiguity, and better clarify the requirements of the statute."); **184:19-23** ("I can say, generally, this helps address the issue, and we'd be supportive of, because t helps clarify-just like dozens of other bills in the session, they help to clarify terms that are not always clear; they might be ambiguous and conflicting).

## VI.    VRF Obtains New Mexico Voter Data and Publishes it on VoteRef.com

### A.    VRF lawfully obtained the voter data from Local Labs

52. On March 29, 2021, Mike Lippert of Local Labs, LLC signed the Voter Data Authorization form for the data which Local Labs eventually acquired for VRF. **Ex. P11, Lippert Form.**

53. On the version of the voter data request form used by Local Labs, LLC, the requester had the option to choose from one of three purposes for the request: Governmental Use, Campaign Use, and Election Related Use; beyond this, Local Labs had to provide no narrative regarding how the data would be used. *Id.* This comports with those uses permitted pursuant to N.M. Stat. §  1-4-5.5. Lippert selected "Election Related." *Id.* He identified his name and that he was making the request on behalf of Local Labs. *Id.*

54. The bottom of the form contained an attestation which states:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplication, or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).

I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

*Id.*

55. Lippert signed on the "signature of Requestor" line just below this authorization. *Id.*

56. The Secretary issued Local Labs a payment receipt, showing it had paid $5,378.12 for the data. **Ex. P13, Local Labs Receipt from SOS, Dkt. 44-2 filed 6/24/22**

57. Defendants' position is that Local Labs' transfer of the data to VRF was itself unlawful, in part because VRF paid money to Local Labs to acquire the data for it. **Ex. P14, SOS Criminal Referral of VRF to AG ("VRF Referral"), Dkt. 44-3 filed 6/24/22; June 15 Tr., 225:5-13**. The AG testified that resale of the data "certainly violates the intent as well as the process" of the law, at least for Local Labs. **Dworak, 130:20-131:16**. The AG supports the Secretary's position that Local Labs committed false swearing by transferring data to VRF. *Id.*, **70:7-21**.

58. The AG was equivocal when presented with actual evidence that other entities were reselling New Mexico voter data to their customers. ███████████████

**B. VRF published the data online for governmental and election related purposes**

59. On December 16, 2021, VRF published the New Mexico voter data it received from Local Labs on its Website, VoteRef.com. **Ex. P15, VRF Dec. 16, 2021 Press Release re: NM Data, Dkt. 44-13 filed 6/24/22.**

60. The data on the Website included: name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history and no voter's voter ID number, social security number, telephone number, or email address was posted on the Website. **May 17 Tr., 40:5-14; 50:10-15; 102:18-22.**

61. Before accessing this data on the Website, a user was required to agree to the Website's Terms of Service which state, in relevant part:

> VoteRef.com and the services offered through VoteRef.com are only for election-related, non-commercial use… You may not use information on VoteRef.com for any purpose unrelated to elections. You may not use information on VoteRef.com for commercial purposes. "Commercial purposes" includes use in connection with advertising or promoting commercial products or services, or for the purpose of sale, resale, solicitation, or for any purpose in which the user can reasonably anticipate the receipt of monetary gain from direct or indirect use. For example, you may not sell information obtained from VoteRef.com, or use it in connection with advertising or promoting commercial products or services, or solicitation.
>
> . . .
>
> You may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law. By way of example but not limitation, you may not: … (b) alter, edit, or delete the materials on VoteRef.com, including the deletion of any trademark or copyright notices on VoteRef.com; … (d) intentionally or unintentionally violate any applicable local, state, national, or international law or any regulations having the force of law; (e) impersonate any person or entity or misrepresent your connection to any person or entity; (f) "stalk," harass, or otherwise advocate the stalking or harassing of another person; (f) collect or store personally identifiable information about other users in connection with the prohibited conduct and activities set forth herein; (h) reproduce, duplicate, copy, sell, trade, resell, or exploit for any commercial purposes, any portion of VoteRef.com; (i) attempt to override or circumvent any security measures of VoteRef.com or VRF's third party providers or access parts of VoteRef.com you are not authorized to visit; (j) engage in any unauthorized screen scraping, database scraping, or spidering, or collection of personally identifiable information, or use any other automated means to collect information from VoteRef.com; (k) use any software, tool, or other device (such as browsers, spiders, or avatars) to search VoteRef.com, other than the search functionality offered through VoteRef.com or other generally available web browsers…

**FAC ¶62; Answer ¶62** (admitted).

62. When a user viewed a particular voter's information, they were simultaneously shown a state specific disclaimer regarding the data. When the New Mexico data was live, the New Mexico specific disclaimer stated:

The information on this website about this voter, including records of this voter's voting history, was provided to Voter Reference Foundation LLC ("VRF") by the New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15, 2021. The information is publicly available here. The information published here by VRF appears exactly as provided by the Bureau. By publishing Bureau records verbatim, VRF does not state, represent, suggest, or imply that this voter voted or that this voter's ballot was not counted. Additionally, the registration information of any voter who is in the Safe At Home program (hereinafter referred to as a "protected voter") must be removed from the publicly available voter list by the New Mexico Secretary of State. If you believe the information provided to VRF by the Bureau is inaccurate, or if you believe that you or any person listed on VoteRef.com is a protected voter whose protected information should not appear on VoteRef.com, please immediately contact the Bureau by emailing sos.elections@state.nm.us or calling 505-827-3600. For assistance with the process of becoming a protected voter, click here (Safe At Home program). Upon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com.

**May 17 Tr., 56:18-57:12; FAC ¶63; Answer ¶63** (admitted).

63. Until VRF's New Mexico data was removed from the Website, that data was accompanied by "chain of custody" disclosures showing that Local Labs requested the data that VRF had posted and the date on which the data was requested. **May 17 Tr., 67:19-68:5**. It even showed the chain of emails between Local Labs and the Secretary regarding requesting and transmitting the data. ***Id.*** Any user of the website could access the chain of custody information. ***Id.***

64. The New Mexico voter data was made available by VRF on the Website at no charge, subject to the user's agreement to the terms outlined in paragraphs 61-62 above. **May 17 Tr., 66:23-67:10; FAC ¶67; Answer ¶67** (admitting no fee to access Website).

**C. VRF conducted an internal analysis of the voter data, issued a press release about that analysis, and reached out to the Secretary to discuss the analysis**

65. VRF maintains two related, but distinct projects. **May 17 Tr., 54:15-55:23.** The first project, described above, is to share voter data online with citizens. ***Id.*, 54:15-55:2.** The second project is accomplished in-house without the need to publish the data online. ***Id.*, 70:20-71:10.**

This second project involves VRF election professionals comparing the total number of ballots cast in an election to the number of voters with a credit in their vote history file for having voted in that election. ***Id.*, 55:3-55:13.**

66. Though not necessarily indicative of fraud or malicious activity, there are sometimes discrepancies between the two numbers. **See Ex. P15, VRF Press Release; May 17 Tr., 55:14-23; 58:20-59:20, 98:17-101:2.** When there are, VRF attempts to contact state election officials regarding the discrepancy and "work backwards" to determine why there might be a difference. **May 17 Tr., 59:21-60:22.** VRF then publishes the "audit trail" so that citizens can understand how and why voter registrations are removed from the voter list. ***Id.*, 55:14-23, 56:6-11.**

67. VRF's Executive Director testified that through this process, VRF has identified discrepancies in other states and worked with state officials to explain the difference. VRF originally identified a discrepancy in the state of Colorado but, working with Colorado's Secretary, they were able to reduce the discrepancy by 11,000 votes. **May 17 Tr., 60:14-22.**

68. On or about December 16, 2021, as part of its election integrity efforts, VRF posted New Mexico voter information on VoteRef.com. **See Ex. P15, VRF Press Release**; **May 17 Tr., 66:23-25**. In conjunction with the posting of that information, VRF issued a press release announcing the publication of the information and identifying a "discrepancy" of about 3,800 votes, reflecting a difference between the number of voters listed as having voted in the 2020 general election (according to the voter list) and the number of ballots reported being cast according to the New Mexico's official reports. **See Ex. P15, VRF Press Release.**

69. VRF's press release stated: "These discrepancies don't necessarily indicate fraud, but the differences between the voter list and the election canvass indicates, at the very least, issues with

record keeping and points to the need to be more transparent and proactive about maintaining the voter rolls and reconciling ballots cast and voters having voted in every election." *Id.*

70. On December 14, 2021, prior to posting the New Mexico data, VRF emailed the Secretary's office to discuss the identified discrepancy in an attempt to remedy the apparent difference in numbers, as VRF has done in other states. See **Ex. P16, VRF Dec. 14, 2021 Email to Secretary, Dkt. 44-14 filed 6/24/22; May 17 Tr., 60:5-22** (process reduced discrepancy in Colorado).

71. That email invited a conversation regarding VRF's findings and methodology, including inviting the Secretary to provide feedback on the same. **Ex. P16.** The email identified "a discrepancy between registered voters with ballots cast (RVBC) and total ballots cast (TBC) of 3,844. This number represents more ballots cast than registered voters who have credit for voting. *Id.* The email further stated:

> Please provide any feedback you have on these results, and if there is a factor or factors that we may be unaware of that would explain the discrepancies.
>
> Attached is a link to the voter history and voter registration data file provided by your office on April 13, 2021. It is our understanding that the data you have provided does not include any voter who is in the Safe At Home program. If that is inaccurate, please let us know.
>
> We would be pleased to have a call with you or your staff if that would provide a better format to review your assessment of the results. If you have time and staff available, we would be grateful for the opportunity to meet with you by phone.

72. The Secretary did not respond. **May 17 Tr., 61:21-62:10; FAC ¶77; Answer ¶77.**

73. The Secretary's communications director thereafter accused VRF of not trying to reach out to discuss this very data "likely because it would not serve their intended goal of spreading misinformation." **Ex. P17, Emails Between A. Curtas and M. O'Matz, Dkts. 44-19, 44-20.**

## VII.    The Secretary Refers VRF to the AG for Criminal Investigation

74. Instead of responding to VRF's letter, the Secretary, on December 20, 2021, wrote a letter to the AG referring VRF for criminal investigation and prosecution, alleging VRF unlawfully transferred and published the voter data. **Ex. P14, VRF Referral.**

75. The Secretary never received a complaint about VRF. **Vigil, 54:24-55:6**. Instead, it received a contact from ProPublica, an investigative news agency. *Id.*

76. The decision to make the criminal referral of VRF was made by Sharon Pino, and that decision was reviewed and approved by the Secretary. *Id.***, 52:23-53:13.**

77. The general counsel, Dylan Lange, drafted the criminal referral letter, and its ultimate signatory, Sharon Pino, and Mandy Vigil reviewed drafts. *Id.***, 57:3-22**.

78. Deputy Secretary of State Sharon Pino signed and submitted the referral to the AG on behalf of the Secretary based on VRF's use and posting of the voter data it requested and obtained through Local Labs. **Ex. P14, VRF Referral.** Before the referral, the Secretary did not undertake a "specific analysis relating to each item" in New Mexico's statutory test for permissible uses, and "it was determined holistically it was not permissible under state law." **Vigil, 79:11-80:5**.

79. The Secretary's analysis for making a referral did not depend on whether visitors to VRF's website first had to agree to use the data for permissible purposes before receiving access. *Id.***, 99:22-101:16**. The Secretary's analysis did not depend on the relationship that was formed between VRF and users of its website. *Id.***, 102:13-18**.

80. The Secretary cannot say that, before making a referral, it knew that VRF required users to agree that they would only use the data for permissible purposes. *Id.***, 105:7-11**.

81. The Secretary believed that the transfer and publication of the voter data was a violation of the Election Code. *Id.***, 55:17-24**. The Secretary believed VRF had violated the law by posting

"private voting information online." *Id.*, **55:25-56:7**. The Secretary also believed that "publishing" the data "on VoteRef.com" was an illegal use of the data. *Id.*, **56:8-13.**

## VIII.   The Use Restrictions

82. The Secretary believes that VRF's posting of the data was not a permissible use because it was not for a governmental or campaign purpose. *Id.*, **74:9-75:6.**

83. The Secretary believes VRF's posting of the data on the internet was not for a governmental purpose because it is not a governmental entity. *Id.*, **75:22-76:9**. The Secretary refuses to say whether VRF's analysis of the data, independent of VRF's public posting, qualifies as a governmental use, and claims it still "would need some review." *Id.*, **76:10-78:19.**

84. The AG's position is that VRF's stated use of the voter data is arguably not a governmental purpose. **Dworak, 73:8-21.**

85. The AG takes the same position as the Secretary on the question of whether VRF's use of the data is election related. *Id.*, **73:22-74:13.**

86. The AG maintains that public posting on a website is not for a research or campaign purpose. *Id.*, **74:19-75:10.**

87. The AG takes these positions both as a party and the Secretary's counsel. *Id.*, **74:14-18.**

88. The Secretary's referral raised concerns regarding how VRF was using the data, specifically that the use amounted to "spreading misinformation." **Ex. P14, VRF Referral.**

89. Later, the Secretary clarified that publication of the data on the Internet alone, even if completely accurate, constituted misinformation. **See Ex. P12,** ROG 7 to SOS.

90. The Secretary believes that VRF's sharing of out-of-date voter data could constitute disinformation. **Vigil, 122:18-22.** The Secretary believes VRF engaged in disinformation when, in

response to the District Court's preliminary injunction allowing VRF to repost the data, it reposted the data with inaccurate information explaining it. ***Id.*, 123:12-124:16; 124:24-125:13.**

91. The Secretary also believes that VRF's publication of voter data "writ large," without any further explanation, may also constitute misinformation. ***Id.*, 126:9-127:4.** The Secretary believes the problem of voters confusing past data with the current data is not fixed if the voter data also includes an explanation of when the data file was received, because "the average voter, typically…isn't as educated on this process. You know, we work to educate them, but I don't think they're going to understand the complexities if there's someone who is making a claim of a discrepancy without context." ***Id.*, 128:19-129:6.** Thus, the mere fact of publishing an old file, even if accompanied by a disclosure that it was obtained on a certain date, "invites and provides a potential of misinformation." ***Id.*, 129:7-17.** The Secretary's position is that posting when and how the data was received isn't enough to correct the misinformation. ***Id.*, 129:24-130:4.**

92. The AG supports the Secretary's position that VRF's publication of voter data is election misinformation. **Dworak, 68:11-18**.

## IX.  The ProPublica Article

93.  Before referring VRF, the Secretary never told it that its use of the voter data on its Website might violate New Mexico law. **May 17 Tr., 68:13-19; FAC ¶86, Answer ¶86.**

94. ProPublica reporter Megan O'Matz contacted the Secretary for comment and background on a story she was writing. See **Ex. P17, Curtas and O'Matz Email Exchanges.** O'Matz's email exchanges and eventual phone call with Secretary Toulouse Oliver were incorporated into an article published on March 7, 2022, entitled "Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques." **See Ex. P18,**

**ProPublica Article re: VRF, Dkt. 44-4 filed 6/24/22**. The article focused almost entirely on VRF and its Website, generally in a critical manner. *Id.*

95. Before publishing the article, the O'Matz exchanged emails over the course of nearly a month with Alex Curtas, Communications Director for Secretary Toulouse Oliver. **Ex. P17.** The exchange began on December 14, 2021, with O'Matz asking Curtas about the discrepancy (identified in the VRF Dec. 16, 2021 Press Release, **Ex. P15**), including inquiring about any potential explanations for the discrepancy and whether VRF reached out to the Secretary to discuss its methodology and findings. ***Id.*** After some non-substantive exchanges, Curtas responded as follows to O'Matz's inquiry:

> Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are *perpetuating misinformation*. They reflect a lack of understanding about how the process of voter list maintenance works. These attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country.

*Id.* (emphasis added). The "discrepancy," Curtas charged, was simply VRF's own lack of understanding regarding how voter rolls are maintained. *Id*.

96. In response to ProPublica's question about whether VRF had reached out to the Secretary's office before publishing its statement, Curtas falsely stated that VRF had not contacted the Secretary's office, "likely because that would not serve their intended goal of spreading misinformation." ***Id*; see also Ex. P16, VRF Dec. 14, 2021 Email to Secretary** (showing VRF contacted the Secretary's office to share its findings and discuss analysis two days before email).

97. When the Secretary's counsel asked her own witness why the Secretary's office had not responded to VRF, Ms. Vigil suggested that it was because VRF's request "kind of came in simultaneously" with ProPublica's request, and the requests caused the Secretary's office to "look at the data." **June 15 Tr., 102:15-103:1**.

98. Curtas made other accusations against VRF. In responding to O'Matz for her story on December 16, 2021, he added, "we do not have a record of this group requesting voter data from our office directly, which brings into question how they obtained this data, if the data has not been manipulated, and if they are using it for a lawful purpose." **Ex. P17.**

99. Later testimony, however, reflected that the Defendants did not and do not have any reason to believe that VRF manipulated any voter data received from the Secretary. **June 15 Tr., 127:25-128:15.** Further, the evidence showed that, following its ordinary practice, VRF's New Mexico data tab on its Website did disclose where and when VRF obtained the data: it disclosed the email chain by which Local Labs had requested the data for VRF, and any viewer of the website could click through to see it. **See SOF ¶63, above.**

100. In concluding his December 16 email for O'Matz's ProPublica story, Curtas defended New Mexico's voter roll maintenance process from a perceived affront from VRF:

> Because accusations from political operatives like this are meant to impugn the integrity of our voter rolls, I'd also just want to note that our Office is confident that the processes and procedures already in place for voter list maintenance not only follow all state and federal guidelines and keep our voter rolls clean and up-to-date, but go above and beyond those requirements… All of these systems combine to ensure that voter information is up-to-date in New Mexico, resulting in our state having some of the "cleanest" voter records in the United States.

