

# PohlmanUSA®
## Court Reporting and Litigation Services

---

Deputy Attorney General Joseph Dworak

March 13, 2023

---

Voter Reference Foundation, LLC

vs.

Raul Torrez, et al.

EXHIBIT

P2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO


VOTER REFERENCE FOUNDATION, et al.,

     Plaintiff,

     VS.                    NO. 22-CV-0222 JB/KK

RAUL TORREZ, in his official capacity
as New Mexico Attorney General, et al.,

     Defendants.



DEPOSITION OF JOSEPH DWORAK
March 13, 2023
10:25 a.m.
Office of the Attorney General
Santa Fe, New Mexico



     PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  MR. MATT MUELLER
            Attorney for Plaintiff


REPORTED BY: Jennifer Bean, FAPR-RDR, RMR CRR,
            New Mexico CCR 94
            Bean & Associates, Inc.
            Professional Court Reporting Service
            201 Third Street, Northwest, Suite 1630
            Albuquerque, New Mexico 87102
(8018N) JB

Page 14

1 that enforcement looks like very much depends upon
2 the facts of the situation.
3        Q.   Is there a specific division or group of
4 people in the Attorney General's Office that would
5 kind of be assigned to policing unlawful use of voter
6 data?
7        A.   The individuals in our office that would be
8 involved with issues related to voter data or any
9 voter issues would depend upon how we obtain the
10 information related to it.
11        So, I mean, yeah, I guess there is not a
12 clear answer.  It's not limited just to one group of
13 people in the office.
14        Q.   Does the Attorney General's Office have a
15 role related to voter data, other than investigating
16 potential unlawful use of voter data?
17        MS. LECOCQ:  Objection.
18        A.   The Office of the Attorney General's role,
19 again, is very much dependent upon what the referral
20 is.  It could come from members of the public.  It
21 could come from a role with providing assistance to
22 the Secretary of State, monitoring elections.  It
23 could come from a referral from the Secretary of
24 State.  It could come from a referral from somewhere
25 else.

Page 15

1        Q.   So let's say you, the Attorney General's
2 Office, receives a complaint from a citizen about
3 something related to their voter data.  Would that be
4 handled in-house, or would that be referred to, say,
5 the Secretary of State's Office?
6        A.   It depends on what the allegations are.  I
7 mean, many of those are often referred to the
8 Secretary of State, which obviously is the agency
9 charged with enforcing and reviewing election laws on
10 a daily basis.  And, you know, our office works in
11 conjunction with them, if there is something that,
12 you know, after their review, if there is something
13 that we need to look at from a civil or criminal
14 standpoint.
15        Q.   I'm not asking for any advice you might be
16 giving here.  But does the Attorney General's Office
17 advise the Secretary of State's Office if there is a
18 question regarding whether voter data is being used
19 unlawfully?
20        MS. LECOCQ:  Objection.
21        A.   I mean, generally, we certainly have the
22 ability to -- and have -- I can't say that every time
23 there is a question we would necessarily have to be
24 involved, or have been involved.
25        Q.   Does the Attorney General's Office provide

Page 16

1 advice to the Secretary about whether or not it
2 should provide voter data to a requester?
3        MS. LECOCQ:  Objection.
4        A.   Is that speculative?  I mean, I guess I'm
5 not sure if you're asking has that happened in the
6 past, or could that, or would that happen?
7        Q.   Well, let's say:  Has that happened in the
8 past, has the Attorney General given advice
9 to the Secretary about whether it should provide
10 voter data to a requester?
11        MS. LECOCQ:  Objection.
12        A.   I mean, part of -- certainly, some of that
13 would be privileged, if we were --
14        Q.   And I'm not asking for the content.
15        A.   Yeah, I mean those, questions certainly
16 have come up in the past.
17        Q.   Would you agree that the Attorney General's
18 Office has a duty to investigate the actual or
19 potential misuse or unlawful use of voter data?
20        A.   Can you ask that question again?
21        Q.   So would you agree that the Attorney
22 General's Office has a duty to investigate the actual
23 or potential misuse of voter data?
24        A.   That question would depend on the
25 circumstances.  I mean, if it's more appropriate for

Page 17

1 that -- at least initial investigation or review to
2 be done by, say, the Secretary of State, who is
3 charged statutorily with enforcing and reviewing
4 those laws, then you might start there.
5        So it doesn't mean that anytime that there
6 is an alleged allegation it would necessarily have to
7 be us exclusively, or us first.  We certainly -- our
8 office certainly has the ability and duty, when
9 appropriate, to investigate these kind of issues.
10        Q.   And what if the Attorney General's Office
11 receives a referral from the Secretary of State's
12 Office saying:  Hey, we think that voter data is
13 being used unlawfully, does the Attorney General's
14 Office then have a duty to investigate that?
15        A.   We certainly have the authority to.  I
16 don't know if we have an affirmative duty to.
17        Q.   Has the Attorney General's Office ever
18 initiated an investigation into the use of voter data
19 without receiving a referral from, say, the Secretary
20 of State's Office or a citizen complaint?
21        MS. LECOCQ:  Objection.
22        A.   That's outside of the scope of these
23 questions.  I don't know the history of, you know,
24 100 year history of our office.  I couldn't speak to
25 that.

Page 18

1    Q.   Are you aware of the Attorney General
2  initiating an investigation into the use of voter
3  data on its own volition since you've been at the
4  Attorney General's Office?
5       MS. LECOCQ:  Objection.
6       A.   From my own standpoint?  I can't speak to
7  the office, because again, that's outside of the
8  scope of what I prepared for with this deposition.
9  But not that I'm aware of.  But I wouldn't
10 necessarily be aware of it either because of my role
11 inside the office.
12      Q.   Okay.  Well, I'm going to move right in.  I
13 want to talk generally about the Attorney General's
14 positions on how New Mexico law regulates voter data.
15 And I want to start from a high level, just -- we're
16 going to talk about some of the statutes that have
17 been raised in this case.  And then kind of move into
18 how that applies to our present case.  But, just
19 generally, what restrictions does New Mexico law
20 place on how voter data may be used?
21      MS. LECOCQ:  Objection.
22      A.   Yeah, I don't -- I wasn't prepared to talk
23 about all of the different types of laws and the
24 Election Code that could potentially be implicated
25 related to voting.  So could you be a little bit more

Page 19

1  specific?
2       Q.   Well, let's start with what restrictions
3  does New Mexico law place on the sharing or
4  dissemination of voter data?
5       MS. LECOCQ:  Objection.
6       A.   Yeah, I mean, I have the same answer.  I
7  can't speak generally to that.  But as some of the
8  examples that relate specifically to this case tie
9  into the limitations on the use of data, that they
10 have to be for authorized purposes.  And so that's
11 laid out pretty clearly in the statute what those
12 purposes can and can't be used for, and the process
13 of the Secretary of State's Office has for requesting
14 such data.
15      Q.   What are the purposes that voter data can
16 be used for?  And let's limit it to under Section
17 1-4-5.5, which is the one implicated in this case.
18      A.   Do you have a copy of the statute?
19      Q.   I'm sure we do.  We can go ahead and mark
20 this as Exhibit 2.
21      (Exhibit 2 marked.)
22      Q.   If you can let me know when you've had time
23 to review it.
24      A.   Yeah, I finished.
25      Q.   So for what purposes can voter data be used

Page 20

1  under -- let's limit it to 1-4-5.5?
2       MS. LECOCQ:  Objection.
3       A.   Well, first, I'll say that there are other
4  laws that are implicated here.  This can't be read in
5  just a vacuum.  But clearly, requesters of this
6  information can only use voter data for these listed
7  purposes, which include governmental purposes and
8  election campaign purposes.  And it also explicitly
9  states that the data shall not be made available or
10 used for unlawful purposes.  And so I know that there
11 is another law that clarifies use and limitations of
12 voter data.
13      Q.   I noticed when you were going over the
14 permissible uses here, you omitted election from the
15 uses that are permissible.  Is that intentional?
16      MS. LECOCQ:  Objection.
17      A.   Well, I was just clarifying the two that
18 are defined here in the statute.
19      Q.   But you agree that Subsection C of this
20 statute says can be used for -- shall be used for
21 governmental or election and election campaign
22 purposes only?
23      MS. LECOCQ:  Objection.
24      A.   That's what the statute says.
25      Q.   Okay.  You mentioned that there are other

Page 21

1  laws that are implicated here, I believe was the word
2  you used.  What other laws are implicated?
3       A.   Well, there is a number.  I mean, there is
4  statute, the entire Election Code, of course, and
5  then there is regulations that are adopted by the
6  Secretary of State under the state Election Code.
7       I know that there is -- I can't recall the
8  section, but in Article 5, I believe, there is a
9  section that describes unauthorized use and what that
10 includes, which is prohibited under state law.
11      Q.   What's the relationship, then, between this
12 1-4-5.5 and this other section that you're referring
13 to?
14      MS. LECOCQ:  I'm going to have a standing
15 objection for legal conclusion, so I quit
16 interrupting you.
17      MR. MUELLER:  Certainly.
18      A.   Yeah, well, I'll say one -- a legal
19 conclusion that I could draw is not necessarily the
20 conclusion of our office.  And also these are laws
21 that govern the Secretary of State's Office.  And so,
22 you know, it's difficult for me to answer, you know,
23 how these should be interpreted when this isn't a
24 statute that governs activity of the office of the
25 Attorney General.

6  (Pages 18 to 21)

Page 38

1   they're both -- you know, that provides for
2   violations of under the Voter Records System Act,
3   1-4-5.6 does.  And 1-5-23, as you stipulated, is part
4   of Voter Records System Act.  So I would assume, but
5   again, that conclusion would be dependent upon a
6   fact-specific analysis to determine what statutes are
7   implicated and what potential penalties could be
8   imposed, and violations.
9       Q.  Is it a violation of New Mexico law to post
10  voter data on the internet?
11      MS. LECOCQ:  Objection.
12      A.  That is a question also that would be very
13  fact specific.  It would depend upon what publishing
14  means.  Is it publishing in a manner that's
15  controlled to ensure that use is limited for lawful
16  purposes, or whether it was published in a manner
17  that would, you know, allow it to be used for
18  unauthorized purposes.  Because clearly, the state
19  law allows for only limited purposes for this data.
20  And, you know, that would be dependent upon the
21  control of that data.  So publishing is not a clear
22  term, right?  I mean, publishing could mean many
23  different things.
24      Q.  Okay.  If I define publishing as the
25  willful selling, loaning, providing access to, or

Page 39

1   otherwise surrendering voter file, is publishing
2   voter data on the internet a violation of New Mexico
3   law?
4       MS. LECOCQ:  Objection.
5       A.  Again, it would depend upon the facts of
6   that circumstance.  Whether it was in a controlled
7   environment or whether it was published publicly, and
8   then all the, you know, different conditions with
9   that, I think would change the analysis with that.
10  So you can't simply just say it is or it isn't,
11  because there is too many variables to those
12  conditions.
13      Q.  What do you mean when you say "controlled
14  environment"?
15      A.  Well, under the -- the Election Code
16  and Voter System Act, often political campaigns will
17  purchase this data.  One person will purchase it, and
18  maybe somebody else in the campaign actually is the
19  one to put the mailers out, to send, you know,
20  campaign material.  So they clearly shared it, right,
21  with someone else.  But that environment is
22  controlled.  So, you know, that's a good example
23  because that happens regularly.  And then, you know,
24  it would be very dependent upon what the control of
25  that sharing is, inside or outside of groups,

Page 40

1   controlling for use, to ensure that that use wasn't
2   used for unlawful purposes as defined by state law.
3       Q.  So when I asked this question it was simply
4   about publication on the internet.  And so I
5   understand some positions about sharing the voter
6   data within an entity versus outside an entity.  But
7   what does control look like if voter data is
8   published on the internet?
9       Let me rephrase that.  You mentioned
10  publication to the general public.  Is it unlawful to
11  publish voter data online to something less than the
12  general public?
13      MS. LECOCQ:  Objection.
14      A.  Again, it's a very fact-specific situation.
15  I mean, if a campaign published it to a website that
16  only their staff had access to, that's very different
17  than publishing it on a website that the public has
18  access to.  You know, publishing in the newspaper,
19  you know, I mean, publishing of, you know, mailers, I
20  mean just sharing that information generally, passing
21  around flyers.  You know, publishing is not a word
22  that's defined.  And I think -- well, I don't know if
23  it's intentional or not, but certainly any word
24  that's not defined, and even some that are, require a
25  fact-specific analysis to determine, you know,

Page 41

1   whether it's implicated or not in these types of
2   analyses.
3       Q.  Is it unlawful for a person that filled out
4   the affidavit for the Secretary of State and received
5   voter data in response to then transfer that voter
6   data to a third party?
7       MS. LECOCQ:  Objection.
8       A.  I can't come up with a conclusion from our
9   office with a hypothetical.  But again, I think it
10  would be very much dependent upon the specific facts,
11  which may take, you know, significant time to review
12  and determine whether or not the data that has
13  limited uses is being shared in a way that would
14  violate those restrictions that are placed on it by
15  statute.
16      Q.  Okay.  Let's talk about this case, then.
17  Do you understand that an entity called Local Labs
18  requested data from the Secretary of State and
19  received that data?
20      A.  I'm generally aware of that.
21      Q.  And are you aware that Local Labs then gave
22  that data to Voter Reference Foundation, the
23  plaintiff in this case?
24      MS. LECOCQ:  Objection.
25      A.  I'm generally aware of that.

