

# **Pohlman**USA®
## Court Reporting and Litigation Services

---

Mandy Vigil

February 27, 2023

---

Voter Reference Foundation, LLC

vs.

Raul Torrez, et al.

EXHIBIT

P6

exhibitsticker.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


CASE NO. 1:22-cv-00222-JB-KK


| VOTER REFERENCE FOUNDATION, | ) |
| LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| VS. | ) |
| | ) |
| RAUL TORREZ, in his official | ) |
| capacity as New Mexico | ) |
| Attorney General, and | ) |
| MAGGIE TOULOUSE OLIVER, in | ) |
| her official capacity as New | ) |
| Mexico Secretary of State, | ) |
| | ) |
| Defendants. | ) |


The deposition upon oral examination of

MANDY VIGIL, a witness produced and sworn

before me, Valerie Fillenwarth, RPR, a Notary

Public in and for the County of Johnson, State

of Indiana, taken on behalf of the Plaintiff,

via Zoom, on February 27, 2023, commencing at

the hour of 12:00 p.m., EST, pursuant to the

Federal Rules of Civil Procedure.

Page 2

APPEARANCES

FOR THE PLAINTIFF:
Mr. Edward D. Greim
Mr. Jackson Tyler
GRAVES GARRETT, LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
816.256.3181
edgreim@gravesgarrett.com

FOR THE DEFENDANTS:
Ms. Erin Lecocq
Ms. Kelsey Schremmer
Office of the New Mexico Attorney General
408 Galisteo Street
Santa Fe, New Mexico 87501
505.490.4060
elecocq@nmag.gov

---

Page 3

INDEX OF EXAMINATION

Page
DIRECT EXAMINATION................. 5
  Questions by Mr. Greim

INDEX OF EXHIBITS

Page
Deposition Exhibit No.:
1- Amended Notice of Deposition...... 6
2- Response of Defendant Secretary of
   State Maggie Toulouse Oliver, in
   her Official Capacity, to Plaintiff
   Voter Reference Foundation's Third
   Interrogatories and Requests for
   Production........................ 9
3- Morgan Lee article titled
   "New Mexico challenges effort to
   post voter rolls online.".......... 40
4- December 20, 2021 letter to Anne
   Kelly from Sharon Pino with
   attachments....................... 51
5- February 21, 2023 e-mail string... 85
6- Response of Defendant Secretary of
   State Maggie Toulouse Oliver, in
   her Official Capacity, to
   Plaintiff Voter Reference
   Foundation's Second Interrogatories,
   Requests for Production, and
   Requests for Admission........... 125
7- March 11, 2022 e-mail string...... 163
8- May 27, 2022 letter to
   Secretary Toulouse Oliver from
   Edward Greim with attachments..... 168

---

Page 4

(Continued.)

INDEX OF EXHIBITS

Page
Deposition Exhibit No.:
9- November 17, 2022 e-mail string...   180
10- House Bill 4......................   202
11- Agency Bill Analysis, 2022
    Regular Session...................   211

12- January 31, 2023 e-mail string
    with attachment...................   220

---

Page 5

MANDY VIGIL,
having been first duly sworn to tell the truth,
the whole truth, and nothing but the truth,
testified as follows:
DIRECT EXAMINATION,
QUESTIONS BY MR. EDWARD D. GREIM:

Q.   Good morning, Ms. Vigil.  Good to see you
again.  Rather than going through all the
background questions, which we've already done
with you before, I would just ask you, has --
has anything about your background changed
since we last spoke back in the summer of last
year?

A.   No.

Q.   Okay.  You have the same job title?

A.   I do.

Q.   You have the same duties?

A.   I do.

Q.   No additional classes or expertise since that
time?

A.   No.

Q.   Okay.  Now, I understand that, unlike your
prior testimony, you're here today to answer
questions on behalf of the secretary of state's
office, do you understand that?

2  (Pages 2 to 5)

## Page 10

1    record just real fast?
2        MR. GREIM: Okay. Sure.
3        (WHEREUPON, at this time a discussion was
4    held off the record.)
5    BY MR. GREIM:
6    Q.  So let me ask you, Ms. Vigil, have you studied
7    yet the responses to Interrogatories 10
8    through 17?  Have you seen these responses
9    before?
10   A.  No.
11   Q.  Okay.  So have you -- have you verified their
12   accuracy?
13   A.  No, I haven't.
14   Q.  Well, then, I think we're going to have to
15   wait.  You're going to need to read these and
16   see if you agree with them.  And if you do,
17   then, you know, we'll need a sworn response.
18   If you don't agree with them, I guess we'll
19   need revisions to whatever you want to change.
20   A.  Okay.
21   Q.  So you -- you can't tell us that these are
22   really the responses of your office, is that
23   correct?
24   A.  Not without reading them.
25   Q.  Okay.  I'm going to direct you to certain

## Page 11

1    statements in here as we go and I'm going to
2    ask for your position on these.  Let me ask
3    you, during your prep for today, you did not
4    review these responses?
5    A.  I have not reviewed these yet, no.
6        MR. GREIM:  Okay.  We're back on record,
7    correct?
8        THE COURT REPORTER:  Yeah.
9    BY MR. GREIM:
10   Q.  Okay.  Well, I'll just ask you about certain
11   things in here and we'll see if you agree, and
12   if you don't, we'll just -- we'll just revisit
13   it.  But this will be the fastest way, I think,
14   to handle this.  And I know they look like
15   they're long, but most of these start with an
16   objection and then the answer starts lower
17   down.
18        And so I'm not going to take you through
19   the objection.  I'm going to focus on the
20   provision of actual information here.  But I'm
21   glad we did that here at the outset.  Let's put
22   these aside.  We'll come back to them in a
23   little bit when we get into specific topics.
24        Let me just ask you, what's the secretary
25   of state's role in collecting voter data?

## Page 12

1    A.  So the secretary of state's office is
2    responsible for maintaining a statewide voter
3    registration database, and that includes all of
4    the voter data.
5    Q.  Where does the voter data come from?
6    A.  Comes from voter registration applications that
7    are submitted by an individual and processed by
8    a county clerk.
9    Q.  Okay.  Who has access to that database?
10   A.  All election administrators within the state of
11   New Mexico have access, so secretary of state's
12   office, there are certain individuals, and
13   county clerk offices.
14   Q.  Does anyone else have access to the database,
15   like a code to get in and view information or
16   alter data?
17   A.  No.
18   Q.  But I ask you that, it may seem like an odd
19   question, but in some states they give out
20   something that they call key codes or things
21   like that, they give out a certain number of
22   those.  And that's within the discretion of the
23   county clerk to then distribute those.  So
24   not -- not everybody who gets them is actually
25   a government official.  So my question is, do

## Page 13

1    you know if that happens in New Mexico?
2    A.  No.
3    Q.  Did you --
4    A.  It does not happen in New Mexico.
5    Q.  It does not happen.  Okay.  Now, what about --
6    how does voting information get into the
7    database?  By that I mean whether someone casts
8    a vote in an election.
9    A.  So you're asking, to be clear, on kind of voter
10   credit, is that the question?
11   Q.  It may be.  Is a voter credit a record that
12   someone voted in a particular election?
13   A.  Yes.  So if a voter participates in an
14   election, we assign what's called voter credit
15   in New Mexico.  And that assignment is
16   completed by a county clerk's office.  And
17   there are system functions that support that.
18   Q.  What do you mean that there are system
19   functions that support that?
20   A.  So there's data that's exchanged between our
21   databases.  It's not always a manual process of
22   a human making that entry.
23   Q.  I see.  So let's just -- I don't want to go too
24   much further, but I just want to understand the
25   database.  So do you mean that, for example,

Page 18

1    A.  Certainly.
2    Q.  And that includes -- among all the other things
3        you just mentioned, it includes some voter data
4        from other states?
5    A.  Yes.
6    Q.  And New Mexico also shares its own data with
7        ERIC also, right?
8    A.  We do.
9    Q.  And that includes data that's in the database
10       that we've just been talking about, right?
11   A.  It does.
12   Q.  And I'm going to assume that ERIC does not fill
13       out an affidavit under the statutory process
14       that we're going to get to here in a minute, do
15       they?
16   A.  We have a membership agreement that we did
17       enter into with ERIC.
18   Q.  And there's a statute that actually allows for
19       that, right?
20   A.  Correct.
21   Q.  Okay.  When you receive these list maintenance
22       reports from ERIC, do you retain them?
23   A.  That -- that's actually a function of our IT
24       department, so -- I know we don't maintain them
25       long-term.

Page 19

1    Q.  Can the public request the list maintenance
2        reports?
3    A.  No.
4    Q.  They're closed records under New Mexico law?
5    A.  That is a good question.  I would have to
6        double check the exact language of the law.
7        But it's certainly a requirement of our
8        membership agreement.
9    Q.  Okay.
10   A.  There's MVD data that's included, and that is
11       protected under federal law as well as SSD --
12       security --
13   Q.  What is --
14   A.  We have MVD data and social security
15       information, so there are separate laws that
16       protect that data.
17   Q.  What's MVD data?
18   A.  Sorry, motor vehicle division.
19   Q.  From other states, right?
20   A.  Yes.
21   Q.  And yours, okay.
22       By the way, this is probably a
23       fundamental question, but we should just do it
24       now.  Tell us, your answers to questions here
25       suggest there's really just one database that

Page 20

1        has -- that all of this information feeds into,
2        is that correct?
3    A.  There is one statewide voter registration
4        database.
5    Q.  Okay.  And for any given voter, what does
6        the -- what fields does the database contain?
7    A.  There are many fields for a voter.  Certainly
8        demographic information, so name, date of
9        birth, social security number, in some cases
10       driver's license.  We also maintain information
11       such as a party affiliation and any activity on
12       their voter registration record.
13   Q.  Those would be voter credits?
14   A.  In part, but also any updates to the
15       information.
16   Q.  What do you mean updates?
17   A.  If somebody was married and updated their name,
18       potentially, so we did a registration update.
19   Q.  I see.  So the very fact that there was an
20       update is also tracked within the database?
21   A.  Correct.
22   Q.  That's viewed as activity?
23   A.  Correct.
24   Q.  And what if they move, is that also kept as
25       activity?

Page 21

1    A.  Updates to their record are logged.
2    Q.  Now, let me ask you, when someone makes a
3        request for the database, which elements of
4        that data is released -- are released?  So
5        we've talked about name, date of birth.  Tell
6        me what is released when someone requests a
7        voter file.
8    A.  So if a person goes through the appropriate
9        process to request a voter file --
10   Q.  Uh-huh.
11   A.  -- and we determine that it's for an
12       appropriate use, then voter data that's
13       provided would have requested information as
14       long as it wasn't protected.  So the requester
15       has an option to request history, voter
16       history, or not.  And they have choices in what
17       data they'd like to obtain.  So it is dependent
18       on the request.
19   Q.  Okay.  And -- but what they can never receive
20       is the full date of birth, correct?
21   A.  Anything that is protected, that's correct.
22   Q.  They can receive a year of birth?
23   A.  Yes.
24   Q.  They can't receive the full social security?
25   A.  No portion of the social security number.

6 (Pages 18 to 21)

Page 22

1  Q.  No portion.  They can receive the party
2     affiliation?
3  A.  Yes.
4  Q.  They can receive the credit information?
5  A.  They can.
6  Q.  And they can receive the history of updates,
7     correct or no?
8  A.  No.  That's just not included in a routine data
9     request.
10 Q.  Okay.  Well, are those closed to the public?
11 A.  I would actually -- I don't know that we've
12    ever received an exact request.  So that is
13    something that we'd have to take a look at.
14 Q.  Okay.  We don't need to probe much deeper.
15 A.  Yeah.
16 Q.  But I do want to put a bookmark on this in case
17    it becomes relevant later.  Nobody has -- no
18    one has ever come to you and said, "I would
19    like to just see the updates that you've made
20    to the records over the last two months"?
21    That's never come in?
22 A.  If you're asking me in particular about list
23    maintenance.
24 Q.  Uh-huh.
25 A.  Is that the question?

Page 23

1  Q.  No, I -- let's just stick with my question.
2     I'm not -- maybe we can come back to list
3     maintenance, let's just stick with my question.
4     Is it clear enough or is there something vague
5     about it?
6  A.  There's something vague about it, I'm sorry.
7  Q.  Okay.  What do I need to specify to help you
8     get --
9  A.  If you can repeat the question --
10 Q.  Okay.
11 A.  -- that will be helpful.
12 Q.  So let me just ask you:  Has anyone ever come
13    to the secretary of state's office, it's just
14    say in the last two years, and said, "I would
15    simply like to see the activity reports" --
16    MR. GREIM:  I'm sorry, are you able to
17    hear us okay?
18    THE COURT REPORTER:  Did you say activity
19    reports?
20    MR. GREIM:  Yes.
21    THE COURT REPORTER:  Okay.  We're good.
22    BY MR. GREIM:
23 Q.  Okay.  So has somebody come to you and said, "I
24    would like to see the activity reports for the
25    last three months for, you know, your entire

Page 24

1     database," has someone made that request of
2     you?
3  A.  That's something I'd certainly have to confirm.
4     As I mentioned earlier, it's not an option for
5     a voter data request.
6  Q.  Okay.
7  A.  It would not have come through as a data
8     request.
9  Q.  Okay.  At the very least, this is not ringing a
10    bell that this has happened any time recently,
11    correct?
12 A.  Not to my knowledge.
13 Q.  And then who is in charge of the system, of
14    maintaining the database and then responding to
15    requests?
16 A.  As far as a voter data request, you know, I'm
17    happy to repeat the process, but I think we've
18    discussed that an affidavit would have to come
19    in.
20 Q.  Oh, let me stop you.  I'm just asking who is in
21    charge.  What employee is responsible within
22    the secretary of state's office for list
23    maintenance and fulfilling requests?
24 A.  So number one, the secretary of state's office
25    does not have the authority to update voter

Page 25

1     registration records.  So, though, we support
2     the function of list maintenance, we do not
3     update voter records directly in our office, by
4     law.
5  Q.  Okay.  Well, let me ask you this:  For the
6     functions that the secretary of state's office
7     does control, is there a particular employee
8     who is in charge of that section of the
9     secretary of state's activity?
10 A.  As far as responding to a request, a general
11    request, you know, we have a team, the Bureau
12    of Elections, who is responsible for responding
13    to constituent inquiries or requests.
14 Q.  And you're the director of the Bureau of
15    Elections?
16 A.  Yes.
17 Q.  Is it fair to say you're the -- you're the
18    person responsible for the process for
19    fulfilling requests?
20 A.  For the process, yes.
21 Q.  And to the extent that you have a supporting
22    role regarding list maintenance, that also
23    falls under the Bureau of Elections and falls
24    under you, correct?
25 A.  It does.

7 (Pages 22 to 25)

Page 26

1    Q.  Now, let me go back to a few questions ago
2       before we -- we're going to move on in just a
3       second here.
4          I asked you about people requesting
5       updates and then you asked me about list
6       maintenance.  So I'm going to ask you:  Is it
7       possible to receive, from the secretary of
8       state, list maintenance reports?  Is it
9       poss- -- let me rephrase that question.
10         Is it possible for a member of the public
11      to request, from the secretary of state's
12      office, list maintenance reports?
13   A.  We certainly have information in our database,
14      but as I mentioned, at first like the
15      NVRA processing, list maintenance completed by
16      ERIC, those are county clerk functions.
17   Q.  So the secretary of state doesn't have the
18      data, you have to go to the country clerk to
19      get it?
20   A.  I guess it depends on exactly what data you're
21      asking me about.  So that would be helpful to
22      get some clarity.
23   Q.  Okay.  Well, what are examples of data where
24      you would be able to provide the answer to a
25      request for a list maintenance report?

Page 27

1    A.  I think we certainly have access to voter data,
2       as you are clear on.  And as far as, you know,
3       efforts completed at the county, we don't have
4       a report that I could just pull.  It's data
5       that we have access to but, again, it's not
6       public facing report.
7    Q.  So the actual changes to the database in
8       response to an ERIC report happen at the county
9       level?
10   A.  Yes.
11   Q.  And are members of the public able to ask
12      county officials for records of the list
13      maintenance that they undertake based on ERIC
14      reports?
15   A.  ERIC data is protected, whether it's asked for
16      at the secretary of state's office or at the
17      county level.
18   Q.  And I'm not -- let's see if we can
19      differentiate between the actual ERIC data and
20      the record that a change was made based on ERIC
21      data.  Do you understand the difference?
22   A.  Yes.
23   Q.  Okay.  So can a member of the public ask a
24      county official for a record of changes that
25      were made due to receiving ERIC data?

Page 28

1    A.  Let me think.  There is opportunities within
2       the statute to request list maintenance data.
3    Q.  Now, does -- if someone cites the statute and
4       says, "I want this maintenance data," and they
5       ask the secretary of state for it, does the
6       secretary of state have list maintenance data?
7    A.  What I can speak to -- you know, not this kind
8       of hypothetical that you're presenting to me,
9       but what I can certainly speak to is that our
10      office would receive any request; we would
11      review the statute; and we would make an
12      analysis on what data was public and provide
13      any data that was public.
14   Q.  Okay.  I understand that you -- you would
15      always do that.  But my question is very
16      specific.  So there is a statute that says that
17      list maintenance data can be requested, and the
18      NVRA covers this as well.  So my question is if
19      somebody comes to the secretary of state, makes
20      a proper request, there's an affidavit, they do
21      everything they're supposed to do, does the
22      secretary of state have list maintenance data
23      that it can produce in response to requests?
24   A.  Our office does have list maintenance data that
25      we would be able to produce if we received a

Page 29

1       legal request, an appropriate legal request.
2    Q.  Okay.  And the other facts you would need to
3       know on a given request is whether the things
4       that make it a legal request.  We'd have to --
5       we'd have to give you all those facts, about
6       who was requesting and what purpose they were
7       requesting it for and all those things, right?
8    A.  I think we're speaking again -- just for
9       clarity, are we speaking about a voter data
10      request submitted or a separate request under
11      NVRA or IPRA?
12   Q.  Well, I guess I would say this:  What if the
13      requester doesn't know whether it's an NVRA
14      request or it's -- it's under your voter data
15      request process and just says, "I would like a
16      voter, you know -- I would like voter list
17      maintenance data."  I mean, there's no magic
18      words required to cite the statute.  I mean,
19      they're citing the same.  And so, I mean, I
20      guess my question back to you is does it matter
21      whether they cite the NVRA or whether they cite
22      your state statute?
23   A.  I think that we would have to take any request,
24      review the content, review, you know, the
25      legal -- any statute that applies before we

8 (Pages 26 to 29)

Page 30

1  could appropriately respond.  That -- that
2  would be our process.
3  Q.  Okay.  We're going to spend a little more time
4  here before we move on.  I want to understand
5  this.  It sounds to me like in your penultimate
6  answer, you said, well, there are some requests
7  that come in for voter data under our state
8  law.  Then there are other requests that come
9  in under NVRA; you're viewing those as two
10  separate groups.  Do I understand you
11  correctly?
12 A.  I don't think they're always two separate
13  groups, but we do receive separate requests,
14  yes.
15 Q.  Okay.  Okay.  And you would agree that under
16  the NVRA, I mean, you have to provide voter
17  list maintenance data when someone makes a
18  request under the NVRA, correct?
19 A.  I agree.
20 Q.  And does someone making that request have to
21  follow the voter data request statutes under
22  New Mexico law and use the required affidavit
23  of the secretary of state's office?
24 A.  Yes.  Anytime a requester is asking us to
25  receive voter data, state law requires that

Page 31

1  they complete the affidavit.
2  Q.  And voter list maintenance data is voter data,
3  correct?
4  A.  Voter list maintenance is voter data, yes.
5  Q.  Okay.  Okay.  Would you agree with me that
6  personal voter data are things like name of the
7  voter or the birth year for the voter, data
8  that specifically ties to an individual voter,
9  if I use the term personal voter data?
10 A.  That term is not defined, to my knowledge.
11 Q.  Okay.
12     MS. SCHREMMER:  Are you asking her to
13  define a term for you, or are you telling her
14  the term you're about to use in your
15  questioning?
16     MR. GREIM:  No, I was asking her.
17 BY MR. GREIM:
18 Q.  So if I just said personal voter data, that
19  means nothing to you whatsoever?  It's
20  completely useless as a descriptor of types of
21  data in the voter database?
22 A.  Yeah.
23 Q.  Okay.  Okay.  I'm going to shift gears here for
24  a second.  One of our topics for today is just
25  the secretary's public statements about -- I

Page 32

1  think it -- let me just make sure I'm right
2  about this.  Yeah.  Statements that are made
3  either by the secretary or her agents regarding
4  VRF, request for or uses of voter data, or this
5  lawsuit.
6     And so let me ask you before we turn in
7  to this topic, what did you do to prepare for
8  yourself for that today?
9  A.  I did not do anything in particular to prepare
10  for the item.
11 Q.  Okay.  Well, let's just charge into it.  Would
12  you agree that any statement that gets issued
13  by the office is made with the approval of the
14  secretary of state?
15 A.  What I can speak to is that process within the
16  secretary of state's office is that we
17  certainly -- you know, as a leadership team we
18  meet, we speak about current events within the
19  office.  And we speak to any sort of messaging
20  that's appropriate for what's currently going
21  on.  So certainly there's an understanding of
22  the correct and appropriate message, but there
23  is not a particular approval of each statement
24  made.
25 Q.  Who's in this leadership team that meets to

Page 33

1  talk about statements?
2  A.  I mean, it's any director within the office of
3  the secretary of state's office.
4  Q.  So that's you?
5  A.  Me.
6  Q.  Alex Curtas?
7  A.  Alex is our communications director.
8  Q.  He would always be in those discussions,
9  correct?
10 A.  Any time there's messaging, Alex is
11  participating, yes.
12 Q.  Okay.  The secretary?
13 A.  Yes, as far as that group.
14 Q.  Sharon Pino?
15 A.  Yes.  Dylan Lange.
16 Q.  Who else?
17 A.  I don't know that anyone else is relevant to
18  this topic, but we also have our director of
19  our business services, and our deputy directors
20  participate in those weekly leadership calls.
21 Q.  Oh, I see.  Those are phone calls?
22 A.  Or meetings.
23 Q.  Let me ask you:  Who -- I assume that before a
24  statement goes out, there's a draft prepared
25  and people have a chance to look at it?

