

# PohlmanUSA®
## Court Reporting and Litigation Services

Hugh Alexander Curtas

February 28, 2023

Voter Reference Foundation, LLC

vs.

Raul Torrez, et al.

EXHIBIT

P19

exhibitsticker.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


VOTER REFERENCE FOUNDATION, LLC, )
                                 )
              Plaintiff,          )
                                 )
       -vs-                       ) Case No.
                                 ) 1:22-cv-00222-
RAUL TORREZ, in his official      ) JB-KK
capacity as New Mexico            )
Attorney General, and             )
MAGGIE TOULOUSE OLIVER, in        )
her official capacity as          )
New Mexico Secretary of State,    )
                                 )
              Defendants.         )



DEPOSITION OF HUGH ALEXANDER CURTAS

February 28, 2023


          Remote oral deposition of

HUGH ALEXANDER CURTAS, conducted at the location of

the witness, commencing at 9:08 a.m. MST, on the

above date, before CORINNE T. MARUT, C.S.R. No.

84-1968, Registered Professional Reporter,

Certified Realtime Reporter and Notary Public.

Page 50

1  answering the questions here, and she would have
2  been someone to -- she would have likely been the
3  one to have initiated the, "Hey, staff, look
4  through your records.  Do you have any
5  correspondence with this organization?"
6       Because I definitely didn't in terms of,
7  you know, my -- because one of the first things I
8  would have done, especially because I am the press
9  person or I am the communications person, if
10 someone is going to have correspondence about
11 alleging something like this, they should have come
12 to me and nobody had come to me at this point as
13 far as...
14      So, I could say that I hadn't had any
15 correspondence, but I needed confirmation from the
16 larger amount of staff.  And that's what this
17 bullet point is there.
18      MS. LECOCQ:  I hate to interrupt.  Once we are
19 done with this exhibit, do you think it's possible
20 to take a break?  It's been almost an hour.
21      MR. TYLER:  Yes.
22      MS. LECOCQ:  Thanks.  We don't need it now.
23      MR. TYLER:  The rest of this might take a
24 little bit.
25      MS. LECOCQ:  Okay.

Page 51

1       MR. TYLER:  So, let's go ahead and take a
2  break now.
3       MS. LECOCQ:  I appreciate it.  Thank you.
4       MR. TYLER:  What time is it right now?  I
5  think we are going to go off the record and come
6  back at 10:20.
7            (WHEREUPON, a recess was had
8            from 10:08 to 10:21 a.m.)
9       MR. TYLER:  We will go back on the record
10 here.
11 BY MR. TYLER:
12      Q.   We were talking about I believe the
13 December 16 e-mail from you to Megan O'Matz?
14      A.   Um-hmm.
15      Q.   Okay.
16      A.   Yes.
17      Q.   And I'm just going to -- I'm going to go
18 through here and ask you about some specific
19 things, and just answer as to as much of your
20 knowledge as you actually remember.
21      A.   Okay.
22      Q.   And, so, if you're saying, you know, "I
23 would have contacted this person," or something
24 like that, just try to be as specific as possible.
25      A.   Okay.

Page 52

1       Q.   Okay.  So, you say, "Simply put,
2  VoteRef.com is misleading the public about New
3  Mexico's voter rolls and are perpetuating
4  misinformation."
5       I have got a couple terms just in that
6  sentence that I would like to define quickly.
7       When you say "misinformation," what do
8  you mean?
9       A.   I mean misinformation about voting and
10 elections that was very prominent at the time and
11 continues to be very prominent.
12      Q.   So, misinformation, though, what do
13 you -- what is misinformation to you?
14      A.   So, misinformation in -- are you talking
15 in general or specific what I'm specifically
16 referring to here?
17      Q.   If there is a general definition that
18 you have and then a different specific definition
19 in this context, then I would like to know both of
20 those.  But if there is just one, I'd like to know
21 that one.
22      A.   I think in this context, they are the
23 same.  And what I mean by misinformation and
24 election and voting misinformation at this -- here,
25 is putting out information about our voting and

Page 53

1  elections that doesn't correspond to the truth.
2       Q.   And in this context, you're saying that
3  VRF is perpetuating misinformation.  What is the
4  information that VRF was putting forth that did not
5  correspond to the truth?
6       A.   Sure.  So, the misinformation that
7  Voter Ref is -- you know, that I'm claiming here,
8  is that there are discrepancies within our voter
9  data.
10      Q.   And how did you come to that conclusion?
11      A.   That conclusion is basically the first
12 bullet point of my answer in this e-mail, namely,
13 that this organization is claiming that our voter
14 data is not accurate and they are mis- -- I mean,
15 they are, they being Voter Ref, are
16 mischaracterizing the data they seem to be in
17 possession of.
18      Q.   What is the characterization by
19 Voter Ref that you are saying is misinformation?
20      A.   That there are differences between the
21 voter -- like the voter data and number of ballots
22 cast or, you know, what they are alleging in here,
23 in there or what I have been told from this
24 reporter at this point is incorrect.
25      A discrepancy -- well, what I came to

