## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**VOTER REFERENCE FOUNDATION, LLC,**

            **Plaintiff,**

                                            **Case No: 1:22-cv-00222-JB-KK**

**v.**

**RAÚL TORREZ, in his official capacity as
New Mexico Attorney General;**

**and**

**MAGGIE TOULOUSE OLIVER, in her official
capacity as Secretary of State of New
Mexico,**

            **Defendants.**

---

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Erin E. Lecocq
Kelsey Frobisher Schremmer
Jeff Dan Herrera
Assistant Attorneys General
408 Galisteo St
Santa Fe, NM 87501
Tel.: (505) 490-4060
Fax: (505) 490-4881
elecocq@nmag.gov
kschremmer@nmag.gov
jherrera@nmag.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION _____ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS_____ 2

STANDARD OF REVIEW _____ 17

ARGUMENT_____ 18

I.   The NVRA claims fail because Plaintiff's records requests did not fall within the scope of the NVRA and because New Mexico was entitled to refuse requests made for an unlawful purpose. _____ 18

A.   The NVRA does not provide an "unqualified" right of access, as Plaintiff alleges. 19

B.   The NVRA does not preempt New Mexico's law on permissible subsequent uses of voter data. ................................................................................ 24

C.   Plaintiff is not entitled to relief under Count I or II. ............................... 28

II.   Plaintiff's Claim for First Amendment Retaliation Fails Because Plaintiff Engaged in Unprotected Conduct and Cannot Show Retaliatory Motivation _____ 33

A.   Plaintiff's Conduct Is Not Constitutionally Protected Speech .................. 33

B.   Defendants' Conduct Was Not Viewpoint Discriminatory .......................... 37

III.   Plaintiff's Claim V Fails as a Matter of Law Because States May Condition Grants of Access to Data Based on Policy Considerations_____ 41

IV.   New Mexico's Prohibition on Sharing and Distributing Voter Data is Not Overbroad 45

A.   The challenged statutes, as construed by the Secretary of State, prohibit access to and use of government data that would result in harm to the public. ............... 47

B.   The challenged statutes are not overbroad because there is no general First Amendment right to access government information.......................................... 48

V.   New Mexico's Statutes Prohibiting Sharing Voter Data Are Not Vague. _____ 50

VI.   House Bill 4 Renders Moot Any Claims that the Statutes are Vague. _____ 55

CONCLUSION _____ 57

**INTRODUCTION**

At the core of this case is a website: VoteRef.com. That site publishes the full names (first, middle, last); home addresses; full birth dates (month, date, year);[1] and registration information of citizens who have registered to exercise their right to vote. VoteRef.com provides this information without regard to whether the citizen is a law enforcement officer, prosecutor or public defender, judge, or parole officer or has some other reason to fear threats, stalking, bullying, or harassment. As justification for this invasion of privacy, VoteRef.com's homepage proclaims that the public "own[s] this data."

Plaintiff Voter Reference Foundation, LLC, is the entity behind VoteRef.com. It has filed this suit with a single aim: to force the Office of the New Mexico Secretary of State ("Secretary") to supply the personal information of all New Mexicans who have registered to exercise their fundamental constitutional right to vote. In furtherance of this aim, Plaintiff has alleged claims under the Constitution and the National Voter Registration Act ("NVRA").

More specifically, Plaintiff alleges that the NVRA and the First Amendment each provide an unrestricted right to access and publish all of New Mexico's voter data (Counts I–II, VIII); that Defendants' efforts to enforce New Mexico's laws on *use* of voter data violate

---

[1] Whether the full complement of information appears for any given voter depends on what information the voter's state has chosen to provide. For example, some states have no data listed on the site at all, while others provide voter birth years but not dates.

the NVRA and the First Amendment (Count II–III, V); and that those state laws are facially invalid under the First and Fourteenth Amendment (Counts VI–VII).[2]

There is no dispute of any facts material to these claims. Because there is no independent constitutional right to access government data, because the NVRA does not grant an unconditional right to access and publish all voters' personal information, because New Mexico's laws are clearly worded and narrowly tailored, and because Defendants' interpretations and applications of New Mexico law have been content- and viewpoint-neutral, Plaintiff cannot prove its claims against Defendants. Summary judgment should be entered in favor of Defendants.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

A. The Challenged Statutes

1.   Plaintiff challenges the following state statutes under the First Amendment: N.M. Stat. Ann. 1978, § 1-4-5.5, Requests for voter data, mailing labels or special voter lists; which reads:

A. The county clerk or secretary of state shall furnish voter data, mailing labels or special voter lists only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section; provided, however, all requesters shall be treated equally in regard to the charges and the furnishing of the materials.

B. In furnishing voter data, mailing labels or special voter lists, the county clerk or secretary of state shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where

---

[2] Pursuant to the Court's oral ruling during a hearing held on February 28, 2023, Plaintiff's Count IV—and all issues related to alleged prior restraints on speech—are "out of [the] case" pending a Tenth Circuit ruling on Defendant's interlocutory appeal. *See* Clerk's Minutes, ECF No. 106, at 2. Consequently, Defendants do not address these issues in this motion, and they expressly reserve the right to file dispositive motions on those issues as may become appropriate in the future.

voters have registered, a voter's day and month of birth or voters'
telephone numbers if prohibited by voters.

C. Each requester of voter data, mailing labels or special voter lists shall sign
an affidavit that the voter data, mailing labels and special voter lists shall
be used for governmental or election and election campaign purposes
only and shall not be made available or used for unlawful purposes.

D. The secretary of state shall prescribe the form of the affidavit.

E. As used in this section:

(1) "election campaign purposes" means relating in any way to a
campaign in an election conducted by a federal, state or local
government;

(2) "governmental purposes" means noncommercial purposes relating
in any way to the structure, operation or decision-making of a
federal, state or local government;

(3) "mailing labels" means prepared mailing labels of selected voters
arranged in the order in which requested and providing only the
name and address of the voter;

(4) "special voter list" means a prepared list of selected voters arranged
in the order in which requested; and

(5) "voter data" means selected information derived from the voter
file.

2. N.M. Stat. Ann. 1978, § 1-4-5.6, Unlawful use of voter data, mailing labels or special

voter lists; penalties, which reads:

A. Unlawful use of voter data, mailing labels or special voter lists consists of
the knowing and willful use of such information for purposes prohibited
by the Voter Records System Act [Chapter 1, Article 5 N.M. Stat. Ann.
1978].

B. Any person, organization or corporation or agent, officer, representative
or employee thereof who commits unlawful use of voter data, mailing
labels or special voter lists is guilty of a fourth degree felony and upon
conviction shall be fined one hundred dollars ($100) for each and every
line of voter information that was unlawfully used.

    C.  Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense.[3]

3.  Also relevant to this matter, but not being challenged, is N.M. Stat. Ann. 1978, § 1-5-22, Unlawful disposition of voter file; penalty, which reads:

    A.  Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System Act to have possession of the file.

    B.  For purposes of this section, a file maintenance list shall be considered a voter file or a part of a voter file.

    C.  Any data processor, officer, deputy, assistant, agent or employee who commits unlawful disposition of a voter file is guilty of a fourth degree felony.

4.  Since at least 2011, the Secretary has consistently interpreted Section 1-4-5.6 of the Election Code as prohibiting the willful selling, loaning, providing access to or otherwise surrendering of New Mexico voter data by any person or entity. *See* ECF Nos. 44-8, 44-9, and 44-10; PI Hearing, June 15, 2022, Tr. 77:17 – 78:7, relevant portions attached as Exhibit 1; Dep. Of Mandy Vigil ("Vigil Dep.") at 207:23-208:8, relevant portions attached as Exhibit 2.

5.  Also since 2011, the Secretary has interpreted Section 1-4-5.5 as allowing voter data obtained in compliance therewith to be shared within an organization such as a

---

[3] This section was amended by the 2023 New Mexico legislature, as discussed more fully in Fact Number 9.

company, a political party, or a party and a candidate from the same party. This interpretation is reflected in each version of the Voter Information Authorization form, all of which include the option for the requester to be an organization. ECF Nos. 44-8, 44-9, and 44-10; PI Hearing, June 15, 2022, Tr.10:1-12; Vigil Dep. at 93:17-94:1.

6.  Individuals not members of the same entity, as well as different entities, must each submit a separate Voter Information Authorization form and must comply with the regulatory process. This is true regardless of the identity or viewpoint of the requester. PI Hearing, June 15, 2022, Tr. 32:18-33:1; PI Hearing, June 15, 2022, Tr. 75:16-22.

7.  The Secretary's interpretation of Section 1-4-5.6 does not prohibit discussing voter data so long as the data itself is not released or shared. PI Hearing, June 15, 2022, Tr. 76:21-77:5.

8.  The Secretary reads Sections 1-4-5.5, 1-4-5.6, and 1-5-22 together to conclude that an entity or individual may access voter data for specific purposes, and may not use that data for any purpose deemed unlawful or share that data with anyone outside the entity who originally requested and signed an affidavit for the data. Vigil Dep. at 82:11-12, 83:1-2, 84:9-12.

9.  House Bill 4, signed by the Governor on March 30, 2023 and chaptered as 2023 New Mexico Laws Ch. 84, codifies the Secretary's interpretation into N.M. Stat. Ann. 1978, Section 1-4-5.6(A). Effective July 1, 2023, this section now reads:

A. Unlawful use of voter data, mailing labels or special voter lists consists of:

(1) the knowing and willful selling, loaning, providing access to or otherwise surrendering of voter data, mailing labels or special voter lists by a person for purposes prohibited by the Election Code; or

(2) causing voter data, mailing labels or special voter lists or any part of the voter data, mailing label or special voter lists that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means.

NM LEGIS 84 (2023), 2023 New Mexico Laws Ch. 84 (H.B. 4), relevant portions attached as Exhibit 3.

<u>B. Voter Reference Foundation and the Secretary</u>

10. Plaintiff Voter Reference Foundation, LLC, ("VRF") is a nonprofit organization which describes itself as "dedicated to increasing voter participation in elections while protecting election integrity." Am. Compl., ECF No. 74 at ⁋ 1.

11. VRF is a subsidiary of Restoration Action, Inc., a 501(c)(4) social welfare organization. Am. Compl., ECF No. 74 at ⁋ 13.

12. Gina Swoboda is VRF's Executive Director. PI Hearing, May 17, 2022, at 52:18-19, relevant portion attached as Exhibit 4.

13. VRF aims to publish the voter rolls of every state on its website VoteRef.com for free forever. VRF's work in this regard is "unprecedented" and "the first of its kind." PI Hearing, May 17, 2022, at 93:5-6, 8-10.

14. Ms. Swoboda testified that she "want[s] to update [the voter data on VRF's website] every quarter going forward." She intends to do so by submitting "FOIAs." PI Hearing, May 17, 2022 at 54:21-55:4.

15. The New Mexico Secretary of State is the chief election officer of the state. She is responsible for furnishing voter data to requesters and referring potential violations of the Election Code to the Attorney General for prosecution. N.M. Stat. Ann. § 1-2-1(A); § 1-2-1.1(C).

16. Mandy Vigil is the Elections Director for the Secretary. PI Hearing, May 17, 2022, Tr. 125:15-16, relevant portions attached as Exhibit 4.

17. In order to obtain voter data in New Mexico, a requester has to submit a properly completed Voter Information Authorization form. N.M. Stat. Ann. 1978, § 1-4-5.5; PI Hearing, May 17, 2022, Tr. at 128:13-15.

18. The Voter Information Authorization form includes an affidavit required under the New Mexico Election Code. N.M. Stat. Ann. 1978, § 1-4-5.5; PI Hearing, May 17, 2022, Tr. at 128:13-15.

## C. Local Labs and Initial Data Release

19. On March 29, 2021, David Michael Lippert, an apparent employee or agent of Local Labs, LLC ("Local Labs"), submitted a Voter Information Authorization form to the Secretary requesting the name, physical address, mailing address, year of birth, party affiliation, precinct assignment, jurisdiction, registrant ID number, associated

districts, voting history, and method of voting for each registered voter in the State of New Mexico ("Voter Data"). ECF No. 44-1.

20. Local Labs and VRF are separate entities. PI Hearing, May 17, 2022 Tr. 66:3-15.

21. Local Labs is a commercial entity that provides public records requests and other services. PI Hearing, May 17, 2022 Tr. 66:3-15.

22. On the form Lippert used, the requester had the option to choose from one of three purposes for the request: Governmental Use, Campaign Use, and Election Related Use. ECF No. 44-1. This comports with those uses permitted under N.M. Stat. Ann. § 1-4-5.5. Lippert selected "Election Related." ECF No. 44-1. He identified his name and that he was making the request on behalf of Local Labs. *Id*. The bottom of the form contains an attestation which states:

> Unlawful use of the information requested on this for shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplication, or alteration of information as stated in the Voter Records System Act (N.M. Stat. Ann. 1978, §§ 1-5-1 through 1-5-31).

> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

*Id*.

23. Local Labs' March 29, 2021 request was submitted pursuant to a contract with VRF. PI Hearing, May 17, 2022 Tr. 73:18-25; 74:9-13.

24. Prior to contracting with Local Labs, VRF's legal team reviewed relevant New Mexico statutes. PI Hearing, May 17, 2022 Tr., at 73:18-25; 74:9-13.

25. The Voter Data was provided to Local Labs by the Secretary on April 13, 2021. ECF No. 44-14.

26. On April 14, 2021, Local Labs submitted to the Secretary a payment of $5,378.12 for the Voter Data. ECF No. 44-2.

27. VRF paid Local Labs $15,000 for its services, including the Voter Data. PI Hearing, May 17, 2022 Tr., at 73:18-25; 74:9-13.

D. The Secretary's Voter Authorization Form

28. The Secretary of State prescribes the form for the affidavit by which a person may request voter data. N.M. Stat. Ann. 1978, § 1-4-5.5(D); PI Hearing, May 17, 2022 Tr. 132:2.

29. The Voter Authorization Form itself was amended in January 2021 and again on February 10, 2022 to provide increased clarity to the requesters or anyone using the form. PI Hearing, May 17, 2022 Tr. 138:14-15; 136:14-23; 140:2-4.

30. Since 2011 the Voter Information Authorization form has been updated three times. During the first update in January 2022, "research" and "other" were removed as potential purposes for a voter data request. The form was amended twice in February 2022, where "research" was also removed from the Authorization section of the form, which is the statutory affidavit, and several line items were added for each requestor to initial. ECF No. Nos. 44-8, 44-9, 44-10; PI Hearing May 17, 2022, Tr. 134:24-25, 138:6-15; 20-24, 139:1-4, 139:12-140:4; PI Hearing June 15, 2022 Tr. 80:2-20.

31. The affidavit in the form has been corrected to more strictly align to the statute. PI Hearing, May 17, 2022 Tr. 132:20-23.

32. The updates were prompted by inquiries from a county clerk and a records custodian for the Secretary. PI Hearing, May 17, 2022 Tr. 132:20-23.

33. The goal of the updates was to better align the form to the current version of Section 1-4-5.5 of the Election Code. PI Hearing, May 17, 2022 Tr. 132:20-23.

34. None of the three updates was related in any way to VRF or this lawsuit. PI Hearing, June 15, 2022, Tr. 80:25-81:3; 85:18-86:10.

D. ProPublica Article

35. On December 14, 2021, the Secretary received information from Megan O'Matz, a reporter at news outlet ProPublica that Plaintiff had a public website to which it was posting voter data from New Mexico (and other states). ECF No. 44-20, p. 6-7.

36. The website, VoteRef.com, made available to the public voter information for every registered voter in New Mexico, including their name, address, birth year, registered party, and last election in which they voted. ECF No. 44-15 p. 2; PI Hearing May 17, 2022 Tr.at 54:17-25.

37. VRF claims the purpose of providing public access to the voter data is to allow "citizens [to] check their own voting status, voting history, and those of their neighbors, friends, and others, and [be] thereby able to 'crowd-source' the process of rectifying any errors." Am. Compl., ECF No. 74 ¶ 57; PI Hearing May 17, 2022 Tr. at 117:1-7.

38. ProPublica inquired with the Secretary about VRF's allegation of a discrepancy between the number of ballots reported as cast in the last general election versus the number of voters in State's the voter history. ECF No. 44-19.

39. ProPublica also stated it was looking into VRF and that it would publish a story about the organization during the week of February 28, 2022. ECF No. 44-20.

40. Before publishing the article, O'Matz exchanged emails over the course of nearly a month with Alex Curtas, Communications Director for the Secretary. ECF No. Nos. 44-19 and 44-20.

41. After some non-substantive exchanges, Curtas responded as follows to O'Matz's inquiry: "Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are perpetuating misinformation. They reflect a lack of understanding about how the process of voter list maintenance works. These attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country." The "discrepancy," Curtas charged, was simply VRF's own lack of understanding regarding how voter rolls are maintained. ECF No. 44-20, pp. 5-6.

42. Alex Curtas told ProPublica: "The issue relates to the transfer and publication of the voter data. This is the crux: 'We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a "governmental

purpose," "election related," or "election campaign purposes.'" ECF No. 44-27 pp. 18-19.

43. When it finally appeared in March 2022, the ProPublica article attributed several quotes to Secretary Maggie Toulouse Oliver. By state law, she said, the rolls can only be used for governmental or campaign purposes. ... "Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said. ECF No. No. 44-4, p. 10.

E. The Criminal Referrals

44. On December 20, 2021, Deputy Secretary of State Sharon Pino signed and submitted a criminal referral to the New Mexico Office of the Attorney General for investigation and prosecution of both Local Labs and VRF, stating "[The Secretary's] office believes the transfer and publication of this voter data is in direct violation of the Election Code. We believe that both VoteRef.com and Local Labs have violated the prohibition against 'providing' voter data by posting New Mexicans' private voting information online, or in Local Labs case, providing the voter data to VoteRef.com." ECF No. 44-3.

45. Local Labs was referred because, as the data requestor, it had potentially committed false swearing in violation of Sections 1-4-5.5 and 1-20-10, and had potentially violated Section 1-4-5.6 by selling or otherwise surrendering the Voter Data to VRF. PI Hearing, June 15, 2022 Tr. 150:14-23, 151:3-8, 168:15-25; ECF No. 44-1.

46. VRF was referred because it made the voter data public by distributing it on VoteRef.com, thus making the data available to the general public. ECF No. 44-3; PI Hearing, May 17, 2022 Tr. 142:20-22; 146:22-24; 147:2-5.

47. The Secretary's concern was voter privacy as well as the fact that the data could be misread and manipulated. PI Hearing, May 17, 2022 Tr. at 146:22-24; 127:11-21.

48. The Secretary's referral of VRF was not related to the alleged "discrepancy" between the number of people recorded as having voted and the number of ballots. ECF No. 44-3; PI Hearing, May 17, 2022 Tr. 142:20-22; 146:22-24; 147:2-5.

49. The Secretary did not believe VRF's conduct of analyzing the voter data and sharing that analysis (separate from the voter data itself) was unlawful. ECF No. 44-3; PI Hearing, May 17, 2022 Tr. 142:20-22; 146:22-24; 147:19-25.

50. The Office of the Attorney General sent a copy of the Secretary's criminal referral to the FBI. ECF No. 44-23.

51. Other companies, such as Catalist and i360, have obtained voter data from the Secretary. PI Hearing, June 15, 2022, Tr. 100:13-101:20.

52. Other conservative or Republican entities or organizations have sought—and received—New Mexico voter data by filling out the prescribed affidavit. Spreadsheet of Requests, attached as Exhibit 5.

53. A Republican candidate for Secretary of State, Audrey Trujillo, campaigned on a platform that New Mexico elections lacked integrity and honesty, that the current administration has taken cues "straight out of the Jim Crow Laws" to undermine the

electoral process, and that voting machines have been used to manipulate elections. ELECT AUDREY TRUJILLO FOR SECRETARY OF STATE, https://www.audreytruehero4nm.com/ (last visited Mar. 28, 2023). Moreover, Ms. Trujillo accused Toulouse Oliver of illegal, unethical, and conspiratorial practices to "weaponiz[e] her office and us[e] it to give her party an advantage in elections." Audrey Trujillo (Audrey Trujillo The Next NM Secretary of State), FACEBOOK (Nov. 6, 2022, 12:35 AM), shorturl.at/oxGTV.

54. Defendants are not aware of any entity or organization other than VRF that makes voter data accessible to the general public by posting that data online. PI Hearing, May 17, 2022, Tr. 93:5-10.

55. If the Secretary became aware that any other company was posting New Mexico voter data online, that company would be referred to the AGO for investigation and potential prosecution. PI Hearing, June 15, 2022, Tr. 45:3-24; 180:12-21.

56. The Secretary has not received any complaints about any other entity potentially misusing voter data except the Otero County Voter Audit Task Force. ECF No. 44-12; PI Hearing, May 17, 2022, Tr. 129:22-130:12; PI Hearing, June 15, 2022, Tr. 18:1-12.

57. In 2021, both Catalist and i360 submitted two Voter Information Authorization Forms each. Each form was filled out properly and signed and contained no information to suggest that voter data would be used unlawfully. Each request was processed just as any other. PI Hearing, June 15, 2022, Tr. at 100:13-101:20; ECF No. 44-29.

58. On May 27, 2022, VRF sent a letter in which it made additional requests for voter data, and attached completed and signed voter authorization request forms. ECF No. 44-22.

59. In this letter, VRF requested voter data for two purposes: to publish the voter roll online as it had done before, and to use the voter roll data for its own analysis. *See* Fact 59; ECF No. 44-22, p. 4.

60. VRF also alluded to additional requests it had made for voter data under the National Voter Registration Act ("NVRA") for the first time and alluded to additional requests it had made under New Mexico's Inspection of Public Records Act ("IPRA"). ECF No. 44-22, p. 1-2.

61. In its May 27, 2022 letter, VRF stated that it will only publish the personal information of voters online if VRF is granted relief in this matter or in any other legal proceeding. ECF No. 44-22, p.4; Vigil Dep. 170:15-171:10.

62. At no point did VRF state that it would not, under any circumstances, post New Mexico voter data online. ECF No. 42-22.

63. The Secretary had decided it would not fulfill any voter data requests from VRF. ECF No. 44-16; PI Hearing, June 15, 2022 Tr. at 49:7-52:9.

64. The Secretary made a determination that VRF's May 27, 2022 letter was neither a public records request nor a normal voter data request. The Secretary had already referred VRF to the Attorney General for investigation, and sought guidance from

the Attorney General about fulfilling this request. Ultimately, the Secretary did not provide the requested data to VRF. PI Hearing, June 15, 2022 Tr. at 49:16-25.

65. The Secretary's decision not to provide voter data to VRF for either asserted reason was based on a concern that the data would be posted online. Vigil Depo Tr. 165:15-168:20; Letter from Dylan Lange, attached as Exhibit 6.

66. VRF has indicated it would like to post voter data again after the 2022 election, stating "VRF desires to access, post, distribute, and otherwise use publicly available New Mexico voter information on the Website in the future so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls. VRF has continued to seek the same data from the New Mexico Secretary of State as New Mexico's data files are updated over time and plans to continue to seek the same data from the New Mexico Secretary of State after the 2022 election this November." Am. Compl., ECF No. 74, ¶ 112.

67. Asserting a fear of prosecution, VRF removed New Mexico voter data from its website after the release of the ProPublica Article. PI Hearing, May 17, 2022, Tr. 69:11-18.

68. After the filing of its Amended Complaint, Plaintiff purported to make two additional NVRA requests. One, dated September 28, 2022, requested identifying information of and details about "any person or organization who has submitted a request for access to voter registration data since November 3, 2020." Exhibit 7. The other, dated October 18, 2022, requested not only voter registration data but also

information about "total ballots cast, statewide" in the 2022 election and voter histories/credits, including the method and place of voting, for that election. Exhibit 8.

F. Voter Data

69. VRF published New Mexico's data on its website sometime before December 14, 2021. ECF No. 44-14.

70. In an email to the Secretary of State on December 14, 2021, Ms. Swoboda stated, "It is our understanding that the [Voter Data] you provided does not include any voter who is in the Safe At Home program. If that is inaccurate, please let us know." ECF No. 44-14.

71. Though Ms. Swoboda stated she always checked with the respective election official prior to publication, VRF had already published New Mexico voter data at the time this email was sent. ECF No. 44-27, p. 23-24; PI Hearing, May 17, 2022, Tr. 57:17-58:14.

