## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | |
| | ) | **CASE NO: 1:22-cv-00222-JB-KK** |
| | ) | |
| **RAÚL TORREZ**, in his official | ) | |
| capacity as New Mexico Attorney General, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| **MAGGIE TOULOUSE OLIVER,** in her | ) | |
| Official capacity as New Mexico | ) | |
| Secretary of State, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF VOTER REFERENCE FOUNDATION, LLC'S
## <u>RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................v

INTRODUCTION .................................................................................................1

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
UNDISPUTED MATERIAL FACTS ......................................................................4

PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS ("SAF") ..........................18

SUMMARY JUDGMENT STANDARD ...............................................................30

ARGUMENT .....................................................................................................31

    I.    Defendants are not entitled to judgment as a matter of law on
             VRF's Count I because VRF made three lawful requests
             pursuant to the NVRA which the Secretary unlawfully refused
             to produce at the advice of the Attorney General. ............................31

          a.  VRF made three requests for New Mexico voter data that
             constitute "records" under the NVRA (addressing Sections
             I.A, I.C) .....................................................................................32

             i.    Three Requests Validly Sought Records Under the NVRA ...32

             ii.   The NVRA's Plain Text and the Great Weight of
                  Precedent Shows that these Were Requests for
                  "Records" under the NVRA ................................................33

          b.  The Secretary's various excuses for nonproduction fail. ...............37

             i.    Failure to use magic words in the request (February
                  and October) ........................................................................37

              ii.   Failure to plead the request (October) ..................................37

             iii.  Request required "creation" of documents .............................38

              iv.  Improper pre-suit notice .......................................................40

              v.   Fear of committing a crime ...................................................43

    II.   Defendants are not entitled to judgment on Count II, VRF's NVRA
             preemption claim because the Defendants' Use Restrictions and
             Data Sharing Ban unlawfully obstruct a key objective of the NVRA
             (Defendants' Section I.A, I.B) ...........................................................43

    a.   The NVRA right of access is unqualified ......................44

    b.   Defendants' Use Restrictions and Data Sharing Ban impede VRF's access to New Mexico voter data in contravention of the NVRA ...............45

    c.   The Data Sharing Ban and Use Restrictions are Preempted by the NVRA ......................46

III.   VRF's right to access the voter data at issue emanates from the NVRA, not the First Amendment. ...............50

IV.   VRF's publication of voter data and criticism of the Secretary are protected speech under the First Amendment. ...............51

V.   Defendants Fail to Address the Analysis Material to VRF's First Amendment Claim (Count V) and their Motion Should be Denied. ...............52

    a.   The restrictions do not serve a compelling interest. ...............54

    b.   The restrictions are not narrowly tailored. ...............55

VI.   Defendants retaliated against VRF for engaging in First Amendment protected speech: publishing voter data online. ...............57

    a.   VRF lawfully obtained the voter data that was posted on VoteRef.com from Local Labs. ...............57

    b.   The State cannot condition access to voter data on requestor's surrender of rights afforded by the NVRA or the First Amendment. ...............59

    c.   The Secretary referred VRF for prosecution and denied VRF access to voter data that is required to be made available under New Mexico law and the NVRA because of VRF's protected speech. ...............60

VII.   Defendants are not entitled to summary judgment on VRF's First Amendment viewpoint discrimination claim. ...............61

    a.   The law of First Amendment viewpoint discrimination. ...............63

    b.   As the Court has already recognized, there is abundant evidence of viewpoint discrimination. ...............64

VIII.   Defendants are not entitled to summary judgment on the First Amendment overbreadth claim because there are disputes of material fact regarding the scope of the Data Sharing Ban and the Ban is overbroad. ...................................................66

    a.   Defendants downplay the scope of how they interpret and apply the Data Sharing Ban and that application is overbroad. ........67

    b.   HB 4 does not remedy the overbreadth issues, but merely codifies them. ...................................................68

IX.   Defendants are not Entitled to Summary Judgment on VRF's Vagueness Claim Because their Amorphous Interpretations of the Use Restrictions and Data Sharing Ban Fail to Give Notice as to What They Claim is Prohibited, Chilling Protected Speech in the Process. ...................................................69

    a.   Defendants' pretextual interpretation of the Data Sharing Ban is illogical, incoherent, and inconsistent. ..............................71

    b.   The Data Sharing Ban is vague. ..............................73

    c.   The passage of HB4 supports and does not moot VRF's vagueness claim. ...................................................75

CONCLUSION ...................................................76

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adickes v. S.H. Kress & Co.*,
    398 U.S. 144 (1970) ................................................................................................... 30

*American Ass'n of People with Disabilities v. Herrera*,
    690 F.Supp.2d 1183 (D.N.M. 2010) ........................................................................ 49

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986) ................................................................................................... 30

*Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*,
    912 F.2d 1238 (10th Cir. 1990) ............................................................................... 30

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
    570 U.S. 1 (2013) ...................................................................................................... 46

*Ashcroft v. Free Speech Coalition*,
    535 U.S. 234 (2002) ................................................................................................... 66

*Ass'n of Cmty. Organizations for Reform Now v. Miller*,
    129 F.3d 833 (6th Cir. 1997) ................................................................................... 42

*Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo.*,
    744 F.2d 739 (10th Cir. 1984) ......................................................................... 54, 66

*Bacchus Indus., Inc. v. Arvin Indus., Inc.*,
    939 F.2d 887 (10th Cir. 1991) ................................................................................. 30

*Broadrick v. Oklahoma*,
    413 U.S. 601 (1973) ................................................................................................... 66

*California First Amend. Coal. v. Lungren*,
    No. C 95-0440-FMS, 1995 WL 482066 (N.D. Cal. Aug. 10, 1995) .................... 55

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    408 F.3d 1349 (11th Cir. 2005) ............................................................................... 46

*Chicago v. Morales*,
    527 U.S. 41 (1999) ..................................................................................................... 70

*Chisholm's Village Plaza, LLC v. Travelers Commercial Insurance Company*,
    No. CIV 20-0920 JB/JHR, 2022 WL 3369202 (D.N.M. Aug. 16, 2022) ............ 38

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010) .......................................................................................... 51, 54

*Connick v. Myers*,
    461 U.S. 138 (1983) .............................................................................................. 51

*Cooper v. Dillon*,
    403 F.3d 1208 (11th Cir. 2005) ........................................................................... 55

*Connally v. General Constr. Co.*,
    269 U.S. 385 (1926) .............................................................................................. 70

*Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*,
    447 U.S. 530 (1980) .............................................................................................. 54

*Crosby v. Nat'l Foreign Trade Council*,
    530 U.S. 363 (2000) .............................................................................................. 46

*ETP Rio Rancho Park, LLC v. Grisham*,
    522 F. Supp. 3d 966 (D.N.M. 2021) .................................................................... 71

*Forsham v. Harris*,
    445 U.S. 169 (1980) .............................................................................................. 39

*Fusaro v. Cogan*,
    930 F.3d 241 (4th Cir. 2019) .......................................................................... *passim*

*Giaccio v. Pennsylvania*,
    382 U.S. 399 (1966) .............................................................................................. 70

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .............................................................................................. 70

*Green Party of N.Y. v. N.Y. State Bd. of Elections*,
    389 F.3d 411 (2d Cir. 2004) ................................................................................. 59

*Griffin v. Bryant*,
    30 F. Supp. 3d 1139 (D.N.M. 2014) ............................................................... 54, 55

*Gross v. Burggraf Constr. Co.*,
    53 F.3d 1531 (10th Cir. 1995) ............................................................................. 13

*Halley v. Huckaby*,
    902 F.3d 1136 (10th Cir. 2018) ........................................................................... 30

*Herrera v. Santa Fe Pub. Schs.*,
    956 F. Supp. 2d 1191 (D.N.M. 2013) ............................................................. 30

*Hill v. Colorado,*
    530 U.S. 703 (2000) ............................................................................................ 70

*Hunt v. Cromartie*,
    526 U.S. 541 (1999) ............................................................................................ 30

*Jones v. Southpeak Interactive Corp. of De.*,
    777 F.3d 658 (4th Cir. 2015) .............................................................................. 35

*Judicial Watch, Inc. v. Lamone,*
    399 F.Supp.3d 425 (D. M.D. 2019) ........................................... 34, 37, 46, 48

*Keller v. State Bar of Cal.,*
    496 U.S. 1 (1990) ............................................................................................... 52

*Lane v. Page*,
    272 F.R.D. 581 (D.N.M. 2011) ......................................................................... 41

*Los Angeles Police Dep't v. United Reporting Pub. Corp.*,
    528 U.S. 32 (1999) ............................................................................................. 51

*Martinez v. Naranjo*,
    328 F.R.D. 581 (D.N.M. 2018) ......................................................................... 41

*Martin v. City of Struthers, Ohio,*
    319 U.S. 141 (1943) ........................................................................................... 52

*McCraw v. City of Oklahoma City*,
    973 F.3d 1057 (10th Cir. 2020) ........................................................................ 56

*Mini Spas, Inc. v. South Salt Lake City Corp.,*
    810 F.2d 939 (10th Cir. 1987) .......................................................................... 70

*Meyer v. Grant*,
    486 U.S. 414 (1988) ................................................................................... 52, 54

*National Council of La Raza v. Cegavske*,
    800 F.3d 1032 (9th Cir. 2015) .......................................................................... 42

*New Hampshire v. Maine*,
    532 U.S. 742, 121 S.Ct. 1808 (2001) ............................................................... 40

*North Carolina State Bd. of Elections*,
   996 F.3d 257 (4th Cir. 2021) .................................................................. 34, 44

*Pahls v. Thomas*,
   718 F.3d 1210 (10th Cir. 2013) ............................................................... 62, 63

*Pharm. Research and Mfrs. of Am. v. Walsh*,
   538 U.S. 644 (2003) ................................................................................ 46

*Project Vote v. Blackwell*,
   455 F. Supp. 2d 694 (N.D. Ohio 2006) ................................................... 46

*Project Vote, Inc., v. Kemp*,
   208 F. Supp 3d 1320 (N.D.Ga 2016) ...................................................... 38, 44

*Project Vote/Voting for Am., Inc. v. Long*,
   682 F.3d 331 (4th Cir. 2012) ................................................................... *passim*

*Pub. Int. Legal Found., Inc. v. Bellows*,
   588 F.Supp.3d 124 (D. Me. 2022) ........................................................... 34, 49

*Pub. Int. Legal Found. v. Chapman*,
   595 F.Supp.3d 296 (M.D. Pa. 2022) ....................................................... 38

*Pub. Int. Legal Found., Inc. v. Matthews*,
   589 F. Supp. 3d 932 (C.D. Ill. 2022) ...................................................... 34, 37

*Pub. Int. Legal Found., Inc. v. North Carolina State Board of Elections*,
   996 F.3d 257 (4th Cir. 2021) ................................................................... 34

*Republican Party of Minnesota v. White*,
   536 U.S. 765 (2002) ................................................................................ 54

*Rosenberger v. Rector and Visitors of Univ. of Va.*,
   515 U.S. 819 (1995) ................................................................................ 52, 63

*Salazar v. Ashcroft*,
   No. CV 02-0878 JB/RLP, 2004 WL 7337748 (D.N.M. May 26, 2004) ........... 63

*Sierra Club v. El Paso Gold Mines, Inc.*,
   421 F.3d 1133 (10th Cir. 2005) ............................................................... 31

*Simon v. Taylor*,
   252 F. Supp. 3d 1196 (D.N.M. 2017) ..................................................... 30

*Smith v. Goguen*,
    415 U.S. 566 (1974) ............................................................................................. 70

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ............................................................................................. 51

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ..................................................................................... 59, 63

*True the Vote v. Hosemann*,
    43 F.Supp.3d 693 (S.D. Miss. 2014) ................................................................. 44

*Turner Broadcasting System, Inc. v. FCC*,
    512 U.S. 622 (1994) ............................................................................................. 55

*United States v. American Library Assn., Inc.*,
    539 U.S. 194 (2003) ............................................................................................. 59

*United States v. Williams*,
    553 U.S. 285 (2008) ..................................................................................... 67, 70

*Van Deelen v. Johnson*,
    497 F.3d 1151 (10th Cir. 2007) ......................................................................... 57

*Virginia v. Hicks*,
    539 U.S. 113 (2003) ............................................................................................. 66

## Other Authorities

18 U.S.C. § 2721 ....................................................................................................... 50

52 U.S.C. § 20507 ............................................................................................. *passim*

52 U.S.C. § 20510 ..................................................................................................... 18

Fed. R. Civ. P. 56 ............................................................................................... 30, 53

N.M. Stat. § 1-4-5.5 ......................................................................................... *passim*

N.M. Stat. § 1-4-5.6 ......................................................................................... *passim*

N.M. Stat. § 1-5-2 ............................................................................................. *passim*

N.M. Stat. § 1-5-5.6 ................................................................................................... 27

N.M. Stat. § 1-5-14 .................................................................................19, 55, 62

N.M. Stat. § 1-5-22 ..........................................................................................*passim*

N.M. Stat. § 1-5-23 ..........................................................................................*passim*

U.S. Const. Amend. 1 .......................................................................................*passim*

## INTRODUCTION

This Court should grant the summary judgment motion of the Plaintiff, Voter Reference Foundation ("VRF") (Dkt. 119) rather than the Defendants' cross-motion (Dkt. 121). From the National Voter Registration Act ("NVRA") to the First Amendment, the undisputed facts show the Defendants were violating VRF's federally protected rights long before the Secretary convinced the legislature to change the law by enacting HB4. The Defendants calculate that HB4 buys them cover by enacting into law the provisions they previously had to pretend were there— at least when it came to VRF.

Instead, the enactment of HB4 proves that New Mexico is committed to denying disfavored groups like VRF access to, and use of, voter data, even when those groups are using it for the very purposes for which Congress enacted the NVRA in 1993. Congress considered arguments like the ones Defendants make now, but chose the side of sunshine and open debate by including a Public Inspection Provision. Court after court has invalidated state laws that limit this grant of access, whether by direct bans or by indirect rules which unequally treat speakers, speech, or uses of the data. Defendants cannot cite a single case holding that VRF's requests are not for "records" under the NVRA, or that state denials of use or access are not preempted. The cases are to the contrary. VRF should win on Counts I (NVRA violation) and II (NVRA preemption).

VRF's First Amendment claims should also prevail. The facts show that Defendants' holy war against claimed "misinformation" was triggered because they brook no criticism from constituents or perceived political opponents about how they run their voting systems. If VRF is presumed evil, then, for example, its *promise not* to publish data online without an order of this Court is seen as a *threat* to do *the opposite*, becoming yet another convenient pretext for denying lawful NVRA requests. Defendants' Motion now advances this position all the way to its absurd conclusion, claiming Defendants are potential victims of the NVRA and of this Court's orders

enforcing it, as any production of the requested records to VRF would make them "complicit" in VRF's unlawful use and therefore criminally liable under New Mexico law. *See* Motion at 31. And as VRF shows in its own Motion, the Secretary now claims that the stain of VRF's past reliance on this Court's preliminary injunction may never wear off, precluding VRF from ever obtaining documents under the NVRA. Yet the Attorney General now openly doubts the very theory the Defendants relied upon for nearly a year to claim that VRF was breaking the law. These are not all mistakes made by witnesses at deposition, they are official positions the Defendants advance in their briefs (or fail to disavow when given the chance). In sum, the evidence of retaliation is overwhelming, both with respect to the criminal referral and investigation, and the possible forever-ban on VRF's access to NVRA-covered records. VRF should win on Count III.

Next, on VRF's main First Amendment claims that attack Defendants' policies (soon to be effective under HB4), Counts V and VI, the Defendants rely on a fundamental misreading of the law, and therefore fail to even address the proper level of scrutiny (or apply it), a virtual waiver of their position. Because the NVRA grants access to the voter data, New Mexico's bans on requesters' access and use of the data (which Defendants admit constitute speech) are subject to First Amendment scrutiny. Here, strict scrutiny applies because New Mexico totally bans sharing, and limits use in ways that are arguably content-based. Defendants seem to believe they need not brief scrutiny or prove their state interest and narrow tailoring because they have labeled VRF's speech a "crime." But in fact, that is what gives VRF standing and requires Defendants to carry their burden. They have shirked it. VRF should win Counts V and VI.

Finally, Plaintiffs should win on Count VII, vagueness, with respect to Defendants' continued threats to prosecute VRF for its pre-HB4 conduct. Defendants continue to devise exceptions, provisos, and new paradigms for interpreting their Data Sharing Ban and Use

Restrictions—a new one appears each time a new concern arises in the briefing or in deposition. That's precisely the problem with a vague and overbroad law: it anoints executive officials as both judges and lawmakers, since only they "know" the true extent of, and exceptions to, the law. As shown in Count III, this is fertile ground for retaliation and viewpoint discrimination; officials feel entitled to do whatever it takes to stay one step ahead of the purveyors of "misinformation."

It is the Defendants who forced a zero-sum game between, on the one hand, the NVRA and First Amendment, and on the other, Defendants' professed concern (not backed by evidence) that voters will be harassed by VRF users or victimized by "misinformation." As VRF showed, states can enact laws that allow NVRA-mandated access, but that allow officials to uncover and prosecute anyone who promises to review the data to promote election integrity and participation, but who later uses it for an unlawful reason. In all relevant respects, VRF is like other data requesters who, without official retaliation, share it with third-party customers. In each case, the recipient of the shared information—the speech—could potentially use it for malign purposes, but in each case, we trust the third-party recipients' promise to the original requesters and the possibility of after-the-fact enforcement. In no case did Defendants provide evidence of rulebreakers—let alone that such bad actors are impacting election integrity or participation. Defendants' draconian, speech-banning remedy is a solution in search of a problem, something the First Amendment forbids. VRF should prevail.

