## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**VOTER REFERENCE FOUNDATION, LLC,**

       **Plaintiff,**

**v.**                                                    **Case No: 1:22-cv-00222-JB-KK**

**RAÚL TORREZ, in his official capacity as**
**New Mexico Attorney General;**

**and**

**MAGGIE TOULOUSE OLIVER,**
**in her official capacity as**
**Secretary of State of New Mexico,**

       **Defendants.**

---

### DEFENDANTS' RESPONSE TO PLAINTIFF'S
### MOTION FOR SUMMARY JUDGMENT

---

Kelsey Frobisher Schremmer
Jeff Dan Herrera
Assistant Attorneys General
408 Galisteo St.
Santa Fe, NM 87501
Tel.: (505) 490-4060
Fax: (505) 490-4881
kschremmer@nmag.gov
jherrera@nmag.gov

*Counsel for Defendants*

## DEFENDANTS' RESPONSES TO
## PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

1.      Uncontroverted, but immaterial, that VRF's representative has testified as follows: "It's a foundation dedicated to publishing the voter rolls online for free forever to promote transparency and get the public engaged in understanding how the process works, and to try to do their public oversight duties under the National Voter Registration Act." May 17 Tr., ECF No. 119-1, 53:14-19.

2.      Uncontroverted that VRF has and does make state voter registration information available on the Website (VoteRef.com). Uncontroverted, but immaterial, that VRF's representative has testified as quoted in Response to SOF 1 *supra*.

3.      Controverted to the extent this SOF is intended to state that publication of election records will, in fact, lead more people to vote. *See* Statement of Additional Facts ("SOAF") ¶¶ 245–46. (showing that VRF's publication made people less likely to register, or stay registered to vote); *see also* Complaints, attached hereto as Exhibit A. Uncontroverted, but immaterial, that VRF's representative has testified as follows: "I think we need to do better oversight.  This is a process that's meant to be overseen by the public.  And if the public doesn't understand it, they're going to lose confidence, and then they are not going to participate.  And I see that a lot.  And on a personal level, that frightens me."

4.      Controverted that VRF's projects do, in fact, accomplish a mission of voter participation and transparency. *See* SOAF ¶¶ 245–46; *see also* Ex. A. Controverted, but immaterial, that VRF endeavors to publish information from "every state," as the testimony cited does not speak to VRF's efforts in the many states not found on VoteRef.com. Uncontroverted that VRF publicizes voter registration information for certain states. Controverted that VoteRef.com "empowers" a citizen to contact the Secretary, as VRF has supplied no evidence to support that this contact occurs. Defendants object to

the remainder of this SOF as legal argument.

5.    Controverted in part; *see* Response to SOF 3 *supra*. Uncontroverted that VRF operates VoteRef.com.

6.    Controverted that VoteRef.com only shares information when state law allows. *See generally* Argument & Authorities *infra*. Controverted that users can typically view only a voter's "year of birth," as VoteRef.com continues to publish the full birthdate of thousands of individuals. *See* VoteRef.com, last visited  May 10, 2023. The remainder of this SOF is uncontroverted.

7.    Uncontroverted.

8.    Controverted to the extent this SOF alleges that VoteRef.com is an effective tool for crowdsourcing or that it increases voter participation, as the evidence cited does not support this conclusion. Uncontroverted as to the remainder.

9.    Controverted to the extent this SOF alleges that these types of errors have actually been identified or reported to the Secretary, as the evidence cited does not support that conclusion. Uncontroverted, but immaterial, as to the remainder.

10.   Uncontroverted but immaterial.

11.    Controverted that when members of the public go through lawful channels to obtain New Mexico voter data, that data is received in an "unusable" format, as the testimony cited does not support this conclusion. Uncontroverted as to the remainder, including that VRF converts data into a format that can be searched online by members of the public.

12.   Uncontroverted, but immaterial, that the cited testimony characterizes the cost and accessibility in this manner.

13.   Uncontroverted that VRF posts this data for the public to access free of charge. Controverted as to any legal conclusion that this public access is necessary to, or effective in, supporting the NVRA.

14.   Uncontroverted.

15. Uncontroverted.

16. Controverted that the Attorney General "relies" on the Secretary for investigative decisions. Dworak Dep , ECF No. 119-2, 17:5-9. Uncontroverted that a referral from the Secretary—or any other citizen or agency in New Mexico—can result in investigation into conduct of which the Attorney General was previously unaware. Uncontroverted that New Mexico law vests the Secretary with the authority to interpret and enforce the Election Code, including statutes relating to voter data. *See also* NMSA 1978, § 1-2-2(A); NMSA 1978, § 1-2-2(D); NMSA 1978, § 1-4-5.6.

17. Uncontroverted.

18. Uncontroverted.

19. Uncontroverted.

20. Uncontroverted but incomplete. *See* Response to SOF 187 *infra*.

21. Uncontroverted.

22. Uncontroverted.

23. Uncontroverted.

24. Uncontroverted that the Attorney General agrees with the Secretary's analysis. Controverted to the extent this SOF implies that the Attorney General is delegating its analysis to the Secretary. *See* Dworak Dep., ECF No. 119-2, 53:18-25, 54:19-24.

25. Uncontroverted.

26. Uncontroverted.

27. Uncontroverted.

28. Uncontroverted except as to the implication that the Secretary's site employs no safeguards against improper action: the requirement that a user provide a full name as reflected in the voter rolls and date of birth serves as this protection against widespread review of other citizens' personal information.

29.   Objection. This SOF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or local rule D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent one is desired, Defendants' deny and controvert this statement. *See generally* Argument & Authorities *infra*.

30.   Uncontroverted.

31.   Controverted.   Mr. Dworak's testimony recognizes that NMSA 1978, Sec. 1-4-5.5(C) provides for "governmental or election and election campaign purposes."  Dworak Dep., ECF No. 119-2, 20:19-24.

32.   Uncontroverted.

33.   Uncontroverted.

34.   Uncontroverted.

35.   Uncontroverted.

36.   Uncontroverted.

37.   Uncontroverted.

38.   Controverted. The earlier, undated version of the Voter Information Authorization states "Unlawful use of the information requested on this form shall consist of the willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).  I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law."

39.   Controverted as to allegation of a "Data Sharing Ban" arising only from Defendants' policies and positions. Defendants are bound to follow New Mexico law, which prohibits (i) use of voter data for unlawful purposes as defined in Section 1-4-5.5 or (ii) intentional sharing of specific voter data with persons separate from and outside of the organization that requested and received the data.

NMSA 1978, § 1-4-5.5(C).

40.  Controverted as to allegation that the prohibition against sharing of data only arises from Defendants' policies and positions. Defendants are bound—and the representative for the Secretary testified as such in the cited testimony—to follow New Mexico law and to assess novel situations for their compliance with New Mexico law. *See also* Responses to SOFs 211–16 *infra*.

41.  Uncontroverted.

42.  Uncontroverted.

43.  Controverted as to the testimony concerning sharing data within a family.  Ms. Vigil testified that "there is no legal exception in the statute for sharing the data," but that it was unlikely in this one limited, hypothetical scenario to be referred for criminal prosecution.  June 15 Tr. at 31:4-12. Again, Defendants are bound—and the representative for the Secretary testified as such in the cited testimony—to follow New Mexico law and to assess novel situations for their compliance with New Mexico law. *See also* Responses to SOFs 211–16 *infra*.

44.  Objection. This SOF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent one is desired, Defendants' deny and controvert this statement. *See generally* Argument & Authorities *infra*.

45.  Objection. This SOF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent one is desired, Defendants' deny and controvert this statement. *See generally* Argument & Authorities *infra*. To the extent that this Statement presents an admission of fact, that admission is correctly stated: NMSA 1978, Sec. 1-5-22 does not, on its own terms, apply to VRF. It has, however, been incorporated and applies to VRF and other data requestors via NMSA 1978, Sec. 1-4-5.6(A) ("Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information

for purposes prohibited by the Voter Records System Act [Chapter 1, Article 5, NMSA 1978]." Chapter 1, Article 5 NMSA 1978 includes Sec. 1-5-22.

46.   Objection. The materials cited are arguments of counsel and are not testimony. It is uncontroverted, however, that Defendants take the position that New Mexico law imposes restrictions on sharing voter data outside the requesting entity. *See, e.g.*, Responses to SOFs 211–16 *infra*.

47.   Uncontroverted as to the reproduction of this testimony. Controverted as to any implication that the plain language of the statutes does not already mandate this result.

48.   Objection. The materials cited are arguments of counsel and not testimony. It is uncontroverted, however, that the Attorney General believes the Secretary's position is correct. *See* Response to SOF 24 *supra*.

49.   Controverted. This is a correct statement as to publicly available posting on the Internet. But there has been no testimony to the effect that any "communication…over the Internet," which could encompass behavior as private as emailing data to oneself, is "banned." Vigil Dep., ECF No. 119-5, 75:5-6 ("The office believes that VRF's *public* posting of the data is not a permissible use."); *Id.*, 82:11-12 ("So it is our position that the *public* posting of the data is not permissible under state law."); *Id.*, 84:9-12 ("The requester that follows the appropriate process, the lawful process, that would publicly post that data on the internet, that would be a violation under state law."); Vigil, 88:9-15 ("I, again, today would share that the position of the office is that sharing within an organization is different than sharing outside of that organization, and so that applies to the Internet.  You are obviously sharing outside of the organization if it's *publicly* posted online.").

50.   Objection. This SOF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or local rule 56.1. It requires no response, but to the extent one is desired, Defendants' deny and controvert this statement. *See generally* Argument & Authorities *infra*.

51.   Controverted. *See* Defs' Resp. to SOF 201–07 *infra*. The evidence cited does not give rise to

the conclusion that both Defendants "supported" House Bill 4, much less that they believed there were ambiguities to be addressed. The testimony cited in full context states that Mr. Dworak is "not aware of our office taking a formal position" on the legislation, is "not aware" of any motivation for legislation that would have been motivated by this suit, and "can't speak to the intent of the sponsors, the legislators." [Dworak Tr] 184:17–186:7.

52.    Uncontroverted.

53.    Objection to the extent this SOF states a legal conclusion ("This comports with…"). Uncontroverted as to the remainder.

54.    Uncontroverted.

55.    Uncontroverted.

56.    Uncontroverted.

57.    Controverted in part.  The cited testimony at Dworak Dep., ECF No. 11-2, 130:20-131:16, is in answer to a question concerning a hypothetical situation in which VRF resells voter data to "third parties who agreed by contract that they would only use it for permissible purposes," which is a different set of circumstances than the facts of the relationship between Local Labs and VRF. Further, Mr. Dworak specifically prefaces his answer that he "can't speculate to a conclusion." Mr. Dworak's full testimony at 70:7-21 states, "Yeah, I can't draw that conclusion.  But I would say, generally, that would make sense to me.  I mean, that's logical."

58.    Controverted. The cited testimony does not support this SOF. The cited testimony states only that the Attorney General would have to evaluate any new criminal referral on the specific merits of the specific situation.

59.    Uncontroverted.

60.    Uncontroverted as to New Mexico voter data.

61.    Uncontroverted.

62.   Uncontroverted as to the disclaimer that appeared when a user clicks on an individual New Mexico voter's individual page. But for states remaining on VoteRef.com, voter data is also visible, however, on a state-by-state basis, which data can be scrolled through without the display of this disclaimer. *See* VoteRef.com, last visited May 11, 2023.

63.   Uncontroverted that VRF's representative testified that VoteRef.com contained the "chain of custody disclosures."

64.   Uncontroverted.

65.   Uncontroverted.

66.   Controverted that there has been any "discrepancy" in New Mexico's numbers. As repeatedly explained and supported with ample evidence, when voter data requests are fulfilled, they present a snapshot in time. The number of voters registered in the state changes constantly, and the number of votes cast in the prior election captures an old and distinct snapshot in time. Rockstroh, ECF No. 119-13, 33:10-25 ("So it is very much a snapshot in time, but not necessarily – but the data skews the further away you – the further away you get away over time."). Controverted that VRF has meaningfully attempted to contact New Mexico officials about the "discrepancy." Uncontroverted that VRF emailed the Secretary's office approximately 48 hours before publishing a press release about the "discrepancy" in New Mexico voter data. *See* SOF 68–70 *infra*.

67.   Uncontroverted and immaterial.

68.   Uncontroverted.

69.   Uncontroverted and immaterial that the press release stated this.  Controverted that there is evidentiary support for this conclusion.

70.   Uncontroverted.

71.   Uncontroverted.

72.   Uncontroverted.

73. Uncontroverted.

74. Uncontroverted.

75. Controverted. The Secretary has received several complaints about VRF, Ex. A, all of which post-date the first contact from ProPublica.

76. Uncontroverted.

77. Uncontroverted.

78. Uncontroverted.

79. Uncontroverted.

80. Controverted as to the legal assertion that VRF could dictate and define a "permissible purpose" for data that was already being accessed in an impermissible manner. Uncontroverted that the Secretary's referral did not depend on whether or not VRF attempted to impose terms and conditions on end users.

81. Uncontroverted.

82. Uncontroverted.

83. Controverted that the cited testimony supports the proposition that the Secretary "refuses to say" whether VRF's analysis qualifies as a governmental use. The cited testimony states, "It's the public posting piece that has been analyzed, not some of these other hypotheticals scenarios that you're describing. This is different." Vigil Dep., ECF No. 119-5, 78:13-16. Uncontroverted as to the remainder.

