**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | |
| | ) | **CASE NO: 1:22-cv-00222-JB-KK** |
| | ) | |
| **RAÚL TORREZ**, in his official | ) | |
| capacity as New Mexico Attorney General, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| **MAGGIE TOULOUSE OLIVER,** in her | ) | |
| Official capacity as New Mexico | ) | |
| Secretary of State, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF VOTER REFERENCE FOUNDATION, LLC'S**
**REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ...................................................................................v

**INTRODUCTION** ..............................................................................................1

**VRF' RESPONSE TO DEFENDANTS' STATEMENT OF
ADDITIONAL FACTS** ......................................................................................2

**ARGUMENT** ....................................................................................................6

    **I.**      **Defendants' response to VRF's Statement of Facts fails to sufficiently
controvert many of VRF's factual assertions.** ...................................6

        **a.**  **Arguing materiality is ineffective to dispute a statement of fact.** .........6

        **b.**  **Defendants fail to cite the record for many facts they claim to controvert.** ..6

        **c.**  **Defendants' legal conclusion objections are largely ineffective and fail
to dispute the statements to which they respond.** ...............................7

        **d.**  **Defendants waived the objection they now assert to SOF ¶123.** ...............8

    **II.**    **Defendants assert new facts not in the summary judgment record
without complying with Local Rule 56.1(b).** .......................................9

    **III.**   **Defendants make several key admissions in their Response brief
which further warrant judgment in VRF's favor.** ..............................10

        **a.**  **Defendants admit "the voter file is a powerful tool for conducting
political speech."** .............................................................................10

        **b.**  **The Secretary claims to comply with state law requiring her to create
a "file maintenance list" by maintaining the requisite data in a raw
file, yet argues that raw data need not be produced to comply with
the NVRA.** ......................................................................................11

        **c.**  **Despite Defendants' focus on misinformation and misrepresentation,
they finally reveal that their restrictions prohibit the publication of
*truthful, accurate* voter data.** .........................................................13

        **d.**  **Defendants (again) admit that their decision not to provide voter data
to VRF was retaliation for VRF's posting of data online.** ..................13

**IV.    Plaintiff is entitled to judgment on Count II, VRF's NVRA preemption claim, because the Defendants' Use Restrictions and Data Sharing Ban unlawfully obstruct a key objective of the NVRA** ...................14

   **a.    Defendants regular "access" to records made public by the NVRA by predicating that access on an unlawful "use" restriction.** ....................14

   **b.    Defendants' reliance on *American Ass'n of People with Disabilities v. Herrera* is misplaced.** ...................15

   **c.    Defendants cannot defeat VRF's preemption claim with hollow policy arguments.** ...................17

      **i.    Defendants' unsupported policy arguments do not affect preemption** ...................18

      **ii.    Congress has already spoken to the importance of voter record transparency** ...................19

**V.    VRF is entitled to judgment as a matter of law on its NVRA violation claim because (Count II) because VRF made three lawful NVRA requests which the Secretary unlawfully refused to honor at the advice of the Attorney General.** ...................19

   **a.    VRF's requests complied with NVRA.** ...................19

      **i.    New Mexico law requires the Secretary to conduct various programs and activities related to voter registration and voter registration and voter list maintenance, records of which must be made available under the NVRA.** ...................21

   **b.    Voter data is essential, not merely incidental, to the scope of the NVRA's Publica Inspection Provision.** ...................22

   **c.    VRF's requests do not implicate uniquely sensitive information.** ...................23

   **d.    Section 20507(i)(1) is not limited to § 20507(i)(2).** ...................23

   **e.    VRF's requests did not require "creation" of any "records".** ...................24

   **f.    The data requested in the February 15, 2022 request falls within the NVRA's Public Inspection Provision.** ...................26

   **g.    Defendants' other pretextual excuses for failing to produce the requested data and records and unavailing** ...................27

    **h. Defendants waived any challenge to the NVRA's pre-suit notice requirement, but VRF nonetheless provided proper notice.**........................27

**VI. VRF is entitled to judgment as a matter of law on its First Amendment Claim (Count V).**..................30

    **a. VRF's right to access the voter data at issue emanates from the NVRA and it does not argue that it has right to access the data under the First Amendment.**.................30

    **b. Strict scrutiny applies, not *Anderson-Burdick***.................31

    **c. Even if the Court applies *Anderson-Burdick,* the analysis does not materially change because the Data Sharing Ban and Use Restrictions severely burden VRF's First Amendment rights, triggering strict scrutiny**.................34

    **d. Neither the Use Restrictions nor the Data Sharing Ban can survive strict scrutiny.**.................36

**VII. VRF's is entitled to judgment as a matter of law on its overbreadth and vagueness claims.**.................38

    **a. VRF's vagueness and overbreadth claims are not mooted by HB 4.**.................38

    **b. Defendants' argument that the Data Sharing Ban is not vague is premised on legal argument already rejected by the Court.**.................39

    **c. Defendants' overbreadth argument rests on the erroneous assumption that sharing voter data is never protected by the First Amendment**.................40

**VIII. Defendants concede that their repeated refusals to deny VRF access to voter data were motivated by VRF's protected speech, establishing First Amendment retaliation.**.................42

**IX. Defendants engaged in viewpoint discrimination targeted at VRF's perceived criticism of the Secretary's voter list maintenance.**.................43

**X. VRF is entitled to permanent injunction.**.................47

**CONCLUSION**.................47

# TABLE OF AUTHORITIES

**Cases**

*American Ass'n of People with Disabilities v. Herrera*,
690 F.Supp.2d 1183 (D.N.M. 2010) ...................................................... *passim*

*Anderson v. Celebrezze*,
460 U.S. 780 (1983) ...................................................... 31-35

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997) ...................................................... 38

*ACORN v. Municipality of Golden*,
744 F.2d 739 (10th Cir. 1984) ...................................................... 41

*Ass'n of Cmty. Organizations for Reform Now v. Miller*,
129 F.3d 833 (6th Cir. 1997) ...................................................... 29

*Bartnicki v. Vopper*,
532 U.S. 514 (2001) ...................................................... 13, 30

*Beattie v. United States*,
949 F.2d 1092 (10th Cir.1991) ...................................................... 38

*Buckley v. American Const. L. Found.*,
525 U.S. 182 (1999) ...................................................... 32, 35

*Burdick v. Takushi*,
504 U.S. 428 (1992) ...................................................... 31-35

*Campbell v. Buckley*,
203 F.3d 738 (10th Cir. 2000) ...................................................... 32, 35

*Citizens for Responsible Government State Political Action Committee v. Davidson*,
236 F.3d 1174 (10th Cir. 2000) ...................................................... 39

*City of Erie v. Pap's A.M.,*
529 U.S. 277 (2000) ...................................................... 38

*Collins v. Yellen*,
141 S.Ct. 1761 (2021) ...................................................... 16

*Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*,
447 U.S. 530 (1980) ...................................................... 36

*Cox Broad. Corp. v. Cohn*,
    420 U.S. 469 (1975) ................................................................................................. 13

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ................................................................................................. 31

*Dahlstrom v. Sun-Times Media, LLC*,
    777 F.3d 937 (7th Cir. 2015) .................................................................................. 30

*Daye v. Cmty. Fin. Serv. Centers, LLC*,
    233 F. Supp. 3d 946 (D.N.M. 2017) ..................................................................... 6

*Doe v. City of Albuquerque*,
    667 F.3d 1111 (10th Cir. 2012) .............................................................................. 41

*Edwards-Flynn v. Yara*,
    2009 WL 1563375 (D.N.M. May 18, 2009) ....................................................... 43

*Fusaro v. Cogan*,
    930 F.3d 241 (4th Cir. 2019) .......................................................... 11, 30, 33, 34

*Grange v. Washington State Republican Party*,
    552 U.S. 442 (2008) ................................................................................................. 31

*Griffin v. Bryant*,
    30 F. Supp. 3d 1139 (D.N.M. 2014) ............................................................. 36, 37

*Gross v. Burggraf Constr. Co.*,
    53 F.3d 1531 (10th Cir. 1995) ................................................................................ 2

*Kennecott Utah Copper Corp. v. Becker*,
    186 F.3d 1261 (10th Cir.1999) ............................................................................. 38

*Lane v. Page*,
    272 F.R.D. 581 (D.N.M. 2011) ............................................................................ 28

*Libertarian Party of Indiana v. Marion Cnty. Bd. of Voter Registration*,
    778 F. Supp. 1458 (S.D. Ind. 1991) ................................................................... 32

*Martinez v. Naranjo*,
    328 F.R.D. 581 (D.N.M. 2018) ............................................................................ 28

*Massachusetts v. Oakes*,
    491 U.S. 576 (1989) ................................................................................................. 39

*McClendon v. City of Albuquerque,*
    100 F.3d 863 (10th Cir.1996) ........................................................ 38

*McCraw v. City of Oklahoma City,*
    973 F.3d 1057 (10th Cir. 2020) .................................................... 37

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995) ............................................................... 31, 32

*Meyer v. Grant,*
    486 U.S. 414 (1999) ............................................................... 30, 32

*MIMICS, Inc. v. Village of Angel Fire,*
    394 F.3d 836 (10th Cir.2005) ...................................................... 43

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ................................................................. 28

*Norman v. Reed,*
    502 U.S. 279 (1992) ................................................................. 31

*Ohio Dem. Party v. Husted,*
    834 F.3d 620 (6th Cir. 2016) ...................................................... 34

*Perez v. Ellington,*
    421 F.3d 1128 (10th Cir. 2005) .................................................... 43

*Project Vote, Inc., v. Kemp,*
    208 F.Supp.3d 1320 (N.D. Ga. 2016) ............................................ 24

*Project Vote/Voting for Am., Inc. v. Long,*
    682 F.3d 331 (4th Cir. 2012) ................................................ 20, 21, 24

*Pub. Int. Legal Found., Inc. v. Bellows (Bellows II),*
    Slip Op. WL 2663827 (March 28, 2023) ..................................... 16, 17, 20

*Pub. Int. Legal Found. v. Chapman,*
    595 F.Supp.3d 296 (M.D. Pa. 2022) ........................................... 24, 25

*Pub. Int. Legal Found., Inc. v. Matthews,*
    589 F. Supp. 3d 932 (C.D. Ill. 2022) .......................................... 20, 23

*Pub. Int. Legal Found., Inc. v. North Carolina State Board of Elections,*
    996 F.3d 257 (4th Cir. 2021) ...................................................... 20

*Republican Party of Minnesota v. White*,
    536 U.S. 765 (2002) .......................................................................................... 36

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) .......................................................................................... 44

*Schad v. Borough of Mt. Ephraim*,
    452 U.S. 61 (1981) ............................................................................................ 40

*Smith v. Daily Mail Publishing Co.*,
    443 U.S. 97 (1979) ............................................................................................ 13

*Tashjian v. Republican Party*,
    479 U.S. 208 (1986) .......................................................................................... 31

*Timmons v. Twin Cities Area New Party*,
    520 U.S. 351 (1997) .......................................................................................... 31

*True the Vote v. Hosemann*,
    43 F.Supp.3d 693 (S.D. Miss. 2014) ............................................................. 23, 25

*Turner Broadcasting Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) .......................................................................................... 37

*U.S. v. Ganadonegro*,
    854 F.Supp.2d 1068 (D.N.M. 2012) ............................................................... 16

**Statutes**

42 U.S.C. § 1973 ...................................................................................................... 15

42 U.S.C. § 1988 ...................................................................................................... 48

52 U.S.C. § 20503 ............................................................................................. 15, 16

52 U.S.C. § 20507 ............................................................................................. *passim*

D.N.M.LR-Civ. 56.1(b) ............................................................................................ 8

N.M. Stat. § 1-4-1.1 ................................................................................................ 21

N.M. Stat. § 1-4-8 ................................................................................................... 21

N.M. Stat. § 1-4-5.5 ................................................................................. 20, 30, 40, 41

N.M. Stat. § 1-4-5.6 ........................................................................................................ 38-40

N.M. Stat. § 1-4-22 .......................................................................................................... 21

N.M. Stat. § 1-4-24 .......................................................................................................... 21

N.M. Stat. § 1-4-25 .......................................................................................................... 21

N.M. Stat. § 1-4-27 .......................................................................................................... 21

N.M. Stat. § 1-4-28 .......................................................................................................... 21

N.M. Stat. § 1-4-29 .......................................................................................................... 22

N.M. Stat. § 1-4-32 .......................................................................................................... 22

N.M. Stat. § 1-5-2 ............................................................................................................ 20

N.M. Stat. § 1-5-5 ............................................................................................................ 22

N.M. Stat. § 1-5-14 ................................................................................................. 12, 22, 45

N.M. Stat. § 1-5-21 .......................................................................................................... 22

N.M. Stat. § 1-5-22 .......................................................................................................... 40

N.M. Stat. § 1-5-30 .......................................................................................................... 22

U.S. Const. Amend. 1 .................................................................................................. *passim*

## <u>INTRODUCTION</u>

This Court should enter summary judgment for the Voter Reference Foundation, enabling it to resume (1) receiving the voter data to which it is unquestionably entitled under the National Voter Registration Act and (2) engaging in online speech in which it shares that data with those who are willing to agree to only use it for election-related purposes.

