## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**VOTER REFERENCE FOUNDATION, LLC,**

      **Plaintiff,**

v.                                                          **Case No: 1:22-cv-00222-JB-KK**

**RAÚL TORREZ,** in his official capacity as
New Mexico Attorney General;

and

**MAGGIE TOULOUSE OLIVER,**
in her official capacity as
Secretary of State of New Mexico,

      **Defendants.**

---

### DEFENDANTS' REPLY IN SUPPORT OF THEIR
### MOTION FOR SUMMARY JUDGMENT

---

Kelsey Frobisher Schremmer
Jeff Dan Herrera
Assistant Attorneys General
408 Galisteo St.
Santa Fe, NM 87501
Tel.: (505) 490-4060
Fax: (505) 490-4881
kschremmer@nmag.gov
jherrera@nmag.gov

*Counsel for Defendants*

**REPLY IN SUPPORT OF**
**DEFENDANTS' STATEMENT OF FACTS**

Plaintiff admits that the following facts in Defendants' summary judgment memorandum are uncontroverted: 1–3, 9–16, 19–20, 22–26, 28, 30, 35, 37–40, 43, 50–52, 56, 62, 67–68, 70.  Defendants here address the facts that are not expressly uncontroverted.

**Original Fact 4:** Since at least 2011, the Secretary has consistently interpreted Section 1-4-5.6 of the Election Code as prohibiting the willful selling, loaning, providing access to or otherwise surrendering of New Mexico voter data by any person or entity. *See* ECF Nos. 44-8, 44-9, and 44-10; PI Hearing, June 15, 2022, Tr. 77:17 – 78:7, relevant portions attached as Exhibit 1; Dep. Of Mandy Vigil ("Vigil Dep.") at 207:23-208:8, relevant portions attached as Exhibit 2.

**Plaintiff's Response:** Controverted. Plaintiff denies that the Secretary has consistently interpreted Section 1-4-5.6 as prohibiting the willful selling, loaning, providing access to, or otherwise surrendering of New Mexico voter data by any person or entity. The Secretary's affidavits clearly allowed transfers for permissible purposes, and only changed after VRF was brought to the Secretary's attention. Compare Ex. P8, Dkt. 44-81, Undated Form (no requirement that requestor retain control over transferee's use of data and no attempt to extract promises from requestor regarding transferring data) and Ex. P11, Dkt. 44-1, Lippert Form (same, as to form signed by Local Labs) with Ex. P7, Dkt. 44-10, February 14, 2022 Revised Form (requiring, for the first time, promise from requestor that it will not "sell, loan, provide access to, or otherwise surrender voter information received as a result of this request."). The Secretary's interpretation of the law has been anything but consistent. *See* Plaintiff's Motion for Summary Judgment, Dkt. 119, at p.39-42, ¶¶200-217. This paragraph also fails to address the AG's testimony that he can no longer draw the conclusion the Defendants advanced in their argument and briefing at the preliminary injunction: that § 1-4-5.6 incorporates the prohibitions of § 1-5-22(a) to make VRF's publication of data unlawful. Ex. P2, Dkt. 119-22, Tr. of Dep. of AG 30(b)(6) Representative, Deputy AG Joseph Dworak ("Dworak"), 144:7-16.

**Defendants' Reply:** It is completely unclear what VRF is referencing when it denies, based on the form that Lippert signed prior to this litigation, that the form did not prohibit the willful selling, loaning, etc., of data. The very exhibit that VRF references—ECF No. 44-1, the Voter Information Authorization form executed by Lippert on March 29, 2021—contains this statement under the header Authorization, and above Lippert's signature:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).

ECF No. 44-1. Neither does the remainder of the response, which contains legal argument, controvert this fact. Plaintiff states that the Secretary's interpretation has been inconsistent and cites to its own MSJ as support for this position. Plaintiff does not, however, cite to record evidence. The Secretary's interpretation of NMSA 1978, Sec. 1-4-5.6 has remained consistent for at least 11 years. *See* ECF No. 121 at 73 (PI Hearing, June 15, 2022 Tr. 77:17-19). Finally, as to the contention that the AG testified that the office's position has changed, that is a complete misconstruction of testimony. The Attorney General's representative, Mr. Dworak, testified that "[T]he actions take [by VRF], and the use of this information is not in compliance with New Mexico law." When asked by Plaintiff's counsel whether the Attorney General's position had changed since the preliminary injunction hearing, Mr. Dworak testified that "there is no reason that I have, that I'm aware of to, you know, challenge any positions that she took" but that he would need to "consult[] with counsel" as to any specific legal conclusions. Plaintiff's counsel continued to press the fact witness for legal conclusions, to which Mr. Dworak responded that he "can't draw that conclusion." Dworak Dep., ECF No. 119-2, 142:10-44:16.

**Original Fact 5:** Also since 2011, the Secretary has interpreted Section 1-4-5.5 as allowing voter data obtained in compliance therewith to be shared within an organization, such as a company, a political party, or a party and a candidate from the same party. This interpretation is reflected in each

version of the Voter Information Authorization form, all of which include the option for the requester to be an organization. ECF Nos. 44-8, 44-9, and 44-10; PI Hearing, June 15, 2022, Tr.10:1-12; Vigil Dep. at 93:17-94:1.

**Plaintiff's Response:** Controverted. None of the cited testimony supports the assertion made, as the Secretary seems to have only recently opined that the organization can "make the data available to itself," Ex. P10, Dkt. 119-6, Tr. of June 15 Hearing ("June 15 Tr.") at 10:1-2, and qualifies even this statement by stating the rule as, "we would not feel like it was a violation if folks were sharing the data within that organization," but "we would have to go back to an attorney to understand some of those intricacies…" Ex. P6, Dkt. 119-5, Tr. of Deposition of SOS 30(b)(6) Representative, Elections Director Mandy Vigil ("Vigil") at 93:17-94:1. Further, the Voter Information Authorization form, or any iteration thereof, fails to inform a requester that voter data may be shared within, but not outside, an organization. Ex. P8, Dkt. 44-8, Undated Form (no information that sharing inside entity is permissible but outside entity is illegal); P11, Dkt. 44-1, Lippert Form (same); P7, Dkt. 44-10, February 14, 2022 Revised Form (same).

**Defendants' Reply:** *See* Reply to SOF ¶ 4. VRF cites testimony consistent with this fact allegation, plus specific examples of how the law might be applied in hypothetical, and complex, agency situations presented to a lay witness, who testified that she would need legal advice on how the rule might apply. *See also* Reply to SOF ¶ 6 *infra*.

**Original Fact 6:** Individuals not members of the same entity, as well as different entities, must each submit a separate Voter Information Authorization form and must comply with the regulatory process. This is true regardless of the identity or viewpoint of the requester. PI Hearing, June 15, 2022, Tr. 32:18-33:1; PI Hearing, June 15, 2022, Tr. 75:16-22.

**Plaintiff's Response:** Controverted. Plaintiff admits that this paragraph accurately reflects the Defendants' argument in this litigation, but denies that the law requires that individuals not members of the same entity or entirely different entities must submit separate forms to access voter data. Defendants' witness opined only that one academic could not share his or her data with another academic without running afoul of the law, that the second academic wanting the data would "need to comply," and that in this situation the academics' viewpoints would not matter. June 15 Tr., 32:6-33:9. And in fact, despite the Secretary's position here, she selectively allows other entities and individuals to receive data without signing a new affidavit. *Id.* at 30:17-31:20 (sharing of a voter's information by a canvasser with close family members or other members of his or her household permitted without separate forms); *id.* at 34:17-24 (sharing by a political data compilation/analysis firm and its political clients permissible without separate forms); *id.* at 91:1-5, 91:17-20 (sharing between a political party and a candidate it supports, but who is not affiliated with the party, permissible without separate forms). Further, the Court has already held that this position does not find support in New Mexico law. July 22, 2022 Memorandum Opinion and Order, Dkt. 51 ("Mem. Op.") at 157-8 (Defendants position that data cannot be shared outside of requesting organization has no statutory basis).

**Defendants' Reply:** VRF has not properly controverted this fact. It "admits that this paragraph accurately reflects" Defendants' interpretation of New Mexico law, and argues only that VRF disagrees with this interpretation. Neither does VRF's contention that the Secretary's application of the rule to novel hypotheticals presented during the PI hearing—for example whether a family member's presence for a conversation between a canvasser and a voter constitutes third-party sharing or whether a political party and its official candidate are sufficiently within an entity to permit sharing—controvert the basic rule that "individual members not of the same entity…must submit separate forms."

**Original Fact 7:** The Secretary's interpretation of Section 1-4-5.6 does not prohibit discussing voter data so long as the data itself is not released or shared. PI Hearing, June 15, 2022, Tr. 76:21-77:5.

**Plaintiff's Response:** Controverted. The Secretary based her referral of VRF to the AG in part on her concern regarding spreading "misinformation" and her concern that spreading "misinformation" violated New Mexico law. Ex. P14, Dkt. 44-3, SOS Criminal Referral of VRF to AG ("VRF Referral"); Ex. P12, Dkt. 119-7, ROG 7 to SOS, (publication on the Internet alone, even if completely accurate, constituted unlawful misinformation); Vigil, 126:9-127:4 (publication of voter data at large may constitute misinformation); *id.* at 129:7-17 (publishing "old" file constitutes misinformation); Dworak, 68:11-18 (AG agrees with Secretary that VRF's publication of voter data is election misinformation). The Secretary's communications director, Alex Curtas, later tied this concept of "misinformation" directly to VRF's identification and publication of a discrepancy after it analyzed the data. Curtas claimed that because VRF had engaged in "misinformation," its speech was not for a governmental purpose, election related, or election campaign purpose, and the Secretary admits that this is a material fact. DSOF 42 ("We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use."). Sharon Pino, the Deputy Secretary of State who signed the criminal referral, said the same thing and affirmed, "I still believe that today." June 15 Tr., 139:5-15. Further, the Secretary would not allow a "discussion" that reveals anything from the data, even if it does not personally identify a voter. *See* Ex. P26, Dkt. 119-11, Secretary's June 16, 2022 Response to NVRA Notice (refusing to produce voter data to VRF to engage in discrepancy analysis based on claim that promise not to release "personal voter data" was not broad enough.).

**Defendants' Reply:** VRF does not properly controvert this fact. It makes arguments based on skewed reading of a referral letter that speaks for itself. ECF No. 44-3. The first paragraph of that

letter shows that the Secretary's focus was on the illegal transfer and internet publication of voter data. The single line that VRF highlights, when read in context, is simply a plea from the Secretary that the Attorney General's office treat this referral as a time sensitive one—not an explanation of the grounds on which the referral is being made:

> The SOS is referring a criminal matter for investigation and prosecution related to an illegal transfer and use of voter data pursuant to NMSA 1978, Section 1-4-5.6. It has come to our attention that a website maintained and operated by VoteRef.com has posted New Mexico voter data on its website obtained through a voter data request from our office. The voter data can be found on the following website, [URL omitted]. The likely source of the voter data transfer is through David Michael Lippert at Local Labs, who was provided voter data in April of this year. We have attached our office's communication with Mr. Lippert regarding his voter data request. We believe that this data was illegally provided by Mr. Lippert of Local Labs to VoteRef.com and is being used against New Mexico state law. Swift action is needed as voter data can quickly be manipulated and used to spread election misinformation.

ECF No. 44-3 at 1. The only other reference to "misinformation" in the entire letter is in the context of an explanation of Section 1-4-5.5, which defines permissible uses as governmental or election and election campaign purposes: "We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign purposes.'" Notably, VRF's response cuts that sentence short in order to imply that the Secretary was referring VRF simply because she thought its use was "inappropriate" rather than because she correctly assessed that its use was not appropriate with reference to the three statutorily permissible uses. This fact should be deemed admitted.

**Original Fact 8:** The Secretary reads Sections 1-4-5.5, 1-4-5.6, and 1-5-22 together to conclude that an entity or individual may access voter data for specific purposes, and may not use that data for any purpose deemed unlawful or share that data with anyone outside of the entity that originally requested and signed an affidavit for the data. Vigil Dep. at 82:11-12, 83:1-2, 84:9-12.

**Plaintiff's Response:** Uncontroverted that this is the Secretary's legal position in briefing and oral argument, although none of the cited deposition testimony speaks to the Secretary's theory regarding the relationship between sections § 1-4-5.5, § 1-4-5.6, and § 1-5-22. The three citations to Vigil's deposition speak of the Secretary's position that posting of voter data online is unlawful, but provides no legal basis for that position. *See* Vigil Dep. at 82:11-12, 83:1-2, 84:9-12. The AG is also a Defendant in this proceeding and this paragraph fails to address the AG's unwillingness to adopt the same position. Dworak, 144:7-16. Further, the Court has already held that this position does not find support in New Mexico law. Mem. Op. at 157-8 (Defendants' position that data cannot be shared outside of requesting organization has no statutory basis).

**Defendants' Reply:** This fact is expressly uncontroverted. The remainder of VRF's response is commentary, fully addressed in the briefing below, and a repetition of VRF's misconstruction of Mr. Dworak's testimony, addressed in response to SOF ¶ 4.

