IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** )<br>)<br>Plaintiff, )<br>v. )<br>)<br>**RAÚL TORREZ**, in his official )<br>capacity as New Mexico Attorney General, )<br>)<br>and )<br>)<br>**MAGGIE TOULOUSE OLIVER,** in her )<br>Official capacity as New Mexico )<br>Secretary of State, )<br>)<br>Defendants. ) | CASE NO: 1:22-cv-00222-JB-KK |

**PLAINTIFF VOTER REFRENCE FOUNDATION, LLC'S
RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEFING
ON NATIONAL VOTER REGISTRATION ACT RECORDS**

Judge Harvie Wilkinson has authored the leading opinion interpreting the Public Inspection Provision of the National Voter Registration Act, which, writing for the Fourth Circuit, he describes as "embod[ying] Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334–35 (4th Cir. 2012). Defendants bitterly oppose *Long*. Their Supplemental Brief (Doc. 133) therefore advocates a cramped view of the Public Inspection Provision that would leave election officials free to ***publicize*** rigorous processes, but then hide their failure to ***actually use*** them—precisely the "chicanery, oversights, and inefficiencies" of which Judge Wilkinson warned. *Id*.

1

## PROCEDURAL BACKGROUND

At the June 14, 2023, hearing on the Parties' cross-motions for summary judgment, after Defendants suggested for the first time at argument that perhaps they could meet some of Plaintiffs' NVRA requests for voter data, the Court instructed Defendants to file a letter or notice with the Court that includes an exhaustive list identifying what records the Secretary would make available under the Defendants' interpretation of the NVRA's Public Inspection Provision, 52 U.S.C. § 20507(i)(1). On June 30, 2023, Defendants filed their Supplemental Brief (the "Brief"), characterizing the Court's order as one directing them to "supply information as to what kinds of records to which the NVRA does create a right of public inspection." Doc. 133 at p.1.

Defendants' Brief does not identify a single actual document which the Secretary offers to produce under the NVRA's Public Inspection Provision. Instead, Defendants admit that at least nine *categories* of documents are relevant to the functions that New Mexico carries out under the NVRA and concede that documents related to those functions must be made publicly available:

> Category 1: List Maintenance Procedures.[1]
> Category 2: SOS Voter Cancellation Program.
> Category 3: Same-Day Registration.
> Category 4: Automatic Voter Registration.
> Category 5: Online Voter Registration.
> Category 6: Electronic Voter Registration Information Center (ERIC).
> Category 7: Felon Registration Restoration.
> Category 8: Voter Registration Agencies.
> Category 9: Voter Registration Agents.

Under each category, Defendants list *types* of documents that could potentially be related to the listed function. For example, under category 1, Defendants state that "relevant state statutory provisions," "relevant federal statutory provisions", and some administrative rules relevant to list

---

[1] Note that though the term varies slightly, "File maintenance" is defined in the New Mexico Administrative Code as "the total activities undertaken by county or state election officials to ensure the accuracy and integrity of the statewide voter file." NMAC 1.10.35.7(N). Thus, this category is merely a restatement of the very categories of documents that the NVRA says must be made available.

2

maintenance (among other things) would be made available. For categories 3-9, the descriptions of the types of documents which may be made available consist of a boilerplate recitation of identical descriptors unspecific to the activity identified.

Additionally, in stark contrast to Defendants' suggestion at oral argument, their Brief does not list any actual *voter data* which would be made available under the NVRA. Voter data, however, is what Plaintiffs repeatedly requested from the Defendants.

In responding to Plaintiff's original requests, and in their briefing **until** their June 30, 2023, filing, Defendants never took the position that voter data is **never producible**. *See* Doc. 119-11 (Secretary's June 16, 2022 Response to Notice of NVRA Violation); Doc. 119-14 (Secretary's November 17, 2022 Response to Plaintiff's Request for Voter Data); Doc. 121 (Defendants' Motion for Summary Judgment). Indeed, the Secretary of State's official position at the culmination of discovery, sworn under oath at her Rule 30(b)(6) deposition, was the opposite. There, the Secretary testified that at the very least, certain voter data related to list maintenance ***had to be produced under the NVRA***. Now, however, Defendants' Brief inexplicably fails to inform the Court of their own binding testimony. Further, their list of disclosable items does not even include items established as producible by their own admissions in discovery.

