IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** )<br>)<br>Plaintiff, )<br>v. )<br>)<br>)<br>**RAÚL TORREZ**, in his official )<br>capacity as New Mexico Attorney General, )<br>)<br>and )<br>)<br>**MAGGIE TOULOUSE OLIVER,** in her )<br>Official capacity as New Mexico )<br>Secretary of State, )<br>)<br>Defendants. ) | CASE NO: 1:22-cv-00222-JB-KK |

**PLAINTIFF VOTER REFRENCE FOUNDATION, LLC'S
SECOND SUPPLEMENTAL BRIEF ON THE PARTIES'
<u>CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>**

Since this Court heard the parties' arguments on their cross-motions for summary judgment and the parties both submitted supplemental briefing on the particular "records" made available by the National Voter Registration Act's ("NVRA") public disclosure provision, Defendants have made two key admissions that bear directly on the motions, and which should support judgment in Plaintiff VRF's favor..

First, the Secretary of State produced some voter data to VRF in response to VRF's Inspection of Public Records Act ("IPRA") request, which VRF made the day after the Court's June 14, 2023 hearing on the cross-motions. That request purposely used the same language as the NVRA's Public Inspection Provision, asking the Secretary for "all records concerning the

1

implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." VRF did not submit an affidavit and made no promises regarding how the response to the IPRA request would be used, nor did the Secretary demand such promises. Nevertheless, on August 22, 2023, the Secretary produced, among other things, individualized, identifiable voter data. This contradicted or undermined various positions Defendants maintain in this lawsuit, including: (1) that the Secretary will not provide voter data absent a signed affidavit; (2) that the "records" described in the NVRA's Public Inspection Provision do not include individualized voter data; and (3) that providing voter data to VRF would be tantamount to participation in a criminal conspiracy.

Second, Defendants' counsel wrote to VRF on August 30, 2023, offering to produce to VRF the data it requested on May 27, 2022, claiming that some unidentified statement by Plaintiff's counsel at the June 14, 2023 summary judgment hearing constituted a change of Plaintiff's VRF's position, causing them to have a change of heart about providing the data to VRF. Defendants' conspicuous delay in agreeing to produce the data only after hearing the Court's remarks at summary judgment, only after the pretrial conference, and a mere 11 days before the originally scheduled trial in this matter is yet another step in the Defendants' game which this Court aptly described as "cat and mouse."

While Defendants are sure to assert that their belated productions somehow moot certain claims and cut in their favor, these events undermine Defendants' prior positions regarding voter data being unavailable under the NVRA, underscore their pretextual positions to deny VRF access to voter data, and demonstrate their discrimination against VRF.

## SUPPLEMENTAL STATEMENT OF ADDITIONAL
## UNCONTROVERTED FACTS

SSS. At the June 14, 2023 hearing on the Parties' cross-motions for summary judgment, the Court expressed its concern that Defendants continued to discriminate against VRF by refusing to make voter data available to VRF after it promised not to publish New Mexico voter data online:

> The Court: So for you not to give them the documents seems to me that you're just singling out this group because they're not going to publish it either. They're making the same promises everybody else is.
>
> [. . .]
>
> The Court: But I guess I'm troubled by that. Because if they're saying: We're not going to do anything if the Court denies our PI – which I did – I guess I don't understand why you're singling them out.
>
> [. . .]
>
> The Court: I just think you have problems here.
>
> Ms. Schremmer: Understood.
>
> The Court: I mean, I just think they're making the same assurances that everybody else is making. . . . But I do think you've singled them out, when they make the same promise as everybody else. And I think it's because it's what they want to do with it, not what they're going to do. They made promises, just like everybody else, that they won't do it.
>
> [. . .]
>
> The Court: And I don't think you can deny a group, which you don't like, when they're doing the same thing everybody else is.

**Ex. P34**, **Excerpts from June 14, 2023 Transcript of Hearing on Parties' Motion for Summary Judgment at 49:9-13; 50:3-7; 50:24-51:11; 51:13-15.**

TTT. At the June 14, 2023 hearing on the Parties' cross-motions for summary judgment, the Court directed Defendants to file a supplemental brief detailing precisely what they believe must be made available pursuant to the NVRA's Public Inspection Provision, 52 U.S.C. § 20507(i):

3

> The Court: I think it's your obligation to tell me what documents – even if their request is faulty, I think you've got to tell me what documents the Secretary of State thinks falls within the narrow definition, and would produce if requested.
>
> [. . .]
>
> The Court: . . . I'd be as exhaustive as possible. What is it – you know, don't just give me examples, really bottom out over there, what it is that they do to comply the [N]VRA.