**Ex. P17.**

101. O'Matz followed up shortly thereafter asking: "Is there anything improper under New Mexico law about accessing the data this way or posting it all online? I appreciate any link to the relevant statute." Before Curtas responded, O'Matz followed up again:

> Alex, I see that your law says the voter rolls can be used only for "Governmental or election and election campaign purposes only." Unlawful use of lists is a 4th degree felony.
>
> The VoteRef folks say online: "The purpose of this website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states. Our system of

government is based upon citizen participation. We believe the people, in effect, own this data and have a legal right to see it in an understandable and transparent form…

Is this an acceptable use under New Mexico law?

*Id.*

102.     Curtas responded on December 17th, stating:

On the legal issue: Our office believes this publication of voter data by VoteRef.com is in direct violation of the New Mexico Election Code. We do not believe that posting New Mexican's private voting information online is legal use of this information. We will refer the use of this information by VoteRef.com to the New Mexico Attorney General for criminal investigation and prosecution.

*Id.*

103.     O'Matz responded with a pointed question about the Secretary's position: "Question – can you elaborate on how the publication of voter data online may violate state law? (VoteRef likely will argue that they are using it for election and research purposes.)" *Id.*

104. Four days later, Curtas responded:

The issue relates to the transfer and publication of the voter data. *This is the crux*: "We do not believe providing this personal voter data on a private website *that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a "governmental purpose," "election related," or "election campaign purposes.*"

I've attached our referral letter which lays it all out. Let me know if I can provide any clarification on this.

*Id.* (emphasis added). Curtas again focused on the idea that "spreading misinformation" renders use of the data unlawful and focuses the analysis on the permissible purposes—governmental, election related, or election campaign related—under the statute. *Id.*

105.     Curtas and O'Matz continued to communicate to set up a phone call with Secretary Toulouse Oliver and O'Matz to further discuss the issues involved. *Id.*

106.     The ProPublica article attributed several quotes to the Secretary (which the parties stipulated are attributable to her, Doc. 32, ¶7) focusing on the use of the data, including:

> In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is *not an allowable use of voter data*. By state law, she said, *the rolls can only be used for governmental or campaign purposes*.
>
> …
>
> "Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said. In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

**Ex. P18, ProPublica Article** (emphasis added).

107.     The day after the Article was published, the Secretary shared it on her official Twitter account accusing VRF of "attempt[ing] to impugn the integrity of our voter rolls" and again accusing VRF of "violating the Election Code." **FAC ¶89; Answer ¶89 (admitted).**

108.     The "Secretary or Deputy Secretary of State will always be involved in messaging; meaning that we are providing the appropriate public message and that we are all clear and on the same page as to what that message is." **Vigil, 35:18-36:4.**

109.     Deputy Secretary of State and Chief of Staff Sharon Pino "runs the office," helps make any decisions, directs projects, oversees all directors, and reports directly to the Secretary. **June 15 Tr., 123:12-16**. In her hearing testimony, she echoed the Secretary's March 2022 comments that VRF's use was not for governmental or campaign purposes. Pino testified that at the time of her written criminal referral to the AG in December 2021—which, as discussed below, unequivocally accused VRF of operating "a private website that intends to spread misinformation about the 2020 General Election"—she had a factual basis for everything in the letter. ***Id.,* 133:18-21, 138:4-10**. Second, Pino testified that in her view, "misinformation" is not for a "governmental purpose" (***id.,* 135:14-136:20**) or "election purpose" (***id.,* 137:1-138:3**).

110.     Pino had no evidence that VRF had ever manipulated voter data that it had posted, but testified that in her own view and the view of her office, if data was used in such a way that it

could *potentially* be manipulated, even if by a third party who is not the requestor, its use falls

outside the statutorily permitted purposes. ***Id.*, 138:21-139:15**.

## X.     The Secretary Believes VRF Spreads Misinformation

111.     The Secretary believed VRF was spreading misinformation about voting and

elections. **Ex. P19, Excerpts from Deposition of Alex Curtas ("Curtas"), 52:7-53:9.**

112.     The Secretary's office believed the misinformation VRF is spreading is that there

are discrepancies within New Mexico's voter data—maintained by the Secretary. ***Id.*, 53:6-9.**

113.     The Secretary sought to "push back hard" against VRF's speech which it

characterized as misinformation. ***Id.*, 72:17-22.** It is part of the Secretary's office mission to "push

back hard" against VRF's speech which it characterizes as misinformation. ***Id.***

114.     The Secretary's office associated VRF's speech with a "larger strategy of election

denialism" encompassing organizations other than VRF. ***Id.*, 72:23-73:12.**

## XI.     VRF Requests Additional Voter Data from the Secretary on February 15, 2022

115.      On February 15, 2022, VRF sent a request for voter data to the Secretary for "the

total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020,

election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any

registration status other than active) or any voter that has been removed or deleted from the voter

rolls between November 3, 2020 and April 13, 2021." **Ex. P5, Feb. 15, 2022 Request Emails.**

116.     VRF's request was assigned to Patrick Rostock, a paralegal and custodian of

records in the Secretary's office. VRF, having not received a response, emailed on March 10,

2022 asking for an update. ***Id.*; May 17 Tr., 79:24-80:12; June 15 Tr., 48:23-49:6**.

117.     Rostock forwarded that email to Mandy Vigil, and Sharon Pino stating, in part:

"Per Dylan's contact with the AG, *we are not fulfilling records requests from VoteRef*." **Ex. P5.**

118.     The AG advised the Secretary regarding whether it should fulfill VRF's voter data request. While the Secretary did not respond to VRF, based on advice received from the AG, Defendants decided internally they would not fulfill *any* requests from VRF. *Id.*; **June 15 Tr., 49:7-52:9.** The Secretary's office did not communicate this decision to VRF. *Id.*, **51:25-52:4.**

119.     When asked about Rostock's statement—"Per Dylan's contact with the AG, we are not fulfilling records requests from VoteRef"— the Secretary's Elections Director testified that: "…there was a determination that this was neither a public records request nor a normal voter data request. At this point in time we had already engaged with the law enforcement agency and *so we did seek their guidance*. At this point in time it was determined that we were not going to provide the data… Because we had already referred their use of the data to a law enforcement agency…" **June 15 Tr., 49:16-25** (emphasis added).

120.     The Secretary continues to maintain the decision it made in March 2022 that it will not fulfill VRF's voter data requests. **Vigil, 163:12-164:22.**

121.     The Secretary claims there is no reason for the denial of the request other than what was conveyed to VRF in writing in conjunction with the denial. **Ex. P12,** ROG 6 to SOS.

## XII.     Defendants Investigate VRF, Including Through Coordination with other State and Federal Law Enforcement

122.     The Secretary referred VRF to the AG for criminal investigation and potential prosecution. **Ex. P14.** The Secretary had not withdrawn that referral as of June 15, 2022. **June 15 Tr., 69:5-6,** and the AG asserts its right and duty to investigate and prosecute VRF. **See SOF ¶18.**

123.     The AG opened a criminal investigation and began actively investigating VRF after it received the referral. **Dworak, 84:8-18.** The AG is not aware of any entity other than VRF having been investigated for its use of voter data. *Id.*, **168:12-18.**

124.     Additionally, on January 26, 2022, Anna Trujillo of the AG's Office sent a copy of the VRF Referral (**Ex. P14**) to the FBI. **Ex. P20, Email to FBI, Dkt. 44-23 filed 6/24/22**; **Ex. P4**, RFA 2.

125.     The AG communicated with other state AGs regarding VRF. **Ex. P4**, RFA 3.

126.     On April 6, 2022, the Chief Counsel for the California Secretary of State emailed Secretary Toulouse Oliver to connect someone in the New Mexico Attorney General's Office with California Deputy Attorney General Tony O'Brien. **Ex. P21, Email Exchange with CA AG, Dkt. 44-24 filed 6/24/22**. Secretary Toulouse Oliver connected the California authorities with Deputy Secretary of State Sharon Pino, who she said was "working directly with our AG office and can help make that connection." *Id.* Pino then provided the California authorities with the contact information for New Mexico Chief Deputy AG of Criminal Affairs, Anne Kelly. *Id.*

127.     The New Mexico and California Attorneys General exchanged emails and held conference calls to discuss this litigation, including sharing briefs and orders which Defendants then relied on in their briefing. **See Ex. P22, Additional Email Exchanges with CA AG, Dkts. 44-25, 44-26**

128.     The AG also communicated with the Washington State Attorney General regarding VRF. **Ex. P23, Email Exchanges with WA AG**.

129.     The Secretary believes the criminal investigation of VRF remains pending. **Vigil, 65:23-25**. At deposition on February 27, 2023, the Secretary's office continued to maintain that "[i]nvestigation by the attorney general is ongoing…" *Id.*, **84:13-85:11**.

**XIII.   VRF Removes the New Mexico Data from VoteRef.com and Files this Lawsuit**

130.     VRF removed the New Mexico voter data from its website on March 28, 2022— just before this lawsuit was initially filed—out of fear that it would be prosecuted based on the

Secretary's interpretation of the law and her referral of VRF to the AG for potential prosecution. **May 17 Tr., 69:11-18.**

131.     Because VRF was unaware of the Secretary's referral until the ProPublica article was published, it was VRF's knowledge of the Secretary's criminal referral to the AG, and the impending threat of investigation, which led VRF to initially remove the date from the Website, refrain from engaging in political speech, and to seek recourse from this Court. *Id.*

132.     VRF filed this action because if it obtains a favorable ruling, it wants to resume posting, distributing, and otherwise using the New Mexico voter data on the Website so that the public may become and remain informed regarding the State's elections and voter registration rolls. **May 17 Tr. 61:4-11**. VRF continues to seek data from New Mexico. See **SOF ¶¶136, 185**.

**XIV.   On May 27, 2022, VRF Provides Notice of the Secretary's Violation of the NVRA and Makes Additional Requests for Data which the Secretary Refuses to Fulfill**

133.     On May 27, 2022, VRF sent a "Notice of Violation of National Voter Registration Act & Request for Records" (the "Notice") to the Secretary pursuant to § 20510(b)(1) ("A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved."). **See Ex. P24, NVRA Notice, Dkt. 44-22 filed 6/24/22.**

134.     The Secretary does not deny that VRF's notice was proper under the NVRA. **See Ex. P25, SOS 2-24-23 Responses to VRF Third Discovery,** ROG 11 to SOS.

135.     In the Notice, VRF again apprised the Secretary of her statutory duty to make certain voter data available for public inspection pursuant to the NVRA. **Ex. P24, NVRA Notice**. The Notice stated New Mexico's restrictions on public inspection of certain types of voter data are preempted by the NVRA and that the Secretary's refusal to respond to VRF's February 15, 2022, request violates the NVRA's Public Inspection Provision. *Id.*

136.      Finally, the Notice again requested the Secretary comply with the NVRA and New Mexico law, including by providing data in response to new requests raised in the May 27th letter:

> 1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.
> 2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

*Id.*

137.      The Notice further stated that VRF intended to use the requested data for each of its two distinct election related projects. *Id.* For the first project—the publication of data on the Website—VRF assured the Secretary that it would not post the personal information of voters on the Website unless it was granted judicial relief allowing it to do so. *Id.*, p. 4. VRF stated that for the second project—the internal review and analysis of the data—no publication would occur regardless of the outcome of any litigation. *Id.*

138.      VRF provided completed affidavits for each of the separate requests. *Id.*

139.      Despite VRF's compliance with the requirements for making such a request and its assurance regarding how the requested data would be used, the Secretary refused to provide the requested documents. **FAC ¶85, 159**; **Answer ¶85, 159 (admitted).**

140.      On June 15, 2022, a day before the Secretary rejected VRF's May 27 request, when asked about the Office's proposed response, Ms. Vigil testified that, despite the fact that VRF did not intend to publish voter data absent relief from a court, on advice of counsel, the Secretary's Office would not release data to VRF. **June 15 Tr., 57:25-59:18.**

141.      On June 16, 2022, the Secretary's office formally responded. **Ex. P26, Secretary's June 16, 2022 Response to NVRA Notice; see also FAC ¶160; Answer ¶160 (admitted).** Citing

FOIA and IPRA case law, the Secretary contended that the February 15, 2022, request for changes to the voter file was not a request for records under the NVRA because it would have required the Secretary to create a new record. **Ex. P26.** The Secretary likewise dismissed the identical portion of the May 27th request as requiring the creation of a new record. ***Id.***

142.    The AG participated in the Secretary's denial. The day before the denial, on June 15, 2022, the AG elicited testimony from its own client, the Secretary through Mandy Vigil, that the AG had advised the Secretary to reject the May 2022 request. **June 15 Tr., 93:11-20**.

143.    The AG revealed in its own questioning that by June 15, the Secretary had actually pulled data in response to what the AG characterized as a "lengthy request," even though the Secretary's witness had not seen it yet. **June 15 Tr., 94:2-6**.

144.    The AG then had its own witness, Mandy Vigil, reveal that the supposed reason for the refusal of the Secretary to produce would have been the AG's claimed view that complying with VRF's NVRA request would have placed the Secretary in a "criminal conspiracy" with VRF under New Mexico law. **June 15 Tr., 95:7-21**.

145.    Vigil confirmed the AG's involvement in the denial, testifying that denials of VRF's requests for voter data were approved by Mandy Vigil, Dylan Lange, and the attorney general's office. **Vigil, 154:22-155:8**. Olga Serafimova at the AG's office gave the Secretary advice about rejecting VRF's requests. ***Id.*, 157:14-21**. Pino was also involved. ***Id.*, 158:4-11**.

146.    The Secretary must create a "file maintenance report" at least monthly which shows additions, deletions, and changes, if any, to each of the county registers. NMSA § 1-5-14. The Secretary previously admitted that it maintained a file maintenance report, but argued that VRF's request was not clear enough to indicate that it was requesting that report. **Ex. P27, Secretary's 10-21-22 Responses to VRF First Discovery,** ROG 2.

147.     The Secretary's Chief Information Officer admitted that the Secretary had the capacity to provide the reports that VRF requested. See **Ex. P28, Excerpts from Transcript of Deposition of Secretary's Chief Information Officer G. Rockstroh ("Rockstroh"), 24:11-18.** Rockstroh also testified that the Secretary provided reports to other requesters that, like VRF's, required it to provide data for subsets of voters over a specific period of time. ***Id.*, 34:13-36:14.**

148.     The Secretary admits that it "does have list maintenance data that we would be able to produce if we received a legal request, an appropriate legal request." **Vigil, 28:14-29:1.**

149.     The Secretary admits that the office would "have to provide voter list maintenance data when someone makes a request under the NVRA." ***Id.*, 30:15-19.**

150.     The Secretary's position is that because voter list maintenance data under the NVRA is voter data for state law purposes, even NVRA requests must be accompanied by the required affidavit promulgated by the Secretary: "Anytime a requester is asking us to receive voter data, state law requires that they complete the affidavit." ***Id.*, 30:20-31:4.**

151.     The Secretary also denied the second part of VRF's request (for current voter registration data for all voters) based on its "position that publishing *any* New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability." **Ex. 26**, p. 2. The Secretary claimed it was "prudent to delay production of this data at this time" stating that it will "either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal." *Id.* The Secretary also cited a New Mexico statute criminalizing any conspiracy to violate the Election Code. See *Id.* (citing NMSA 1978, § 1-20-15). *Id.*

152.     These requests were denied despite the written and explicit assurances of VRF that it would not publish voter data absent a judicial order allowing it to do so. ***Id.*; see also Ex. P24, NVRA Notice; Aug 31 Tr., 10:22-24**.

153.     Further, VRF promised not to publish some of the data at all, even if it prevails in this Court. **Ex. 24, NVRA Notice**. The Secretary's claim that it was "prudent" to deny even that request provides no explanation of any kind, nor does it cite any legal authority for refusing to honor VRF's request. **Ex. 26, Response to NVRA Notice.**

154.     When the Secretary rejected VRF's request for voter data, it did not do so because there was any defect in the submitted affidavits. **Vigil, 168:24-170:1.**

155.     One reason the Secretary rejected the request is that it claimed to be concerned that that VRF would post the voter data online. ***Id.*, 170:2-11**.

156.     The statements that caused VRF's concern were Greim's promises that VRF would publish its analysis "without disclosing the personal information of any voter," and that "again, for the sake of clarity, no personal information of any individual voter will be published online unless VRF is granted relief in the federal litigation." ***Id.*, 172:23-174:7**. The Secretary claimed to be concerned because the office did not know what Greim meant by "personal information," and thought he might actually have been threatening that VRF would publish personal information because he was secretly using a very narrow definition. ***Id***. Yet no one from the Secretary's office ever reached out to Greim to discuss this concern, or clarify "personal information," before rejecting the request. ***Id.*, 174:8-20**.

157.     Since the Secretary allegedly learned in a hearing that VRF would not in fact disclose the information online, "we have not revisited this" because counsel told the Secretary not to do so. ***Id.*, 174:21-175:17**.

158.     After the Secretary was again told at deposition in February 2023 VRF's position that it would not post personal voter data online, the Secretary continued to claim, "I don't know" whether VRF will post the data online, and that "there's a concern." ***Id.*, 178:21-179:20**. The

Secretary cannot say what VRF can ever do to alleviate its concern and have its requests processed. *Id.*, **179:21-180:16.**

159.    Dylan Lange's response rejecting VRF's request was reviewed and approved by both Sharon Pino and Mandy Vigil, and by Olga Serafimova on behalf of the AG, before it was sent. *Id.*, **180:17-181:15**.