11 (Pages 38 to 41)

Page 50

1    plaus bly alleged that VRF was violating New Mexico
2    law?
3         A.   Our office hasn't made a determination --
4    there is different laws here, right, and criminal
5    implication and actions of the Secretary of State's
6    Office.  So, I mean, our position was to defend the
7    Secretary of State.  There wasn't a separate
8    determination by our office.
9         Q.   What do you mean when you say your
10   "position was to defend the Secretary of State"?
11        A.   Well, I mean, that's the basis of this
12   litigation is the Secretary of State's Office, an
13   agency of the state, was sued, and we were defending
14   the Secretary of State's position and the actions
15   that they had taken.
16        Q.   Okay.  But let's look at this.  This
17   referral is dated December 20, 2021; correct?
18        A.   Correct.
19        Q.   Do you know when your office received this
20   referral?
21        A.   I don't see a time stamp.  I don't know
22   what day, if it came -- well, it says email, so I
23   would assume it was emailed that day.  But I don't --
24   I can't confirm that.
25        Q.   Did your office receive this referral prior

Page 51

1    to VRF filing its lawsuit?
2         A.   These dates I recall, but I'd have to
3    refresh my memory on what the dates were.  I know
4    some of these dates were close together.
5         Q.   If I tell you that VRF filed its lawsuit in
6    late March of 2022, does that refresh your
7    recollection?
8         A.   Yes.
9         Q.   Okay.  So did your office receive this
10   referral before VRF filed its lawsuit?
11        A.   Yes.
12        Q.   So you were saying that -- I asked a
13   question about, at the time it received the referral,
14   did the Attorney General agree that the facts
15   outlined in the referral plausibly alleged that VRF
16   was violating the law?
17        A.   I mean, some of that is subject to attorney
18   work product and attorney-client privilege with the
19   Secretary of State's Office.  I mean, I think the
20   work done by our office clearly shows the position
21   that we took, which supported the determination by
22   the Secretary of State that New Mexico laws were
23   being violated.
24        Q.   Is that the Attorney General's position, as
25   we sit here today, that VRF has violated New Mexico

Page 52

1    law?
2         A.   That's the position that we have supported
3    through this litigation.  And I think, you know, what
4    penalties or what additional laws could be violated
5    is like an independent matter from a criminal
6    standpoint, it's different from upholding any, you
7    know, administrative decision by the Secretary of
8    State, which I think is important to note.
9         Q.   Setting the referral aside, and what it
10   says the positions that the SOS took in the referral,
11   is the Attorney General's position, as we sit here
12   today, that Voter Reference Foundation has violated
13   New Mexico law?
14            MS. LECOCQ:  Objection.
15        A.   Yeah, again -- and I mean, I know we're
16   going to get to this -- but there are parallel issues
17   in questions.  And this case is, you know, primarily
18   focused on the administrative decision of the
19   Secretary of State and our position which supports
20   it, which is yes.
21            You know, could there be additional
22   determinations that our office could make?  Yes.  But
23   the office hasn't taken independent action or
24   taken -- you know, made separate decisions apart from
25   the specific issue related to this case, which is the

Page 53

1    determination by the Secretary of State.
2         Q.   You used the term "administrative decision"
3    a few times there.  Can you tell me what you mean by
4    that?
5         A.   Well, the decision by the Secretary of
6    State is not a judicial decision.  It's not something
7    that required a court determination to make.  And so
8    they chose to withhold this voter data from -- as an
9    administrative action.
10        Q.   So when you say "administrative decision,"
11   you're referring to them not giving data to VRF?
12        A.   Correct.
13        Q.   You're not referring to them making this
14   referral?
15        A.   Correct.
16        Q.   Okay.  I just --
17        A.   No, that's a good distinction.
18        Q.   I'm trying to think how to ask this.  In
19   terms of this civil litigation, is the Attorney
20   General taking the same position as the SOS as to the
21   legality of Voter Reference's actions?
22            MS. LECOCQ:  Objection.
23        A.   Well, I think that's pretty clear in the
24   pleadings that we filed and representing the
25   Secretary of State in the pleadings, so yes.

14  (Pages 50 to 53)

Page 54

1       Q.   And I think we can acknowledge a
2   difference, that there is one role for the Attorney
3   General's Office that is representing Secretary of
4   State in the litigation.  There is another role,
5   which is the Attorney General is the chief law
6   enforcement officer, and is, itself, a defendant in
7   the litigation.  Do you agree with that?
8       A.   Yes.  And yeah, there are many roles that
9   the Attorney General's Office plays within the state.
10      Q.   And so I suppose I'm saying that just
11  because the Attorney General's Office is representing
12  the Secretary of State in this litigation, it doesn't
13  necessarily have to mean that the Attorney General is
14  taking all of the same legal positions as the
15  Secretary of State; correct?
16      A.   I'd have to see if there was anything in
17  the pleadings that have made that position.  But
18  that's not impossible, certainly.
19      Q.   Are you aware of any positions that the
20  Attorney General's Office, as a party to this
21  lawsuit, has taken that are different than positions
22  taken by the Secretary of State's Office?
23      A.   Public positions, actions, I'm not aware of
24  any, no.
25      Q.   I want to get into the referral more, but

Page 55

1   before we do that I want to ask some questions
2   generally before we get into the stuff that your
3   counsel and I have already negotiated some protection
4   for.  And I think this is in your discovery response.
5   So your counsel informed us last week that the
6   investigation into VRF became inactive, I believe, on
7   April 12, 2022; is that correct?
8       A.   That's correct.
9       Q.   What are the different -- I'm going to call
10  "inactive" a status, okay?  What are the different
11  statuses of investigation by your office?
12      A.   That's a great question.  I can speak
13  generally to my understanding.  I have not -- some of
14  that very much is dependent upon the administration,
15  which has changed, and the individuals.  I think
16  those categories are not set in stone.  Because what
17  they might mean might be somewhat subjective.
18          But our office -- criminal matters in our
19  office, the most common would be open or closed.  And
20  I think the inactive status is -- and you could use
21  different terms, and imagine different terms have
22  been used in the past, where it's not as definitive,
23  because, you know, a formal position might not be
24  taken.  And that could be for a variety of reasons.
25      Q.   This is going to seem very rudimentary, but

Page 56

1   what does it mean for a case to be -- let's say --
2   let me rephrase this.
3          If I refer to a case as open or active, can
4   we agree that that means the same thing?  I think you
5   just used the word "open."  They've used the term
6   inactive?
7       A.   Sure.  I think much of this could very well
8   be subjective, right, but I think those two terms are
9   very synonymous.
10      Q.   So what does it mean for an investigation
11  to be active or open?
12      A.   That it's under investigation.
13      Q.   What does it mean for a case to be closed?
14      A.   That there had been some dispositive
15  action.  Whether there had been a prosecution,
16  whether there was, you know, findings taken at face
17  value would not amount to any type of crime, so,
18  therefore, the dispositive action was that, you know,
19  no law was implicated.  It could mean that the
20  investigation was put on hold, you know, or something
21  else.  It wasn't, you know, determined if there was a
22  violation or not.
23      Q.   Okay.  What does inactive mean?  Or let me
24  be more specific.  What is your understanding of what
25  it meant for a case to become inactive at the time

Page 57

1   this case became inactive, which was April 12, 2022?
2       A.   I was not aware of the -- at that time, in
3   2022, I wasn't even in the office.  When did I --
4   yeah, I wasn't even in our office at that time.  So I
5   mean, certainly at that time I didn't have any idea.
6   But I know that speaking to individuals within our
7   office, that term means that, just like I said
8   before, that it wasn't under active investigation;
9   that it was not -- you know, there was nothing
10  happening to the case.  No final determination was
11  made.  And that there was no, you know, ongoing
12  involvement from our office.
13      Q.   I want to clarify one thing.  You said
14  closed meant that there is some kind of dispositive
15  action, which I believe you said can include
16  prosecution, findings of facts that amount to a
17  crime, or you said that it may just be that it's on
18  hold?
19      A.   No, I said that was if it was inactive --
20      Q.   Okay.
21      A.   -- not closed.
22      Q.   So if it's on hold, it would likely be
23  labeled as inactive or some similar term?
24      A.   Yeah.
25      Q.   Okay.

Page 66

1    time?
2        A.   Well, it depends on -- I guess there is two
3    different -- this is a criminal -- if you're
4    referencing a criminal determination as to whether it
5    was a criminal law being violated, there certainly
6    was not a determination made at the time this letter
7    was received.
8        Q.   Okay.  If we move on a little further in
9    that paragraph, it says, "We have attached our
10   office's communication with Mr. Lippert regarding his
11   voter data request.  We believe that this data was
12   illegally provided by Mr. Lippert or Local Labs to
13   VoteRef.com and is being used against New Mexico
14   state law."  Did I read that correctly?
15       A.   Yes.
16       Q.   So at least at this time, the Secretary of
17   State was conveying its position to the Attorney
18   General that the transfer of data from Local Labs to
19   VoteRef was illegal; correct?
20       A.   That's what they're writing in this letter.
21       Q.   It then says, "Swift action is needed as
22   voter data can quickly be manipulated and used to
23   spread election misinformation."
24            Did I read that incorrectly?
25       A.   Yes.

Page 67

1        Q.   Is spreading election misinformation a
2    crime under New Mexico law?
3            MS. LECOCQ:  Objection.
4        A.   That is not a defined term that has
5    elements that would constitute a crime.  But I think
6    this isn't written in any type of legal document
7    that's laying out charges and elements of a crime.  I
8    think it's just speaking.
9        Q.   I understand that, and I appreciate the
10   distinction.  But I'm just asking, you know, for your
11   position, as the representative of the New Mexico
12   Attorney General's Office, if it is a crime under New
13   Mexico law to spread election misinformation?
14           MS. LECOCQ:  Objection.
15       A.   Yeah, I mean, I can't draw a legal
16   conclusion.  And also, I mean, there aren't elements
17   to that.  But I think that is part of protecting
18   voter information, so -- and they're alluding -- I'm
19   assuming that they're alluding to public policy,
20   which is certainly, you know, underlined in all of
21   the Election Code and the purpose for these statutes.
22       Q.   Okay.  Are you aware of any New Mexico
23   state statute which makes it unlawful to spread
24   election misinformation?
25           MS. LECOCQ:  Objection -- never mind, go

Page 68

1    ahead.
2        A.   Not that term.  But I think that term is
3    also not defined.  Protecting information is part of
4    election information, misinformation.
5            So again, I think read in a vacuum, no,
6    there is no reference to election misinformation or
7    spreading election misinformation as a cause of
8    action or elements to it.  But I think that's
9    speaking broadly, and does capture many of the
10   purposes of the Election Code.
11       Q.   Does VRF's publication of voter data on its
12   website constitute election misinformation?
13           MS. LECOCQ:  Objection.
14       A.   I don't believe our office has taken a
15   formal position on that, but I believe that the
16   Secretary of State's Office has.  And we would
17   support that position, as much as they've made that a
18   defendant.
19       Q.   Okay.  If we look at the next section, it
20   lays out some facts -- it appears to be facts upon
21   which the basis of this referral are grounded.  And
22   it talks about how M ke Lippert was provided voter
23   data by the Secretary of State's Office on April 15,
24   2021.  Is that correct?
25       A.   Yes.