9 (Pages 30 to 33)

Page 34

1  A.  That is true in some instances but not always.
2  Q.  Okay.  Who usually prepares the draft of the
3      statement?
4  A.  Alex.
5  Q.  And then it gets -- do you communicate by
6      e-mail, or does he prepare a memo that gets
7      given around the office, you know, physically?
8      How does he communicate that to the team?
9  A.  Yeah, it depends.  So it depends on what -- you
10     know, the timeline of what needs to get
11     accomplished.  It depends on availability.  So
12     it -- I'm happy to speak to a certain instance.
13     But generally Alex is the primary source for
14     any communication from our office.  There is a
15     team that participates in kind of ensuring that
16     our messaging is correct.  But Alex, at the end
17     of the day, executes those messages.
18  Q.  Let's go back to the Exhibit 2, because we
19      tried to get the answer to this question by
20      interrogatory.  If you could go to page 10,
21      it's Interrogatory Number 16.  I sure wish she
22      would have stapled these.  I know, this was my
23      fault, I meant to say clip and then staple the
24      individual.  Okay.  So Number 16 says,
25      "Identify each person involved in drafting,

Page 35

1      revising, approving, and sending each public
2      statement or statement to a member of the media
3      relating to VRF or relating to the lawsuit that
4      was made by (i) the secretary, and (ii) Alex
5      Curtas."  That's the request.
6          Then the response, "Subject to and,
7      without waiving objections, the secretary
8      states Alex Curtas, the communications
9      director, drafted public statements or
10     statements to a member of the media relating to
11     VRF or this lawsuit, which would have been
12     approved by Sharon Pino or the secretary.
13     Ultimately, the secretary makes the final
14     decision with respect to what information is
15     provided in a public statement."
16         Did I read that correctly?
17  A.  Let me just read it again.
18  Q.  Sure.  My question is going to be whether you
19      agree with that response.
20  A.  To be clear, my answer to your question is that
21      we do have a process and we do participate as a
22      leadership team.  And I agree that the
23      secretary or the deputy secretary of state will
24      always be involved in messaging; meaning that
25      we are providing the appropriate public message

Page 36

1      and that we are all clear and on the same page
2      as to what that message is.  And so I agree
3      that they would have knowledge of, generally,
4      our message to the public.
5  Q.  Okay.  Now, of course, this is a really
6      specific interrogatory.  I'm not just asking
7      about your process always.  We were trying to
8      find out about statements to the media relating
9      to VRF or the lawsuit that were made by the
10     secretary or by Alex Curtas.  We've got those,
11     okay.  So I want you to limit it to that.  All
12     right.
13         And so here is my question:  I mean, do
14     you agree with the statement that's typed up as
15     the response here, or would you change it?
16  A.  I think it would be helpful is to understand,
17     you know, the exact message that we're speaking
18     about.  I agree that Alex would have drafted.
19     I agree that there would have been
20     conversations supporting the message and
21     clarity as to our position on this lawsuit and
22     our public messaging.  As far as each
23     individual, you know, statement, it would be
24     important to understand what statement I'm
25     answering to.

Page 37

1  Q.  I see.  So you -- so the very last sentence is
2      the one that's most important to me and that
3      could save us some time if it were true.  It
4      says, "Ultimately, the secretary makes the
5      final decision with respect to what information
6      is provided in a public statement."  Is that
7      true?
8  A.  And I think it's, to be clear, as far as the
9      statement, the message, the response, that is
10     true.  As far as the exact words in a media
11     release, it would be something that we'd have
12     to look at each individual request.  I agree
13     that she would certainly participate in the
14     decision about the public message and that Alex
15     would have drafted it.  Ultimately, yes, she
16     has an understanding and would approve our
17     public message.  I am not speaking to each
18     individual statement and each word in that
19     statement.
20  Q.  Okay.  Well, what about with respect to what
21     information is provided in a public statement,
22     do you agree that the secretary makes the final
23     decision on what information is provided in a
24     public statement?
25  A.  And when you say "information," can you

10  (Pages 34 to 37)

Page 50

1   on. I didn't hear, I missed a part of it. And
2   the fact that voters would be intimidated and
3   cause them to what? To want to --
4        THE WITNESS: To de-register and not
5   participate in our process. That is a fact
6   that our office was contacted by voters with
7   those exact concerns and requests.
8        MR. GREIM: I move to strike that answer
9   as non-responsive.
10  BY MR. GREIM:
11  Q. Okay. Let's just move on to some other topics
12  here. Well, let me ask you this: I may --
13  A. May I ask for a restroom break?
14       MR. GREIM: Yeah, why don't we. We've
15  been going for a little while.
16       Okay. We're going to go off the record
17  for five to ten minutes and come back and keep
18  charging ahead.
19       (WHEREUPON, at this time a brief recess
20  was taken.)
21       MR. GREIM: Before we begin -- resume
22  questioning of the witness, we just have a
23  stipulation to enter onto the record. And why
24  don't you -- since you're the stipulator, why
25  don't you say it.

Page 51

1        MS. LECOCQ: Sure. The State is
2   stipulating -- well, I'll just let you do it.
3        MS. SCHREMMER: In Exhibit 3, and it's
4   physical page 4, there is a quote attributed to
5   Toulouse Oliver that begins, "This is an
6   overtly political purpose." And we're
7   stipulating that we do not have any reason to
8   believe this is a misquote.
9        MR. GREIM: Okay. Thank you very much.
10  BY MR. GREIM:
11  Q. Okay. We're going to shift gears now and we're
12  going to talk a little bit about the criminal
13  referral. So what are we on now, 4?
14  A. Yes.
15       (WHEREUPON, Deposition Exhibit 4 was
16  marked for identification.)
17  BY MR. GREIM:
18  Q. I'm going to hand you what we're marking as
19  Exhibit 4. And I'm going to ask you if you
20  recognize this document.
21  A. I do.
22  Q. What is it?
23  A. This is the referral that our office made to
24  the attorney general's office related to Voter
25  Reference Foundation's posting of the data.

Page 52

1        THE COURT REPORTER: Posting of what?
2   Q. Okay. And who --
3        THE WITNESS: I'm sorry, posting online.
4   BY MR. GREIM:
5   Q. Okay. And this was signed by Sharon Pino,
6   correct?
7   A. It is.
8   Q. And you were present when I questioned Ms. Pino
9   some months ago about this referral, do you
10  recall that?
11  A. I was present?
12  Q. Well, actually, maybe you weren't, because it
13  was on my -- you may not have been around for
14  that. Okay, we'll strike that.
15       Now, we have asked the secretary of state
16  who participated in the decision to make this
17  referral. Okay, so keep your finger on
18  Exhibit 4, but go back please to Exhibit 2, the
19  interrogatory responses. And turn to page 8,
20  please. We're going to go between pages 8 and
21  9.
22  A. Okay.
23  Q. And we asked the secretary to identify each
24  person who participated in the decision to make
25  a criminal referral of VRF, and the person, if

Page 53

1   any, who made the final decision. And then we
2   asked certain things about each one of those.
3   So that's the question. And then if you turn
4   to page 9, you'll see there's an objection that
5   it's privilege, and then there's a little
6   paragraph at the end that says "Without
7   waiving, and subject to those objections, the
8   secretary states that Sharon Pino, deputy
9   secretary of state, made the decision to make
10  the criminal referral, which was reviewed and
11  approved by the secretary."
12       Now, is that a true statement?
13  A. Yes.
14  Q. Okay. My question is: Who else was involved
15  in the decision?
16       MS. LECOCQ: Objection to the extent that
17  any of this involved discussion with counsel,
18  with Mr. Lange.
19  BY MR. GREIM:
20  Q. Well, my -- okay, left's start with Mr. Lange.
21  Let's get this out of the way. Was Mr. Lange
22  involved in the decision?
23       MS. LECOCQ: Objection. You can go ahead
24  and answer.
25  A. Okay. Yes.

14 (Pages 50 to 53)

Page 54

```
 1    BY MR. GREIM:
 2    Q.  Okay.  Let's put him to one side.  Who else was
 3         involved in the decision?
 4    A.  Myself.
 5    Q.  Okay.  Who else?
 6    A.  And the Deputy Secretary of State Sharon Pino.
 7    Q.  Okay.  And who else?
 8    A.  And the secretary certainly had received a
 9         recommendation and did approve.
10    Q.  Okay.  Who else?  Alex Curtas?
11    A.  Not in the decision, no.
12    Q.  Okay.  So how was the decision made?  I'm not
13         going to ask you for substance.  I just want to
14         know was there an e-mail exchange or one or
15         more e-mail exchanges or text exchanges, or did
16         it happen in a meeting?
17    A.  It happened in a meeting.
18    Q.  Okay.  And when was that meeting?
19    A.  I don't have the exact date.  It was certainly
20         prior to December 20th of 2021.  And it was
21         upon us being made aware that this data, that's
22         when we initiated conversation, once we were
23         aware.
24    Q.  Okay.  Did you receive a complaint?
25    A.  We did not receive a formal complaint.  We did
```

Page 55

```
 1         receive an inquiry from the media.
 2    Q.  From ProPublica, correct?
 3    A.  From ProPublica.
 4    Q.  ProPublica did not make a complaint against
 5         VRF, did it?
 6    A.  No.
 7    Q.  Okay.  Let's turn to Exhibit 4.  I just want to
 8         ask very generally here -- let's go to the
 9         conclusion.  By the way, I assume you reviewed
10         this document in preparation for your testimony
11         today?
12    A.  I have not recently reviewed this document.
13    Q.  Okay.  And it sounds like you did not speak
14         with Ms. Pino in preparation for your testimony
15         today?
16    A.  I did not.
17    Q.  Well, let's look at the very first line of the
18         conclusion.  "Our office believes the transfer
19         and publication of this voter data is in direct
20         violation of the Election Code."
21              Did I read that correctly?
22    A.  You did.
23    Q.  Is that a true statement?
24    A.  Yes.
25    Q.  And then the next sentence, "We believe that
```

Page 56

```
 1         both VoteRef.com and Local Labs have violated
 2         the prohibition against 'providing' voter data
 3         by posting New Mexican's private voting
 4         information online, or in Local Labs' case,
 5         providing the voter data to VoteRef.com."
 6              Is that a true statement?
 7    A.  Yes.
 8    Q.  And then it says, "We also believe that
 9         VoteRef.com and Local Labs have 'illegally'
10         used this voter data by publishing it on
11         VoteRef.com."
12              Is that a true statement?
13    A.  Yes.
14    Q.  All right.  Did you recall there being any
15         false statement in Ms. Pino's referral to the
16         secret- -- to the attorney general?
17    A.  No.
18    Q.  Before the referral occurred, and set aside
19         Mr. Lange, were there any dissenting voices
20         between Ms. Pino, yourself, and the secretary
21         of state on whether this referral should be
22         sent out?
23    A.  No.
24    Q.  Were there any drafts prepared of this
25         referral?
```

Page 57

```
 1    A.  Yes.
 2    Q.  Okay.  Who prepared the drafts?
 3    A.  I believe our general counsel did.
 4    Q.  Okay.  And is he the one who actually drafted
 5         this letter and Ms. Pino signed it?
 6         MS. LECOCQ:  Objection.
 7    A.  I believe our general counsel prepared this and
 8         it was reviewed and the final version was
 9         signed by Ms. Pino.
10    BY MR. GREIM:
11    Q.  Okay.  Who -- did certain people suggest edits
12         to this?
13    A.  Anyone that was part of the decision making, so
14         myself, Ms. Pino, general counsel, would have
15         reviewed and suggested any edits.
16    Q.  What edits, if any, did you suggest?
17    A.  I don't recall suggesting any edits.
18    Q.  What edits did Ms. Pino suggest?
19    A.  I don't recall if there were any specific
20         edits --
21    Q.  And what -- okay.
22    A.  -- throughout the process.
23    Q.  Okay.  Well, it went through several drafts,
24         correct?
25    A.  I don't know if there were several drafts.  I
```

Page 62

1  receipt.
2  Q.  Okay.  So did the attorney general ever provide
3  any updates on, you know, what he was or wasn't
4  doing with the referral?
5      MS. LECOCQ:  Objection.
6  **A.  No, I do not have any status update on any sort**
7  **of action taken on the criminal referral.**
8  BY MR. GREIM:
9  Q.  Okay.  Now, I'm not just asking about you; I'm
10  asking about the office.  Did the attorney
11  general give any status reports to Ms. Pino or
12  to the secretary or even Mr. Lange about what
13  was going on with the investigation?
14      MS. LECOCQ:  Objection, and especially
15  with respect to Mr. Lange.
16  **A.  So I am not aware that the office has**
17  **received -- there is no status updates from the**
18  **attorney general's office on this criminal**
19  **matter at this time.**
20  BY MR. GREIM:
21  Q.  Okay.  At this time, my question is whether
22  there has ever been written or oral updates
23  provided by the AG's office to the secretary of
24  state's office regarding this referral?
25      MS. LECOCQ:  Objection.

Page 63

1  **A.  At this point in time, the office is not aware**
2  **of any action taken by the AG's office on this**
3  **matter and no status updates received on this**
4  **criminal matter at this time.**
5  BY MR. GREIM:
6  Q.  Okay.  I'm not going to ask you any more about
7  it at this time.  My question is now, at any
8  time, this referral was made in December of
9  2021, right, so about 14 months ago.
10  **A.  Okay.**
11  Q.  So your testimony is that the attorney general
12  never orally or in writing ever communicated
13  again with the secretary of state about this
14  referral?
15  **A.  No.**
16  Q.  And did you -- did you do any investigation to
17  see whether that was true before today?
18  **A.  Whether what was true?**
19  Q.  Whether it's true that the attorney general has
20  never mentioned this investigation again to the
21  secretary of state's office after this
22  December 20th referral?
23      MS. LECOCQ:  Objection.
24  **A.  What I can speak to is that there has been no**
25  **status updates provided to the secretary of**

Page 64

1  **state's office on any action being taken on**
2  **this criminal referral by the attorney**
3  **general's office.**
4  BY MR. GREIM:
5  Q.  Okay.  And how do you know that to be true?
6  **A.  Because I would have been made aware.**
7  Q.  Did you ask Ms. Pino before today whether she
8  had received any -- any commun-- let's just
9  aside the term status update for second.  Okay.
10  Let's just say any communication at all from
11  the attorney general's office.  Let me rephrase
12  this to make it clear for the record.
13      Has there been any communication at all
14  from the attorney general's office to the
15  secretary of state's office about this
16  investigation since December 20, 2021?
17      MS. LECOCQ:  Objection.
18  **A.  So the only thing that I can speak to is that I**
19  **have asked Ms. Pino and Dylan Lange if the**
20  **attorney general's office has taken any action**
21  **on this matter and the response has been no.**
22  BY MR. GREIM:
23  Q.  Okay.  And when did you last ask Ms. Pino that
24  question?
25  **A.  It's been several months.**

Page 65

1  Q.  When did you last ask Mr. Lange that question?
2      MS. LECOCQ:  Objection.  Actually don't
3  answer that.
4      MR. GREIM:  Well, it's not a request for
5  legal advice.  It's just a request about
6  whether there has been communication or not.
7      MS. LECOCQ:  Okay.
8  **A.  Yes.  More recently, I would say probably**
9  **within the last month.**
10  BY MR. GREIM:
11  Q.  But since the new year?
12  **A.  Yes.**
13  Q.  And I don't want you to give me any legal
14  advice that Mr. Lange told you, but I need to
15  know, did Mr. Lange tell you whether he had
16  heard anything from the attorney general about
17  the investigation?
18      MS. LECOCQ:  Go ahead.
19  **A.  Mr. Lange has -- to my knowledge, has not heard**
20  **anything from the attorney general's office**
21  **about this investigation.**
22  BY MR. GREIM:
23  Q.  Okay.  Does the secretary of state's office
24  know if the investigation is continuing?
25  **A.  Our understanding is that it's still pending.**

17 (Pages 62 to 65)

Page 70

1    BY MR. GREIM:
2    Q.   But you didn't ask him whether he was providing
3         any other information to the AG's office?
4    A.   I didn't.
5    Q.   Before we move along, you said in the past
6         month.  Maybe we can drill down a little bit
7         more.  Was it in the month of February?
8    A.   Do you have a calendar?  I think it was
9         certainly in the month of January or February.
10   Q.   Was it in the last two weeks?
11   A.   No.
12   Q.   It could have been in early February, but it
13        also may have been in January?
14   A.   I'm just trying to remember an exact date.  I
15        feel confident in saying that it was the past
16        three weeks.
17   Q.   Okay.  So let me ask you this:  What
18        information has the secretary of state
19        gathered -- and I guess we can't know whether
20        it's been passed on to the attorney general or
21        not.  That would be information Mr. Lange has.
22        So I understand that.  But what information has
23        the office gathered it has at least considered
24        passing on to the attorney general's office?
25   A.   Our office has not gathered anything specific

Page 71

1         to a criminal investigation.  Anything that we
2         have -- you know, our concern was data posted
3         on the website, that was the focus.  And so
4         there would only be updates provided to our
5         attorneys on this case related to the status of
6         that data.
7    Q.   Okay.  Whether it was up or down?
8    A.   Correct.
9    Q.   And separately, I'm going to draw the line so
10        that we don't invade privilege here, at least
11        until I think about this some more, it sounds
12        like there was some other information of some
13        type given to Mr. Lange for him to decide
14        whether he wanted to give it out to the AG's
15        office?
16        MS. LECOCQ:  Objection.
17   A.   No, I never said that.
18        BY MR. GREIM:
19   Q.   No?  Okay.  Then I misunderstood.  I understood
20        that Mr. Lange would have been the person to
21        give it on if there were something to give on?
22   A.   Sure.
23   Q.   Right?  We don't know whether he has done so or
24        not, correct?
25   A.   Correct.

Page 72

1    Q.   And so I guess my question is:  Was there any
2         information that you -- that the office has
3         given to Mr. Lange so that he can make the
4         decision about whether to pass it on or not?
5    A.   The only thing that I am responding to is the
6         fact that our concern was about the data being
7         posted or taken down from the Internet.  And so
8         that would be the only update that would have
9         been provided to our attorneys in this case.
10   Q.   Okay.
11   A.   And if Dylan so chose, that he felt like that
12        was relevant to the criminal referral, he may
13        have provided an update.  There is no
14        additional investigation that our office is
15        undergoing; that is for the attorney general's
16        office.
17   Q.   Okay, very good.  Now, there has been a
18        reference to contact with voters -- or not with
19        voters, with members of the general public who
20        have contacted the secretary of state's office
21        about their concerns with VRF.  You mentioned
22        that already.  And I just want to be clear.  I
23        mean, can we be certain that everything has
24        been turned over in discovery at this point,
25        everything that the office has received?