14 (Pages 50 to 53)

Page 70

```
1      A.   No, no.
2      Q.   And your first bullet point, the
3  discrepancy -- we kind of talked around this for a
4  while, so I'm trying really hard not to make you
5  repeat yourself.  I'm sorry if you have to do that.
6      The discrepancy that you're talking
7  about, who is the person that you went to with that
8  question?
9      MS. LECOCQ:  Objection.
10 BY MR. TYLER:
11     Q.   I think that you said it was Mandy and
12 Greg?
13     A.   Yes.  That's correct.
14     Q.   Are those the only two people?
15     A.   Those would -- those were the people
16 that I knew to go to first, and those were the
17 people that I addressed that question to.
18     Q.   Do you remember what information they
19 gave you so that you could come to this conclusion?
20     A.   This was the information that they --
21 they gave me.
22     Q.   Okay.
23     A.   Yeah.
24     Q.   So, are these their words or are these
25 your words?
```

Page 71

```
1      A.   These are my words drafted from what
2  they told me.
3      Q.   Okay.  In the course of either, you
4  know, when you got the first e-mail from Megan
5  O'Matz or at any point after that, have you created
6  any like file on VRF or anything like that that you
7  would have, research documents and/or drafts of
8  things?
9      MS. LECOCQ:  Objection.
10 BY THE WITNESS:
11     A.   No, no.  Other than, you know, the
12 e-mails that -- these e-mails and things that I
13 have produced for discovery, yeah, that's -- that's
14 the only information I would have referencing VRF.
15 BY MR. TYLER:
16     Q.   Okay.  And moving on to the second
17 bullet point, you say, "No, our Office has not been
18 contacted by this group to discuss their findings
19 likely because that would not serve their intended
20 goal of spreading misinformation."
21     I think we've hit that first clause a
22 good amount.
23     A.   Um-hmm.
24     Q.   The second one, where did you come to
25 this conclusion or how did you come to this
```

Page 72

```
1  conclusion that the intended goal of VRF is to
2  spread misinformation?
3      A.   So, I would have -- I came to that
4  conclusion because of the information that I had at
5  that point and -- which cannot also -- which must
6  be seen in the larger context of what's going on in
7  December of 2021 and to now, which is an immense
8  amount of mis- and disinformation about voting and
9  elections being, you know, in the public
10 conversation.
11     So, that's to say me specifically,
12 because I'm kind of the front line on this, but our
13 office more generally, very -- we are very attuned
14 to the misinformation that's out there about
15 elections in general and New Mexico's elections
16 specifically.
17     And, so, I as the spokesperson for the
18 office am pushing back hard wherever I find it,
19 wherever I see it, and because we want New Mexicans
20 to have accurate information about their voting and
21 elections.  It's part of our mission at the office.
22 And, so, I'm very attuned to that.
23     Once I kind of looked at all of this,
24 namely, that this group is in illegal possession of
25 our voter data and not only are they in illegal
```

Page 73

```
1  possession of our voter data, they are making
2  claims, false claims, about the data that they
3  have, and those two things are really concerning to
4  me and led me to the conclusion -- especially
5  because there is a larger kind of strategy of
6  election denialism that focuses on voter list
7  maintenance specifically.
8      So, it's not like this is happening in a
9  vacuum.  There is a reason that when I'm looking at
10 all of this information that I have at this point,
11 I am, you know -- I'm of the opinion that this
12 is -- that this is their intention.
13     Q.   Are there other people in the
14 Secretary's office that share your feelings about
15 this?
16     A.   I wouldn't be able to talk about -- I
17 mean, specifically to whatever individuals are
18 thinking about this and, you know, about this group
19 and in this time.  So, I mean, you know, this is --
20 yeah, I mean, I don't know exactly what someone
21 like Sharon or Mandy or whatever, you know, would
22 think about this group at this time.
23     Q.   Have you ever talked to anyone in the
24 office about the kind of -- what you're referencing
25 as the greater kind of misinformation around
```

Page 134

1    I, CORINNE T. MARUT, C.S.R. No. 84-1968,
2   Registered Professional Reporter and Certified
3   Shorthand Reporter, do hereby certify:
4        That previous to the commencement of the
5   examination of the witness, the witness was duly
6   sworn to testify the whole truth concerning the
7   matters herein;
8        That the foregoing deposition transcript
9   was reported stenographically by me, was thereafter
10  reduced to typewriting under my personal direction
11  and constitutes a true record of the testimony
12  given and the proceedings had;
13       That the said deposition was taken
14  before me at the time and place specified;
15       That the reading and signing by the
16  witness of the deposition transcript was waived;
17       That I am not a relative or employee or
18  attorney or counsel, nor a relative or employee of
19  such attorney or counsel for any of the parties
20  hereto, nor interested directly or indirectly in
21  the outcome of this action.
22

     _____
23       CORINNE T. MARUT, Certified Reporter
         Registered Professional Reporter
24       License No. 84-1968
25

PohlmanUSA Court Reporting
(877) 421-0099      PohlmanUSA.com