## STANDARD OF REVIEW

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party moving for summary judgment bears the initial burden of showing an absence of any issues of material fact." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986)). "If the movant makes this showing, the burden then shifts to the nonmovant

to 'set forth specific facts showing that there is a genuine issue for trial.'" *Tesone*, 942 F.3d

at 994 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

## ARGUMENT

**I.      The NVRA claims fail because Plaintiff's records requests did not fall within the scope of the NVRA and because New Mexico was entitled to refuse requests made for an unlawful purpose.**

The facts of Plaintiff's NVRA claims (Counts I & II) are undisputed. Plaintiff made

just one relevant NVRA request[4] of the Secretary, by letter dated May 27, 2022. This letter—

which Plaintiff also relies upon as its NVRA notice under 52 U.S.C. § 20510(b)—made two

specific requests for records:

> 1.   A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

> 2.   Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active[)].

---

[4] After the filing of its Amended Complaint, Plaintiff purported to make two additional NVRA requests. One, dated September 28, 2022, for identifying information of and details about "any person or organization who has submitted a request for access to voter registration data since November 3, 2020." Fact 68. And another dated October 18, 2022, requesting not only voter registration data but also information about "total ballots cast, statewide" in the 2022 election and voter histories/credits, including the method and place of voting, for that election. Fact 68. These requests are not part of the claims asserted in Plaintiff's Amended Complaint and, as shown below (Sec. I.C *infra*), they request information *far* beyond what is required or permitted under the NVRA.

Fact 58. In this same letter, Plaintiff references a prior voter data request (sent February 15, 2022), which was not expressly made under the NVRA but which Plaintiff retroactively claims was an NVRA request:

> Please provide us with the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, [sic] who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) [sic] or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021.

Fact 59. The Secretary denied these requests by letter dated June 16, 2022, explaining that the requests would require the creation of new documents and analyses not already in existence and that Plaintiff had expressly stated its plans to use the information in ways that would violate state law. Fact 63.

These undisputed facts present a purely legal question which this Court can, and should, now resolve in favor of Defendants.

### A.    The NVRA does not provide an "unqualified" right of access, as Plaintiff alleges.

Plaintiff's NVRA claims rely on what Plaintiff has described as an "unqualified right of access," created and codified in the NVRA, at 52 U.S.C. § 20507(i). But no such right exists.

First, the NVRA does not give an unfettered right to obtain and use all Secretary of State data. Section 20507 imposes on states the obligation to enact certain programs geared toward increasing voter participation and preventing discrimination against voters. It also

creates an attendant responsibility to maintain records of compliance and to make *these* records available for public inspection:

> Each State shall maintain for at least 2 years and shall make available for public inspection … all records concerning the *implementation of programs and activities* conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.

§ 20507(i)(1) (emphasis added). "Programs and activities" are not defined terms in the NVRA, and the Tenth Circuit has not previously interpreted this section. In fact, most circuit courts are silent on the definition of "programs and activities." The Fourth Circuit evaluated which actions constitute a state program or activity, for purposes of NVRA disclosure, by looking to state law and specific practices. *See Public Interest Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021) (describing actual conduct of North Carolina's State Board of Elections to determine that Board's citizenship audit was such a program or activity); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335–36 (4th Cir. 2012) (citing Virginia's election code to determine that completed voter registration applications were program records). Under the Fourth Circuit's interpretation, what will constitute a record concerning the implementation of programs and activities could vary from state to state, and program to program.

Neither do "records concerning implementation" of these programs necessarily encompass full access to all of the information obtained and retained by a state office. The plain language of the statute shows that Congress did not intend these records to simply include entire voter databases because, in addition to the specific exemptions in Section

20507(i)(1), Section 20507(i)(2) clarifies that records for inspection "shall include lists of the names and addresses of all persons to whom [change-of-address] notices are sent." If *all* names and addresses of *all* registered voters were always open to public inspection under the NVRA, then this limited clarification—that *some* names and addresses of certain registered voters are open to inspection—would be at best surplusage and, more probably, facially inconsistent language. *See Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (explaining "preference for avoiding surplusage constructions"). Stated more directly: if Congress intended full voter data in all voter rolls to be unqualifiedly open to the public, then it could and would have said that. Instead, it directed that states make publicly available their records of "implementation of programs and activities" related to voter roll maintenance. This is a different data set than what Plaintiff argues or what it has requested from New Mexico. *Id.* at 1208 n.6 ("[W]e underscore that we have 'no roving license, even in ordinary cases of statutory interpretation, to disregard clear language simply on the view that ... Congress "must have intended" something broader.'" (ellipses original)) (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014)).

Second, to the extent that the NVRA makes certain data publicly available, it only permits the *inspection* of existing compliance records. It does not mandate the *creation* of additional reports, explanations, or data analyses, such as Plaintiff requested here. *See* 52 U.S.C. § 20507(i)(1); *cf. Forsham v. Harris*, 445 U.S. 169, 186 (1980) (observing that the disclosure requirements codified in the Freedom of Information Act "impose[] no duty on the agency to create records").

Third, whatever records may be subject to inspection under the NVRA, this right of inspection is not—as Plaintiff argues—"unqualified." Even where records may fall within the NVRA's disclosure requirements, courts have recognized restrictions or exceptions to disclosure, including information protected by the Privacy Act of 1974, the Driver's Privacy Protection Act of 1994, and information obtained from confidential sources (such as Department of Homeland Security databases). *See Public Interest Legal Found.*, 996 F.3d at 259. As the Fourth Circuit reasoned, "Contrary to the Foundation's argument, the term 'all records' in the disclosure provision does not encompass any relevant record from any source whatsoever, but must be read in conjunction with the various statutes enacted by Congress to protect the privacy of individuals and confidential information held by certain government agencies." *Id.* at 264. And these exceptions are not just limited to federal statutes. Courts have also required the redaction of records containing "sensitive information vulnerable to abuse," such as information subject to common-law privileges or information that could "subject [ individuals] to potential embarrassment or harassment." *Id.* at 259, 267; *see also Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344–45 (N.D. Ga. 2016) ("[I]t is illogical that in enacting the NVRA, Congress intended to erode Federal and State law protecting against the disclosure or private, personal information. That Congress intended to limit certain confidential information from disclosure has been recognized by every court that has considered Section 8(i).") (internal citations omitted) (denying disclosure of telephone numbers, social security numbers, email addresses, and birthdates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 734–35 (S.D. Miss. 2014)

("Plaintiffs' unrestrained interpretation of required NVRA disclosures would create a gaping hole in the statutory landscape whereby personal, otherwise protected information would lose its protection once a citizen registered to vote. It is hard to imagine that in enacting the NVRA, Congress intended to abrogate all protections provided for by Federal and State laws against the disclosure of private and confidential information.") (denying request for voter birthdates); *cf. Public Interest Legal Found.*, 996 F.3d at 264 (citing general, common-law confidentiality concerns related to criminal investigations). Thus, neither exemptions from disclosure nor limitations—such as New Mexico's—on the use of disclosed information run afoul of the NVRA.

The 2021 *Public Interest Legal Foundation* opinion from the Fourth Circuit is particularly notable, as Plaintiff relies on a 2012 decision from the same court to make the argument that NVRA "records" must include all "identifiable voter information files." *See* Am. Compl., ECF No. 74, ¶ 122 (citing *Long*, 682 F.3d at 335–36). To the extent that *Long* required the direct disclosure of voter files and voter data, the opinion is erroneous. The plain language of the NVRA controls, and as shown above, it requires disclosure only of records related to "programs and activities"—not of *all* voter information. In addition, *Long* is more fairly read to say only that identifiable voter information may, in some situations, be included within NVRA records of state-specific programs and activities. *Public Interest Legal Found.*, 996 F.3d at 265–66. The presence or absence of this voter information is incidental to—and not a defining feature of—the scope of the disclosure requirement. And the fact that a record falls within this scope does not mean it cannot be withheld or

redacted to protect confidential or sensitive data. *See id.* (discussing fact-specific aspects of *Long* and warning of the "'intolerable burden' on the right to vote" that would be caused by disclosure of particularly sensitive information, such as social security numbers); *cf. Hosemann*, 43 F. Supp. 3d at 722 ("The NVRA establishes a uniform code for voter registration and removal. The Court declines to adopt Plaintiffs' interpretation of the NVRA Public Disclosure Provision in a manner that would turn it into a *post*-election discovery device for detecting voter fraud."). In other words, the right of access under the NVRA is very much qualified, even under federal law.

### B.      The NVRA does not preempt New Mexico's law on permissible subsequent uses of voter data.

Having established that Plaintiff does not, in fact, have an unqualified right of access to New Mexico voter data, the next question is what qualifications the State of New Mexico may validly impose on the access to such data. The question need not be answered to its outer limits, because New Mexico has not actually imposed any qualifications on what data VRF can request or receive under the NVRA. Instead, it has sought to enforce its own laws as to the ways in which VRF can *use* any New Mexico voter data contained in NVRA records.

VRF essentially makes three arguments: (i) that the NVRA's "unqualified right of public access" preempts New Mexico law to the extent that the NVRA gives broader access than New Mexico's disclosure laws would; (ii) that the NVRA's "unqualified right of public access" preempts any New Mexico law regulating the *use* of its own voter data; and (iii) that obstacle preemption preempts any New Mexico law that specifically prohibits publication

of voter data on the internet. *See* Am. Compl., ECF No. 74 at ¶¶ 125–29. As demonstrated above, there is no unqualified right of access, and Plaintiff's first two arguments need not be credited.

As to alleged obstacle preemption, the NVRA does not preempt New Mexico's ability to regulate the use of certain data. Significantly, Defendants have not sought to regulate access to records under the NVRA. VRF (via Local Labs) has previously received from New Mexico voter data that, at minimum, overlaps with NVRA records. So have many other organizations. Facts 51 and 52. What Defendants have sought to do is to enforce state law on the permissible, and impermissible, ways in which voter data—whether contained in NVRA records or not—can be *shared*.[5]

This prohibition of general online publication is in no way at odds with, or preempted by, the NVRA because the laws occupy two separate spheres: access to information and *use* of information. These are distinct concerns and involve the regulation of distinct conduct. The Federal Rules of Civil Procedure, for example, require redaction from court filings of the month and day of any birthdate. Fed. R. Civ. P. 5.2. That prohibition on placing sensitive data into the public record in no way impedes a party's right to receive, evaluate, and reference this data (through the Rules' discovery procedures, for example). The Federal Rules of Criminal Procedure mandate that grand jury proceedings be recorded, but strictly limit the purposes for which the contents of those proceedings may be shared.

---

[5] The precise sequence of events, in this case, is somewhat unique. But the reasons for, and import of, the Secretary's determination is unchanged. VRF's NVRA request was made *after* VRF had confirmed its plan to use NVRA records for the specific, and prohibited, purpose of online publication.

Fed. R. Crim. P. 6(e). And the United States Code prohibits stalking—a prohibition on use that remains valid even if the stalker has an independent right to *possess* the addresses, phone numbers, or email addresses used to stalk. *See* 18 U.S.C. § 2261A.

In other words, the right to have information does not give rise to an unfettered right to use information. And New Mexico's state law prohibiting certain misuses of voter data, including unredacted, non-anonymized online posting to the general public, is well within the State's general police powers.

Moreover, this state law does not sit in tension with the NVRA's disclosure provision. Most of VRF's preemption arguments center on its overbroad interpretation of data access. It makes only one preemption argument against New Mexico's right to regulate data use: "[T]o the extent that New Mexico law actually prohibits the publication of voter data on the internet, it is preempted by the NVRA under obstacle preemption." Am. Compl., ECF No. 74 at ¶ 129. "Obstacle preemption" is one method of showing implied conflict preemption, "'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 98 (1992)). It does not apply here.

Generally, there is a presumption against preemption. And although that presumption does not apply to federal elections law matters, *see Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 13–14 (2013), obstacle preemption must still be judiciously

applied:[6] "In deciding whether obstacle preemption applies in a given case, a court must 'consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written.'" *In re MDL 2700 Genentech Herceptin (Trastuzumab) Marketing & Sales Prac. Litig.*, 960 F.3d 1210, 1230 (10th Cir. 2020) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525–26 (1977)); *see also Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1225 (D.N.M. 2010) (describing the "burden of showing that a state statute stands as an obstacle to Congress' objectives" as "high"). Thus, even where the FDA possessed authority over the labeling, misbranding, and "declaration of net quantity" of biopharmaceuticals, a state was not preempted from enforcing its own requirements on the acceptable quantity range for biopharmaceutical vials. *In re Genentech Herceptin*, at 1232–34 & n.11. This was because the state law enforcement attempts "in this case are consistent with, and thus do not pose an obstacle to, the federal framework." *Id* at 1234.

So, too, with New Mexico's restrictions on voter data misuse. As this Court has recognized, the NVRA has a dual purpose of "protecting the overall integrity of the electoral process" and "increasing voter participation." *Herrera*, 690 F. Supp. 2d at 1226; *see also* 52 U.S.C. § 20501. *Herrera* involved arguments that New Mexico election laws intended to prevent voter fraud could negatively impact voter participation in frustration of the NVRA.[7]

---

[6] In fact, this Court has observed the risks of over-extending obstacle preemption, noting the Supreme Court's apparent concern with liberal applications of the doctrine. *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1207–08, 1225–26 (D.N.M. 2010) (Browning, J.).

[7] *Herrera* did not involve the NVRA's disclosure requirements, but rather its voter registration provisions.

The Court dispatched this concern with the observation that neither one of the NVRA's overarching purposes may be so quickly subordinated to the other. *Herrera*, 690 F. Supp. 2d at 1226. Moreover, the Court determined that there is "no indication in the text of the NVRA that it was intended to supersede or frustrate state voting laws." *Id.* Instead, it found that where any alleged negative impact was "debatable" and where the New Mexico law at issue was consistent with at least one of the NVRA's stated purposes, the disfavored doctrine of obstacle preemption should not apply. *See id.* Thus, where the currently challenged state laws seek to protect and promote voter participation[8]—without any affirmatively negative impact on election integrity—obstacle preemption does not prohibit New Mexico from regulating the use of its voter data.

### C.   Plaintiff is not entitled to relief under Count I or II.

Plaintiff's requests for information were not limited to records actually available under the NVRA, and Plaintiff does not have an unfettered, unqualified right of access to New Mexico's entire voter database. Even if the NVRA provides a right of access to voter data, it does not prevent New Mexico from imposing reasonable regulations on the *use* of any information obtained through the NVRA or otherwise. Therefore, Defendants are entitled to judgment in their favor on Counts I and II of the Amended Complaint.

---

[8] As explained in Defendants' Response to Plaintiff's Motion for Preliminary Injunction, ECF No. 13, p. 16, the publication of individual voter information online is detrimental to voters' willingness to register and participate in the democratic process. And prohibiting this publication does not affect the integrity of elections or even public perceptions of election integrity, where this is no prohibition on publishing and discussing anonymized or aggregated data and analyses of voter data.

As explained in the Secretary's June 2022 letter denying Plaintiff's NVRA request, there were at least two reasons the NVRA did not require disclosure. First, Plaintiff's requests were not "for a record that is maintained by [the Secretary's] Office; rather, it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to aggregated and analyzed." Fact 63. Indeed, Plaintiff's February 15 request did not request, as permitted under the NVRA, records of programs or activities that the state conducted to ensure current and accurate official lists. This request was not actually for any existing record at all. It was for a "total count," calculated and organized by county/precinct, not just of currently "eligible voters" but of individuals who had previously voted in a particular election, further categorized by parameters set in Plaintiff's request. This type of analysis or calculation is not a request for records covered by the NVRA. *See* Section I.A *supra*. Plaintiff's May 27 requests fare no better. The first request made on that date is the same essential request made on February 15. The second request is for not only data on current voter lists but also "voter history"—a term not defined in the request but likely inclusive of when and where each person casts votes. This is, again, not a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists." 52 U.S.C. § 20507(i)(1).

Second, Plaintiff's own request letter disclosed that it intended to "publish the requested information online," in violation of New Mexico law, assuming that it obtained a preliminary injunction preventing New Mexico from enforcing its own laws (and without

any assurance that it would wait for a final judgment or resolution of any appeal). In other words, Defendants had every reason to believe that providing the requested information to Plaintiff would result in the imminent publication of voters' private and personal information online, in contravention of state law, even before this litigation concluded. As explained below, New Mexico has the right to limit the legal *uses* of its own government data. Part III *infra*. And even if Plaintiff had a right to obtain this information—which it did not, given the overbroad nature of the requests—New Mexico had no obligation to provide this data to a requestor who had promised to use it for illegal purposes. *Cf. Holt v. Howard,* 806 F.3d 1129, 1132 (8th Cir. 2015) (holding that state law requiring attorney assistance, and prohibiting pro se action, for certain open records requests served a legitimate government interest in preventing the use of records to harass or threaten, and observing that "ethical rules … prohibit an attorney from helping a client request records" for these purposes).

In fact, the State had a responsibility *not* to disclose in these circumstances. *See, e.g., State ex rel. Riddle v. Oliver,* 487 P.3d 815, 828, 2021-NMSC-018, ¶ 36 (N.M. 2021) (observing that the Secretary of State has a "nondiscretionary duty" to comply with the Election Code and that she is not only "duty-bound to follow" the Code but is also responsible implementing the Code); *see also Herrera,* 690 F. Supp. 2d at 1228. The federal Driver's Privacy Protection Act provides an analogy. Like New Mexico's election laws, it permits disclosure of government data but only for specifically identified purposes. Thus, when state officials disclose this data without ensuring the disclosure is related to permissible purposes, they face liability. *Collier v. Dickinson,* 477 F.3d 1306 (11th Cir. 2007). The fact that

this data is contained within public records, or that it could be released for certain *permissible* purposes, provides no defense. *Welch v. Theodorides-Bustle*, 677 F. Supp. 2d 1283, 1286 (N.D. Fla. 2010). Granted, the statutes at issue here are not identical in language or purposes. But neither are the facts. *Collier* and *Welch* were decided in situations where the government officials merely failed to confirm the requestor's intended purposes. This case involves facts in which the Secretary *knew*, by Plaintiff's own assertions, that the intended purposes were impermissible under state law. *Cf. Forest Serv. Emp'ees for Environ. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1026 (9th Cir. 2008) (applying FOIA's privacy-invasion exemption where the requestor, "[b]y its own admission, ... plans to contact the Forest Service employees named in the Report if their identities are disclosed"). Again, the NVRA governs state processes and the disclosure of compliance records—it does not preempt state law regulating use of government data after disclosure. Thus, it was no violation to withhold records under these unique circumstances, where fulfilling the request could make the Secretary complicit in a state plan to violate state law after any NVRA production.

Finally, Plaintiff has not actually complied with the NVRA's pre-suit notice provisions. The NVRA permits private parties "who [are] aggrieved by a violation" of the NVRA to "provide written notice of the violation," after which the state will have some period of time to correct the violation (20 or 90 days, depending on election timing). 52 U.S.C. § 20510. Only after that period may a private civil action commence. *Id.*

Here, Plaintiff's May 27 request constituted its first NVRA request. Despite Plaintiff's reference in that letter to earlier requests, no earlier ask from Plaintiff had referenced the NVRA or specifically requested records related to that statute. And none of the prior productions (to Local Labs) or denials of data specifically addressed NVRA issues. As a consequence, the May 27 request is the first event related to Plaintiff's NVRA claims.

The Secretary's office responded to the May 27 request on June 16, explaining the reasons that the requests could not be fulfilled. No written notice of violation followed. Fact 64. Plaintiff made no further attempts to narrow its requests for records, withdraw its stated intention to misuse any records, or explain why the Secretary's June 16 response was a violation of the NVRA. The written notice requirements of the NVRA exist for good reason. To this day, it is unclear whether Plaintiff is seeking certain existing records or if it still wants only to force the Secretary to create new data analyses and "total counts." To the extent Plaintiff would be satisfied with existing records, it remains ambiguous which types of records Plaintiff believes fall under the NVRA's provisions or how those records relate to New Mexico programs or activities. As a result, Plaintiff was not entitled to add the NVRA claims to its Amended Complaint, and the Court has yet one more reason to dispose of those claims now. *See Hosemann*, 43 F. Supp. 3d at 713–17 (collecting cases and determining that NVRA notice requirements are mandatory, serve an important purpose, and are a "procedural bar" to proceeding without compliance).

**II.     Plaintiff's Claim for First Amendment Retaliation Fails Because Plaintiff Engaged in Unprotected Conduct and Cannot Show Retaliatory Motivation**

Plaintiff's claim for First Amendment Retaliation should fail because there is no genuine dispute of material fact, and the undisputed facts do not support the necessary elements of the claim. A claim for First Amendment Retaliation must show "(a) [the plaintiff] was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)). Plaintiff's conduct here is not constitutionally protected speech and thus cannot form the basis of any claim for retaliation motivating Defendants' actions. Further, Plaintiff weaves an allegation of viewpoint discrimination into its broader claim for retaliation. This, too, should fail. Plaintiff cannot identify a similarly situated individual or entity with different views that posted voter data online to prove discrimination.

**A.     Plaintiff's Conduct Is Not Constitutionally Protected Speech**

In March 2021, Local Labs, LLC requested voter data from the Secretary, which it then provided to Plaintiff in order to publish on Plaintiff's website. Facts 19 and 23. In exchange for obtaining the New Mexico voter data from the Secretary on behalf of Plaintiff,

Plaintiff paid Local Labs $15,000. Fact 27. Michael Lippert of Local Labs, LLC signed the voter data request form. Facts 19 and 22. In signing, Mr. Lippert swore to the attestation contained on the form, which stated that,

> "Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplication, or alteration of information as stated in the Voter Records System Act (N.M. STAT. ANN. 1978, 1-5-1 through 1-5-31). I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law."

Facts 19 and 22. After receiving the voter data from Local Labs, Plaintiff published the New Mexico voter rolls in their entirety on their website, including their name, address, birth year, registered party, and last election in which they voted. Fact 69.

Plaintiff's conduct fails to meet the first prong of a First Amendment retaliation claim because the State may permissibly condition its grant of access to the data based on the requestor's agreement not to publish or share that data. States bear no constitutional obligation to provide access to information held by government bodies. *See Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) ("This Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control."). The power of the state not to provide access to government-held information necessarily includes the lesser power to condition that access based on policy considerations, subject to restraints on content and viewpoint neutrality. *See* Section II.B, *infra*, for further discussion of the authority of the state to condition its grant of access to data. Because Defendants are not constitutionally obliged to provide access to the voter file, the State

may create conditions upon its grant of access. Therefore, the State is permitted to condition its access based upon sworn affidavit by the requestor not to share, publish, duplicate, or reproduce that data.

Further, the affidavit requirement is not a content-based or viewpoint-discriminatory restraint on speech. Rather, it exists merely as a content-neutral time, place, and manner restriction. Government bodies may enact "licensing restrictions that are content neutral and restrict only the time, place, and manner of speech . . . ." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013) (citing *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)).

The New Mexico Election Code requires that each requester of voter data "sign an affidavit that the voter data . . .shall not be made available or used for unlawful purposes." NMSA 1978, § 1-4-5.5(C). The Election Code further states that "Unlawful use of voter data . . . consists of the knowing and willful use of such information for purposes prohibited by the Voter Records Systems Act [NMSA 1978, §§ 1-5-1 to -31]." NMSA 1978, § 1-4-5.6(A). Further, "any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data . . . is guilty of a fourth degree felony . . . ." NMSA 1978, § 1-4-5.6(B). The Election Code further states, "Unlawful disposition of the voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file . . . to anyone not authorized by the Voter Records System Act to have possession of the file." NMSA 1978, § 1-5-22(A). Finally, the Election Code prohibits false swearing in connection

with conduct under the Election Code. NMSA 1978, § 1-20-10. False swearing is defined as "taking any oath required by the Election Code . . . with the knowledge that the thing or matter sworn to is not a true and correct statement." *Id.*

The New Mexico Office of the Secretary of State has interpreted this statutory framework to permit sharing data within an entity or organization for use in furtherance of a permissible purpose, but not to permit sharing outside of it for any purpose. Per the Secretary's interpretation—which has been in place for at least twelve years and across two administrations—selling, loaning, providing access to, duplicating, or otherwise surrendering voter data outside of the organization that requested this data is prohibited by law and subject to the criminal penalties specified in the above statutes. Facts 4-8. When requesting data, an agent may sign the Voter Information Authorization Form. Fact 4. Per the Secretary's interpretation, sharing voter information within the organization or entity covered by the signed form is permissible. Fact 5. However, individuals not members of the same entity, as well as different entities, must each submit a separate form. Fact 6. The Secretary further interprets this framework to prohibit publishing data for general availability on the internet. Facts 7 and 8. This interpretation has recently been affirmed and codified by the New Mexico Legislature with the passage of HB4. Fact 9.