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## STATEMENT OF UNDISPUTED MATERIAL FACTS

1. **Defendants' Statement of Fact ("DSOF") ¶4**: Controverted. Plaintiff denies that the Secretary has consistently interpreted Section 1-4-5.6 as prohibiting the willful selling, loaning, providing access to, or otherwise surrendering of New Mexico voter data by any person or entity. The Secretary's affidavits clearly allowed transfers for permissible purposes, and only changed after VRF was brought to the Secretary's attention. Compare **Ex. P8, Dkt. 44-8[1], Undated Form** (no requirement that requestor retain control over transferee's use of data and no attempt to extract promises from requestor regarding transferring data) and **Ex. P11, Dkt. 44-1, Lippert Form** (same, as to form signed by Local Labs) with **Ex. P7, Dkt. 44-10, February 14, 2022 Revised Form** (requiring, for the first time, promise from requestor that it will not "sell, loan, provide access to, or otherwise surrender voter information received as a result of this request."). The Secretary's interpretation of the law has been anything but consistent. *See* Plaintiff's Motion for Summary Judgment, Dkt. 119, at p.39-42, ¶¶200-217. This paragraph also fails to address the AG's testimony that he can no longer draw the conclusion the Defendants advanced in their argument and briefing at the preliminary injunction: that § 1-4-5.6 incorporates the prohibitions of § 1-5-22(a) to make VRF's publication of data unlawful. **Ex. P2, Dkt. 119-2[2], Tr. of Dep. of AG 30(b)(6) Representative, Deputy AG Joseph Dworak ("Dworak"), 144:7-16.**

2. **DSOF ¶5**: Controverted. None of the cited testimony supports the assertion made, as the Secretary seems to have only recently opined that the organization can "make the data available to itself," **Ex. P10, Dkt. 119-6, Tr. of June 15 Hearing ("June 15 Tr.") at 10:1-2**, and qualifies even this statement by stating the rule as, "we would not feel like it was a violation if folks were

---

[1] All citations to docket entries beginning in "44" were filed on June 24, 2022.
[2] All citations to docket entries beginning in "119" were filed on April 14, 2023.

sharing the data within that organization," but "we would have to go back to an attorney to understand some of those intricacies…" **Ex. P6, Dkt. 119-5, Tr. of Deposition of SOS 30(b)(6) Representative, Elections Director Mandy Vigil ("Vigil") at 93:17-94:1**. Further, the Voter Information Authorization form, or any iteration thereof, fails to inform a requester that voter data may be shared within, but not outside, an organization. **Ex. P8, Dkt. 44-8, Undated Form** (no information that sharing inside entity is permissible but outside entity is illegal); **P11, Dkt. 44-1, Lippert Form** (same); **P7, Dkt. 44-10, February 14, 2022 Revised Form** (same).

3. **DSOF ¶6**: Controverted. Plaintiff admits that this paragraph accurately reflects the Defendants' argument in this litigation, but denies that the law requires that individuals not members of the same entity or entirely different entities must submit separate forms to access voter data. Defendants' witness opined only that one academic could not share his or her data with another academic without running afoul of the law, that the second academic wanting the data would "need to comply," and that in this situation the academics' viewpoints would not matter. **June 15 Tr., 32:6-33:9**. And in fact, despite the Secretary's position here, she selectively allows other entities and individuals to receive data without signing a new affidavit. *Id.* **at 30:17-31:20** (sharing of a voter's information by a canvasser with close family members or other members of his or her household permitted without separate forms); *id.* **at 34:17-24** (sharing by a political data compilation/analysis firm and its political clients permissible without separate forms); *id.* **at 91:1-5, 91:17-20** (sharing between a political party and a candidate it supports, but who is not affiliated with the party, permissible without separate forms). Further, the Court has already held that this position does not find support in New Mexico law. **July 22, 2022 Memorandum Opinion and Order, Dkt. 51 ("Mem. Op.") at 157-8** (Defendants position that data cannot be shared outside of requesting organization has no statutory basis).

4.   **DSOF ¶7**: Controverted. The Secretary based her referral of VRF to the AG in part on her concern regarding spreading "misinformation" and her concern that spreading "misinformation" violated New Mexico law. **Ex. P14, Dkt. 44-3, SOS Criminal Referral of VRF to AG ("VRF Referral"); Ex. P12, Dkt. 119-7**, **ROG 7 to SOS,** (publication on the Internet alone, even if completely accurate, constituted unlawful misinformation); **Vigil, 126:9-127:4** (publication of voter data at large may constitute misinformation); *id.* **at 129:7-17** (publishing "old" file constitutes misinformation); **Dworak, 68:11-18** (AG agrees with Secretary that VRF's publication of voter data is election misinformation). The Secretary's communications director, Alex Curtas, later tied this concept of "misinformation" directly to VRF's identification and publication of a discrepancy after it analyzed the data. Curtas claimed that because VRF had engaged in "misinformation," its speech was not for a governmental purpose, election related, or election campaign purpose, and the Secretary admits that this is a material fact. **DSOF 42** ("We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use."). Sharon Pino, the Deputy Secretary of State who signed the criminal referral, said the same thing and affirmed, "I still believe that today." **June 15 Tr., 139:5-15**. Further, the Secretary would not allow a "discussion" that reveals anything from the data, even if it does not personally identify a voter. *See* **Ex. P26, Dkt. 119-11, Secretary's June 16, 2022 Response to NVRA Notice** (refusing to produce voter data to VRF to engage in discrepancy analysis based on claim that promise not to release "personal voter data" was not broad enough.).

5.   **DSOF ¶8**: Uncontroverted that this is the Secretary's legal position in briefing and oral argument, although none of the cited deposition testimony speaks to the Secretary's theory regarding the relationship between sections § 1-4-5.5, § 1-4-5.6, and § 1-5-22. The three citations

to Vigil's deposition speak of the Secretary's position that posting of voter data online is unlawful, but provides no legal basis for that position. *See* **Vigil Dep. at 82:11-12, 83:1-2, 84:9-12**. The AG is also a Defendant in this proceeding and this paragraph fails to address the AG's unwillingness to adopt the same position. **Dworak, 144:7-16.** Further, the Court has already held that this position does not find support in New Mexico law. **Mem. Op. at 157-8** (Defendants' position that data cannot be shared outside of requesting organization has no statutory basis).

6.   **DSOF ¶17**: Controverted. Plaintiff admits that this paragraph accurately reflects the Defendants' position, but otherwise states a legal conclusion rather than a statement of fact. Whether the NVRA permits a state to condition access on the execution of a form not required by the NVRA is at issue here. Further, New Mexico allows many individuals and entities who do not fill out the affidavit to obtain and use voter data from intermediaries. *See* **Response to DSOF 6.**

7.   **DSOF ¶18**: Controverted. Plaintiff admits that § 1-4-5.5 prescribes the use of an affidavit to acquire voter data, but does not prescribe the specific language that must be used. Further, the language used in the affidavit is not consistent with New Mexico law. **Ex. P7, Dkt. 44-10, February 14, 2022 Revised Form** (requiring requestor to agree not to "sell, loan, provide access to, or otherwise surrender voter information received as a result of this request."); *see also* **Mem. Op. at 148** ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act.").

8.   **DSOF ¶21**: Controverted. The term "commercial" is undefined under New Mexico law and is not internally defined in Defendants' motion. Regardless, the cited hearing testimony does not state that Local Labs is a "commercial entity" or support that conclusion, and in fact, in this case they were working on behalf of a nonprofit entity that intended to use the data for governmental and election-related purposes. *See* **P1, Dkt. 119-1, Excerpts of Tr. from May 17**

**Preliminary Injunction Hearing, ("May 17 Tr.")** at 66:3-15 ("Q. In this case, though, did another entity request that data? A. Yes, Local Labs requested that data before I came on. Q. And did it do this in other states for VRF as well? A. Yes. Q. Why use Local Labs? A. It's my understanding they're a company that does public records requests and FOIAs, and they work in that area all the time, so they're more familiar with the forms and who to contact, and have people on the ground.")

9.   **DSOF ¶27**: Controverted. VRF paid Local Labs $15,000 to acquire voter data on its behalf in New Mexico. **May 17 Tr. at 73:18-22**. As part of its services, Local Labs paid the state $5,378.12 for the voter data it acquired. **Ex. P13, Dkt. 44-2Local Labs Receipt from SOS.**

10. **DSOF ¶29**: Controverted. Plaintiff admits that the Voter Authorization Form was amended in January 2021 and February 10, 2022. But the Form was also amended on February 14, 2022. *See* **Ex. P7, Dkt. 44-10, Feb. 14 Form**. Plaintiff further denies that the amendments were "to provide increased clarity" to users of the form. Rather, the amendments were substantive and departed from New Mexico law. One set of changes was content-based by eliminating certain categories of authorized uses. *See* **Response to DSOF 18**; compare **Ex. P11, Dkt. 44-1, Lippert Form** (allowing governmental, campaign, and election related uses, in use in 2021) with **Ex. P9, Dkt. 44-9, Feb. 10 Form** (removing "election related"); with **Ex. P7, Feb. 14 Form** (requiring requesters to provide further detail on purpose of "governmental" or "campaign" use). Another set of changes replaced New Mexico's statutory requirement. From the earliest forms, through the Lippert Form of 2021, until February 10, 2022, "the requestor" promised not to use or share the data for purposes "other than governmental, election, research, and campaign purposes." *See, e.g.*, **Lippert Form, Dkt. 44-1**; **Early Form, Dkt. 44-8**. Starting on February 10, 2022, this completely changed: from that date, the "requestor" had to promise not to "sell, loan, provide access to, or

otherwise surrender" the data, and the allowance for sharing the data for permissible purposes was removed. *See* **Feb. 10 Form, Feb. 14 Form**. The Secretary's claim that hearsay "inquiries" of parties who are not witnesses prompted a need to "clarify" the form is not credible. The Secretary produced no documents, notes, or communications containing the "inquiries" or discussing how those "inquires" could have required changes. Further, the Secretary elsewhere claimed that the changes were minor and that all of the forms—even the superseded forms from 2021, which Local Labs had signed—accurately described New Mexico law, and for that reason, were still being accepted to the present day. **June 15 Tr. at 89:16-20** (older, outdated versions of form still accepted); **Vigil, 169:16-21** (same). It is far more likely that the form was changed in Feb. 2022 because the Secretary had made her criminal referral a few weeks previously, the language in the Local Labs form allowing sharing for permissible purposes was flatly inconsistent with the criminal complaint, and the Secretary was preparing for the impending March 2022 release of the Pro Publica article, which would heavily quote her attacks on VRF for supposedly breaking New Mexico law. *See* **DSOF ¶39** (Secretary knew ProPublica article would be published week of February 28).

11. **DSOF ¶31**: Controverted. The affidavit conflicts with New Mexico's statutes regulating the use and dissemination of voter data. *See* **Response to DSOF ¶29**.

12. **DSOF ¶32**. There is no competent evidence for "inquiries" by two unnamed and unavailable declarants, and no one can know what was said. Further, the actual reasons for the changes were not likely these unexplained "inquiries," but instead, the need to avoid having forms that conflicted with the Secretary's just-made referral, the news of which was about to be broken by the Pro Publica article with quotes by the Secretary attacking VRF. ***See*** **response to DSOF 29**.

13. **DSOF ¶33**: Controverted. The affidavit conflicts with New Mexico's statutes regulating the use and dissemination of voter data. *See* **Response to DSOF ¶29**.

14. **DSOF ¶34**: Uncontroverted that the updates were related to this as-yet-unfiled lawsuit. Controverted that the updates were unrelated to VRF, as the Secretary amended the forms to eliminate the right to share for lawful purposes, a new restriction (unsupported by statute) which directly targeted VRF's operation of VoteRef.com. Compare **Ex. P8, Dkt. 44-8, Undated Form** (no requirement that requestor retain control over transferee's use of data and no attempt to extract promises from requestor regarding transferring data); **Ex. P11, Dkt. 44-1, Lippert Form** (same, as to form signed by Local Labs) with **Ex. P7, Dkt. 44-10, February 14, 2022 Revised Form** (requiring, for the first time, promise from requestor that it will not "sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.").

15. **DSOF ¶36**. Controverted in part. Members of the public could view the data, but only if they entered into an agreement with VRF to use it for purposes that were lawful under New Mexico law. **FAC ¶62; Answer ¶62** (admitting users had to agree to Terms of Service); **May 17 Tr., 56:18-57:12; FAC ¶63; Answer ¶63** (admitting that users were showed New Mexico specific disclaimer regarding uses of data).

16. **DSOF ¶41**: Controverted. Plaintiff denies that the quoted exchange occurred after "some non-substantive exchanges." **ECF No. 44-20, p. 7** shows substantive exchanges between O'Matz and the Secretary's Communications Director, Alex Curtas. This exchange occurred before the quoted exchange. O'Matz asks specific, substantive questions regarding the discrepancy identified by VRF and the Secretary's position on the same. *Id.* Plaintiff admits that Curtas "charged" that the "discrepancy" "was simply VRF's own lack of understanding regarding how voter rolls are

maintained," **Ex. P17, Dkts. 44-19, Emails Between A. Curtas and M. O'Matz,** but Plaintiff denies that this statement is true.

17. **DSOF ¶42**: Controverted. Plaintiff admits that Curtas wrote the quoted words in an email to O'Matz but denies that this statement was made in isolation. Curtas's email exchanges, **ECF Nos. 44-19 and 44-20**, supply the full context of the exchanges and speak for themselves.

18. **DSOF ¶44**: Controverted. Plaintiff admits that the quoted language appears in the referral but denies that this paragraph quotes all relevant language of the referral, which speaks for itself. **Ex. P14, Dkt. 44-3, VRF Referral.**

19. **DSOF ¶45**: Controverted. The referral of VRF and Local Labs speaks for itself and makes no mention of "false swearing" or section § 1-20-10. **Ex. P14, Dkt. 44-3, VRF Referral**. Rather, it states: "We believe that both VoteRef.com and Local Labs have violated the prohibition against 'providing' voter data by posting New Mexican's private voting information online, or in Local Labs case, providing the voter data to VoteREf.com. We also believe that VoteREf.com and Local labs have illegally 'used' this voter data by publishing it on VoteRef.com." *Id.*

20. **DSOF ¶46**: Controverted. The referral of VRF and Local Labs speaks for itself. **Ex. P14, Dkt. 44-3, VRF Referral**. The referral states that VRF was referred because the Secretary believed that "[s]wift action [was] needed as voter data can quickly be manipulated and used to spread election misinformation." *Id.* **at p.1**. The referral continues:

> We believe that both VoteRef.com and coal Labs have violated the prohibition against "providing" voter data by posting New Mexican's private voting information online, or in Local Labs Case, providing the voter data to VoteREf.com. We also believe that VoteREf.com and Local labs have illegally "used" this voter data by publishing it on VoteRef.com.

*Id.* **at p.2**. The referral never uses the term "general public." Further, VRF was referred because the Secretary was hostile to VRF's political viewpoint and speech and deemed it "misinformation."

*See* **Response to DSOF 7; Ex. P14, VRF Referral** (asserting theory that "[w]e do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign purposes.'"); **Ex. P17, Dkts. 44-19, 44-20, Emails Between A. Curtas and M. O'Matz,** (Secretary's communications director accused VRF of not trying to reach out to discuss this very data "likely because it would not serve their intended goal of spreading misinformation."); *id.* ("Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are *perpetuating misinformation*…These attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country."); **Ex. P12, Dkt. 119-7,** ROG 7 to SOS (Secretary states that publication of data on Internet alone, even if completely accurate, constituted misinformation); **Dworak, 84:8-18 (**AG opened a criminal investigation and began actively investigating VRF after it received the referral); *id.***, 168:12-18 (**AG is not aware of any entity other than VRF having been investigated for its use of voter data).

21. **DSOF ¶47**: Controverted. The referral of VRF and Local Labs speaks for itself. **Ex. P14, Dkt. 44-3, VRF Referral**. The referral makes only scant reference to the Secretary's concern with "voter privacy" (alleging that the entities "violated the prohibition against 'providing' voter data by posting New Mexican's private voting information online") and does not state any concern that the information may be "misread." *Id.* Instead, the referral reflects concern that the data may be "manipulated and used to spread election misinformation." *Id.*; *see also* **Response to DSOF 7 and 46** (showing referral motivated by hostility towards VRF's viewpoint).

22. **DSOF ¶48**: Controverted. The Secretary's referral was precisely aimed at what the Secretary alleged to be "misinformation," which the Secretary's communications director later tied

directly to VRF's identification of a discrepancy. **See Ex. P14, Dkt. 44-3,VRF Referral; Ex. P17, Dkts. 44-19, 44-20, Emails Between A. Curtas and M. O'Matz** (O'Matz asks about discrepancy and Curtas responds accusing VRF of "perpetuating misinformation"). ***See* also Response to DSOF 7 and 46** (referral motivated by hostility towards VRF's viewpoint).

23. **DSOF ¶49**: Controverted. The Secretary based her referral of VRF to the AG in part on her concern regarding spreading "misinformation," Dkt. 44-3, and her concern that spreading "misinformation" violated New Mexico law. ***See* Response to DSOF 7, 46, and 48** (showing referral motivated by hostility towards VRF's viewpoint). The Deputy who signed the referral said the same. **PI Hearing June 15 Tr., 139:5-15** (Sharon Pino affirming, "I still believe that today").

24. **DSOF ¶53**: Controverted. Plaintiff admits that this paragraph quotes from the linked pages, but the links are not competent evidence capable of supporting a motion for summary judgment. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing ... summary judgment."). These links have never been produced to Plaintiff, are not authenticated, and no foundation has been provided. Any statements contained therein are also inadmissible hearsay.