84. Uncontroverted.

85. Uncontroverted.

86. Uncontroverted.

87. Uncontroverted.

88.   Controverted.  The range of concerns with VRF's misuse of the data included: "transfer and publication of [the] voter data" as a "direct violation of the Election Code," that "VoteRef.com and Local Labs have violated the prohibition against 'providing' voter data by posting New Mexican's private voting information online, or in Local Labs' case providing the voter data to VoteRef.com," and that "VoteRef.com and Local Labs have illegally 'used' this voter data by publishing it on VoteRef.com."  ECF No. 44-3.

89.   Controverted that the cited exhibit supports the SOF. The Secretary's Response to ROG 7 reads, "The Secretary believes that publication of voter data writ large may constitute misinformation. The New Mexico voter file is a living document that is constantly updated by state and county agencies.  If a private individual or entity were to obtain a copy of the voter file, that copy would be out of date and bearing erroneous information before the private individual or entity even had a chance to publish the copy.  The only proper, accurate way to look up voter information is through the New Mexico Secretary of State or county clerks." ECF No. 119-7.

90.   Uncontroverted.

91.   Uncontroverted, but immaterial.  New Mexico statutes prohibit the publication of voter data, regardless of whether the information is accurate.  *See* NMSA 1978, §§ 1-4-5.5, 1-4-5.6, 1-5-22.

92.   Controverted in part. The testimony cited is Mr. Dworak stating "I don't believe our office has taken a formal position on that" but that the office "would support" the position that the Secretary has taken. Dworak Tr. 68:11–18.

93.   Uncontroverted but immaterial.

94.   Uncontroverted but immaterial.

95.   Uncontroverted but immaterial.

96.   Controverted to the extent that Curtas's statement is described as "false." Curtas did not, subjectively, know about VRF's communication at the time that he made this response, as the email

had come in—to a different email inbox than his own—less than 48 hours prior. Curtas Tr. 41:23-
42:1 (stating that Mr. Curtas had not heard of Voter Reference Foundation before he received an
email from Megan O'Matz). Uncontroverted as to the remainder.

97.   Uncontroverted.

98.   Controverted as to the description of this statement as an "accusation." Curtas's quoted
statement was factually accurate.

99.   Uncontroverted that further evaluation and discovery did not yield any reason to believe the
data had been manipulated. As to the remainder, Defendants incorporate their response to SOF 63
*supra.*

100.  Uncontroverted that the quoted material is accurate.

101.  Uncontroverted but immaterial.

102.  Uncontroverted.

103.  Uncontroverted (but immaterial) that the quoted material is accurate.

104.  Uncontroverted that the quoted material is accurate. Controverted as to the characterization
of the quoted material, which is not supported by the quote itself.

105.  Uncontroverted.

106.  Uncontroverted.

107.  Uncontroverted.

108.  Uncontroverted.

109.  Uncontroverted.

110.  Uncontroverted.

111.  Objection. Controverted. The testimony cited is the personal, fact witness testimony of Alex
Curtas and does not support the broad SOF: "[T]he misinformation that Voter Ref is—you know,
that I'm claiming here, is that there are discrepancies within our [New Mexico] voter data." Curtas

Dep., 53:6-9.

112. *See* Response to SOF 111 *supra*.

113. Objection. Again, Mr. Curtas was testifying in his individual capacity to his individual actions at work. He was not a designated 30(b)(6) representative and was not testifying on behalf of the Secretary in his deposition. *See also* Curtas Dep., 73:13-19 ("Q: Are there other people in the Secretary's office that share your feelings about this? A: I wouldn't be able to talk about—I mean, specifically to whatever individuals are thinking about this …."). Uncontroverted that this SOF accurately reflects Mr. Curtas's testimony in his personal capacity as a fact witness.

114. *See* Response to SOF 113 *supra*.

115. Uncontroverted.

116. Uncontroverted.

117. Uncontroverted.

118. Controverted in part. Uncontroverted that the Attorney General's office provided legal advice to the Secretary in this matter. Uncontroverted that the Secretary's office determined not to provide voter data in response to VRF's February 15 request due to VRF's internet posting of prior data. Controverted as to extent to which this SOF reflects *all* requests for voter data from the Secretary. Subsequent requests for voter data were denied, by responsive letter. *See, e.g.,* Lange Letter to Swoboda, Nov. 17, 2022.

119. Uncontroverted.

120. Uncontroverted that the Secretary's representative testified as follows: "Q: And has this policy ever changed at the secretary of state's office? A: What policy? Q: 'Per [general counsel]'s contact with the AG, we are not fulfilling records request from Vote Ref?' A: I don't think it was a policy, but certainly it is based on legal advice related to this case and our understanding of the use of the data that that's still the position we maintained." Vigil Dep., ECF No. 119-5, 164:14-22.

121. Uncontroverted.

122. Uncontroverted.

123. Objection. Topics concerning other entities or persons investigated for misuse of voter data were beyond the scope of Mr. Dworak's 30(b)(6) deposition. Controverted to the extent that this SOF implies it is factually correct that no entity other than VRF has been investigated for its use of voter data. As VRF is aware, at least one other entity has been investigated for using voter data to harass and intimidate voters in person. ECF No. 44-12. Uncontroverted that this SOF accurately reflects the testimony cited.

124. Uncontroverted.

125. Controverted in part. Uncontroverted that the Attorney General's office communicated with other state Attorney General's offices regarding the civil aspects of the VRF matter. Controverted to the extent the SOF implies that these communications were related to criminal investigation into VRF or that the New Mexico Attorney General was the initiating party for all communications. *See*, *e.g.*, ECF No. 44-24.

126. Uncontroverted.

127. Uncontroverted.

128. Uncontroverted.

129. Uncontroverted.

130. Uncontroverted.

131. Objection. This SOF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or local rule D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent one is desired, Defendants' deny and controvert that VRF's conduct was protected political speech. *See generally* Argument & Authorities *infra*.

132. Controverted that VRF's desired conduct does, in fact, allow the public to become better

informed, as VRF has presented no competent evidence on that assertion. Uncontroverted as to the remainder.

133. Objection. This SOF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or local rule 56.1. It requires no response, but to the extent one is desired, Defendants' deny that this letter did, in fact, constitute an appropriate notice under the referenced statute, *see generally* Argument & Authorities *infra*, but do not controvert that a letter so titled was sent on May 27, 2022.

134. Controverted. The cited materials reference Defendants' Answer to Plaintiffs' Amended Complaint, in which Defendants stated that the allegation of proper notice called for a legal conclusion. And, indeed, whether the May 27 letter was sufficient notice under the NVRA is a live, but purely legal, dispute in this case. *See generally* Argument & Authorities *infra*.

135. Controverted to the extent this SOF states that the May 27 letter "again apprised the Secretary," as this letter was VRF's first mention of the NVRA.  *See* ECF No. 44-14; ECF No. 44-16. Uncontroverted that the letter contained the remaining assertions, with which Defendants' do not agree.

136. *See* Response to SOF 135 *supra*.

137. Controverted. The May 27 letter stated it would not publish data online unless it was granted "relief" in the instant case. The relief contemplated was in the form of a *preliminary* ruling and would go only to New Mexico's ability to prosecute VRF's conduct—not to the affirmative validity of VRF's conduct. As to the "second project" referenced, the May 27 letter again says that "no personal information of any individual voter will be published online *unless* VRF is granted relief." It does not state, as alleged here, that "no publication would occur regardless." Uncontroverted as to any remainder.

138. Uncontroverted that along with the letter in which VRF said it would publish online voter

data in the event of a favorable preliminary injunction ruling it submitted affidavits swearing that it would never do so.

139. Uncontroverted that the Secretary denied the request. The remainder of this SOF is inappropriate argument to which no response is required.

140. Uncontroverted that Ms. Vigil testified as follows: "Q: Okay.  I'll stop you there with that. So you, yourself, don't have any information about why the Secretary is claiming that VRF may publish the information anyway?  A:  I don't think that statement has been made at all, and I certainly have not made that statement.  Again, the request has been reviewed, and based on our counsel's analysis, our understanding is that we cannot conspire to publish this information, because it would be against the statute."

141. Uncontroverted that the Secretary's office responded to the May 27 letter by letter dated June 16. That letter speaks for itself and correctly points out that VRF's specific requests would have required the generation of new documents and analyses, rather than just the production of existing records.

142. Uncontroverted that the Attorney General provided legal advice to the Secretary in this matter.

143. Controverted in part. This SOF reads an assumption into the questioning of counsel and does not present any testimony in support of the proposition. Uncontroverted and immaterial that the questioning of counsel characterized VRF's request as "lengthy."

144. Uncontroverted that the Secretary was properly concerned with providing data that the Secretary actually knew would be used in violation of New Mexico law and that Ms. Vigil testified as follows: "Q: So if the request is denied, it will be on my [counsel's] advice not to violate the New Mexico Criminal Code? A: It will be based on the advice, yes, and the fact that we do not want to violate the law." June 15 Tr., ECF No. 119-6, 95:7-18.

145. Uncontroverted that the Attorney General provided legal advice to the Secretary in this matter.

146. Controverted as to the characterization of the Secretary's Response to Interrogatory 2, which stated that VRF had requested a compilation of information that was different than what a file maintenance list would show. Uncontroverted as to the remainder.

147. Controverted to the extent this statement suggests there were existing reports that the Secretary's office could have produce. Uncontroverted that Mr. Rockstroh testified that the information VRF had requested could, at least in part, have been generated through a work-intensive process code-writing and raw-data work by IT professionals and that the Secretary's office had the capability to perform that work. Rockstroh Dep., ECF No. 119-13, 26:18–27:10, 34:13–36:14.

148. Uncontroverted.

149. Uncontroverted.

150. Uncontroverted.

151. Uncontroverted.

152. Objection. This SOF presents only improper argument and does not comport with Fed. R. Civ. P. 56 or local rule 56.1. It requires no response, but to the extent one is desired, Defendants' deny and controvert this statement. *See* Response to SOF 137 *supra*.

153. Objection. *See* Responses to SOFs 137 & 152 *supra*; *see also* ECF No. 121 at 131–32 (Ex. 6) (copy of letter, with clear explanations).

154. Uncontroverted.

155. Uncontroverted that the Secretary did, in fact, have this concern.

156. Controverted in part. Defendants cannot speak to "VRF's concern" on the basis of the testimony cited, and this testimony does not speak holistically to the concerns of the Secretary or to the limited nature of VRF's promises. *See* Response to SOF 137 *supra*. Uncontroverted as to the

remainder.

157. Controverted that VRF has ever stated it would permanently refrain from posting individual voter data online. Its May 27 letter expressly states the opposite. *See* Response to SOF 137 *supra*.

158. Controverted. In the testimony cited, opposing counsel did not make an affirmative representation that VRF would permanently refrain from posting individual voter data online. Instead, he asked "Does the secretary of state believe that if you make a response tomorrow to use, that we are going to … put it online?" To which the Secretary's representative responded, "I don't know." She then stated "I don't think your position has changed … therefore nothing would change in our response" and explained that the office would follow orders made in this litigation and advice given by counsel. Vigil Dep., ECF No. 119-5, 178:21–180:16.

159. Uncontroverted but immaterial.

160. Uncontroverted.

161. Uncontroverted.

162. Uncontroverted.

163. Uncontroverted.

164. Controverted in part. Mr. Rockstroh testified that SERVIS offers certain types of reports, using certain fields of data, that can be automatically produced upon user request. Rockstroh Dep., ECF No. 119-13, 31:2-8. VRF refers to these as "canned" reports. *See* SOF 166. But reports other than these canned reports cannot be auto-run by SERVIS and instead require IT personnel to individually work with raw data to create. *Id.* at 26:9–27:1.

165. Uncontroverted; *see* Response to SOF 164 *supra*.

166. Uncontroverted.

167. Uncontroverted.

168. Uncontroverted that the SERVIS vendor applies no extra charge; Secretary of State IT

personnel take the lead on creating non-canned reports. Rockstroh Dep., ECF No. 119-13, 21:3-13.

169. Uncontroverted.

170. Uncontroverted that Mr. Rockstroh had no knowledge of such a denial.

171. Uncontroverted.

172. Controverted. Mr. Rockstroh's next statement was that he was not familiar with the contents of such a report. ECF No. 119-13, 24:11–21.

173. Uncontroverted.

174. Uncontroverted.

175. Uncontroverted that the Secretary's staff has fulfilled requests for non-canned reports and those can take days or weeks to fulfill. Controverted that the testimony cited supports the SOF or the implication that such non-canned reports are frequent or usual: "Q: And have you ever received a request like that before? A: Yes. Q: Okay. When was that? A: I don't recall. Q: In the last five years? A: Yes. Q: Do you know who made the request? A: No." Rockstroh Dep., ECF No. 119-13, 36:8-16.

176. Controverted to the extent this SOF implies that VRF's requests could be fulfilled by canned reports. In the testimony cited, opposing counsel acknowledged that this was just "the very first part" of the request and that "I know there's more…[b]ut then, of course, it goes on. You can't just stop with the canned report." Rockstroh Dep., ECF No. 119-13, 39:14-25 (Greim). Uncontroverted that this limited portion of VRF's request could be fulfilled using a canned report.