VRF would still be engaging in this political speech today in New Mexico, as in many of its sister states, had an activist reporter not contacted the Defendant Secretary of State in December 2021 accusing VRF of misinformation. This accusation triggered the Secretary's spasm of public attacks on VRF. Her criminal referral to the Defendant Attorney General caused his office to contact the FBI and work with the Secretary to manufacture excuses for violating VRF's rights under the NVRA. When VRF sued, obtained a preliminary injunction from this Court, and reposted the data, the Secretary lashed out with attacks on the Court's decision and VRF to generate public fear about alleged "privacy" concerns, tracking a handful of phone calls as "evidence" that VRF was causing injury. Incredibly, the Secretary even cites VRF's online speech *in reliance on this Court's order* as cause to indefinitely deny VRF's NVRA requests. Finally, as discovery wound to a close, the AG backed away from the statutory theory the Defendants had cited to this Court from day one as the reason for prosecuting VRF. This conduct is inexcusable.

No disputes of material fact prevent this Court from holding (and declaring under Count VIII) that the Secretary must produce NVRA voter data to VRF (Counts I-II); that Defendants' retaliatory denial of access to data must end (Count III); that once VRF has that data, a blanket ban on VRF's speech communicating it to citizens who agree to use it for election purposes fails strict First Amendment scrutiny (Counts V and VI); and that VRF cannot be punished for its past speech under the "old," vague version of Defendants' Use Restrictions and Data Sharing Ban (Count VII). This Court should also entertain VRF's reasonable fee request under 42 U.S.C. §1988.

## VRF'S RESPONSE TO DEFENDANTS'
## STATEMENT OF ADDITIONAL FACTS[1]

A. **(¶245)**. Controverted. The Vigil Declaration (Exhibit B at ¶5) makes conclusory factual allegations that "[i]ndividuals asked how they may have their information removed. Several asked to cancel their voter registration to remove their name from the posted data." The declaration does not attach these alleged complaints, nor do the complaints provided as Exhibit A show any person *asking to cancel* or *actually cancelling* their New Mexico voter registration as a result of VRF's posting. *See* Defs. Ex. A. If such statements do exist, they are inadmissible hearsay and are not competent evidence to oppose summary judgment. *See Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995) ("It is well settled in this circuit that we can consider only admissible evidence in reviewing ... summary judgment"). Further, many of the "complaints" referenced in Exhibits A & C fail to demonstrate any concrete harm actually caused by VRF's posting of New Mexico voter data. Several of the "complaints" are from non-New Mexico citizens. *See* Ex. A at 2 (Virginia resident); *id.* (California resident). Several speak of hypothetical harms. *See* Ex. A at 2-3 ("I feel I *could be* threatened… *In* theory, anyone with a grievance against me could *conceivably* come to my home…") (emphasis added); *id.* at5 (August 4, 2022 email discussing concerns for hypothetical but unrealized harms). A handful exhibit the same hostility towards VRF's viewpoints that the Defendants have shown, hostility which is not proper to weigh against VRF. *See* Ex. A at 1 ("I am writing to you because I am concerned that addresses and partial birthdates of New Mexico voters including myself are being publicly shared online by the

---

[1] Defendants' Statement of Additional Uncontroverted Facts (Defs. Resp. at pp. 27-28, ¶¶245-249) fails to comply with Local Rule 56.1(b). ("The response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be **lettered** and must refer with particularity to those portions of the record upon which the non-movant relies.") (emphasis original). To comply with the Local Rule, VRF labels Defendants' additional facts with letters and notes the corresponding paragraph number in Defendants' brief.

voteref.com, a subsidiary of a conservative pro-Republican Restoration PAC without voters' knowledge and permission."). Several of the "complaints" acknowledge that this data is publicly available but merely disagree with that policy decision. *See* Ex. A at 5 ("I know that the records are public, but that does not mean they should be accessible from anywhere by anyone."); *id.* ("I'm aware this information was previously available for a fee and used by pollsters. I object to the rationale behind making this Information freely available."). And at least six of the "complaints" purport to be notes from phone calls that some staffer in the Secretary's Office purportedly had with a concerned citizen. *See* Ex. A at 5 (8/4/2022 "Phone Call" notes); p. 6 (two separate 8/3/2022 "Phone Call" notes); p. 7 (7/28/2022 and two 7/29/2022 "Phone Call" notes). Because Defendants rely on these notes for the truth of the matter asserted—that is, that the unidentified third parties expressed the recited concerns on the phone—these statements are inadmissible hearsay and are not competent evidence to oppose summary judgment. *See Gross*, 53 F.3d at 1541. Additionally, the Secretary admits she is not claiming that any of these individuals ***actually canceled*** their registrations, Vigil 140:23-141:12, even though the Secretary has access to the database that could have established whether any of these allegedly concerned citizens did in fact cancel their own registrations. Finally, Defendants' Exhibit C shows that when individuals demonstrated to VRF that they are law enforcement officers, Ex. C at 3, VRF removed their data from VoteRef.com.

B. **(¶246)**. Controverted. Exhibit B is a declaration from Mandy Vigil. Paragraph 6 of that declaration states "[t]he Secretary of State's Office has also received inquiries from state and federal court entities, the New Mexico Department of Corrections, and the U.S. Marshals Service, concerned that Voter Reference Foundation's postings endanger judges, corrections officers, law enforcement, and other personnel." The declaration does not attach any of the alleged communications. Because the declaration is offered to prove the truth of the matter asserted—that

these third parties did communicate with the Secretary's Office regarding concerns with VRF's website—it is inadmissible hearsay and is not competent evidence to oppose summary judgment. *See Gross*, 53 F.3d at 1541 ("It is well settled in this circuit that we can consider only admissible evidence in reviewing ... summary judgment"). Further, as Defendants' Exhibit C demonstrates, when individuals demonstrated to VRF that they were law enforcement officers, Ex. C at 3, VRF removed their data from VoteRef.com.

C.  **(¶247).** Uncontroverted.

D.  **(¶248).** Controverted. Defendants assert that "[e]ntities and organizations with viewpoints similar or identical to VRF's have sought and received New Mexico voter data by completion of the prescribed affidavit," citing to Exhibit 5 to their Motion for Summary Judgment. Exhibit 5 (ECF no. 121 at 128) purports to be a list of every requestor of voter data since November 4, 2020. Defendants fail to identify what entities or organizations with supposedly "similar or identical" viewpoints requested and received voter data, or to even identify what those "similar or identical viewpoints" are. From their own characterization of SOAF ¶248, it appears that this viewpoint is any that accuses the Secretary of "illegal, unethical, and conspiratorial conduct," or it may be that Defendants want to group VRF with Republican and right-of-center entities. But Ex. 5 does not demonstrate either. Further, Defendants now assert that "Elect Audrey Trujillo for Secretary of State," who they perceive to be an ideological opponent and critic of the Secretary and comparable to VRF, received voter data. Yet Exhibit 5 does not show that this entity received voter data. And in their own Motion for Summary Judgment (ECF 121 at 42) and their legal argument in their response, Defendants state that the *Republican Party*, not Ms. Trujillo's campaign, received voter data, contradicting their own statement of "fact." *See* Defendants' Response in Opposition to

VRF's Motion for Summary Judgment, ECF No. 126 ("Defs. Resp.") at 55[2] ("Despite these aggressive campaign statements from Toulouse Oliver's political opponent—including those that falsely suggest New Mexico elections are fraudulent—the Office of the Secretary of State readily provided access to the file to the Republican Party of New Mexico."). Finally, Defendants support this SOAF with links to a campaign website and a Facebook post which are inadmissible hearsay and not competent evidence to oppose summary judgment. *See Gross*, 53 F.3d at 1541.

E. **(¶249)**. Controverted. Substantial record evidence demonstrates that the Secretary's referral of VRF for prosecution and her theory as to why VRF is violating New Mexico law relies, at least in part, on her characterization of VRF's discrepancy analysis (and the publication of that analysis) as "misinformation." Defendants cite ECF 44-3—the VRF Referral itself—in support of their proposition. Yet the Referral clearly states: "Swift action is needed as voter data can quickly be manipulated and *used to spread election misinformation*." *Id.* Though Defendants admit they have no evidence that VRF manipulated any voter data, *see* VRF Motion for Summary Judgment ("VRF MSJ"), ECF No. 119 at 59, SOF ¶232, they have time and again claimed that VRF's conduct is unlawful because they do not agree that there is any "discrepancy," and any statement that a "discrepancy" exists constitutes misinformation. *See Id.* at ¶¶73, 91-92, 95-96, 104, 109, 111-114. Finally, this SOAF states "[t]he Secretary *did not believe* VRF's conduct of analyzing the Voter Data and sharing that analysis (separate from publishing the Voter Data itself) was unlawful." (emphasis added). It makes no statement whether the Secretary *currently* takes the same position. It also omits the AG's position on the issue either now or in the past.[3]

---

[2] All references to page numbers in briefing refer to the page number assigned by the ECF system in the upper right hand corner of the document.

[3] The AG is a critical Defendant in this case, though his role is largely ignored in Defendants' briefing.

## ARGUMENT

I. **Defendants' response to VRF's Statement of Facts fails to sufficiently controvert many of VRF's factual assertions.**

a. **Arguing materiality is ineffective to dispute a statement of fact.**

Defendants claim 31 paragraphs[4] of VRF's Statement of Facts are "immaterial," but:

> Contending that a fact is immaterial is not disputing a fact, nor is it specifically controverting a fact by directing the Court with particularity to the record. See D.N.M.LR–Civ. 56.1(b). The Court has previously noted that arguing a proposed fact at summary judgment is immaterial to the Court's disposition of the summary judgment motion is not effective to contest a fact: "Materiality is not proper grist for the statement of facts and is considered properly in the Court's legal analysis."

*Daye v. Cmty. Fin. Serv. Centers, LLC*, 233 F. Supp. 3d 946, 959 (D.N.M. 2017) (Browning, J.)

(citations omitted). Facts which Defendants claim are immaterial but are not otherwise controverted by record evidence are deemed undisputed. *See* Local Rule 56.1(b) ("[a]ll material facts set forth ... will be deemed undisputed unless specifically controverted.").

b. **Defendants fail to cite the record for many facts they claim to controvert.**

Defendants claim to controvert at least nine[5] paragraphs of VRF's statement of facts, but fail to cite any evidence in the record which controverts VRF's assertion. Local Rule 56.1 is clear:

> The response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be **numbered**, *must refer with particularity to those portions of the record upon which the non-movant relies*, and must state the **number** of the movant's fact that is disputed. All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.

(bolded emphasis original, italicized emphasis added). Because these paragraphs are not specifically controverted, they are deemed undisputed. *See* Local Rule 56.1(b).

---

[4] *See, e.g.,* Defs. Resp. at ¶¶1, 2, 3, 4, 9, 10, 12, 67, 69, 91, 93, 94, 95, 101, 103, 143, 159, 210, 211, 213, 214, 215, 216, 217, 219, 224, 225, 228, 238, 240, 241.
[5] *See*, e.g., ¶¶6, 38, 39,40, 132, 134, 143, 146, 202.