**Original Fact 17:** In order to obtain voter data in New Mexico, a requester has to submit a properly completed Voter Information Authorization form. Stat. Ann. 1978, § 1-4-5.5; PI Hearing, May 17, 2022, Tr. at 128:13-15.

**Plaintiff's Response:** Controverted. Plaintiff admits that this paragraph accurately reflects the Defendants' position, but otherwise states a legal conclusion rather than a statement of fact. Whether the NVRA permits a state to condition access on the execution of a form not required by the NVRA is at issue here. Further, New Mexico allows many individuals and entities who do not fill out the affidavit to obtain and use voter data from intermediaries. *See* Response to DSOF 6.

**Defendants' Reply:** Although VRF purports to controvert this fact, it then expressly "admits that this paragraph accurately reflects Defendants' position" and argues only that it is a legal conclusion. To the extent VRF attempts to controvert on the basis that "New Mexico allows" others

to obtain voter data from intermediaries, that assertion is not accurate or supported. *See* Reply to SOF ¶ 6 *supra*.

**Original Fact 18:** The Voter Information Authorization form includes an affidavit required under the New Mexico Election Code. N.M. Stat. Ann. 1978, § 1-4-505; PI Hearing, May 17, 2022, TR. at 128:13-15.

**Plaintiff's Response:** Controverted. Plaintiff admits that § 1-4-5.5 prescribes the use of an affidavit to acquire voter data, but does not prescribe the specific language that must be used. Further, the language used in the affidavit is not consistent with New Mexico law. Ex. P7, Dkt. 44-10, February 14, 2022 Revised Form (requiring requestor to agree not to "sell, loan, provide access to, or otherwise surrender voter information received as a result of this request."); *see also* Mem. Op. at 148 ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act.").

**Defendants' Reply:** VRF does not controvert the fact as it is written: that an affidavit is required by statute for New Mexico voter data requests. VRF only provides argument that goes beyond the scope of the original fact.

**Original Fact 21:** Local Labs is a commercial entity that provides public records requests and other services. PI Hearing, May 17, 2022 Tr. 66:3-15.

**Plaintiff's Response:** Controverted. The term "commercial" is undefined under New Mexico law and is not internally defined in Defendants' motion. Regardless, the cited hearing testimony does not state that Local Labs is a "commercial entity" or support that conclusion, and in fact, in this case they were working on behalf of a nonprofit entity that intended to use the data for governmental and election-related purposes. *See* P1, Dkt. 119-1, Excerpts of Tr. from May 17 Preliminary Injunction

Hearing, ("May 17 Tr.") at 66:3-15 ("Q. In this case, though, did another entity request that data? A. Yes, Local Labs requested that data before I came on. Q. And did it do this in other states for VRF as well? A. Yes. Q. Why use Local Labs? A. It's my understanding they're a company that does public records requests and FOIAs, and they work in that area all the time, so they're more familiar with the forms and who to contact, and have people on the ground.")

**Defendants' Reply:** This fact is not actually controverted. VRF takes issue with the phrase "commercial entity," providing testimony suggesting that Local Labs should instead be called a "company." Substituting "company" for "commercial entity" in no way changes the substance of this fact, which should be deemed uncontroverted.

**Original Fact 27:** VRF paid Local Labs $15,000 for its services, including the Voter Data. PI Hearing, May 17, 2022 Tr., at 73:18-25; 74:9-13.

**Plaintiff's Response:** Controverted. VRF paid Local Labs $15,000 to acquire voter data on its behalf in New Mexico. May 17 Tr. at 73:18-22. As part of its services, Local Labs paid the state $5,378.12 for the voter data it acquired. Ex. P13, Dkt. 44-2 Local Labs Receipt from SOS.

**Defendants' Reply:** This fact should be deemed uncontroverted. VRF responds that it did, as alleged, pay Local Labs $15,000 for its services. It then adds an additional, but consistent, fact about the amount that Local Labs spent in performing these services.

**Original Fact 29:** The Voter Authorization Form itself was amended in January 2021 and again on February 10, 2021, to provide increased clarity to the requesters or anyone using the form. PI Hearing, May 17, 2022 Tr. 138:14-15; 136:14-23; 140:2-4.

**Plaintiff's Response:** Controverted. Plaintiff admits that the Voter Authorization Form was amended in January 2021 and February 10, 2022. But the Form was also amended on February 14,

2022. *See* Ex. P7, Dkt. 44-10, Feb. 14 Form. Plaintiff further denies that the amendments were "to provide increased clarity" to users of the form. Rather, the amendments were substantive and departed from New Mexico law. One set of changes was content-based by eliminating certain categories of authorized uses. *See* Response to DSOF 18; compare Ex. P11, Dkt. 44-1, Lippert Form (allowing governmental, campaign, and election related uses, in use in 2021) with Ex. P9, Dkt. 44-9, Feb. 10 Form (removing "election related"); with Ex. P7, Feb. 14 Form (requiring requesters to provide further detail on purpose of "governmental" or "campaign" use). Another set of changes replaced New Mexico's statutory requirement. From the earliest forms, through the Lippert Form of 2021, until February 10, 2022, "the requestor" promised not to use or share the data for purposes "other than governmental, election, research, and campaign purposes." *See, e.g.*, Lippert Form, Dkt. 44-1; Early Form, Dkt. 44-8. Starting on February 10, 2022, this completely changed: from that date, the "requestor" had to promise not to "sell, loan, provide access to, or otherwise surrender" the data, and the allowance for sharing the data for permissible purposes was removed. *See* Feb. 10 Form, Feb. 14 Form. The Secretary's claim that hearsay "inquiries" of parties who are not witnesses prompted a need to "clarify" the form is not credible. The Secretary produced no documents, notes, or communications containing the "inquiries" or discussing how those "inquires" could have required changes. Further, the Secretary elsewhere claimed that the changes were minor and that all of the forms—even the superseded forms from 2021, which Local Labs had signed—accurately described New Mexico law, and for that reason, were still being accepted to the present day. June 15 Tr. at 89:16-20 (older, outdated versions of form still accepted); Vigil, 169:16-21 (same). It is far more likely that the form was changed in Feb. 2022 because the Secretary had made her criminal referral a few weeks previously, the language in the Local Labs form allowing sharing for permissible purposes was flatly inconsistent with the criminal complaint, and the Secretary was preparing for the impending March 2022 release of the Pro Publica article, which would heavily quote her attacks on VRF for supposedly breaking

New Mexico law. *See* DSOF ¶39 (Secretary knew ProPublica article would be published week of February 28).

**Defendants' Reply:** This fact is not properly controverted and should be deemed admitted. Once again, VRF admits the fact as stated and then adds additional, not inconsistent, facts and its own legal argument in an attempt to create the appearance of controversy. Here, VRF admits the fact and then argues its own opinion that—regardless of the intent to which the Secretary testified—more clarity was not achieved.

**Original Fact 31:** The affidavit in the form has been corrected to more strictly align to the statute. The updates were prompted by inquiries from a county clerk and a records custodian for the Secretary, and the goal of the updates was to better align the form to the current version of Section 1-4-5.5 of the Election Code. PI Hearing, May 17, 2022 Tr. 132:20-23.

**Plaintiff's Response:** Controverted. The affidavit conflicts with New Mexico's statutes regulating the use and dissemination of voter data. *See* Response to DSOF ¶29.

**Defendants' Reply:** This fact states that the affidavit has been revised and that the goal was to more strictly align it to the statute after inquiries from county officials and a records custodian. VRF does not controvert any portion of the fact, but instead offers legal argument about its opinion of New Mexico law. This fact should be deemed admitted. *See also* Reply to SOF ¶ 29.

**Original Fact 32:** The updates were prompted by inquiries from a county clerk and a records custodian for the Secretary. PI Hearing, May 17, 2022 Tr. 132:20-23.

**Plaintiff's Response:** There is no competent evidence for "inquiries" by two unnamed and unavailable declarants, and no one can know what was said. Further, the actual reasons for the changes were not likely these unexplained "inquiries," but instead, the need to avoid having forms that

conflicted with the Secretary's just-made referral, the news of which was about to be broken by the Pro Publica article with quotes by the Secretary attacking VRF. *See* response to DSOF 29.

**Defendants' Reply:** The testimony cited supports the Secretary's state of mind and motivation for updating the forms. VRF offers nothing to controvert this testimony other than its own suspicions. Moreover, the first updates to the affidavit referenced began in January 2021—before VRF's suit or referral. *See* Reply to SOF ¶ 29. This fact should be deemed admitted.

**Original Fact 33:** The goal of the updates was to better align the form to the current version of Section 1-4-5.5 of the Election Code. PI Hearing, May 17, 2022 Tr. 132:20-23.

**Plaintiff's Response:** Controverted. The affidavit conflicts with New Mexico's statutes regulating the use and dissemination of voter data. *See* Response to DSOF ¶29.

**Defendants' Reply:** *See* Reply to SOF ¶¶ 29, 31. This fact should be deemed admitted.

**Original Fact 34:** None of the three updates was related in any way to VRF or this lawsuit. PI Hearing, June 15, 2022, Tr. 80:25-81:3; 85:18-86:10.

**Plaintiff's Response:** Uncontroverted that the updates were [un]related to this as-yet-unfiled lawsuit. Controverted that the updates were unrelated to VRF, as the Secretary amended the forms to eliminate the right to share for lawful purposes, a new restriction (unsupported by statute) which directly targeted VRF's operation of VoteRef.com. Compare Ex. P8, Dkt. 44-8, Undated Form (no requirement that requestor retain control over transferee's use of data and no attempt to extract promises from requestor regarding transferring data); Ex. P11, Dkt. 44-1, Lippert Form (same, as to form signed by Local Labs) with Ex. P7, Dkt. 44-10, February 14, 2022 Revised Form (requiring, for the first time, promise from requestor that it will not "sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.").

**Defendants' Reply:** *See* Reply to SOF ¶¶ 29–33. This fact should be deemed admitted.

**Original Fact 36:** The website, VoteRef.com, made available to the public voter information for every registered voter in New Mexico, including their name, address, birth year, registered party, and last election in which they voted. ECF No. 44-15 p. 2; PI Hearing May 17, 2022 Tr.at 54:17-25.

**Plaintiff's Response:** Controverted in part. Members of the public could view the data, but only if they entered into an agreement with VRF to use it for purposes that were lawful under New Mexico law. FAC ¶62; Answer ¶62 (admitting users had to agree to Terms of Service); May 17 Tr., 56:18-57:12; FAC ¶63; Answer ¶63 (admitting that users were showed New Mexico specific disclaimer regarding uses of data).

**Defendants' Reply:** This fact is not controverted. VRF offers only an additional, immaterial fact that it required users to click through a terms of use screen before accessing its site.

**Original Fact 41:** After some non-substantive exchanges, Curtas responded as follows to O'Matz's inquiry: "Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are perpetuating misinformation. They reflect a lack of understanding about how the process of voter list maintenance works. These attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country." The "discrepancy," Curtas charged, was simply VRF's own lack of understanding regarding how voter rolls are maintained. ECF No. 44-20, pp. 5-6.

**Plaintiff's Response:** Controverted. Plaintiff denies that the quoted exchange occurred after "some non-substantive exchanges." ECF No. 44-20, p. 7 shows substantive exchanges between O'Matz and the Secretary's Communications Director, Alex Curtas. This exchange occurred before the quoted exchange. O'Matz asks specific, substantive questions regarding the discrepancy identified

by VRF and the Secretary's position on the same. *Id.* Plaintiff admits that Curtas "charged" that the "discrepancy" "was simply VRF's own lack of understanding regarding how voter rolls are maintained," Ex. P17, Dkts. 44-19, Emails Between A. Curtas and M. O'Matz, but Plaintiff denies that this statement is true.

**Defendants' Reply:** It appears the basis of this attempt to controvert is the description of the non-referenced conversation as "non-substantive." Disagreement about this description does not controvert the quoted, material portions of the email.

**Original Fact 42:** Alex Curtas told ProPublica: "The issue relates to the transfer and publication of the voter data. This is the crux: 'We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a "governmental purpose," "election related," or "election campaign purposes."'" ECF No. 44-27 pp. 18-19.

**Plaintiff's Response:** Controverted. Plaintiff admits that Curtas wrote the quoted words in an email to O'Matz but denies that this statement was made in isolation. Curtas's email exchanges, ECF Nos. 44-19 and 44-20, supply the full context of the exchanges and speak for themselves.

**Defendants' Reply:** This fact is uncontroverted. VRF simply points out that the remainder of the email exchange speaks for itself, which is correct and does not change the uncontroverted fact.

**Original Fact 44:** On December 20, 2021, Deputy Secretary of State Sharon Pino signed and submitted a criminal referral to the New Mexico Office of the Attorney General (the "Attorney General") for investigation and prosecution of both Local Labs and VRF, stating, "[The Secretary's] office believes the transfer and publication of this voter data is in direct violation of the Election Code. We believe that both VoteRef.com and Local Labs have violated the prohibition against 'providing'

voter data by posting New Mexicans' private voting information online, or in Local Labs case, providing the voter data to VoteRef.com." ECF No. 44-3.

**Plaintiff's Response:** Controverted. Plaintiff admits that the quoted language appears in the referral but denies that this paragraph quotes all relevant language of the referral, which speaks for itself. Ex. P14, Dkt. 44-3, VRF Referral.