Defendants' filing is unsupported by any facts or an affidavit from a relevant official attesting to the underlying basis for the assertions contained in it. Defendants' position is contrary to the plain language and purpose of the NVRA, and the overwhelming weight of authority interpreting and applying the Public Inspection Provision. Not a single case has ever adopted anything like Defendants' view of the law. For these and other reasons discussed below, Plaintiff contests and controverts Defendants' list, which significantly understates those documents which fall within the Public Inspection Provision.

# ARGUMENT

**I.    The NVRA Public Inspection Provision's language is vastly broader than what the Secretary ascribes and requires the production of all records *concerning* list maintenance activities.**

There are *two* key prongs to the NVRA's Public Inspection Provision, 52 U.S.C. 20507(i):

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

The first prong of the Public Disclosure Provision is broad, requiring disclosure of any record *concerning* the relevant programs and activities, and as discussed below, this does include voter data. But the second prong goes a step further by expressly stating that certain **voter data itself**—the lists of names and addresses of voters to whom NVRA notices are sent—will be made publicly available. Yet despite this express statutory directive, Defendants' response does not even purport to make this information available.

Every federal court to decide this issue disagrees with Defendants' position, and requires the disclosure of voter data, either on the applications themselves or on lists compiled from the applications. The key case is *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 334–35 (4th Cir. 2012). There, Judge Wilkinson considered whether the NVRA required Virginia to produce completed voter registration applications, which would disclose voter data. *Id*. The answer was a resounding "yes." The review of voter registration applications is a "program" and "activity" which is "plainly 'conducted for the purpose of ensuring the accuracy and currency of official lists

4

of eligible voters.'" *Id.* at 335. The applications themselves were "clearly" records of this program and activity, because "[w]ithout verification of an applicant's citizenship, age, and other necessary information provided by registration applications, state officials would be unable to determine whether that applicant meets the statutory requirements for inclusion in official voting lists." *Id.* at 336. The Court noted that the NVRA's "very clearly requires that '*all* records'" be disclosed, and that "the use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth." *Id.* (citation omitted).

Virginia argued it should not have to disclose the applications and the data contained in them, claiming, *inter alia*, that doing so would implicate citizen privacy. Judge Wilkinson gave this argument thoughtful consideration, but ultimately held that the language of the statute and relevant policy considerations required disclosure:

> We do not think appellants' privacy concerns unfounded. By requiring public disclosure of personal information, Section 8(i)(1) may conceivably inhibit voter registration in some instances. However, this potential shortcoming must be balanced against the many benefits of public disclosure. It is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls. State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer.
>
> It is not the province of this court, however, to strike the proper balance between transparency and voter privacy. That is a policy question properly decided by the legislature, not the courts, and Congress has already answered the question by enacting NVRA Section 8(i)(1), which plainly requires disclosure of completed voter registration applications. Public disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections.

*Id.* at 339-40.

Every other Court of which Plaintiff is aware that has considered the issue has similarly held that voter data itself, not merely documents that describe processes, must be made available

5

under the Public Inspection Provision. *See, e.g., Judicial Watch, Inc. v. Lamone*, 399 F.Supp.3d 425 (D. Md. 2019) (complete voter registration lists by county, including: name, home address, most recent voter activity, status (active or inactive)); *Pub. Int. Legal Found., Inc. v. Bellows*, 588 F.Supp.3d 124 (D. Me. 2022) (statewide voter registration list, including: name, residential and mailing address, date of birth, enrollment status, electoral district, voter status, date of registration, date of change of voter record (if applicable), voter participation history, voter record number and any applicable special designation); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F.Supp.3d 932 (C.D. Ill. 2022) (complete statewide voter registration list with the following redacted: telephone number, social security number, street number of home address, birthdate, identifiable portion of email address).

Each of these cases relies on the same rationale: the NVRA requires disclosure of "all" records "concerning" the actual "implementation" of "programs and activities" for ensuring the "accuracy and currency" of voter lists. While manuals and descriptions of processes might describe the programs and activities the Secretary hopes to implement, the key records concerning those programs' actual "implementation" is the lists themselves, which are what ultimately show whether the programs and activities did ensure the lists' accuracy and currency. The proof of the programs is in the pudding. As shown below, the Secretary seemed to recognize this at one point.