***Id.*** **at 34:10-15; 37:1-4**

UUU. On June 15, 2023, VRF sent a request for records to the Secretary of State's Office pursuant to the New Mexico Inspection of Public Records Act. That request sought the following documents from September 1, 2021, to present:

> 1. All requests the Secretary of State has received from any person for records which are available, or which the requestor claims must be made available, under the National Voter Registration Act.
>
> 2. Any non-privileged communications pertaining to the requests identified in paragraph 1 above, including but not limited to any communications between the Secretary's Office and the requestor.
>
> 3. All documents the Secretary of State has produced in response to any of the requests identified in response to paragraph 1, above.
>
> 4. All records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.

**Ex. P35**, **VRF's 06-16- 2023 IPRA Request to NM SOS re: NVRA Requests and Materials.**

VVV. VRF's June 15, 2023 IPRA request did not contain an executed affidavit or Voter Information Authorization form of any sort. ***Id***.

WWW. VRF's June 15, 2023 IPRA request did not contain any promise that VRF would not post the records produced in response to the request on the Internet. ***Id***.

4

XXX. Item 4 of VRF's June 15, 2023 IPRA request exactly mirrors the text of the NVRA's Public Inspection provision (the "NVRA Item"). *Compare id.* with 15 U.S.C. § 20507(i)(1).

YYY. On June 23, 2023, Charlotte Chinana, Deputy Elections Director for the New Mexico Secretary of State, sent an email to Mandy Vigil (the Secretary's Director of Elections), Peter Auh (the Secretary's General Counsel), and Sharon Pino (the Secretary's Deputy) stating that the Secretary has 31,743 records in response to the first request of VRF's May 27, 2022 NVRA Notice and Request. **Ex. P36, June 23, 2023 Email from Charlotte Chinana to SOS Team.**

ZZZ. Seven days later, on June 30, 2023, though this Court instructed Defendants to be "exhaustive" in their list of documents made available under the NVRA, Defendants filed a supplemental brief listing nine "categories" of records Defendants claim they would make available under the NVRA, including:

- List maintenance Procedures;
- SOS Voter Cancelation Program;
- Same-Day Registration;
- Automatic Voter Registration;
- Online Voter Registration;
- Electronic Voter Registration Information Center (ERIC);
- Felon Registration Restoration;
- Voter Registration Agencies; and
- Voter Registration Agents.

**Dkt. 133 ("Defendants' NVRA Brief").**

AAAA. Defendants' NVRA Brief did not state that the Secretary would make any individual, identifiable voter records available under the NVRA. *Id.* It did not include or make

reference to any of the records the Secretary's office had identified, just seven days previously, as responsive to the first part of VRF's May 27, 2022 NVRA request, which by then had been pending for over a year. *Id*.

BBBB. Defendants' NVRA Brief did not state that the Secretary would make any aggregated voter records available under the NVRA. *Id*.

CCCC. Defendants' NVRA Brief did not include lists of the names and addresses of individuals to whom NVRA notices are sent. *Id*.

DDDD. On June 30, 2023, the same day Defendants' NVRA Brief was filed, the Secretary made its first production in response to VRF's June 15, 2023 IPRA request (the "First Production"). **Ex. P37**, **6-30-2023 Letter from SOS Detailing First IPRA Production.**

EEEE. On July 7, 2023, VRF filed its Response to Defendants' NVRA Brief, including caselaw holding that individual, identifiable voter records are subject to disclosure pursuant to the NVRA's Public Inspection Provision, 52 U.S.C. § 20507(i)(1). **Dkt. 134.**

FFFF. The Secretary made a second production in response to VRF's June 15, 2023 IPRA request on August 22, 2023 (the "Second Production"). **Ex. P38, Excerpts of 8-22-2023 SOS Production of Documents Responding to VRF's 6-15-2023 IPRA Request.**

GGGG. In the Secretary's Second Production, it detailed which groups of documents were responsive to each of VRF's four items. **Ex. P39, SOS 8-22-2023 Letter Detailing SOS Production of Documents.**

HHHH. Specifically in response to VRF's NVRA Item—the Item that sought production of any records the Secretary had which met the requirements of the Public Disclosure Provision under the NVRA—the Secretary produced, among other things:

- Internal presentations containing screenshots of voter data, including an individual's name, voter ID, last four digits of the voter's social security number, date of birth, age,

- registration date, voter status, party, county, voter history, gender, driver's license number, and phone number.
- The "SOS Voter Registration Annual Counts," detailing the "counts" of registered and unregistered voters by county.
- Four counties' "Purge Lists" of inactive voters, containing the individual identifiable voter data of hundreds of voters, including their voter ID number, name, party, gender, registration date, city, source of registration, inactive date, and last voted date.