## XV.    New Mexico Stores and Can Easily Access the Data VRF Requests

160.    New Mexico contracts with a third-party vendor to store voter data in a database called SERVIS, which is owned by the Secretary. **Rockstroh, 10:18-11:15; 15:2-4.**

161.    The Secretary's office receives voter registration information from the Motor Vehicle Division and the online voter registration system. *Id.*, **12:3-7.**

162.    The SERVIS system stores, among other things, voter credits which reflect data showing a voter has cast a vote in a given election, *Id.*, **14:6-12**, as well as when and how a voter registered. *Id.*, **20:10-13.**

163.    The Secretary's office used the SERVIS system to develop reports detailing different aspects of voter data, mostly coming from voter data requests or an inspection of public records (IPRA) request. *Id.*, **16:5-7; 17:8-10.**

164.    An authorized user can log into SERVIS and pick and choose what data he or she wants included in a report. *Id.*, **31:2-8.**

165.    Reports from the SERVIS system do not exist prior to a user selecting settings in the system and generating a report for specific data. *Id.*, **31:13-16.**

166.    The SERVIS system contains coding that automatically pulls specific data for 30-40 types of "canned" reports that are retrieved on a regular basis. *Id.*, **18:7-9.**

167.    The Secretary's personnel are also able to use the SERVIS system to develop non-canned reports from the numerous data fields in the system. ***Id.*, 19:12-15.**

168.    Even when personnel in the Secretary's office use the SERVIS system to develop non-"canned" reports, there is no additional charge from the vendor. ***Id.*, 21:3-6.**

169.    Occasionally, if the Secretary's personnel are not able to develop a requested report, the Secretary's office contacts the vendor for assistance. The Secretary does not incur any charge for this service. ***Id.*, 21:10-17.**

170.    The Secretary's office has never rejected requests for voter data because they require too much work to compile the specific data. ***Id.*, 21:18-23.**

171.    Even after a voter is no longer "active" his or her data is still stored in the SERVIS system. ***Id.*, 24:15-19.** Voter data in SERVIS is stored indefinitely. ***Id.*, 24:1-2.**

172.    The "File Maintenance List" is a canned report available in the SERVIS system without additional effort. ***Id.*, 24:11-18.**

173.    Every discrete change to an individual's voter file is retained in SERVIS; the system does not simply reflect the most recent change. ***Id.*, 27:17-25; 26:2-7.**

174.    Users can set date ranges for voter data in SERVIS. ***Id.*, 32:4-7.**

175.    The Secretary's staff run reports for other requesters of voter data that are not "canned" reports and can therefore take up to multiple weeks to fulfill. ***Id.*, 34:13-36:14.**

176.    The data making up "A complete list by county precinct of any registered voters who cast a ballot in the November 3, 2020 general election" is contained in a "canned" report. ***Id.*, 38:18-39:23.**

177.     The data showing voters who voted in the 2020 election who have since been placed in an inactive, canceled, deleted, or removed status may not be a "canned" report, but is available in SERVIS and can be obtained by the Secretary's staff. ***Id.*, 39:24-40:11.**

178.     Data illustrating "[a]ny voter that has been removed between [] two dates" may not be a "canned" report, but is available in the SERVIS system and can be obtained by the Secretary's staff. ***Id.*, 40:12-25.**

## XVI.  VRF Again Posts New Mexico Voter Data on the Website Following this Court's Issuance of a Preliminary Injunction Allowing it to do so.

179.     On July 22, 2022, this Court issued a preliminary injunction, enjoining Defendants "from prosecuting Plaintiff Voter Reference Foundation, LLC, under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs." ***See* Memorandum Opinion and Order ("Mem. Op."), Dkt. 51 dated 6/22/22 at p. 210**.

180.     The Court expressly rejected the Defendants' legal theory upon which the Data Sharing Ban is premised. ***Id.*, 137-149** ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act. *See* May Tr. at 39:14 -23 (Serafimova).").

181.     The Court further characterized its holding as a conclusion that "New Mexico's Election Code does not prohibit Voter Reference –or any organization—from posting voter data online." ***Id.*, 151.**

182.     The Court also held that VRF's internal analysis of aggregated voter data is either a governmental or election purpose under § 1-4-5.5. ***Id.*, 150.**

183.     The Court also held that VRF's publication of voter data on the internet is for a "governmental purpose" under § 1-4-5.5. ***Id.*, 150-151**.

184.     In reliance on this Court's issuance of the preliminary injunction, VRF republished the New Mexico voter data it already possessed on VoteRef.com. **Vigil, 123:12:19.**

**XVII.  Defendants Refuse a Third Request from VRF for New Mexico Voter Data**

185.      On October 18, 2022, VRF sent an additional document request to the Secretary requesting, among other things, the same data it requested on May 27. **Ex. P29, 11-17-22 Letter from C. Lange to G. Swoboda**.

186.     In a denial letter authored by the Secretary's General Counsel, Dylan Lange, the Secretary refused to produce the requested records. *Id.* The Secretary specifically took issue with two of VRF's five requests for records. *Id.*

187.     Regardless of the issues claimed with those two requests, the Secretary went on to say that it would not produce *any* voter data to VRF: "… we will refrain from producing any responsive voter data maintained by our office due to numerous issues further detailed below." *Id.*

188.     First, the Secretary explained it would not produce any voter data because it believed VRF would publish the data online and VRF did not explicitly say that it would not post the data online. *Id.*

189.     Though the AG ███████████████████████████████████

███████████ , the Attorney General's position is that VRF's counsel promised in May 2022 that voter information would not be posted online without a court order. **Dworak, 156:10-15**.

190.     Then, the Secretary said that it would not produce data because VRF did not submit an affidavit. **Ex. P29** (claiming request was non-compliant for lack of affidavit).

191.     The Secretary states that there is no reason for the denial of the request other than whatever information was conveyed to VRF in writing in conjunction with the denial.  **Ex. P12,** ROG 6 to SOS.

192.     The Secretary testified that it continued to be concerned on November 17, 2022, that VRF would post any data it received online, despite the representations of its counsel. **Vigil, 184:21-186:18**. The Secretary determined that based on its supposed "knowledge that it [voter data] was going to be posted online," it would not produce voter data until after the Court of Appeals stayed litigation. *Id.*, **190:6-191:13**. The Secretary claimed to believe that the stay litigation might result in an affirmative decision that VRF could never post data online. *Id.*, **194:25-195:25**.

193.     The Secretary cannot state when it will stop considering VRF's "past practice" of posting data online in deciding to reject VRF's voter data requests. *Id.*, **187:11-15**.

194.     The Secretary claimed that in rejecting VRF's October 2022 request in November 2022, it was following ordinary practice in rejecting an entire request if any part of it asked for data the Secretary does not have. *Id.*, **182:17-184:3**.

195.     The Secretary states that the lack of an affidavit is "absolutely" a reason for rejecting an NVRA request. *Id.*, **197:8-20**. The Secretary simultaneously admits that the October request would have been rejected even if an affidavit was submitted. *Id.*, **198:6-8**.

196.     The Secretary also holds it against VRF that after allegedly "promising" not to post data in May 2022, it posted data in reliance on the federal district court's decision in July 2022, and has decided that this data point "is a very clear indication of the intention of the use of the data." *Id.*, **187:21-188:23**. The Secretary gives no credit to VRF for taking down the data again after the Court of Appeals stay order, "because it's a court order, not out of respect for state law or our position or our policy." *Id.*, **188:24-189:6**.

197.     The Secretary believes that "without a court order that prohibits the posting of data, VRF has demonstrated that its intention is to post the data." *Id.*, **190:1-5**.

198.     The Attorney General 

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ agrees with the position the Secretary took. ▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓ **160:22-161:17 (agrees)**.

## XVIII. VRF Removes New Mexico Voter Data from the Website Following the Tenth Circuit's Stay of the Preliminary Injunction

199.     On December 28, 2022, a two-judge panel of the Tenth Circuit stayed this Court's preliminary injunction pending the outcome of Defendants' appeal. **See Ex. P30,** Order Granting Stay in *Voter Reference Foundation, LLC, v. Torrez, et al.*, 22-2101 (10th Cir. Dec. 28, 2022). VRF removed the New Mexico voter data from its Website the same day. **Vigil, 188:24-189:6.**

## XIX. Defendants Take Vague and Inconsistent Positions Regarding the Data Sharing Ban and the Scope of the Law to Single Out VRF

200.     The Defendants each initially took the position that the Data Sharing Ban applied uniformly to ban all sharing of the data, including VRF's speech sharing the data over the internet, based on their statutory interpretation. See **SOF ¶¶39-51** above.

201.     However, after Plaintiffs mounted an overbreadth attack on the Data Sharing Ban, the Defendants changed their interpretation of its reach. First, the AG testified that he can no longer draw the conclusion the Defendants advanced in their argument and briefing at the preliminary injunction: that § 1-4-5.6 incorporates the prohibitions of § 1-5-22(a) to make VRF's publication of data unlawful. **Dworak, 144:7-16.**

202.     The Defendants have restated their construction of the law to suggest that the Data Sharing Ban only applies in cases just like VRF's—when an entity publishes voter data online to the "general public." **See Ex. P31, Feb. 21, 2023 Email from E. Lecocq to E. Greim** (clarifying earlier discovery response and stating "[b]oth the AG and the SOS believe that "sharing data" outside one's organization, or publishing that data to make it available for the *general public*,

constitutes a violation of New Mexico Law. *This is not just the act of sharing data, but rather disseminating that information to the general public*.") (emphasis added).

203.     The AG suggested after the close of discovery that under his view of the Ban, not all use of the internet is "disseminating to the general public," but refused to take a position about what sort of protection or password is sufficient to make "internet publication" sufficiently private to not be deemed "disseminating" to the general public. **Dworak, 128:16-129:14**.

204.     Defendants' supplemental response to one of VRF's discovery requests also reflected an amorphous standard: "'Publishing online' could be construed to mean anything from making an internal list of registered voters for use in an internal website, or a secured website, or maintaining that information on an internal website for others to access internally, such as on Google Drive, or sending mass emails to voters as part of a campaign. The AG believes this type of 'publishing,' used within the context of permissible government or election campaign use, is acceptable, whereas 'publishing' to the general public is not." **Ex. P31.**

205.      In the same email, Defendants stated, in their "Answer" to a clarification of Request for Admission 3: "As stated above, the definition of publication might be straightforward, but the question is who is able to access that information, as it depends on whether it's published on a secure website or a website accessible only by certain people. To that extent, the clarification that it is published to members of the public helps with that distinction, and that would not change the Secretary's admission to that RFA. The Secretary believes that publishing voter data to the general public constitutes a violation of NM law." **Ex. P31.**

206.     The AG's office testified that its standard is that sharing could occur after all, so long as "there is not a risk of that information being used for unlawful purposes." **Dworak, 128:24-129:14**. The AG believes a case-by-case analysis would be required to determine whether someone

has violated the law by publishing the data to "the general public," but believes that it generally consists of making it available without a pay wall. *Id.*, **111:7-22**.

207.     The AG believes it might violate the law to transfer the data for election research, governmental, or campaign purposes, if the transferor lost control of the data. *Id.*, **72:4-19.**

208.     The AG's analysis of whether VRF's posting of the data on the internet is unlawful does not depend on whether any person has actually used the data for an impermissible purpose. *Id.*, **100:11-18**. The AG's position is that so long as there is no guarantee that individuals who use it will not misuse it, it's being used for an impermissible purpose. *Id.*, **103:1-104:6.**

209.     The AG's position is that posting or publishing data on the internet may not be unlawful, depending on whether the data is published in a way to ensure its use is limited for lawful purposes, or that could allow it to be used for unlawful purposes. *Id.*, **38:9-23**. "You can't just say it is or it isn't, because there is too many variables to those conditions." *Id.*, **38:24-39:12.**

210.     Further, the AG was not prepared to say whether sharing the data with an agent or a contractor violates the law. *Id.*, **116:14-117:11**.

211.     Likewise, the Secretary does not know whether, under current law, an entity would violate the ban on sharing data "outside of the organization" if it retained an independent contractor to analyze data. **Vigil, 88:17-89:24.**

212.     The Secretary claims to no longer know whether, under current law, an entity would violate the ban on sharing data "outside of the organization" if it shared the data on the Internet with a customer via a secure connection. **Compare** *Id.* **at 97:19-98:11 with SOF ¶41.**

213.     The Secretary believes political party volunteers count as "within the organization" of the political party if the volunteers are considered "staff," but otherwise has no "particular legal definition" of the line between criminal and legal conduct. **Vigil, 106:24-107:6.** The Secretary

would need "additional review" to know whether political parties commit a crime by giving a walking list to door-to-door walkers who are unpaid college students who are not employees. ***Id.,* 113:23-114:13.**

214.     The Secretary relies wholly on the affidavit submitted by groups to ensure that they are using it lawfully, and does nothing to investigate whether their volunteers or other connected individuals actually meet the Secretary's definition of "within the organization." Only if it is made aware of a violation will the Secretary investigate. ***Id.*, 109:11-110:6.** The Secretary does not require the requester to identify any individuals who actually receive the data. ***Id.*, 145:23-146:4.**

215.     With respect to the question of whether Defendants view a particular volunteer as part of the organization for purposes of the Data Sharing Ban, "each scenario" has "facts that need to be evaluated" and "would need to go to our counsel for an analysis to determine if it's lawfully part of [an] organization or not." ***Id.*, 110:7-111:6.**

216.     The Secretary will not commit that "being within an organization" is "limited to employees." ***Id.*, 112:1-5.** The Secretary cannot say whether it matters that the individuals are paid, whether the individuals "need to have an agreement with the organization" of some kind because "[W]e have not outlined all of those logistical details," and "every scenario would require some analysis to determine if it's within the bounds of the statute or not." ***Id.*, 113:6-22.**

217.     The Secretary has also taken conflicting positions regarding whether it keeps a "file maintenance list" as that term is defined under New Mexico law and whether it could produce said list to VRF. **Compare ROG 2 in Ex. P27** (admitting Secretary maintains a "file maintenance list") **with RFP 15 in Ex. P25** (denying that Secretary keeps a file maintenance list).

XX.    **Defendants' Indifference towards Entities Actually *Selling* New Mexico Voter Data to Third Parties Persists throughout this Litigation**

218.    VRF has repeatedly informed the Defendants that other entities, including Aristotle, Catalist, and i360 were likely *selling* New Mexico voter data. **May 17 Tr., 93:16-24, 94:8-21, 44:4-11**, **June 15 Tr., 180:12-21; 205:4-12; 238:2-14; FAC ¶¶175, 193**; **Dkts. 84-87** (notices of subpoenas to Aristotle, Catalist, i350, and TargetSmart). Elections Director Vigil even made promises on the record that the Secretary would look into these entities. **June 15 Tr., 238:9-14**.

219.    Catalist and i360 were also mentioned in the Court's order granting the preliminary injunction: "The Secretary of State's interpretation of the Election Code criminalizes requesters such as Catalist, i360, Data Targeting, and L2 Inc., *who apply for voter data and then sell it to clients outside their own organization.*" **Mem. Op., 158-9** (emphasis added).

220.    In September, VRF asked Defendants whether they had conducted any investigation into Catalist, i360, or any other commercial entity that purchased data from the Secretary, but when Defendants responded in mid-October, they again said they had not. **See Ex. 32,** ROG 1 to SOS**; See Ex. P4,** ROG 1 to AG**.

221.    Since Vigil's testimony promising to look into at least Catalist in the summer of 2022, the Secretary has done nothing to investigate whether Catalist and Aristotle, groups that sell New Mexico voter data to customers for a fee, are violating the law. **Vigil, 116:6-117:3.** The Secretary claims it has "not received any complaints nor allegation that they have violated the law." ***Id.*, 118:5-16.** Even if a federal district court made the Secretary aware of criminal activity, it might not be sufficient for the Secretary to institute an investigation because, for the Secretary, investigations are a matter of "managing the appropriate resources and the appropriate priorities." ***Id.*, 119:19-120:1**. The Secretary's position is that it doesn't "think there is anything additional in particular" that would cause it to further investigate the district court's factual findings about

Catalist and Aristotle in this case**. *Id.*, 121:2-17.** The Secretary investigated and criminally referred VRF, but not Catalist and Aristotle, because the "deciding factor" was that the Secretary believed VRF was endangering "voter rights" and their "participation in the process." *Id.*, **121:18-122:6.**

222.     At a March 2023 deposition, the AG claimed to be unaware of Catalist, i360, or Aristotle, or whether these entities sell any data that they receive from the Secretary's office. **Dworak, 167:16-168:11**. The AG made the same response to an interrogatory seeking this information in October 2022—that the AG had not received a referral or complaint, and had not conducted an investigation. *Id.*, **170:17-171:6**. The AG cannot state what it would take for the office to consider VRF's claims during the litigation that these other entities are violating the law as the AG interprets it. *Id.*, **172:9-23**.

223.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████.