Page 69

1        Q.   It then says, "Mr. Lippert was provided the
2    entire statewide voter file after he paid $5,378.12,
3    and signed a vote information authorization form
4    swearing they, quote, 'will not use or make available
5    to others to use the requested material for purposes
6    others than governmental election research and
7    campaign purposes, under penalty of law."  Did I read
8    that correctly?
9        A.   Yes.
10       Q.   Did Local Labs commit false swearing under
11   that term quoted there, when it transferred the data
12   from itself to VRF?
13           MS. LECOCQ:  Objection.
14       A.   Yeah, I think you're asking for a legal
15   conclusion, which I can't make.  I'm not sure if this
16   was addressed in positions taken by our office or the
17   Secretary of State in pleadings.
18       Q.   If the Secretary of State's Office took the
19   position that that was an unlawful transfer, which it
20   appears that they did from the part we just read
21   above, does the Attorney General's Office have any
22   reason to disagree with that position?
23           MS. LECOCQ:  Objection.
24       A.   Again, it would be difficult for me to
25   analyze that and put it in context with anything that

18  (Pages 66 to 69)

Page 70

1  we filed with the litigation, because, you know,
2  there could have been nuances to any position or
3  argument we've made.  And I don't want to
4  misrepresent anything.  But I don't see why we
5  wouldn't agree and support the Secretary of State's
6  position with that.
7      Q.   Okay.  And I think, again, you know, I'm
8  asking for positions now based off of the facts and
9  the law, not necessarily, you know, just reciting the
10  positions that have been taken.
11      So the facts in here as alleged -- in fact,
12  as alleged in the verified complaint in our federal
13  lawsuit -- admit that Local Labs transferred the data
14  to VRF.
15      Okay.  Knowing that, did Local Labs commit
16  false swearing by transferring that data from VRF
17  based off the quoted term here?
18      MS. LECOCQ:  Objection.
19      A.   Yeah, I can't draw that conclusion.  But I
20  would say, generally, that would make sense to me.  I
21  mean, that's logical.
22      Q.   Okay.  That quoted section says, "Will not
23  use or make available to others to use, the requested
24  material for purposes other than governmental
25  election research and campaign purposes under penalty

Page 71

1  of law."  I read that correctly again, did I not?
2      A.   Yes.
3      Q.   Do you agree with me that, if Local Labs
4  makes the data available to someone for a
5  governmental election research or campaign purpose,
6  it has not violated the agreement there in that
7  quoted section?
8      MS. LECOCQ:  I'm going to just do a
9  standing objection.  I think this is outside the
10  scope of our topics.  I'll just leave it at that.
11      A.   So, at which step this sharing of
12  information violated New Mexico law, one has to be
13  taken in context.  And that context is what happened,
14  right?  It may not be clear exactly at what point the
15  misuse of data occurred.
16      But certainly, the end result, which was
17  published in a way that allowed no control over the
18  use of it, violated the restricted use of the data,
19  right, the prohibited uses that are allowed for by
20  statute.
21      So there certainly is a good argument to be
22  made that at that point sharing could have limited
23  that control.  But you could make the argument in the
24  alternative as well.  And I understand that.  But, I
25  mean, you know, this issue wasn't resolved from just

Page 72

1  at one singular point did the violation occur.
2      I don't know if that answers -- I'm happy
3  to try to better answer your question.
4      Q.   I understand what you're saying.  But I
5  believe one of the positions taken in this litigation
6  is that, you know, Local Labs committed false
7  swearing, because they agreed to this term, and then
8  they gave data to VRF.
9      Knowing that, I'm asking if Local Labs gave
10  the data to VRF for purposes that were governmental,
11  election research, or campaign purposes, would that
12  still be a violation?
13      A.   It could be if they lost control, and
14  therefore, you know, in an agency relationship, you
15  know, that argument could be made.  And, again,
16  that's dependent upon all of the facts in this fact
17  pattern, which, you know, there were more obviously
18  beyond that, at which point the issue was raised.
19      At that point alone, yeah, arguably maybe
20  not.  But that's not where the facts ended.
21      Q.   So does that become a false swearing
22  because VRF published the data on its website?
23      A.   I think arguably that's part of it, at
24  least part of it.
25      Q.   What if Local Labs didn't know how VRF was

Page 73

1  going to use the data?
2      MS. LECOCQ:  Objection.
3      A.   Again, that's a hypothetical that -- I
4  mean, I'm not going to answer hypothetical questions
5  that our office certainly hasn't taken a position on,
6  and the Secretary of State certainly hasn't taken a
7  position on, at least in terms of conclusions of law.
8      Q.   If VRF has taken the position that it posts
9  this information online so that the public can police
10  errors in voter records, is that a governmental
11  purpose under New Mexico law?
12      MS. LECOCQ:  Objection.
13      A.   Arguably, no.
14      Q.   Okay.  I get arguably.  But is it the
15  Attorney General's position that the publication of
16  voter data online, so that citizens could police the
17  voter records, was not a governmental purpose?
18      MS. LECOCQ:  Objection.
19      A.   Yeah, I think that position has been made
20  pretty clear in the pleadings that we have taken that
21  position.
22      Q.   Is it the Attorney General's position that
23  that same posting was not an election purpose?
24      MS. LECOCQ:  Objection.
25      A.   Well -- and again, our office's position

19 (Pages 70 to 73)

Page 74

1   has only been made clear through these pleadings. I
2   mean, there is not any other action or position that
3   we've taken.
4       I think the position was the Secretary of
5   State's Office that we're supporting and defending.
6   So, you know, indirectly, yes.
7       Q.   So the Attorney General's Office is taking
8   the same position as the Secretary of State's office
9   with regard to whether or not the posting was
10  election related?
11      MS. LECOCQ:  Objection.
12      A.   Yeah, I mean our position has been
13  consistent with the Secretary of State's.
14      Q.   Is that your position as the attorneys
15  defending the Secretary of State, or is that the
16  Attorney General's position as a party to this case?
17      A.   I think that position has been made clear
18  that it's both.
19      Q.   Same question:  Is it the Attorney
20  General's position, as a party in this case, that
21  this -- the publishing of voter data was not for a
22  research purpose?
23      MS. LECOCQ:  Objection.
24      A.   And you mean the publishing for the public;
25  is that correct, for anyone?

Page 75

1       Q.   Yes, I'm speaking about the ultimate
2   publication of the data online to the public.
3       A.   Yes.  Yes, that's our position.  That's my
4   understanding that's the position of the Secretary of
5   State's Office and our office as well.
6       Q.   And is it the position of the Attorney
7   General's Office, as a party to this litigation, that
8   that public posting on the website was not for a
9   campaign purpose?
10      A.   Yes.
11      Q.   When the Attorney General's Office received
12  this referral, what facts did it need to figure out
13  to determine if a violation occurred?
14      MS. LECOCQ:  Objection.
15      A.   Yeah.  I mean, that's -- that analysis, I
16  think, would be dependent on many things, including
17  the position the individuals that did the analysis --
18  so I can't speak to exactly what we would require,
19  you know, these five questions be answered.  But I
20  mean, I think we've discussed this generally to
21  determine under, you know, the review and actions
22  taken by the Secretary of State, whether that
23  position was supported by law, and you know, whether
24  the publication and use of this data violated any of
25  the Election Code or related statutes.

Page 76

1       Q.   Upon receiving this, to determine if a
2   violation occurred, would the Attorney General's
3   Office investigate whether, in fact, this voter data
4   was online?
5       MS. LECOCQ:  Objection.
6       A.   Are we -- so we're speaking to the criminal
7   referral; is that correct?
8       Q.   Yes.
9       A.   I think any type of referral -- this one
10  included -- would require a thorough review of the
11  facts and the law.  So I mean, that's certainly one
12  of the facts that would have to be considered.
13      Q.   And would the Attorney General's Office
14  investigate the purpose for which the data was being
15  posted online?
16      MS. LECOCQ:  Objection.
17      A.   Again, I mean, any review of alleged
18  violations of law, whether criminal or civil, would
19  necessarily require that, because that's one of the,
20  you know, elements of or conditions of the data use
21  under the statute.
22      Q.   And would the Attorney General investigate
23  how VRF obtained the data?
24      MS. LECOCQ:  Objection.
25      A.   I mean, again, all of this is very fact

Page 77

1   specific with, you know, where the -- where any
2   investigation is at, in terms of timing; what other
3   information is needed from agencies that refer; what
4   type of allegations are being raised, what laws are
5   being implicated.  And so I can't speak to the, you
6   know, exactly what happened or should have happened
7   with this investigation with this specific case,
8   right?
9       Q.   I suppose the position taken in the
10  litigation is that the publication of the voter data
11  on the website to the general public violated New
12  Mexico law.  What more would the Attorney General's
13  Office need to determine other than that the data was
14  posted online to the general public?
15      MS. LECOCQ:  Objection.
16      A.   I'm -- in terms of a criminal
17  investigation?
18      Q.   Yes.
19      A.   I mean, a criminal investigation can branch
20  out and look at many different elements of law.  So I
21  mean, I can't speak to whether or not, you know, this
22  might cause review of other statutes, right, other
23  criminal laws being implicated.  I mean, it's very
24  fact specific.  I mean, specific to this -- I guess,
25  yeah, I'm not really sure -- I guess I'm not really



## Page 82

1 the issue. I'm not asking about the -- you know,
2 policy decisions, or likelihood of success of an
3 actual prosecution. But certainly the decision about
4 whether or not the law was violated, or a position on
5 that issue is resolved before all those other things
6 are considered.
7 So I'm asking -- knowing that we admitted
8 to what seems like the relevant facts for determining
9 if we violated the law under this theory, are there
10 other facts -- facts only, not other
11 considerations -- that the Attorney General's Office
12 needed to investigate to take a position on this
13 issue?
14 MS. LECOCQ: Objection. Answer the
15 question, Joe.
16 But before we get there, I think if you
17 wanted to know specifically why the Attorney
18 General's Office has not sought out other facts, we
19 can answer that. But that goes to the stuff that's
20 confidential.
21 MR. MUELLER: Let's finish this question
22 and, then I'll go into that, because I think that
23 might be causing --
24 MS. LECOCQ: Yeah.
25 A. Yeah.

## Page 83

1 Q. So if you could answer that question, I
2 appreciate it. If it needs to wait for me to ask you
3 the stuff that's going to be protected, I can
4 appreciate that.
5 A. Yeah. And I think what's important to note
6 here is that a decision from our office, or a
7 position from our office, if we're talking about a
8 formal position, is different than internal, you
9 know, does an attorney believe that a law was
10 violated.
11 When our office takes positions on criminal
12 matters, it's a very big deal. And so those other --
13 what I'm also calling facts, because they are facts
14 and other things that affect any type of criminal
15 investigation by our office -- have to be considered.
16 We cannot make decisions in a vacuum in criminal
17 cases.
18 I don't think any law enforcement agency,
19 prosecutorial law enforcement agency, can do that.
20 It's just not -- I mean, maybe it's a rare example,
21 but, you know, you can't do that. This office cannot
22 take positions on pieces of a criminal investigation,
23 you know, without considering all of these other
24 things that we've discussed.
25 Q. Okay. I'm going to go into the actual

## Page 84

1 investigation of VRF and some of the questions that
2 we know are going to be under our agreement. I don't
3 think all of these questions are subject -- at least
4 not to the AEO counsel restrictions -- but I've
5 marked in my outline where I think that's going to
6 come up. So I will disclaim that before I ask those.
7 MS. LECOCQ: All right.
8 Q. Let's start with: Did the Attorney General
9 conduct an investigation into VRF's activities prior
10 to April 12, 2022?
11 A. The office opened an investigation.
12 Q. Okay. Did it take steps to actually
13 investigate the facts and theories as raised in the
14 Secretary of State's referral?
15 A. It, at least, began reviewing, you know,
16 the laws that were implicated, the evidence that was
17 received from the referral from the Secretary of
18 State's Office.