Page 73

1    A.   Yes.
2    Q.   Okay.  That saves us a bunch of time.
3         I now want to talk a little bit more
4         about the secretary of state's position here.
5         THE COURT REPORTER:  I'm sorry, say that
6         again.  I didn't hear your full question.
7         BY MR. GREIM:
8    Q.   Sure.  I now want to talk more now about the
9         secretary of state's position.
10        THE COURT REPORTER:  Oh, thank you.
11        MR. GREIM:  Sorry.  I know I'm
12        shuffling -- there are some papers really close
13        to the microphone.  I'm going to try to do
14        better.
15        THE COURT REPORTER:  That's okay.
16   A.   Mr. Greim, just on your last question you asked
17        me in particular about the list or the
18        information from voters, and you asked if we
19        had turned that all over, correct, that was the
20        question?
21        BY MR. GREIM:
22   Q.   Well, my question is:  Is there any other
23        information that you've received about
24        complaints?  And we've received the list.  I
25        just want to know if there's a list update that

Page 74

```
 1    we haven't gotten yet.
 2    A.  Okay, that's correct.  We haven't -- you've
 3        received any -- the information you've received
 4        is current.
 5    Q.  Okay.  Let me ask you -- let's go to
 6        Interrogatory Number 13.  And we're on back to
 7        Exhibit 2, it's on page 7.
 8    A.  Okay.
 9    Q.  And the question is, "State whether you contend
10        that VRF's use of New Mexico data failed to
11        qualify as either a governmental or
12        election-related or campaign use under New
13        Mexico law, and if so, explain how and why
14        VRF's use did not qualify for each applicable
15        category."
16            Do you see that?
17    A.  Uh-huh.
18    Q.  And there's an objection.  And then there's
19        response subject to the objection.  And I'm
20        going to start reading from that line, it says,
21        "The secretary does contend that VRF's public
22        posting of New Mexico data on the Internet
23        failed to qualify as a permissible use under
24        New Mexico law because it was not for a
25        governmental, election, or campaign purpose
```

Page 75

```
 1        within the plain meaning of applicable laws."
 2            Did I read that correctly?
 3    A.  You did.
 4    Q.  Okay.  And is that a correct statement?
 5    A.  Yes.  The office believes that VRF's public
 6        posting of the data is not a permissible use.
 7    Q.  Now, you might recall we went -- we explored
 8        this topic in some detail at the preliminary
 9        injunction hearing.  So I want to understand a
10        little bit more about why the public posting is
11        not a permissible use.  Okay, so let me start
12        with governmental.  That's one of three uses,
13        right?
14    A.  Right.
15    Q.  So why is the public -- why is VRF's public
16        posting of New Mexico data not a permissible
17        governmental use?
18    A.  Again, I feel like this is something that would
19        have been analyzed and discussed with our
20        attorneys in particular on how to apply the law
21        appropriately.
22    Q.  I'm not asking for communications with counsel.
23        I'd like to know the secretary of state's
24        position.  Why did it fail to qualify as a
25        governmental use?
```

Page 76

```
 1    A.  I think because it's not a government entity
 2        utilizing the data.  They're not using it for a
 3        governmental purpose.
 4    Q.  Okay.  So the secretary's position is that
 5        because VRF is not a governmental entity, its
 6        use is not a governmental use?
 7    A.  I don't think that's the only thing I said.  I
 8        said they're also not using it for a
 9        governmental purpose.
10    Q.  Okay.  And so let's talk about for a second
11        what they're using it for so that we're on the
12        same page.  You understand that -- and we went
13        through this before so we're going to have to
14        kind of warm up and refresh our memory.  Do you
15        recall VRF saying it was going to analyze the
16        data and determine if there were discrepancies
17        between basically the credits that show on
18        the -- on the snapshot of the list that it got
19        and then compare that against the ballots cast
20        in the 2020 election and then try to explain
21        why there was a difference between those two?
22        Do you remember VRF's assertion and testimony
23        about that basic idea?
24    A.  I recall that basic idea that there was an
25        intention to utilize voter data received from
```

Page 77

```
 1        our office at a point in time.
 2    Q.  Uh-huh.
 3    A.  And also analyze that based on information on
 4        ballots cast, correct.
 5    Q.  And let's just stick with that for a second.  I
 6        will tell you -- well, let me just -- I'll just
 7        ask the question.  Is it the secretary's
 8        position that that's not a governmental use,
 9        analyzing the data for that purpose?
10    A.  I think that would certainly be something that
11        would be reviewed by our attorney.
12    Q.  Maybe.  But my question is the secretary's
13        position.
14    A.  I think that the public posting of the data on
15        the website is what I can speak to as not being
16        something that was prepared under state law.
17    Q.  Okay.  So in other words, the secretary is not
18        taking a position that this first project I
19        just talked about is not a governmental use.
20        When you say it's not a governmental use,
21        you're really talking about the public posting
22        of the data, correct?
23            MS. LECOCQ:  Objection.
24    A.  I think that your specific question is not
25        something that we specifically analyzed at this
```

Page 78

1  point in time.  So I think the public posting
2  is the piece that I can speak to related to
3  that question.
4      BY MR. GREIM:
5  Q.  Okay.  Well, let's just -- let's keep it to
6  that.  Let's just keep it to that.  So is it
7  the secretary's position that publicly posting
8  the data and asking voters to review it and
9  report any inconsistencies or perceived errors
10  to the secretary of state is not a governmental
11  use?
12      MS. LECOCQ:  Objection.
13  A.  Again, it's the public posting piece that has
14  been analyzed, not some of these other
15  hypotheticals scenarios that you're describing.
16  That is different.
17      BY MR. GREIM:
18  Q.  Okay.
19  A.  And it would need some review.
20  Q.  Well, let's -- let's maybe make it as simple as
21  we can.  It sounds to me like the secretary's
22  position -- and just tell me if I -- if you
23  disagree.  It sounds to me like the secretary's
24  position is that as soon as you have publicly
25  posted the data on the Internet, that cannot be

Page 79

1  a governmental use regardless of what you tell
2  the public about why you're doing it.
3      MS. LECOCQ:  Objection.
4      BY MR. GREIM:
5  Q.  Is that true?
6  A.  I disagree.  So I think what I can speak to are
7  the facts of what Voter Reference Foundation
8  did in this circumstance, that's what's been
9  evaluated and reviewed, and that's the public
10  posting that I can speak about.
11  Q.  Okay.  So, you know what, that is the easiest
12  way to do it.  So before the criminal referral
13  was made, I take it the secretary of state's
14  office got on and looked at the VRF website,
15  right?
16  A.  Yes.
17  Q.  Okay.  And based on what it found on the VRF
18  website, it decided this is not a governmental
19  use, correct?
20  A.  It's not a permissible use.
21  Q.  Okay.  And we're on governmental right now.  So
22  they decided -- we'll get to the other ones.
23  They decided this is not a governmental use,
24  correct?
25  A.  The analysis was really just based on a

Page 80

1  permissible use.  I do not have a recollection
2  of a specific analysis related to each item.
3  Q.  Okay.
4  A.  It was determined that holistically it was not
5  permissible under state law.
6  Q.  Okay.  But let's just -- let's talk about --
7  the permissible uses are defined under state
8  law, right?
9  A.  Uh-huh.
10  Q.  And what are they?
11  A.  I have them here, and I don't have the statute
12  in front of me, but this came from our
13  attorneys, so I'm going to trust that it --
14  governmental election or campaign purpose.
15  Q.  Right.  I don't want to -- I'm not going to
16  make this an exhibit, but I just don't want to
17  have any lack of clarity here.  I thought I had
18  it.  Here we go.  I'm just going to give you a
19  copy -- I'm going to give you the copy of the
20  statute here.  I'm not going to mark it, but
21  I'm giving you 1-4-5.5.  Here we go.  The list
22  of uses is under C, correct?
23  A.  Yes.
24  Q.  Okay.  And so 1-4-5.5 C lists the permissible
25  uses under the statute, right?

Page 81

1  A.  Yes.
2  Q.  Okay.  And then those are further defined down
3  in subsection E?
4  A.  Correct.
5  Q.  And maybe we can't go much further than this,
6  but I do want to tie this together.  I mean,
7  the secretary of state's position is that VRF's
8  posting on its website, the actual posting it
9  did, after it reviewed the website, was not a
10  governmental use, correct?
11  A.  Again, the secretary of state's office, in
12  reviewing the statute, not only this section,
13  made a decision that the public posting of the
14  voter data was not a permissible use of that
15  data.
16  Q.  Okay.  And when you say "not a permissible
17  use," you mean not a governmental use or
18  election use or election campaign purposes use,
19  correct?
20  A.  In part.  And it also ties back to the fact
21  that it was not appropriately received from our
22  office and it was being publicly distributed,
23  and we feel like that was a violation.
24  Q.  And I'm not asking about all the different --
25  I'm just trying to focus, okay, I'm trying to

21  (Pages 78 to 81)

Page 82

1  focus on the lack of permissible use. We just
2  found where the permissible uses are. And, I
3  mean, I just hope we're clear. I -- that the
4  secretary's position is that VRF's use by
5  posting on the Internet is not any of those
6  uses, correct?
7  A.  You asked me about our decision. You asked me
8  about, you know, what -- why did the secretary
9  of state make this decision and what is our
10  position. And that's what I'm responding to.
11  So it is our position that the public posting
12  of the data is not permissible under state law.
13  Q.  Well, but hold on now, okay? We saw the actual
14  statement. The actual statement says it's not
15  a permissible use, okay? And so we know that
16  there are either two or three permissible uses,
17  depending on how you read that section, right?
18  Governmental is one of them, right?
19  A.  Uh-huh.
20  Q.  And if it's not governmental, what's the other
21  use have to be?
22  A.  Election campaign purpose.
23  Q.  Okay. And so if it's a permissible use, it's
24  got to be one or the other, right?
25  A.  And I think there's also parameters around how

Page 83

1  that can be utilized. And public posting
2  online is not one of them.
3  Q.  Okay. But let's just -- let's just stick with
4  the analysis. If it's a permissible use, it's
5  got to be one or the other, governmental or
6  election campaign purposes, right?
7  A.  Correct.
8  Q.  And VRF's posting on the Internet that you
9  observed, your -- the secretary's opinion is
10  it's not governmental and it's not election
11  campaign purposes, correct?
12  A.  I feel like it was a broader analysis based on
13  the public posting and that it was not obtained
14  appropriately and that it was being publicly
15  distributed. So, you know, you continue to ask
16  that question. I understand. And my answer is
17  what I've shared, that our analysis was broader
18  than those two elements.
19  Q.  Well, I'm going to ask -- and this is getting
20  interesting. Okay. I'm going to have to probe
21  a little further now.
22  So is the secretary's position that if it
23  were -- if it -- VRF had obtained them directly
24  from the secretary of state's office, that
25  their posting on the Internet would be for

Page 84

1  governmental or election campaign focuses?
2  MS. LECOCQ:  Objection.
3  A.  What I can answer is that that -- number one,
4  that's not what occurred.
5  BY MR. GREIM:
6  Q.  I understand. I'm trying to understand the
7  conduct that you contend is sufficient to
8  violate this statute.
9  A.  The requester that follows the appropriate
10  process, the lawful process, that would
11  publicly post that data on the Internet, that
12  would be a violation under state law.
13  Q.  We'll just leave it. That's fine. By the way,
14  before -- I don't want to move too far.
15  Interrogatory Number 13, let's come back to it.
16  The top of the page, this is actually page 8,
17  the paragraph that continues and ends on the
18  very top of the page. The very last sentence
19  there says "Investigation by the attorney
20  general is ongoing and has not yet resulted in
21  any criminal action against VRF."
22  Did I read that correctly?
23  A.  You did.
24  Q.  Is that true?
25  A.  Yes. I don't feel like that's any different

Page 85

1  than what I shared before and that we have no
2  knowledge that the case has been closed. We
3  also don't have any knowledge that there's been
4  any action, again, by the attorney general
5  office on that investigation.
6  Q.  You're not backing away from the statement we
7  just read, are you?
8  A.  I'm not.
9  Q.  Okay.
10  A.  I'm simply saying it's aligned with what I said
11  before.
12  Q.  Let me ask you a little bit more about the
13  posting issue on the Internet. Okay, we're not
14  going to focus so much now on governmental
15  election or election campaign.
16  I want to show you a response that we
17  received from your attorneys clarifying some of
18  your prior interrogatory responses. I think
19  this is Exhibit --
20  A.  5.
21  Q.  -- 5.
22  (WHEREUPON, Deposition Exhibit 5 was
23  marked for identification.)
24  BY MR. GREIM:
25  Q.  I'm going to show you an e-mail dated just last

Page 86

1    Tuesday, February 21, from Erin Lacocq to me
2    copying some other attorneys.  And there are
3    some questions that I've posed about some of
4    the other answers.  And let me -- let me go to
5    the very bottom of the page.  Let's see here.
6    Okay.  Actually, let's go to the very first --
7    you see there's some bolding in the very middle
8    of the page?  And I'm asking a question of
9    counsel.  You'll see there's an answer in bold.
10   It says, "Both the AG and the SOS believe that
11   'sharing data' outside one's organization, or
12   publishing that data to make it available for
13   the general public, constitutes a violation of
14   New Mexico law.  This is not just the act of
15   sharing data, but rather disseminating that
16   information to the general public."
17          Did I read that correctly?
18   **A.  You read that bold section correctly.**
19   Q.  Okay.  And so I guess my simple question is:
20   Is this the position of the secretary of
21   state's office?
22   **A  Can I have a moment just to --**
23   Q.  You can.  I will tell you, we've printed off
24   the entire e-mail chain.  It also has lots of
25   discussion about other things, unfortunately.

Page 87

1    So the only -- the e-mail that we actually care
2    about is just on pages 1 and 2.  And it's got
3    other questions that don't really relate to
4    what we're doing here today.
5          MS. LECOCQ:  I object to the extent that
6    we're getting into legal contentions rather
7    than the position of the office.  But other
8    than that, go ahead.
9    **A.  (Witness reviewing document.)  Okay.**
10   BY MR. GREIM:
11   Q.  My very first question is:  Is what's in bold,
12   the very first bolded answer on this page, the
13   position of the secretary of state's office?
14   **A.  Yes.**
15   Q.  Okay.  And I now -- I want to explore the idea
16   of sharing the data with the general public
17   online.  I mean, we talked -- I asked you
18   questions before in another proceeding where I
19   asked about sharing data outside of an
20   organization.  Do you remember that?
21   **A.  Yes.**
22   Q.  We talked at some length.  I'm going to put
23   that aside.  We're going to focus on the
24   Internet, okay?  And so my question is:  What
25   is it about having data available on the

Page 88

1    Internet to the general public that makes the
2    conduct unlawful in the view of the secretary
3    of state?
4          MS. LECOCQ:  I'm going to go ahead and
5    just do a standing objection for legal
6    contentions.
7          MR. GREIM:  Noted.
8    **A.  I remember our past conversation as well, and
9    I, again, today would share that the position
10   of the office is that sharing within an
11   organization is different than sharing outside
12   of that organization, and so that applies to
13   the Internet.  You are obviously sharing
14   outside of the organization if it's publicly
15   posted online.**
16   BY MR. GREIM:
17   Q.  Okay.  And I want to understand -- well, let me
18   ask you this:  What if an entity contracts with
19   individuals to review voter data it has
20   requested, in the secretary of state's view, is
21   that sharing the data outside of your
22   organization?
23   **A.  I'm just going to make sure I understand your
24   question.**
25   Q.  Sure.

Page 89

1    **A.  So you're describing a scenario in which there
2    is an entity that has lawfully obtained the
3    voter data.**
4    Q.  Correct.
5    **A.  And they have agents within their organization
6    that they are sharing the data with, that --
7    that are contained in that organization."**
8    Q.  No.  They've lawfully obtained the data, then
9    they go and they hire very smart data analysts
10   and they execute contracts with these data
11   analysts, independent contractor agreements,
12   and they say, "Here's the data.  I want you to
13   see if there are flaws here.  And we'll pay you
14   $100 an hour for your work."
15         In the view of the secretary of state, is
16   that sharing the data outside of the
17   organization?
18         MS. LECOCQ:  Objection.
19   **A.  Yeah, that -- that is certainly a set of facts
20   that have not been explored currently by our
21   office in particular.  What I can speak to,
22   again, is if it's considered a part of the
23   organization within that same entity, you know,
24   that's unlawful sharing of the data.**
25   BY MR. GREIM:

23  (Pages 86 to 89)

Page 94

1   obtained that data.
2   Q.   Okay.  So implicit within your referral, I
3        think, is the secretary of state -- well, let
4        me back up.
5             The secretary of state understands
6        that -- because they -- you've visited VRF's
7        website, correct?
8   A.   Uh-huh.
9   Q.   And on the website for New Mexico before the
10       data was pulled down, you must click that you
11       will only use the data for specific purposes,
12       correct?  Do you recall that?
13  A.   I recall that being something that was
14       testified to.  I didn't -- yeah, I recall
15       that -- somebody sharing that.
16  Q.   And so VRF is taking the position here that
17       someone who agrees to use the data for
18       permissible purposes, for the purposes that VRF
19       wants to use the data for, is part of VRF.  It
20       forms an association with us to use this data
21       for a certain purpose.  Does the secretary of
22       state agree with that position?
23            MS. LECOCQ:  Objection.
24  A.   Again, I think you're going back to kind of
25       something that would require some additional

Page 95

1   legal analysis, right, what is the relationship
2   between that individual and Voter Reference
3   Foundation.
4        What I will say is that, again, we feel
5   like the statute is very clear in that a
6   requester needs to complete an affidavit with
7   our office to be able to utilize, to receive
8   that data, and to use it for a permissible
9   purpose.
10       And so in that case, Voter Reference
11  Foundation, from our perspective, does not have
12  the authority to prescribe that affidavit.
13            BY MR. GREIM:
14  Q.   Voter Reference Foundation doesn't have the
15       authority to prescribe the affidavit?
16  A.   Yes.
17  Q.   What do you mean by that?
18  A.   The statute, our state statute requires that a
19       requester complete an affidavit.  I know we
20       spoke about that pretty in depth.  So there is
21       an appropriate lawful process to receive voter
22       data.
23  Q.   Right.
24  A.   And one piece of that process is for a
25       requester to complete an affidavit, submit it

Page 96

1   to our office, pay for data, and then receive
2   the data.
3   Q.   And so my question is simply this:  If Voter
4        Reference Foundation makes a request with the
5        affidavit, pays for the data and receives it,
6        and then posts the data online for anyone who
7        agrees to use it for lawful purposes, okay,
8        which we know is true, we know the second thing
9        is true, why does the secretary of state's
10       office not recognize the viewers of VRF's data
11       as being within the organization of VRF?
12            MS. LECOCQ:  Objection.
13  A.   And, again, I think that's different than what
14       I responded to.  So, one, I was clear that I am
15       not an attorney.  I can't speak to what that,
16       you know, relationship is from a legal
17       perspective.  I would need to take those facts
18       in particular and address it with our general
19       counsel or our attorney to get clarity on how
20       to apply the law in that specific scenario.
21            What I can state, however, is that there
22       is a specific process to lawfully obtain, and
23       that requires the affidavit.
24            BY MR. GREIM:
25  Q.   Okay.  I'm not asking you anymore about

Page 97

1   lawfully obtaining it, okay?  We'll come back
2   to that question.
3        I'm asking you now about an organization
4   that lawfully has the data.  They want to share
5   that data with other people and they know the
6   issue is going to be:  Is the secretary of
7   state going to think these people are within
8   the organization or are they not within the
9   organization, okay?
10       So my question to you is:  Why does the
11  secretary of state contend that people who
12  agree, before they're given access to the data
13  that they will only use it for lawful purposes,
14  are not within the organization of VRF?
15            MS. LECOCQ:  Objection.
16  A.   I don't understand your last statement.  Are
17       you asking me a question?
18            BY MR. GREIM:
19  Q.   Okay.  I was.  I was.  My question is -- I'm
20       trying to think of a way to break this down.
21            Let's look at it this way:  If an entity,
22       with lawfully requested data, it sells that
23       data to its customers, but requires -- and it
24       makes it available to them on the Internet, but
25       it requires them to do that through a secure

25  (Pages 94 to 97)

Page 98

1 connection, does the secretary of state say
2 that's okay, those customers are really within
3 the organization?
4         MS. LECOCQ:  Objection.
5 A.  Again, you know, what I can speak to is either
6 in the organization or out of the organization.
7 That is the determination.  That is the
8 position of the office.  Your specific
9 hypothetical scenarios would require a specific
10 analysis on those facts that I am not able to
11 speak to.
12 BY MR. GREIM:
13 Q.  Because the data -- the statute doesn't speak
14 to those situations, does it?
15 A.  It speaks to within the organization or out of
16 the organization.  That is clear from our
17 analysis based on the requirement that this
18 came to the office and we had to review those
19 specific facts.  And so we've taken a position.
20 We are still, you know, of that same position
21 today; if it's in the organization, you can
22 share it.  If it's not, no.  And that has not
23 changed.  But, you know, you're kind of coming
24 off with something that's outside of that
25 analysis --

Page 99

1 Q.  Okay.
2 A.  -- that would require some review.
3 Q.  Well, let's just make it this simple.  The
4 secretary of state contends that VRF's sharing
5 with people who click on the link before
6 getting the data is not sharing within the
7 organization, correct?
8         MS. LECOCQ:  Objection.
9 A.  I don't -- I don't have an awareness of us
10 taking that specific position that clicking on
11 a link is what determines if you're in or
12 outside of the organization.
13 BY MR. GREIM:
14 Q.  Well, I'd like to know what it is about VRF's
15 conduct that caused the referral, okay?  And
16 certainly the secretary of state's office
17 visited the website.  We know that, okay?  And
18 the secretary of state's office encountered the
19 initial requirement that a user click that they
20 will agree to the terms of the use, including
21 that it be used for a lawful purpose.
22 The secretary of state -- well, let me
23 ask you this:  Can the secretary of state tell
24 us that they encountered that when they came on
25 to the website?