Plaintiff's conduct in publishing the data cannot satisfy the first element of a claim for First Amendment retaliation because it is not constitutionally protected activity. As stated, New Mexico is constitutionally permitted to condition its grant of access to voter file information upon agreement of the requestor not to publish that data. Here, Plaintiff

violated the conditions upon which the State conditioned its access to the voter file. First, Plaintiff used its agent, Local Labs, to falsely attest that it would not share the data it received. Second, Plaintiff then published the voter file in its entirety on the internet. This publication permitted any person with internet access to bypass the affidavit requirement in the New Mexico Election Code, thus nullifying a safeguard designed to ensure the privacy and safety of New Mexico voters. Because the State was constitutionally permitted to condition its access to the data on sworn statement to refrain from such actions, VRF's publication of voter data was not a constitutionally permitted activity. Therefore, Plaintiff's entire claim for First Amendment Retaliation should fail as a matter of law.

### B.     Defendants' Conduct Was Not Viewpoint Discriminatory

Plaintiff's Count III alleges that Defendants acted with discriminatory purpose and suggests that Plaintiff's motivation was viewpoint discriminatory. While discriminatory purpose or motive is not an element strictly outlined under Tenth Circuit First Amendment retaliation caselaw— e.g., *Van Deelen v. Johnson*—Plaintiff has woven the allegation of viewpoint discrimination into its claim for retaliation. Here, Defendants' actions were motivated solely by enforcement of New Mexico's constitutionally valid Election Code and were not undertaken to retaliate against Plaintiff for any viewpoint held or espoused. Absent the broad, unprecedented publication of the state voter file, Defendants were unlikely to have taken any action against Plaintiff.

Establishing motivation in constitutional retaliation cases requires showing "but-for" causation. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ("[T]he District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct."); *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) ("Accordingly, a plaintiff must prove that 'but for' the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place." (internal citation and quotation omitted)). With respect to retaliatory motivation concerning Plaintiff publishing the voter file to the internet, publication is not protected activity and thus cannot be the subject of a retaliation claim.

However, to the extent that Plaintiff weaves a viewpoint discrimination claim into the third element of a claim for retaliation—that "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct"—Defendants have not discriminated based upon Plaintiff's espoused or held viewpoints. *Van Deelen*, 497 F.3d at 556. "In § 1983 . . . actions, a claim of viewpoint discrimination in contravention of the First Amendment requires a plaintiff to show that the defendant acted with a viewpoint-discriminatory purpose." *Pahls v. Thomas*, 718 F.3d 1210, 1230 (10th Cir. 2013) (internal citations omitted). "Purposeful discrimination requires more than intent as volition or intent as awareness of consequences . . . . It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the

action's adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) (internal citation and quotations omitted). By its nature, discrimination on a protected basis—in this instance, viewpoint—requires showing that a similarly situated party lacking that same protected basis, was treated more favorably. *Cf. Lucero v. Sandia Corp.*, 495 F. App'x 903 (10th Cir. 2012) (affirming summary judgment in action for employment discrimination where employee failed to introduce evidence of more favorably treated employees being similarly situated).

Plaintiff cannot show that Defendants' actions were motivated by a discriminatory purpose on the basis of Plaintiff's viewpoint. Plaintiff cannot identify a single party with different viewpoints who has published New Mexico voter data on a publicly-available website whom Defendants have not referred for criminal prosecution or to whom Defendants have denied requests for voter data. This is because no such party exists. By Plaintiff's own admission, a project to publish state voter rolls is "unprecedented" and "the first of its kind." Fact 13.

Plaintiff's Amended Complaint lacks specifics on exactly what viewpoints Defendants have used as the basis for discrimination. *See* Am. Compl., ECF No. 74 at ¶ 155. However, Defendants infer from the nature and purpose of Plaintiff's organization and project that the views relate to the existence of incorrect and erroneous voter rolls and, possibly, election fraud. *See* Am. Compl., ECF No. 74 at ¶ 1. While no party is similarly situated to Plaintiff such that Plaintiff can prove Defendants' viewpoint-discriminatory

purpose, many parties exist with comparable viewpoints to those of the Plaintiff to whom Defendant Toulouse Oliver has provided access to the New Mexico voter file.

In 2022, Toulouse Oliver, in her personal capacity, stood for reelection as the Democratic nominee for the office of Secretary of State. She ran against the Republican nominee for Secretary of State, Audrey Trujillo. Ms. Trujillo campaigned on a platform that New Mexico elections lacked integrity and honesty, that the current administration has taken cues "straight out of the Jim Crow Laws" to undermine the electoral process, and that voting machines have been used to manipulate elections. Fact 53. Moreover, Ms. Trujillo accused Toulouse Oliver of illegal, unethical, and conspiratorial practices to "weaponiz[e] her office and us[e] it to give her party an advantage in elections." Fact 53.

Despite these aggressive campaign statements from Toulouse Oliver's political opponent—including those that falsely suggest New Mexico elections are fraudulent—the Office of the Secretary of State readily provided access to the file to the Republican Party of New Mexico. Fact 52. The Republican Party, as the entity supporting its nominee, Ms. Trujillo's, bid to challenge Toulouse Oliver for Secretary of State, was not denied access to this voter file, nor was any nominee with comparable views concerning election integrity denied access. *Id.*

Further, the Secretary has fulfilled voter data requests to individuals from across the ideological spectrum. The voter data request spreadsheet reflects all such requests received by the Secretary over a two-year window. Fact 52. In that time frame, Defendant Toulouse Oliver's office filled requests for data from myriad ideologically diverse requestors. *Id.* The

Secretary provided voter data to candidates and campaigns representing parties as diverse as the Constitution Party, the Democratic Party, the Green Party, the Libertarian Party, the Republican Party, and the Working Families Party. *Id.* Further, the Office provided voter data to candidates critical of New Mexico election administration and, specifically, of Toulouse Oliver herself. *Id.*

Thus, Plaintiff cannot reasonably assert that it was a viewpoint-discriminatory interest motivating Defendants' actions. On the contrary, the only motive for the Secretary denying subsequent requests for voter data was as a response to an unprecedented publication of the entire state voter file in attempt to enforce New Mexico's laws and protect the privacy and safety of New Mexico voters.

Plaintiff's publication of the voter file does not constitute protected First Amendment speech. Thus, this action cannot serve as the basis of a claim for First Amendment retaliation and Plaintiff's claim must fail. Further, Defendants acted with no discriminatory purpose, but merely sought to enforce New Mexico law.

### III.  Plaintiff's Claim V Fails as a Matter of Law Because States May Condition Grants of Access to Data Based on Policy Considerations

Plaintiff's claim that the "Data Sharing Ban" and use restrictions on New Mexico voter data constitute a ban on core political speech fails as a matter of law. No genuine dispute of material fact exists to allow this claim to proceed to trial. Therefore, Defendants are entitled to summary judgment because states are not constitutionally required to provide access to voter files and therefore may condition the access they do grant upon

conditions decided as a matter of state policy. So long as these conditions do not violate First Amendment content- and viewpoint-neutral restraints, they are permissible restrictions under the law.

Neither First Amendment case law, nor the NVRA require that states make their voter files unconditionally available in their entirety to all citizens. The Supreme Court has held that the First Amendment does not create a "guarantee of a right of access to all sources of information within government control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978). *See also Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001) ("It is well-settled that there is no general First Amendment right of access to all sources of information within governmental control."); *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1168 (3d Cir. 1986) ("[I]t requires some straining of the text to construe the Amendment's explicit preclusion of government interference as conferring upon each citizen a presumptive right of access to any government-held information which may interest him or her."). Even where core political speech and matters of public importance are implicated by the subject matter of the information at hand, this does not obligate states or their subdivision to provide access to that information under the First Amendment. In *Shero v. City of Grove*, the Tenth Circuit held that citizen access to city councilor packets of information— containing agenda items for meetings and other information—was not a protected right under the First Amendment. 510 F.3d 1196, 1202 (10th Cir. 2007). The court held that, while the city may have an obligation to provide the documents under state open records laws or other such statutes, the First Amendment does not compel disclosure to citizens. *See id.*

Where a government possesses an authority or power, it necessarily follows that the government may exercise that authority in a more limited or conditional manner as well. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982) (holding that the power of Indian tribes to exclude nonmembers from tribal land necessarily included the lesser powers of placing conditions on entry, on continued presence, or on on-reservation conduct, such as a tax on business activities conducted on the reservation); *Kavalin v. White*, 44 F.2d 49, 51 (10th Cir. 1930) ("The power to grant a pardon includes the lesser power to grant a conditional pardon."); *United States v. O'Neil*, 11 F.3d 292, 296 (1st Cir. 1993) ("The principle that the grant of a greater power includes the grant of a lesser power is a bit of common sense that has been recognized in virtually every legal code from time immemorial. It has found modern expression primarily in the realm of constitutional law."); *but see Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002) (holding that the greater power to dispense with judicial elections altogether does not include a content-based restriction under the state canon of judicial conduct prohibiting candidates from announcing their views on disputed legal or political issues).

Here, the relevant question is whether the state may condition access to voter data on the agreement not to share, publish, or duplicate that data. The state is under no constitutional obligation to provide this data. *See Houchins*, 438 U.S. at 9. And because there is no right to obtain voter data, conditional access to such data is constitutional. Further, neither the NVRA nor the New Mexico Inspection of Public Records Act, creates a statutory obligation to provide this data. *See* Sec. I, *supra*; NMSA 1978, § 14-2-8(B)

("Nothing in the Inspection of Public Records Act shall be construed to require a public body to create a public record."). And, even if those statutory provisions did require providing access to the data, this still could not create the basis of a First Amendment claim. *See Shero*, 510 F.3d, at 1202 ("The City is not compelled by the *First Amendment* to provide information to Mr. Shero but must only provide the council packets to him under *state* law, and Mr. Shero has already received his remedy in state court." (emphasis in original)). Access to voter data is conditioned upon requestor agreement not to share, publish, or duplicate. *See* Facts 8, 22. This is a valid lesser-power restriction contained within the broader power of the state to not provide access to voter data in the first place.

Further, the sharing and use restrictions do not constitute a content- or viewpoint-based restraint on data requestors' speech, nor do they leave requestors without ample alternatives to engage in free expression. The conditional grant of voter data to requestors who agree not to directly share or publish the data itself does not contemplate the content of the speech requestors may engage in once in possession of the data. For example, there is no prohibition on requestors sharing their opinions about or analyses of New Mexico data, or even anonymized aggregations of the data. Fact 49. This expression may take the form of ballot issue advocacy, campaign electioneering, social issue awareness and activism, volunteer recruitment, academic research, or any other number of core political objectives. Nor do the content and use restrictions contemplate the methodology of speech, which may include door-to-door canvassing, phone banking, direct-mail pieces, email campaigns, mathematical and statistical analysis, synthesis of the voter file with

other available sources of information (e.g., commercially available consumer data), or any other number of creative ways to engage in free expression to the public. The prohibition on sharing or publishing this data is narrowly tailored in pursuit of legitimate state objectives of ensuring voter privacy and safety.

The conditional grant of access to the voter file permits those seeking to engage the public with a powerful, voluminous resource built by state and county election officials. This resource provides ample, robust opportunities for direct voter engagement. The mere condition that the resource itself not be shared beyond those individuals who request it from the state does not give rise to a First Amendment claim. Defendants respectfully request the Court enter summary judgment on Plaintiff's Count V.

## IV.   New Mexico's Prohibition on Sharing and Distributing Voter Data is Not Overbroad

Plaintiff challenges the "Data Sharing Ban," which it characterizes as Defendants' interpretation of Section 1-4-5.5 as "an absolute prohibition on the sharing of voter data between a requester and any other person, regardless of whether the sharing is for a governmental or election purpose." Am. Compl., ECF No. 74 at ¶210. Plaintiff challenges the Data Sharing Ban both facially and as applied to Plaintiff's activities. Am. Compl., ECF No. 74 at ¶228. As alleged by Plaintiff, the "Data Sharing Ban" prohibits the sharing of voter data in two circumstances: with persons or entities who may or will use the voter data for

an unlawful purposes; or with individuals or entities outside the organization that requests it. *Id.*[9]

A challenged statute is overbroad when it "offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.'" *Zwickler v. Koota*, 389 U.S. 241, 250, (1967) (internal citations omitted). Under First Amendment overbreadth doctrine, a statute is facially invalid if it prohibits a substantial amount of protected speech; however, the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. *See Bushco v. Shurtleff*, 729 F.3d 1294, 1302 (10th Cir. 2013) (internal citations omitted). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615-16 (1973). There must be more than just an impermissible application of the statute to reach a determination of overbreadth; there must be a realistic danger the statute will significantly compromise recognized First Amendment protections of parties not before the Court. *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800-801 (1984).

---

[9] The Secretary of State does not agree with Plaintiff's characterization of NMSA 1978, Section 1-4-5.5 as a "Data Sharing Ban," and has consistently taken the position that it is not a total ban, but a restriction on sharing voter data outside of the organization that requested it or the specific unlawful use of that data. *See* Facts 5-8.

The statutes Plaintiff challenges here do not fall into these categories. Rather, the statutes permit a party to obtain and use government data subject to certain provisions, none of which is overbroad or unconstitutional.

### A. The challenged statutes, as construed by the Secretary of State, prohibit access to and use of government data that would result in harm to the public.

The first step in overbreadth analysis is to construe the challenged statute. *United States v. Williams*, 553 U.S. at 293. The Secretary of State has construed the challenged statutes as a prohibition on providing that data to those who may or will use the voter data for an unlawful purpose as N.M.S.A. § 1-4-5.5 defines that term; or with individuals or entities outside the organization that requests it.

The Secretary reads Sections 1-4-5.5, 1-4-5.6, and 1-5-22 together to conclude that an entity or individual may access voter data for specific purposes, and may not use that data for any purpose deemed unlawful or share that data with anyone outside the entity who has requested it. Facts 5-8. This interpretation is supported by the New Mexico Legislature's passage of House Bill 4, which has been signed by the Governor and becomes effective on July 1, 2023. In House Bill 4, the Secretary's interpretation of these three statutes has been codified into a new section under Section 1-4-5.6, which criminalizes "selling, loaning, providing access to or otherwise surrendering of voter data, mailing labels or special voter lists by a person for purposes prohibited by the Election Code; or causing [such data] that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or

residence address to be made publicly available on the internet or through other means .
Fact 9.

Similarly, Plaintiff characterizes the Secretary's interpretation of NMSA 1978, Section 1-4-5.5 as imposing "restrictions on a use of the data that is not for a specific candidate or ballot measure campaign, but that is for election purposes; and . . . restrictions on a use of the data that is not by the government itself, but that is by a private person for the purpose of publishing, reviewing, and engaging in speech regarding the governmental operation of elections." Am. Compl., ECF 74 at ¶37. According to the Secretary, the restrictions on use of voter data comport with her interpretation of the election code, in NMSA 1978, Section 1-4-5.5, Section 1-4-5.6, and Section 1-5-22, which differs from VRF's interpretation of those statutes.

### B.     The challenged statutes are not overbroad because there is no general First Amendment right to access government information.

There is no general right under the First Amendment to access government information; therefore, there can be no overbroad restriction on obtaining that information. *See Houchins,* 438 U.S. at 11 ("There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy."); *see also Fusaro v. Cogan,* 930 F.3d 241, 250 (4th Cir. 2019) ("There is generally no First Amendment claim based on the government's denial of access to information in its possession."). But once a State chooses to provide access to certain information, the State can control the access by any means other than content or viewpoint restrictions. See

*Fusaro*, 930 F.3d at 256-57 ("[T]he initial decision to release such information remains, fundamentally, a policy choice. . . . And the judgment of the Maryland legislature regarding the release of government information is entitled to substantial deference, particularly where [the statute] is a part of a complex scheme to regulate elections.").

There is no right under the First Amendment to access or obtain certain government information, therefore, limits on the ability to obtain such information do not place any burden on protected speech. While Plaintiff argues its access to this information is important to "protect election integrity," [Am. Complaint, ECF 74 at ¶1] Plaintiff cannot contend that its access to this information is necessary to achieve this goal in a broad sense. As the Supreme Court stated in *Houchins v. KQED, Inc.*:

> The prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. *The right to speak and publish does not carry with it the unrestrained right to gather information.*

*Houchins v. KQED, Inc.*, 438 U.S. at 12 (quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) (emphasis in the original)). Because that there is no general First Amendment right to access government information, the State can control the access that it provides based on policy considerations, subject to content- and viewpoint-based restrictions. *See Fusaro v. Cogan*, 930 F.3d at 256-57. Even if VRF has a legitimate purpose in obtaining this information, the purpose for which the information is used does not confer a right under the First Amendment, nor does it make the data sharing limits overbroad.

New Mexico has chosen to control how an individual may use the information in voter file by enacting the challenged statutes. These statutes impose content-neutral restrictions, *see* Section II.A, *supra*, on who can access the voter file and how the voter file can be used. Specifically, the statutes require the requesting party to fill out an affidavit limiting the manner in which the party will use the data. Additionally, the statutes prevent the party who obtained that information from sharing that information, via the "Data Sharing Ban," and from publishing that information, via the "Use Restrictions." *See* NMSA 1978, §§ 1-4-5.5.5; 1-4-5.6; and § 1-5-22. These statutes do not restrain any amount of protected speech because access to this information is not a right under the First Amendment. *See KQED, Inc.*, 438 U.S. at 14 ("There is no constitutional right to have access to particular government information, or to require openness from the bureaucracy.").

The challenged statutes cannot be overbroad, therefore, because obtaining and using this information is not constitutionally protected. Defendants respectfully request the Court so find as a matter of law.

## V.   New Mexico's Statutes Prohibiting Sharing Voter Data Are Not Vague.

Plaintiff alleges the Data Sharing Ban, as Plaintiff interprets it, is similarly void for vagueness. Plaintiff alleges the statutes fail to give notice as to what uses of the voter data are permissible and which are prohibited and fails to give notice that sharing the data is absolutely banned. [Am. Compl. ECF 74 at ¶9] Plaintiff argues the lack of notice in the statutes encourages arbitrary enforcement, and they are therefore void for vagueness to the extent they actually criminalize VRF's conduct here. [Am. Compl., ECF 74 at ¶¶9, 214-226]

Prohibited and permissible uses are laid out specifically in the statutes and leave no room for ambiguity or subjective interpretation. *See* NMSA 1978, § 1-4-5.5 and § 1-4-5.6. Moreover, even if the statute is vague, both the Secretary's data request forms and the accompanying information included in NMSA 1978, § 1-5-22 clarify what uses are permitted and what are not. Facts 5-8, 22, 28-31. Additionally, House Bill 4 codifies these prohibitions into a single section that makes permissible uses unequivocally clear. Fact 9.

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citing Chicago v. Morales, 527 U.S. 41, 56–57 (1999)). *See also United States v. Williams*, 553 U.S. at 304 (describing a vague statute as failing "to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so standardless that it authorizes or encourages seriously discriminatory enforcement.").

While courts require greater precision in statutes when the laws regulate speech, the test remains the same: a statute may be considered vague when it is so ambiguous that a party cannot tell what action is permitted and what is proscribed. *See NAACP v. Button*, 371 U.S. 415, 433 (1963).

Permissible and prohibited uses do not need to specifically be based in a single statute. Here, before the passage of House Bill 4, permissible uses were explained in both the voter data request forms and in other portions of the Election Code; specifically, in

Section 1-5-22. As stated above, Plaintiff is challenging two statutes: NMSA 1978, Section 1-4-5.5 and Section 1-4-5.6. Section 1-4-5.5 governs parties who seek to obtain data, and section (C) requires each requester of voter data, mailing labels or special voter lists to "sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." Section 1-4-5.6 describes the aforementioned unlawful use of voter data, stating that such unlawful use "consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." NMSA 1978, § 1-4-5.6(A).

Article 5 in the Election Code is titled "The Voter Records Systems Act," and contains the following description of prohibited purposes: "Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System Act to have possession of the file." NMSA 1978 § 1-5-22. Read together, it is not ambiguous or unclear that a party who seeks voter data cannot loan, sell, or provide access to anyone who is not authorized to have the data, which has consistently been the Secretary's position, including with respect to Plaintiff.

The Secretary's position has been further clarified by the passage of House Bill 4 in the 2023 Legislative Session, which was signed by the Governor on March 30, 2023. In that

bill, the Legislature has explicitly spelled out what constitutes permitted use of the voter

data file, House Bill 4 proscribes "the knowing and willful selling, loaning, providing access

to or otherwise surrendering of voter data, mailing labels or special voter lists by a person

for purposes prohibited by the Election Code" and "causing voter data, mailing labels or

special voter lists or any part of the voter data, mailing label or special voter lists that

identifies, or that could be used to identify, a specific voter or the voter's name, mailing or

residence address to be made publicly available on the internet or through other means."

These provisions are placed in Section 1-4-5.6, which also provides penalties for violations.

*See* Section 1-4-5.6(C).

    Finally, the challenged laws do not contain any terms that call for subjective

judgment and enforcement; rather, these laws spell out objective uses that are and are not

permitted. The laws' terms are a far cry from the ambiguous language used in the

challenged law in *Smith v. Goguen,* where an individual was charged under a statute that

prohibited treating the United States flag "contemptuously." *See Smith v. Goguen*, 415 U.S.

566, 574 (1974) (finding the statute "fails to draw reasonably clear lines between the kinds

of nonceremonial treatment that are criminal and those that are not."). Similarly, in

*Dodger's Bar & Grill, Inc. v. Johnson Cnty. Bd. Of Cnty. Com'rs,* a Kansas county enforced a

statute restricting an adult entertainment venue from engaging in dances or acts which

"simulate sexual intercourse." 32 F.3d 1436, 1444 (10th Cir. 1994). While the statute was

challenged for vagueness because it was "unclear at what point an expressive dance

becomes a simulation of sexual intercourse," *id.,* the Tenth Circuit did not find such a

prohibition unconstitutionally vague. By contrast, the activities proscribed by New Mexico's Election Code are clear, unambiguous, and objectively enforceable.

The statutes here outline the manner in which a party may obtain voter data ("sign an affidavit swearing it will be used for permitted purposes") and then specifically outline the impermissible purposes, both in the statute and by referencing Article 5 ("willful selling, loaning, providing access to or otherwise surrendering of the voter file. . . to anyone not authorized by the Voter Records System Act to have possession of the file."). *See* NMSA 1978, §§ 1-4-5.5; 1-4-5.6; and 1-5-22. These prohibitions are more specific and narrowly stated than the ambiguous and broad language used in the statute in *Smith*—and even that upheld in *Dodger's Bar*.

Contrary to Plaintiff's argument that it was referred for prosecution under "arbitrary enforcement," [Am. Compl., ECF 74 at ¶9], Plaintiff was referred to the Attorney General for prosecution when it published the voter file data on its website, thus making it available to members of the general public, whom Plaintiff should have known were clearly not "authorized by the Voter Records System Act to have possession of the file." N.M. Stat. Ann. § 1-5-22(A). Similarly, this Court denied a preliminary injunction based in part on a vagueness argument in *ETP Rio Rancho Park, LLC v. Grisham*. There, this Court determined that when reading the challenged statutes in combination with an Attorney General Opinion, a "person of common intelligence" did not have to guess at the meaning of "public health" when looking at the context of the Governor's powers as explained in the Attorney General opinion. *See ETP Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1038

(D.N.M. 2021) (Browning, J.). Here, the forms used by the Secretary, read in context with the statutes, identify prohibited and permissible uses of voter data that do not require guessing at the meaning of the statute. *Id*; Facts 5-8, 22.