25. **DSOF ¶54**: Controverted. The citation to the hearing transcript does not support the proposition asserted that: "Defendants are not aware of any entity or organization other than VRF that makes voter data accessible to the general public by posting that data online." Defendants assert that *they* lack knowledge of any entity posting voter data online. In support of that assertion, they cite the transcript of the May 17, 2022, preliminary injunction hearing at page 93:5-10. This citation is to testimony from Gina Swoboda, Executive Director of VRF, in which Ms. Swoboda states that "[t]o my knowledge, no one has ever published the voter registration records for every

state online, for free, for the public forever, no." This statement from Ms. Swoboda simply has no bearing on whether Defendants have knowledge of any particular facts relevant to this matter.

26. **DSOF ¶55**: Controverted. Not only do the cited transcript sections fail to reference any promise to refer an entity that was "posting New Mexico data online," and fail to support the claimed allegation, but Defendants have repeatedly been made aware that other entities sell New Mexico voter data and make that information available online to their clients. **May 17 Tr., 93:16-24, 94:8-21, 44:4-11; June 15 Tr., 180:12-21; 205:4-12; 238:2-14; FAC ¶¶175, 193; Dkts. 84-87** (notices of subpoenas to Aristotle, Catalist, i360, and TargetSmart); **June 15 Tr., 238:9-14** (promise from Vigil to look into these entities)**; Mem. Op., 158-9** ("The Secretary of State's interpretation of the Election Code criminalizes requesters such as Catalist, i360, Data Targeting, and L2 Inc., *who apply for voter data and then sell it to clients outside their own organization.*") (emphasis added). Despite this information, Defendants have not conducted any investigation into these entities. **Ex. P4, Dkt. 119-1, ROG 1 to AG; Dworak, 170:17-171:6**. Defendants are unwilling to investigate commercial entities selling data online and seem uninterested in investigating anyone other than VRF. **Dworak, 172:9-23** (AG cannot state what it would take for the office to consider VRF's claims during the litigation that these other entities are violating the law as the AG interprets it).

27. **DSOF ¶57**: Controverted. The Secretary's witness states that the affidavits submitted are valid on their face and that, as a result, Catalist's and i360's requests were not "treated differently from anyone else who submits a fully executed valid affidavit." **June Tr., 101:5-8**. This is false. VRF submitted two valid, fully executed affidavits with its requests on May 27, 2022, yet were denied the requested data. **Ex. P24, Dkt. 44-22, NVRA Notice and Request at p. 8-9** (fully executed affidavits for each project); **June Tr. 237:17-21** ("So we've never actually denied any

properly filled out affidavit. Again, there is the only one exception, which is the VRF affidavit that was submitted May 27th, as we discussed, it will very likely be denied.").

28. **DSOF ¶58**: Controverted. Plaintiff's May 27, 2022, letter speaks for itself. **Dkt. 44-22.** Defendants omit that the May 27 letter also included notice to them that they were in violation of the NVRA and that VRF intended to sue over those violations if they were not cured. *Id.*

29. **DSOF ¶59**: Controverted. Defendants misstate the planned projects conveyed in VRF's letter. *See* **Dkt. 44-22**. VRF did state that it would use the data for two projects. *Id.* The first involved publishing the voter data online as it had done before, but VRF made clear that it would not do so absent a Court order saying that it was authorized to post the information. *Id.* The second project involved using the data for an internal analysis, which VRF stated would not involve publishing the data online even if it did obtain a court order allowing it to do so. *Id.*

30. **DSOF ¶60**: Controverted. VRF denies that it "alluded" to any requests it made under the NVRA or otherwise "for the first time" in its May 27, 2022, letter. **Dkt. 44-22**. VRF made requests for voter data on February 15, 2022, *id.* **at p. 7**, and followed up regarding those requests on March 10, 2022. *Id.* **at p. 6**. Defendants' counsel also specifically asked questions regarding these requests at the May 17th Preliminary Injunction hearing. **May 17 Tr. 79:24-80:12.**

31. **DSOF ¶61**: Controverted. Paraph 61 mischaracterizes the promises that VRF made about publishing voter data online. Those promises, as conveyed in the letter, speak for themselves. **Dkt. 44-22, p. 4-5**. Specifically, VRF stated:

> VRF's intended election use comprises two distinct projects. For its first project, just as VRF publishes voter data for many other states, and as it recently published voter data in New Mexico, VRF intends to publish the requested information online for election related purposes, **but it will only publish the personal information of voters online if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV- 00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding**.

For its second project, VRF intends to analyze the records, information, and data provided in response to the above requests in order to engage in a discrepancy review of the New Mexico voter rolls. **VRF intends to publish this analysis online without disclosing the personal information of any individual voter. VRF will comply with this non-public-disclosure promise for the data it uses on its second project regardless of whether it prevails in the Federal Litigation. And again, for the sake of clarity, no personal information of any individual voter will be published online unless VRF is granted relief in the Federal Litigation or in any other legal proceeding.**

*Id.* (emphasis added).

32. **DSOF ¶63**: Controverted. DSOF 63 omits that the Secretary decided it would not fulfill *any* voter data requests from VRF by March 11, 2022 on the advice for the AG. **Ex. P5, Dkt. 44-16, 3-11-22 Email Exchange with Rostock, Vigil, and Pino regarding VRF 2-15-22 Request**. This decision was made months earlier and was not a response to the May 27, 2022, letter. ***See id.***

33. **DSOF ¶64**: Controverted. The cited testimony from the June 15th preliminary injunction hearing discusses the Secretary's decision to ignore VRF's February 15, 2022, request for voter data. ***See* June 15 Tr. at 47:15-49:25** (discussing February request and reasons for denial). The cited testimony in no way refers to or discusses the Secretary's rationale for ignoring Plaintiff's May 27th requests, as Defendants assert in DSOF ¶64.

34. **DSOF ¶65**: Controverted. The Secretary's claimed concern in litigation that VRF would post the data online notwithstanding its repeated promises to comply with the law until it obtained a court order otherwise is purely a retaliatory artifice and invention aimed at indefinitely blocking VRF from accessing data. *See* **Response to DSOF 46**; *see also* **Vigil, 163:12-164:22** (Secretary maintains March 2022 decision that it will not fulfill VRF's voter data requests); ***id.*, 179:21-180:16** (Secretary cannot say what VRF can ever do to alleviate its concern and have its requests processed); ***Id.*, 198:6-8** (later requests would have been denied even if VRF provided affidavit).

16

35. **DSOF ¶66**: Uncontroverted that this accurately quotes Plaintiff's Amended Complaint, but controverted to the extent Defendants claim that this is Plaintiff's full intent, or that Plaintiff intends to post data even if does not get judicial relief. *See* **Response to DSOF 61** (outlining VRF's promises to not post voter data without judicial decree);**Am. Comp. ¶¶84-85.**

36. **DSOF ¶69**: Controverted. The document cited, **ECF No. 44-14**, does not support the proposition that VRF published the New Mexico data on its website before December 14, 2021. That email from Gina Swoboda merely states that VRF has conducted an analysis of the data and identified a discrepancy, inviting the Secretary to discuss that discrepancy with VRF. *Id.* It makes no statement regarding publication of the data online. *Id.*

37. **DSOF ¶71**: Controverted. The record citations do not support the proposition asserted. **Dkt. 44-27** is an email from ProPublica's Megan O'Matz sent at 2:46 P.M. on December 14, 2021. Like **Dkt. 44-14**, O'Matz's email does not state that VRF had posted New Mexico's voter data by that date. Rather, she says: "I'm a reporter with ProPublica and am looking into an organization called VoteRef.com that is posting tens of thousands of voter histories online nationwide, including New Mexico." She then goes on to ask a number of questions regarding the 3,844 vote discrepancy identified by VRF. *Id.* She makes no reference to the New Mexico data actually being online at that time. Further, VRF issued a press release on December 16, 2021, entitled "VRF website VoteRef.com adds New Mexico voter rolls to nationwide database" which stated "The Voter Reference Foundation (VRF), through its website VoteRef.com, *today* released data from its 11th state, creating a database that so far includes more than 27 percent of the country's population." **Dkt. 44-13** (emphasis added).

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS ("SAF")

Pursuant to Local Rule 56.1(b), Plaintiff identifies the following additional facts that are material to the resolution of Defendants' Motion for Summary Judgment:

**1. Voter Reference Foundation and VoteRef.com**

A. VRF accomplishes its efforts to create and maintain the Website by requesting voter registration data from state agencies on a quarterly basis (either directly or through third party vendors) and then compiling and posting that data in a way that is easily accessible, searchable, and usable by the public. **May 17 Tr., 54:15-55:2; 55:3-4.**

B. After it acquires raw voter data from a state, VRF's database analysts map the data that would otherwise be unusable by the public and put the data into a searchable, understandable format for the public to review and analyze. **May 17 Tr., 53:20-54:6.**

C. In many states, access to the data is prohibitively expensive and members of the general public lack the knowledge to map the raw data in a manner that is usable. ***Id.* at 54:2-6.**

D. Local Labs paid $5,378.12 for the New Mexico voter data. **Ex. P13, Dkt. 44-2, Receipt.**

**2. VRF Requested additional data**

E. On May 27, 2022, VRF sent a "Notice of Violation of National Voter Registration Act & Request for Records" (the "Notice") to the Secretary pursuant to § 20510(b)(1) ("A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved."). **Ex. P24, Dkt. 44-22, NVRA Notice.**

F. The Secretary does not deny that VRF's notice was proper under the NVRA. ***See* Ex. P25, Dkt. 119-10, SOS 2-24-23 Responses to VRF Third Discovery,** ROG 11 to SOS.

G. In the Notice, VRF again apprised the Secretary of her statutory duty to make certain voter data available for public inspection pursuant to the NVRA. **Ex. P24, Dkt. 44-22, NVRA Notice**. The Notice stated New Mexico's restrictions on public inspection of certain types of voter data are

preempted by the NVRA and that the Secretary's refusal to respond to VRF's February 15, 2022, request violates the NVRA's Public Inspection Provision. *Id.*

H.   Finally, the Notice again requested the Secretary comply with the NVRA and New Mexico law, including by providing data in response to new requests raised in the May 27th letter:

> 1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

> 2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

*Id.*

### 3.   New Mexico stores and can easily access the data VRF requests

I.   The Secretary must create a "file maintenance report" at least monthly which shows additions, deletions, and changes, if any, to each of the county registers. NMSA § 1-5-14. The Secretary previously admitted that it maintained a file maintenance report, but argued that VRF's request was not clear enough to indicate that it was requesting that report. **Ex. P27, Dkt. 119-12, Secretary's 10-21-22 Responses to VRF First Discovery,** ROG 2.

J.   The Secretary's Chief Information Officer admitted that the Secretary had the capacity to provide the reports that VRF requested. *See* **Ex. P28, Dkt. 119-13, Excerpts from Transcript of Deposition of Secretary's Chief Information Officer G. Rockstroh ("Rockstroh"), 24:11-18.** Rockstroh also testified that the Secretary provided reports to other requesters that, like VRF's, required it to provide data for subsets of voters over a specific period of time. ***Id.*, 34:13-36:14.**

K.   The Secretary admits that it "does have list maintenance data that we would be able to produce if we received a legal request, an appropriate legal request." **Vigil, 28:14-29:1.**

L.   The Secretary admits that the office would "have to provide voter list maintenance data when someone makes a request under the NVRA." *Id.*, **30:15-19.**

M. New Mexico contracts with a third-party vendor to store voter data in a database called SERVIS, which is owned by the Secretary. **Rockstroh, 10:18-11:15; 15:2-4.**

N.   The Secretary's office receives voter registration information from the Motor Vehicle Division and the online voter registration system. *Id.*, **12:3-7.**

O.   The SERVIS system stores, among other things, voter credits which reflect data showing a voter has cast a vote in a given election, *Id.*, **14:6-12**, as well as when and how a voter registered. *Id.*, **20:10-13.**

P.   The Secretary's office used the SERVIS system to develop reports detailing different aspects of voter data, mostly coming from voter data requests or an inspection of public records (IPRA) request. *Id.*, **16:5-7; 17:8-10.**

Q.   An authorized user can log into SERVIS and pick and choose what data he or she wants included in a report. *Id.*, **31:2-8.**

R.   Reports from the SERVIS system do not exist prior to a user selecting settings in the system and generating a report for specific data. *Id.*, **31:13-16.**

S.   The SERVIS system contains coding that automatically pulls specific data for 30-40 types of "canned" reports that are retrieved on a regular basis. *Id.*, **18:7-9.**

T.   The Secretary's personnel are also able to use the SERVIS system to develop noncanned reports from the numerous data fields in the system. *Id.*, **19:12-15.**

U.   Even when personnel in the Secretary's office use the SERVIS system to develop non "canned" reports, there is no additional charge from the vendor. *Id.*, **21:3-6.**

V. If the Secretary's personnel are not able to develop a requested report, the Secretary contacts the vendor for assistance and is not charged for that assistance. ***Id.*, 21:10-17.**

W. The Secretary's office has never rejected requests for voter data because they require too much work to compile the specific data. ***Id.*, 21:18-23.**

X. Even after a voter is no longer "active" his or her data is still stored in the SERVIS system. ***Id.*, 24:15-19.** Voter data in SERVIS is stored indefinitely. ***Id.*, 24:1-2.**

Y. The "File Maintenance List" is a canned report. ***Id.*, 24:11-18.**

Z. Every discrete change to an individual's voter file is retained in SERVIS; the system does not simply reflect the most recent change. ***Id.*, 27:17-25; 26:2-7.**

AA. Users can set date ranges for voter data in SERVIS. ***Id.*, 32:4-7.**

BB. The Secretary's staff run reports for other requesters of voter data that are not "canned" reports and can therefore take up to multiple weeks to fulfill. ***Id.*, 34:13-36:14.**

CC. "A complete list by county precinct of any registered voters who cast a ballot in the November 3, 2020 general election" is in a "canned" report. ***Id.*, 38:18-39:23.**

DD. The data showing voters who voted in the 2020 election who have since been placed in an inactive, canceled, deleted, or removed status may not be a "canned" report, but is available in SERVIS and can be obtained by the Secretary's staff. ***Id.*, 39:24-40:11.**

EE. The Secretary cannot state why its interest in knowing who accesses the data is not fully vindicated by having requesters keep a record of whom it shares the data with. **Vigil, 146:5-149:2.**

**3.  The Data Sharing Ban and Use Restrictions have chilled VRF's First Amendment protected speech and will continue to do so absent judicial intervention.**

FF. The Secretary referred VRF to the AG for criminal investigation and potential prosecution. **Ex. P14, Dkt. 44-3, VRF Referral**. The Secretary had not withdrawn that referral as of June 15, 2022. **June 15 Tr., 69:5-6**, and the AG has stated that it has a "duty" and is "required" to prosecute

violations of the Election Code. **Ex. P3, Dkt. 119-3, Excerpts from August 31, 2022 Hearing on Mtn. to Stay ("Aug 31 Tr."), 5:21-24**; **id.**, **32:3-9** (AG "has the statutory mandate to enforce New Mexico law, including the Election Code. And if we believe that a violation is occurring—'we' meaning the Attorney General's Office--yes, we are entitled and required to prosecute.").

GG.     VRF removed the New Mexico voter data from its website on March 28, 2022—just before this lawsuit was filed—out of fear that it would be prosecuted based on the Secretary's interpretation of the law and her referral of VRF to the AG. **May 17 Tr., 69:11-18.**

HH.     Because VRF was unaware of the Secretary's referral until the ProPublica article was published, it was VRF's knowledge of the Secretary's criminal referral to the AG, and the impending threat of investigation, which led VRF to remove the data from the Website, refrain from engaging in political speech, and to seek recourse from this Court. **Id.**

II.  The AG has repeatedly refused to state that it will not prosecute VRF for its prior posting of voter data online. **Ex. P4, Dkt. 119-4, AG's 3-8-23 First Supp. Responses to VRF First Discovery at RFA 4** (admitting that AG has not declined to prosecute VRF for its use or sharing of voter data, including but not limited to the operation of the website VoteRef.com**).**

**4.   Neither Defendant presents any evidence that the Use Restrictions or Data Sharing Ban serve a compelling state interest, or that anyone has been harmed by VRF's posting of voter data on VoteRef.com.**

JJ.  The AG doesn't know how many people have canceled voter registrations because of the online posting of the data. **Dworak, 106:9-12**.

KK.     The Secretary has no information that any voter has canceled their voter registration because of VRF's publication of voter data on its website. **Vigil, 140:23-141:5.**

LL.The AG has no information that any person has used the VRF data to stalk or harass anyone, or for any unlawful purpose. **Dworak, 100:1-101:16.**

MM.     The Secretary is unaware of anyone using VRF's website for stalking, commercial solicitations, any criminal purpose, or any other improper purpose. **Vigil, 136:8-138:9**.

NN.     The Secretary has no evidence that VRF manipulated voter data. ***Id.*, 140:19-22**.

**5.  Defendants believe that VRF's posting of voter data on the Internet violates the Use Restrictions because that posting was not for a permissible purpose.**

OO.     The Secretary believes that VRF's posting of the data was not a permissible use because it was not for a governmental or campaign purpose. ***Id.*, 74:9-75:6**.

PP. The Secretary believes VRF's posting of the data on the internet was not for a governmental purpose because it is not a governmental entity. ***Id.*, 75:22-76:9**. The Secretary refuses to say whether VRF's analysis of the data, independent of VRF's public posting, qualifies as a governmental use, and claims it still "would need some review." ***Id.*, 76:10-78:19**.

QQ.     The AG says that VRF's stated use is not "governmental." **Dworak, 73:8-21**.

RR.     The AG takes the same position as the Secretary on the question of whether VRF's use of the data is election related. ***Id.*, 73:22-74:13**.

SS. The AG maintains that public posting on a website is not for a research or campaign purpose. ***Id.*, 74:19-75:10**.