177. Uncontroverted. *See also* Responses to SOFs 164 & 175 *supra*.

178. Uncontroverted. *See also* Responses to SOFs 164 & 175 *supra*.

179. Uncontroverted.

180. Objection. This SOF presents only legal argument and other non-fact materials and does not comport with Fed. R. Civ. P. 56 or local rule 56.1. It requires no response, but to the extent one is desired, Defendants' refer to their Argument & Authorities, *infra*.

181. Objection. This SOF presents only legal argument and other non-fact materials and does not comport with Fed. R. Civ. P. 56 or local rule 56.1. It requires no response, but to the extent one is desired, Defendants' refer to their Argument & Authorities, *infra*.

182. Objection. This SOF presents only legal argument and other non-fact materials and does not comport with Fed. R. Civ. P. 56 or local rule 56.1. It requires no response, but to the extent one is desired, Defendants' refer to their Argument & Authorities, *infra*.

183. Objection. This SOF presents only legal argument and other non-fact materials and does not comport with Fed. R. Civ. P. 56 or local rule 56.1. It requires no response, but to the extent one is desired, Defendants' refer to their Argument & Authorities, *infra*.

184. Uncontroverted.

185. Uncontroverted.

186. Controverted in part. The letter speaks for itself, and for the reasons explained in that letter, the Secretary was not in a position to fulfill any of the requests that involved individual voter data. But as to two specific requests, one was for future data not yet in existence and another was for publicly available information, and the letter gave specific instructions and a URL to assist VRF in locating that information on the Secretary's website. Uncontroverted as to the remainder.

187. Controverted in part. The quote is accurate but incomplete. The letter reads: "[D]ue to the nature of your request, the ongoing litigation, your past practice of posting this data online, and the fact that such a request is not accompanied by the required affidavit, our office is unable to process your request at this time. We of course will comply with any court order in the case relating to the production of records or otherwise." ECF No. 119-14, at 2.

188. *See* Response to SOF 187 *supra*.

189. Objection. Controverted. The testimony cited is opposing counsel reviewing portions of VRF's May 27 letter with Mr. Dworak and Mr. Dworak stating "That's what it [the letter] says."

190. Uncontroverted that in the Secretary's November 11, 2022, letter, Mr. Lange pointed out that VRF had not executed an affidavit for its most recent requests.

191. Uncontroverted.

192. Controverted in part. The cited testimony references the Secretary's position that it was not "appropriate to produce voter data until the Court [of Appeals] has ruled on the motion," that VRF's posting of the data online was and would be unlawful, and that the Tenth Circuit could rule in favor of Defendants ("We believe that is a possibility."). [Vigil 30b6] 190:6–195:25.

193. Objection. Counsel objected to the question posed, as it was vague, ambiguous, and argumentative. Indeed, Ms. Vigil's response was that she "d[id]n't even know how to answer that question" and was not a substantive response." Vigil Dep., ECF No. 119-5, 187:11-15.

194. Controverted. The testimony cited is that when a request cannot be fulfilled because, for example, it asks for future data not in existence, then "[o]ur position and our process across the board is to respond to requests, to respond to the request that was made. And we could not because that window of time [requested] didn't exist at the time." Vigil Dep., ECF No. 119-5, 183:2-24.

195. Uncontroverted. There was more than one reason to deny the October request.

196. Controverted in part. The testimony cited does not support that the Secretary was "holding anything against" VRF but instead is the Secretary's representative stating that "I get that you're going to do what the Court allows you to do" but that the choice to repost data after the Court preliminarily enjoined prosecution of VRF is "a very clear indication" of VRF's continued intent to post individual voter data online, in contravention of New Mexico law. [Vigil dep] 188:5-23.

197. Uncontroverted.

198. Uncontroverted.

199. Uncontroverted.

200. *See* Response to SOFs 39–51 *supra*.

201. Objection. Controverted. This SOF misstates and mischaracterizes deposition testimony that is unambiguous. Mr. Dworak testified that "[T]he actions taken [by VRF], and the use of this information is not in compliance with New Mexico law." When asked by Plaintiff's counsel whether the Attorney General's position had changed since the preliminary injunction hearing, Mr. Dworak testified that "there is no reason that I have, that I'm aware of to, you know, challenge any positions that she took" but that he would need to "consult[] with counsel" as to any specific legal conclusions. Plaintiff's counsel continued to press the fact witness for legal conclusions, to which Mr. Dworak responded that he "can't draw that conclusion." Dworak Dep., ECF No. 119-2, 142:10–144:16.

202. Controverted. Neither Defendants has taken the position stated here. Both Defendants take the position that sharing data—meaning sharing it outside of the requestor's own organization—is unlawful. This is not limited to a situation like VRF's, but VRF's conduct certainly falls within this category of prohibited use. Because "sharing data" alone could include lawful conduct such as privately, internally "sharing" data within a requesting organization, Defendants have made clear that it "is not just the act of sharing data" alone. The quoted materials cited are accurate and uncontroverted.

203. Uncontroverted that not all use of the internet would involve dissemination to the general public (e.g., email or saving to private cloud-based storage). Controverted as to the characterization of the cited testimony, in which Mr. Dworak stated he could not take a position on several hypotheticals "without knowing all of the facts."

204. Objection to the extent this SOF presents argument. The quoted materials are accurate, and far from amorphous.

205. Uncontroverted.

206. Objection. Controverted. This SOF misstates and mischaracterizes deposition testimony that is unambiguous. Mr. Dworak testified that one example of publishing to the general public would be

"posting to a website that doesn't have a pay wall. I think you could also publish to the public in a more limited context. But, of course, all that would be a case by case, you know, analysis." He further testified that "I can't draw a conclusion without knowing all of the facts, because I think the facts or who has access and what controls are still available … And that there is not a risk of that information being used for unlawful purposes. So I think all of that would … require a thorough review of the circumstances and the facts and the scope of the use and the scope of the individuals with access." Dworak Dep., ECF No. 119-2, 111:7-22, 128:24–129:14.

207. Controverted. In the testimony cited, Mr. Dworak was asked whether Local Labs committed false swearing when it executed the Secretary's affidavit and then sold data to VRF. Mr. Dworak responded that there were arguments that could be made both for and against Local Labs, including whether it was in an agency relationship with VRF and whether it maintained sufficient control of the data but that "again, that's dependent upon all of the facts."

208. Uncontroverted that VRF's posting of the data on the internet is unlawful regardless of how their website viewers ultimately use the data, which is a sound policy decision made by the New Mexico Legislature in light of the inherent and serious risks in the publication of this sensitive data.

209. *See* Responses to SOFs 202–04 *supra*.

210. Uncontroverted and immaterial.

211. Uncontroverted and immaterial.

212. Controverted. The Secretary's representative testified that, while she couldn't opine on complete hypotheticals, the core factor "is either in the organization or out of the organization. That is the determination." Vigil Dep., ECF No. 119-5, 97:21–98:11.

213. Objection. Counsel objected to these deposition questions as improperly calling for a legal question and as beyond the scope of the 30(b)(6) deposition. The Secretary's position, reflected in the testimony cited, is that the core question is whether sharing is internal to an organization or outside

of it, and the Secretary could not take a position on various hypotheticals. Further, those hypotheticals are immaterial here, as they do not reflect the conduct that actually occurred in this case.

214. Controverted and immaterial. The testimony cited is not that the Secretary is entitled to rely upon sworn affidavits and does not "as a practice" conduct unprompted investigations, but that if the Secretary is "made aware" of unlawful conduct, then the office may investigate. Vigil Dep., ECF No. 119-5, 109:19–110:6. Uncontroverted as to the remainder.

215. Uncontroverted and immaterial.

216. Uncontroverted and immaterial. *See also* Responses to SOFs 210–15 *supra*.

217. Controverted and immaterial. The Secretary complies with the requirement of a "file maintenance list" by maintaining all of the requisite data on file maintenance, which data exists in raw form. *See* Response to RFP 15.

218. Uncontroverted except that the SOF provides no evidentiary support for Ms. Vigil's "promises," as the material cited is argument of counsel and not testimony. As to Ms. Vigil and the Secretary's stated position, *see* Responses to SOFs 220–21 *infra*.

219. Uncontroverted and immaterial.

220. Uncontroverted. This same interrogatory response also stated that just because no investigation had yet occurred "does not preclude [the Secretary] from doing so" in the future.

221. Controverted to the extent this SOF states or implies that the Secretary will not be investigating these entities. The Secretary's representative testified, in the sections cited, of the suggestions of possible violations received so far: "I don't think it's insufficient [for us to investigate]. I think, you know, our office has limited resources. There's nothing saying we won't look into it. The question I've responded to as of right now, we have not. That doesn't mean we won't."

222. Uncontroverted.

223. Controverted in part. The testimony cited was elicited, as Mr. Dworak pointed out, upon

documents that the witness had never before seen and could not verify or sufficiently investigate. Based on this lack of information, Mr. Dworak stated that he could not commit the office to a position of having a "concern" but that "I certainly have—we would have questions," that more information was needed, and that simple disclaimer language was not necessarily "sufficient to absolve any legal issues that might be raised."

224. Uncontroverted and immaterial.

225. Uncontroverted and immaterial.

226. Controverted in part. The summary of testimony is accurate but incomplete. Ms. Vigil testified as follows: "I think that's *a* reason. That is not our primary reason by any means. … It is a reason to make sure we have revenue to maintain our system, but that is absolutely not the priority." Vigil Dep., ECF No. 119-5, 143:9-24 (emphasis added).

227. Controverted. When asked what *the* priority for the office was, the Secretary's representative responded that it was "to follow state law." She continued: "We want to ensure that we are adhering to the appropriate process that's defined in our state law. And we feel like the intention behind an appropriate administration of that provision provides for us to maintain a record of individuals that are requesting the dat. I think it's important because it's the only mechanism to be able to go back and track if somebody does use it unlawfully. If we do see an instance of stalking or harassment or intimidation, it is the only way that we have an ability to manage who is receiving that data and potentially a tool for enforcement to follow the law. That's our priority." Vigil Dep., ECF No. 119-5, 143:25–144:24.

228. Controverted and immaterial. The Secretary's representative repeatedly testified in response to this question that the office did not have the authority to unilaterally diverge from what state law requires.

229. Uncontroverted.

230. Controverted in part. The specific "education interest" discussed in the cited testimony is the interest in ensuring that data requestors know and agree to the specific conditions of using voter data. Uncontroverted as to the remainder.

231. Objection. This SOF is vague and ambiguous, in that Defendants cannot ascertain what is meant by "other than these interests." Uncontroverted that when Ms. Vigil was asked about other interests in use of the form, she responded "Not in addition to what we've already gone over" in the prior 151 pages of deposition testimony.

232. Uncontroverted that Defendants have not identified evidence that VRF has manipulated voter data. As to misrepresentation of that data, uncontroverted that Mr. Dworak testified as follows: "I wouldn't be able to speak to any potential criminal investigation that may have been part of that question. But from the civil context, I'm not aware of that being raised."

233. Uncontroverted but incomplete. Mr. Dworak also testified, in the portions cited, that "the fact that it's out there and in an unrestricted setting, so anyone could use it, is the unauthorized use, because there is no control over how people use it."

234. Uncontroverted.

235. Uncontroverted but incomplete. What the Secretary did produce in response to this interrogatory was evidence of more than 25 complaints—generated in the very short time that VoteRef.com displayed New Mexico information—including those that "express distress for potential solicitation, harassment, or abuse as a result of their information being published, and certain complaints express an interest in withdrawing voter registration if the information is not removed." *See* SOS Complaint Log, attached as Exhibit A; VRF Complaints, attached as Exhibit C.

236. Uncontroverted; *see* Response to SOF 235 *supra*.

237. Controverted as to any implication that this has not, in fact, occurred. The testimony cited states that the Secretary has no method to track why any particular voter cancels his or her registration:

"Aside from the inquiries and the calls and the log that you've been provided tied to voters and concerns with this issue, there would be no way for us to have a voter affirm that [she canceled her registration due to VoteRef.com]."

238. Uncontroverted and immaterial.

239. Controverted as to any implication that this has not, in fact, occurred. The testimony cited states that the Secretary has no method to track such activity.

240. Uncontroverted and immaterial.

241. Uncontroverted and immaterial.

242. *See* Response to SOF 4 *supra*.

243. *See* Response to SOF 6 *supra*.

244. Uncontroverted.

**DEFENDANTS' STATEMENT OF
ADDITIONAL UNCONTROVERTED FACTS**

245.    In the short span of time that VoteRef.com displayed New Mexico voter data, the Secretary and VRF each received numerous complaints from citizens concerned about their safety and privacy. Exs. A & C; *see also* Decl. Mandy Vigil, attached hereto as Exhibit B, at ¶ 5.

246.    The Secretary's office has also been contacted by state and federal courts, departments of correction, and law enforcement services to voice their concern about VoteRef.com endangering judges, corrections officers, law enforcement officers, and others. Ex. B at ¶ 6.

247.    VRF aims to publish the voter rolls of every state on its website VoteRef.com for free and forever. VRF's work in this regard is "unprecedented" and "the first of its kind." PI Hearing, May 17, 2022, at 93:5-6, 8-10.