**c. Defendants' legal conclusion objections are largely ineffective and fail to dispute the statements to which they respond.**

Defendants object to several of VRF's statements of material fact as asserting only legal conclusions.[6] Defendants are incorrect and do not sufficiently controvert those statements, which are deemed undisputed. *See* Local Rule 56.1(b). Several of these objections cite to Defendants' "Arguments and Authorities" rather than to the record. For example, paragraph 131 references hearing testimony about the reason VRF removed New Mexico voter data from its website. SOF ¶131. Defendants state that they controvert the contents of ¶131, but provide no competing fact, only referring generally to their Arguments and Authorities. Defs. Resp. at ¶131. Similarly, VRF's ¶29 in part directly quotes from the NVRA itself and states what is included under the New Mexico statute. SOF ¶29. This is at minimum a mixed statement of fact and law. Though Defendants claim to controvert this statement, they point to no competing statement of fact—only generally to their own argument. With regard to any potential facts that are jumbled into Defendants' argument section, the Court previously has stated:

> D.N.M.LR-Civ. 56.1(b) is designed to isolate the relevant facts and to present them in an orderly fashion to the Court, and when parties do not follow the procedures listed in this local rule, the Court may have difficulty properly determining what the relevant facts are. Furthermore, it is not the Court's responsibility to scour the parties' evidence and filings to determine what facts are in dispute and what facts will defeat a motion for summary judgment. *See Gonzales v. City of Albuquerque*, 849 F.Supp.2d 1123, 1161-62, No. 09-0520, 2011 WL 1114830, at *24 (D.N.M. Mar. 23, 2011)("[I]t is not the Court's responsibility to scour the record for evidence to defeat [a] Motion for Summary Judgment...."); *Hauff v. Petterson*, 755 F.Supp.2d 1138, 1150 (D.N.M. 2010) (Kelly, J.)("Nor is it the court's function to 'scour the record in search of evidence to defeat a motion for summary judgment.' " (quoting *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996))). The Court will do its best to present the facts that the parties have set out in their factual sections of their briefs, or what appear to be the factual sections of their briefs, but may not be able to consider what may or may not be asserted facts set out in the argument section of the parties' filings. The Court can think of no sound basis to distinguish between what might be arguments and what might be asserted facts when parties include those matters in the argument section of their filings but not their factual sections of their filings.

---

[6] *See, e.g.*, ¶¶29, 44, 45, 50, 53, 131, and 133.

*Coffey v. United States*, 870 F. Supp. 2d 1202, 1209 (D.N.M. 2012) (Browning, J.).

Defendants' responses to ¶¶44, 45, 50, 53, and 133 are similarly deficient for claiming that a factual assertion is a legal conclusion and failing to controvert the assertion with record evidence. These objections should be overruled.

### d. Defendants waived the objection they now assert to SOF ¶123.

Defendants object to VRF's SOF 123, which states: "The AG opened a criminal investigation and began actively investigating VRF after it received the referral. Dworak, 84:8-18. The AG is not aware of any entity other than VRF having been investigated for its use of voter data. *Id.*, 168:12-18." Defendants' objection states:

> Objection. Topics concerning other entities or persons investigated for misuse of voter data were beyond the scope of Mr. Dworak's 30(b)(6) deposition. Controverted to the extent that this SOF implies it is factually correct that no entity other than VRF has been investigated for its use of voter data. As VRF is aware, at least one other entity has been investigated for using voter data to harass and intimidate voters in person. ECF No. 44-12. Uncontroverted that this SOF accurately reflects the testimony cited.

Defendants' counsel made a similar objection during Mr. Dworak's deposition but withdrew that objection after discussion with VRF's counsel. *See* Dworak, 165:6-167:5.[7] After this waiver,

---

[7] Q: Is the Attorney General's Office aware of any entity that sells voter data?
A: Not that I'm aware of, no.
Q: Does the Attorney General's Office have any knowledge of an entity called Catalist?
**Ms. Lecocq**: Objection.
A: Yea, that name does not ring a bell to me.
**Mr. Mueller**: I'm going to give Ms. Lecocq a chance, in case she's –

**Ms. Lecocq**: Unless I have really misinterpreted this, I don't believe -- this is not a subject that I -- Catalist and what it did, or what our knowledge is, I think is just the knowledge of the Secretary of State. I don't believe that the Attorney General's Office has any reason to know about it. And I don't see it in the topics, unless I'm misconstruing these topics.

**Mr. Mueller**: Well, I don't want to get into too much argument on the record here. But certainly, the treatment of VRF, as compared to different entities that use, share, and even sell voter data, certainly relates to the claims in our case, including viewpoint discrimination and the defenses raised by the parties in this case, one of which is on appeal, about how we must show disparate treatments as to us and other entities. So I would say that there is a category that says, you know, claims and defenses raised in the litigation. I think this calls for -- and it's been raised several times throughout this case. I don't think I'm surprising you by asking you about it here. I believe it's also in a discovery response. So to the extent we've asked for testimony about discovery responses, then I think we're there.

VRF's counsel went on to question Mr. Dworak regarding other entities, including i360, Aristotle, and Catalist without further objection from Defendants' counsel that the questioning was outside the scope of the noticed deposition topics. *See id.* at 167:16-172:24. Because this topic was included in the notice of deposition, this objection is not meritorious; even if it was, the objection was waived by counsel during the deposition.

## II. Defendants assert new facts not in the summary judgment record without complying with Local Rule 56.1(b).

Local Rule 56.1(b) permits Defendants to include a "Statement of Additional Facts" in their response brief. Though they failed to comply with the lettered paragraph requirement of the Local Rule, they demonstrated their awareness of the rule by asserting five statements of additional fact in their response. *See* Defs. Resp. at 27-28. However, throughout their brief, Defendants make numerous factual assertions that appear nowhere in the summary judgment record and are not supported by any citation to admissible evidence.[8]

---

**Ms. Lecocq**: Mr. Dworak has certainly reviewed the discovery responses. Do you know which one?

**Mr. Mueller**: I think as early as Interrogatory 1…Interrogatory No. 1. Do we have a copy of this? It says, "State whether you have conducted any investigation or made any inquiry into the use or sharing of voter data by Catalist, i360, or any other commercial entity that has purchased voter data from New Mexico" -- goes on. And then there is an answer from the Attorney General's Office, which I don't want to read out loud until I ask about it.

**Ms**. **Lecocq**: Sure. Let me just refresh his recollection with this. Sorry, go ahead.

[8] *See, e.g.,* Defs. Resp. at 36 (asserting without citation that "…Defendants had every reason to believe that providing the requested information to Plaintiff would result in the imminent publication of voters' private and personal information online in contravention of state law, even before this litigation concluded); p. 42 (asserting facts regarding VRF's acquisition and posting of data without citation to record); p. 43 (asserting a paragraph of facts regarding the Secretary's interpretation of the law and forms without citation to record); p. 43-44 (asserting without citation facts regarding VRF's alleged intent to break the law or use an agent to do so); p. 44 (asserting without citation that "[t]he proscription on  publication serves the compelling and concrete interest of protecting the safety and wellbeing of registered voters, safeguarding their fundamental right to vote, and ensuring that voters should not have to choose between participating in democracy and being safe in their homes"); p. 46 (asserting without citation that Defendants produced in discovery evidence that the publication of New Mexico voter data online harms voters' privacy interest and puts some voters in harm's way."); p. 47 (asserting without citation facts regarding limitations of the Safe At Home Program); p. 53 (asserting without citation that "Defendants' actions were motivated solely by enforcement of New Mexico's constitutionally valid Election Code…[and] were not undertaken to retaliate against VRF for any viewpoint held or espoused."). This list is not exhaustive.

By failing to include these (and other factual assertions) as "Statements of Additional Fact" pursuant to Local Rule 56.1(b) but nevertheless relying on them to support their legal arguments, Defendants deprive VRF of the ability to respond or object, and deprive the Court of any means to verify their provenance. The Court should strike or disregard any factual assertions made by Defendants in their response brief which fail to comply with the rules and are not adequately supported by citations to the record.

This includes, but is not limited to, Defendants' salacious and inflammatory attempt to link VRF's posting of voter data and recent "politically motivated violence" in New Mexico. With no factual support whatsoever, Defendants would connect VRF's past posting of voter data with what they call "politically motivated violence against public officials" in New Mexico in recent months. *See* Defs. Resp. at 46-47. Defendants admit that they have no evidence connecting these acts to VRF. *Id.* at 46 ("While it is very difficult to know that someone committed a crime after finding their victim's address on a particular website…"). The Court should give these factually unsupported accusations the weight they are due: none. Still, that such claims were allowed into a brief is itself evidence of the political bias that pervades the highest levels of Defendants' offices.

**III.   Defendants make several key admissions in their Response brief which further warrant judgment in VRF's favor.[9]**

    **a.   Defendants admit "the voter file is a powerful tool for conducting political speech."**

VRF has argued throughout this case that the voter file cannot be separated from its function as an important—if not the most important—tool for political speech. Defendants agree: "The voter file is a powerful tool for conducting political speech." Defs. Resp. at 51.

---

[9] To begin, Defendants concede that VRF has standing to brings its claims. *See* Defs. Resp. at 29, n.1.

Defendants also cite case law that discusses the critical importance of voter data to political speech, though they conspicuously stop just short of acknowledging the full proposition. Defendants cite *Fusaro* for the proposition that there is generally no *First Amendment* access claim to government information. *Id.* at 63 (citing *Fusaro v. Cogan*, 930 F.3d 241,250 (4th Cir. 2019). Yet Defendants tellingly omit the very next line of *Fusaro*:

> Nevertheless, three important considerations compel our conclusion that [the statute] implicates interests that are protected by the First Amendment.

*Fusaro*, 930 F.3d at 250. Defendants irreconcilably resist VRF's First Amendment claims—and the application of strict scrutiny to Defendants' restrictions—while simultaneously acknowledging that the voter rolls directly enable political speech protected by the First Amendment.

> **b.  The Secretary claims to comply with state law requiring her to create a "file maintenance list" by maintaining the requisite data in a raw file, yet argues that raw data need not be produced to comply with the NVRA.**

One of VRF's statements of undisputed fact (¶217) states:

> The Secretary has also taken conflicting positions regarding whether it keeps a "file maintenance list" as that term is defined under New Mexico law and whether it could produce said list to VRF.

VRF MSJ at p. 55. In response, Defendants state:

> Controverted and immaterial. **The Secretary complies with the requirement of a "file maintenance list" by maintaining all of the requisite data on file maintenance, which data exists in raw form**. *See* Response to RFP 15.

Defs. Resp. at p. 24 (emphasis added). At the same time, the Secretary resists complying with the NVRA because she contends that the voter data VRF seeks is kept only in raw data format and the NVRA does not require the production of raw data, even if it relates to a "program or activity" within the scope of the Public Inspection Provision. *See* Defs. Resp. at p. 17, ¶147; *id.* at 35-36. The Secretary wants to have her cake and eat it too. Conveniently, in her mind, raw voter data is

enough to satisfy her state law obligation but also allows her to avoid her federal obligations. Yet the statutory text—both New Mexico's and the NVRA—renders her position untenable.

N.M.S.A. § 1-5-14(A) requires that "[a]t least once a month, the secretary of *state shall have made from the state voter file* a file maintenance *report* of additions, deletions and changes, if any, to each of the county registers." The statute indicates that merely *keeping* raw data in the voter file does not satisfy the Secretary's further obligation to "*have made*" from that raw data a file maintenance "*report*." This conclusion is buttressed by the requirement in subsection (B), requiring "[a] digital version of the file maintenance report [to] be stored by the secretary of state for at least one year." If the mere existence of raw data in a database was sufficient to meet the Secretary's obligation to create and maintain a file maintenance list, this requirement that the *report* be "made" and "stored" would be surplusage.

By comparison, the NVRA requires that the state "maintain for at least 2 years and [] make available for public inspection… all records concerning the implementation programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i)(1). The Secretary contends that she need not produce the data VRF requested because it consists of raw data, rather than an already existing record.[10]

The requirements of the state law are more specific than the NVRA, requiring that a monthly report be "made" from raw data, rather than merely mandating the storage of the raw data itself. Yet the Secretary says that raw data is good enough for state law but need not be produced to comply with the broader requirements of the NVRA, a fallacy unsupported by the statutes themselves. This is yet another example of the Secretary's willingness to stretch statutes beyond their plain meaning in order to pretextually single out VRF. The Court should not be persuaded.

---

[10] As VRF explained in its Motion for Summary Judgment and below, this argument was specifically undermined by the testimony of the Secretary's IT representative. *See* Section V(e) below; *see also* VRF MSJ at 61-62.

**c.   Despite Defendants' focus on misinformation and misrepresentation, they finally reveal that their restrictions prohibit the publication of *truthful, accurate* voter data.**

Throughout this litigation, Defendants have feigned concern with misrepresented or manipulated data while simultaneously admitting that they have no evidence that VRF has misrepresented or manipulated any data. Defendants now explicitly concede that their restrictions on voter data prohibit the publication of data, even when that publication is truthful and accurate. *See* Defs. Resp. at 11, ¶91 ("New Mexico statutes prohibit the publication of voter data, *regardless of whether the information is accurate*.") (emphasis added).