**Defendants' Reply:** This fact is uncontroverted. VRF simply points out that the remainder of the referral letter speaks for itself, which is correct and does not change the uncontroverted fact.

**Original Fact 45:** Local Labs was referred because, as the data requestor, it had potentially committed false swearing in violation of Sections 1-4-5.5 and 1-20-10, and had potentially violated Section 1-4-5.6 by selling or otherwise surrendering the Voter Data to VRF. PI Hearing, June 15, 2022 Tr. 150:14-23, 151:3-8, 168:15-25; ECF No. 44-1.

**Plaintiff's Response:** Controverted. The referral of VRF and Local Labs speaks for itself and makes no mention of "false swearing" or section § 1-20-10. Ex. P14, Dkt. 44-3, VRF Referral. Rather, it states: "We believe that both VoteRef.com and Local Labs have violated the prohibition against 'providing' voter data by posting New Mexican's private voting information online, or in Local Labs case, providing the voter data to VoteREf.com. We also believe that VoteREf.com and Local labs have illegally 'used' this voter data by publishing it on VoteRef.com." *Id.*

**Defendants' Reply:** VRF attempts to controvert facts about the referral of *Local Labs* by reference to the letter referring *VRF*. The two were separately handled, because they had engaged in distinct behavior. For discussion of the referral of VRF, *see* Reply to SOF ¶¶ 46–49 *infra*. This fact is uncontroverted.

**Original Fact 46:** VRF was referred because it made the Voter Data public by distributing it on VoteRef.com, thus making the data available to the general public. ECF No. 44-3; PI Hearing, May 17, 2022 Tr. 142:20-22; 146:22-24; 147:2-5.

**Plaintiff's Response:** Controverted. The referral of VRF and Local Labs speaks for itself. Ex. P14, Dkt. 44-3, VRF Referral. The referral states that VRF was referred because the Secretary believed that "[s]wift action [was] needed as voter data can quickly be manipulated and used to spread election misinformation." *Id.* at p.1. The referral continues:

> We believe that both VoteRef.com and coal Labs have violated the prohibition against "providing" voter data by posting New Mexican's private voting information online, or in Local Labs Case, providing the voter data to VoteREf.com. We also believe that VoteREf.com and Local Labs have illegally "used" this voter data by publishing it on VoteRef.com.

*Id.* at p.2. The referral never uses the term "general public." Further, VRF was referred because the Secretary was hostile to VRF's political viewpoint and speech and deemed it "misinformation." *See* Response to DSOF 7; Ex. P14, VRF Referral (asserting theory that "[w]e do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign purposes.'"); Ex. P17, Dkts. 44-19, 44-20, Emails Between A. Curtas and M. O'Matz, (Secretary's communications director accused VRF of not trying to reach out to discuss this very data "likely because it would not serve their intended goal of spreading misinformation."); *id.* ("Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are *perpetuating misinformation*…These attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country."); Ex. P12, Dkt. 119-7, ROG 7 to SOS (Secretary states that publication of data on Internet alone, even if completely accurate, constituted misinformation); Dworak, 84:8-18 (AG opened a criminal investigation and began actively investigating VRF after it received the referral);

*id.*, 168:12-18 (AG is not aware of any entity other than VRF having been investigated for its use of voter data).

**Defendants' Reply:** *See* Reply to SOF ¶ 7.

**Original Fact 47:** The Secretary's concern was voter privacy, as well as the fact that the data could be misread and manipulated. PI Hearing, May 17, 2022 Tr. at 146:22-24; 127:11-21.

**Plaintiff's Response:** Controverted. The referral of VRF and Local Labs speaks for itself. Ex. P14, Dkt. 44-3, VRF Referral. The referral makes only scant reference to the Secretary's concern with "voter privacy" (alleging that the entities "violated the prohibition against 'providing' voter data by posting New Mexican's private voting information online") and does not state any concern that the information may be "misread." *Id.* Instead, the referral reflects concern that the data may be "manipulated and used to spread election misinformation." *Id.*; *see also* Response to DSOF 7 and 46 (showing referral motivated by hostility towards VRF's viewpoint).

**Defendants' Reply:** *See* Reply to SOF ¶ 7.

**Original Fact 48:** The Secretary's referral of VRF was not related to the alleged "discrepancy" between the number of people recorded as having voted and the number of ballots. ECF No. 44-3; PI Hearing, May 17, 2022 Tr. 142:20-22; 146:22-24; 147:2-5.

**Plaintiff's Response:** Controverted. The Secretary's referral was precisely aimed at what the Secretary alleged to be "misinformation," which the Secretary's communications director later tied directly to VRF's identification of a discrepancy. See Ex. P14, Dkt. 44-3, VRF Referral; Ex. P17, Dkts. 44-19, 44-20, Emails Between A. Curtas and M. O'Matz (O'Matz asks about discrepancy and Curtas responds accusing VRF of "perpetuating misinformation"). *See* also Response to DSOF 7 and 46 (referral motivated by hostility towards VRF's viewpoint).

**Defendants' Reply:** *See* Reply to SOF ¶ 7.

**Original Fact 49:** The Secretary did not believe VRF's conduct of analyzing the Voter Data and sharing that analysis (separate from publishing the Voter Data itself) was unlawful. ECF No. 44-3; PI Hearing, May 17, 2022 Tr. 142:20-22; 146:22-24; 147:19-25.

**Plaintiff's Response:** Controverted. The Secretary based her referral of VRF to the AG in part on her concern regarding spreading "misinformation," Dkt. 44-3, and her concern that spreading "misinformation" violated New Mexico law. *See* Response to DSOF 7, 46, and 48 (showing referral motivated by hostility towards VRF's viewpoint). The Deputy who signed the referral said the same. PI Hearing June 15 Tr., 139:5-15 (Sharon Pino affirming, "I still believe that today").

**Defendants' Reply:** *See* Reply to SOF ¶ 7.

**Original Fact 53:** Ms. Trujillo campaigned on a platform that New Mexico elections lacked integrity and honesty, that the current administration has taken cues "straight out of the Jim Crow Laws" to undermine the electoral process, and that voting machines have been used to manipulate elections. ELECT AUDREY TRUJILLO FOR SECRETARY OF STATE, https://www.audreytruehero4nm.com/ (last visited Mar. 28, 2023). Moreover, Ms. Trujillo accused Toulouse Oliver of illegal, unethical, and conspiratorial practices to "weaponiz[e] her office and us[e] it to give her party an advantage in elections." Audrey Trujillo (Audrey Trujillo The Next NM Secretary of State), FACEBOOK (Nov. 6, 2022, 12:35 AM), shorturl.at/oxGTV.

**Plaintiff's Response:** Controverted. Plaintiff admits that this paragraph quotes from the linked pages, but the links are not competent evidence capable of supporting a motion for summary judgment. *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing ... summary judgment."). These

links have never been produced to Plaintiff, are not authenticated, and no foundation has been provided. Any statements contained therein are also inadmissible hearsay.

**Defendants' Reply:** VRF's authenticity and foundation objections are not well-founded. VRF contends that it was able to use the links provided to access the webpage and verify that the quotes accurately reflect materials on the linked pages. The hearsay objection might be valid if the quotes were offered for their truth, but they are not. (In fact, Defendants would strongly dispute the truth of these statements.) Under Federal Rule of Evidence 801(c), a statement is not hearsay in the first instance—and requires no exception for admissibility—unless it is offered "to prove the truth of the matter asserted in the statement." These statements, rather than being offered for their truth, are instead offered to show the public positions that Ms. Trujillo and her campaign took and what the Secretary's office was able to know of those positions when they fulfilled data requests.

**Original Fact 54:** Defendants are not aware of any entity or organization other than VRF that makes voter data accessible to the general public by posting that data online. PI Hearing, May 17, 2022, Tr. 93:5-10.

**Plaintiff's Response:** Controverted. The citation to the hearing transcript does not support the proposition asserted that: "Defendants are not aware of any entity or organization other than VRF that makes voter data accessible to the general public by posting that data online." Defendants assert that *they* lack knowledge of any entity posting voter data online. In support of that assertion, they cite the transcript of the May 17, 2022, preliminary injunction hearing at page 93:5-10. This citation is to testimony from Gina Swoboda, Executive Director of VRF, in which Ms. Swoboda states that "[t]o my knowledge, no one has ever published the voter registration records for every state online, for free, for the public forever, no." This statement from Ms. Swoboda simply has no bearing on whether Defendants have knowledge of any particular facts relevant to this matter.

**Defendants' Reply:** VRF only cements the truth of this fact, by pointing out that it was its own representative who testified that no other entity has done what VRF has done with New Mexico voter data. But to the extent that a citation for Defendants' knowledge is required, please see Mandy Vigil's Deposition Transcript, ECF No. 119-5 at 119:3-7 ("And in particular, I think it's important to notice that the *distinguishing factor* for Voter Reference Foundation was it was online; that was the alarming issue.") (emphasis added). *See also* Vigil Dep., ECF No. 119-5 at 121:2-24 (testifying, in answer to questions about "Catalist and the other entities" that "I have not heard anything that you have presented here today that tells me that they are publishing it online").

**Original Fact 55:** If the Secretary became aware that any other company was violating the Election Code, that company would be referred to the AGO for investigation and potential prosecution. PI Hearing, June 15, 2022, Tr. 45:3-24; 180:12-21.

**Plaintiff's Response:** Controverted. Not only do the cited transcript sections fail to reference any promise to refer an entity that was "posting New Mexico data online," and fail to support the claimed allegation, but Defendants have repeatedly been made aware that other entities sell New Mexico voter data and make that information available online to their clients. May 17 Tr., 93:16-24, 94:8-21, 44:4-11; June 15 Tr., 180:12-21; 205:4-12; 238:2-14; FAC ¶¶175, 193; Dkts. 84-87 (notices of subpoenas to Aristotle, Catalist, i360, and TargetSmart); June 15 Tr., 238:9-14 (promise from Vigil to look into these entities); Mem. Op., 158-9 ("The Secretary of State's interpretation of the Election Code criminalizes requesters such as Catalist, i360, Data Targeting, and L2 Inc., *who apply for voter data and then sell it to clients outside their own organization*.") (emphasis added). Despite this information, Defendants have not conducted any investigation into these entities. Ex. P4, Dkt. 119-1, ROG 1 to AG; Dworak, 170:17-171:6. Defendants are unwilling to investigate commercial entities selling data online and seem uninterested in investigating anyone other than VRF. Dworak, 172:9-23 (AG cannot

state what it would take for the office to consider VRF's claims during the litigation that these other entities are violating the law as the AG interprets it).

**Defendants' Reply:** VRF confuses a lack of prosecution to date for a declination to investigate or prosecute. Further, the Secretary's representative testified that the "office has limited resources. There's nothing saying we won't look into it. The question I've responded to as of right now, we have not. That doesn't mean we won't." ECF No. 119-5 at 121:8-12. Ms. Vigil also clarified that the posting online was the "distinguishing factor" that made VRF's actions "alarming" and provided "an immediate concern for public safety" that resulted in the first dedication of resources to the VRF violation, as there is nothing "today that tells me that they [the other entities referenced] are publishing it online." ECF No. 119-5 at 118:8–121:24.


**Original Fact 57:** In 2021, both Catalist and i360 submitted two Voter Information Authorization Forms each. Each form was filled out properly and signed and contained no information to suggest that voter data would be used unlawfully. Each request was processed just as any other. PI Hearing, June 15, 2022, Tr. at 100:13-101:20; ECF No. 44-29.

**Plaintiff's Response:** Controverted. The Secretary's witness states that the affidavits submitted are valid on their face and that, as a result, Catalist's and i360's requests were not "treated differently from anyone else who submits a fully executed valid affidavit." June Tr., 101:5-8. This is false. VRF submitted two valid, fully executed affidavits with its requests on May 27, 2022, yet were denied the requested data. Ex. P24, Dkt. 44-22, NVRA Notice and Request at p. 8-9 (fully executed affidavits for each project); June Tr. 237:17-21 ("So we've never actually denied any properly filled out affidavit. Again, there is the only one exception, which is the VRF affidavit that was submitted May 27th, as we discussed, it will very likely be denied.").

**Defendants' Reply:** Confusingly, VRF is responding not to the original fact provided but rather to deposition testimony with which it takes issue. The original fact states that, on their face, affidavits submitted by Catalist and i360 were proper and did not suggest any unlawful use, and that Catalist and i360's affidavits were processed using normal procedures. VRF provides no materials that controvert those statements.

**Original Fact 58:** On May 27, 2022, VRF sent a letter in which it made additional requests for voter data, and attached completed and signed voter authorization request forms. ECF. No. 44-22.

**Plaintiff's Response:** Controverted. Plaintiff's May 27, 2022, letter speaks for itself. Dkt. 44-22. Defendants omit that the May 27 letter also included notice to them that they were in violation of the NVRA and that VRF intended to sue over those violations if they were not cured. *Id.*

**Defendants' Reply:** This fact is not controverted. Once again, VRF admits the original fact and then seeks to introduce an additional, not inconsistent fact. This fact should be deemed admitted.

**Original Fact 59:** In this letter, VRF requested voter data for two purposes: to publish the voter roll online as it had done before, and to use the voter roll data for its own analysis. *See* Fact No. 49; ECF No. 44-22, p. 4.