    **II.**    **The Secretary admitted in discovery that *voter data* is subject to disclosure under the NVRA, and made numerous other admissions that Defendants belatedly contradict with their filing.**

In their Supplemental Brief, Defendants contended for the first time that no voter data need be made available under the NVRA. Yet the Secretary's Elections Director and 30(b)(6) deponent testified in this case that the Secretary would "have to provide voter list maintenance *data* when someone makes a request under the NVRA." *See* VRF MSJ [Doc. 124] at p. 45, SOF 149 (citing

6

Vigil Depo., 30:15-19). This data, most readily contained in a file maintenance report which the Secretary is required to maintain under state law, shows the additions, deletions, and changes to the voter roll. *See id*. at p. 44. The Secretary further testified that it "does have list maintenance data that we would be able to produce if we received a legal request, an appropriate legal request." *Id.* at p. 45, SOF 148 (citing Vigil Depo., 28:14-29:1). In Defendants' response to VRF's Motion for Summary Judgment, they did not controvert SOF 148 or 149. *See* Doc. 126 at p. 17.

Even earlier in the case, the Secretary admitted in written discovery responses that *voter data* fell within the ambit of the NVRA's Public Inspection Provision. Plaintiff's RFP 14 directed the Secretary to:

> Produce documents sufficient to show each type of report, list, database, or document the Secretary maintains that contain voter data, ***including but not limited to each type of document the Secretary contends it will produce if it receives a request under the National Voter Registration Act***.

**Ex. P33**, Defendant Secretary of State's Response to Plaintiff's Third Interrogatories and Requests for Production, p. 15 (emphasis added).

In response, the Secretary stated that she can and would produce *raw voter data* in response to an NVRA request:

> The Secretary states that the only database in the Secretary's possession is the voter file they maintain pursuant to statute; all registration or other updates are done at the county level. ***If the Secretary receives a request for information related to this data pursuant to the National Voter Registration Act, the Secretary's staff can run a report in response to that specific request from the raw data.*** The Secretary is not in possession of any specific documents responsive to this request.

*Id.* (emphasis added).

In the same set of discovery responses, the Secretary stated that her office does not maintain "written procedures" for processing voter data requests under New Mexico Law or the National Voter Registration Act, "other than what is required of the Secretary pursuant to the National Voter

7

Registration Act (52 U.S.C. §§ 20501 et seq.) and the New Mexico Inspection of Public Records Act (NMSA 1978, §§ 14-2-1 et seq.)." *Id*. at 16. Yet now the Secretary deflects the Court's inquiry by pointing to her supposed willingness to produce policy manuals and procedure guides—materials the Secretary earlier claimed did not exist—to fulfill her duty under the NVRA.

These admissions are irreconcilable with Defendants' latest positions in their Supplemental Brief. Again, most importantly, the Brief makes no mention of the existence of, or of any plan to produce, "voter list maintenance data."

**III.   Defendants' filing outlines why voter data must be made available under the NVRA.**

Defendants' Brief includes several categories which should concede access to voter data under the NVRA, though Defendants stop short of actually acknowledging that fact. Most glaringly, under Category 2, Defendants include a single bullet point entitled, "List of voters subject to voter cancellation." Doc. 133 at p. 3. This "list of voters" *can only be raw voter data*, presumably including name, address, and voter status, at least. Defendants cannot now reasonably represent to this Court they need not produce voter data under the NVRA.

Additionally, Defendants include the vague term, "Voter communication," eight times in their filing. If this is taken literally, then voter "communications" included in categories regarding voter registration and registration cancellation *must* include voter registration applications and voter registration cancellation forms, both of which are hard copies of raw voter data that also appears on the list. If "voter communications" does not include voters' communications of their own data via registration applications or registration cancellations, why not? There is no principled basis under the plain text of the NVRA to include generalized discussions with voters about the process, but not the communications that actually reflect the "implementation" of the process.

Indeed, the NVRA is focused on "all" records "concerning" actual "implementation," not merely records that outline processes the Secretary hopes to follow. 52 U.S.C. 20507(i)(1).