**Ex. P38.**[1]

IIII. The Secretary's IPRA response produced individual, identifiable voter data in response to VRF's NVRA Item. *Id*.

JJJJ. In a letter accompanying the Second Production, the Secretary indicated that while it believes Items 1-3 are fulfilled, the NVRA Item still remains open. *See* **Ex. P39**.

KKKK. On August 30, 2023, Defendants sent a letter to VRF offering to provide the New Mexico voter data VRF requested in its May 27, 2022 NVRA Notice of Violation of National Voter Registration Act & Request for Records. **Ex. P40, Letter From Mark Allen re Voter Data File.**

LLLL. In the August 30, 2023 Letter, Defendants stated:

We are providing this data now because of statements made in Court at hearing on our respective Motions for Summary Judgment (i.e., that VRF will not post New Mexico's voter data online except in the event of a final judgment stating that VRF has the right to do so and that New Mexico cannot lawfully prohibit it).

[. . .]

VRF's current stance—that it will not post the data unless a court says it can lawfully do so—is meaningfully different than its May 2022 stance—that it would not post the data unless a court said it wouldn't get in trouble when it did so.

*Id.*

---

[1] VRF has redacted the specific voter data. Defendants' production did not redact this data, except for residential address in some selected documents.

MMMM. Contemporaneously with the August 30, 2023 letter, Defendants provided an invoice describing the data Defendants now offer VRF:

1. Records for voters who were removed from the voter rolls between November 3, 2020, and April 13, 2021.

2. Records for current active and inactive voters who are registered, including voter history for those who cast ballots in 2020.

**Ex. P41**, **8-30-23 Invoice for Records Request.**

NNNN. On September 5, 2023, VRF responded to Defendants' letter, clarifying that it did not make any promises at the June 14, 2023 summary judgment hearing that it did not also make in writing in the May 27th request or at various other times throughout this litigation. **Ex. P42**, **September 5, 2023 Letter From VRF to Mark Allen.**

OOOO. Defendants have not responded to VRF's September 5, 2023 letter and have not withdrawn their offer to produce the NVRA records once payment is received.

## ARGUMENT

**I.     The Second Production is wholly inconsistent with Defendants' prior statements.**

**A. The Second Production demonstrates Defendants' true interpretation of the NVRA's Public Disclosure provision.**

Throughout this litigation, VRF has argued that the NVRA's Public Inspection Provision, 52 U.S.C. § 20507(i)(1), requires states to make available individual, identifiable voter information, including the state's voter database itself, as that data constitutes "records" as described by the NVRA. *See e.g.*, **Dkt. 124 at 71**. Defendants, though they have argued for a "limited" interpretation of the Public Inspection Provision, have not specified what exactly they believe is made available under the NVRA, instead relying on the argument that whatever must be made available, it falls short of voter data itself. *See* **Dkt. 126 at 32**. Even after this Court requested Defendants file an "exhaustive" supplemental briefing detailing precisely what they believed to be

8

made available by the NVRA, *see* **P34, at 34:10-15; 37;1-4**, Defendants filed a brief containing only *categories* of documents they believed to be made available. *See* **Dkt. 133**. Defendants' categories did not include *any* voter data—not even the voter data made explicitly available by § 20507(i)(2). *Id*. VRF has already outlined the deficiencies of Defendants' submission to this Court. *See* **Dkt. 134**.

But now, the Secretary's Second Production concedes what Defendants have attempted to avoid saying out loud: the NVRA makes individual, identifiable voter information available to the public. VRF's NVRA Item in its June 15, 2023 IPRA Request mirrors the text of the NVRA's Public Inspection Provision. **SOF UUU; XXX**. The Secretary produced at least some voter data in response to that request. **SOF HHHH.** There is simply no logical distinction between the records included in the Secretary's production and the materials Defendants refuse to admit are made available under the NVRAI. It cannot be that a requester of voter data in New Mexico cannot receive NVRA materials by invoking the statutory mechanism of the NVRA itself and instead must file an IPRA request using the ***same language as federal statute*** and hope the Secretary complies.