224.     The Secretary "has not evaluated" whether, under current law, a political campaign that shares voter data with paid political consultants constitutes "sharing within organization." **Vigil, 108:4-17.**

225.     Nothing is stopping the Secretary from investigating any political party for sharing voter data with their paid political consultants who are not part of a campaign. *Id.,* **108:18-109:5.**

**XXI.   The State Interests Purportedly Served by the Data Sharing Ban and Use Restrictions**

226.     One reason the Secretary wants to prohibit the sharing of voter data outside of an organization is to require requesters to come directly to the Secretary for the data, and thereby generate revenue. **Vigil, 143:9-24.**

227.     The main reason the Secretary wants to enforce the Data Sharing Ban is that it allows the Secretary to keep a record of individuals who requested the data, so that it can use that information as a tool for enforcement "if we do see an instance of stalking or harassment or intimidation." *Id.*, **144:1-24.**

228.     The Secretary cannot state why its interest in knowing who has accessed the data is not fully vindicated by simply having requesters keep a record of the individuals with whom it shares the data. *Id.*, **146:5-149:2.**

229.     The Secretary believes the current affidavit is sufficient to satisfy the state's interest in ensuring that the recipients of the data understand what they're supposed to do and not do with the data. *Id.*, **151:4-12.**

230.     The Secretary believes that its interest in educating the public is not fully vindicated by having the initial recipients require that their own recipients agree to the specific provisions of New Mexico law, because the Secretary's form promotes uniformity and consistency. *Id.*, **151:13-152:20.** Failing to use the current form is not a reason to reject a request. *Id.*, **168:24-169:24.**

231.     Other than these interests, the state has no other interest in requiring users of the data in signing a form directly with the Secretary. *Id.*, **152:21-24.**

## XXII.  Defendants Fail to Produce any Evidence that VRF's Publication of Voter Data has Caused Harm to Voters or the State

232.      The AG has no information that VRF has manipulated or misrepresented voter data. **Dworak, 98:18-99:14**. The Secretary also lacks any facts or documents showing that VRF manipulated or tried to manipulate New Mexico voter data. **Ex. P27,** ROG 4 to SOS (no facts or documents relating to VRF's manipulation of or attempt to manipulate New Mexico voter data).

233.      The AG has no information that any person has used the VRF data to stalk or harass anyone, or for any unlawful purpose. **Dworak,100:1-101:16**.

234.      The AG doesn't know how many people have canceled voter registrations because of the online posting of the data. ***Id.,*106:9-12**.

235.      The Secretary likewise did not produce any evidence of any person being subjected to unwanted solicitation, harassment, or abuse, because VRF shared voter data with the public on VRF's website. **Ex. P27,** ROG 3 to SOS.

236.      The Secretary has no information about citizens who contacted her office about concerns with VRF other than what was provided during discovery. **Vigil, 72:17-73:1.**

237.      The Secretary has no information that any voter has canceled their voter registration because of VRF's publication of voter data on its website. ***Id.*, 140:23-141:5.**

238.      The Secretary has no information that particular users of VRF's website were misinformed when accessing the data and disclosures on VRF's website. ***Id.*, 130:12-19.**

239.      The Secretary has no information that anyone used VRF's website for stalking, commercial solicitations, any criminal purpose, or any other improper purpose. ***Id.*, 136:8-138:9.**

240.      The Secretary has no information that anyone used VRF's website to engage in misinformation about elections. ***Id.*, 138:12-17.**

241.       The Secretary has no evidence that VRF manipulated voter data. ***Id.*, 140:19-22.**

46

**XXIII. VRF's Future Plans Involving New Mexico Voter Data**

242.　　　VRF desires to access, post, distribute, and otherwise use publicly available New Mexico voter data on the Website in the future so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls and conduct the oversight envisioned in the NVRA. **May 17 Tr., 71:18-72:5.**

243.　　　VRF's actual and proposed use is limited to that voter information which is publicly available under New Mexico law, and it does not seek to disseminate or use any information prohibited from being disclosed by law, including voters' social security numbers, a voter's day and month of birth, or voters' telephone numbers if prohibited by voters. **May 17 Tr., 40:5-14; 50:10-15; 102:18-22.**

244.　　　VRF desires to update its website over time with new data from the Secretary. **May 17 Tr., 55:3-4.**

## ARGUMENT

### I.      Summary Judgment Standard.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A mere "scintilla" of evidence will not avoid summary judgment. *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1539 (10th Cir. 1993). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). Notably, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 806 (1999).

### II.     VRF has Standing to Bring its First Amendment and NVRA Claims.

Last summer, this Court determined that VRF has standing to pursue its First Amendment claims. *See* July 22, 2022, Memorandum Opinion and Order (Dkt. 51)("Mem. Op.") at p. 159-163 (finding VRF satisfied Article III and prudential standing requirements). New facts bolster that finding and apply equally to the Verified First Amended Complaint ("FAC"), Dkt. 74.

The Secretary referred VRF to the AG for criminal investigation and potential prosecution. **SOF ¶122**. The chill on VRF's speech forced it to remove the New Mexico portion of the Website. Mem. Op. at 162; **SOF ¶¶130-132**. When this Court's injunction removed that chill, VRF reposted the data, **SOF ¶184**, but removed it again after the injunction was stayed. **SOF ¶199**. VRF intends to re-engage in that speech, including re-posting voter data, if it prevails. **SOF ¶¶132, 242.**

48

VRF's injury is fairly traceable to Defendants' conduct, including the Secretary's referral of VRF to the AG, **SOF ¶122**, the AG's ensuing investigation, **SOF ¶123**, and the continued retaliation against VRF by both Defendants, including the continued denial of access to New Mexico voter data in violation of state and federal law. **SOF ¶¶118-120, 139-145, 186-198.** Defendants continue to argue that VRF cannot engage in online speech sharing voter data, and consistently refuse every chance to foreswear prosecution. See *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022) (discussing provision of "affidavit foreswearing prosecution" to plaintiff to mitigate its fears); *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 17 (1st Cir. 1996) ("[D]efendants have not only refused to disavow [the statute], but their defense of it indicates that they will some day enforce it.").[3] VRF's speech will continue to be chilled until and unless this Court grants relief.

As for the prudential standing factors, VRF asserts its own rights to access voter data under the NVRA and to speak on the Internet using that same data, free of Defendants' retaliation. The Defendants' combined efforts to investigate, prosecute, and retaliate against VRF violates its First Amendment rights. *See Bd. of Cnty. Commissioners of Sweetwater Cnty. v. Geringer,* 297 F.3d 1108, 1112 (10th Cir. 2002). Moreover, VRF does not assert a generalized grievance; VRF itself seeks to access and post the voter data and, in fact, has posted the voter data during those periods in which it was free from fear of criminal prosecution. **SOF ¶¶59, 68, 184**. Finally, VRF's grievance falls within the zone of interests that the First Amendment protects, because VRF argues

---

[3] However, even "an attorney general's non-binding promise not to prosecute does not eliminate plaintiffs' standing" because "the Attorney General or his successors might change their mind." *Rhode Island Med. Soc. v. Whitehouse*, 66 F. Supp. 2d 288, 303 (D.R.I. 1999); *see Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) ("[O]ur precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law enforcement authorities.'" (citation omitted)).

that the Defendants' interpretation and application of New Mexico law unconstitutionally infringes on VRF's protected speech. See *Geringer*, 297 F.3d at 1112.

Additionally, though VRF's NVRA claims were not before the Court in July 2022, VRF has standing to bring those claims. VRF has been "aggrieved" by the Secretary's decision to not provide it with "records" covered by the NVRA's Public Inspection Provision (52 U.S.C. § 20507(i)), a decision the Secretary made on the AG's advice and with his support. *See* 52 U.S.C. § 20510(b); **SOF ¶¶142-45**. VRF complied with the NVRA's pre-suit notice requirement and waited the requisite period before amending its complaint to include the NVRA claims. See 52 U.S.C. § 20510(b)(2)-(3); **SOF ¶¶133-4**. The injury caused by the violation—the Secretary's failure to produce records subject to the NVRA's Public Inspection Provision based on advice of the AG—can be redressed by an order from this Court requiring production of the requested records and enjoining Defendants from denying future requests based on the same pretextual excuses at issue here. VRF asserts its own rights under the NVRA.

VRF has standing to bring the First Amendment and NVRA claims alleged in the FAC.

## III.   VRF is Entitled to Judgment as a Matter of Law on its NVRA Claims

The NVRA's "Public Inspection Provision," 52 U.S.C. § 20507(i), gives VRF the right to access and use individual, identifiable New Mexico voter information. The Secretary has unlawfully restricted VRF's access based on its interpretation of New Mexico state law, preventing VRF from accessing or sharing New Mexico voter data on VoteRef.com. This violates the NVRA in two ways: (1) Defendants' Data Sharing Ban (**SOF ¶¶39-51**) and Use Restrictions (**SOF ¶¶82-92**) are object-preempted by the NVRA because they unlawfully frustrate the mechanisms by which the NVRA accomplishes its goals; and (2) by refusing to fulfill VRF's requests for voter data, the Secretary has repeatedly failed to comply with the NVRA's Public Inspection Provision.

a. **The law regarding the federal right to access individual, identifiable voter information.**

The NVRA requires states to make reasonable efforts to maintain the accuracy of their voter rolls, including removing the names of ineligible voters due to death or change of address. 52 U.S.C. § 20507(a)(4). Documents related to this maintenance function are "records" which must be made available for public inspection. *See* § 20507(i)(1) (Public Inspection Provision applies to "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]").

Those "records" which must be made available pursuant to the NVRA include the "file maintenance list" and "voter data" as those terms are defined in NMSA § 1-5-2, as well as "voter data" as that term is used in NMSA § 1-4-5.5. These are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *See Judicial Watch, Inc. v. Lamone,* 399 F.Supp.3d 425, 439 (D. Md. 2019) (individual voter registration information "records"); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335-36 (4th Cir. 2012) (registration applications are "records"); *Pub. Int. Legal Found., Inc. v. Bellows*, 588 F.Supp.3d 124, 133 (D. Me. 2022)(same)[4]; *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 940 (C.D. Ill. 2022) (voter list is "record").

In *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 333 (4th Cir. 2012), Virginia refused the request of a non-profit organization similar to VRF to produce voter registration applications. On summary judgment, the district court held the NVRA's Public Inspection Provision entitled the plaintiff to access. *Id*. It relied on four determinations. *Id*. First, "the process of reviewing voter registration applications is a 'program' . . . because it is carried

---

[4] The Court previously cited *Bellows* to distinguish Maine's explicit statutory prohibition on Internet publication with New Mexico's similar informal prohibition. Mem. Op. at 153-154. Maine's prohibition was recently held to be preempted by the NVRA. *See Pub. Int. Legal Found., Inc. v. Bellows*, Slip Op. at *9, WL 2663827 (March 28, 2023).

out in the service of a specified end—maintenance of voter rolls—and it is an 'activity' because it is a particular task . . . of Virginia election employees." *Id*. at 335.

Second, "the 'program' and 'activity' of evaluating voter registration applications is 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'" *Id*.  "[T]he process of reviewing voter registration applications keeps official voter lists both 'accurate'—free from error—and 'current'—most recent…By registering eligible applicants and rejecting ineligible applicants, state officials "ensure that the state is keeping a 'most recent' and errorless account of which persons are qualified or entitled to vote within the state." *Id*.

Third, the Court observed that "the registration applications requested by Project Vote are clearly 'records concerning the implementation of' this 'program[ ] and activit[y].'" *Id*. at 335-36 (quoting 42 U.S.C. § 1973gg-6(i)(1), *as amended*, 52 U.S.C. § 20507(i)(1)) (alterations in original). The applications are "'the means by which an individual provides the information necessary for [Virginia] to determine his eligibility to vote.'" *Id.* at 336 (citation omitted).

Finally, the Court observed that Section 8(i)(1) "'very clearly requires that *all* records be disclosed.'" *Id.* at 336 (emphasis in original; citation omitted); *see* 52 U.S.C. § 20507(i)(1). It explained that "'the use of the word all [as a modifier] suggests an expansive meaning because all is a term of great breadth.'" *Id.* (quotation marks omitted) (alteration in original) (citation omitted). Moreover, it held that the phrase, "shall include," as used in Section 8(i)(2) of the NVRA, "sets 'a floor, not a ceiling'" as to the sorts of "records" that must be disclosed under Section 8(i)(1). *Id.* at 336-37 (citation omitted); *see also Jones v. Southpeak Interactive Corp. of De.*, 777 F.3d 658, 671 (4th Cir. 2015) ("term 'shall include' sets a floor, not a ceiling" and "[c]ourts have repeatedly indicated that 'shall include' is not equivalent to 'limited to'") (quoting *Long*, 682 F.3d at 337).

In this case, VRF requested voter data on three separate occasions. **SOF ¶¶115-121 (Feb. 15); ¶¶133-159 (May 27); ¶¶185-198 (Oct. 18)**. VRF sought two sets of voter data:

> the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021.

**SOF ¶¶115**; **136, 185,** and

> Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

**SOF ¶136, 185**.

The voter data VRF requested is clearly a "record" subject to the Public Inspection Provision. It consists of (1) voter data, containing the individual's personal information and registration status sorted into fields; and (2) an activity log that records the changes made to the voter data. **SOF ¶¶115**; **136, 185**. Like the voter registration applications in *Long*, the voter list maintenance file and other corresponding data are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1). The process of creating, updating, and auditing voter data "is a 'program'...because it is carried out in the service of a specified end—maintenance of voter rolls—and it is an 'activity' because it is a particular task ...of [New Mexico] election employees." *Id.*, 682 F.3d at 335 (quotation omitted).

In New Mexico, state and local officials update the voter file with new information (**SOF ¶¶160-62; 172-73**), thereby "'ensuring the accuracy and currency of official lists of eligible voters.'" *Long*, 682 F.3d at 335 (internal citation omitted). The voter list is a record that concerns the implementation of the program and activity of maintaining accurate and current eligible voter lists. After all, the list contains the information on which New Mexico election officials rely to

monitor, track, and determine voter eligibility. *See id.* at 336. Thus, VRF requested "records" which are covered by the NVRA's Public Inspection Provision.

### b. New Mexico's restrictions on requesting and accessing voter records are preempted by the NVRA's Public Inspection Provision (Count I)

Defendants assert New Mexico's Data Sharing Ban prohibits requesters of voter data from sharing that data on the Internet and, in turn, cite VRF's past posting on the Internet and conditional plans to post in the future[5] to justify not fulfilling *any* VRF request for voter data. **SOF ¶¶117-120; 158**. But the Data Sharing Ban applied by Defendants is a pretextual interpretation of New Mexico law and exists nowhere in statute. See Mem. Op. at 157 ("[d]espite its appeal, however, the Court can find no statutory basis for this interpretation."). Even if New Mexico were to amend its law to match Defendants' policy and practice, the resulting statutory ban on Internet speech (and the ban on the access necessary for that speech to occur) would violate the NVRA's *unqualified* right of public access. It would also frustrate one of the NVRA's main objectives: for citizens to access, analyze, and discuss the data so that they can detect and remedy errors in the maintenance of voter rolls. Blocking citizen-to-citizen speech discussing the data manifestly defeats the purpose of public access in the first place and creates an unlawful obstacle to effectuating the NVRA's mandates.

### i. The law of obstacle preemption

Obstacle preemption is one form of implied preemption under the Supremacy Clause. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (preemption appropriate where challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644,

---

[5] VRF has repeatedly and explicitly assured Defendants and the Court that it will not post New Mexico voter data online absent a court order allowing it to do so. **SOF ¶¶152-53.**

679 (2003) (Thomas, J., concurring) ("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). For example, a federal rule which permits, but does not require, airbags in passenger vehicles preempts claims that a car is defective because it *lacks* an airbag. *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 886 (2000).

Importantly, no presumption against preemption applies to Elections Clause legislation such as the NVRA. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013).[6] The Elections Clause "empowers Congress to 'make or alter' state election regulations[,]" and therefore the "assumption that Congress is reluctant to pre-empt does not hold when Congress acts" under that Clause. *Id.* at 14. *See also Harkless v. Brunner*, 545 F.3d 445, 455 (6th Cir. 2008) (The rule "that Congress must be explicit when it encroaches in areas traditionally within a state's core governmental functions [ ] does not apply when Congress acts under the Elections Clause, as it did in enacting the NVRA") (citations omitted).

Against this background, the NVRA preempts a range of state laws. *See Inter Tribal*, 570 U.S. at 11-13 (NVRA preempts state laws requiring proof of citizenship by requiring states to "accept and use" the federal registration form); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (Georgia law limiting who can accept voter registrations was preempted by NVRA's provision regarding mailed applications); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (Ohio requirements for registration workers preempted).

State limitations on non-profits' access to voter data are also preempted. *See Judicial Watch, Inc. v. Lamone*, 399 F.Supp.3d 425, 445 (M.D. 2019). In *Lamone*, Judicial Watch, an advocacy group dedicated to "promoting transparency, integrity, and accountability in

---

[6] "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators." U.S. Const. Art. I, § 4, cl. 1.

government" requested voter records from the state of Maryland. *Id*. at 429. Judicial Watch planned to "analyze[] all responses and disseminate[] both its findings and the requested records to the American public to inform it about 'what the government is up to.'" *Id*. (citation omitted). The data included voter registration records, listing a voter's name, date of birth, address, current voter registration status, the reason for the most recent change in status, and the source of the change. *Id*. at 432. Maryland's Board of Elections denied Judicial Watch's request because state law banned access for other states' residents. *Id*. at 431-32. Judicial Watch sued.

On summary judgment, the court first held that individual, identifiable voter records are "records" subject to the NVRA's Public Inspection Provision. *Id*. at 441-42. Second, it held the Maryland law "undermines Section 8(i)'s efficacy," was "an obstacle to the accomplishment of the NVRA's purposes" and was therefore preempted by the NVRA. *Id*. at 445.

### ii.   The NVRA preempts the Data Sharing Ban and Use Restrictions.

Congress expressly stated the NVRA has four purposes: to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance [] the participation of eligible citizens as voters in elections for Federal office," *id.* § 20501(b)(2); "to protect the integrity of the electoral process," *id.* § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(4). Section 8(i) of the NVRA provides for the disclosure of voter registrations in order to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote*, 682 F.3d at 339. Any prohibition on Internet speech that shares the voter data (including any condition on access predicated on the requestor's surrender of the First Amendment right to engage in such speech), clearly contradicts Congress's stated objectives in the NVRA and creates many improper obstacles to its implementation.