## Page 85



PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 98

```
1        Q.   And are you aware, generally, of what the
2    purpose of these communications were?
3        A.   I am.
4        Q.   And what was that purpose?
5        A.   To -- the purpose -- similar -- well,
6    except this was on our own, we initiated this
7    communication -- but it was similar to the
8    communication initiated by California, which is
9    normal by our office to consult points of contact in
10   other attorneys general offices, to see if similar
11   issues are being addressed by other offices, if they
12   have any perspective on the issue, if it's a regional
13   or potentially national issue.  And so I think that
14   was the -- that's my understanding of the purpose.
15       Q.   Was this part of the criminal investigation
16   of Voter Reference Foundation?
17       A.   No.
18       Q.   Does the Attorney General have any evidence
19   that VRF has manipulated voter data?
20       MS. LECOCQ:  Objection.
21       A.   Yeah -- well, one, I wouldn't be able to
22   speak to the -- any type of investigative work
23   product that persons that we may or may not be
24   looking at.  And I'm not aware of manipulation -- but
25   I am not aware of manipulation arguments in any of
```

Page 99

```
1    the civil litigation.
2        Q.   Is the Attorney General's Office aware of
3    VRF misrepresenting any voter data that was posted on
4    its website?
5        A.   Misrepresenting any voter data?  In the
6    civil litigation?
7        Q.   I'm asking if the Attorney General's Office
8    has any knowledge that VRF has misrepresented any
9    data that was posted on its website?
10       MS. LECOCQ:  Objection.
11       A.   Yeah, I wouldn't be able to speak to any
12   potential criminal investigation that may have been a
13   part of that question.  But from the civil context,
14   I'm not aware of that being raised.
15       Q.   And I suppose, given your answer here, I'm
16   just going to ask your counsel if you're invoking a
17   privilege as to not disclose the evidence that the
18   Attorney General might have from its criminal
19   investigation regarding the manipulation or
20   misrepresentation of voter data by VRF?
21       MS. LECOCQ:  That's right.
22       MR. MUELLER:  Can we get on the record what
23   the privilege assertion is?
24       MS. LECOCQ:  Investigative work product.
25   Attorney client.
```

Page 100

```
1        Q.   Is the Attorney General's Office aware of
2    anyone using VRF's website for unlawful purposes?
3        MS. LECOCQ:  Objection, same objection.
4        A.   Again, yeah, I wouldn't know, and I
5    couldn't speak to criminal investigation of that.
6    But I think, you know, using it -- I mean, the fact
7    that it's out there and in an unrestricted setting,
8    so anyone could use it, is the unauthorized use,
9    because there is no control over how people use it.
10   That, itself, is the issue.
11       Q.   So is a person committing unlawful use by
12   accessing the data that's on the website, or that was
13   on the website?
14       A.   That's a great question.  But I don't think
15   that's a conclusion that our office has come to yet.
16   Because I don't think individuals access this data
17   that's out there is part of any of the analysis or
18   positions our office has taken.
19       Q.   Is the Attorney General aware of anyone
20   using the data that was posted on VRF's website to
21   stalk any individual?
22       MS. LECOCQ:  Objection.
23       A.   I wouldn't be able to speak to any type of
24   criminal investigation, which, you know, would
25   obviously be more serious for a question of that
```

Page 101

```
1    context.  But I don't believe that there was any
2    evidence that we introduced as part of a civil
3    litigation or have said publicly of individual cases
4    that actually have occurred.
5        Q.   Is the Attorney General aware of anyone
6    using data that was posted on VRF's website to harass
7    any other individual?
8        MS. LECOCQ:  Objection.
9        A.   Again, to the criminal investigation
10   context, I can't speak to that.  But I think, also in
11   the civil context, the term "harass" is pretty
12   subjective, I mean, what that means.  But I'm not
13   aware of any individual cases, individual person,
14   that we've raised this example, either in the
15   litigation or any other type of public position on
16   it.
17       Q.   Has the Attorney General investigated
18   whether anyone used the data that was posted on VRF's
19   website for any of those purposes?
20       MS. LECOCQ:  Objection.
21       A.   So speaking just to this litigation --
22   I wanted the criminal investigation.
23       MS. LECOCQ:  Can you rephrase your
24   question?
25       Q.   Has the Attorney General conducted an
```

26  (Pages 98 to 101)

Page 102

1   investigation as to whether any person has used the
2   data posted on VRF's website for unlawful purposes,
3   stalking, or harassment?
4       MS. LECOCQ:  Objection; privilege on that,
5   investigative work product, or attorney-client.
6       A.  So, yeah, I can't speak to any potential
7   criminal investigation regarding that.  But the --
8   can you ask the question one more time.  I want to
9   make sure I'm answering it the best I can.
10      Q.  I said:  Has the Attorney General's Office
11  conducted any investigation as to whether a person
12  has used the data that was posted on VRF's website
13  for -- let's say, for any unlawful purpose?
14      A.  Well, the position that we've taken is that
15  posting this information and allowing it to be used
16  for any purposes is the legal issue, right?  That's
17  the unlawful purposes.  So part of that, I think, was
18  reviewed -- part of how long the website has been up
19  there, that it has been accessed, it's publicly
20  available, a list of individuals.
21      I'm not sure if there has been a list of
22  how many people have accessed that.  But the -- are
23  you asking if those individuals accessing the
24  information or the data, do we have a list of them?
25  Is that what you're asking?

Page 103

1       Q.  Perhaps this is a little clearer.  Setting
2   aside VRF, are you aware of any third party -- let's
3   exclude VRF and Local Labs from that definition --
4   using the data was posted on VoteRef.com for any
5   unlawful purpose?
6       MS. LECOCQ:  Objection.
7       A.  Yeah, I'm not sure if I can answer that,
8   because -- and I'd have to look at the facts and the
9   arguments raised by our office and the Secretary of
10  State.  But the unlawful action is any -- you know,
11  the fact that it's there and individuals are using
12  it.  Again, I don't -- I don't know if there is a
13  list of all of those accessing it.  But the fact that
14  it's there, accessing it would be -- because there is
15  no control over who can -- you know, who can use that
16  information, and any guarantee whatsoever that use of
17  that data would be for permissible purposes.  So,
18  therefore, it violates the statutes that are
19  implicated.
20      Q.  Okay.  So the position you've articulated
21  is that:  If a third party accesses or uses the data,
22  it must be used for one of the purposes permitted by
23  statute?
24      A.  Well, yes, but also by sharing data, and
25  not -- and doing so in a way that allows for anyone

Page 104

1   to use it, you know, to use it without any
2   restrictions or conditions is the issue.
3       It's not just a trust exercise.  You can't
4   just throw out data, and just hope that somebody that
5   gets access to it will use it only the way the law
6   prescribes.
7       Q.  That speaks as to VRF, though, correct?
8   VRF is committing the allegedly unlawful act by
9   publication.
10      But I'm asking about someone that logs on
11  to VoteRef.com and accesses, say, someone else's
12  data.  Have they violated the law by accessing that
13  data?
14      MS. LECOCQ:  Objection.
15      A.  Yeah, that will draw a legal conclusion
16  that I don't think we've made in this case.  I think
17  it's a valid question.  But we haven't taken a
18  position, so I couldn't speak on behalf of the
19  office.  I think it very much would depend upon
20  intent and, you know, the purpose which they're using
21  it for.
22      Q.  I'll focus further.  I'm not asking if your
23  office has taken a position on that.  I'm asking you,
24  as you sit here, is the position of the Attorney
25  General's Office that a third party, by accessing

Page 105

1   someone else's data on the VoteRef website is
2   violating New Mexico law?
3       MS. LECOCQ:  Objection.
4       A.  Yeah, I can't draw legal conclusions
5   without -- you know, with just a hypothetical like
6   this.  But I imagine, yes, it's possible that they
7   could.
8       Q.  If they accessed that data, does the use
9   towards which they put, say, another person's data
10  impact whether or not that use is lawful?
11      MS. LECOCQ:  Objection.
12      A.  I mean, all of these are very fact
13  specific, right?  You'd have to look at who are using
14  it, for what purposes, what controls are taken.  And
15  all of that would be part of an analysis done to
16  determine, you know, what position our office would
17  take, or arguably the Secretary of State's Office,
18  too.
19      Q.  What if, while that data was active, I
20  looked at your information to see if your address was
21  correct.  Have I violated New Mexico law?
22      MS. LECOCQ:  Objection.
23      A.  You could be.
24      Q.  And what facts would you need to determine
25  if that was a violation of New Mexico law?

27  (Pages 102 to 105)

1    MS. LECOCQ:  Objection.
2        A.  Again, I can't draw -- well, there are
3    certain elements, obviously, you would have to look
4    at in the context of just looking at the data, how it
5    was obtained, the circumstances of the person using
6    it, what conditions they had that information, all of
7    these that are governed by the laws that restrict the
8    use of this voter data.
9        Q.  How many New Mexico voters have canceled
10   their voter registration because of VRF's website
11   posting voter data online?
12       A.  I don't know.
13       Q.  I want to take a step back to Section 5.5
14   that we were discussing before.  I think you should
15   still have a copy in front of you if you need it.
16   And I want to ask what state interests are served by
17   the restriction in 5.5 about the uses towards which
18   data can be put?
19       A.  So are you asking about legislative intent?
20       Q.  I'm asking what state interests are served
21   by having this restriction in place?
22       A.  Well, I mean, any intent of law you have to
23   do an analysis of instruction, legislative intent,
24   and there is policy often written into statutes.
25   Some of that can be inferred.  I don't recall if

1    there is a policy statement under these statutes that
2    we're dealing with.
3        But I can speak generally, the Secretary of
4    State's Office is charged with protecting voter
5    information and the voting process.  Our office is
6    charged with upholding state laws, and representing
7    state agencies and the decisions that they make when
8    they're litigated.  And the general public interest
9    besides any, you know, statutory language about the
10   policy or purpose of an act or these acts, is to
11   ensure that this information, which is often highly
12   sensitive, is not disseminated in a way that violates
13   privacy primarily.  And that information is private
14   for a reason.
15       Q.  Okay.  I want to walk through the interests
16   that have been asserted by the parties in briefing in
17   this case.  The first is that these restrictions
18   ensure that individuals are made explicitly aware of
19   the permissible uses of New Mexico voter data by
20   signing the affidavit required in 1-4-5.5.  Does the
21   Attorney General's Office agree that that is a
22   signature served by 1-4-5.5?
23       A.  So what was state interest?
24       Q.  To ensure that individuals are made
25   explicitly aware of the permissible uses of New

1    Mexico voter data, by signing the affidavit?
2        A.  Yes, that is true.
3        Q.  Are there other places that people could
4    look to determine what uses are permissible under New
5    Mexico law?
6        A.  There are, and I know we've gone over a few
7    of them, conditions and restrictions on the use of
8    voter data.
9        Q.  Are you referring to the statutes that we
10   looked at?
11       A.  Yes.
12       Q.  Are you aware if there is any publications
13   from, let's say the Attorney General's Office, about
14   how voter data may or may not be used?
15       A.  Our office issues a lot of opinions, formal
16   public opinions and advisory letters, and has for
17   over 100 years.  I have not looked through all of the
18   opinions to see which ones might be relevant to this.
19   So I'm not aware of any off the top of my head.
20       Q.  What about something short of an opinion,
21   like a web page on how it can be used?
22       A.  I'm not familiar with a web page that's run
23   by our office that -- yeah, that provides guidance on
24   voter information.
25       Q.  The second state interest that's been

1    asserted here is that these restrictions ensure the
2    payment of reasonable fees for the production of
3    voter data, which fees subsidize the mandatory voter
4    registration system.  Does the Attorney General's
5    Office agree that that is a state interest served by
6    the regulations at issue in this case?
7        A.  Charging a fee for obtaining such data,
8    yeah, the office does.  And it's not dissimilar at
9    all from similar statutory provisions.  There are
10   hundreds of thousands of professional and
11   occupational licenses issued by the state by dozens
12   of boards and commissions.  That data maintained in
13   databases is not available under IPRA.  But there is
14   a provision in statute that allows the agencies to
15   charge fees.  And it's for a very similar purpose.
16   It's usually for companies selling continuing
17   education to licensees.  So you can get, through
18   inspection of public records requests some of this
19   information.  But IPRA requests would not provide
20   such things as a mailing address, or even an email
21   address.  They withhold those, and they run queries
22   through these databases and charge -- those boards
23   and commissions all have rule promulgation authority,
24   and set the fees for those lists, usually in the
25   rule.  And some vary depending upon the size of the

28  (Pages 106 to 109)

Page 110

1 list or type of filters. But it's very similar to
2 this type of data.
3     Q.  How is this interest accomplished?  That is
4 we're looking at 5.5, which says you can only use
5 this for certain purposes, and we're looking at 5.6
6 and some other statutes which say how it can be
7 shared.  Which one of those protects the Secretary of
8 State's ability to receive fees?
9     MS. LECOCQ:  Objection.
10    A.  Which one of these statutes protects their
11 ability?  I'd have to look closely.  I'm not sure
12 where the authority with charging fees comes to the
13 Secretary of State, if it's something that's
14 established.  Where it's established in the statute
15 or authorized in the statute, I'd have to look at the
16 full statute to confirm.
17    Q.  Would you agree with me that if a requester
18 who obtains the voter data from the Secretary of
19 State, but then transfers that to a third party, the
20 Secretary of State is not collecting a fee from that
21 third party under that issue?
22    A.  Yeah, because the Secretary of State at
23 that point does not have control over any further
24 request from a third party.
25    Q.  The final state interest that's been

Page 111

1 asserted in this case says that because voter data
2 produced at any single moment represents a, quote,
3 "snapshot of the voter files as of that moment,"
4 whereas, voter files may change -- sorry, one
5 second -- I will happily come back to that when I
6 find the page.
7     We talked a little bit about the
8 publication of voter data online.  And it seems to be
9 the position taken in this case, and that you've
10 referenced a few times here, is that publication to
11 the -- and I'm quoting here -- "the general public is
12 unlawful."  What does it mean to publish to the
13 general public?
14    MS. LECOCQ:  Objection.
15    A.  Yeah, I mean, that would be, of course,
16 dependent upon the specific facts.  But, generally,
17 published in a way that anyone in the public can
18 access, or even -- you know, I mean, that's in the
19 purest sense, posting to a website that doesn't have
20 a pay wall.  I think you could also publish to the
21 public in a more limited context.  But, of course,
22 all that would be a case by case, you know, analysis.
23    Q.  You said, "publishing to a website that
24 doesn't have a pay wall."  Why does the pay wall
25 matter?