Page 100

1         MS. LECOCQ:  Objection.
2 A.  I don't recall that being a specific item that
3 was discussed.  I can speak that I heard
4 testimony that that existed on the website.  I
5 don't recall that being part of the analysis.
6 BY MR. GREIM:
7 Q.  Okay.  Well, does the secretary of state
8 contend that, in fact, users who get on the
9 website to view the data don't have to click
10 first to agree that they'll only use the data
11 for permissible purposes?
12         MS. LECOCQ:  Objection.
13 A.  I don't know what Voter Ref asks them when you
14 go into their website.
15 BY MR. GREIM:
16 Q.  Okay.  And did the secretary of state ever
17 investigate that before making a criminal
18 referral?
19 A.  I think we certainly viewed the website and we
20 had an understanding that our voter data was
21 being publicly made available and it was being
22 made publicly available by an entity that did
23 not request that data from our office.  And
24 that was the basis of the analysis.
25 Q.  Okay.  So did the secretary of state make any

Page 101

1 effort to determine what users had to do before
2 they could view the data on VRF's website?
3         MS. LECOCQ:  Objection.
4 A.  Again, I don't recall that being part of the
5 analysis.
6 BY MR. GREIM:
7 Q.  Who knows the answer to that question?
8 A.  I'm sure our attorney.  But I just don't think
9 that was a key point.  It was a fact that the
10 data was publicly available; it was a fact that
11 Voter Reference Foundation has not submitted
12 the appropriate affidavit to receive that data;
13 and it is a fact that our analysis about how
14 you may distribute that is leading to the
15 containment in the organization.  So the World
16 Wide Web is not an organization.
17 Q.  So the secretary -- it didn't matter to the
18 secretary of state what someone had to agree to
19 before viewing the data on the website?
20         MS. LECOCQ:  Objection.
21 A.  I wouldn't say it didn't matter.  But I've
22 shared what our analysis was based on.  You
23 know, again, going back to your original
24 question, if I click a box, does that
25 constitute being a part of Voter Reference

Page 102

1    Foundation as an organization?  That is not
2    something that I am prepared to answer and
3    would require some analysis from an attorney.
4    If you're asserting that it somehow brings them
5    into your organization, I guess that's your
6    argument to make, but...
7    BY MR. GREIM:
8    Q.   The secretary of state didn't -- well, let me
9    ask you this -- you said what your analysis
10   was, okay.  I'm trying to understand that a
11   little bit better.
12   A.   Sure.
13   Q.   So did the analysis at all depend on the
14   relationship that was formed between VRF and
15   the users of its website?
16   A.   No.
17   Q.   It was irrelevant?
18   A.   It was not considered as part of the analysis.
19   Q.   And it's possible -- because we can't ask you
20   again because this is our last day, I think we
21   have to leave it at this -- it's possible that
22   the secretary of state did not determine before
23   making the referral whether users, in fact, had
24   to click through and promise that they would
25   only use the data for permissible purposes?

Page 103

1    MS. LECOCQ:  Objection.
2    A.   Again, I think I've been clear on the position
3    of the office that posting voter data online is
4    a public distribution of that data, and that
5    that is the position of the office.
6    BY MR. GREIM:
7    Q.   That wasn't my question.  Okay.  My question is
8    what the secretary's office did before making
9    the referral.  I'm not asking you to repeat
10   your position.  We have that down.
11   My question is:  Is it possible that no
12   one from the secretary of state's office looked
13   to see what members of the public had to do in
14   order to get access to the information on VRF's
15   website?
16   MS. LECOCQ:  Objection.
17   A.   And I, again, shared that it was not part of
18   the analysis.
19   BY MR. GREIM:
20   Q.   I know it's not part of the analysis.  I'm
21   trying to now probe your knowledge.  I'm trying
22   to probe the knowledge of the office when it
23   made the referral; not its analysis, its
24   knowledge.  And I'm trying to determine whether
25   the secretary of state determined what members

Page 104

1    of the public had to do before accessing the
2    data.  That's what these questions are about.
3    I'm going to ask it very -- just listen
4    very carefully.  I'm going to speak slowly.  I
5    know we're covering a lot of ground.  Let's
6    just try to nail this down.
7    My question is:  Did the secretary of
8    state's office determine, before making the
9    referral, what members of the public had to do
10   in order to get access to the data on VRF's
11   website?
12   A.   And, again -- I will also speak slowly -- that,
13   in fact, our office did not utilize the fact
14   that there was a check box as a part of a
15   discussion for making a determination if it was
16   lawful or unlawful.  And so, therefore, I
17   cannot speak if our attorney clicked the box.
18   What I know is that the office made a
19   determination based on the fact that voter data
20   was being publicly made available on the
21   Internet.
22   Q.   My question is not what your determination was.
23   My question is:  What did the secretary of
24   state's office know about how the website
25   worked?  I'm not asking whether it mattered to

Page 105

1    you or not.  I'm asking whether you knew.  And
2    so whether an attorney wrote it or an
3    investigator in your office, either you knew or
4    you did not know, or you don't know whether he
5    knew.  Okay, so I'm going to ask it one last
6    time.
7    Did the secretary of state's office know
8    what was required for members of the public to
9    do before they accessed the data on VRF's
10   website?
11   A.   I don't know.
12   Q.   Who would know the answer to that question?
13   A.   I suspect our attorney.
14   Q.   Do you know who investigated it?  Was it an
15   attorney?
16   A.   I think we talked about who was involved in
17   making a decision about referring it.  So that
18   was myself, Deputy Secretary of State Sharon
19   Pino, general counsel Dylan Lange.  And based
20   on all of the information we had in hand, we
21   made a decision to refer that.
22   Q.   Okay.  And there was no one else involved in
23   making that decision?
24   A.   And as I shared, we made a recommendation and
25   the secretary of state did approve that

27 (Pages 102 to 105)

Page 106

1   referral.
2        MR. GREIM:  Let's take another little
3   break here.
4        (WHEREUPON, at this time a lunch break
5   was taken.)
6   BY MR. GREIM:
7   Q.   Back on the record.  So I wanted to -- before
8   we totally move past what we did at the end
9   of -- before our break, I want to ask you about
10  some other recipients of the voter data here.
11       Now, each political party requests the
12  voter data, don't they, on a regular basis?
13  A.   Yes.
14  Q.   And do you recall testifying before that, you
15  know, political parties sharing the data with
16  volunteers would not be deemed sharing outside
17  the organization?
18  A.   Agreed.
19  Q.   Okay.  And the secretary of state does not go
20  and ask the political parties to submit a --
21  some sort of agreement from each volunteer for
22  a party or document that in any way, correct?
23  A.   No, if it's within that organization.
24  Q.   And so how -- what is it that makes the
25  volunteers part of the organization of a

Page 107

1   political party?
2   A.   I don't think there's any particular legal
3   definition that I can point you to, but they
4   are participating as a member of that
5   organization.  My understanding is they are
6   staff of the organization.
7   Q.   And what about a political party, you know,
8   sharing the data with their political
9   consultants that they pay for, would that be
10  okay with the secretary of state's office?
11  That does not count as sharing outside the
12  organization?
13  A.   I think we're back to, you know, in the
14  organization, out of the organization, is there
15  specific facts that need to be reviewed, then
16  that would be something we would have to look
17  at on an individual basis.  But if it is part
18  of their organization, that they can share.
19  Q.   Well, and as I understand that -- I mean, I
20  think -- I'm going to do a few more of these
21  questions, and if you do not have an answer
22  that require consulting with counsel --
23  A.   Uh-huh.
24  Q.   -- then I'd advise you to give me an answer if
25  you can, but -- but just tell me that that

Page 108

1   would require counsel.  Well, yeah, I'm not
2   going to suggest an answer to you.  Let's just
3   move ahead.
4        So let me -- let me ask you, I mean,
5   political parties and candidates both use
6   volunteers, you know that.  And you know that
7   candidates in this state and elsewhere hire
8   political consultants to help run their
9   campaigns, right?
10  A.   Right.
11  Q.   And I guess your testimony is that the
12  secretary of state does not have a position, as
13  we sit here today, as to whether the candidates
14  sharing voter data with their paid consultants
15  would constitute sharing within the
16  organization?
17  A.   We have not evaluated that particular fact.
18  Q.   Now, what if I tell you -- I know I'm not from
19  New Mexico, but if I tell you right here and
20  now that I believe that political parties are
21  sharing voter data that they receive -- that
22  they lawfully receive with paid political
23  consultants who are not part of the political
24  party and not part of the candidate campaign,
25  and I say I'm making a complaint and I believe

Page 109

1   they're doing it, I mean, what's stopping you
2   from investigating?
3   A.   Getting a complaint about an alleged violation,
4   there is nothing that would stop us from
5   looking into it.
6   Q.   Okay.  Now, let's talk about other requesters,
7   other recipients of data.  The group called the
8   Public Interest Law Foundation requests data
9   from the secretary of state's office, right?
10  A.   Right.
11  Q.   And would your position be that they cannot
12  share the voter data with their own volunteers,
13  or would it be that, just like political
14  parties, their volunteers are okay to receive
15  the data?
16  A.   I think that we would handle it in the same
17  way.  So if they're a part of the organization,
18  then they would be allowed to share the data.
19  Q.   And you would not go to PILF, I'll call it, and
20  say we need to see documentation proving that
21  these volunteers are part of your organization?
22  A.   As a practice, no.  If we're made aware that
23  something is happening outside the bounds of
24  the law, then we may ask additional questions.
25  But if they are affirming through the affidavit

28  (Pages 106 to 109)

Page 110

1  that they are using it lawfully, meaning they
2  are not unlawfully sharing or distributing or
3  selling, that is the document that we utilize
4  to assess that they're going to follow the law.
5  If we're made aware, then we would take a
6  different step forward.
7  Q.  Can VRF share data that it lawfully receives
8     from the secretary of state'S office with its
9     own volunteers without violating the same
10    organization issue?
11 A.  If they're a part of the organization, anything
12    that is a lawful part of an entity, that
13    determination is not mine to make in this
14    instant.  But if it's sharing it within its own
15    organization, that is the parameter.  That is
16    the position of our office that that's the
17    parameter that we would ask an entity to
18    follow.  And we believe it's outlined in the
19    affidavit.
20 Q.  And volunteers count, just like they count for
21    parties, correct?
22 A.  Again, I think -- you know, you are I think
23    stretching my answer a little bit there.  I
24    think my direct answer to you has been and will
25    continue to be that the position of the office

Page 111

1  is that you have to be within the organization.
2  And I continue to say that each scenario --
3  facts that need to be evaluated, I think you
4  said it best, would need to go to our counsel
5  for an analysis to determine if it's lawfully a
6  part of organization or not.
7  Q.  Okay.  So for VRF, the request would need to go
8     to counsel, correct?
9  A.  Under any circumstance, any relationship.
10 Q.  So does -- the party's use of volunteer, that
11    has gone to counsel?
12 A.  I think that you asked me if I had testified to
13    that fact, and my understanding is that they
14    are -- what I said was my understanding was
15    that they are employed with that organization.
16 Q.  Well, obviously, volunteers for political
17    parties are not employees of the parties.
18 A.  They are staff is my understanding, is what I
19    testified to and what I answered here today.
20 Q.  Okay.  Well, the -- let's just say this:  You
21    don't -- you're not backing away from what your
22    testimony was before, correct?  We can just go
23    back and look to see what you say.  You're not
24    changing anything today?
25 A.  I'm not changing anything today.

Page 112

1  Q.  Okay.  And I just want to be clear because you
2     just used the word "employees."  I take it your
3     position is not that being within an
4     organization is limited to employees, correct?
5  A.  I have not stated that.
6  Q.  Okay.  Because volunteers are not paid, right?
7  A.  Again, I think that, you know, you're asking me
8     to analyze scenarios that have yet to come to
9     our office.
10       What I can speak to is if you're a part
11    of the organization.  And you continue to ask
12    me to, you know, make some legal analysis on
13    hypothetical scenarios that I am not able to do
14    in this moment.  So I think it's the same
15    question.
16 Q.  Okay.  But it's fair to say that the secretary
17    of state's office, and you're here as the
18    30(b)(6) witness, they have not actually
19    undertaken a formal analysis on the questions
20    I've asked you so far, you're not aware of any
21    such analysis?
22 A.  Correct.
23 Q.  Well, let me ask you -- today VRF has voter
24    data from the secretary of state's office.  It
25    has it.  Can VRF share that voter data with its

Page 113

1  volunteers without violating the -- within the
2  organization's restriction?
3  A.  I don't have a different answer for you,
4     Mr. Greim.  If it's within your organization,
5     you may share it.
6  Q.  Right.  My question is:  Are volunteers within
7     the organization?
8  A.  Are they a part of the staff?  I guess that
9     goes back to the analysis that you're tying it
10    to.  So that is -- that was my testimony and
11    that still is if they're a part of the
12    organization.
13 Q.  It's okay if they're unpaid?
14 A.  I think the fact is are they a part of the
15    organization or not.  That is really what the
16    requirement is.
17 Q.  So do they -- do they need to have an agreement
18    with the organization of any kind?
19 A.  We have not outlined all of those logistical
20    details.  Right?  Every scenario would require
21    some analysis to determine if it's within the
22    bounds of the statute or not.
23 Q.  Okay.  Well, I'm going to go just a bit further
24    before we move on.  So canvassers who walk door
25    to door for candidates and political parties

Page 114

1  get a list of voter data that comes from the
2  secretary of state.  And let's just stipulate
3  those door-to-door walkers are not employees,
4  they're not being paid, they're college
5  students.  Is that unlawful activity?
6       MS. LECOCQ:  Objection.
7  A.  I think -- I guess the question would remain
8      are they a part of the organization that
9      originally received the data.  Again, the same
10     question.
11 Q.  So the secretary of state can't answer that
12     question?
13 A.  Not without additional review, agreed.
14 Q.  Now, remember I asked you about a couple of
15     for-profit groups such as Catalist and
16     Aristotle and i360, I think a couple of times
17     before in your prior testimony, right?
18 A.  Uh-huh.
19 Q.  And these are groups the district court made
20     factual findings about.  Did you read the
21     district court's decision in this case?
22 A.  I did not.
23 Q.  Okay.  Well, do you recall that I raised the
24     question of these groups requesting data from
25     the secretary of state and then charging

Page 115

1  clients to make the data available for them for
2  their own purposes?  And I asked you whether
3  that counts as sharing outside the organization
4  of these for-profit companies like Catalist or
5  Aristotle.  Do you recall that questioning?
6  A.  I recall similar questioning.  I guess just to
7      be clear, who are they sharing with?  I
8      didn't --
9  Q.  Customers.
10 A.  What does that mean?
11 Q.  It could be a candidate, it could be a
12     non-profit that wants to engage in advocacy.
13     And rather than requesting the data directly
14     from you, they go and they buy access to
15     databases from groups like Catalist and
16     Aristotle.
17         And when I mentioned this to you before,
18     I think you said you'd never heard of these
19     groups before, correct?
20 A.  Uh-huh.
21 Q.  Now, you know there is a record the secretary
22     of state has of the groups requesting data.  I
23     take it you don't review that list every month
24     or something, right?
25 A.  I don't.

Page 116

1  Q.  Okay.  And I think you said you never had a
2      complaint about those groups, which is why
3      you'd never looked into it before.  Do you
4      recall that?
5  A.  Yes.
6  Q.  Okay.  Now, I asked you specifically in your
7      testimony before the Court whether your office
8      would, in fact, go and look into these groups
9      to determine whether they were violating the
10     law.  Do you remember that?
11 A.  If I received a complaint, is that what you
12     stated?
13 Q.  No, I didn't ask whether you received a
14     complaint.  I just said based on the
15     information we had during the proceeding at
16     that time, whether your office would go and
17     look into those entities.  Do you recall that?
18 A.  I recall a different statement.
19 Q.  Okay.  What do you recall?
20 A.  What I recall was you being -- asking for
21     clarity and if we had an awareness that these
22     groups were violating the law, if we would look
23     into it.
24 Q.  I see.  I see.  Okay.  Well, let me ask you:
25     Have you done anything since your testimony to

Page 117

1  look into whether these groups were violating
2  the law?
3  A.  No.
4  Q.  And let me ask you this:  If a for-profit group
5      is receiving data from New Mexico and other
6      states and other sources of information and
7      then charging clients a fee for access to that
8      data, would that comply with your
9      within-the-organization requirement?  Is that
10     sharing permissible?
11 A.  They're sharing it outside of the organization?
12 Q.  Yes, with their clients.
13 A.  So outside of their organization is a part of
14     this?  That is the background?
15 Q.  Yeah, I'm asking whether that counts as outside
16     of the organization.
17 A.  Oh, you're asking me to make a determination?
18 Q.  Yeah.
19 A.  Again, you know, I'm not clear on who are these
20     entities.  I don't know their relationship.  If
21     it's within their organization, they're good.
22     If it's not, they can't share it.
23 Q.  What would it take for you to look deeper into
24     this question to decide whether the law is
25     being violated?