### VI.   House Bill 4 Renders Moot Any Claims that the Statutes are Vague.

Even if the initial statutes were sufficiently unclear to be considered vague, the passage and enactment of House Bill 4 renders those claims moot. Plaintiff cannot seek injunctive relief to remedy a past injury; Plaintiff can only seek a preliminary injunction for prospective relief. *See Collins v. Daniels*, 916 F.3d 1202, 1215 (10th Cir. 2019) ("[A] plaintiff cannot sustain a claim for prospective injunctive relief that is based on speculative future harm." (internal quotation marks and citation omitted)). Absent a "sufficient likelihood" that a plaintiff "will again be wronged in a similar way" a "federal court may not entertain a claim ... that a state's laws are unconstitutional." *Id*. (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)) (internal quotation marks, brackets, and ellipsis omitted). The relief Plaintiff seeks cannot be administered in light of the change to N.M. Stat. Ann. 1-4-5.6.

An exception to mootness "exists when the wrongdoing is 'capable of repetition yet evading review.'" *Marks v. Colorado Dep't of Corr.*, 976 F.3d 1087, 1093 (10th Cir. 2020) (quoting *Ind v. Colorado Dep't of Corr.*, 801 F.3d 1209, 1215 (10th Cir. 2015)). This is a "narrow" exception "only to be used in exceptional situations." *Marks*, 976 F.3d at 1093 (citation omitted); *see also Jordan v. Sosa*, 654 F.3d 1012, 1034–35 (10th Cir. 2011). The plaintiff invoking this exception bears the burden of proof. *Marks*, 976 F.3d at 1093. "To satisfy this burden," the plaintiff "must establish that the challenged action ended too quickly to be

fully litigated and 'a reasonable expectation' exists for" the plaintiff "to again experience the same" injury. *Id.* at 1094 (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam)); *see also Murphy v. Hunt*, 455 U.S. 478, 482 (1982). This second, "reasonable expectation" component of the exception is not assessed "in gross," but must be established for each claim. *Nathan M. by & through Amanda M. v. Harrison Sch. Dist. No. 2*, 942 F.3d 1034, 1044 (10th Cir. 2019).

To show that a controversy is "capable of repetition" requires "a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party." *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 463 (2007) (internal quotation marks and citation omitted); *see also City of Herriman v. Bell*, 590 F.3d 1176, 1181–82 (10th Cir. 2010). A "'reasonable expectation' must be more than 'a mere physical or theoretical possibility'; it must be something akin to a 'demonstrated probability' that the" plaintiff "will again be in this situation." *Steven R.F. by & through Fernandez v. Harrison Sch. Dist. No. 2*, 924 F.3d 1309, 1314 (10th Cir. 2019) (quoting *Murphy*, 455 U.S. at 482). "[T]he 'wrong' that is, or is not, 'capable of repetition' must be defined in terms of the precise controversy it spawns." *Nathan M.*, 942 F.3d at 1043 (internal quotation marks and citation omitted).

Here, given the amended statute's very clear prohibition against causing voter data "to be made publicly available on the internet or through other means," it is unlikely that VRF will endeavor to post such data online, as VRF has explicitly stated that it would only do so if it were permitted to do so pursuant to a court order, or, one would assume, other

lawful means. As making such data publically available online is explicitly prohibited in New Mexico, VRF cannot lawfully post such data in the future, nor can VRF continue to claim the prohibitions are unconstitutionally vague.

Any proscribed use with respect to the voter data file is objective, specific, and unambiguous, and given the change to Section 1-4-5.6 in House Bill 4, is only further elucidated. These statutes are sufficiently clear to inform a reasonable person as to what conduct is permitted and what is not. Defendants respectfully request the Court so find as a matter of law.

## CONCLUSION

The Secretary has been consistent with her interpretation of who may access New Mexico voter data with respect to how that data will be used, which is simply that New Mexico voter data cannot be shared outside of the entity that requested it, nor can it be made publicly available. This interpretation reflects the Secretary's consistent belief that this is necessary to protect voter privacy and to keep any potentially nefarious actors from manipulating the voter data or from using the voter data to intimidate or harass voters. VRF is the only entity to request voter roll data for the specific purpose of making the data available to the general public by publishing it on its website. For this reason—not because of VRF's purported viewpoints, but because of VRF's stated intent of what it planned to do with the data—VRF's requests have been denied. Because there is no right to access government data—under the NVRA or under New Mexico law—and, under New Mexico law, making such data available to the public is prohibited, there can be no First

Amendment claim that VRF's actions are being unconstitutionally restricted. Defendants respectfully request this Court so find as a matter of law, and enter summary judgment in favor of Defendants.

By: */s/ Erin E. Lecocq*
Erin E. Lecocq
Kelsey Frobisher Schremmer
Jeff Dan Herrera
Assistant Attorneys General
408 Galisteo St
Santa Fe, NM 87501
Tel.: (505) 490-4060
Fax: (505) 490-4881
elecocq@nmag.gov
kschremmer@nmag.gov
jherrera@nmag.gov

**Attorneys for Defendants**

## CERTIFICATE OF SERVICE

I certify that on April 14, 2023, I served the foregoing on counsel of record for all parties via the CM/ECF No. system.

*/s/ Erin E. Lecocq*
Erin E. Lecocq

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW MEXICO

3

4    VOTER REFERENCE FOUNDATION, et al.,

5          Plaintiff,

6          VS.                    NO. CV-22-00222 JB/KK

7    Hector Balderas, Attorney General
     for the State of New Mexico, et al.,

8
          Defendants.

9

10                    VOLUME 2

11                 ZOOM HEARING

12

13        Transcript of Motion for Preliminary Injunction
     Proceedings before The Honorable James O. Browning,
     United States District Judge, Albuquerque, Bernalillo
14   County, New Mexico, commencing on June 15, 2022.

15

     For the Plaintiff:  Mr. Eddie Greim; Mr. Matt Miller;
16   Mr. Carter Harrison

17   For the Defendant:  Ms. Olga Serafimova; Mr. Dylan
     Lange

18

19

20

21

22        Jennifer Bean, FAPR, RDR, RMR, CCR
             United States Court Reporter
23           Certified Realtime Reporter
              333 Lomas, Northwest
24            Albuquerque, NM  87102
             Phone:  (505) 348-2283
25             Fax:  (505) 843-9492



EXHIBIT
1

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Correct.   The requester -- anyone that is

2    requesting the data may receive and utilize the data.

3      Q.   Okay.   And on the form it asks the

4    requester to disclose an organization; correct?

5      A.   It does.

6      Q.   Okay.   And so the Secretary of State's

7    interpretation is that the data can be disseminated

8    within the organization but not outside of the

9    organization?

10     A.   Yeah, if there is a new requester, a new

11   individual, a new organization, then they need to

12   also request it for themselves.

13     Q.   Let me ask you about the first line.  It

14   says, "The data may be purchased for government and

15   campaign purposes only."  I don't see anything in

16   there about "election related."  Why is that word not

17   in the first sentence?

18     A.   I don't think there is a specific reason.

19   I think it's just an assumption that this section of

20   the website is relating to all elections.  That is

21   what we do in our office.

22     Q.   Okay.  But could someone request the data

23   for a government purpose that is not election

24   related?

25     A.   There is a specific definition of



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492
                                                              1-800-669-9492
                                                    e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   Okay.  And the reason that you call this

2    "intimidation" is that they stated that they were in

3    a position of authority, and there was an allegation

4    that they asked people who they voted for?

5      A.   And they were physically appearing at

6    someone's door, and nobody had any idea why they were

7    there.  And they were in the video that I observed,

8    you know, aggressive in that nature.

9      Q.   Okay.  So you watched a video of an

10   interaction between someone?

11     A.   An Otero County voter and a representative

12   of the New Mexico Audit Force.

13     Q.   Okay.  So someone recorded one of these

14   interactions?

15     A.   Correct.

16     Q.   And so in the Secretary of State's view, is

17   that a reason under the statute to deny access to the

18   data?

19     A.   I don't think it would be about receiving

20   data.  Again, once you have the data, if you've

21   received it through the appropriate statutory

22   process, and then you go on to use it in a way that

23   is unlawful, those are two separate things.  So you

24   can receive data lawfully, and then, if you choose to

25   use it unlawfully, those are two separate paths.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          THE COURT:  Well, she can answer the

2    question.  So overruled.

3          A.   I don't think there is any difference in

4    the scenario you're describing, in that, yes, I would

5    seek guidance from my general counsel.

6          Q.   Okay.  Let me ask you now about an academic

7    paper that's exploring the way the election was run.

8    So one academic pays for the data, and writes a

9    paper, does a statistical analysis.  Then another

10   academic at a rival university, maybe, I don't know

11   New Mexico versus New Mexico State, another political

12   science professor says:  I don't agree with your

13   conclusions; you know, I want to write a review of

14   your article.  Can I see the data?  Okay?  So is it a

15   crime -- would you criminally refer the first

16   academic who shared the data with the second academic

17   who is trying to verify his conclusions?

18         A.   So, again, I think anyone who wants to

19   receive data, we've established that there is a

20   statutory process in which they need to complete an

21   affidavit.  In signing that affidavit, they are

22   agreeing to specific statutory terms that are defined

23   in Article 5.  And so anyone that has statutorily

24   received that data needs to comply.  And so, in that

25   case, a separate individual, a separate entity would

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   need to also comply with receiving the data.

2        Q.   Okay.  So the answer is it would be a

3   criminal referral, then, for the first academic to

4   share the data with the second academic?

5        A.   Again, if somebody is going outside of the

6   bounds of law, we have an obligation to consistently

7   apply that law.  And if we felt that they were

8   unlawfully using the data, we would refer it for a

9   review of a law enforcement agency.

10       Q.   Okay.  I only have a few more.  We could go

11   on for quite a while, but I won't go on forever,

12   okay.

13            Let's say a voter, like the Plaintiff Holly

14   Steinberg here, goes and buys the entire file; hires

15   programmers so she can use the data; runs her own

16   analysis.  And then she calls VRF and says:  Well,

17   here's what I found.  Now, VRF also has the data,

18   okay?  But Holly Steinberg shares the data that she

19   has with VRF as part of that discussion.  Is that a

20   criminal violation?

21       A.   I think my answer will be the same, if

22   you'd like me to restate it.  The data can be shared

23   within the same organization.  Otherwise, individuals

24   need to obtain that data directly.  And again, we've

25   established in prior conversation that that data is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