TT. The AG takes these positions both as a party and the Secretary's counsel. ***Id.*, 74:14-18**.

UU.     Defendants only recognize "governmental" and "election campaign" uses as permissible. **Dworak, 19:25-20:12; Ex. P7, Dkt. 44-10, Feb. 14 Form.**

**6.  Defendants target VRF by labeling its speech "misinformation," which is simply a code word for "speech with which the State disagrees"**

VV.     The Secretary's referral raised concerns regarding how VRF was using the data specifically that the use amounted to "spreading misinformation." **Ex. P14, VRF Referral.**

WW.     Later, the Secretary clarified that publication of the data on the Internet alone, even if completely accurate, constituted misinformation. *See* **Ex. P12, Dkt. 119-7,** ROG 7 to SOS.

XX.     The Secretary testified that VRF's "analysis about a discrepancy that was inaccurate" constituted "misinformation." **Vigil 125:4-13** (Q: I'm asking about whether posting the data online itself, with no other statement about a discrepancy itself, is misinformation? A. I think it's important to note that's not what happened. So our position on the misinformation was tied to the data being posted publicly, outdated data, with an analysis about a discrepancy that was inaccurate. So that was the misinformation issue.").

YY.     The Secretary believes that VRF's sharing of out-of-date voter data could constitute disinformation. **Vigil, 122:18-22.** The Secretary believes VRF engaged in disinformation when, in response to the District Court's preliminary injunction allowing VRF to repost the data, it reposted the data with inaccurate information explaining it. *Id.***, 123:12-124:16; 124:24-125:13.**

ZZ.The Secretary's communications director accused VRF of not trying to reach out to discuss this very data "likely because it would not serve their intended goal of spreading misinformation." **Ex. P17, Dkts. 44-19, 44-20, Emails Between A. Curtas and M. O'Matz.**

AAA.    Before publishing the article, the O'Matz exchanged emails over the course of nearly a month with Alex Curtas, Communications Director for Secretary Toulouse Oliver. *Id.* The exchange began on December 14, 2021, with O'Matz asking Curtas about the discrepancy (identified in the VRF Dec. 16, 2021 Press Release, **Ex. P15, Dkt. 44-13**), including inquiring about any potential explanations for the discrepancy and whether VRF reached out to the Secretary to discuss its methodology and findings. *Id.* After some non-substantive exchanges, Curtas responded as follows to O'Matz's inquiry:

> Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are *perpetuating misinformation*. They reflect a lack of understanding about how the

> process of voter list maintenance works. These attempts by political operatives to cast
> doubt on the 2020 elections are an affront to our democracy and to the professionals
> who run our elections throughout the country.

*Id.* (emphasis added). The "discrepancy," Curtas charged, was simply VRF's own lack of understanding regarding how voter rolls are maintained. *Id*.

BBB.    In response to ProPublica's question about whether VRF had reached out to the Secretary's office before publishing its statement, Curtas falsely stated that VRF had not contacted the Secretary's office, "likely because that would not serve their intended goal of spreading misinformation." *Id*; *see also* **Ex. P16, Dkt. 44-14, VRF Dec. 14, 2021 Email to Secretary** (showing VRF contacted Secretary to share findings and discuss analysis two days before email).

CCC.    Four days later, Curtas responded:

> The issue relates to the transfer and publication of the voter data. *This is the crux*: "We
> do not believe providing this personal voter data on a private website *that intends to
> spread misinformation about the 2020 General Election meets the definition of
> appropriate use as either for a "governmental purpose," "election related," or
> "election campaign purposes.*" I've attached our referral letter which lays it all out. Let
> me know if I can provide any clarification on this.

*Id.* (emphasis added). Curtas again focused on the idea that "spreading misinformation" renders use of the data unlawful and focuses the analysis on the permissible purposes—governmental, election related, or election campaign related—under the statute. *Id.*

DDD.    The Secretary believed the misinformation VRF is spreading is that there are discrepancies within New Mexico's voter data—maintained by the Secretary. **Ex. P19, Dkt. 119-8, Excerpts of Deposition of Alex Curtas ("Curtas"), 53:6-9.** The Secretary sought to "push back hard" against VRF's speech which it characterized as misinformation. **Id., 72:17-22.** It is part of the Secretary's office mission to "push back hard" against VRF's speech which it characterizes as misinformation. **Id.** The Secretary's office associated VRF's speech with a "larger strategy of election denialism" encompassing organizations other than VRF. **Id., 72:23-73:12.**

**7. Defendants indefinitely hold VRF's past posting against it and will not produce new data.**

EEE.      VRF requested additional voter data in May under the NVRA and promised not to publish some of the data at all, even if it prevails if this Court. **Ex. P24, Dkt. 44-22, NVRA Notice**. The Secretary's claim that it was "prudent" to deny even that request provides no explanation of any kind, nor does it cite any legal authority for refusing to honor VRF's request. **Ex. P26, Dkt. 119-11, Response to NVRA Notice.**

FFF.      These requests were denied despite the written and explicit assurances of VRF that it would not publish voter data absent a judicial order allowing it to do so. ***Id.*; *see also* Ex. P24, Dkt. 44-22, NVRA Notice; Aug 31 Tr., 10:22-24.**

GGG.      The statements that caused VRF's concern were Greim's promises that VRF would publish its analysis "without disclosing the personal information of any voter," and that "again, for the sake of clarity, no personal information of any individual voter will be published online unless VRF is granted relief in the federal litigation." **Vigil, 172:23-174:7**. The Secretary claimed to be concerned because the office did not know what Greim meant by "personal information," and thought he might actually have been threatening that VRF would publish personal information because he was secretly using a very narrow definition. Id. Yet no one from the Secretary's office ever reached out to Greim to discuss this concern, or clarify "personal information," before rejecting the request. ***Id.*, 174:8-20**.

HHH.      The Attorney General's position is that VRF's counsel promised in May 2022 that voter information would not be posted online without a court order. **Dworak, 156:10-15**.

III. The Secretary cannot state when it will stop considering VRF's "past practice" of posting data online in deciding to reject VRF's voter data requests. **Vigil, 187:11-15**.

**8.  Defendants' interpretation of the Data Sharing Ban is derived from an illogical and pretextual interpretation of the law that this Court has already rejected.**

JJJ. Defendants' interpretation giving rise to the Data Sharing Ban comes from combining multiple statutes, reading the language of § 1-4-5.6 to incorporate by reference language from § 1-5-22 such that § 1-4-5.6 prohibits *any person*, not just government employees and data processors, from "selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file…". **May 17 Tr., 34:3-14** (admitting Defendants' theory is that 1-4-5.6 incorporates by reference § 1-5-22--not in its entirety-- but the purposes that 22 prohibits); *id.,* **34:23-35:14** ("purposes" when used in § 1-4-5.6 refers to purposes prohibited by Article 5, not "purposes" in § 1-4-5.5); *id.,* **36:10-11** ("…Local Labs, by providing the data to VRF, and VRF by providing it to the world on the website violated § 1-5-5.6.); *id.,* **37:11-19** ("…[I]t is the Attorney General's position, as a party in this case, that if there is any criminal liability on the table, it is not for violating the so-called use restrictions under § 1-4-5.5(c). It is for providing-- otherwise providing access or otherwise surrendering or selling or lending the voter data under § 1-4-5.6); *id.,* **50:25- 51:5** (same); **June 15 Tr., 228:4-16** (§ 1-4-5.6 incorporates § 1-5-22).

KKK.     The Defendants have agreed that § 1-5-22 on its face does not apply to VRF, as it is not a government employee, contractor, or data processor. **May 17 Tr., 38:23-39:6**.

LLL.     At the preliminary injunction hearing(s), Plaintiff's counsel propounded a number of hypotheticals to the Secretary's Elections Director and Deputy Secretary of State. The responses to those hypotheticals revealed that the Defendants absolutely prohibit the sharing of voter data between a requestor and any other person, regardless of whether the sharing is for a governmental, election, or election campaign purpose. This would include sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for (**June 15 Tr. at 33:13-34:16**); sharing between an academic who had used the data to write a paper regarding

the voter registration system, and another academic who wanted to question or validate the data (*id.* **at 32:6-33:9**); sharing between a political party and a candidate it supports, but who is not affiliated with the party (*id.* **at 91:1-5, 91:17-20**); sharing of a voter's information by a canvasser with close family members or other members of his or her household (*id.* **at 30:17-31:20**); sharing by a political data compilation/analysis firm and its political clients (*id.* **at 34:17-24**); and sharing via publication on the internet (*id.* **at 91:12-16**).

MMM.     However, after Plaintiff mounted an overbreadth attack on the Data Sharing Ban, the Defendants changed their interpretation of its reach. First, the AG testified that he can no longer draw the conclusion the Defendants advanced in their argument and briefing at the preliminary injunction: that § 1-4-5.6 incorporates the prohibitions of § 1-5-22(a) to make VRF's publication of data unlawful. **Dworak, 144:7-16.**

NNN.     Both Defendants also supported the passage of HB4 to address the ambiguities raised by the issues being litigated in this case. **Dworak, 186:12-16** ("I see this as addressing an issue that- you know, obviously we're arguing over these terms, and this would clarify, to help avoid that ambiguity, and better clarify the requirements of the statute."); **184:19-23** ("I can say, generally, this helps address the issue, and we'd be supportive of, because it helps clarify-just like dozens of other bills in the session, they help to clarify terms that are not always clear; they might be ambiguous and conflicting).

OOO.     The Defendants have restated their construction of the law to suggest that the Data Sharing Ban only applies in cases just like VRF's—when an entity publishes voter data online to the "general public." ***See* Ex. P31, Dkt. 119-16, Feb. 21, 2023 Email from E. Lecocq to E. Greim.** (clarifying earlier discovery response and stating "[b]oth the AG and the SOS believe that "sharing data" outside one's organization, or publishing that data to make it available for the

*general public*, constitutes a violation of New Mexico Law. *This is not just the act of sharing data, but rather disseminating that information to the general public*.") (emphasis added).

PPP.     Defendants adhered to this view despite its odd results. Defendants maintained that a voter list could be obtained by a single party official signing a single affidavit, but widely disseminated among a variety of organizations and individuals, including candidate campaign committees at all levels (so long as the candidate is affiliated with the party), candidate campaign and party workers, and even volunteers. **June 15 Tr., 29:2-30:4**. Defendants allow sharing within a family, and even though that might violate the ban, it would not be enforced. ***Id.*, 31:4-12**.

QQQ.     The AG suggested after the close of discovery that under his view of the Ban, not all use of the internet is "disseminating to the general public," but refused to take a position about what sort of protection or password is sufficient to make "internet publication" sufficiently private to not be deemed "disseminating" to the general public. **Dworak, 128:16-129:14**.

RRR.     The AG believes it might violate the law to transfer the data for election research, governmental, or campaign purposes, if the transferor lost control of the data. ***Id.*, 72:4-19**.

## SUMMARY JUDGMENT STANDARD[3]

The court shall grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When a defendant moves for summary judgment, he "bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" *Herrera v. Santa Fe Pub. Schs.*, 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013) (Browning, J.) (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. *See Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018).

If the movant meets this initial burden, the party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990). The court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550-55 (1999); *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The court cannot decide credibility issues, *see Liberty Lobby*, 477 U.S. at

---

[3] Though all parties have moved for summary judgment, the standard is unchanged. *See Simon v. Taylor*, 252 F. Supp. 3d 1196, 1229 (D.N.M. 2017), *aff'd*, 794 F. App'x 703 (10th Cir. 2019) (Browning, J.) (The standard for cross-motions for summary judgments is the same as for individual motions for summary judgment. Thus, the court handles cross-motions as if they were two distinct, independent motions ... [and] in evaluating each motion, the court must consider the facts and inferences in the light most favorable to the non-moving party.) (citations and quotations omitted).

255, and "non-movants ... are given wide berth to prove a factual controversy exists." *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133, 1150 (10th Cir. 2005).

Defendants' Motion should be denied because they misstate several facts which they claim are material and uncontroverted; several of their allegedly uncontroverted facts are in dispute; and they are not entitled to judgment as a matter of law.

## ARGUMENT

**I.    Defendants are not entitled to judgment as a matter of law on VRF's Count I because VRF made three lawful requests pursuant to the NVRA which the Secretary unlawfully refused to produce at the advice of the Attorney General.**

As shown below and in VRF's own Motion for Summary Judgment, it should prevail on its claim (Count I) that the Secretary violated the NVRA by deciding—with the encouragement of the Attorney General—that she would ***never*** fulfill VRF's voter data requests. That caused her to reject three requests: those made on February 15, 2022 (**DSOF ¶58**); May 27, 2022 (**SAF E-H**), and October 18, 2022 (**Defs. Ex. 8**). The facts are undisputed that (1) the requests were made; (2) they were denied; and (3) they will continue to be denied indefinitely. The only complexity in this claim arises from the Defendants' evolving mix of excuses for noncompliance, which are scattered and repeated throughout Sections I.A-C of their Memorandum. Confusingly, in those same sections, Defendants occasionally digress to argue parts of VRF's Count II, ***a distinct claim*** which argues that New Mexico's Use Restrictions and Data Sharing Ban are preempted by the NVRA. VRF isolates and refutes those arguments in Section II. Below, in Section I, VRF shows that it is entitled to judgment on its Count I because the Secretary has proffered a series of invalid excuses for failing to produce records in response to VRF's data requests.

31

> a. **VRF made three requests for New Mexico voter data that constitute "records" under the NVRA (addressing Sections I.A, I.C)**

As noted above, in 2022, VRF made three valid requests—not just one—for New Mexico voter data under the NVRA. [4] Defendants' Motion for Summary Judgment ("Defs. MSJ") at 20-21. [5] Each of VRF's requests triggered NVRA protections because they sought data related to the implementation of such "programs and activities."

### i. Three Requests Validly Sought Records under the NVRA

- VRF's **February 15, 2022 request** sought:

  the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021.

**DSOF ¶59**. The Secretary never responded. **DSOF ¶63-64**.

- VRF's **May 27, 2022 request** sought:

1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same; and

2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

**SAF H**.

- VRF's **October 18, 2022 request** sought:

1. Voter registration data for all voters, including each voter's classification or status (e.g., active, inactive, suspended, canceled, purged, etc.), down to the lowest geopolitical

---

[4] Defendants cite a September 28 request, but that request was only to identify *other requesters* of voter data, it has never been part of Plaintiff's claim, and Plaintiff has not moved for summary judgment on any violation by Defendants.

[5] Plaintiff refers to page numbers as labeled by the ECF system in the upper right hand corner of the document, rather than the page numbers inserted within Defendants' document at the bottom left corner.

subdivision available (precinct, municipality, town, county, etc.), as it exists on November 8, 2022, or as close to this date as possible;

2.  Records reflecting the total ballots cast, statewide, in the November 8, 2022, general election;

3.  Voter registration data for all voters removed or canceled from any voter list (e.g., active list, inactive list, suspended list, purged list, deleted list, etc.) between September 24, 2022 and December 15, 2022;

4.  Voting history/credit data for each voter that voted in items 1-3 for the November 8, 2022, general election, including the method of voting (election day polling place, absentee early, etc.), and the voting jurisdiction the vote occurred in, down to the lowest geopolitical subdivision available (precinct, municipality, town, county, etc.); and

5.  The unique voter ID or key identifier of each voter that voted in the November 8, 2022, general election.

**Defs. Exhibit 8**.

> ### ii.   The NVRA's Plain Text and the Great Weight of Precedent Shows that these Were Requests for "Records" under the NVRA

All of these requests seek NVRA records. The scope of the NVRA's public inspection requirement is clear: "***all records*** concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1) (emphasis added). As shown below, this means the ***lists*** themselves, and the ***voter data*** within those lists. Though Defendants claim to disagree, Defs. MSJ at 22-23, elsewhere they let down their guard in a moment of candor, admitting that what VRF received from Local Labs in 2021, the same type of records VRF was later denied because they supposedly fall outside the NVRA, "***at minimum, overlaps with NVRA records***." *Id.* at 27 (admitting that "VRF (via Local Labs) has previously received from New Mexico voter data that, at ***minimum***, overlaps with NVRA records." (emphasis added)). As shown below, the law supports Defendants' admission, because—in contrast to the many cases that adopt VRF's plain-text reading of the NVRA— Defendants cannot cite a single case to support their claim that voter lists and data are uncovered.

There is no dispute that the NVRA's public disclosure provision is "broad." *Pub. Int. Legal Found., Inc. v. North Carolina State Board of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). Those "records" which must be made available pursuant to the NVRA include the "file maintenance list" and "voter data" as those terms are defined in NMSA § 1-5-2, as well as "voter data" as that term is used in NMSA § 1-4-5.5, because these are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *See Judicial Watch, Inc. v. Lamone*, 399 F.Supp.3d 425, 439 (D. Md. 2019) (individual voter registration information "records"); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335-36 (4th Cir. 2012) (registration applications are "records"); *Pub. Int. Legal Found., Inc. v. Bellows*, 588 F.Supp.3d 124, 133 (D. Me. 2022) (same); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 940 (C.D. Ill. 2022) (voter list is a "record").

*Long* is instructive. There, Virginia had refused the request of a non-profit organization similar to VRF to produce voter registration applications. 682 F.3d at 333. On summary judgment, the district court held the NVRA's Public Inspection Provision entitled the plaintiff to access. *Id*. It first observed that "the process of reviewing voter registration applications is a 'program' . . . because it is carried out in the service of a specified end—maintenance of voter rolls—and it is an 'activity' because it is a particular task . . . of Virginia election employees." *Id*. at 335.

Second, it noted "the 'program' and 'activity' of evaluating voter registration applications is 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.' [T]he process of reviewing voter registration applications keeps official voter lists both 'accurate'—free from error—and 'current'—most recent…By registering eligible applicants and rejecting ineligible applicants, state officials "ensure that the state is keeping a 'most recent' and errorless account of which persons are qualified or entitled to vote within the state." *Id*.