248.    Entities and organizations with viewpoints similar or identical to VRF's have sought and received New Mexico voter data by completion of the prescribed affidavit. *See* Ex. 5 to Defs.'

Summ. J. Mot., ECF No. 121. These entities include Elect Audrey Trujillo for Secretary of State, a campaign committee with a platform that New Mexico elections lacked integrity and honesty, that voting machines are used to manipulate New Mexico election results, and that Secretary Toulouse Oliver's administration has actively undermined the electoral process. *Id*; ELECT AUDREY TRUJILLO FOR SECRETARY OF STATE, https://www.audreytruehero4nm.com/ (last visited Mar. 28, 2023). In addition, this entities accused Toulouse Oliver personally of illegal, unethical, and conspiratorial conduct. Audrey Trujillo (Audrey Trujillo The Next NM Secretary of State), FACEBOOK (Nov. 6, 2022, 12:35 AM), shorturl.at/oxGTV.

249.    The Secretary did not believe VRF's conduct of analyzing the Voter Data and sharing that analysis (separate from publishing the Voter Data itself) was unlawful. ECF No. 44-3; PI Hearing, May 17, 2022 Tr. 142:20-22; 146:22-24; 147:19-25.

## STANDARD OF REVIEW FOR CROSS-MOTIONS

Where, as here, both sides move for summary judgment, "the court must analyze each motion individually and on its own merits." *G.M. ex rel. B.M. v. Casalduc*, 982 F. Supp. 2d 1235, 1241 (D.N.M. 2013) (citing *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). "[T]he denial of one does not require the grant of another." *Buell Cabinet*, 608 F.2d at 433. "Cross-motions for summary judgment, however, do authorize a court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties." *Castaneda v. City of Albuquerque*, 276 F. Supp. 3d 1152, 1164 (D.N.M. 2016) (internal quotation marks and citations omitted).

## ARGUMENT

VRF's core argument seems to be that it is either statutorily or constitutionally entitled to access huge amounts of New Mexico voter data and that New Mexico's attempts to regulate the *use*

of this sensitive, government-gathered data are a de facto denial of *access*. But the right to access and the right to use are two different rights, requiring separate analyses.[1]

VRF does have a statutorily defined right of access to certain records under the NVRA. (It does not have the complete and "unqualified" access to *all* state data that it claims the NVRA provides.) The First Amendment, however, is not a source of any additional access rights, and to the extent that VRF claims a right of access via the First Amendment, that claim should be denied.

Despite providing certain access rights, the NVRA does not provide a right to *use* voter data in any particular manner—and certainly not in the manner that VRF proposes. Neither can VRF resort to the First Amendment to support its desire to publish the non-anonymized, non-aggregated personal data of every New Mexico voter to the Internet. Such conduct is not protected speech, and given its detrimental effect on New Mexicans' exercise of their fundamental right to vote, the State's regulation of this conduct would survive any level of scrutiny regardless.

Because these conclusions not only follow from federal law, but are also plain and unambiguous under state law, Defendants respectfully request judgment in their favor on all of VRF's claims, including those under the NVRA, the First Amendment, and the Fourteenth Amendment.

## I.    New Mexico's restrictions on the *use* of voter data are not preempted by the NVRA. (Count I)

VRF appears to recognize that the NVRA does not directly permit its unfettered use of NVRA records or directly prevent the states from regulating its own data. It relies, instead, on a theory of obstacle preemption to argue that preventing the publication of voter data on VoteRef.com

---

[1] VRF dedicates a large portion of its summary judgment briefing to standing. Defendants do not contest VRF's standing on the record currently before the Court, but they note that a plaintiff's burden to show standing exists throughout litigation and becomes weightier at each stage, including at trial. *Collins v. Daniels*, 916 F.3d 1202, 1214 (10th Cir. 2019); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). They reserve their right to raise issues of standing as may become appropriate in the course of further litigation.

"unlawfully frustrate[s] the mechanisms by which the NVRA accomplishes its goals." Doc. 124 at 63. This conclusion is factually inaccurate and doctrinally attenuated.

Obstacle preemption—already a disfavored and narrow preemption doctrine—asks whether a state law impedes the "purposes and objectives" of a federal law. *Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 98 (1992)); *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1207–08, 1225–26 (D.N.M. 2010) (Browning, J.) (discussing the Supreme Court's apparent concern with liberal applications of the doctrine). VRF does not, and cannot, argue that New Mexico's protection of citizen data from online publication actually prevents the NVRA from furthering its dual purposes of encouraging voter participation and ensuring a valid electoral process. *See Herrera*, 690 F. Supp. 2d at 1226; *see also* 52 U.S.C. § 20501. Instead, VRF theorizes that one of these purposes could be even further enhanced by universal publication of NVRA records—a measure that Congress could have written into the NVRA but did not. More specifically, VRF argues two points: that organizations have greater resources and expertise than individual NVRA requestors might and that sharing information between citizens could increase the rate at which any errors are identified. Doc. 124 at 70. VRF does not substantiate its contention that this "crowd-sourced" review of voter rolls increases voter participation or improves the accuracy of the electoral process. In fact, Defendants have presented evidence that the publication of individual voter information online *discourages* people from registering to vote and participating in the democratic process. Statements of Additional Facts ("SOAF") ¶¶ 245–46. Further, prohibiting this publication does not affect the integrity of elections or even public perceptions of election integrity, where this is no prohibition on publishing and discussing anonymized or aggregated data and analyses of voter data. *See infra* Part III(C)(1). As a result, VRF's obstacle preemption argument is not supported by undisputed facts meriting summary judgment. *See Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019) (party moving for summary judgment bears initial burden of showing absence of any issues of material fact).

Even if VRF could establish undisputed facts showing that its posting voter data improves voter participation and election validity, the NVRA would not preempt New Mexico's Election Code. Obstacle preemption exists to remedy situations where state law effectively prevents a federal law from achieving its aims in the first instance; it is not an appropriate finding where state law merely prohibits conduct that could, theoretically, make a functioning federal statute marginally more effective than it already is. *See Herrera*, 690 F. Supp. 2d at 1225 (describing the "burden of showing that a state statute stands as an obstacle to Congress' objectives" as "high").[2]

Moreover, the prohibition of general online publication is in no way at odds with even a broad interpretation of the NVRA's purpose because the laws occupy two separate spheres: access to information and use of information. *See* VRF MSJ (ECF No. 124) at 54 (conflating access to and use of information by arguing that a "statutory ban on Internet speech … would violate the NVRA's *unqualified* right of public access"). Unlike preemption situations where "federal and state regulations both sp[eak] to the same issue and differ[] in their requirements," the Court does not need in this case to "parse" the NVRA for "silences where the state could regulate." *Contra Fish v. Kobach*, 840 F.3d 710, 728–29 (10th Cir. 2016). Instead, the NVRA and New Mexico law focus on distinct concerns and regulate distinct conduct. There are countless examples of federal law regulating the *use* or publication of data, even where the user has an absolute right to know or possess the information. *See* ECF No. 121 at 27–28.

Finally, this Court has already encountered a similar question in *Herrera*, which involved arguments that New Mexico laws intended to prevent voter fraud could negatively impact voter participation in frustration of the NVRA.[3] The Court dispatched this concern with the observation

---

[2] *Herrera's* high threshold for obstacle preemption in an NVRA case further demonstrates that, despite the lack of a presumption against preemption in election cases, VRF MSJ (ECF No. 124) at 55, VRF still faces a difficult burden in establishing that the NVRA preempts the Election Code.

[3] *Herrera* did not involve the NVRA's disclosure requirements, but rather its voter registration provisions.

that neither one of the NVRA's overarching purposes may be so quickly subordinated to the other. *Herrera*, 690 F. Supp. 2d at 1226. Moreover, the Court determined that there is "no indication in the text of the NVRA that it was intended to supersede or frustrate state voting laws." *Id.* Instead, it found that where any alleged negative impact was "debatable" and where the New Mexico law at issue was consistent with at least one of the NVRA's stated purposes, the disfavored doctrine of obstacle preemption should not apply. *See id.* VRF's only answer is a nonbinding opinion from the District of Maine, which is currently on appeal to the First Circuit. VRF MSJ (ECF No. 124) at 64 & n.4 (citing *Pub. Int. Legal Found., Inc. v. Bellows*, 2023 WL 2663827 (Mar. 28, 2023). Although that opinion presents similar facts, it fails to adopt the narrow, judicious view of obstacle preemption that Supreme Court precedent warrants, and it mistakenly conflates access with use. It does not control, and ought not persuade, in the Court here.

In sum, where the challenged state laws seek to protect and promote voter participation—without any harm to election integrity—VRF cannot establish, let alone as undisputed fact, that obstacle preemption prohibits New Mexico from regulating the use of its voter data. Plaintiff VRF is not entitled to judgment on Count I.

## II.   Plaintiff's requests did not comport with the NVRA, and their denial did not violate the NVRA. (Count II)

As shown above, the NVRA's access rights can and do exist in harmony with New Mexico's reasonable regulations on the *use* of voter information obtained through the NVRA or otherwise. Count II is concerned with the scope of those access rights and whether Defendants have failed to comply with the NVRA's affirmative requirements.

VRF's arguments hinge on the belief that the NVRA "mandates public disclosure of individual, identifiable voter information" by deeming all such data "records" subject to Section 20507(8)(i). Doc. 124 at 71. But what the NVRA requires is, in fact, more limited:

> Each State shall maintain for at least 2 years and shall make available for public inspection … all records concerning the *implementation of programs and activities* conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.

§ 20507(i)(1) (emphasis added). "Programs and activities" are not defined terms in the NVRA, and the Tenth Circuit has not previously interpreted this section. The Fourth Circuit has analyzed "programs and activities" by reference to state law and specific practices. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021) (describing actual conduct of North Carolina's State Board of Elections to determine that Board's citizenship audit was such a program or activity); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335–36 (4th Cir. 2012) (citing Virginia's election code to determine that completed voter registration applications were program records). In other words, what constitutes a record concerning the implementation of programs and activities will vary by state based on the state's election laws and programs. *Long* essentially says that identifiable voter information may, in some situations, be included within NVRA records of state-specific programs and activities where the state's voter program of maintaining a voter list entails the review of records containing the voter information. *Pub. Int. Legal Found.*, 996 F.3d at 265–66. But the presence or absence of this voter information is incidental to—and not a defining feature of—the disclosure requirement's scope. And the fact that a record falls within this scope does not mean it cannot be withheld or redacted to protect confidential or sensitive data. *See id.* (discussing fact-specific aspects of *Long* and warning of the "'intolerable burden' on the right to vote" that would be caused by disclosure of particularly sensitive information, such as social security numbers); *cf. True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 722 (S.D. Miss. 2014) ("The NVRA establishes a uniform code for voter registration and removal. The Court declines to adopt Plaintiffs' interpretation of the NVRA Public Disclosure Provision in a manner that would turn it into a *post*-election discovery device for detecting voter fraud.").

If Congress had intended, instead, for the NVRA to require disclosure of entire voter databases it could have said so. This it did not do. And, in addition to the specific exemptions in Section 20507(i)(1), Section 20507(i)(2) clarifies that records for inspection "shall include lists of the names and addresses of all persons to whom [change-of-address] notices are sent." If *all* names and addresses of *all* registered voters were always open to public inspection under the NVRA, then this limited clarification—that *some* names and addresses of certain registered voters are open to inspection—would be at best surplusage and, more probably, facially inconsistent language. *See Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (explaining "preference for avoiding surplusage constructions").

Thus, what the NVRA requires by allowing production of program and activity records is much more limited than what VRF argues or what it has requested from New Mexico. *Id.* at 1208 n.6 ("[W]e underscore that we have 'no roving license, even in ordinary cases of statutory interpretation, to disregard clear language simply on the view that … Congress "must have intended" something broader.'" (ellipses original)) (quoting *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 794 (2014)). And to the extent that the NVRA makes certain data publicly available, it only permits the *inspection* of existing compliance records. It does not mandate the *creation* of additional reports, explanations, or data analyses, such as Plaintiff requested here. *See* 52 U.S.C. § 20507(i)(1); *cf. Forsham v. Harris*, 445 U.S. 169, 186 (1980) (observing that the disclosure requirements codified in the Freedom of Information Act "impose[] no duty on the agency to create records"). Still, VRF has not made any attempt to connect its records requests to any state programs or activities about which it wants information. It has only repackaged its state-law voter data requests under the label of an NVRA request without any meaningful attempt to conform its requests to the NVRA. There are at least two reasons that the Secretary could—and did—properly deny this request.

First, Plaintiff's requests were not "for a record that is maintained by [the Secretary's] Office; rather, it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to be aggregated and analyzed." ECF No. 119-11. Indeed, Plaintiff's February 15 request did not request, as permitted under the NVRA, records of programs or activities that the state conducted to ensure current and accurate official lists. This request was not actually for any existing record at all. It was for a "total count," calculated and organized by county/precinct, not just of currently "eligible voters" but of individuals who had previously voted in a particular election, further categorized by parameters set in Plaintiff's request. This type of analysis or calculation is not a request for any portions of records concerning New Mexico's implementation of programs or activities to maintain voter rolls, and thus is not a request for records covered by the NVRA.