As a general matter, "state action to punish the publication of truthful information seldom can satisfy constitutional standards." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (*citing Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 102 (1979)); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) ("Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media…In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection."). Defendants' protestations about "misinformation" and "manipulation" ring hollow, as their restrictions purport to prohibit even the publication of fully accurate information and data. This new position exacerbates the overbreadth issues VRF has already identified by bringing within its prohibitions all speech involving voter data—accurate or not.

**d.   Defendants (again) admit that their decision not to provide voter data to VRF was retaliation for VRF's posting of data online.**

Finally, though their position is nearly etched in stone at this point, Defendants once again admit that their decision to deny VRF access to voter data is a direct result of VRF's posting of

voter data online before initiating this litigation. *See* Defs. Resp. at p. 13 ("Uncontroverted that the Secretary's office determined not to provide voter data in response to VRF's February 15 request due to VRF's internet posting of prior data."). VRF's posting of the data was protected political speech. *See* VRF MSJ at 78-80. Defendants argue that VRF must show "but for" causation to prove its First Amendment retaliation claim, while simultaneously admitting that they do not controvert that VRF's posting of the data—online political speech—was the but-for cause of their decision to later withhold a benefit by refusing to provide new data to VRF.

**IV.   VRF is entitled to judgment on Count II, VRF's NVRA preemption claim, because the Defendants' Use Restrictions and Data Sharing Ban unlawfully obstruct a key objective of the NVRA.**

Defendants claim to avoid preemption by drawing an imaginary boundary between the NVRA's right of "access," and New Mexico's attempt to regulate "uses" of the data. That distinction dissolves, however, because New Mexico prohibits ***access*** when recipients fail to toe the line regarding officials' current views on what ***uses*** are acceptable. Defendants themselves vividly prove that linkage by claiming that complying with the NVRA might make them state law criminals. *See* Defs. Resp. at 37. Further, Defendants attempt to stretch this Court's own reasoning and ignore clear precedent yet still fail to justify their unlawful restrictions. VRF is entitled to judgment as a matter of law on its NVRA preemption claim.

**a.   Defendants regulate "access" to records made public by the NVRA by predicating that access on an unlawful "use" restriction.**

First, Defendants attempt to circumvent the NVRA's disclosure mandate by pitching their restrictions only as affecting the "use" of voter data. *See* Defs. Resp. at 29-31. Defendants go as far as to argue that the NVRA and their own inconsistent and pretextual interpretation of New Mexico law occupy "two separate spheres: *access* to information and *use* of information." *Id.* at 31 (emphasis added). This is a smokescreen. In truth, Defendants regulate *access* to New Mexico

voter data because they predicate access on compliance with their own (unlawful) *use* restrictions, including the Data Sharing Ban. Defendants indisputably connect access with use by denying VRF access to the data because of VRF's intended use and publication of the data. *See id.* at 13, ¶118 ("Uncontroverted that the Secretary's office determined not to provide voter data in response to VRF's February 15 request due to VRF's internet posting of prior data.").

> **b. Defendants' reliance on *American Ass'n of People with Disabilities v. Herrera* is misplaced.**

Regardless of how Defendants mischaracterize the Data Sharing Ban and Use Restrictions, they are obstacle-preempted by the NVRA. Defendants rely on this Court's decision in *American Ass'n of People with Disabilities v. Herrera*, 690 F.Supp.2d 1183 (D.N.M. 2010) to argue against preemption, but that reliance is misplaced. In *Herrera*, this Court considered the interplay of an entirely different portion of the NVRA (§ 1973gg-2(a), concerning national procedures for voter registration for elections for Federal office) with sections of New Mexico law not relevant here (§ 1-4-49, concerning third-party voter registration). *Id.* at 1225. Importantly, the provision of the NVRA at issue in *Herrera* explicitly provided for state regulation of voter registration: "[N]otwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office[.]" 52 U.S.C.A. § 20503(a).[11] Accordingly, this Court concluded:

> The NVRA explicitly provides for state regulations for voter registration. The Court believes § 1-4-49 fits squarely within the NVRA's acknowledgment that states may have their own voting regulations. The Court finds that the NVRA does not explicitly preempt § 1-4-49.

*Herrera*, 690 F.Supp.2d at 1225.

---

[11] 42 U.S.C.A. § 1973gg-2 was transferred to 52 U.S.C.A. § 20503.

Unlike the portion of the NVRA at issue in *Herrera*, the Public Inspection Provision (§ 20507(i)) does not explicitly carve out or otherwise invite state regulation—let alone contemplate regulation that would conflict with public access. Instead, the Public Inspection Provision provides for disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" This mandate is unqualified. Congress's ability to carve out space for state regulation (as evidenced by § 20503(a)), coupled with the undisputed lack of such a reservation in § 20507(i)(1), further demonstrates that the Public Inspection Provision controls here. *See Collins v. Yellen*, 141 S.Ct. 1761, 1782 (2021) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."); *see also U.S. v. Ganadonegro*, 854 F.Supp.2d 1068, 1081 (D.N.M. 2012) (same).

Still, Defendants try to borrow from the pattern of this Court's reasoning in *Herrera* to argue that their desire for use restrictions advances other NVRA purposes and should not be "subordinated" to the NVRA's competing purposes in making certain voter records publicly available. Defs. Resp. at 32. But this Court never held that the plain text of the NVRA (or any federal statute) can be disregarded in favor of judicial policymaking. There is no inconsistency in the NVRA's purposes as applied to voting records, but even if there were, the plain text of the Public Inspection Provision plainly tells us how Congress resolved those purposes: in favor of disclosure. Simply, the text of the NVRA ***does*** mandate disclosure of certain voter records, § 20507(i)(1), and it chose ***not*** to provide for state limitations on such disclosure.

This Court should consider the recent decision in *Bellows*, in which the District Court in Maine considered a state regulation almost identical to the one at issue here. *Pub. Int. Legal*

16

*Found., Inc. v. Bellows (Bellows II)*, Slip Op. at *7, 23 WL 2663827 (March 28, 2023). The court concluded:

> The Public Disclosure Provision's disclosure mandate, meanwhile, does not allow a state to impose these restrictions. . . . the Public Disclosure Provision furthers Congress's purposes of "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b); *see id.* §§ 20507, 20510. The Court concludes that Exception J, by limiting the disclosure of information within the ambit of the Public Disclosure Provision, poses "sufficient obstacle[s]" to the accomplishment and execution of Congress's purposes. *See Maine Forst Prod. Council v. Cormier*, 51 F.4th 1,6 (1st Cir. 2022)("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)); *see also Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 445 (D. Md. 2019) (concluding that state law's exclusion of voter organizations, which "have the resources and expertise that few individuals can marshal," from access to voter registration lists undermined the Public Disclosure Provision's efficacy). To the extent the Secretary asks this Court to interpret Exception J as consistent with the NVRA, the Court declines to "finely parse" the NVRA "for gaps or silences into which [the] state regulation might fit." *Fish v. Kobach*, 840 F.3d 710, 729 (10th Cir. 2016). "If Congress intended to permit states to so alter or modify" the Public Disclosure Provision by limiting the disclosure of certain information, "it would have so indicated." *Id.*

*Id.* (citations modified). *Bellows II* aptly noted that "Congress provided two exceptions to the Public Disclosure Provision's broad mandate, neither of which apply here. It is not within this Court's purview to manufacture additional exceptions." *Id.* at 10, n. 20.

This Court should not be distracted by Defendants' attempt to assign phantom holdings to *Herrera* and then apply them far outside of their original context. When courts have considered the types of restrictions at issue in *this* case, they find preemption. This Court should do the same.

### c. Defendants cannot defeat VRF's preemption claim with hollow policy arguments.

Knowing they cannot overcome preemption, Defendants assert various policy arguments taking issue with the Public Inspection Provision. *See* Defs. Resp. at 30. These are arguments for Congress, not for a court.

### i. Defendants' unsupported policy arguments do not affect preemption.

Defendants claim they are excused from their obligation under the NVRA because they have received assorted complaints regarding VRF's posting of voter data online. Defs. Resp. at 30. As explained below, the factual record cannot bear the weight Defendants place on it.

First, just a few complaints were received, *see* Defs. Ex. A, and they appear to have been provoked by the Secretary's own press release attacking this Court's decision to grant a preliminary injunction last summer. A portion of the non-hearsay complaints actually before the Court are not from New Mexico citizens. *Id*. The last complaint is from nearly ten months ago, August 15, 2022, and Defendants have provided no new complaints in their filings or during discovery, even though these followed crucial months of public focus on elections before the midterms—precisely when one would expect an increase in complaints if the State's fears were valid. *Id*. A handful of scattered complaints that track the Secretary's own press release are hardly a bellwether for the public interest as a whole. *Id*.

Finally, some of the complaints mimic Defendants' partisan political animus against VRF. *Id*. In one email, a citizen, not confirmed to be a New Mexico citizen, warns the Secretary that VRF is "a subsidiary of a conservative *pro-Republican* Restoration PAC." *Id*. at 1 (emphasis added). Some of these citizens seem to have been inflamed by the Secretary's own hyperbolic reaction to this Court's issuance of the preliminary injunction and insinuation that VRF's work will lead to voter intimidation. *Id*. at 2. (citing the Secretary's own statement about VRF). Adopting such comments as a basis for state action is simply another form of viewpoint discrimination and retaliation, considerations which cannot support a legal argument against preemption.

ii. **Congress has already spoken to the importance of voter record transparency.**

Defendants make further policy arguments regarding the "crowd sourced" review of voter rolls, arguing that that such review does not actually increase voter participation or improve the accuracy of the voter rolls. Defs. Resp. at 30. But this Court need not credit Defendants' assumptions, because Congress has already resolved this debate by passing the Public Inspection Provision, which does allow the "crowd-sourcing" of review of voter rolls. *See* § 20507(i)(1).

Defendants then suggest that "anonymized or aggregated data and analyses of voter data" could also support election integrity. That there may exist alternatives to the NVRA's Public Inspection Provision is a policy argument for Congress, not a reason to disregard the plain text of Congress's law or the Supremacy Clause. Further, anonymized and aggregated data defeats the purpose of the NVRA because, as addressed below, citizens simply have to take the government at their word that the data underlying those anonymized analyses is correct. This is contrary to the NVRA and cannot defeat preemption.

V.   **VRF is entitled to judgment as a matter of law on its NVRA violation claim (Count II) because VRF made three lawful NVRA requests which the Secretary unlawfully refused to honor at the advice of the AG.**

VRF should prevail on its claim (Count II) that the Secretary violated the NVRA by deciding—with the encouragement of the AG—that she would *never* fulfill VRF's voter data requests. She then rejected three of VRF's requests made on February 15, 2022 (SOF ¶¶141-45); May 27, 2022 (SOF ¶¶151-59), and October 18, 2022 (SOF ¶186). It is undisputed that (1) the requests were made; (2) they were denied; and (3) they will continue to be denied indefinitely.

a.   **VRF's requests complied with the NVRA.**

All of VRF's requests sought NVRA records. The scope of the NVRA's public inspection requirement is clear: "***all records*** concerning the implementation of programs and activities

conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1) (emphasis added). As shown below, this means the ***lists*** themselves, and the ***voter data*** within those lists, as well as the other specific data sought in VRF's requests.

There is no dispute that the NVRA's Public Inspection Provision is "broad." *Pub. Int. Legal Found., Inc. v. North Carolina State Board of Elections*, 996 F.3d 257, 264 (4th Cir. 2021). Those "records" which must be made available pursuant to the NVRA include the "file maintenance list" and "voter data" as those terms are defined in NMSA § 1-5-2, as well as "voter data" as that term is used in NMSA § 1-4-5.5, because these are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *See Lamone*, 399 F.Supp.3d at 439 (individual voter registration information "records"); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335-36 (4th Cir. 2012) (registration applications are "records"); *Pub. Int. Legal Found., Inc. v. Bellows (Bellows I)*, 588 F.Supp.3d 124, 133 (D. Me. 2022) (same); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 940 (C.D. Ill. 2022) (voter list is a "record").

*Long* is instructive. There, Virginia had refused the request of a non-profit organization similar to VRF to produce voter registration applications. 682 F.3d at 333. On summary judgment, the court held the NVRA's Public Inspection Provision entitled the plaintiff to access. *Id*. Defendants, however, mischaracterize the holding in *Long*, suggesting that the court concluded voter data is only available under the NVRA in "some situations." Defs. Resp. at 33. *Long* simply does not stand for this proposition. There is no parsing of "situations" in which the Public Inspection Provision applies and when it does not. Instead, the court recognized that the Public Inspection Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, ***a right that must not be sacrificed to***

*administrative chicanery, oversights, or inefficiencies*. . . . [T]his mandates disclosure of the records requested by Project Vote." *Long*, 682 F.3d at 334-35. (emphasis added).