**Plaintiff's Response:** Controverted. Defendants misstate the planned projects conveyed in VRF's letter. *See* Dkt. 44-22. VRF did state that it would use the data for two projects. *Id.* The first involved publishing the voter data online as it had done before, but VRF made clear that it would not do so absent a Court order saying that it was authorized to post the information. *Id.* The second project involved using the data for an internal analysis, which VRF stated would not involve publishing the data online even if it did obtain a court order allowing it to do so. *Id.*

**Defendants' Reply:** *See* Reply to SOF ¶ 58.

**Original Fact 60:** VRF also referenced the National Voter Registration Act ("NVRA") for the first time, and alluded to additional requests it had made under New Mexico's Inspection of Public Records Act ("IPRA"). ECF No. 44-22, p. 1-2.

**Plaintiff's Response:** Controverted. VRF denies that it "alluded" to any requests it made under the NVRA or otherwise "for the first time" in its May 27, 2022, letter. Dkt. 44-22. VRF made requests for voter data on February 15, 2022, *id.* at p. 7, and followed up regarding those requests on March 10, 2022. *Id.* at p. 6. Defendants' counsel also specifically asked questions regarding these requests at the May 17th Preliminary Injunction hearing. May 17 Tr. 79:24-80:12.

**<u>Defendants' Reply:</u>** VRF appears to take issue with this fact due to the word "allude." It also disputes that it expressly made requests under the NVRA for the first time on May 27, but the documents that it cites only support the truth of that statement. The fact is not properly controverted.

**Original Fact 61:** In its May 27, 2022 letter, VRF stated that it will only publish the personal information of voters online if VRF is granted relief in this matter or in any other legal proceeding. ECF No. 44-22, p.4; Vigil Dep. 170:15-171:10.

**Plaintiff's Response:** Controverted. Para[gra]ph 61 mischaracterizes the promises that VRF made about publishing voter data online. Those promises, as conveyed in the letter, speak for themselves. Dkt. 44-22, p. 4-5. Specifically, VRF stated:

> VRF's intended election use comprises two distinct projects. For its first project, just as VRF publishes voter data for many other states, and as it recently published voter data in New Mexico, VRF intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters online if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV- 00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding. For its second project, VRF intends to analyze the records, information, and data provided in response to the above requests in order to engage in a discrepancy review of the New Mexico voter rolls. VRF intends to publish this analysis online without disclosing the personal information of any individual voter. VRF will comply

with this non-public-disclosure promise for the data it uses on its second project regardless of whether it prevails in the Federal Litigation. And again, for the sake of clarity, no personal information of any individual voter will be published online unless VRF is granted relief in the Federal Litigation or in any other legal proceeding.

*Id.* (emphasis added).

**<u>Defendants' Reply:</u>** VRF claims the original fact misstates its letter, but the quoted materials that VRF reproduces are wholly consistent. It is unclear how VRF intends to controvert this fact, and it should be deemed admitted.

**Original Fact 63:** The Secretary had decided it would not fulfill any voter data requests from VRF. ECF. No. 44-16**;** PI Hearing, June 15, 2022 Tr. at 49:7-52:9.

**Plaintiff's Response:** Controverted. DSOF 63 omits that the Secretary decided it would not fulfill *any* voter data requests from VRF by March 11, 2022 on the advice for the AG. Ex. P5, Dkt. 44-16, 3-11-22 Email Exchange with Rostock, Vigil, and Pino regarding VRF 2-15-22 Request. This decision was made months earlier and was not a response to the May 27, 2022, letter. *See id.*

**<u>Defendants' Reply:</u>** *See* Reply to SOF ¶ 58.

**Original Fact 64:** The Secretary made a determination that VRF's May 27, 2022, letter was neither a public records request nor a normal voter data request. The Secretary had already referred VRF to the Attorney General for investigation, and sought guidance from the Attorney General about fulfilling this request. Ultimately, the Secretary did not provide the requested data to VRF. PI Hearing, June 15, 2022 Tr. at 49:16-25.

**Plaintiff's Response:** Controverted. The cited testimony from the June 15th preliminary injunction hearing discusses the Secretary's decision to ignore VRF's February 15, 2022, request for voter data. *See* June 15 Tr. at 47:15-49:25 (discussing February request and reasons for denial). The

cited testimony in no way refers to or discusses the Secretary's rationale for ignoring Plaintiff's May 27th requests, as Defendants assert in DSOF ¶64.

**Defendants' Reply:** VRF is correct in part. The testimony cited, which provides general context for the handling of VRF's requests, is specifically related to the February 15, 2022, request. The rationale for denying the May 27 request—which was not ignored but was instead denied in writing—is set out in a letter from the Secretary's counsel dated June 16. ECF No. 119-11.

**Original Fact 65:** The Secretary's decision not to provide voter data to VRF was based on a concern that the data would be posted online. Vigil Depo Tr. 165:15-168:20; Letter from Dylan Lange, attached as Exhibit 6.

**Plaintiff's Response:** Controverted. The Secretary's claimed concern in litigation that VRF would post the data online notwithstanding its repeated promises to comply with the law until it obtained a court order otherwise is purely a retaliatory artifice and invention aimed at indefinitely blocking VRF from accessing data. *See* Response to DSOF 46; *see also* Vigil, 163:12-164:22 (Secretary maintains March 2022 decision that it will not fulfill VRF's voter data requests); *id.*, 179:21-180:16 (Secretary cannot say what VRF can ever do to alleviate its concern and have its requests processed); *Id.*, 198:6-8 (later requests would have been denied even if VRF provided affidavit).

**Defendants' Reply:** VRF does not controvert the fact or the evidence it cites. Instead it offers argument about its retaliation claim.

**Original Fact 66:** VRF has indicated it would like to post voter data again after the 2022 election, stating "VRF desires to access, post, distribute, and otherwise use publicly available New Mexico voter information on the Website in the future so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls. VRF has continued to seek

the same data from the New Mexico Secretary of State as New Mexico's data files are updated over time and plans to continue to seek the same data from the New Mexico Secretary of State after the 2022 election this November." Am. Compl., ECF 74, ¶ 112.

**Plaintiff's Response:** Uncontroverted that this accurately quotes Plaintiff's Amended Complaint, but controverted to the extent Defendants claim that this is Plaintiff's full intent, or that Plaintiff intends to post data even if does not get judicial relief. *See* Response to DSOF 61 (outlining VRF's promises to not post voter data without judicial decree);Am. Comp. ¶¶84-85.

**Defendants' Reply:** *See* Reply to SOF ¶ 58.

**Original Fact 69:** VRF published New Mexico's data on its website sometime before December 14, 2022. ECF No. 44-14.

**Plaintiff's Response:** Controverted. The document cited, ECF No. 44-14, does not support the proposition that VRF published the New Mexico data on its website before December 14, 2021. That email from Gina Swoboda merely states that VRF has conducted an analysis of the data and identified a discrepancy, inviting the Secretary to discuss that discrepancy with VRF. *Id.* It makes no statement regarding publication of the data online. *Id.*

**Defendants' Reply:** Defendants' have reviewed VRF's evidence and agree that this fact needs revision: VRF published New Mexico's data on its website on or before December *16*, 202*1*. Ms. Swoboda emailed the Secretary shortly beforehand, on December 14, 202*1*. This correction is immaterial to the summary judgment arguments.

**Original Fact 71:** Though Ms. Swoboda stated she always checked with the respective election official prior to publication, VRF had already published New Mexico voter data at the time this email was sent. ECF No. 44-27, p. 23-24; PI Hearing, May 17, 2022, Tr. 57:17-58:14.

**Plaintiff's Response:** Controverted. The record citations do not support the proposition asserted. Dkt. 44-27 is an email from ProPublica's Megan O'Matz sent at 2:46 P.M. on December 14, 2021. Like Dkt. 44-14, O'Matz's email does not state that VRF had posted New Mexico's voter data by that date. Rather, she says: "I'm a reporter with ProPublica and am looking into an organization called VoteRef.com that is posting tens of thousands of voter histories online nationwide, including New Mexico." She then goes on to ask a number of questions regarding the 3,844 vote discrepancy identified by VRF. *Id.* She makes no reference to the New Mexico data actually being online at that time. Further, VRF issued a press release on December 16, 2021, entitled "VRF website VoteRef.com adds New Mexico voter rolls to nationwide database" which stated "The Voter Reference Foundation (VRF), through its website VoteRef.com, *today* released data from its 11th state, creating a database that so far includes more than 27 percent of the country's population." Dkt. 44-13 (emphasis added).

**Defendants' Reply:** *See* Reply to SOF 69. It remains unclear how ProPublica knew on December 14, 2021, that VRF "is posting tens of thousands of voter histories online nationwide, including New Mexico," other than by visiting VoteRef.com and seeing New Mexico's data. But VRF is correct that, beyond this reasonable inference, there is no record evidence that can prove posting until December 16, 2021. This correction is immaterial to the summary judgment arguments.

## DEFENDANTS' RESPONSE TO
## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

A.     Uncontroverted, but immaterial.

B.     Controverted that when members of the public go through lawful channels to obtain New Mexico voter data, that data is received in an "unusable" format, as the testimony cited does not support this conclusion. Uncontroverted as to remainder, including that VRF converts data into a format that can be searched by members of the public.

C.     Uncontroverted, but immaterial, that the cited testimony characterizes the cost and accessibility in this manner.

D.      Uncontroverted.

E.       Objection.  This SAF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent one is desired, Defendants deny that this letter did, in fact, constitute an appropriate notice under the referenced statute, *see generally* ECF No. 126 at 37, but do not controvert that a letter so titled was sent on May 27, 2022.

F.      Controverted.   The cited materials reference Defendants' Answer to Plaintiffs' Amended Complaint, in which Defendants stated that the allegation of proper notice called for a legal conclusion.   And, indeed, whether the May 27 letter was sufficient notice under the NVRA is a live, but purely legal, dispute in this case.  *See generally* ECF No. 126 at 37 & Argument & Authorities, *infra*.

G.      Controverted to the extent this SAF states the May 27 letter "again apprised the Secretary," as this letter was VRF's first mention of the NVRA. *See* ECF No. 44-14; ECF No. 44-16. Uncontroverted that the letter contained the remaining assertions, with which Defendants disagree.

H.      *See* Response to SAF G, *supra*.

I.      Controverted as to the characterization of the Secretary's Response to Interrogatory 2, which stated that VRF had requested a compilation of information that was different than what a file maintenance list would show.  Uncontroverted as to the remainder.

J.      Controverted to the extent this statement suggests there were existing reports that the Secretary's office could have produced.  Uncontroverted that Mr. Rockstroh testified that the information VRF had requested could, at least in part, have been generated through a work-intensive process code-writing and raw-data work by IT professionals and that the Secretary's office had the capability to perform that work.  Rockstroh Dep., ECF No. 119-13, 26:18-27:10, 34:13-36:14.

K.      Uncontroverted.

L.      Uncontroverted.

M.      Uncontroverted.

N.      Uncontroverted.

O.      Uncontroverted.

P.      Uncontroverted.

Q.      Controverted in part.  Mr. Rockstroh testified that SERVIS offers certain types of reports, using certain fields of data, that can be automatically produced upon user request.  Rockstroh Dep., ECF No. 119-13, 31:2-8. VRF refers to these as "canned" reports.  *See* SAF S. But reports other than these canned reports cannot be auto-run by SERVIS and instead require IT personnel to individually work with raw data to create them. *Id.* at 26:9-27:1.

R.      Uncontroverted; *see* Response to SAF Q, *supra*.

S.      Uncontroverted.

T.      Uncontroverted.

U.      Uncontroverted the SERVIS vendor applies no extra charge; the Secretary's IT personnel take the lead on creating non-canned reports. *See* Rockstroh Dep., ECF No. 119-13, 21:3-13.

V.      Uncontroverted.

W.      Uncontroverted that Mr. Rockstroh had no knowledge of such a denial.

X.      Uncontroverted.

Y.      Controverted.  Mr. Rockstroh's next statement was that he was not familiar with the contents of such a report.  *Id.* at 24:11-21.

Z.      Uncontroverted.

AA.     Uncontroverted.

BB.     Uncontroverted that the Secretary's staff have fulfilled requests for non-canned reports and those can take days or weeks to fulfill.  Controverted that the testimony cited supports the SAF or the implication that such non-canned reports are frequent or usual: "Q: And have you

ever received a request like that before? A: Yes. Q: Okay. When was that? A: I don't recall. Q: In the last five years? A: Yes. Q: Do you know who made the request? A: No." *Id.* at 36:8-16.

CC.     Controverted to the extent this SAF implies that VRF's requests could be fulfilled by canned reports.  In the testimony cited, opposing counsel acknowledged that this was just "the very first part" of the request and that "I know there's more… [b]ut then, of course, it goes on. You can't just stop with the canned report." *Id.* at 39:14-25 (Greim). Uncontroverted that this limited portion of VRF's request could be fulfilled using a canned report.

DD.     Uncontroverted. *See also* Responses to SAFs Q and BB, *supra*.

EE.     Controverted and immaterial. The Secretary's representative repeatedly testified in response to this question that the office did not have the authority to unilaterally diverge from what state law requires. ECF No. 119-5 at 31 (Vigil Dep. 146:11-148:3).