Defendants also include several vague descriptors, "County communications," "County correspondence," "Email communication," and "Communications with election administrators" in their list of records which they purport to make available. These, too, would have to include raw voter data if they are taken literally. County election officials make communications to the Secretary, at least monthly, showing additions, deletions, and changes to the county registers. *See* Doc. 124 at p. 31, ¶146 (stating that the Secretary must create a "file maintenance report" noting these changes); Doc. 126 (stating assertion was uncontroverted, in relevant part). This is the same report that Defendants have already admitted is made available under the NVRA, but left out of their filing to this Court. Again, if the Secretary only means to include communications with counties *about the process*, but not communications containing voter data that *are actual "implementation"* (52 U.S.C. 20507(i)(1)) *of the process*, this line-drawing finds no warrant under the plain text of the NVRA, and cuts out the very "implementation" documents with which the NVRA is most concerned.

Though Defendants now admit that these communications must be made available pursuant to the NVRA, they still inexplicably omit any express reference to the actual voter data from their filing. Why be coy? Considering Defendants' earlier admissions during discovery and summary judgment briefing along with the explicit and implied concessions in this Supplemental Brief, it is clear they now seek to hide their true position regarding voter data from even this Court by disguising it in vague categories lacking any substance.

**IV.     The New Mexico Administrative Code contemplates the creation and maintenance of NVRA records which include voter data, but are not identified in Defendants' Brief.**

   **i.     NVRA confirmation mailings.**

The NVRA contemplates that a state may remove a voter from the rolls if the voter receives a notice as contemplated under 52 U.S.C. § 20507(d) and fails to respond. That notice must be sent postage prepaid to the voter's address so that the voter may state his current address, together with a notice regarding how and what to submit depending on whether the voter moved or not. § 20507(d)(2). The New Mexico Administrative Code, in turn, requires several steps to carry out this edict.

When an "Initial Mailing" is returned as undeliverable, a special "NVRA" designation is applied in the statewide voter file for that voter. NMAC 1.10.35.7(U). After Initial Mailings and NVRA designations are made, a second "Confirmation Mailing" occurs. The Confirmation Mailing is "a non-discriminatory mass mailing; conducted by the office of the SOS to voters flagged as NVRA on the statewide voter file and to voters who have filed a change of address request with the postal service since the last confirmation mailing." NMAC 1.10.35.7(F).

This process is specifically intended to fulfill the explicit requirements under the NVRA to maintain the accuracy and currency of the list. *See* 52 U.S.C. § 20507(d). Records of that mailing occurring and the response to it (or lack thereof) are records of a "program" or "activity" specifically required by the NVRA. Disclosure of the voter list would entail disclosure of "all" documents "concerning" this activity, satisfying both subsections (1) and (2) of 52 U.S.C. § 20507(i). Reading Defendants' filing, one could be forgiven for not thinking that such a program exists. Again, Defendants' categories for disclosure plainly violate the NVRA.

    **ii. Processing voter registration applications.**

The New Mexico Administrative Code lays out specific requirements for how a voter registration application must be processed. *See* NMAC 1.10.35.8(A)-(F). Those requirements include: running a duplicate search to determine if the voter is already registered conviction (NMAC 1.10.35.8(A)(1)); verifying the voter's age (NMAC 1.10.35.8(A)(2)), comparing the voter registration certificate to the statewide voter system to determine if the applicant has previously been marked as deceased or having a felony conviction (NMAC 1.10.35.8(A)(3)); entering the data from the voter registration certificate to the statewide database (NMAC 1.10.35.8(A)(4)); and proofreading to avoid errors (NMAC 1.10.35.8(A)(5)). A clerk must also match a paper voter registration certificate to the Motor Vehicle database for "investigative purposes." (NMAC 1.10.35.8(B)(1)). Procedures for rejecting applications and providing notice of that rejection, as well as procedures for processing online voter registration, are also laid out in the Administrative Code. *See* NMAC 1.10.35.8(C)-(F).

Each of these requirements is a "program" or "activity" which New Mexico uses to ensures the accuracy and currency of its voter rolls, yet no documents related to these functions are included in the Defendants' supplemental brief. Again, the ***voter list itself*** is the best evidence of whether (and how well) New Mexico implements this activity in practice. But neither the list nor any other documents pertaining to this activity appear in Defendants' Brief.