The "Purge Lists"[2] in Defendants' Second Production also demonstrates what individual, identifiable voter data the Secretary believes must be made public under the NVRA, as those lists contain voters' identification numbers, voter name, party affiliation, gender, registration date, city, source of registration, inactive date, last voted date. **SOF HHHH**. The Purge Lists themselves do

---

[2] "Purge Lists" are created pursuant to N.M.S.A. 1-4-28(A), which provides:

> The secretary of state, county clerks and boards of registration, in compliance with the federal National Voter Registration Act of 1993, shall remove from the official list of eligible voters the names of voters who are ineligible to vote due to change of residence.

include a voter's residential address, though Defendants have, without an explanation, redacted that data, despite that fact that 52 U.S.C. § 20507(i)(2) explicitly lists "address" as a field of voter data which states must make available. *Id*. Thus, even in the limited voter data included in the Second Production, Defendants still are not in compliance with the NVRA.

> **B. The Secretary's Second Production further demonstrates Defendants' excuses for not producing voter data are pretextual.**

This Court has already concluded Defendants reasons for denying VRF access to New Mexico voter data are pretextual, *see* **Dkt. 51 at 185**, and based in "dubious" interpretations of state law. But the Second Production cements this conclusion.

First, Defendants have repeatedly argued that, in order to receive New Mexico voter data—even under the NVRA—a requester *must* fill out an affidavit (or Voter Information Authorization form) stating, among other things, that it will not "sell, loan, provide access to, or otherwise surrender voter information" and only use the data for an approved purpose. *See* **SOF 150**. But when the Secretary was confronted with VRF's IPRA request including the NVRA Item, *without any affidavit*, it produced individualized voter data. *See* **SOF HHHH**. VRF's June 15, 2023 IPRA request did not even include a promise not to post voter data online—as past requests have. *See* **SOF VVV; WWW**. This inconsistency reveals the requirement of an affidavit to be exactly what VRF has said all along: merely pretext with which to discriminate against VRF or other disfavored requesters. *See* **Dkt. 124 at 69**. The Second Production simultaneously undercuts Defendants' revelation that it could finally produce voter data to VRF following some unidentified "new" promise at the June hearing regarding VRF refraining from posting that data. The Secretary produced the voter data in the Second Production to VRF without any such accompanying promise.

Second, Defendants have made much of the State's interest in protecting the "privacy and safety of New Mexico voters" and argue that interest prevents the disclosure of voter data to VRF

10

or the subsequent publication of that data online. *See* **Dkt. 121, at 43**. But the Secretary did disclose voter data to VRF and because the request remains unfulfilled and the Secretary's production only included four counties' sets of voter data, this disclosure will—and should—continue. **SOF HHHH; JJJJ.** What is more, PowerPoint presentations included in the Secretary's production include screenshots of voter data detailing extremely sensitive personal information of voters, including the last four digits of a voter's social security number. **Ex. HHHH, at 2**.[3] If the Secretary were truly interested in protecting voters' personal information, such unredacted production would not occur.

> II. **Defendants' remaining excuses for refusing to produce New Mexico voter data are demonstratively pretextual.**

Just moments after this Court candidly addressed both parties on its reading of the Summary Judgment Motions and the facts of Defendants' discriminatory refusal to accept VRF's promises, *see* **SOF SSS**, the Defendants claim to have heard Plaintiffs' counsel utter a "new" promise in the courtroom; it is this promise, they say, that finally alleviated the concerns they had genuinely held for over a year, leading them to offer to fulfill VRF's May 27, 2022 NVRA request. **SOF LLLL**. This is hogwash.

Plaintiff VRF's May 2022 request had sought the following records:

1. A complete list, by county/precinct, of any registered voters who cast ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

---

[3] Including voter data in a PowerPoint presentation also begs the question of whether the author of that presentation "validly" requested the data pursuant to Defendants' interpretation of the election code, including filing an affidavit, and whether sharing sensitive voter information (like portions of a social security number) itself violates the election code. Again, VRF redacted the particular voter data in this filing, but Defendants left that data unredacted in their production to VRF.