First, "[o]rganizations . . . have the resources and expertise that few individuals can marshal. By excluding such organizations from access to voter registrations, the State law undermines Section 8(i)'s efficacy." *Lamone*, 399 F.Supp.3d at 445. VRF has resources that individual citizens do not: it can purchase statewide data, (**SOF ¶12**) which typically costs thousands of dollars per state. **SOF ¶56**. VRF also has the expertise and resources to convert the large and difficult-to-use data files produced by most states into a format that ordinary citizens can meaningfully use, and presents that complex data in an easy-to-access medium. **SOF ¶¶10-12**. The NVRA's objective of empowering citizens to aid states in detecting errors in voter rolls would be entirely defeated if states could require what Defendants seems to envision: that each individual citizen wishing to analyze state data must (because he cannot obtain it from a fellow citizen sharing his interest in the voter rolls) individually invest the enormous amounts of time and money that VRF commits to obtaining and formatting statewide data.

Even if the Secretary in every state provided free, user-friendly portals to their data and, like VRF, performed all the work formatting their entire data file, it would still be necessary for citizens to share and discuss the data with each other. Detecting error requires citizens to compare the state's official data with their own personal knowledge regarding friends, neighbors, relatives, and community events. Citizens are much more effective, and their knowledge grows exponentially, when they can share their analyses—and the underlying data—with each other. In contrast, if citizens must operate in a cone of silence, with each person limited to isolated communications with a government election administrator, they cannot effectively combine their knowledge, experience, and analysis, and will be relegated to occasionally providing their own confidential "tips" directly to a bureaucrat. This, too, defeats the objectives of the NVRA.[7]

---

[7] To the extent the recently signed legislation amending § 1-4-5.6 codifies Defendants' Data Sharing Ban and Use restrictions by making it unlawful to "caus[e] voter data…that identifies, or that could be used to identify, a specific

### c.   Regardless of preemption, the Defendants violated the NVRA by failing to produce records in response to VRF's lawful request (Count II)

As shown above, the NVRA's Public Inspection Provision mandates public disclosure of individual, identifiable voter information as a "record" "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(8)(i). Because individual, identifiable voter information is a "record" pursuant to the NVRA, VRF is accordingly entitled to New Mexico voter data under the plain text of the NVRA. VRF made three separate requests for New Mexico voter data. **SOF ¶¶115-121 (Feb. 15); 133-159 (May 27); 185-198 (Oct. 18)**. The Secretary, though obligated to do so by the NVRA, refused to fulfill those requests. **SOF ¶¶117-120; 139-145; 151-159; 186-198**. In doing so, Defendants have repeatedly violated the NVRA.

### i.   VRF made three lawful requests under the NVRA which the Secretary was required to fulfill.

VRF's first request on February 15, 2022, was for "the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, election who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020, and April 13, 2021." **SOF ¶¶115-121**. After the Secretary failed to respond, VRF sent the

---

voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means" that legislation is also preempted by the NVRA for the same reasons stated above. As previously mentioned, a Maine statute with near-identical language was recently found to be preempted by the NVRA. *See Bellows*, at *3, WL 2663827. (Holding "[t]he [NVRA's] Public Disclosure Provision's disclosure mandate, meanwhile does not allow a state to impose these restrictions."). In so holding, the *Bellows* court invalidated Maine's amended statute which forbid anyone to:

(1)   Sell, transfer to another person or us eth voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations; or

(2)   Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

*Id*. at *3.

Secretary a timely and sufficient "Notice of Violation of National Voter Registration Act & Request for Records" (the "Notice") pursuant to § 20510(b)(1). **SOF ¶¶133-134**. The Notice again requested the Secretary comply with the NVRA, renewed the request for the same data requested on February 15th, and propounded a new request under the NVRA and New Mexico law seeking:

> Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

**SOF ¶¶135-136**. The Notice further stated that VRF intended to use the requested data for each of its two distinct election related projects, but would not post New Mexicans' personal voter data online absent a court order. **SOF ¶137**. As required by the Secretary, VRF provided a completed Voter Information Authorization form for each of the separate requests. **SOF ¶138**.

VRF sent a final request for the same voter data on October 18, 2022. **SOF ¶¶185-198**.

### ii.  The Secretary rejected all of VRF's requests.

The Secretary's office rejected all of VRF's requests for invalid and groundless reasons. Its reasons for rejecting VRF's February 15th and May 27th requests were identical. **SOF ¶ 141-45; 151-59**. First, it claimed VRF's request for changes to the voter file did not request "records" under the NVRA because it purportedly required creating a "new" record. **SOF ¶141**.

Next, despite VRF's promise not to publish voter information on its website absent a court order, **SOF ¶137**, the Secretary claimed to deny the second part of VRF's request (for current voter registration data for all voters) because it disbelieved that promise, and "publishing any New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability." **SOF ¶¶151-53**. █████████████████████████████

███████  Finally, the Secretary rejected the October request on November 17, 2022. **SOF ¶186**. It claimed this denial was because VRF provided no affidavit, **SOF ¶190**, and because (despite VRF's compliance with the district court's orders, and promises not post without an order) "you

will post any voter data provided on your website." **SOF ¶188**. The Secretary claims this excuse was based on VRF's past practice. **SOF ¶¶192-93**.

### iii. The Secretary's pretextual reasons for blocking VRF's requests for voter data violate common sense and the NVRA

The Secretary's contradictory reasons for failing to fulfill VRF's requests for voter data find no home in the law, the facts, or common sense, and lack any basis in the NVRA. Discovery further confirmed this Court's July 2022 finding that the excuses were pretextual: by November 2022, the Defendants' lack of justification for their denials were, if anything, more brazen. By the spring of 2023, the Defendants had taken the most extreme position of all: because of VRF's past conduct, the Secretary will not commit to produce data to VRF even if it supplies affidavits and restates its repeated promise not to post data without a court order. **SOF ¶¶195-97**.

### 1. The alleged fear that VRF would break promises

The Secretary refuses to accept VRF's repeated promises—made in writing, in open court, and in person—starting in May 2022 and continuing to today, that it will not share voters' personal information on its website without a court order. **SOF ¶137**. Why? The Secretary believes VRF's very act of sharing data with the public shows an intent to violate the law and that it cannot be trusted. **SOF ¶¶192-3**. The Secretary even punishes VRF for posting data after this Court awarded a preliminary injunction. ***Id.*; see also ¶196.** The Secretary refused to say when the "stain" of VRF's past conduct—including its reliance on this Court's injunction—will ever wear off, allowing VRF to receive data like other requesters. **SOF ¶¶192-3**.

This is the culmination of a long pattern of obstruction. The Secretary's June 16th denial asserted that VRF's alleged plans to post the data online justified non-compliance with the NVRA, **SOF ¶¶140; 151-53**, even though VRF specifically stated it would not do this absent a court order. The Secretary's November 17th denial is no better. There, the Secretary suggests substantially

different justifications than in the June 16th letter. **SOF ¶¶185-197**. This alone signals the pretextual nature of the Secretary's reasoning. In November, the Secretary complained that the October 18 request did not state within its four corners that VRF will not post any voter data on its Website. **SOF ¶188**. Yet VRF had clearly and repeatedly stated it would not post the data online absent a court order—Defendants simply chose to draw contrary conclusions despite these representations. **SOF ¶¶192-3; 197**. To assert that the absence of these representations—which Defendants will in turn disregard—is grounds for denial is nonsensical.

The Secretary's repeated refusal, even now (**SOF ¶158**), to take VRF at its word is inexplicable. The Secretary has gone so far as to say that nothing, not even the repeated promises of VRF's counsel to the Secretary and the Court, will assuage the Secretary's fears. **SOF ¶156**. This Court already concluded the Secretary's position on this issue "causes impermissible viewpoint discrimination." **Mem. Op., 181**. Defendants continue to prove the Court correct.

### 2.   The pretext that the requested records "do not exist"

The Secretary rejected VRF's requests because they allegedly require the Secretary to create a new record. **SOF ¶141**. This fails as a matter of fact and law.

First, the NVRA does not allow a state to refuse a request simply because the state would have to "create" a new record from existing data. *See Project Vote, Inc., v. Kemp*, 208 F.Supp. 3d 1320 (N.D.Ga 2016) ("That Defendant may, due to the manner in which the Requested Records are stored, experience technical burdens in making the records available, does not" affect the obligation to produce those records.). Second, the Secretary's objection knowingly mischaracterizes the way her office maintains data and produces it to requesters in the form of "reports." New Mexico's data is stored in the SERVIS database, not within a set of pre-existing reports. **SOF ¶¶160-74**. SERVIS stores various fields of voter data, including voter credits which

reflect data showing a voter cast a vote in a given election. **SOF ¶162.** Every time the Secretary fulfills any request for voter data, programming containing filters and algorithms creates a new report by pulling from the database's collection of several fields of data. **SOF ¶¶163-165**. A user interface generates "canned" reports, for which coding has already been written to pull oft-requested data, but the Secretary is able to create non-canned reports as well. **SOF ¶¶166-67**.

For this reason, as confirmed by the Secretary's own IT department head, Greg Rockstroh, the Secretary was fully capable of fulfilling VRF's requests, just like any other request for voter data. **SOF ¶¶147-49**. Indeed, it often does provide similar reports to other requesters where no "canned" report is responsive. **SOF ¶¶175; 170.** Here, the SERVIS database actually does provide a "canned" report containing the correct algorithm for part of VRF's request, **SOF ¶172,** and the data not contained in a "canned" report is and was available in the system. **SOF ¶176.** Specifically, the data making up "A complete list by county precinct of any registered voters who cast a ballot in the November 3, 2020 general election" is contained in a "canned" report. *Id.* The data showing voters who voted in the 2020 election who have since been placed in an inactive, canceled, deleted, or removed status is not a "canned" report, but is available in the SERVIS system along with data illustrating "[a]ny voter that has been removed between [] two dates." **SOF ¶177.**

Finally, the "File Maintenance List," another VRF request, is a canned report available in SERVIS without additional effort. **SOF ¶172**. State law requires the Secretary to create this report at least monthly, **SOF ¶146**, the Secretary admitted multiple times to both creating and maintaining this report, **SOF ¶¶148, 217**, and admitted her office would "have to provide voter list maintenance data when someone makes a request under the NVRA." **SOF ¶149**. In short, the Secretary knew it had an obligation to fulfill VRF's request, but instead of complying with state and federal law, the Secretary and AG concocted pretextual justifications to block VRF's access to the data.

### 3.   Ongoing litigation

Next, the November 2022 denial suggested that the Secretary's effort to stay this Court's preliminary injunction is a distinct reason for denying VRF's request. This was illogical: the Court's injunction did not cover newly requested data, and so the pendency of an appellate stay application could have had no impact on VRF's right to the data. Further, no law suggests there is an "ongoing litigation" exception to the NVRA.

### 4.   Failure to attach affidavits to the October 2022 request

Finally, the Secretary contended that VRF did not comply with "NMSA 1978 section 1-4-5.5 in requesting voter data, by not submitting the required affidavit." **SOF ¶190.** The NVRA contains no affidavit requirement. Additionally, VRF previously presented the Secretary with the required affidavits and the Secretary still denied VRF's request. **SOF ¶¶138;141.** More recently, the Secretary admitted at deposition that even if VRF had attached the required affidavit, it would not have fulfilled VRF's request. **SOF ¶¶195.** The Secretary's denials are clearly pretextual.

VRF made multiple lawful requests under the NVRA for data which constitutes "records" subject to the NVRA's Public Inspection Provision, and the Secretary had the ability and obligation to process these requests and have processed similar requests for others, but still the Secretary refused to fulfill VRF's requests. Instead, the Secretary (relying on the AG) concocted various nonsensical excuses which are belied by both the facts and the law. In doing so, the Secretary violated the NVRA and VRF is entitled to judgment as a matter of law on Count II.

### IV.   VRF is Entitled to Judgment as a Matter of Law on its First Amendment Claim Because the Ban and Use Restrictions Directly Restrict Core Political Speech, Impose Unconstitutional Conditions, and Fail Strict Scrutiny (Count V)

Defendants admit that the regulations at issue are direct restrictions on speech protected by the First Amendment. See Def.'s Response to Mtn. for Prel. Inj. [Dkt. 13] at p. 8. Because the Data

Sharing Ban and Use Restrictions are direct restrictions on core political speech, they are subject to strict scrutiny. They fail that test. Further, New Mexico imposes the Use Restrictions and Data Sharing Ban as conditions on access to a benefit (i.e., voter data) made available by the state. For the same reasons the regulations fail strict scrutiny, they fail as unconstitutional conditions.

### a. VRF need not show a right to access New Mexico voter data under the First Amendment, as its right of access is derived from the NVRA and state law

The Court should address one threshold matter before taking up VRF's First Amendment claims: whether a challenge to state restrictions on private citizens' First Amendment *right to use* voter data requires the plaintiff to first prove a generalized First Amendment *right to access* that data. The answer is no. As addressed above, federal law (including the NVRA's Public Inspection Provision) and state law (NMSA §1-4-5.5) both require the state of New Mexico to make its voter data available, especially for the types of tasks performed by VRF and users of the Website. **SOF ¶¶4; 29**. Because the NVRA and state law require that voter data be made available, VRF need not establish an independent right to access that information under the First Amendment. Once a state makes information, data, or records available to the public, the First Amendment limits how the government may restrict the public's subsequent use and sharing of that information, and also prevents the state from conditioning access in a manner which would violate the First Amendment. See Mem. Op. at p. 176 ("The Fourth Circuit also notes that, once a State chooses to provide a process allowing for the right to access voter information, there are 'limits to its freedom to decide how that benefit will be distributed.' *Fusaro v. Cogan*, 930 F.3d at 256 (quoting *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. at 43 (Ginsburg, J., concurring))).

Thus, even if a state could permissibly refuse to withhold *all* voter data,[8] once the state makes the information available, it must comply in all respects with the First Amendment protections afforded to the use and dissemination of that information. *See Fusaro*, 930 F.3d at 255–56 ("Thus, Maryland could have decided not to release its voter registration list without violating the First Amendment… But when the Maryland legislature decided to make the List publicly available, it could not condition access to the List on any basis whatsoever….") (internal citations and quotations omitted). *See also Meyer v. Grant*, 486 U.S. 414, 425 (1988) (the state's power to ban initiative petitions entirely does not imply a power to burden initiative petition speech once it has allowed the initiative process). Following *Fusaro* and *Meyer*, then, this Court need not resolve whether VRF has a *First Amendment* right to access voter data; it need only recognize VRF's statutory right under the NVRA (52 U.S.C. §20507(i)) and NMSA § 1-4-5.5.

### b.   Speech involving voter data is protected by the First Amendment, particularly when that data is required to be made available under State and Federal law.

Once it is established that VRF has a right to possess the data under the NVRA and § 1-4-5.5, the pivotal question is this: how does the First Amendment protect VRF's speech when it shares that data with those who choose to associate with VRF by accepting the terms and conditions of its website? At minimum, as shown below,[9] the First Amendment protects VRF from (1) unreasonable burdens on core political speech regarding elections; and (2) from unconstitutional conditions on VRF's rights, such as restrictions that apply based on content, viewpoint, the speaker, or the purpose of the speech.

---

[8] See *Los Angeles Police Dep't*, 528 U.S. at 40 ("This is not a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses…California could decide not to give out arrestee information at all without violating the First Amendment.")

[9] VRF is also protected, of course, from regulations that are overbroad (Part V) and vague (Part VI), and from viewpoint discrimination and retaliation (Part VII).

The First Amendment commands, "Congress shall make no law [. . .] abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The speech and petition protections of the First Amendment have been incorporated against the states. *See Gitlow v. New York*, 268 U.S. 652 (1925). The First Amendment safeguards speech and the dissemination of information on the Internet with the same vigor as the writings in a newspaper or a speaker in the town square. *See Reno v. ACLU,* 521 U.S. 844, 868 (1997); see also *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper,* 532 U.S. 514, 527, (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.").

"The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983), and "[t]he First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation omitted).

The Constitution protects both speaker and listener, as the ability to receive information is also a fundamental First Amendment right. See *Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143, (1943) (First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it."). Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957).

Speech about and including voter data, including individually identifiable data, is protected. As the *Fusaro* court noted:

> … three important considerations compel our conclusion that § 3-506 implicates interests that are protected by the First Amendment. First, the List is closely tied to political speech, which generally receives the strongest First Amendment protection… the List is a valuable tool for political speech… And, in addition to the List's obvious practical utility to political expression, § 3-506 all but ensures that the List will be used to further such speech. More specifically, § 3-506(c) makes it a misdemeanor to use the list 'for any purpose not related to the electoral process.' Thus, the text of § 3-506 reinforces the connection between the List and political speech. In these circumstances, we are obliged to hesitate before placing such a regulation beyond judicial scrutiny…"

*Id*., 930 F.3d at 250 (citations omitted).

A state may violate the protections of the First Amendment in many ways, *e.g.*, *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819 (1995); *Keller v. State Bar of Cal.,* 496 U.S. 1 (1990), but a law imposing criminal penalties on protected speech is a stark example of speech suppression.

### c. **VRF's constitutionally protected speech is infringed by the Use Restrictions and the Data Sharing Ban.**

#### i. **Restriction of Core Political Speech**

VRF's speech that shares New Mexico voter data is constitutionally protected. See Section IV(b), *supra*. New Mexico routinely makes voter data available to political parties and campaigns for inherently political means and even conditions access to the voter data, in part, on the data being used for election and election campaign purposes—necessarily political objectives. **SOF ¶¶31, 43, 204**. ███████████████████████████████████████████. ███████████████████████████████████████████████████████████ Because voter data cannot be divorced from its wholly political nature, the dissemination of that data is protected under the First Amendment.