Page 112

1     A.  Well, that's just an example, because that
2 means anyone could access it.  I can go and look at
3 the office of the Attorney General's website, and I
4 don't have to be a member or subscribe or anything
5 else to access it.  But that doesn't mean that you
6 couldn't also still publish to the public, even if
7 there were other barriers, whether it's a
8 subscription, fee based, or other types of, you know,
9 consents.  It would be very much, you know, a fact
10 analysis on a case-by-case basis.
11    Q.  I understand that.  But you seem to be
12 focusing a fair amount on whether or not someone is
13 paying to access the data.  Why does that matter
14 under New Mexico law?
15    A.  It doesn't.  It's just the easiest example
16 I could think of to make a point.
17    Q.  So if VoteRef.com had just charged people a
18 dollar to access the website, would it then not be
19 unlawful use?
20    MS. LECOCQ:  Objection.
21    A.  Yeah, I'm not going to draw a legal
22 conclusion with this either.  But the point is that
23 the position our office and the Secretary of State
24 has taken is that, by providing this information in a
25 public forum, defeats the purpose of the control and

Page 113

1 protection that's provided for under these statutes;
2 that this type of data can only be used for limited
3 purposes, and that the Secretary of State, by
4 statute, is charged with ensuring that that data is
5 protected.  And by publishing it in a manner
6 available to the public, even with conditions, you
7 know, defeats the purpose of that statute.
8     Q.  But I suppose by saying, you know,
9 publication to the general public that seems to imply
10 that publication is something less than the general
11 public could perhaps remedy that issue.  So I'm
12 trying to understand what general public means as
13 you've said and as your counsel has used it in this
14 case.
15     So, what if VRF's data required someone to
16 sign up but not pay money to access?  Is that
17 information to the general public?
18    A.  I can't come to a legal conclusion or any
19 type of definitive conclusion, because this would be
20 subject to looking at all the facts on a case-by-case
21 basis.  But what I think is important here is that,
22 whether or not there is control over the use of this
23 data for intended purposes is the purpose of this
24 statute and these restrictions on the use of this
25 data.

PohlmanUSA Court Reporting
(877) 421-0099        PohlmanUSA.com

Page 114

1    And so, if a requester takes that data and
2  uses it in a way where there is no longer the ability
3  to control its use, and ensure that the data is not
4  being used in an unauthorized way, then that would
5  defeat the purpose of all of these conditions on its
6  use, and the process that the Secretary of State
7  follows by law, you know, to share this data to
8  requesters when requested.
9    Q.  I understand you keep saying that this is
10  to, you know, serve the purpose of these laws.  But
11  what New Mexico statute tells someone that
12  publication to the general public is unlawful, but
13  publication to something less than the general public
14  might not be?
15    MS. LECOCQ:  Objection.
16    A.  Yeah, I'm not really sure -- I'll try to be
17  helpful in answering this, because I think that there
18  is -- to just make the point that I'm trying, is
19  that -- so if a political campaign, a candidate's
20  campaign requests this information for purposes of
21  sending out mailers to the individual voters that are
22  registered to vote, maybe of a certain party in the
23  district they are running in, one person could
24  request it, but they might put it on a Google doc to
25  share it with somebody else in the campaign, to then,

Page 115

1  you know, actually -- or a couple people that are
2  helping do mail merges, and you know, stamp envelopes
3  and send out these mailers.
4    But you know, that's a very different
5  analysis than sharing it with anyone outside of the
6  control or nebulous, not in an agency capacity, which
7  was what was being done here.
8    So that's the distinction that I'm trying
9  to make, is that there are examples that are very
10  narrow and limited of sharing, that are a very
11  different set of facts than these hypotheticals that
12  we're talking about.
13    Q.  So VRF has alleged in this lawsuit that one
14  of the projects they undertake is that internally,
15  without sharing any data with any member of the
16  general public, they conduct an analysis that looks
17  at voter history to see if there are what they call
18  "discrepancies" in that data.  So is VRF's internal
19  sharing of that data for purposes of conducting this
20  analysis an unlawful use of that data?
21    MS. LECOCQ:  Objection.
22    A.  Yeah, I mean, without knowing the facts of
23  exactly what's going, and assuming everything is
24  fine, and arguably, yeah, it might not be.  But I
25  can't say definitively one way or the other whether

Page 116

1  it violated any of these laws.
2    Q.  There has been two positions -- or at least
3  I view them as two positions -- that have been taken
4  by the defendant in this litigation, which is, one,
5  that data cannot be shared outside of an entity.
6  Okay.
7    The second, kind of more recent iteration
8  is that data cannot just be posted for the general
9  public.  But at least in your example of a political
10  party or campaign, those kind of seem to bleed into
11  one another, because your explanation of publication
12  to the general public relied on the fact they weren't
13  sharing it outside of their own people.
14    So I suppose my question is:  Are those two
15  concepts the same -- let me be very specific here --
16  the concept that you cannot share the data outside of
17  an entity or organization that requests it, and the
18  concept of publication to the general public?
19    A.  I mean, sharing outside of an entity is
20  also, I mean, subject to interpretation, right?  I
21  mean, you could share with a contractor, right?  But
22  if they're under contract are they acting in an
23  agency capacity?  Is there still control?  Are they
24  using it for the same purposes, right?  I mean, there
25  are not black-and-white answers to many of these

Page 117

1  questions, because again, they're subject to factual
2  analysis, which is going to be different in every
3  case, right?
4    I can't definitively say that sharing
5  outside of an agency violates this law, because I can
6  use that example, as just one of -- well, oh, there
7  is that exception, right, it's an agent, right?
8  Agency relationship, is that enough to say:  Well,
9  it's outside entity, but closely enough that it's
10  okay.  I mean, again, all those are, you know,
11  fact-based analysis.
12    Q.  You kind of hinted at this, but are you
13  aware that most political parties in New Mexico
14  request voter data from the Secretary of State?
15    A.  I mean, nobody has told me that, but I
16  would assume that, based off of how campaigns work,
17  yeah.
18    Q.  Well, take it for what it's worth, but I'll
19  represent to you that the Republican, Democratic,
20  Libertarian -- I'll stop there, because I can't state
21  for sure -- have all requested voter data from the
22  Secretary of State, say, since the beginning of this
23  litigation, or at least from the chart that we were
24  provided by the parties.  If the party requesting
25  that data gives it to a canvasser to go knock on

30 (Pages 114 to 117)

Page 126

1 Q. If we go to the next answer provided, it
2 says: "Answer: 'Publishing online,' could be
3 construed to mean anything from making an internal
4 list of registered voters for use in an internal
5 website, or secured website, or maintaining that
6 information on an internal website for others to
7 access internally, such as on Google Drive, or
8 sending mass emails to voters as part of a campaign.
9 The AG believes this type of 'publishing' used within
10 the context of permissible government or election
11 campaign use, is acceptable, whereas 'publishing' to
12 the general public is not." Did I read that correct?
13 A. Yes.
14 Q. Is that the position of the AG's Office as
15 we sit here today?
16 A. I believe it is.
17 Q. What's the difference between an internal
18 website and an external website?
19 A. I think, again, that would be a
20 fact-specific analysis, right? What type of
21 protections? You know, it's not always black and
22 white. But I think, generally, that would be a
23 website that is not accessible except to people
24 within that entity. And, you know, an external site
25 would be something that was generally public, you

Page 127

1 know, generally available to the public.
2 Q. Does it have to be password protected to be
3 an internal website?
4 A. Again, it's a fact-based analysis. I think
5 that's just one factor that would have to be
6 considered to whether or not, you know, something is
7 publicly available and shared outside of an entity or
8 not.
9 Q. And I'm sure you can appreciate that I'm
10 trying to figure out the terms that your office used,
11 and just reaffirm here is your position, actually
12 means, because, you're right, internal to me doesn't
13 really have a meaning without knowing what your
14 office's position on what "internal" means.
15 So, again, I'm just going to ask: Is it
16 your office's position that a -- let's say a website
17 that requires someone have a user name and password,
18 is that an internal website or external website?
19 A. It depends on who is asking.
20 Q. Okay. The people using it are people that
21 signed up for a user name and password?
22 A. I mean, that could be limitless people that
23 are outside of the entity, with no control over their
24 use, or it could be, you know, campaign
25 representatives or a contractor who has been

Page 128

1 contracted to coordinate mailings, right, and has
2 that close agency relationship or contractor
3 relationship. So, again, I don't think you can just
4 use one example and say definitively this applies to
5 any type of situation.
6 Q. You seem to be getting back to the idea of,
7 you know, internal and external to the organization
8 as kind of all encompassing for what publishing is
9 and is not allowed. And I'm trying to understand if
10 the internal, external, you know, analysis is one
11 factor, and this general, public, unsecure website,
12 internal/external website, is a different factor. If
13 those are really the same thing, and the means of
14 keeping the data within the entity is to have a
15 password protected website for that entity's members.
16 So my question is: If VoteRef's website
17 was secured so that only people that want to
18 volunteer to further VoteRef's mission can sign up
19 for user name and password access to data, is that
20 permissible?
21 A. Again, it would have to depend on the
22 circumstances and the control of that data, and if
23 that even falls within the permitted uses.
24 Q. Let's assume here that it is being used by
25 the end user for a permitted purpose. Does the fact

Page 129

1 that the website requires a user name and password
2 mean that it's lawful to use it in that manner?
3 MS. LECOCQ: Objection.
4 A. Yeah, because I can't draw a conclusion
5 without knowing all of the facts, because I think the
6 facts of who has access and what controls are still
7 available, and assurances that there is that
8 connection with the organization; it's not just
9 anyone, right? And that there is not a risk of that
10 information being used for unlawful purposes. So I
11 think all of that would be very -- you know, would
12 require a thorough review of the circumstances and
13 the facts and the scope of the use and the scope of
14 the individuals with access.
15 Q. Can anyone volunteer to do work for a
16 campaign?
17 A. I don't think I could just go and volunteer
18 for a campaign and they would give me access to this
19 type of information, if that's what you're saying.
20 Q. That wasn't my question, but I appreciate
21 that answer.
22 You seem to draw a distinction between
23 whether VoteRef is just providing data under this set
24 of facts to anyone. But what's the difference
25 between someone saying: I want to volunteer for a

Page 130

1   campaign to use it for campaign purposes, and I want
2   to volunteer to help VoteRef use it for a purpose
3   which, for the sake of this question, we're presuming
4   is permissible?
5        MS. LECOCQ:  Objection.
6        A.  I think that type of use, there are clear
7   distinctions.  And a volunteer -- campaigns don't
8   just let anyone volunteering for the campaign get
9   access to all of that information.  It's maintained,
10  and you know, they can't then -- there is no
11  protections -- or there would be protections,
12  arguably, for that information only to be used for
13  that limited purpose.  And it's within that nebulous
14  of the campaign.  Campaigns don't post this
15  information on their website and say:  Anybody that
16  wants to volunteer, here's all of this information,
17  and you can go use it however you see fit.  And we
18  don't have examples of that that I'm aware of
19  happening, like VoteRef is doing in this case.
20       Q.  What if VoteRef was selling the data to
21  third parties who agreed by contract that they would
22  only use it for permissible purposes?
23       MS. LECOCQ:  Objection.
24       A.  Yeah, again, I can't speculate to a
25  conclusion.  I mean, that's just not relevant to the