Page 118

```
 1   A.  I think it would take just somebody making our
 2       office aware of the practice, the allegation,
 3       and the details of any violation, that's how we
 4       handle all complaints.
 5   Q.  So if ProPublica contacted you about this, that
 6       might be sufficient?
 7           MS. LECOCQ:  Objection.
 8   A.  If we're made aware of a potential violation,
 9       our office has the authority to look into it.
10           BY MR. GREIM:
11   Q.  And as of today, there's been no effort
12       whatsoever to look into what Catalist or
13       Aristotle are doing?
14   A.  We have not -- again, the fact remains that we
15       have not received any complaints nor allegation
16       that they have violated the law.
17   Q.  Do you have a written policy that you won't
18       investigate without a complaint?
19   A.  No.
20   Q.  Okay.  That's just a rule of thumb that the
21       office uses?
22   A.  I think our office has limited resources, and
23       so we have to develop policies and procedures
24       that provide our office an opportunity to both
25       manage our workload and treat constituents
```

Page 119

```
 1       equally.  So we do have a policy and procedure
 2       related to voter complaints.  We receive
 3       several on various matters.  And in particular,
 4       I think it's important to notice that the
 5       distinguishing factor for Voter Reference
 6       Foundation was it was online; that was the
 7       alarming issue.
 8   Q.  Okay.  So -- well, maybe let's ask about this
 9       then.  Is the office's position that sharing
10       outside the organization is okay so long as
11       it's not online?
12   A.  No.
13   Q.  Okay.
14   A.  But to your point on -- you know, what in this
15       case -- it wasn't a complaint that we received,
16       right?  We were made aware.  We took an action
17       outside of that complaint process that there
18       was an immediate concern for public safety.
19   Q.  What if a federal district court made you aware
20       of possible criminal activity, would that be
21       sufficient or would you need to receive it from
22       someone else?
23   A.  I don't think there's any one single source,
24       right.  It's simply a matter of being aware and
25       managing the appropriate resources and the
```

Page 120

```
 1       appropriate priorities.
 2   Q.  Okay.  I'm just going to read to you from the
 3       district court's decision in this case,
 4       document 51, pages 158 to 159.
 5           "The Court found the secretary of state's
 6       interpretation of the election code
 7       criminalizes requesters, such as Catalist,
 8       i360, Data Targeting, and L2 Inc., who applied
 9       for voter data and then sell it to clients
10       outside their own organization."  That's at
11       pages 158 and 159.  Now, having --
12   A.  Sorry.  What did it say, the Court determined
13       that?
14   Q.  Yes.  Yeah.  This is from a court decision in
15       this case.  So my question is:  Was the
16       secretary of state aware of that statement and
17       the district court's decision?
18   A.  Two questions ago I responded that I had not
19       read that decision.
20   Q.  Okay.  You haven't.  But I take it that the
21       secretary of state -- the secretary of state
22       issued a press release about that decision,
23       right?  So is it your testimony that the
24       secretary of state was unaware of that
25       statement and the Court's decision?
```

Page 121

```
 1   A.  Our office is currently aware of that decision.
 2   Q.  Okay.  And so was why was that statement not
 3       sufficient, a finding from a federal district
 4       court, to at least look into whether Catalist
 5       and the other entities were violating the law?
 6           MS. LECOCQ:  Objection.
 7           MS. SCHREMMER:  Objection.
 8   A.  I don't think it's insufficient.  I think, you
 9       know, our office has limited resources.
10       There's nothing saying we won't look into it.
11       The question I've responded to as of right now,
12       we have not.  That doesn't mean we won't.
13           BY MR. GREIM:
14   Q.  Well, what additional information would it take
15       for you to look into these questions?
16   A.  I don't think there is anything additional in
17       particular.
18   Q.  So maybe one day somebody will check out one of
19       the websites and understand what they do with
20       their data?
21           MS. LECOCQ:  Objection.
22   A.  I have not heard anything that you have
23       presented here today that tells me that they
24       are publishing it online.
25           BY MR. GREIM:
```

31 (Pages 118 to 121)

Page 122

```
 1   Q.  I see.  So is that the threshold for
 2       determining -- for starting an investigation?
 3   A.  It's not, but what I've spoken to is it was a
 4       deciding factor in the prioritization out of
 5       concern for our voters and voter rights and for
 6       their participation in the process.
 7   Q.  Of course, the secretary of state also didn't
 8       make any effort to determine how the general
 9       public was actually accessing the data on the
10       website, did it?
11           MS. LECOCQ:  Objection.
12   A.  I'm sorry?
13       BY MR. GREIM:
14   Q.  We'll just strike that and move on.
15           I want to now change gears a little bit.
16       And we'll talk about the -- this allegation of
17       disinformation.
18           Is it the secretary's position that the
19       sharing of out-of-date voter data could
20       constitute disinformation?
21   A.  I think there's a potential, yes.
22   Q.  Okay.  And explain that to us.
23   A.  Sure.  So the voter registration database, the
24       voter's file, or the roll as we call it, it's a
25       dynamic file.  It's ever changing.  There are
```

Page 123

```
 1       constant updates being made.  And so it's a
 2       point in time anytime somebody receives that
 3       data.
 4           And if we're doing comparisons, I think
 5       anytime you're analyzing data, it's important
 6       to be comparing the same type of data, right?
 7       We can't take something from years ago and look
 8       at it for a specific election.
 9           So I think the concern is that outdated
10       data does present the potential for
11       misinformation.
12   Q.  Okay.  Now, in this case, VRF posted data
13       online after winning a preliminary injunction
14       from the district court.  Do you recall that?
15   A.  Uh-huh.
16   Q.  And the data that it posted at that time was
17       the only data that it was able to receive
18       through your office, right?
19   A.  Right.
20   Q.  Now, by that time, that was not the most recent
21       information that it had -- that was -- I'm
22       sorry.  That was not the most recent version of
23       the voter file, was it?
24   A.  No.
25   Q.  Does the secretary contend that VRF was
```

Page 124

```
 1       engaging in disinformation when it reposted
 2       that data?
 3   A.  I think it was not the data alone.
 4   Q.  Okay.  What else was it?
 5   A.  I feel like there is information explaining the
 6       data that was not accurate.
 7   Q.  Okay.  So when VRF reposted its data online, it
 8       was not just the data but was the accompanying
 9       explanation that made it disinformation?
10   A.  It was the comparison.  As I said, I spoke to
11       you're comparing -- they were comparing
12       outdated data to election results that were --
13       it wasn't a correct accurate comparison.  There
14       wasn't an understanding for the viewer as to
15       the details, very important details, to share
16       facts about the data.
17   Q.  Okay.  So what you're referring to there is the
18       statement that was made about there being a
19       discrepancy between the voting credits shown in
20       the data file that VRF received and a separate
21       data source which was the number of ballots
22       cast in the election, right?
23   A.  Correct.
24   Q.  So -- and I think we all know what that
25       statement was.  My question for you is a little
```

Page 125

```
 1       bit different though, okay?  And it may be
 2       that -- it may be that you'll have a different
 3       answer.
 4           I'm asking about whether posting the data
 5       online itself, with no other statement about a
 6       discrepancy itself, is misinformation?
 7   A.  I think it's important to note that's not what
 8       happened.  So our position on the
 9       misinformation was tied to the data being
10       posted publicly, outdated data, with an
11       analysis about a discrepancy that was
12       inaccurate.  So that was the misinformation
13       issue.
14           (WHEREUPON, Deposition Exhibit 6 was
15       marked for identification.)
16       BY MR. GREIM:
17   Q.  Okay.  I don't want to -- I'm just going to
18       show you your own interrogatory response.  This
19       is an earlier set of interrogatories.  We're
20       going to mark this as Exhibit 6.  And if you go
21       to page 6 -- by the way, I'll tell you -- I'll
22       represent to you that attached here that we do
23       have your verified statement for this set of
24       interrogatories.
25           So on page 6 you'll see there's something
```

32 (Pages 122 to 125)

Page 126

1    called Interrogatory Number 7, and it asks the
2    secretary of state to "Identify any and all
3    misinformation, including regarding the 2020
4    general election, you believe VRF has or
5    intends to spread on its website VoteRef.com."
6          And so there's a response saying, you
7    know, we can supplement it, we're still
8    learning.
9          Then there's a larger paragraph below
10   there.  And the very first sentence says, "The
11   secretary believes that publication of voter
12   data writ large may constitute misinformation.
13   The New Mexico voter file is a living document
14   that is constantly updated by state and county
15   agencies.  If a private individual or entity
16   were to obtain a copy of the voter file, that
17   copy would be out of date and bearing erroneous
18   information before the private individual or
19   entity even had a chance to publish the copy.
20   The only proper, accurate way to look up voter
21   information is through the New Mexico secretary
22   of state or county clerks."
23          Did I read that right?
24   A.   Yes.
25   Q.   And that's a statement that you swore to in

Page 127

1    your response to these questions.  And is that
2    still an accurate statement of the secretary's
3    position?
4    A.   Yes.
5    Q.   Okay.  And so let me just go back.  I mean, I
6    understand that -- the allegation that VRF
7    published the analysis that accused -- or
8    that said that there was a discrepancy, the
9    contention that that is misinformation.  I'm
10   asking you now, though, whether the publication
11   of voter data writ large as stated in that
12   response can also constitute misinformation?
13         MS. LECOCQ:  Objection.
14   A.   Can you just clarify for me --
15         BY MR. GREIM:
16   Q.   Sure.
17   A.   -- obviously, I didn't use this word -- of what
18   you believe "writ large" is referring?
19   Q.   That's your answer, not mine, right?  That's
20   not my answer, that's your answer.
21         So you say the secretary believes the
22   publication of voter data writ large may
23   constitute misinformation.
24         So I'm asking you:  Given that statement,
25   do you agree with me that simply publishing the

Page 128

1    voter data may constitute misinformation?
2    A.   And I think my question was:  What is your
3    understanding of that definition?
4    Q.   Well, I'm asking you, okay?  I -- I mean, this
5    is your answer.  I didn't choose those words.
6          So, I mean, do you agree with me that the
7    secretary -- and if not, just tell me.  I mean,
8    if the secretary does not contend that posting,
9    you know, voter data from eight months ago is
10   itself misinformation, then we can -- we're
11   going to move on.  But it sounds to me like the
12   secretary is saying that it does constitute
13   misinformation.
14   A.   I think I answered initially when we started
15   this line of questioning that providing and
16   publishing inaccurate, incomplete, out-of-date
17   data does provide a potential for
18   misinformation.
19   Q.   Okay.  And what if -- what if the publication
20   actually discloses when the data file was
21   received, does that fix the problem or no?
22   A.   No.
23   Q.   Why not?
24   A.   Because I think that of our election
25   administrators or kind of really -- you know,

Page 129

1    the average voter, typically as -- isn't as
2    educated on this process.  You know, we work to
3    educate them, but I don't think they're going
4    to understand the complexities if there's
5    someone who is making a claim of a discrepancy
6    without context.
7    Q.   Okay.  And now I'm just -- I'm not asking you
8    about the discrepancy anymore, okay?  We got
9    your full testimony on that.
10         My question now is:  Is the mere fact of
11   publishing old voter data, putting on the
12   Internet saying here is the New Mexico voter
13   data, this file was obtained in April of 2021,
14   is that misinformation?  Is that the
15   secretary's position in this case?
16   A.   Our position is that it invites and provides
17   for a potential of misinformation.
18   Q.   Because the people who read it are not properly
19   educated and they may not understand the
20   disclosure?
21   A.   I think the data, without an understanding or
22   without context or without explanation, makes
23   it difficult to understand.
24   Q.   And the secretary's position is that posting
25   when and how the data was received isn't

33 (Pages 126 to 129)

Page 130

1    enough, correct, to --
2    A.  Correct.
3    Q.  -- to correct the misinformation?
4    A.  Yes.
5    Q.  Okay.  And why is that?  It's because -- well,
6        strike that.  You answered why.
7            Does the secretary of state have
8        information in this case that particular users
9        of VRF's website were misinformed when viewing
10       the data and the disclosures online?
11   A.  Sorry, if you can repeat that.
12   Q.  Does the secretary of state have any
13       information in this case that particular users
14       of VRF were misinformed when accessing the data
15       and the disclosures on VRF's website?
16           MS. LECOCQ:  Objection.
17   A.  Not particular users.  I think I shared earlier
18       that we had voters contact us out of concern
19       for their data being on the site.
20   BY MR. GREIM:
21   Q.  And, right, that's not my question.  I'm asking
22       you about worry that users of VRF are being
23       misinformed.
24   A.  Did you say worry of it?
25   Q.  Yeah.  I'm asking whether the secretary of

Page 131

1        state has information that this misinformation
2        is occurring?
3            MS. LECOCQ:  Objection.
4    BY MR. GREIM:
5    Q.  Have you learned that someone has looked at the
6        VRF website and become misinformed about the
7        voter process?
8            MS. LECOCQ:  Objection.
9    A.  As a representative of the office, I can share
10       that anecdotally we received concerned
11       individuals contacting our office asking about
12       discrepancies certainly, and asking about how
13       they could get their data off the site.  Those
14       were the calls we were receiving.
15   BY MR. GREIM:
16   Q.  Okay.  So individuals --
17   A.  Confusion about understanding what was posted,
18       confusion about how it got there.  They
19       believed we were posting their data.  So there
20       was certainly calls to our office about
21       confusion related to Voter Ref posting data
22       online.
23   Q.  Okay.  Were they confused about what the data
24       represented?
25   A.  Yes.

Page 132

1    Q.  Okay.  Do you have any records of this?
2    A.  I can certainly go back and look.
3    Q.  We've already asked for it.  Do you have -- did
4        you personally speak to any voters who were
5        confused about the data online?
6    A.  I do not personally.  My team did.
7    Q.  Who?
8    A.  I would have to find the phone log, but in
9        particular, we had a paralegal who was tracking
10       things on behalf of the office and he received
11       calls he made me aware of.
12   Q.  And you've produced all of your tracking
13       spreadsheets already, right?
14   A.  Right.
15   Q.  When you say voters were confused -- so you
16       said they were confused about who had actually
17       posted the data online?
18   A.  Correct.  We got voters calling us saying take
19       me off your list that you have on the website.
20   Q.  Okay.  So maybe VRF engaged in misinformation
21       by not making it clear that it's VRF's website
22       and not yours?
23           MS. LECOCQ:  Objection.
24   A.  We clearly had voters that did not understand
25       who posted that or where it came from and

Page 133

1        believed it was our office.
2    BY MR. GREIM:
3    Q.  Okay.  The secretary of state doesn't make any
4        allegation here that VRF is impersonating the
5        secretary of state or --
6    A.  No.
7    Q.  -- trying to act as if it is an official
8        office?
9    A.  No.
10   Q.  Okay.  We've noticed online that there's a new
11       tab that says that the online system has
12       real-time updates now.
13           MS. LECOCQ:  Objection.
14   BY MR. GREIM:
15   Q.  Is that correct?
16   A.  I'm not clear as to what you're referring to.
17   Q.  Okay.  Going on the secretary of state's
18       website -- well, you don't have it printed off
19       here.  But let me just ask you:  Does the
20       secretary of state hold out that its website is
21       up to date, it's like to the minute in
22       real-time?
23           MS. LECOCQ:  Objection.
24   A.  I'm just -- I mean, we have a website --
25   BY MR. GREIM:

34  (Pages 130 to 133)

Page 134

1  Q.  You have a website --
2  A.  -- but I don't know what data would be being
3     updated in real-time on the website.
4  Q.  Okay.  Well, there's -- okay.  There's a
5     website and there's a portal.  Let's talk about
6     that.  Maybe I'm using the wrong term.
7  A.  Okay.
8  Q.  There is a -- there is a portal, is there not?
9  A.  A voter information portal.
10  Q.  Right.  And is that updated in real-time?
11  A.  Yes.
12  Q.  Okay.  And any person who goes on there who
13     enters the correct information for a voter is
14     going to get the absolute most up-to-date
15     version of voter data for that voter, correct?
16  A.  Yeah, that source is our voter registration
17     database.
18  Q.  The database itself?
19  A.  Yes.
20  Q.  And anyone with the first and last name and
21     birthday of a voter can pull that voter's
22     information off the website, correct?
23  A.  Correct.
24  Q.  Now, is the secretary of state aware of anyone
25     using its website for an improper purpose?

Page 135

1         MS. LECOCQ:  Objection.
2     BY MR. GREIM:
3  Q.  Let me -- yeah, let me ask you a better
4     question.
5         Is the secretary of state aware of anyone
6     using its website to stalk other people?
7  A.  Our website?
8  Q.  Yeah, using the portal.
9  A.  I don't have any knowledge of that.
10  Q.  Okay.  Let me -- would the secretary of state
11     know if someone were just putting someone's
12     name and birthday into the portal and learning
13     where they live?
14  A.  We wouldn't unless we were made aware.
15  Q.  And the secretary of state doesn't require
16     people using the portal to certify that they're
17     using the information to look up their -- that
18     the portal -- to look up their own information,
19     do they?
20  A.  I haven't walked through the screens in a
21     while, but I don't recall any sort of
22     affirmation.
23  Q.  In fact, it doesn't require any affirmation
24     about the purposes for which someone is
25     entering in the information and making a query

Page 136

1     on the portal, does it?
2  A.  I don't believe so.
3  Q.  Is the secretary of state aware of anyone using
4     VRF's website for illegal purposes?
5         MS. LECOCQ:  Objection.
6  A.  Using the website?  Sorry, can you --
7     BY MR. GREIM:
8  Q.  Sure.  Let me back up.  So there was a time
9     when VRF had New Mexico voter data available on
10     its website, correct?
11  A.  Correct.
12  Q.  And I'm just asking whether the secretary of
13     state knows of anyone accessing the voter data
14     on VRF's website using it for an improper
15     purpose?
16         MS. LECOCQ:  Objection.
17  A.  We wouldn't have a way to track that
18     information.
19     BY MR. GREIM:
20  Q.  I understand that.  I understand that you don't
21     have some special way to look into it.  I'm
22     just asking if you have any information that
23     that's ever occurred?
24  A.  And specifically you asked me that somebody was
25     stalking someone --

Page 137

1  Q.  Well, I -- yeah, let's start with stalking.
2     Are you aware of anyone getting on the VRF
3     website and the New Mexico data was posted and
4     they were using that information to stalk
5     someone?
6  A.  I don't have an awareness of somebody stalking
7     someone off that.
8  Q.  Okay.  Well -- and let's go to some other
9     things, too.  Are you aware of anyone getting
10     onto the VRF website and using it to come up
11     with a list to solicit -- to make commercial
12     solicitations?
13  A.  I don't have that specific information, no.
14  Q.  Okay.  I mean, I guess let's just -- I'm not
15     going to go through a long list.  Is it fair to
16     say the secretary of state has no information
17     about anyone getting on the VRF website, when
18     it had the New Mexico voter data, and using it
19     for any improper purpose?
20         MS. LECOCQ:  Objection.
21  A.  You're asking me to kind of -- and just so I'm
22     clear, are you asking me if we have an
23     awareness of a connection to a voter being
24     harassed, stalked, any sort of criminal -- like
25     when you say improper use --

35 (Pages 134 to 137)

Page 138

BY MR. GREIM:

Q.   Okay.  All right.  We'll go through.  So I'm asking -- I mean, I asked about stalking already.  I think we got an answer to that question.  Okay.

Let's -- let's go criminal purposes.  Does the secretary of state have any information that any person has gotten on the VRF website that had the New Mexico voter data and used that data for a criminal purpose?

A.   No.

Q.   Does it have any information that any person got on the VRF website when it had New Mexico voter data and used that data to engage in misinformation about elections?

MS. LECOCQ:  Objection.

A.   I don't have any direct knowledge.

BY MR. GREIM:

Q.   Okay.  Do you have indirect knowledge that this happened?

A.   I think that our office -- you know, we received calls.  I spoke to questions and concerns from voters.  And we also had individuals that contacted our office at a similar window of time related to a separate

Page 139

issue that was taking place in one of our counties.

Q.   Who were the voters who called?

A.   I think we provided the list of any voters that we received that felt like they were being potentially intimidated based on an issue happening in one of our counties.

Q.   Okay.  That's Otero County, right?

A.   Correct.

Q.   Does the secretary -- and now it's been well over a year.  Does the secretary of state -- well, that may not be right.  It's been some time.

Does the secretary of state's office have any information that the Otero County group was connected in any way with VRF?

MS. LECOCQ:  Objection.

A.   I don't have any understanding that they were directly connected, no.

BY MR. GREIM:

Q.   Do you have any --

A.   I think your question was:  Do we believe that anyone may have obtained data through the website and used it improperly.

Q.   That was the original question.  Okay.  You

Page 140

said you had indirect knowledge.

So let me ask you this:  Do you have any -- my question that you answered, seeming to have information, was that you didn't know of any connection between the two groups.

Now I'm going to ask you:  Do you have any information at all that the Otero County group got their data from VRF?

MS. LECOCQ:  Objection.

A.   No.

BY MR. GREIM:

Q.   In fact, the secretary of state's office now, I think, knows how the Otero County group got their data, doesn't it?

MS. LECOCQ:  Objection.

A.   I don't know that we're here to speak on that, but I don't.

BY MR. GREIM:

Q.   Okay.  Do you have any evidence that VRF has manipulated the data that was posted on its website?

A.   No.

Q.   How many voters have canceled their voter registration because of VRF's publication of voter data on its website?

Page 141

MS. LECOCQ:  Objection.

A.   Aside from the inquiries and the calls and the log that you've been provided tied to voters and concerns with this issue, there would be no way for us to have a voter affirm that.

BY MR. GREIM:

Q.   So let's just be very clear.  The secretary of state has no knowledge of any voter that has canceled his or her registration because of VRF's website?

MS. LECOCQ:  Objection.

A.   I don't.  I think we have knowledge that voters were concerned --

BY MR. GREIM:

Q.   Okay.

A.   -- and reached out asking us how they could remove themselves because they didn't want to potentially risk their information being made public.  I do not have a list of voters that have affirmed that they canceled because of Voter Ref.