45

```
1          A.   Again, our position on the statutory

2   provisions do not change.

3          Q.   Well, I mean, that's what we're trying to

4   find out, though, because we've heard some different

5   things depending on our scenarios.   So I'm asking

6   you, if Catalist is selling the data to progressive

7   clients, how is that not a violation of New Mexico

8   law?

9          A.   I do not know if they're doing that, nor

10  has that been determined.   But any entity that has

11  requested the data should only be sharing that within

12  their entity, within the same organization.

13         Q.   Well, what would it take --

14         A.   That statement has not changed.

15         Q.   Okay.   What more would it take to spark the

16  Secretary of State's interest in Catalist to maybe

17  just begin an investigation to see what they're

18  doing?

19         A.   I don't think I'm asking for anything more.

20  You asked me if we have.   And I have not.   And we

21  have not received any complaint, nor any affirmative

22  information as to them unlawfully using the data.   So

23  at this point in time, I do not have that

24  information.

25         Q.   Okay.   And so do you have any plans to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    a status report.  Thank you."  And that goes to

2    Mr. Rostock; correct?

3          A.   Yes.

4          Q.   All right.  And then Mr. Rostock, the

5    following day, forwards this ticket on to you; right?

6          A.   He sent us an email.

7          Q.   So let me ask you this:  When someone

8    emails your office, do you typically ignore them

9    altogether unless they happen to have an affidavit

10   already filled out and attached to their request?

11         A.   I don't think there is a goal to ignore

12   someone who communicates with our office.

13         Q.   Okay.  Why was Voter Reference Foundation

14   ignored here?

15         A.   In this case, you know, Patrick, in working

16   with our general counsel, there was a determination

17   that this was neither a public -- a formal public

18   records request nor a normal voter data request.  At

19   this point in time, we had already engaged with the

20   law enforcement agency, and so we did seek their

21   guidance.  And at this point in time, it was

22   determined that we were not going to provide data.

23         Q.   Why not?

24         A.   Because we had already referred their use

25   of the data to a law enforcement agency.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Okay.  So is there a part of the statute

2  that says that if you referred someone for

3  prosecution, you don't answer their requests anymore?

4    A.   There is not a statutory provision that

5  requires us to respond in this case.  And there is

6  not a statutory provision that says you should not

7  respond.  That was a decision made based on the

8  information we had.

9    Q.   Okay.  So why would having referred them to

10  the AG -- and by the way, the AG had not actually

11  charged them at this point; correct?

12    A.   There is no charge that I have an awareness

13  of.

14    Q.   So why did the AG tell you not to respond?

15    A.   I can't speak to that.  I don't know.

16    Q.   Who does know?

17    A.   The Attorney General, I'm sure.

18    Q.   Well, who is the contact -- who did the

19  Attorney General speak to in your office?

20    A.   Typically, it goes to our general counsel.

21    Q.   So do you know whether there was

22  anything -- let me ask you this:  Why not just

23  respond to VRF and say that you need to submit an

24  authorization, here's a link to the form?

25    A.   It just was determined that we were not

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

51

1  going to be providing data at that point in time

2  based on knowledge that it had already been published

3  on a website.

4       Q.   So you say, "based on knowledge it had

5  already been published."  So you're assuming that

6  this data would be published, you're just assuming

7  that; right?

8       A.   I think that there is currently an

9  investigation taking place, in particular, about this

10 entity.  And so we did seek guidance on how to handle

11 this request in particular.  And we were provided the

12 guidance, as it is stated in the email, that we were

13 not to provide the data.

14      Q.   And you had no knowledge that this data was

15 going to be published, did you?

16      A.   Not at that point in time, that data had

17 not been received.

18      Q.   Okay.  And you have no knowledge today that

19 this data was going to be published; correct?

20      A.   If you're referring to the most recent

21 request from VoteRef --

22      Q.   No, I'm referring to this request.

23      A.   So this request does not provide any more

24 information than you've read to the Court.

25      Q.   And no one reached out to VRF to find out

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

52

1      whether they were going to publish it or not; right?

2           A.    No.

3           Q.    The answer was just to ignore them; right?

4           A.    To not provide data.

5           Q.    Okay.  So we'll have to ask the AG why they

6      made this recommendation, and we'll have to ask

7      someone else at the Secretary of State to understand

8      why they accepted this advice; correct?

9           A.    Correct.

10          Q.    Let me now ask you about the most recent

11     request that you started to talk about.  So about 19

12     days ago you received a notice and a request from our

13     office on behalf of VRF; correct?

14          A.    Correct.

15          Q.    Okay.  Let's pull that up.  Sorry, I

16     can't -- I'm trying to reduce the size of this so it

17     makes sense to us.

18                So this is what we marked as Exhibit P10.

19     Do you recognize this?

20          A.    I do.

21          Q.    I'm sorry, was the answer yes?

22          A.    Yes.

23          Q.    Okay.  And by the way --

24                MR. GREIM:  Okay, I move to admit P10.

25                THE COURT:  Any objection, Ms. Serafimova?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    obtained from your office, and then shares that voter

2    data with another academic, would that be a

3    violation.  And your answer was:  Yes, it appears

4    that it would be; correct?

5         A.   Correct.

6         Q.   And that answer is not dependent on the

7    topic of the first academic's paper, is it?

8         A.   No.  My understanding of that scenario was

9    sharing the actual data, the voter file.

10        Q.   And your answer was not dependent on the

11   topic of the second academic's paper?

12        A.   I have no idea what those topics are, no.

13        Q.   Okay.  So the content of those papers is

14   not relevant to you?

15        A.   No.

16        Q.   And the viewpoint that each hypothetical

17   academic may hold or express in their paper, that's

18   also not of concern to you?

19        A.   It is not.

20        Q.   Those are completely irrelevant subjects;

21   right?

22        A.   Correct.

23        Q.   Now, you were asked about sharing and if --

24   and let's say, if VRF discusses the data that they

25   receive from your office, if that would be a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   violation; right?

2        A.   It was.

3        Q.   Okay.  And the statute, 5.6, this is what

4   we're talking about; right?

5        A.   Correct.

6        Q.   That statute says:  Selling, loaning,

7   providing access to, or otherwise surrendering the

8   voter data, that's our interpretation; correct?

9        A.   Right.

10       Q.   It doesn't say discussing the data?

11       A.   It does not mention discussing the data.

12       Q.   So when someone requests voter data in

13   compliance with 5.5, they receive a file from your

14   office; correct?

15       A.   Yes.

16       Q.   So if I sign an affidavit, receive that

17   file, and then, you know, put it on a Drop Box and

18   let other people have access to it, would that be a

19   violation?

20       A.   Yes.

21       Q.   But me discussing what I saw in that file

22   and any discrepancies that I may have identified with

23   other people, would that be a violation?

24       A.   No.  It's specifically sharing the content

25   of the data, the file.  When I say "voter data," that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   is what I'm referring to.

2       Q.   Okay.   And if I make paper copies of the

3   file, thousands of pages, right, and I just hand them

4   out to people, would that be a violation?

5       A.   Yes.

6       Q.   Okay.   So let's talk about 5.6 a little

7   more.

8           You have heard Mr. Greim express the

9   position that in this case, you know, with respect to

10  VRF specifically, the Secretary of State's Office is

11  now advancing a so-called new interpretation of the

12  Election Code; right?

13      A.   Right.

14      Q.   And you been employed by the Secretary of

15  State's Office for how long?

16      A.   For 11 years.

17      Q.   Okay.   And during those 11 years, has the

18  Office's interpretation of 1-4-5.6 ever changed?

19      A.   It has not.

20      Q.   And what is that interpretation?

21      A.   So 1-4-5.6 refers to the use of voter data.

22  And within that same section it actually refers us to

23  a section in Article 5 that gives us the details on

24  prohibitions of using that data.   And in that case,

25  it then applies to everyone that would receive that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    data from our office.  So we believe that there are

2    some prohibitions identified in the statute for how

3    that data may be used.  And mainly, you know, the

4    prohibitions identified in our affidavit.

5         Q.   Okay.  So that's the selling, loaning,

6    providing access to, and so on; correct?

7         A.   Yes.

8         Q.   And you mentioned the affidavit, so I will

9    pull up stipulated Exhibit 8, which is the oldest

10   version of the affidavit that we have in the record

11   in this case, if you just give me a second.  And

12   while I'm doing that, can you tell us -- so Exhibit

13   8 -- which is coming, I promise -- here it is -- was

14   this the version of the form that was in use when you

15   joined the Secretary of State's Office?

16        A.   Yes.

17        Q.   So we're talking about this first sentence

18   right here, right, under "Authorization."  And that

19   sentence is actually identical in all four versions

20   that we have on record in this case; correct?

21        A.   You're correct.

22        Q.   So I, A, J, and H.  So this language has

23   not changed since at least 2011; is that right?

24        A.   That's right.

25        Q.   Now, does this form ever go to data

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   Yes.

2            Q.   But then you add these line items, I call

3    them, that each requester has to acknowledge, whether

4    by checking off -- yeah, okay?

5            A.   By initials.

6            Q.   Okay.  By initialing.  Oh, yes, you're

7    right.  Okay.  So if this first sentence already

8    informs the requester that they may not sell, loan,

9    or provide access to the information that they

10   receive by way of this affidavit, why did the Office

11   also include it as a separate line item?

12           A.   We added that just to provide clarity to

13   anyone that is completing this form, just as an

14   attempt to make sure that we're both educating and

15   providing them clear guidance on what they're

16   agreeing to.

17           Q.   And what triggered this update?

18           A.   Just feedback and working with other

19   election administrators, specifically our county

20   clerks, they're required to use this form.  There has

21   certainly been an increased request for data.  So in

22   just using it more and learning more about the

23   process, we received feedback that it would be

24   helpful to be clearer in this document.

25           Q.   So did this update have anything to do with

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    either VRF, the VoteRef website, Local Labs, or this

2    lawsuit, generally?

3           A.    No.

4           Q.    Okay.  So then if we can talk about 5.5 for

5    a second, and I'll pull up State's Exhibit 4.  Give

6    me just moment.  And you're familiar with that

7    statute; right?

8           A.    Yes.

9           Q.    Here it is.  So here is Section 1-4-5.5.

10   Now, does this section -- tell me if you need me to

11   scroll up or down, I know you're familiar with it,

12   but does this section mention anywhere election

13   purposes?

14          A.    No.

15          Q.    Election-related purposes?

16          A.    No.

17          Q.    Anything to that effect?

18          A.    No.  There are just two definitions.

19          Q.    So paragraph C says, governmental or

20   election and election campaign purposes, right?

21          A.    I'm sorry, I didn't hear you entirely.

22          Q.    So paragraph C contains the phrase

23   governmental or election and election campaign

24   purposes, right?  We're looking at it right here?

25          A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   And then down here in "Authorization,"

2  second sentence, it also mentions research; right?

3       A.   Um-hum.

4       Q.   And that term remained in the form until

5  2022, when versions I and J were put out; correct?

6       A.   Right.

7       Q.   And this version H, which was in use since

8  2011, also includes "election related"; right?

9       A.   It does.

10      Q.   And I represented to you yesterday that the

11  definitions for governmental and election campaign

12  purposes were added to the statute by the legislature

13  in 2015; right?

14      A.   Right.

15      Q.   And yet "election related" remained on the

16  form, again, until 2022?

17      A.   It did.

18      Q.   So is it fair to say that this form, while

19  it may be desirable, does not get updated the moment

20  that the language of the statute changes; right?

21      A.   Right.

22      Q.   Sometimes there is quite a delay; right?

23  In the case of "research," we had a decade?

24      A.   Correct.

25      Q.   And that just happens in state government;

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    right?

2         A.    Correct.

3         Q.    There was nothing intentional about failing

4    to update this form prior to 2021?

5         A.    There was not.

6         Q.    Okay.   And was the update of taking out

7    "election related" again, at all related to the

8    plaintiffs in this case or this case or Local Labs or

9    anything that we're talking about in this lawsuit?

10        A.    No.

11        Q.    Okay.   And I think -- well, what prompted

12   the specific update of taking "election related" out?

13        A.    Again, you know, with the increase in

14   requests for this data, and different entities

15   seeking this data, it was just highlighted as a need

16   to clarify the process and update our documentation

17   to align and to support the statute.   So it was

18   really, again, just based on questions received from

19   either a requester, a county clerk, and being

20   reviewed, the documents in the process, and make it

21   clearer.

22        Q.    Okay.   And, by the way, before I forget,

23   would you say that the term "academic" would be

24   related to research?

25        A.    It certainly could.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.   I have seen this press release.

2          Q.   And what does that press release do with

3    respect to the letter that we just discussed?

4          A.   Again, this, similar to the one prior, is a

5    response to that request.

6          Q.   Okay.  And it's a denial?

7          A.   This request does indicate that our office

8    will not be providing that data, yes.

9          Q.   Okay.  And is this letter -- again, is this

10   letter an affidavit, as required under Section 5.5?

11         A.   This is not an affidavit, as required, to

12   be able to lawfully provide data to a requester.

13         Q.   Okay.  So changing subjects, going to

14   Catalist and I360.  I will pull up State's Exhibit 3.

15   So State's Exhibit 3 has four pages, and these are

16   two affidavits by Catalist and two affidavits by

17   I360.  Do you see that?  Catalist, Catalist, I360,

18   I360; right?

19         A.   Right.

20         Q.   And these are the exhibits we have for the

21   record in this case.  Have you had a chance to look

22   at them?

23         A.   I have seen them.

24         Q.   Okay.  Can you tell us whether they are

25   complete on their face?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   The requests are complete on their face.
 2        Q.   And do they contain any information to
 3   suggest that voter data would be used unlawfully?
 4        A.   No.
 5        Q.   And so were they treated differently from
 6   anyone else who submits a fully executed valid
 7   affidavit?
 8        A.   No, the data was provided.
 9        Q.   So you did not treat them more favorably?
10        A.   No.
11        Q.   And you did not treat them less favorably?
12        A.   We did not.
13        Q.   Okay.  And as you sit here today, do you
14   have any reason to believe that either one of these
15   companies is violating New Mexico law in the way
16   they're using the voter data?
17        A.   I do not have that information, no.
18        Q.   And if you did, would you report them to
19   the Attorney General's Office for investigation?
20        A.   Yes.
21        Q.   All right.  Now, if we can go to P2,
22   Plaintiffs' Exhibit 2.  Give me a second.  You were
23   asked, you know, if your office responded to emails
24   from VoteRef, if you remember.  So this is one such
25   email.  Have you seen this before?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    Okay.  And my question is not about whether

2    you knew the specifics.  My question is:  Are his

3    statements consistent with the Secretary of State's

4    general position about VRF and VRF's conduct?

5        A.    I couldn't answer that question, because

6    again, I don't think our office has taken a position

7    on VRF or its conduct, other than the fact of what we

8    put in the referral, that we believe that them

9    putting voter data on a publicly available website

10   may be a violation of New Mexico State law.

11       Q.    Now, you say "may be."  The letter is not

12   that -- the letter is more definite than that, isn't

13   it?

14       A.    Yes.  I think it laid out our facts and

15   positions.  But this is not a legal brief, and we had

16   not conducted any investigation.  Just on the facts

17   and information available to us at the time, we

18   outlined the statute that either -- and I believe

19   that there were several potential targets in that

20   letter; that being Local Labs who signed off on an

21   affidavit asserting that they intended to use the

22   data in a certain way.  So that could have

23   potentially been a false swearing.

24            And then there was also the conduct of

25   VoterRef, if they improperly used the data under New

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   Mexico law by making it publicly available on a

2   website.

3       Q.    Okay.   And Local Labs' false swearing would

4   be that it was -- the data was not used for one of

5   the three purposes that you mention here; correct?

6       A.    Under the -- what is it? -- 5.5, and,

7   again, what you have to affirm and swear off in an

8   affidavit of when you request the data, yes.

9       Q.    Very good.   Thank you.

10           Let's now go to the other -- there is

11   another theory here.   I don't want to leave that

12   behind because you've referenced it a few times.   If

13   you look in the last paragraph before the conclusion,

14   the very last point raised it kind of stands out with

15   the word "additionally."   It's in the very middle of

16   the paragraph.   Do you see it there?

17       A.    Yes.

18       Q.    Referring back to Exhibit C for the record

19   here.

20           And so after running out the other theory,

21   it says, "Additionally, Section 1-5-22A states, and

22   the signed authorization form quotes that" -- then it

23   has a long quote from the statute; right?

24       A.    Yes.

25       Q.    However, the signed authorization form

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   with respect to Local Labs, you suspected there may

2   have been a violation of 5.5, does that sound right?

3         A.    Potentially, yes.  I mean, again, we hadn't

4   conducted any investigation.  Just based off of facts

5   that we had at that time, we were trying to lay it

6   all out.  That's really up to the Attorney General's

7   Office to do their own investigation and determine

8   if, in fact, they violated that.

9         Q.   Okay.  And then you knew, at this point, it

10  sounds like, that Local Labs potentially handed over

11  the data to VRF, is that --

12        A.    It seems like, yeah, we were able to trace

13  the specific data that was being put out on this

14  website to the request that was made by Local Labs.

15        Q.   And with that action of Local Labs handing

16  over the file to VRF, did you suspect that that was a

17  violation of the Election Code?

18        A.    Of them handing it over to -- it

19  potentially -- again, we had no information at the

20  time that Local Labs knew that it was going to be

21  used for an unlawful -- used in an unlawful manner,

22  which, again, if the Attorney General's Office did

23  uncover that, that could be some potential liability

24  from Local Labs for a violation of 5.6.  But we

25  didn't have any of the information at that time.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    who they are before then.
 2         Q.    And that was going to be my next question.
 3    When did you first become aware of them?  In the
 4    context of this case?
 5         A.    Yes.
 6         Q.    More specifically, the prior hearing and
 7    today; is that right?
 8         A.    Um-hum.
 9         Q.    Do you have any knowledge as to what either
10    company's products is?
11         A.    I do not.
12         Q.    So if you received information that an
13    entity named Catalist, LLC, is uploading New Mexico
14    voter data on its website, would that potentially
15    cause you to refer them to the Attorney General's
16    Office?
17         A.    Absolutely.
18         Q.    And the same with I360.  If you believe you
19    had probable cause to refer them to the Attorney
20    General's Office, would you refer them?
21         A.    Yes.
22         Q.    And then final topic, from me anyway, is
23    you've shared with me that, as a public servant, a
24    pretty high level public servant, you have taken
25    certain steps to keep your personal information
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1                    C-E-R-T-I-F-I-C-A-T-E

2


3     UNITED STATES OF AMERICA

4     DISTRICT OF NEW MEXICO

5


6


7         I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8     Official Court Reporter for the State of New Mexico,

9     do hereby certify that the foregoing pages constitute

10    a true transcript of proceedings had before the said

11    Court, held in the District of New Mexico, in the

12    matter therein stated.

13        In testimony whereof, I have hereunto set my

14    hand on June 18, 2022

15

16

17

18    _____
      Jennifer Bean, FAPR, RMR-RDR-CCR
19    Certified Realtime Reporter
      United States Court Reporter
20    NM CCR #94
      333 Lomas, Northwest
21    Albuquerque, New Mexico 87102
      Phone:   (505) 348-2283
22    Fax:     (505) 843-9492

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


CASE NO. 1:22-cv-00222-JB-KK


VOTER REFERENCE FOUNDATION,  )
LLC,                         )
                             )
          Plaintiff,         )
                             )
VS.                          )
                             )
RAUL TORREZ, in his official )
capacity as New Mexico       )
Attorney General, and        )
MAGGIE TOULOUSE OLIVER, in   )
her official capacity as New )
Mexico Secretary of State,   )
                             )
          Defendants.        )



     The deposition upon oral examination of

MANDY VIGIL, a witness produced and sworn

before me, Valerie Fillenwarth, RPR, a Notary

Public in and for the County of Johnson, State

of Indiana, taken on behalf of the Plaintiff,

via Zoom, on February 27, 2023, commencing at

the hour of 12:00 p.m., EST, pursuant to the

Federal Rules of Civil Procedure.


EXHIBIT
2

Page 82

1  focus on the lack of permissible use.  We just
2  found where the permissible uses are.  And, I
3  mean, I just hope we're clear.  I -- that the
4  secretary's position is that VRF's use by
5  posting on the Internet is not any of those
6  uses, correct?
7  A.  You asked me about our decision.  You asked me
8  about, you know, what -- why did the secretary
9  of state make this decision and what is our
10  position.  And that's what I'm responding to.
11  So it is our position that the public posting
12  of the data is not permissible under state law.
13  Q.  Well, but hold on now, okay?  We saw the actual
14  statement.  The actual statement says it's not
15  a permissible use, okay?  And so we know that
16  there are either two or three permissible uses,
17  depending on how you read that section, right?
18  Governmental is one of them, right?
19  A.  Uh-huh.
20  Q.  And if it's not governmental, what's the other
21  use have to be?
22  A.  Election campaign purpose.
23  Q.  Okay.  And so if it's a permissible use, it's
24  got to be one or the other, right?
25  A.  And I think there's also parameters around how

Page 83

1  that can be utilized.  And public posting
2  online is not one of them.
3  Q.  Okay.  But let's just -- let's just stick with
4  the analysis.  If it's a permissible use, it's
5  got to be one or the other, governmental or
6  election campaign purposes, right?
7  A.  Correct.
8  Q.  And VRF's posting on the Internet that you
9  observed, your -- the secretary's opinion is
10  it's not governmental and it's not election
11  campaign purposes, correct?
12  A.  I feel like it was a broader analysis based on
13  the public posting and that it was not obtained
14  appropriately and that it was being publicly
15  distributed.  So, you know, you continue to ask
16  that question.  I understand.  And my answer is
17  what I've shared, that our analysis was broader
18  than those two elements.
19  Q.  Well, I'm going to ask -- and this is getting
20  interesting.  Okay.  I'm going to have to probe
21  a little further now.
22  So is the secretary's position that if it
23  were -- if it -- VRF had obtained them directly
24  from the secretary of state's office, that
25  their posting on the Internet would be for

Page 84

1  governmental or election campaign focuses?
2  MS. LECOCQ:  Objection.
3  A.  What I can answer is that that -- number one,
4  that's not what occurred.
5  BY MR. GREIM:
6  Q.  I understand.  I'm trying to understand the
7  conduct that you contend is sufficient to
8  violate this statute.
9  A.  The requester that follows the appropriate
10  process, the lawful process, that would
11  publicly post that data on the Internet, that
12  would be a violation under state law.
13  Q.  We'll just leave it.  That's fine.  By the way,
14  before -- I don't want to move too far.
15  Interrogatory Number 13, let's come back to it.
16  The top of the page, this is actually page 8,
17  the paragraph that continues and ends on the
18  very top of the page.  The very last sentence
19  there says "Investigation by the attorney
20  general is ongoing and has not yet resulted in
21  any criminal action against VRF."
22  Did I read that correctly?
23  A.  You did.
24  Q.  Is that true?
25  A.  Yes.  I don't feel like that's any different

Page 85

1  than what I shared before and that we have no
2  knowledge that the case has been closed.  We
3  also don't have any knowledge that there's been
4  any action, again, by the attorney general
5  office on that investigation.
6  Q.  You're not backing away from the statement we
7  just read, are you?
8  A.  I'm not.
9  Q.  Okay.
10  A.  I'm simply saying it's aligned with what I said
11  before.
12  Q.  Let me ask you a little bit more about the
13  posting issue on the Internet.  Okay, we're not
14  going to focus so much now on governmental
15  election or election campaign.
16  I want to show you a response that we
17  received from your attorneys clarifying some of
18  your prior interrogatory responses.  I think
19  this is Exhibit --
20  A.  5.
21  Q.  -- 5.
22  (WHEREUPON, Deposition Exhibit 5 was
23  marked for identification.)
24  BY MR. GREIM:
25  Q.  I'm going to show you an e-mail dated just last

22  (Pages 82 to 85)

Page 90

1  Q.  Okay.
2  A.  And I can't speak to all the contractual --
3  Q.  Okay.
4  A.  -- scenarios that you've provided.
5  Q.  So the secretary, as we sit here today, does
6     not have a position on whether sharing the data
7     with contractors would violate the statute?
8         MS. LECOCQ:  Objection.
9  A.  I think that we have a position that if it's
10    within the same organization, it can be shared.
11    BY MR. GREIM:
12 Q.  I understand.
13 A.  Outside of the organization, it should not be
14    shared without lawfully obtaining the data.
15 Q.  Okay.  And what we're exploring is sharing
16    outside of the organization.  I'm trying to
17    understand when we cross that line, you know,
18    where is the line?  That's what all these
19    questions are going to try to do.  You know
20    that's what I'm doing.  I'm going to do my
21    best.  And your answer may well be:  We do not
22    have a position on where that line exists.  We
23    have not explored that question.  We do not
24    know the answer to it.  That's okay.  I just --
25    I want to learn what I can.

Page 91

1         And so I understand your answer is when
2     you share it outside of the organization,
3     that's where the line is crossed.  But we're
4     all lawyers here, okay?  And there's lots of
5     people who want to use the data.  And so I'm
6     trying to understand what the principle is
7     behind that.  I'm asking you specific questions
8     to try to understand that principle, if we can.
9     I'm not going to spend too much longer given
10    the time we have.
11        So the question I just asked was about
12    people who don't become employees of the
13    organization, they just get hired under a
14    contract to do a job with the data.  And I
15    think the answer that I have back is the
16    secretary of state doesn't have a response to
17    that question, doesn't have a position on that?
18 A.  I don't think that's what I said.  So number
19    one, you made a good distinction.  You're all
20    attorneys, I'm not.  So that's why we would
21    seek the guidance and advice of an attorney for
22    a separate set of facts.  I think what you've
23    described is very fact based.  And those facts
24    have not been explored by our office at this
25    point in time.

Page 92

1  Q.  Okay.  I understand they haven't.  I understand
2     that you would eventually come to some
3     decision, you know, but -- and so what I'm
4     trying to understand is right now does the
5     secretary of state's office have a position
6     about contractors?  That's my question.  And
7     either you do or you do not.
8  A.  I think that that is dependent on what the
9     relationship is to the organization that has
10    received the data, and that's what I cannot
11    speak to.
12 Q.  So if the relationship is just contractual, you
13    cannot tell us whether that counts as inside
14    the organization or outside the organization?
15 A.  I am not prepared to answer what constitutes,
16    you know, a contractual agreement, what means
17    you're a part of the organization or not.  I
18    think that's very dependent on the facts of the
19    specific scenario.
20 Q.  Why is it important that the person who
21    receives the data from the lawful requester is
22    a part of the organization?
23 A.  Because I think that is a clear distinction
24    that we're able to make based on our analysis
25    of the statute.

Page 93

1  Q.  Okay.  Based -- obviously the statute doesn't
2     say part of the organization.  That doesn't
3     exist in the statute.  You agree with me on
4     that?
5  A.  I agree that we've reviewed and provided some
6     legal review and analysis on the facts that we
7     feel like our position -- we maintain the
8     position that if you're within the
9     organization, that is permissible sharing.  And
10    if you're outside of the organization, that's
11    not permissible under state law.
12 Q.  And what is it about being part of the
13    organization or within the organization --
14    those are the words you just used -- that make
15    it permissible to share the data with those
16    individuals?
17 A.  We feel like based on analysis -- you know,
18    again, we would probably have to go back to an
19    attorney to understand some of those
20    intricacies.  But that is a fact that has been
21    presented to our office and we've reviewed it
22    and made a determination that based on state
23    law we would not feel like it was a violation
24    if folks were sharing the data within that
25    organization because they have appropriately

24  (Pages 90 to 93)

Page 94

1    obtained that data.
2    Q.   Okay.  So implicit within your referral, I
3         think, is the secretary of state -- well, let
4         me back up.
5              The secretary of state understands
6         that -- because they -- you've visited VRF's
7         website, correct?
8    A.   Uh-huh.
9    Q.   And on the website for New Mexico before the
10        data was pulled down, you must click that you
11        will only use the data for specific purposes,
12        correct?  Do you recall that?
13   A.   I recall that being something that was
14        testified to.  I didn't -- yeah, I recall
15        that -- somebody sharing that.
16   Q.   And so VRF is taking the position here that
17        someone who agrees to use the data for
18        permissible purposes, for the purposes that VRF
19        wants to use the data for, is part of VRF.  It
20        forms an association with us to use this data
21        for a certain purpose.  Does the secretary of
22        state agree with that position?
23             MS. LECOCQ:  Objection.
24   A.   Again, I think you're going back to kind of
25        something that would require some additional

Page 95

1         legal analysis, right, what is the relationship
2         between that individual and Voter Reference
3         Foundation.
4              What I will say is that, again, we feel
5         like the statute is very clear in that a
6         requester needs to complete an affidavit with
7         our office to be able to utilize, to receive
8         that data, and to use it for a permissible
9         purpose.
10             And so in that case, Voter Reference
11        Foundation, from our perspective, does not have
12        the authority to prescribe that affidavit.
13             BY MR. GREIM:
14   Q.   Voter Reference Foundation doesn't have the
15        authority to prescribe the affidavit?
16   A.   Yes.
17   Q.   What do you mean by that?
18   A.   The statute, our state statute requires that a
19        requester complete an affidavit.  I know we
20        spoke about that pretty in depth.  So there is
21        an appropriate lawful process to receive voter
22        data.
23   Q.   Right.
24   A.   And one piece of that process is for a
25        requester to complete an affidavit, submit it

Page 96

1         to our office, pay for data, and then receive
2         the data.
3    Q.   And so my question is simply this:  If Voter
4         Reference Foundation makes a request with the
5         affidavit, pays for the data and receives it,
6         and then posts the data online for anyone who
7         agrees to use it for lawful purposes, okay,
8         which we know is true, we know the second thing
9         is true, why does the secretary of state's
10        office not recognize the viewers of VRF's data
11        as being within the organization of VRF?
12             MS. LECOCQ:  Objection.
13   A.   And, again, I think that's different than what
14        I responded to.  So, one, I was clear that I am
15        not an attorney.  I can't speak to what that,
16        you know, relationship is from a legal
17        perspective.  I would need to take those facts
18        in particular and address it with our general
19        counsel or our attorney to get clarity on how
20        to apply the law in that specific scenario.
21             What I can state, however, is that there
22        is a specific process to lawfully obtain, and
23        that requires the affidavit.
24             BY MR. GREIM:
25   Q.   Okay.  I'm not asking you anymore about

Page 97

1         lawfully obtaining it, okay?  We'll come back
2         to that question.
3              I'm asking you now about an organization
4         that lawfully has the data.  They want to share
5         that data with other people and they know the
6         issue is going to be:  Is the secretary of
7         state going to think these people are within
8         the organization or are they not within the
9         organization, okay?
10             So my question to you is:  Why does the
11        secretary of state contend that people who
12        agree, before they're given access to the data
13        that they will only use it for lawful purposes,
14        are not within the organization of VRF?
15             MS. LECOCQ:  Objection.
16   A.   I don't understand your last statement.  Are
17        you asking me a question?
18             BY MR. GREIM:
19   Q.   Okay.  I was.  I was.  My question is -- I'm
20        trying to think of a way to break this down.
21             Let's look at it this way:  If an entity,
22        with lawfully requested data, it sells that
23        data to its customers, but requires -- and it
24        makes it available to them on the Internet, but
25        it requires them to do that through a secure

25  (Pages 94 to 97)

1    to ask and I'm going ask what counsel advised,
2    one way or another, from you or from counsel.
3    If you just tell me the basis of the decision,
4    you don't need to tell me that, well, part of
5    this was what counsel wanted or this is -- and
6    you can protect the privilege by not explaining
7    to me what parts of what you tell me are from
8    an attorney.  I'm just going to say that while
9    we're on --
10          MS. SCHREMMER:  I object to your
11   definition about privileged communication.
12   BY MR. GREIM:
13   Q.   I mean, maybe we have a dispute.  We're about
14   to find out, I think.  But I certainly don't
15   think any part of the reasoning -- the basis
16   for any of the decisions can be shielded
17   because a lawyer was involved.  It's possible
18   to tell me the reasoning without saying, oh,
19   this is what our lawyer told us, but we'll see.
20   We'll let it play out if there needs to be an
21   objection and instruction.
22          MS. LECOCQ:  Can you give me one second?
23   We might -- let me talk to Kelsey.  And then I
24   might just give her a little bit of advice.
25          MR. GREIM:  Sure.  Okay.  Let's go off

1    the record for two minutes.
2          (WHEREUPON, at this time a brief recess
3    was taken.)
4          (WHEREUPON, Deposition Exhibit 7 was
5    marked for identification.)
6    BY MR. GREIM:
7    Q.   Okay.  I'm going to hand you what we've marked
8    as Exhibit 7, and you've seen this before.  I'm
9    just going to ask you if you recognize this
10   e-mail?
11   A.   I do.
12   Q.   Okay.  This is a Patrick Rostock e-mail to you
13   on March 11, 2022?
14   A.   Yes.
15   Q.   And it relates to ticket number 4148 (sic).
16   I'm just reading from the subject line,
17   "[External] Information Request," right?
18   A.   Right.
19   Q.   And you see there's a question from Voter
20   Reference Foundation at the bottom of the
21   e-mail chain?
22   A.   Uh-huh.
23   Q.   And then -- do you recall getting this e-mail?
24   A.   Yes.
25   Q.   Okay.  What did you do in reaction to this?

1    A.   I reached out to Dylan.
2    Q.   Okay.  Did you ask him for legal advice of some
3    kind?
4    A.   Yeah.
5    Q.   Okay.  Did he provide you legal advice in
6    response?
7    A.   Yes.
8    Q.   All right.  And is the first line of this
9    e-mail correct for Dylan's contact with the AG,
10   "...we are not fulfilling records from VoteRef"
11   (verbatim)?
12   A.   There was clarification related to voter data
13   requests, but, yes.
14   Q.   Okay.  And has this policy ever changed at the
15   secretary of state's office?
16   A.   What policy?
17   Q.   "Per Dylan's contact with the AG, we are not
18   fulfilling records request from VoteRef"?
19   A.   I don't think it was a policy, but certainly it
20   is based on legal advice related to this case
21   and our understanding of the use of the data
22   that that's still the position we maintained.
23   Q.   Okay.  What will VRF need to do in order to
24   obtain voter information from the secretary of
25   state's office?

1    A.   I think it is going to need some clarity from
2    legal counsel to respond to that.  I think it's
3    all relevant to this case in particular.
4    Q.   Well, why can't VRF simply fill out the current
5    affidavit and receive voter data?
6    A.   We have not stated that you cannot.
7    Q.   Well, that's -- I'm asking you that.  I'm
8    asking you, even if the current -- I mean, we
9    have a dispute about whether the current
10   affidavit actually follows New Mexico law, but
11   put that aside.  If VRF simply fills out the
12   current affidavit for voter data, is there
13   any -- is there any reason that the secretary
14   of state's office wouldn't fill the request?
15   A.   Again, I think barring any guidance from our
16   attorney related to this case, no.  I think our
17   concern is relevant in that there's an
18   understanding that it will be posted online;
19   that's the concern.
20   Q.   So even if VRF fills out an affidavit that says
21   "I won't share it on the Internet," VRF is not
22   going to get the data because of a concern that
23   it might show on the Internet anyway?
24   A.   I don't think I said that.
25   Q.   Well, I want to understand you.

Page 166

```
1    A.  So if VRF submits an affidavit and completes
2    it, I think there is a review of that affidavit
3    and a determination to provide the data.
4    Q.  When you say it --
5    A.  I don't think I've said that we wouldn't.
6    Q.  Okay.  Well, that's important because I thought
7    my question actually posed that very
8    hypothetical, that VRF fills out the affidavit
9    and submits it to you.  I just wonder if
10   there's any reason why the secretary of state
11   would still not produce the data.
12   A.  It would only be based on legal guidance.
13   Q.  Well, in other -- when you say only based on
14   legal guidance, you mean you're holding out
15   that attorneys might tell you not to produce
16   the data anyway?
17   A.  I think there's a potential, yes, based on
18   concerns of it being posted online.
19   Q.  Okay.  So is VRF in a position where the
20   secretary of state doesn't feel that it can
21   trust VRF's affidavit?
22      MS. LECOCQ:  Objection.
23   A.  What affidavit, I'm sorry?
24   Q.  The affidavit we've just been talking about.
25   A.  Ours, our prescribed form, completing it?
```

Page 168

```
1    there was still a concern that VRF might post
2    the data online anyway?
3    A.  There's currently active litigation with Voter
4    Reference Foundation, so any interaction we
5    would engage with our legal counsel, yes.
6    Q.  Okay.  So part of the -- so it sounds like part
7    of the block for VRF getting the data is the
8    fact that there's ongoing litigation, is that
9    correct?
10   A.  I don't know if there is a block.  I'm saying
11   because there is active litigation, that is a
12   usual process to consult with our attorneys.
13   Q.  Okay, fair enough.  But can the secretary of
14   state commit right here, right now, that if VRF
15   fills out the affidavit, as required by New
16   Mexico law, it will produce the data requested?
17      MS. LECOCQ:  Objection.
18   A.  I think I have responded that because there's
19   an active litigation, that we would seek
20   guidance from our counsel.
21      (WHEREUPON, Deposition Exhibit 8 was
22   marked for identification.)
23   BY MR. GREIM:
24   Q.  I'm going to hand you what we've marked as
25   Exhibit 8.  Do you recognize this document?
```

Page 167

```
1    Q.  Correct.
2    A.  But in that you are saying you're going to make
3    some sort of affirmation that you're not going
4    to put it online?
5    Q.  No, no.  I'm saying if VRF -- I want to be
6    clear here.  I thought we were, but I -- it
7    seems vague.
8       If VRF fills out the current affidavit --
9    on -- currently online, for the secretary of
10   state, is there any reason at all that the
11   secretary of state would cite to still refuse
12   to produce the voter data to VRF?
13   A.  And, again, I said as long as the form is
14   completed and we consult with our attorney, if
15   there is no concern related to it being posted
16   online, based on the circumstances of this
17   case, I foresee no reason to deny that.
18   Q.  Okay.  Well, it's that middle hedge that is
19   very important in this case.
20   A.  Well, that's the reality.
21   Q.  Well, I mean, so would the secretary of
22   state -- so what you're telling me is, in fact,
23   the secretary of state would not simply produce
24   the data if it received an affidavit, it would
25   first talk to counsel and determine whether
```

Page 169