Third, *Long* observed that "the registration applications requested by Project Vote are clearly 'records concerning the implementation of' this 'program[ ] and activit[y].'" *Id*. at 335-36 (quoting 42 U.S.C. § 1973gg-6(i)(1), as amended, 52 U.S.C. § 20507(i)(1)) (alterations in original). The applications are "'the means by which an individual provides the information necessary for [Virginia] to determine his eligibility to vote.'" *Id*. at 336 (citation omitted).

Finally, *Long* observed that Section 8(i)(1) "'very clearly requires that all records be disclosed.'" *Id*. at 336 (emphasis in original; citation omitted); *see* 52 U.S.C. § 20507(i)(1). It explained that "'the use of the word all [as a modifier] suggests an expansive meaning because all is a term of great breadth.'" *Id*. (quotation marks omitted) (alteration in original) (citation omitted). Moreover, it held that the phrase, "shall include," as used in Section 8(i)(2) of the NVRA, "sets 'a floor, not a ceiling'" as to the sorts of "records" that must be disclosed under Section 8(i)(1). *Id*. at 336-37 (citation omitted); *see also Jones v. Southpeak Interactive Corp. of De.*, 777 F.3d 658, 671 (4th Cir. 2015) ("term 'shall include' sets a floor, not a ceiling" and "[c]ourts have repeatedly indicated that 'shall include' is not equivalent to 'limited to'") (quoting *Long*, 682 F.3d at 337).[6]

VRF's requests fall within *Long* because they sought voter data that are "records" subject to the Public Inspection Provision. The raw data consists of (1) individuals' personal registration information and status sorted into fields; and (2) another field, an activity log, that records the changes made to individuals' data. **SAF ¶Z**. Like the voter registration applications in *Long,* the

---

[6] Defendants fail to circumvent this authority. First, they argue without citation or reasoning that *Long* is "erroneous." MSJ at 23. Second, they mischaracterize its holding as suggesting that voter data is only available under the NVRA in "some situations." *Id*. *Long* simply does not stand for this proposition. There is no parsing of "situations" in which the Public Inspection Provision applies and when it does not. Instead, the court recognized that the Public Inspection Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, ***a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies***. . . . [T]his mandates disclosure of the records requested by Project Vote." *Long*, 682 F.3d at 334-35. (emphasis added). Finally, Defendants confusingly argue without any citation that access to voter information is "incidental to—and not a defining feature of—the scope of the disclosure requirement." *Id*. That is wrong. As every one of VRF's cases, shows, *voter data is at the core of what must be disclosed under the disclosure requirement.*

voter list maintenance file and other corresponding data are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1). The process of creating, updating, and auditing voter data "is a 'program'...because it is carried out in the service of a specified end—maintenance of voter rolls—and it is an 'activity' because it is a particular task ...of [New Mexico] election employees." *Long*, 682 F.3d at 335 (quotation omitted).

In New Mexico, state and local officials update the voter file with new information (**SAF ¶¶I, N**), thereby "'ensuring the accuracy and currency of official lists of eligible voters.'" *Long*, 682 F.3d at 335 (internal citation omitted). The voter list is a record that concerns the implementation of the program and activity of maintaining accurate and current eligible voter lists. After all, the list contains the information on which New Mexico election officials rely to monitor, track, and determine voter eligibility. *See id*. at 336. Thus, VRF requested "records" which are covered by the NVRA's Public Inspection Provision.

To the extent that Defendants argue the records requested in the February 15, 2022, request are not "records" subject to the NVRA because a "count" is not a "record," that conclusion is erroneous and Defendants provide no support for it. These "counts" assist election officials in the administration of elections by ensuring, among other things, the maintenance of accurate voter lists. Therefore, the "counts" concern "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1).

Defendants briefly argue that § 20507(i)(1) does not mandate access to all of the information obtained by the Secretary regarding all registered voters because § 20507(i)(2) specifies that certain records concerning individuals "to whom [change-of-address] notices are sent" shall be "include[d]" in the inspection requirement, and so VRF's construction would create

surplusage or facial inconsistency. Defs. MSJ at 22-23. This argument has been rejected elsewhere. In *Matthews*, the defendants similarly argued that § 20507(i)(2) narrowed the definition of "all records." 589 F.Supp.3d at 941 (C.D. Il. 2022). The court rejected this argument, holding that "the Public Disclosure Provision casts a wide net, mandating 'all records' be made publicly available. Such expansive language 'sets a floor, not a ceiling.'" *Id.* (*quoting Long*, 682 F.3d at 337) (rejecting the argument that § 20507(i)(2) limits "all records"); *see also Lamone*, 399 F.Supp.3d at 438 ("in this Court's view, Section 8(i)(1) very clearly requires that *all* record be disclosed . . . the use of the word all as a modifier suggests an expansive meaning because all is a term of great breadth[.])" (internal quotations omitted). In short, there is little question but that VRF made three valid records requests under the NVRA.

### b.  The Secretary's various excuses for nonproduction fail.

#### i.  Failure to use magic words in the request (February and October)

Defendants argue the NVRA does not apply to two requests that did not explicitly cite the NVRA, but cites no authority that a request must incant "NVRA" or other magic words to invoke the federal statute. Defs. MSJ at 21. As shown above, what matters is that each request was indeed for records of "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1). Nothing more is needed.

#### ii.  Failure to plead the request (October)

In a conclusory footnote, Defendants assert the October request should not be considered with VRF's claims because these requests were not included in VRF's Amended Complaint. Defs. MSJ at 20, n.4. Yet the October request is absent from VRF's September 26, 2022, Amended Complaint only because it post-dated filing by three weeks. As this Court has recognized, "[p]arties may allege new claims in motions for summary judgment," and "[w]hen a party raises a

new claim in a motion for summary judgment, a court treats the motion for summary judgment as

a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure."

*Chisholm's Village Plaza, LLC v. Travelers Commercial Insurance Company*, No. CIV 20-0920

JB/JHR, 2022 WL 3369202, at *19 (D.N.M. Aug. 16, 2022). Further:

> [w]hile the purpose of "fact pleading" is to give defendants fair notice of claims
> against them without requiring the plaintiff to have every legal theory or fact
> developed in detail before the complaint is filed and the parties have opportunity
> for discovery, plaintiffs may not wait until the last minute to ascertain and refine
> the theories on which they intend to build their case.

*Id*. (internal quotations omitted). Discovery revealed that the Secretary decided to reject every

VRF request, including those after the Amended Complaint. *See* Responds to DSOF ¶63. The

Secretary cannot demand that VRF file a new lawsuit for every request she rejects, and cannot

claim surprise or prejudice because all of her conduct (and her future plan to keep rejecting

requests) is subject to VRF's motion.

### iii.   Request required "creation" of documents

Defendants next argue that the NVRA only "permits the *inspection* of existing compliance

records" and "does not mandate the *creation* of additional reports, explanations, or data analyses."

MSJ at 21. (emphasis original). These are word games. VRF has not requested any "reports,"

"explanations," or "data analyses." What Defendants really claim is that the data VRF is requesting

requires extra work ("analyses") because of the way Defendants keep it in their database. *Id*.

Defendants are wrong on both the law and the facts. States cannot refuse NVRA requests

simply because the state would have to "create" a new record from existing data. *See Project Vote,*

*Inc., v. Kemp*, 208 F.Supp.3d 1320 (N.D. Ga. 2016) ("That Defendant may, due to the manner in

which the Requested Records are stored, experience technical burdens in making the records

available, does not" affect the obligation to produce those records.); *see also Pub. Int. Legal Found.*

*v. Chapman*, 595 F.Supp.3d 296, 306 (M.D. Pa. 2022) ("The Commonwealth's use of the SURE

database to maintain the accuracy and currency of county voting registration lists brings the records held in that dataset within the universe of disclosable records under NVRA.").[7]

Like every state, New Mexico stores its voter data in a database, so that ***every*** data request ***requires*** the "creation" of a new record as data is electronically pulled to produce a report meeting the request's parameters. New Mexico's data is stored in the SERVIS database, not as a set of pre-existing reports. **SAF ¶¶M-BB**. SERVIS stores various fields of voter data, including voter credits which reflect data showing a voter cast a vote in a given election. **SAF ¶O**. Every time the Secretary fulfills any request for voter data, programming containing filters and algorithms creates a new report by pulling from the database's collection of several fields of data. **SAF ¶¶M-V**. A user interface generates "canned" reports, for which coding has already been written to pull oft requested data, but the Secretary is able to create non-canned reports as well. **SAF ¶¶S-T**.

For this reason, as confirmed by the Secretary's own IT department head, Greg Rockstroh, the Secretary was fully capable of fulfilling VRF's requests, just like any other request for voter data. **SAF ¶¶Y-EE**. Indeed, it often does provide similar reports to other requesters where no "canned" report is responsive. **SAF ¶¶BB.** Here, the SERVIS database actually does provide a "canned" report containing the correct algorithm for part of VRF's request, **SAF ¶Y**, and the data not contained in a "canned" report is and was available in the system. **SAF ¶CC**. Specifically, the data making up "A complete list by county precinct of any registered voters who cast a ballot in the November 3, 2020 general election" is contained in a "canned" report. *Id*. The data showing voters who voted in the 2020 election who have since been placed in an inactive, canceled, deleted,

---

[7] Defendants' only citation is an inapposite Freedom of Information Act ("FOIA") case, *Forsham v. Harris*, 445 U.S. 169 (1980). There, the plaintiffs argued that FOIA required the government to obtain a record it did not currently have in its possession. *Id*. at 183. Here, the Secretary has the requested data and merely claims extracting it from her database is too laborious.

or removed status is not a "canned" report, but is available in the SERVIS system along with data illustrating "[a]ny voter that has been removed between [] two dates." **SAF ¶DD.**

Finally, the "File Maintenance List," another VRF request, is a canned report available in SERVIS without additional effort. **SAF ¶Y.** State law requires the Secretary to create this report at least monthly, **SAF ¶I,** the Secretary admitted to both creating and maintaining this report, **SAF ¶K,** and admitted her office would "have to provide voter list maintenance data when someone makes a request under the NVRA." **SAF ¶L.** In short, the Secretary knew it had an obligation to fulfill VRF's request, but instead of complying with state and federal law, the Secretary and AG concocted pretextual justifications to block VRF's access to the data. —further supporting VRF's retaliation claims, as discussed in Section VI below. For Count I, it is sufficient to conclude that Defendants' claim that VRF's requested data are not NVRA "records" is indefensible.

### iv.   Improper pre-suit notice

Finally, Defendants halfheartedly claim VRF "has not actually complied with the NVRA's pre-suit notice provisions." Defs. MSJ at 33. This assertion rests on two equally faulty premises: (1) that VRF's February 15, 2022 NVRA request was not actually a request subject to the NVRA because it did not specifically reference the NVRA; and (2) because the February 15 letter was not an NVRA request, VRF's first valid NVRA request was on May 27, 2022, and no written notice followed—meaning that no actual notice was ever given. This argument fails for three reasons.

First, Defendants long ago waived this argument.[8] VRF's Amended Complaint alleges: "VRF fully complied with the NVRA's pre-suit notice requirements prior to filing this Amended Complaint." Am. Comp.  ¶23. This is a factual allegation to which Rule 8 requires a response. Instead of responding and putting VRF on notice of any dispute over this fact, Defendants stated

---

[8] *See New Hampshire v. Maine*, 532 U.S. 742, 750, 121 S.Ct. 1808 (2001) (noting that judicial estoppel is often invoked to "prohibit[] parties from deliberately changing positions according to the exigencies of the moment.").

in their answer to paragraph 23: "Paragraph 23 states a legal conclusion about VRF's compliance with the law, to which no response is required." Def. Ans. 23.

> Defendants must respond to all of a plaintiff's allegations. Responses that documents speak for themselves and that allegations are legal conclusions do not comply with rule 8(b)'s requirements. . . . Indeed, legal conclusions are an integral part of the federal notice pleading regime. Therefore, legal conclusions must be addressed in one of the three ways contemplated by Rule 8.

*Martinez v. Naranjo*, 328 F.R.D. 581, 600 (D.N.M. 2018) (internal quotations omitted). Further, "an allegation of the complaint is admitted if a responsive pleading is required and the allegation is not denied." *Lane v. Page*, 272 F.R.D. 581, 603 (D.N.M. 2011) (internal quotations omitted).

Not only was VRF's allegation regarding the propriety of pre-suit notice not solely a legal issue (evidenced by the fact that Defendants now dispute the factual basis for VRF's notice compliance), a response was required even had it been a purely legal issue. Defendants' failure to follow Rule 8 means this fact is deemed admitted, and they are estopped from contesting it now.

Second, Defendants conceded VRF's notice was proper during discovery. VRF specifically asked Defendants if they took issue with its NVRA notice. **SAF ¶F.** Crucially, the Secretary responded that she does not deny that VRF's notice was proper under the NVRA. *Id*.

Third, the argument is not supported by law. Defendants argue that the February 15, 2022 request was not made under the NVRA because it did not "reference[] the NVRA or specifically request records related to that statute." Defs. MSJ at 34. Defendants provide no support for the contention that a request which falls under the NVRA must include magic words in order for the Secretary to recognize her duty under federal law. And, as explained above, the data requested in the February 15, 2022 request falls within the purview of the NVRA. *See* Section I(A). Thus, the

May 27, 2022 Notice of Violation and Request for Additional Records put the Secretary on notice that she was in violation of the NVRA for failing to respond to the February 15, 2022 request.[9]

Even if this Court were to not consider the February 15 request as being made under the NVRA, the notice requirement was still satisfied. In circumstances where an NVRA violation is "ongoing and systemic," courts have held that "[a] plaintiff can satisfy the NVRA's notice provision by plausibly alleging that an ongoing, systemic violation is occurring at the time the notice is sent or, if no notice is sent, when the complaint is filed within 30 days of a federal election." *National Council of La Raza v. Cegavske*, 800 F.3d 1032, 1035 (9th Cir. 2015). Here, VRF filed its Amended Complaint on September 26, 2022 and New Mexico held a federal election only 43 days later on November 8, 2022. In its Amended Complaint, VRF more than plausibly alleged an ongoing violation of the NVRA. Am. Comp. ¶112. Indeed, the Secretary has stated several times that it refuses to fulfill VRF's NVRA requests. **DSOF ¶63**. Thus, VRF was not obligated to even give notice, but nonetheless, its complaint sufficed as proper notice.

Similarly, no notice of violation is required when it would be futile due to the violating party's clear intent not to comply with the NVRA. *See Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997). Here again, any notice of the Secretary's continued and adamant refusal to comply with the NVRA would be futile. The Secretary repeatedly states her intent not to fulfill VRF's NVRA requests. **DSOF ¶63-65**. In fact, the Secretary cannot state if there is even anything VRF can do to convince the Secretary to comply—including an order from this Court. **SAF ¶DD**. That position is telling—the epitome of Defendants' cavalier attitude towards the NVRA and the constitutional rights of their perceived opponents.

---

[9] Notably, Defendants do not assert that the May 27, 2022 Notice was insufficient itself, only that the February 15, 2022 request did not count as an initial request.

### v. Fear of committing a crime

Defendants finally claim that they could not comply with VRF's NVRA requests because it would have exposed them to liability for committing a New Mexico crime. Defs. MSJ at 31-33. According to Defendants, the promise of VRF's counsel that no data would be published online unless VRF received relief from this Court gave them "every reason to believe" the exact opposite: "that providing the requested information to Plaintiff would result in the imminent publication of voters' private and personal information online…" *Id*. at 30. Quite simply, this is absurd. As VRF shows elsewhere, Defendants' claimed mistrust of VRF's counsel and the judicial process is simply incredible, and further supports VRF's First Amendment retaliation claim. If Defendants are correct, they are not at all bound by this Court's interpretation of New Mexico law or its adjudication of their duties under the NVRA, and a New Mexico court could find them criminally liable for complying with this Court and the NVRA. *Id*. at 32-33 (state officials would "face liability" because they "knew" VRF would immediately rely on this Court's order and break the law). As shown below in Section II, this very conflict establishes obstacle preemption for Count II purposes. Judgment should be entered in VRF's favor on Count I for NVRA violations.

## II. Defendants are not entitled to judgment on Count II, VRF's NVRA preemption claim because the Defendants' Use Restrictions and Data Sharing Ban unlawfully obstruct a key objective of the NVRA (Defendants' Section I.A, I.B)

Defendants claim to avoid preemption by drawing a sharp line between NVRA's right of "access," and New Mexico's supposed right to limit certain "uses" of the data. That distinction dissolves, however, because New Mexico apparently prohibits **access** when recipients fail to toe the line regarding officials' current views on what **uses** are acceptable. Defendants themselves vividly prove that linkage by claiming (as addressed just above at p.39) that complying with the NVRA might make them state law criminals. They also claim the NVRA right of access is "qualified," but their cited authority relies on specific types of data and federal statutes not at issue

here. They fail to show how these narrow exceptions justify New Mexico's wholesale ban on (1) providing access to VRF; and (2) data sharing. In short, among the many faults of New Mexico's unpredictable and draconian data-access scheme is its frustration of the NVRA's objectives.

### a. The NVRA right of access is unqualified

Defendants argue that the right to access records subject to the NVRA is qualified or conditional (Defs. MSJ, Section I.A at 21-26), allowing states to similarly chip away at the NVRA disclosure scheme to the point that they can rely on "use" restrictions to ban "access" that the NVRA would otherwise allow (*id.*, Section I.B at 26-30). This argument, scattered across different sections of Defendants' brief, misunderstands the law and is seriously flawed from start to finish.