Plaintiff's May 27 requests fare no better. The first request made on that date is the same essential request made on February 15. The second request is for not only data on current voter lists but also "voter history"—a term not defined in the request but likely inclusive of when and where each person casts votes. This is, again, not a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists." 52 U.S.C. § 20507(i)(1). VRF offers no evidence that New Mexico's implementation of programs or activities to keep its voter lists accurate includes the creation of the requested data. Instead, VRF relies on the contention that "[d]ocuments related to this maintenance function" of updating voter rolls "must be made available for public inspection," VRF MSJ (ECF No. 124) at 51, a standard broader than the NVRA's statutory language.

VRF dramatizes the Secretary's explanation that VRF requested records that do not exist or are not part of New Mexico's implementation of voter list maintenance programs as "pretext" and even a "mischaracterization" of how the Secretary's office maintains data. Doc. 124 at 74. But it has

admitted—as it must do in the face of deposition testimony that it elicited from the Secretary's Chief Information Officer—that only one small portion of its data requests could have been fulfilled by existing reports that the office maintains. VRF MSJ (ECF No. 124) at 75. The remainder of the requests, VRF contends, *could* have been generated for VRF from raw data in the Secretary's possession. *Id.* But VRF confuses technical capability with legal obligation, and the plain language of the NVRA simply does not require what VRF demands.[4] Indeed, non-existent records that *could* be generated cannot, by definition, be records "concerning the implementation" of New Mexico's programs and activities because they are not records from any existing program or activity.

Second, Plaintiff's own request letter disclosed that it intended to "publish the requested information online," in violation of New Mexico law, assuming that it obtained a preliminary injunction preventing New Mexico from enforcing its own laws (and without any assurance that VRF would wait for a final judgment or resolution of any appeal). In other words, Defendants had every reason to believe that providing the requested information to Plaintiff would result in the imminent publication of voters' private and personal information online, in contravention of state law, even before this litigation concluded. New Mexico has the right to limit the legal *uses* of its own government data. Part I *supra.* And even if Plaintiff had a right to obtain all of this information—which it did not— New Mexico had no obligation to provide this data to a requestor who had promised to use it for illegal purposes. *Cf. Holt v. Howard*, 806 F.3d 1129, 1132 (8th Cir. 2015). In fact, the State had a responsibility *not* to disclose in these circumstances. *See, e.g., State ex rel. Riddle v. Oliver*, 2021-NMSC-018, ¶ 36, 487 P.3d 815. (observing that the Secretary of State has a "nondiscretionary duty" to comply with the Election Code and that she is not only "duty-bound to follow" the Code, but is also

---

[4] VRF cites to *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320 (N.D. Ga. 2016), for the contention that technical burdens do not affect the obligation to produce records under the NVRA. VRF MSJ (ECF No. 124) at 61. In *Project Vote*, however, the plaintiff had not requested records that did not exist. In fact, the court noted that "Plaintiff … does not seek the Requested Records in any particular format." *Id.* at 1336.

responsible for implementing the Code); *see also Herrera*, 690 F. Supp. 2d at 1228; *cf. Collier v. Dickinson*, 477 F.3d 1306 (11th Cir. 2007) (Driver's Privacy Protection Act); *Welch v. Theodorides-Bustle*, 677 F. Supp. 2d 1283, 1286 (N.D. Fla. 2010) (same); *Forest Serv. Emp'ees for Environ. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1026 (9th Cir. 2008) (FOIA). VRF argues that it had "promise[d] not to publish voter information on its website absent a court order," and laments that the Secretary "disbelieved that promise." VRF MSJ (ECF No. 124) at 72. But, again, all that VRF promised was to hold off on publication until it received a preliminary order (which has since been stayed on appeal), pending this Court's opportunity to conduct a full trial on the merits and issue any final order. And that promise came in the same sentence as this one: "VRF intends to publish the requested information online for election related purposes." ECF 44-22 at 4. Thus, it was no violation to withhold records under these unique circumstances, where fulfilling the request could make the Secretary complicit in a state plan to violate state law after any NVRA production.[5]

Finally, Plaintiff has not actually complied with the NVRA's pre-suit notice provisions. The NVRA permits private parties "who [are] aggrieved by a violation" of the NVRA to "provide written notice of the violation," after which the state will have some period of time to correct the violation (20 or 90 days, depending on election timing). 52 U.S.C. § 20510. Only after that period may a private civil action commence. *Id.* Plaintiff's May 27 request constituted its first NVRA request. Despite Plaintiff's reference in that letter to earlier requests, no earlier ask from Plaintiff had cited the NVRA or specifically requested records related to that statute. And none of the prior productions (to Local Labs) or denials of data specifically addressed NVRA issues. As a consequence, the May 27 request is

---

[5] VRF argues that because the Secretary testified it would have denied VRF's voter data request even if VRF had included a voter data request affidavit, the lack of an affidavit must be a pretextual basis for the Secretary's denial. VRF MSJ (ECF No. 124) at 63. This argument confuses multiple reasons for denying a request with pretextual reasons. Because other reasons for denying VRF's request would have still existed had VRF submitted an affidavit, the Secretary correctly testified that it would not have provided VRF with the requested data even with an affidavit.

the first event related to Plaintiff's NVRA claims. *See* SOAF ¶ 135. The Secretary's office sent a written denial and explanation to the May 27 request on June 16, but no written notice of violation followed. Plaintiff made no further attempt to narrow its requests for records, withdraw its stated intention to misuse any records, or explain why the Secretary's June 16 response was a violation of the NVRA. As a result, Plaintiff was not entitled to add the NVRA claims to its Amended Complaint, and the Court has yet one more reason to dispose of those claims now. *See Hosemann*, 43 F. Supp. 3d at 713–17 (collecting cases and determining that NVRA notice requirements are mandatory, serve an important purpose, and are a "procedural bar" to proceeding without compliance).

### III.   VRF's First Amendment rights have not been impermissibly restricted. (Counts III & V)

VRF does not have a First Amendment or statutory right to access New Mexico voter data, and the First Amendment does not protect VRF's desire to use the data in ways not permitted by New Mexico's statutory grant of conditional access. Consequently, there is no restriction of protected speech implicated in VRF's suit. But even if there were, New Mexico's neutral and non-discriminatory regulations would survive constitutional scrutiny.

### A.   VRF does not have a First Amendment or statutory right to access the Secretary's data.

VRF's claim that New Mexico's restrictions on the use of state voter data effectively ban core political speech fails as a matter of law. States are not constitutionally required to provide access to voter files and, therefore, when they do grant access may do so upon conditions decided as a matter of state policy. So long as these conditions are content- and viewpoint-neutral, they do not offend the constitution. No genuine dispute of material fact exists to allow VRF's First Amendment claims to proceed to trial, and VRF's request for judgment on Counts III and V should be denied.

Neither First Amendment case law, nor the NVRA require that states make their voter files unconditionally available in their entirety to all citizens. The Supreme Court has held that the First

Amendment does not create a "guarantee of a right of access to all sources of information within government control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978); *see also Smith v. Plati*, 258 F.3d 1167, 1178 (10th Cir. 2001) ("It is well-settled that there is no general First Amendment right of access to all sources of information within governmental control."); *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1168 (3d Cir. 1986) ("[I]t requires some straining of the text to construe the Amendment's explicit preclusion of government interference as conferring upon each citizen a presumptive right of access to any government-held information which may interest him or her."). Contrary to VRF's assertion, the fact that the subject matter of this information could implicate core political speech and matters of public importance still does not obligate states or their subdivisions to provide access under the First Amendment. In *Shero v. City of Grove,* the Tenth Circuit held that citizen access to city councilor packets of information—containing agenda items for meetings and other information—was not a protected right under the First Amendment. 510 F.3d 1196, 1202 (10th Cir. 2007). The court held that, while the city may have an obligation to provide the documents under state open records laws or other such statutes, the First Amendment does not compel disclosure to citizens. *See id.*

Where a government possesses an authority or power, it necessarily follows that the government may exercise that authority in a more limited or conditional manner as well. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 144 (1982) (holding that the power of Indian tribes to exclude nonmembers from tribal land necessarily included the lesser powers of placing conditions on entry, continued presence, or on-reservation conduct). Thus, where a state has the power to hold entirely private sensitive data that its voters have entrusted to it, it also has the lesser power to grant access to that data on non-discriminatory conditions. *Cf. Kavalin v. White*, 44 F.2d 49, 51 (10th Cir. 1930) ("The power to grant a pardon includes the lesser power to grant a conditional pardon."); *United States v. O'Neil*, 11 F.3d 292, 296 (1st Cir. 1993) ("The principle that the grant of a greater power includes the grant of a lesser power is a bit of common sense that has been recognized in virtually every legal code

from time immemorial. It has found modern expression primarily in the realm of constitutional law."); *Republican Party of Minn. v. White*, 536 U.S. 765, 788 (2002) (holding that the greater power to dispense with judicial elections altogether does not include the power to impose *content*-based restriction on judicial candidate speech). Because there is no First Amendment right to obtain voter data, *See Houchins*, 438 U.S. at 9, there is no First Amendment prohibition on granting conditional access to such data.

Furthermore, because access to voter data is not guaranteed by the First Amendment, the State's election to condition access on an entity's agreement not to post the data on the internet is not an unconstitutional condition. *See Fusaro v. Cogan*, 930 F.3d 241, 256–57 (4th Cir. 2019) ("[T]he initial decision to release such information remains, fundamentally, a policy choice…."). Prohibitions on the posting of voter data do not "withhold" "a benefit guaranteed by the NVRA and state law," VRF MSJ (ECF No. 124) at 70, but are conditions inherent in or permitted by those statutory provisions themselves. That is, the New Mexico Election Code does not guarantee the right to obtain voter data on which Defendants have imposed unconstitutional conditions, but the conditions are part of the statutory benefit itself. Nor does the NVRA create a federal statutory obligation to provide all of the data that VRF has requested. *See* Part I–II *supra*. And even if it did, the NVRA still could not form the basis of a First Amendment claim. *See Shero*, 510 F.3d, at 1202 ("The City is not compelled by the *First Amendment* to provide information to Mr. Shero but must only provide the council packets to him under *state* law, and Mr. Shero has already received his remedy in state court." (emphasis in original)).

New Mexico's sharing and use restrictions also do not constitute a content- or viewpoint-based restraint on data requestors' speech or leave requestors without ample alternatives to engage in free expression. Plaintiffs assert that the restrictions are viewpoint- or content-based but do not actually explain how the prohibitions are not content-neutral. *See* VRF MSJ (ECF No. 124) at 71–72; Mem. Op. (ECF No. 51) at 194–98 (concluding that voter data request process is not content-based).

40

The conditional grant of voter data to requestors who agree not to directly share or publish the data itself does not contemplate the content of any other speech that requestors might make based on their own analysis, summarization, or opinions of the data. There is no prohibition on requestors sharing their opinions about or analyses of New Mexico data, or even anonymized aggregations of the data. SOAF ¶ 249. This expression may take the form of ballot issue advocacy, campaign electioneering, social issue awareness and activism, volunteer recruitment, academic research, or any other number of core political objectives. Nor do the content and use restrictions contemplate the methodology of speech, which may include door-to-door canvassing, phone banking, direct-mail pieces, email campaigns, mathematical and statistical analysis, synthesis of the voter file with other available sources of information (*e.g.*, commercially available consumer data), or any other number of creative ways to engage in free expression to the public. As a result, the Election Code's restrictions on the use of voter data are permissible "licensing restrictions that are content neutral and restrict only the time, place, and manner of speech . . . ." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013) (citing *Ward v. Rock Against Racism,* 491 U.S. 781 (1989)). The prohibition on sharing or publishing just the data itself is narrowly tailored in pursuit of the legitimate state objectives of ensuring voter privacy and safety. *See infra* Part III(C)(1).

The conditional grant of access to the voter file permits those seeking to engage the public with a powerful, voluminous resource built by state and county election officials. This resource provides ample, robust opportunities for direct voter engagement. The mere condition that the resource itself not be shared beyond those entities who request it from the state, and in so doing agree not to share the data improperly, does not give rise to a First Amendment claim.

## B. VRF's publication of voter data violates New Mexico's permissible restrictions on the use of voter data.

Not only does VRF lack a First Amendment right to access voter data, but it has also failed to show that Defendants have regulated VRF's protected speech. Rather, VRF's collection and

publication of voter data violated permissible restrictions contained in New Mexico law. In March

2021, Local Labs, LLC requested voter data from the Secretary, which it then provided to VRF in

order to publish on Plaintiff's website. Michael Lippert of Local Labs, LLC signed the voter data

request form. In signing, Mr. Lippert swore to the attestation contained on the form, which stated

that,

> "Unlawful use of the information requested on this form shall consist of willful
> selling, loaning, providing access to or otherwise surrendering, duplication, or
> alteration of information as stated in the Voter Records System Act (N.M.
> STAT. ANN. 1978, 1-5-1 through 1-5-31). I hereby swear that the requestor
> will not use or make available to others to use the requested material for
> purposes other than governmental, election, research and campaign purposes
> under penalty of law."

ECF No. 44-1. After receiving the voter data from Local Labs, VRF published the New Mexico voter

rolls in their entirety on their website, including their name, address, birth year, registered party, and

last election in which they voted.