> **i.   New Mexico law requires the Secretary to conduct various programs and activities related to voter registration and voter list maintenance, records of which must be made available under the NVRA.**

Defendants attempt to escape their obligations under the NVRA by feigning ignorance over the state's own "programs and activities" Defs. Resp. at 33. But conveniently, New Mexico law details these programs and activities in which the Secretary and other government officials are statutorily required to engage:

- §§ 1-4-1.1(c) (requiring the Secretary to confer with the Department of Motor Vehicles and federal commissioner of social security to verify the accuracy of the information in its database);

- 1-4-8(c) (requiring the county clerk to process (1) new voter registrations; (2) updates to voter registration; and (3) pending cancellations of existing voter registrations);

- 1-4-22 (allowing the Secretary to petition the district court to remove unqualified voters from the list of eligible voters);

- 1-4-24 (requiring the county clerk to cancel certificates of registration for: death of a voter; a felony conviction of the voter; at the request of the voter; or at the direction of the board of registration);

- 1-4-25 (requiring the state registrar of vital statistics to file monthly lists of certified deceased residents over the age of eighteen; and requiring the Secretary to inspect those lists and send the information to county clerks, who must cancel any deceased resident's certificate of registration);

- 1-4-27 (requiring the Secretary to maintain monthly in the voter registration electronic management system the eligibility status of persons convicted of felonies);

- 1-4-28 (requiring the Secretary to: remove from the official list of eligible voters the names of voters who are ineligible to vote due to change of residence; conduct a general program that identifies voters who no longer reside at their address of registration using information supplied by the USPS nation change of address service; send each voter who it appears has changed address a postage and return card confirming the change; and imposing other list-maintenance duties on county clerks and the board of registration);

- 1-4-29 (requiring the Secretary to investigate registration records, election returns and other pertinent records of a county if the board of registration or county clerk does not cancel registration certificates as required);

- 1-4-32 (requiring county clerks, when a registration is cancelled, to remove, endorse, and file the original certificate of registration according to the secretary of state's procedures, and to retain the cancelled certificates for six years);

- 1-5-5(B) (requiring the Secretary to enter voter information into the voter file);

- 1-5-14 (requiring the Secretary to file a maintenance report of additions, deletions and changes to each county register);

- 1-5-21 (requiring the data processor to preserve and safeguard voter files and voter registration system software from loss, damage, unauthorized alteration, unauthorized access and unauthorized reproduction); and

- 1-5-30 (requiring the Secretary to develop, implement, establish, and supervise a voter registration electronic management system that complies with the federal Help America Vote Act of 2002, and to (among other things) permit county clerks to add, modify, and delete county information from the system to provide for accurate and up to date records; provide security to prevent unauthorized entry; provide procedures for the electronic receipt of voter registration and update information; and provide procedures for entering data into the database).

Though this list is certainly not exhaustive, the records of each and every one of these activities, including the voter data which necessarily comprises most or all of these functions, must be made publicly available under the NVRA, *see* § 20507(i)(1), because they are conducted for the purposes of ensuring the accuracy and currency of official lists of eligible voters.

VRF specifically requested data that constitutes a "record" under the NVRA, but the Secretary failed to produce it for various, unlawful reasons.

### b. Voter data is essential, not merely incidental, to the scope of the NVRA's Public Inspection Provision.

Defendants further argue that access to voter information is "incidental to—and not a defining feature of—the scope of the disclosure requirement." *Id*. It is unclear exactly what Defendants mean by this statement or how it applies to this case. At any rate, they are wrong. As every one of VRF's cases shows, *voter data is at the core of what must be disclosed under the*

*disclosure requirement*. Without the actual, individualized data made available under the NVRA, citizens must simply take their government at its word that their information is correct. This in no way accomplishes the goals of the NVRA. Instead, the NVRA contemplates a check of sorts on the government, allowing citizens to keep their governments accountable.

### c.  VRF's requests do not implicate uniquely sensitive information.

Next, Defendants argue that their denial of access in spite of the NVRA's Public Inspection Provision is acceptable because the government may "protect confidential or sensitive data." Defs. Resp. at 33. Defendants support this notion with a single citation to an inapt case: *True the Vote v. Hosemann*, 43 F.Supp.3d 693, 734-735 (S.D. Miss. 2014). In *Hosemann*, the court considered the redaction of full birthdays when fulfilling an NVRA request. *Id*. at 734. Notably, the court did not decide that the NVRA gave way to privacy or other concerns embedded in state law, allowing a blanket ban on access. *Id*. Instead, the court allowed for the narrow redaction of full birthdates. *Id*. Tellingly, Defendants never claim that such data is at issue here, in part because New Mexico already requires that this specific data not be produced (and provides only birth year), and VRF has neither requested nor posted full birthdates for New Mexico voters.

### d.  Section 20507(i)(1) is not limited by § 20507(i)(2).

Defendants briefly argue that § 20507(i)(1) does not mandate access to all information obtained by the Secretary regarding all registered voters because § 20507(i)(2) specifies that certain records concerning individuals "to whom [change-of-address] notices are sent" shall be "include[d]" in the inspection requirement, and so VRF's construction would create surplusage or facial inconsistency. Defs. MSJ at 22-23. This argument has been rejected elsewhere. In *Matthews*, the defendants similarly argued that § 20507(i)(2) narrowed the definition of "all records." 589 F.Supp.3d at 941. The court rejected this argument, holding that "the Public Disclosure Provision casts a wide net, mandating 'all records' be made publicly available. Such expansive language

23

'sets a floor, not a ceiling.'" *Id.* (*quoting Long*, 682 F.3d at 337) (rejecting the argument that §

20507(i)(2) limits "all records"); *see also Lamone*, 399 F.Supp.3d at 438 ("…Section 8(i)(1) very

clearly requires that *all* record be disclosed . . . the use of the word all as a modifier suggests an

expansive meaning because all is a term of great breadth[.])" (internal quotations omitted).

### e.  VRF's requests did not require the "creation" of any "records."

Defendants next argue that the NVRA only "permits the *inspection* of existing compliance

records" and "does not mandate the *creation* of additional reports, explanations, or data analyses."

Defs. Resp. at 34. (emphasis original). These are word games. VRF has not requested any

"reports," "explanations," or "data analyses." What Defendants really claim is that the data VRF

is requesting requires extra work ("analyses") because of the way Defendants keep it in their

database. *Id*. Defendants are wrong on both the law and the facts.

States cannot refuse NVRA requests simply because the state would have to "create" a new

record from existing data. *See Project Vote, Inc., v. Kemp*, 208 F.Supp.3d 1320 (N.D. Ga. 2016)

("That Defendant may, due to the manner in which the Requested Records are stored, experience

technical burdens in making the records available, does not" affect the obligation to produce those

records.); *see also Pub. Int. Legal Found. v. Chapman*, 595 F.Supp.3d 296, 306 (M.D. Pa. 2022)

("The Commonwealth's use of the SURE database to maintain the accuracy and currency of county

voting registration lists brings the records held in that dataset within the universe of disclosable

records under NVRA.").

Importantly, the court in *Chapman* considered an almost identical factual scenario to the

one in this case. In *Chapman*, Pennsylvania used the "SURE" database to hold voter records and

conduct various activities to ensure the accuracy of the voter list. *Id.* at 306. The Public Interest

Legal Foundation ("PILF") sought various voter records from the Commonwealth under the

NVRA, including specific voter information (name of a registrant, the voting history of such

registrant, etc…). *Id.* at 302-03. The Commonwealth refused to fulfil the request, claiming the NVRA did not cover the specific records PILF requested. *Id.*

All records PILF requested were contained in the Commonwealth's "SURE" database, a computerized compilation of each county's voter registration list which also included personal information about the voter and their voting history. *Id.* The Commonwealth argued that the data contained in this database was not covered by the NVRA, and even cited one of Defendants' cited cases, *Hosemann*, to argue the Commonwealth had no obligation under the NVRA to disclose the data held in the SURE database. *Id.* at 305. The court, recognizing that the Commonwealth used the SURE database to conduct programs and activities to maintain accurate voter lists, concluded:

> NVRA requires states to disclose "all records" related to any effort by the state to ensure "the accuracy and currency" of voter registration lists. As we explained in our decision on the Commonwealth's motion to dismiss, "[t]he word 'all' is expansive." Congress intended NVRA's disclosure obligations to reach a broad array of "programs and activities." The Commonwealth's use of the SURE database to maintain the accuracy and currency of county voting registration lists ***brings the records held in that database within the universe of disclosable records under NVRA***.

*Id.* at 306. (internal citations omitted) (emphasis added).

In this case, as in *Chapman*, New Mexico voter data is held in a computerized database, called SERVIS. VRF MSJ at 47, SOF ¶160. The Secretary uses the SERVIS database to maintain the accuracy and currency of voting registration lists. *Id.* at SOF ¶¶161-63. Thus, all records held in the SERVIS database are within the universe of disclosable records under the NVRA.

Defendants muddy the waters of what is considered a "report" involving the SERVIS database and what is a "record" pursuant to the NVRA. *See* Defs. Resp. at 36. Defendants contend that they only are required to make records or data available if they are already contained in an "existing report[] the office maintains." *Id.* at 36. This is incorrect. First, and most glaringly, the Secretary's office does not maintain *any* "existing reports." VRF MSJ at 47-8, SOF ¶¶160-74.

Instead, as explained by the Secretary's IT Director, the Secretary's office develops a "report" using the SERVIS database by staff members selecting certain fields of data in its possession. *Id.* at 47, SOF ¶¶164-65. This action creates an algorithm the database then uses to gather the relevant "records" to form a "report." *Id.* at SOF ¶¶163-65. Thus, there are no "existing" reports—instead, the database includes some set algorithms ("canned reports") to collect the same "records." *Id.* at 47-48, SOF ¶¶166-67. For example, the "File Maintenance List" is not an "existing" report, but a set algorithm used to retrieve a specific collection of individual data. *Id.* at 48, SOF ¶¶172.

Under Defendants' logic, a government agency could avoid all obligation under the NVRA by simply maintaining, as the Secretary here does, a database with no existing "reports." The government could then deny, as the Secretary did here, any request it does not like on the basis that the requested "records" do not exist. As explained above in Section III(b), the Secretary speaks out of both sides of her mouth by acknowledging that raw data is required to satisfy her requirement under state law, but also need not be produced because it is not actually a "record."

Crucially, Defendants do not controvert any of VRF's facts as to this point. Put simply, the Secretary's office did possess the records VRF requested, VRF MSJ at 45, SOF ¶¶147-49, the NVRA mandates states must make the records VRF requested available, § 20507(i)(1), and the Secretary denied VRF's requests. Defendants do not—and cannot—deny this reality.

###    f.   The data requested in the February 15, 2022 request falls within the NVRA's Public Inspection Provision.

To the extent that Defendants argue the records requested in the February 15, 2022 request are not "records" subject to the NVRA because a "count" is not a "record," that conclusion is erroneous and disingenuous and Defendants provide no support for this contention. These "counts" assist election officials in the administration of elections by ensuring, among other things, the maintenance of accurate voter lists. Therefore, these "counts" concern "programs and activities

conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1). Notably, Defendants elsewhere argue that anonymized voter data, such as total "counts," are the only records actually made available under the NVRA. *See* Defs. Resp. at 41. Defendants' double speak on this issue epitomizes their desire to keep VRF from accessing *any* records to which it is entitled under the NVRA. Indeed, there is no telling what new and internally inconsistent restrictions and excuses the Secretary and AG will concoct next.

>   **g.  Defendants' other pretextual excuses for failing to produce the requested data and records are unavailing.**

Defendants claim that they could not comply with VRF's NVRA requests because it would have exposed them to liability for committing a New Mexico crime. Defs. Resp. at 36. According to Defendants, the promise of VRF's counsel that no data would be published online unless VRF received relief from this Court gave them "every reason to believe" the exact opposite: "that providing the requested information to VRF would result in the imminent publication of voters' private and personal information online…" *Id*. Quite simply, this is absurd. As VRF shows elsewhere, Defendants' claimed mistrust of VRF's counsel and the judicial process is simply incredible, and further supports VRF's First Amendment retaliation claim. If Defendants are correct, they are not at all bound by this Court's interpretation of New Mexico law or its adjudication of their duties under the NVRA, and a New Mexico court could find them criminally liable for complying with this Court and the NVRA. *Id*. at 32-33 (state officials would "face liability" because they "knew" VRF would immediately rely on Court's order and break the law).