FF.     Objection.  This SAF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent one is desired, Defendants deny and controvert that the AG is *required* to prosecute all violations of the Election Code because the AG retains inherent prosecutorial discretion.   "The AG retains independent authority to decide whether VRF should be investigated and prosecuted—power that would exist whether or not the SOS had ever referred VRF to the AG."  Defendants-Appellants' Corrected Brief-In-Chief at 34, *Voter Reference Found., LLC v. Torrez,* (10th Cir. Dec. 08, 2022) (No. 22-2101) (citing *United States v. Robertson*, 45 F.3d 1423, 1438 (10th Cir. 1995)). The Attorney General does not dispute that it has the right and the duty to prosecute violations.

GG.     Uncontroverted.

HH.     Objection. This SAF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent

one is desired, Defendants deny and controvert that VRF's conduct was protected political speech. *See generally* ECF No. 121 at 35–39.

II.     Uncontroverted.

JJ.    Uncontroverted.

KK.   Controverted as to any implication that this has not, in fact, occurred. The testimony cited states that the Secretary has no method to track why any particular voter cancels his or her registration: "Aside from the inquiries and the calls and the log that you've been provided tied to voters and concerns with this issue, there would be no way for us to have a voter affirm that [she canceled her registration due to VoteRef.com]." Moreover, in the short span of time that VoteRef.com displayed New Mexico voter data, the Secretary and VRF each received numerous complaints from citizens, *see* ECF No. 126-1 & 126-3, and multiple communications from state and federal courts, departments of correction, and law enforcement entities voicing their concerns about danger to judges, officers, and others, *see* ECF No. 126-2.

LL.    Uncontroverted, but incomplete. Mr. Dworak also testified, in the portions cited, that "the fact that it's out there and in an unrestricted setting, so anyone could use it, is the unauthorized use, because there is no control over how people use it."

MM.  Controverted as to any implication that this has not, in fact, occurred. The testimony cited states that the Secretary has no method to track such activity.

NN.   Uncontroverted and immaterial.

OO.   Uncontroverted.

PP.    Controverted that the cited testimony supports the proposition that the Secretary "refuses to say" whether VRF's analysis qualifies as a governmental use.  The cited testimony states, "It's the public posting piece that has been analyzed, not some of these other hypotheticals scenarios that you're describing. This is different." Vigil Dep., ECF No. 119-5, 78:13-16.

QQ.    Uncontroverted.

RR.    Uncontroverted.

SS.    Uncontroverted.

TT.    Uncontroverted.

UU.    Controverted.  Mr. Dworak's testimony recognizes that NMSA 1978, Sec. 1-4-5.5(C) provides for "governmental or election and election campaign purposes." Dworak Dep., ECF No. 119-2, 20:19-24.

VV.    Controverted.   The range of concerns with VRF's misuse of the data included: "transfer and publication of [the] voter data" as a "direct violation of the Election Code," that "VoteRef.com and Local Labs have violated the prohibition against 'providing' voter data by posting New Mexicans' private voting information online, or in Local Labs' case providing the voter data to VoteRef.com," and that "VoteRef.com and Local Labs have illegally 'used' this voter data by publishing it on VoteRef.com." ECF No. 44-3.

WW.    Controverted that the cited exhibit supports the SAF. The Secretary's Response to ROG 7 reads, "The Secretary believes that publication of voter data writ large may constitute misinformation. The New Mexico voter file is a living document that is constantly updated by state and county agencies. If a private individual or entity were to obtain a copy of the voter file, that copy would be out of date and bearing erroneous information before the private individual or entity even had a chance to publish the copy. The only proper, accurate way to look up voter information is through the New Mexico Secretary of State or county clerks." ECF No. 119-7.

XX.    Controverted, but immaterial, as this does not accurately capture the Interrogatory Response, which reads as follows: The Secretary believes that publication of voter data writ large may constitute misinformation. The New Mexico voter file is a living document that is constantly updated

by state and county agencies. … The only proper, accurate way to look up voter information is through the New Mexico Secretary of State or county clerks." ECF No. 119-7 at 3.

YY.     Uncontroverted.

ZZ.     Uncontroverted.

AAA.    Uncontroverted but immaterial.

BBB.    Controverted to the extent that Curtas's statement is described as "false." Curtas did not, subjectively, know about VRF's communications at the time that he made this response, as the email ad come in—to a different email inbox tan his own—less than 48 hours prior. Curtas Tr. 41:23-42:1 (stating that Mr. Curtas had not heard of Voter Reference Foundation before he received an email from Megan O'Matz). Uncontroverted as to the remainder.

CCC.    Uncontroverted that the material is accurately quoted.  Controverted as to the characterization of the quoted material, which is not supported by the quote itself.

DDD.    Objection. Controverted. The testimony cited is the personal, fact witness testimony of Alex Curtas and does not support the broad SAF.  *See* Curtas Dep., 53:6-9 ("[T]he misinformation that Voter Ref is—you know, that I'm claiming here, is that there are discrepancies within our [New Mexico] voter data."); Curtas Dep., 72:17-18 ("And, so, *I as the spokesperson for the office* am pushing back wherever I see it." (emphasis added)); Curtas Dep., 72:23-73:7.  Mr. Curtas was testifying in his individual capacity to his individual actions at work. He was not a designated 30(b)(6) representative and was not testifying on behalf of the Secretary in his deposition. *See also* Curtas Dep., 73:13-19 ("Q: Are there other people in the Secretary's office that share your feelings about this? A: I wouldn't be able to talk about—I mean, specifically to whatever individuals are thinking about this . . . ."). Uncontroverted that this SAF accurately reflects Mr. Curtas's testimony in his personal capacity as a fact witness.

EEE.    Objection. Controverted. This SAF presents legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b).  It requires no response, but to the extent that one is desired, Defendants deny that this letter did, in fact, constitute an appropriate notice under the referenced statute, *see generally* ECF No. 121, at 30–34.  Defendants deny and controvert the characterization of VRF's promises in the May 27 letter, but do not deny that a letter was sent on May 27.  Defendants deny and controvert that no explanation for the denial was provided. *See* ECF No. 121 at 131-32 (Ex. 6) (copy of letter, with clear explanation).

FFF.    Objection. This SAF presents only improper argument and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b).  It requires no response, but to the extent one is desired, Defendants deny and controvert this statement.  *See* Response to SAF EEE, *supra.*

GGG.    Controverted in part.  Defendants cannot speak to "VRF's concern" on the basis of the testimony cited, and this testimony does not speak holistically to the concerns of the Secretary or to the limited nature of VRF's promises.  *See* Response to SAF EEE, *supra.*

HHH.    Objection. Controverted. The testimony cited is opposing counsel reviewing portions of VRF's May 27 letter with Mr. Dworak and Mr. Dworak stating, "That's what [the letter] says."

III.    Objection. Counsel objected to the question posed, as it was vague, ambiguous, and argumentative. Indeed, Ms. Vigil's response was that she "d[id]n't even know how to answer that question" and was not a substantive response. Vigil Dep., ECF No. 119-5, 187:11-15.

JJJ.    Objection. This SAF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent one is desired, Defendants deny and controvert this statement.  *See generally* ECF No. 121 & 126.

KKK.    Objection. This SAF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b). It requires no response, but to the extent one is desired, Defendants deny and controvert this statement. *See generally* ECF No. 121 & 126. To

the extent that this Statement presents an admission of fact, that admission is correctly stated: NMSA 1978, Sec. 1-5-22 does not, on its own terms apply to VRF. It has, however, been incorporated and applies to VRF and other data requestors via NMSA 1978, Sec. 1-4-5.6(A) ("Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records Systems Act [Chapter 1, Article 5, NMSA 1978]." Chapter 1, Article 5 NMSA 1978 includes Sec. 1-5-22.

LLL.   Controverted as to the allegation that the prohibition against sharing of data only arises from Defendants' policies and positions. Defendants are bound-and the representative for the Secretary testified as such in the cited testimony—to follow New Mexico law and to assess novel situations for their compliance with New Mexico law.

MMM. Objection. Controverted. This SAF misstates and mischaracterizes deposition testimony that is unambiguous. Mr. Dworak testified that "[T]he actions taken [by VRF], and the use of this information is not in compliance with New Mexico law." When asked by Plaintiff's counsel whether the Attorney General's position had changed since the preliminary injunction hearing, Mr. Dworak testified that "there is no reason that I have, that I'm aware of to, you know, challenge any positions that she took" but that he would need to "consult[] with counsel" as to any specific legal conclusions. Plaintiff's counsel continued to press the fact witness for legal conclusions, to which Mr. Dworak responded that he "can't draw that conclusion." Dworak Dep., ECF No. 119-2, 142:10-44:16.

NNN. Controverted. The evidence cited does not give rise to the conclusion that both Defendants "supported" House Bill 4, much less that they believed there were ambiguities to be addressed. The testimony cited in full context states that Mr. Dworak is "not aware of our office taking a formal position" on the legislation, is "not aware" of any motivation for legislation that would have been motivated by this suit, and "can't speak to the intent of the sponsors, the legislators." Dworak Dep., ECF No. 119-2, 184:17-186:7.

OOO.  Controverted. Neither Defendant has taken the position stated here. Both Defendants take the position that sharing data—meaning sharing it outside of the requestor's own organization—is unlawful. This is not limited to a situation like VRF's, but VRF's conduct certainly falls within this category of prohibited use. Because "sharing data" alone could include lawful conduct such as privately, internally "sharing" data within a requesting organization, Defendants have made clear that it "is not just the act of sharing data" alone. The quoted materials cited are accurate and uncontroverted.

PPP.    Controverted as to the testimony concerning sharing data within a family. Ms. Vigil testified that "there is no legal exception in the statute for sharing the data," but that it was unlikely in this one limited, hypothetical scenario to be referred for criminal prosecution. ECF No. 119-6 at 4 (PI Hearing, June 15, 2022 Tr. at 31:4-12). Again, Defendants are bound—and the representative for the Secretary testified as such in the cited testimony—to follow New Mexico law and to assess novel situations for their compliance with New Mexico law.

QQQ.  Uncontroverted that not all use of the internet would involve dissemination to the general public (e.g., email or saving to private cloud-based storage). Controverted as to the characterization of the cited testimony, in which Mr. Dworak stated he could not take a position on several hypotheticals "without knowing all of the facts."

RRR.    Controverted. In the testimony cited, Mr. Dworak was asked whether Local Labs committed false swearing when it executed the Secretary's affidavit and then sold data to VRF. Mr. Dworak responded that there were arguments that could be made both for and against Local Labs, including whether it was in an agency relationship with VRF and whether it maintained sufficient control of the data but that "again, that's dependent upon all of the facts."

## INTRODUCTION

In response to Defendants' summary judgment brief, VRF offers strong rhetoric, unencumbered by the facts. It is crucial, at the outset, to correct some of its key misunderstandings.

VRF argues: "Defendants' profess[] concern (not backed by evidence) that voters will be harassed by VRF users or victimized by 'misinformation.' … In no case did Defendants provide evidence of rulebreakers [i.e., recipients of the shared information who use it for malign purposes]—let alone that such bad actors are impacting election integrity or participation." ECF No. 125 at 13.

The record, however, demonstrates that voter information has been used in New Mexico to harass and intimidate voters in person. *See* ECF No. 44-22. The record also yields dozens of complaints about VRF—including statements that the complainant has canceled or intends to cancel their voter registration and including requests for information on how to cancel. *See* ECF No. 126-1 (Complaints to Secretary). These complaints connect VRF's publication of personal information to a decrease in voter participation. VRF is familiar with exactly this evidence. It fielded a good number of the complaints itself. And when it did, it refused to remove information of voters who did not qualify for the Safe at Home program, even when those voters provided detailed information about the safety threats they faced. *See* ECF No. 126-1 & 126-3; Resp. to Statement of Additional Facts KK *supra*.

VRF argues: "New Mexico is committed to denying disfavored groups like VRF access to, and use of, voter data …. Defendants' holy war against claimed 'misinformation' was triggered because they brook no criticism from constituents or perceived political opponents …." ECF No. 125 at 11.

The record shows that the Secretary routinely provides information of the type sought by VRF to requestors, without regard to their viewpoints. This includes the Constitution Party, the Democratic Party, the Green Party, the Libertarian Party, the Republican Party, and the Working Families Party, many of whom are vocal critics of the Secretary and of New Mexico elections. *See* ECF No. 121, SOF ¶ 52 (uncontroverted). It was not VRF's views that set it apart—it was its conduct. The Secretary

treated VRF as she would any entity who placed New Mexicans at risk through publication of sensitive personal information to the worldwide web. *See* ECF No. 121 at 80 (PI Hr'g, June 15 Tr. 101:13-20).

VRF argues: "[T]he Secretary convinced the legislature to change the law by enacting HB4." ECF No. 125 at 11.

The record gives no indication that this occurred. Nor could it. A review of public records from the Legislature's own website shows that bills substantially similar to HB4 have been proposed since 2020—prior to VRF's suit. *See, e.g.*, S.B. 8, 55th Leg., 2d Sess. (N.M. 2022).

VRF argues: "The Secretary now claims that the stain of VRF's past reliance on this Court's preliminary injunction may never wear off, precluding VRF from ever obtaining documents under the NVRA"—a state of alleged affairs that VRF calls a "forever ban." ECF No. 125 at 12.