    **iii. File maintenance activities.**

The New Mexico Administrative Code requires significant file maintenance activities "by county or state election officials to ensure the accuracy and integrity of the statewide voter file." NMAC 1.10.35.7(N). These include:

    a. Confirmation mailings for voters designated as NVRA (NMAC 1.10.35.9(A));

11

  b. Street file maintenance (NMAC 1.10.35.9(B));
  c. Precinct assignments (NMAC 1.10.35.9(C));
  d. Felony convictions and satisfactions  (NMAC 1.10.35.9(D));
  e. Deceased voters (NMAC 1.10.35.9(E));
  f. Native American deceased processing (NMAC 1.10.35.9(F));
  g. Other state notifications (NMAC 1.10.35.9(G)).

Once again, these "program[s]" and "activit[ies]" ensure the accuracy and currency of New Mexico's voter rolls, but Defendants contend that records related to these functions need not be made available.

### V. The Defendants' filing is packed with fluff and filler which distracts from the true issues the Court asked Defendants to address.

#### i. Defendants pad their Brief with fluff.

The proposed categories of records Defendants include are filled with inconsequential fluff far attenuated from the text of the NVRA. This Court instructed Defendants to provide an exhaustive list of actual documents and records they have in their possession that would be made available pursuant to the NVRA. Not only have Defendants failed to identify *any* actual records or documents, their list of "categories" provides little meaningful information.

For example, Defendants list 22 subcategories of documents which are available to the public through a quick Google search, including: "[r]elevant state statutory provisions;" "[r]elevant federal statutory provisions;" "[a]dministrative rules;" "[c]ounty guidance"; "[v]oter outreach materials;" and "[v]oter education materials." While these general topics relate to voter rolls, they do not reflect the types of records contemplated by the Public Inspection Provision. If the main purpose of the NVRA's Public Inspection Provision is to make the text of federal statutes and regulations publicly available through state officials, that is an absurd reading of the statute and would eviscerate Congressional action, reducing the Provision to a long-form Google search alternative.

### ii. The inconsistent scope of Defendants' filing underscores the absurdity of their position.

The scope of Defendants' filing indicates a skewed reading of the text of § 20507(i) which vacillates between exceedingly broad and unworkably narrow. On the "broad" end of the scale, Defendants read the Public Inspection Provision to cover "Draft legislation" and "Legislative analysis/research" as records "concerning" the "implementation of programs and activities . . . [.]" § 20507(i)(1). These are records of the Secretary's action *to lobby the legislature* for new laws *before* any "programs or activities" have actually been codified and preformed. Under Defendants' reading of the Public Inspection Provision, the NVRA's "all records concerning" language really is broad because it even reaches "programs" and "activities" in their pre-formative state (i.e., while they are still being considered by the legislature), before anyone has attempted "implementation" under the NVRA.

At the same time, Defendants abruptly drop their broad interpretation of the NVRA once the program or activity has actually been passed and implemented—records actually showing how the programs' "implementation" is progressing in the voter rolls are off-limits. Though the categories in Defendants' Brief are vague, none explicitly which make available any records of the actual *implementation* of a program or activity, such as voter data or changes in voter data caused by a program or activity.

Similarly, Defendants include various other pre-implementation categories such as copious amounts of training materials and "Relevant requests for proposals" from vendors who will handle the data. These records, while certainly relevant to the NVRA, tell the public nothing of these vendors' actual implementation of any program or activity once they win the bid. The public inspection provision specifically contemplates records of the "implementation" of actual programs or activities, not simply records that are preparatory to those programs or activities.

13

As Defendants have done throughout this litigation, their most recent filing bobs and weaves around the heart of the issue and their own, overtly politicized policy stances. Defendants paint with a broad brush only when it is convenient for them.

## CONCLUSION

The Defendants' position is a mirage. Their interpretation of the NVRA is purely theoretical and would effectively result in the repeal of a federal statue by a state official.

It defies logic.

It defies the text and purpose of the NVRA.

And it is contrary to every case to consider whether voter data must be made available.

Dated: July 7, 2023

Respectfully submitted,
**GRAVES GARRETT, LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

**HARRISON, HART & DAVIS, LLC**
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Edward D. Greim, certify that on July 7, 2023, a copy of foregoing was filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following via email:

Jeff D. Herrera
Mark Allen
jherrera@nmag.gov
mallen@nmag.gov
Office of the New Mexico Attorney
General 408 Galisteo Street
Santa Fe, NM 87501

*/s/ Edward D. Greim*
Edward D. Greim
Counsel for Plaintiff