11

> 2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

See **Dkt. 119, at pp. 29-33, SOF 133-159** (May 27, 2022 NVRA Notice of Violation and Request for Records). Along with that request, VRF stated:

> VRF intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters online if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding.

**Ex. P24, NVRA Notice, Dkt. 44-22 filed 6/24/22.**

Of course, Defendants denied that NVRA request, alleging "Item #1 is not a request for a record, as we do not maintain a list such as the one described therein. As such, we consider both requests closed under the NVRA and, to the extent applicable, IPRA." **Ex P26.** Defendants seemingly had no problem with the substance of Item #2 but still denied this request because they did not believe VRF's promise not to post the data and wanted to delay production until the conclusion of this litigation: "we will either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal." *Id.* Indeed, as the Secretary later claimed, there was nothing VRF could say to convince the Secretary that it would keep its promises not to publish absent a court order. See **SOF 156**.

In Defendants' telling, however, Plaintiff's counsel miraculously happened to utter the magic words four months later in open court—causing Defendants to change their mind and produce the voter data. For Defendants, it is pure coincidence that at the same hearing, this Court had reiterated on the record its view that, on the facts and on the law as set forth in the parties' brief, the Defendants' reasons for rejecting VRF's promises were likely pretextual. Thus, two and a half months after the hearing (ascribing the delays to internal miscommunication), Defendants offered to produce to VRF the following parts of its NVRA request:

12

    (1)    Records for voters who were removed from the voter rolls between November 3, 2020, and April 13, 2021.

    (2)    Records for current active and inactive voters who are registered, including voter history for those who cast ballots in 2020.

**SOF MMMM**. Again, Defendants' only given explanation for ceasing their discriminatory conduct is that "VRF's current stance—that it will not post the data unless a Court says it can lawfully do so—is meaningfully different than its May 27, 2022 stance—that it would not post the data unless a court said it wouldn't get in trouble when it did so." **Ex. P40.**

Defendants' August 2023 letter confirms the pretextual nature of Defendants' prior excuses for not producing the data in at least two ways. First, while Defendants initially claimed the records in paragraph 1 of VRF's May 27 request simply *did not exist*, after the summary judgment hearing, they suddenly have decided the records do exist, and have no problem offering them to VR. **SOF MMMM**. In fact, the Secretary's office discussed VRF's particular May 27 request and determined, internally, that the Secretary was in possession of 31,743 of these records. **SOF YYY**. Despite Defendants' assertions to the contrary at the time, those records existed when VRF made its May 27, 2022 request and should have been produced.

Second, Defendants argue that whatever unidentified promise VRF's counsel made at the June 14, 2023 hearing not to publish New Mexico data is "meaningfully different" than its May 27, 2022 promise not to publish the data—as well as all of the other promises VRF and its counsel have made since. Defendants' assertion is not tethered to reality and is belied by Defendants' own statements and course of conduct.

In fact, the reason reiterated by Defendants over and over again for not providing the data to VRF is simply that they did not believe VRF's promise not to publish it online. Defendants adopted the position that it would not give data to VRF well before VRF's May 27, 2022 request:

13

- In a March 11, 2022 email from Patrick Rostock to Mandy Vigil, Mr. Rostock stated: "Per Dylan's contact with the AG, we are not fulfilling records requests from VoteRef." **Ex. P5, 3-11-22 Email Exchange with Rostock, Vigil, and Pino regarding VRF 2-15-22 Request, Dkt. 44-16 filed 6/24/22.; Dkt. 119, p. 26, SOF 117.**

- During the June 15, 2022 Preliminary Injunction Hearing, Mandy Vigil stated that it is the Secretary's understanding that VRF will not publish the "requested data" online unless "VRF is granted relief in this case or any other legal proceeding," but that the Secretary will continue to deny VRF's requests due to "guidance and direction from [the Secretary's legal counsel]." **Dkt. 119, p. 33, SOF 155-157.**

- During that same hearing, Defendants' counsel walked Mandy Vigil through a detailed explanation of conversations between counsel and Mrs. Vigil in which counsel told the Secretary's office not to fulfill VRF's requests for voter data for fear the Secretary would be violating the New Mexico Criminal Code. *Id.*, **p. 31, SOF 144.**

The Court even recognized that the reason Defendants refused to make voter data available to VRF is not because VRF's repeated promises were somehow insufficient or unclear, but because Defendants did not, for some reason, believe VRF. **Dkt. 51, at 181**.[4] The absurdity of claiming any difference in VRF's promises—without citation or even explanation—suggests that there was some other reason for Defendants' refusal to produce the data. That Defendants still cannot come clean only underscores their long-standing discrimination against VRF.