Until Defendants' threats, VRF posted voter data on the Website along with commentary regarding how ordinary citizens can use and review the data. **SOF ¶59.** The Website also included a call to action for citizens to contact state officers charged with maintaining the voter rolls if errors were identified. **SOF ¶62.** The Website itself, including the voter data on the Website, was and is core political speech. *See Meyer*, 486 U.S. at 421 (any effort to seek "political change," even if it does not involve overtly persuading a citizen that one's views are correct, is core political speech). The State's complete ban on sharing voter data would silence core political speech by banning the sharing of the underlying data necessary to effectively engage in that speech. *See id.* at 424 (striking down Colorado's ban on payments to petition circulators because even though it did not eliminate every avenue of communication, it banned the most effective means of speech, and "the First Amendment protects appellees' right not only to advocate their cause, but also to select what they believe to be the most effective means for so doing.").

Speech sharing information about the voting history of New Mexico voters, particularly when used in the manner contemplated by VRF, sits at the zenith of First Amendment protection. See *Fusaro*, 930 F.3d at 250. Discussions regarding voting, elections, electoral processes, and election integrity are issues in which the public does and should have a high level of interest. Compare *Meyer*, 486 U.S. at 421 (protection was at its "zenith" for speech regarding trucking deregulation). Yet the Use Restrictions and Data Sharing Ban make it more difficult, more expensive, and essentially impossible for VRF to disseminate meaningful information regarding New Mexico's elections, including the State's efforts and success in maintaining accurate and up to date voter rolls. They also impose massive costs on individuals who are not affiliated with a political party or candidate or ballot measure campaign, and therefore cannot receive that campaigns' access to the data. **SOF ¶12.**

Due to the volume of voter information which VRF wishes to share—including data on millions of voters—it is virtually impossible to distribute through any non-Internet means. Further, it is the very accessibility of the data on the Internet that draws interested listeners and political associates to VRF's speech and motivates them to engage in their own speech. Having the data accessible on the Internet also sends its own message: that this is the public's data, and that it is and should be transparent. VRF hopes that thousands or even millions of concerned citizens who share its interest in election transparency, participation, and integrity will view, analyze, and discuss the data. VRF's plan is to crowd-source the analysis of the data, so that interested citizens can associate with VRF and with each other to analyze and engage in political speech regarding the data. **SOF ¶¶4;8**. Yet the Defendants' state that it is precisely the use of the Internet to bring the data to ordinary citizens and to facilitate speech among non-campaign-insiders that renders VRF's use and sharing unlawful.

Thus, in criminalizing the dissemination of voter data, including via the Internet, the Use Restrictions and Data Sharing Ban do not leave open ample, comparable, and effective alternative channels for communication. The Use Restrictions and Data Sharing Ban also infringe on and abridge VRF's speech by limiting the size of the audience that can be reached, as Defendants threaten prosecution based on the theory that dissemination to the "general public" is unlawful.

> **d. The Data Sharing Ban and Use Restrictions violate the First Amendment because they unconstitutionally condition access to voter data on the surrender of First Amendment rights**

The Data Sharing Ban is further constitutionally infirm because, as applied by Defendants, access to voter data that would otherwise be made publicly available is conditioned on the requestor's surrender of First Amendment rights, including specifically the right to share information on the Internet. The Use Restriction suffers from the same infirmity to the extent that

Defendants deny access to otherwise available voter data because they believe VRF will engage in spreading misinformation, that is, speech with which Defendants disagree.

Under the "unconstitutional conditions doctrine," "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech[.]" *United States v. American Library Assn., Inc.*, 539 U.S. 194, 210, 123 S.Ct. 2297 (2003) (cleaned up). Here, citizens' ability to view and then engage in speech that shares the data in the voter rolls is an essential First Amendment right. *See* Section IV(b) above. Speech among citizens that shares data about who has voted, when, and where—the information at issue here—sits at this "highest rung" and is entitled to special protection. *Connick*, 461 U.S. at 145. As explained above, the NVRA requires that states make this data available. *See* 52 U.S.C. § 20507(i)(1).

The NVRA's treatment of voter lists as records that must be available to the public advances the First Amendment rights of requesters who wish to use the records for election purposes and to petition their government to undertake steps to maintain accurate voter rolls. That is because such lists are not simply collections of data, compiled for commercial or administrative use. Rather, voter lists are inherently political and are a tool for political speech and association. See *Fusaro,* 930 F.3d 241, 251 (4th Cir. 2019); *see also Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004) (recognizing that political parties use voter registration lists for "activities essential to their exercise of First Amendment rights"). Indeed, the Secretary's form contemplates that the data will be used for activities of which the First Amendment is most protective, including campaigning, elections, and evaluating the functioning of the government.

VRF desires, and has attempted, to exercise its benefit of access to New Mexico voter data, a benefit guaranteed by the NVRA and state law. No state, including New Mexico, can impair or withhold that benefit by conditioning it on recipients' surrender of their First Amendment-

protected rights to engage in speech with their fellow citizens in which the data is shared for permissible and protected purposes. That surrender particularly stings here, where the very purpose of the data-sharing speech is to enable citizens to petition the government to ensure that the voter rolls are accurate and that elections are being properly and securely run—a goal that, in turn, will increase confidence and participation in elections.

The Supreme Court has specifically recognized that states cannot condition a First Amendment right "on acceptance of a content-based rule that is not drawn to serve the State's asserted interest." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 574 (2011). In *Sorrell*, the Court considered a Vermont law that imposed content-and-speaker based restrictions on the sale, disclosure, and use of prescriber-identifying information. *Id*. at 563-64. The Court concluded that the First Amendment protected this speech and that because the law "is designed to impose a specific, content-based burden on protected expression . . . [i]t follows that heightened judicial scrutiny is warranted." *Id*. at 565; *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 658 (1994) (strict scrutiny applies to regulations reflecting "aversion" to "disfavored speakers"). Similarly, the Fourth Circuit notes that, once a state chooses to provide a process allowing for the right to access voter information, there are "'limits to its freedom to decide how that benefit will be distributed.'" *Fusaro v. Cogan*, 930 F.3d at 256 (quoting *Los Angeles Police Dep't.*, 528 U.S. at 43 (Ginsburg, J., concurring)). More specifically, once a state chooses to provide access to certain information, it can control the manner in which it does so, but only subject to content and viewpoint-based restrictions. *See Fusaro*, 930 F.3d at 256-57.

As in *Sorrell*, Defendants have instituted an unconstitutional catch-22 in which a requester must decide which to give up: the records to which he is entitled, or his constitutional right to speak and associate with his fellow citizens about those very records to ensure that the system that

generated them is fair and accurate, and, perhaps, to provide criticism if they are not. The Data Sharing Ban and Use Restrictions are extreme versions of the *Sorrell* restriction that apply not only to commercial use, but any use that *fails to ensure* that there is no commercial or otherwise unlawful use downstream. New Mexico cannot condition access to statutorily available government records by requiring requestors to agree to refrain from exercising their First Amendment rights. The First Amendment does not tolerate such a high price tag.

### e.   The Use Restrictions and Data Sharing Ban cannot survive strict scrutiny.

Because the Data Sharing Ban and Use Restrictions directly restrict constitutionally protected, core political speech, they cannot stand unless they survive strict scrutiny. Neither the Use Restrictions nor the Data Sharing Ban pass muster.

### i.   Strict scrutiny applies

The Court must apply strict scrutiny to the Data Sharing Ban and Use Restrictions because they (1) burden core political speech and (2) are based on the identity of the speaker and the use for which the speaker puts the voter data.

> [P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. **Laws that burden political speech are subject to strict scrutiny**, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest…**Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints**. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others."

> **Speech restrictions based on the identity of the speaker are all too often simply a means to control content**. Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. **By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice**. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.

*Citizens United v. FEC*, 558 U.S. 310, 340-41 (2010) (internal quotations and citations omitted) (emphasis added). *See also Meyer*, 486 U.S. at 425 (where the state imposes a substantial burden on core political speech, courts apply scrutiny that is "well nigh insurmountable").

### ii.   The Data Sharing Ban and Use Restrictions fail strict scrutiny.

#### 1.   Defendants must, but cannot, demonstrate that the regulations further a compelling state interest and are narrowly tailored towards that interest

Under strict scrutiny, the burden shifts to the defendant to demonstrate that the regulation furthers a compelling state interest and is narrowly tailored. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 774–7 5(2002); *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1189 (D.N.M. 2014) (Browning, J.) ("Strict scrutiny places the burden on the government to identify a compelling interest…and show that the restriction is the least restrictive alternative for achieving that interest…"). In the First Amendment context, the challenged restrictions are not given the ordinary presumption of constitutionality. *Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo.*, 744 F.2d 739, 746 (10th Cir. 1984)

#### 2.   The asserted interests which Defendants claim justify the Data Sharing Ban and Use Restrictions are not "compelling"

The State must demonstrate that the restrictions at issue serve compelling interests. An interest is only compelling if it addresses an actual concrete problem—"[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York,* 447 U.S. 530, 543 (1980); *see also Turner Broadcasting Sys., Inc.,* 512 U.S. at 644 (plurality) ("[The government] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."). An interest aimed at suppressing particular ideas is never a "compelling" interest. *See Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("…[i]nfringements on that right may be justified

by regulations adopted to serve compelling state interests, *unrelated to the suppression of ideas*, that cannot be achieved through means significantly less restrictive of associational freedoms.") (emphasis added). Without assuming the Defendants' burden to prove that the Use Restrictions and Data Sharing Ban satisfy strict scrutiny, VRF suggests that on the undisputed facts, Defendants cannot meet this burden. Defendants identified four interests which they claim justify the restrictions imposed by the Use Restrictions and the Data Sharing Ban:

1. They ensure that only individuals who sign the requisite affidavit and, therefore, are made explicitly aware of the permissible uses of New Mexico voter data, have access to such data;
2. They ensure payment of reasonable fees for the production of voter data, which fees subsidize the mandatory voter registration system;
3. They encourage voter registration by ensuring voters that their voter data will only be disclosed on a need-to-know basis and under penalty of perjury, thereby fostering trust in the registration system by protecting registered voters from unwanted solicitations, harassment, and abuse; and,
4. Because voter data produced at any single moment represents a "snapshot" of the voter files as of that moment, whereas voter files may change in the future, thereby rendering the produced voter data no longer accurate, disseminating voter data may lead to disinformation, which would further erode voter confidence in the voter registration system.

See Def.'s Response to Mtn. for Prel. Inj. [Dkt. 13] at pp. 11-12. Last summer, the Court examined each of these purported justifications for the challenged restrictions and held that they were not compelling. See Mem. Op. at 191 (applying strict scrutiny to prior restraint claim).

As to the first stated interest, the Court found that the educational value was not compelling enough to satisfy strict scrutiny. *Id.* (finding educational interest to be legitimate and important, but holding that state failed to present evidence that it is compelling). The Court's analysis holds true. Though the forms certainly provide some information about New Mexico voter data, the evidence demonstrates that the forms which the Secretary will accept do not accurately outline New Mexico law. **SOF ¶33**. A requester using a prior form would think that "research" was a permissible purpose, **SOF ¶¶36;54**, or that the data could be shared with third parties for lawful

purposes. **SOF ¶¶38; 54.** Yet we know that Defendants would disavow both principles. The affidavits' provision of outdated information does not serve a compelling educational interest.

"As to the second State interest, the Court agrees with the Plaintiffs that '[m]ere revenue generation . . . is not a compelling interest that can only be achieved by a complete ban on the sharing of data,' and notes that '[t]he State provided no evidence whatsoever with respect to this interest.'… [A]lthough revenue generation may be a legitimate State interest, it is not a compelling interest." *Id.* at 192. Though it is hard to conceive of a situation in which the State's interest in revenue generation could be so compelling as to justify a ban on speech, the Court need not decide if that could ever be the case, for Defendants have not produced any evidence that their interest in forcing each and every requester of voter data to pay them for that data is compelling.

On the third asserted interest, the Court noted that the interest in fostering trust in the voter registration process and protecting voters from "solicitations, harassment, and abuse" could be an important interest. *Id.* at 193. However, based on the evidence presented at the hearing, the Court went on to note: "in the absence of any evidence that posting the voter data has or will cause such problems, these concerns do not rise to the level of compelling interests…The voter data was posted online for around three months, and there is no evidence in the record that posting the data caused any of the problems about which the Secretary of State is concerned." *Id.* at 193-4.

Defendants must, but have not, presented any evidence that the Court's concern regarding this third interest came to fruition. In fact, Defendants have specifically been unable to produce any evidence that VRF's posting of voter data on the Internet led a single New Mexico citizen to cancel their voter registration. **SOF ¶¶234, 237.** Nor do Defendants have any evidence that voters were solicited, harassed, or abused as a result of VRF's posting. **SOF ¶¶233; 239.** Nor have Defendants produced any evidence that VRF has misrepresented or manipulated any voter data in

its possession, including the data that was made available to the public. **SOF ¶¶241.** The alleged

harm to voters remains speculative and metaphysical rather than an "actual concrete problem."

In ruling on the preliminary injunction motion, the Court did not weigh the fourth asserted

interest—avoiding "disinformation"—but as VRF previously argued, this "interest" veers

dangerously close to blatant viewpoint discrimination in its own right. Whether Defendants use

the term "misinformation" or "disinformation," it is apparent that they are simply trying to label

speech with which they disagree, like the existence of a "discrepancy" in New Mexico's 2020

voter data as identified by VRF. **SOF ¶95.** But the First Amendment vigorously protects against

restrictions on speech that are aimed at preventing a speaker from sharing a viewpoint simply

because the government disagrees with what the speaker has to say. *See Clark v. Community for*

*Creative Non–Violence,* 468 U.S. 288, 295 (1984) ("The principal inquiry in determining content

neutrality…is whether the government has adopted a regulation of speech because

of disagreement with the message it conveys."); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–

64 (2015) ("Government regulation of speech is content based if a law applies to

particular speech because of the topic discussed or the idea or message expressed.…Some facial

distinctions based on a message are obvious, defining regulated speech by particular subject

matter, and others are more subtle, defining regulated speech by its function or purpose. Both are

distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict

scrutiny.") (citations omitted); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,

457 U.S. 853, 871 (1982) ("Our Constitution does not permit the official suppression of *ideas*.").

To the extent Defendants' argument admits that the Use Restrictions and Data Sharing Ban

are being used to silence speech with which the state disagrees, such as the existence of a

"discrepancy," Defendants have proved Plaintiff's case for it. See Mem. Op. at 184 ("The Plaintiffs

also argue that a concern for misinformation motivated the Secretary of State's decision, which necessarily constitutes viewpoint discrimination…These assertions, grounded in the record, together support a finding of a discriminatory purpose.").

### 3. Even if Defendants identified a compelling state interest, the restrictions at issue are not narrowly tailored

Though none of the interests asserted by Defendants are compelling and thus it does not matter whether the regulations are narrowly tailored,[10] the Use Restrictions and Data Sharing Ban nevertheless would also fail strict scrutiny for lack of narrow tailoring.[11]

To satisfy its burden, Defendants must demonstrate that the challenged regulations further a compelling interest which would "be achieved less effectively absent the regulation, and…[do] not burden substantially more speech than is necessary to further the government's legitimate interests. Although a regulation need not be the least restrictive or least intrusive means of furthering this interest, the First Amendment requires a close fit between ends and means to ensure speech is                not                sacrificed                for                efficiency." *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1073 (10th Cir. 2020) (internal citations omitted). "The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (internal citations and quotations omitted).

---

[10] If the asserted state interests are anything less than "compelling," the Court need not undergo a narrow tailoring analysis, as the regulation cannot survive strict scrutiny. See *Cooper v. Dillon*, 403 F.3d 1208, 1217 (11th Cir. 2005); *California First Amend. Coal. v. Lungren*, No. C 95-0440-FMS, 1995 WL 482066, at *6 (N.D. Cal. Aug. 10, 1995).

[11] Plaintiff again asserts this argument without assuming any burden of Defendants with regard to this point. *See Griffin*, 30 F. Supp. 3d at 1189 (shifting burden to defendant to prove narrow tailoring).

The Data Sharing Ban in particular fails narrow tailoring because it seeks to achieve the above claimed interests by completely banning the sharing of the most valuable information about elections—the voter data itself. The State could achieve the asserted interests through less burdensome means. If it wanted citizens to be informed regarding the law and the data, the State itself could provide that information to the public, rather than banning speech on the grounds that it constitutes "misinformation" and insisting on the use of forms that do not accurately reflect the current state of the law. The State could, but does not, ask requesters to keep a list of people that use the data, **SOF ¶228,** so that if harassment, stalking, or solicitation occurs, it could track the culprits. Instead, its solution is to maintain a chokehold on the data itself.

The Use Restrictions fail for similar reasons. Defendants still will not commit to VRF's use being permitted under the statute, despite this Court's finding that it is. **SOF ¶¶82-87.** Defendants continue to claim that "governmental" use can only mean use *by the government*, **SOF ¶¶83**, and that even though "election" related is included in the statute, it is not an independently permissible use. **SOF ¶31.** There is no reason to believe—and no factual showing has been made—that allowing non-campaigns and non-government bodies to use the data to test the maintenance and accuracy of the system will seriously harm privacy in ways that are not already inherent in the State's current practice of making the data widely available to Defendants' favored speakers.

For the reasons stated above and herein, the Use Restrictions and Data Sharing Ban violate VRF's First Amendment rights and cannot survive strict scrutiny. Thus, VRF is entitled to judgment as a matter of law on its Count V.