Page 131

1   facts in this case.  But I'd have to look more
2   closely at the statute and the rules, and what
3   amounts to an agreement with the Secretary of State's
4   Office, and the use for this data, and whether or not
5   that type of use, you know, subsequent sale or
6   distribution is authorized.  I think it clearly would
7   go against the statutes, arguably the statutory and
8   legislative intent of ensuring that the Secretary of
9   State's Office is the one that maintains control and
10  protection over this information.  And just by
11  allowing it to be disseminated, without these
12  requests to the Secretary of State's Office,
13  following this process that's provided in law,
14  would -- you know, it certainly violates the intent
15  as well as the process -- the intent of the law and
16  the process set up by the Secretary of State.
17       Q.  Can VRF share the data that it has in its
18  possession with its own employees?
19       MS. LECOCQ:  Objection.
20       A.  That would first depend upon whether or not
21  the use is permitted, right, by law.  Our contention
22  is that it still is not.  And it would depend upon
23  what mechanisms there are to control, right?  Just
24  like a campaign that started sharing this information
25  broadly -- I mean, the same questions would be

Page 132

1   raised.  What type of control mechanisms are there?
2   And who, knowingly or not, allowed this information,
3   which is protected, to be used for unlawful purposes?
4   So I think it would be a very fact-specific analysis.
5        Q.  So I understand you as saying that the
6   legality of the transfer of the data, at least in
7   part, hinges on how the data is going to be used by
8   the recipient.  Am I correct in saying that?
9        A.  Yeah.
10       Q.  If a citizen contacts VRF and says:  Hey, I
11  looked at your website.  My data is incorrect.  And
12  VRF informs, let say the relevant county clerk, that
13  the data is incorrect.  Has VRF violated the law by
14  pointing out that the inaccuracy to the county clerk?
15       MS. LECOCQ:  Objection.
16       A.  Yeah, I can't get into hypotheticals.  One,
17  I mean, this isn't any type of determination that the
18  Secretary of State's Office or our office has made.
19  And, you know, I can't speak to a legal conclusion.
20  I mean, that's going to be something that's argued in
21  the pleadings in this case.
22       Q.  But do you understand that the allegation
23  that VRF has made in this case is that that is
24  precisely why they have this website, is to identify
25  discrepancies and communicate those discrepancies, or

Page 133

1   errors or whatever you want to call them, to the
2   relevant officials so they can be remedied?
3        A.  I understand that's the argument being
4   raised, yeah.
5        Q.  Okay.  If we assume the truth of that
6   argument, if that is actually how the data is being
7   used, is that permissible under 1-4-5.5?
8        MS. LECOCQ:  Objection.
9        A.  Yeah, I mean, again, I think that this is
10  addressed in our arguments in the case and the
11  position taken by the Secretary of State as the
12  decision-maker in denying this information or this
13  data.  But, yeah, I think that that is for unlawful
14  purposes.
15       Q.  Okay.  I put a binder of transcripts in
16  front of you, and I put one in front of your counsel
17  as well.  If we can turn to that binder.
18       MR. MUELLER:  I don't know -- I mean, these
19  are all in the record.  We can label this as an
20  exhibit if we want.  If you want to deal with a copy
21  of it, you can.
22       MS. LECOCQ:  I don't think it's necessary.
23       MR. MUELLER:  I don't think so either.
24       Q.  Okay.  Let's start with the very first
25  transcript.  This is from the May 17, 2022 hearing on

Page 142

1  "The basis for the Attorney General's assertion that
2  VRF, or anyone acting in concert with it, violated
3  New Mexico law or may have violated New Mexico law."
4       Okay.  I want to move on to the second
5  transcript.  That's the 6/15/22.  This is a
6  continuation of the preliminary injunction hearing.
7  Looking at page 225, line 20.  Let me know when
8  you're there.
9  A.  Yeah, I've read it.
10      Q.  I'm going to read, starting at page 225,
11 line 20.  And I will first represent that if you go
12 back to page 223, this is Ms. Serafimova speaking.
13 "Now, on a substantive challenge, again, we do --
14 given our interpretation of 5.5, we do concede that
15 plaintiffs have not violated any of the use
16 restrictions, because those use restrictions do not
17 proh bit uploading the data to a website.  That is
18 under 5.36.  So that doesn't change our theory."
19      Did I read that correctly?
20 A.  Yes.
21      Q.  Was that the Attorney General's position at
22 the time of this hearing?
23      MS. LECOCQ:  Objection.
24 A.  Again, you know, I was not -- it was a
25 different administration, and this individual is no

Page 143

1  longer employed by our office.  I presume there is no
2  reason that I have, that I'm aware of to, you know,
3  challenge any positions that took.
4       Q.  Is the Attorney General's Office willing to
5  state, at least prior to the filing of the first
6  amended complaint, that the representation made by
7  counsel for the Attorney General accurately reflect
8  the positions of the Attorney General's Office?
9  A.  I couldn't answer that without consulting
10 with counsel.
11      Q.  So you're not willing to state whether
12 these are accurate representations of the Attorney
13 General's position?
14      MS. LECOCQ:  Objection.  I think -- if it
15 helps, I think we can stipulate that this was the
16 reflection of the Attorney General Hector Balderas at
17 the time that this was done, yes.
18      Q.  Has the Attorney General's position on this
19 case changed since the new Attorney General took
20 over?
21 A.  What do you mean by "position"?
22      Q.  Position on whether VRF has engaged in
23 unlawful activity.
24      MS. LECOCQ:  Objection.
25 A.  Yeah, I mean, I think that that's a

Page 144

1  complicated question, given both the criminal and
2  civil angles from this.  But I mean, generally, the
3  positions are:  The actions taken, and the use of
4  this information is not in compliance with New Mexico
5  law.  I mean, individual legal arguments, you know, I
6  think that's separate.  But generally, yeah.
7       Q.  Okay.  Then, I'm going to ask you to look
8  at 1-4-5.6 and 1-5-22 as we sit here now.  We've
9  already looked at these and confirmed the language,
10 so I'm not going to belabor that.  Is it the Attorney
11 General's position, as we sit here today, that
12 1-4-5.6 incorporates the proh bitions of 1-5-22(a) to
13 make Voter Reference Foundation's publication of data
14 unlawful?
15      MS. LECOCQ:  Objection.
16 A.  I can't draw that conclusion.
17      Q.  Are you aware if that's a position that's
18 been taken in this case, let's say, since the filing
19 of the first amended complaint?
20 A.  I'm aware of competing arguments regarding
21 the applicability of the criminal penalties and
22 competing arguments about what applies and what
23 doesn't.  But I can't recall right now where we're
24 currently at with this argument.
25      Q.  What do you mean "competing arguments"?

Page 145

1  You mean between plaintiff and defendants --
2  A.  Yeah.
3       Q.  -- or internally?
4  A.  Plaintiffs and defendants.
5       Q.  Are you aware that VRF has made requests
6  for voter data to the Secretary of State, let's say,
7  since it acquired the data from Local Labs?
8  A.  Yes.
9       Q.  Are you aware that all those requests have
10 been denied?
11 A.  Yes.
12      Q.  I think we are moving into our next
13 confidentiality segment here, just a warning there.
14 Not there quite yet, but these questions might bleed
15 over pretty quickly.
16      (Exhibit 11 marked.)
17      Q.  Handing you what I've marked as Exhibit 11.
18 Have you seen this document before?
19 A.  I don't -- it looks familiar.  It may have
20 been in one of the many hundreds of pages of
21 documents that I reviewed that included some email
22 correspondence.  But I can't say definitively.  I
23 think that this was in there.
24      Q.  Okay.  I'm just going to read from the
25 first line here.  It says, "Per Dylan's contact with

37 (Pages 142 to 145)

Page 154

1     A.  I mean, that's stated in this letter, so
2   yes.
3     Q.  Okay.  The second to the last paragraph,
4   "To further clarify another point, you have not
5   complied with NMSA 1978 Section 1-4-5.5 in requesting
6   voter data, by not submitting the required
7   affidavit."
8          Did I read that correctly?
9     A.  Yes.
10    Q.  So you would agree with me that this
11  request was denied, at least in part, because no
12  affidavit was provided?
13    A.  Yeah, that's what it says.
14        (Exhibit 13 marked.)
15    Q.  I'm handing to you what we've marked as
16  Exh bit 13.  Have you seen this document before?
17    A.  It also looks familiar.  Everything is
18  starting to blur together a little bit, but it looks
19  like one of the documents that was included in the
20  documents I've reviewed for this deposition.
21    Q.  Okay.  Can you tell me what this document
22  is?
23    A.  It is a letter from your law firm to the
24  Secretary of State.
25    Q.  Would you agree with me -- well, let me

Page 155

1   read the subject line.  It says, "Notice of Violation
2   of National Voter Registration Act and Request for
3   Records."   Did I read that correctly?
4     A.  Yes.
5     Q.  Would you agree with me that this, at least
6   on its face -- you can characterize it how you
7   want -- but that this characterizes itself as a
8   request for voter records under the National Voter
9   Registration Act?
10    A.  Yeah, I mean, that's the subject.  It
11  states that it's a notice of violation, or alleged
12  violation, and also a request for records.
13    Q.  Would you agree with me as well that this
14  is a request for records under Section 1-4-5.5, New
15  Mexico statute?
16    A.  Yes.
17    Q.  And it would perhaps help to point your
18  attention to page 4 where it says, "Requests for
19  records."
20    A.  Yeah.
21    Q.  I'd like to draw your attention to the
22  second to the last paragraph on page 4.  It says,
23  VRF's intended election use comprises two distinct
24  projects.  For its first project, just as VRF
25  publishes voter data for many other states, and as it

Page 156

1   recently published voter data in New Mexico, VRF
2   intends to publish the requested information online
3   for election related purposes, but it will only
4   publish the personal information of voters online if
5   VRF is granted relief in" -- and it lists this
6   case.  And it says, "or in any other legal
7   proceeding."
8          Did I read that correctly?
9     A.  Yes.
10    Q.  And so would you agree with me that VRF is
11  representing, through counsel here, that it will not
12  publish the personal information of voters online
13  unless a court gives them relief saying they can do
14  so?
15    A.  That's what it says.
16    Q.  I'm going to continue on the last
17  paragraph.  "For its second project, VRF intends to
18  analyze the records, information, and data provided
19  in response to the above requests in order to engage
20  in a discrepancy review of the New Mexico voter
21  rolls.  VRF intends to publish this analysis online
22  without disclosing the personal information of any
23  voter.  VRF will comply with this
24  non-public-disclosure promise for the data it uses on
25  the second project regardless of whether it prevails

Page 157

1   in the federal litigation.  And again, for the sake
2   of clarity, no personal information of any voter will
3   be published online unless VRF is granted relief in
4   the federal litigation or in any other legal
5   proceeding."
6          Did I read that correctly?
7     A.  Yes.
8     Q.  And you'll agree that VRF, through counsel,
9   is promising there that it will not publish voter
10  data online absent a court order telling them they
11  can do so?
12    A.  That's what it says.
13    Q.  Okay.  If you look at page 5 of this,
14  second paragraph, it says, "Signed voter information
15  authorization forms for each of the above requests
16  are attached to this letter as Exhibit B."
17         Did I read that correctly?
18    A.  I'm sorry, which page are you looking at?
19    Q.  Page 5, second paragraph.
20    A.  Okay.
21    Q.  "Signed voter information authorization
22  forms for each of the above requests are attached to
23  this letter as Exhibit B."
24         Did I read that correctly?
25    A.  Yes.

Page 158

1   Q.   And if we flip -- it looks l ke maybe the
2   Exhibit B label got cut off a little bit.
3   **A.   Yes.**
4   Q.   But you'll see two documents there.  Can
5   you tell me what those documents are?
6   **A.   They say, "Voter Information**
7   **Authorization."  It's a form from the Secretary of**
8   **State.**
9   Q.   Okay.  And what is this form used for?
10  **A.   I presume it's used for requesting voter**
11  **data.**
12  Q.   And you'll agree with me -- if you look at
13  the section on each of these, it says, "Information
14  of Requester," it says, "Name, Gina Swobada, Voter
15  Reference Foundation.  Is that correct?
16  **A.   Yes.**
17  Q.   Just below that in the Authorization,
18  you'll see that Gina Swobada has signed as the
19  signature of the requester; is that correct?
20  **A.   Yes.**
21  Q.   Was VRF given voter data in response to
22  that request?
23  **A.   I don't believe so.**
24  Q.   Do you have any reason to think that it
25  was?