Q.   Any every phone call you received, that inquiry has been documented and produced to us, correct?

A.   Any that staff tracked have been, yes.

Page 142

1  Q.  Okay.  Do you claim that there are others that
2  we don't know about that staff didn't track?
3  A.  I think, you know, initially when we were first
4  learning about those concerns, we weren't at a
5  place to have that process established.  So I
6  do believe there were some additional, but I do
7  feel like the majority were tracked.
8  Q.  I'm going to ask you a little bit about the
9  interest that the secretary of state has
10  alleged it's trying to advance by enforcing the
11  statutes at issue here.  You've actually
12  covered a little bit of this already, but
13  there's a few things we didn't cover.
14      So I understand the secretary of state to
15  contend that the -- that one reason for
16  requiring the affidavit process that we've
17  talked about and requiring that users of the
18  data directly request that from the secretary
19  of state is in order to generate revenue to run
20  the voter data system.
21  A.  Is that --
22  Q.  Is that correct?
23  A.  Is that somewhere?
24  Q.  Yeah, I don't -- I don't have it.  It's in
25  your -- I mean, I'm just going to ask a

Page 143

1  question.  If you disagree that that's one of
2  the reasons to enforce it, then that's okay,
3  we'll just move on.  Or if you're not sure,
4  we'll just move on.
5      MS. LECOCQ:  Sorry.  I just want to note
6  that our standing objection to legal
7  contentions are still standing.
8      BY MR. GREIM:
9  Q.  So is an important reason to require groups
10  like VRF to request the data directly from the
11  secretary of state and then not share it with
12  people outside the organization that the
13  secretary of state wants to generate revenue
14  from user fees to help pay for the voter data
15  system?
16      MS. LECOCQ:  Objection.
17  A.  I think from the office's perspective, I think
18  that's a reason.  That is not our primary
19  reason by any means.
20      BY MR. GREIM:
21  Q.  Okay.  But it's one of the reasons?
22  A.  It is a reason to make sure we have revenue to
23  maintain our system, but that is absolutely not
24  the priority.
25  Q.  What would you say -- what is the priority?

Page 144

1  What is the main reason that the secretary of
2  state does not want VRF to be able to request
3  the data from the secretary of state's office
4  and then share it online with people who agree
5  to use it for VRF's purposes?  What's -- what's
6  the reason why the secretary of state wants to
7  enforce that?
8      MS. LECOCQ:  Same objection.
9  A.  Sure.  The secretary of state's office wants to
10  follow state law.  We want to ensure that we
11  are adhering to the appropriate process that's
12  defined in our state law.  And we feel like the
13  intention behind an appropriate administration
14  of that provision provides for us to maintain a
15  record of individuals that are requesting the
16  data.
17      I think it's important because it's the
18  only mechanism to be able to go back and track
19  if somebody does use it unlawfully.  If we do
20  see an instance of stalking or harassment or
21  intimidation, it is the only way that we have
22  an ability to manage who is receiving that data
23  and potentially a tool for enforcement to
24  follow the law.  That's our priority.
25  BY MR. GREIM:

Page 145

1  Q.  And has the secretary of state actually used
2  its record of individuals who requested the
3  data to investigate instances of harassment?
4      MS. LECOCQ:  Objection.
5  A.  Yes.
6  BY MR. GREIM:
7  Q.  It did so in the Otero County case, right?
8  A.  Correct.
9  Q.  Other than Otero County, has it done any
10  other time?
11  A.  Other than a review -- not for harassment, but
12  we did take a look at our logs when we felt
13  like there was a potential violation by
14  Voter Ref by posting it online.  That was
15  another opportunity for us to refer to that
16  record.  And we were able to identify that it
17  had not been lawfully obtained.
18  Q.  So Otero County and VRF.  Any other examples?
19  A.  The Local Labs in the distribution of the data.
20  Q.  Okay.  The Otero County and VRF, Local Labs,
21  any other examples?
22  A.  No.
23  Q.  Okay.  So does the secretary of state require
24  Catalist or i360 or Aristotle to share the
25  identities of its customers who purchased the

37 (Pages 142 to 145)

Page 146

1    data?
2  A.  I don't think we require any requester to
3      identify anything more than what's on the
4      affidavit.
5  Q.  Well, let's say the secretary of state did
6      require their requesters to keep a log of each
7      person who shared the data with them.  Why
8      wouldn't that equally satisfy your interest of
9      being able to trace possible abuses?
10 A.  Number one, we don't require that.
11 Q.  I understand.  I'm asking why wouldn't
12     requiring that yield the same result?
13 A.  Because it's not following the statute.
14 Q.  I understand that.  I understand what the
15     statute says.  My question is:  Why wouldn't
16     requiring the requesters who first get the data
17     to keep a log of who they share it with achieve
18     the same result of compiling a record of people
19     who access the data?
20     MS. LECOCQ:  Objection.
21 A.  I think that we're -- there's only -- that's
22     one piece of the statute, right?  There's a
23     secondary piece that requires a payment.  And
24     there's also a secondary piece that requires an
25     affirmation of that separate entity to affirm

Page 147

1      that they will also comply with the statute.
2      BY MR. GREIM:
3  Q.  Okay.  And I -- we'll get to the other uses of
4      the statute.  I'm sticking right now to the
5      interest in being able to trace who had access
6      to the data, okay?  I'm not asking about
7      payment right now.  I'm asking about why -- I
8      mean, and if you don't know, you don't know.
9      But my question is:  Why wouldn't requiring the
10     requesters to maintain a record of individuals,
11     whom they share the data, yield the same
12     benefit as keeping your own list of the initial
13     set of requesters?  Either way you've got a
14     list of everybody who accessed the data.
15     MS. LECOCQ:  Objection.
16     BY MR. GREIM:
17 Q.  Why isn't it good enough to have the requesters
18     keep their own list?
19 A.  Sure.  That's one piece of my answer, but I
20     gave you other reasons.  So there was, you
21     know, a broader picture.  And so we can't just
22     point to one piece of the statute, right?  We
23     are required to administer the statute in its
24     entirety --
25 Q.  I know.

Page 148

1  A.  -- and so that's our obligation, that's our
2      authority.  And the hypothetical that you're
3      speaking to just isn't reality.
4  Q.  Well, I'm asking about the State's interest.
5      I'm not asking you what the statute says.  In
6      this case, on the constitutional question there
7      are questions of fact about what is the State's
8      interest and is this the most narrowly tailored
9      version of a law.  Okay.  So I'm not asking you
10     anymore about what the law says.  I'm asking
11     you about what does the State lose -- how is
12     the State worse off by simply having the
13     requesters keep a record of the individuals to
14     whom they grant access so that if there is an
15     illegal use the secretary of state can simply
16     go to the requesters and say who have you
17     shared it with?
18     MS. LECOCQ:  Objection.
19     BY MR. GREIM:
20 Q.  Why is that insufficient to meet the interest
21     that you raised regarding tracing who dealt
22     with it?
23     MS. LECOCQ:  Objection.
24 A.  And I would just reiterate that that's one
25     interest.  So what we lose is the opportunity

Page 149

1      to kind of respond to all of our interests,
2      right?  That's not our only interest.
3      BY MR. GREIM:
4  Q.  Okay.  Let's go ahead -- let's talk about the
5      other interests then.  So you lose the ability
6      to generate revenue from the other requesters,
7      right?
8  A.  Sure.
9  Q.  Okay.  And what else do you lose, if there's
10     other things you lose, too?  You mentioned
11     something else earlier.
12 A.  I don't remember saying that we lose
13     anything --
14 Q.  Let me -- I'll help you.  You said -- I think
15     you said there's the State interest in making
16     sure that the individuals who get access to the
17     data agree to use it for the purposes that are
18     permitted under New Mexico law.  You didn't use
19     those words, but I think that's what you were
20     getting at.  Do you recall that?
21 A.  And I think, you know, you asked me what's our
22     priority, what's our interest, and I think I
23     said first and foremost it's to follow the
24     state law.  And so I'm just reiterating that
25     that is our interest.  And there's not just

38  (Pages 146 to 149)

Page 150

1    this one provision, you know, it is a bigger
2    picture than that.
3   Q.  I understand.  And we can stipulate that the
4    secretary of state's office says that it wants
5    to follow the state law.  You've said that.
6    That's not what I'm talking about, though.
7    That's not what these questions go to.  I'm
8    trying to understand the interest.
9       So we've talked about the payment
10    interest.  We've talked about the tracing
11    interest.  And I'm trying to get you now to
12    talk about the third interest that I could
13    swear I heard you say, I think I've read in
14    your briefing, which is the State wants to have
15    some way to ensure that the people who receive
16    access to the data are going to use it for the
17    purposes that are allowed under the statute.
18    Do you agree that that's --
19  A.  I agree.
20  Q.  That's an important State interest, isn't it?
21  A.  Yes.
22  Q.  Okay.  And the way that you satisfy that
23    interest now is by having the person who
24    directly contacts the SOS's office sign the
25    affidavit that lists what the purposes are,

Page 151

1    right?
2  A.  Whoever is going to receive the data, completes
3    the affidavit affirming those items.
4  Q.  Okay.  And so my question to you -- and you
5    would agree that, from the State's perspective,
6    that is sufficient -- the affidavit is
7    sufficient to satisfy the State's interest in
8    ensuring that the recipients of the data who
9    came and requested it from the secretary of
10    state's office, understand that what they're
11    supposed to do and not do with the data, right?
12  A.  Yes.
13  Q.  And so my question to you is:  How does the
14    State lose anything by having the individuals
15    who might receive access to the data from the
16    initial requesters also agree that they are
17    going to use it for the purposes permitted
18    under New Mexico law?  What's lost there from
19    the State's perspective?
20       MS. LECOCQ:  Objection.
21  BY MR. GREIM:
22  Q.  If anything?
23  A.  Are you saying also agreed, what, through a
24    different entity?
25  Q.  Yeah, they manifest their assent to the extent

Page 152

1    same use requirements that the initial
2    requester manifested their assent to.  So
3    what's lost by having the person who receives
4    it is from initial requester agree to the same
5    conditions?
6  A.  Like, by how -- like, through what mechanism?
7  Q.  Well, for example, by on the website saying I
8    agree to only use it for these purposes before
9    getting access to it?
10  A.  I think, number one, for uniformity, generally,
11    it's important that when our office is
12    prescribing a form, it's our official form, I
13    think we want to maintain that uniformity and
14    consistency of the election polls overall.
15    But, two, I think we lose the opportunity to
16    educate directly from our office and to receive
17    that affirmation directly to our office.
18  Q.  Okay.  So there's some benefit in the fact that
19    the form comes directly from the office?
20  A.  Consistent and it's uniform.
21  Q.  Okay.  Okay, so -- okay, I understand.  Any
22    other interests there, other than uniformity?
23  A.  Not in addition to what we've already gone
24    over.
25  Q.  Okay.  Let me ask you about the Safe at Home

Page 153

1    program; that's come up a few times as well.
2    There are some people who want to be removed
3    from the list who don't satisfy the
4    Safe at Home program, correct?
5  A.  Correct.
6  Q.  And so is anything stopping New Mexico from
7    changing the requirements of the Safe at Home
8    program?
9       MS. LECOCQ:  Objection.
10  BY MR. GREIM:
11  Q.  Let me -- let me change the question.  Is there
12    anything keeping New Mexico from broadening the
13    Safe at Home program to reach additional people
14    who don't want their voter data disclosed?
15       MS. LECOCQ:  Objection.
16  A.  Yes.
17  BY MR. GREIM:
18  Q.  What?
19  A.  So I think that the statute surrounding the
20    Safe at Home program is very specific to a
21    certain population within the state of New
22    Mexico.
23  Q.  Okay.  And my question is:  Is there anything
24    stopping New Mexico from just broadening that
25    population --

Page 154

```
 1              MS. LECOCQ:  Objection.
 2       BY MR. GREIM:
 3       Q.  -- and saying there are other people now that
 4           we want to let into the Safe at Home program?
 5       A.  Sure.  It's -- the Safe at Home program is not
 6           specific to just voting, right; that's one
 7           piece of that program.  But it is a larger
 8           program that is meant to support victims of
 9           domestic violence.  So it's not just a
10           confidential address necessarily.  It is -- it
11           is not just specific to voting.
12       Q.  Okay.
13       A.  So there are implications for that population
14           outside of just voting.
15              MR. GREIM:  Okay.  We've been going for
16           little over an hour.  Why don't we take --
17           let's take one more break for maybe another ten
18           minutes.
19              (WHEREUPON, at this time a brief recess
20           was taken.)
21       BY MR. GREIM:
22       Q.  All right.  I think we're getting closer here
23           to the end.  But I'm going to ask you about now
24           the denials of VRF requests for data over the
25           last year or two.
```

Page 155

```
 1              I want to first know who was involved,
 2           what staff were involved in the secretary's
 3           office in responding to VRF requests for data.
 4       A.  Myself and our attorneys.
 5       Q.  Okay.  You say our attorneys.  Who are those
 6           attorneys?
 7       A.  Dylan Lange and representation from the
 8           attorney general's office.
 9       Q.  Okay.  Okay.  Now, when you say representation
10           from the attorney general's office, are you
11           talking about -- is that -- is the secretary of
12           state getting legal advice from the attorney
13           general's office about whether to respond to
14           requests?
15              MS. LECOCQ:  Objection.
16       A.  With relation to this case?
17       BY MR. GREIM:
18       Q.  Okay.  Well, let me -- I'm not going to ask you
19           the contents of the advice.  I'm just wanting
20           to establish who is asking the question and,
21           you know, basically who is involved in the
22           communication, okay?
23              So we know the name of one attorney,
24           Lange, okay.  And then when you say the AG's
25           office, I'm trying to make sure we're not just
```

Page 156

```
 1           talking about litigation counsel who was always
 2           up to speed presumably on what's happening.  So
 3           I'm trying to do with this without compromising
 4           the privilege.
 5              Is a request being made of the attorney
 6           general's office about whether a response to a
 7           document request is lawful or not?
 8              MS. LECOCQ:  Objection.
 9       A.  A response to a document request from Voter
10           Reference Data -- I mean vote Voter Reference
11           Foundation --
12       BY MR. GREIM:
13       Q.  Right.
14       A.  Yeah, our -- Dylan Lange and our attorneys
15           representing us in this case.
16       Q.  Okay.  So litigation counsel are -- the lawyers
17           in this case for the attorney general's office
18           are giving advice to the secretary of state
19           about responses to the requests?
20              MS. LECOCQ:  Objection.  Can we -- sorry,
21           can you just give me one second?
22              MR. GREIM:  Sure.
23              MS. LECOCQ:  I just want to state on the
24           record this is getting really close to -- and I
25           understand it's super tricky with the attorney
```

Page 157

```
 1           general's office, but the attorney general's
 2           office, by statute, represents these agencies.
 3           So if what you're wanting her to answer is who,
 4           I don't think we have any issue with that.  I
 5           think where it gets a little bit tricky is
 6           any -- kind of anything beyond that, you know,
 7           what questions were asked, what specific
 8           topics, what's being sought, and that's really
 9           what is, kind of, our objection.
10              MR. GREIM:  I'm not going to be beyond
11           the question I just asked.
12              MS. LECOCQ:  Okay.
13       BY MR. GREIM:
14       Q.  Which is, you know, advice on responding to the
15           request, not asking what the advice was or what
16           questions were lodged.  It's who at the AG's
17           office is giving advice on how to respond to
18           the VRF request.  That's it.
19       A.  What individual?
20       Q.  Yes.
21       A.  Yeah, at the time was Olga.
22       Q.  Okay.  And she was still there in November or
23           she was gone?
24       A.  I don't know the exact day, I'm sorry.
25       Q.  Okay.  Was it anyone other than Olga?
```

Page 158

1   A.  No.
2   Q.  Okay.
3   A.  Just Dylan and Olga.
4   Q.  Sharon Pino involved at all?
5   A.  Yes.
6   Q.  Okay.  What was her role?
7   A.  Again, it's a collaborative effort to kind of
8   understand all of the facts, have a
9   conversation, a discussion, and make a
10  determination.  So she participated like the
11  rest of us.
12  Q.  Well, who made the final decision in the SOS's
13  office?
14      MS. LECOCQ:  Objection.
15  A.  I don't think there was one single person.  It
16  was, again, a collaborative decision.
17  BY MR. GREIM:
18  Q.  Okay.  If you could, please go back and turn to
19  Exhibit 2, Interrogatory Number 15.  It's on
20  page 9 -- 9 and 10 is where I want you to look.
21  Okay.  And so you'll see Interrogatory Number
22  15, it says, "Identify each person who
23  participated in each decision not to provide
24  data in response to a VRF request or to ignore
25  a VRF request, and the person, if any, who made

Page 159

1   the final decision."  And then it wants the
2   titles.  That's the request.
3       And now let's go to the answer, next
4   page.  "Subject to, and without waving
5   objections, the secretary states the secretary
6   never ignored a request."  Is that correct?
7   A.  Yes.
8   Q.  Okay.  "If such a request was received,
9   reviewed, and subsequently denied, the decision
10  to do so was made by Sharon Pino on advice of
11  counsel."  Now, is that correct or no?
12  A.  I don't think it's incorrect.  Again, you know,
13  we all had a role in making this decision.  At
14  the end of the day, Sharon is deputy secretary
15  of state, so I don't think there's anything
16  incorrect here.
17  Q.  Okay.  Just -- since Sharon Pino is the only
18  person to -- specifically mentioned here, it's
19  just odd that you didn't mention her in your
20  response and then you seemed to say she was
21  just part of the team.  So I've got a response
22  from you and I've got a -- sort of a draft from
23  counsel.  I just want to meld the two, if I
24  can.
25      I mean, do you -- does this statement

Page 160

1   need to be changed, decision to do so was made
2   by Sharon Pino?
3   A.  I think the only thing I would add is, you
4   know, probably upon advice of counsel and, I
5   guess, in consultation with myself.
6   Q.  Okay.  And let me talk about the
7   decision-making process.  Did it occur by
8   e-mail?
9   A.  No, I feel like it was a meeting, either
10  virtual -- it was a virtual meeting.
11  Q.  Okay.  Because there was a couple of denials,
12  all right.  And so each time there was nothing
13  committed to writing.  It was all done orally?
14  A.  Yes.
15  Q.  Okay.  So there will be no -- have you searched
16  for documents that discussed the decision?
17  A.  No, but I don't believe there to be any.  I
18  recall the verbal conversations.
19  Q.  I mean, do you know all the decision -- all the
20  communications that Sharon Pino may have had
21  with others about it?
22  A.  I don't believe Sharon Pino had any additional
23  communications.  The only thing I can't speak
24  to is if Dylan had any communications, but I
25  feel like the decision was made through a

Page 161

1   virtual meeting.
2   Q.  And the decision was not made by lawyers,
3   right, it was made by Sharon Pino?
4   A.  That's not what I said.  I said it was made in
5   consultation with a group of us, including
6   guidance from our attorneys.
7   Q.  Okay.  Well, I mean, was Sharon Pino the final
8   decision maker or no?
9   A.  I think what I asked to be changed in the
10  statement was that Sharon Pino, upon advice of
11  counsel, in consultation with Mandy Vigil.
12  Q.  Okay.
13  A.  So I think that represents my testimony.
14  Q.  Okay.  Well, specifically, I'm going to be very
15  clear about this, the decisions were not
16  actually delegated to counsel; they were made
17  by you and Sharon Pino?
18  A.  Upon advice of counsel.
19  Q.  Upon advice of counsel?
20  A.  Yes.
21  Q.  Okay.  Okay.  Well, I'm about to ask you the
22  basis for the decision, okay?  And I'm just
23  going to say this, I mean, I -- if you say, you
24  know -- if you say "We relied on counsel," then
25  I'm going to ask -- at that point I'm entitled

41  (Pages 158 to 161)

Page 162

```
 1    to ask and I'm going ask what counsel advised,
 2    one way or another, from you or from counsel.
 3    If you just tell me the basis of the decision,
 4    you don't need to tell me that, well, part of
 5    this was what counsel wanted or this is -- and
 6    you can protect the privilege by not explaining
 7    to me what parts of what you tell me are from
 8    an attorney.  I'm just going to say that while
 9    we're on --
10         MS. SCHREMMER:  I object to your
11    definition about privileged communication.
12    BY MR. GREIM:
13  Q. I mean, maybe we have a dispute.  We're about
14    to find out, I think.  But I certainly don't
15    think any part of the reasoning -- the basis
16    for any of the decisions can be shielded
17    because a lawyer was involved.  It's possible
18    to tell me the reasoning without saying, oh,
19    this is what our lawyer told us, but we'll see.
20    We'll let it play out if there needs to be an
21    objection and instruction.
22         MS. LECOCQ:  Can you give me one second?
23    We might -- let me talk to Kelsey.  And then I
24    might just give her a little bit of advice.
25         MR. GREIM:  Sure.  Okay.  Let's go off
```