```
1    A.  I do.
2    Q.  What is this?
3    A.  It is a request to our office for records.
4    Q.  Okay.  And it is accompanied by -- something
5    might be wrong.  Can I look at your version
6    quickly?  It's accompanied by a couple of
7    affidavits, correct, under Exhibit B?
8    A.  Yes.
9    Q.  Now, take a second to look at these affidavits.
10   Is there anything irregular or altered in these
11   two affidavits?
12   A.  I don't believe this is our most current form.
13   I think this is an outdated version.
14   Q.  Okay.  Is that a reason to reject a request?
15   A.  No.
16   Q.  And, in fact, do you recall when I asked you
17   this at your earlier testimony you stated that
18   secretary of state would accept all versions of
19   the form as it changed over time, right?
20   A.  Correct, as long as it provides the
21   information.
22   Q.  And is there anything lacking on these two
23   affidavits?
24   A.  No.
25   Q.  Okay.  Now, this request was denied, right?
```

43  (Pages 166 to 169)

Page 170

1    A.  Yes.
2    Q.  I'm going to -- and one of the reasons was that
3       the secretary of state was concerned that VRF
4       was going to take the information and post it
5       online, right?
6    A.  Right.
7    Q.  Okay.  And the basis for that was actually
8       something that I put in my letter, right?
9    A.  Basis for?
10   Q.  For the concern.
11   A.  Yes.
12   Q.  All right.  And specifically it's page 4 of my
13      letter.  Can you go to page 4?
14   A.  Okay.
15   Q.  And let's go to the third paragraph where I
16      talk about the request for records.  And you'll
17      see that it's about two different projects,
18      above there, and then I say in my third
19      paragraph -- or, I'm sorry, the second full
20      unnumbered paragraph, "VRF's intended election
21      use comprises two distinct projects.  For its
22      first project, just as VRF publishes voter data
23      for many other states, and as it recently
24      published voter data in New Mexico, VRF intends
25      to publish the requested information online for

Page 171

1       election related purposes, but will only
2       publish the personal information of voters
3       online if VRF is granted relief in..." and then
4       it cites this case, right?
5    A.  Uh-huh.
6    Q.  "...or any other legal proceeding."
7       Okay.  So did the secretary of state's
8       office decide that it believed that statement
9       was truthful?
10   A.  No.
11   Q.  Did not doubt what I put in my letter?
12   A.  I don't think there was any discussion of
13      doubt.
14   Q.  Okay.  Okay.  And then we go to the fourth
15      paragraph, I talk now about the second project.
16      And its says, "For its second" -- and by the
17      way, data for the first project is in a
18      separate safety affidavit, isn't it?  You see
19      there's two affidavits?
20   A.  There are two affidavits.  I am not clear what
21      is specific to each project.
22   Q.  Okay.  Okay.  Well, that's all right.  That's
23      all right.  You see that each --
24   A.  They each ask for the same data.
25   Q.  Do you see the first one under "Other" has one

Page 172

1       description, the second one has a different
2       one, right?
3    A.  One is asking for county and precinct, is that
4       the difference?
5    Q.  Right.  So, I mean, if you look, the first one
6       says "Current voter registration data,
7       including voter history for all active,
8       inactive, suspended, and canceled status
9       voters," right, "(including any registration
10      status other than active)," that's the first
11      one?
12   A.  Uh-huh.
13   Q.  The second one says "A complete list, by
14      county/precinct of any registered voters who
15      cast a ballot in the November 3, 2020 general
16      election, who have subsequently been placed in
17      inactive, canceled, deleted, or removed status,
18      or any voter that has been removed or deleted
19      from the rolls."
20         So those are not asking for the same
21      data, are they?
22   A.  No.
23   Q.  All right.  Fair enough.  Okay.  Let's come
24      back now to my letter.  In my second paragraph
25      I say, "VRF intends to analyze the records,

Page 173

1       information, and data provided in response to
2       the above requests in order to engage in a
3       discrepancy review of the New Mexico voter
4       rolls.  VRF intends to publish this analysis
5       online without disclosing the personal
6       information of any individual voter."
7         Do you see that correct -- did I read
8       that correctly?
9    A.  I do.
10   Q.  Okay.  And then I go on, just so it's clear,
11      "VRF will comply with this
12      non-public-disclosure promise for the data it
13      uses on its second project regardless of
14      whether it prevails in the federal litigation."
15         Did I read that right?
16   A.  You did.
17   Q.  "And again, for the sake of clarity, no
18      personal information of any individual voter
19      will be published online unless VRF is granted
20      relief in the federal litigation or in any
21      other legal proceeding."
22         Did I say that right?
23   A.  You read it correctly, yes.
24   Q.  And the secretary's position is that you didn't
25      know what I meant by personal information,

Page 206

1   between there.  That's the underlined language?
2  **A.  Right.**
3   Q.  And this is language the secretary of state is
4      proposing, right?
5  **A.  Or supportive of, yes.**
6   Q.  Supportive, okay.  And why does the secretary
7      of state support that?
8  **A.  Because we -- you know, this is not brand-new**
9      **language.  This is actually something that was**
10     **introduced in the past legislative session as**
11     **well.  And just like any other opportunity to**
12     **clarify an administrative process or to clarify**
13     **the law, that is something that we feel would**
14     **help to just create some bright lines so that**
15     **all parties involved with have clear direction**
16     **on what's expected.**
17  Q.  And clear notice, right?
18  **A.  Correct.**
19  Q.  Now, interesting here, in this underlined
20     language, it says that the, you know, data
21     "shall not be transferred, copied, shared, or
22     conveyed to any person outside the requesting
23     party's agency or organization," right?
24  **A.  Right.**
25  Q.  And now that's the first time that language has

Page 207

1      ever appeared in the statute, if that's
2      enacted, right?
3  **A.  That's right.**
4   Q.  That doesn't appear in any guidance or
5      regulation or even an existing affidavit, does
6      it?  Unfortunately, we don't have all the
7      affidavits.  I know you're wanting to look back
8      at my -- Exhibit 8 is what you want.
9  **A.  I know we have a more updated -- a more**
10     **recently updated version of this affidavit.**
11     **But I believe it tracks a little closer to the**
12     **existing statute than this authorization**
13     **section of what's in Exhibit 8.**
14  Q.  Well, look, I'm not going to ask you to guess
15     at the law or the affidavit.  We can look that
16     up ourselves, but I will -- I mean, putting
17     aside affidavits, you agree with me that this
18     standard of conveyed to any person outside the
19     requesting party's agency or organization has
20     not appeared in the code until now, if this is
21     enacted?
22     MS. LECOCQ:  Objection.
23  **A.  I think what we -- I think this is clarifying**
24     **it, but I do think the affidavit language does**
25     **indicate that the requester has to swear that**

Page 208

1  **they're not going to make it available to**
2  **others.  So I think there's an implication, but**
3  **I do think this language in the proposed bill**
4  **makes it very clear of what our interpretation**
5  **and intention is of that language.  So I do**
6  **think it's already stated.  But to your exact**
7  **question, is there a -- is this exact language**
8  **existing in the current statute, no.**
9      BY MR. GREIM:
10  Q.  And, in fact, the authorization doesn't just
11     stop after the word "others," does it?
12  **A.  No.**
13  Q.  It says, "make available to others to use the
14     requested material for purposes other than
15     governmental, election, research, and campaign
16     purposes," right?
17  **A.  This version, yes.**
18  Q.  It does, right.  And the statute now basically
19     says, "shall not be transferred, copied,
20     shared, or conveyed to any other person outside
21     the requesting party's agency or organization,"
22     and it doesn't hinge on the purpose for which
23     it's conveyed, correct?
24  **A.  Correct.**
25  Q.  Now, it goes on and it says, "shall not be made

Page 209

1      accessible by the general public on the
2      Internet or through other means."  That's also
3      new language, right?
4  **A.  Yes.**
5   Q.  Okay.  Who drafted that language?
6  **A.  There are drafters involved.  I don't know the**
7     **specific individual that drafted it.**
8   Q.  Did anyone in the secretary of state's office
9      propose that language?
10  **A.  Potentially Dylan.**
11  Q.  Okay.  And then let's go to the next page.  You
12     see there's new definitions for election
13     campaign purposes and governmental purposes,
14     right?
15  **A.  Yes.**
16  Q.  And so now election campaign purposes means
17     "use by" a campaign in an election, in certain
18     elections, right?  And it's --
19  **A.  "Use by," yes.**
20  Q.  And it strikes the language "relating in any
21     way to" a campaign, right?
22  **A.  Right.**
23  Q.  So under the amendment, now the "use" has to be
24     "by a campaign," right?
25  **A.  For election campaign purposes, yes.**



# The Legislature

of the

# State of New Mexico

___56th___ **Legislature,** ___1st___ **Session**

LAWS _____2023_____

CHAPTER __84__



HOUSE BILL 4, as amended

with certificate of correction

## Introduced by

REPRESENTATIVE JAVIER I. MARTÍNEZ
REPRESENTATIVE GAIL CHASEY
SENATOR KATY M. DUHIGG
REPRESENTATIVE D. WONDA JOHNSON
REPRESENTATIVE RAYMUNDO LARA

REPRESENTATIVE ANTHONY ALLISON
REPRESENTATIVE PATRICIA A. ROYBAL CABALLERO
REPRESENTATIVE DERRICK J. LENTE



EXHIBIT
**3**

State of New Mexico

# House of Representatives

### OFFICE of the CHIEF CLERK

Santa Fé

RECEIVED

2023 MAR 16  AM 8: 01

OFFICE OF THE CHIEF CLERK

**LISA M. ORTIZ McCUTCHEON**
Chief Clerk

State Capitol, Room 100
Santa Fe, NM  87501
Business Phone: (505) 986-4751
Email: lisa.ortiz@nmlegis.gov

FIFTY-SIXTH LEGISLATURE
FIRST SESSION, 2023

March 15, 2023

CERTIFICATE OF CORRECTION

I certify that the following error was found in

HOUSE BILL 4, as amended

and has been corrected in enrolling and engrossing:

1.  On Page 21, line 7, NSMA should read NMSA.  Corrected on page 18, line 11 on the enrolled and engrossed bill.

Respectfully submitted,

Lisa M. Ortiz McCutcheon, Chief Clerk
House of Representatives

CHAPTER 84

AN ACT

RELATING TO ELECTIONS; AMENDING AND ENACTING AUTOMATIC VOTER

REGISTRATION AND UPDATES TO REGISTRATION PROVISIONS;

REPEALING AND REPLACING THE DRIVER'S LICENSE VOTER

REGISTRATION PROVISIONS; REPEALING AND REPLACING THE

REGISTRATION AT VOTING LOCATION PRIOR TO VOTING PROVISIONS;

DEFINING THE UNLAWFUL USE OR DISPOSITION OF VOTER DATA,

MAILING LABELS OR SPECIAL VOTER LISTS;  PROVIDING THAT

INMATES ARE ELIGIBLE TO VOTE AND REGISTER TO VOTE UPON

RELEASE; ELIMINATING A REQUIREMENT THAT A VOTER'S

REGISTRATION BE CANCELED UPON FELONY CONVICTION AND

CONFORMING THE RESTORATION OF CITIZENSHIP PROVISION

ACCORDINGLY; CREATING A VOLUNTARY PERMANENT ABSENTEE VOTER

LIST; PROVIDING REQUIREMENTS FOR THE PROVISION OF MONITORED

SECURED CONTAINERS; ENACTING THE NATIVE AMERICAN VOTING

RIGHTS ACT TO PROTECT POLLING PLACE ACCESS AND ADDRESS OTHER

ELECTION ISSUES INVOLVING VOTERS ON INDIAN NATION, TRIBAL AND

PUEBLO LAND; DECLARING THE DAY OF A GENERAL ELECTION AND A

REGULAR LOCAL ELECTION A SCHOOL HOLIDAY; MAKING CONFORMING

AND TECHNICAL CHANGES; AMENDING, REPEALING AND ENACTING

SECTIONS OF THE NMSA 1978.


BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF NEW MEXICO:

    **SECTION** 1.  Section 1-3-8 NMSA 1978 (being Laws 1969,

Chapter 240, Section 58, as amended) is amended to read:

HB 4/a
Page 1

"1-3-8.   PRECINCT CHANGES--NOTICE AND PUBLICATION.--
Upon the adoption of any resolution, or upon the final action
of any district court upon a petition creating, abolishing,
dividing or consolidating any precinct, or changing any
precinct boundary, or changing any designated polling place,
the board of county commissioners shall:

A.   send a certified copy of the resolution or
court order to the secretary of state and to the county chair
of each of the major political parties; and

B.   publish once the resolution in a newspaper as
provided in the Election Code."

**SECTION 2.**   Section 1-4-5.2 NMSA 1978 (being Laws 1995,
Chapter 198, Section 3) is amended to read:

"1-4-5.2.   AGENCY REGISTRATION--FORM.--

A.   A qualified elector may register to vote at
certain state government offices.

B.   Pursuant to Section 1-4-47 NMSA 1978, a
qualified elector who applies for a driver's license, license
renewal or motor vehicle identification card who is not
registered to vote in this state and who is not automatically
registered to vote pursuant to the automatic voter
registration provisions of Section 1-4-47 NMSA 1978 may
simultaneously register to vote or file a change of address
for voter registration purposes.

C.   Pursuant to Section 1-4-48 NMSA 1978, a

HB 4/a
Page 2

1   qualified elector may register to vote in any state agency

2   that provides public assistance or services to persons with

3   disabilities.  The secretary of state may designate other

4   state or local public offices with the agreement of those

5   offices.

6        D.  Pursuant to Sections 1-4-47 and 1-4-47.1 NMSA

7   1978, a qualified elector may become registered to vote by

8   automatic voter registration at the motor vehicle division of

9   the taxation and revenue department or other state or local

10  public offices designated by the secretary of state."

11       SECTION 3.  Section 1-4-5.6 NMSA 1978 (being Laws 1975,

12  Chapter 255, Section 79, as amended) is amended to read:

13       "1-4-5.6.  UNLAWFUL USE OR DISPOSITION OF VOTER DATA,

14  MAILING LABELS OR SPECIAL VOTER LISTS--PENALTIES.--

15       A.  Unlawful use of voter data, mailing labels or

16  special voter lists consists of:

17            (1)  the knowing and willful selling,

18  loaning, providing access to or otherwise surrendering of

19  voter data, mailing labels or special voter lists by a person

20  for purposes prohibited by the Election Code; or

21            (2)  causing voter data, mailing labels or

22  special voter lists or any part of the voter data, mailing

23  label or special voter lists that identifies, or that could

24  be used to identify, a specific voter or the voter's name,

25  mailing or residence address to be made publicly available on

HB 4/a
Page 3

1   the internet or through other means.

2        B.  Any person, organization or corporation or

3   agent, officer, representative or employee thereof who

4   commits unlawful use of voter data, mailing labels or special

5   voter lists is guilty of a fourth degree felony and upon

6   conviction shall be fined one hundred dollars ($100) for each

7   line of voter information that was unlawfully used.

8        C.  Each unlawful use of voter data, mailing labels

9   or special voter lists constitutes a separate offense."

10      SECTION 4.  Section 1-4-5.7 NMSA 1978 (being Laws 2019,

11  Chapter 67, Section 1, as amended) is repealed and a new

12  Section 1-4-5.7 NMSA 1978 is enacted to read:

13      "1-4-5.7.  REGISTRATION AT VOTING LOCATION PRIOR TO

14  VOTING.--

15        A.  Notwithstanding the provisions of Section 1-4-8

16  NMSA 1978 providing for the closing of registration prior to

17  an election, a qualified elector seeking to register to vote

18  or update an existing certificate of registration in the

19  state shall be allowed to do so at a voting location

20  immediately before voting in that election after signing an

21  affidavit under oath that the elector has not voted in the

22  election in this state or elsewhere and as further provided

23  in this section.

24        B.  During a statewide election, a qualified

25  elector may register to vote or update an existing

HB 4/a
Page 4

_____
Javier I. Martínez, Speaker
House of Representatives


_____
Lisa M. Ortiz McCutcheon, Chief Clerk
House of Representatives


_____
Howie C. Morales, President
Senate


_____
Cheri D. Lujan, Chief Clerk
Senate


Approved by me this 30th day of March_____, 2023


_____
Michelle Lujan Grisham, Governor
State of New Mexico

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

4     VOTER REFERENCE FOUNDATION, et al.,

5          Plaintiff,

6          VS.                          NO. CV 22-00222 JB/KK

7     Hector Balderas, Attorney General
      for the State of New Mexico, et al.

8
           Defendants.
9

10

11
           Transcript of Motion Proceedings before
12    The Honorable James O. Browning, United States
      District Judge, Albuquerque, Bernalillo County,
13    New Mexico, commencing on May 17, 2022.

14
      For the Plaintiff:  Mr. Eddie Greim; Mr. Matt Miller;
15    Mr. Carter Harrison

16    For the Defendant:  Ms. Olga Serafimova

17

18

19

20              Jennifer Bean, FAPR, RDR, RMR, CCR
21              United States Court Reporter
                Certified Realtime Reporter
22                 333 Lomas, Northwest
                 Albuquerque, NM  87102
23               Phone:  (505) 348-2283
                   Fax:  (505) 843-9492
24

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                      TINA SWOBODA,
 2          after having been first duly sworn under oath,
 3          was questioned and testified as follows:
 4                      DIRECT EXAMINATION
 5              THE COURT:  All right.  Ms. Swoboda.  Mr.
 6     Greim.
 7     BY MR. GREIM:
 8          Q.   Ms. Swoboda, we'll try to focus on some of
 9     the questions that the Court had, and hopefully,
10     you'll do better than I did and give some testimony
11     on those points.
12              Before we jump into that, could you please
13     just give us a little bit about your education?
14          A.   Sure.  I have a bachelor's degree from
15     Arizona State, and I'm completing my grad degree in
16     political psychology from Arizona State.
17          Q.   And what's your current position?
18          A.   I'm the Executive Director of Voter
19     Reference Foundation.
20          Q.   What are your duties as executive director?
21          A.   I manage the operations staff and the data
22     staff, and I talk about the data.
23          Q.   Could you just walk us through your past
24     five years or so, your career before you came to VRF?
25          A.   Sure.  I served under two different
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   meaningful access to the voter lists right now.  In

2   many states they are prohibitively expensive.  They

3   are huge files.  You would have to be a database

4   analyst to open the giant file.  And so we don't

5   think the public has the ability to view the data in

6   a meaningful, clear, simple to understand way.

7        Q.   So why are you so focused on the voter

8   rolls themselves?

9        A.   They are everything in the election.  The

10  election begins with who is eligible; that's the

11  voter roll.  And the election ends with who gets vote

12  credit.  That's the voter roll.  You can't have an

13  election without it.  That's the entire basis of the

14  process.

15       Q.   Okay.  Maybe you can walk us through now

16  what VRF does to fulfill its mission?

17       A.   Sure.  So we acquire the data.  We map it.

18  So different states have different data variables in

19  their data sets.  Some states give year of birth,

20  some give the whole birthday, some just give age.

21  Some have party affiliations, some don't.  So we map

22  those variables within the data file and the voter

23  history file.  In some states there are two separate

24  files.  In some estates it's all in one.  And then we

25  map that up against our fields on our user interface

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   on VoteRef.com.   And we publish it.   That's on the

2   voter registration side.

3            And I do quarterly FOIAs now.   I want to

4   update that every quarter going forward.

5            On the election side of Vote Ref we're

6   comparing the total ballots cast election-wide.

7   That's often called turnout.  We don't look at a

8   particular context because there are under votes.

9   You know, people will leave a race blank.  We just

10  want to know the total ballots cast as reported by

11  the election officials compared to the total voters

12  in the vote history file, with credit for having

13  voted.

14           And, you know, the numbers don't reconcile.

15  There are reasons for that.  Every state is

16  different.  I talked to Mississippi, and they said:

17  Hey, pull the canceled voters file, because we pull

18  the vote history out when we archive the voters.  So

19  I'm holding Mississippi until I get that additional

20  data.  I reach out to the state election official

21  and, hopefully, they work with us so we can

22  understand what we need to get to reconcile the data.

23  Sometimes they don't answer.

24      Q.   What does VRF intend the public to do with

25  the data once they log on to the website?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Is the pop-up and the terms and conditions

2    that come up, are those the same across the country,

3    or are they tailored to the states?

4    A.   I've got a legal team.  And I modify them

5    for every state I put up to ensure I'm in compliance

6    with the terms of service and privacy provisions

7    within each specific state.  And we have a disclaimer

8    on every single voter detail page that cites the

9    specific language of the state with regard to

10   protections for people that are secured voters, like

11   stays at home, and that kind of thing, confidential

12   voters.

13   Q.   Before we move on, because I don't think we

14   mentioned this concept yet.  Could you explain that

15   concept to us, the secure voters or the protected

16   voters.  What is that?

17   A.   Yes.  It's very important.  So there are

18   law enforcement officials, victims of domestic

19   violence or stalking.  There are many different

20   categories, depending on your state, of voters whose

21   records are protected and redacted.  Their addresses

22   must not be shown.  When I publish a file, before I

23   publish a file, I notify the chief election official,

24   and I send a link to the file they gave me back to

25   them, and say:  It's my understanding you don't have

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   anyone in here under -- and then whatever the statute

2   and the program is.  If that's not the case, let us

3   know.  And if anyone in this list that you gave me

4   should seek to become protected, please notify me so

5   that I may redact them.  And I've got a big glossary

6   for every state.  And on each voter show page for

7   every state it tells them how to apply to become a

8   protected voter.  And if they email me, I will redact

9   them immediately.

10       Q.   By the way, did you do that in New Mexico?

11  In other words, did you send the voter file to the

12  Secretary of State with the caution and the request

13  about any protected voters here?

14       A.   I did.

15       Q.   And did the Secretary of State get back to

16  you?

17       A.   They did not.

18       Q.   Did they acknowledge your email?

19       A.   No, they did not.

20       Q.   Let's talk for a minute -- I did my best

21  with the Court, but I want to ask you now a little

22  bit about the election side of your analysis.  You

23  told us before what you're comparing, the two items

24  that you're comparing.  And what do you call the gap

25  between those two?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  your own open records team working with you now?

2      A.   Yes.

3      Q.   In this case, though, did another entity

4  request that data?

5      A.   Yes, Local Labs requested that data before

6  I came on.

7      Q.   And did it do this in other states for VRF

8  as well?

9      A.   Yes.

10      Q.   Why use Local Labs?

11      A.   It's my understanding they're a company

12  that does public records requests and FOIAs, and they

13  work in that area all the time, so they're more

14  familiar with the forms and who to contact, and have

15  people on the ground.

16      Q.   How was Local Labs reimbursed for its

17  services?

18      A.   I think they get a flat rate for every

19  state; that includes doing the research on who to get

20  the data from, filing the proper forms, making sure

21  they're in compliance, and then acquiring the data

22  itself.

23      Q.   When was the New Mexico data first posted?

24      A.   I posted New Mexico, December, I believe,

25  16, 2021.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No.

 2        Q.   Did it ever contact you to try to find some

 3   way to accomplish your goal, while also complying

 4   with the Secretary's view of the law?

 5        A.   No.

 6        Q.   Did the AG ever do this?

 7        A.   No.

 8        Q.   Has there ever been any contact from the

 9   AG's office to VRF?

10        A.   No.

11        Q.   Why did VRF take the New Mexico portion of

12   the database down?

13        A.   Because we read in the ProPublica article

14   that the New Mexico Secretary of State thought we

15   were violating the law and had referred the matter to

16   the Attorney General for prosecution.  And so we took

17   it down until we could figure out what we had done

18   wrong and how to be in compliance.

19        Q.   I just have one other question for you.

20   Are you aware of an entity called Catalist?

21        A.   Yeah, I'm aware of several entities and

22   political organizations that acquire voter data in

23   all 50 states.

24        Q.   And just to be clear, so is your answer

25   yes?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.  So you weren't there for the actual

2  transactions that happened between VRF and Local

3  Labs?

4     A.  Correct.

5     Q.  But in your declaration -- you remember you

6  submitted a declaration with the pleadings?

7     A.  Yes.

8     Q.  So in that declaration you state, "I am

9  familiar with VRF's process of obtaining and using

10  voter registration data made available by the New

11  Mexico Secretary of State's Office."  Is that a true

12  statement?

13     A.  It is.

14     Q.  So you are familiar with that transaction?

15     A.  I have seen the records of the transaction

16  and the invoices that go out from the foundation,

17  yes.

18     Q.  So how much did Voter Ref, or VRF, pay

19  Local Labs for this service?

20     A.  I believe it's a flat $15,000 fee for all

21  services per state for that initial acquisition of

22  the data.

23     Q.  Okay.  And so in this case that would have

24  been submitting the affidavit, submitting the

25  payment, emailing with Lauren, presumably, right;

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    obtaining the file, and handing it over to you?

2         A.    And I mean, it should be researching and

3    doing due diligence about what was lawful with regard

4    to acquiring and transferring the data, and who to go

5    to for the data.  Whatever their entire service

6    process is of their services.

7         Q.    So it should be, or do you know that that

8    was part of the contract?

9         A.    This data was acquired in April.  I believe

10   that that is part of the contract.  I believe that

11   that is part of the contract.  I am sorry, I don't

12   have it in front of me, so that's the best of my

13   recollection.

14        Q.    So it may or may not have been part of the

15   contract?

16        A.    It may or may not.

17        Q.    Okay, great.  And also in that affidavit

18   you said that, "Before Local Labs requested voter

19   data from the New Mexico Secretary of State, VRF

20   confirmed that its intended use of the data for

21   election-related purposes was permitted by New Mexico

22   law by reviewing the relevant statutes, including

23   Section 1-4-5.5."  Is that a true statement?

24        A.    Yes.  We have a legal team that looks at

25   every state and tells us whether or not we may

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Forgive me.  It's on the second page,
 2   second -- so we have a one-sentence paragraph, then
 3   the next paragraph in the middle first sentence
 4   says -- and this is something attributed to you --
 5   "We're well on our way to accomplishing something
 6   that has never been done before."
 7             Is that a true statement?
 8        A.    Yes.   To my knowledge, no one has ever
 9   published the voter registration records for every
10   state online, for free, for the public forever, no.
11        Q.    Catalist has not done that; correct?
12        A.    I don't know all of Catalist's business, so
13   I could not say.  I think they have clients.  I don't
14   know.  I know the political parties publish the data
15   online.
16        Q.    Let me back up.  You just said that to your
17   knowledge, no one else has done this.  And yet, when
18   I asked you:  Has Catalist done it, you say you don't
19   know.  So which one is it?
20        A.    So, to my knowledge, no other entity has
21   tried to publish all 50 voter registration records
22   for all 50 states for free.  I believe Catalist
23   charges people for their services.  I don't charge
24   anybody to access my data.
25        Q.    When you say you believe, what is that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    or a major election.  Because we are -- those are

2    active people.  And you start there, and then you

3    also ask them to reach out to others around them,

4    neighbors, friends, and ask them to -- if they're in

5    the same community -- to participate in upcoming

6    meetings, and get to know what's going on so they

7    have additional sources of information.

8        Q.   We've heard a lot of talk about this idea

9    of crowd sourcing, kind of checking the veracity of

10   voter information and databases, whether it's New

11   Mexico, or elsewhere.  Would you engage in that kind

12   of crowd sourcing to ensure just that it's accurate

13   to the best of your knowledge?

14       A.   You know, I think it's a good idea,

15   whenever there is information out there about

16   yourself, to make sure it represents you correctly.

17   And I encourage others to do the same thing.  Some of

18   the process of going through and making calls and

19   contacting people in my community is -- it's

20   difficult, because there is really no central source

21   of information.  So I do think that people need to be

22   aware of that and go out and use the tools that are

23   available so they can check and see.

24       Q.   Would you ever deliberately use voter data

25   in a way that's unlawful?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Ms. Steinberg, you

 2    may step down.  Thank you for your testimony.

 3              All right.  Mr. Greim, do you have your

 4    next witness or evidence?

 5              MR. GREIM:  We'll call Ms. Vigil.

 6              THE COURT:  All right.  Ms. Vigil, if

 7    you'll come up and stand next to the witness box.

 8    Before you're seated, Ms. Rotonda will swear you in.

 9                       MANDY VIGIL,

10         after having been first duly sworn under oath,

11         was questioned and testified as follows:

12                     DIRECT EXAMINATION

13              THE COURT:  Ms. Vigil.  Mr. Greim.

14    BY MR. GREIM:

15         Q.   Ms. Vigil, what is your title?

16         A.   The State Elections Director.

17         Q.   What are your duties?

18         A.   I oversee the administration of the Bureau

19    of Elections.  So we are responsible for assisting

20    county clerks, election administrators across the

21    state with adhering to the Election Code.  So there

22    are a lot of different programs that go into that

23    administration, but generally, that is the

24    responsibility.

25         Q.   How many people report to you?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    of State probably does several things to make sure

2    that the law is being followed in New Mexico; right?

3        A.   We're responsible for providing an

4    administrative process to access that data.  And if

5    we become -- if we're made aware that there is some

6    sort of concern with how that data is being used, the

7    Election Code provides us with an opportunity to

8    refer that to a law enforcement agency.

9        Q.   Do you do anything other than just make the

10   administrative process available?

11       A.   We also provide information to voters,

12  requesters.  And we are also responsible for

13  providing guidance and training to other election

14  administrators, such as the county clerks.

15       Q.   Okay.  So, you know, I know at the federal

16  level there is formal guidance, informal guidance,

17  frequently asked questions, all kind of things.  But

18  I see that on your website you have some informal

19  guidance on the law relating to disclosure of voter

20  data.  You have some of that; correct?

21       A.   Correct.

22       Q.   So if you look at P-3, for example.  Again,

23  I think that binder just has the number 3.

24       A.   Okay.

25       Q.   If you see this is a multi-page document,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

128

1    and I'll tell you we pulled it from your website.

2    Does this document contain some of the guidance that

3    you make available to requesters?

4         A.    As a resource.

5         Q.    And you try to make sure that this material

6    is completely accurate; correct?

7         A.    Yes.

8         Q.    And is correct under New Mexico law?

9         A.    Correct.

10        Q.    Okay.  You talked about an administrative

11   process.  Are you basically referring to the process

12   by which you accept an affidavit from people?

13        A.    The state law does require that we collect

14   an affidavit, and that we also log the requester, and

15   maintain that log.

16        Q.    Have you ever rejected an affidavit or

17   denied a request by affidavit?

18        A.    No.

19        Q.    Have you ever looked at who the requester

20   is to make sure they say that they are who they say

21   they are?

22        A.    If you can clarify?

23        Q.    Sure.  If somebody -- you know, if you get

24   a request and, you know, it says, you know, Mick

25   Jagger requesting on behalf of, you know, the New

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Mexico Democratic Party, do you do anything to make

2   sure that that's a real person and a real

3   organization requesting the data?

4       A.   The form needs to be complete.  It needs to

5   be signed.  And they need to agree to the terms

6   through their signature.  But we do not investigate

7   through a call or reaching out to them, no.

8       Q.   Is it fair to say that you've only done two

9   investigations of requesters?

10      A.   We have not done any investigations of

11  requesters.

12      Q.   Well, okay.  Have you done an investigation

13  of Local Labs and VRF?

14      A.   We did refer both Local Labs and VRF to the

15  Attorney General's Office due to the use, and our

16  concerns with the data being made available online.

17      Q.   And you investigated to come up with the

18  facts that you put into your referral letter;

19  correct?

20      A.   We did research the facts to provide,

21  correct.

22      Q.   And you've also investigated another

23  entity -- and I'm going to get this wrong -- it's out

24  of Otero County, I think.

25      A.   I think it's important that we clarify that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    we don't have investigators.  We're not a law

2    enforcement agency.  We did review and we did provide

3    the facts to the best of our knowledge, and turn

4    those over to someone who does have an investigator.

5        Q.   And by the way, you determined that this

6    Otero County group is not connected to VRF; correct?

7        A.   We have not made any determination of a

8    connection.

9        Q.   So does the Secretary of State still

10   believe -- does it believe that VRF is connected to

11   this Otero County group?

12       A.   I don't think we have that information.

13       Q.   Have you ever become aware of a potential

14   violation of the law until ProPublica contacted your

15   office regarding Local Labs and VRF?

16       A.   That is the first time we were made aware.

17       Q.   Now, we talked -- let's change gears for a

18   second here.  We talked about informal guidance on

19   the Secretary of State's website.  The Secretary of

20   State also makes numerous statements about New Mexico

21   law in this area, doesn't she?

22       A.   I don't know what you're referring to.

23       Q.   Okay.  I'm sorry, you're not aware that the

24   Secretary of State, the person you directly report

25   to, has made statements about New Mexico law and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    designs the forms?

2        A.    Someone in the Bureau of Elections.

3        Q.    Okay.   Who approves them?

4        A.    I participate in that approval, along with

5    a legal review, usually done by our general counsel

6    or our Deputy Secretary of State.

7        Q.    Has the Secretary of State's Office ever

8    authored a form that was inaccurate under New Mexico

9    law?

10       A.    Ever in the history of the office, I can't

11   speak to.

12       Q.    Okay.   Fair enough.   Let's say in the last

13   two years?

14       A.    Not to my knowledge.

15       Q.    So we're going to look through these forms

16   in a second.   But your testimony is that every single

17   form that's been used in the last two years has been

18   consistent with New Mexico law?

19       A.    I think you're referring to the affidavit.

20   And so we did make a correction to that affidavit

21   once we were made aware that it needed to more

22   strictly align to the statute.   So there was a

23   correction made to the affidavit.

24       Q.    Okay.   Well, let's just jump right into

25   that.   I wasn't going to do that quite yet, but now

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              MR. GREIM:  A through L.
2              THE COURT:  No objection to A through L.
3              MS. SERAFIMOVA:  No.
4              THE COURT:  Are these Joint Exhibits, A
5    through L?
6              MR. GREIM:  They are.
7              THE COURT:  All right.  So Joint Exhibits A
8    through L will be admitted into evidence.
9              MR. GREIM:  A little housekeeping, I'm
10   sorry, Ms. Vigil.
11       Q.   So you mentioned the affidavit.  There are
12   obviously different parts of this request.  So we'll
13   get to the affidavit.  But let's look at the very top
14   box where it says, "Please indicate the purpose of
15   this request."  Then it's got three boxes, okay?
16   Now, here, which box is checked?
17       A.   Election-related.
18       Q.   Okay.  And so is it your understanding that
19   these are the three permissible purposes of use of
20   voter data?
21       A.   I think that these needed to be clarified.
22       Q.   Well, okay.  Is governmental use an
23   appropriate purpose for voter data?
24       A.   It is.  I think there are two defined terms
25   in the state code.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    going to be utilized.  And, generally, it's either

2    going to be, you know, an election administrator, a

3    campaign, or somebody directly involved in the

4    election process.

5         Q.   I see.  So what if it's an observer of the

6    election campaign who is advocating for changes to

7    election laws?  Would you say that it's not an

8    election-campaign-related use?

9         A.   I think that it would need some analysis,

10   and that's why we have legal guidance.  I would

11   probably seek information from our general counsel.

12        Q.   Well, why was the election-related category

13   taken off the form?

14        A.   Again, as I mentioned, in reviewing the

15   state code, and wanting to provide clarity to the

16   requesters, to anyone using the form, including our

17   state county clerks who would like clear, bright

18   lines, that is the purpose of our office is to

19   provide guidance where there is something that needs

20   clarity.  And in doing analysis of what the

21   legislature intended, we reviewed that portion of the

22   code and updated the form accordingly, that provided

23   for the two defined specific purposes.

24        Q.   Was this at the same time that you received

25   the report from Ms. -- was it Trujillo?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    box for "research and other."

2         Q.   Okay.  Okay.  So one of the issues she

3    raised was that another version of this form had

4    extra check boxes at the top; is that right?

5         A.   Yes.

6         Q.   And those check boxes also had a box for

7    research?

8         A.   Yes.

9         Q.   Okay.  That should have been an exhibit.

10   I'm actually not seeing it.

11        A.   Exhibit H.

12        Q.   Is the older form, Exhibit H?

13        A.   It is.

14        Q.   So when was this change made?

15        A.   In early 2021, January.

16        Q.   Okay.  So just a few months before

17   Mr. Lippert signed Exhibit B?

18        A.   I don't see the date on his form.  March,

19   yes.

20        Q.   And so one thing that was changed is that

21   "research and other" were taken off from the top box?

22        A.   Correct.

23        Q.   I see that no change was made to the

24   bottom, though, to the affidavit?

25        A.   Correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    So maybe I misunderstood.   Did Ms. Trujillo
 2   suggest making a change to that affidavit?
 3        A.    It was an oversight to not align that with
 4   the top portion.
 5        Q.   I see.  So your position, then, would be
 6   that the bottom affidavit, that bottom sentence, "I
 7   hereby swear" is correct, but maybe the word
 8   "research" should have been taken out?
 9        A.   Correct.
10        Q.   Okay.  Otherwise, it's accurate, though?
11        A.   Correct.
12        Q.   So that was eventually changed, though,
13   wasn't it?
14        A.   It was.
15        Q.   Now, if it was accurate before, why was it
16   changed?
17        A.   Again, you know, anytime we're made aware
18   of a process, a procedure, we receive feedback from
19   external customers, our partners, which are
20   stakeholders, county clerks, you know, we're going to
21   evaluate and make adjustments.  We want to improve,
22   we want to modernize.
23            So based on feedback, you know, that's when
24   the adjustment was made, again, to provide clarity,
25   and to specifically align with the statute to avoid
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    confusion.
 2         Q.    So that change was made on February 10th;
 3    correct?
 4         A.    Correct.
 5         Q.    Now, you said feedback from stakeholders
 6    and all these other people.  Who suggested to you
 7    that the authorization needed to be changed?
 8         A.    It came out of a conversation mainly with
 9    one of our county clerk offices.  As we all have an
10    awareness, 2020, there is a lot of interest in the
11    election process.  We receive inquiries into our
12    procedures and our process daily, multiple times a
13    day.  And so it is always kind of a work in progress.
14    We want to improve.  So this specifically came out of
15    a conversation with the Otero County Clerk.
16         Q.    Okay.  So this happened just in February of
17    2010.  What was the reason the Otero County Clerk
18    raised?  How did this come to that clerk's attention?
19         A.    Sure.  So they are inundated with records
20    requests at this point in that time, you know, along
21    with interest in the 2020 election.  We have also
22    just experienced the need to ensure the election
23    security of our processes, both a cyber issue and a
24    physical issue.  And part of that is making sure that
25    we are consistently providing correct and consistent
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    My question was:  Is it your testimony that the

2    authorization in Exhibit A is consistent with New

3    Mexico law?

4         A.   They are both.

5         Q.   We kind of beat around the bush earlier

6    about what election related means, that it can be

7    different from campaign related.  Let me ask you if

8    VRF, our client here, requested data, obtained the

9    data itself; let's say you had filled one of the

10   requests.  Someone had said:  Hey, just fill out this

11   form.  You filled out the form.  And they agreed --

12   let's just say right now, they agreed they weren't

13   going to send the data to anyone else.  They were

14   just simply going to analyze it, and then publish

15   this information about the discrepancy.

16            Okay.  Is it the Secretary of State's view

17   that that is consistent with New Mexico law; that

18   that is an election-related use that would be

19   allowed?

20        A.   The issue is not their use of obtaining the

21   data.  It was really the distribution that was the

22   concern with VRF in particular.  So we would have not

23   denied a request, given the scenario you described.

24   If they would have selected a relevant purpose, we

25   would have provided the data to Vote Ref directly.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     related use?

2         A.    I think that there is no strict

3     prohibition.   And I think it would require a

4     consultation with my legal counsel to ensure that we

5     are consistently providing the data.

6         Q.    What more would you need to know?

7         A.    I think that we would need to do a legal

8     analysis.   I'm not an attorney.

9         Q.    I'm trying to understand what about

10    election -- I'm trying to understand what activities,

11    what purposes of speech, election related encompassed

12    that are no longer allowed under the new form.

13        A.    And I think we have very clear guidance on

14    two purposes that we can provide a response for a

15    requester on.   I think, if it needs a legal analysis,

16    we would seek that from our general counsel.

17        Q.    Okay.   If you learned that someone is using

18    the data for a purpose that, in your view, does not

19    comport with this form, we've seen that you will

20    refer that person for criminal prosecution; correct?

21        A.    The circumstance was not about one of those

22    two definitions.   It was very clear about how that

23    information was being made public.   It was a concern

24    for the voter's privacy.   It was not based on any

25    analysis of using it to make some determination of

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                         1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1   what's being called, incorrectly, "a discrepancy."
 2        Q.    I see.   And so the reason that Voter
 3   Reference Foundation was referred was because of a
 4   concern for voter privacy?
 5        A.    It was the distribution of the voter data.
 6        Q.    And the Secretary of State's position is
 7   that the requester can never, ever, ever share the
 8   voter data; is that correct?
 9             MS. SERAFIMOVA:   Objection, Your Honor.
10             THE COURT:   Overruled.
11        A.    There are specific prohibitions in our
12   Election Code.  And we do feel like our analysis in
13   this circumstance of publishing the information
14   online for the world is a violation of those
15   prohibitions.
16        Q.    And we are here -- we're just about done --
17   we are here to understand exactly what parts of VRF's
18   conduct caused the referral.   And so my question is:
19   Is it the use, or is it the sharing?
20        A.    Sure.   So, you know, in the authorization
21   itself, we can look through kind of those itemized
22   items, and it indicates they cannot sell, loan,
23   provide access to -- so providing access to -- or
24   otherwise surrender voter information.   And they
25   cannot use it for any commercial purpose.   So I would
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