First, the entire basis for Defendants' claim that the NVRA is only "conditional" is that, in granting Plaintiffs like VRF access to records, some federal courts have approved redactions to records that would otherwise have been produce-able under the combined operation of the NVRA and state law. Defs. MSJ at 24-26.[10] This mundane and unexceptional point arises because some states keep data in such a way that an NVRA request could require the production of such private data, such as Social Security numbers. But none of Defendants' cases involve a situation where a state completely banned access to all of its voter data—based on the requester's planned use, or based on some other excuse—based on a hidden "qualification" within the NVRA's Public Inspection Provision. This Court should not be the first to make new law in this area, especially

---

[10] Defendants mainly rely on three cases: *North Carolina State Bd. of Elections*, 996 F.3d at259*; True the Vote v. Hosemann*, 43 F.Supp.3d 693, 734-735 (S.D. Miss. 2014), and *Kemp*,208 F.Supp.3d at 1344-45. But in none of the cases did the court adopt Defendants' reasoning and decide that the NVRA gave way to privacy or other concerns embedded in state law, allowing a blanket ban on access. Instead, the courts applied other federal statutes that made specific information within the produce-able data set private (including things like social security numbers, dates of birth, and the like. Thus, for example, the *North Carolina State Bd. Of Elections* court remanded the case to the trial court with instructions to redact certain information which another federal law protected, and "uniquely sensitive" data concerning the identify of individuals subject to immigration violations or criminal charges and documents like passports and birth certificates. 996 F.3d at 262-63. Tellingly, Defendants never claim that such data is at issue here, in part because New Mexico already requires that this specific data not be produced, and VRF is not trying to post it.

on a factual record where Defendants have failed to show that any particular data field is uniquely damaging to citizens, or that Plaintiff VRF intends to post the types of data—like Social Security numbers, full birth dates, and the like—that have caused other courts to order redactions (not complete denials of access). In fact, Defendants concede that "New Mexico has not actually imposed any qualifications on what data VRF can request or receive under the NVRA." Defs. MSJ at 26. Here, there is no logical argument that the raw data VRF is seeking is prevented from disclosure from another federal law, or is "uniquely sensitive" under cases like *PILF*.

### b. Defendants' Use Restrictions and Data Sharing Ban impede VRF's access to New Mexico voter data in contravention of the NVRA

Defendants argue that a complete data sharing ban is not preempted by the NVRA. Defs. MSJ at 26. In doing so, Defendants concede that there are actually no qualifications on what data VRF can request or receive under the NVRA. *Id*. Instead, Defendants argue they are only enforcing their own laws regarding the ways in which a party may *use* New Mexico voter data. *Id*. For Defendants, the NVRA and their own inconsistent and pretextual interpretation of New Mexico law occupy "two separate spheres: access to information and *use* of information." Defs. MSJ at 25. (emphasis original). Slaves to this myth, Defendants go so far as to claim they "have not sought to regulate access to records under the NVRA." Defs. MSJ at 27. This is false. The Secretary has repeatedly denied access to VRF in response to its NVRA requests, citing as pretext their fabricated Data Sharing Ban and Use Restrictions. **DSOF ¶15**.

Defendants regulate *access* to New Mexico voter data by predicating access on compliance with their own *use* restrictions. Anyone that does not agree to these restrictions Defendants place on use is denied access, like VRF.

### c.   The Data Sharing Ban and Use Restrictions are Preempted by the NVRA

Regardless of how Defendants re-characterize the Data Sharing Ban and Use Restrictions, they are obstacle-preempted by the NVRA. Obstacle preemption is one form of implied preemption under the Supremacy Clause. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (preemption appropriate where challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 679 (2003) (Thomas, J., concurring) ("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law."). Importantly, as Defendants admit, no presumption against preemption applies to Elections Clause legislation such as the NVRA. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013).

Against this background, the NVRA preempts a range of state laws. *See Inter Tribal*, 570 U.S. at 11-13 (NVRA provision that preempts state laws requiring proof of citizenship by requiring states to "accept and use" the federal registration form); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (Georgia law prohibiting anyone other than registrars or authorized personnel from accepting voter registrations was preempted by NVRA's provision regarding mailed applications); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (compelling "voter registration workers who are compensated" to "pre-register with the [Ohio] Secretary of State, undergo an 'online-only' Internet training program, and submit" a special affirmation is not uniform and non-discriminatory as required by 52 U.S.C. § 20507(b)(1)).

State limitations on non-profits' access to voter data are also frequently preempted. *See Lamone*, 399 F.Supp.3d at 445. In *Lamone*, Judicial Watch, an advocacy group dedicated to "promoting transparency, integrity, and accountability in government" requested voter records

from the state of Maryland. *Id.* at 429. Judicial Watch planned to "analyze[] all responses and disseminate[] both its findings and the requested records to the American public to inform it about 'what the government is up to.'" *Id.* (citation omitted). The data included voter registration records, listing a voter's name, date of birth, address, current voter registration status, the reason for the most recent change in status, and the source of the change. *Id.* at 432. Maryland's Board of Elections denied Judicial Watch's request because state law banned access for other states' residents. *Id.* at 431-32. Judicial Watch sued.

On summary judgment, the court first held that individual, identifiable voter records are "records" subject to the NVRA's Public Inspection Requirement. *Id.* at 441-42. Second, it held the Maryland law "undermines Section 8(i)'s efficacy," was "an obstacle to the accomplishment of the NVRA's purposes" and was therefore preempted by the NVRA. *Id.* at 445.

Congress expressly stated the NVRA has four purposes: to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance [] the participation of eligible citizens as voters in elections for Federal office," *id.* § 20501(b)(2); "to protect the integrity of the electoral process," *id.* § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(4). Section 8(i) of the NVRA provides for the disclosure of voter registrations in order to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Long*, 682 F.3d at 339. Any prohibition on Internet speech that shares the voter data (including any condition on access predicated on the requestor's surrender of the First Amendment right to engage in such speech), clearly contradicts Congress's stated objectives in the NVRA and creates many improper obstacles to its implementation.

First, "[o]rganizations . . . have the resources and expertise that few individuals can marshal. By excluding such organizations from access to voter registrations, the State law undermines Section 8(i)'s efficacy." *Lamone*, 399 F.Supp.3d at 445. VRF has resources that individual citizens do not: it can purchase statewide data, (**SAF ¶C**) which typically costs thousands of dollars per state. **SAF ¶D**. VRF also has the expertise and resources to convert the large and difficult-to-use data files produced by most states into a format that ordinary citizens simply cannot utilize without computer programming and data analysis skills, and presents that complex data in an easy-to-access medium. **SAF ¶¶A-C**.

The NVRA's objective of empowering citizens to aid states in detecting errors in voter rolls would be entirely defeated if states could require what Defendants seems to envision: that each individual citizen wishing to analyze state data must individually invest the enormous amounts of time and money that VRF commits to obtaining and formatting statewide data.

Even if the Secretary in every state provided free, user-friendly portals to their data and, like VRF, performed all the work formatting their entire data file, it would still be necessary for citizens to share and discuss the data with each other. Detecting error requires citizens to compare the state's official data with their own personal knowledge regarding friends, neighbors, relatives, and community events. Citizens are much more effective, and their knowledge grows exponentially, when they can share their analyses—and the underlying data—with each other. In contrast, if citizens must operate in a cone of silence, with each person limited to isolated communications with a government election administrator, they cannot effectively combine their knowledge, experience, and analysis, and will be relegated to occasionally providing their own confidential "tips" directly to a bureaucrat. This, too, defeats the objectives of the NVRA.[11]

---

[11] To the extent the recently signed legislation amending § 1-4-5.6 codifies Defendants' Data Sharing Ban and Use restrictions by making it unlawful to "caus[e] voter data…that identifies, or that could be used to identify, a specific

Defendants try to resist this authority in a single sentence, concluding that because the Data Sharing Ban "seek[s] to protect and promote voter participation—without any affirmatively negative impact on election integrity—obstacle preemption does not prohibit New Mexico from regulating the use of voter data." Defs. MSJ at 30.[12] This is erroneous. Not only does Defendants' unlawful use restriction negatively impact election integrity as observed in *Long* ("[the right to vote] ***must not be sacrificed to administrative chicanery, oversights, or inefficiencies"***), but Defendants do not and cannot show the Use Restrictions or Data Sharing Ban actually do promote voter participation. *Long*, 682 F.3d at 334-35. (emphasis added). They cite no evidence supporting their position.

On the other hand, the Defendants' Use Restrictions and Data Sharing Ban completely prevent VRF from accessing records which the Secretary is federally required to make available. The Secretary's "dubious" interpretation of New Mexico law is wholly obstructing the mechanism of the NVRA's public inspection provision. Mem. Op. at 185.

---

voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means" that legislation is also preempted by the NVRA for the same reasons stated above. As previously mentioned, a Maine statute with near-identical language was recently found to be preempted by the NVRA. *See Bellows*, at *3, WL 2663827. (Holding "[t]he [NVRA's] Public Disclosure Provision's disclosure mandate, meanwhile does not allow a state to impose these restrictions."). In so holding, the *Bellows* court invalidated Maine's amended statute which forbid anyone to:

> (1) Sell, transfer to another person or us eth voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations; or

> (2) Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

*Id*. at *3.

[12] Defendants unhelpfully cite *American Ass'n of People with Disabilities v. Herrera*, 690 F.Supp.2d 1183 (D.N.M. 2010) for the proposition that the various interests of the NVRA are not subordinate to one another. Defs. MSJ at 28. Fair enough—but *Herrera* is inapposite. This Court considered various state voter registration statutes, *id*. at 1224-25, and the extent to which the different interests of the NVRA were burdened by these statutes. *Id*. Notably, the statutes at issue did not, as here, completely frustrate a provision of the NVRA. *Id*. at 1226.

Finally, Defendants try to justify their unlawful conduct by drawing an analogy to the Driver's Privacy Protection Act ("DPPA"). Defs. MSJ at 32. DPPA "permits disclosure of government data but only for specifically identified purposes." *Id*. However, the analogy is inapt: DPPA's entire purpose, under its plain text, is to ***restrict*** the release of personal information from motor vehicle and driver licensing records. *See* 18 U.S.C.A. §§ 2721(a), 2724. ***Congress*** made the decision to both allow and restrict access in a particular way; there is no preemption issue. The issue here is that the text of the NVRA does ***not*** provide for the restriction of access to voter data, while New Mexico does.

At bottom, Defendants misconstrue the effects of their Use Restrictions and Data Sharing Ban, which obstruct the mechanism and purposes of the NVRA and are preempted. Thus, Defendants are not entitled to judgment as a matter of law on VRF's preemption claim.

## III.   VRF's right to access the voter data at issue emanates from the NVRA, not the First Amendment.

Defendants' argument regarding VRF's First Amendment claims rests on a single point that rings hollow no matter how many times it is repeated. They contend that because the *First Amendment* does not confer upon VRF a right to access New Mexico voter data, VRF has no First Amendment rights regarding how that data is subsequently used (or published). Defs. MSJ at 36. But this argument misapprehends VRF's claims. While the First Amendment protects VRF's right to use and publish the voter data, its right to access the data *emanates from the NVRA* rather than the First Amendment. *See* Sections I-II, above. The Secretary was legally obligated to produce the voter data—"records" under the NVRA—to VRF for inspection, 52 U.S.C. § 20507(i), but refused to do so. Had the Secretary produced the data as she was supposed to, it would have been the NVRA that compelled access. *Id*. And had VRF then published that data, the publication would have been protected by the First Amendment. *See* Section IV, below.

Thus, the Court need not decide whether VRF has a First Amendment right of access the individual, identifiable voter data it requested (or that data which Local Labs requested and produced to it) because that right of access is statutory under the NVRA's Public Inspection Provision.[13] And once government information is required to be made available—by statute or by the First Amendment—the First Amendment limits how the government may restrict the public's subsequent use and sharing of that information. *See* Mem. Op. at p. 176 ("The Fourth Circuit also notes that, once a State chooses to provide a process allowing for the right to access voter information, there are 'limits to its freedom to decide how that benefit will be distributed.' *Fusaro v. Cogan*, 930 F.3d 241, 256 (4th Cit. 2019) (quoting *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 43 (1999) (Ginsburg, J., concurring))).

## IV.   VRF's publication of voter data and criticism of the Secretary are protected speech under the First Amendment.

Defendants claim that VRF has committed a crime by publishing voter data that any person could have obtained under the NVRA. ***See* DSOF 44, 46**. But both VRF's sharing of voter data with the public, and its press releases and comments regarding the Secretary's maintenance of the voter rolls, are core political speech protected by the First Amendment.

"The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983), and "[t]he First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation omitted). The

---

[13] *See also* Plaintiff's Motion for Summary Judgment, Dkt. 119 at p. 77-78.

Constitution protects both speaker and listener, as the ability to receive information is also a fundamental First Amendment right. *See Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143, (1943) (First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it.").

Speech about and including voter data, including individually identifiable data, is protected. As the *Fusaro* court noted:

> … three important considerations compel our conclusion that § 3-506 implicates interests that are protected by the First Amendment. First, the List is closely tied to political speech, which generally receives the strongest First Amendment protection… the List is a valuable tool for political speech… And, in addition to the List's obvious practical utility to political expression, § 3-506 all but ensures that the List will be used to further such speech. More specifically, § 3- 506(c) makes it a misdemeanor to use the list 'for any purpose not related to the electoral process.' Thus, the text of § 3-506 reinforces the connection between the List and political speech. In these circumstances, we are obliged to hesitate before placing such a regulation beyond judicial scrutiny…"

*Id*. at 250 (citations omitted). A state may violate the protections of the First Amendment in many ways, *e.g., Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819 (1995); *Keller v. State Bar of Cal.,* 496 U.S. 1 (1990), but a law imposing criminal penalties on protected speech is a stark example of speech suppression.

VRF's Website itself, including the voter data on the Website, was and is core political speech. *See Meyer v. Grant*, 486 U.S. 414, 421 (1988) (any effort to seek "political change," even if it does not involve overtly persuading a citizen that a view is correct, is core political speech).

## V.    Defendants Fail to Address the Analysis Material to VRF's First Amendment Claim (Count V) and their Motion Should be Denied.

VRF's Count V alleges that the Use Restrictions and Data Sharing Ban infringe on core political speech protected by the First Amendment and that those restrictions cannot survive strict scrutiny. As addressed above (*see* Section IV), VRF's publication of voter data and discussion of that data are protected by the First Amendment. And Defendants admit that the challenged

restrictions are direct restrictions on that speech. *See* Def.'s Response to Mtn. for Prel. Inj. [Dkt. 13] at p. 8. But rather than arguing that the Use Restrictions and Data Sharing Ban survive First Amendment scrutiny, Defendants simply rely on their argument that New Mexico is not required to provide access to voter files under the First Amendment or NVRA, thus their restrictions must be upheld without subjecting them to First Amendment scrutiny. Defs. MSJ at 43-44. That is, because the state could not provide the voter data at all, it may exercise the inferior right to limit access only to those requestors that agree not to subsequently share the data. *Id*. at 45.

Defendants' argument is built upon the erroneous foundation that they need not provide the requested data at all. As addressed above, however, Defendants are required to make the requested data available under the NVRA because they are "records" of New Mexico's "programs and activities" directed at maintenance of the voter rolls. *See* Sections I-II(a). And because that data must be made available under the NVRA, Defendants cannot place restrictions on how the data is used if those restrictions run afoul of the First Amendment. *See* Section III (once data or records are made available, state restrictions on speech involving the data or records are subject to First Amendment scrutiny).

Despite Defendants' admission that the challenged regulations directly restrict protected speech, Defendants do not identify *any* level of scrutiny which they claim is applicable, nor do they address the state interests purportedly supporting the challenged restrictions or whether those restrictions are appropriately tailored.[14] They only assert, in conclusory fashion, that "[t]he prohibition on sharing or publishing this data is narrowly tailored in pursuit of legitimate state objectives of ensuring voter privacy and safety." Defs. MSJ at 47. Though Defendants fail to address the issue, the Court must apply strict scrutiny to the Data Sharing Ban and Use Restrictions

---

[14] Failing to address the relevant level of scrutiny to be applied is itself a reason to deny Defendants' motion. *See* Fed. R. Civ. P. 56(a) (movant bears burden of demonstrating entitlement to judgment as matter of law).

because they (1) burden core political speech and (2) are based on the identity of the speaker and the use for which the speaker puts the voter data. *Citizens United*, 558 U.S. at 340-41; *see also Meyer*, 486 U.S. at 425 (where the state imposes a substantial burden on core political speech, courts apply scrutiny that is "well nigh insurmountable").

Because the Use Restrictions and Data Sharing Ban burden First Amendment protected speech—as has been conceded here—the burden shifts to the government to prove that the restrictions further a compelling state interest and are narrowly tailored. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 774–75 (2002); *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1189 (D.N.M. 2014) (Browning, J.) ("Strict scrutiny places the burden on the government to identify a compelling interest…and show that the restriction is the least restrictive alternative for achieving that interest…"). In the First Amendment context, the challenged restrictions are not given the ordinary presumption of constitutionality. *Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo.*, 744 F.2d 739, 746 (10th Cir. 1984). Though Defendants have the burden of defending the regulations against the strict scrutiny analysis, they have not done so, or even attempted to do so.[15]

### a.   The restrictions do not serve a compelling interest.

Defendants' motion should be denied for failing to identify any compelling interest that is served by the Use Restrictions and Data Sharing Ban. *See Griffin*, 30 F. Supp. 3d at 1189 (government has burden to identify compelling interest). Defendants have not—and cannot—do so. An interest is only compelling if it addresses an actual concrete problem—"[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York, Inc. v.*

---

[15] Though Plaintiff addresses each of the relevant factors below, it does so without assuming Defendants' burden to demonstrate that the restrictions satisfy First Amendment scrutiny. *See Griffin*, 30 F. Supp. 3d at 1189 (shifting burden to state to prove compelling interest).