The New Mexico Election Code requires that each requester of voter data "sign an affidavit

that the voter data . . .shall not be made available or used for unlawful purposes." NMSA 1978, § 1-4-

5.5(C). The Election Code further states that "Unlawful use of voter data . . . consists of the knowing

and willful use of such information for purposes prohibited by the Voter Records Systems Act [NMSA

1978, §§ 1-5-1 to -31]." NMSA 1978, § 1-4-5.6(A). Further, "any person, organization or corporation

or agent, officer, representative or employee thereof who commits unlawful use of voter data . . . is

guilty of a fourth degree felony . . . ." NMSA 1978, § 1-4-5.6(B). The Election Code further states,

"Unlawful disposition of the voter file consists of the willful selling, loaning, providing access to or

otherwise surrendering of the voter file, duplicates of the file or a part of the file . . . to anyone not

authorized by the Voter Records System Act to have possession of the file." NMSA 1978, § 1-5-22(A).

Finally, the Election Code prohibits false swearing in connection with conduct under the Election

Code. NMSA 1978, § 1-20-10. False swearing is defined as "taking any oath required by the Election

Code . . . with the knowledge that the thing or matter sworn to is not a true and correct statement." *Id.*

The Secretary has interpreted this statutory framework to permit sharing data within an entity or organization for use in furtherance of a permissible purpose, but not to permit sharing outside of it for any purpose. Per the Secretary's interpretation—which has been in place for at least twelve years and across two administrations—selling, loaning, providing access to, duplicating, or otherwise surrendering voter data outside of the organization that requested this data is prohibited by law and subject to the criminal penalties specified in the above statutes. When requesting data, an agent may sign the Voter Information Authorization Form. Per the Secretary's interpretation, sharing voter information within the organization or entity covered by the signed form is permissible. However, individuals not members of the same entity, as well as different entities, must each submit a separate form. The Secretary further interprets this framework to prohibit publishing data for general availability on the internet.

This interpretation has recently been affirmed by the New Mexico Legislature with the passage of House Bill 4 amending Section 1-4-5.6 NMSA. The revised statute expressly provides that causing voter data "to be made publicly available on the internet or through other means" is unlawful. VRF's proposal to post voter data online so that it may be reviewed in a "crowd sourcing" effort violates the conditions that New Mexico has imposed on parties accessing voter data.

VRF's conduct in publishing this data cannot support its claim that Defendants have banned protected speech (Count V) or retaliated against the exercise of constitutional rights (Count III), because VRF's conduct was not constitutionally protected activity. As explained above, New Mexico is constitutionally permitted to condition its grant of access to voter file information upon agreement of the requestor not to publish that data. VRF violated the conditions upon which the State conditioned its access to the voter file. First, VRF either used an agent, Local Labs, to falsely attest

that it would not share the data it received, or in event that VRF contends Local Labs was not an agent, purchased data from a third party to intentionally bypass state requirements. Second, VRF published the voter file in its entirety on the internet. This publication permitted any person with internet access to bypass the affidavit requirement in the New Mexico Election Code, thus nullifying a safeguard designed to ensure the privacy and safety of New Mexico voters. Because the State was permitted to condition its access to the data on a sworn statement to refrain from such actions, VRF's publication of voter data was not a constitutionally protected activity. Therefore, the entirety of VRF's First Amendment claims should fail as a matter of law.

### C.   Even if VRF's conduct were protected speech, New Mexico's regulation would remain constitutionally permissible.

Even if the Court were to consider VRF's posting of voter data to be protected First Amendment activity, the State's proscription against publishing state voter data on the internet is constitutionally sound.  The proscription on publication serves the compelling and concrete interest of protecting the safety and wellbeing of registered voters, safeguarding their fundamental right to vote, and ensuring that voters should not have to choose between participating in democracy and being safe in their homes.  Where state election laws are alleged to both burden and protect the fundamental right to vote, then the appropriate analysis requires the sort of constitutional balancing outlined by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under this standard, "the state's important regulatory interests are generally sufficient to justify" a "reasonable, nondiscriminatory" burden on otherwise constitutionally protected conduct created by a state's election laws.  *Anderson*, 460 U.S. at 788.  Here, the state's interest in the safety of voters and fulsome participation in elections certainly meet this standard. But even if the Court instead applies a strict scrutiny analysis, VRF is still not entitled to judgment as a matter of law

44

on its First Amendment claims, as the State has a compelling interest with regulations that are narrowly tailored to the objective and that leave open ample opportunities for other forms of speech.

### 1. The State has a compelling interest in protecting voter safety and preventing a chilling effect on election participation.

Under either the *Anderson v. Celebrezze* analysis or a strict scrutiny analysis, New Mexico's prohibition on publishing voter data exists to effect the compelling state interests of public safety and electoral participation. The Court should find that these interests justify upholding the State's prohibition against publishing New Mexico voter data.

The Supreme Court has held that both public safety and the prevention of crime are significant government interests justifying some modest restriction on otherwise constitutionally protected activity. *See Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (holding that public safety is a significant government interest justifying injunctive relief against individuals protesting facilities providing abortion facilities); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (holding that preventing crime and community safety may be compelling government interests justifying pretrial detention in contravention of the Fifth and Eighth Amendments). So, too, with the interest in preserving access to the fundamental right to vote. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 198–99 (1992) (describing as "obviously" compelling a state's interests in protecting citizens' right to freely vote and observing that some "cases … force us to reconcile our commitment to free speech with our commitment to other constitutional rights embodied in government proceedings").

VRF contends that Defendants have not presented any evidence that its posting of voter data can result in the solicitation, harassment, and abuse of voters. VRF MSJ (ECF No. 124) at 75. To begin, this argument rests on an improperly narrow concept of relevant evidence where only evidence proving that VRF's specific posting of data can be linked to harm to voters can support the State's interest. As Defendants have argued in their pending preliminary injunction appeal, No. 22-2101, Op. Br. at 43–46, the Supreme Court and Tenth Circuit have recognized a well-established privacy interest

45

in one's home and home address. *See Forest Guardians v. FEMA*, 410 F.3d 1214, 1220 (10th Cir. 2005) (recognizing "significant" "privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address" (internal quotation marks omitted)); *Dep't of Defense v. FLRA*, 510 U.S. 487, 501 (1994) ("We are reluctant to disparage the privacy of the home, which is accorded special consideration in our Constitution, laws, and traditions.").

To the contrary, VRF and Defendants have both produced in discovery evidence that the publication of New Mexico voter data online harms voters' privacy interest and puts some voters in harm's way. The Deputy Secretary of State testified that as a public official, she has used a "scrubbing service" and Post Office Box to keep her personal address off the internet, and that VRF's posting home addresses will cause her irreparable harm, especially given threats against election officials. 6-15-22 PI hearing at 180:22-182:3. She further testified that she believed disclosing voters' home addresses would have "a chilling effect … where people don't want to participate and don't want to vote" based on her experience with voter files being shared and used to interrogate voters door-to-door. *Id.* at 185:1–186:12.

In addition, numerous voters have emailed the Secretary's office, as well as VRF directly, to request that their names be removed from the list or—more troubling still, asking to cancel their voter registration—for fear of harm from individuals who may learn the voters' addresses from VRF's website. SOAF ¶ 245; Ex. A. In these emails, voters have cited fear of harm from violent ex-partners, stalkers, or family members with mental instability. *Id.* VRF has also received requests from law enforcement officials wishing to have their names removed. The Secretary of State has received inquiries by court and correction officials, as well as the U.S. Marshals Service, seeking ways to protect judges, prosecutors, and law enforcement officers. SOAF ¶ 246; Ex. B at ¶ 6. While it is very difficult to know that someone committed a crime after finding their victim's address on a particular website, New Mexico has also seen politically motivated violence against public officials in recent months. *See*

Christina A. Cassidy, "New Mexico Shootings Follow Two Years of Election Assaults," *AP* (Jan. 18, 2023) (legislative candidate who believed that election he lost was "rigged" hired people who shot at the homes of four Democratic lawmakers);[6] Vera Bergengruen, "Accused 'Mastermind' of New Mexico Political Shootings Left a Chilling Digital Trail," *Time* (Jan. 18, 2023) (candidate targeted election officials who certified results candidate believed were fraudulent).[7] Reflecting these concerns, New Mexico's Legislature recently passed a bill, amending the Election Code to make public officials' home addresses confidential in disclosures filed with the SOS. N.M. Senate Bill 180 (2023), § 1.[8] VRF's website, if permitted to publish voter data, would be an effective tool for individuals intending to harass or harm elected officials, judges, prosecutors, public employees, or any other member of the public. The publication is also fertile grounds for scam artists who pose as government authorities or employers and potential employers who might discriminate based on political affiliation or voting record.

While the state has some limited ability to provide additional privacy protection—such as the Safe At Home program—that program is much too limited to account for and safeguard the wide variety of reasons that a person might not want their confidential voter information published. Moreover, the burden of that safety should not fall on individual voters to find an option to protect themselves when the government should—and more effectively can—maintain the confidentiality of the information that the government collected in the first place. Prohibiting publication of voter data directly and squarely furthers the compelling government interest of protecting public safety by

---

[6]     https://apnews.com/article/politics-new-mexico-state-government-michigan-2022-midterm-elections-fc96f8ea93cfc5107bf4e9bfaaa55482

[7] https://time.com/6247844/new-mexico-shootings-targeting-democrats/

[8] https://www.nmlegis.gov/Legislation/Legislation?Chamber=S&LegType=B&LegNo=180&year=23

ensuring that wide swaths of voters who may be subject to some form of violence or harassment do not have their public information widely disseminated.

Relatedly, prohibiting publication of voter data furthers the state interest of increased electoral participation. While VRF has not produced any evidence that its underlying theory—publishing voter rolls increases voter participation—Defendants have produced evidence that VRF's publication of voter rolls will result in some voters canceling their registrations. SOAF ¶¶ 245–46. The same individuals with legitimate cause to fear for their safety from having voter rolls published may determine that it is simply not worth being registered to vote if the cost of that registration is an increased chance of violence. Citizens should not have to choose between their safety and their right to participate in our democratic processes.

The Supreme Court has recognized that compelled disclosure of political activity may chill the exercise of protected constitutional rights. In *Americans for Prosperity v. Bonta*, the Supreme Court held that California's law compelling nonprofits to disclose donors to the state attorney general's office failed exacting scrutiny because such disclosure would chill speech (in the form of reduced monetary donations to the plaintiff entities). 141 S.Ct. 2373, 2388 (2021). In that case, the Supreme Court held that, even though the disclosures were only to the California AG's office and not to the broader public, the law was facially invalid based on its mere "risk of a chilling effect." *Id.* at 2389. Although *Bonta* addresses a different set of facts, the same risk of chilling democratic participation is present here and deserving of similar consideration. "The right to vote is 'a fundamental right, … preservative of all rights.'" *Fish v. Schwab*, 957 F.3d 1105, 1121 (10th Cir. 2020) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (omission in original)). Further, the right to vote is "too precious, too fundamental to be so burdened or conditioned." *Id.* (quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)). If the interest in preventing a chilling effect on participatory democracy is so great that it requires

48

facially invalidating California's state statute, then surely the *protection* of that interest under New Mexico's duly enacted laws warrants treatment as a compelling state interest.

### 2. New Mexico's prohibition on publishing data is constitutionally permissible under the *Anderson-Burdick* analysis.

Even if the Court finds that both New Mexico's regulation and VRF's desired conduct touch upon participation in free elections, then the Court should proceed to balance these interests under the *Anderson-Burdick* analysis. The Supreme Court has held that this "more flexible standard applies" when considering First Amendment "challenge[s] to a state election law[…]." *Burdick*, 504 U.S. at 434. In analyzing this case under the *Anderson-Burdick* balancing framework, the Court should find that New Mexico's interests in prohibiting publication of its voter rolls justifies any burden placed on VRF.

The Supreme Court has opined that "[c]onstitutional challenges to specific provisions of a State's election laws … cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson*, 460 U.S. at 789. While the regulation of elections necessarily implicates fundamental rights, "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Id.* at 788. The Supreme Court held:

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson*, 460 U.S. at 789. The Court refined the test in *Burdick*: "[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434.

Myriad courts have held that the *Anderson-Burdick* test is the appropriate analysis when considering constitutional challenges to state election laws. *See, e.g., Fish*, 957 F.3d at 1121–23; *Utah Republican Party v. Cox*, 892 F.3d 1066, 1077 (10th Cir. 2018) ("[W]e analyze electoral regulations using

the now-familiar Anderson-Burdick balancing test."); *see Herrera*, 690 F. Supp. 2d at 1211–1213 (applying *Anderson-Burdick* test in a case challenging New Mexico's third-party voter registration law, NMSA 1978, § 1-4-49).  While the origin of the test is rooted in challenges to ballot access, federal courts have applied the analysis in many other circumstances concerning election regulation. *See Anderson*, 460 U.S. at 782–83 (stating the question presented as whether "Ohio's early filing deadline placed an unconstitutional burden on the voting and associational rights of [the plaintiff's] supporters."); *Burdick*, 504 U.S. at 430 (stating that the issue was "whether Hawaii's prohibition on write-in voting unreasonably infringes upon its citizens' rights under the First and Fourteenth Amendments"); *Daunt v. Benson*, 956 F.3d 396, 406–07 (6th Cir. 2020) (noting that the "*Anderson-Burdick* may apply to First Amendment claims" and affirming denial of preliminary injunction seeking to enjoin an eligibility criteria for Michigan's independent redistricting commission on First Amendment grounds); *Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1283 (10th Cir. 2019) (applying the analysis to an unequal districting apportionment case under the Fourteenth Amendment).