>   **h.  Defendants waived any challenge to the NVRA's pre-suit notice requirement, but VRF nonetheless provided proper notice.**

Finally, Defendants halfheartedly claim VRF "has not actually complied with the NVRA's pre suit notice provisions." Defs. Resp. at 37. This assertion rests on two equally faulty premises: (1) that VRF's February 15, 2022, NVRA request was not actually a request subject to the NVRA

because it did not specifically reference the NVRA; and (2) because the February 15 letter was not an NVRA request, VRF's first valid NVRA request was on May 27, 2022, and no written notice followed—meaning that no actual notice was ever given. This argument fails for three reasons.

First, Defendants long ago waived this argument.[12] VRF's Amended Complaint alleges: "VRF fully complied with the NVRA's pre-suit notice requirements prior to filing this Amended Complaint." Am. Comp. ¶23. This is a factual allegation to which Rule 8 requires a response. Instead of responding and putting VRF on notice of any dispute over this fact, Defendants stated in their answer to paragraph 23: "Paragraph 23 states a legal conclusion about VRF's compliance with the law, to which no response is required." Def. Ans. 23.

> Defendants must respond to all of a plaintiff's allegations. Responses that documents speak for themselves and that allegations are legal conclusions do not comply with rule 8(b)'s requirements. . . . Indeed, legal conclusions are an integral part of the federal notice pleading regime. Therefore, legal conclusions must be addressed in one of the three ways contemplated by Rule 8.

*Martinez v. Naranjo*, 328 F.R.D. 581, 600 (D.N.M. 2018) (internal quotations omitted). Further, "an allegation of the complaint is admitted if a responsive pleading is required and the allegation is not denied." *Lane v. Page*, 272 F.R.D. 581, 603 (D.N.M. 2011) (internal quotations omitted). Not only was VRF's allegation regarding the propriety of pre-suit notice not solely a legal issue (evidenced by the fact that Defendants now dispute the factual basis for VRF's compliance), a response was required even if it were a purely legal issue. Defendants' failure to follow Rule 8 means this fact is deemed admitted, and they are estopped from contesting it now.

Second, Defendants conceded VRF's notice was proper during discovery. VRF specifically asked Defendants if they took issue with its NVRA notice. VRF MSJ at 42, SOF ¶134. Crucially, the Secretary responded that she does not deny that VRF's notice was proper under the NVRA. *Id*.

---

[12] *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (judicial estoppel is often invoked to "prohibit[] parties from deliberately changing positions according to the exigencies of the moment.").

Third, the argument is not supported by law. Defendants argue that the February 15, 2022 request was not made under the NVRA because it did not "reference[] the NVRA or specifically request[] records related to that statute." Defs. Resp. at 37. Defendants provide no support for the contention that a request which falls under the NVRA must include magic words in order for the Secretary to recognize her duty under federal law. And, as explained in VRF's motion for summary judgment, the data requested in the February 15, 2022, request falls within the purview of the NVRA. *See* VRF MSJ Section I(A). Thus, the May 27, 2022, Notice of Violation and Request for Additional Records put the Secretary on notice that she was in violation of the NVRA for failing to respond to the February 15, 2022 request and also sought additional records under the NVRA.[13]

Importantly, no notice of violation is even required when it would be futile due to the violating party's clear intent not to comply with the NVRA. *See Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997). Here again, any notice of the Secretary's continued and adamant refusal to comply with the NVRA would be futile. The Secretary decided in March 2021 not to fulfill VRF's NVRA requests and maintains that position currently. VRF MSJ at 27, SOF ¶120. In fact, the Secretary cannot state if there is even anything VRF can do to convince the Secretary to comply— including an order from this Court. SOF ¶¶192-93. That position is telling—the epitome of Defendants' cavalier attitude towards the NVRA and the constitutional rights of their perceived opponents. Judgment should be entered in VRF's favor on Count II for NVRA violations.

---

[13] Notably, Defendants do not assert that the May 27, 2022, Notice was insufficient itself, only that the February 15, 2022 request did not count as an initial request.

**VI.   VRF is entitled to judgment as a matter of law on its First Amendment Claim (Count V).**

**a.   VRF's right to access the voter data at issue emanates from the NVRA and it does not argue that it has right to access the data under the First Amendment.**

VRF has been clear that its right to access the voter data at issue emanates from the NVRA, not the First Amendment. *See* VRF MSJ at 78 ("Following *Fusaro* and *Meyer*, then, this Court need not resolve whether VRF has a *First Amendment* right to access voter data; it need only recognize VRF's statutory right under the NVRA (52 U.S.C. §20507(i)) and NMSA § 1-4-5.5."). Defendants either misunderstand or repeatedly misrepresent VRF's position. *See* Defs. Resp. at 38 (arguing that VRF does not have right of access under First Amendment); *id.* at 41 (same); *id.* at 64 (arguing that no First Amendment right of access exists, while acknowledging that VRF argued its right emanates from the NVRA and state law, not the First Amendment).

The voter data at issue must be made available under the NVRA. *See* Section V, above; *see also* VRF MSJ at 64-67. Because it must be made available, the First Amendment restricts the conditions that the state may place on speech involving that information. Mem. Op. at 176 ("…once a State chooses to provide a process allowing for the right to access voter information, there are "'limits to its freedom to decide how that benefit will be distributed.'" *Fusaro v. Cogan*, 930 F.3d at 256 (*quoting Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. at 43 (Ginsburg, J., concurring)).

Nor must VRF establish a First Amendment access right to bring a First Amendment claim against Defendants' restrictions on speech involving the data. *See Bartnicki*, 532 U.S. at 535 (finding First Amendment right to publish truthful information, even if *unlawfully* obtained in the first instance); *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 941 (7th Cir. 2015) (acknowledging right to publish photographs and names of officers obtained via FOIA request).

### b. **Strict scrutiny applies, not *Anderson-Burdick*.**

Defendants ask the Court to evaluate their speech restrictions under the framework developed following the Supreme Court's decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See* Defs. Resp. at 44-51. VRF claims that the Defendants' restrictions on the sharing and dissemination of voter data are unconstitutional, but none of VRF's claims directly implicate voting rights, only the records of the exercise of those rights. Even if VRF succeeds in this litigation, it would have no effect on who can register to vote, who can vote, the mechanics of registering to vote or voting, or the regulation of the ballot.

The *Anderson-Burdick* framework is applied when the claims at issue involve a citizen's right to vote, and, in particular, the mechanisms involved in registering to vote or casting a ballot. The fact that an election law burdens a fundamental right is necessary but not sufficient to trigger *Anderson-Burdick*; the law also must regulate "the mechanics of the electoral process." *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 345 (1995) (rejecting application of *Anderson-Burdick* in challenge to ban on anonymous leafletting of political materials as it constituted the "regulation of pure speech"). The Supreme Court has employed *Anderson-Burdick* to evaluate electoral-process regulations, including ballot access rules, *see Anderson*, 460 U.S. at 788-806; *Norman v. Reed*, 502 U.S. 279, 288-91 (1992); regulation of party primaries, *see Tashjian v. Republican Party*, 479 U.S. 208, 214-29 (1986); *Grange v. Washington State Republican Party*, 552 U.S. 442, 451-59 (2008); voter identification laws, *see Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189-204 (2008); and the content of ballots, *see Burdick*, 504 U.S. at 428; *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 351-52 (1997).

However, laws that aim at regulating speech, rather than the electoral process, are subject to traditional First Amendment analysis. The Supreme Court has declined to apply *Anderson-Burdick* to election-related regulations that burdened interactive communication between

individuals. *See  Meyer v. Grant*, 486 U.S. 414, 421-22 (1999) (law prohibiting payment for petition circulators was a regulation of core political speech because circulators must engage one-on-one with potential signatories about the pressing issues of the day); *McIntyre*, 514 U.S. at 345-46 & n.10 (ban on anonymous political leafleting regulated pure political speech); *Buckley v. American Const. L. Found.*, 525 U.S. 182, 199 (1999) (requirement that petition circulators be registered voters implicated "core political speech" no less than the "fleeting encounter" of leafletting or the more involved "discussion of the merits" that attended the petition circulation). Although the Tenth Circuit has applied the *Anderson-Burdick* framework when deciding the "constitutionality of a content-neutral regulation of the voting process," even there, it acknowledges that strict scrutiny must apply "where the government restricts the overall quantum of speech available to the election or voting process." *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000).

Defendants identify only two cases in which courts applied *Anderson-Burdick* to restrictions on the availability of voter data. *Libertarian Party of Indiana v. Marion Cnty. Bd. of Voter Registration*, 778 F. Supp. 1458 (S.D. Ind. 1991) involved an equal protection challenge to an Indiana law providing voter lists only to major parties. The court acknowledged the *Anderson-Burdick* framework, but then noted that "[p]erhaps a stricter standard of review should be used to judge the statute at issue here, as it is discriminatory in the sense that it favors the two largest political parties." *Id.* at 1463 (citation omitted). Ultimately, the court decided that it "need not resolve whether a stricter standard should be applied…because even under the standard applied in *Anderson,* the state's regulatory interests do not serve to justify the burdens it has imposed on the plaintiffs." *Id.*

In *Fusaro*, 930 F.3d at 247, the court applied *Anderson-Burdick* to plaintiff's claims that Maryland's prohibition on providing voter lists to non-Maryland citizens violated the First Amendment because it favored some political speakers over others. Unlike here, *Fusaro* first and foremost addressed an *access* rather than a *speech* claim. *Id.* Even so, the court acknowledged its own hesitation in applying a lax standard when political speech is implicated:

> We recognize that the close connection between voter registration lists and political speech may, in some contexts, urge an application of strict scrutiny. But the purpose of the *Anderson-Burdick* test is to ensure that the courts carefully balance all the interests at stake, recognizing that "there is no substitute for the hard judgments that must be made." *See Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. Additionally, our Court and the Supreme Court have each distinguished between laws that, on the one hand, regulate "pure speech," and those that, by contrast, are a step removed from direct acts of communication, with the latter receiving more flexible treatment. *See McIntyre*, 514 U.S. at 345, 115 S.Ct. 1511 (distinguishing "regulation of pure speech" from "ordinary election restriction"); …That distinction is particularly relevant in light of *Burdick*'s warning that "to subject every voting regulation to strict scrutiny" would "tie the hands of States seeking to assure that elections are operated equitably and efficiently." *See Burdick*, 504 U.S. at 433, 112 S.Ct. 2059. Moreover, the *Anderson-Burdick* test provides for the application of strict scrutiny in an appropriate case, that is, when an election regulation severely burdens First and Fourteenth Amendment rights.

*Id.* at 259. *Fusaro* did not resolve the merits, as the case reached it at the motion to dismiss stage and the state had not yet articulated the interests supporting the challenged restrictions. *Id.* at 264.

*Herrera*, upon which Defendants heavily rely, is also distinguishable. Though it involved claims under the NVRA and First Amendment, those claims specifically related to the mechanisms of voter registration, and, in particular, whether New Mexico's restrictions on third party voter *registration* violated the First Amendment. *Herrera*, 690 F. Supp. 2d at 1188. Because this directly related to how an individual would go about exercising their franchise, and how others might help them in doing so, applying the *Anderson-Burdick* framework made sense: "The Supreme Court has noted… that state voting laws, 'whether [they] govern[ ] the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—

at least to some degree—the individual's right to vote and his right to associate with others for political ends.'" *Id.* (citing *Burdick*, 504 U.S. at 433). That is not this case, because as Defendants admit, the Use Restrictions and Data Sharing Ban are "direct restrictions on speech." *See* Def.'s Response to Mtn. for Prel. Inj. (ECF No. 13) at 8.

In addition to all of this, there is no doubt that if a restriction distinguishes between permissible and impermissible speakers or viewpoints, it must survive strict scrutiny even if the speech is related to an election or electoral process.[14] Given that Defendants took adverse action against VRF because of, not merely in spite of, its viewpoint, strict scrutiny is unavoidable.