The record shows that the Secretary has maintained that the office awaits the outcome of this case and will abide by the rulings issued herein. *See* ECF No. 119-14, at 2 (referencing the ongoing litigation and stating that "[w]e of course will comply with any court order in the case relating to the production of records or otherwise"). The record also shows that VRF's alleged promise not to publish, which the Secretary (on advice of counsel) deemed insufficient, was quite a narrow one: all that VRF promised was to hold off on publication until it received a preliminary order (which has since been stayed on appeal), pending this Court's opportunity to conduct a full trial on the merits and issue any final order. And that promise came in the same sentence as this one: "VRF intends to publish the requested information online for election related purposes." ECF 44-22 at 4. It was hardly retaliatory to withhold records under these unique circumstances.

The facts and the record are not the only things with which VRF plays fast and loose. It is only through constant conflation of distinct concepts that it arrives at a workable legal theory. Careful analysis of both the record and the law reveal that Defendants are entitled to summary judgment: VRF has no First Amendment right of access, has no First Amendment right of use, has a limited NVRA

right of access for which it has not exhausted its statutory remedies, and has a limited NVRA right of use that does not extend to internet publication of individually identifiable voter data. Defendants respectfully request the Court enter judgment in their favor.

## ARGUMENT AND AUTHORITIES

### I. VRF's expansive reading of the NVRA and obstacle preemption should not be credited.

#### A. VRF still cannot show how its records request relate to NVRA programs or activities.

Despite ample opportunity to explain how its specific records requests are NVRA records relating to state "programs or activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i)(1), VRF argues only that the records meet this definition "because they sought data related to the implementation of such 'programs and activities.'" ECF No. 125 at 42. For this conclusion, VRF relies on Fourth Circuit precedent in which voter data constituted an NVRA record. *See* ECF No. 125 at 44. But to reach those decisions, the Fourth Circuit evaluated specific state law and practices and how the requested data fit within those state programs. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266 (4th Cir. 2021) (describing actual conduct of North Carolina's State Board of Elections to determine that Board's citizenship audit was such a program or activity); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335–36 (4th Cir. 2012) (citing Virginia's election code to determine that completed voter registration applications were program records). Such analysis is key, as Congress could have, but did not, simply write the NVRA to provide access to all voter data.

VRF, in contrast, asserts circularly that its requests were for NVRA records because they were for NVRA records. *See* ECF No. 125 at 32–37. It offers no analysis of what portions of its broad requests relate to New Mexico's efforts to ensure accurate lists of currently eligible voters. Nor could it. VRF argues that virtually any and every request it has ever made of the Secretary invokes the NVRA. *See* ECF No. 125 at 42. First, it argues that its February 15, 2022, request—which did not reference

the NVRA and predated its first express NVRA request by three months—"triggered NVRA protections." *Id.* As Defendants have repeatedly explained to VRF, that request was not a simple and direct request for existing records of programs and activities. Instead, it sought an analysis: the total count, organized by precinct, of registered voters who (i) voted on November 3, 2020, and then (ii) moved into any status other than active after voting on November 3, plus the number of voters who had "been removed or deleted from the voter rolls" during a specific five-month range. Not only does this request something other than an existing NVRA record, but it is unclear how this information would constitute a record of New Mexico's voter roll maintenance programs. Second, VRF argues that a virtually identical May 27 request was also an NVRA event. And, third, VRF argues that an expansive multipart request from October 18, 2022, invoked the NVRA. Among other things, that request sought "[r]ecords reflecting the total ballots cast, statewide, in the November 8, 2022, general election"; the "[v]oting history/credit data for each voter that voted in items 1-3 for the November 8, 2022 general election"; information about "the method of voting (election day polling place, absentee early, etc.)" and location; etc. ECF No. 125 at 43. VRF argues that these are NVRA records, but it does not explain how data on the place and manner of voting relates to maintenance of a correct voter list. Neither does it clarify how analyzing voters by participation in ballot "items" constitutes an NVRA record. Nor does it explain why the Secretary would be obligated, under the NVRA, to provide this data for an election that—at the time of the request—had not yet even occurred. VRF is seeking much more than what the NVRA provides access to, and it seeks to use the federal statute as a hammer when it is denied. The Court should decline to expand the plain text of the statute as VRF requests.

**B.  Even if VRF were entitled to records under the NVRA, it is not entitled to use them in the manner it desires.**

To the extent that the NVRA makes certain data publicly available, it only permits the *inspection* of existing compliance records. It does not mandate the *creation* of additional reports, explanations, or

data analyses, such as Plaintiff requested here. *See* 52 U.S.C. § 20507(i)(1); *cf. Forsham v. Harris*, 445 U.S. 169, 186 (1980) (observing that the disclosure requirements codified in the Freedom of Information Act "impose[] no duty on the agency to create records"). Nor does it provide an unqualified right to use the records in any manner desired. *See Pub. Int. Legal Found.*, 996 F.3d at 265–66 (warning of the "'intolerable burden' on the right to vote" that would be caused by disclosure of particularly sensitive information, such as social security numbers); *cf. True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 722 (S.D. Miss. 2014) ("The NVRA establishes a uniform code for voter registration and removal. The Court declines to adopt Plaintiffs' interpretation of the NVRA Public Disclosure Provision in a manner that would turn it into a *post*-election discovery device for detecting voter fraud."). VRF attempts to distinguish these cases by claiming that the data it publishes is somehow less sensitive (despite the fact that a review of its website contains hundreds of thousands of full birth dates). But that is immaterial to the point of these cases, which is that the NVRA does not convey an "unqualified" or "unfettered" right to use, and that the NVRA does not always trump existing protections for sensitive information.

Plaintiff's own request letter disclosed that it intended to "publish the requested information online," in violation of New Mexico law, assuming that it obtained a preliminary injunction or ruling "in any other legal proceeding" preventing New Mexico from enforcing its own laws (and without any assurance that VRF would wait for a final judgment or resolution of any appeal). In other words, Defendants had every reason to believe that providing the requested information to Plaintiff would result in the imminent publication of voters' private and personal information online, in contravention of state law, even before this litigation concluded. New Mexico has the right to limit the legal *uses* of its own government data. Part I.C. *infra*. And even if Plaintiff had a right to obtain all of this information—which it did not—New Mexico had no obligation to provide this data to a requestor

who had promised to use it for illegal purposes.[1] *Cf. Holt v. Howard*, 806 F.3d 1129, 1132 (8th Cir. 2015). In fact, the State had a responsibility *not* to disclose in these circumstances. *See, e.g., State ex rel. Riddle v. Oliver*, 2021-NMSC-018, ¶ 36, 487 P.3d 815; *see also Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1228 (D.N.M. 2010); *cf. Collier v. Dickinson*, 477 F.3d 1306 (11th Cir. 2007) (Driver's Privacy Protection Act); *Welch v. Theodorides-Bustle*, 677 F. Supp. 2d 1283, 1286 (N.D. Fla. 2010) (same); *Forest Serv. Emp'ees for Environ. Ethics v. U.S. Forest Serv.*, 524 F.3d 1021, 1026 (9th Cir. 2008) (FOIA).

## C.  VRF has not shown, and cannot show, that obstacle preemption is proper.

VRF prefers to cite to extra-jurisdictional decisions on preemption rather than to this Court's analysis in *Herrera*. In that case, the Court thoroughly explored the NVRA's purposes—which included not only voter roll accuracy but also voter *participation*—and the extremely light touch with which obstacle preemption ought to be applied. *Herrera*, 690 F. Supp. 2d at 1207–08, 1225–26.

To combat this position, VRF claims that Defendants "cannot show the Use Restrictions or Data Sharing Ban actually do promote voter participation" and "cite no evidence." To the contrary, the undisputed facts show that when VRF posted individual voter data to the internet in contravention of the so-called Use Restriction or Data Sharing Ban, voter participation directly suffered. *See* Part II.C.1. *infra*. Moreover, the prohibition of general online publication is in no way at odds with even a broad interpretation of the NVRA's purpose because the laws occupy two separate spheres: access to information and use of information. Thus, where New Mexico's use regulations further the NVRA's purpose to promote voter participation, and where those regulations do not inhibit its other purpose

---

[1] It is unclear where VRF derives its conclusion that the Secretary refused to be complicit in unlawful activity only because she feared criminal prosecution. *See* ECF No. 125 at 11–12. The Secretary has an affirmative obligation to uphold the State's election laws. She cannot knowingly choose to do otherwise. *See, e.g., State ex rel. Riddle v. Oliver*, 2021-NMSC-018, ¶ 36, 487 P.3d 815 (observing Secretary has a "nondiscretionary duty" to comply with Election Code and she is not only "duty-bound to follow" the Code, but also responsible for implementing it).

of election integrity, it cannot be said that New Mexico's law so frustrate the NVRA's purposes that obstacle preemption ought to intervene. *See Herrera*, 690 F. Supp. 2d at 1225–26.

### D.  The Secretary treated the NVRA requests appropriately.

In light of the NVRA's plain language, and the guidance available in this jurisdiction, the NVRA does not entitle VRF to the wide array of information requested. What is more, the NVRA's access rights can and do exist in harmony with New Mexico's reasonable regulations on the *use* of voter data obtained via the NVRA or otherwise. The Secretary responded properly to the requests.

Again, VRF's requests were not "for a record that is maintained by [the Secretary's] Office; rather, it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to be aggregated and analyzed." ECF No. 119-11. This type of analysis or calculation is not a request for any portions of records concerning New Mexico's implementation of programs or activities to maintain voter rolls, and thus is not a request for records covered by the NVRA. Its subsequent requests—which only grew more and more broad—fare no better. VRF admits that only one small portion of its data requests could have been fulfilled by existing reports that the office maintains. ECF No. 124 at 75. The remainder of the requests, VRF contends, *could* have been generated for VRF from raw data in the Secretary's possession. *Id.* But VRF confuses technical capability with legal obligation, and the plain language of the NVRA simply does not require what VRF demands. Non-existent records that *could* be generated cannot, by definition, be records "concerning the implementation" of New Mexico's programs and activities because they are not records from any existing program or activity.

Neither should VRF's arguments of unfair treatment receive credit. Its own requests disclosed that VRF intended to "publish the requested information online." Again, Defendants had every reason to believe that providing the requested data to VRF would result in the imminent publication of voters'

sensitive information online, even before this litigation concluded. This is not content-based mistreatment. It is a proper response to unlawful conduct. The Secretary's denials were appropriate.

### E. VRF relies on an unsupported theory of waiver to avoid its pre-suit notice obligations.

VRF responds to its failure to provide statutory pre-suit notice by claiming that Defendants either have waived, or should be estopped from asserting, this provision. ECF No. 125 at 50–51. It arrives at this conclusion by pointing to Defendants' Answer and to an interrogatory response,[2] both of which assert that proper notice is a purely legal question for the Court, and neither of which contain any admission that VRF fulfilled these legal requirements. VRF contends that the issue is "not solely a legal" one, ECF No. 125 at 51, and that some factual response from Defendants was required. But there *are* no additional facts in Defendants' possession. The undisputed facts pertain only to communications that VRF sent (on February 15, May 27, and October 18, 2022) and whether the contents of those communications comport with the legal requirements of 52 U.S.C. § 20510.

That legal question is answered by the mandatory requirements of Section 20510. *See Hosemann*, 43 F. Supp. 3d at 713–17 (collecting cases to determine that the NVRA's pre-suit notice requirements are mandatory). VRF balks at the idea that NVRA requests "must include magic words." ECF No. 125 at 51. But requiring a request to at least *reference* the NVRA before it will be considered an NVRA request is no magic-word requirement. Here, VRF's February 15 request was specifically one for data

---

[2] Defendants do acknowledge that the response to Interrogatory 11 is not a paragon of clarity. But the response accurately answered the extremely narrow question asked, and the answer has not changed: there are no additional documents or facts necessary to analyze this issue, and the question is a purely legal one. That said, Defendants are happy to supplement or amend their response to answer, in the affirmative, VRF's follow-up question of whether Defendants dispute the legal sufficiency of the May 27 letter. In the event that the interrogatory response was somehow deficient, the relief is not automatic waiver or estoppel of a claim or defense. It is, instead, a multifaceted inquiry into any "actual prejudice to the defendant," interference with the judicial process, culpability, advanced warnings, and availability of lesser effective sanctions. *See Ehrenhaus v. Reynolds*, 965 F.2d 913, 920–21 (10th Cir. 1992). VRF has suffered no prejudice, and no delay or interference with the proceedings has resulted because the question was and is a purely legal one, the outcome of which will hinge entirely on facts within VRF's knowledge and under its control.

under New Mexico state law. Its May 27 letter was both its first NVRA request and a purported "notice of violation." And at no time after the Secretary's denial of the May 27 request did VRF send a pre-suit notice letter that attempted to explain the nature of the alleged violation or even which portions of VRF's request were meant to relate to the NVRA versus state law. This is significant in a case where the requests sought information much broader than what the NVRA provides, *see* Part I.A. *supra*, and the purpose of the pre-suit requirement is to offer a meaningful opportunity for resolution before litigation. *Hosemann*, 43 F. Supp. 3d at 715–16.