**III.    Defendants' recent production does not cure their continued violation of the NVRA or their discrimination based on VRF's viewpoint.**

---

[4] The Court acknowledged VRF's promise not to publish New Mexico voter data and Defendants' ensuing discrimination:

> Voter Reference, however, maintains that, although it will publish current voter registration data for election-related purposes, it will not publish voters' personal information without a Court order saying that it can publish it. See June 15 Tr. at 55:22-56:1 (Greim). The Secretary of State's decision not to take Voter Reference at its word that it will not sue the data contrary to the Secretary of State's interpretation of N.M.S.A. § 1-4-5.5, therefore, causes impermissible viewpoint discrimination.

**Dkt. 51, at 181.**

Defendants' recently proffered production of New Mexico voter data does not affect VRF's claims related to Defendants' refusal to fulfill VRF's requests for data. First, Defendants have not actually ceased their discriminatory conduct. While the Letter does grant VRF access to some of the data it requested, a large portion of the requested data is left out. The unproduced data includes all of the data requested on October 18, 2022. Defendants have articulated various reasons for not making this data available, including (1) the fear that VRF would break its promises not to post the data; (2) that the requested records "do not exist"; (3) ongoing litigation; and (4) the failure to attach affidavits to the October 2022 request. **Ex. P29.** VRF has already argued to this Court why those reasons are pretextual. **Dkt. 124, at 71-76**.

Moreover, the Letter does not itself signify any change in the Secretary's discriminatory policy. Instead, the letter contorts VRF's positions regarding publishing the data and states the only change is VRF's positions: "***In light of the new statements,*** the Secretary's Office can lawfully provide the data requested in VRF's affidavits and is happy to do so." **Ex. P40.** The nonsensical logic of the Secretary's reasoning aside, it is clear the Secretary has not retreated from the position that voter data need not be made available under the NVRA—even if her recent IPRA production undercuts that position.

Second, to the extent Defendants have actually ceased their discriminatory conduct, this Court may still take judicial action:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. Such abandonment is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice, but that is a matter relating to the exercise rather than the existence of judicial power.

*City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). If the rule were otherwise, courts would be compelled to leave "the defendant free to return to his old ways." *United States v. Concentrated Phosphate Export Assn.*, Inc., 393 U.S. 199, 203 (1968) (cleaned up); *see also Allee*

15

*v. Medrano*, 416 U.S. 802, 810-11 (1974) ("We may not assume that because during this period they directed their efforts to the judicial battle, they have abandoned their principal cause. . . . It is settled that an action for an injunction does not become moot merely because the conduct complained of has terminated, if there is a possibility of recurrence[.]").

This reasoning holds when the underlying claim is rooted in viewpoint discrimination. *See e.g., Christian Legal Soc. Chapter of the University of Calif., Hastings College of the Laws v. Martinez*, 561 U.S. 661 741, n.3 (Alito, J., dissenting) (recognizing that had the majority concluded the school's action was discriminatory, declaratory judgment and permanent injunction relief were still warranted even though the school changed its allegedly discriminatory policy).

## CONCLUSION

In sum, Defendants' recent capitulation and production of voter data does nothing but underscore their discrimination against VRF. While Defendants have attempted to hide the ball regarding the correct interpretation of "records" under the NVRA, their voluntary IPRA production—including voter data—speaks for itself. Moreover, Defendants' August 30, 2023 letter blatantly mischaracterizing VRF's past and present statements is a continuing cover-up. It only confirms that what Defendants are covering up is viewpoint discrimination.

Dated: September 25, 2023

        Respectfully submitted,
**GRAVES GARRETT, LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

**HARRISON, HART & DAVIS, LLC**
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Edward D. Greim, certify that on September 25, 2023, a copy of foregoing was filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following via email:

Jeff D. Herrera
Mark Allen
jherrera@nmag.gov
mallen@nmag.gov
Office of the New Mexico Attorney General 408 Galisteo Street
Santa Fe, NM 87501

        */s/ Edward D. Greim*
        Edward D. Greim
        Counsel for Plaintiff