**V.    VRF is Entitled to Judgment as a Matter of Law on its Claims that the Data Sharing Ban is Overbroad (Count VI)**

The Data Sharing Ban prevents the sharing, dissemination, loaning, selling, or otherwise making voter data available to any person outside of the requesting entity. **SOF ¶39.** The Ban is

effectively the antithesis of the NVRA. While the NVRA champions sunlight, transparency, and citizen involvement, the Data Sharing Ban embraces state control over citizen speech regarding the Secretary's maintenance of New Mexico voter rolls. Yet "[t]he very purpose of the First Amendment is to foreclose public authority from assuming a guardianship of the public mind. . . . In this field, every person must be his own watchman for truth, because the forefathers did not trust any government to separate the true from the false for us." *Thomas v. Collins*, 323 U.S. 516, 323 U.S. 545 (1945) (Jackson, J. concurring). Here, the Ban prohibits substantially more protected speech than is necessary to accomplish any compelling government interest it furthers. For this reason, the Ban is overbroad and cannot stand.

### a.   Law regarding the merits of overbreadth challenges

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The severity of criminal sanctions may well cause speakers, including Plaintiff, to remain silent rather than communicate even arguably unlawful words, ideas, and images. See, *e.g., Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965).

"The first step in overbreadth analysis is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). Whereas here, the challenged restriction does not come directly from the language of the statute itself, but rather the policy of the agencies charged with enforcing the restriction, the Court should focus its overbreadth analysis on the challenged policy.

This is particularly true given the Court's previous finding that the statutes themselves do not support Defendants' interpretation of the law or its resulting enforcement practices. **SOF ¶180; Mem. Op. at 143, 152, 154.** Thus, the Court should construe the challenged regulations just as Defendants do, meaning that the Ban prohibits the sharing, dissemination, distribution, and publication of, or otherwise making voter data available to, any third party. **SOF ¶39.**

Second, the Court must consider whether the Data Sharing Ban proscribes "a substantial amount of protected expressive activity" judged relative to any plainly legitimate purpose served by the Ban. *Williams*, 553 U.S. at 297. When assessing whether an overbroad statute is likely to chill protected speech, courts should assess not only whether the number of potential unconstitutional applications of the statute is significant, but also the level of interpretive discretion given to those in charge of its enforcement, and the likelihood of capricious enforcement. Last July, the Court hinged its analysis of this second prong on the issue of "whether Voter Reference has a First Amendment right to access the voter data." Mem. Op. at p. 175. However, as addressed in Section IV(a) above, VRF's First Amendment claims are focused on its rights to share and disseminate data after it is in VRF's possession. VRF's right to access that data in the first instance stems from both the NVRA and New Mexico law. The Court need not determine whether VRF has a right to those records under the First Amendment where these statutory access rights exist. And once the statutory access rights exist, the First Amendment attaches to the documents, records, and information made available by statute. *See* Mem. Op. at p. 176.

Having established this statutory right to access, the Court's inquiry properly focuses on (1) construing the Data Sharing Ban based on the positions and actions taken by Defendants and (2) determining whether the Ban proscribes "a substantial amount of protected expressive activity" judged relative to any plainly legitimate purpose it serves.

### b.  The Data Sharing Ban is unconstitutionally overbroad[12]

The Data Sharing Ban is an absolute prohibition on the sharing of voter data between a requester and any other person, regardless of whether the sharing is for an otherwise permissible— that is, governmental or election related—purpose. **SOF ¶¶39-51**.  Even if there are important state interests which may be served by restricting the sharing of voter data in some instances, a complete Ban attacks a problem which may call for a scalpel by employing a machete.

Importantly, as the Court has previously noted, see Mem. Op. at 112, the overbreadth analysis is not limited to an examination of whether the Ban deters VRF's speech in particular, but whether it proscribes a substantial amount of protected speech, even by parties not before the Court. The Court already articulated the Ban's impact on VRF's own speech, finding that it necessarily prohibits VRF from using the data to engage in "election" related and governmental uses as otherwise permitted by New Mexico law. Mem. Op. at 150.

As to other parties, the Ban proscribes sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for; sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic at a different institution who wanted to use the original data set to validate the research; sharing between a political party and a candidate it supports, but who is not affiliated with the party; sharing of a voter's information by a canvasser with close family members or other members of his or her household; sharing by a political data compilation/analysis firm and its political clients; and, of course, sharing via publication on the Internet. **SOF ¶40.**

---

[12] VRF reiterates that, in the face of an overbreadth challenge, it is Defendants' burden to prove the challenged regulation is constitutional, rather than plaintiff's burden to prove that it is not. *See ACORN*, 744 F.2d at 746. Plaintiff does not assume Defendants' burden here by addressing these points in its opening brief.

This reach—a near total ban on speech that involves the sharing of data, much of which constitutes core political speech[13]—is far broader than any legitimate sweep of a statute dedicated to ensuring that voter data is not used for commercial or nefarious purposes. Because of the overbreadth of the restrictions and the uncertainty as to the boundary between that which is permissible and that which is prohibited, Plaintiff and others like it have refrained and will refrain from engaging in speech protected by the First Amendment out of fear of prosecution.

## VI.    VRF Prevails as a Matter of Law on its Vagueness Claim (Count VII)

The Data Sharing Ban, a violation of which is a class IV felony and subjects the violator to a fine of $100 for each line of voter data unlawfully used, is void for vagueness. Requestors and users of voter data are entitled to fair notice regarding how that data may be used and shared, and also have rights to not have a vague policy weaponized against them via discriminatory enforcement. In the First Amendment context, vagueness and overbreadth are two sides of the same coin, and the two sorts of challenges are often conceived of as "alternative and often overlapping" theories. *Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005) (McConnell, J.).

### a.    Law regarding void for vagueness challenges

The government violates the Fourteenth Amendment by depriving citizens of life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–358 (1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of

---

[13] See Mem. Op. at 117-18 ("Some commentators have suggested that, when considering whether a statute's overbreadth is substantial, courts should take into account the importance of the protected speech being restricted or chilled… Under this view, a statute that chills a swath of political speech should be more readily facially invalidated than one that chills sexual, frivolous, or even artistic speech—the latter statute being more amenable to as-applied challenges…")(internal citations omitted).

law," and a regulation that flouts it "violates the first essential of due process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000) (*citing Chicago v. Morales,* 527 U.S. 41, 56–57 (1999)); see also *Mini Spas, Inc. v. South Salt Lake City Corp.,* 810 F.2d 939, 942 (10th Cir. 1987). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams,* 553 U.S. at 306; *see also Giaccio v. Pennsylvania*, 382 U.S. 399, 402-403 (1966) ("It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.")

The doctrine embodies the concept of fair notice, *Williams*, 553 U.S. at 304, and simultaneously guards against arbitrary or discriminatory law enforcement by prohibiting regulations that "impermissibly delegate[] basic policy matters" to policemen, judges, prosecutors, and juries for "resolution on an ad hoc and subjective basis . . . ." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). When a criminal statute's vagueness exerts a "chilling effect" on First Amendment liberties, the void-for-vagueness doctrine "demands a greater degree of specificity than in other contexts…" *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

In *Grayned,* 408 U.S. 104, the Supreme Court stated that, when assessing whether a statute is vague, it looks to "the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, *and, perhaps to some degree, to the interpretation of the statute given*

*by those charged with enforcing it.*" 408 U.S. at 110 (internal quotations omitted) (emphasis added). Here, where the interpretation of the statute given by those charged with enforcing it is plainly unsupported by the language of the statute itself, as this Court previously held, the Court's vagueness analysis should evaluate the interpretation of the statute(s) given by Defendants, rather than the language of the statute itself. See *Fusaro*, 19 F.4th 357 (evaluating as-applied First Amendment vagueness challenge to term "related to the electoral process" as applied to plaintiff); *Butcher v. Knudsen*, 38 F.4th 1163, 1170 (9th Cir. 2022) (evaluating as-applied First Amendment vagueness challenge to term "de minimis" created by rule of commissioner's delegated authority).

### b. Defendants' theory regarding the source of the Data Sharing Ban requires illogical, incoherent, and inconsistent statutory interpretation and is pretextual

The most telling indication that the Data Sharing Ban is impermissibly vague is that the Ban does not appear in any New Mexico statute, rule, regulation, or administrative guidance. **Mem. Op. at 143, 152, 154.** It did not even exist in writing until it was concocted as a defense to liability in this case. To arrive at Defendants' interpretation of New Mexico law, an interpretation from which the Data Sharing Ban springs forth, two statutes from different articles of New Mexico law must be read in conjunction. First, Defendants read § 1-4-5.6 which states "Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." Rather than the word "purposes" referring to the purposes expressly outlined in the immediately preceding statute, § 1-4-5.5, Defendants say that "purposes" refers to any purpose prohibited by Article 5, the Voter Records System Act. **SOF ¶44**. Defendants' position next requires that this language in § 1-4-5.6 incorporates by reference the language from § 1-5-22(A) which states:

> Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file by a data processor; a data processor's agent or employee; a state or county

officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System Act to have possession of the file.

Defendants acknowledge that § 1-5-22 does not apply to anyone other than a "data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent…" **SOF ¶45.** Yet, under Defendants' theory, when § 1-5-22 is transmuted through the lens of § 1-4-5.6, the prohibitions on "selling, loaning, [and] providing access" under § 1-5-22 apply to *any person* in possession of voter data, not just the specific parties listed in § 1-5-22. **SOF ¶44.** While reading these statutes in conjunction, Defendants must also ignore the explicit, independent penalty for violating § 1-5-22(a) found in § 1-5-22(c):

> Any data processor, officer, deputy, assistant, agent or employee who commits unlawful disposition of a voter file[14] is guilty of a fourth degree felony.

Under Defendants' theory and policy, when § 1-5-22(a) is violated by someone other than one of the parties listed in the statute (for example, VRF), that liability stems from the criminal penalty under § 1-4-5.6(b) rather than the criminal penalty laid out in § 1-5-22(c). Though a person reading § 1-5-22 could easily determine whether or not they are a "data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent," and thus whether that statute applies to them, Defendants theory requires them to discern that the prohibition in § 1-5-22(A) is broadened to include all persons because § 1-5-22 and § 1-4-5.6 work hand in glove to do so.[15]

The Court questioned Defense counsel at length last summer regarding the genesis of the Data Sharing Ban and, in its Order that followed, expressly rejected Defendants' argument that the Ban finds textual support in New Mexico statute. See Mem. Op. at 137; *id.* at 148 ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions

---

[14] "Unlawful disposition of voter file" is defined under § 1-5-22(A).
[15] § 1-4-5.6 does not reference § 1-5-22. § 1-5-22 does not reference § 1-4-5.6.

in §§ 1-5-22 and 1-5-23 of the Voter Records System Act…"). Though the Court refrained from finding that the Data Sharing Ban is vague based on the information available to it when it issued its July decision on the preliminary injunction motion, since that decision, Defendants' wavering positions, including purported exceptions to the Ban, underscore the Ban's vagueness.

     c.  **The Data Sharing Ban is vague.**

The Data Sharing Ban is impermissibly vague, as no such prohibition appears anywhere in New Mexico statute, yet Defendants insist that their interpretation and attempted enforcement of the law bans all sharing. Referring to the recent amendments to section 5.6, the AG's 30(b)(6) representative admitted that the theory underlying the Data Sharing Ban is ambiguous. **SOF ¶51.** Even more shocking, the AG's office seems to no longer subscribe to the statutory construction theory its representatives painstakingly described to the Court earlier in this case. **SOF ¶ 201**.

Additionally, Defendants have revealed that there are a number of exceptions to the Ban. These ad hoc exceptions to the blanket ban to which they purport to hold VRF further exacerbate the vagueness issue. For example, the AG testified that the level of "control" of the data is at least partially determinative of whether the data is shared lawfully. **SOF ¶207.** A political campaign can share data with a volunteer for a canvass, but VRF cannot share data with a volunteer helping to verify the accuracy of the data itself. **SOF ¶¶43.** Similarly, the AG and SOS indicated for the first time just a few weeks ago that it is now important to their position whether the data is posted online to the "general public," though neither Defendant could or would define that term and neither Defendant cited any source in New Mexico law which so states. **SOF ¶202-3.** The generic, undefined nature of this apparently material term further contributes to the Ban's vagueness. Mem. Op. at 153 ("…New Mexico's Election Code does not address whether voter data can be made "accessible by the general public on the Internet or through other means…").

As noted above, the vagueness doctrine (1) provides fair notice so that people can comply with the law and (2) avoids arbitrary enforcement. The Ban fails both criteria. It does not appear in any New Mexico statute, and Defendants' original contorted theory of interpretation (**SOF ¶44**) seems to have been abandoned by at least the AG (**SOF ¶201**). Further, the AG's new theory of enforcement based on degrees of "control" of data, and both officeholders' unpredictable and sometimes changing list of exceptions, is a recipe for arbitrary enforcement.

The vagueness of the Defendants' Data Sharing Ban has caused VRF and others to refrain from engaging in First Amendment protected activities because the uncertain and unclear policies and positions of the Defendants, including the Data Sharing Ban itself, fail to provide sufficient guidelines for VRF and others to know what conduct is permissible and what is prohibited. This chilling effect is both real and substantial, as VRF fears additional investigation and potential prosecution for exercising its First Amendment rights. The indeterminacy of the Data Sharing Ban in fact chilled VRF's speech, as it had to remove the section of its Website devoted to New Mexico out of fear of criminal prosecution. **SOF ¶130-31.** Absent a decision from this Court protecting VRF's rights, that speech will continue to be silenced, particularly because Defendants have refused to state they will not prosecute VRF for its past posting of voter data. **SOF ¶¶19; 122.**

### d. The New Mexico Legislature's Amendment of § 1-4-5.6 Supports VRF's Vagueness Claim

Defendants are likely to ask this Court to reject Plaintiff's vagueness claim—and perhaps others—because of a change in New Mexico law they advocated for while this case was pending. This Court should reject that invitation and consider the merits of VRF's claims.

On March 30, 2023, the Governor signed a bill recently passed by the New Mexico legislature that amends § 1-4-5.6. Voting Rights Protections Act, H.B. 4, 56th N.M. Leg., 2023. The bill amends section § 1-4-5.6 to match some of the positions taken by Defendants in this

litigation. *Id*. Specifically, it amends § 1-4-5.6 to actually incorporate the language from § 1-5-22 to explicitly include within the definition of "unlawful use of voter data" the "knowing and willful selling, loaning, providing access to or otherwise surrendering of voter data, mailing labels or special voter lists by a person for purposes prohibited by the Election Code." *Id*. The Amendment also purports to make it unlawful to "caus[e] voter data…that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means." *Id.*

If Defendants' position in this litigation regarding the Data Sharing Ban had been correct as a matter of statutory interpretation, there would have been no need for the Legislature to amend the law in this manner. The AG claims that this amendment was merely to "clarify" the law, SOF ¶50, yet the need to clarify the law necessarily concedes its initial ambiguity. The AG admits that the law pre-HB4 is ambiguous. *Id*. Because of the Defendants' refusal to state they will not prosecute VRF for its pre-amendment speech, Plaintiff's vagueness claim remains necessary to protect it from prosecution for this prior, now-completed speech.

Moving forward, this amendment solidifies rather than remedies the First Amendment injury of VRF and others who continue to wish to engage in speech over the Internet that shares and discusses the data to which they are entitled under the NVRA. New Mexico will only have removed any doubt about whether it wants to: ban core political speech; attach unconstitutional conditions to groups' access to voter data which distinguish among speakers and uses of the data; or enact overbroad bans on online speech. Indeed, all of these claims can be taken up with greater clarity—and resolved in VRF's favor—once the plain text of HB4 is considered.

VII.    **VRF is Entitled to Judgment as a Matter of Law on its First Amendment Retaliation and Viewpoint Discrimination Claims (Count III)**

Defendants retaliated against VRF based on their own animus towards VRF's perceived political ideology and protected speech by refusing to deliver the properly requested voter data and by threatening VRF with criminal prosecution for engaging in protected speech. Consequently, Defendants chilled VRF's protected speech in violation of the First Amendment.

### a.   The law of First Amendment retaliation

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. I. The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. *See Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech"). By engaging in retaliatory acts, public officials place informal restraints on speech "allow[ing] the government to 'produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (alterations in original) (citation omitted); *see also Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions").

If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim. *Ibid.* (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283–284 (1977)). The plaintiff must show: "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action

was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007).

### b. Defendants unlawfully retaliated against VRF by threatening VRF with prosecution and refusing to fulfill VRF's lawful requests for voter data.

First, as previously established, VRF's speech involving New Mexico voter data is protected by the First Amendment. *See* Section IV(b). Second, Defendant's actions have caused VRF to suffer a real and substantial injury which has chilled VRF's constitutionally protected speech. Most notably, VRF was forced to stop disseminating New Mexico voter information for fear of prosecution and to seek judicial protection. **SOF ¶130-31.** Defendants' adverse actions in this case take two forms: threatening VRF with prosecution for its Constitutionally protected speech and refusing to fulfill VRF's lawful requests for voter data. As detailed below, these actions were substantially motivated as a direct response to VRF's viewpoint and protected speech.