Page 159

1   **A.   No.**

[redacted]

12          MR. MUELLER:  I think we're outside of the
13  confidentiality.  That's the last question.
14          (A discussion was held off the record.)
15          (Exhibit 14 marked.)
16  Q.   I'm handing you what we've marked as
17  Exhibit 14.  Would you look at that?  When you've had
18  a chance to review I'll ask if have you seen this
19  document?
20  **A.   I believe I have.**
21  Q.   And can you tell me what this document is?
22  **A.   It's a letter in response to the request**
23  **that we were just looking at from the Secretary of**
24  **State's Office.**
25  Q.   Okay.  And who is the author of this

Page 160

1   response?
2   **A.   Dylan Lange.**
3   Q.   Okay.  I want to draw your attention to the
4   last paragraph on page 2.  It says, "With respect to
5   item number 2 and the affidavit you submitted as
6   required by New Mexico law, in the notice VRF states
7   that it 'intends to publish the requested information
8   online for election related purposes, but it will
9   only publish the personal information of voters if
10  VRF is granted relief in'" -- citing this case --
11  "or in any other legal proceeding.'"
12          Did I read that correctly?
13  **A.   Yes.**
14  Q.   Skipping the citation there, it says, "As
15  you know from the federal litigation and otherwise,
16  it is our position that publishing any" -- with
17  emphasis on the "any" there -- New Mexico voter data
18  on a website is a violation of the New Mexico
19  Election Code that carries criminal liability."
20          Did I read that correctly?
21  **A.   Yes.**
22  Q.   At the time this response was sent, did the
23  Attorney General's Office agree with that position?
24  **A.   I think that would reveal any privileged**
25  **communication that we would have with the Secretary**

Page 161

1   of State's Office.
2   Q.   I'm not asking what advice you gave them.
3   I'm asking, as a defendant and litigant in this case,
4   if that is -- if that comports with the position that
5   the Attorney General was taking?
6   **A.   Our position is that we support the**
7   **Secretary of State's Office.  And so, you know, had**
8   **we disagreed, you know, I think you could infer that**
9   **we were having disagreement with our client.  So,**
10  **yeah, I mean we certainly support the position taken**
11  **by the Secretary of State's Office, and the decision**
12  **that they made, in our role representing the state**
13  **and that agency.**
14  Q.   We can agree that the Secretary effectively
15  denied this request and did not produce voter data to
16  Voter Reference Foundation; is that correct?
17  **A.   Yes.**
18  Q.   Okay.  I want to compare the denial of the
19  October 18th request, that we just looked at, with
20  the November 17th letter, to the denial here.
21          So we established that in Mr. Lange's
22  November 17, 2022 letter, two of the reasons for
23  which that request was denied -- we'll start with the
24  first one -- it says, "You have not indicated that
25  you will not post any voter data online, and based on

Page 166

1  different entities that use, share, and even sell
2  voter data, certainly relates to the claims in our
3  case, including viewpoint discrimination and the
4  defenses raised by the parties in this case, one of
5  which is on appeal, about how we must show disparate
6  treatments as to us and other entities. So I would
7  say that there is a category that says, you know,
8  claims and defenses raised in the litigation. I
9  think this calls for -- and it's been raised several
10  times throughout this case. I don't think I'm
11  surprising you by asking you about it here. I
12  believe it's also in a discovery response. So to the
13  extent we've asked for testimony about discovery
14  responses, then I think we're there.
15         MS. LECOCQ: Mr. Dworak has certainly
16  reviewed the discovery responses. Do you know which
17  one?
18         MR. MUELLER: I think as early as
19  Interrogatory 1.
20      Q. Interrogatory No. 1. Do we have a copy of
21  this? It says, "State whether you have conducted any
22  investigation or made any inquiry into the use or
23  sharing of voter data by Catalist, i360, or any other
24  commercial entity that has purchased voter data from
25  New Mexico" -- goes on.

Page 167

1         And then there is an answer from the
2  Attorney General's Office, which I don't want to read
3  out loud until I ask about it.
4         MS. LECOCQ: Sure. Let me just refresh his
5  recollection with this. Sorry, go ahead.
6         MR. MUELLER: Just to clarify, did he hand
7  you the supplemental responses or the original? Is
8  it the 3/8 or the 10/20? They're not different, but
9  it's just important.
10         MS. LECOCQ: This is response, so this is
11  the initial, not supplemental.
12         MR. MUELLER: I'll note that they're not
13  different. But I want to note that they're not
14  different.
15         MS. LECOCQ: That's fine.
16      Q. Okay. So going back to my question, has
17  the Attorney General ever investigated -- let me
18  backtrack there. Is the Attorney General aware of
19  whether Catalist sells voter data that it receives
20  from the Secretary of State's Office?
21      A. Not that I'm aware of.
22      Q. And is that the office or is that you
23  speaking individually?
24      A. That's me speaking on behalf of the office.
25      Q. What about i360? Is the Attorney General

Page 168

1  aware of whether or not i360 sells voter data that it
2  receives from the New Mexico Secretary of State's
3  Office?
4      A. No, not that I can recall that the office
5  generally is aware of any investigation or knowledge
6  of the details.
7      Q. Same question with regard to Aristotle. Is
8  the Attorney General aware that it sells voter data
9  that it receives from the New Mexico Secretary of
10  State?
11      A. The same answer, no.
12      Q. Has the Attorney General ever investigated
13  any entity, other than VRF, for how it uses voter
14  data requests from the Secretary of State?
15         MS. LECOCQ: Objection. Go ahead.
16      A. Yeah, I'm not aware of any referral that
17  would have resulted in any type of investigation of
18  that sort.
19      Q. Do you have a copy of the supplemental
20  interrogatories? And we can mark that as Exhibit 15.
21         (Exhibit 15 marked.)
22      Q. And I'll represent that this document --
23  thank you for marking that -- it is Defendant Raul
24  Torrez's First Supplemental Response to Plaintiff
25  Voter Reference Foundation's First Interrogatories,

Page 169

1  Requests for Production and Requests for Admission.
2  Do you agree with me that that is what this document
3  is?
4      A. Yes.
5      Q. And if you'd look at -- if you look at the
6  very last page, the certificate of service, do you
7  agree with me that these were served on -- or
8  produced to Voter Reference Foundation on March 8,
9  2023?
10      A. Yes.
11      Q. Directing your attention to Interrogatory
12  No. 1 -- that's on page 4 -- Interrogatory No. 1
13  says, "State whether you have conducted any
14  investigation or made any inquiry into the use or
15  sharing of voter data by Catalist, i360, or any other
16  commercial entity that has purchased voter data from
17  New Mexico."
18         Did I read that correctly?
19      A. Did you say Interrogatory No. 4 or 1?
20      Q. I said 1 on page 4.
21      A. Yes, that's correct.
22      Q. And then it says -- well, it says, "If
23  answered" -- skip that part. You'll note that there
24  is two objections made, but then a response is given
25  subject to that objection. Am I characterizing that

Page 170

```
1    correctly?
2        A.   Yes.
3        Q.   And that response says, "Without waiving,
4    and subject to, the foregoing general and specific
5    objections, defendant has not received a referral
6    from a state or county elections agency or a citizen
7    complaint concerning the above-referenced entities.
8    that defendant has not conducted an investigation or
9    inquiry into the above-referenced entities does not
10   preclude defendant from doing so."
11       Did I read that correctly?
12       A.   Yes.
13       Q.   You'll agree with me that this is a
14   supplemental response that, as we noted, was served
15   last week?
16       A.   Yes.
17       Q.   And I'll represent to you that the initial
18   response to this interrogatory was served on October
19   20, 2022.  Would you agree with me that the response
20   has not changed from October 20, 2022 to March 8,
21   2023?  And perhaps it would be helpful -- I want to
22   find it to show you.  On the requests that were
23   supplemented on March 8, it's noted that there is a
24   supplemental response.
25           So taking a step back, can we agree that
```

Page 171

```
1    there is no supplemental response provided to
2    Interrogatory No. 1?
3        A.   That's correct.
4        Q.   So the Attorney General's response to that
5    was the same on October 20, 2022 and March 8, 2023?
6        A.   Yes.
7        Q.   Are you aware that these entities were
8    specifically identified to the Secretary of State,
9    the Attorney General, and the Court at the
10   preliminary injunction hearings held last summer?
11       A.   I'm generally aware that -- I mean,
12   throughout this -- that they've been mentioned, and
13   these questions have been asked.
14       Q.   Does the Attorney General's Office consider
15   VRF's identification of those entities to be a
16   citizen complaint?
17       MS. LECOCQ:  Objection.
18       A.   Yeah, I think that would -- what
19   constitutes a citizen's complaint, and what happens
20   from complaints or information received to us -- and
21   we generally know that just raising an allegation or
22   issue in an ongoing case or pleading would not
23   generally constitute any type of formal complaint
24   with our office.
25       Q.   Has the Secretary of State ever brought any
```

Page 172

```
1    of those three entities to the attention of the
2    Attorney General?
3        A.   Not that I'm aware of.  Although,
4    they're -- yeah, not that I'm aware of.  I mean --
5    and that's what our answer says, is that we haven't
6    had any referrals or complaints provided to our
7    office.  So I think that's consistent with that
8    answer.
9        Q.   What would it take Voter Reference
10   Foundation giving the AG about these entities for the
11   AG to be concerned that they are selling voter data?
12       MS. LECOCQ:  Objection.
13       A.   Again, I think a lot of that is very fact
14   specific.  And what complicates this is the ongoing
15   litigation.  Defenses raised in litigation are
16   treated a little bit differently, obviously, than a
17   complaint filed or referral from another state agency
18   or a complaint filed by a member of the public or any
19   entity through our complaint process.  So, I mean --
20   and that's how many complaints come through our
21   office.  They come through, you know, either a form
22   filled out on our website or by referral from another
23   government entity.
24           (Exhibit 16 marked.)
25       Q.   I'm going to hand you what I've marked
```

Page 173

```
1    as -- pretty poorly -- as Exh bit 16.  Once you've
2    had a chance to review it, can you tell me if you've
3    seen this document before?
4        A.   No, I don't believe I've ever seen this.
5        Q.   Just on its face, can you tell me what this
6    document purports to be?
7        A.   I mean, having never seen it before, it's a
8    little hard for me to do that.  But it just says it's
9    a "Declaration of Records Custodian of Aristotle
10   International, Inc.," and there are a number of --
11   looks like screen shots or -- yeah, screen shots --
12   from some websites.
13       Q.   And if we look at the second page of the
14   declaration, will you agree with me that it is signed
15   by a J. Blair Richardson, Jr., who at least purports
16   to be general counsel for this entity?
17       A.   Yeah, that's what it says.
18       Q.   Okay.  I want to draw your attention to
19   attachment number 2.  On page 1, it identifies
20   attachment 2 as, "Aristotle's Test
21   Voterlistsonline.com sales order and agreement used
22   for Aristotle customers wishing to purchase access to
23   New Mexico voter data."
24           Did I read that description on page 1
25   correctly?
```

44 (Pages 170 to 173)



PohlmanUSA Court Reporting
(877) 421-0099     PohlmanUSA.com



Page 178

Page 180

Page 179

Page 181

**Page 180**

17    Q.  Did the Attorney General's Office know who
18  Aristotle was before today?
19        MS. LECOCQ:  Objection.
20    A.  So, having refreshed my memory, these
21  entities were mentioned in discovery.  So, I mean, at
22  least that knowledge.  I'm not aware of any -- you
23  know, as I stated before, there is nothing formal, no
24  formal complaints, or any of that action.  But
25  certainly our knowledge, just by reference to these

**Page 181**

1  entity's names.
2    Q.  Has the Attorney General's Office had any
3  contact with Aristotle, let's say, in the last two
4  years?
5    A.  Not that I'm aware of.  And, you know, that
6  wasn't part of any review or research I did in
7  preparation for today.
8        (Exhibit 17 marked.)
9    Q.  I'm handing you what's been marked as
10  Exhibit 17.  Have you seen this document or some
11  iteration of this document before?
12    A.  Yes.
13    Q.  And what is this?
14    A.  This is a draft of House Bill 4, introduced
15  during this legislative session, 2023.
16    Q.  Has the Attorney General's Office -- I
17  don't want privileged information here -- but has the
18  Attorney General's Office been involved in drafting
19  this proposed amendment?
20    A.  Not that I'm aware of, no.
21    Q.  Did the Attorney General's Office make any
22  suggestions regarding the proposed amendments to
23  Sections 1-4-5.5 and 1-4-5.6?
24    A.  Not other than our normal process of
25  providing fiscal impact reports through the