Page 163

```
 1    the record for two minutes.
 2         (WHEREUPON, at this time a brief recess
 3    was taken.)
 4         (WHEREUPON, Deposition Exhibit 7 was
 5    marked for identification.)
 6    BY MR. GREIM:
 7  Q. Okay.  I'm going to hand you what we've marked
 8    as Exhibit 7, and you've seen this before.  I'm
 9    just going to ask you if you recognize this
10    e-mail?
11  A. I do.
12  Q. Okay.  This is a Patrick Rostock e-mail to you
13    on March 11, 2022?
14  A. Yes.
15  Q. And it relates to ticket number 4148 (sic).
16    I'm just reading from the subject line,
17    "[External] Information Request," right?
18  A. Right.
19  Q. And you see there's a question from Voter
20    Reference Foundation at the bottom of the
21    e-mail chain?
22  A. Uh-huh.
23  Q. And then -- do you recall getting this e-mail?
24  A. Yes.
25  Q. Okay.  What did you do in reaction to this?
```

Page 164

```
 1  A. I reached out to Dylan.
 2  Q. Okay.  Did you ask him for legal advice of some
 3    kind?
 4  A. Yeah.
 5  Q. Okay.  Did he provide you legal advice in
 6    response?
 7  A. Yes.
 8  Q. All right.  And is the first line of this
 9    e-mail correct for Dylan's contact with the AG,
10    "...we are not fulfilling records from VoteRef"
11    (verbatim)?
12  A. There was clarification related to voter data
13    requests, but, yes.
14  Q. Okay.  And has this policy ever changed at the
15    secretary of state's office?
16  A. What policy?
17  Q. "Per Dylan's contact with the AG, we are not
18    fulfilling records request from VoteRef"?
19  A. I don't think it was a policy, but certainly it
20    is based on legal advice related to this case
21    and our understanding of the use of the data
22    that that's still the position we maintained.
23  Q. Okay.  What will VRF need to do in order to
24    obtain voter information from the secretary of
25    state's office?
```

Page 165

```
 1  A. I think it is going to need some clarity from
 2    legal counsel to respond to that.  I think it's
 3    all relevant to this case in particular.
 4  Q. Well, why can't VRF simply fill out the current
 5    affidavit and receive voter data?
 6  A. We have not stated that you cannot.
 7  Q. Well, that's -- I'm asking you that.  I'm
 8    asking you, even if the current -- I mean, we
 9    have a dispute about whether the current
10    affidavit actually follows New Mexico law, but
11    put that aside.  If VRF simply fills out the
12    current affidavit for voter data, is there
13    any -- is there any reason that the secretary
14    of state's office wouldn't fill the request?
15  A. Again, I think barring any guidance from our
16    attorney related to this case, no.  I think our
17    concern is relevant in that there's an
18    understanding that it will be posted online;
19    that's the concern.
20  Q. So even if VRF fills out an affidavit that says
21    "I won't share it on the Internet," VRF is not
22    going to get the data because of a concern that
23    it might show on the Internet anyway?
24  A. I don't think I said that.
25  Q. Well, I want to understand you.
```

Page 166

1    A.  So if VRF submits an affidavit and completes
2        it, I think there is a review of that affidavit
3        and a determination to provide the data.
4    Q.  When you say it --
5    A.  I don't think I've said that we wouldn't.
6    Q.  Okay.  Well, that's important because I thought
7        my question actually posed that very
8        hypothetical, that VRF fills out the affidavit
9        and submits it to you.  I just wonder if
10       there's any reason why the secretary of state
11       would still not produce the data.
12   A.  It would only be based on legal guidance.
13   Q.  Well, in other -- when you say only based on
14       legal guidance, you mean you're holding out
15       that attorneys might tell you not to produce
16       the data anyway?
17   A.  I think there's a potential, yes, based on
18       concerns of it being posted online.
19   Q.  Okay.  So is VRF in a position where the
20       secretary of state doesn't feel that it can
21       trust VRF's affidavit?
22          MS. LECOCQ:  Objection.
23   A.  What affidavit, I'm sorry?
24   Q.  The affidavit we've just been talking about.
25   A.  Ours, our prescribed form, completing it?

Page 167

1    Q.  Correct.
2    A.  But in that you are saying you're going to make
3        some sort of affirmation that you're not going
4        to put it online?
5    Q.  No, no.  I'm saying if VRF -- I want to be
6        clear here.  I thought we were, but I -- it
7        seems vague.
8          If VRF fills out the current affidavit --
9        on -- currently online, for the secretary of
10       state, is there any reason at all that the
11       secretary of state would cite to still refuse
12       to produce the voter data to VRF?
13   A.  And, again, I said as long as the form is
14       completed and we consult with our attorney, if
15       there is no concern related to it being posted
16       online, based on the circumstances of this
17       case, I foresee no reason to deny that.
18   Q.  Okay.  Well, it's that middle hedge that is
19       very important in this case.
20   A.  Well, that's the reality.
21   Q.  Well, I mean, so would the secretary of state
22       -- so what you're telling me is, in fact,
23       the secretary of state would not simply produce
24       the data if it received an affidavit, it would
25       first talk to counsel and determine whether

Page 168

1        there was still a concern that VRF might post
2        the data online anyway?
3    A.  There's currently active litigation with Voter
4        Reference Foundation, so any interaction we
5        would engage with our legal counsel, yes.
6    Q.  Okay.  So part of the -- so it sounds like part
7        of the block for VRF getting the data is the
8        fact that there's ongoing litigation, is that
9        correct?
10   A.  I don't know if there is a block.  I'm saying
11       because there is active litigation, it is a
12       usual process to consult with our attorneys.
13   Q.  Okay, fair enough.  But can the secretary of
14       state commit right here, right now, that if VRF
15       fills out the affidavit, as required by New
16       Mexico law, it will produce the data requested?
17          MS. LECOCQ:  Objection.
18   A.  I think I have responded that because there's
19       an active litigation, that we would seek
20       guidance from our counsel.
21          (WHEREUPON, Deposition Exhibit 8 was
22       marked for identification.)
23   BY MR. GREIM:
24   Q.  I'm going to hand you what we've marked as
25       Exhibit 8.  Do you recognize this document?

Page 169

1    A.  I do.
2    Q.  What is this?
3    A.  It is a request to our office for records.
4    Q.  Okay.  And it is accompanied by -- something
5        might be wrong.  Can I look at your version
6        quickly?  It's accompanied by a couple of
7        affidavits, correct, under Exhibit B?
8    A.  Yes.
9    Q.  Now, take a second to look at these affidavits.
10       Is there anything irregular or altered in these
11       two affidavits?
12   A.  I don't believe this is our most current form.
13       I think this is an outdated version.
14   Q.  Okay.  Is that a reason to reject a request?
15   A.  No.
16   Q.  And, in fact, do you recall when I asked you
17       this at your earlier testimony you stated that
18       secretary of state would accept all versions of
19       the form as it changed over time, right?
20   A.  Correct, as long as it provides the
21       information.
22   Q.  And is there anything lacking on these two
23       affidavits?
24   A.  No.
25   Q.  Okay.  Now, this request was denied, right?

43  (Pages 166 to 169)

## Page 170

1  **A. Yes.**
2  Q.  I'm going to -- and one of the reasons was that
3  the secretary of state was concerned that VRF
4  was going to take the information and post it
5  online, right?
6  **A. Right.**
7  Q.  Okay.  And the basis for that was actually
8  something that I put in my letter, right?
9  **A. Basis for?**
10  Q.  For the concern.
11  **A. Yes.**
12  Q.  All right.  And specifically it's page 4 of my
13  letter.  Can you go to page 4?
14  **A. Okay.**
15  Q.  And let's go to the third paragraph where I
16  talk about the request for records.  And you'll
17  see that it's about two different projects,
18  above there, and then I say in my third
19  paragraph -- or, I'm sorry, the second full
20  unnumbered paragraph, "VRF's intended election
21  use comprises two distinct projects.  For its
22  first project, just as VRF publishes voter data
23  for many other states, and as it recently
24  published voter data in New Mexico, VRF intends
25  to publish the requested information online for

## Page 171

1  election related purposes, but will only
2  publish the personal information of voters
3  online if VRF is granted relief in..." and then
4  it cites this case, right?
5  **A. Uh-huh.**
6  Q.  "...or any other legal proceeding."
7       Okay.  So did the secretary of state's
8  office decide that it believed that statement
9  was truthful?
10  **A. No.**
11  Q.  Did not doubt what I put in my letter?
12  **A. I don't think there was any discussion of**
13  **doubt.**
14  Q.  Okay.  Okay.  And then we go to the fourth
15  paragraph, I talk now about the second project.
16  And its says, "For its second" -- and by the
17  way, data for the first project is in a
18  separate safety affidavit, isn't it?  You see
19  there's two affidavits?
20  **A. There are two affidavits.  I am not clear what**
21  **is specific to each project.**
22  Q.  Okay.  Okay.  Well, that's all right.  That's
23  all right.  You see that each --
24  **A. They each ask for the same data.**
25  Q.  Do you see the first one under "Other" has one

## Page 172

1  description, the second one has a different
2  one, right?
3  **A. One is asking for county and precinct, is that**
4  **the difference?**
5  Q.  Right.  So, I mean, if you look, the first one
6  says "Current voter registration data,
7  including voter history for all active,
8  inactive, suspended, and canceled status
9  voters," right, "(including any registration
10  status other than active)," that's the first
11  one?
12  **A. Uh-huh.**
13  Q.  The second one says "A complete list, by
14  county/precinct of any registered voters who
15  cast a ballot in the November 3, 2020 general
16  election, who have subsequently been placed in
17  inactive, canceled, deleted, or removed status,
18  or any voter that has been removed or deleted
19  from the rolls."
20       So those are not asking for the same
21  data, are they?
22  **A. No.**
23  Q.  All right.  Fair enough.  Okay.  Let's come
24  back now to my letter.  In my second paragraph
25  I say, "VRF intends to analyze the records,

## Page 173

1  information, and data provided in response to
2  the above requests in order to engage in a
3  discrepancy review of the New Mexico voter
4  rolls.  VRF intends to publish this analysis
5  online without disclosing the personal
6  information of any individual voter."
7       Do you see that correct -- did I read
8  that correctly?
9  **A. I do.**
10  Q.  Okay.  And then I go on, just so it's clear,
11  "VRF will comply with this
12  non-public-disclosure promise for the data it
13  uses on its second project regardless of
14  whether it prevails in the federal litigation."
15       Did I read that right?
16  **A. You did.**
17  Q.  "And again, for the sake of clarity, no
18  personal information of any individual voter
19  will be published online unless VRF is granted
20  relief in the federal litigation or in any
21  other legal proceeding."
22       Did I say that right?
23  **A. You read it correctly, yes.**
24  Q.  And the secretary's position is that you didn't
25  know what I meant by personal information,

Page 174

1  right?
2  A.  Uh-huh.
3  Q.  And that what I have might have actually been
4     saying is that we are going to publish personal
5     information because I might have a really
6     narrow definition of what it means, right?
7  A.  Uh-huh.
8  Q.  Now, did anybody from the secretary's office
9     say -- it was an unclear phrase, right, that's
10    your position?
11 A.  I think we established that during this
12    testimony as well.
13 Q.  Right.  And did anyone ever reach out to ask
14    Voter Reference Foundation, hey, we see this
15    phrase "personal information," you're
16    referencing the lawsuit, where we're actually
17    litigating this question, could you tell us
18    what you mean?
19        No one did that, did they, for VRF?
20 A.  I don't believe anyone from our office did.
21 Q.  No.  And then, in court, VRF then stated that
22    we're not going to disclose name or address,
23    anything from which you could tell the identity
24    of any voter.  We're just going to give the
25    analysis of what the discrepancy was.  And at

Page 175

1  that point did the secretary of state's office
2  go back and say now we understand?  We're no
3  longer concerned about posting personal
4  information online?  Did that ever happen?
5  A.  We have not revisited this, no.  I think,
6     again, the decision we've been discussing for
7     the past hour or so was based on guidance from
8     our counsel, based on pending litigation, and
9     the requests received, you know, in response to
10    this litigation.
11 Q.  So the reason why the secretary didn't go back
12    and produce the data, after getting the
13    explanation of personal information, was
14    because of the litigation, is that right?
15 A.  No, based on our outreach to our counsel,
16    because there is pending litigation.  So we are
17    going to follow the guidance of our counsel.
18 Q.  Okay, I understand.  And, unfortunately, I now
19    need to know the reason why you didn't do it.
20    I know you asked counsel.  I need to now
21    understand why -- clarification.  Because,
22    after that, you knew we weren't going to be
23    posting any personal information online, why
24    that wasn't good enough.  What was still
25    missing at that point?

Page 176

1  A.  And when you say we knew, can you point me to
2     where we would know that?
3  Q.  Sure.  You know, let's do it this way:  Today,
4     does the secretary of state's office believe
5     that if we got -- if you fulfil this status
6     request tomorrow, maybe somebody saw this and
7     thought it was -- you know, they just answered
8     it.  Do you believe that -- do you believe that
9     VRF would take the data and post the names,
10    addresses, year of birth, voter registration
11    information of voters online?  Does the
12    secretary of state's office actually believe
13    that today?
14 A.  I don't think that's the question.  I think --
15 Q.  I'm asking you that right now.
16 A.  I think it's broader than that, that's my
17    point.  There's active litigation, and we have
18    to -- we have to deal with the reality.  Our
19    office is currently engaged in important
20    litigation on this matter.  We've received
21    guidance from our counsel, period.
22 Q.  Well --
23 A.  And same answer to your question about the
24    affidavit.  This request is a request for the
25    same data, the same question that you asked me

Page 177

1  about the affidavit and that process and our
2  position would not change.  Based on this
3  letter, it was an NVRA request for the
4  affidavit that was submitted.
5  Q.  I'm going to ask you a very different question.
6     Okay.  My question is:  Today, does the
7     secretary of state believe that if it produced
8     to us the data requested here, now that you've
9     heard what I've said -- actually, let me do
10    this.  Let's back up.
11        I'm going to tell you -- this is not a
12    hypothetical, okay?  I'm going to tell you that
13    if the secretary of state produces data in
14    response to this request, any other request
15    that comes in, using your affidavits, that
16    Voter Reference Foundation is not going to
17    publish any of the personal information of any
18    voter.  I'm going to go a step further, just in
19    case you think I'm saying the opposite.  It's
20    not going to post the voter's name, their
21    address, their voting history, their last four
22    of their Social Security number, their year of
23    birth.  Can you name for me any other personal
24    information in the data set that people get?
25    Anything else that identifies an individual

45  (Pages 174 to 177)

Page 178

1    voter?
2  **A.  Which question am I answering?**
3    Q.  Well, I'm going to say -- I'm going to tell you
4      we're not going to post any of that data
5      online.  I'm telling you that right now.
6      Knowing that, does the secretary of state have
7      any reason to believe that if you produced this
8      data tomorrow, that Voter Reference Foundation
9      will go and post the data online anyway?
10       MS. LECOCQ:  Objection.
11   **A.  I think what I can respond to is that that is**
12   **the same kind of position that you had, right,**
13   **the same question you asked me about the**
14   **affidavit, and based on our analysis and**
15   **guidance from our attorney, our position has**
16   **not changed.  So, again, it would require, you**
17   **know, guidance from our attorneys based on this**
18   **pending litigation if we received a new request**
19   **from you.**
20     BY MR. GREIM:
21   **Q.  Okay.  Now I'm going to ask you:  Does the**
22   **secretary of state believe that if you make a**
23   **response tomorrow to us, that we are going to**
24   **take the information of the voters, the**
25   **individual information for each voter, and put**

Page 179

1    **it online?**
2  **A.  I don't know.**
3    **Q.  So you think it's possible they'll do it**
4      **anyway?**
5  **A.  I think that it's an analysis that was taken**
6    **based on your position.  I don't think your**
7    **position has changed.  And we have received**
8    **guidance that it is in our best interest to**
9    **protect our position and so, therefore, we**
10   **didn't provide it.**
11   **Q.  I'm not asking --**
12   **A.  I don't think anything has changed, therefore**
13   **nothing would change in our response.**
14   **Q.  Okay.  So even me telling you every category**
15   **that will not be put online, the position**
16   **remains that the secretary of state believes**
17   **that VRF may put it online anyway?  You don't**
18   **know?  You don't know?  You think we might,**
19   **right?**
20   **A.  I think there's a concern.**
21   **Q.  Okay.  Is there anything Voter Reference**
22   **Foundation can do to get rid of that concern?**
23   **Is there anything at all it can do?**
24     MS. LECOCQ:  Objection.
25   **A.  Are you asking for my personal --**

Page 180

1    BY MR. GREIM:
2    Q.  I'm asking for office's position.
3  **A.  You know, I think that I don't have anything to**
4    **point to.  I think it's all a matter of getting**
5    **to the end of this litigation so that we all**
6    **have clarity.**
7    **Q.  So the litigation will need to end before you**
8    **can answer that question?**
9  **A.  I don't know.  Again, you know, nothing has**
10   **changed up to this point.**
11   **Q.  Okay.**
12   **A.  So until something were to change and we got**
13   **different guidance, I don't have a different**
14   **answer.**
15   Q.  So it's kind of what the lawyers say?
16 **A.  Yes.**
17     (WHEREUPON, Deposition Exhibit 9 was
18     marked for identification.)
19     BY MR. GREIM:
20   Q.  Well, let's go to our next exhibit.  I'm
21     handing you what we're marking as Exhibit 9.
22     You'll see this is a Dylan Lange letter.  It's
23     actually an e-mail attaching a letter to Voter
24     Reference Foundation and it copies you.  Do you
25     recognize this document?

Page 181

1  **A.  Give me just a second.  I recognize the**
2    **document.**
3    Q.  Okay.  Did you -- who was involved in drafting
4      this document?
5  **A.  I know that I spoke to Dylan about it.  Dylan**
6    **drafted the document, and I know that we**
7    **discussed it with Sharon.**
8    Q.  So is it fair to say that Sharon and you both
9      approved this document before it went out the
10     door?
11   **A.  Yes, and also, at the time, Olga.**
12   Q.  And Olga, okay.  You understood that she was
13     advising on behalf of the attorney general's
14     office, correct?
15   **A.  Right.**
16   Q.  Okay.  So it looks to me like on October 18,
17     2022, Gina Swoboda, VRF, made a request for
18     about five categories of items.  And then this
19     response was made on November 17th, about a
20     month later, right?
21   **A.  Right.**
22   Q.  Okay.  And Ms. Swoboda, on behalf of VRF, made
23     this request under both the NVRA and the New
24     Mexico Public Records Law, right?
25   **A.  Correct.**

46 (Pages 178 to 181)

Page 182

1   Q.  So let's go to Mr. Lange's -- and by the way,
2       you agreed with everything in Mr. Lange's
3       response?
4   A.  I do.
5   Q.  Okay.  I'm going to ask you now about these
6       items.  So Mr. Lange says, "To begin with,
7       request number 3 is a request for future data
8       that does not/did not exist at the time of your
9       request, and we cannot fulfil requests in
10      perpetuity."  That means can't ful- -- you
11      can't make a request for the future, way in the
12      future, and just keep expecting to be billed,
13      right?
14  A.  Uh-huh.
15  Q.  Okay.  Is that what VRF did here?
16  A.  Yes.
17  Q.  Well, let's look at the request.  So number 3,
18      is "Voter registration data for all voters
19      removed or canceled from any list between
20      September 24, 2022," right, "and December 15,
21      2022."  And so part of that time is into the
22      future, right?
23  A.  Uh-huh.
24  Q.  But part of it already existed when the request
25      is made, right?

Page 183

1   A.  But the ask was for a window of time.
2   Q.  Sure.  But is there any reason not to just to
3       give the data that you do have from
4       September 24th to the date of the response?
5           MS. LECOCQ:  Objection.
6   A.  Our position and our process across the board
7       is to respond to requests, to respond to the
8       request that was made.  And we could not
9       because that window of time didn't exist at
10      that time.
11  BY MR. GREIM:
12  Q.  Okay.  So if somebody were to ask you -- let me
13      ask you this:  What if the request was
14      through -- from September 24th of 2022 to
15      November 17, 2022, would you say we're going to
16      not respond to that request because on
17      October 18th it wasn't November yet?
18          MS. LECOCQ:  Objection.
19  BY MR. GREIM:
20  Q.  I mean, I'm just trying to understand the
21      principle here.
22  A.  The request was for future data that we did not
23      have.  So if it was asking for future data, we
24      do not have it.
25  Q.  You reject the entire request then?