```
1                    C-E-R-T-I-F-I-C-A-T-E

2

3    UNITED STATES OF AMERICA

4    DISTRICT OF NEW MEXICO

5

6

7         I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8    Official Court Reporter for the State of New Mexico,

9    do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13        In testimony whereof, I have hereunto set my

14   hand on May 24, 2022.

15

16

17

18        _____
          Jennifer Bean, FAPR, RMR-RDR-CCR
19        Certified Realtime Reporter
          United States Court Reporter
20        NM CCR #94
          333 Lomas, Northwest
21        Albuquerque, New Mexico 87102
          Phone:   (505) 348-2283
22        Fax:     (505) 843-9492

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

| Date of Request | Requestor | Organization Requesting | Information Requested | Number of Records | Total Cost for Records | Date Requestor Notified | Date Payment Received | Date of Issue | Method of Delivery |
|---|---|---|---|---|---|---|---|---|---|
| 11/4/2020 | Dan Jones | | Lincoln County voter data with history for 2010 to 2020 Primary and General Elections | 14,913 | $74.65 | 11/17/2020 by phone and e-mail | | | |
| 11/4/2020 (unsigned request) 11/13/2020 (signed) | Lorenzo Gutierrez | America Votes | Statewide voter data with history for 2020 General Electio | 143,002 | $587.01 | 11/17/2020 vm and email | 11/17/2020 | | 11/18/2020 Email, Kiteworks |
| 11/9/2020 | Alec Ferretti | | Database extract of SERVIS showing all registered, deceased and purged voters | | | Improperly completed form | | | |
| 11/10/2020 | Adam Daugherty | Democratic Party of NM | Voting history for 2020 General Election voters | 928,726 | N/A | | N/A | | 11/17/2020 Email, Kiteworks |
| 11/10/2020 | Adam Daugherty | Democratic Party of NM | Statewide voter data | 1,353,428 | N/A | | N/A | | 11/17/2020 Email, Kiteworks |
| 11/19/2020 | Jake London | Alloy | Statewide voter data with history for General and Primary elections 2010-2020 | 1,354,980 | $5,434.92 | 11/24/2020 VM 12/14/2020 VM | | | |
| 11/25/2020 | Russ Howell | Republican Party of Luna County | Luna County voter data with history for 2020 General Election | 12,965 | $66.86 | 12/4/2020 by e-mail and phone | 12/4/2020 | 12/4/2020 | Email |
| 12/4/2020 | Adam Daugherty | Democratic Party of NM | Statewide voter data with history for 2018 General Election | 1,356,838 | N/A | | N/A | | 12/7/2020 Email, Kiteworks |
| 12/4/2020 | Adam Daugherty | Democratic Party of NM | Statewide voter data with history for 2016 General Election | 1,356,795 | N/A | | N/A | | 12/7/2020 Email, Kiteworks |
| 12/4/2020 | Adam Daugherty | Democratic Party of NM | Statewide voter data with history for 2014 General Election | 1,356,745 | N/A | | N/A | | 12/7/2020 Email, Kiteworks |
| 12/4/2020 | Adam Daugherty | Democratic Party of NM | Statewide voter data with history for 2012 General Election | 1,356,719 | N/A | | N/A | | 12/7/2020 Email, Kiteworks |
| 12/7/2020 | Rhonda Billings | Republican Party of Grant County | Grant County Voter History for 2020 General Election | 20,727 | $97.91 | Spiceworks and voicemail | 12/8/2020 | 12/8/2020 | Email |
| 12/8/2020 | Charleen Bishop | Constitution Party of NM | Statewide data for Constitution Party voters with history for 2020 General Election including printed list | 826 | N/A | | N/A | | 12/9/2020 Email and mail |
| 12/9/2020 | Jon Boller | Legislative Council Service | Statewide voter data with history for 2020 General Election | 1,357,563 | N/A | | N/A | | 12/11/2020 Email, Kiteworks |
| 12/21/2020 | Rachel Martinez | Republican Party of NM | Statewide voter data with history | ? Exported and Fulfilled y Charlotte | N/A | | N/A | | 12/22/2020 Email, Kiteworks |
| 12/23/2020 | Chris Luchini | Libertarian Party of NM | Statewide voter data with history for 2019 and 2020 elections | ? Exported and Fulfilled by Charlotte | N/A | | N/A | | 12/23/2020 Email, Kiteworks |
| Date of Request | Requestor | Organization Requesting | Information Requested | Number of Records | Total Cost for Records | Date Requestor Notified | Date Payment Received | Date of Issue | Method of Delivery |
| | Linda S Alvarez | Community Advocate | Dona Ana, District 36, Village of Hatch; Caballo Soil and Water Conservation | | | | | | |
| 1/4/2021 | Adam Daugherty | Democratic Party of NM | Statewide Voter Data | 1,359,598 | N/A | | N/A | | 1/5/2021 Email, Kiteworks |
| 1/4/2021 | Eileen Miller | Provext, LLC | Did not request Data but asked if Philipp Arthur Djang was a registered voter in Dona Ana County | 1, (Confirmed registration of a voter by that name via letter) | N/A | | N/A | 1/13/2021 | Mail |
| 1/15/2021 | Marguerita ten Houten | Catalist | Statewide voter data with history for 2020 and primary, 2019 RLE, all other general and primary elections | 1,359,651 | $5,453.60 | 1/22/2021 by Spiceworks #33778 | 1/26/2021 | | 1/26/2021 Email, Kiteworks |
| 1/20/2021 | A. Blair Dunn | Aubrey Dunn for New Mexico | Voter data for Congressional Dist. 1 with history for 2018 and 2020 General elections per call 1/20/2021. Clarified 1/21/2021 to include CD-1Bernalillo County only for 2020 elections | 465,835 | $1,878.34 | 1/20/2021 by e-mail 1/25/2021 by telephone | Per phone call 1/25/2021, he will obtain data another way | | |
| 1/22/2021 | VEMG LLC | Santa Fe Mobile Lab | Statewide voter data with history for | | | | | | |
| 1/25/2021 | Andrew Early-Griffith | L2 Inc. | Statewide voter data with history for 2020 general and primary, and 2019 RLE | 1,359,711 | $5,453.84 | 1/25/2021 by telephone | 1/25/2021 | 1/25/2021 | Email, Kiteworks |