*Pub. Serv. Comm'n of New York,* 447 U.S. 530, 543 (1980); *see also Turner Broadcasting Sys., Inc. v. F.C.C.,* 512 U.S. 622, 644 (1994) (plurality) ("[The government] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."). Defendants identified four interests at the preliminary injunction stage which they contended justified the restrictions at issue here, but the Court rejected the argument that any of those interests were compelling. *See* Mem. Op. at 190-194. Defendants make no argument as to why the Court's analysis should differ here.

Though the Court's order invited Defendants to bolster their argument that the asserted interests are compelling, Defendants fail to present any evidence that VRF's posting of voter data on the Internet led to a single New Mexico citizen cancelling their voter registration. **SAF ¶¶JJ-KK.** Nor do Defendants have any evidence that voters were solicited, harassed, or abused as a result of VRF's posting. **SAF ¶¶LL-MM.** Nor have Defendants produced any evidence that VRF has misrepresented or manipulated[16] any voter data in its possession, including the data that was made available to the public. **SAF ¶NN.**

Defendants fail to identify any compelling state interest justify the Use Restrictions and Data Sharing Ban, as is their burden here. The motion should be denied as to Count V.

### b. The restrictions are not narrowly tailored.[17]

Because Defendants fail to identify any compelling state interest justifying the Use Restrictions and Data Sharing Ban, the Court need not proceed to decide if those restrictions are narrowly tailored.[18] But any such showing would fail. Defendants had the burden of proving that

---

[16] State law requires that file maintenance reports and updated voter files must be made available in a "*manipulable* digital format." N.M.S.A. § 1-5-14(D) (emphasis added).
[17] Plaintiff again asserts this argument without assuming Defendants' burden on this point. *See Griffin*, 30 F. Supp. 3d at 1189 (shifting burden to state to prove narrow tailoring).
[18] If the asserted state interests are anything less than "compelling," the Court need not undergo a narrow tailoring analysis, as the regulation cannot survive strict scrutiny. *See Cooper v. Dillon*, 403 F.3d 1208, 1217 (11th Cir. 2005); *California First Amend. Coal. v. Lungren*, No. C 95-0440-FMS, 1995 WL 482066, at *6 (N.D. Cal. Aug. 10, 1995).

the challenged regulations further a compelling interest which would "be achieved less effectively absent the regulation, and…[do] not burden substantially more speech than is necessary to further the government's legitimate interests. Although a regulation need not be the least restrictive or least intrusive means of furthering this interest, the First Amendment requires a close fit between ends and means to ensure speech is not sacrificed for efficiency." *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1073 (10th Cir. 2020) (internal citations omitted).

The Data Sharing Ban fails narrow tailoring because it seeks to achieve the above-claimed interests by completely banning the sharing of the most valuable information about elections—the voter data itself. The State could achieve the asserted interests through less burdensome means. If it wanted citizens to be informed regarding the law and the data, the State itself could provide that information to the public, rather than banning speech on the grounds that it constitutes "misinformation" and insisting on the use of forms that do not accurately reflect the current state of the law. The State could, but does not, ask requesters to keep a list of people that use the data, so that if harassment, stalking, or solicitation occurs, it could track the culprits. Instead, its solution is to maintain a chokehold on the data itself.

The Use Restrictions fail for similar reasons. Defendants still will not commit to VRF's use being permitted under the statute, despite this Court's finding that it is. **SAF ¶¶OO-TT**. Defendants continue to claim that "governmental" use can only mean use *by the government*, **SAF ¶PP**, and that even though "election" related is included in the statute, it is not an independently permissible use. **SAF ¶UU.** There is no reason to believe—and no factual showing— that allowing non-campaigns and non-government bodies to use the data to test the maintenance and accuracy of the system will seriously harm privacy in ways that are not already inherent in the State's current practice of making the data available to Defendants' favored speakers.

Because Defendants have not met their burden to show that the Use Restrictions and Data Sharing Ban serve a compelling state interest and are narrowly tailored, their motion must be denied as to Count V of VRF's Amended Complaint.

## VI.   Defendants retaliated against VRF for engaging in First Amendment protected speech: publishing voter data online.

To succeed on a First Amendment retaliation claim, VRF must show that it "(a) was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007). Defendants only address the first element, and do not seriously contest that they took adverse action against VRF because it published voter data online, both by denying future requests for voter data and by referring VRF for prosecution.

Instead, they contend that there can be no First Amendment retaliation because VRF never engaged in any conduct protected by the First Amendment. *See* Defs. MSJ at p. 35 ("Plaintiff's conduct here is not constitutionally protected speech and thus cannot form the basis of any claim for retaliation motivating Defendants' actions."). Defendants contend that VRF's publication on VoteRef.com lacks constitutional protection because (1) VRF unlawfully obtained the data from Local Labs (*id.* at 39), and (2) the state has the right to condition access to voter data on the requestor's agreement not to share it (*id.* at 34). These arguments fail on the law and the facts.

### a.   VRF lawfully obtained the voter data that was posted on VoteRef.com from Local Labs.

Defendants make new accusations that VRF directed Local Labs—its "agent"—to falsely attest that it would not share the data it received from the Secretary. Defs. MSJ at p. 39. VRF then received the data from Local Labs and published it on the Internet. *Id.*

VRF did not violate any New Mexico statute by receiving the voter data from Local Labs. Mem. Op. at 60 (The Court stated that it believes that Local Labs' and Voter Reference's use of the data is "lawful under New Mexico State law," because it "relate[es] in any way to election campaign purposes, and relat[es] in any way to governmental purposes." May Tr. at 4:21-25 (Court).). Defendants present no evidence that VRF directed Local Labs to falsely attest to anything, or to violate any law in order to acquire the data. Even under Defendants' theory that transferring or sharing voter data is unlawful—a theory this Court has already rejected[19]— Defendants have never contended that the *receipt* of that data is likewise unlawful.

Rather, Local Labs signed a form in which it attested that it would "not use or *make available to others to use* the requested material *for purposes other than governmental, election, research and campaign purposes* under penalty of law." Ex. P11, Dkt. 44-1 filed 6/24/22 (emphasis added). Defendants would have the Court ignore the second half of this clause. Local Labs never agreed to refrain from making voter data available to others *under any circumstances*. Rather, it agreed that it would only make the voter data available to others to use for "governmental, election, research and campaign purposes." *Id.* It did exactly that when it gave the data to VRF to use for its projects, which the Court has already determined were "governmental" or "election related." Mem. Op. at 150-151. Thus, Local Labs committed no false swearing by giving the data to VRF for the very purposes permitted by the Voter Authorization Form.

Because neither Local Labs' transfer, nor VRF's receipt of, the voter data violated New Mexico law or the language of the form Local Labs signed, there is no conceivable argument that VRF unlawfully obtained the data.

---

[19] *See* Mem. Op. at 148 ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act.").

**b.  The State cannot condition access to voter data on a requestor's surrender of rights afforded by the NVRA or the First Amendment.**

Defendants next argue that because the state is not compelled to produce voter data under the First Amendment, it may permissibly condition access to voter data on the requestor's agreement not to publish or share the data, so long as that restriction is neither content nor viewpoint based. *See* Defs. MSJ at p. 36 ("States bear no constitutional obligation to provide access to information held by government bodies."). But this argument is again undermined by the fact that VRF has a right to access the requested voter data under the NVRA itself, rather than the First Amendment. *See* Section III. Restrictions on that right of access are preempted. *See* Section II.

Not only does this position fail an NVRA preemption analysis, but conditioning a right of access afforded by a federal statute on a requestor's surrender of First Amendment rights— including the right to share and publish that information—itself violates the First Amendment. Under the "unconstitutional conditions doctrine," "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech[.]" *United States v. American Library Assn., Inc*., 539 U.S. 194, 210 (2003) (cleaned up). This voter data is inherently political and a tool for political speech and association. *Fusaro,* 930 F.3d at 251; *see also Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004) (recognizing that political parties use voter registration lists for "activities essential to their exercise of First Amendment rights"). The data having been made available by the NVRA, VRF's right to share that data, and the public's right to receive that data, are both protected by the First Amendment.

The Supreme Court has specifically recognized that states cannot condition a First Amendment right "on acceptance of a content-based rule that is not drawn to serve the State's asserted interest." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 574 (2011). As in *Sorrell*, Defendants

have instituted an unconstitutional catch-22 in which a requester must decide which to give up: the records to which he is entitled, or his constitutional right to speak and associate with his fellow citizens about those very records to ensure that the system that generated them is fair and accurate, and, perhaps, to provide criticism if they are not. Because Defendants cannot condition access to statutorily available government records by requiring requestors to surrender First Amendment rights, Defendants' argument on this point fails as a matter of law.

   c.   **The Secretary referred VRF for prosecution and denied VRF access to voter data that is required to be made available under New Mexico law and the NVRA because of VRF's protected speech.**

Defendants retaliated against VRF by referring it for prosecution and refusing to fulfill VRF's lawful requests for voter data. The referral was a direct result of VRF's publication of the voter data online, which is protected speech. Ex. P14, Dkt. 44-3, VRF Referral (linking referral with online publication and alleged "misinformation); *see also* Section IV, above (online posting of data and criticism of Secretary are protected speech). Additionally, VRF made subsequent requests for voter data under state law and the NVRA which were denied specifically because VRF had engaged in this protected speech:

> To begin with this decision [to not fulfill VRF's requests for data] is motivated by the fact that will post any voter data provided on your website[.] You have not indicated that you will not post any voter data online, and based on our past practice, we believe you will do so again.
> [. . .]
> Therefore, due to . . . your past practice of posting this data online, . . . our office is unable to process your request at this time.

Ex. P29, Dkt. 119-14 filed 4/14/23, 11-17-22 Letter from C. Lange to G. Swoboda. The Secretary holds it against VRF that it posted New Mexico voter data after this Court granted a preliminary injunction allowing it to do so. **SAF ¶¶YY; III**. Even after VRF has promised *ad nauseum* that it will not publish New Mexico voter data absent a court order allowing it to do, **SAF ¶¶EEE-FFF**, the Secretary chooses not to believe VRF and continues to withhold voter data. **SAF ¶¶GGG-**

**HHH**. The Secretary cannot even tell VRF if it will ever again be able to receive voter data or what VRF needs to do in order to receive voter data. **SAF ¶III.**

Further, to the extent Defendants took adverse action against VRF because it criticized the Secretary's voter file maintenance by identifying a "discrepancy," that adverse action is likewise retaliatory. The Secretary's communications director and her 30(b)(6) representative each testified that the Secretary's office believed that VRF's statements identifying a discrepancy were themselves misinformation. **SAF ¶¶XX; DDD.** The Secretary sought to "push back hard" against VRF's speech which it characterized as misinformation because that is part of the Secretary's mission. ***Id.*** The Secretary's office associated VRF's speech with a "larger strategy of election denialism" encompassing organizations other than VRF. ***Id.***

Having openly admitted that both the referral and the subsequent refusals to provide the requested voter data were a direct result of VRF's publication of voter data online—speech protected by the First Amendment—Defendants are not entitled to judgment as a matter of law on Plaintiff's First Amendment Retaliation claim.

**VII.   Defendants are not entitled to summary judgment on VRF's First Amendment viewpoint discrimination claim.**

VRF's Amended Complaint alleges that Defendants engaged in viewpoint discrimination by singling out VRF for prosecution and punishment even though various other parties use New Mexico voter data in ways that would ostensibly violate Defendants' views on the law, including by selling that data to third party clients. Am. Comp., Dkt. 74 at ¶¶155, 164, 194. Defendants contend that there was no viewpoint discrimination and that any actions they took towards VRF "were motivated solely by enforcement of New Mexico's constitutionally valid Election Code." Defs. MSJ at p.39. In support of this argument, Defendants once again rely on their contention that

VRF's publication of voter data on VoteRef.com was not First Amendment protected speech. *Id.* at 40. As discussed above, this is an incorrect statement of law and fact. *See* Section III.

Defendants further contend that VRF has not shown that they acted with a "viewpoint-discriminatory purpose." Defs. MSJ at 40 (citing *Pahls v. Thomas*, 718 F.3d 1210, 1230 (10th Cir. 2013)). Citing to a single employment discrimination case, Defendants assert that VRF must show that it was treated less favorably than a similarly situated group. *Id.* at 41. Defendants then take an exceptionally narrow position on what it means to be "similarly situated," claiming that VRF must identify a "party with different viewpoints who has published New Mexico voter data on a publicly-available website whom Defendants have not referred for criminal prosecution or to whom Defendants have denied requests for voter data." *Id.*

Next, Defendants contend that they have not discriminated against VRF, because in 2022, the Secretary faced a Republican opponent who criticized the Secretary and New Mexico's elections. *Id.* at 42. But the Secretary asserts that she could not possibly have discriminated against VRF, because even though her primary opponent made similar criticisms of the Secretary, the Secretary's office still gave voter data *to the Republican Party of New Mexico*. *Id.* at 42. The Secretary seeks absolution for any viewpoint discrimination against VRF because when her campaign opponent criticized her, she still produced voter data, not to her opponent, but to the political party supporting her opponent.[20]

And finally, Defendants assert that because the Secretary provides voter data to candidates and campaigns of various parties[21], she cannot have discriminated against VRF. Defs. MSJ at 43.

---

[20] This, of course, ignores the fact that New Mexico law specifically requires the Secretary to produce an updated voter file to the Republican Party upon request. *See* N.M.S.A. § 1-5-14(C).

[21] *See id.*

### a. The law of First Amendment viewpoint discrimination.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. The First Amendment prohibits the government from preferring one form of private speech over another. *See id*. Government discrimination against speech "because of its message is presumed to be unconstitutional." *Id.* "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* at 829. Consequently, viewpoint discrimination is a "particularly 'egregious form'" of content-based restriction. *Pahls*, 718 F.3d at 1229 (quoting *Rosenberger*, 515 U.S. at 829). Once a state agrees to make its data publicly available—or whereas here, federal law requires data be made publicly available—the state may not condition access to that data based on the requestor's viewpoint. *See Sorrell*, 564 U.S. at 574; *Fusaro*, 930 F.3d at 256.

To succeed on a viewpoint discrimination claim, a plaintiff must show that the defendant "acted with a viewpoint discriminatory purpose." *Pahls*, 718 F.3d at 1230. More specifically, a plaintiff must show: (i) defendants' actions caused viewpoint discrimination; and (ii) that defendants' actions were taken because of, not merely in spite of, plaintiff's views. *Id.* at 1230-31.

To begin, a First Amendment viewpoint discrimination claim requires the Court to examine and determine the Defendants' motive in acting towards VRF. *See id.* The issue of motive is not proper to resolve on the Defendants' motion for summary judgment. "If plaintiffs claim that some conduct on the part of defendant abridged their First Amendment rights, summary judgment may be precluded because questions concerning defendant's motives or knowledge must be determined." *Salazar v. Ashcroft*, No. CV 02-0878 JB/RLP, 2004 WL 7337748, at *9 (D.N.M.

May 26, 2004) (Browning, J.) (citing 10B C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2732.2, at 153-54, 177 (3d ed. 1998)).

> **b.  As the Court has already recognized, there is abundant evidence of viewpoint discrimination.**

As the Court already held last Summer, the Secretary conditioned its decision not to respond to or fulfill VRF's requests on VRF's viewpoint—specifically the "misinformation" of a discrepancy existing in the data. Mem. Op. at 180-82. In an attempt to fashion a non-discriminatory reason for its refusal to fulfill VRF's requests, the Secretary argues VRF's use of the data violates New Mexico law. This attempt fails. This Court has already concluded VRF's use of the data does not violate the Election Code. Even if this Court were to entertain Defendants' pretextual interpretation of the Election Code, Defendants' animus still shows through in that even after VRF has profusely promised not to post the data—thus curing any purported violation of the election code—the Secretary still refuses to fulfill the data requests. **SAF ¶¶EEE-FFF; HHH.** Importantly, this Court has already concluded: "the Secretary of State's indication that it will not honor Voter Reference's May 27, 2022, request, despite Voter Reference's assurances that it will not publish voter's personal information without a Court order, constitutes impermissible viewpoint discrimination." Mem. Op. at 180-81.

The evidence, including the Secretary's own statements, prove Defendants acted solely *because of* VRF's views. This Court already concluded as much:

> [T]o the extent the Plaintiffs challenge the Secretary of State's lack of response to Voter Reference's request for voter data, the Plaintiffs likely are to succeed on their viewpoint discrimination claim. The Secretary of State's actions caused viewpoint discrimination. . . . [O]nce the State agrees to make its data publicly available, the State may not condition access to that data based on the requestor's viewpoint. . . . The Secretary of State has conditioned its decision not to respond to Voter Reference's data request on Voter Reference's viewpoint -- specifically, the fear that giving the data to Voter Reference may reveal that the Secretary of State is lax about maintaining the State's voter data.

Mem. Op. at 180. This, in turn, leaves only one conclusion: the Secretary's refusal is solely based on her animus towards VRF's viewpoint, specifically, the viewpoint that the Secretary's data is flawed. There is no rational explanation for the Secretary's refusal absent a discriminatory purpose.

Similarly, the Secretary engaged in viewpoint discrimination by referring VRF to the AG for investigation. The Secretary was motivated to make the initial referral by a view that VRF's public statements about the data were misinformation, and that if VRF was not prosecuted, it would foster additional misinformation. The criminal referral itself asserted the theory that "[w]e do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign purposes.'" **DSOF 42**. Here, the facts show that the Secretary initially referred the matter to the AG because of a disagreement with what the Secretary claimed was VRF's "misinformation" about her operation of the state's voter data system. **SAF ¶¶VV-WW; ZZ-CCC; Ex. P14.**

In sum, Defendants' motivation for the referral was because of, not merely in spite of, VRF's views. Mem. Op. at 182. Defendants' version of events requires drawing numerous tenuous inferences from evidence that, on its face, supports a different conclusion. *See* Mem. Op. at 183-84. ("[T]he extant evidence suggests that the Secretary of State caused viewpoint discrimination by referring Voter Reference and Local Labs for investigation. . . . Moreover, the evidence suggest that the referral was because of, not merely in spite of, Voter Reference's views."). Defendants are not entitled as a matter of law to judgment on VRF's viewpoint discrimination claim.