    At least two courts have applied the *Anderson-Burdick* test to cases involving state election laws concerning limitations on availability of voter data.  In *Libertarian Party of Indiana v. Marion Cnty. Bd. of Voter Registration*, a district court held that a state law providing copies of voter registration lists only to the two major political parties was unconstitutional. 778 F. Supp. 1458, 1462-63 (S.D. Ind. 1991). The court held that the state had offered no interest sufficiently important "to justify the unnecessary impingement upon the first amendment and equal protection rights of the plaintiff political parties in this lawsuit that results from distributing the list to only two political parties." *Id.* at 1464.

    The other case applying *Anderson-Burdick* to requests for voter data, *Fusaro v. Cogan*, considered a constitutional challenge by a Virginia resident to a Maryland election law restricting access to copies of voter registration lists to registered Maryland voters (though allowing for non-Maryland voters to borrow the same records from a local office of the board of elections). 930 F.3d at 244.  The Fourth

Circuit stated in its opinion that the "precise balancing required by the *Anderson-Burdick* analysis" requires "resolv[ing] the tension between the deference that the courts owe to legislatures in areas meriting careful regulation and the need the protect 'fundamental' First Amendment rights[…]." *Id.* at 258. In conducting its analysis, the court stated that the "threshold question" of the *Anderson-Burdick* framework is "whether the challenged regulation 'severely' burdens First and Fourteenth Amendment rights." *Id.* at 259 (citing *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995)). The court concluded that the burden in this instance was not severe and, therefore, did not warrant a strict scrutiny analysis. *Id.* The court based its opinion, in part, on the ample other opportunities for political speech open to the plaintiffs to accomplish their objectives: billboards, newsletters, internet advertisements, or even broad, blanket mailings to anyone with a phonebook listing. *Id.* at 260.

Here, the burden is even less severe than that in *Fusaro*, and the alternative options for speech are even more numerous. Unlike the plaintiff in *Fusaro*, VRF has obtained a copy of the voter file and may be able to do so again after the instant litigation concludes. The voter file is a powerful tool for conducting political speech. Possession of the voter file leaves VRF with the opportunity to perform statistical analysis; recruit likeminded volunteers; go door-to-door in support of their cause; phone bank; conduct a direct-mail campaign; target their outreach based upon party affiliation, age, and voting history; or combine the voter file with commercially available consumer data for improved communication options. This is to say nothing of the opportunities for mass communication: television, radio, digital, and print advertising.

Given the ample opportunities for alternative forms of political speech available to VRF, the burden of prohibition from publishing the voter file itself cannot be said to be "severe." Therefore, the Court should reject VRF's argument that strict scrutiny applies. Instead, the Court should perform the *Anderson-Burdick* balancing test, considering the nature of the alleged First Amendment burden

resulting from the prohibition on publication of the state voter file against the state's regulatory interests in protecting safety, privacy, and participation of New Mexico voters.  Under such an analysis, these interests of the state—as a sovereign responsible for its citizens' safety—heavily outweigh any incidental burden to VRF.

However, even if the Court does decide that the burden upon VRF is severe—either as a categorical matter of law based upon the nature of prohibition or based upon VRF's specific facts— and strict scrutiny is warranted, the prohibition against publication of the voter file satisfies that standard as well. *See* Part III.C.1 *supra.* "Under strict scrutiny, the State must assert a significant and compelling state interest, and the law must be narrowly tailored to serve that compelling state interest." *Herrera*, 690 F.Supp. 2d at 1194 (citing *Perry Educ. Ass'n v. Perry Local Educ. Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed. 2d 794 (1983)).  Here, as stated, the State maintains a compelling interest in the safety and welfare of its citizens and in their free participation in elections. Given that publication of a voter's address would likely put voters in harm's way for numerous different reasons—based upon career, domestic violence history, ethnic identity, etc.—the prohibition against publication of the voter file is the only way to protect against all of these simultaneously.  Therefore, the state's restriction is narrowly tailored and does, in fact, serve a compelling interest.

VRF contends that New Mexico law is not narrowly tailored because the State could protect voter privacy and prevent harassment and abuse through other means. VRF MSJ at 78. But the alternatives VRF posits—having the State post voter data or "ask[ing] requesters to keep a list of the people that use the data"—would still invade voters' privacy and permit the general public to obtain voters' home addresses, political affiliation, and voting history. Such alternatives also would not prevent people from using this personal information to stalk, harass, intimidate, or solicit voters at their homes.

Conditioning access to voter file data upon agreement to refrain from publication of that data is a policy choice within the purview of the State and does not implicate any First Amendment protections.  But, if the Court finds that First Amendment rights are implicated, the Court should find that the burden upon VRF is not severe and is sufficiently justified by the State's interests under the *Anderson-Burdick* test.  Finally, if the Court does find that the burden is severe and strict scrutiny applies, the Court should find that the State's interests are compelling and the law is narrowly tailored to achieve that compelling interest.

### D. Defendants' enforcement of these constitutional regulations was not retaliatory or discriminatory.

VRF's Count III alleges that the Secretary's referral of VRF to the AG and denials of voter data requests were had a discriminatory purpose and that Defendants' motivation was viewpoint discriminatory. VRF MSJ (ECF No. 124) at 90–92. But Defendants' actions were motivated solely by enforcement of New Mexico's constitutionally valid Election Code and out of an immediate concern for protecting voters from an unprecedented intrusion of their privacy by posting voter data online. They were not undertaken to retaliate against VRF for any viewpoint held or espoused. Absent the broad internet publication of the state voter file, there is nothing to suggest that Defendants would have taken any action against Plaintiff. At a minimum, the reasons for the Secretary's referral of VRF to the Attorney General and the Secretary's denial of VRF's voter data requests present fact questions ill-suited for summary judgment.

First, VRF cannot establish that Defendants retaliated against VRF because of its viewpoint. VRF MSJ (ECF No. 124) at 90–92. Establishing motivation in constitutional retaliation cases requires showing "but-for" causation. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) ("[T]he District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's

reemployment even in the absence of the protected conduct."); *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) ("Accordingly, a plaintiff must prove that 'but for' the retaliatory motive, the incidents to which he refers, including the disciplinary action, would not have taken place." (internal citation and quotation omitted)). Because VRF's publishing the voter file to the internet is not protected activity, *see* Part III.A.–B. *supra*. VRF's publication of the file cannot form the basis of a retaliation claim.

Additionally, VRF has not established that the investigative referral or voter data denials would not have occurred "but for" VRF's criticism of the Secretary. VRF acknowledges that the Secretary's referral letter to the AG "states the referral is based on VRF's posting of voter data online." VRF MSJ (ECF No. 124) at 90–91. VRF's contention that Defendants' actions were motivated by a concern for VRF's criticisms of the Secretary are also belied by the fact that the Secretary acknowledged that VRF's posting of voter roll analyses—which were actually critical of the Secretary, as opposed to the voter roll itself—did not violate the Election Code. May 17, 2022, PI Hearing at 145:8–146:5.

Second, VRF cannot establish a viewpoint discrimination claim that Defendants discriminated against VRF based upon Plaintiff's espoused or held viewpoints. VRF MSJ (ECF No. 124) at 93–96. "In § 1983 . . . actions, a claim of viewpoint discrimination in contravention of the First Amendment requires a plaintiff to show that the defendant acted with a viewpoint-discriminatory purpose." *Pahls v. Thomas*, 718 F.3d 1210, 1230 (10th Cir. 2013) (internal citations omitted). Here, VRF holds the burden. *Id.* "Purposeful discrimination requires more than intent as volition or intent as awareness of consequences . . . . It instead involves a decisionmaker's undertaking a course of action because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Ashcroft v. Iqbal*, 556 U.S. 662, 676-77 (2009) (internal citation and quotations omitted). By its nature, discrimination on a protected basis—in this instance, viewpoint—requires showing that a similarly situated party lacking that same protected basis, was treated more favorably. *Cf. Lucero v. Sandia Corp.*, 495 F. App'x 903

(10th Cir. 2012) (affirming summary judgment in action for employment discrimination where employee failed to introduce evidence of more favorably treated employees being similarly situated).

VRF cannot show that Defendants' actions were motivated by a discriminatory purpose on the basis of VRF's viewpoint. In fact, VRF cannot identify a single party with different viewpoints who has published New Mexico voter data on a publicly available website whom Defendants have not referred for criminal prosecution or to whom Defendants have denied requests for voter data. This is because no such party exists. By VRF's own admission, a project to publish state voter rolls is "unprecedented" and "the first of its kind." SOAF ¶ 247.

Nonetheless, VRF argues that it is being targeted for spreading "'misinformation' of a discrepancy existing in the data." VRF MSJ (ECF No. 124) at 107. While no party is similarly situated to VRF in its publication of voter data online, many parties exist who share this viewpoint with VRF and who have received access to New Mexico voter data form the Secretary. For example, in 2022, Toulouse Oliver, in her personal capacity, stood for reelection as the Democratic nominee for the office of Secretary of State. She ran against the Republican nominee for Secretary of State, Audrey Trujillo. Ms. Trujillo campaigned on a platform that New Mexico elections lacked integrity and honesty, that the current administration has taken cues "straight out of the Jim Crow Laws" to undermine the electoral process, and that voting machines have been used to manipulate elections. SOAF ¶ 248. Moreover, Ms. Trujillo accused Toulouse Oliver of illegal, unethical, and conspiratorial practices to "weaponiz[e] her office and us[e] it to give her party an advantage in elections." SOAF ¶ 248.

Despite these aggressive campaign statements from Toulouse Oliver's political opponent— including those that falsely suggest New Mexico elections are fraudulent—the Office of the Secretary of State readily provided access to the file to the Republican Party of New Mexico. SOAF ¶ 248. The Republican Party, as the campaign apparatus supporting Ms. Trujillo's bid to challenge Toulouse

Oliver for Secretary of State, was not denied access to this voter file, nor was any nominee with comparable views concerning election integrity denied access. *Id.*

Further, the Office of the Secretary of State has fulfilled voter data requests to individuals from across the ideological spectrum. The voter data request spreadsheet reflects all such requests received by the Secretary over a two-year window. In that time frame, Defendant Toulouse Oliver's office filled requests for data from myriad ideologically diverse requestors. *Id.* The Secretary provided voter data to candidates and campaigns representing parties as diverse as the Constitution Party, the Democratic Party, the Green Party, the Libertarian Party, the Republican Party, and the Working Families Party. *Id.* The Office provided voter data to candidates critical of New Mexico election administration and, specifically, of Toulouse Oliver herself. *Id.*

Thus, VRF cannot reasonably assert that it was a viewpoint-discriminatory interest motivating Defendants' actions. On the contrary, the only motive for the Secretary denying subsequent requests for voter data was as a response to an unprecedented publication of the entire state voter file in attempt to enforce New Mexico's laws and protect the privacy and safety of New Mexico voters.

Again, VRF's publication of the voter file does not constitute protected First Amendment speech. This action cannot serve as the basis of a claim for First Amendment retaliation and VRF's claim must fail. Further, Defendants acted with no discriminatory purpose, but merely sought to enforce New Mexico law.

### IV.   New Mexico's regulations are not vague or overbroad. (Counts VI–VII)

VRF also challenges New Mexico's laws as either overbroad in violation of the First Amendment or vague in violation of the Fourteenth. They are neither.

Importantly, VRF's arguments largely ignore recent legislation, which will take effect June 16, 2023, and which will moot VRF's claims of vagueness and overbreadth. This legislation, enacted as House Bill 4, is sufficient reason to dispose of these particular claims. But even under current law, the

Court should decline to enter judgment for VRF on either its theory of vagueness or overbreadth. *See* Mem. Op. (ECF No. 51) at 172–78, 198–204 (rejecting vagueness and overbreadth challenges on preliminary injunction).

### A. VRF's overbreadth and vagueness claims are moot.

House Bill 4 moots VRF's claims of overbreadth and vagueness. The Eleventh Amendment dictates that VRF can seek only prospective injunctive relief from Defendants, meaning that only those laws that can now or in the future be enforced against VRF may support a claim for relief in this case. *See Collins v. Daniels*, 916 F.3d 1202, 1215 (10th Cir. 2019) (observing that, absent a "sufficient likelihood" that a plaintiff "will again be wronged in a similar way" a "federal court may not entertain a claim … that a state's laws are unconstitutional").

Here, House Bill 4 makes abundantly clear that a very specific type of activity—*i.e.*, causing voter data "to be made publicly available on the internet or through other means"—is unlawful. VRF cannot claim that this prohibition is vague or that it burdens constitutionally protected activity. *See* Part IV.B. *infra*. The statutes were clear and sufficiently narrow before, and they are even more so now. Thus, any future enforcement of the law against any future conduct of VRF is not subject to criticism on the basis of vagueness or overbreadth. These claims are moot, and VRF has not shown that any exception to mootness applies. *Marks v. Colorado Dep't of Corr.*, 976 F.3d 1087, 1093 (10th Cir. 2020) (recognizing that plaintiffs bear the burden of showing an exception to mootness).