> **c. Even if the Court applies *Anderson-Burdick*, the analysis does not materially change because the Data Sharing Ban and Use Restrictions severely burden VRF's First Amendment rights, triggering strict scrutiny.**

Even if the Court applies *Anderson-Burdick*, Defendants cannot escape strict scrutiny. "Under the *Anderson v. Celebrezze* test, the Court must resolve the VRF's constitutional challenge…by first considering the character and magnitude of the asserted injury to the VRF's First–Amendment rights and then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Herrera*, 690 F. Supp. 2d at 1218. When the challenged law is "minimally burdensome" on the exercise of constitutional rights, *Anderson-Burdick* requires a "less-searching examination close to rational basis" review. *Ohio Dem. Party v. Husted*, 834 F.3d 620, 627 (6th Cir. 2016) (citing *Burdick*, 504 U.S. at 434). Regulations "imposing severe burdens" on plaintiff's rights, however, "must be narrowly

---

[14] *See Fusaro*, 930 F.3d at 261–62 ("In *Anderson*, the Supreme Court emphasized that 'it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status.' *See* 460 U.S. at 793, 103 S.Ct. 1564. In other words, an election regulation that plausibly burdens First Amendment rights on the basis of viewpoint, political affiliation, or class should be subject to strict scrutiny…And in *United Reporting*, a central concern of the various justices writing separately was that, in controlling access to government information, states might impose conditions 'based on an illegitimate criterion such as viewpoint.' *See* 528 U.S. at 43, 120 S.Ct. 483 (Ginsburg, J., concurring).").

tailored and advance a compelling state interest." *Campbell*, 203 F.3d at 743 (quoting *Timmons*, 520 U.S. at 358). This latter test is none other than strict scrutiny.

Here, Defendants' restrictions totally ban speech that conveys certain content—voter data—regardless of whether that speech is completely accurate and truthful. *See* Defs. Resp. at 11 ("New Mexico statutes prohibit the publication of voter data, regardless of whether the information is accurate."). This completely eliminates VRF's speech and association with citizens through crowd-sourcing. It criminalizes any effort by VRF to share the data on which its analyses are based the next time Defendants accuse it of misinformation. VRF MSJ at SOF ¶¶73, 91-92, 95-96, 104, 109, 111-114. But it also criminalizes sharing of data between academics regarding conflicting studies of the accuracy of the Secretary's database; one candidate's sharing of the data to a friendly third-party candidate; and all other speech that conveys the data. *Id.* at SOF ¶40. Such a sweeping prohibition, which is chilling VRF's speech and has the capacity to chill others, must satisfy strict scrutiny. *See Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 205 (1999) (affirming Tenth Circuit's application of varying degrees of scrutiny under *Anderson-Burdick* but imposing strict scrutiny to reject a requirement that petition circulators wear personal identification badges, because the requirement chilled petition circulation and the "First Amendment affords the broadest protection to political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.").

Whether the Court applies strict scrutiny in the first instance (as it should) or does so after concluding that the restrictions are severe enough to warrant strict scrutiny even through the lens of *Anderson-Burdick*, the outcome is the same: the Use Restrictions and the Data Sharing Ban must, but cannot, survive strict scrutiny.

**d. Neither the Use Restrictions nor the Data Sharing Ban can survive strict scrutiny.**

Defendants bore the burden of proving that their restrictions satisfy strict scrutiny. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 774–75 (2002); *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1189 (D.N.M. 2014) (Browning, J.) ("Strict scrutiny places the burden on the government to identify a compelling interest…and show that the restriction is the least restrictive alternative for achieving that interest…"). They have not done so.

Acknowledging their burden to demonstrate a compelling interest to justify the Use Restrictions and Data Sharing Ban, Defendants simply assert that New Mexico "maintains a compelling interest in the safety and welfare of its citizens and in their free participation in elections." Defs. Resp. at 52. They then go on to discuss hypothetical harms that could be caused by disclosing voter data, arriving at the conclusion that the only way to prevent those harms is an absolute prohibition on sharing the data. *Id.* This is mere brainstorming, though, because Defendants cite nothing in the record demonstrating that these are actual, realized harms, or that their restrictions are narrowly tailored to address those harms.

VRF largely addressed these arguments in its Motion for Summary Judgment—arguments that Defendants fail to rebut. *See* VRF MSJ at 86-90 (addressing each interest asserted by Defendants and addressing why those interests are not compelling). The Court also examined these same interests last summer and found that they were not sufficiently compelling to justify Defendants' speech restrictions. *See* Mem. Op. at 191 (applying strict scrutiny to prior restraint claim). Defendants had a whole year to add to their proof but add nothing new.[15] They once again

---

[15] Defendants do submit a handful of communications and complaints regarding VRF. For the reasons stated in response to SOAF ¶¶245-246, these complaints do not establish that VRF's posting of voter data has led to the harms that Defendants prognosticate. *See Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 543 (1980) ("Mere speculation of harm does not constitute a compelling state interest."; *see also Turner Broadcasting Sys., Inc. v. FCC,*, 512 U.S. 622, 644 (1994) (plurality) ("[The government] must demonstrate that the

fail to meet their burden of identifying a compelling interest or connecting that interest to their broad prohibitions on sharing data.

Finally, Defendants fail their task of demonstrating that the Use Restrictions and Data Sharing Ban are narrowly tailored.[16] *See Griffin*, 30 F. Supp. 3d at 1189 (shifting burden to defendant to prove narrow tailoring). VRF posed a number of "narrow tailoring" ideas suggesting how the asserted interests may be achieved short of an absolute ban on sharing data, including asking requesters to obtain users' agreement that they will comply with New Mexico's purpose-of-use restrictions, while tracking who uses data and making that information available to the state on request.[17] That two-step process is, after all, the sum total of the state's current enforcement. Indeed, the Secretary's staff do not investigate the veracity of the information on request forms, and refuse to investigate even when informed of violations of the law. *See* VRF MSJ at 56-57, ¶¶218-222. It would have been surprising if Defendants could have shown that this would be less effective than the state's own current enforcement measures. But Defendants do not even try. Instead, they vaguely and without evidence suggest that this "would still invade voters' privacy," one of the four asserted (but not compelling) interests. Defs. Resp. at 52. This cannot move the needle. Defendants had to prove that the restrictions do "not burden substantially more speech than is necessary to further the government's legitimate interests…" and that there is "a close fit between ends and means to ensure speech is not sacrificed for efficiency." *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1073 (10th Cir. 2020) (internal citations omitted).

---

recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.").

[16] Because there is no compelling interest served by the restrictions, it does not matter if they are narrowly tailored.

[17] Defendants assert that VRF suggested that the State could simply host the data to be made available to the public. VRF made no such suggestion. *See* VRF MSJ at 91 (offering suggestions on narrow tailoring).

Defendants fail to present competent evidence of a concrete, compelling interest served by the challenged restrictions and make no showing that those restrictions are narrowly tailored. Strict scrutiny requires them to do so. Therefore, the restrictions do not pass constitutional muster.

**VII.  VRF's is entitled to judgment as a matter of law on its overbreadth and vagueness claims.**

### a.  VRF's vagueness and overbreadth claims are not mooted by HB 4.

Defendants argue that the passage of HB4 renders VRF's overbreadth and vagueness challenges moot. Defs. Resp. at 56-57. HB4, by Defendants' own admission, merely codifies the very proscriptions which VRF has challenged throughout this litigation. VRF's claims challenging the Defendants' now-codified policy apply with equal force to the new version of section 1-4-5.6. VRF's speech will continue to be chilled post-HB 4, as it bans exactly the same speech Defendants claimed was banned all along. Additionally, Defendants have repeatedly refused to disclaim that they will prosecute VRF. VRF MSJ at 19, ¶¶18-19.

"[T]he existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque,* 100 F.3d 863, 867 (10th Cir.1996) (citing *Beattie v. United States,* 949 F.2d 1092, 1093 (10th Cir.1991)). "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *City of Erie v. Pap's A.M.,* 529 U.S. 277 (2000) (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979) (citation omitted)). The crucial question is whether "granting a present determination of the issues offered ... will have some effect in the real world." *Kennecott Utah Copper Corp. v. Becker,* 186 F.3d 1261, 1266 (10th Cir.1999) (quotations and citations omitted). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 67

(1997) (quotations and citations omitted). The parties must continue to have a personal stake in the outcome throughout the case.

In some cases, the repeal or amendment of a statute can moot a challenge to that statute. *See Citizens for Responsible Government State Political Action Committee v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000). But this potential for mootness hinges on the idea that "parties have no legally cognizable interest in the constitutional validity of an obsolete statute." *Id*. This is not the case, however, when a party has already acted in a way that would trigger the unlawful enforcement of the now obsolete version of the statute. In that case, the party has a significant, legally cognizable interest in not being prosecuted under an unlawful statute. Indeed, the purpose of invalidating an unconstitutional statute is to "prevent[] future prosecutions under a constitutionally defective standard." *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989).

Here, the amendments to § 1-4-5.6 (which as the time of filing have yet to take effect) do not render VRF's overbreadth and vagueness challenges moot because VRF is still under the unwavering threat of prosecution, VRF MSJ at 19, ¶¶18-19, because VRF already engaged in the activity which Defendants argue is unlawful under the pre-amendment statute by publishing New Mexico voter data on its website. Thus, an "actual controversy" still exists and this Court must act to "prevent[] future prosecution under a constitutionally defective standard." *Oakes*, 491 U.S. at 584. Crucially, a determination of the issues by this Court will still have an effect "in the real world." *Becker*, 186 F.3d at 1266.

> **b. Defendants' argument that the Data Sharing Ban is not vague is premised on a legal argument already rejected by the Court.**

The parties agree that the restrictions at issue are vague unless VRF had "fair notice" that posting voter information to VoteRef.com was unlawful. *See* Defs. Resp. at 59. Defendants repeat VRF's argument that the prohibitions at issue here "do[] not appear in any New Mexico statute,

rule, regulation or administrative guidance" as if that helps them in defending against VRF's vagueness claim. *Id.* at 58. Defendants argue that VRF had fair notice based on a contorted interpretation of statutes which, read independently, do not prohibit the publication of voter data, but, when read together, contain such a prohibition (according to Defendants). *See id.* at 59 (reiterating theory that §§ 1-4-5.5, 1-4-5.6, and 1-5-22 combine to create a prohibition on publication of voter data).

But the Court has already rejected this very theory. "[T]he Court can find no statutory basis for this interpretation." *See* Mem. Op. at 158. Nor can VRF. Nor can a reasonable person trying to determine whether and under what circumstances voter data can be shared. This is the essence of a vagueness issue: citizens cannot conform their conduct due to the unclear standards and prohibitions and, as seen throughout this litigation with Defendants' waffling positions on what one can and cannot do with voter data, the risk of discriminatory enforcement and chilled speech is too high for the First Amendment to tolerate.[18] Thus, with respect to VRF's backward-looking request that the Court prohibit Defendants from enforcing their restrictions against VRF from the pre-lawsuit stage, when no one could have guessed what Defendants would argue here, VRF's vagueness claim can still provide a basis for relief.

### c. Defendants' overbreadth argument rests on the erroneous assumption that sharing voter data is never protected by the First Amendment.

A challenged statute is overbroad when it regulates substantially more expression than the First Amendment allows the government to regulate. *See Schad v. Borough of Mt. Ephraim*, 452

---

[18] Defendants also interject a new argument that "governmental purposes" as used in section 1-4-5.5(C) means something other than the definition of that term in section 1-4-5.5(E). *See* Defs. Resp. at 59-60. Defendants contend that the definition only applies to uses by the government, rather than uses by private entities which would otherwise meet the definition of "governmental purposes" in section 1-4-5.5(E). *Id.* at 60. Specifically, they contend that monitoring government conduct is not a "governmental purpose," though this Court has already held otherwise. Mem. Op. at 137 ("Second, the Court concludes that the Election Code permits Voter Reference's use of voter data as a 'governmental purpose[],'N.M.S.A. § 1-4-5.5(E), and, in contrast to the Secretary of State's interpretation, permits Voter Reference's publication of voter data online.").

U.S. 61, 64 (1981). The Data Sharing Ban purports to prohibit speech sharing any voter data outside of the requesting entity, regardless of whether that data is accurately conveyed or not. *See* Defs. Resp. at 11 ("New Mexico statutes prohibit the publication of voter data, regardless of whether the information is accurate."). The Ban prohibits the sharing of voter data for any purpose, even a purpose which is permitted under section § 1-4-5.5. VRF MSJ at SOF ¶¶40, 49, 207-208. The Ban has chilled, and continues to chill, VRF's speech. Mem. Op. at 162; VRF MSJ at SOF ¶¶130-132. Beyond VRF, the Ban purports to proscribe large swaths of speech which would otherwise be permissible and protected under the First Amendment. *See* Section VI(c), above.

Defendants attempt to improperly shift the burden to VRF to prove that the Use Restrictions and Data Sharing Ban are overbroad. Defs. Resp. at 63 ("VRF does not explain why these restrictions are not well-tailored to furthering the State's interest…"). In a First Amendment overbreadth challenge, the government bears the burden of establishing the statute's constitutionality, *see ACORN v. Municipality of Golden*, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated, *see Doe v. City of Albuquerque*, 667 F.3d 1111, 1120 (10th Cir. 2012).