## II. VRF concedes most of its First Amendment claim, and cannot support the remainder.

### A. VRF concedes that it has no First Amendment right to access.

In their opening brief, and their response to VRF's motion for summary judgment, Defendants fully briefed and explained that VRF has no constitutional right of access to the Secretary's voter data. *See* ECF No. 121 at 41–45; ECF No. 126 at 38–41. Because VRF has conceded this point, Defendants need not brief it further. *See* ECF No. 125 at 60 (acknowledging that VRF's "right to access the data *emanates from the NVRA* rather than the First Amendment" (emphasis original)).

### B. VRF fails to prove a First Amendment right to use government information to which it has no access rights.

Having conceded that it has no case unless the NVRA affirmatively provides a right to the wide-ranging data and analyses that VRF requested, VRF continues to argue some First Amendment right to widely publish information it has no constitutional right to possess. ECF No. 125 at 60. VRF arrives at this conclusion by citing Justice Ginsburg's concurrence in *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 43 (1999), wherein Justice Ginsburg observed that once a state decides to allow access to information—despite its lack of constitutional obligation—the state then encounters "limits to its freedom to decide how that benefit will be distributed." But contrary to VRF's suggestion, this concurrence did not go so far as to suggest that the partial, voluntary sharing of information confers a First Amendment right to do whatever one wants with the information. Instead,

the concurrence that VRF cites, in fuller context, states that "[i]t does not appear that the selective disclosure of address information … impermissibly burdens speech" and that while the state must not distribute this voluntary benefit on discriminatory bases, it "is free to support some speech without supporting other speech." *Id.* ("California could not, for example, release address information only to those whose political views were in line with the party in power. But if the award of the subsidy is not based on illegitimate criterion such as viewpoint, California is free to support some speech without supporting other speech." (internal citations omitted)). VRF also cites a Fourth Circuit case that reaches this same, unremarkable conclusion: "[W]hen the Maryland legislature decided to make the List publicly available, it could not condition access to the List on any basis whatsoever." *Fusaro v. Cogan*, 930 F.3d 241, 256 (4th Cir. 2019).

Of course, the state cannot grant a right or benefit on discriminatory bases, no matter the voluntary nature of that grant. But that is not the question here. The question here is whether New Mexico could condition access—to sensitive citizen data that the state collected through the exercise of its governmental powers—on certain types of universally applicable, content- and viewpoint-neutral, use restrictions. It can, and the First Amendment does not suggest otherwise. *Cf. Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 42 (10th Cir. 2013) (citing *Ward v. Rock Against Racism,* 491 U.S. 781 (1989)) (declining to apply strict scrutiny to speech regulations that resembled an "administrative licensing scheme" applying "restrictions that are content neutral and restrict only the time, place, and manner of speech"). Thus, New Mexico's prohibition on the widespread publication of non-anonymized, non-aggregated personal data does not come into conflict with any First Amendment right that VRF might possess.

### C.   Even if VRF had a use right, New Mexico's regulation survives constitutional scrutiny.

Even if VRF did have a constitutional right to use citizen data in any manner it pleases, this would not end the inquiry. If VRF can prove that it holds some First Amendment right, then the

question becomes whether New Mexico's law withstands the applicable constitutional scrutiny. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) ("[T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."). Because it does, Defendants remain entitled to judgment regardless of whether VRF can demonstrate a constitutional right.

VRF asks the Court to sidestep the scrutiny analysis and skip to a decision in favor of VRF because Defendants did not analyze strict scrutiny in their opening brief and have, therefore, committed "a virtual waiver of their position." ECF No. 125 at 12, 62–64. But VRF cannot explain why Defendants would be required to analyze an anticipated counter-argument in their affirmative summary judgment brief in order to avoid waiver of their reply. VRF's untethered, highly tactical theory of waiver should be ignored.

As Defendants have thoroughly briefed in their response to VRF's summary judgment motion, *see* ECF No. 126 at 44–53, New Mexico's use regulations survive even the highest constitutional scrutiny. The State's proscription on publication serves the compelling and concrete interest of protecting the wellbeing of voters, safeguarding their fundamental right to vote, and ensuring they do not have to choose between participating in democracy and being safe in their homes.

As an initial matter, it is not clear that strict scrutiny applies, even if VRF has some First Amendment interest in publishing voter data. When state election laws are alleged to both burden and protect the fundamental right to vote, then the appropriate analysis is a constitutional balancing as outlined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick*. Under this standard, "the state's important regulatory interests are generally sufficient to justify" a "reasonable, nondiscriminatory" burden on otherwise constitutionally protected conduct created by a state's election laws. *Anderson*, 460 U.S. at 788. Here, the State's interest in the safety of voters and participation in elections weigh

in favor of upholding the regulations. But even if strict scrutiny applies, it is satisfied, as the State has a compelling interest and its regulations are narrowly tailored to the objective.

### 1. *Anderson-Burdick Balancing*

When it comes to First Amendment challenges to state election law, the Supreme Court has applied a "more flexible standard" from the *Anderson-Burdick* line of cases. This framework recognizes that the regulation of elections necessarily implicates fundamental rights, but that "the state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson*, 460 U.S. at 788. Consequently, a court is to "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments … [then] identify and evaluate the precise interests put forward by the State as justifications." *Id.* at 789. "In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*; *see also Burdick*, 504 U.S. at 434.

While the origin of the *Anderson-Burdick* test is rooted in ballot-access challenges, federal courts have applied the analysis in many other circumstances concerning election regulation. *See Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1283 (10th Cir. 2019) (applying the analysis to an unequal districting apportionment case under the Fourteenth Amendment); *see also Daunt v. Benson*, 956 F.3d 396, 406–07 (6th Cir. 2020) (noting that the "*Anderson-Burdick* may apply to First Amendment claims"); *Fusaro*, 930 F.3d at 244 (applying test to Maryland law that provided voter lists to in-state voters but denied it to out-of-state citizens); *Libertarian Party of Indiana v. Marion Cnty. Bd. of Voter Registration*, 778 F. Supp. 1458, 1462-63 (S.D. Ind. 1991) (applying test to find it unconstitutional to provide copies of voter lists only to the two major political parties).

In *Fusaro*, for example, the Fourth Circuit asked "whether the challenged regulation 'severely' burdens First and Fourteenth Amendment rights." 930 U.S. at 259 (citing *McLaughlin v. N.C. Bd. of*

*Elections*, 65 F.3d 1215, 1220 (4th Cir. 1995)). It concluded that the burden imposed by the state—which did not allow out-of-state residents to obtain copies of voter registration lists but did permit them to borrow the lists from the board of elections—was not severe and, therefore, did not warrant strict scrutiny. *Id.* It observed that there were ample alternatives for political speech open to plaintiffs. *Id.* at 260. Here, the burden is even less severe, and the alternatives for speech even more numerous. Unlike the plaintiff in *Fusaro*, VRF has obtained a copy of the voter file and may obtain an updated copy after a final judgment in this case provides the parties with instructions on its scope of use. Possession of the voter file leaves VRF with the opportunity to perform statistical analyses; recruit likeminded volunteers; go door-to-door in support of their cause; phone bank; conduct a direct-mail campaign; target their outreach based upon party affiliation, age, and voting history; or combine the voter file with commercially available consumer data for improved communication options. Given the ample opportunities for alternative forms of political speech available to VRF, the burden of prohibition from publishing the voter file itself cannot be said to be "severe."

Therefore, the Court should reject VRF's argument that strict scrutiny applies and should instead balance any mild burden to VRF with the State's strong regulatory interests in protecting safety, privacy, and participation of New Mexico voters. Under such an analysis, these interests heavily outweigh any incidental burden to VRF.

### 2. *Compelling Interests*

Under either *Anderson-Burdick* balancing or a strict scrutiny analysis, New Mexico's prohibition on publishing voter data protects the interests of public safety and electoral participation. These compelling interests justify upholding the State's prohibition against publishing voter data.

The Supreme Court has held that both public safety and the prevention of crime are significant government interests justifying some restriction on otherwise protected activity. *See Schenk v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997) (holding that public safety justified injunction on protest

activity); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (holding that crime prevention and community safety may justify pretrial detention). So, too, with the interest in preserving access to the fundamental right to vote. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 198–99 (1992) (describing state's interest in protecting right to vote as "obviously" compelling and observing some "cases … force us to reconcile our commitment to free speech with our commitment to other constitutional rights embodied in government proceedings"). Additionally, the Supreme Court and Tenth Circuit have recognized a well-established privacy interest in one's home and address. *See Forest Guardians v. FEMA*, 410 F.3d 1214, 1220 (10th Cir. 2005) (recognizing "significant" "privacy interest of an individual in avoiding the unlimited disclosure of his or her name and address" (internal quotation marks omitted)); *Dep't of Defense v. FLRA*, 510 U.S. 487, 501 (1994) ("We are reluctant to disparage the privacy of the home, which is accorded special consideration in our Constitution, laws, and traditions.").

VRF contends that Defendants have not presented any evidence that VRF's posting of voter data has resulted in the solicitation, harassment, and abuse of voters. ECF No. 125 at 64–65 (arguing that harms are merely speculative or conjectural because there is no proof that the posting "led to a single New Mexico citizen cancelling their voter registration"). First, this argument takes an improperly narrow view of relevant evidence. VRF knows the Secretary does not demand reasons from voters who cancel their registrations and, so, has no way to track why any given voter canceled their voting status. See ECF No. 119-5 at 29 (Vigil Tr. 141:2-5). Second, it reads the requirements of more-than-speculative injury to mean that only past events have any constitutional significance. The number of voters who, as a matter of historical fact, canceled their registration in the handful of months that VRF's New Mexico data was on the internet is not dispositive of the non-speculative future harms that the State can reasonably anticipate or the nature of its interest in preventing them. *See Golan v. Holder*, 609 F.3d 1076, 1084–86 (10th Cir. 2010) (according deference to legislators in identifying harms, and seeking only a "substantial basis" to support their conclusion of a "real threat")

Perhaps more importantly, this argument ignores the record. VRF and Defendants have both produced in discovery evidence that the publication of New Mexico voter data online harms voters' privacy interest and puts some voters in harm's way. The Deputy Secretary of State testified that as a public official, she has used a "scrubbing service" and Post Office Box to keep her personal address off the internet, and that VRF's posting home addresses will cause her irreparable harm, especially given threats against election officials. ECF No. 119-6 at 37 (PI Hearing, June 15, 2022 Tr. at 180:22–182:3). She further testified that she believed disclosing voters' home addresses would have "a chilling effect … where people don't want to participate and don't want to vote" based on her experience with voter files being shared and used to interrogate voters door-to-door. *Id.* at 185:1–186:12.

In addition, numerous voters have emailed the Secretary's office, as well as VRF directly, to request that their names be removed from the list or—more troubling still, asking to cancel their voter registration—for fear of harm from individuals who may learn the voters' addresses from VRF's website. Resp. to Statement of Additional Fact KK; ECF No. 126-1. In these emails, voters have cited fear of harm from violent ex-partners, stalkers, or family members with mental instability. *Id.* VRF has also received requests from law enforcement officials wishing to have their names removed. The Secretary of State has received inquiries by court and correction officials, as well as the U.S. Marshals Service, seeking ways to protect judges, prosecutors, and law enforcement officers. Resp. to Statement of Additional Fact KK; ECF No. 126-2. While it is very difficult to know that someone committed a crime after finding their victim's address on a particular website, New Mexico has also seen politically motivated violence against public officials in recent months. *See* Christina A. Cassidy, "New Mexico Shootings Follow Two Years of Election Assaults," *AP* (Jan. 18, 2023) (legislative candidate who believed that election he lost was "rigged" hired people who shot at the homes of four Democratic

lawmakers);[3] Vera Bergengruen, "Accused 'Mastermind' of New Mexico Political Shootings Left a Chilling Digital Trail," *Time* (Jan. 18, 2023) (candidate targeted election officials who certified results candidate believed were fraudulent).[4] Reflecting these concerns, New Mexico's Legislature recently passed a bill, amending the Election Code to make public officials' home addresses confidential in disclosures filed with the Secretary. N.M. Senate Bill 180 (2023), § 1.[5] VRF's website, if permitted to publish voter data, would be an effective tool for individuals intending to harass or harm elected officials, judges, prosecutors, public employees, or other members of the public. At minimum, it is a perverse incentive for these officials, judges, prosecutors, public servants, and private citizens to cancel their voter registration. The publication is also fertile grounds for scam artists who pose as government authorities and for employers who might discriminate on political affiliation or voting record.

The Supreme Court has recognized that compelled disclosure of political activity may chill the exercise of protected constitutional rights. In *Americans for Prosperity v. Bonta*, the Supreme Court held that California's law compelling nonprofits to disclose donors to the state attorney general's office failed exacting scrutiny because such disclosure would chill speech (in the form of reduced monetary donations to the plaintiff entities). 141 S.Ct. 2373, 2388 (2021). In that case, the Supreme Court held that, even though the disclosures were only to the California AG's office and not to the broader public, the law was facially invalid based on its mere "risk of a chilling effect." *Id.* at 2389. Although *Bonta* addresses a different set of facts, the same risk of chilling democratic participation is present here. "The right to vote is 'a fundamental right, … preservative of all rights.'" *Fish v. Schwab*, 957 F.3d 1105, 1121 (10th Cir. 2020) (quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (omission in original)). Further, the right to vote is "too precious, too fundamental to be so burdened or conditioned." *Id.*

---

[3] https://apnews.com/article/politics-new-mexico-state-government-michigan-2022-midterm-elections-fe96f8ea93cfc5107bf4e9bfaaa55482

[4] https://time.com/6247844/new-mexico-shootings-targeting-democrats/

[5] https://www.nmlegis.gov/Legislation/Legislation?Chamber=S&LegType=B&LegNo=180&year=23

(quoting *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966)). If the interest in preventing a chill on participatory democracy is so great that it facially invalidates California's statute, then surely the protection of that interest under New Mexico law warrants treatment as a compelling state interest.