### 1. Threat of prosecution

After VRF posted New Mexico voter data on its website and issued a news release announcing the results of its analysis and finding a potential discrepancy in the data, the Secretary was contacted by a reporter from ProPublica. **SOF ¶75**. In communications with that reporter, the Secretary repeatedly stated VRF was spreading misinformation. **SOF ¶¶95-96**. The Secretary also accused VRF of attempting to "impugn the integrity of [New Mexico's] voter rolls. **SOF ¶100**. The Secretary wanted to "push back hard" against VRF's protected speech because it deemed that speech was misinformation. **SOF ¶113.** The Secretary's Press Director even stated it is the Secretary's *mission* to "push back hard" against misinformation. ***Id.*** The Secretary also associated VRF with what it perceives as a "larger strategy of election denialism." **SOF ¶114.**

In response to VRF's speech, the Secretary sent a letter to the AG referring VRF for prosecution. **SOF ¶74.** In the referral, the Secretary states the referral is based on VRF's posting

of voter data online. **SOF ¶78; Ex. P14.** The Referral also states the Secretary believes VRF has violated New Mexico election Code. **Ex. P14.** This Court has already recognized that the Election Code does not prohibit VRF's speech. Mem. Op. at **143: 152: 154**. Nevertheless, the AG has refused to state it will not prosecute VRF under this faulty and pretextual interpretation of the election code. **SOF ¶19.** In fact, the AG has engaged with other law enforcement agencies and attorneys general regarding investigating and prosecuting VRF. **SOF ¶¶124-28.**

Defendants' threat of prosecution is indisputable. The fact that this threat was made in direct response to VRF's protected speech is proved by the myriad facts in this case, including the Defendants' own statements. Defendants' motive is also clear: to produce a result which it could not command directly—in direct violation of the First Amendment. This threat of prosecution is real and substantial and has caused VRF to cease its First Amendment-protected speech for fear of being prosecuted. **SOF ¶¶130-32.**

### 2. Refusing to fulfill VRF's requests

VRF made three separate requests for New Mexico voter data. **SOF ¶¶115-121 (Feb. 15); 133-159 (May 27); 185-198 (Oct. 18)** The Secretary has either refused to fulfill these requests or refused to respond altogether. **SOF ¶¶117; 141; Ex. P26; Ex. P29.** ████████████████ ████████████████████████████████████████ Defendants freely and repeatedly admitted this decision is directly motivated by VRF's protected speech:

> To begin with this decision [to not fulfill VRF's requests for data] is motivated by the fact that will post any voter data provided on your website[.] You have not indicated that you will not post any voter data online, and based on our past practice, we believe you will do so again.
> [. . .]
> Therefore, due to . . . your past practice of posting this data online, . . . our office is unable to process your request at this time.

**Ex. P29**. The Secretary holds it against VRF that it posted New Mexico voter data after this Court granted a preliminary injunction allowing it to do so. **SOF ¶¶90; 193**.  Even after VRF has

promised ad nauseum that it will not publish New Mexico voter data absent a court order allowing it to do, **SOF ¶¶152-53**, the Secretary chooses not to believe VRF and continues to withhold voter data. **SOF ¶¶156;189**. The Secretary cannot even tell VRF if it will ever again be able to receive voter data or what VRF needs to do in order to receive voter data. **SOF ¶193.**

The Secretary has also argued that VRF's protected speech, publishing New Mexico voter data on its website, violates state law. **SOF ¶¶23-4; 44; 81; Ex. P14**. This Court has already concluded, to the contrary, that New Mexico's election code does not prohibit VRF's use and publication of voter data, Mem. Op. at 143; 152; 154, and that the Secretary and AG worked together to create a solely pretextual restriction that would deny VRF access to voter data. *Id.* at 183-4. This has not stopped Defendants from concocting new interpretations of the Elections Code to single out VRF, as they now contend that VRF must maintain a certain level of "control" over the data it receives. **SOF ¶207.** This interpretation, of course, has no basis in the law.

It is, again, indisputable that the Secretary has refused to give VRF access to new, up to date voter data. And the only plausible construction of the facts in this case, including communications from the Secretary to VRF, compel this Court to conclude that Defendants are refusing to fulfill VRF's requests for voter data because of VRF's engagement in First Amendment-protected speech. This Court recognized as much. See Mem. Op. at 180. This refusal to comply with both state and federal law has caused substantial injury to VRF. VRF cannot continue its protected speech without new and up-to-date data from the Secretary and VRF does not even know what it needs to do in order to receive data—or even if it will be able to receive data ever again.

For the reasons stated herein, this Court should conclude that Defendants impermissibly retaliated against VRF in violation of the First Amendment.

### c. Defendants engaged in improper viewpoint discrimination.

Defendants' various discriminatory actions have caused three separate effects: disparate treatment of VRF compared to other requesters of New Mexico voter data; the refusal to fulfill VRF's lawful requests for voter data; and the Secretary's referral of VRF to the AG.

### i. The law of viewpoint discrimination

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. The First Amendment prohibits the government from preferring one form of private speech over another. *See id.* Government discrimination against speech "because of its message is presumed to be unconstitutional." *Id*. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*. at 829. Consequently, viewpoint discrimination is a "particularly 'egregious form'" of content-based restriction. *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) (quoting Rosenberger, 515 U.S. at 829). Once a state agrees to make its data publicly available—or whereas here, federal law requires data be made publicly available—the state may not condition access to that data based on the requestor's viewpoint. See *Sorrell*, 564 U.S. at 574; *Fusaro*, 930 F.3d at 256.

To succeed on a viewpoint discrimination claim, a plaintiff must show that the defendant "acted with a viewpoint discriminatory purpose." *Pahls*, 718 F.3d at 1230. More specifically, a plaintiff must show: (i) defendants' actions caused viewpoint discrimination; and (ii) that defendants' actions were taken because of, not merely in spite of, plaintiff's views. *Id.* at 1230-31.

### ii. Refusal to produce voter data to VRF

███████████████████████████████████████████████

███████████████████████████████████████████████

█ The Secretary has admitted multiple times its refusal is based on VRF's protected speech. **SOF ¶¶ 151-53; 156-58; 188; 191-98**. VRF has a right to the data under the NVRA. *See* 52 U.S.C. § 20507(i). But even if this Court were to not recognize this right under the NVRA, VRF still maintains the right under New Mexico state law, *see* NMSA § 1-4-5.5(A), and once a State agrees to make its data publicly available, the State may not condition access to that data based on the requestor's viewpoint. *See Sorrell*, 564 U.S. at 574; *Fusaro*, 930 F.3d at 256.

Here, as this Court already found, the Secretary conditioned its decision not to respond to or fulfill VRF's requests on VRF's viewpoint—specifically the "misinformation" of a discrepancy existing in the data. Mem. Op. at 180-82. In an attempt to fashion a non-discriminatory reason for its refusal to fulfill VRF's requests, the Secretary argues VRF's use of the data violates New Mexico law. **See SOF ¶44; P14**. This attempt fails. This Court has already concluded VRF's use of the data does not violate the Election Code and, as already analyzed above, Defendants cannot even bring themselves to articulate a single, coherent theory of the violation. Additionally, even if this Court were to entertain Defendants' pretextual interpretation of the Election Code, Defendants' animus still shows through in that even after VRF has profusely promised not to post the data—thus curing any purported violation of the election code—the Secretary still refuses to fulfill the data requests. **SOF ¶¶152-53; 189.** Importantly, this Court has already concluded: "the Secretary of State's indication that it will not honor Voter Reference's May 27, 2022, request, despite Voter Reference's assurances that it will not publish voter's personal information without a Court order, constitutes impermissible viewpoint discrimination." Mem. Op. at 180-81.

The Defendants' actions have caused viewpoint discrimination in that VRF cannot obtain data to which it is legally entitled because of its viewpoint. This is not a case where the government

accidentally causes discrimination. The evidence, including the Secretary's own's statements, prove Defendants acted solely *because of* VRF's views. This Court already concluded as much:

> [T]o the extent the Plaintiffs challenge the Secretary of State's lack of response to Voter Reference's request for voter data, the Plaintiffs likely are to succeed on their viewpoint discrimination claim. The Secretary of State's actions caused viewpoint discrimination. . . . [O]nce the State agrees to make its data publicly available, the State may not condition access to that data based on the requestor's viewpoint. . . . The Secretary of State has conditioned its decision not to respond to Voter Reference's data request on Voter Reference's viewpoint -- specifically, the fear that giving the data to Voter Reference may reveal that the Secretary of State is lax about maintaining the State's voter data.

Mem. Op. at 180. This, in turn, leaves only one conclusion: the Secretary's refusal is solely based on her animus towards VRF's viewpoint, specifically, the viewpoint that the Secretary's data is flawed. There is no rational explanation for the Secretary's refusal absent a discriminatory purpose.

### iii.   Referring VRF to the AG for investigation and prosecution

Similarly, the Secretary engaged in viewpoint discrimination by referring VRF to the AG for investigation. The Secretary was motivated to make the initial referral by a view that VRF's public statements about the data were misinformation, and that if VRF was not prosecuted, it would foster additional misinformation. The criminal referral itself asserted the theory that "[w]e do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign purposes.'" **Ex. P14**.

Here, the facts show that the Secretary initially referred the matter to the AG because of a disagreement with what the Secretary claimed was VRF's "misinformation" about her operation of the state's voter data system. **SOF ¶¶73; 88-89; 95-96; 104; Ex. P14.** Further, the AG, with knowledge of the Secretary's motivation, then proceeded to investigate VRF for violation of the Data Sharing Ban and Use Restrictions. **SOF ¶123**. It did this even though, as this Court has already concluded, the statutes cited by Defendants do not support either restriction. Mem. Op. at

137-154. What is more, VRF is the only entity that had ever been accused or investigated for a criminal violation under the Data Sharing Ban, even though numerous commercial entities that may well sell voter data continually and consistently request the state's voter data. **SOF ¶123.**

In sum, Defendants' motivation for the referral was because of, not merely in spite of, VRF's views. Mem. Op. at 182. Defendants' version of events requires drawing numerous tenuous inferences from evidence that, on its face, supports a different conclusion. *See* Mem. Op. at 183-84. ("[T]he extant evidence suggests that the Secretary of State caused viewpoint discrimination by referring Voter Reference and Local Labs for investigation. . . . Moreover, the evidence suggest that the referral was because of, not merely in spite of, Voter Reference's views."). Accordingly, VRF is entitled as a matter of law to judgment on its claims of viewpoint discrimination.

## VIII.   The Court Should Enter a Permanent Injunction

### a.   Standard for permanent injunctive relief.

To attain a permanent injunction, a plaintiff must demonstrate: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction if issued, will not adversely affect the public interest." *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009).

### b.   VRF is entitled to a permanent injunction.

VRF is entitled to permanent injunctive relief preventing its prosecution for past and future posting of voter data and preventing Defendants from continuing to retaliate against it. Because the first factor for permanent injunctive relief—success on the merits—is the subject of the entirety of these Suggestions in Support to this point, VRF does not copy its merits arguments here but incorporates them by reference. Additionally, VRF notes that in granting a preliminary injunction

last summer, the Court weighed the second, third, and fourth factors and found preliminary injunctive relief appropriate. Mem. Op. at 190-94. As they did then, at this stage, those three factors weigh in favor of permanent injunctive relief.

### i. VRF will suffer irreparable harm absent permanent injunctive relief

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d at 1189 (quoting *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The loss of First Amendment freedoms, even for minimal periods of time, unquestionable constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); see also *Awad v. Ziriax*, 670 F.3d 1111, 131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Thus, if the Court finds for VRF on the merits of any of its First Amendment claims, that determination necessitates a finding that VRF is suffering irreparable injury. VRF not only suffers from the restraint of its speech using the data already in its possession, but the speech in which it would be engaging but for Defendants' continued efforts to stifle the same. See Mem. Op. at 206 (First Amendment prohibits threat of prosecution for publishing data already in VRF's possession); *Id.* at 207 ("Any ongoing threat of prosecution for publishing the data Voter Reference received from Local Labs constitutes irreparable injury…").

Additionally, unlike the posture of this case last summer at the preliminary injunction stage, VRF now asks the Court to remedy both the violations of the NVRA and the viewpoint discrimination exhibited by the Secretary in denying VRF's requests for voter data. See Mem. Op. at 205-6 ("Although the Secretary of State's decision not to honor Voter Reference's May 27, 2022, request for data constitutes impermissible viewpoint discrimination, the Plaintiffs do not ask the Court to enjoin the Secretary of State to honor their request…").

### ii. The injury to VRF outweighs any harm that may be caused to Defendants and the public interest favors an injunction

Voter Reference's claimed injury outweighs any harm to the public interest that a permanent injunction may cause. "Vindicating First Amendment freedoms is clearly in the public interest." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005); *Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1164-54 (D.N.M. 2020) (Browning, J.). As explained above, VRF will suffer irreparable injury without an injunction.

Additionally, if the Court reaches this stage of the analysis, it has likely already determined that the asserted state interests are not compelling under the strict scrutiny analysis outlined above. Though preventing Defendants from prosecuting VRF is no small matter, in exceptional circumstances such as these a district court may offer injunctive relief to prevent a State from prosecuting someone if prosecuting would violate that person's constitutional rights. See *Wooley v. Maynard*, 430 U.S. 705, 710-13 (1977); *Steffel v. Thompson*, 415 U.S. 452, 475 (1974).

Finally, Defendants' protestations of harm to the public are speculative and unsupported by any actual evidence that any voter has de-registered because of VRF's speech. **SOF ¶¶234, 237.** Defendants present no concrete evidence that VRF's speech erodes public confidence in New Mexico elections, that VRF manipulated or misrepresented any voter data, **SOF ¶¶241**, or that anyone has been harassed, stalked, or solicited as a result of VRF's speech. **SOF ¶¶233; 239.** Defendants' reliance on a small number of complaints from citizens that dislike VRF's method of making already-public data available is insufficient to overcome the interests of VRF and the public in conveying and receiving the data—interests Congress itself recognized under the NVRA. Because VRF is entitled to judgment as a matter of law on the above claims and the equities weigh in its favor, it is also entitled to permanent injunctive relief.

## CONCLUSION & REQUESTED RELIEF

The Court should enter judgment for Plaintiff Voter Reference Foundation, LLC and against Defendants on Counts I, II, III, V, VI, VII, and VIII of Plaintiff's First Amended Complaint. The facts material to these claims are not in dispute and are established by the record before the Court. VRF respectfully requests the Court enter judgment in its favor as follows:

A) On Count I, declare that New Mexico's restrictions on access to and use of voter data, included the Data Sharing Ban and Use Restrictions, are preempted by the NVRA's Public Inspection Provision and award Plaintiff its costs and attorneys' fees in prosecuting that claim under 52 U.S.C. § 20510(c);

B) On Count II, hold that, regardless of whether the Use Restrictions and Data Sharing Ban are preempted, Defendants violated the NVRA's Public Inspection Provision by refusing to produce the records requested by VRF on February 18, 2022, May 27, 2022, and October 18, 2022, enter declaratory and injunctive relief that VRF is entitled to those records and future requests shall not be denied for the same or similar reasons, and award Plaintiff its costs and attorneys' fees in prosecuting that claim under 52 U.S.C. § 20510(c);

C) On Count III, hold that the Defendants retaliated against VRF for engaging in First Amendment protected speech, and under 28 U.S.C. §§ 2201- 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, enter declaratory relief to this effect and enter injunctive relief prohibiting prosecution of VRF for its past receipt and use of voter data, and award Plaintiff its costs and attorneys' fees in prosecuting that claim under 42 U.S.C. § 1988;

D) On Count V, hold that the Use Restrictions and Data Sharing Ban constitute a ban on core political speech that fails to satisfy strict scrutiny, and under 28 U.S.C. §§ 2201- 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, enter declaratory relief to this effect and enter injunctive relief prohibiting the denial of access to data or prosecution of VRF for its use of data based on the Use Restrictions and Data Sharing Ban, and award Plaintiff its costs and attorneys' fees in prosecuting that claim under 42 U.S.C. § 1988;

E) On Count VI, hold that the Data Sharing Ban and Use Restrictions are unconstitutionally overbroad, and under 28 U.S.C. §§ 2201- 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, enter declaratory relief to this effect and enter injunctive relief prohibiting the denial of access to data or prosecution of VRF for its use of data based on the Use Restrictions or Data Sharing Ban, and award Plaintiff its costs and attorneys' fees in prosecuting that claim under 42 U.S.C. § 1988;

F) On Count VII, hold that the Data Sharing Ban and Use Restrictions are unconstitutionally vague, and under 28 U.S.C. §§ 2201- 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, award declaratory relief to that effect and enjoin any prosecution of VRF for its use of data based on the Data Sharing Ban, and award Plaintiff its costs and attorneys' fees in prosecuting that claim under 42 U.S.C. § 1988;

G) Pursuant to 28 U.S.C. § 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, make permanent injunctive relief in favor of Plaintiff, its agents, and others similarly situated, effective against Defendants' agents, employees, and all persons acting in active concert or participation with them;

H) Grant all other and further relief that the Court deems equitable, just, and proper.

Respectfully submitted this 14th day of April, 2023.

| | |
|---|---|
| **GRAVES GARRETT, LLC** | **HARRISON, HART & DAVIS, LLC** |
| */s/Edward D. Greim* | Carter B. Harrison IV |
| Edward D. Greim | 924 Park Avenue SW, Suite E |
| Missouri Bar No. 54034 | Albuquerque, NM 87102 |
| *Admitted Pro Hac Vice* | Tel: (505) 369-6599 |
| GRAVES GARRETT LLC | Fax: (505) 341-9340 |
| 1100 Main Street, Suite 2700 | carter@harrisonhartlaw.com |
| Kansas City, Missouri 64105 | |
| Tel.: (816) 256-3181 | |
| Fax: (816) 222-0534 | |
| edgreim@gravesgarrett.com | |

*Attorneys for Plaintiff*
*Voter Reference Foundation, LLC*

## STIPULATION REGARDING EXHIBITS PURSUANT TO D.N.M.LR-CIV 10.5

Pursuant to D.N.M.LR-Civ 10.5, the Parties have agreed to allow up to 250 total pages of exhibits per movant.

## CERTIFICATE OF SERVICE

I, Edward D. Greim, certify that on April 14, 2023, a copy of foregoing was filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following via email:

Jeff D. Herrera
Erin Lecocq
Kelsey Schremmer
jherrera@nmag.gov
elecocq@nmag.gov
kschremmer@nmag.gov
Office of the New Mexico Attorney General
408 Galisteo Street
Santa Fe, NM 87501

/s/ Edward D. Greim
Edward D. Greim
Counsel for Plaintiff