46  (Pages 178 to 181)

Page 182

1  legislative session, which we do -- at this count
2  it's about 560 different bills. So this is one of
3  560 that have come into our office in the past 51
4  days.
5      Q.   Does the Attorney General's Office have an
6  understanding of what House Bill 4 proposes to change
7  with regard to -- let's say specifically Sections
8  1-4-5.5 and 5.6?
9      A.   I'm sorry, can you ask that question again?
10     Q.   Sure. Does the Attorney General's Office
11 have an understanding of what this bill proposes with
12 regard to 5.5 and 5.6?
13     A.   So the office, generally -- the volume --
14 and I have to put context into this, because it
15 affects the way I answer and explain -- answer your
16 question and explain bill analyses -- our office --
17 right now, I'm overseeing the bill analysis for our
18 office, which includes requests from the Legislative
19 Finance Committee analysts -- which there is a number
20 of them, and they request fiscal impact reports --
21 which aren't just fiscal impact -- it's also any
22 types of issues. And they ask them often of many
23 agencies for every bill, amendments, and
24 substitutions. Not all, but many. My estimate is
25 that we get about 75 percent of the bills introduced

Page 183

1  with a request for a fiscal impact report to our
2  office.
3      And so, by the time we receive a request,
4  we have 24 hours, generally, to return the fiscal
5  impact. They're assigned to, I think, about 40
6  attorneys throughout the office, based off of some
7  subject matter, experience; sometimes, it's
8  completely random, too. And the attorney then has 18
9  hours to complete the analysis, submit it. And it
10 usually goes through one, sometimes two, reviews
11 before being released back to the Legislative Finance
12 Committee.
13     So our office being aware of a bill, these
14 attorneys and someone who reviews it will generally
15 be aware of it. But the time constraints on our
16 office's ability, you know, to get into the weeds on
17 bills, there aren't many that I can say the office,
18 as an entity, is familiar with. Some attorneys that
19 do the fiscal impact reports are aware of it.
20     But, can I say that the Attorney General,
21 or even the executive team, understands all the
22 details of every single bill? No, they don't. It's
23 not possible, literally possible, for that to happen,
24 given that we receive over 100 of these a week, on
25 top of everyone's normal workload.

Page 184

1  I know that's a long answer. I hope that
2  helps put it in context.
3      Q.   Does the Attorney General's Office support
4  the proposed amendments to 5.5 and 5.6?
5      MS. LECOCQ: If you want to declare -- I
6  don't know if you want me to show him where they are
7  in this bill? Because it's a huge bill.
8      MR. MUELLER: I mean, we're on page 4 and 5
9  of this document.
10     MS. LECOCQ: Okay.
11     Q.   Page 4 starts with 1-4-5.5.
12     A.   Excuse me, what page is it?
13     Q.   Page 4.
14     A.   Page 4. Would you like me to answer the
15 question?
16     Q.   Yes.
17     A.   So I'm not aware of our office taking a
18 formal position publicly in support of this. I can
19 ==say, generally, this helps address the issue, and==
20 ==we'd be supportive of, because it helps clarify --==
21 ==just like dozens of other bills in the session, they==
22 ==help to clarify terms that are not always clear; they==
23 ==might be ambiguous and conflicting.==
24     Q.   Does the Attorney General have any
25 understanding as to whether these proposed amendments

Page 185

1  were motivated, in whole or in part, by VRF's
2  lawsuit?
3      A.   I'm not aware of that. That might be a
4  better question for the Secretary of State, because
5  they're the subject matter expert in these statutes
6  that are being amended.
7      Q.   Okay. If we look at the proposed amendment
8  to 5.5 C -- which is the second to the last paragraph
9  on page 4 -- I'm just going to read through this and
10 annotate as I go. So C says, "Each requester of
11 voter data, mailing labels or special voter lists
12 shall sign an affidavit that the voter data, mailing
13 lists, or special voter lists shall sign an affidavit
14 that the voter data, mailing lists shall be used for
15 governmental or" -- and then this amendment proposes
16 to remove "election and." The original has "election
17 campaign purposes only." This amendment would add,
18 "shall not be transferred, copied, shared or conveyed
19 to any person outside the requesting party's agency
20 or organization, shall not be made accessible by the
21 general public on the internet or through other
22 means." And then the original has "and shall not be
23 made available for use for unlawful purposes."
24     Did I fairly characterize that?
25     A.   Yes.

PohlmanUSA Court Reporting
(877) 421-0099        PohlmanUSA.com

Page 186

1    Q.  If New Mexico law already prohibits posting
2    voter data on the internet, why is this amendment
3    necessary?
4         MS. LECOCQ:  Objection.
5         A.  Yeah, I can't speak to the intent of the
6    sponsors, the legislators.  That would be a question
7    for a member of the legislature.
8         But I will just say -- and I mentioned this
9    before -- that there are many statutes that need
10   housekeeping.  And some of that -- you know, terms
11   that are insistent, terms that are duplicative, terms
12   that aren't defined.  And I see this as addressing an
13   issue that -- you know, obviously we're arguing over
14   these terms, and this would clarify, so help avoid
15   that ambiguity, and better clarify the requirements
16   of the statute.
17        Q.  Okay.  I want to then turn your
18   attention -- if you look at the bottom of page 5, it
19   begins the amendments to Section 1-4-5.6.
20        And in the definition of "Unlawful use of
21   voter data, mailing labels, or special voter lists,
22   consists of -- this is Subsection A -- it says, "the
23   knowing and willful."  The amendment purports to
24   strike the words "use of such information for
25   purposes prohibited by the Voter Records System Act,"

Page 187

1    and to add:  "Selling, loaning, providing access to
2    or otherwise surrendering of voter data, mailing
3    labels or special voter lists by a person for
4    purposes prohibited by the Election Code."
5         Did I fairly characterize that section?
6         A.  Yes.
7         Q.  Does that language that this would add on
8    lines 2 to 4 of page 6 sound familiar to you?
9         MS. LECOCQ:  Objection.
10        A.  I mean, have I read that word for word?  I
11   can't -- I don't know if I have or not.  I mean, some
12   of those points I know we're addressing here.
13        Q.  I think you have a copy of 1-5-22 in front
14   of you, if you need to refresh your recollection on
15   this.  But I'll ask:  Is that the same language
16   that's currently in Section 1-5-22?
17        A.  I'll say yes.
18        Q.  I'm going to move -- sorry, if you want a
19   chance to --
20        A.  No, no, that's fine, go ahead.
21        Q.  I just want to move to line 6 on page 6.
22   There is a (2) in parentheses that says -- this is an
23   addition from the amendment, "causing voter data,
24   mailing labels or special voter lists or any part of
25   the voter data, mailing labels or special lists that

Page 188

1    identifies, or that could be used to identify, a
2    specific voter or the voter's name, mailing or
3    residential address to be made publicly available on
4    the internet or through other means."
5         Did I read that section correctly?
6         A.  Yes.
7         Q.  Does the Attorney General agree that
8    violations of these provisions both, as they are
9    currently written, and as would be amended, are
10   crimes under New Mexico law?
11        MS. LECOCQ:  Objection.
12        A.  I mean, our office hasn't taken a position
13   on these proposed -- that I'm -- the fiscal impact
14   reports they include a note that they're not formal
15   positions of our office.  But, I mean, these are in
16   the same section as, you know, describing the fourth
17   degree felonies.  So I think that can be presumed.
18   But our office hasn't taken any kind of formal
19   position on it.
20        Q.  You'll agree with me that lines 12 through
21   17 do say that the unlawful use of voter data is a
22   fourth degree felony; and upon conviction, the
23   violator shall be fined $100 for each line of the
24   information that was unlawfully used?
25        A.  Yeah, I mean, that's where my conclusion

Page 189

1    comes from.
2         Q.  So there is a criminal penalty there for
3    someone that violates that statute, both as written,
4    as it would be written if this amendment passes?
5         A.  Yes.
6         Q.  I just want to go back to 1-4-5.5 that we
7    just looked at, on page 4.  Is a violation of 1-4-5.5
8    a crime?
9         MS. LECOCQ:  Objection.
10        A.  I know that this is being -- this is part
11   of the issue that's being raised on appeal, and I
12   believe that our office has taken a position that it
13   is or could be.  And I think that can be resolved by
14   the court, if there was a determination by the court.
15        MR. MUELLER:  Okay.  I would like to
16   propose a four-minute break.  I'm going to talk with
17   Jackson real quick, see if we have anything to clean
18   up.  And if not, we'll be done.
19        MS. LECOCQ:  Great.  We'll just step out.
20        (A discussion was held off the record.)
21        MR. MUELLER:  Okay.  We can go back on the
22   record.  And if Erin agrees, I would like to ask a
23   question about the document that you gave me.  And we
24   can do it --
25        MS. LECOCQ:  Under Attorneys' eyes.

48  (Pages 186 to 189)

Page 194

```
1              IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF NEW MEXICO
3    VOTER REFERENCE FOUNDATION, LLC,
4            Plaintiff,
5    vs.        NO:  22-CV-0222 JB/KK
6    RAUL TORREZ, in his official capacity as
     New Mexico Attorney General, et al.,
7
8            Defendants.
9            REPORTER'S CERTIFICATE
10   I, JENNIFER BEAN, New Mexico CCR #94, DO HEREBY
     CERTIFY that on March 13, 2023, the Deposition
11   of JOSEPH DWORAK was taken before me at the
     request of, and sealed original thereof retained
12   by:
13   Attorney for the Plaintiff
14   MR. MATT MUELLER
     GRAVES GARRETT, LLC
15   1100 Main Street, Suite 2700
     Kansas City, MO  64105
16
     I FURTHER CERTIFY that copies of this Certificate
17   have been mailed or delivered to all Counsel,
     and parties to the proceedings not represented
18   by counsel, appearing at the taking of the
     Deposition.
19
     I FURTHER CERTIFY that examination of this transcript
20   and signature of the witness was required by the
     witness and all parties present.  On_____ a
21   letter was mailed or delivered Ms. Erin Lecocq
     regarding obtaining signature of the witness,
22   and corrections, if any, were appended to the
     original and each copy of the Deposition.
23
24
25
```

Page 195

```
1
     I FURTHER CERTIFY that the recoverable cost of the
2    original and one copy of the Deposition,
     including exhibits, to MR. MATT MUELLER is
3    $_____.
4    I FURTHER CERTIFY that I did administer the oath to
     the witness herein prior to the taking of this
5    Deposition; that I did  hereafter report in
     stenographic shorthand the questions and answers
6    set forth herein, and the foregoing is a true
     and correct transcript of the proceeding had
7    upon the taking of this Deposition to the best
     of my ability.
8
     I FURTHER CERTIFY that I am neither employed by nor
9    related to nor contracted with (unless excepted
     by the rules) any of the parties or attorneys in
10   this case, and that I have no interest
     whatsoever in the final disposition of this case
11   in any court.
12
13
     _____
14      Jennifer Bean, FAPR, RMR, RDR, CRR
     BEAN & ASSOCIATES, INC.
15   NM Certified Court Reporter #94
     License Expires: 12/31/23
16
     (8018N) JB
17   Date taken:  March 13, 2023
     Proofread by:  LR
18
19
20
21
22
23
24
25
```

Page 196

```
1    VOTER REFERENCE v. RAUL TORREZ, et al.
2        WITNESS SIGNATURE/CORRECTION PAGE
3    If there are any typographical errors to your
        deposi ion, indicate them below:
4
5    PAGE  LINE
6    _____ Change to _____
7    _____ Change to _____
8    _____ Change to _____
9    _____ Change to _____
10   Any other changes to your deposition are to be listed
        below with a statement as to the reason for such
11   change.
12   PAGE  LINE  CORRECTION        REASON FOR CHANGE
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   I, JOSEPH DWORAK, do hereby certify that I have read
        the foregoing pages of my tes imony as
20   transcribed and  hat the same is a true and
        correct transcript of he testimony given by me
21   in this deposition on March 13, 2023, except for
        the changes made.
22
23        _____
             JOSEPH DWORAK
24   (8018N) JB
```