Page 184

1   A.  That is the request.
2   Q.  You do that for everybody?
3   A.  We respond to the request, yes.
4   Q.  You understand -- you don't -- you're not
5       arguing that VRF asked for data in perpetuity,
6       are you?
7   A.  I just said that I agreed with this statement
8       made by Dylan in this letter.  So I do believe
9       it was asking future data.
10  Q.  Well, I'm not asking future.  I'm asking in
11      perpetuity.  VRF is not asking for data in
12      perpetuity, is it?
13  A.  I don't see that.
14  Q.  Okay.  Let's now go to the second paragraph.
15      It says, "Additionally, we will refrain from
16      producing any responsive voter data maintained
17      by our office at this time due to numerous
18      issues further detailed below."  It says that,
19      right?
20  A.  Yes.
21  Q.  And let's just march through those.  He says,
22      "To begin with, this decision is motivated by
23      the fact that you will post any voter data
24      provided on your website, which our office
25      believes is a violation of law."

Page 185

1       Now, on what basis did the secretary of
2   state believe on November 17th that Voter
3   Reference Foundation was just going to post
4   whatever it got on its website?
5   A.  Because it had occurred.
6   Q.  Did you consider any statements that Voter
7       Reference Foundation or its counsel -- promises
8       that counsel made in open court afterwards,
9       were those considered?
10  A.  What is the date?  Maybe we can clarify the
11      date.  Was this letter before or after that
12      hearing?
13  Q.  This was in November, and this issue was
14      discussed -- you know, I hate to start making
15      representations without the transcripts here.
16      There were no hearings after November 17th,
17      I'll just tell you that.
18          So, I mean, my question is:  On
19      November 17th it sounds like the only data
20      point for the secretary of state's office was
21      that at one time VRF had posted data on its
22      website.
23  A.  And I think I've spoken to that concern.
24      Because it had been posted online, that was a
25      concern to us.

47 (Pages 182 to 185)

Page 186

```
 1   Q.   And any promises VRF made not to post on its
 2        website were not relevant, is that right?
 3             MS. LECOCQ:  Objection.
 4   A.   Again, the decision was made on past practice.
 5             BY MR. GREIM:
 6   Q.   Okay.  I understand that.  My question is
 7        whether it's relevant when Voter Reference
 8        Foundation comes to you directly and says it
 9        will not post data online?
10   A.   Clearly -- my understanding, just to make sure
11        I have the timeline correct, this request came
12        to us after the hearing in which you made those
13        statements, correct?
14   Q.   Yeah, it definitely did.
15   A.   Okay.  So our position, as outlined in this
16        letter, was that based on past practice and
17        concerns that it was going to be posted, we
18        were not going to provide the data.
19   Q.   And I'm just trying to understand what weight,
20        if any, you gave to VRF's direct statements
21        that it would not do so?  Did you give that
22        statement any weight?
23   A.   I think we consider all things, right, but at
24        the end of the day --
25   Q.   Did you consider it?
```

Page 187

```
 1   A.   -- we have obligation to protect what we
 2        believe is folks' privacy and to maintain their
 3        opportunity to participate in the process.  So
 4        as I stated consistently, you know, at the
 5        hearing, again today, in our responses, our
 6        concern, based on past practice, was that this
 7        data was going to be posted online.
 8   Q.   So when --
 9   A.   And there was a decision not to provide the
10        data.
11   Q.   So when will VRF's past practice of posting the
12        data stop counting against it when it makes
13        data requests?
14             MS. LECOCQ:  Objection.
15   A.   I don't even know how to answer that question.
16             BY MR. GREIM:
17   Q.   Okay.  Did you consider the fact that VRF
18        posted data after obtaining an injunction from
19        the Court?  Did that concern you as well?
20   A.   Did I what, I'm sorry?
21   Q.   You're saying you were considering past
22        practices.  Was one of the past practices that
23        you considered the fact that VRF reposted the
24        data after getting an injunction from the
25        Court?
```

Page 188

```
 1             MS. LECOCQ:  Objection.
 2   A.   When was that?  I'm just trying to get that in
 3        my mind at this point.
 4             BY MR. GREIM:
 5   Q.   July, the Court told us not to repost it.
 6   A.   2022, and you reposted it, correct?  And so
 7        then it was posted at the time of this request
 8        for more data.
 9   Q.   It was, yes.
10   A.   So, yes.  So after a promise not to post it, it
11        was reposted, and then we get a request for
12        more data, absolutely.
13   Q.   Now, do you recall that the promise not to post
14        it was unless or until we got relief from the
15        Court?  Do you recall that?  We can go back and
16        look at the letter.  Let's go back.
17   A.   That's fine.  I get that you're going to do
18        what the Court allows you to do.
19   Q.   Right.  But nonetheless, there was a dock
20        against VRF when deciding whether to -- whether
21        to --
22   A.   I think that's a very clear indication of the
23        intention of the use of the data.
24   Q.   Okay.  And so, now, how do you factor in the
25        fact that after the Court of Appeals stayed the
```

Page 189

```
 1        injunction VRF immediately took it down?
 2   A.   Because it's a court order, not out of respect
 3        for the state law or our position or our
 4        policy.
 5   Q.   Because we had to?
 6   A.   Yes.
 7   Q.   Okay, got it.  But do you believe VRF will
 8        maybe even post it without a court order?
 9   A.   Post what without a court order?
10   Q.   Voter data.
11   A.   That if the Court says you cannot?
12   Q.   Right.
13   A.   If the Court says you cannot, no.
14   Q.   Do you believe that while the issue is still
15        pending, VRF might just decide to start posting
16        again?
17   A.   I think without a court order, I think their
18        intention is to post that data, yes.
19   Q.   Oh, so you believe VRF is going to -- you
20        believe VRF will post voter data even without a
21        court order?
22   A.   I don't think I said that.
23   Q.   Okay.  I thought I -- I could have sworn you
24        said that.
25   A.   No.
```

PohlmanUSA Court Reporting
(877) 421-0099    PohlmanUSA.com

Page 190

1   Q.   So even while this case is pending, do you
2        believe VRF is going to repost data?
3   A.   I think without a court order that prohibits
4        the posting of data, VRF has demonstrated that
5        its intention is to post the data.
6   Q.   Okay.  The next thing is, finally, on
7        November 10, 2022 -- I'm back to Exhibit 9.  On
8        November 10, 2022, we filed a motion to stay --
9        second paragraph.  I'm kind of at the bottom of
10       that second one.  "We filed a motion to stay
11       the preliminary injunction pending appeal...
12       ...and do not think it is appropriate to
13       produce voter data until the Court has ruled on
14       the motion."
15           Did I read that right?
16  A.   You did.
17  Q.   Okay.  Why not?
18  A.   Why do we feel like it's not appropriate?
19  Q.   Yes.
20  A.   Because we feel like it's against the law.
21  Q.   Right.  But -- so -- oh, so you -- is it the
22       secretary of state's position that it is
23       actually against the law to produce data to
24       VRF?
25  A.   No.

Page 191

1   Q.   Okay.  So I'm asking you why the secretary of
2        state says that "We do not think it is
3        appropriate to produce voter data until the
4        Court has ruled on the motion"?
5   A.   We appealed -- we were in the process of
6        appealing because we felt like posting it
7        online was against state law --
8   Q.   Okay.  But --
9   A.   -- is against state law.
10  Q.   So what was inappropriate about just producing
11       data to VRF at this time?
12  A.   The knowledge that it was going to be posted
13       online.
14  Q.   Okay.  Well, let's talk about this.  Did the
15       order allow VRF to post all data online or just
16       some data?
17  A.   I don't know.
18       MS. LECOCQ:  Objection.
19  BY MR. GREIM:
20  Q.   Okay.  Well, we may have to actually pull it
21       out.  Did the secretary of state recall that
22       the order only related to the data that VRF had
23       already received?
24  A.   I'd have to look at the order.
25  Q.   I think we're going to have to pull the order

Page 192

1   up.  While we're doing that, let me make sure I
2   understand.  The inappropriateness here in this
3   sentence relates to another concern that
4   without a definitive win in the Court of
5   Appeals, VRF might start posting even new data
6   on the Internet, is that right?  Let me
7   rephrase that.
8       The inappropriateness you're referring to
9   here is the secretary of state's concern that
10  unless and until the secretary of state got a
11  definitive win in the Tenth Circuit that VRF
12  might just post any data it got online?
13       MS. LECOCQ:  Objection.
14  BY MR. GREIM:
15  Q.   Is that the concern?
16  A.   The concern was that VRF had posted data.  We
17       understand that they had an intention to post
18       data, and they're asking for updated data, so,
19       yes, there is a concern that it would be
20       posted.
21  Q.   Okay.  I'm just going to read to you -- you're
22       not in a good position for me to tilt the
23       computer around.  I'm looking at DOC 51,
24       page 210.  And it says, "It is ordered that (i)
25       the Plaintiffs' motion for preliminary

Page 193

1   injunction is granted in part; (ii) that AG
2   Balderas and Defendant SOS Oliver are enjoined
3   from prosecuting Plaintiff VRF for publish-" --
4   okay, this is all one thing -- "are enjoined
5   from prosecuting Plaintiff Voter Reference
6   Foundation under N.M.S.A. 1-4-5.5 or 1-4-5.6
7   for publishing data it already received from
8   Local Labs."
9       Okay.  So does that refresh your
10  recollection that the order only went to the
11  data we already received?
12       MS. LECOCQ:  Objection.
13  A.   I mean, I heard you.  Now I know what it says.
14  BY MR. GREIM:
15  Q.   Okay.  So is it possible that the secretary of
16       state -- I mean, you're here not as yourself
17       but for the secretary of state, did not know
18       that the injunction only related to the data
19       that VRF had received from Local Labs?
20       MS. SCHREMMER:  Objection.
21  A.   It's possible.  But I guess also, you know,
22       when I hear that statement all along, right,
23       there's 200 and something other pages to
24       consider in that order, so I am going to,
25       obviously, rely on an attorney to read that in

49  (Pages 190 to 193)

Page 194

```
 1    its entirety.  So it already received, does
 2    that mean the fields?  Does that mean only from
 3    a certain date and time?  I don't think that's
 4    clear.
 5    BY MR. GREIM:
 6    Q.   Okay.  So the secretary of state thought that
 7    the injunction was unclear?
 8        MS. SCHREMMER:  Objection.
 9    A.   I think that statement you just read that
10    you're asking me respond to is unclear, as I
11    think there is a much larger document that was
12    reviewed and considered by our legal counsel.
13    BY MR. GREIM:
14    Q.   Okay.  Well, let me just ask you.  I want to
15    make sure I fully understand the meaning of
16    this last phrase about "do not think it's
17    appropriate to produce voter data."  Is there
18    any other concern about appropriateness there
19    other than the fear that VRF was going to take
20    the new data and post that online?
21    A.   It was the belief, based on past practice, that
22    it was going to post the new data online, and
23    also the fact that we were appealing that
24    decision that provided opportunity to post.
25    Q.   So why would the appeal make a difference?  I'm
```

Page 195

```
 1    trying to understand why would the fact of the
 2    appeal keep VRF from being able to get data?
 3        MS. LECOCQ:  Objection.
 4    BY MR. GREIM:
 5    Q.   Why did the secretary of state think that the
 6    appeal mattered?
 7    A.   It mattered because we believed that posting it
 8    online is contrary to what the law allows.
 9    Q.   But was the secretary of state going to get a
10    decision from the Tenth Circuit that VRF can
11    never post the data online?  Was that even a
12    possibility on the appeal?
13    A.   We believe that is a possibility.
14    Q.   Okay.
15    A.   We believe that we are following the law.
16    Q.   Okay.
17    A.   That's it.
18    Q.   Okay.  So the secretary of state -- I'm just --
19    believes that it might win in the Tenth
20    Circuit, and the Tenth Circuit might say, "VRF,
21    you can't post this online at all," and you
22    thought you needed to wait to see what the
23    Tenth Circuit said, is that right?
24    A.   In part, and the past practice of reposting
25    online, yes.
```

Page 196

```
 1    Q.   Okay.  And so, I mean, the Tenth Circuit
 2    decision isn't decided now either, right?
 3    Still waiting?
 4    A.   We are still waiting.
 5    Q.   Okay.  Well, actually, let's be clear.  What
 6    you cite here is the motion to stay the
 7    preliminary injunction --
 8    A.   Correct.
 9    Q.   -- right?  Well, that was granted.
10    A.   Yes.
11    Q.   So does that change this sentence?  Would you
12    now produce the data because the motion to stay
13    was granted, or would you be less inclined to
14    produce the data because the motion to stay was
15    granted?
16    A.   I think as I stated before, you know, there
17    hasn't been a significant change in the facts,
18    right, so there's not a change in your
19    position, not a change in our position, no.
20    Q.   Well -- okay.  But the letter cites the motion
21    to stay, as a fact that it's pending, as a
22    reason not to produce the data, and so the
23    motion to stay has been decided, it has been
24    granted.  And so now that something -- that has
25    changed, the thing cited here has changed.  And
```

Page 197

```
 1    so my question is which way does that cut?
 2    Does it make it -- is the secretary of state
 3    more inclined to release the data after having
 4    won the motion to stay or less inclined
 5    to release the data?
 6    A.   I don't have an updated response from the
 7    office on that item.
 8    Q.   Okay.  I'm going to be adding that to the list
 9    of things that we don't have an answer to and
10    this may require counsel being involved.  I'd
11    like to understand that.  We need to understand
12    what this letter means.
13        Okay.  The next -- we can keep moving
14    through.  The next paragraph says that you have
15    not submitted the required affidavit and it
16    cites -- oh, here, it actually cites the
17    injunction, so it cites part of the injunction.
18    So is the lack of an affidavit one of the
19    reasons for rejecting the request?
20    A.   Absolutely.
21    Q.   Even had there been an affidavit attached, it
22    still would have been rejected, though,
23    correct?
24    A.   I think we don't know that answer because we
25    didn't receive one, right?
```

Page 198

1   Q.  No -- well --
2   A.  But based on what we do know at this -- are we
3       asking about this point in time?
4   Q.  Yes.
5   A.  Yes.
6   Q.  Okay.  It would have been rejected even with
7       the affidavit?
8   A.  Yes.
9   Q.  Okay.  And then finally at the very end you say
10      that if the Court orders you to produce it, you
11      will, right?
12  A.  Right.
13  Q.  That remains true?
14  A.  Correct.
15          (WHEREUPON, at this time a discussion was
16      held off the record.)
17  BY MR. GREIM:
18  Q.  I have one more question about Exhibit 9 -- a
19      different part -- I'm sorry, this is Exhibit 8.
20      Let's go back here.  Exhibit 8 does double
21      duty.  It is a request for -- it attaches a
22      request for records and it also provides a
23      notice of violation.  Do you see the bolded
24      section in the beginning?  There's some
25      indentation problems there, but it says "Notice

Page 199

1       of Violation of National Voter Registration Act
2       and Request for Records," do you see that?
3   A.  I do.
4   Q.  Okay.  Now, one thing we're asking for the
5       secretary of state's position on in this case
6       is whether there was any information missing
7       from this notice.  Is there anything in here
8       that it is claiming should have been inserted
9       into this notice to make it a proper notice?
10      And my question is:  Is there anything missing
11      in the notice?
12  A.  A proper notice of NVRA violation?
13  Q.  Uh-huh.
14  A.  I don't know what's required of the notice of
15      an NVRA violation.
16  Q.  Did you do anything before the deposition today
17      to explore that topic?
18  A.  Compliance with federal law from your
19      organization?
20  Q.  No, no.  Let's -- I mean, I can -- we can go
21      back to the -- we can go back to the notice.
22      Let's see here.  Oh, it's the admissions and
23      denials and responses to discovery.  Okay.
24      Well, we asked you a question about whether
25      this notice was proper.

Page 200

1       So your counsel may have an objection
2       that I can't ask this question or that you
3       don't need to give me an answer, but I'm just
4       going to ask it on the record.  Does the
5       secretary of state contend that there is
6       anything defective in this notice of violation
7       of the NVRA?
8           MS. LECOCQ:  Objection.  You can answer.
9   A.  I don't know.
10          MR. GREIM:  Now we can take our break.
11          (WHEREUPON, at this time a brief recess
12      was taken.)
13  BY MR. GREIM:
14  Q.  All right.  Before we leave our last topic, the
15      denials of records, we talked, Ms. Vigil, about
16      the reasons for the secretary of state denying
17      the requests that I made in May and then we
18      talked again about the denials of the November
19      requests.  I just want to make sure we're not
20      missing any of the reasons for the denials of
21      the requests.
22  A.  I mean, it was made in October, right?
23  Q.  Yeah, made in October, that's right.  And so
24      maybe if we can go back to Exhibit 8, we talked
25      about the statements regarding personal

Page 201

1       information, not publishing it online, and --
2       but I skipped over, kind of, the second of the
3       two projects.  And so I list in this request
4       two different projects that we were going to do
5       with the data.  And you'll see the first one is
6       this complete list by county precinct -- I'm
7       sorry.  These are two sets of data.  And the
8       second one is the current voter registration
9       data.
10          And then I go in and mention the two
11      projects.  At the very bottom I say for a
12      second project VRF intends to analyze basically
13      the data or to engage in a discrepancy review
14      of the voter rolls.  Do you remember reading
15      over that earlier?
16  A.  Yes.
17  Q.  And I just wanted to know, earlier I think you
18      testified that some of the misinformation that
19      the secretary thinks that VRF was engaging in
20      was that discrepancy analysis and its
21      statements about that, which would have been
22      back in late 2021.  And so before I ask a
23      question, I just want to make sure that you're
24      tracking with me.  Do you recall testifying
25      earlier about the secretary's concern that the

Page 222

1  don't believe the AG's office has shared any
2  feedback on the amendment.
3  BY MR. GREIM:
4  Q.  Okay.  But back to the question that I asked,
5      which is not about the response to this, my
6      question is whether the secretary of state's
7      office, okay, your office, is supporting these
8      particular amendments in order to impact the
9      current litigation?
10         MS. LECOCQ:  Objection.
11  A.  No.
12         MR. GREIM:  We're all set.  We're done
13     here.
14         THE COURT REPORTER:  Erin, would you like
15     a copy?
16         MS. LECOCQ:  Yes.
17         MR. GREIM:  We are asking for a rough by
18     Thursday, and they may also want the same.
19         MS. LECOCQ:  Yeah, we would like that,
20     too.
21
22         (Deposition concluded at 6:53 p.m. EST.)
23
24
25

Page 223

1         ACKNOWLEDGMENT OF DEPONENT
2
3         I, MANDY VIGIL, do
4  hereby certify that I have read the
5  foregoing pages, and that the same is
6  a correct transcription of the answers
7  given by me to the questions therein
8  propounded, except for the corrections or
9  changes in form or substance, if any,
10  noted in the attached Errata Sheet.
11
12
13  _____
14  MANDY VIGIL          DATE
15
16
17
18
19
20
21
22
23
24
25

Page 224

1  STATE OF INDIANA   )
2                     ) SS:
3  COUNTY OF JOHNSON  )
4
5         CERTIFICATE
6
7      I, Valerie Fillenwarth, RPR, a Notary
8  Public in and for the County of Johnson, State
9  of Indiana, maintaining an office in Johnson
10  County, Indiana, do hereby certify the
11  following:
12
13      That the witness herein, MANDY VIGIL, was
14  first duly sworn to tell the truth, the whole
15  truth and nothing but the truth in the
16  foregoing deposition;
17
18      That all testimony was taken down in
19  stenographic notes and afterward reduced to
20  typewritten form under my direction and then
21  presented to counsel for the purpose of
22  obtaining the deponent's signature;
23
24      That I recorded and transcribed any and
25  all objections made by counsel and the reasons

Page 225

1  therefore; and
2
3      That I am not a relative or employee,
4  attorney or counsel of any of the parties, nor
5  a relative or employee of such attorney or
6  counsel, nor am I financially interested in
7  this action.
8
9      IN WITNESS HEREOF, I have hereunto set my
10  hand and affixed my Notarial Seal this 16th day
11  of March 2023.
12
13
14
15
16      Valerie Fillenwarth, RPR
17      Notary Public
18
19
20
21
22
23  My County of Residence is:  Johnson
24  Commission Number:  NP0669434
25  My Commission Expires:  June 22, 2023

57 (Pages 222 to 225)