**EXHIBIT 5**

| Date | Requester | Organization | Description | Count | Fee | Fulfilled/Method | Date | Date | Method |
|---|---|---|---|---|---|---|---|---|---|
| 1/28/2021 | Andrew Early-Griffith | L2 Inc. | Statewide voter data include districts listed on e-mail | 1,254,564 | $3,778.69 | 1/29/2021 by e-mail | 1/29/2021 | | 1/29/2021 Email, Kiteworks |
| 2/1/2021 | Adam Daugherty | Democratic Party of NM | Statewide Voter Data | 1,360,322 | N/A | | N/A | | 2/3/2021 Email, Kiteworks |
| 2/9/2021 | Rachel Dixon Phipps | Target Smart Communications | Voter data with history for Bernalillo County 2019 RLE | 95,969 | $398.88 | 2/9/2021 by phone and e-mail | 2/9/2021 | | 2/9/2021 Email |
| 2/24/2021 | Judith Gordon | Democratic Party of Sandoval County | Voter data for Sandoval County, Precinct 132 with history for general, primary, municipal elections 2016 to 2020 | 639 | $17.56 | 2/24/2021 Spiceworks e-mail | 2/24/2021 | | 2/24/2021 Email |
| 2/25/2021 | Em Ward | GPAMA | Voter data for Green Party in Bernalillo, Sandoval, Torrance and Valencia counties. Per call on 2/25/2021, requestor wants separate files for each county to include districts specified in her request. | 2,174 | $21.52 | 2/26/2021 Spiceworks e-mail | 2/26/2021 | | 2/26/2021 Email |
| 2/26/2021 | Rachel Dixon Phipps | Target Smart Communications | voter data for voters participating in 2/5/13 Albuquerque School District Elections | 14,652 | $73.61 | 2/26/2021 Spiceworks e-mail | 2/26/2021 | | 2/26/2021 Email |
| 3/1/2021 | Adam Daugherty | Democratic Party of NM | Statewide voter data | 1,359,926 | N/A | | N/A | | 3/1/2021 Email, Kiteworks |
| 3/2/2021 | Chris Luchini | Libertarian Party of New Mexico | Statewide voter data of voters who voted in 2020 General and Primary elections | 936,998 | N/A | | N/A | | 3/2/2021 Email, Kiteworks |
| 3/16/2021 | Evan Logan | i360 | Statewide Voter Data with history for 2020 elections | 1,341,166 | $5,379.66 | 3/16/2021 E-mail, 3/18/2021 phone | 3/23/2021 | | 3/23/2021 Email, Kiteworks |
| 4/6/2021 | Melissa Fruzel | Republican Party of New Mexico | Statewide Voter Data with districts, Voting History, Method voted, registration date, and last updated date. | | | | | | 4/9/2021 Email |
| 3/29/2021 | Mike Lippert | Local Labs | Statewide Voter Data with districts, Voting History, Method voted. | | | | | | 4/9/2021 Email |
| 4/1/2021 | Adam Daugherty | Democratic Party of NM | Statewide voter data | 1,359,926 | N/A | | N/A | | 4/13/2021 Email, Kiteworks |
| 4/1/2021 | Chris Luchini | Libertarian Party of New Mexico | Statewide voter data of voters who voted in 2020 General and Primary elections | 936,998 | N/A | | N/A | | 4/13/2021 Email, Kiteworks |
| 4/19/2021 | Rachel Martinez | Republican Party of New Mexico | Statewide voter data | 1,359,926 | N/A | | N/A | | 4/19/2021 Email, Kiteworks |
| 4/22/2021 | Sheridan Lund | People's Party for Lund | CD01 Voter Data | | | 4/23/2021 | | | |
| 4/30/2021 | Elizabeth Hanes | Libertarian Party of New Mexico | Statewide voter data | | N/A | | N/A | | 4/30/2021 Email, Kiteworks |
| 5/3/2021 | Adam Daugherty | Democratic Party of NM | Statewide voter data | | N/A | | N/A | | 5/3/2021 Email, Kiteworks |
| 5/19/2021 | Rachel Martinez | Republican Party of New Mexico | Statewide voter data | | N/A | | N/A | | 5/20/2021 Email, Kiteworks |
| 6/1/2021 | Adam Daugherty | Democratic Party of NM | Statewide voter data | | N/A | | N/A | | 6/3/2021 Email, Kiteworks |
| 6/1/2021 | Elizabeth Hanes | Libertarian Party of New Mexico | Statewide voter data | | N/A | | N/A | | 6/3/2021 Email, Kiteworks |
| 6/11/2021 | Miles Nelson | N/A | Rio Arriba voter Data | | | 6/11/2021 | | | 6/17/2021 Email, Kiteworks |
| 6/14/2021 | Charlene Bishop | Constitution Party | Statewide voter data for the Constitution Party Members | | | 6/14/2021 | | | 6/17/2021 Email, Kiteworks |
| 6/17/2021 | Michaela Gallegos | Working Families Party | Statewide voter data | 691 | | 6/17/2021 | | | 6/18/2021 Email, Kiteworks |
| 6/23/2021 | Rachel Martinez | Republican Party of New Mexico | Statewide voter data | | N/A | | N/A | | 6/23/2021 Email, Kiteworks |
| 7/1/2021 | Adam Daugherty | Democratic Party of NM | Statewide voter data | | N/A | | N/A | | 7/1/2021 Email, Kiteworks |
| 7/6/2021 | Rachel Martinez | Republican Party of New Mexico | Statewide voter data | | N/A | | N/A | | 7/6/2021 Email, Kiteworks |
| 7/6/2021 | Elizabeth Hanes | Libertarian Party of New Mexico | Statewide voter data | | N/A | | N/A | | Email, Kiteworks |
| 7/13/2021 | Abigail Robinson | Aristole International | Statewide Voter History Data | | | 7/13/2021 | | | |
| 7/1/2021 | Adam Daugherty | Democratic Party of NM | CD1 Voter History Data | | N/A | | N/A | | 7/16/2021 Email, Kiteworks |
| 7/6/2021 | Rachel Martinez | Republican Party of New Mexico | CD1 Voter History Data | | N/A | | N/A | | 7/16/2021 Email, Kiteworks |
| 7/6/2021 | Elizabeth Hanes | Libertarian Party of New Mexico | CD1 Voter History Data | | N/A | | N/A | | 7/16/2021 Email, Kiteworks |
| 7/15/2021 | Nicole Dunger | Catalist | CD1 Voter History & History from 1990-2020 | 1,343,582 | $5,069.28 | 7/15/2021 | 7/16/2021 | | 7/16/2021 Email, Kiteworks |
| 5/27/2021 | Luke Boeche | Data Targeting | CD1 Voter History & History from 1990-2020 | 1,343,582 | $5,069.28 | 6/10/2021 | 6/12/2021 | | 7/16/2021 Email, Kiteworks |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 7.29.2021 | Beth Miller | RPNM | Statewide Voter Data | 1,343,582 | N/A | | N/A | 7/30/2021 | Email, Kiteworks | |
| | 8/2/2021 | Adam Daugherty | DPNM | Statewide Voter Data | 1,343,582 | N/A | | N/A | 8/3/2021 | Email, Kiteworks |
| | 7/30/2021 | Evan Logan | | Statewide data | 1,343,614 | $5,069.67 | 8/1/2021 | | Email, Kiteworks |
| | 8/18/2021 | Bill Rogers | N/A | Santa Fe Public Schools-d3 | 20,241 | | $75.72 8/15/2021 | 8/24/2021 | Email, Kiteworks |
| | 8/23/2021 | Beth Miller | RPNM | Statewide Voter Data | 1,343,582 | N/A | | N/A | 7/30/2021 | Email, Kiteworks |
| | 8/24/2021 | Elizabeth Hanes | Libertarian Party of New Mexico | Statewide voter data and voter history from speicals generals and primaryis in 2019, 2018 and 2016 | | N/A | | N/A | 9/7/2021 | Email, Kiteworks |
| | 9/2/2021 | Adam Daugherty | DPNM | Statewide Voter Data | | N/A | | N/A | 9/3/2021 | Email, Kiteworks |
| | 9/7/2021 | Charles Webser | Veterans | Red River Data | | 16.07 | | | | Email, Kiteworks |

| Anthony Quoglitz: ThoughtWorld | 12/24/2021 | Yes | | 1806300 | $5,000.00 | Not Paid | | | | ThoughtWorld | Statewide Voter file with voter history for 2020 and 2021. |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nicole Dunger | 12/22/2021 | Yes | | 1341560 | $5,381.24 | Paid | Complete | Lauren Hutchison | 1/12/2022 | 2/12/2022 Statewide data Dunger | |
| Mike Lippert | 3/29/2021 | Yes | | 1340781 | $5,378.12 | Paid | Complete | Lauren Hutchison | 4/13/2021 | NM Statewide Voter History for 2020 General | |

| Requestor Name | Request Date | Authorization Form Received? | # of Records | Total Cost | Payment Status | Fulfillment Status | Fulfillment By | Fulfillment Date | Customer Notified? | Delivery Date | PSR Title | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | Input file for Jury Wheels per request letter dated 10/31/2022. |
| Lincoln Sorrell | 11/23/2022 | NA | 1369182 | $0.00 | NA | | Complete | Greg Rockstroh | 11/28/2022 | Yes | 11/28/2022 NM Statewide Voter File - US District Court | Electronic delivery process is recorded here: \\posfilesrv2\Elections\PSR_Files\2022\U.S._DistrictCourt_11-15-2022 |
| Jake London | 10/5/2022 | Yes | 1360206 | $5,455.82 | Paid | | Complete | | 10/11/2022 | Yes | Jake London | with history as many Primary and General as possible. |
| Craig Swanson i360 | 9/27/2022 | Yes | 1357256 | $4,086.77 | Paid | | Complete | Lauren Hutchison | | | i360 September 2022 | statewide no history |
| Print by design | 8/25/2022 | Yes | 105582 | $437.33 | Paid | | Complete | | | | Print by design | |
| Maddy - Catalist | 8/25/2022 | Yes | 1352957 | $5,426.83 | Paid | | Complete | | 8/24/2022 | | 8/24/2022 Catalyst Primary | |
| Kelly Davis LWV SF | 8/25/2022 | Yes | 2200 | $23.80 | Paid | | Complete | | 8/22/2022 | Yes | LWV SF | |
| Philip Nichols | 8/15/2022 | Yes | 21553 | $101.21 | Paid | | Complete | | | | Pegasus Strat 1 | |
| Philip Nichols | 8/15/2022 | Yes | 22793 | $106.17 | Paid | | Complete | | | | Pegasus Strat 2 | |
| Collin Pace | 8/1/2022 | Yes | 1048575 | $4,209.30 | Paid | | Complete | | | | Strata Solutions | |
| DPNM | 8/1/2022 | Yes | 1351989 | $4,070.97 | NA | | In Progress | | | | DPNM August | Statewide |
| DPNM | 7/8/2022 | Yes | 1346282 | $4,053.85 | NA | | In Progress | | | | DPNM JULY | |
| Melanie Aranda | 6/28/2022 | Yes | 1347356 | $5,404.42 | Not Paid | | | | | | Center for Civic Policy Primary | |
| Kim Skaggs RPNM | 6/3/2022 | Yes | 1348341 | $5,408.36 | NA | | Complete | Lauren Hutchison | | | RPNM June Data | Voter History 4 years |
| Leo Arias | 5/16/2022 | Yes | 3810 | $30.24 | Not Paid | | | | | | Dems in Colfax with three years Voter history. | ariasleonard@gmail.com |
| Suzanne Valdez | 4/29/2022 | Yes | 3822 | $26.47 | Paid | | Complete | | | | Dems in Colfax | |
| Craig Swanson | 4/25/2022 | Yes | 1347806 | $4,058.42 | Not Paid | | In Progress | | | | i360 April | |
| Craig Swanson | 4/25/2022 | Yes | 1347806 | $4,058.42 | Not Paid | | In Progress | | | | i360 April | |
| Paige Ryan APV | 4/14/2022 | Yes | 58684 | $249.74 | Not Paid | | | | | | APV data | We would like an estimate for voter data for General and Primary elections for the last 5 years for HD 38, HD 44 and HD 70. |
| Deborah Boyer | 4/12/2022 | Yes | 1877 | $22.51 | Not Paid | | In Progress | | | | Catron Republicans | 2018 Primary Voter history |
| Deborah Boyer | 4/12/2022 | Yes | 1877 | $22.51 | Not Paid | | In Progress | | | | Catron Republicans | 2018 Primary Voter history |
| Laura Gutierrez | 4/11/2022 | Yes | 21601 | $79.80 | Not Paid | | In Progress | | | | HD 15 | |
| Sandra Hammack | 4/7/2022 | Yes | 18218 | $394.36 | Paid | | Complete | Lauren Hutchison | | | 4/12/2022 Labels Dis 38 | |
| Sandra Hammack | 4/1/2022 | Yes | 18183 | $87.73 | Paid | | Complete | Lauren Hutchison | 4/12/2022 | | Sandra Hammack HD 38 | Voter history 2018 and 2020 general |
| Paige Ryan | 3/28/2022 | Yes | 67588 | $285.35 | Not Paid | | In Progress | Lauren Hutchison | | | Animal Protection Voters | General and Primary elections for the last 5 years for HD38, HD44 and HD47. |
| Paige Ryan | 3/28/2022 | Yes | 67588 | $285.35 | Not Paid | | In Progress | Lauren Hutchison | | | Animal Protection Voters | General and Primary elections for the last 5 years for HD38, HD44 and HD47. |
| DPNM | 3/24/2022 | Yes | 1345058 | $4,050.17 | NA | | In Progress | Lauren Hutchison | 3/24/2022 | Yes | 3/24/2022 DPNM March | |
| DPNM | 3/24/2022 | Yes | 1345058 | $4,050.17 | NA | | In Progress | Lauren Hutchison | 3/24/2022 | Yes | 3/24/2022 DPNM March | |
| Gail Armstrong | 3/17/2022 | Yes | 18188 | $87.75 | Not Paid | | In Progress | | | | HD 38 | Voter History General and Primary from 2020 2018 2016 and 2014 |
| Gail Armstrong | 3/17/2022 | Yes | 18188 | $87.75 | Not Paid | | In Progress | | | | HD 38 | Voter History General and Primary from 2020 2018 2016 and 2014 |
| Fransisco Lopez | 3/14/2022 | Yes | 25937 | $118.75 | Not Paid | | In Progress | Lauren Hutchison | | | State House Dis 47 | |
| Fransisco Lopez | 3/14/2022 | Yes | 25937 | $118.75 | Not Paid | | In Progress | Lauren Hutchison | | | State House Dis 47 | |
| Brian Lloyd | 3/1/2022 | Yes | 1343833 | $4,046.50 | NA | | In Progress | Lauren Hutchison | 3/1/2022 | | 3/1/2022 DPNM March | Statewide no history |
| John Block | 2/28/2022 | Yes | 8857 | $50.43 | Not Paid | | In Progress | Lauren Hutchison | | Yes | Rep. In Leg dis 51 | |
| John Block | 2/28/2022 | Yes | 8857 | $50.43 | Not Paid | | In Progress | Lauren Hutchison | | Yes | Rep. In Leg dis 51 | |
| Deborah Boyer | 2/25/2022 | Yes | 1849 | $22.40 | Not Paid | | In Progress | Lauren Hutchison | | No | Catron Republicans | |
| Deborah Boyer | 2/25/2022 | Yes | 1849 | $22.40 | Not Paid | | In Progress | Lauren Hutchison | | No | Catron Republicans | |
| Hnery Trujillo | 2/21/2022 | Yes | 6489 | $34.47 | Not Paid | | In Progress | Lauren Hutchison | | Yes | Active Dem and Rep in Colfax | |
| David Finger | 2/21/2022 | Yes | 105181 | $435.72 | Not Paid | | In Progress | | | Yes | Fifth Judicial | |
| Deborah Abeita Torres | 2/17/2022 | Yes | 17321 | $66.96 | Not Paid | | In Progress | Lauren Hutchison | | Yes | Mark Moores Data | |
| Deborah Abeita Torres | 2/17/2022 | Yes | 22398 | $82.19 | Not Paid | | In Progress | Lauren Hutchison | | Yes | Greg Baca Data | Greg Baca district data. |
| Rosalie Joiner | 2/15/2022 | Yes | 2342 | $26.71 | Paid | | In Progress | Lauren Hutchison | 2/16/2022 | Yes | 2/18/2022 De Baca Printed List | Suzanne is mailing? |
| Ryan Salazar | 1/17/2022 | Yes | 3210 | $27.84 | Paid | | Complete | Lauren Hutchison | 1/21/2022 | Yes | 1/21/2022 Ryan Salazar | District 46 dems with voter history |
| Michaela Gallegos | 1/14/2022 | Yes | 1159 | $19.64 | Paid | | Complete | Lauren Hutchison | 1/21/2022 | Yes | 1/21/2022 Working Families | All registered Working Families party members with voter history from 2018 and 2020. |
| Mark Flesher | 1/12/2022 | Yes | 645 | $17.58 | Paid | | Complete | Lauren Hutchison | 1/13/2022 | Yes | 1/13/2022 Espanola Data File | Phone number of registered voters in espanola |
| Judith Gordon | 1/6/2022 | Yes | 645 | $17.58 | Paid | | Complete | Lauren Hutchison | 1/12/2022 | Yes | 1/12/2022 Sandoval PCT 132 | Sandoval PCT 132 with voting history |



STATE OF NEW MEXICO
**MAGGIE TOULOUSE OLIVER**
SECRETARY OF STATE

June 16, 2022

*Via Electronic Mail Only*

Edward D. Greim
1100 Main St., Ste 2700
Kansas City, MO 64105
Email: EDGreim@gravesgarrett.com

**Re:      Response to Notice of Violation of NVRA**

Mr. Griem:

On May 27, 2022, our Office received your Notice of Violation of the National Voter Registration Act ("NVRA") ("Notice"). In the *Notice*, you allege a violation of 52 U.S.C. § 20507(i)(1). You allege that Voter Reference Foundation ("VRF") made a NVRA request for records via email on February 15, 2022. *See Exhibit. A of the Notice* Specifically, the email stated:

> "Dear Election Official,
>
> Please provide us with the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021."

The February 15 email was not a request for a record that is maintained by our Office; rather, it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to be aggregated and analyzed. Such an inquiry would require our Office to conduct research, aggregate data from multiple sources, generate a report, and potentially separate protected information from such report. While under the NVRA our Office must allow for the inspection of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," this is not a requirement that compels an agency to create new records. 52 U.S.C. § 20507(i)(1). Indeed, both state and federal courts have held as such regarding records request. *See* NMSA 1978, § 14-2-8(B) ("Nothing in the Inspection of Public Records Act shall be construed to require a public body to create a public record."); *Forsham v. Harris,* 445 U.S. 169, 186 (1980) ("FOIA imposes no duty on the agency to create records.). Therefore, your assertion that we

**EXHIBIT**
**6**

violated the NVRA with respect to the February 15, 2022 email is incorrect.

In addition, in your *Notice* you have requested the following information:

> 1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

> 2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

As with the February 15 email referenced above, Item #1 is not a request for a record, as we do not maintain a list such as the one described therein. As such, we consider both requests closed under the NVRA and, to the extent applicable, IPRA.

With respect to Item #2 and the Affidavit you submitted as required by New Mexico law, in the *Notice*, VRF states that it "intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding." *Notice* at 4. As you know from the Federal Litigation and otherwise, it is our position that publishing *any* New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability. As such, we believe it prudent to delay production of this data at this time; we will either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal. *See* NMSA 1978, § 1-20-15 ("Conspiracy to violate the Election Code consists of knowingly combining, uniting or agreeing with any other person to omit any duty or commit any act, the omission of which duty, or combination of such act, would by the provisions of the Election Code constitute a fourth degree felony.").

Respectfully,

*/s/ Dylan K. Lange*
Dylan K. Lange
General Counsel
The Office of The New
Mexico Secretary of State

cc:   Edward Greim
      Rebekah Badell
      Carter Harrison, IV
      Sharon Pino



STATE OF NEW MEXICO
**MAGGIE TOULOUSE OLIVER**
SECRETARY OF STATE

## REQUEST TO INSPECT PUBLIC RECORDS

In accordance with the Inspection of Public Records Act (IPRA) Section 14-2-1 NMSA 1978, as amended, every person has the right to inspect public records maintained by the New Mexico Secretary of State's Office, with certain exceptions.  A "public record" is defined to include any document, tape or other material, regardless of form, that is used, created, received, maintained or held by or on behalf of a public body, and is related to public business.

***Do not use this form to request information.  This form should only be used to request public records as defined above.***

Date: 9/28/2022
_____

Gina                                    Swoboda
_____
First Name                          Last Name

1901 Butterfield Road, Suite 120
_____
Address

Downers Grove              IL                          60515
_____
City                                    State                              Zip

data@voterreferencefoundation.c   844-302-2109
_____
Email Address                     Phone Number


**PLEASE IDENTIFY THE RECORDS SOUGHT WITH REASONABLE PARTICULARITY:**
**(*Please print*)**
Please see attached
_____
_____
_____
_____
_____

EXHIBIT
**7**

**Completed form should be emailed to ipra.sos@state.nm.us or faxed to 505-827-4387.**



September 28, 2022

**New Mexico Secretary of State**
ipra.sos@state.nm.us


Dear Election Official:

We request that you provide us the following:

- The names and addresses of any person or organization who has submitted a request for access to voter registration data since November 3, 2020;
- the date the request was submitted;
- under what provisions;
- for what uses are the person or organization permitted to have the data; and
- a copy of each request including any form submitted by the requesting individual or organization.

This request is being made by Voter Reference Foundation LLC under the National Voter Registration Act of 1993, 52 U.S.C. § 20501, et. seq., and specifically 52 U.S.C. § 20507(i), and under the New Mexico Public Records Law, NMSA 1978, §14-2-1 to – 12.

Please provide the records in electronic format, either in the original file format, or as a CSV, Excel or PDF, by email or an online file hosting service (such as Dropbox).

You may reply to us with the documents or with any questions at data@voterreferencefoundation.com. We appreciate your prompt assistance in providing these records.

Sincerely,

Voter Reference Foundation
844-302-2109 (Office)
data@voterreferencefoundtion.com



STATE OF NEW MEXICO
**MAGGIE TOULOUSE OLIVER**
SECRETARY OF STATE

## <u>REQUEST TO INSPECT PUBLIC RECORDS</u>

In accordance with the Inspection of Public Records Act (IPRA) Section 14-2-1 NMSA 1978, as amended, every person has the right to inspect public records maintained by the New Mexico Secretary of State's Office, with certain exceptions.   A "public record" is defined to include any document, tape or other material, regardless of form, that is used, created, received, maintained or held by or on behalf of a public body, and is related to public business.

*Do not use this form to request information.  This form should only be used to request public records as defined above.*

Date:  10/18/2022
_____

Gina                                    Swoboda
_____
First Name                        Last Name

1901 Butterfield Road, Suite 120
_____
Address

Downers Grove                    IL                              60515
_____
City                                State                        Zip

data@voterreferencefoundation.c    844-302-2109
_____
Email Address                    Phone Number


**PLEASE IDENTIFY THE RECORDS SOUGHT WITH REASONABLE PARTICULARITY:**
(***Please print***)
Please see attached
_____
_____
_____
_____
_____

**EXHIBIT**
**8**

**Completed form should be emailed to ipra.sos@state.nm.us or faxed to 505-827-4387.**



October 18, 2022

New Mexico Secretary of State
ipra.sos@state.nm.us


Dear Election Official,

Regarding the upcoming 2022 General Election, we request that you provide us the following data **as each item becomes available**:

1. Voter registration data for all voters, including each voter's classification or status (e.g., active, inactive, suspended, canceled, purged, etc.), down to the lowest geopolitical subdivision available (precinct, municipality, town, county, etc.), as it exists on November 8, 2022, or as close to this date as possible;
2. Records reflecting the total ballots cast, statewide, in the November 8, 2022, general election;
3. Voter registration data for all voters removed or canceled from any voter list (e.g. active list, inactive list, suspended list, purged list, deleted list, etc.) between September 24, 2022 and December 15, 2022;
4. Voting history/credit data for each voter that voted in items 1-3 for the November 8, 2022, general election, including the method of voting (election day polling place, absentee, early, etc.), and the voting jurisdiction the vote occurred in, down to the lowest geopolitical subdivision available (precinct, municipality, town, county, etc.); and
5. The unique voter ID or key identifier of each voter that voted in the November 8, 2022, general election.

Please provide each item as it becomes available rather than holding the request until all items are available.

This request is being made by Voter Reference Foundation under the National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et. seq.*, and specifically 52 U.S.C. § 20507(i). This request is also being made under the New Mexico Public Records Law, NMSA 1978, §14-2-1 to – 12.

Please provide the records in electronic format, either in the original file format, or as a CSV, Excel, TXT or PDF file, by email or an online file hosting service (such as Dropbox).

You may reply to us with the documents or with any questions at data@voterreferencefoundation.com. We appreciate your prompt assistance in providing these records.

Sincerely,

Voter Reference Foundation