VIII.   **Defendants are not entitled to summary judgment on the First Amendment overbreadth claim because there are disputes of material fact regarding the scope of the Data Sharing Ban and the Ban is overbroad.**

Defendants contend that they are entitled to summary judgment on VRF's overbreadth challenge to the Data Sharing Ban.[22] "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The concern that an overbroad statute deters protected speech is especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Faced with an overbreadth challenge, it is Defendants' burden to prove the challenged regulation is constitutional, rather than plaintiff's burden to prove that it is not. *See ACORN*, 744 F.2d at 746.

Defendants repeat a familiar tome, arguing that the Data Sharing Ban cannot be overbroad because there is no First Amendment right to access voter data. Defs. MSJ at 50. And, their argument goes, since there is no First Amendment right of access, the Defendants can limit the use, sharing, and dissemination of voter data so long as they do not do so in a discriminatory manner. But this once again ignores that VRF has an unconditional right under the NVRA to access the voter data. *See* Sections I-III, above. That right having been conferred by federal law, the First Amendment limits how the state can restrict the sharing and dissemination of the data. *See* Section IV, above (NVRA right of access having been conferred by federal law, the First Amendment limits how the state can restrict the sharing and dissemination of the data).

---

[22] Defendants do not address Plaintiff's claim that the Use Restrictions are overbroad.

Despite this, Defendants assert that their "incorporation by reference" argument, in which § 1-4-5.5, § 1-4-5.6, and § 1-5-22 are morphed together into a single restriction, is constitutionally sound even though it prohibits nearly all sharing and even though it has no support in New Mexico law. *See* Mem. Op. at 148 ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act…").  They argue, in turn, that "[t]hese statutes do not restrain any amount of protected speech because access to this information is not a right under the First Amendment…The challenged statutes cannot be overbroad, therefore, because obtaining and using this information is not constitutionally protected" Defs. MSJ at p. 52. And perhaps they would be right if the NVRA did not exist, giving VRF an independent, federal statutory right to access the data. But as of the date of this response, the NVRA is still the supreme law of the land.

As discussed below, the Data Sharing Ban prohibits vast amounts of protected speech regarding the voter data which New Mexico must make available under federal law.

### a.  Defendants downplay the scope of how they interpret and apply the Data Sharing Ban and that application is overbroad.

The first step in overbreadth analysis is to construe the challenged statute. *United States v. Williams*, 553 U.S. 285, 293 (2008). Defendants assert:

> The Secretary of State has construed the challenged statutes as a prohibition on providing that data to those who may or will use the voter data for an unlawful purpose as N.M.S.A. § 1-4-5.5 defines that term; or with individuals or entities outside the organization that requests it. The Secretary reads Sections 1-4-5.5, 1-4-5.6, and 1-5-22 together to conclude that an entity or individual may access voter data for specific purposes, and may not use that data for any purpose deemed unlawful or share that data with anyone outside the entity who has requested it.

Defs. MSJ at p. 49. The Court previously rejected this argument. Mem. Op. at 148. However, for purposes of determining whether the restriction is overbroad, the Court should decide whether the Defendants' interpretation and practice of enforcement runs afoul of the First Amendment.

Importantly, as the Court has previously noted, *see* Mem. Op. at 112, the overbreadth analysis is not limited to an examination of whether the Ban deters VRF's speech in particular, but whether it proscribes a substantial amount of protected speech, even by parties not before the Court. The Court already articulated the Ban's impact on VRF's own speech, finding that it necessarily prohibits VRF from using the data to engage in "election" related and governmental uses as otherwise permitted by New Mexico law. Mem. Op. at 150.

As to other parties, the Ban proscribes sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for; sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic at a different institution who wanted to use the original data set to validate the research; sharing between a political party and a candidate it supports, but who is not affiliated with the party; sharing of a voter's information by a canvasser with close family members or other members of his or her household; sharing by a political data compilation/analysis firm and its political clients; and, of course, sharing via publication on the Internet. **SAF ¶LLL.**

This reach—a near total ban on speech that involves the sharing of data, much of which constitutes core political speech—is far broader than any legitimate sweep of a statute dedicated to ensuring that voter data is not used for commercial or nefarious purposes. Because of the overbreadth of the restrictions and the uncertainty as to the boundary between that which is permissible and that which is prohibited, Plaintiff and others like it have refrained and will refrain from engaging in speech protected by the First Amendment out of fear of prosecution.

### b. HB 4 does not remedy the overbreadth issues, but merely codifies them.

Defendants argue that the New Mexico Legislature's recent passage of House Bill 4 supports their interpretation of the Data Sharing Ban. Defs. MSJ at 49. HB 4 does change New Mexico law to comport with the Secretary's "incorporation by reference" theory. Specifically, it

amends section § 1-4-5.6 to criminalizes the "selling, loaning, providing access to or otherwise surrendering of voter data, mailing labels or special voter lists by a person for purposes prohibited by the Election Code; or causing [such data] that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means." **DSOF 9**.

HB 4 has not yet become effective. *Id.* But even when it does, it cannot logically remedy the overbreadth issue. The "new" version of the statute under HB 4 merely codifies the Defendants' overbroad interpretation of New Mexico law (albeit a pretextual one) that has been developed during this litigation. VRF's claims have challenged that interpretation, which are soon to be codified in statute rather than existing as regulatory enforcement policies poorly articulated as part of Defendants' litigation strategy. To the extent the "new" statute merely copies that interpretation, it is similarly overbroad. Second, Defendants may seek to prosecute VRF for publishing the voter data on VoteRef.com, which occurred under the "old" version of the statute which did not specifically codify the Defendants' interpretation of the Data Sharing Ban. In deciding whether to prospectively enjoin Defendants from prosecuting VRF under the "old" statute, the Court still must decide whether the "old" version is overbroad.

## IX.   Defendants are not Entitled to Summary Judgment on VRF's Vagueness Claim Because their Amorphous Interpretations of the Use Restrictions and Data Sharing Ban Fail to Give Notice as to What They Claim is Prohibited, Chilling Protected Speech in the Process.

The Data Sharing Ban, a violation of which is a class IV felony and subjects the violator to a fine of $100 for each line of voter data unlawfully used, is void for vagueness. Requestors and users of voter data are entitled to fair notice regarding how that data may be used and shared, and also have rights to not have a vague policy weaponized against them via discriminatory enforcement. The prohibition on vagueness in "is a well recognized requirement, consonant alike

with ordinary notions of fair play and the settled rules of law," and a vague regulation "violates the first essential of due process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000) (*citing Chicago v. Morales,* 527 U.S. 41, 56–57 (1999)); *see also Mini Spas, Inc. v. South Salt Lake City Corp.,* 810 F.2d 939, 942 (10th Cir. 1987). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams,* 553 U.S. at 306; *see also Giaccio v. Pennsylvania*, 382 U.S. 399, 402-403 (1966) ("It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.")

When a criminal statute's vagueness exerts a "chilling effect" on First Amendment liberties, the void-for-vagueness doctrine "demands a greater degree of specificity than in other contexts…" *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

In *Grayned v. City of Rockford,* the Supreme Court stated that, when assessing whether a statute is vague, it looks to "the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, *and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it.*" 408 U.S. 104,110 (1972) (internal quotations omitted) (emphasis added). Here, where the interpretation of the statute given by those charged with enforcing it is plainly unsupported by the language of the statute itself, as this Court previously

held, the Court's vagueness analysis should evaluate the interpretation of the statute(s) given by Defendants, rather than the language of the statute itself.

> **a. Defendants' pretextual interpretation of the Data Sharing Ban is illogical, incoherent, and inconsistent.**

Defendants argue that the Data Sharing Ban is not vague because (1) it is clearly delineated in sections § 1-4-5.5 and § 1-4-5.6, and (2) "even if the statute is vague, both the Secretary's data request forms and the accompanying information included in NMSA 1978, § 1-5-22 clarify what uses are permitted and what are not." Defs. MSJ at p. 53. As to the statutes themselves, Defendants contend that "Read together, it is not ambiguous or unclear that a party who seeks voter data cannot loan, sell, or provide access to anyone who is not authorized to have the data, which has consistently been the Secretary's position, including with respect to Plaintiff." *Id.* at 54. As to the forms, the Secretary compares them to an Attorney General's Opinion, which when read in conjunction with an unclear statute, may give notice to a person regarding what is prohibited and what is permitted. *Id.* at 56-57 (citing *ETP Rio Rancho Park, LLC v. Grisham*, 522 F. Supp. 3d 966, 1038 (D.N.M. 2021) (Browning, J.)).

The Court already rejected this first argument—that the Data Sharing Ban as interpreted by the Defendants can be found in the text of the statute itself. Mem. Op. at 148. If the Data Sharing Ban is as clearly and unambiguously laid out as the Defendants assert, that clarity is lost on both VRF and the Court.

And the second argument—that any vagueness should be forgiven because the forms clarify what sharing is prohibited—cannot save the day. The Secretary's forms make it *less* clear what is prohibited, as the older forms (which are still accepted) state that sharing is allowed so long as the recipient uses the data for a statutorily permissible purpose. **Response to DSOF 29**.

The most telling indication that the Data Sharing Ban is impermissibly vague is that the Ban does not appear in any New Mexico statute, rule, regulation, or administrative guidance. **Mem. Op. at 143, 152, 154.** It did not even exist in writing until it was concocted as a defense to liability in this case. To arrive at Defendants' interpretation of New Mexico law, an interpretation from which the Data Sharing Ban springs forth, two statutes from different articles of New Mexico law must be read in conjunction. First, Defendants read § 1-4-5.6 which states "Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." Rather than the word "purposes" referring to the purposes expressly outlined in the immediately preceding statute, § 1-4-5.5, Defendants say that "purposes" refers to any purpose prohibited by Article 5, the Voter Records System Act. **SAF ¶JJJ**. Defendants' position next requires that this language in § 1-4-5.6 incorporates by reference the language from § 1-5-22(A) which prohibits the "willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file" by certain parties, which they concede VRF is not. **SAF ¶KKK.**

Yet, under Defendants' theory, when § 1-5-22 is transmuted through the lens of § 1-4-5.6, the prohibitions on "selling, loaning, [and] providing access" under § 1-5-22 apply to *any person* in possession of voter data, not just the specific parties listed in § 1-5-22. **SAF ¶JJJ.** While reading these statutes in conjunction, Defendants must also ignore the explicit, independent penalty for violating § 1-5-22(a) found in § 1-5-22(c).[23] Under Defendants' theory and policy, when § 1-5-22(a) is violated by someone other than one of the parties listed in the statute (for example, VRF), that liability stems from the criminal penalty under § 1-4-5.6(b) rather than the criminal penalty laid out in § 1-5-22(c). Though a person reading § 1-5-22 could easily determine whether or not

---

[23] "Any data processor, officer, deputy, assistant, agent or employee who commits unlawful disposition of a voter file is guilty of a fourth degree felony."

they are a "data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent," and thus whether that statute applies to them, Defendants theory requires them to discern that the prohibition in § 1-5-22(A) is broadened to include all persons because § 1-5-22 and § 1- 4-5.6 work hand in glove to do so.

The Court questioned Defense counsel at length last summer regarding the genesis of the Data Sharing Ban and, in its Order that followed, expressly rejected Defendants' argument that the Ban finds textual support in New Mexico statute. *See* Mem. Op. at 137; *id.* at 148 ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act…"). Though the Court refrained from finding that the Data Sharing Ban is vague based on the information available to it when it issued its July decision on the preliminary injunction motion, since that decision, Defendants' wavering positions, including purported exceptions to the Ban, underscore the Ban's vagueness.

**b.  The Data Sharing Ban is vague.**

The Data Sharing Ban is impermissibly vague, as no such prohibition appears anywhere in New Mexico statute, yet Defendants insist that their interpretation and attempted enforcement of the law bans all sharing. Referring to the recent amendments to section 5.6, the AG's 30(b)(6) representative admitted that the theory underlying the Data Sharing Ban is ambiguous. **SAF ¶NNN.** Even more shocking, ***the AG's office no longer subscribes to the statutory construction theory its representatives painstakingly described to the Court earlier in this case***. **SAF ¶MMM**.

Additionally, Defendants have revealed that there are a number of unwritten exceptions to the Ban. These ad hoc exceptions only underscore the vagueness problem. For example, the AG revealed for the first time at deposition that the level of "control" of the data is at least partially determinative of whether the data is shared lawfully. **SAF ¶RRR.** A political campaign can share data with a volunteer for a canvass, but VRF cannot share data with a volunteer helping to verify

the accuracy of the data itself. **SAF ¶QQQ.** Similarly, the AG and SOS indicated for the first time just a few weeks ago that it is now important to their position whether the data is posted online to the "general public," though neither Defendant could or would define that term and neither Defendant cited any source in New Mexico law which so states. **SAF ¶¶OOO-PPP.** The generic, undefined nature of this apparently material term further contributes to the Ban's vagueness. Mem. Op. at 153 ("…New Mexico's Election Code does not address whether voter data can be made "accessible by the general public on the Internet or through other means…").

As noted above, the vagueness doctrine (1) provides fair notice so that people can comply with the law and (2) avoids arbitrary enforcement. The Ban fails both criteria. It does not appear in any New Mexico statute, and Defendants' original contorted theory of interpretation (**SAF ¶JJJ**) seems to have been abandoned by at least the AG (**SAF ¶MMM**). Further, the AG's new theory of enforcement based on degrees of "control" of data, and both officeholders' unpredictable and sometimes changing list of exceptions, is a recipe for arbitrary enforcement.

The vagueness of the Defendants' Data Sharing Ban has caused VRF and others to refrain from engaging in First Amendment protected activities because the uncertain and unclear policies and positions of the Defendants, including the Data Sharing Ban itself, fail to provide sufficient guidelines for VRF and others to know what conduct is permissible and what is prohibited. This chilling effect is both real and substantial, as VRF fears additional investigation and potential prosecution for exercising its First Amendment rights. The indeterminacy of the Data Sharing Ban in fact chilled VRF's speech, as it had to remove the section of its Website devoted to New Mexico out of fear of criminal prosecution. *See* **SAF ¶FF-II.** Absent a decision from this Court protecting VRF's rights, that speech will continue to be silenced, particularly because Defendants have refused to state they will not prosecute VRF for its past posting of voter data. ***Id.***

### c.   The passage of HB4 supports and does not moot VRF's vagueness claim.

As outlined above, the Secretary recently lobbied the New Mexico legislature to pass HB4, which essentially implements her litigating position regarding the Data Sharing Ban. But contrary to Defendants' argument, Defs. MSJ at 57, this hurts rather than helps their vagueness claim. If Defendants' position in this litigation regarding the Data Sharing Ban had been correct as a matter of statutory interpretation, there would have been no need for the Legislature to amend the law in this manner. The AG claims that this amendment was merely to "clarify" the law, **DSOF ¶50**, yet the need to clarify the law necessarily concedes its initial ambiguity. The AG admits that the law pre-HB4 is ambiguous. *Id*. Because of the Defendants' refusal to state they will not prosecute VRF for its pre-HB4 speech, Plaintiff's vagueness claim remains necessary to protect it from prosecution for this prior, now-completed speech.

Defendants argue that VRF cannot seek injunctive relief to remedy a past injury and can only seek prospective relief. *Id.* They go on: "As making such data publicly available online is explicitly prohibited in New Mexico, VRF cannot lawfully post such data in the future, nor can VRF continue to claim the prohibitions are unconstitutionally vague." *Id.* at 59. This simply misapprehends VRF's requested relief. VRF's *vagueness claim* seeks to prevent any *future* prosecution for its *past* posting of voter data on VoteRef.com under the vague, pre-amendment statute that would apply to VRF's past conduct. Am. Comp., Dkt. 74 at p. 55.

Moving forward, *outside of VRFs' vagueness claim*, HB4 solidifies rather than remedies the First Amendment injury of VRF and others who continue to wish to engage in speech over the Internet that shares and discusses the data to which they are entitled under the NVRA. New Mexico will only have removed any doubt about whether it wants to (1) ban core political speech; (2) attach unconstitutional conditions to groups' access to voter data which distinguish among

speakers and uses of the data; and (3) enact overbroad bans on online speech. Indeed, all of these claims have greater clarity—and should be resolved in VRF's favor—under the plain text of HB4.

## CONCLUSION

Defendants have not carried their burden under Rule 56 because (1) they omit various material facts detrimental to their arguments, (2) many of the facts they claim are undisputed are in fact in dispute, and (3) they are not entitled to judgment as a matter of law. For these reasons, as well as those stated in Plaintiff's Motion for Partial Summary Judgment (Dkt. 119), Defendants' motion should be denied in its entirety.


Dated: May 12, 2023

<div style="margin-left:40%">

Respectfully submitted,
**GRAVES GARRETT, LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com


**HARRISON, HART & DAVIS, LLC**
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

*Counsel for Plaintiff*

</div>

## <u>CERTIFICATE OF SERVICE</u>

I, Edward D. Greim, certify that on May 12, 2023, a copy of foregoing was filed with the

Clerk of the Court using the CM/ECF system, which sent notification to the following via email:

Jeff D. Herrera
Kelsey Schremmer
jherrera@nmag.gov
kschremmer@nmag.gov
Office of the New Mexico Attorney General
408 Galisteo Street
Santa Fe, NM 87501

<div align="right">

*/s/ Edward D. Greim*
Edward D. Greim
Counsel for Plaintiff

</div>