VRF argues that its claims are not moot because it could still be prosecuted for its past posting of voter data under the prior statute. VRF MSJ (ECF No. 124) at 88. Yet VRF's *past* posting of voter data necessarily cannot be chilled; it has already occurred. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (standing in chilled speech case requires desire to engage in regulated speech in the future). Future speech is subject to the version of Section 1-4-5.6 revised by House Bill 4, and any vagueness or overbreadth challenges must be brought to that law.

### B.  Even if the claims may proceed, they are not supported.

#### i.     *Vagueness*

Even prior to House Bill 4, the challenged provisions of the Election Code were not unconstitutionally vague. VRF MSJ (ECF No. 124) at 82–88. Statutes are not constitutionally void for vagueness unless their terms effectively prevent "ordinary people" from obtaining "fair notice of the conduct … proscribe[d]." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). This analysis presumes "people of ordinary intelligence" and requires nothing more than a "reasonable opportunity to understand." *Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1158 (10th Cir. 2006). In other words, it does not entitle courts to nullify legislation based on interpretations that are speculative or intentionally obtuse. *Cf. Hill v. Colorado*, 530 U.S. 703, 732 (2000) ("[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" (quoting *United States v. Raines*, 362 U.S. 17, 23 (1960)). Neither does it condemn statutes simply because they require some reasonable application of law to novel facts. *See id.* at 733 ("[W]hile there is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question, because we are condemned to the use of words, we can never expect mathematical certainty from our language." (internal quotation marks and citation omitted)).

VRF once again constructs a unique interpretation of what the law requires and then asks the State to defend *that* construct. Specifically, VRF argues that New Mexico law enacts a total "Data Sharing Ban" that would prohibit not only widespread publication of voter data but would also prevent a private citizen from sharing her own data with another private citizen, an entity from sharing its own summary or analysis of data with the public, or a volunteer canvasser from discussing voter data if he might be overheard by a third party. *See* VRF MSJ (ECF No. 124) at 95. Of course such prohibitions "do[] not appear in any New Mexico statute, rule, regulation or administrative guidance." *Id.* at 97.

Such prohibitions simply don't exist. What *is*, and has always been, prohibited is posting to the Internet, on a publicly available website, all New Mexico voter data in a non-anonymized, non-aggregated form. How New Mexico law might apply to myriad hypothetical situations is not the question under the Fourteenth Amendment. *Hill*, 530 U.S. at 732–33. Instead, the question is whether VRF had "fair notice" that posting voter information to VoteRef.com was unlawful.

Prohibited and permissible uses for New Mexico's voter data are laid out specifically in NMSA Sections 1-4-5.5 and 1-4-5.6. Permissible and prohibited uses do not need to specifically be based in a single statute. And even before the passage of House Bill 4, permissible uses were explained in both the voter data request forms and in Section 1-5-22. VRF argues that Defendants improperly read "two statutes from different articles in New Mexico law … in conjunction," VRF MSJ (ECF No. 124) at 84, but the statutes expressly reference one another making such reading together not vague but expressly directed in law.

Section 1-4-5.5 governs parties who seek to obtain data, and section (C) requires each requester of voter data, mailing labels or special voter lists to "sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes." Although the statutes use broad "relating in any way" language in defining a governmental purpose, a plain language reading of that definition presumes that the *actor* is itself a government or government agent acting on behalf of a government. *See* NMSA 1978, § 1-4-5.5(E)(2) ("'[G]overnmental purposes' means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government."). Although New Mexico courts have not interpreted this particular provision, case law in other areas reveals that the phrase "governmental purpose" is not used with reference to any actor

other than a government entity or agent.[9] Moreover, past New Mexico case law has addressed questions of whether even a government actor was acting for a governmental *purpose*, giving further context to the Legislature's decision to clarify the meaning of "governmental purpose" within the Election Code: "Some functions [of government entities] seem to be exclusively governmental such as the adoption of legislation, the administration of justice, the exercise of eminent domain, and the assessment and collection of taxes. … Conversely, there is a distinctly governmental quality about many [government] activities classified as proprietary by New Mexico courts." *Morningstar Water Users Ass'n, Inc. v. Farmington Mun. Sch. Dist. No. 5*, 1995-NMSC-052, ¶¶ 21–23, 901 P.2d 725, 730 (abolishing the "governmental-proprietary distinction" for New Mexico governmental entities); *see also Altman v. Kilburn*, 1941-NMSC-023, ¶ 33, 116 P.2d 812, 817 ("The municipality exercises a governmental *function* in levying the tax … but it is not for a governmental *purpose*." (emphasis original)); *Herrera v. Quality Imports*, 1999-NMCA-140, ¶ 8, 992 P.2d 313, 315–16 (presuming New Mexico Legislature knows of existing law when it enacts legislation). Thus, the "governmental purpose" definition is not so broad as to encompass the actions of private entities or citizens who are merely taking an interest in government. *Cf. Harrington v. Atteberry*, 1915-NMSC-058, ¶ 50, 153 P. 1041, 1048 ("The fact that the corporation exercised power over the subject which might well have required the attention of the city did not have the effect of designating the defendant as a subordinate governmental agency."). Thus,

---

[9] *See, e.g.*, *State v. Bd. Cnty. Comm'rs Dona Ana Cnty.*, 1963-NMSC-074, ¶ 6, 380 P.2d 830, 831 (describing land held by county as exempt from eminent domain provisions because it was "public property and used for governmental purposes"); *Brown v. Bowling*, 1952-NMSC-017, ¶ 18, 240 P.2d 846, 849 ("It is recognized that for some purposes the County Board of Education is an agency of the state. For other purposes . . . [i]t is an entity for specific governmental purposes distinct from the county within which it lies."); *Vigil v. Penitentiary N.M.*, 1948-NMSC-32, ¶ 16, 195 P.2d 1014, 1016–17 (quoting with approval North Carolina holding that contracted prison corporations are agents of the state performing "a governmental function" because prison management is "an indispensable part of the administration of the criminal laws of the state"); *Shackelford v. McGlashan*, 1921-NMSC-093, ¶ 11, 505 P. 690, 691 ("The primary purpose of every law for the enforcement of tax liens … is the obtaining of the funds necessary for governmental purposes."); *Dow v. Irwin*, 1915-NMSC-009, ¶ 12, 157 P. 490, 493 (defining counties as "political subdivision[s] of the state for governmental purposes").

VRF's stated desire to monitor government conduct is not a "governmental purpose" under New Mexico law.

Section 1-4-5.6, for its part, defines the "unlawful purposes" referenced in Section 1-4-5.5 as "the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." NMSA 1978, § 1-4-5.6(A). That act, with relevant portions found in Section 1-5-22, provides the following description of prohibited purposes: "Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System Act to have possession of the file." Of course, VRF is not a "data processor." But that is the import of Section 1-4-5.6 incorporating language, which extends by reference the prohibitions in the Voter Records System Act to persons who sign affidavits for voter data.

Nor do the challenged laws do not contain any terms that call for subjective judgment and enforcement. These laws spell out objective uses that are and are not permitted, and contrary to Plaintiff's argument that it was referred for prosecution under "arbitrary enforcement," Plaintiff was referred to the Attorney General for prosecution when it published the voter file data on its website, making it available to members of the general public in direct contravention of these laws.

Neither statements by the AG's witness nor the Legislature's amendment of Section 1-4-5.6 establish that the Election Code is unconstitutionally vague. VRF MSJ (ECF No. 124) at 86, 88. House Bill 4 made explicit in a single provision that voter data may not be posted on the internet, and the AG's witness testified that this change made the law clearer. It does not follow, however, that just because a statute has been made *more* clear, that the statute originally was so vague as to be

unconstitutional. *See Dr. John's*, 465 F.3d at 1158 (law must simply afford "reasonable opportunity to understand").

Whether read together in the prior version of the Election Code or expressly in House Bill 4, the Election Code provides fair notice that party who seeks and obtains voter data cannot loan, sell, or provide access to anyone who is not authorized to have the data. It is certainly not ambiguous that VRF's publication of voter data to the general public on VoteRef.com is prohibited. This has consistently been the Secretary's position, including with respect to VRF. New Mexico's laws are not unconstitutionally vague.

ii.   ***Overbreadth***

Neither is New Mexico's law overbroad. VRF MSJ (ECF No. 124) at 78–82. A challenged statute is overbroad when it "offends the constitutional principle that 'a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms.'" *Zwickler v. Koota*, 389 U.S. 241, 250, (1967) (internal citations omitted). Under First Amendment overbreadth doctrine, a statute is facially invalid only if it prohibits a substantial amount of protected speech; the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it overbroad. *See Broadrick v. Oklahoma*, 413 U.S. 601, 615–16 (1973) ("[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."); *Bushco v. Shurtleff*, 729 F.3d 1294, 1302 (10th Cir. 2013). In other words, there must be more than just one possible misapplication of the statute to reach a determination of overbreadth; there must, instead, be a realistic danger the statute will significantly compromise recognized First Amendment protections of parties not before the Court. *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800–801 (1984). Therefore, although VRF contends that its overbreadth

challenge may be founded on the NVRA or state law, VRF MSJ (ECF No. 124) at 80, VRF must have

a First Amendment right to publish the voter data for restrictions on that right to be overbroad.

To the contrary, there is no general right under the First Amendment to access government

information. *See Houchins,* 438 U.S. at 14 ("There is no constitutional right to have access to particular

government information, or to require openness from the bureaucracy."); *see also Fusaro*, 930 F.3d at

250 ("There is generally no First Amendment claim based on the government's denial of access to

information in its possession."). Once a State chooses to provide access to certain information, the

State can control the access by any nondiscriminatory means. See *Fusaro*, 930 F.3d at 256-57 ("[T]he

initial decision to release such information remains, fundamentally, a policy choice. . . . And the

judgment of the Maryland legislature regarding the release of government information is entitled to

substantial deference, particularly where [the statute] is a part of a complex scheme to regulate

elections."). As the Supreme Court stated in *Houchins*:

> The prohibition of unauthorized entry into the White House diminishes the
> citizen's opportunities to gather information he might find relevant to his
> opinion of the way the country is being run, but that does not make entry into
> the White House a First Amendment right. *The right to speak and publish does not
> carry with it the unrestrained right to gather information.*

*Houchins*, 438 U.S. at 12 (quoting *Zemel v. Rusk*, 381 U.S. 1, 16-17 (1965) (emphasis original)).

Even if overbreadth doctrine applied to the Election Code, the challenged statutes are not

overbroad. Contrary to VRF's totalitarian hypotheticals, VRF MSJ (ECF No. 124) at 81, the Secretary's

actual interpretation and enforcement of relevant statutes only conditions receipt of voter data on

refraining from (i) use of voter data for unlawful purposes as defined in Section 1-4-5.5 or (ii)

intentional sharing of specific voter data with persons separate from and outside of the organization

that requested and received the data. VRF does not explain why these restrictions are not well-tailored

to furthering the State's interests in encouraging voter participation or protecting voters privacy. *See*

VRF MSJ (ECF No. 124) at 81–82.

New Mexico has chosen to control how an individual may use the information in voter file by enacting the challenged statutes. These statutes impose content-neutral conditions, *see* Section III.D, *supra*, on the use of voter data and prohibit access to data for persons unwilling to abide by those conditions. But these statutes do not burden any amount of protected speech because unconditional access to this information is not a right under the First Amendment. *See also* VRF MSJ (ECF No. 124) at 77 (acknowledging that any right of access VRF has "is derived from the NVRA and state law"). The challenged statutes cannot be overbroad, therefore, because obtaining and using this information is not constitutionally protected. Defendants respectfully request the Court so find as a matter of law.

### V.     VRF is not entitled to a permanent injunction.

VRF is not entitled to permanent injunctive relief. As Plaintiff correctly notes, the four factors outlined in *Southwest Stainless, LP v. Sappington* govern the award of a permanent injunction. *See Southwest Stainless, LP. v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (requiring the party seeking a permanent injunction to prove (i) actual success on the merits; (ii) irreparable harm without an injunction; (iii) injury outweighing the harm that an injunction will cause the opposing party; and (iv) no adverse effect to the public interest.).

For all the reasons shown above, Plaintiff has not proven "actual success on the merits." VRF merits case contains several flaws that warrant not only a denial of its requested injunction but also an award of summary judgment in favor of Defendants. *See* Defs. Mtn. for Summary Judgment, ECF No. 121. Moreover, success on the merits is only one factor of four, and VRF has failed to address the very real threat to public interests and harm to the State of New Mexico that will result if it receives its requested injunction. As shown above, in Part III.C., the public harms of VRF's conduct are weighty and concrete and the public interest in preventing the widespread publication of sensitive government data on New Mexican citizens would be adversely affected in VRF were granted the injunction it seeks.

## CONCLUSION

For the reasons stated above, Defendants respectfully move the Court to deny judgment in favor of Plaintiff.

> By: */s/ Kelsey Frobisher Schremmer*
> Kelsey Frobisher Schremmer
> Jeff Dan Herrera
> Assistant Attorneys General
> 408 Galisteo St
> Santa Fe, NM 87501
> Tel.: (505) 490-4060
> Fax: (505) 490-4881
> kschremmer@nmag.gov
> jherrera@nmag.gov
>
> **Attorneys for Defendants**

## CERTIFICATE OF SERVICE

I certify that on May 12, 2023, I served the foregoing on counsel of record for all parties via the CM/ECF system.

> */s/ Jeff Dan Herrera*