Defendants then assert that "…VRF must have a First Amendment right to publish the voter data for restrictions on that right to be overbroad." Defs. Resp. at 63. But in the very next sentence, they conflate the right to *access* that data with the right to *publish* that data. *See id.* ("To the contrary, there is no general right under the First Amendment to *access* government information.") (emphasis added). They next argue that because New Mexico is not obliged to make the data available, it can condition access in any content or viewpoint neutral manner, including by proscribing otherwise protected speech. *Id.* ("Once a State chooses to provide access to certain information, the State can control the access by *any* nondiscriminatory means.") (emphasis added).

This argument entirely ignores the fact that, regardless of New Mexico's own policy decisions, the NVRA requires the state to make the requested data available. *See* Section V, above; *see also* VRF MSJ at 64-67.

Because the NVRA requires that the State make the requested information available and the Data Sharing Ban prohibits nearly all speech involving that data once it is made available, the Defendants have not met their burden of demonstrating that the Ban is not overbroad.

**VIII.  Defendants concede that their repeated refusals to deny VRF access to voter data were motivated by VRF's protected speech, establishing First Amendment retaliation.**

Defendants admit that their repeated decisions to refuse to provide voter data to VRF are a result of VRF's past speech sharing voter data online. *See* Defs. Resp. at 13 ("Uncontroverted that the Secretary's office determined not to provide voter data in response to VRF's February 15 request due to VRF's internet posting of prior data."). Sharing the voter data was protected speech and was not prohibited by New Mexico law. *See* VRF MSJ at 78-80. Thus, Defendants' withholding of a government benefit—access to voter data—is directly motivated by VRF's First Amendment protected speech. Defendants do not—and cannot—deny this causal link, but argue that they have not retaliated against VRF (1) because the publication of the voter data was not protected by the First Amendment, and (2) because there are also other reasons for withholding the data. *See* Defs. Resp. at 53 ("But Defendants' actions were motivated solely by enforcement of New Mexico's constitutionally valid election code and out of an immediate concern for protecting voters…").

As to the first argument, VRF's posting of the voter data online to enable citizens to verify the accuracy of the rolls and to enable them to contact state officials if inaccuracies are noted, is

plainly protected by the First Amendment. *See* VRF MSJ at 78-80. This sharing also did not violate New Mexico law, as this Court has already held. *See* Mem. Op. at 143, 152, 154.

As to the second argument, Defendants are incorrect that they can rebut a showing of retaliation merely by pointing to some purportedly non-retaliatory reason that would have justified their taking adverse action against VRF. "It has long been clearly established that the First Amendment bars retaliation for protected speech and [political] association." *Edwards-Flynn v. Yara*, No. CIV 08-0186 JB/ACT, 2009 WL 1563375, at *5–6 (D.N.M. May 18, 2009), *objections overruled*, No. CIV. 08-0186 JB/ACT, 2010 WL 624086 (D.N.M. Jan. 26, 2010) (*citing MIMICS, Inc. v. Village of Angel Fire,* 394 F.3d 836, 848 (10th Cir.2005)). An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper. *Id.* at *6; *see also Perez v. Ellington*, 421 F.3d 1128, 1132 (10th Cir. 2005) (defendants' extreme delay in releasing liens on plaintiffs' property following association with sovereign tribe evidences a retaliatory motive). Defendants' argument on this point is further undermined by their admissions that they had never withheld voter data from any other person in response to a lawful request.

Having conceded the "but for" causation between VRF's past posting of voter data—protected speech—and the withholding of voter data in response to additional requests from VRF, Defendants have made their bed and must now lie in it.

## IX.   Defendants engaged in viewpoint discrimination targeted at VRF's perceived criticism of the Secretary's voter list maintenance.

VRF published that it identified a difference of 3,844 between registered voters with ballots cast and total ballots cast in the 2020 election. VRF MSJ at 31, ¶71. The publication of that finding and the voter data VRF received from Local Labs triggered the events giving rise to this case, including the Secretary's referral of VRF for investigation, SOF ¶74, and the repeated denials of

access to voter data. SOF ¶117 (Secretary takes position that it will not fulfill any records requests from VRF following VRF's February 15, 2022 request); SOF ¶139 (denial of May 27, 2022 request); SOF 186 (denial of October 18, 2022 request). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828 (1995). VRF's viewpoint discrimination claims allege that Defendants (1) referred VRF for investigation and/or investigated VRF because of their disagreement with its viewpoint and (2) refused to produce voter data to it because of its viewpoint, including fear that the data would be used to speak critically of the Secretary's voter roll maintenance functions. *See* Amended Complaint, ECF No. 74 at ¶¶7, 94, 155, 194.

Defendants assert that there is no discriminatory purpose because the Secretary tolerated VRF's criticism of her. Defs. Resp. at 54.[19] Yet the Secretary's hostility towards VRF's perceived criticism of her office is well documented. The Secretary based her referral of VRF to the AG in part on her concern regarding spreading "misinformation" and her concern that spreading "misinformation" violated New Mexico law. VRF MSJ at ¶¶88-89, 91-92. The Secretary's communications director, Alex Curtas, later tied this concept of "misinformation" directly to VRF's identification and publication of a discrepancy after it analyzed the data. Curtas claimed that because VRF had engaged in "misinformation," its speech was not for a governmental purpose, election related, or election campaign purpose, and the Secretary admits that this is a material fact. *Id.* at ¶104 ("We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use."). Further, the Secretary would not allow a "discussion" that reveals anything

---

[19] This assertion cites directly to the May 17, 2022, PI hearing transcript rather than any properly asserted statement of additional fact. For the reasons set forth above in Section II, above, the Court should disregard this improperly alleged and unsupported assertion of fact.

from the data, even if it does not personally identify a voter. *Id.* at ¶141 (refusing to produce voter data to VRF to engage in discrepancy analysis based on claim that promise not to release "personal voter data" was not broad enough.).

Finally, Defendants argue that VRF must show a similarly situated organization with a different viewpoint that was treated more favorably than VRF, or else it cannot succeed in demonstrating that Defendants acted with a viewpoint discriminatory purpose. Defs. Resp. at 54-56. VRF disagrees with this assertion, particularly because Defendants have failed to identify any case law in this proceeding or their appeal to the Tenth Circuit applying this requirement to a First Amendment viewpoint discrimination case. Nevertheless, even if they are correct, Defendants take an incredibly narrow view of who might be "similarly situated" for these purposes, stating:

> VRF cannot identify a single party with different viewpoints who has published New Mexico voter data on a publicly available website whom Defendants have not referred for criminal prosecution or to whom Defendants have denied requests for voters data. This is because no such party exists.

*Id.* at 55. In turn, Defendants contend that they have not discriminated against VRF, because in 2022, the Secretary faced a Republican opponent who criticized the Secretary and New Mexico's elections. *Id.* at 42. But the Secretary asserts that she could not possibly have discriminated against VRF, because even though her primary opponent made similar criticisms of the Secretary, the Secretary's office still gave voter data *to the Republican Party of New Mexico*. *Id.* at 55-56.[20] The Secretary seeks absolution for any viewpoint discrimination against VRF because when her campaign opponent criticized her, she still produced voter data, not to her opponent, but to the political party supporting her opponent.[21] Defendants then assert that because the Secretary

---

[20] Defendants' assertions of fact on this point, including those in paragraph 248 of their statement of additional facts, are not supported by admissible evidence and are not properly considered at this stage. *See* Response to SOAF ¶248, above.

[21] This, of course, ignores the fact that New Mexico law specifically requires the Secretary to produce an updated voter file to the Republican Party upon request. *See* N.M.S.A. § 1-5-14(C).

provides voter data to candidates and campaigns of various parties,[22] she cannot have discriminated against VRF. *Id.* at 56. Defendants fail to cite a single First Amendment viewpoint discrimination case requiring a direct comparison to some that engaged in precisely the same activity but was treated less favorably, but for their viewpoint.

Though Defendants claim that "the only motive for the Secretary denying subsequent requests for voter data was as a response to an unprecedented publication of the entire state voter file…", this Court has already found ample evidence that the Defendants' actions were motivated by, or constitute, impermissible viewpoint discrimination. *See* Mem. Op. at 180-81. ("the Secretary of State's indication that it will not honor Voter Reference's May 27, 2022, request, despite Voter Reference's assurances that it will not publish voter's personal information without a Court order, constitutes impermissible viewpoint discrimination."); *id.* at 180 ("[T]o the extent the Plaintiffs challenge the Secretary of State's lack of response to Voter Reference's request for voter data, the Plaintiffs likely are to succeed on their viewpoint discrimination claim. The Secretary of State's actions caused viewpoint discrimination. . .. [O]nce the State agrees to make its data publicly available, the State may not condition access to that data based on the requestor's viewpoint. . .. The Secretary of State has conditioned its decision not to respond to Voter Reference's data request on Voter Reference's viewpoint -- specifically, the fear that giving the data to Voter Reference may reveal that the Secretary of State is lax about maintaining the State's voter data."); *id.* at 183-84 ("[T]he extant evidence suggests that the Secretary of State caused viewpoint discrimination by referring Voter Reference and Local Labs for investigation. . .. Moreover, the evidence suggests that the referral was because of, not merely in spite of, Voter Reference's views."). The fact that

---

[22] *See id.*

the Secretary provides voter data to political parties, as she is required to do under state law, does not alter this determination.

**X.      VRF is entitled to a permanent injunction.**

The parties agree on the four factors the Court must use to determine if a permanent injunction is appropriate. *See* Defs. Resp. at 64. The parties' primary dispute regarding injunctive relief is whether VRF has demonstrated actual success on the merits. *Id.* VRF acknowledges that if it does not succeed on the merits, it is not entitled to injunctive relief, but understandably disagrees with Defendants that its claims will not succeed.

Defendants also incorrectly assert that "VRF has failed to address the very real threat to public interest and harm to the state of New Mexico that will result if it receives its requested injunction." *Id.* VRF addressed precisely these issues in its Motion for Summary Judgment. *See* VRF MSJ, Dkt. 119 at 111 ("The injury to VRF outweighs any harm that may be caused to Defendants and the public interest favors an injunction"). Thus, if VRF succeeds on the merits of any of its First Amendment claims alleged herein, it is entitled to a permanent injunction to prevent future similar violations. *See also id.* at 109-111.

**CONCLUSION**

For the reasons stated herein, as well as those stated in VRF's Motion for Summary Judgment,[23] VRF respectfully requests that the Court enter judgment in its favor and against Defendants on Counts I (NVRA Preemption), II (NVRA Failure to Produce Records), III (First Amendment Retaliation), V (First Amendment), VI (First Amendment Overbreadth), VII (First/Fourteenth Amendment Vagueness), and VIII (Declaratory Judgment) of VRF's First

---

[23] VRF's Motion for Summary Judgment and a redacted version of its Suggestions in Support were filed as ECF 119 and 120, respectively. An unredacted version of VRF's Suggestions in Support was filed under seal at ECF 124.

Amended Complaint (ECF 74), and award VRF its attorney's fees and costs incurred in this matter

pursuant to 42 U.S.C. § 1988.


Dated: May 26, 2023                              Respectfully submitted,

                                                 **GRAVES GARRETT, LLC**
                                                 */s/ Edward D. Greim*
                                                 Edward D. Greim
                                                 Missouri Bar No. 54034
                                                 *Admitted Pro Hac Vice*
                                                 GRAVES GARRETT LLC
                                                 1100 Main Street, Suite 2700
                                                 Kansas City, Missouri 64105
                                                 Tel.: (816) 256-3181
                                                 Fax: (816) 222-0534
                                                 edgreim@gravesgarrett.com


                                                 **HARRISON, HART & DAVIS, LLC**
                                                 Carter B. Harrison IV
                                                 924 Park Avenue SW, Suite E
                                                 Albuquerque, NM 87102
                                                 Tel: (505) 369-6599
                                                 Fax: (505) 341-9340
                                                 carter@harrisonhartlaw.com

                                                 *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I, Edward D. Greim, certify that on May 26, 2023, a copy of foregoing was filed with the

Clerk of the Court using the CM/ECF system, which sent notification to the following via email:

Jeff D. Herrera
Kelsey Schremmer
jherrera@nmag.gov
kschremmer@nmag.gov
Office of the New Mexico Attorney General
408 Galisteo Street
Santa Fe, NM 87501

*/s/ Edward D. Greim*
Edward D. Greim
Counsel for Plaintiff