### 3. *Narrow Tailoring*

If the Court nonetheless determines that strict scrutiny applies, that too is met. As shown above, New Mexico's laws are supported by several compelling interests. *See* Part II.C.1. *supra*. Given that VRF's publication can put voters in harm's way, open them to discrimination or harassment, or—at minimum—create meaningful fear among voters, the prohibition against publication of the voter file is the only way to protect the State's compelling interests in public safety and voter participation. Therefore, the state's restriction is narrowly tailored to the compelling interests that it serves.

VRF's strawman argument, that the State's only interest is in combatting "misinformation" and that other means could serve this interest, is no answer. *See* ECF No. 125 at 66. Ironically, VRF then suggests that the State could require tracking who obtains the data so that it can trace any malicious use of the sensitive information. *Id.* That is precisely what New Mexico does by requiring that each data requestor submit its own data request forms. Regardless, that alone is insufficient because, like the alternatives VRF posits—having the State "ask requesters to keep a list of the people that use the data"—would still invade voters' privacy and permit the general public to obtain voters' home addresses, political affiliation, and voting history. Such alternatives also would not prevent people from using this personal information to stalk, harass, intimidate, or solicit voters at their homes.

VRF's only other argument is that allowing private persons to "test the maintenance and accuracy of the system will [not] seriously harm privacy." *Id.* New Mexico does not prevent private persons from conducting these sorts of tests. Again, there is simply no prohibition on data requestors sharing their opinions about or analyses of New Mexico data, or even anonymized or aggregated versions of the data. SOF ¶ 7. Nor is there anything to prevent data recipients from using what they

learn from the data to engage in issue advocacy, education, research, canvassing, or other projects. These efforts to "test" the voter rolls are not affected by the real regulation that VRF seeks to remove: the prohibition on publishing individual, non-anonymized voter data on the internet.

VRF does not meaningfully contest that this narrow regulation is sufficiently tailored. *See* ECF No. 125 at 66–67. Nor could it. As VRF acknowledges, narrow tailoring, even under the strictest of scrutiny, requires only a "close fit between ends and means." *McCraw v. City of Okla. City*, 973 F.3d 1057, 1073 (10th Cir. 2020); *see also* ECF No. 125 at 66. Because New Mexico's law does not *substantially* burden more speech than necessary, it is not unconstitutional under the First Amendment. *Id.*

### D. VRF has not supported any separate claim of retaliation.

Because VRF's conduct was not protected under the First Amendment, it cannot satisfy the elements of retaliation. *See Van Deelen v. Johnson*, 497 F.3d 1151, 1155–56 (10th Cir. 2007). But even if VRF's conduct was constitutionally protected, there was still no retaliation.

VRF's theory of retaliation has slowly shifted. After originally arguing that Defendants engaged in retaliation because of "VRF's perceived political ideology," ECF No. 119 at 102, VRF's summary judgment response *now* contends that the "retaliation" it suffered was for the protected activity of "publishing voter data online." ECF No. 125 at 67.

Of course, Defendants dispute that publishing government data to the worldwide web is protected activity. *See* Parts II.A.–B. *supra*. But Defendants do not dispute what VRF has quietly conceded: the criminal referral and all other enforcement activity that VRF casts as retaliation was "a direct result of VRF's publication of the voter data online." ECF No. 125 at 70. This agreed point has several important ramifications. First, there is no causal link between VRF's viewpoint or ideology and Defendants' conduct, and no retaliation claim may proceed on that theory.[6] Second, the entirety

---

[6] In the event VRF inconsistently argues that Defendants retaliated both due to VRF's publication online *and* some other basis, then Defendants incorporate by reference their arguments on protected activity and but-for causation as explained in their opening brief and response to VRF's summary judgment brief. Docs. 121 & 126.

of VRF's retaliation claim boils down to whether publication on the internet is or is not constitutionally protected activity, and whether the regulation of that activity satisfies constitutional scrutiny. Both of these questions can be answered in favor of Defendants, *see* Part II.A.–C. *supra*, and judgment should be entered for them on any retaliation claim.

### E.  VRF has not supported its claim of viewpoint discrimination.

Reduced to its logical essence, VRF's viewpoint discrimination claim is that unless and until a state correctly identifies and prosecutes every single person who violates its laws, it may not constitutionally prosecute any single person who is caught violating its laws. Of course, disparate treatment of similarly situated persons may give rise to a claim of discrimination. But VRF has not identified similarly situated persons whom Defendants treated differently.

VRF violated New Mexico law in a manner so flagrant, with consequences so urgent, that it immediately spawned citizen complaints and requests for information on canceling voter registration. In contrast, VRF cites the existence of various data requestors that it suspects are also violating regulations on sharing voter data. But these entities have not published voter data in a globally accessible internet format, have not created the same chill on the exercise of voting rights in New Mexico, have not generated complaints from the public, and have not put private citizens in imminent fear for safety. The Secretary has by no means ruled out investigation or referral of entities suspected of this conduct, ECF No. 121 at 84 (PI Hearing, June 15, 2022 Tr. 180:12-21), but the fact that limited resources were first directed at a documented, known, and urgent violation is no indication of discrimination. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009); *Pahls v. Thomas*, 718 F.3d 1210, 1230 (10th Cir. 2013).

Further, Defendants again emphasize VRF's freedom to engage—as other data requestors have done, *see* ECF No. 121 at 15-16, Defs. SOF ¶¶ 52–54—in speech that is evaluative and even critical of the Secretary or others. As early as the preliminary injunction hearing in this matter, the

Secretary acknowledged that VRF may post voter roll analyses without violating the Election Code. ECF No. 119-1, May 17, 2022, PI Hearing at 145:8–146:5. Defendants do not contest VRF's ability to post direct criticisms of the Secretary such as these voter roll analyses, only the pure voter data which implicates privacy concerns—but is not editorial criticism at all. That position has not changed, and it renders untenable VRF's argument that Defendants' conduct is related to VRF's substantive viewpoints, rather than its dangerous conduct in publishing identifiable voter data. Judgment should be entered in favor of Defendants on this claim.

### III. VRF's Overbreadth and Vagueness claims cannot proceed.

#### A. VRF identifies no material disputes of fact.

VRF introduces its counter-arguments by claiming "disputes of material fact regarding the scope of the Data Sharing Ban." ECF No. 125 at 76. But its brief reveals no such disputes. Overbreadth and vagueness present legal questions, and for the reasons below, should resolve in Defendants' favor.

#### B. VRF's overbreadth claim relies on an implied expansion of the NVRA.

VRF once again rests its arguments on its interpretation of "an unconditional right under the NVRA to access the voter data." ECF No. 125 at 76. There are at least three flaws with this argument. First, there is no *unconditional* right to such access. *See* Part I.A. *supra*. Second, even under VRF's theory, any such right attaches to access—not use. *See* ECF No. 125 at 76. And, third, VRF's concession that there is no First Amendment access right means that there is no overbreadth claim, because overbreadth is a doctrine protecting *constitutional* rights. *See Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972) ("A clear and precise enactment may nevertheless be 'overbroad' if in its reach it prohibits constitutionally protected conduct."). As to any tension with the NVRA, New Mexico's laws are either preempted or they are not—they cannot be set aside on an overbreadth theory applied to a federal statute.

Because even its expansive interpretation of the NVRA falls short, VRF next asks the Court to enlarge upon persuasive authority regarding the non-discriminatory distribution of state benefits. Specifically, VRF asks the Court to create an unconditional First Amendment right to data use. *But see* Part II.A.–B. *supra*. It is from this cobbling together of expansive readings, both of the NVRA and the First Amendment, that VRF derives its overbreadth claim. The Court should decline to facilitate this incursion, particularly where Supreme Court precedent requires a conservative approach to overbreadth: "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broaderick v. Oklahoma*, 413 U.S. 601, 615–16 (1973).

Moreover, the Secretary's actual interpretation and enforcement of relevant statutes only conditions receipt of voter data on refraining from (i) use of the data for unlawful purposes as defined in Section 1-4-5.5 or (ii) intentional sharing of specific voter data with persons outside of the requesting organization. *See* ECF No. 121 at 87 (Vigil Dep. 82:11-12, 83:1-2, 84:9-12). VRF's extreme hypotheticals are neither on point nor relevant, because overbreadth requires more than just one hypothetical misapplication of a law; it requires realistic danger that a law will significantly compromise recognized First Amendment protections of parties not before the Court. *See City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800–801 (1984); *Bushco v. Shurtleff*, 729 F.3d 1294, 1302 (10th Cir. 2013). There is no such danger before the Court, and VRF's overbreadth claim should not proceed.

### C.   VRF's vagueness claim was unsupported before and is moot now.

Despite VRF's argument that the contours of New Mexico law are "lost on both VRF and the Court," ECF No. 125 at 81, the Court has opined that "the Election Code is not so vague that the State fails to provide sufficient guidelines about what conduct is permissible" because "[a] person of ordinary intelligence would understand that, if he or she shared voter data with individuals or entities outside their organization, then he or she has broken the promise" reflected on the affidavit executed to obtain the data in the first place ECF No. 51 at 201–02. This was true before the enactment of

House Bill 4, and following House Bill 4, VRF's arguments to the contrary are moot. That legislation, passed in the 2023 session, makes abundantly clear that a very specific type of activity—*i.e.*, causing voter data "to be made publicly available on the internet or through other means"—is unlawful. VRF's void-for-vagueness claim is moot, and VRF has not argued that any exception applies. *See* ECF No. 125 at 85.

In response, VRF contorts testimony of the Attorney General to claim that the office has changed its position on New Mexico law and argues that its claim is not moot because of the potential for *future* prosecution of *past* speech. As to the first, VRF cherry picks one line of deposition testimony from the Attorney General's representative—that he "can't draw [a legal] conclusion" as formulated by VRF's counsel—to conclude that "the AG's office no longer subscribes to the statutory construction theory" it has set out in this litigation. ECF No. 125 at 83. This misconstrues deposition testimony that is, when read fairly, quite unambiguous. The Attorney General's representative, Joe Dworak, testified squarely that "[T]he actions taken [by VRF], and the use of this information is not in compliance with New Mexico law." When asked by VRF's counsel whether the Attorney General's position had changed since the preliminary injunction hearing, Mr. Dworak testified that "there is no reason that I have, that I'm aware of to, you know, challenge any positions that she took" but that he would need to "consult[] with counsel" as to any specific legal conclusions. VRF's counsel continued to press the fact witness for legal conclusions, to which Mr. Dworak responded that he "can't draw that conclusion." Dworak Dep., ECF No. 119-2, 142:10–144:16. This is a far cry from the "shocking" "admission" that VRF paints it to be, and it does not change the analysis of VRF's vagueness claim.

As to VRF's remaining argument against mootness, that it could still be prosecuted for past posting, VRF's *prior* conduct cannot be chilled. It has already occurred. *See Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (standing in chilled speech case requires desire to engage in regulated speech in the future). To the extent VRF believes it has some constitutional

defense to a future prosecution on the basis of a past law, that may present a question of lenity within a specific prosecution. *Cf. United States v. Lanier*, 520 U.S. 259, 266 (1997). It does not, however, present a basis to *facially* void the current law on vagueness ground.

VRF's vagueness claim is moot with the passage of House Bill 4. *See* ECF No. 125 at 75–76 (recognizing HB 4 is clear). And even prior to that bill, VRF was on fair notice because the permissible uses for New Mexico voter data have long been explained clearly in both the voter data request forms and in Section 1-5-22, NMSA 1978. Despite VRF's argument that Defendants improperly "transmute" Section 1-5-22 through other election laws, ECF No. 125 at 82, those statutes expressly reference one another, making such a reading not only clear but expressly directed in law. *See* §§ 1-4-5.5, 1-4-5.6. VRF's interpretation of the Election Code, to the contrary, asks the Court to ignore the plain language of Section 1-4-5.6(A)'s express reference to the Voter Records System Act. VRF was and is on fair notice, and the Court should enter judgment in Defendants' favor on VRF's vagueness claim.

## CONCLUSION

For the reasons stated above, Defendants respectfully move the Court to grant judgment in their favor.

By: */s/ Kelsey Frobisher Schremmer*
Kelsey Frobisher Schremmer
Jeff Dan Herrera
Assistant Attorneys General
408 Galisteo St
Santa Fe, NM 87501
Tel.: (505) 490-4060
Fax: (505) 490-4881
kschremmer@nmag.gov
jherrera@nmag.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 26, 2023, I served the foregoing on counsel of record for all parties via the CM/ECF system.

<u>/s/ *Kelsey Frobisher Schremmer*          </u>