**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | |
| | ) | **CASE NO: 1:22-cv-00222-JB-KK** |
| | ) | |
| **RAÚL TORREZ**, in his official capacity as New Mexico Attorney General, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| **MAGGIE TOULOUSE OLIVER,** in her Official capacity as New Mexico Secretary of State, | ) | |
| | ) | |
| Defendants. | ) | |

<u>**JOINT TRIAL DEPOSITION DESIGNATIONS AND OBJECTIONS**</u>

Plaintiff Voter Reference Foundation, LLC ("VRF" or "Plaintiff") and Defendants Attorney General Raul Torrez and Secretary of State Maggie Toulouse Oliver ("Defendants"), pursuant to the Joint Pretrial Order [Dkt. 152] and D.N.M.LR-Civ. 10.6, designate the following deposition testimony, subject to the listed objections for this Court's consideration.

| **Mandy Vigil**<br>February 27, 2023<br><br>**Plaintiff's Designations** | | **Defendants' Objection** | **Plaintiff's Response** |
|---|---|---|---|
| **Beginning** | **Ending** | | |
| 5:7 | 6:1 | | |
| 13:11 | 13:17 | | |
| 19:22 | 20:4 | | |
| 20:5 | 21:1 | | |
| 25:5 | 25:20 | | |
| 28:14 | 29:1 | | |
| 30:15 | 30:19 | | |

| | | | |
|---|---|---|---|
| 30:20 | 31:4 | | |
| 35:18 | 36:4 | | |
| 52:23 | 53:13 | | |
| 54:24 | 55:6 | | |
| 55:17 | 55:24 | | |
| 55:25 | 56:7 | | |
| 56:8 | 56:13 | | |
| 57:3 | 57:22 | | |
| 65:23 | 65:25 | | |
| 72:17 | 73:1 | | |
| 74:9 | 75:6 | | |
| 75:22 | 76:9 | | |
| 76:10 | 78:19 | 77:23 Misstates prior testimony, foundation; 78:12 foundation:<br><br>The question posed at 77:17-22 purports to restate Ms. Vigil's prior testimony but does not do so. | VRF's question clarifies Mrs. Vigil's testimony and gives her an opportunity to respond-it does not purport to restate prior testimony verbatim. To the extent that Mrs. Vigil felt the question did not accurately state the Secretary's position, she was invited to explain. |
| 79:11 | 80:5 | | |
| 82:11 | 82:12 | | |
| 83:1 | 83:2 | | |
| 84:9 | 84:12 | | |
| 84:13 | 85:11 | | |
| 88:17 | 89:24 | 89:18 Relevance:<br><br>Hypothetical and counterfactual questions are not relevant. VRF's burden is to produce evidence of actual disparate treatment, not hypothetical disparate treatment. | The testimony in this excerpt concerns hypothetical situations which shed light on the Secretary of State's positions regarding the sharing of voter data. These positions are highly relevant to VRF's First Amendment claims because they show the Secretary's reasons for denying VRF's requests for New Mexico voter data are pretextual. Additionally, the Secretary's answers to these questions are relevant to VRF's vagueness and overbreadth claims because they show the deficiencies of the Data Sharing Ban. |
| 93:17 | 94:1 | | |
| 97:19 | 98:11 | 98:4 Relevance:<br><br>The testimony in this excerpt concerns hypothetical situations which shed light on the Secretary |

| | | Hypothetical and counterfactual questions are not relevant.  VRF's burden is to produce evidence of actual disparate treatment, not hypothetical disparate treatment. | of State's positions regarding the sharing of voter data. These positions are highly relevant to VRF's First Amendment claims because they show the Secretary's reasons for denying VRF's requests for New Mexico voter data are pretextual. Additionally, the Secretary's answers to these questions are relevant to VRF's vagueness and overbreadth claims because they show the deficiencies of the Data Sharing Ban. |
|---|---|---|---|
| 99:22 | 101:16 | 100:1 Relevance; 100:12 Relevance; 101:3 Relevance:<br><br>There is no agreement that must be signed, there is a click-through.  VRF has not raised as a defense to violations of the election code that the click-through shields them from criminal liability, nor have Defendants insinuated as much. | This testimony concerns the contents of VRF's website and the agreement users must sign in order to view voter data on VRF's website. As such, it is highly relevant to Defendants' purported justifications for denying VRF's requests for New Mexico voter data. |
| 102:13 | 102:18 | | |
| 105:7 | 105:11 | | |
| 106:24 | 107:6 | | |
| 108:4 | 108:17 | | |
| 109:11 | 110:6 | | |
| 110:7 | 111:6 | | |
| 112:1 | 112:5 | | |
| 113:6 | 113:22 | | |
| 113:23 | 114:13 | 114:6 Calls for speculation; Relevance:<br><br>The question asks for a legal opinion regarding a hypothetical invented by counsel. | The referenced question asks for the Secretary of State's knowledge of the legality of other entities' use of voter data which is highly relevant to showing that the Secretary of State's reasons for denying VRF's requests for New Mexico voter data are pretextual. |
| 116:6 | 117:3 | | |

| | | | |
|---|---|---|---|
| 118:5 | 118:16 | | |
| 119:19 | 120:1 | | |
| 121:2 | 121:17 | | |
| 121:18 | 122:6 | 121:21 Calls for speculation; Relevance:<br><br>The question was "maybe one day somebody will check out one of the websites and understand what they do with their data." This calls for speculation about the both the identity of the investigator and the presumed result of the investigation. | This questioning concerns what is necessary for the Secretary of State's office to conduct an investigation into an entity for violating the election code. If the Secretary of State does not know and must "speculate," that is relevant to show that the Secretary of State's office is not treating all entities requesting voter data equally. |
| 122:18 | 122:22 | | |
| 123:12 | 124:16 | | |
| 124:24 | 125:13 | | |
| 126:9 | 127:4 | | |
| 128:19 | 129:6 | | |
| 129:7 | 129:17 | | |
| 129:24 | 130:4 | | |
| 130:12 | 130:19 | | |
| 134:8 | 134:23 | | |
| 134:24 | 135:9 | | |
| 135:10 | 135:14 | | |
| 135:15 | 136:2 | | |
| 136:8 | 138:17 | | |
| 140:19 | 140:22 | | |
| 140:23 | 141:13 | | |
| 143:9 | 143:24 | | |
| 144:1 | 144:24 | | |
| 145:23 | 146:4 | | |
| 146:5 | 149:2 | | |
| 151:4 | 151:12 | | |
| 151:13 | 152:20 | | |
| 152:21 | 152:24 | | |
| 154:22 | 155:8 | | |
| 157:14 | 157:21 | | |
| 158:4 | 158:11 | | |
| 163:12 | 164:22 | | |
| 168:24 | 170:1 | | |
| 170:2 | 170:11 | | |

| | | | |
|---|---|---|---|
| 172:23 | 174:7 | | |
| 174:8 | 174:20 | | |
| 174:21 | 175:17 | | |
| 178:21 | 179:20 | | |
| 179:21 | 180:16 | | |
| 180:17 | 181:15 | | |
| 182:17 | 184:3 | | |
| 184:21 | 186:18 | | |
| 187:11 | 187:15 | | |
| 187:21 | 188:23 | | |
| 188:24 | 189:6 | | |
| 190:1 | 190:5 | | |
| 190:6 | 191:13 | | |
| 194:25 | 195:25 | | |
| 197:8 | 197:20 | Improper form: commentary of counsel, not a question:<br><br>All objections other than to form and foundation are preserved.  If VRF wished to have all objections raised and resolved as they arose during testimony, VRF could have done so.  Having failed to do so, VRF is not permitted to enter as evidence extensive commentary of counsel. | Defendants failed to apprise VRF of the reason for their objection during the deposition, thereby depriving VRF of a chance to cure any perceived infirmities with that question. As such, this objection is waived.<br><br>Defendants' acknowledge that objections to form are not preserved.<br><br>Additionally,  there is no such federal "trial deposition" rule which Defendants seem to invoke. |
| 198:6 | 198:8 | | |

|  |  |
|---|---|
| **Mandy Vigil,**<br>February 27, 2023<br>**Defendants' Designations** | |
| Begin | End |
| 74:5 | 74:8 |
| 136:16 | 137:20 |
| 192:8 | 192:20 |



# PohlmanUSA®
## Court Reporting and Litigation Services

Mandy Vigil

February 27, 2023

Voter Reference Foundation, LLC

vs.

Raul Torrez, et al.

Page 2

```
 1            A P P E A R A N C E S
 2
 3     FOR THE PLAINTIFF:
 4       Mr. Edward D. Greim
         Mr. Jackson Tyler
 5       GRAVES GARRETT, LLC
         1100 Main Street, Suite 2700
 6       Kansas City, Missouri 64105
         816.256.3181
 7       edgreim@gravesgarrett.com
 8
 9     FOR THE DEFENDANTS:
         Ms. Erin Lecocq
10       Ms. Kelsey Schremmer
         Office of the New Mexico Attorney General
11       408 Galisteo Street
         Santa Fe, New Mexico 87501
12       505.490.4060
         elecocq@nmag.gov
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1     (Continued.)
 2
           I N D E X   O F   E X H I B I T S
 3
                                              Page
 4     Deposition Exhibit No.:
 5     9- November 17, 2022 e-mail string...   180
 6     10- House Bill 4.....................   202
 7     11- Agency Bill Analysis, 2022
           Regular Session..................   211
 8
 9     12- January 31, 2023 e-mail string
           with attachment..................   220
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1       I N D E X   O F   E X A M I N A T I O N
 2                                            Page
 3     DIRECT EXAMINATION.................   5
         Questions by Mr. Greim
 4
 5
 6
 7       I N D E X   O F   E X H I B I T S
                                            Page
 8     Deposition Exhibit No.:
 9     1- Amended Notice of Deposition......   6
10     2- Response of Defendant Secretary of
         State Maggie Toulouse Oliver, in
11       her Official Capacity, to Plaintiff
         Voter Reference Foundation's Third
12       Interrogatories and Requests for
         Production.......................   9
13
14     3- Morgan Lee article titled
         "New Mexico challenges effort to
15       post voter rolls online.".........  40
16     4- December 20, 2021 letter to Anne
         Kelly from Sharon Pino with
17       attachments......................  51
18     5- February 21, 2023 e-mail string...  85
19     6- Response of Defendant Secretary of
         State Maggie Toulouse Oliver, in
20       her Official Capacity, to
         Plaintiff Voter Reference
21       Foundation's Second Interrogatories,
         Requests for Production, and
22       Requests for Admission..........  125
23     7- March 11, 2022 e-mail string......  163
24     8- May 27, 2022 letter to
         Secretary Toulouse Oliver from
25       Edward Greim with attachments.....  168
```

Page 5

```
 1            MANDY VIGIL,
 2     having been first duly sworn to tell the truth,
 3     the whole truth, and nothing but the truth,
 4     testified as follows:
 5     DIRECT EXAMINATION,
 6     QUESTIONS BY MR. EDWARD D. GREIM:
 7     Q.  Good morning, Ms. Vigil.  Good to see you
 8         again.  Rather than going through all the
 9         background questions, which we've already done
10         with you before, I would just ask you, has --
11         has anything about your background changed
12         since we last spoke back in the summer of last
13         year?
14     A.  No.
15     Q.  Okay.  You have the same job title?
16     A.  I do.
17     Q.  You have the same duties?
18     A.  I do.
19     Q.  No additional classes or expertise since that
20         time?
21     A.  No.
22     Q.  Okay.  Now, I understand that, unlike your
23         prior testimony, you're here today to answer
24         questions on behalf of the secretary of state's
25         office, do you understand that?
```

                                        2  (Pages 2 to 5)

Page 10

1    record just real fast?
2         MR. GREIM:  Okay.  Sure.
3         (WHEREUPON, at this time a discussion was
4    held off the record.)
5    BY MR. GREIM:
6    Q.   So let me ask you, Ms. Vigil, have you studied
7         yet the responses to Interrogatories 10
8         through 17?  Have you seen these responses
9         before?
10   A.   No.
11   Q.   Okay.  So have you -- have you verified their
12        accuracy?
13   A.   No, I haven't.
14   Q.   Well, then, I think we're going to have to
15        wait.  You're going to need to read these and
16        see if you agree with them.  And if you do,
17        then, you know, we'll need a sworn response.
18        If you don't agree with them, I guess we'll
19        need revisions to whatever you want to change.
20   A.   Okay.
21   Q.   So you -- you can't tell us that these are
22        really the responses of your office, is that
23        correct?
24   A.   Not without reading them.
25   Q.   Okay.  I'm going to direct you to certain

Page 11

1    statements in here as we go and I'm going to
2    ask for your position on these.  Let me ask
3    you, during your prep for today, you did not
4    review these responses?
5    A.   I have not reviewed these yet, no.
6         MR. GREIM:  Okay.  We're back on record,
7    correct?
8         THE COURT REPORTER:  Yeah.
9    BY MR. GREIM:
10   Q.   Okay.  Well, I'll just ask you about certain
11        things in here and we'll see if you agree, and
12        if you don't, we'll just -- we'll just revisit
13        it.  But this will be the fastest way, I think,
14        to handle this.  And I know they look like
15        they're long, but most of these start with an
16        objection and then the answer starts lower
17        down.
18        And so I'm not going to take you through
19        the objection.  I'm going to focus on the
20        provision of actual information here.  But I'm
21        glad we did that here at the outset.  Let's put
22        these aside.  We'll come back to them in a
23        little bit when we get into specific topics.
24        Let me just ask you, what's the secretary
25        of state's role in collecting voter data?

Page 12

1    A.   So the secretary of state's office is
2         responsible for maintaining a statewide voter
3         registration database, and that includes all of
4         the voter data.
5    Q.   Where does the voter data come from?
6    A.   Comes from voter registration applications that
7         are submitted by an individual and processed by
8         a county clerk.
9    Q.   Okay.  Who has access to that database?
10   A.   All election administrators within the state of
11        New Mexico have access, so secretary of state's
12        office, there are certain individuals, and
13        county clerk offices.
14   Q.   Does anyone else have access to the database,
15        like a code to get in and view information or
16        alter data?
17   A.   No.
18   Q.   But I ask you that, it may seem like an odd
19        question, but in some states they give out
20        something that they call key codes or things
21        like that, they give out a certain number of
22        those.  And that's within the discretion of the
23        county clerk to then distribute those.  So
24        not -- not everybody who gets them is actually
25        a government official.  So my question is, do

Page 13

1    you know if that happens in New Mexico?
2    A.   No.
3    Q.   Did you --
4    A.   It does not happen in New Mexico.
5    Q.   It does not happen.  Okay.  Now, what about --
6         how does voting information get into the
7         database?  By that I mean whether someone casts
8         a vote in an election.
9    A.   So you're asking, to be clear, on kind of voter
10        credit, is that the question?
11   Q.   It may be.  Is a voter credit a record that
12        someone voted in a particular election?
13   A.   Yes.  So if a voter participates in an
14        election, we assign what's called voter credit
15        in New Mexico.  And that assignment is
16        completed by a county clerk's office.  And
17        there are system functions that support that.
18   Q.   What do you mean that there are system
19        functions that support that?
20   A.   So there's data that's exchanged between our
21        databases.  It's not always a manual process of
22        a human making that entry.
23   Q.   I see.  So let's just -- I don't want to go too
24        much further, but I just want to understand the
25        database.  So do you mean that, for example,

4  (Pages 10 to 13)

Page 18

1  A.  Certainly.
2  Q.  And that includes -- among all the other things
3      you just mentioned, it includes some voter data
4      from other states?
5  A.  Yes.
6  Q.  And New Mexico also shares its own data with
7      ERIC also, right?
8  A.  We do.
9  Q.  And that includes data that's in the database
10     that we've just been talking about, right?
11 A.  It does.
12 Q.  And I'm going to assume that ERIC does not fill
13     out an affidavit under the statutory process
14     that we're going to get to here in a minute, do
15     they?
16 A.  We have a membership agreement that we did
17     enter into with ERIC.
18 Q.  And there's a statute that actually allows for
19     that, right?
20 A.  Correct.
21 Q.  Okay.  When you receive these list maintenance
22     reports from ERIC, do you retain them?
23 A.  That -- that's actually a function of our IT
24     department, so -- I know we don't maintain them
25     long-term.

Page 19

1  Q.  Can the public request the list maintenance
2      reports?
3  A.  No.
4  Q.  They're closed records under New Mexico law?
5  A.  That is a good question.  I would have to
6      double check the exact language of the law.
7      But it's certainly a requirement of our
8      membership agreement.
9  Q.  Okay.
10 A.  There's MVD data that's included, and that is
11     protected under federal law as well as SSD --
12     security --
13 Q.  What is --
14 A.  We have MVD data and social security
15     information, so there are separate laws that
16     protect that data.
17 Q.  What's MVD data?
18 A.  Sorry, motor vehicle division.
19 Q.  From other states, right?
20 A.  Yes.
21 Q.  And yours, okay.
22         By the way, this is probably a
23     fundamental question, but we should just do it
24     now.  Tell us, your answers to questions here
25     suggest there's really just one database that

Page 20

1      has -- that all of this information feeds into,
2      is that correct?
3  A.  There is one statewide voter registration
4      database.
5  Q.  Okay.  And for any given voter, what does
6      the -- what fields does the database contain?
7  A.  There are many fields for a voter.  Certainly
8      demographic information, so name, date of
9      birth, social security number, in some cases
10     driver's license.  We also maintain information
11     such as a party affiliation and any activity on
12     their voter registration record.
13 Q.  Those would be voter credits?
14 A.  In part, but also any updates to the
15     information.
16 Q.  What do you mean updates?
17 A.  If somebody was married and updated their name,
18     potentially, so we did a registration update.
19 Q.  I see.  So the very fact that there was an
20     update is also tracked within the database?
21 A.  Correct.
22 Q.  That's viewed as activity?
23 A.  Correct.
24 Q.  And what if they move, is that also kept as
25     activity?

Page 21

1  A.  Updates to their record are logged.
2  Q.  Now, let me ask you, when someone makes a
3      request for the database, which elements of
4      that data is released -- are released?  So
5      we've talked about name, date of birth.  Tell
6      me what is released when someone requests a
7      voter file.
8  A.  So if a person goes through the appropriate
9      process to request a voter file --
10 Q.  Uh-huh.
11 A.  -- and we determine that it's for an
12     appropriate use, then voter data that's
13     provided would have requested information as
14     long as it wasn't protected.  So the requester
15     has an option to request history, voter
16     history, or not.  And they have choices in what
17     data they'd like to obtain.  So it is dependent
18     on the request.
19 Q.  Okay.  And -- but what they can never receive
20     is the full date of birth, correct?
21 A.  Anything that is protected, that's correct.
22 Q.  They can receive a year of birth?
23 A.  Yes.
24 Q.  They can't receive the full social security?
25 A.  No portion of the social security number.

6  (Pages 18 to 21)

Page 22

1  Q.  No portion.  They can receive the party
2     affiliation?
3  A.  Yes.
4  Q.  They can receive the credit information?
5  A.  They can.
6  Q.  And they can receive the history of updates,
7     correct or no?
8  A.  No.  That's just not included in a routine data
9     request.
10 Q.  Okay.  Well, are those closed to the public?
11 A.  I would actually -- I don't know that we've
12    ever received an exact request.  So that is
13    something that we'd have to take a look at.
14 Q.  Okay.  We don't need to probe much deeper.
15 A.  Yeah.
16 Q.  But I do want to put a bookmark on this in case
17    it becomes relevant later.  Nobody has -- no
18    one has ever come to you and said, "I would
19    like to just see the updates that you've made
20    to the records over the last two months"?
21    That's never come in?
22 A.  If you're asking me in particular about list
23    maintenance.
24 Q.  Uh-huh.
25 A.  Is that the question?

Page 23

1  Q.  No, I -- let's just stick with my question.
2     I'm not -- maybe we can come back to list
3     maintenance, let's just stick with my question.
4     Is it clear enough or is there something vague
5     about it?
6  A.  There's something vague about it, I'm sorry.
7  Q.  Okay.  What do I need to specify to help you
8     get --
9  A.  If you can repeat the question --
10 Q.  Okay.
11 A.  -- that will be helpful.
12 Q.  So let me just ask you:  Has anyone ever come
13    to the secretary of state's office, it's just
14    say in the last two years, and said, "I would
15    simply like to see the activity reports" --
16    MR. GREIM:  I'm sorry, are you able to
17    hear us okay?
18    THE COURT REPORTER:  Did you say activity
19    reports?
20    MR. GREIM:  Yes.
21    THE COURT REPORTER:  Okay.  We're good.
22    BY MR. GREIM:
23 Q.  Okay.  So has somebody come to you and said, "I
24    would like to see the activity reports for the
25    last three months for, you know, your entire

Page 24

1     database," has someone made that request of
2     you?
3  A.  That's something I'd certainly have to confirm.
4     As I mentioned earlier, it's not an option for
5     a voter data request.
6  Q.  Okay.
7  A.  It would not have come through as a data
8     request.
9  Q.  Okay.  At the very least, this is not ringing a
10    bell that this has happened any time recently,
11    correct?
12 A.  Not to my knowledge.
13 Q.  And then who is in charge of the system, of
14    maintaining the database and then responding to
15    requests?
16 A.  As far as a voter data request, you know, I'm
17    happy to repeat the process, but I think we've
18    discussed that an affidavit would have to come
19    in.
20 Q.  Oh, let me stop you.  I'm just asking who is in
21    charge.  What employee is responsible within
22    the secretary of state's office for list
23    maintenance and fulfilling requests?
24 A.  So number one, the secretary of state's office
25    does not have the authority to update voter

Page 25

1     registration records.  So, though, we support
2     the function of list maintenance, we do not
3     update voter records directly in our office, by
4     law.
5  Q.  Okay.  Well, let me ask you this:  For the
6     functions that the secretary of state's office
7     does control, is there a particular employee
8     who is in charge of that section of the
9     secretary of state's activity?
10 A.  As far as responding to a request, a general
11    request, you know, we have a team, the Bureau
12    of Elections, who is responsible for responding
13    to constituent inquiries or requests.
14 Q.  And you're the director of the Bureau of
15    Elections?
16 A.  Yes.
17 Q.  Is it fair to say you're the -- you're the
18    person responsible for the process for
19    fulfilling requests?
20 A.  For the process, yes.
21 Q.  And to the extent that you have a supporting
22    role regarding list maintenance, that also
23    falls under the Bureau of Elections and falls
24    under you, correct?
25 A.  It does.

7 (Pages 22 to 25)

Page 26

1  Q.  Now, let me go back to a few questions ago
2     before we -- we're going to move on in just a
3     second here.
4        I asked you about people requesting
5     updates and then you asked me about list
6     maintenance.  So I'm going to ask you:  Is it
7     possible to receive, from the secretary of
8     state, list maintenance reports?  Is it
9     poss-- let me rephrase that question.
10       Is it possible for a member of the public
11    to request, from the secretary of state's
12    office, list maintenance reports?
13 A.  We certainly have information in our database,
14    but as I mentioned, you know, at first like the
15    NVRA processing, list maintenance completed by
16    ERIC, those are county clerk functions.
17 Q.  So the secretary of state doesn't have the
18    data, you have to go to the country clerk to
19    get it?
20 A.  I guess it depends on exactly what data you're
21    asking me about.  So that would be helpful to
22    get some clarity.
23 Q.  Okay.  Well, what are examples of data where
24    you would be able to provide the answer to a
25    request for a list maintenance report?

Page 27

1  A.  I think we certainly have access to voter data,
2     as you are clear on.  And as far as, you know,
3     efforts completed at the county, we don't have
4     a report that I could just pull.  It's data
5     that we have access to, but, again, it's not
6     public facing report.
7  Q.  So the actual changes to the database in
8     response to an ERIC report happen at the county
9     level?
10 A.  Yes.
11 Q.  And are members of the public able to ask
12    county officials for records of the list
13    maintenance that they undertake based on ERIC
14    reports?
15 A.  ERIC data is protected, whether it's asked for
16    at the secretary of state's office or at the
17    county level.
18 Q.  And I'm not -- let's see if we can
19    differentiate between actual ERIC data and
20    the record that a change was made based on ERIC
21    data.  Do you understand the difference?
22 A.  Yes.
23 Q.  Okay.  So can a member of the public ask a
24    county official for a record of changes that
25    were made due to receiving ERIC data?

Page 28

1  A.  Let me think.  There is opportunities within
2     the statute to request list maintenance data.
3  Q.  Now, does -- if someone cites the statute and
4     says, "I want this maintenance data," and they
5     ask the secretary of state for it, does the
6     secretary of state have list maintenance data?
7  A.  What I can speak to -- you know, not this kind
8     of hypothetical that you're presenting to me,
9     but what I can certainly speak to is that our
10    office would receive any request; we would
11    review the statute; and we would make an
12    analysis on what data was public and provide
13    any data that was public.
14 Q.  Okay.  I understand that you -- you would
15    always do that.  But my question is very
16    specific.  So there is a statute that says that
17    list maintenance data can be requested, and the
18    NVRA covers this as well.  So my question is if
19    somebody comes to the secretary of state, makes
20    a proper request, there's an affidavit, they do
21    everything they're supposed to do, does the
22    secretary of state have list maintenance data
23    that it can produce in response to requests?
24 A.  Our office does have list maintenance data that
25    we would be able to produce if we received a

Page 29

1     legal request, an appropriate legal request.
2  Q.  Okay.  And the other facts you would need to
3     know on a given request is whether the things
4     that make it a legal request.  We'd have to --
5     we'd have to give you all those facts, about
6     who was requesting and what purpose they were
7     requesting it for and all those things, right?
8  A.  I think we're speaking again -- just for
9     clarity, are we speaking about a voter data
10    request submitted or a separate request under
11    NVRA or IPRA?
12 Q.  Well, I guess I would say this:  What if the
13    requester doesn't know whether it's an NVRA
14    request or it's -- it's under your voter data
15    request process and just says, "I would like a
16    voter, you know -- I would like voter list
17    maintenance data."  I mean, there's no magic
18    words required to cite the statute.  I mean,
19    they're citing the same.  And so, I mean, I
20    guess my question back to you is does it matter
21    whether they cite the NVRA or whether they cite
22    your state statute?
23 A.  I think that we would have to take any request,
24    review the content, review, you know, the
25    legal -- any statute that applies before we

8 (Pages 26 to 29)

Page 30

1    could appropriately respond.  That -- that
2    would be our process.
3    Q.  Okay.  We're going to spend a little more time
4        here before we move on.  I want to understand
5        this.  It sounds to me like in your penultimate
6        answer, you said, well, there are some requests
7        that come in for voter data under our state
8        law.  Then there are other requests that come
9        in under NVRA; you're viewing those as two
10       separate groups.  Do I understand you
11       correctly?
12   A.  I don't think they're always two separate
13       groups, but we do receive separate requests,
14       yes.
15   Q.  Okay.  Okay.  And you would agree that under
16       the NVRA, I mean, you have to provide voter
17       list maintenance data when someone makes a
18       request under the NVRA, correct?
19   A.  I agree.
20   Q.  And does someone making that request have to
21       follow the voter data request statutes under
22       New Mexico law and use the required affidavit
23       of the secretary of state's office?
24   A.  Yes.  Anytime a requester is asking us to
25       receive voter data, state law requires that

Page 31

1        they complete the affidavit.
2    Q.  And voter list maintenance data is voter data,
3        correct?
4    A.  Voter list maintenance is voter data, yes.
5    Q.  Okay.  Okay.  Would you agree with me that
6        personal voter data are things like name of the
7        voter or the birth year for the voter, data
8        that specifically ties to an individual voter,
9        if I use the term personal voter data?
10   A.  That term is not defined, to my knowledge.
11   Q.  Okay.
12       MS. SCHREMMER:  Are you asking her to
13       define a term for you, or are you telling her
14       the term you're about to use in your
15       questioning?
16       MR. GREIM:  No, I was asking her.
17   BY MR. GREIM:
18   Q.  So if I just said personal voter data, that
19       means nothing to you whatsoever?  It's
20       completely useless as a descriptor of types of
21       data in the voter database?
22   A.  Yeah.
23   Q.  Okay.  Okay.  I'm going to shift gears here for
24       a second.  One of our topics for today is just
25       the secretary's public statements about -- I

Page 32

1        think it -- let me just make sure I'm right
2        about this.  Yeah.  Statements that are made
3        either by the secretary or her agents regarding
4        VRF, request for or uses of voter data, or this
5        lawsuit.
6            And so let me ask you before we turn in
7        to this topic, what did you do to prepare for
8        yourself for that today?
9    A.  I did not do anything in particular to prepare
10       for the item.
11   Q.  Okay.  Well, let's just charge into it.  Would
12       you agree that any statement that gets issued
13       by the office is made with the approval of the
14       secretary of state?
15   A.  What I can speak to is that process within the
16       secretary of state's office is that we
17       certainly -- you know, as a leadership team we
18       meet, we speak about current events within the
19       office.  And we speak to any sort of messaging
20       that's appropriate for what's currently going
21       on.  So certainly there's an understanding of
22       the correct and appropriate message, but there
23       is not a particular approval of each statement
24       made.
25   Q.  Who's in this leadership team that meets to

Page 33

1        talk about statements?
2    A.  I mean, it's any director within the office of
3        the secretary of state's office.
4    Q.  So that's you?
5    A.  Me.
6    Q.  Alex Curtas?
7    A.  Alex is our communications director.
8    Q.  He would always be in those discussions,
9        correct?
10   A.  Any time there's messaging, Alex is
11       participating, yes.
12   Q.  Okay.  The secretary?
13   A.  Yes, as far as that group.
14   Q.  Sharon Pino?
15   A.  Yes.  Dylan Lange.
16   Q.  Who else?
17   A.  I don't know that anyone else is relevant to
18       this topic, but we also have our director of
19       our business services, and our deputy directors
20       participate in those weekly leadership calls.
21   Q.  Oh, I see.  Those are phone calls?
22   A.  Or meetings.
23   Q.  Let me ask you:  Who -- I assume that before a
24       statement goes out, there's a draft prepared
25       and people have a chance to look at it?

9  (Pages 30 to 33)

Page 34

1  A.  **That is true in some instances but not always.**
2  Q.  Okay.  Who usually prepares the draft of the
3     statement?
4  A.  **Alex.**
5  Q.  And then it gets -- do you communicate by
6     e-mail, or does he prepare a memo that gets
7     given around the office, you know, physically?
8     How does he communicate that to the team?
9  A.  **Yeah, it depends.  So it depends on what -- you**
10    **know, the timeline of what needs to get**
11    **accomplished.  It depends on availability.  So**
12    **it -- I'm happy to speak to a certain instance.**
13    **But generally Alex is the primary source for**
14    **any communication from our office.  There is a**
15    **team that participates in kind of ensuring that**
16    **our messaging is correct.  But Alex, at the end**
17    **of the day, executes those messages.**
18 Q.  Let's go back to the Exhibit 2, because we
19    tried to get the answer to this question by
20    interrogatory.  If you could go to page 10,
21    it's Interrogatory Number 16.  I sure wish she
22    would have stapled these.  I know, this was my
23    fault, I meant to say clip and then staple the
24    individual.  Okay.  So Number 16 says,
25    "Identify each person involved in drafting,

Page 35

1     revising, approving, and sending each public
2     statement or statement to a member of the media
3     relating to VRF or relating to the lawsuit that
4     was made by (i) the secretary, and (ii) Alex
5     Curtas."  That's the request.
6        Then the response, "Subject to and
7     without waiving objections, the secretary
8     states Alex Curtas, the communications
9     director, drafted public statements or
10    statements to a member of the media relating to
11    VRF or this lawsuit, which would have been
12    approved by Sharon Pino or the secretary.
13    Ultimately, the secretary makes the final
14    decision with respect to what information is
15    provided in a public statement."
16       Did I read that correctly?
17 A.  **Let me just read it again.**
18 Q.  Sure.  My question is going to be whether you
19    agree with that response.
20 A.  **To be clear, my answer to your question is that**
21    **we do have a process and we do participate as a**
22    **leadership team.  And I agree that the**
23    **secretary or the deputy secretary of state will**
24    **always be involved in messaging; meaning that**
25    **we are providing the appropriate public message**

Page 36

1     **and that we are all clear and on the same page**
2     **as to what that message is.  And so I agree**
3     **that they would have knowledge of, generally,**
4     **our message to the public.**
5  Q.  Okay.  Now, of course, this is a really
6     specific interrogatory.  I'm not just asking
7     about your process always.  We were trying to
8     find out about statements to the media relating
9     to VRF or the lawsuit that were made by the
10    secretary or by Alex Curtas.  We've got those,
11    okay.  So I want you to limit it to that.  All
12    right.
13       And so here is my question:  I mean, do
14    you agree with the statement that's typed up as
15    the response here, or would you change it?
16 A.  **I think it would be helpful is to understand,**
17    **you know, the exact message that we're speaking**
18    **about.  I agree that Alex would have drafted.**
19    **I agree that there would have been**
20    **conversations supporting the message and**
21    **clarity as to our position on this lawsuit and**
22    **our public messaging.  As far as each**
23    **individual, you know, statement, it would be**
24    **important to understand what statement I'm**
25    **answering to.**

Page 37

1  Q.  I see.  So you -- so the very last sentence is
2     the one that's most important to me and that
3     could save us some time if it were true.  It
4     says, "Ultimately, the secretary makes the
5     final decision with respect to what information
6     is provided in a public statement."  Is that
7     true?
8  A.  **And I think it's, to be clear, as far as the**
9     **statement, the message, the response, that is**
10    **true.  As far as the exact words in a media**
11    **release, it would be something that we'd have**
12    **to look at each individual request.  I agree**
13    **that she would certainly participate in the**
14    **decision about the public message and that Alex**
15    **would have drafted it.  Ultimately, yes, she**
16    **has an understanding and would approve our**
17    **public message.  I am not speaking to each**
18    **individual statement and each word in that**
19    **statement.**
20 Q.  Okay.  Well, what about with respect to what
21    information is provided in a public statement,
22    do you agree that the secretary makes the final
23    decision on what information is provided in a
24    public statement?
25 A.  **And when you say "information," can you**

Page 50

1   on.  I didn't hear, I missed a part of it.  And
2   the fact that voters would be intimidated and
3   cause them to what?  To want to --
4           THE WITNESS:  To de-register and not
5   participate in our process.  That is a fact
6   that our office was contacted by voters with
7   those exact concerns and requests.
8           MR. GREIM:  I move to strike that answer
9   as non-responsive.
10  BY MR. GREIM:
11  Q.  Okay.  Let's just move on to some other topics
12  here.  Well, let me ask you this:  I may --
13  A.  May I ask for a restroom break?
14          MR. GREIM:  Yeah, why don't we.  We've
15  been going for a little while.
16          Okay.  We're going to go off the record
17  for five to ten minutes and come back and keep
18  charging ahead.
19          (WHEREUPON, at this time a brief recess
20  was taken.)
21          MR. GREIM:  Before we begin -- resume
22  questioning of the witness, we just have a
23  stipulation to enter onto the record.  And why
24  don't you -- since you're the stipulator, why
25  don't you say it.

Page 51

1           MS. LECOCQ:  Sure.  The State is
2   stipulating -- well, I'll just let you do it.
3           MS. SCHREMMER:  In Exhibit 3, and it's
4   physical page 4, there is a quote attributed to
5   Toulouse Oliver that begins, "This is an
6   overtly political purpose."  And we're
7   stipulating that we do not have any reason to
8   believe this is a misquote.
9           MR. GREIM:  Okay.  Thank you very much.
10  BY MR. GREIM:
11  Q.  Okay.  We're going to shift gears now and we're
12  going to talk a little bit about the criminal
13  referral.  So what are we on now, 4?
14  A.  Yes.
15          (WHEREUPON, Deposition Exhibit 4 was
16  marked for identification.)
17  BY MR. GREIM:
18  Q.  I'm going to hand you what we're marking as
19  Exhibit 4.  And I'm going to ask you if you
20  recognize this document.
21  A.  I do.
22  Q.  What is it?
23  A.  This is the referral that our office made to
24  the attorney general's office related to Voter
25  Reference Foundation's posting of the data.

Page 52

1           THE COURT REPORTER:  Posting of what?
2   Q.  Okay.  And who --
3           THE WITNESS:  I'm sorry, posting online.
4   BY MR. GREIM:
5   Q.  Okay.  And this was signed by Sharon Pino,
6   correct?
7   A.  It is.
8   Q.  And you were present when I questioned Ms. Pino
9   some months ago about this referral, do you
10  recall that?
11  A.  I was present?
12  Q.  Well, actually, maybe you weren't, because it
13  was on my -- you may not have been around for
14  that.  Okay, we'll strike that.
15          Now, we have asked the secretary of state
16  who participated in the decision to make this
17  referral.  Okay, so keep your finger on
18  Exhibit 4, but go back please to Exhibit 2, the
19  interrogatory responses.  And turn to page 8,
20  please.  We're going to go between pages 8 and
21  9.
22  A.  Okay.
23  Q.  And we asked the secretary to identify each
24  person who participated in the decision to make
25  a criminal referral of VRF, and the person, if

Page 53

1   any, who made the final decision.  And then we
2   asked certain things about each one of those.
3   So that's the question.  And then if you turn
4   to page 9, you'll see there's an objection that
5   it's privilege, and then there's a little
6   paragraph at the end that says "Without
7   waiving, and subject to those objections, the
8   secretary states that Sharon Pino, deputy
9   secretary of state, made the decision to make
10  the criminal referral, which was reviewed and
11  approved by the secretary."
12          Now, is that a true statement?
13  A.  Yes.
14  Q.  Okay.  My question is:  Who else was involved
15  in the decision?
16          MS. LECOCQ:  Objection to the extent that
17  any of this involved discussion with counsel,
18  with Mr. Lange.
19  BY MR. GREIM:
20  Q.  Well, my -- okay, left's start with Mr. Lange.
21  Let's get this out of the way.  Was Mr. Lange
22  involved in the decision?
23          MS. LECOCQ:  Objection.  You can go ahead
24  and answer.
25  A.  Okay.  Yes.

14  (Pages 50 to 53)

Page 54

```
 1      BY MR. GREIM:
 2   Q.  Let's put him to one side.  Who else was
 3      involved in the decision?
 4   A.  Myself.
 5   Q.  Who else?
 6   A.  And the Deputy Secretary of State Sharon Pino.
 7   Q.  Okay.  And who else?
 8   A.  And the secretary certainly had received a
 9      recommendation and did approve.
10   Q.  Okay.  Who else?  Alex Curtas?
11   A.  Not in the decision, no.
12   Q.  Okay.  So how was the decision made?  I'm not
13      going to ask you for substance.  I just want to
14      know was there an e-mail exchange or one or
15      more e-mail exchanges or text exchanges, or did
16      it happen in a meeting?
17   A.  It happened in a meeting.
18   Q.  Okay.  And when was that meeting?
19   A.  I don't have the exact date.  It was certainly
20      prior to December 20th of 2021.  And it was
21      upon us being made aware that this data, that's
22      when we initiated conversation, once we were
23      aware.
24   Q.  Okay.  Did you receive a complaint?
25   A.  We did not receive a formal complaint.  We did
```

Page 55

```
 1      receive an inquiry from the media.
 2   Q.  From ProPublica, correct?
 3   A.  From ProPublica.
 4   Q.  ProPublica did not make a complaint against
 5      VRF, did it?
 6   A.  No.
 7   Q.  Okay.  Let's turn to Exhibit 4.  I just want to
 8      ask very generally here -- let's go to the
 9      conclusion.  By the way, I assume you reviewed
10      this document in preparation for your testimony
11      today?
12   A.  I have not recently reviewed this document.
13   Q.  Okay.  And it sounds like you did not speak
14      with Ms. Pino in preparation for your testimony
15      today?
16   A.  I did not.
17   Q.  Well, let's look at the very first line of the
18      conclusion.  "Our office believes the transfer
19      and publication of this voter data is in direct
20      violation of the Election Code."
21         Did I read that correctly?
22   A.  You did.
23   Q.  Is that a true statement?
24   A.  Yes.
25   Q.  And then the next sentence, "We believe that
```

Page 56

```
 1      both VoteRef.com and Local Labs have violated
 2      the prohibition against 'providing' voter data
 3      by posting New Mexican's private voting
 4      information online, or in Local Labs' case,
 5      providing the voter data to VoteRef.com."
 6         Is that a true statement?
 7   A.  Yes.
 8   Q.  And then it says, "We also believe that
 9      VoteRef.com and Local Labs have 'illegally'
10      used this voter data by publishing it on
11      VoteRef.com."
12         Is that a true statement?
13   A.  Yes.
14   Q.  All right.  Did you recall there being any
15      false statement in Ms. Pino's referral to the
16      secret- -- to the attorney general?
17   A.  No.
18   Q.  Before the referral occurred, and set aside
19      Mr. Lange, were there any dissenting voices
20      between Ms. Pino, yourself, and the secretary
21      of state on whether this referral should be
22      sent out?
23   A.  No.
24   Q.  Were there any drafts prepared of this
25      referral?
```

Page 57

```
 1   A.  Yes.
 2   Q.  Okay.  Who prepared the drafts?
 3   A.  I believe our general counsel did.
 4   Q.  Okay.  And is he the one who actually drafted
 5      this letter and Ms. Pino signed it?
 6         MS. LECOCQ:  Objection.
 7   A.  I believe our general counsel prepared this and
 8      it was reviewed and the final version was
 9      signed by Ms. Pino.
10      BY MR. GREIM:
11   Q.  Okay.  Who -- did certain people suggest edits
12      to this?
13   A.  Anyone that was part of the decision making, so
14      myself, Ms. Pino, general counsel, would have
15      reviewed and suggested any edits.
16   Q.  What edits, if any, did you suggest?
17   A.  I don't recall suggesting any edits.
18   Q.  What edits did Ms. Pino suggest?
19   A.  I don't recall if there were any specific
20      edits --
21   Q.  And what -- okay.
22   A.  -- throughout the process.
23   Q.  Okay.  Well, it went through several drafts,
24      correct?
25   A.  I don't know if there were several drafts.  I
```

15  (Pages 54 to 57)

Page 62

1    receipt.
2    Q.  Okay.  So did the attorney general ever provide
3        any updates on, you know, what he was or wasn't
4        doing with the referral?
5            MS. LECOCQ:  Objection.
6    A.  **No, I do not have any status update on any sort**
7        **of action taken on the criminal referral.**
8        BY MR. GREIM:
9    Q.  Okay.  Now, I'm not just asking about you; I'm
10       asking about the office.  Did the attorney
11       general give any status reports to Ms. Pino or
12       to the secretary or even Mr. Lange about what
13       was going on with the investigation?
14           MS. LECOCQ:  Objection, and especially
15       with respect to Mr. Lange.
16   A.  **So I am not aware that the office has**
17       **received -- there is no status updates from the**
18       **attorney general's office on this criminal**
19       **matter at this time.**
20       BY MR. GREIM:
21   Q.  Okay.  At this time, my question is whether
22       there has ever been written or oral updates
23       provided by the AG's office to the secretary of
24       state's office regarding this referral?
25           MS. LECOCQ:  Objection.

Page 63

1    A.  **At this point in time, the office is not aware**
2        **of any action taken by the AG's office on this**
3        **matter and no status updates received on this**
4        **criminal matter at this time.**
5        BY MR. GREIM:
6    Q.  Okay.  I'm not going to ask you any more about
7        it at this time.  My question is now, at any
8        time, this referral was made in December of
9        2021, right, so about 14 months ago.
10   A.  **Okay.**
11   Q.  So your testimony is that the attorney general
12       never orally or in writing ever communicated
13       again with the secretary of state about this
14       referral?
15   A.  **No.**
16   Q.  And did you -- did you do any investigation to
17       see whether that was true before today?
18   A.  **Whether what was true?**
19   Q.  Whether it's true that the attorney general has
20       never mentioned this investigation again to the
21       secretary of state's office after this
22       December 20th referral?
23           MS. LECOCQ:  Objection.
24   A.  **What I can speak to is that there has been no**
25       **status updates provided to the secretary of**

Page 64

1    **state's office on any action being taken on**
2    **this criminal referral by the attorney**
3    **general's office.**
4        BY MR. GREIM:
5    Q.  Okay.  And how do you know that to be true?
6    A.  **Because I would have been made aware.**
7    Q.  Did you ask Ms. Pino before today whether she
8        had received any -- any commun-- let's just
9        aside the term status update for second.  Okay.
10       Let's just say any communication at all from
11       the attorney general's office.  Let me rephrase
12       this to make it clear for the record.
13           Has there been any communication at all
14       from the attorney general's office to the
15       secretary of state's office about this
16       investigation since December 20, 2021?
17           MS. LECOCQ:  Objection.
18   A.  **So the only thing that I can speak to is that I**
19       **have asked Ms. Pino and Dylan Lange if the**
20       **attorney general's office has taken any action**
21       **on this matter and the response has been no.**
22       BY MR. GREIM:
23   Q.  Okay.  And when did you last ask Ms. Pino that
24       question?
25   A.  **It's been several months.**

Page 65

1    Q.  When did you last ask Mr. Lange that question?
2            MS. LECOCQ:  Objection.  Actually don't
3        answer that.
4            MR. GREIM:  Well, it's not a request for
5        legal advice.  It's just a request about
6        whether there has been communication or not.
7            MS. LECOCQ:  Okay.
8    A.  **Yes.  More recently, I would say probably**
9        **within the last month.**
10       BY MR. GREIM:
11   Q.  But since the new year?
12   A.  **Yes.**
13   Q.  And I don't want you to give me any legal
14       advice that Mr. Lange told you, but I need to
15       know, did Mr. Lange tell you whether he had
16       heard anything from the attorney general about
17       the investigation?
18           MS. LECOCQ:  Go ahead.
19   A.  **Mr. Lange has -- to my knowledge, has not heard**
20       **anything from the attorney general's office**
21       **about this investigation.**
22       BY MR. GREIM:
23   Q.  Okay.  Does the secretary of state's office
24       know if the investigation is continuing?
25   A.  **Our understanding is that it's still pending.**

17 (Pages 62 to 65)

Page 70

```
1    BY MR. GREIM:
2    Q.   But you didn't ask him whether he was providing
3         any other information to the AG's office?
4    A.   I didn't.
5    Q.   Before we move along, you said in the past
6         month.  Maybe we can drill down a little bit
7         more.  Was it in the month of February?
8    A.   Do you have a calendar?  I think it was
9         certainly in the month of January or February.
10   Q.   Was it in the last two weeks?
11   A.   No.
12   Q.   It could have been in early February, but it
13        also may have been in January?
14   A.   I'm just trying to remember an exact date.  I
15        feel confident in saying that it was the past
16        three weeks.
17   Q.   Okay.  So let me ask you this:  What
18        information has the secretary of state
19        gathered -- and I guess we can't know whether
20        it's been passed on to the attorney general or
21        not.  That would be information Mr. Lange has.
22        So I understand that.  But what information has
23        the office gathered it has at least considered
24        passing on to the attorney general's office?
25   A.   Our office has not gathered anything specific
```

Page 71

```
1         to a criminal investigation.  Anything that we
2         have -- you know, our concern was data posted
3         on the website, that was the focus.  And so
4         there would only be updates provided to our
5         attorneys on this case related to the status of
6         that data.
7    Q.   Okay.  Whether it was up or down?
8    A.   Correct.
9    Q.   And separately, I'm going to draw the line so
10        that we don't invade privilege here, at least
11        until I think about this some more, it sounds
12        like there was some other information of some
13        type given to Mr. Lange for him to decide
14        whether he wanted to give it out to the AG's
15        office?
16             MS. LECOCQ:  Objection.
17   A.   No, I never said that.
18             BY MR. GREIM:
19   Q.   No?  Okay.  Then I misunderstood.  I understood
20        that Mr. Lange would have been the person to
21        give it on if there were something to give on?
22   A.   Sure.
23   Q.   Right?  We don't know whether he has done so or
24        not, correct?
25   A.   Correct.
```

Page 72

```
1    Q.   And so I guess my question is:  Was there any
2         information that you -- that the office has
3         given to Mr. Lange so that he can make the
4         decision about whether to pass it on or not?
5    A.   The only thing that I am responding to is the
6         fact that our concern was about the data being
7         posted or taken down from the Internet.  And so
8         that would be the only update that would have
9         been provided to our attorneys in this case.
10   Q.   Okay.
11   A.   And if Dylan so chose, that he felt like that
12        was relevant to the criminal referral, he may
13        have provided an update.  There is no
14        additional investigation that our office is
15        undergoing; that is for the attorney general's
16        office.
17   Q.   Okay, very good.  Now, there has been a
18        reference to contact with voters -- or not with
19        voters, with members of the general public who
20        have contacted the secretary of state's office
21        about their concerns with VRF.  You mentioned
22        that already.  And I just want to be clear.  I
23        mean, can we be certain that everything has
24        been turned over in discovery at this point,
25        everything that the office has received?
```

Page 73

```
1    A.   Yes.
2    Q.   Okay.  That saves us a bunch of time.
3             I now want to talk a little bit more
4         about the secretary of state's position here.
5             THE COURT REPORTER:  I'm sorry, say that
6         again.  I didn't hear your full question.
7             BY MR. GREIM:
8    Q.   Sure.  I now want to talk more now about the
9         secretary of state's position.
10            THE COURT REPORTER:  Oh, thank you.
11            MR. GREIM:  Sorry.  I know I'm
12        shuffling -- there are some papers really close
13        to the microphone.  I'm going to try to do
14        better.
15            THE COURT REPORTER:  That's okay.
16   A.   Mr. Greim, just on your last question you asked
17        me in particular about the list or the
18        information from voters, and you asked if we
19        had turned that all over, correct, that was the
20        question?
21            BY MR. GREIM:
22   Q.   Well, my question is:  Is there any other
23        information that you've received about
24        complaints?  And we've received the list.  I
25        just want to know if there's a list update that
```

19  (Pages 70 to 73)

Page 74

1  we haven't gotten yet.
2  **A.  Okay, that's correct.  We haven't -- you've**
3  **received any -- the information you've received**
4  **is current.**
5  Q.  Okay.  Let me ask you -- let's go to
6  Interrogatory Number 13.  And we're on back to
7  Exhibit 2, it's on page 7.
8  **A.  Okay.**
9  Q.  And the question is, "State whether you contend
10 that VRF's use of New Mexico data failed to
11 qualify as either a governmental or
12 election-related or campaign use under New
13 Mexico law, and if so, explain how and why
14 VRF's use did not qualify for each applicable
15 category."
16    Do you see that?
17 **A.  Uh-huh.**
18 Q.  And there's an objection.  And then there's
19 response subject to the objection.  And I'm
20 going to start reading from that line, it says,
21 "The secretary does contend that VRF's public
22 posting of New Mexico data on the Internet
23 failed to qualify as a permissible use under
24 New Mexico law because it was not for a
25 governmental, election, or campaign purpose

Page 75

1  within the plain meaning of applicable laws."
2    Did I read that correctly?
3  **A.  You did.**
4  Q.  Okay.  And is that a correct statement?
5  **A.  Yes.  The office believes that VRF's public**
6  **posting of the data is not a permissible use.**
7  Q.  Now, you might recall we went -- we explored
8  this topic in some detail at the preliminary
9  injunction hearing.  So I want to understand a
10 little bit more about why the public posting is
11 not a permissible use.  Okay, so let me start
12 with governmental.  That's one of three uses,
13 right?
14 **A.  Right.**
15 Q.  So why is the public -- why is VRF's public
16 posting of New Mexico data not a permissible
17 governmental use?
18 **A.  Again, I feel like this is something that would**
19 **have been analyzed and discussed with our**
20 **attorneys in particular on how to apply the law**
21 **appropriately.**
22 Q.  I'm not asking for communications with counsel.
23 I'd like to know the secretary of state's
24 position.  Why did it fail to qualify as a
25 governmental use?

Page 76

1  **A.  I think because it's not a government entity**
2  **utilizing the data.  They're not using it for a**
3  **governmental purpose.**
4  Q.  Okay.  So the secretary's position is that
5  because VRF is not a governmental entity, its
6  use is not a governmental use?
7  **A.  I don't think that's the only thing I said.  I**
8  **said they're also not using it for a**
9  **governmental purpose.**
10 Q.  Okay.  And so let's talk about for a second
11 what they're using it for so that we're on the
12 same page.  You understand that -- and we went
13 through this before so we're going to have to
14 kind of warm up and refresh our memory.  Do you
15 recall VRF saying it was going to analyze the
16 data and determine if there were discrepancies
17 between basically the credits that show on
18 the -- on the snapshot of the list that it got
19 and then compare that against the ballots cast
20 in the 2020 election and then try to explain
21 why there was a difference between those two?
22 Do you remember VRF's assertion and testimony
23 about that basic idea?
24 **A.  I recall that basic idea that there was an**
25 **intention to utilize voter data received from**

Page 77

1  **our office at a point in time.**
2  Q.  Uh-huh.
3  **A.  And also analyze that based on information on**
4  **ballots cast, correct.**
5  Q.  And let's just stick with that for a second.  I
6  will tell you -- well, let me just -- I'll just
7  ask the question.  Is it the secretary's
8  position that that's not a governmental use,
9  analyzing the data for that purpose?
10 **A.  I think that would certainly be something that**
11 **would be reviewed by our attorney.**
12 Q.  Maybe.  But my question is the secretary's
13 position.
14 **A.  I think that the public posting of the data on**
15 **the website is what I can speak to as not being**
16 **something that was prepared under state law.**
17 Q.  Okay.  So in other words, the secretary is not
18 taking a position that this first project I
19 just talked about is not a governmental use.
20 When you say it's not a governmental use,
21 you're really talking about the public posting
22 of the data, correct?
23    MS. LECOCQ:  Objection.
24 **A.  I think that your specific question is not**
25 **something that we specifically analyzed at this**

20  (Pages 74 to 77)

Page 78

1    point in time.  So I think the public posting
2    is the piece that I can speak to related to
3    that question.
4         BY MR. GREIM:
5    Q.  Okay.  Well, let's just -- let's keep it to
6    that.  Let's just keep it to that.  So is it
7    the secretary's position that publicly posting
8    the data and asking voters to review it and
9    report any inconsistencies or perceived errors
10   to the secretary of state is not a governmental
11   use?
12        MS. LECOCQ:  Objection.
13   A.  Again, it's the public posting piece that has
14   been analyzed, not some of these other
15   hypotheticals scenarios that you're describing.
16   That is different.
17        BY MR. GREIM:
18   Q.  Okay.
19   A.  And it would need some review.
20   Q.  Well, let's -- let's maybe make it as simple as
21   we can.  It sounds to me like the secretary's
22   position -- and just tell me if I -- if you
23   disagree.  It sounds to me like the secretary's
24   position is that as soon as you have publicly
25   posted the data on the Internet, that cannot be

Page 79

1    a governmental use regardless of what you tell
2    the public about why you're doing it.
3         MS. LECOCQ:  Objection.
4         BY MR. GREIM:
5    Q.  Is that true?
6    A.  I disagree.  So I think what I can speak to are
7    the facts of what Voter Reference Foundation
8    did in this circumstance, that's what's been
9    evaluated and reviewed, and that's the public
10   posting that I can speak about.
11   Q.  Okay.  So, you know what, that is the easiest
12   way to do it.  So before the criminal referral
13   was made, I take it the secretary of state's
14   office got on and looked at the VRF website,
15   right?
16   A.  Yes.
17   Q.  Okay.  And based on what it found on the VRF
18   website, it decided this is not a governmental
19   use, correct?
20   A.  It's not a permissible use.
21   Q.  Okay.  And we're on governmental right now.  So
22   they decided -- we'll get to the other ones.
23   They decided this is not a governmental use,
24   correct?
25   A.  The analysis was really just based on a

Page 80

1    permissible use.  I do not have a recollection
2    of a specific analysis related to each item.
3    Q.  Okay.
4    A.  It was determined that holistically it was not
5    permissible under state law.
6    Q.  Okay.  But let's just -- let's talk about --
7    the permissible uses are defined under state
8    law, right?
9    A.  Uh-huh.
10   Q.  And what are they?
11   A.  I have them here, and I don't have the statute
12   in front of me, but this came from our
13   attorneys, so I'm going to trust that it --
14   governmental election or campaign purpose.
15   Q.  Right.  I don't want to -- I'm not going to
16   make this an exhibit, but I just don't want to
17   have any lack of clarity here.  I thought I had
18   it.  Here we go.  I'm just going to give you a
19   copy -- I'm going to give you the copy of the
20   statute here.  We're not going to mark it, but
21   I'm giving you 1-4-5.5.  Here we go.  The list
22   of uses is under C, correct?
23   A.  Yes.
24   Q.  Okay.  And so 1-4-5.5 C lists the permissible
25   uses under the statute, right?

Page 81

1    A.  Yes.
2    Q.  Okay.  And then those are further defined down
3    in subsection E?
4    A.  Correct.
5    Q.  And maybe we can't go much further than this,
6    but I do want to tie this together.  I mean,
7    the secretary of state's position is that VRF's
8    posting on its website, the actual posting it
9    did, after it reviewed the website, was not a
10   governmental use, correct?
11   A.  Again, the secretary of state's office, in
12   reviewing the statute, not only this section,
13   made a decision that the public posting of the
14   voter data was not a permissible use of that
15   data.
16   Q.  Okay.  And when you say "not a permissible
17   use," you mean not a governmental use or
18   election use or election campaign purposes use,
19   correct?
20   A.  In part.  And it also ties back to the fact
21   that it was not appropriately received from our
22   office and it was being publicly distributed,
23   and we feel like that was a violation.
24   Q.  And I'm not asking about all the different --
25   I'm just trying to focus, okay, I'm trying to

21  (Pages 78 to 81)

Page 82

1     focus on the lack of permissible use.  We just
2     found where the permissible uses are.  And, I
3     mean, I just hope we're clear.  I -- that the
4     secretary's position is that VRF's use by
5     posting on the Internet is not any of those
6     uses, correct?
7     A.  You asked me about our decision.  You asked me
8     about, you know, what -- why did the secretary
9     of state make this decision and what is our
10    position.  And that's what I'm responding to.
11    So it is our position that the public posting
12    of the data is not permissible under state law.
13    Q.  Well, but hold on now, okay?  We saw the actual
14    statement.  The actual statement says it's not
15    a permissible use, okay?  And so we know that
16    there are either two or three permissible uses,
17    depending on how you read that section, right?
18    Governmental is one of them, right?
19    A.  Uh-huh.
20    Q.  And if it's not governmental, what's the other
21    use have to be?
22    A.  Election campaign purpose.
23    Q.  Okay.  And so if it's a permissible use, it's
24    got to be one or the other, right?
25    A.  And I think there's also parameters around how

Page 83

1     that can be utilized.  And public posting
2     online is not one of them.
3     Q.  Okay.  But let's just -- let's just stick with
4     the analysis.  If it's a permissible use, it's
5     got to be one or the other, governmental or
6     election campaign purposes, right?
7     A.  Correct.
8     Q.  And VRF's posting on the Internet that you
9     observed, your -- the secretary's opinion is
10    it's not governmental and it's not election
11    campaign purposes, correct?
12    A.  I feel like it was a broader analysis based on
13    the public posting and that it was not posted
14    appropriately and that it was being publicly
15    distributed.  So, you know, you continue to ask
16    that question.  I understand.  And my answer is
17    what I've shared, that our analysis was broader
18    than those two elements.
19    Q.  Well, I'm going to ask -- and this is getting
20    interesting.  Okay.  I'm going to have to probe
21    a little further now.
22       So is the secretary's position that if it
23    were -- if it -- VRF had obtained them directly
24    from the secretary of state's office, that
25    their posting on the Internet would be for

Page 84

1     governmental or election campaign focuses?
2        MS. LECOCQ:  Objection.
3     A.  What I can answer is that that -- number one,
4     that's not what occurred.
5     BY MR. GREIM:
6     Q.  I understand.  I'm trying to understand the
7     conduct that you contend is sufficient to
8     violate this statute.
9     A.  The requester that follows the appropriate
10    process, the lawful process, that would
11    publicly post that data on the Internet, that
12    would be a violation under state law.
13    Q.  We'll just leave it.  That's fine.  By the way,
14    before -- I don't want to move too far.
15    Interrogatory Number 13, let's come back to it.
16    The top of the page, this is actually page 8,
17    the paragraph that continues and ends on the
18    very top of the page.  The very last sentence
19    there says "Investigation by the attorney
20    general is ongoing and has not yet resulted in
21    any criminal action against VRF."
22       Did I read that correctly?
23    A.  You did.
24    Q.  Is that true?
25    A.  Yes.  I don't feel like that's any different

Page 85

1     than what I shared before and that we have no
2     knowledge that the case has been closed.  We
3     also don't have any knowledge that there's been
4     any action, again, by the attorney general
5     office on that investigation.
6     Q.  You're not backing away from the statement we
7     just read, are you?
8     A.  I'm not.
9     Q.  Okay.
10    A.  I'm simply saying it's aligned with what I said
11    before.
12    Q.  Let me ask you a little bit more about the
13    posting issue on the Internet.  Okay, we're not
14    going to focus so much now on governmental
15    election or election campaign.
16       I want to show you a response that we
17    received from your attorneys clarifying some of
18    your prior interrogatory responses.  I think
19    this is Exhibit --
20    A.  5.
21    Q.  -- 5.
22       (WHEREUPON, Deposition Exhibit 5 was
23    marked for identification.)
24    BY MR. GREIM:
25    Q.  I'm going to show you an e-mail dated just last

22  (Pages 82 to 85)

Page 86

1  Tuesday, February 21, from Erin Lacocq to me
2  copying some other attorneys.  And there are
3  some questions that I've posed about some of
4  the other answers.  And let me -- let me go to
5  the very bottom of the page.  Let's see here.
6  Okay.  Actually, let's go to the very first --
7  you see there's some bolding in the very middle
8  of the page?  And I'm asking a question of
9  counsel.  You'll see there's an answer in bold.
10  It says, "Both the AG and the SOS believe that
11  'sharing data' outside one's organization, or
12  publishing that data to make it available for
13  the general public, constitutes a violation of
14  New Mexico law.  This is not just the act of
15  sharing data, but rather disseminating that
16  information to the general public."
17        Did I read that correctly?
18  **A.  You read that bold section correctly.**
19  Q.  Okay.  And so I guess my simple question is:
20  Is this the position of the secretary of
21  state's office?
22  **A.  Can I have a moment just to --**
23  Q.  You can.  I will tell you, we've printed off
24  the entire e-mail chain.  It also has lots of
25  discussion about other things, unfortunately.

Page 87

1  So the only -- the e-mail that we actually care
2  about is just on pages 1 and 2.  And it's got
3  other questions that don't really relate to
4  what we're doing here today.
5        MS. LECOCQ:  I object to the extent that
6  we're getting into legal contentions rather
7  than the position of the office.  But other
8  than that, go ahead.
9  **A.  (Witness reviewing document.)  Okay.**
10  BY MR. GREIM:
11  Q.  My very first question is:  Is what's in bold,
12  the very first bolded answer on this page, the
13  position of the secretary of state's office?
14  **A.  Yes.**
15  Q.  Okay.  And I now -- I want to explore the idea
16  of sharing the data with the general public
17  online.  I mean, we talked -- I asked you
18  questions before in another proceeding where I
19  asked about sharing data outside of an
20  organization.  Do you remember that?
21  **A.  Yes.**
22  Q.  We talked at some length.  I'm going to put
23  that aside.  We're going to focus on the
24  Internet, okay?  And so my question is:  What
25  is it about having data available on the

Page 88

1  Internet to the general public that makes the
2  conduct unlawful in the view of the secretary
3  of state?
4        MS. LECOCQ:  I'm going to go ahead and
5  just do a standing objection for legal
6  contentions.
7        MR. GREIM:  Noted.
8  **A.  I remember our past conversation as well, and**
9  **I, again, today would share that the position**
10  **of the office is that sharing within an**
11  **organization is different than sharing outside**
12  **of that organization, and so that applies to**
13  **the Internet.  You are obviously sharing**
14  **outside of the organization if it's publicly**
15  **posted online.**
16  BY MR. GREIM:
17  Q.  Okay.  And I want to understand -- well, let me
18  ask you this:  What if an entity contracts with
19  individuals to review voter data it has
20  requested, in the secretary of state's view, is
21  that sharing the data outside of your
22  organization?
23  **A.  I'm just going to make sure I understand your**
24  **question.**
25  Q.  Sure.

Page 89

1  **A.  So you're describing a scenario in which there**
2  **is an entity that has lawfully obtained the**
3  **voter data.**
4  Q.  Correct.
5  **A.  And they have agents within their organization**
6  **that they are sharing the data with, that --**
7  **that are contained in that organization."**
8  Q.  No.  They've lawfully obtained the data, then
9  they go and they hire very smart data analysts
10  and they execute contracts with these data
11  analysts, independent contractor agreements,
12  and they say, "Here's the data.  I want you to
13  see if there are flaws here.  And we'll pay you
14  $100 an hour for your work."
15        In the view of the secretary of state, is
16  that sharing the data outside of the
17  organization?
18        MS. LECOCQ:  Objection.
19  **A.  Yeah, that -- that is certainly a set of facts**
20  **that have not been explored currently by our**
21  **office in particular.  What I can speak to,**
22  **again, is if it's considered a part of the**
23  **organization within that same entity, you know,**
24  **that's unlawful sharing of the data.**
25  BY MR. GREIM:

23  (Pages 86 to 89)

Page 90

1   Q.  Okay.
2   A.  And I can't speak to all the contractual --
3   Q.  Okay.
4   A.  -- scenarios that you've provided.
5   Q.  So the secretary, as we sit here today, does
6       not have a position on whether sharing the data
7       with contractors would violate the statute?
8           MS. LECOCQ:  Objection.
9   A.  I think that we have a position that if it's
10      within the same organization, it can be shared.
11      BY MR. GREIM:
12   Q.  I understand.
13   A.  Outside of the organization, it should not be
14      shared without lawfully obtaining the data.
15   Q.  Okay.  And what we're exploring is sharing
16      outside of the organization.  I'm trying to
17      understand when we cross that line, you know,
18      where is the line?  That's what all these
19      questions are going to try to do.  You know
20      that's what I'm doing.  I'm going to do my
21      best.  And your answer may well be:  We do not
22      have a position on where that line exists.  We
23      have not explored that question.  We do not
24      know the answer to it.  That's okay.  I just --
25      I want to learn what I can.

Page 91

1           And so I understand your answer is when
2       you share it outside of the organization,
3       that's where the line is crossed.  But we're
4       all lawyers here, okay?  And there's lots of
5       people who want to use the data.  And so I'm
6       trying to understand what the principle is
7       behind that.  I'm asking you specific questions
8       to try to understand that principle, if we can.
9       I'm not going to spend too much longer given
10      the time we have.
11          So the question I just asked was about
12      people who don't become employees of the
13      organization, they just get hired under a
14      contract to do a job with the data.  And I
15      think the answer that I have back is the
16      secretary of state doesn't have a response to
17      that question, doesn't have a position on that?
18   A.  I don't think that's what I said.  So number
19      one, you made a good distinction.  You're all
20      attorneys, I'm not.  So that's why we would
21      seek the guidance and advice of an attorney for
22      a separate set of facts.  I think what you've
23      described is very fact based.  And those facts
24      have not been explored by our office at this
25      point in time.

Page 92

1   Q.  Okay.  I understand they haven't.  I understand
2       that you would eventually come to some
3       decision, you know, but -- and so what I'm
4       trying to understand is right now does the
5       secretary of state's office have a position
6       about contractors?  That's my question.  And
7       either you do or you do not.
8   A.  I think that that is dependent on what the
9       relationship is to the organization that has
10      received the data, and that's what I cannot
11      speak to.
12   Q.  So if the relationship is just contractual, you
13      cannot tell us whether that counts as inside
14      the organization or outside the organization?
15   A.  I am not prepared to answer what constitutes,
16      you know, a contractual agreement, what means
17      you're a part of the organization or not.  I
18      think that's very dependent on the facts of the
19      specific scenario.
20   Q.  Why is it important that the person who
21      receives the data from the lawful requester is
22      a part of the organization?
23   A.  Because I think that is a clear distinction
24      that we're able to make based on our analysis
25      of the statute.

Page 93

1   Q.  Okay.  Based -- obviously the statute doesn't
2       say part of the organization.  That doesn't
3       exist in the statute.  You agree with me on
4       that?
5   A.  I agree that we've reviewed and provided some
6       legal review and analysis on the facts that we
7       feel like our position -- we maintain the
8       position that if you're within the
9       organization, that is permissible sharing.  And
10      if you're outside of the organization, that's
11      not permissible under state law.
12   Q.  And what is it about being part of the
13      organization or within the organization --
14      those are the words you just used -- that make
15      it permissible to share the data with those
16      individuals?
17   A.  We feel like based on analysis -- you know,
18      again, we would probably have to go back to an
19      attorney to understand some of those
20      intricacies.  But that is a fact that has been
21      presented to our office and we've reviewed it
22      and made a determination that based on state
23      law we would not feel like it was a violation
24      if folks were sharing the data within that
25      organization because they have appropriately

Page 94

1  obtained that data.
2  Q.  Okay.  So implicit within your referral, I
3      think, is the secretary of state -- well, let
4      me back up.
5          The secretary of state understands
6      that -- because they -- you've visited VRF's
7      website, correct?
8  A.  Uh-huh.
9  Q.  And on the website for New Mexico before the
10     data was pulled down, you must click that you
11     will only use the data for specific purposes,
12     correct?  Do you recall that?
13 A.  I recall that being something that was
14     testified to.  I didn't -- yeah, I recall
15     that -- somebody sharing that.
16 Q.  And so VRF is taking the position here that
17     someone who agrees to use the data for
18     permissible purposes, for the purposes that VRF
19     wants to use the data for, is part of VRF.  It
20     forms an association with us to use this data
21     for a certain purpose.  Does the secretary of
22     state agree with that position?
23     MS. LECOCQ:  Objection.
24 A.  Again, I think you're going back to kind of
25     something that would require some additional

Page 95

1      legal analysis, right, what is the relationship
2      between that individual and Voter Reference
3      Foundation.
4          What I will say is that, again, we feel
5      like the statute is very clear in that a
6      requester needs to complete an affidavit with
7      our office to be able to utilize, to receive
8      that data, and to use it for a permissible
9      purpose.
10         And so in that case, Voter Reference
11     Foundation, from our perspective, does not have
12     the authority to prescribe that affidavit.
13     BY MR. GREIM:
14 Q.  Voter Reference Foundation doesn't have the
15     authority to prescribe the affidavit?
16 A.  Yes.
17 Q.  What do you mean by that?
18 A.  The statute, our state statute requires that a
19     requester complete an affidavit.  I know we
20     spoke about that pretty in depth.  So there is
21     an appropriate lawful process to receive voter
22     data.
23 Q.  Right.
24 A.  And one piece of that process is for a
25     requester to complete an affidavit, submit it

Page 96

1      to our office, pay for data, and then receive
2      the data.
3  Q.  And so my question is simply this:  If Voter
4      Reference Foundation makes a request with the
5      affidavit, pays for the data and receives it,
6      and then posts the data online for anyone who
7      agrees to use it for lawful purposes, okay,
8      which we know is true, we know the second thing
9      is true, why does the secretary of state's
10     office not recognize the viewers of VRF's data
11     as being within the organization of VRF?
12     MS. LECOCQ:  Objection.
13 A.  And, again, I think that's different than what
14     I responded to.  So, one, I was clear that I am
15     not an attorney.  I can't speak to what that,
16     you know, relationship is from a legal
17     perspective.  I would need to take those facts
18     in particular and address it with our general
19     counsel or our attorney to get clarity on how
20     to apply the law in that specific scenario.
21         What I can state, however, is that there
22     is a specific process to lawfully obtain, and
23     that requires the affidavit.
24     BY MR. GREIM:
25 Q.  Okay.  I'm not asking you anymore about

Page 97

1      lawfully obtaining it, okay?  We'll come back
2      to that question.
3          I'm asking you now about an organization
4      that lawfully has the data.  They want to share
5      that data with other people and they know the
6      issue is going to be:  Is the secretary of
7      state going to think these people are within
8      the organization or are they not within the
9      organization, okay?
10         So my question to you is:  Why does the
11     secretary of state contend that people who
12     agree, before they're given access to the data
13     that they will only use it for lawful purposes,
14     are not within the organization of VRF?
15     MS. LECOCQ:  Objection.
16 A.  I don't understand your last statement.  Are
17     you asking me a question?
18     BY MR. GREIM:
19 Q.  Okay.  I was.  I was.  My question is -- I'm
20     trying to think of a way to break this down.
21         Let's look at it this way:  If an entity,
22     with lawfully requested data, it sells that
23     data to its customers, but requires -- and it
24     makes it available to them on the Internet, but
25     it requires them to do that through a secure

25  (Pages 94 to 97)

Page 98

1    connection, does the secretary of state say
2    that's okay, those customers are really within
3    the organization?
4         MS. LECOCQ:  Objection.
5    A.  Again, you know, what I can speak to is either
6    in the organization or out of the organization.
7    That is the determination.  That is the
8    position of the office.  Your specific
9    hypothetical scenarios would require a specific
10   analysis on those facts that I am not able to
11   speak to.
12   BY MR. GREIM:
13   Q.  Because the data -- the statute doesn't speak
14   to those situations, does it?
15   A.  It speaks to within the organization or out of
16   the organization.  That is clear from our
17   analysis based on the requirement that this
18   came to the office and we had to review those
19   specific facts.  And so we've taken a position.
20   We are still, you know, of that same position
21   today; if it's in the organization, you can
22   share it.  If it's not, no.  And that has not
23   changed.  But, you know, you're kind of coming
24   off with something that's outside of that
25   analysis --

Page 99

1    Q.  Okay.
2    A.  -- that would require some review.
3    Q.  Well, let's just make it this simple.  The
4    secretary of state contends that VRF's sharing
5    with people who click on the link before
6    getting the data is not sharing within the
7    organization, correct?
8         MS. LECOCQ:  Objection.
9    A.  I don't -- I don't have an awareness of us
10   taking that specific position that clicking on
11   a link is what determines if you're in or
12   outside of the organization.
13   BY MR. GREIM:
14   Q.  Well, I'd like to know what it is about VRF's
15   conduct that caused the referral, okay?  And
16   certainly the secretary of state's office
17   visited the website.  We know that, okay?  And
18   the secretary of state's office encountered the
19   initial requirement that a user click that they
20   will agree to the terms of the use, including
21   that it be used for a lawful purpose.
22        The secretary of state -- well, let me
23   ask you this:  Can the secretary of state tell
24   us that they encountered that when they came on
25   to the website?

Page 100

1         MS. LECOCQ:  Objection.
2    A.  I don't recall being a specific item that
3    was discussed.  I can speak that I heard
4    testimony that that existed on the website.  I
5    don't recall that being part of the analysis.
6    BY MR. GREIM:
7    Q.  Okay.  Well, does the secretary of state
8    contend that, in fact, users who get on the
9    website to view the data don't have to click
10   first to agree that they'll only use the data
11   for permissible purposes?
12        MS. LECOCQ:  Objection.
13   A.  I don't know what Voter Ref asks them when you
14   go into their website.
15   BY MR. GREIM:
16   Q.  Okay.  And did the secretary of state ever
17   investigate that before making a criminal
18   referral?
19   A.  I think we certainly viewed the website and we
20   had an understanding that our voter data was
21   being publicly made available and it was being
22   made publicly available by an entity that did
23   not request that data from our office.  And
24   that was the basis of the analysis.
25   Q.  Okay.  So did the secretary of state make any

Page 101

1    effort to determine what users had to do before
2    they could view the data on VRF's website?
3         MS. LECOCQ:  Objection.
4    A.  Again, I don't recall that being part of the
5    analysis.
6    BY MR. GREIM:
7    Q.  Who knows the answer to that question?
8    A.  I'm sure our attorney.  But I just don't think
9    that was a key point.  It was a fact that the
10   data was publicly available; it was a fact that
11   Voter Reference Foundation has not submitted
12   the appropriate affidavit to receive that data;
13   and it is a fact that our analysis about how
14   you may distribute that is leading to the
15   containment in the organization.  So the World
16   Wide Web is not an organization.
17   Q.  So the secretary -- it didn't matter to the
18   secretary of state what someone had to agree to
19   before viewing the data on the website?
20        MS. LECOCQ:  Objection.
21   A.  I wouldn't say it didn't matter.  But I've
22   shared what our analysis was based on.  You
23   know, again, going back to your original
24   question, if I click a box, does that
25   constitute being a part of Voter Reference

26  (Pages 98 to 101)

Page 102

1  **Foundation as an organization?  That is not**
2  **something that I am prepared to answer and**
3  **would require some analysis from an attorney.**
4  **If you're asserting that it somehow brings them**
5  **into your organization, I guess that's your**
6  **argument to make, but...**
7  **BY MR. GREIM:**
8  Q.  The secretary of state didn't -- well, let me
9  ask you this -- you said what your analysis
10  was, okay.  I'm trying to understand that a
11  little bit better.
12  **A.  Sure.**
13  Q.  So did the analysis at all depend on the
14  relationship that was formed between VRF and
15  the users of its website?
16  **A.  No.**
17  Q.  It was irrelevant?
18  **A.  It was not considered as part of the analysis.**
19  Q.  And it's possible -- because we can't ask you
20  again because this is our last day, I think we
21  have to leave it at this -- it's possible that
22  the secretary of state did not determine before
23  making the referral whether users, in fact, had
24  to click through and promise that they would
25  only use the data for permissible purposes?

Page 103

1  MS. LECOCQ:  Objection.
2  **A.  Again, I think I've been clear on the position**
3  **of the office that posting voter data online is**
4  **a public distribution of that data, and that**
5  **that is the position of the office.**
6  **BY MR. GREIM:**
7  Q.  That wasn't my question.  Okay.  My question is
8  what the secretary's office did before making
9  the referral.  I'm not asking you to repeat
10  your position.  We have that down.
11  My question is:  Is it possible that no
12  one from the secretary of state's office looked
13  to see what members of the public had to do in
14  order to get access to the information on VRF's
15  website?
16  MS. LECOCQ:  Objection.
17  **A.  And I, again, shared that it was not part of**
18  **the analysis.**
19  **BY MR. GREIM:**
20  Q.  I know it's not part of the analysis.  I'm
21  trying to now probe your knowledge.  I'm trying
22  to probe the knowledge of the office when it
23  made the referral; not its analysis, its
24  knowledge.  And I'm trying to determine whether
25  the secretary of state determined what members

Page 104

1  of the public had to do before accessing the
2  data.  That's what these questions are about.
3  I'm going to ask it very -- just listen
4  very carefully.  I'm going to speak slowly.  I
5  know we're covering a lot of ground.  Let's
6  just try to nail this down.
7  My question is:  Did the secretary of
8  state's office determine, before making the
9  referral, what members of the public had to do
10  in order to get access to the data on VRF's
11  website?
12  **A.  And, again -- I will also speak slowly -- that,**
13  **in fact, our office did not utilize the fact**
14  **that there was a check box as a part of a**
15  **discussion for making a determination if it was**
16  **lawful or unlawful.  And so, therefore, I**
17  **cannot speak if our attorney clicked the box.**
18  **What I know is that the office made a**
19  **determination based on the fact that voter data**
20  **was being publicly made available on the**
21  **Internet.**
22  Q.  My question is not what your determination was.
23  My question is:  What did the secretary of
24  state's office know about how the website
25  worked?  I'm not asking whether it mattered to

Page 105

1  you or not.  I'm asking whether you knew.  And
2  so whether an attorney wrote it or an
3  investigator in your office, either you knew or
4  you did not know, or you don't know whether he
5  knew.  Okay, so I'm going to ask it one last
6  time.
7  Did the secretary of state's office know
8  what was required for members of the public to
9  do before they accessed the data on VRF's
10  website?
11  **A.  I don't know.**
12  Q.  Who would know the answer to that question?
13  **A.  I suspect our attorney.**
14  Q.  Do you know who investigated it?  Was it an
15  attorney?
16  **A.  I think we talked about who was involved in**
17  **making a decision about referring it.  So that**
18  **was myself, Deputy Secretary of State Sharon**
19  **Pino, general counsel Dylan Lange.  And based**
20  **on all of the information we had in hand, we**
21  **made a decision to refer that.**
22  Q.  Okay.  And there was no one else involved in
23  making that decision?
24  **A.  And as I shared, we made a recommendation and**
25  **the secretary of state did approve that**

Page 106

```
 1   referral.
 2        MR. GREIM:  Let's take another little
 3   break here.
 4        (WHEREUPON, at this time a lunch break
 5   was taken.)
 6   BY MR. GREIM:
 7   Q.  Back on the record.  So I wanted to -- before
 8   we totally move past what we did at the end
 9   of -- before our break, I want to ask you about
10   some other recipients of the voter data here.
11        Now, each political party requests the
12   voter data, don't they, on a regular basis?
13   A.  Yes.
14   Q.  And do you recall testifying before that, you
15   know, political parties sharing the data with
16   volunteers would not be deemed sharing outside
17   the organization?
18   A.  Agreed.
19   Q.  Okay.  And the secretary of state does not go
20   and ask the political parties to submit a --
21   some sort of agreement from each volunteer for
22   a party or document that in any way, correct?
23   A.  No, if it's within that organization.
24   Q.  And so how -- what is it that makes the
25   volunteers part of the organization of a
```

Page 107

```
 1   political party?
 2   A.  I don't think there's any particular legal
 3   definition that I can point you to, but they
 4   are participating as a member of that
 5   organization.  My understanding is they are
 6   staff of the organization.
 7   Q.  And what about a political party, you know,
 8   sharing the data with their political
 9   consultants that they pay for, would that be
10   okay with the secretary of state's office?
11   That does not count as sharing outside the
12   organization?
13   A.  I think we're back to, you know, in the
14   organization, out of the organization, is there
15   specific facts that need to be reviewed, then
16   that would be something we would have to look
17   at on an individual basis.  But if it is part
18   of their organization, that they can share.
19   Q.  Well, and as I understand that -- I mean, I
20   think -- I'm going to do a few more of these
21   questions, and if you do not have an answer
22   that require consulting with counsel --
23   A.  Uh-huh.
24   Q.  -- then I'd advise you to give me an answer if
25   you can, but -- but just tell me that that
```

Page 108

```
 1   would require counsel.  Well, yeah, I'm not
 2   going to suggest an answer to you.  Let's just
 3   move ahead.
 4        So let me -- let me ask you, I mean,
 5   political parties and candidates both use
 6   volunteers, you know that.  And you know that
 7   candidates in this state and elsewhere hire
 8   political consultants to help run their
 9   campaigns, right?
10   A.  Right.
11   Q.  And I guess your testimony is that the
12   secretary of state does not have a position, as
13   we sit here today, as to whether the candidates
14   sharing voter data with their paid consultants
15   would constitute sharing within the
16   organization?
17   A.  We have not evaluated that particular fact.
18   Q.  Now, what if I tell you -- I know I'm not from
19   New Mexico, but if I tell you right here and
20   now that I believe that political parties are
21   sharing voter data that they receive -- that
22   they lawfully receive with paid political
23   consultants who are not part of the political
24   party and not part of the candidate campaign,
25   and I say I'm making a complaint and I believe
```

Page 109

```
 1   they're doing it, I mean, what's stopping you
 2   from investigating?
 3   A.  Getting a complaint about an alleged violation,
 4   there is nothing that would stop us from
 5   looking into it.
 6   Q.  Okay.  Now, let's talk about other requesters,
 7   other recipients of data.  The group called the
 8   Public Interest Law Foundation requests data
 9   from the secretary of state's office, right?
10   A.  Right.
11   Q.  And would your position be that they cannot
12   share the voter data with their own volunteers,
13   or would it be that, just like political
14   parties, their volunteers are okay to receive
15   the data?
16   A.  I think that we would handle it in the same
17   way.  So if they're a part of the organization,
18   then they would be allowed to share the data.
19   Q.  And you would not go to PILF, I'll call it, and
20   say we need to see documentation proving that
21   these volunteers are part of your organization?
22   A.  As a practice, no.  If we're made aware that
23   something is happening outside the bounds of
24   the law, then we may ask additional questions.
25   But if they are affirming through the affidavit
```

Page 110

1  that they are using it lawfully, meaning they
2  are not unlawfully sharing or distributing or
3  selling, that is the document that we utilize
4  to assess that they're going to follow the law.
5  If we're made aware, then we would take a
6  different step forward.
7  Q.  Can VRF share data that it lawfully receives
8  from the secretary of state'S office with its
9  own volunteers without violating the same
10  organization issue?
11  A.  If they're a part of the organization, anything
12  that is a lawful part of an entity, that
13  determination is not mine to make in this
14  instant.  But if it's sharing it within its own
15  organization, that is the parameter.  That is
16  the position of our office that that's the
17  parameter that we would ask an entity to
18  follow.  And we believe it's outlined in the
19  affidavit.
20  Q.  And volunteers count, just like they count for
21  parties, correct?
22  A.  Again, I think -- you know, you are I think
23  stretching my answer a little bit there.  I
24  think my direct answer to you has been and will
25  continue to be that the position of the office

Page 111

1  is that you have to be within the organization.
2  And I continue to say that each scenario --
3  facts that need to be evaluated, I think you
4  said it best, would need to go to our counsel
5  for an analysis to determine if it's lawfully a
6  part of organization or not.
7  Q.  Okay.  So for VRF, the request would need to go
8  to counsel, correct?
9  A.  Under any circumstance, any relationship.
10  Q.  So does -- the party's use of volunteer, that
11  has gone to counsel?
12  A.  I think that you asked me if I had testified to
13  that fact, and my understanding is that they
14  are -- what I said was my understanding was
15  that they are employed with that organization.
16  Q.  Well, obviously, volunteers for political
17  parties are not employees of the parties.
18  A.  They are staff is my understanding, is what I
19  testified to and what I answered here today.
20  Q.  Okay.  Well, the -- let's just say this:  You
21  don't -- you're not backing away from what your
22  testimony was before, correct?  We can just go
23  back and look to see what you say.  You're not
24  changing anything today?
25  A.  I'm not changing anything today.

Page 112

1  Q.  Okay.  And I just want to be clear because you
2  just used the word "employees."  I take it your
3  position is not that being within an
4  organization is limited to employees, correct?
5  A.  I have not stated that.
6  Q.  Okay.  Because volunteers are not paid, right?
7  A.  Again, I think that, you know, you're asking me
8  to analyze scenarios that have yet to come to
9  our office.
10       What I can speak to is if you're a part
11  of the organization.  And you continue to ask
12  me to, you know, make some legal analysis on
13  hypothetical scenarios that I am not able to do
14  in this moment.  So I think it's the same
15  question.
16  Q.  Okay.  But it's fair to say that the secretary
17  of state's office, and you're here as the
18  30(b)(6) witness, they have not actually
19  undertaken a formal analysis on the questions
20  I've asked you so far, you're not aware of any
21  such analysis?
22  A.  Correct.
23  Q.  Well, let me ask you -- today VRF has voter
24  data from the secretary of state's office.  It
25  has it.  Can VRF share that voter data with its

Page 113

1  volunteers without violating the -- within the
2  organization's restriction?
3  A.  I don't have a different answer for you,
4  Mr. Greim.  If it's within your organization,
5  you may share it.
6  Q.  Right.  My question is:  Are volunteers within
7  the organization?
8  A.  Are they a part of the staff?  I guess that
9  goes back to the analysis that you're tying it
10  to.  So that is -- that was my testimony and
11  that still is if they're a part of the
12  organization.
13  Q.  It's okay if they're unpaid?
14  A.  I think the fact is are they a part of the
15  organization or not.  That is really what the
16  requirement is.
17  Q.  So do they -- do they need to have an agreement
18  with the organization of any kind?
19  A.  We have not outlined all of those logistical
20  details.  Right?  Every scenario would require
21  some analysis to determine if it's within the
22  bounds of the statute or not.
23  Q.  Okay.  Well, I'm going to go just a bit further
24  before we move on.  So canvassers who walk door
25  to door for candidates and political parties

29  (Pages 110 to 113)

Page 114

1   get a list of voter data that comes from the
2   secretary of state.  And let's just stipulate
3   those door-to-door walkers are not employees,
4   they're not being paid, they're college
5   students.  Is that unlawful activity?
6       MS. LECOCQ:  Objection.
7   A.  I think -- I guess the question would remain
8   are they a part of the organization that
9   originally received the data.  Again, the same
10  question.
11  Q.  So the secretary of state can't answer that
12  question?
13  A.  Not without additional review, agreed.
14  Q.  Now, remember I asked you about a couple of
15  for-profit groups such as Catalist and
16  Aristotle and i360, I think a couple of times
17  before in your prior testimony, right?
18  A.  Uh-huh.
19  Q.  And these are groups the district court made
20  factual findings about.  Did you read the
21  district court's decision in this case?
22  A.  I did not.
23  Q.  Okay.  Well, do you recall that I raised the
24  question of these groups requesting data from
25  the secretary of state and then charging

Page 115

1   clients to make the data available for them for
2   their own purposes?  And I asked you whether
3   that counts as sharing outside the organization
4   of these for-profit companies like Catalist or
5   Aristotle.  Do you recall that questioning?
6   A.  I recall similar questioning.  I guess just to
7   be clear, who are they sharing with?  I
8   didn't --
9   Q.  Customers.
10  A.  What does that mean?
11  Q.  It could be a candidate, it could be a
12  non-profit that wants to engage in advocacy.
13  And rather than requesting the data directly
14  from you, they go and they buy access to
15  databases from groups like Catalist and
16  Aristotle.
17      And when I mentioned this to you before,
18  I think you said you'd never heard of these
19  groups before, correct?
20  A.  Uh-huh.
21  Q.  Now, you know there is a record the secretary
22  of state has of the groups requesting data.  I
23  take it you don't review that list every month
24  or something, right?
25  A.  I don't.

Page 116

1   Q.  Okay.  And I think you said you never had a
2   complaint about those groups, which is why
3   you'd never looked into it before.  Do you
4   recall that?
5   A.  Yes.
6   Q.  Okay.  Now, I asked you specifically in your
7   testimony before the Court whether your office
8   would, in fact, go and look into these groups
9   to determine whether they were violating the
10  law.  Do you remember that?
11  A.  If I received a complaint, is that what you
12  stated?
13  Q.  No, I didn't ask whether you received a
14  complaint.  I just said based on the
15  information we had during the proceeding at
16  that time, whether your office would go and
17  look into those entities.  Do you recall that?
18  A.  I recall a different statement.
19  Q.  Okay.  What do you recall?
20  A.  What I recall was you being -- asking for
21  clarity and if we had an awareness that these
22  groups were violating the law, if we would look
23  into it.
24  Q.  I see.  I see.  Okay.  Well, let me ask you:
25  Have you done anything since your testimony to

Page 117

1   look into whether these groups were violating
2   the law?
3   A.  No.
4   Q.  And let me ask you this:  If a for-profit group
5   is receiving data from New Mexico and other
6   states and other sources of information and
7   then charging clients a fee for access to that
8   data, would that comply with your
9   within-the-organization requirement?  Is that
10  sharing permissible?
11  A.  They're sharing it outside of the organization?
12  Q.  Yes, with their clients.
13  A.  So outside of their organization is a part of
14  this?  That is the background?
15  Q.  Yeah, I'm asking whether that counts as outside
16  of the organization.
17  A.  Oh, you're asking me to make a determination?
18  Q.  Yeah.
19  A.  Again, you know, I'm not clear on who are these
20  entities.  I don't know their relationship.  If
21  it's within their organization, they're good.
22  If it's not, they can't share it.
23  Q.  What would it take for you to look deeper into
24  this question to decide whether the law is
25  being violated?

30  (Pages 114 to 117)

Page 118

```
 1   A.  I think it would take just somebody making our
 2       office aware of the practice, the allegation,
 3       and the details of any violation, that's how we
 4       handle all complaints.
 5   Q.  So if ProPublica contacted you about this, that
 6       might be sufficient?
 7       MS. LECOCQ:  Objection.
 8   A.  If we're made aware of a potential violation,
 9       our office has the authority to look into it.
10       BY MR. GREIM:
11   Q.  And as of today, there's been no effort
12       whatsoever to look into what Catalist or
13       Aristotle are doing?
14   A.  We have not -- again, the fact remains that we
15       have not received any complaints nor allegation
16       that they have violated the law.
17   Q.  Do you have a written policy that you won't
18       investigate without a complaint?
19   A.  No.
20   Q.  Okay.  That's just a rule of thumb that the
21       office uses?
22   A.  I think our office has limited resources, and
23       so we have to develop policies and procedures
24       that provide our office an opportunity to both
25       manage our workload and treat constituents
```

Page 119

```
 1       equally.  So we do have a policy and procedure
 2       related to voter complaints.  We receive
 3       several on various matters.  And in particular,
 4       I think it's important to notice that the
 5       distinguishing factor for Voter Reference
 6       Foundation was it was online; that was the
 7       alarming issue.
 8   Q.  Okay.  So -- well, maybe let's ask about this
 9       then.  Is the office's position that sharing
10       outside the organization is okay so long as
11       it's not online?
12   A.  No.
13   Q.  Okay.
14   A.  But to your point on -- you know, what in this
15       case -- it wasn't a complaint that we received,
16       right?  We were made aware.  We took an action
17       outside of that complaint process that there
18       was an immediate concern for public safety.
19   Q.  What if a federal district court made you aware
20       of possible criminal activity, would that be
21       sufficient or would you need to receive it from
22       someone else?
23   A.  I don't think there's any one single source,
24       right.  It's simply a matter of being aware and
25       managing the appropriate resources and the
```

Page 120

```
 1       appropriate priorities.
 2   Q.  Okay.  I'm just going to read to you from the
 3       district court's decision in this case,
 4       document 51, pages 158 to 159.
 5       "The Court found the secretary of state's
 6       interpretation of the election code
 7       criminalizes requesters, such as Catalist,
 8       i360, Data Targeting, and L2 Inc., who applied
 9       for voter data and then sell it to clients
10       outside their own organization."  That's at
11       pages 158 and 159.  Now, having --
12   A.  Sorry.  What did it say, the Court determined
13       that?
14   Q.  Yes.  Yeah.  This is from a court decision in
15       this case.  So my question is:  Was the
16       secretary of state aware of that statement and
17       the district court's decision?
18   A.  Two questions ago I responded that I had not
19       read that decision.
20   Q.  Okay.  You haven't.  But I take it that the
21       secretary of state -- the secretary of state
22       issued a press release about that decision,
23       right?  So is it your testimony that the
24       secretary of state was unaware of that
25       statement and the Court's decision?
```

Page 121

```
 1   A.  Our office is currently aware of that decision.
 2   Q.  Okay.  And so was why was that statement not
 3       sufficient, a finding from a federal district
 4       court, to at least look into whether Catalist
 5       and the other entities were violating the law?
 6       MS. LECOCQ:  Objection.
 7       MS. SCHREMMER:  Objection.
 8   A.  I don't think it's insufficient.  I think, you
 9       know, our office has limited resources.
10       There's nothing saying we won't look into it.
11       The question I've responded to as of right now,
12       we have not.  That doesn't mean we won't.
13       BY MR. GREIM:
14   Q.  Well, what additional information would it take
15       for you to look into these questions?
16   A.  I don't think there is anything additional in
17       particular.
18   Q.  So maybe one day somebody will check out one of
19       the websites and understand what they do with
20       their data?
21       MS. LECOCQ:  Objection.
22   A.  I have not heard anything that you have
23       presented here today that tells me that they
24       are publishing it online.
25       BY MR. GREIM:
```

31 (Pages 118 to 121)

Page 122

1   Q.   I see.  So is that the threshold for
2       determining -- for starting an investigation?
3   A.   It's not, but what I've spoken to is it was a
4       deciding factor in the prioritization out of
5       concern for our voters and voter rights and for
6       their participation in the process.
7   Q.   Of course, the secretary of state also didn't
8       make any effort to determine how the general
9       public was actually accessing the data on the
10      website, did it?
11          MS. LECOCQ:  Objection.
12  A.   I'm sorry?
13  BY MR. GREIM:
14  Q.   We'll just strike that and move on.
15          I want to now change gears a little bit.
16      And we'll talk about the -- this allegation of
17      disinformation.
18          Is it the secretary's position that the
19      sharing of out-of-date voter data could
20      constitute disinformation?
21  A.   I think there's a potential, yes.
22  Q.   Okay.  And explain that to us.
23  A.   Sure.  So the voter registration database, the
24      voter's file, or the roll as we call it, it's a
25      dynamic file.  It's ever changing.  There are

Page 123

1       constant updates being made.  And so it's a
2       point in time anytime somebody receives that
3       data.
4           And if we're doing comparisons, I think
5       anytime you're analyzing data, it's important
6       to be comparing the same type of data, right?
7       We can't take something from years ago and look
8       at it for a specific election.
9           So I think the concern is that outdated
10      data does present the potential for
11      misinformation.
12  Q.   Okay.  Now, in this case, VRF posted data
13      online after winning a preliminary injunction
14      from the district court.  Do you recall that?
15  A.   Uh-huh.
16  Q.   And the data that it posted at that time was
17      the only data that it was able to receive
18      through your office, right?
19  A.   Right.
20  Q.   Now, by that time, that was not the most recent
21      information that it had -- that was -- I'm
22      sorry.  That was not the most recent version of
23      the voter file, was it?
24  A.   No.
25  Q.   Does the secretary contend that VRF was

Page 124

1       engaging in disinformation when it reposted
2       that data?
3   A.   I think it was not the data alone.
4   Q.   Okay.  What else was it?
5   A.   I feel like there is information explaining the
6       data that was not accurate.
7   Q.   Okay.  So when VRF reposted its data online, it
8       was not just the data but was the accompanying
9       explanation that made it disinformation?
10  A.   It was the comparison.  As I said, I spoke to
11      you're comparing -- they were comparing
12      outdated data to election results that were --
13      it wasn't a correct accurate comparison.  There
14      wasn't an understanding for the viewer as to
15      the details, very important details, to share
16      facts about the data.
17  Q.   Okay.  So what you're referring to there is the
18      statement that was made about there being a
19      discrepancy between the voting credits shown in
20      the data file that VRF received and a separate
21      data source which was the number of ballots
22      cast in the election, right?
23  A.   Correct.
24  Q.   So -- and I think we all know what that
25      statement was.  My question for you is a little

Page 125

1       bit different though, okay?  And it may be
2       that -- it may be that you'll have a different
3       answer.
4           I'm asking about whether posting the data
5       online itself, with no other statement about a
6       discrepancy itself, is misinformation?
7   A.   I think it's important to note that's not what
8       happened.  So our position on the
9       misinformation was tied to the data being
10      posted publicly, outdated data, with an
11      analysis about a discrepancy that was
12      inaccurate.  So that was the misinformation
13      issue.
14          (WHEREUPON, Deposition Exhibit 6 was
15      marked for identification.)
16  BY MR. GREIM:
17  Q.   Okay.  I don't want to -- I'm just going to
18      show you your own interrogatory response.  This
19      is an earlier set of interrogatories.  We're
20      going to mark this as Exhibit 6.  And if you go
21      to page 6 -- by the way, I'll tell you -- I'll
22      represent to you that attached here that we do
23      have your verified statement for this set of
24      interrogatories.
25          So on page 6 you'll see there's something

32  (Pages 122 to 125)

Page 126

1  called Interrogatory Number 7, and it asks the
2  secretary of state to "Identify any and all
3  misinformation, including regarding the 2020
4  general election, you believe VRF has or
5  intends to spread on its website VoteRef.com."
6      And so there's a response saying, you
7  know, we can supplement it, we're still
8  learning.
9      Then there's a larger paragraph below
10  there.  And the very first sentence says, "The
11  secretary believes that publication of voter
12  data writ large may constitute misinformation.
13  The New Mexico voter file is a living document
14  that is constantly updated by state and county
15  agencies.  If a private individual or entity
16  were to obtain a copy of the voter file, that
17  copy would be out of date and bearing erroneous
18  information before the private individual or
19  entity even had a chance to publish the copy.
20  The only proper, accurate way to look up voter
21  information is through the New Mexico secretary
22  of state or county clerks."
23      Did I read that right?
24  A.  Yes.
25  Q.  And that's a statement that you swore to in

Page 127

1  your response to these questions.  And is that
2  still an accurate statement of the secretary's
3  position?
4  A.  Yes.
5  Q.  Okay.  And so let me just go back.  I mean, I
6  understand that -- the allegation that VRF
7  analysis that accused -- or
8  that said that there was a discrepancy, the
9  contention that that is misinformation.  I'm
10  asking you now, though, whether the publication
11  of voter data writ large as stated in that
12  response can also constitute misinformation?
13      MS. LECOCQ:  Objection.
14  A.  Can you just clarify for me --
15  BY MR. GREIM:
16  Q.  Sure.
17  A.  -- obviously, I didn't use this word -- of what
18  you believe "writ large" is referring?
19  Q.  That's your answer, not mine, right?  That's
20  not my answer, that's your answer.
21      So you say the secretary believes the
22  publication of voter data writ large may
23  constitute misinformation.
24      So I'm asking you:  Given that statement,
25  do you agree with me that simply publishing the

Page 128

1  voter data may constitute misinformation?
2  A.  And I think my question was:  What is your
3  understanding of that definition?
4  Q.  Well, I'm asking you, okay?  I -- I mean, this
5  is your answer.  I didn't choose those words.
6      So, I mean, do you agree with me that the
7  secretary -- and if not, just tell me.  I mean,
8  if the secretary does not contend that posting,
9  you know, voter data from eight months ago is
10  itself misinformation, then we can -- we're
11  going to move on.  But it sounds to me like the
12  secretary is saying that it does constitute
13  misinformation.
14  A.  I think I answered initially when we started
15  this line of questioning that providing and
16  publishing inaccurate, incomplete, out-of-date
17  data does provide a potential for
18  misinformation.
19  Q.  Okay.  And what if -- what if the publication
20  actually discloses when the data file was
21  received, does that fix the problem or no?
22  A.  No.
23  Q.  Why not?
24  A.  Because I think that of our election
25  administrators or kind of really -- you know,

Page 129

1  the average voter, typically as -- isn't as
2  educated on this process.  You know, we work to
3  educate them, but I don't think they're going
4  to understand the complexities if there's
5  someone who is making a claim of a discrepancy
6  without context.
7  Q.  Okay.  And now I'm just -- I'm not asking you
8  about the discrepancy anymore, okay?  We got
9  your full testimony on that.
10      My question now is:  Is the mere fact of
11  publishing old voter data, putting on the
12  Internet saying here is the New Mexico voter
13  data, this file was obtained in April of 2021,
14  is that misinformation?  Is that the
15  secretary's position in this case?
16  A.  Our position is that it invites and provides
17  for a potential of misinformation.
18  Q.  Because the people who read it are not properly
19  educated and they may not understand the
20  disclosure?
21  A.  I think the data, without an understanding or
22  without context or without explanation, makes
23  it difficult to understand.
24  Q.  And the secretary's position is that posting
25  when and how the data was received isn't

Page 130

1    enough, correct, to --
2    A.  Correct.
3    Q.  -- to correct the misinformation?
4    A.  Yes.
5    Q.  Okay.  And why is that?  It's because -- well,
6        strike that.  You answered why.
7            Does the secretary of state have
8        information in this case that particular users
9        of VRF's website were misinformed when viewing
10       the data and the disclosures online?
11   A.  Sorry, if you can repeat that.
12   Q.  Does the secretary of state have any
13       information in this case that particular users
14       of VRF were misinformed when accessing the data
15       and the disclosures on VRF's website?
16           MS. LECOCQ:  Objection.
17   A.  Not particular users.  I think I shared earlier
18       that we had voters contact us out of concern
19       for their data being on the site.
20   BY MR. GREIM:
21   Q.  And, right, that's not my question.  I'm asking
22       you about worry that users of VRF are being
23       misinformed.
24   A.  Did you say worry of it?
25   Q.  Yeah.  I'm asking whether the secretary of

Page 131

1    state has information that this misinformation
2    is occurring?
3        MS. LECOCQ:  Objection.
4    BY MR. GREIM:
5    Q.  Have you learned that someone has looked at the
6        VRF website and become misinformed about the
7        voter process?
8            MS. LECOCQ:  Objection.
9    A.  As a representative of the office, I can share
10       that anecdotally we received concerned
11       individuals contacting our office asking about
12       discrepancies certainly, and asking about how
13       they could get their data off the site.  Those
14       were the calls we were receiving.
15   BY MR. GREIM:
16   Q.  Okay.  So individuals --
17   A.  Confusion about understanding what was posted,
18       confusion about how it got there.  They
19       believed we were posting their data.  So there
20       was certainly calls to our office about
21       confusion related to Voter Ref posting data
22       online.
23   Q.  Okay.  Were they confused about what the data
24       represented?
25   A.  Yes.

Page 132

1    Q.  Okay.  Do you have any records of this?
2    A.  I can certainly go back and look.
3    Q.  We've already asked for it.  Do you have -- did
4        you personally speak to any voters who were
5        confused about the data online?
6    A.  I do not personally.  My team did.
7    Q.  Who?
8    A.  I would have to find the phone log, but in
9        particular, we had a paralegal who was tracking
10       things on behalf of the office and he received
11       calls he made me aware of.
12   Q.  And you've produced all of your tracking
13       spreadsheets already, right?
14   A.  Right.
15   Q.  When you say voters were confused -- so you
16       said they were confused about who had actually
17       posted the data online?
18   A.  Correct.  We got voters calling us saying take
19       me off your list that you have on the website.
20   Q.  Okay.  So maybe VRF engaged in misinformation
21       by not making it clear that it's VRF's website
22       and not yours?
23           MS. LECOCQ:  Objection.
24   A.  We clearly had voters that did not understand
25       who posted that or where it came from and

Page 133

1    believed it was our office.
2    BY MR. GREIM:
3    Q.  Okay.  The secretary of state doesn't make any
4        allegation here that VRF is impersonating the
5        secretary of state or --
6    A.  No.
7    Q.  -- trying to act as if it is an official
8        office?
9    A.  No.
10   Q.  Okay.  We've noticed online that there's a new
11       tab that says that the online system has
12       real-time updates now.
13           MS. LECOCQ:  Objection.
14   BY MR. GREIM:
15   Q.  Is that correct?
16   A.  I'm not clear as to what you're referring to.
17   Q.  Okay.  Going on the secretary of state's
18       website -- well, you don't have it printed off
19       here.  But let me just ask you:  Does the
20       secretary of state hold out that its website is
21       up to date, it's like to the minute in
22       real-time?
23           MS. LECOCQ:  Objection.
24   A.  I'm just -- I mean, we have a website --
25   BY MR. GREIM:

34  (Pages 130 to 133)

Page 134

```
 1   Q.   You have a website --
 2   A.   -- but I don't know what data would be being
 3        updated in real-time on the website.
 4   Q.   Okay.  Well, there's -- okay.  There's a
 5        website and there's a portal.  Let's talk about
 6        that.  Maybe I'm using the wrong term.
 7   A.   Okay.
 8   Q.   There is a -- there is a portal, is there not?
 9   A.   A voter information portal.
10   Q.   Right.  And is that updated in real-time?
11   A.   Yes.
12   Q.   Okay.  And any person who goes on there who
13        enters the correct information for a voter is
14        going to get the absolute most up-to-date
15        version of voter data for that voter, correct?
16   A.   Yeah, that source is our voter registration
17        database.
18   Q.   The database itself?
19   A.   Yes.
20   Q.   And anyone with the first and last name and
21        birthday of a voter can pull that voter's
22        information off the website, correct?
23   A.   Correct.
24   Q.   Now, is the secretary of state aware of anyone
25        using its website for an improper purpose?
```

Page 135

```
 1        MS. LECOCQ:  Objection.
 2        BY MR. GREIM:
 3   Q.   Let me -- yeah, let me ask you a better
 4        question.
 5        Is the secretary of state aware of anyone
 6        using its website to stalk other people?
 7   A.   Our website?
 8   Q.   Yeah, using the portal.
 9   A.   I don't have any knowledge of that.
10   Q.   Okay.  Let me -- would the secretary of state
11        know if someone were just putting someone's
12        name and birthday into the portal and learning
13        where they live?
14   A.   We wouldn't unless we were made aware.
15   Q.   And the secretary of state doesn't require
16        people using the portal to certify that they're
17        using the information to look up their -- that
18        the portal -- to look up their own information,
19        do they?
20   A.   I haven't walked through the screens in a
21        while, but I don't recall any sort of
22        affirmation.
23   Q.   In fact, it doesn't require any affirmation
24        about the purposes for which someone is
25        entering in the information and making a query
```

Page 136

```
 1        on the portal, does it?
 2   A.   I don't believe so.
 3   Q.   Is the secretary of state aware of anyone using
 4        VRF's website for illegal purposes?
 5        MS. LECOCQ:  Objection.
 6   A.   Using the website?  Sorry, can you --
 7        BY MR. GREIM:
 8   Q.   Sure.  Let me back up.  So there was a time
 9        when VRF had New Mexico voter data available on
10        its website, correct?
11   A.   Correct.
12   Q.   And I'm just asking whether the secretary of
13        state knows of anyone accessing the voter data
14        on VRF's website using it for an improper
15        purpose?
16        MS. LECOCQ:  Objection.
17   A.   We wouldn't have a way to track that
18        information.
19        BY MR. GREIM:
20   Q.   I understand that.  I understand that you don't
21        have some special way to look into it.  I'm
22        just asking if you have any information that
23        that's ever occurred?
24   A.   And specifically you asked me that somebody was
25        stalking someone --
```

Page 137

```
 1   Q.   Well, I -- yeah, let's start with stalking.
 2        Are you aware of anyone getting on the VRF
 3        website and the New Mexico data was posted and
 4        they were using that information to stalk
 5        someone?
 6   A.   I don't have an awareness of somebody stalking
 7        someone off that.
 8   Q.   Okay.  Well -- and let's go to some other
 9        things, too.  Are you aware of anyone getting
10        onto the VRF website and using it to come up
11        with a list to solicit -- to make commercial
12        solicitations?
13   A.   I don't have that specific information, no.
14   Q.   Okay.  I mean, I guess let's just -- I'm not
15        going to go through a long list.  Is it fair to
16        say the secretary of state has no information
17        about anyone getting on the VRF website, when
18        it had the New Mexico voter data, and using it
19        for any improper purpose?
20        MS. LECOCQ:  Objection.
21   A.   You're asking me to kind of -- and just so I'm
22        clear, are you asking me if we have an
23        awareness of a connection to a voter being
24        harassed, stalked, any sort of criminal -- like
25        when you say improper use --
```

35 (Pages 134 to 137)

Page 138

1     BY MR. GREIM:
2     Q.   Okay.  All right.  We'll go through.  So I'm
3     asking -- I mean, I asked about stalking
4     already.  I think we got an answer to that
5     question.  Okay.
6         Let's -- let's go criminal purposes.
7     Does the secretary of state have any
8     information that any person has gotten on the
9     VRF website that had the New Mexico voter data
10    and used that data for a criminal purpose?
11    A.   No.
12    Q.   Does it have any information that any person
13    got on the VRF website when it had New Mexico
14    voter data and used that data to engage in
15    misinformation about elections?
16        MS. LECOCQ:  Objection.
17    A.   I don't have any direct knowledge.
18    BY MR. GREIM:
19    Q.   Okay.  Do you have indirect knowledge that this
20    happened?
21    A.   I think that our office -- you know, we
22    received calls.  I spoke to questions and
23    concerns from voters.  And we also had
24    individuals that contacted our office at a
25    similar window of time related to a separate

Page 139

1     issue that was taking place in one of our
2     counties.
3     Q.   Who were the voters who called?
4     A.   I think we provided the list of any voters that
5     we received that felt like they were being
6     potentially intimidated based on an issue
7     happening in one of our counties.
8     Q.   Okay.  That's Otero County, right?
9     A.   Correct.
10    Q.   Does the secretary -- and now it's been well
11    over a year.  Does the secretary of state --
12    well, that may not be right.  It's been some
13    time.
14        Does the secretary of state's office have
15    any information that the Otero County group was
16    connected in any way with VRF?
17        MS. LECOCQ:  Objection.
18    A.   I don't have any understanding that they were
19    directly connected, no.
20    BY MR. GREIM:
21    Q.   Do you have any --
22    A.   I think your question was:  Do we believe that
23    anyone may have obtained data through the
24    website and used it improperly.
25    Q.   That was the original question.  Okay.  You

Page 140

1     said you had indirect knowledge.
2         So let me ask you this:  Do you have
3     any -- my question that you answered, seeming
4     to have information, was that you didn't know
5     of any connection between the two groups.
6         Now I'm going to ask you:  Do you have
7     any information at all that the Otero County
8     group got their data from VRF?
9         MS. LECOCQ:  Objection.
10    A.   No.
11    BY MR. GREIM:
12    Q.   In fact, the secretary of state's office now, I
13    think, knows how the Otero County group got
14    their data, doesn't it?
15        MS. LECOCQ:  Objection.
16    A.   I don't know that we're here to speak on that,
17    but I don't.
18    BY MR. GREIM:
19    Q.   Okay.  Do you have any evidence that VRF has
20    manipulated the data that was posted on its
21    website?
22    A.   No.
23    Q.   How many voters have canceled their voter
24    registration because of VRF's publication of
25    voter data on its website?

Page 141

1         MS. LECOCQ:  Objection.
2     A.   Aside from the inquiries and the calls and the
3     log that you've been provided tied to voters
4     and concerns with this issue, there would be no
5     way for us to have a voter affirm that.
6     BY MR. GREIM:
7     Q.   So let's just be very clear.  The secretary of
8     state has no knowledge of any voter that has
9     canceled his or her registration because of
10    VRF's website?
11        MS. LECOCQ:  Objection.
12    A.   I don't.  I think we have knowledge that voters
13    were concerned --
14    BY MR. GREIM:
15    Q.   Okay.
16    A.   -- and reached out asking us how they could
17    remove themselves because they didn't want to
18    potentially risk their information being made
19    public.  I do not have a list of voters that
20    have affirmed that they canceled because of
21    Voter Ref.
22    Q.   Any every phone call you received, that inquiry
23    has been documented and produced to us,
24    correct?
25    A.   Any that staff tracked have been, yes.

36 (Pages 138 to 141)

Page 142

1  Q.  Okay.  Do you claim that there are others that
2  we don't know about that staff didn't track?
3  A.  I think, you know, initially when we were first
4  learning about those concerns, we weren't at a
5  place to have that process established.  So I
6  do believe there were some additional, but I do
7  feel like the majority were tracked.
8  Q.  I'm going to ask you a little bit about the
9  interest that the secretary of state has
10 alleged it's trying to advance by enforcing the
11 statutes at issue here.  You've actually
12 covered a little bit of this already, but
13 there's a few things we didn't cover.
14    So I understand the secretary of state to
15 contend that the -- that one reason for
16 requiring the affidavit process that we've
17 talked about and requiring that users of the
18 data directly request that from the secretary
19 of state is in order to generate revenue to run
20 the voter data system.
21 A.  Is that --
22 Q.  Is that correct?
23 A.  Is that somewhere?
24 Q.  Yeah, I don't -- I don't have it.  It's in
25 your -- I mean, I'm just going to ask a

Page 143

1  question.  If you disagree that that's one of
2  the reasons to enforce it, then that's okay,
3  we'll just move on.  Or if you're not sure,
4  we'll just move on.
5    MS. LECOCQ:  Sorry.  I just want to note
6  that our standing objection to legal
7  contentions are still standing.
8  BY MR. GREIM:
9  Q.  So is an important reason to require groups
10 like VRF to request the data directly from the
11 secretary of state and then not share it with
12 people outside the organization that the
13 secretary of state wants to generate revenue
14 from user fees to help pay for the voter data
15 system?
16    MS. LECOCQ:  Objection.
17 A.  I think from the office's perspective, I think
18 that's a reason.  That is not our primary
19 reason by any means.
20 BY MR. GREIM:
21 Q.  Okay.  But it's one of the reasons?
22 A.  It is a reason to make sure we have revenue to
23 maintain our system, but that is absolutely not
24 the priority.
25 Q.  What would you say -- what is the priority?

Page 144

1  What is the main reason that the secretary of
2  state does not want VRF to be able to request
3  the data from the secretary of state's office
4  and then share it online with people who agree
5  to use it for VRF's purposes?  What's -- what's
6  the reason why the secretary of state wants to
7  enforce that?
8    MS. LECOCQ:  Same objection.
9  A.  Sure.  The secretary of state's office wants to
10 follow state law.  We want to ensure that we
11 are adhering to the appropriate process that's
12 defined in our state law.  And we feel like the
13 intention behind an appropriate administration
14 of that provision provides for us to maintain a
15 record of individuals that are requesting the
16 data.
17    I think it's important because it's the
18 only mechanism to be able to go back and track
19 if somebody does use it unlawfully.  If we do
20 see an instance of stalking or harassment or
21 intimidation, it is the only way that we have
22 an ability to manage who is receiving that data
23 and potentially a tool for enforcement to
24 follow the law.  That's our priority.
25 BY MR. GREIM:

Page 145

1  Q.  And has the secretary of state actually used
2  its record of individuals who requested the
3  data to investigate instances of harassment?
4    MS. LECOCQ:  Objection.
5  A.  Yes.
6  BY MR. GREIM:
7  Q.  It did so in the Otero County case, right?
8  A.  Correct.
9  Q.  Other than Otero County, has it done it any
10 other time?
11 A.  Other than a review -- not for harassment, but
12 we did take a look at our logs when we felt
13 like there was a potential violation by
14 Voter Ref by posting it online.  That was
15 another opportunity for us to refer to that
16 record.  And we were able to identify that it
17 had not been lawfully obtained.
18 Q.  So Otero County and VRF.  Any other examples?
19 A.  The Local Labs in the distribution of the data.
20 Q.  Okay.  The Otero County and VRF, Local Labs,
21 any other examples?
22 A.  No.
23 Q.  Okay.  So does the secretary of state require
24 Catalist or i360 or Aristotle to share the
25 identities of its customers who purchased the

37 (Pages 142 to 145)

Page 146

1   data?
2   A.   I don't think we require any requester to
3   identify anything more than what's on the
4   affidavit.
5   Q.   Well, let's say the secretary of state did
6   require their requesters to keep a log of each
7   person who shared the data with them.  Why
8   wouldn't that equally satisfy your interest of
9   being able to trace possible abuses?
10  A.   Number one, we don't require that.
11  Q.   I understand.  I'm asking why wouldn't
12  requiring that yield the same result?
13  A.   Because it's not following the statute.
14  Q.   I understand that.  I understand what the
15  statute says.  My question is:  Why wouldn't
16  requiring the requesters who first get the data
17  to keep a log of who they share it with achieve
18  the same result of compiling a record of people
19  who access the data?
20       MS. LECOCQ:  Objection.
21  A.   I think that we're -- there's only -- that's
22  one piece of the statute, right?  There's a
23  secondary piece that requires a payment.  And
24  there's also a secondary piece that requires an
25  affirmation of that separate entity to affirm

Page 147

1   that they will also comply with the statute.
2   BY MR. GREIM:
3   Q.   Okay.  And I -- we'll get to the other uses of
4   the statute.  I'm sticking right now to the
5   interest in being able to trace who had access
6   to the data, okay?  I'm not asking about
7   payment right now.  I'm asking about why -- I
8   mean, and if you don't know, you don't know.
9   But my question is:  Why wouldn't requiring the
10  requesters to maintain a record of individuals,
11  whom they share the data, yield the same
12  benefit as keeping your own list of the initial
13  set of requesters?  Either way you've got a
14  list of everybody who accessed the data.
15       MS. LECOCQ:  Objection.
16  BY MR. GREIM:
17  Q.   Why isn't it good enough to have the requesters
18  keep their own list?
19  A.   Sure.  That's one piece of my answer, but I
20  gave you other reasons.  So there was, you
21  know, a broader picture.  And so we can't just
22  point to one piece of the statute, right?  We
23  are required to administer the statute in its
24  entirety --
25  Q.   I know.

Page 148

1   A.   -- and so that's our obligation, that's our
2   authority.  And the hypothetical that you're
3   speaking to just isn't reality.
4   Q.   Well, I'm asking about the State's interest.
5   I'm not asking you what the statute says.  In
6   this case, on the constitutional question there
7   are questions of fact about what is the State's
8   interest and is this the most narrowly tailored
9   version of a law.  Okay.  So I'm not asking you
10  anymore about what the law says.  I'm asking
11  you about what does the State lose -- how is
12  the State worse off by simply having the
13  requesters keep a record of the individuals to
14  whom they grant access so that if there is an
15  illegal use the secretary of state can simply
16  go to the requesters and say who have you
17  shared it with?
18       MS. LECOCQ:  Objection.
19  BY MR. GREIM:
20  Q.   Why is that insufficient to meet the interest
21  that you raised regarding tracing who dealt
22  with it?
23       MS. LECOCQ:  Objection.
24  A.   And I would just reiterate that that's one
25  interest.  So what we lose is the opportunity

Page 149

1   to kind of respond to all of our interests,
2   right?  That's not our only interest.
3   BY MR. GREIM:
4   Q.   Okay.  Let's go ahead -- let's talk about the
5   other interests then.  So you lose the ability
6   to generate revenue from the other requesters,
7   right?
8   A.   Sure.
9   Q.   Okay.  And what else do you lose, if there's
10  other things you lose, too?  You mentioned
11  something else earlier.
12  A.   I don't remember saying that we lose
13  anything --
14  Q.   Let me -- I'll help you.  You said -- I think
15  you said there's the State interest in making
16  sure that the individuals who get access to the
17  data agree to use it for the purposes that are
18  permitted under New Mexico law.  You didn't use
19  those words, but I think that's what you were
20  getting at.  Do you recall that?
21  A.   And I think, you know, you asked me what's our
22  priority, what's our interest, and I think I
23  said first and foremost it's to follow the
24  state law.  And so I'm just reiterating that
25  that is our interest.  And there's not just

38  (Pages 146 to 149)

Page 150

```
 1    this one provision, you know, it is a bigger
 2    picture than that.
 3    Q.  I understand.  And we can stipulate that the
 4        secretary of state's office says that it wants
 5        to follow the state law.  You've said that.
 6        That's not what I'm talking about, though.
 7        That's not what these questions go to.  I'm
 8        trying to understand the interest.
 9            So we've talked about the payment
10        interest.  We've talked about the tracing
11        interest.  And I'm trying to get you now to
12        talk about the third interest that I could
13        swear I heard you say, I think I've read in
14        your briefing, which is the State wants to have
15        some way to ensure that the people who receive
16        access to the data are going to use it for the
17        purposes that are allowed under the statute.
18        Do you agree that that's --
19    A.  I agree.
20    Q.  That's an important State interest, isn't it?
21    A.  Yes.
22    Q.  Okay.  And the way that you satisfy that
23        interest now is by having the person who
24        directly contacts the SOS's office sign the
25        affidavit that lists what the purposes are,
```

Page 151

```
 1    right?
 2    A.  Whoever is going to receive the data, completes
 3        the affidavit affirming those items.
 4    Q.  Okay.  And so my question to you -- and you
 5        would agree that, from the State's perspective,
 6        that is sufficient -- the affidavit is
 7        sufficient to satisfy the State's interest in
 8        ensuring that the recipients of the data who
 9        came and requested it from the secretary of
10        state's office, understand that what they're
11        supposed to do and not do with the data, right?
12    A.  Yes.
13    Q.  And so my question to you is:  How does the
14        State lose anything by having the individuals
15        who might receive access to the data from the
16        initial requesters also agree that they are
17        going to use it for the purposes permitted
18        under New Mexico law?  What's lost there from
19        the State's perspective?
20            MS. LECOCQ:  Objection.
21        BY MR. GREIM:
22    Q.  If anything?
23    A.  Are you saying also agreed, what, through a
24        different entity?
25    Q.  Yeah, they manifest their assent to the extent
```

Page 152

```
 1    same use requirements that the initial
 2    requester manifested their assent to.  So
 3    what's lost by having the person who receives
 4    it is from initial requester agree to the same
 5    conditions?
 6    A.  Like, by how -- like, through what mechanism?
 7    Q.  Well, for example, by on the website saying I
 8        agree to only use it for these purposes before
 9        getting access to it?
10    A.  I think, number one, for uniformity, generally,
11        it's important that when our office is
12        prescribing a form, it's our official form, I
13        think we want to maintain that uniformity and
14        consistency of the election polls overall.
15        But, two, I think we lose the opportunity to
16        educate directly from our office and to receive
17        that affirmation directly to our office.
18    Q.  Okay.  So there's some benefit in the fact that
19        the form comes directly from the office?
20    A.  Consistent and it's uniform.
21    Q.  Okay.  Okay, so -- okay, I understand.  Any
22        other interests there, other than uniformity?
23    A.  Not in addition to what we've already gone
24        over.
25    Q.  Okay.  Let me ask you about the Safe at Home
```

Page 153

```
 1    program; that's come up a few times as well.
 2    There are some people who want to be removed
 3    from the list who don't satisfy the
 4    Safe at Home program, correct?
 5    A.  Correct.
 6    Q.  And so is anything stopping New Mexico from
 7        changing the requirements of the Safe at Home
 8        program?
 9            MS. LECOCQ:  Objection.
10        BY MR. GREIM:
11    Q.  Let me -- let me change the question.  Is there
12        anything keeping New Mexico from broadening the
13        Safe at Home program to reach additional people
14        who don't want their voter data disclosed?
15            MS. LECOCQ:  Objection.
16    A.  Yes.
17        BY MR. GREIM:
18    Q.  What?
19    A.  So I think that the statute surrounding the
20        Safe at Home program is very specific to a
21        certain population within the state of New
22        Mexico.
23    Q.  Okay.  And my question is:  Is there anything
24        stopping New Mexico from just broadening that
25        population --
```

39 (Pages 150 to 153)

## Page 154

1       MS. LECOCQ:  Objection.

2     BY MR. GREIM:

3   Q.  -- and saying there are other people now that

4     we want to let into the Safe at Home program?

5   **A.  Sure.  It's -- the Safe at Home program is not**

6     **specific to just voting, right; that's one**

7     **piece of that program.  But it is a larger**

8     **program that is meant to support victims of**

9     **domestic violence.  So it's not just a**

10    **confidential address necessarily.  It is -- it**

11    **is not just specific to voting.**

12   Q.  Okay.

13   **A.  So there are implications for that population**

14    **outside of just voting.**

15       MR. GREIM:  Okay.  We've been going for

16    little over an hour.  Why don't we take --

17    let's take one more break for maybe another ten

18    minutes.

19       (WHEREUPON, at this time a brief recess

20    was taken.)

21     BY MR. GREIM:

22   Q.  All right.  I think we're getting closer here

23    to the end.  But I'm going to ask you about now

24    the denials of VRF requests for data over the

25    last year or two.

## Page 155

1      I want to first know who was involved,

2    what staff were involved in the secretary's

3    office in responding to VRF requests for data.

4   **A.  Myself and our attorneys.**

5   Q.  Okay.  You say our attorneys.  Who are those

6    attorneys?

7   **A.  Dylan Lange and representation from the**

8    **attorney general's office.**

9   Q.  Okay.  Okay.  Now, when you say representation

10    from the attorney general's office, are you

11    talking about -- is that -- is the secretary of

12    state getting legal advice from the attorney

13    general's office about whether to respond to

14    requests?

15      MS. LECOCQ:  Objection.

16   **A.  With relation to this case?**

17     BY MR. GREIM:

18   Q.  Okay.  Well, let me -- I'm not going to ask you

19    the contents of the advice.  I'm just wanting

20    to establish who is asking the question and,

21    you know, basically who is involved in the

22    communication, okay?

23      So we know the name of one attorney,

24    Lange, okay.  And then when you say the AG's

25    office, I'm trying to make sure we're not just

## Page 156

1    talking about litigation counsel who was always

2    up to speed presumably on what's happening.  So

3    I'm trying to do with this without compromising

4    the privilege.

5      Is a request being made of the attorney

6    general's office about whether a response to a

7    document request is lawful or not?

8      MS. LECOCQ:  Objection.

9   **A.  A response to a document request from Voter**

10    **Reference Data -- I mean vote Voter Reference**

11    **Foundation --**

12     BY MR. GREIM:

13   Q.  Right.

14   **A.  Yeah, our -- Dylan Lange and our attorneys**

15    **representing us in this case.**

16   Q.  Okay.  So litigation counsel are -- the lawyers

17    in this case for the attorney general's office

18    are giving advice to the secretary of state

19    about responses to the requests?

20      MS. LECOCQ:  Objection.  Can we -- sorry,

21    can you just give me one second?

22      MR. GREIM:  Sure.

23      MS. LECOCQ:  I just want to state on the

24    record this is getting really close to -- and I

25    understand it's super tricky with the attorney

## Page 157

1    general's office, but the attorney general's

2    office, by statute, represents these agencies.

3    So if what you're wanting her to answer is who,

4    I don't think we have any issue with that.  I

5    think where it gets a little bit tricky is

6    any -- kind of anything beyond that, you know,

7    what questions were asked, what specific

8    topics, what's being sought, and that's really

9    what is, kind of, our objection.

10      MR. GREIM:  I'm not going to be beyond

11    the question I just asked.

12      MS. LECOCQ:  Okay.

13     BY MR. GREIM:

14   Q.  Which is, you know, advice on responding to the

15    request, not asking what the advice was or what

16    questions were lodged.  It's who at the AG's

17    office is giving advice on how to respond to

18    the VRF request.  That's it.

19   **A.  What individual?**

20   Q.  Yes.

21   **A.  Yeah, at the time was Olga.**

22   Q.  Okay.  And she was still there in November or

23    she was gone?

24   **A.  I don't know the exact day, I'm sorry.**

25   Q.  Okay.  Was it anyone other than Olga?

Page 158

1  A. No.
2  Q. Okay.
3  A. Just Dylan and Olga.
4  Q. Sharon Pino involved at all?
5  A. Yes.
6  Q. Okay. What was her role?
7  A. Again, it's a collaborative effort to kind of
8  understand all of the facts, have a
9  conversation, a discussion, and make a
10  determination. So she participated like the
11  rest of us.
12  Q. Well, who made the final decision in the SOS's
13  office?
14     MS. LECOCQ: Objection.
15  A. I don't think there was one single person. It
16  was, again, a collaborative decision.
17  BY MR. GREIM:
18  Q. Okay. If you could, please go back and turn to
19  Exhibit 2, Interrogatory Number 15. It's on
20  page 9 -- 9 and 10 is where I want you to look.
21  Okay. And so you'll see Interrogatory Number
22  15, it says, "Identify each person who
23  participated in each decision not to provide
24  data in response to a VRF request or to ignore
25  a VRF request, and the person, if any, who made

Page 159

1  the final decision." And then it wants the
2  titles. That's the request.
3     And now let's go to the answer, next
4  page. "Subject to, and without waiving
5  objections, the secretary states the secretary
6  never ignored a request." Is that correct?
7  A. Yes.
8  Q. Okay. "If such a request was received,
9  reviewed, and subsequently denied, the decision
10  to do so was made by Sharon Pino on advice of
11  counsel." Now, is that correct or no?
12  A. I don't think it's incorrect. Again, you know,
13  we all had a role in making this decision. At
14  the end of the day, Sharon is deputy secretary
15  of state, so I don't think there's anything
16  incorrect here.
17  Q. Okay. Just -- since Sharon Pino is the only
18  person to -- specifically mentioned here, it's
19  just odd that you didn't mention her in your
20  response and then you seemed to say she was
21  just part of the team. So I've got a response
22  from you and I've got a -- sort of a draft from
23  counsel. I just want to meld the two, if I
24  can.
25     I mean, do you -- does this statement

Page 160

1  need to be changed, decision to do so was made
2  by Sharon Pino?
3  A. I think the only thing I would add is, you
4  know, probably upon advice of counsel and, I
5  guess, in consultation with myself.
6  Q. Okay. And let me talk about the
7  decision-making process. Did it occur by
8  e-mail?
9  A. No, I feel like it was a meeting, either
10  virtual -- it was a virtual meeting.
11  Q. Okay. Because there were a couple of denials,
12  all right. And so each time there was nothing
13  committed to writing. It was all done orally?
14  A. Yes.
15  Q. Okay. So there will be no -- have you searched
16  for documents that discussed the decision?
17  A. No, but I don't believe there to be any. I
18  recall the verbal conversations.
19  Q. I mean, do you know all the decision -- all the
20  communications that Sharon Pino may have had
21  with others about it?
22  A. I don't believe Sharon Pino had any additional
23  communications. The only thing I can't speak
24  to is if Dylan had any communications, but I
25  feel like the decision was made through a

Page 161

1  virtual meeting.
2  Q. And the decision was not made by lawyers,
3  right, it was made by Sharon Pino?
4  A. That's not what I said. I said it was made in
5  consultation with a group of us, including
6  guidance from our attorneys.
7  Q. Okay. Well, I mean, was Sharon Pino the final
8  decision maker or no?
9  A. I think what I asked to be changed in the
10  statement was that Sharon Pino, upon advice of
11  counsel, in consultation with Mandy Vigil.
12  Q. Okay.
13  A. So I think that represents my testimony.
14  Q. Okay. Well, specifically, I'm going to be very
15  clear about this, the decisions were not
16  actually delegated to counsel; they were made
17  by you and Sharon Pino?
18  A. Upon advice of counsel.
19  Q. Upon advice of counsel?
20  A. Yes.
21  Q. Okay. Okay. Well, I'm about to ask you the
22  basis for the decision, okay? And I just
23  going to say this, I mean, I -- if you say, you
24  know -- if you say "We relied on counsel," then
25  I'm going to ask -- at that point I'm entitled

41 (Pages 158 to 161)

Page 162

1    to ask and I'm going ask what counsel advised,
2    one way or another, from you or from counsel.
3    If you just tell me the basis of the decision,
4    you don't need to tell me that, well, part of
5    this was what counsel wanted or this is -- and
6    you can protect the privilege by not explaining
7    to me what parts of what you tell me are from
8    an attorney. I'm just going to say that while
9    we're on --
10        MS. SCHREMMER: I object to your
11    definition about privileged communication.
12   BY MR. GREIM:
13   Q. I mean, maybe we have a dispute. We're about
14    to find out, I think. But I certainly don't
15    think any part of the reasoning -- the basis
16    for any of the decisions can be shielded
17    because a lawyer was involved. It's possible
18    to tell me the reasoning without saying, oh,
19    this is what our lawyer told us, but we'll see.
20    We'll let it play out if there needs to be an
21    objection and instruction.
22        MS. LECOCQ: Can you give me one second?
23    We might -- let me talk to Kelsey. And then I
24    might just give her a little bit of advice.
25        MR. GREIM: Sure. Okay. Let's go off

Page 163

1    the record for two minutes.
2        (WHEREUPON, at this time a brief recess
3    was taken.)
4        (WHEREUPON, Deposition Exhibit 7 was
5    marked for identification.)
6    BY MR. GREIM:
7    Q. Okay. I'm going to hand you what we've marked
8    as Exhibit 7, and you've seen this before. I'm
9    just going to ask you if you recognize this
10    e-mail?
11   A. I do.
12   Q. Okay. This is a Patrick Rostock e-mail to you
13    on March 11, 2022?
14   A. Yes.
15   Q. And it relates to ticket number 4148 (sic).
16    I'm just reading from the subject line,
17    "[External] Information Request," right?
18   A. Right.
19   Q. And you see there's a question from Voter
20    Reference Foundation at the bottom of the
21    e-mail chain?
22   A. Uh-huh.
23   Q. And then -- do you recall getting this e-mail?
24   A. Yes.
25   Q. Okay. What did you do in reaction to this?

Page 164

1    A. I reached out to Dylan.
2    Q. Okay. Did you ask him for legal advice of some
3     kind?
4    A. Yeah.
5    Q. Okay. Did he provide you legal advice in
6     response?
7    A. Yes.
8    Q. All right. And is the first line of this
9     e-mail correct for Dylan's contact with the AG,
10    "...we are not fulfilling records from VoteRef"
11    (verbatim)?
12   A. There was clarification related to voter data
13    requests, but, yes.
14   Q. Okay. And has this policy ever changed at the
15    secretary of state's office?
16   A. What policy?
17   Q. "Per Dylan's contact with the AG, we are not
18    fulfilling records request from VoteRef"?
19   A. I don't think it was a policy, but certainly it
20    is based on legal advice related to this case
21    and our understanding of the use of the data
22    that that's still the position we maintained.
23   Q. Okay. What will VRF need to do in order to
24    obtain voter information from the secretary of
25    state's office?

Page 165

1    A. I think it is going to need some clarity from
2     legal counsel to respond to that. I think it's
3     all relevant to this case in particular.
4    Q. Well, why can't VRF simply fill out the current
5     affidavit and receive voter data?
6    A. We have not stated that you cannot.
7    Q. Well, that's -- I'm asking you that. I'm
8     asking you, even if the current -- I mean, we
9     have a dispute about whether the current
10    affidavit actually follows New Mexico law, but
11    put that aside. If VRF simply fills out the
12    current affidavit for voter data, is there
13    any -- is there any reason that the secretary
14    of state's office wouldn't fill the request?
15   A. Again, I think barring any guidance from our
16    attorney related to this case, no. I think our
17    concern is relevant in that there's an
18    understanding that it will be posted online;
19    that's the concern.
20   Q. So even if VRF fills out an affidavit that says
21    "I won't share it on the Internet," VRF is not
22    going to get the data because of a concern that
23    it might show on the Internet anyway?
24   A. I don't think I said that.
25   Q. Well, I want to understand you.

Page 166

1   A.  So if VRF submits an affidavit and completes
2       it, I think there is a review of that affidavit
3       and a determination to provide the data.
4   Q.  When you say it --
5   A.  I don't think I've said that we wouldn't.
6   Q.  Okay.  Well, that's important because I thought
7       my question actually posed that very
8       hypothetical, that VRF fills out the affidavit
9       and submits it to you.  I just wonder if
10      there's any reason why the secretary of state
11      would still not produce the data.
12  A.  It would only be based on legal guidance.
13  Q.  Well, in other -- when you say only based on
14      legal guidance, you mean you're holding out
15      that attorneys might tell you not to produce
16      the data anyway?
17  A.  I think there's a potential, yes, based on
18      concerns of it being posted online.
19  Q.  Okay.  So is VRF in a position where the
20      secretary of state doesn't feel that it can
21      trust VRF's affidavit?
22          MS. LECOCQ:  Objection.
23  A.  What affidavit, I'm sorry?
24  Q.  The affidavit we've just been talking about.
25  A.  Ours, our prescribed form, completing it?

Page 167

1   Q.  Correct.
2   A.  But in that you are saying you're going to make
3       some sort of affirmation that you're not going
4       to put it online?
5   Q.  No, no.  I'm saying if VRF -- I want to be
6       clear here.  I thought we were, but I -- it
7       seems vague.
8           If VRF fills out the current affidavit --
9       on -- currently online, for the secretary of
10      state, is there any reason at all that the
11      secretary of state would cite to still refuse
12      to produce the voter data to VRF?
13  A.  And, again, I said as long as the form is
14      completed and we consult with our attorney, if
15      there is no concern related to it being posted
16      online, based on the circumstances of this
17      case, I foresee no reason to deny that.
18  Q.  Okay.  Well, it's that middle hedge that is
19      very important in this case.
20  A.  Well, that's the reality.
21  Q.  Well, I mean, so would the secretary of
22      state -- so what you're telling me is, in fact,
23      the secretary of state would not simply produce
24      the data if it received an affidavit, it would
25      first talk to counsel and determine whether

Page 168

1       there was still a concern that VRF might post
2       the data online anyway?
3   A.  There's currently active litigation with Voter
4       Reference Foundation, so any interaction we
5       would engage with our legal counsel, yes.
6   Q.  Okay.  So part of the -- so it sounds like part
7       of the block for VRF getting the data is the
8       fact that there's ongoing litigation, is that
9       correct?
10  A.  I don't know if there is a block.  I'm saying
11      because there is active litigation, it is a
12      usual process to consult with our attorneys.
13  Q.  Okay, fair enough.  But can the secretary of
14      state commit right here, right now, that if VRF
15      fills out the affidavit, as required by New
16      Mexico law, it will produce the data requested?
17          MS. LECOCQ:  Objection.
18  A.  I think I have responded that because there's
19      an active litigation, that we would seek
20      guidance from our counsel.
21          (WHEREUPON, Deposition Exhibit 8 was
22      marked for identification.)
23  BY MR. GREIM:
24  Q.  I'm going to hand you what we've marked as
25      Exhibit 8.  Do you recognize this document?

Page 169

1   A.  I do.
2   Q.  What is this?
3   A.  It is a request to our office for records.
4   Q.  Okay.  And it is accompanied by -- something
5       might be wrong.  Can I look at your version
6       quickly?  It's accompanied by a couple of
7       affidavits, correct, under Exhibit B?
8   A.  Yes.
9   Q.  Now, take a second to look at these affidavits.
10      Is there anything irregular or altered in these
11      two affidavits?
12  A.  I don't believe this is our most current form.
13      I think this is an outdated version.
14  Q.  Okay.  Is that a reason to reject a request?
15  A.  No.
16  Q.  And, in fact, do you recall when I asked you
17      this at your earlier testimony you stated that
18      secretary of state would accept all versions of
19      the form as it changed over time, right?
20  A.  Correct, as long as it provides the
21      information.
22  Q.  And is there anything lacking on these two
23      affidavits?
24  A.  No.
25  Q.  Okay.  Now, this request was denied, right?

43  (Pages 166 to 169)

Page 170

1  A.  Yes.
2  Q.  I'm going to -- and one of the reasons was that
3      the secretary of state was concerned that VRF
4      was going to take the information and post it
5      online, right?
6  A.  Right.
7  Q.  Okay.  And the basis for that was actually
8      something that I put in my letter, right?
9  A.  Basis for?
10 Q.  For the concern.
11 A.  Yes.
12 Q.  All right.  And specifically it's page 4 of my
13     letter.  Can you go to page 4?
14 A.  Okay.
15 Q.  And let's go to the third paragraph where I
16     talk about the request for records.  And you'll
17     see that it's about two different projects,
18     above there, and then I say in my third
19     paragraph -- or, I'm sorry, the second full
20     unnumbered paragraph, "VRF's intended election
21     use comprises two distinct projects.  For its
22     first project, just as VRF publishes voter data
23     for many other states, and as it recently
24     published voter data in New Mexico, VRF intends
25     to publish the requested information online for

Page 171

1      election related purposes, but will only
2      publish the personal information of voters
3      online if VRF is granted relief in..." and then
4      it cites this case, right?
5  A.  Uh-huh.
6  Q.  "...or any other legal proceeding."
7         Okay.  So did the secretary of state's
8      office decide that it believed that statement
9      was truthful?
10 A.  No.
11 Q.  Did not doubt what I put in my letter?
12 A.  I don't think there was any discussion of
13     doubt.
14 Q.  Okay.  Okay.  And then we go to the fourth
15     paragraph, I talk now about the second project.
16     And it says, "For its second" -- and by the
17     way, data for the first project is in a
18     separate safety affidavit, isn't it?  You see
19     there's two affidavits?
20 A.  There are two affidavits.  I am not clear what
21     is specific to each project.
22 Q.  Okay.  Okay.  Well, that's all right.  That's
23     all right.  You see that each --
24 A.  They each ask for the same data.
25 Q.  Do you see the first one under "Other" has one

Page 172

1      description, the second one has a different
2      one, right?
3  A.  One is asking for county and precinct, is that
4      the difference?
5  Q.  Right.  So, I mean, if you look, the first one
6      says "Current voter registration data,
7      including voter history for all active,
8      inactive, suspended, and canceled status
9      voters," right, "(including any registration
10     status other than active)," that's the first
11     one?
12 A.  Uh-huh.
13 Q.  The second one says "A complete list, by
14     county/precinct of any registered voters who
15     cast a ballot in the November 3, 2020 general
16     election, who have subsequently been placed in
17     inactive, canceled, deleted, or removed status,
18     or any voter that has been removed or deleted
19     from the rolls."
20         So those are not asking for the same
21     data, are they?
22 A.  No.
23 Q.  All right.  Fair enough.  Okay.  Let's come
24     back now to my letter.  In my second paragraph
25     I say, "VRF intends to analyze the records,

Page 173

1      information, and data provided in response to
2      the above requests in order to engage in a
3      discrepancy review of the New Mexico voter
4      rolls.  VRF intends to publish this analysis
5      online without disclosing the personal
6      information of any individual voter."
7         Do you see that correct -- did I read
8      that correctly?
9  A.  I do.
10 Q.  Okay.  And then I go on, just so it's clear,
11     "VRF will comply with this
12     non-public-disclosure promise for the data it
13     uses on its second project regardless of
14     whether it prevails in the federal litigation."
15         Did I read that right?
16 A.  You did.
17 Q.  "And again, for the sake of clarity, no
18     personal information of any individual voter
19     will be published online unless VRF is granted
20     relief in the federal litigation or in any
21     other legal proceeding."
22         Did I say that right?
23 A.  You read it correctly, yes.
24 Q.  And the secretary's position is that you didn't
25     know what I meant by personal information,

44  (Pages 170 to 173)

## Page 174

1    right?

2  A.  Uh-huh.

3  Q.  And that what I have might have actually been

4    saying is that we are going to publish personal

5    information because I might have a really

6    narrow definition of what it means, right?

7  A.  Uh-huh.

8  Q.  Now, did anybody from the secretary's office

9    say -- it was an unclear phrase, right, that's

10   your position?

11 A.  I think we established that during this

12   testimony as well.

13 Q.  Right.  And did anyone ever reach out to ask

14   Voter Reference Foundation, hey, we see this

15   phrase "personal information," you're

16   referencing the lawsuit, where we're actually

17   litigating this question, could you tell us

18   what you mean?

19     No one did that, did they, for VRF?

20 A.  I don't believe anyone from our office did.

21 Q.  No.  And then, in court, VRF then stated that

22   we're not going to disclose name or address,

23   anything from which you could tell the identity

24   of any voter.  We're just going to give the

25   analysis of what the discrepancy was.  And at

## Page 175

1    that point did the secretary of state's office

2    go back and say now we understand?  We're no

3    longer concerned about posting personal

4    information online?  Did that ever happen?

5  A.  We have not revisited this, no.  I think,

6    again, the decision we've been discussing for

7    the past hour or so was based on guidance from

8    our counsel, based on pending litigation, and

9    the requests received, you know, in response to

10   this litigation.

11 Q.  So the reason why the secretary didn't go back

12   and produce the data, after getting the

13   explanation of personal information, was

14   because of the litigation, is that right?

15 A.  No, based on our outreach to our counsel,

16   because there is pending litigation.  So we are

17   going to follow the guidance of our counsel.

18 Q.  Okay, I understand.  And, unfortunately, I now

19   need to know the reason why you didn't do it.

20   I know you asked counsel.  I need to now

21   understand why -- clarification.  Because,

22   after that, you knew we weren't going to be

23   posting any personal information online, why

24   that wasn't good enough.  What was still

25   missing at that point?

## Page 176

1  A.  And when you say we knew, can you point me to

2    where we would know that?

3  Q.  Sure.  You know, let's do it this way:  Today,

4    does the secretary of state's office believe

5    that if we got -- if you fulfill this status

6    request tomorrow, maybe somebody saw this and

7    thought it was -- you know, they just answered

8    it.  Do you believe that -- do you believe that

9    VRF would take the data and post the names,

10   addresses, year of birth, voter registration

11   information of voters online?  Does the

12   secretary of state's office actually believe

13   that today?

14 A.  I don't think that's the question.  I think --

15 Q.  I'm asking you that right now.

16 A.  I think it's broader than that, that's my

17   point.  There's active litigation, and we have

18   to -- we have to deal with the reality.  Our

19   office is currently engaged in important

20   litigation on this matter.  We've received

21   guidance from our counsel, period.

22 Q.  Well --

23 A.  And same answer to your question about the

24   affidavit.  This request is a request for the

25   same data, the same question that you asked me

## Page 177

1    about the affidavit and that process and our

2    position would not change.  Based on this

3    letter, it was an NVRA request for the

4    affidavit that was submitted.

5  Q.  I'm going to ask you a very different question.

6    Okay.  My question is:  Today, does the

7    secretary of state believe that if it produced

8    to us the data requested here, now that you've

9    heard what I've said -- actually, let me do

10   this.  Let's back up.

11     I'm going to tell you -- this is not a

12   hypothetical, okay?  I'm going to tell you that

13   if the secretary of state produces data in

14   response to this request, any other request

15   that comes in, using your affidavits, that

16   Voter Reference Foundation is not going to

17   publish any of the personal information of any

18   voter.  I'm going to go a step further, just in

19   case you think I'm saying the opposite.  It's

20   not going to post the voter's name, their

21   address, their voting history, their last four

22   of their Social Security number, their year of

23   birth.  Can you name for me any other personal

24   information in the data set that people get?

25   Anything else that identifies an individual

45 (Pages 174 to 177)

Page 178

```
 1        voter?
 2   A.   Which question am I answering?
 3   Q.   Well, I'm going to say -- I'm going to tell you
 4        we're not going to post any of that data
 5        online.  I'm telling you that right now.
 6        Knowing that, does the secretary of state have
 7        any reason to believe that if you produced this
 8        data online, that Voter Reference Foundation
 9        will go and post the data online anyway?
10        MS. LECOCQ:  Objection.
11   A.   I think what I can respond to is that that is
12        the same kind of position that you had, right,
13        the same question you asked me about the
14        affidavit, and based on our analysis and
15        guidance from our attorney, our position has
16        not changed.  So, again, it would require, you
17        know, guidance from our attorneys based on this
18        pending litigation if we received a new request
19        from you.
20        BY MR. GREIM:
21   Q.   Okay.  Now I'm going to ask you:  Does the
22        secretary of state believe that if you make a
23        response tomorrow to us, that we are going to
24        take the information of the voters, the
25        individual information for each voter, and put
```

Page 179

```
 1        it online?
 2   A.   I don't know.
 3   Q.   So you think it's possible they'll do it
 4        anyway?
 5   A.   I think that it's an analysis that was taken
 6        based on your position.  I don't think your
 7        position has changed.  And we have received
 8        guidance that it is in our best interest to
 9        protect our position and so, therefore, we
10        didn't provide it.
11   Q.   I'm not asking --
12   A.   I don't think anything has changed, therefore
13        nothing would change in our response.
14   Q.   Okay.  So even me telling you every category
15        that will not be put online, the position
16        remains that the secretary of state believes
17        that VRF may put it online anyway?  You don't
18        know?  You don't know?  You think we might,
19        right?
20   A.   I think there's a concern.
21   Q.   Okay.  Is there anything Voter Reference
22        Foundation can do to get rid of that concern?
23        Is there anything at all it can do?
24        MS. LECOCQ:  Objection.
25   A.   Are you asking for my personal --
```

Page 180

```
 1        BY MR. GREIM:
 2   Q.   I'm asking for office's position.
 3   A.   You know, I think that I don't have anything to
 4        point to.  I think it's all a matter of getting
 5        to the end of this litigation so that we all
 6        have clarity.
 7   Q.   So the litigation will need to end before you
 8        can answer that question?
 9   A.   I don't know.  Again, you know, nothing has
10        changed up to this point.
11   Q.   Okay.
12   A.   So until something were to change and we got
13        different guidance, I don't have a different
14        answer.
15   Q.   So it's kind of what the lawyers say?
16   A.   Yes.
17        (WHEREUPON, Deposition Exhibit 9 was
18        marked for identification.)
19        BY MR. GREIM:
20   Q.   Well, let's go to our next exhibit.  I'm
21        handing you what we're marking as Exhibit 9.
22        You'll see this is a Dylan Lange letter.  It's
23        actually an e-mail attaching a letter to Voter
24        Reference Foundation and it copies you.  Do you
25        recognize this document?
```

Page 181

```
 1   A.   Give me just a second.  I recognize the
 2        document.
 3   Q.   Okay.  Did you -- who was involved in drafting
 4        this document?
 5   A.   I know that I spoke to Dylan about it.  Dylan
 6        drafted the document, and I know that we
 7        discussed it with Sharon.
 8   Q.   So is it fair to say that Sharon and you both
 9        approved this document before it went out the
10        door?
11   A.   Yes, and also, at the time, Olga.
12   Q.   And Olga, okay.  You understood that she was
13        advising on behalf of the attorney general's
14        office, correct?
15   A.   Right.
16   Q.   Okay.  So it looks to me like on October 18,
17        2022, Gina Swoboda, VRF, made a request for
18        about five categories of items.  And then this
19        response was made on November 17th, about a
20        month later, right?
21   A.   Right.
22   Q.   Okay.  And Ms. Swoboda, on behalf of VRF, made
23        this request under both the NVRA and the New
24        Mexico Public Records Law, right?
25   A.   Correct.
```

46 (Pages 178 to 181)

Page 182

```
 1   Q.  So let's go to Mr. Lange's -- and by the way,
 2       you agreed with everything in Mr. Lange's
 3       response?
 4   A.  I do.
 5   Q.  Okay.  I'm going to ask you now about these
 6       items.  So Mr. Lange says, "To begin with,
 7       request number 3 is a request for future data
 8       that does not/did not exist at the time of your
 9       request, and we cannot fulfil requests in
10       perpetuity."  That means can't ful- -- you
11       can't make a request for the future, way in the
12       future, and just keep expecting to be billed,
13       right?
14   A.  Uh-huh.
15   Q.  Okay.  Is that what VRF did here?
16   A.  Yes.
17   Q.  Well, let's look at the request.  So number 3,
18       is "Voter registration data for all voters
19       removed or canceled from any list between
20       September 24, 2022," right, "and December 15,
21       2022."  And so part of that time is into the
22       future, right?
23   A.  Uh-huh.
24   Q.  But part of it already existed when the request
25       is made, right?
```

Page 183

```
 1   A.  But the ask was for a window of time.
 2   Q.  Sure.  But is there any reason not to just to
 3       give the data that you do have from
 4       September 24th to the date of the response?
 5           MS. LECOCQ:  Objection.
 6   A.  Our position and our process across the board
 7       is to respond to requests, to respond to the
 8       request that was made.  And we could not
 9       because that window of time didn't exist at
10       that time.
11   BY MR. GREIM:
12   Q.  Okay.  So if somebody were to ask you -- let me
13       ask you this:  What if the request was
14       through -- from September 24th of 2022 to
15       November 17, 2022, would you say we're going to
16       not respond to that request because on
17       October 18th it wasn't November yet?
18           MS. LECOCQ:  Objection.
19   BY MR. GREIM:
20   Q.  I mean, I'm just trying to understand the
21       principle here.
22   A.  The request was for future data that we did not
23       have.  So if it was asking for future data, we
24       do not have it.
25   Q.  You reject the entire request then?
```

Page 184

```
 1   A.  That is the request.
 2   Q.  You do that for everybody?
 3   A.  We respond to the request, yes.
 4   Q.  You understand -- you don't -- you're not
 5       arguing that VRF asked for data in perpetuity,
 6       are you?
 7   A.  I just said that I agreed with this statement
 8       made by Dylan in this letter.  So I do believe
 9       it was asking future data.
10   Q.  Well, I'm not asking future.  I'm asking in
11       perpetuity.  VRF is not asking for data in
12       perpetuity, is it?
13   A.  I don't see that.
14   Q.  Okay.  Let's now go to the second paragraph.
15       It says, "Additionally, we will refrain from
16       producing any responsive voter data maintained
17       by our office at this time due to numerous
18       issues further detailed below."  It says that,
19       right?
20   A.  Yes.
21   Q.  And let's just march through those.  He says,
22       "To begin with, this decision is motivated by
23       the fact that you will post any voter data
24       provided on your website, which our office
25       believes is a violation of law."
```

Page 185

```
 1           Now, on what basis did the secretary of
 2       state believe on November 17th that Voter
 3       Reference Foundation was just going to post
 4       whatever it got on its website?
 5   A.  Because it had occurred.
 6   Q.  Did you consider any statements that Voter
 7       Reference Foundation or its counsel -- promises
 8       that counsel made in open court afterwards,
 9       were those considered?
10   A.  What is the date?  Maybe we can clarify the
11       date.  Was this letter before or after that
12       hearing?
13   Q.  This was in November, and this issue was
14       discussed -- you know, I hate to start making
15       representations without the transcripts here.
16       There were no hearings after November 17th,
17       I'll just tell you that.
18           So, I mean, my question is:  On
19       November 17th it sounds like the only data
20       point for the secretary of state's office was
21       that at one time VRF had posted data on its
22       website.
23   A.  And I think I've spoken to that concern.
24       Because it had been posted online, that was a
25       concern to us.
```

47 (Pages 182 to 185)

Page 186

```
1   Q.   And any promises VRF made not to post on its
2        website were not relevant, is that right?
3            MS. LECOCQ:  Objection.
4   A.   Again, the decision was made on past practice.
5            BY MR. GREIM:
6   Q.   Okay.  I understand that.  My question is
7        whether it's relevant when Voter Reference
8        Foundation comes to you directly and says it
9        will not post data online?
10  A.   Clearly -- my understanding, just to make sure
11       I have the timeline correct, this request came
12       to us after the hearing in which you made those
13       statements, correct?
14  Q.   Yeah, it definitely did.
15  A.   Okay.  So our position, as outlined in this
16       letter, was that based on past practice and
17       concerns that it was going to be posted, we
18       were not going to provide the data.
19  Q.   And I'm just trying to understand what weight,
20       if any, you gave to VRF's direct statements
21       that it would not do so?  Did you give that
22       statement any weight?
23  A.   I think we consider all things, right, but at
24       the end of the day --
25  Q.   Did you consider it?
```

Page 187

```
1   A.   -- we have obligation to protect what we
2        believe is folks' privacy and to maintain their
3        opportunity to participate in the process.  So
4        as I stated consistently, you know, at the
5        hearing, again today, in our responses, our
6        concern, based on past practice, was that this
7        data was going to be posted online.
8   Q.   So when --
9   A.   And there was a decision not to provide the
10       data.
11  Q.   So when will VRF's past practice of posting the
12       data stop counting against it when it makes
13       data requests?
14           MS. LECOCQ:  Objection.
15  A.   I don't even know how to answer that question.
16           BY MR. GREIM:
17  Q.   Okay.  Did you consider the fact that VRF
18       posted data after obtaining an injunction from
19       the Court?  Did that concern you as well?
20  A.   Did I what, I'm sorry?
21  Q.   You're saying you were considering past
22       practices.  Was one of the past practices that
23       you considered the fact that VRF reposted the
24       data after getting an injunction from the
25       Court?
```

Page 188

```
1            MS. LECOCQ:  Objection.
2   A.   When was that?  I'm just trying to get that in
3        my mind at this point.
4            BY MR. GREIM:
5   Q.   July, the Court told us not to repost it.
6   A.   2022, and you reposted it, correct?  And so
7        then it was posted at the time of this request
8        for more data.
9   Q.   It was, yes.
10  A.   So, yes.  So after a promise not to post it, it
11       was reposted, and then we get a request for
12       more data, absolutely.
13  Q.   Now, do you recall that the promise not to post
14       it was unless or until we got relief from the
15       Court?  Do you recall that?  We can go back and
16       look at the letter.  Let's go back.
17  A.   That's fine.  I get that you're going to do
18       what the Court allows you to do.
19  Q.   Right.  But nonetheless, there was a dock
20       against VRF when deciding whether to -- whether
21       to --
22  A.   I think that's a very clear indication of the
23       intention of the use of the data.
24  Q.   Okay.  And so, now, how do you factor in the
25       fact that after the Court of Appeals stayed the
```

Page 189

```
1        injunction VRF immediately took it down?
2   A.   Because it's a court order, not out of respect
3        for the state law or our position or our
4        policy.
5   Q.   Because we had to?
6   A.   Yes.
7   Q.   Okay, got it.  But do you believe VRF will
8        maybe even post it without a court order?
9   A.   Post what without a court order?
10  Q.   Voter data.
11  A.   That if the Court says you cannot?
12  Q.   Right.
13  A.   If the Court says you cannot, no.
14  Q.   Do you believe that while the issue is still
15       pending, VRF might just decide to start posting
16       again?
17  A.   I think without a court order, I think their
18       intention is to post that data, yes.
19  Q.   Oh, so you believe VRF is going to -- you
20       believe VRF will post voter data even without a
21       court order?
22  A.   I don't think I said that.
23  Q.   Okay.  I thought I -- I could have sworn you
24       said that.
25  A.   No.
```

48 (Pages 186 to 189)

Page 190

```
 1    Q.   So even while this case is pending, do you
 2    believe VRF is going to repost data?
 3    A.   I think without a court order that prohibits
 4    the posting of data, VRF has demonstrated that
 5    its intention is to post the data.
 6    Q.   Okay.  The next thing is, finally, on
 7    November 10, 2022 -- I'm back to Exhibit 9.  On
 8    November 10, 2022, we filed a motion to stay --
 9    second paragraph.  I'm kind of at the bottom of
10    that second one.  "We filed a motion to stay
11    the preliminary injunction pending appeal...
12    ...and do not think it is appropriate to
13    produce voter data until the Court has ruled on
14    the motion."
15         Did I read that right?
16    A.   You did.
17    Q.   Okay.  Why not?
18    A.   Why do we feel like it's not appropriate?
19    Q.   Yes.
20    A.   Because we feel like it's against the law.
21    Q.   Right.  But -- so -- oh, so you -- is it the
22    secretary of state's position that it is
23    actually against the law to produce data to
24    VRF?
25    A.   No.
```

Page 191

```
 1    Q.   Okay.  So I'm asking you why the secretary of
 2    state says that "We do not think it is
 3    appropriate to produce voter data until the
 4    Court has ruled on the motion"?
 5    A.   We appealed -- we were in the process of
 6    appealing because we felt like posting it
 7    online was against state law --
 8    Q.   Okay.  But --
 9    A.   -- is against state law.
10    Q.   So what was inappropriate about just producing
11    data to VRF at this time?
12    A.   The knowledge that it was going to be posted
13    online.
14    Q.   Okay.  Well, let's talk about this.  Did the
15    order allow VRF to post all data online or just
16    some data?
17    A.   I don't know.
18         MS. LECOCQ:  Objection.
19    BY MR. GREIM:
20    Q.   Okay.  Well, we may have to actually pull it
21    out.  Did the secretary of state recall that
22    the order only related to the data that VRF had
23    already received?
24    A.   I'd have to look at the order.
25    Q.   I think we're going to have to pull the order
```

Page 192

```
 1    up.  While we're doing that, let me make sure I
 2    understand.  The inappropriateness here in this
 3    sentence relates to another concern that
 4    without a definitive win in the Court of
 5    Appeals, VRF might start posting even new data
 6    on the Internet, is that right?  Let me
 7    rephrase that.
 8         The inappropriateness you're referring to
 9    here is the secretary of state's concern that
10    unless and until the secretary of state got a
11    definitive win in the Tenth Circuit that VRF
12    might just post any data it got online?
13         MS. LECOCQ:  Objection.
14    BY MR. GREIM:
15    Q.   Is that the concern?
16    A.   The concern was that VRF had posted data.  We
17    understand that they had an intention to post
18    data, and they're asking for updated data, so,
19    yes, there is a concern that it would be
20    posted.
21    Q.   Okay.  I'm just going to read to you -- you're
22    not in a good position for me to tilt the
23    computer around.  I'm looking at DOC 51,
24    page 210.  And it says, "It is ordered that (i)
25    the Plaintiffs' motion for preliminary
```

Page 193

```
 1    injunction is granted in part; (ii) that AG
 2    Balderas and Defendant SOS Oliver are enjoined
 3    from prosecuting Plaintiff VRF for publish-" --
 4    okay, this is all one thing -- "are enjoined
 5    from prosecuting Plaintiff Voter Reference
 6    Foundation under N.M.S.A. 1-4-5.5 or 1-4-5.6
 7    for publishing data it already received from
 8    Local Labs."
 9         Okay.  So does that refresh your
10    recollection that the order only went to the
11    data we already received?
12         MS. LECOCQ:  Objection.
13    A.   I mean, I heard you.  Now I know what it says.
14    BY MR. GREIM:
15    Q.   Okay.  So is it possible that the secretary of
16    state -- I mean, you're here not as yourself
17    but for the secretary of state, did not know
18    that the injunction only related to the data
19    that VRF had received from Local Labs?
20         MS. SCHREMMER:  Objection.
21    A.   It's possible.  But I guess also, you know,
22    when I hear that statement all along, right,
23    there's 200 and something other pages to
24    consider in that order, so I am going to,
25    obviously, rely on an attorney to read that in
```

49 (Pages 190 to 193)

Page 194

1   its entirety. So it already received, does
2   that mean the fields? Does that mean only from
3   a certain date and time? I don't think that's
4   clear.
5   BY MR. GREIM:
6   Q. Okay. So the secretary of state thought that
7   the injunction was unclear?
8       MS. SCHREMMER: Objection.
9   A. I think that statement you just read that
10  you're asking me respond to is unclear, as I
11  think there is a much larger document that was
12  reviewed and considered by our legal counsel.
13  BY MR. GREIM:
14  Q. Okay. Well, let me just ask you. I want to
15  make sure I fully understand the meaning of
16  this last phrase about "do not think it's
17  appropriate to produce voter data." Is there
18  any other concern about appropriateness there
19  other than the fear that VRF was going to take
20  the new data and post that online?
21  A. It was the belief, based on past practice, that
22  it was going to post the new data online, and
23  also the fact that we were appealing that
24  decision that provided opportunity to post.
25  Q. So why would the appeal make a difference? I'm

Page 195

1   trying to understand why would the fact of the
2   appeal keep VRF from being able to get data?
3       MS. LECOCQ: Objection.
4   BY MR. GREIM:
5   Q. Why did the secretary of state think that the
6   appeal mattered?
7   A. It mattered because we believed that posting it
8   online is contrary to what the law allows.
9   Q. But was the secretary of state going to get a
10  decision from the Tenth Circuit that VRF can
11  never post the data online? Was that even a
12  possibility on the appeal?
13  A. We believe that is a possibility.
14  Q. Okay.
15  A. We believe that we are following the law.
16  Q. Okay.
17  A. That's it.
18  Q. Okay. So the secretary of state -- I'm just --
19  believes that it might win in the Tenth
20  Circuit, and the Tenth Circuit might say, "VRF,
21  you can't post this online at all," and you
22  thought you needed to wait to see what the
23  Tenth Circuit said, is that right?
24  A. In part, and the past practice of reposting
25  online, yes.

Page 196

1   Q. Okay. And so, I mean, the Tenth Circuit
2   decision isn't decided now either, right?
3   Still waiting?
4   A. We are still waiting.
5   Q. Okay. Well, actually, let's be clear. What
6   you cite here is the motion to stay the
7   preliminary injunction --
8   A. Correct.
9   Q. -- right? Well, that was granted.
10  A. Yes.
11  Q. So does that change this sentence? Would you
12  now produce the data because the motion to stay
13  was granted, or would you be less inclined to
14  produce the data because the motion to stay was
15  granted?
16  A. I think as I stated before, you know, there
17  hasn't been a significant change in the facts,
18  right, so there's not a change in your
19  position, not a change in our position, no.
20  Q. Well -- okay. But the letter cites the motion
21  to stay, as a fact that it's pending, as a
22  reason not to produce the data, and so the
23  motion to stay has been decided, it has been
24  granted. And so now that something -- that has
25  changed, the thing cited here has changed. And

Page 197

1   so my question is which way does that cut?
2   Does it make it -- is the secretary of state
3   more inclined to release the data after having
4   won the motion to stay or less inclined
5   to release the data?
6   A. I don't have an updated response from the
7   office on that item.
8   Q. Okay. I'm going to be adding that to the list
9   of things that we don't have an answer to and
10  this may require counsel being involved. I'd
11  like to understand that. We need to understand
12  what this letter means.
13      Okay. The next -- we can keep moving
14  through. The next paragraph says that you have
15  not submitted the required affidavit and it
16  cites -- oh, here, it actually cites the
17  injunction, so it cites part of the injunction.
18  So is the lack of an affidavit one of the
19  reasons for rejecting the request?
20  A. Absolutely.
21  Q. Even had there been an affidavit attached, it
22  still would have been rejected, though,
23  correct?
24  A. I think we don't know that answer because we
25  didn't receive one, right?

Page 198

1    Q.  No -- well --
2    A.  But based on what we do know at this -- are we
3        asking about this point in time?
4    Q.  Yes.
5    A.  Yes.
6    Q.  Okay.  It would have been rejected even with
7        the affidavit?
8    A.  Yes.
9    Q.  Okay.  And then finally at the very end you say
10       that if the Court orders you to produce it, you
11       will, right?
12   A.  Right.
13   Q.  That remains true?
14   A.  Correct.
15           (WHEREUPON, at this time a discussion was
16       held off the record.)
17   BY MR. GREIM:
18   Q.  I have one more question about Exhibit 9 -- a
19       different part -- I'm sorry, this is Exhibit 8.
20       Let's go back here.  Exhibit 8 does double
21       duty.  It is a request for -- it attaches a
22       request for records and it also provides a
23       notice of violation.  Do you see the bolded
24       section in the beginning?  There's some
25       indentation problems there, but it says "Notice

Page 199

1        of Violation of National Voter Registration Act
2        and Request for Records," do you see that?
3    A.  I do.
4    Q.  Okay.  Now, one thing we're asking for the
5        secretary of state's position on in this case
6        is whether there was any information missing
7        from this notice.  Is there anything in here
8        that it is claiming should have been inserted
9        into this notice to make it a proper notice?
10       And my question is:  Is there anything missing
11       in the notice?
12   A.  A proper notice of NVRA violation?
13   Q.  Uh-huh.
14   A.  I don't know what's required of the notice of
15       an NVRA violation.
16   Q.  Did you do anything before the deposition today
17       to explore that topic?
18   A.  Compliance with federal law from your
19       organization?
20   Q.  No, no.  Let's -- I mean, I can -- we can go
21       back to the -- we can go back to the notice.
22       Let's see here.  Oh, it's the admissions and
23       denials and responses to discovery.  Okay.
24       Well, we asked you a question about whether
25       this notice was proper.

Page 200

1        So your counsel may have an objection
2        that I can't ask this question or that you
3        don't need to give me an answer, but I'm just
4        going to ask it on the record.  Does the
5        secretary of state contend that there is
6        anything defective in this notice of violation
7        of the NVRA?
8            MS. LECOCQ:  Objection.  You can answer.
9    A.  I don't know.
10           MR. GREIM:  Now we can take our break.
11           (WHEREUPON, at this time a brief recess
12       was taken.)
13   BY MR. GREIM:
14   Q.  All right.  Before we leave our last topic, the
15       denials of records, we talked, Ms. Vigil, about
16       the reasons for the secretary of state denying
17       the requests that I made in May and then we
18       talked again about the denials of the November
19       requests.  I just want to make sure we're not
20       missing any of the reasons for the denials of
21       the requests.
22   A.  I mean, it was made in October, right?
23   Q.  Yeah, made in October, that's right.  And so
24       maybe if we can go back to Exhibit 8, we talked
25       about the statements regarding personal

Page 201

1        information, not publishing it online, and --
2        but I skipped over, kind of, the second of the
3        two projects.  And so I list in this request
4        two different projects that we were going to do
5        with the data.  And you'll see the first one is
6        this complete list by county precinct -- I'm
7        sorry.  These are two sets of data.  And the
8        second one is the current voter registration
9        data.
10           And then I go in and mention the two
11       projects.  At the very bottom I say for a
12       second project VRF intends to analyze basically
13       the data or to engage in a discrepancy review
14       of the voter rolls.  Do you remember reading
15       over that earlier?
16   A.  Yes.
17   Q.  And I just wanted to know, earlier I think you
18       testified that some of the misinformation that
19       the secretary thinks that VRF was engaging in
20       was that discrepancy analysis and its
21       statements about that, which would have been
22       back in late 2021.  And so before I ask a
23       question, I just want to make sure that you're
24       tracking with me.  Do you recall testifying
25       earlier about the secretary's concern that the

51 (Pages 198 to 201)

Page 222

1    don't believe the AG's office has shared any
2    feedback on the amendment.
3    BY MR. GREIM:
4    Q.  Okay.  But back to the question that I asked,
5         which is not about the response to this, my
6         question is whether the secretary of state's
7         office, okay, your office, is supporting these
8         particular amendments in order to impact the
9         current litigation?
10             MS. LECOCQ:  Objection.
11    A.  No.
12             MR. GREIM:  We're all set.  We're done
13    here.
14             THE COURT REPORTER:  Erin, would you like
15    a copy?
16             MS. LECOCQ:  Yes.
17             MR. GREIM:  We are asking for a rough by
18    Thursday, and they may also want the same.
19             MS. LECOCQ:  Yeah, we would like that,
20    too.
21
22             (Deposition concluded at 6:53 p.m. EST.)
23
24
25

Page 223

1              ACKNOWLEDGMENT OF DEPONENT
2
3              I, MANDY VIGIL, do
4    hereby certify that I have read the
5    foregoing pages, and that the same is
6    a correct transcription of the answers
7    given by me to the questions therein
8    propounded, except for the corrections or
9    changes in form or substance, if any,
10    noted in the attached Errata Sheet.
11
12
13    _____
14    MANDY VIGIL              DATE
15
16
17
18
19
20
21
22
23
24
25

Page 224

1    STATE OF INDIANA    )
2                          ) SS:
3    COUNTY OF JOHNSON  )
4
5                   CERTIFICATE
6
7         I, Valerie Fillenwarth, RPR, a Notary
8    Public in and for the County of Johnson, State
9    of Indiana, maintaining an office in Johnson
10    County, Indiana, do hereby certify the
11    following:
12
13         That the witness herein, MANDY VIGIL, was
14    first duly sworn to tell the truth, the whole
15    truth and nothing but the truth in the
16    foregoing deposition;
17
18         That all testimony was taken down in
19    stenographic notes and afterward reduced to
20    typewritten form under my direction and then
21    presented to counsel for the purpose of
22    obtaining the deponent's signature;
23
24         That I recorded and transcribed any and
25    all objections made by counsel and the reasons

Page 225

1    therefore; and
2
3         That I am not a relative or employee,
4    attorney or counsel of any of the parties, nor
5    a relative or employee of such attorney or
6    counsel, nor am I financially interested in
7    this action.
8
9         IN WITNESS HEREOF, I have hereunto set my
10    hand and affixed my Notarial Seal this 16th day
11    of March 2023.
12
13
14
15
16         Valerie Fillenwarth, RPR
17         Notary Public
18
19
20
21
22
23    My County of Residence is:  Johnson
24    Commission Number:  NP0669434
25    My Commission Expires:  June 22, 2023

                              57  (Pages 222 to 225)

| Hugh Alexander Curtas February 28, 2023 Plaintiff's Designations | |
|---|---|
| **Beginning** | **Ending** |
| 4:18 | 4:22 |
| 52:7 | 53:9 |
| 53:6 | 53:9 |
| 72:17 | 72:22 |
| 72:23 | 73:12 |

| Hugh Alexander Curtas February 28, 2023 Defendants' Designations | |
|---|---|
| Beginning | Ending |
| 53:10 | 54:10 |
| 55:1 | 55:10 |
| 71:24 | 72:16 |
| 74:08 | 75:10 |
| 83:4 | 85:11 |
| 89:23 | 90:11 |
| 94:24 | 95:11 |
| 113:4 | 113:18 |
| 116:8 | 117:11 |



# PohlmanUSA®
## Court Reporting and Litigation Services

---

Hugh Alexander Curtas

February 28, 2023

---

Voter Reference Foundation, LLC

vs.

Raul Torrez, et al.

1        THE REPORTER:  All parties to this deposition

2    are appearing remotely and have agreed to the

3    witness being sworn in remotely.

4            Due to the nature of remote reporting,

5    please pause briefly before speaking to ensure all

6    parties are heard completely.

7            Counsel will be noted on the

8    stenographic record.

9            Mr. Curtas, would you raise your right

10   hand, please, sir.

11               (WHEREUPON, the witness was duly

12                sworn.)

13               HUGH ALEXANDER CURTAS,

14   called as a witness herein, having been first duly

15   sworn, was examined and testified as follows:

16                      EXAMINATION

17   BY MR. TYLER:

18      Q.    Mr. Curtas, thanks for coming.  Can you

19   just again give your full name.

20      A.    Sure.  Full name, Hugh Alexander Curtas.

21   I'm the communications director for the Secretary

22   of State's office.

23      Q.    So, it is Curtas, not Curtas

24   (pronunciation)?

25      A.    Yes.

1      Q.    Okay.  So, you say, "Simply put,

2   VoteRef.com is misleading the public about New

3   Mexico's voter rolls and are perpetuating

4   misinformation."

5           I have got a couple terms just in that

6   sentence that I would like to define quickly.

7           When you say "misinformation," what do

8   you mean?

9      A.    I mean misinformation about voting and

10   elections that was very prominent at the time and

11   continues to be very prominent.

12      Q.    So, misinformation, though, what do

13   you -- what is misinformation to you?

14      A.    So, misinformation in -- are you talking

15   in general or specific what I'm specifically

16   referring to here?

17      Q.    If there is a general definition that

18   you have and then a different specific definition

19   in this context, then I would like to know both of

20   those.  But if there is just one, I'd like to know

21   that one.

22      A.    I think in this context, they are the

23   same.  And what I mean by misinformation and

24   election and voting misinformation at this -- here,

25   is putting out information about our voting and

1    elections that doesn't correspond to the truth.

2       Q.    And in this context, you're saying that

3    VRF is perpetuating misinformation.  What is the

4    information that VRF was putting forth that did not

5    correspond to the truth?

6       A.    Sure.  So, the misinformation that

7    Voter Ref is -- you know, that I'm claiming here,

8    is that there are discrepancies within our voter

9    data.

10      Q.    And how did you come to that conclusion?

11      A.    That conclusion is basically the first

12   bullet point of my answer in this e-mail, namely,

13   that this organization is claiming that our voter

14   data is not accurate and they are mis- -- I mean,

15   they are, they being Voter Ref, are

16   mischaracterizing the data they seem to be in

17   possession of.

18      Q.    What is the characterization by

19   Voter Ref that you are saying is misinformation?

20      A.    That there are differences between the

21   voter -- like the voter data and number of ballots

22   cast or, you know, what they are alleging in here,

23   in there or what I have been told from this

24   reporter at this point is incorrect.

25             A discrepancy -- well, what I came to

1   learn was that the data they are referencing here,

2   Voter Ref, via Megan O'Matz and into my e-mail, is

3   from a voter file that was pulled months before

4   this.  And what I learned is that then immediately

5   once anyone pulls a voter file, it's out of date

6   immediately because the voter data is being

7   constantly updated.

8          And, so, to claim a discrepancy in our

9   voter data when there is not one, to me, is

10   misinformation.

11      Q.   And was that the -- let me rephrase.

12          You said to you that's misinformation.

13   Did you talk to anybody else in the office about it

14   being misinformation?

15      A.   That I couldn't recall.  I couldn't

16   recall that.  What I talked to other people in the

17   office was about the facts that I needed to respond

18   to this reporter.

19      Q.   Okay.  Let's move to the next sentence

20   in that first paragraph.

21          "They reflect a lack of understanding

22   about how the process of voter list maintenance

23   works."

24          Did I read that correctly?

25      A.   Yes.

1      Q.      Okay.  You kind of touched on this I
2  think.  But what is the lack of understanding that
3  you were referring to?
4      A.      Yeah, the lack of understanding I'm
5  referring to there is the -- the fact that if you
6  reference -- if you pull a voter data file and then
7  you want to compare that voter data file with
8  current voter data, that -- and claim a
9  discrepancy, you're misunderstanding the data.  And
10 that's what I'm referencing there.
11     Q.      What would you suggest to someone,
12 either an organization like VRF or just a
13 New Mexico citizen, if they had a similar lack of
14 understanding?
15     MS. LECOCQ:  Objection.
16 BY MR. TYLER:
17     Q.      What would you suggest to them to do?
18     A.      I would suggest that they learn just how
19 the process works, you know, just learn the
20 back-end process of how data is maintained and used
21 and what it means to pull the voter file and why as
22 soon as you pull it it's out of date.
23          Just that kind of thing right there,
24 most people wouldn't understand.  "What do you mean
25 it's out of date?  Why?"  You kind of have to

1        A.      These are my words drafted from what
2    they told me.
3        Q.      Okay.  In the course of either, you
4    know, when you got the first e-mail from Megan
5    O'Matz or at any point after that, have you created
6    any like file on VRF or anything like that that you
7    would have, research documents and/or drafts of
8    things?
9        MS. LECOCQ:  Objection.
10   BY THE WITNESS:
11       A.      No, no.  Other than, you know, the
12   e-mails that -- these e-mails and things that I
13   have produced for discovery, yeah, that's -- that's
14   the only information I would have referencing VRF.
15   BY MR. TYLER:
16       Q.      Okay.  And moving on to the second
17   bullet point, you say, "No, our Office has not been
18   contacted by this group to discuss their findings
19   likely because that would not serve their intended
20   goal of spreading misinformation."
21            I think we've hit that first clause a
22   good amount.
23       A.      Um-hmm.
24       Q.      The second one, where did you come to
25   this conclusion or how did you come to this

1    conclusion that the intended goal of VRF is to

2    spread misinformation?

3        A.    So, I would have -- I came to that

4    conclusion because of the information that I had at

5    that point and -- which cannot also -- which must

6    be seen in the larger context of what's going on in

7    December of 2021 and to now, which is an immense

8    amount of mis- and disinformation about voting and

9    elections being, you know, in the public

10   conversation.

11           So, that's to say me specifically,

12   because I'm kind of the front line on this, but our

13   office more generally, very -- we are very attuned

14   to the misinformation that's out there about

15   elections in general and New Mexico's elections

16   specifically.

17           And, so, I as the spokesperson for the

18   office am pushing back hard wherever I find it,

19   wherever I see it, and because we want New Mexicans

20   to have accurate information about their voting and

21   elections.  It's part of our mission at the office.

22   And, so, I'm very attuned to that.

23           Once I kind of looked at all of this,

24   namely, that this group is in illegal possession of

25   our voter data and not only are they in illegal

1   possession of our voter data, they are making

2   claims, false claims, about the data that they

3   have, and those two things are really concerning to

4   me and led me to the conclusion -- especially

5   because there is a larger kind of strategy of

6   election denialism that focuses on voter list

7   maintenance specifically.

8            So, it's not like this is happening in a

9   vacuum.  There is a reason that when I'm looking at

10  all of this information that I have at this point,

11  I am, you know -- I'm of the opinion that this

12  is -- that this is their intention.

13       Q.    Are there other people in the

14  Secretary's office that share your feelings about

15  this?

16       A.    I wouldn't be able to talk about -- I

17  mean, specifically to whatever individuals are

18  thinking about this and, you know, about this group

19  and in this time.  So, I mean, you know, this is --

20  yeah, I mean, I don't know exactly what someone

21  like Sharon or Mandy or whatever, you know, would

22  think about this group at this time.

23       Q.    Have you ever talked to anyone in the

24  office about the kind of -- what you're referencing

25  as the greater kind of misinformation around

```
1   elections?

2       A.    Certainly, yes.  We talk about that all

3   the time.  It's been a major, you know, a major

4   project of our office to push back against election

5   misinformation since 2020.  Actually, before 2020.

6   But a major project of the office.  So, definitely

7   something that is discussed.

8       Q.    Is it fair to say -- so, you said that

9   you were pushing back hard.  Is it fair to say you

10  were pushing back hard because you were associating

11  VRF with these other organizations or other people

12  who were in your mind associated with election

13  denial or anything like that?

14      MS. LECOCQ:  Objection.

15  BY MR. TYLER:

16      Q.    Misinformation.

17      A.    Really, the reason I'm pushing back hard

18  in this instance is really at this point I have not

19  that much information about the Voter Reference

20  Foundation.  The information I have is basically

21  coming from this reporter.

22             I mean, a little bit of that Google

23  search, but really it's coming from this reporter

24  and what I can glean from them being in possession

25  of voter data and then making claims that we
```

1   consider to be false about that voter data.

2          So, I mean, that's what's informing my

3   claim there that they're attempting to spread this

4   misinformation.   I mean, and the larger context in

5   which this is playing out.

6          But I don't -- at this point I don't

7   know enough specifics about these people or

8   anything to say -- to say anything other than on

9   its face it looks like they're spreading

10  misinformation about our voter data.

11       Q.    Could you just discuss the views that

12  you have personal knowledge of of the other people

13  in the Secretary's office about misinformation

14  regarding elections or voter rolls or voter

15  maintenance?

16       MS. LECOCQ:   Objection.

17  BY THE WITNESS:

18       A.    Well, I mean, again, going back, you

19  know, without being able to know exactly what, you

20  know, any one person's thinking, I think that we

21  are aligned, the leadership team in our office is

22  aligned in wanting to get New Mexicans the best

23  information they can and pushing back against what

24  we see as a real problem with the narrative around

25  elections, which is misinformation.

1          So, what you describe there is what my,

2    you know -- is the -- what I was operated -- the

3    knowledge that I was operating off of.

4        Q.    I guess I'm just trying to pinpoint what

5    you're believing and what the office is believing

6    is the misinformation.

7        A.    Sure.  Well, the misinformation.

8    They're claiming almost 4,000 people voted in

9    New Mexico that didn't vote.  That's a -- that's a

10   big bit of misinformation right there because

11   that's just not true.

12          They have no proof of that.  There had

13   never been any proof of that.  What they are

14   referencing in terms of this data does not prove

15   that.

16          And, yeah, so that's kind of what I'm --

17   that's what I'm getting at there is that, you know,

18   they are looking at this, at this data, and they're

19   saying something that's not true about it.  And in

20   my mind that undermines voter confidence.  I

21   understand, you know, their claim is that they are

22   trying to -- voter confidence as well.

23          But in my, you know, work and all of

24   this, these kinds of things, especially coming --

25   this is, again, in the context of 2020 and we're --

1   we've already gotten through the 2020 election,

2   January 6, all of that.  We are coming up on to

3   this very important midterm election.  We want to

4   make sure that people have the correct data.

5              And what I don't want out there as a

6   communications person is a false story that our --

7   that 4,000 more people, that there is some kind of

8   discrepancy between, you know, who is on the rolls

9   and who is going to be able to vote.  And, so,

10  that's why I am really trying to be -- like push

11  back hard on this.

12      Q.    Okay.  And I promised you that I was

13  going to pick up the pace a little bit, and I

14  promise that I will, but I have one last question

15  for you.

16             You've said that if someone had a

17  question or an inquiry like VRF, they should

18  contact you.

19             After you learned that VRF did contact

20  the Secretary of State, did you ever contact VRF?

21      MS. LECOCQ:  Objection.

22  BY THE WITNESS:

23      A.    I did not contact VRF, but I can't say

24  with any certainty whether other -- somebody in my

25  office may have done that.

```
 1   BY MR. TYLER:

 2        Q.    Did anybody come and talk to you about

 3   contacting VRF?

 4        A.    Not that I recall.  Not that I recall.

 5        Q.    Did anybody talk about not contacting

 6   VRF?

 7        MS. LECOCQ:  Objection.

 8   BY THE WITNESS:

 9        A.    Yeah, not that I recall.

10   BY MR. TYLER:

11        Q.    Okay.  I would like to go to page 4, 4

12   and 5.  And, again, the -- a little wonky here.

13   The bottom of page 4 is the first part of the

14   e-mail from the top of page 5.

15        A.    Okay.

16        Q.    And here -- will you just take a second

17   and read that e-mail to yourself.

18        A.    Sure.

19        Q.    Sorry.  Just to clarify right now.  I'm

20   just talking about the December 16 e-mail at 11:44.

21        A.    Okay.  Gotcha.  So, just this one right

22   here.

23        Q.    Yes.

24        A.    Yes, I have read that.

25        Q.    In that e-mail she is talking to you
```

1      **A.     Thank you for numbering these.**

2      Q.     So, this is after some just

3  back-and-forth.  She thanks you for looking into

4  the issue.

5      **A.     We're going up in time here.**

6      Q.     Yes, yes.  It's kind of reverse

7  chronological order here.

8      **A.     I got you.**

9      Q.     And you say, "On the legal issue:  Our

10  office believes publication of voter data by

11  VoteRef.com is in direct violation of New Mexico

12  Election Code.  We do not believe that posting New

13  Mexicans' private voting information online is

14  legal use of this information.  We will refer the

15  use of this information by VoteRef.com to the

16  New Mexico Attorney General for criminal

17  investigation and prosecution."

18          And where did you get this information?

19      MS. LECOCQ:  Objection.

20  BY MR. TYLER:

21      Q.     We can go -- let's just go piece by

22  piece here, make it a little bit more clear.

23          You say, "Our office believes this

24  publication of voter data by VoteRef.com is in

25  direct violation of New Mexico Election Code."

1          Where did that conclusion come from?

2     A.      So -- well, I mean, it comes from the

3    experts in our office.  So, in this specific thing,

4    you know, as -- to compare to that e-mail where I'm

5    doing some editorializing on my own, when it comes

6    to legal issues, I get verbatim words from Dylan

7    and this was a copy-paste.  This is how I respond

8    to the reporter in this claim.

9          And I -- you know, because -- I mean,

10   Dylan is our general counsel, so, this -- he gave

11   us this.

12        MS. LECOCQ:  I'm going to just register an

13   objection.  I don't want to waive any

14   attorney-client privilege.  I understand what it is

15   that you're trying to do here, so I don't want to

16   get in the way of that.  But I just want to put on

17   the record we are not waiving the attorney-client

18   privilege.

19        MR. TYLER:  Sure.  And I will just ask what's

20   in this e-mail.

21   BY MR. TYLER:

22     Q.    So, you said that this was verbatim and

23   you shared this with Megan O'Matz.  Was that from

24   an e-mail?  Did you copy-and-paste it in?

25     A.    It was -- again, I couldn't say

1          A.     No, it's not that formal.

2    BY MR. TYLER:

3          Q.     Okay.

4          A.     Yeah.

5          Q.     Okay.  And, so, I think you've answered

6    this a little bit, but the bit that's in quotes

7    here from "We do not believe" through the end of

8    that paragraph, what is that quoted from?

9          A.     If my recollection is correct, that is a

10   direct copy-paste from the AG referral letter that

11   we're referencing here.

12         Q.     And what do you mean when you say "This

13   is the crux"?  What do you mean?

14         A.     I just mean, you know -- she's asking me

15   that specific question, Megan O'Matz is asking me

16   that specific question.

17                In that last e-mail, you know, I gave

18   her the entire AG referral letter, so she has the

19   entire thing for context.  But just as kind of a

20   quick summary, this is, you know, just so you know,

21   this is the main point, the thesis statement of

22   this, you know, of the referral letter that I've

23   attached.

24         Q.     Who told you that that was the crux or

25   that that was the summary part?

1      MS. LECOCQ:  Objection.

2   BY THE WITNESS:

3      **A.**    **No one specifically.  That would have**

4   **been my -- my, you know, conclusion after reading**

5   **that.  The referral letter, that was the most**

6   **important.  Like I said, that's the thesis**

7   **statement of the letter.  So, that's why I wanted**

8   **her to have that in that e-mail.**

9           **If she didn't look at -- you know, if**

10  **she never wanted to look at that letter, she could**

11  **still get the idea from that sentence.**

12  BY MR. TYLER:

13      Q.    Now that this has kind of turned into,

14  through these e-mails, this has kind of turned into

15  a legal issue and maybe a bigger issue than you

16  maybe thought it was in the first place -- I don't

17  know -- are you running these e-mails by anybody at

18  this point?

19      MS. LECOCQ:  Objection.

20  BY THE WITNESS:

21      **A.**    **No, no.  No, I have the leeway, you**

22  **know, and authority in the office to correspond**

23  **with a reporter in this way.**

24  BY MR. TYLER:

25      Q.    Okay.  Did anybody in the office ever

1      A.     The most prevalent --

2      Q.     Most prevalent.  Okay.

3      A.     -- I would say, yes.

4      Q.     So, why is VRF on this page?

5      A.     Sure.  So, VRF is on this specific

6  page because more -- speaking more to that timely

7  aspect is that after these articles came out, we

8  were concerned -- we wanted people to know exactly

9  what was happening with -- with the publication of

10  the voter data.  So, that's why Voter Reference is

11  mentioned on here.

12      Q.     So, you just wanted people to know about

13  Voter Reference?

14      A.     No.  We wanted to -- we wanted people to

15  know about what was going on with the data -- with

16  the New Mexicans voter data and -- and because it

17  has to do with Voter Reference Foundation, we had

18  to reference them and talk about that as well.

19      Q.     Okay.  And if we go down to where it

20  talks specifically about Voter Reference

21  Foundation, I believe it says -- I believe it's the

22  first one.

23      MS. LECOCQ:  I'm so sorry, Counsel, where are

24  you?

25      MS. SCHREMMER:  What page are you on?

1          A.     And I am in charge of developing this

2     page.

3          Q.     So, if we can go down to what I believe

4     is still on page 1, talking about Voter Reference

5     Foundation, "What you need to know."  You wrote all

6     of this, correct?

7          A.     I did.

8          Q.     Okay.  And what is your goal in putting

9     this on this specific web page?

10          A.     So, the goal when putting this content

11     on this web page is -- and, again, we're talking

12     just about the Voter Reference portion of this

13     page?

14          Q.     Yes.

15          A.     Is to make sure that the public has a

16     resource for more information now that there have

17     been published news articles about these topics.

18               We wanted to make sure that people

19     understood, you know, basically the questions that

20     I have in here, how much of my information is

21     online, can I cancel my voter registration and get

22     my information taken off.

23               And probably what was the most important

24     or one of the most important things we were

25     thinking about at this point is our confidential

1    address program, which is a very important program

2    for our office, shields survivors of domestic abuse

3    and stalking from having their information out

4    there.

5              Of course, publishing voter information,

6    you know, could have potential implications for

7    those people.  So, we wanted to make sure -- that's

8    why, you know, a third of this post, of that

9    section of the post is taken up by the Safe at Home

10   program and really just wanted people to know, hey,

11   this is happening.

12       Q.    Okay.  And, so, you mentioned it there

13   at the end, but just to clarify the program that

14   you were referring to is the Safe at Home program?

15       A.    Yes.  Yes.

16       Q.    There are various things that are in

17   blue here and --

18       A.    You mean the URLs?

19       Q.    Yes.

20       A.    Yes.

21       Q.    I do.  From being the person that wrote

22   this portion, these are links?

23       A.    They are links, yes, sir.

24       Q.    Do you know where these links go?

25       MS. LECOCQ:  Objection.

1        I, CORINNE T. MARUT, C.S.R. No. 84-1968,

2   Registered Professional Reporter and Certified

3   Shorthand Reporter, do hereby certify:

4        That previous to the commencement of the

5   examination of the witness, the witness was duly

6   sworn to testify the whole truth concerning the

7   matters herein;

8        That the foregoing deposition transcript

9   was reported stenographically by me, was thereafter

10  reduced to typewriting under my personal direction

11  and constitutes a true record of the testimony

12  given and the proceedings had;

13       That the said deposition was taken

14  before me at the time and place specified;

15       That the reading and signing by the

16  witness of the deposition transcript was waived;

17       That I am not a relative or employee or

18  attorney or counsel, nor a relative or employee of

19  such attorney or counsel for any of the parties

20  hereto, nor interested directly or indirectly in

21  the outcome of this action.

22

23       CORINNE T. MARUT, Certified Reporter
         Registered Professional Reporter
24       License No. 84-1968

25

| Joseph Dworak March 13, 2023 Plaintiff's Designations | | Defendants' Objection | Plaintiff's Response |
|---|---|---|---|
| **Beginning** | **Ending** | | |
| 6:8 | 6:14 | | |
| 7:12 | 11:6 | 9:18-11:6; Relevance:<br><br>The Open Government division does not provide counsel to the Secretary of State's office. Your proposed use of this testimony for that purpose would be entirely misleading. | This testimony shows (1) the basis of Mr. Dworak's knowledge of record requests and the function of the Open Records division; (2) the function of the Open Records division; and (3) how the Attorney General's office advises various public bodies-*like* the Secretary of State's Office. The connection between the Attorney General's Office and the Secretary of State's office is relevant to VRF's claim that the two worked in concert to refuse to fulfill VRF's requests for voter data and to chill VRF's speech. *Kennicott v. Sandia Corp.*, 327 F.R.D. 454, 469 (D.N.M. 2018) ("Relevance is still to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense.") |
| 16:21 | 17:4 | | |
| 19:25 | 20:12 | Relevance; calls for legal conclusion:<br><br>The testimony recites the statutory language and offers nothing of evidentiary value. Our office does not have a unified position on statutory provisions; attorneys from different division are frequently called upon to litigate against one another and take conflicting positions on these topics.<br><br>If it was Plaintiff's intention to have the judge on standby | The question calls for the Attorney General's position on lawful uses of New Mexico voter data under § 1-4-5.5 which is relevant to show the Attorney General and Secretary of State's basis to deny VRF access to New Mexico voter data-a key issue in VRF's claims in this case.<br><br>To the extent Defendants object to the form of the question on the basis it "calls for a legal conclusion," that objection has been waived as Defendants did not specify the basis for their objection |

| | | | |
|---|---|---|---|
| | | and conduct the deposition with no speaking objections reserved, they could have specified as such.  Having not done so, the risk of asking objectionable questions falls upon the party intending to offer deposition testimony as trial evidence. | during the deposition, stating only: "Objection."<br><br>Even so, the question calls for the application of facts to law which is not an objectionable legal conclusion. |
| 51:24 | 52:8 | Relevance:<br><br>The referral is no longer relevant to this case since it is no longer the potential source of any prior restraint.  Any restriction on VRF's speech at this point is due to the amended statutes governing use of voter data.<br><br>Further, the AG's position is contained in the pleadings in this matter and this testimony adds nothing of evidentiary value. | The question calls for the Attorney General's position on whether or not VRF has violated the New Mexico election code, which is relevant to VRF's claims regarding the Secretary of State's referral of VRF to the Attorney General for investigation and prosecution. It is also relevant to show the reasoning behind Defendants' actions in this case to deprive VRF of New Mexico voter data.<br><br>Further, just because Defendants' may have merely stated a position is pleadings does not somehow preclude VRF from testing those assertions. |
| 53:18 | 53:25 | | |
| 54:19 | 54:24 | | |
| 68:11 | 68:18 | Relevance:<br><br>The AG's view of misinformation is of no relevance to this case | This testimony concerns the Attorney General's position regarding whether VRF's speech constitutes misinformation. The content of VRF's speech and Defendants' position regarding that speech are relevant to VRF's First Amendment claims as well as its NVRA claims to show Defendants' basis for denying VRF voter data and referring VRF for investigation and prosecution. |
| 70:7 | 70:21 | Relevance:<br><br>The witnesses legal conclusions remain irrelevant. | The question of whether or not Local Labs has violated New Mexico election law was interjected by Defendants as a |

| | | | possible reason for refusing to fulfill VRF's requests for voter data and are thus relevant to illustrate Defendants reasoning for doing so. |
|---|---|---|---|
| 72:1 | 72:19 | Relevance<br><br>The Secretary has disclosed voter data to VRF and indicated her intention of continuing to do so under the same terms as other users of voter data. It is no longer relevant why requests were denied as it pertains to that particular transaction, since VRF may only receive prospective relief in this case. | The question of whether or not Local Labs has violated New Mexico election law was interjected by Defendants as a possible reason for refusing to fulfill VRF's requests for voter data and are thus relevant to illustrate Defendants reasoning for doing so. |
| 73:8 | 73:21 | Relevance:<br><br>The testimony reiterates the litigation position articulated by the office in the pleadings and offers nothing of evidentiary value. | This testimony is relevant to show Defendants' basis for conspiring to not fulfill VRF's requests for voter data and for criminal investigation. The cited testimony also, itself, references positions stated in pleadings which relate to VRF's claims that Defendants unlawfully denied VRF's requests for voter data. |
| 73:22 | 74:13 | | |
| 74:14 | 75:10 | Relevance:<br><br>The Secretary has disclosed voter data to VRF and indicated her intention of continuing to do so under the same terms as other users of voter data. It is no longer relevant why requests were denied as it pertains to that particular transaction, since VRF may only receive prospective relief in this case. | This testimony is relevant to VRF's claims that Defendants are unlawfully working together to deny VRF's requests for New Mexico voter data because it shows Defendants' purported reasons for the same. |
| 84:8 | 84:18 | | |
| 98:18 | 99:14 | | |
| 100:1 | 101:16 | | |

11

| 106:9 | 106:12 | Foundation; Relevance:<br><br>The questioning does not establish that the AG's office has any means of directly ascertaining whether registrations have been cancelled or whether there is any way of determining whether registrations were cancelled for a particular reason. | The question merely asks for the Attorney General's knowledge. If the Attorney General does not possess such knowledge, the witness is entitled to say so.<br><br>This question is also highly relevant as Defendants have themselves interjected the issue of canceled voter registrations into this litigation as a defense for denying VRF's requests for voter data. If the Attorney General is unaware of any canceled voter registrations yet works with the Secretary of State to deny VRF's voter data requests on that basis, then that shows Defendants' reasoning is mere pretext. |
| 128:16 | 129:14 | Relevance:<br><br>Neither the denial of voter data nor the statute as written at the time of the deposition have any relevance to this litigation any longer.  VRF is not entitled to retrospective relief on these issues. | The question of what is a permissible use of voter data is highly relevant to this litigation because Defendants have argued they are denying VRF's requests for voter data because they are not using the data for a permissible use. If the Attorney General cannot answer questions as to what is a permissible use under the law, that goes to show that the law, as written and applied, is vague and overbroad. |
| 130:20 | 131:16 | Relevance:<br><br>Neither the denial of voter data nor the statute as written at the time of the deposition have any relevance to this litigation any longer.  VRF is not entitled to retrospective relief on these issues. | The question of what is a permissible use of voter data is highly relevant to this litigation because Defendants have argued they are denying VRF's requests for voter data because they are not using the data for a permissible use. If the Attorney General cannot answer questions as to what is a permissible use under the law, that goes to show that the law, as written and applied, is vague and overbroad. |

| 144:7 | 144:16 | Relevance:<br><br>As noted above, this is not relevant to VRF's claims, which can only address prospective relief. | This question directly relates to the legal basis for the Attorney General's criminal investigation of VRF, which VRF has argued is a basis of its First Amendment claims. If the Attorney General cannot say whether the legal basis previously articulated by the Attorney General's office is correct, then that shows that Defendants' stated basis for criminal referral and investigation is pretextual. |
|---|---|---|---|
| 156:10 | 156:15 | Foundation; Relevance:<br><br>The document being addressed does not make promises regarding voter data, only "personal information of voters."  The question and answer encapsulate the heart of the dispute in this case and this testimony adds nothing on that front. | The Attorney General's knowledge of VRF's consistent promise not to post New Mexico voter data online is highly relevant to Defendants' true reasons for denying VRF's requests for voter data which underpin VRF's First Amendment claims. |
| 159:2 | 159:11 | Requests attorney-client privileged information; relevance:<br><br>The question calls for the contents of privileged communications and any substantive response would quite obviously violate that privilege. | It is unclear from Defendants' objection why they believe the above testimony to be privileged. Nonetheless, this testimony is not privileged because it does not ask for the actual communication between the Attorney General's office and the Secretary of State. Instead, the question only seeks to ascertain the fact of whether any communication happened.<br><br>Whether or not the Attorney General advised the Secretary of State to deny VRF's request for voter data is highly relevant to the whether or not Defendants worked together to deny VRF's requests for voter data—a point which the Attorney General has argued throughout this litigation and in |

| | | | |
|---|---|---|---|
| | | | the 10th Circuit on the basis of standing. |
| 159:16 | 159:24 | | |
| 160:22 | 161:17 | | |
| 165:6 | 167:5 | | |
| 167:16 | 172:24 | Relevance:<br><br>At no point in this litigation has VRF produced evidence that would substantiate their claims that Catalist or i360 sell New Mexico Voter Data. In the absence of such evidence, the fact that they were not investigated is irrelevant. | This testimony concerns whether the Attorney General has criminally investigated other, similarly situated entities as VRF. This line of questioning is relevant to whether or not Defendants maintain a consistent interpretation of the New Mexico election code and whether they enforce that election code consistently, or discriminatorily in order to deprive VRF of New Mexico voter data under that pretext. |
| 176:19 | 177:9 | | |
| 179:12 | 180:2 | Foundation; Relevance:<br><br>The witness is a 30(b)(6) witness and is not charged with knowing how every independent Assistant AG would view any particular facts with regard to a potential investigation. | Defendants' mere objection to "foundation" is unclear. However, the foundation for the Attorney General's answer and the question itself is simply the Attorney General's factual knowledge. The Attorney General's lack of knowledge of or concern of other entities using New Mexico voter data in a way similar to VRF shows the discriminatory nature with which Defendants have acted towards VRF to deny VRF's requests for New Mexico voter data.<br><br>As a 30(b)(6) witness, the purpose of the witness's testimony is to testify on behalf of the Attorney General. If the witness cannot truthfully answer the question, then Defendants' should have proffered a witness who could. |
| 180:12 | 180:16 | | |
| 184:19 | 184:23 | Relevance: | This testimony concerns the "clarity" of § 1-4-5.5 and its recent |

| | | | |
|---|---|---|---|
| | | The former law is no longer relevant to this litigation. | amendments which is relevant to VRF's claim that the law is vague and overbroad. |
| 186:12 | 186:16 | Relevance:<br><br>The former law is no longer relevant to this litigation. | This testimony concerns the "clarity" of § 1-4-5.5 and its recent amendments which is relevant to VRF's claim that the law is vague and overbroad. |

| Joseph Dworak<br>March 13, 2023<br>Defendants' Designations | |
|---|---|
| Begin | End |
| 17:5 | 17:16 |



**PohlmanUSA®**

Court Reporting and
Litigation Services

---

Deputy Attorney General Joseph Dworak

March 13, 2023

---

Voter Reference Foundation, LLC

vs.

Raul Torrez, et al.

## Page 6

1  gritty.  So I want to fly through the beginning, and
2  we're going to take a lunch break and get through
3  this, do some foundational stuff before that.
4       So that all being said, do you have any
5  questions?  That all sounds good from the get-go
6  here?  Anything you take issue with?
7  **A.  No questions.**
8  **Q.   Perfect.  And as we get started here, you**
9  **know, if I refer to the Attorney General or the AG,**
10 **just know that I'm referring to the office, not the**
11 **Attorney General himself.  It seems silly to say**
12 **that, but nevertheless.**
13       **To start out here, I'm going to hand you**
14 **what we've already marked as Exhibit 1.**
15       (Exhibit 1 marked.)
16 **A.   Just so you know, that's the only thing I**
17 **have with me is just a copy of the Exhibit A.**
18       Q.  Perfect.  Okay.  Can you tell me what this
19 is?
20 **A.   This is a notice of the deposition for the**
21 **30(b)(6) witness.**
22       Q.  And have you seen this document before?
23 **A.  I have.**
24       Q.  And you've just stated that you have a copy
25 here with you?

## Page 7

1  **A.  I do.**
2       Q.  Okay.  If you turn to page -- well, it's
3  marked page 2; it's actually the third page of the
4  exhibit I handed you.  Do you see a list of 10 topics
5  on that page?
6  **A.  Yes.**
7       Q.  Have you seen this list of topics before?
8  **A.  I have.**
9       Q.  Are there any topics listed on that page on
10 which you're not prepared to testify today?
11 **A.  No.**
12 **Q.   Okay.  Can you give me a walk-through of**
13 **your background?  Let's start with your education,**
14 **undergrad, and law school.**
15 **A.   Sure.  I went to the University of New**
16 **Mexico in Albuquerque, and received a degree in**
17 **political science and psychology.  I took a little**
18 **bit of time off and worked, and then came back to**
19 **Albuquerque, and went to the University of New Mexico**
20 **School of Law.**
21 **Q.   Okay.  And can you walk me through -- I**
22 **guess, let's start from your first job out of law**
23 **school until your position now.  If you could walk me**
24 **through the roles you've had.**
25 **A.   Well, I took a little bit of a break in the**

## Page 8

1  **middle of law school and worked in Washington, D.C.**
2  **for an FCC commissioner.  And then I came back and**
3  **finished my last semester of law school.  And I**
4  **started my first job here at the AG's Office.**
5  **Q.   And can you walk me through the**
6  **different -- have you had different roles in the AG's**
7  **Office since you've been here?**
8  **A.   I have, yeah.  My first job was a line**
9  **attorney in the Civil Division, which is now the Open**
10 **Government Division.  I had that job for about**
11 **two-and-a-half years or so.  And then I was the**
12 **Deputy Director of the Open Government Division.  And**
13 **then -- also for about two-and-a-half years.  And**
14 **then I was the Civil Litigation Director also for**
15 **about two-and-a-half years.  Then I left this office**
16 **for about a year-and-a-half, and then came back in**
17 **January with the new administration as the Deputy**
18 **Attorney General for Civil Affairs.**
19 **Q.   Okay.  What are your duties generally as**
20 **the Deputy Attorney General?**
21 **A.   They're evolving a little bit with the**
22 **transition, with the new administration.  But**
23 **generally, I oversee several divisions, including the**
24 **Open Government Division, the Civil Litigation**
25 **Division, the Treaty of Guadalupe Hidalgo Division,**

## Page 9

1  **and some other areas of the office, expanding on,**
2  **including tribal work, government transparency, and**
3  **some other areas in the civil side of the office that**
4  **might not necessarily fall in the form of litigation.**
5  **Q.   Who do you report to in your current role?**
6  **A.   The Chief Deputy Attorney General.**
7  **Q.   And do you have people that report directly**
8  **to you?**
9  **A.   Yes.**
10 **Q.   And who would those people be?  You can**
11 **just tell me their roles.  I don't need to know --**
12 **A.   Well, any division director that's under**
13 **me.  We have one division that doesn't have a**
14 **division director at the moment, so it's an exempt**
15 **position we need to fill.  So any management**
16 **positions, or anyone that doesn't have a position**
17 **that's filled would report to me.**
18 **Q.   Can you tell me a little bit about the Open**
19 **Government Division that you referenced?  What kind**
20 **of work does the Open Government Division do?**
21       **MS. LECOCQ:  Objection.  Go ahead.**
22 **A.   Yeah -- well, one, I don't -- I mean, I**
23 **could tell you generally, but that, the role of that**
24 **division is going to change with the new**
25 **administration also.**

3  (Pages 6 to 9)

Page 10

1       Q.  I guess first question:  What did that
2   division do while you were working in that division?
3       MS. LECOCQ:  Objection.
4       A.  Generally, provides representation and
5   legal assistance to about 80, or so, public boards
6   and commissions and small agencies in the state.
7       Q.  What's the scope of that representation?
8   Is it primarily related to IPRA and open records and
9   open meetings kind of issues, or is it broader than
10  that?
11      MS. LECOCQ:  I'm just going to do a
12  standing objection to relevancy just so I don't have
13  to keep objecting.
14      THE COURT:  Sure.
15      A.  So it really depends.  New Mexico is a very
16  unique state.  And it also is -- it's -- that role of
17  representation really depends on the public body that
18  we're working with.  So some boards and commissions
19  are administratively attached to other agencies.  And
20  those agencies have in-house counsel, and so the role
21  is much more narrow, and only provides assistance,
22  really, for matters that become before the public
23  body.  So disciplinary decisions and orders, rule
24  making, other matters that fall within the purview of
25  the public body, in terms of the things that need to

Page 11

1   be voted on in a public meeting, and others, they're
2   broader because they're not administratively attached
3   to another agency that provides legal counsel for
4   things like contracts, and, you know, other matters
5   that might be more of day-to-day work with the public
6   body.
7       Q.  What was your involvement in this case
8   before you were designated to be the representative
9   for this deposition?
10      A.  I didn't have a specific involvement with
11  the case.
12      Q.  And I guess I'm asking specifically first
13  with the civil case itself, you didn't have any
14  involvement?
15      A.  Not that I recall, no.
16      Q.  Okay.  And what about the -- were you
17  involved in any criminal investigation conducted by
18  the Attorney General regarding Voter Reference
19  Foundation?
20      MS. LECOCQ:  Objection.
21      A.  Not that I recall, no.
22      Q.  What did you do to prepare to testify
23  today?
24      A.  Well, I reviewed the pleadings, records in
25  the case, so all of the pleadings that have been

Page 12

1   filed, the discovery, interrogatories, answers,
2   requests for production; spoke with counsel; spoke
3   with two special agents in the case.
4       Q.  Well, who were the special agents that you
5   spoke to regarding this?
6       MS. LECOCQ:  Objection.
7       A.  I should clarify -- I said with the case.
8   They weren't with this case, but two special agents
9   that I know I spoke to about later in a parallel
10  proceeding, or parallel matter, I guess, is the
11  proper term.
12      Q.  By the "parallel matter" do you mean the
13  criminal investigation?
14      MS. LECOCQ:  Objection.
15      A.  Yeah.
16      Q.  Just making sure.
17      Did you review the district court's
18  decision which granted a preliminary injunction to
19  our client last July?
20      A.  I'm familiar with that.  I've looked at
21  that.  But that wasn't in preparation for this.
22      Q.  Okay.  Have you reviewed any transcripts of
23  any hearings in this matter?
24      A.  No, I don't believe I have.
25      Q.  Okay.  Have you reviewed any transcripts of

Page 13

1   any depositions taken in this matter?
2       A.  No.
3       Q.  Did you help prepare any answers to any of
4   the discovery responses that were given by the
5   Attorney General's Office in this matter?
6       A.  No.
7       Q.  But you did say that you have reviewed
8   those responses in preparation for today; correct?
9       A.  Yes.
10      Q.  I want to talk kind of just generally,
11  before we dive specifically into VoteRef, or VRF,
12  about the Attorney General's Office and its role in
13  relation to voter data in general.  And when I say,
14  "voter data" here, I'm just going to adopt the
15  statutory definition which says:  Any information
16  derived from the voter files.  So know when I say
17  "voter data" I'm meaning the same term that New
18  Mexico law uses for that.
19      So, generally, what is the Attorney
20  General's role regarding oversight of how voter data
21  is used?
22      A.  Well, it very much would depend upon the
23  context.  But just like many laws in the state, the
24  Office of the Attorney General is charged with
25  enforcing New Mexico State law.  And, you know, what

4  (Pages 10 to 13)

Page 14

1  that enforcement looks like very much depends upon
2  the facts of the situation.
3      Q.  Is there a specific division or group of
4  people in the Attorney General's Office that would
5  kind of be assigned to policing unlawful use of voter
6  data?
7      A.  The individuals in our office that would be
8  involved with issues related to voter data or any
9  voter issues would depend upon how we obtain the
10  information related to it.
11      So, I mean, yeah, I guess there is not a
12  clear answer.  It's not limited just to one group of
13  people in the office.
14      Q.  Does the Attorney General's Office have a
15  role related to voter data, other than investigating
16  potential unlawful use of voter data?
17      MS. LECOCQ:  Objection.
18      A.  The Office of the Attorney General's role,
19  again, is very much dependent upon what the referral
20  is.  It could come from members of the public.  It
21  could come from a role with providing assistance to
22  the Secretary of State, monitoring elections.  It
23  could come from a referral from the Secretary of
24  State.  It could come from a referral from somewhere
25  else.

Page 15

1      Q.  So let's say you, the Attorney General's
2  Office, receives a complaint from a citizen about
3  something related to their voter data.  Would that be
4  handled in-house, or would that be referred to, say,
5  the Secretary of State's Office?
6      A.  It depends on what the allegations are.  I
7  mean, many of those are often referred to the
8  Secretary of State, which obviously is the agency
9  charged with enforcing and reviewing election laws on
10  a daily basis.  And, you know, our office works in
11  conjunction with them, if there is something that,
12  you know, after their review, if there is something
13  that we need to look at from a civil or criminal
14  standpoint.
15      Q.  I'm not asking for any advice you might be
16  giving here.  But does the Attorney General's Office
17  advise the Secretary of State's Office if there is a
18  question regarding whether voter data is being used
19  unlawfully?
20      MS. LECOCQ:  Objection.
21      A.  I mean, generally, we certainly have the
22  ability to -- and have -- I can't say that every time
23  there is a question we would necessarily have to be
24  involved, or have been involved.
25      Q.  Does the Attorney General's Office provide

Page 16

1  advice to the Secretary about whether or not it
2  should provide voter data to a requester?
3      MS. LECOCQ:  Objection.
4      A.  Is that speculative?  I mean, I guess I'm
5  not sure if you're asking has that happened in the
6  past, or could that, or would that happen?
7      Q.  Well, let's say:  Has that happened in the
8  past, has the Attorney General given advice
9  to the Secretary about whether it should provide
10  voter data to a requester?
11      MS. LECOCQ:  Objection.
12      A.  I mean, part of -- certainly, some of that
13  would be privileged, if we were --
14      Q.  And I'm not asking for the content.
15      A.  Yeah, I mean those, questions certainly
16  have come up in the past.
17      Q.  Would you agree that the Attorney General's
18  Office has a duty to investigate the actual or
19  potential misuse or unlawful use of voter data?
20      A.  Can you ask that question again?
21      Q.  So would you agree that the Attorney
22  General's Office has a duty to investigate the actual
23  or potential misuse of voter data?
24      A.  That question would depend on the
25  circumstances.  I mean, if it's more appropriate for

Page 17

1  that -- at least initial investigation or review to
2  be done by, say, the Secretary of State, who is
3  charged statutorily with enforcing and reviewing
4  those laws, then you might start there.
5      So it doesn't mean that anytime that there
6  is an alleged allegation it would necessarily have to
7  be us exclusively, or us first.  We certainly -- our
8  office certainly has the ability and duty, when
9  appropriate, to investigate those kind of issues.
10      Q.  And what if the Attorney General's Office
11  receives a referral from the Secretary of State's
12  Office saying:  Hey, we think that voter data is
13  being used unlawfully, does the Attorney General's
14  Office then have a duty to investigate that?
15      A.  We certainly have the authority to.  I
16  don't know if we have an affirmative duty to.
17      Q.  Has the Attorney General's Office ever
18  initiated an investigation into the use of voter data
19  without receiving a referral from, say, the Secretary
20  of State's Office or a citizen complaint?
21      MS. LECOCQ:  Objection.
22      A.  That's outside of the scope of these
23  questions.  I don't know the history of, you know,
24  100 year history of our office.  I couldn't speak to
25  that.

5  (Pages 14 to 17)

Page 18

1   Q.  Are you aware of the Attorney General
2   initiating an investigation into the use of voter
3   data on its own volition since you've been at the
4   Attorney General's Office?
5       MS. LECOCQ:  Objection.
6       A.  From my own standpoint?  I can't speak to
7   the office, because again, that's outside of the
8   scope of what I prepared for with this deposition.
9   But not that I'm aware of.  But I wouldn't
10  necessarily be aware of it either because of my role
11  inside the office.
12      Q.  Okay.  Well, I'm going to move right in.  I
13  want to talk generally about the Attorney General's
14  positions on how New Mexico law regulates voter data.
15  And I want to start from a high level, just -- we're
16  going to talk about some of the statutes that have
17  been raised in this case.  And then kind of move into
18  how that applies to our present case.  But, just
19  generally, what restrictions does New Mexico law
20  place on how voter data may be used?
21      MS. LECOCQ:  Objection.
22      A.  Yeah, I don't -- I wasn't prepared to talk
23  about all of the different types of laws and the
24  Election Code that could potentially be implicated
25  related to voting.  So could you be a little bit more

Page 19

1   specific?
2       Q.  Well, let's start with what restrictions
3   does New Mexico law place on the sharing or
4   dissemination of voter data?
5       MS. LECOCQ:  Objection.
6       A.  Yeah, I mean, I have the same answer.  I
7   can't speak generally to that.  But as some of the
8   examples that relate specifically to this case tie
9   into the limitations on the use of data, that they
10  have to be for authorized purposes.  And so that's
11  laid out pretty clearly in the statute what those
12  purposes can and can't be used for, and the process
13  of the Secretary of State's Office has for requesting
14  such data.
15      Q.  What are the purposes that voter data can
16  be used for?  And let's limit it to under Section
17  1-4-5.5, which is the one implicated in this case.
18      A.  Do you have a copy of the statute?
19      Q.  I'm sure we do.  We can go ahead and mark
20  this as Exhibit 2.
21      (Exhibit 2 marked.)
22      Q.  If you can let me know when you've had time
23  to review it.
24      A.  Yeah, I finished.
25      Q.  So for what purposes can voter data be used

Page 20

1   under -- let's limit it to 1-4-5.5?
2       MS. LECOCQ:  Objection.
3       A.  Well, first, I'll say that there are other
4   laws that are implicated here.  This can't be read in
5   just a vacuum.  But clearly, requesters of this
6   information can only use voter data for these listed
7   purposes, which include governmental purposes and
8   election campaign purposes.  And it also explicitly
9   states that the data shall not be made available or
10  used for unlawful purposes.  And so I know that there
11  is another law that clarifies use and limitations of
12  voter data.
13      Q.  I noticed when you were going over the
14  permissible uses there, you omitted election from the
15  uses that are permissible.  Is that intentional?
16      MS. LECOCQ:  Objection.
17      A.  Well, I was just clarifying the two that
18  are defined here in the statute.
19      Q.  But you agree that Subsection C of this
20  statute says can be used for -- shall be used for
21  governmental or election and election campaign
22  purposes only?
23      MS. LECOCQ:  Objection.
24      A.  That's what the statute says.
25      Q.  Okay.  You mentioned that there are other

Page 21

1   laws that are implicated here, I believe was the word
2   you used.  What other laws are implicated?
3       A.  Well, there is a number.  I mean, there is
4   statute, the entire Election Code, of course, and
5   then there is regulations that are adopted by the
6   Secretary of State under the state Election Code.
7   I know that there is -- I can't recall the
8   section, but in Article 5, I believe, there is a
9   section that describes unauthorized use and what that
10  includes, which is prohibited under state law.
11      Q.  What's the relationship, then, between this
12  1-4-5.5 and this other section that you're referring
13  to?
14      MS. LECOCQ:  I'm going to have a standing
15  objection for legal conclusion, so I quit
16  interrupting you.
17      MR. MUELLER:  Certainly.
18      A.  Yeah, well, I'll say one -- a legal
19  conclusion that I could draw is not necessarily the
20  conclusion of our office.  And also these are laws
21  that govern the Secretary of State's Office.  And so,
22  you know, it's difficult for me to answer, you know,
23  how these should be interpreted when this isn't a
24  statute that governs activity of the office of the
25  Attorney General.

6 (Pages 18 to 21)

Page 50

```
 1   plausibly alleged that VRF was violating New Mexico
 2   law?
 3        A.  Our office hasn't made a determination --
 4   there is different laws here, right, and criminal
 5   implication and actions of the Secretary of State's
 6   Office.  So, I mean, our position was to defend the
 7   Secretary of State.  There wasn't a separate
 8   determination by our office.
 9        Q.  What do you mean when you say your
10   "position was to defend the Secretary of State"?
11        A.  Well, I mean, that's the basis of this
12   litigation is the Secretary of State's Office, an
13   agency of the state, was sued, and we were defending
14   the Secretary of State's position and the actions
15   that they had taken.
16        Q.  Okay.  But let's look at this.  This
17   referral is dated December 20, 2021; correct?
18        A.  Correct.
19        Q.  Do you know when your office received this
20   referral?
21        A.  I don't see a time stamp.  I don't know
22   what day, if it came -- well, it says email, so I
23   would assume it was emailed that day.  But I don't --
24   I can't confirm that.
25        Q.  Did your office receive this referral prior
```

Page 51

```
 1   to VRF filing its lawsuit?
 2        A.  These dates I recall, but I'd have to
 3   refresh my memory on what the dates were.  I know
 4   some of these dates were close together.
 5        Q.  If I tell you that VRF filed its lawsuit in
 6   late March of 2022, does that refresh your
 7   recollection?
 8        A.  Yes.
 9        Q.  Okay.  So did your office receive this
10   referral before VRF filed its lawsuit?
11        A.  Yes.
12        Q.  So you were saying that -- I asked a
13   question about, at the time it received the referral,
14   did the Attorney General agree that the facts
15   outlined in the referral plausibly alleged that VRF
16   was violating the law?
17        A.  I mean, some of that is subject to attorney
18   work product and attorney-client privilege with the
19   Secretary of State's Office.  I mean, I think the
20   work done by our office clearly shows the position
21   that we took, which supported the determination by
22   the Secretary of State that New Mexico laws were
23   being violated.
24        Q.  Is that the Attorney General's position, as
25   we sit here today, that VRF has violated New Mexico
```

Page 52

```
 1   law?
 2        A.  That's the position that we have supported
 3   through this litigation.  And I think, you know, what
 4   penalties or what additional laws could be violated
 5   is like an independent matter from a criminal
 6   standpoint, it's different from upholding any, you
 7   know, administrative decision by the Secretary of
 8   State, which I think is important to note.
 9        Q.  Setting the referral aside, and what it
10   says the positions that the SOS took in the referral,
11   is the Attorney General's position, as we sit here
12   today, that Voter Reference Foundation has violated
13   New Mexico law?
14        MS. LECOCQ:  Objection.
15        A.  Yeah, again -- and I mean, I know we're
16   going to get to this -- but there are parallel issues
17   in questions.  And this case is, you know, primarily
18   focused on the administrative decision of the
19   Secretary of State and our position which supports
20   it, which is yes.
21        You know, could there be additional
22   determinations that our office could make?  Yes.  But
23   the office hasn't taken independent action or
24   taken -- you know, made separate decisions apart from
25   the specific issue related to this case, which is the
```

Page 53

```
 1   determination by the Secretary of State.
 2        Q.  You used the term "administrative decision"
 3   a few times there.  Can you tell me what you mean by
 4   that?
 5        A.  Well, the decision by the Secretary of
 6   State is not a judicial decision.  It's not something
 7   that required a court determination to make.  And so
 8   they chose to withhold this voter data from -- as an
 9   administrative action.
10        Q.  So when you say "administrative decision,"
11   you're referring to them not giving data to VRF?
12        A.  Correct.
13        Q.  You're not referring to them making this
14   referral?
15        A.  Correct.
16        Q.  Okay.  I just --
17        A.  No, that's a good distinction.
18        Q.  I'm trying to think how to ask this.  In
19   terms of this civil litigation, is the Attorney
20   General taking the same position as the SOS as to the
21   legality of Voter Reference's actions?
22        MS. LECOCQ:  Objection.
23        A.  Well, I think that's pretty clear in the
24   pleadings that we filed and representing the
25   Secretary of State in the pleadings, so yes.
```

14  (Pages 50 to 53)

Page 54

1    Q.   And I think we can acknowledge a
2  difference, that there is one role for the Attorney
3  General's Office that is representing Secretary of
4  State in the litigation.  There is another role,
5  which is the Attorney General is the chief law
6  enforcement officer, and is, itself, a defendant in
7  the litigation.  Do you agree with that?
8    A.   Yes.  And yeah, there are many roles that
9  the Attorney General's Office plays within the state.
10   Q.   And so I suppose I'm saying that just
11 because the Attorney General's Office is representing
12 the Secretary of State in this litigation, it doesn't
13 necessarily have to mean that the Attorney General is
14 taking all of the same legal positions as the
15 Secretary of State; correct?
16   A.   I'd have to see if there was anything in
17 the pleadings that have made that position.  But
18 that's not impossible, certainly.
19   Q.   Are you aware of any positions that the
20 Attorney General's Office, as a party to this
21 lawsuit, has taken that are different than positions
22 taken by the Secretary of State's Office?
23   A.   Public positions, actions, I'm not aware of
24 any, no.
25   Q.   I want to get into the referral more, but

Page 55

1  before we do that I want to ask some questions
2  generally before we get into the stuff that your
3  counsel and I have already negotiated some protection
4  for.  And I think this is in your discovery response.
5  So your counsel informed us last week that the
6  investigation into VRF became inactive, I believe, on
7  April 12, 2022; is that correct?
8    A.   That's correct.
9    Q.   What are the different -- I'm going to call
10 "inactive" a status, okay?  What are the different
11 statuses of investigation by your office?
12   A.   That's a great question.  I can speak
13 generally to my understanding.  I have not -- some of
14 that very much is dependent upon the administration,
15 which has changed, and the individuals.  I think
16 those categories are not set in stone.  Because what
17 they might mean might be somewhat subjective.
18        But our office -- criminal matters in our
19 office, the most common would be open or closed.  And
20 I think the inactive status is -- and you could use
21 different terms, and imagine different terms have
22 been used in the past, where it's not as definitive,
23 because, you know, a formal position might not be
24 taken.  And that could be for a variety of reasons.
25   Q.   This is going to seem very rudimentary, but

Page 56

1  what does it mean for a case to be -- let's say --
2  let me rephrase this.
3        If I refer to a case as open or active, can
4  we agree that that means the same thing?  I think you
5  just used the word "open."  They've used the term
6  inactive?
7    A.   Sure.  I think much of this could very well
8  be subjective, right, but I think those two terms are
9  very synonymous.
10   Q.   So what does it mean for an investigation
11 to be active or open?
12   A.   That it's under investigation.
13   Q.   What does it mean for a case to be closed?
14   A.   That there had been some dispositive
15 action.  Whether there had been a prosecution,
16 whether there was, you know, findings taken at face
17 value would not amount to any type of crime, so,
18 therefore, the dispositive action was that, you know,
19 no law was implicated.  It could mean that the
20 investigation was put on hold, you know, or something
21 else.  It wasn't, you know, determined if there was a
22 violation or not.
23   Q.   Okay.  What does inactive mean?  Or let me
24 be more specific.  What is your understanding of what
25 it meant for a case to become inactive at the time

Page 57

1  this case became inactive, which was April 12, 2022?
2    A.   I was not aware of the -- at that time, in
3  2022, I wasn't even in the office.  When did I --
4  yeah, I wasn't even in our office at that time.  So I
5  mean, certainly at that time I didn't have any idea.
6  But I know that speaking to individuals within our
7  office, that term means that, just like I said
8  before, that it wasn't under active investigation;
9  that it was not -- you know, there was nothing
10 happening to the case.  No final determination was
11 made.  And that there was no, you know, ongoing
12 involvement from our office.
13   Q.   I want to clarify one thing.  You said
14 closed meant that there is some kind of dispositive
15 action, which I believe you said can include
16 prosecution, findings of facts that amount to a
17 crime, or you said that it may just be that it's on
18 hold?
19   A.   No, I said that was if it was inactive --
20   Q.   Okay.
21   A.   -- not closed.
22   Q.   So if it's on hold, it would likely be
23 labeled as inactive or some similar term?
24   A.   Yeah.
25   Q.   Okay.

15  (Pages 54 to 57)

Page 66

1    time?
2        A.  Well, it depends on -- I guess there is two
3    different -- this is a criminal -- if you're
4    referencing a criminal determination as to whether it
5    was a criminal law being violated, there certainly
6    was not a determination made at the time this letter
7    was received.
8        Q.  Okay.  If we move on a little further in
9    that paragraph, it says, "We have attached our
10   office's communication with Mr. Lippert regarding his
11   voter data request.  We believe that this data was
12   illegally provided by Mr. Lippert or Local Labs to
13   VoteRef.com and is being used against New Mexico
14   state law."  Did I read that correctly?
15       A.  Yes.
16       Q.  So at least at this time, the Secretary of
17   State was conveying its position to the Attorney
18   General that the transfer of data from Local Labs to
19   VoteRef was illegal; correct?
20       A.  That's what they're writing in this letter.
21       Q.  It then says, "Swift action is needed as
22   voter data can quickly be manipulated and used to
23   spread election misinformation."
24           Did I read that incorrectly?
25       A.  Yes.

Page 67

1        Q.  Is spreading election misinformation a
2    crime under New Mexico law?
3           MS. LECOCQ:  Objection.
4        A.  That is not a defined term that has
5    elements that would constitute a crime.  But I think
6    this isn't written in any type of legal document
7    that's laying out charges and elements of a crime.  I
8    think it's just speaking.
9        Q.  I understand that, and I appreciate the
10   distinction.  But I'm just asking, you know, for your
11   position, as the representative of the New Mexico
12   Attorney General's Office, if it is a crime under New
13   Mexico law to spread election misinformation?
14          MS. LECOCQ:  Objection.
15       A.  Yeah, I mean, I can't draw a legal
16   conclusion.  And also, I mean, there aren't elements
17   to that.  But I think that is part of protecting
18   voter information, so -- and they're alluding -- I'm
19   assuming that they're alluding to public policy,
20   which is certainly, you know, underlined in all of
21   the Election Code and the purpose for these statutes.
22       Q.  Okay.  Are you aware of any New Mexico
23   state statute which makes it unlawful to spread
24   election misinformation?
25          MS. LECOCQ:  Objection -- never mind, go

Page 68

1    ahead.
2        A.  Not that term.  But I think that term is
3    also not defined.  Protecting information is part of
4    election information, misinformation.
5           So again, I think read in a vacuum, no,
6    there is no reference to election misinformation or
7    spreading election misinformation as a cause of
8    action or elements to it.  But I think that's
9    speaking broadly, and does capture many of the
10   purposes of the Election Code.
11       Q.  Does VRF's publication of voter data on its
12   website constitute election misinformation?
13          MS. LECOCQ:  Objection.
14       A.  I don't believe our office has taken a
15   formal position on that, but I believe that the
16   Secretary of State's Office has.  And we would
17   support that position, as much as they've made that a
18   defendant.
19       Q.  Okay.  If we look at the next section, it
20   lays out some facts -- it appears to be facts upon
21   which the basis of this referral are grounded.  And
22   it talks about how Mike Lippert was provided voter
23   data by the Secretary of State's Office on April 15,
24   2021.  Is that correct?
25       A.  Yes.

Page 69

1        Q.  It then says, "Mr. Lippert was provided the
2    entire statewide voter file after he paid $5,378.12,
3    and signed a vote information authorization form
4    swearing they, quote, 'will not use or make available
5    to others to use the requested material for purposes
6    others than governmental election research and
7    campaign purposes, under penalty of law."  Did I read
8    that correctly?
9        A.  Yes.
10       Q.  Did Local Labs commit false swearing under
11   that term quoted there, when it transferred the data
12   from itself to VRF?
13          MS. LECOCQ:  Objection.
14       A.  Yeah, I think you're asking for a legal
15   conclusion, which I can't make.  I'm not sure if this
16   was addressed in positions taken by our office or the
17   Secretary of State in pleadings.
18       Q.  If the Secretary of State's Office took the
19   position that that was an unlawful transfer, which it
20   appears that they did from the part we just read
21   above, does the Attorney General's Office have any
22   reason to disagree with that position?
23          MS. LECOCQ:  Objection.
24       A.  Again, it would be difficult for me to
25   analyze that and put it in context with anything that

18  (Pages 66 to 69)

Page 70

1  we filed with the litigation, because, you know,
2  there could have been nuances to any position or
3  argument we've made.  And I don't want to
4  misrepresent anything.  But I don't see why we
5  wouldn't agree and support the Secretary of State's
6  position with that.
7      Q.  Okay.  And I think, again, you know, I'm
8  asking for positions now based off of the facts and
9  the law, not necessarily, you know, just reciting the
10  positions that have been taken.
11      So the facts in here are alleged -- in fact,
12  as alleged in the verified complaint in our federal
13  lawsuit -- admit that Local Labs transferred the data
14  to VRF.
15      Okay.  Knowing that, did Local Labs commit
16  false swearing by transferring that data from VRF
17  based off the quoted term here?
18      MS. LECOCQ:  Objection.
19      A.  Yeah, I can't draw that conclusion.  But I
20  would say, generally, that would make sense to me.  I
21  mean, that's logical.
22      Q.  Okay.  That quoted section says, "Will not
23  use or make available to others to use, the requested
24  material for purposes other than governmental
25  election research and campaign purposes under penalty

Page 71

1  of law."  I read that correctly again, did I not?
2      A.  Yes.
3      Q.  Do you agree with me that, if Local Labs
4  makes the data available to someone for a
5  governmental election research or campaign purpose,
6  it has not violated the agreement there in that
7  quoted section?
8      MS. LECOCQ:  I'm going to just do a
9  standing objection.  I think this is outside the
10  scope of our topics.  I'll just leave it at that.
11      A.  So, at which step this sharing of
12  information violated New Mexico law, one has to be
13  taken in context.  And that context is what happened,
14  right?  It may not be clear exactly at what point the
15  misuse of data occurred.
16      But certainly, the end result, which was
17  published in a way that allowed no control over the
18  use of it, violated the restricted use of the data,
19  right, the prohibited uses that are allowed for by
20  statute.
21      So there certainly is a good argument to be
22  made that at that point sharing could have limited
23  that control.  But you could make the argument in the
24  alternative as well.  And I understand that.  But, I
25  mean, you know, this issue wasn't resolved from just

Page 72

1  at one singular point did the violation occur.
2      I don't know if that answers -- I'm happy
3  to try to better answer your question.
4      Q.  I understand what you're saying.  But I
5  believe one of the positions taken in this litigation
6  is that, you know, Local Labs committed false
7  swearing, because they agreed to this term, and then
8  they gave data to VRF.
9      Knowing that, I'm asking if Local Labs gave
10  the data to VRF for purposes that were governmental,
11  election research, or campaign purposes, would that
12  still be a violation?
13      A.  It could be if they lost control, and
14  therefore, you know, in an agency relationship, you
15  know, that argument could be made.  And, again,
16  that's dependent upon all of the facts in this fact
17  pattern, which, you know, there were more obviously
18  beyond that, at which point the issue was raised.
19      At that point alone, yeah, arguably maybe
20  not.  But that's not where the facts ended.
21      Q.  So does that become a false swearing
22  because VRF published the data on its website?
23      A.  I think arguably that's part of it, at
24  least part of it.
25      Q.  What if Local Labs didn't know how VRF was

Page 73

1  going to use the data?
2      MS. LECOCQ:  Objection.
3      A.  Again, that's a hypothetical that -- I
4  mean, I'm not going to answer hypothetical questions
5  that our office certainly hasn't taken a position on,
6  and the Secretary of State certainly hasn't taken a
7  position on, at least in terms of conclusions of law.
8      Q.  If VRF has taken the position that it posts
9  this information online so that the public can police
10  errors in voter records, is that a governmental
11  purpose under New Mexico law?
12      MS. LECOCQ:  Objection.
13      A.  Arguably, no.
14      Q.  Okay.  I get arguably.  But is it the
15  Attorney General's position that the publication of
16  voter data online, so that citizens could police the
17  voter records, was not a governmental purpose?
18      MS. LECOCQ:  Objection.
19      A.  Yeah, I think that position has been made
20  pretty clear in the pleadings that we have taken that
21  position.
22      Q.  Is it the Attorney General's position that
23  that same posting was not an election purpose?
24      MS. LECOCQ:  Objection.
25      A.  Well -- and again, our office's position

19 (Pages 70 to 73)

Page 74

1   has only been made clear through these pleadings.  I
2   mean, there is not any other action or position that
3   we've taken.
4           I think the position was the Secretary of
5   State's Office that we're supporting and defending.
6   So, you know, indirectly, yes.
7       Q.   So the Attorney General's Office is taking
8   the same position as the Secretary of State's office
9   with regard to whether or not the posting was
10  election related?
11          MS. LECOCQ:  Objection.
12      A.   Yeah, I mean our position has been
13  consistent with the Secretary of State's.
14      Q.   Is that your position as the attorneys
15  defending the Secretary of State, or is that the
16  Attorney General's position as a party to this case?
17      A.   I think that position has been made clear
18  that it's both.
19      Q.   Same question:  Is it the Attorney
20  General's position, as a party in this case, that
21  this -- the publishing of voter data was not for a
22  research purpose?
23          MS. LECOCQ:  Objection.
24      A.   And you mean the publishing for the public;
25  is that correct, for anyone?

Page 75

1       Q.   Yes, I'm speaking about the ultimate
2   publication of the data online to the public.
3       A.   Yes.  Yes, that's our position.  That's my
4   understanding that's the position of the Secretary of
5   State's Office and our office as well.
6       Q.   And is it the position of the Attorney
7   General's Office, as a party to this litigation, that
8   that public posting on the website was not for a
9   campaign purpose?
10      A.   Yes.
11      Q.   When the Attorney General's Office received
12  this referral, what facts did it need to figure out
13  to determine if a violation occurred?
14          MS. LECOCQ:  Objection.
15      A.   Yeah.  I mean, that's -- that analysis, I
16  think, would be dependent on many things, including
17  the position the individuals that did the analysis --
18  so I can't speak to exactly what we would require,
19  you know, these five questions be answered.  But I
20  mean, I think we've discussed this generally to
21  determine under, you know, the review and actions
22  taken by the Secretary of State, whether that
23  position was supported by law, and you know, whether
24  the publication and use of this data violated any of
25  the Election Code or related statutes.

Page 76

1       Q.   Upon receiving this, to determine if a
2   violation occurred, would the Attorney General's
3   Office investigate whether, in fact, this voter data
4   was online?
5           MS. LECOCQ:  Objection.
6       A.   Are we -- so we're speaking to the criminal
7   referral; is that correct?
8       Q.   Yes.
9       A.   I think any type of referral -- this one
10  included -- would require a thorough review of the
11  facts and the law.  So I mean, that's certainly one
12  of the facts that would have to be considered.
13      Q.   And would the Attorney General's Office
14  investigate the purpose for which the data was being
15  posted online?
16          MS. LECOCQ:  Objection.
17      A.   Again, I mean, any review of alleged
18  violations of law, whether criminal or civil, would
19  necessarily require that, because that's one of the,
20  you know, elements of or conditions of the data use
21  under the statute.
22      Q.   And would the Attorney General investigate
23  how VRF obtained the data?
24          MS. LECOCQ:  Objection.
25      A.   I mean, again, all of this is very fact

Page 77

1   specific with, you know, where the -- where any
2   investigation is at, in terms of timing; what other
3   information is needed from agencies that refer; what
4   type of allegations are being raised, what laws are
5   being implicated.  And so I can't speak to the, you
6   know, exactly what happened or should have happened
7   with this investigation with this specific case,
8   right?
9       Q.   I suppose the position taken in the
10  litigation is that the publication of the voter data
11  on the website to the general public violated New
12  Mexico law.  What more would the Attorney General's
13  Office need to determine other than that the data was
14  posted online to the general public?
15          MS. LECOCQ:  Objection.
16      A.   I'm -- in terms of a criminal
17  investigation?
18      Q.   Yes.
19      A.   I mean, a criminal investigation can branch
20  out and look at many different elements of law.  So I
21  mean, I can't speak to whether or not, you know, this
22  might cause review of other statutes, right, other
23  criminal laws being implicated.  I mean, it's very
24  fact specific.  I mean, specific to this -- I guess,
25  yeah, I'm not really sure -- I guess I'm not really

## Page 82

1  the issue.  I'm not asking about the -- you know,
2  policy decisions, or likelihood of success of an
3  actual prosecution.  But certainly the decision about
4  whether or not the law was violated, or a position on
5  that issue is resolved before all those other things
6  are considered.
7        So I'm asking -- knowing that we admitted
8  to what seems like the relevant facts for determining
9  if we violated the law under this theory, are there
10  other facts -- facts only, not other
11  considerations -- that the Attorney General's Office
12  needed to investigate to take a position on this
13  issue?
14        MS. LECOCQ:  Objection.  Answer the
15  question, Joe.
16        But before we get there, I think if you
17  wanted to know specifically why the Attorney
18  General's Office has not sought out other facts, we
19  can answer that.  But that goes to the stuff that's
20  confidential.
21        MR. MUELLER:  Let's finish this question
22  and, then I'll go into that, because I think that
23  might be causing --
24        MS. LECOCQ:  Yeah.
25   A.  Yeah.

## Page 83

1   Q.  So if you could answer that question, I
2  appreciate it.  If it needs to wait for me to ask you
3  the stuff that's going to be protected, I can
4  appreciate that.
5   A.  Yeah.  And I think what's important to note
6  here is that a decision from our office, or a
7  position from our office, if we're talking about a
8  formal position, is different than internal, you
9  know, does an attorney believe that a law was
10  violated.
11        When our office takes positions on criminal
12  matters, it's a very big deal.  And so those other --
13  what I'm also calling facts, because they are facts
14  and other things that affect any type of criminal
15  investigation by our office -- have to be considered.
16  We cannot make decisions in a vacuum in criminal
17  cases.
18        I don't think any law enforcement agency,
19  prosecutorial law enforcement agency, can do that.
20  It's just not -- I mean, maybe it's a rare example,
21  but, you know, you can't do that.  This office cannot
22  take positions on pieces of a criminal investigation,
23  you know, without considering all of these other
24  things that we've discussed.
25   Q.  Okay.  I'm going to go into the actual

## Page 84

1  investigation of VRF and some of the questions that
2  we know are going to be under our agreement.  I don't
3  think all of these questions are subject -- at least
4  not to the AEO counsel restrictions -- but I've
5  marked in my outline where I think that's going to
6  come up.  So I will disclaim that before I ask those.
7        MS. LECOCQ:  All right.
8   Q.  Let's start with:  Did the Attorney General
9  conduct an investigation into VRF's activities prior
10  to April 12, 2022?
11   A.  The office opened an investigation.
12   Q.  Okay.  Did it take steps to actually
13  investigate the facts and theories as raised in the
14  Secretary of State's referral?
15   A.  It, at least, began reviewing, you know,
16  the laws that were implicated, the evidence that was
17  received from the referral from the Secretary of
18  State's Office.
19   Q.  Okay.  I'll just -- so this part, we'll
20  call it Attorneys Eyes Only, and I'll let you know
21  when we're outside of that restriction.
22        So the investigation was, say, moved from
23  active or open to inactive on April 12, 2022;
24  correct?
25   A.  Yes.

## Page 85

1   Q.  What was the reason for why it was moved to
2  inactive?
3   A.  That was a few months after the case was
4  transferred.  The investigation was transferred to
5  the FBI.
6   Q.  Was that decision in any way motivated by
7  VRF filing the present lawsuit?
8   A.  No.
9   Q.  Does the Attorney General's Office continue
10  to play any role in that investigation by the FBI?
11   A.  No.
12   Q.  Is it possible for the Attorney General's
13  investigation to be reopened or reactivated in your
14  office?
15   A.  Yes.
16   Q.  Has the AG conducted any sort of
17  investigation of VRF since April 12, 2022?
18   A.  No.
19        MS. LECOCQ:  Objection.  I just want to
20  clarify, criminal or civil?
21        MR. MUELLER:  Let's say criminal first.
22   A.  No criminal.
23   Q.  Okay.  And what about civil investigation?
24   A.  The civil investigation related to this
25  litigation and our work with the Secretary of State.

22  (Pages 82 to 85)

Page 98

1    Q.   And are you aware, generally, of what the
2  purpose of these communications were?
3    A.  I am.
4    Q.   And what was that purpose?
5    A.   To -- the purpose -- similar -- well,
6  except this was on our own, we initiated this
7  communication -- but it was similar to the
8  communication initiated by California, which is
9  normal by our office to consult points of contact in
10  other attorneys general offices, to see if similar
11  issues are being addressed by other offices, if they
12  have any perspective on the issue, if it's a regional
13  or potentially national issue.  And so I think that
14  was the -- that's my understanding of the purpose.
15    Q.   Was this part of the criminal investigation
16  of Voter Reference Foundation?
17    A.  No.
18    Q.   Does the Attorney General have any evidence
19  that VRF has manipulated voter data?
20    MS. LECOCQ:  Objection.
21    A.   Yeah -- well, one, I wouldn't be able to
22  speak to the -- any type of investigative work
23  product that persons that we may or may not be
24  looking at.  And I'm not aware of manipulation -- but
25  I am not aware of manipulation arguments in any of

Page 99

1  the civil litigation.
2    Q.   Is the Attorney General's Office aware of
3  VRF misrepresenting any voter data that was posted on
4  its website?
5    A.   Misrepresenting any voter data?  In the
6  civil litigation?
7    Q.   I'm asking if the Attorney General's Office
8  has any knowledge that VRF has misrepresented any
9  data that was posted on its website?
10    MS. LECOCQ:  Objection.
11    A.   Yeah, I wouldn't be able to speak to any
12  potential criminal investigation that may have been a
13  part of that question.  But from the civil context,
14  I'm not aware of that being raised.
15    Q.   And I suppose, given your answer here, I'm
16  just going to ask your counsel if you're invoking a
17  privilege as to not disclose the evidence that the
18  Attorney General might have from its criminal
19  investigation regarding the manipulation or
20  misrepresentation of voter data by VRF?
21    MS. LECOCQ:  That's right.
22    MR. MUELLER:  Can we get on the record what
23  the privilege assertion is?
24    MS. LECOCQ:  Investigative work product.
25  Attorney client.

Page 100

1    Q.   Is the Attorney General's Office aware of
2  anyone using VRF's website for unlawful purposes?
3    MS. LECOCQ:  Objection, same objection.
4    A.   Again, yeah, I wouldn't know, and I
5  couldn't speak to criminal investigation of that.
6  But I think, you know, using it -- I mean, the fact
7  that it's out there and in an unrestricted setting,
8  so anyone could use it, is the unauthorized use,
9  because there is no control over how people use it.
10  That, itself, is the issue.
11    Q.   So is a person committing unlawful use by
12  accessing the data that's on the website, or that was
13  on the website?
14    A.   That's a great question.  But I don't think
15  that's a conclusion that our office has come to yet.
16  Because I don't think individuals access this data
17  that's out there is part of any of the analysis or
18  positions our office has taken.
19    Q.   Is the Attorney General aware of anyone
20  using the data that was posted on VRF's website to
21  stalk any individual?
22    MS. LECOCQ:  Objection.
23    A.   I wouldn't be able to speak to any type of
24  criminal investigation, which, you know, would
25  obviously be more serious for a question of that

Page 101

1  context.  But I don't believe that there was any
2  evidence that we introduced as part of a civil
3  litigation or have said publicly of individual cases
4  that actually have occurred.
5    Q.   Is the Attorney General aware of anyone
6  using data that was posted on VRF's website to harass
7  any other individual?
8    MS. LECOCQ:  Objection.
9    A.   Again, to the criminal investigation
10  context, I can't speak to that.  But I think, also in
11  the civil context, the term "harass" is pretty
12  subjective, I mean, what that means.  But I'm not
13  aware of any individual cases, individual person,
14  that we've raised this example, either in the
15  litigation or any other type of public position on
16  it.
17    Q.   Has the Attorney General investigated
18  whether anyone used the data that was posted on VRF's
19  website for any of those purposes?
20    MS. LECOCQ:  Objection.
21    A.  So speaking just to this litigation --
22  I wanted the criminal investigation.
23    MS. LECOCQ:  Can you rephrase your
24  question?
25    Q.   Has the Attorney General conducted an

26  (Pages 98 to 101)

Page 126

1    Q.  If we go to the next answer provided, it
2    says: "Answer: 'Publishing online,' could be
3    construed to mean anything from making an internal
4    list of registered voters for use in an internal
5    website, or secured website, or maintaining that
6    information on an internal website for others to
7    access internally, such as on Google Drive, or
8    sending mass emails to voters as part of a campaign.
9    The AG believes this type of 'publishing' used within
10   the context of permissible government or election
11   campaign use, is acceptable, whereas 'publishing' to
12   the general public is not."  Did I read that correct?
13   A.  Yes.
14   Q.  Is that the position of the AG's Office as
15   we sit here today?
16   A.  I believe it is.
17   Q.  What's the difference between an internal
18   website and an external website?
19   A.  I think, again, that would be a
20   fact-specific analysis, right?  What type of
21   protections?  You know, it's not always black and
22   white.  But I think, generally, that would be a
23   website that is not accessible except to people
24   within that entity.  And, you know, an external site
25   would be something that was generally public, you

Page 127

1    know, generally available to the public.
2    Q.  Does it have to be password protected to be
3    an internal website?
4    A.  Again, it's a fact-based analysis.  I think
5    that's just one factor that would have to be
6    considered as to whether or not, you know, something is
7    publicly available and shared outside of an entity or
8    not.
9    Q.  And I'm sure you can appreciate that I'm
10   trying to figure out the terms that your office used,
11   and just reaffirm here is your position, actually
12   means, because, you're right, internal to me doesn't
13   really have a meaning without knowing what your
14   office's position on what "internal" means.
15   So, again, I'm just going to ask:  Is it
16   your office's position that a -- let's say a website
17   that requires someone have a user name and password,
18   is that an internal website or external website?
19   A.  It depends on who is asking.
20   Q.  Okay.  The people using it are people that
21   signed up for a user name and password?
22   A.  I mean, that could be limitless people that
23   are outside of the entity, with no control over their
24   use, or it could be, you know, campaign
25   representatives or a contractor who has been

Page 128

1    contracted to coordinate mailings, right, and has
2    that close agency relationship or contractor
3    relationship.  So, again, I don't think you can just
4    use one example and say definitively this applies to
5    any type of situation.
6    Q.  You seem to be getting back to the idea of,
7    you know, internal and external to the organization
8    as kind of all encompassing for what publishing is
9    and is not allowed.  And I'm trying to understand if
10   the internal, external, you know, analysis is one
11   factor, and this general, public, unsecure website,
12   internal/external website, is a different factor.  If
13   those are really the same thing, and the means of
14   keeping the data within the entity is to have a
15   password protected website for that entity's members.
16   So my question is:  If VoteRef's website
17   was secured so that only people that want to
18   volunteer to further VoteRef's mission can sign up
19   for user name and password access to data, is that
20   permissible?
21   A.  Again, it would have to depend on the
22   circumstances and the control of that data, and if
23   that even falls within the permitted uses.
24   Q.  Let's assume here that it is being used by
25   the end user for a permitted purpose.  Does the fact

Page 129

1    that the website requires a user name and password
2    mean that it's lawful to use it in that manner?
3    MS. LECOCQ:  Objection.
4    A.  Yeah, because I can't draw a conclusion
5    without knowing all of the facts, because I think the
6    facts of who has access and what controls are still
7    available, and assurances that there is that
8    connection with the organization; it's not just
9    anyone, right?  And that there is not a risk of that
10   information being used for unlawful purposes.  So I
11   think all of that would be very -- you know, would
12   require a thorough review of the circumstances and
13   the facts and the scope of the use and the scope of
14   the individuals with access.
15   Q.  Can anyone volunteer to do work for a
16   campaign?
17   A.  I don't think I could just go and volunteer
18   for a campaign and they would give me access to this
19   type of information, if that's what you're asking.
20   Q.  That wasn't my question, but I appreciate
21   that answer.
22   You seem to draw a distinction between
23   whether VoteRef is just providing data under this set
24   of facts to anyone.  But what's the difference
25   between someone saying:  I want to volunteer for a

Page 130

1  campaign to use it for campaign purposes, and I want
2  to volunteer to help VoteRef use it for a purpose
3  which, for the sake of this question, we're presuming
4  is permissible?
5     MS. LECOCQ:  Objection.
6     A.  I think that type of use, there are clear
7  distinctions.  And a volunteer -- campaigns don't
8  just let anyone volunteering for the campaign get
9  access to all of that information.  It's maintained,
10  and you know, they can't then -- there is no
11  protections -- or there would be protections,
12  arguably, for that information only to be used for
13  that limited purpose.  And it's within that nebulous
14  of the campaign.  Campaigns don't post this
15  information on their website and say:  Anybody that
16  wants to volunteer, here's all of this information,
17  and you can go use it however you see fit.  And we
18  don't have examples of that that I'm aware of
19  happening, like VoteRef is doing in this case.
20     Q.  What if VoteRef was selling the data to
21  third parties who agreed by contract that they would
22  only use it for permissible purposes?
23     MS. LECOCQ:  Objection.
24     A.  Yeah, again, I can't speculate to a
25  conclusion.  I mean, that's just not relevant to the

Page 131

1  facts in this case.  But I'd have to look more
2  closely at the statute and the rules, and what
3  amounts to an agreement with the Secretary of State's
4  Office, and the use for this data, and whether or not
5  that type of use, you know, subsequent sale or
6  distribution is authorized.  I think it clearly would
7  go against the statutes, arguably the statutory and
8  legislative intent of ensuring that the Secretary of
9  State's Office is the one that maintains control and
10  protection over this information.  And just by
11  allowing it to be disseminated, without these
12  requests to the Secretary of State's Office,
13  following this process that's provided in law,
14  would -- you know, it certainly violates the intent
15  as well as the process -- the intent of the law and
16  the process set up by the Secretary of State.
17     Q.  Can VRF share the data that it has in its
18  possession with its own employees?
19     MS. LECOCQ:  Objection.
20     A.  That would first depend upon whether or not
21  the use is permitted, right, by law.  Our contention
22  is that it still is not.  And it would depend upon
23  what mechanisms there are to control, right?  Just
24  like a campaign that started sharing this information
25  broadly -- I mean, the same questions would be

Page 132

1  raised.  What type of control mechanisms are there?
2  And who, knowingly or not, allowed this information,
3  which is protected, to be used for unlawful purposes?
4  So I think it would be a very fact-specific analysis.
5     Q.  So I understand you as saying that the
6  legality of the transfer of the data, at least in
7  part, hinges on how the data is going to be used by
8  the recipient.  Am I correct in saying that?
9     A.  Yeah.
10     Q.  If a citizen contacts VRF and says:  Hey, I
11  looked at your website.  My data is incorrect.  And
12  VRF informs, let say the relevant county clerk, that
13  the data is incorrect.  Has VRF violated the law by
14  pointing out that the inaccuracy to the county clerk?
15     MS. LECOCQ:  Objection.
16     A.  Yeah, I can't get into hypotheticals.  One,
17  I mean, this isn't any type of determination that the
18  Secretary of State's Office or our office has made.
19  And, you know, I can't speak to a legal conclusion.
20  I mean, that's going to be something that's argued in
21  the pleadings in this case.
22     Q.  But do you understand that the allegation
23  that VRF has made in this case is that that is
24  precisely why they have this website, is to identify
25  discrepancies and communicate those discrepancies, or

Page 133

1  errors or whatever you want to call them, to the
2  relevant officials so they can be remedied?
3     A.  I understand that's the argument being
4  raised, yeah.
5     Q.  Okay.  If we assume the truth of that
6  argument, if that is actually how the data is being
7  used, is that permissible under 1-4-5.5?
8     MS. LECOCQ:  Objection.
9     A.  Yeah, I mean, again, I think that this is
10  addressed in our arguments in the case and the
11  position taken by the Secretary of State as the
12  decision-maker in denying this information or this
13  data.  But, yeah, I think that that is for unlawful
14  purposes.
15     Q.  Okay.  I put a binder of transcripts in
16  front of you, and I put one in front of your counsel
17  as well.  If we can turn to that binder.
18     MR. MUELLER:  I don't know -- I mean, these
19  are all in the record.  We can label this as an
20  exhibit if we want.  If you want to deal with a copy
21  of it, you can.
22     MS. LECOCQ:  I don't think it's necessary.
23     MR. MUELLER:  I don't think so either.
24     Q.  Okay.  Let's start with the very first
25  transcript.  This is from the May 17, 2022 hearing on

34  (Pages 130 to 133)

Page 142

1  "The basis for the Attorney General's assertion that
2  VRF, or anyone acting in concert with it, violated
3  New Mexico law or may have violated New Mexico law."
4       Okay.  I want to move on to the second
5  transcript.  That's the 6/15/22.  This is a
6  continuation of the preliminary injunction hearing.
7  Looking at page 225, line 20.  Let me know when
8  you're there.
9     A.  Yeah, I've read it.
10     Q.  I'm going to read, starting at page 225,
11  line 20.  And I will first represent that if you go
12  back to page 223, this is Ms. Serafimova speaking.
13  "Now, on a substantive challenge, again, we do --
14  given our interpretation of 5.5, we do concede that
15  plaintiffs have not violated any of the use
16  restrictions, because those use restrictions do not
17  prohibit uploading the data to a website.  That is
18  under 5.36.  So that doesn't change our theory."
19       Did I read that correctly?
20     A.  Yes.
21     Q.  Was that the Attorney General's position at
22  the time of this hearing?
23       MS. LECOCQ:  Objection.
24     A.  Again, you know, I was not -- it was a
25  different administration, and this individual is no

Page 143

1  longer employed by our office.  I presume there is no
2  reason that I have, that I'm aware of to, you know,
3  challenge any positions that took.
4     Q.  Is the Attorney General's Office willing to
5  state, at least prior to the filing of the first
6  amended complaint, that the representation made by
7  counsel for the Attorney General accurately reflect
8  the positions of the Attorney General's Office?
9     A.  I couldn't answer that without consulting
10  with counsel.
11     Q.  So you're not willing to state whether
12  these are accurate representations of the Attorney
13  General's position?
14       MS. LECOCQ:  Objection.  I think -- if it
15  helps, I think we can stipulate that this was the
16  reflection of the Attorney General Hector Balderas at
17  the time that this was done, yes.
18     Q.  Has the Attorney General's position on this
19  case changed since the new Attorney General took
20  over?
21     A.  What do you mean by "position"?
22     Q.  Position on whether VRF has engaged in
23  unlawful activity.
24       MS. LECOCQ:  Objection.
25     A.  Yeah, I mean, I think that that's a

Page 144

1  complicated question, given both the criminal and
2  civil angles from this.  But I mean, generally, the
3  positions are:  The actions taken, and the use of
4  this information is not in compliance with New Mexico
5  law.  I mean, individual legal arguments, you know, I
6  think that's separate.  But generally, yeah.
7     Q.  Okay.  Then, I'm going to ask you to look
8  at 1-4-5.6 and 1-5-22 as we sit here now.  We've
9  already looked at these and confirmed the language,
10  so I'm not going to belabor that.  Is it the Attorney
11  General's position, as we sit here today, that
12  1-4-5.6 incorporates the prohibitions of 1-5-22(a) to
13  make Voter Reference Foundation's publication of data
14  unlawful?
15       MS. LECOCQ:  Objection.
16     A.  I can't draw that conclusion.
17     Q.  Are you aware if that's a position that's
18  been taken in this case, let's say, since the filing
19  of the first amended complaint?
20     A.  I'm aware of competing arguments regarding
21  the applicability of the criminal penalties and
22  competing arguments about what applies and what
23  doesn't.  But I can't recall right now where we're
24  currently at with this argument.
25     Q.  What do you mean "competing arguments"?

Page 145

1  You mean between plaintiff and defendants --
2     A.  Yeah.
3     Q.  -- or internally?
4     A.  Plaintiffs and defendants.
5     Q.  Are you aware that VRF has made requests
6  for voter data to the Secretary of State, let's say,
7  since it acquired the data from Local Labs?
8     A.  Yes.
9     Q.  Are you aware that all those requests have
10  been denied?
11     A.  Yes.
12     Q.  I think we are moving into our next
13  confidentiality segment here, just a warning there.
14  Not there quite yet, but these questions might bleed
15  over pretty quickly.
16       (Exhibit 11 marked.)
17     Q.  Handing you what I've marked as Exhibit 11.
18  Have you seen this document before?
19     A.  I don't -- it looks familiar.  It may have
20  been in one of the many hundreds of pages of
21  documents that I reviewed that included some email
22  correspondence.  But I can't say definitively.  I
23  think that this was in there.
24     Q.  Okay.  I'm just going to read from the
25  first line here.  It says, "Per Dylan's contact with

37 (Pages 142 to 145)

Page 154

1    A.  I mean, that's stated in this letter, so
2  yes.
3    Q.  Okay.  The second to the last paragraph,
4  "To further clarify another point, you have not
5  complied with NMSA 1978 Section 1-4-5.5 in requesting
6  voter data, by not submitting the required
7  affidavit."
8       Did I read that correctly?
9    A.  Yes.
10   Q.  So you would agree with me that this
11  request was denied, at least in part, because no
12  affidavit was provided?
13   A.  Yeah, that's what it says.
14       (Exhibit 13 marked.)
15   Q.  I'm handing to you what we've marked as
16  Exhibit 13.  Have you seen this document before?
17   A.  It also looks familiar.  Everything is
18  starting to blur together a little bit, but it looks
19  like one of the documents that was included in the
20  documents I've reviewed for this deposition.
21   Q.  Okay.  Can you tell me what this document
22  is?
23   A.  It is a letter from your law firm to the
24  Secretary of State.
25   Q.  Would you agree with me -- well, let me

Page 155

1  read the subject line.  It says, "Notice of Violation
2  of National Voter Registration Act and Request for
3  Records."  Did I read that correctly?
4    A.  Yes.
5    Q.  Would you agree with me that this, at least
6  on its face -- you can characterize it how you
7  want -- but that this characterizes itself as a
8  request for voter records under the National Voter
9  Registration Act?
10   A.  Yeah, I mean, that's the subject.  It
11  states that it's a notice of violation, or alleged
12  violation, and also a request for records.
13   Q.  Would you agree with me as well that this
14  is a request for records under Section 1-4-5.5, New
15  Mexico statute?
16   A.  Yes.
17   Q.  And it would perhaps help to point your
18  attention to page 4 where it says, "Requests for
19  records."
20   A.  Yeah.
21   Q.  I'd like to draw your attention to the
22  second to the last paragraph on page 4.  It says,
23  VRF's intended election use comprises two distinct
24  projects.  For its first project, just as VRF
25  publishes voter data for many other states, and as it

Page 156

1  recently published voter data in New Mexico, VRF
2  intends to publish the requested information online
3  for election related purposes, but it will only
4  publish the personal information of voters online if
5  VRF is granted relief in" -- and it lists this
6  case.  And it says, "or in any other legal
7  proceeding."
8       Did I read that correctly?
9    A.  Yes.
10   Q.  And so would you agree with me that VRF is
11  representing, through counsel here, that it will not
12  publish the personal information of voters online
13  unless a court gives them relief saying they can do
14  so?
15   A.  That's what it says.
16   Q.  I'm going to continue on the last
17  paragraph.  "For its second project, VRF intends to
18  analyze the records, information, and data provided
19  in response to the above requests in order to engage
20  in a discrepancy review of the New Mexico voter
21  rolls.  VRF intends to publish this analysis online
22  without disclosing the personal information of any
23  voter.  VRF will comply with this
24  non-public-disclosure promise for the data it uses on
25  the second project regardless of whether it prevails

Page 157

1  in the federal litigation.  And again, for the sake
2  of clarity, no personal information of any voter will
3  be published online unless VRF is granted relief in
4  the federal litigation or in any other legal
5  proceeding."
6       Did I read that correctly?
7    A.  Yes.
8    Q.  And you'll agree that VRF, through counsel,
9  is promising there that it will not publish voter
10  data online absent a court order telling them they
11  can do so?
12   A.  That's what it says.
13   Q.  Okay.  If you look at page 5 of this,
14  second paragraph, it says, "Signed voter information
15  authorization forms for each of the above requests
16  are attached to this letter as Exhibit B."
17       Did I read that correctly?
18   A.  I'm sorry, which page are you looking at?
19   Q.  Page 5, second paragraph.
20   A.  Okay.
21   Q.  "Signed voter information authorization
22  forms for each of the above requests are attached to
23  this letter as Exhibit B."
24       Did I read that correctly?
25   A.  Yes.

40  (Pages 154 to 157)

Page 158

1   Q.   And if we flip -- it looks like maybe the
2   Exhibit B label got cut off a little bit.
3   A.   Yes.
4   Q.   But you'll see two documents there.  Can
5   you tell me what those documents are?
6   A.   They say, "Voter Information
7   Authorization."  It's a form from the Secretary of
8   State.
9   Q.   Okay.  And what is this form used for?
10  A.   I presume it's used for requesting voter
11  data.
12  Q.   And you'll agree with me -- if you look at
13  the section on each of these, it says, "Information
14  of Requester," it says, "Name, Gina Swobada, Voter
15  Reference Foundation.  Is that correct?
16  A.   Yes.
17  Q.   Just below that in the Authorization,
18  you'll see that Gina Swobada has signed as the
19  signature of the requester; is that correct?
20  A.   Yes.
21  Q.   Was VRF given voter data in response to
22  that request?
23  A.   I don't believe so.
24  Q.   Do you have any reason to think that it
25  was?

Page 159

1   A.   No.
2   Q.   Did the Attorney General advise the
3   Secretary of State about whether or not to produce
4   voter data in response to the May 27th request from
5   counsel?
6   A.   Well, I can't speak to advice.  But my
7   understanding is this is the third request for the --
8   which is one of the three requests -- or this is one
9   of the three requests -- subsequent requests -- that
10  were denied, that our office was consulted on by the
11  Secretary of State's Office.
12      MR. MUELLER:  I think we're outside of the
13  confidentiality.  That's the last question.
14      (A discussion was held off the record.)
15      (Exhibit 14 marked.)
16  Q.   I'm handing you what we've marked as
17  Exhibit 14.  Would you look at that?  When you've had
18  a chance to review I'll ask if have you seen this
19  document?
20  A.   I believe I have.
21  Q.   And can you tell me what this document is?
22  A.   It's a letter in response to the request
23  that we were just looking at from the Secretary of
24  State's Office.
25  Q.   Okay.  And who is the author of this

Page 160

1   response?
2   A.   Dylan Lange.
3   Q.   Okay.  I want to draw your attention to the
4   last paragraph on page 2.  It says, "With respect to
5   item number 2 and the affidavit you submitted as
6   required by New Mexico law, in the notice VRF states
7   that it 'intends to publish the requested information
8   online for election related purposes, but it will
9   only publish the personal information of voters if
10  VRF is granted relief in'" -- citing this case --
11  "or in any other legal proceeding.'"
12      Did I read that correctly?
13  A.   Yes.
14  Q.   Skipping the citation there, it says, "As
15  you know from the federal litigation and otherwise,
16  it is our position that publishing any" -- with
17  emphasis on the "any" there -- New Mexico voter data
18  on a website is a violation of the New Mexico
19  Election Code that carries criminal liability."
20      Did I read that correctly?
21  A.   Yes.
22  Q.   At the time this response was sent, did the
23  Attorney General's Office agree with that position?
24  A.   I think that would reveal any privileged
25  communication that we would have with the Secretary

Page 161

1   of State's Office.
2   Q.   I'm not asking what advice you gave them.
3   I'm asking, as a defendant and litigant in this case,
4   if that is -- if that comports with the position that
5   the Attorney General was taking?
6   A.   Our position is that we support the
7   Secretary of State's Office.  And so, you know, had
8   we disagreed, you know, I think you could infer that
9   we were having disagreement with our client.  So,
10  yeah, I mean we certainly support the position taken
11  by the Secretary of State's Office, and the decision
12  that they made, in our role representing the state
13  and that agency.
14  Q.   We can agree that the Secretary effectively
15  denied this request and did not produce voter data to
16  Voter Reference Foundation; is that correct?
17  A.   Yes.
18  Q.   Okay.  I want to compare the denial of the
19  October 18th request, that we just looked at, with
20  the November 17th letter, to the denial here.
21      So we established that in Mr. Lange's
22  November 17, 2022 letter, two of the reasons for
23  which that request was denied -- we'll start with the
24  first one -- it says, "You have not indicated that
25  you will not post any voter data online, and based on

Page 162

1   your past practice we believe you will do so again."
2       You already agreed that I read that
3   statement correctly, and that that was one of the
4   reasons for denying the request.
5       MS. LECOCQ:  I'm sorry, which -- you said
6   the first one.
7       MR. MUELLER:  I'm on page 2 of the November
8   17, 2022 letter from Dylan Lange.
9       MS. LECOCQ:  Sorry.  Got you.  I'm so
10  sorry.  Go ahead.
11      Q.  So perhaps to clarify, in the November 17,
12  2022 letter, at least one of the reasons for the
13  denial of the request was that VoteRef did not
14  promise not to publish the voter data online; is that
15  correct?
16      A.  Yeah, that's one of the explanations.
17      Q.  And in the May 27th request, which was
18  subsequently denied on June 16, VoteRef specifically
19  stated that it was not going to publish the data
20  online without a court order allowing it to do so; is
21  that correct?
22      A.  Yeah, that's what it says.
23      Q.  Okay.  Similarly, in the November 17, 2022
24  letter from Mr. Lang, on page 2, as we went over, one
25  of the reasons for denial was that VoteRef did not

Page 163

1   submit the required affidavit; is that correct?
2       A.  Yes.
3       Q.  And if we look at the May 27th request --
4   which was then denied on June 16, 2022 -- VoteRef
5   included two different affidavits, did it not?
6       A.  Yes.
7       MR. MUELLER:  I think we should go ahead
8   and take a break and then power through this last bit
9   here.
10      MS. LECOCQ:  Okay.
11      (A discussion was held off the record.)
12      MR. MUELLER:  I have one more topic I want
13  to knock out and then that may be it.  I'll say a
14  caveat.  I want to knock this out, maybe take another
15  short break, look through my stuff again, and then we
16  may be done.  So I'm hoping 5:00 for all of our
17  sakes.
18      Q.  Is the New Mexico Attorney General's Office
19  aware of any other entity that posts voter data
20  online?
21      A.  Not to my knowledge under similar fact
22  patterns that are here.  You know, publicly post.  I
23  mean --
24      Q.  Let's say specifically, is the Attorney
25  General's Office aware of any other entity that posts

Page 164

1   voter data online to the general public?
2       A.  No, not that I'm aware.
3       Q.  Is the Attorney General's Office aware of
4   any other entity who posts voter data online to
5   something less than the general public?
6       A.  Well, I guess I should also clarify what
7   type of voter data, right?  I mean, the detail, the
8   home addresses, just simply names -- I mean, I think
9   it depends on the extent of the data being shared
10  also.
11      Q.  I mentioned this, but it was a long time
12  ago.  When I'm saying voter data, I'm meaning
13  specifically the definition given to voter data in
14  1-4-5.5 C, which is -- I want to be clear what we're
15  talking about.  So when I use the term "voter data,"
16  as I stated earlier, voter data, as defined in
17  1-4-5.5, Subsection E, paragraph 5.  "Voter data
18  means selected information derived from the voter
19  file."
20      So with that clarification, does that
21  change your answer to the question:  Is the AG's
22  Office aware of any entity that publishes voter data
23  online to the general public?
24      A.  Yeah, I mean, not generally, that I'm aware
25  of.

Page 165

1       Q.  Okay.  Is the AG's Office aware of any
2   entity that posts voter data online to something less
3   than the general public?
4       A.  Yeah, not that I'm aware of, that I've been
5   privy to conversations about, no.
6       Q.  Is the Attorney General's Office aware of
7   any entity that sells voter data?
8       A.  Not that I'm aware of, no.
9       Q.  Does the Attorney General's Office have any
10  knowledge of an entity called Catalist?
11      MS. LECOCQ:  Objection.
12      A.  Yeah, that name does not ring a bell to me.
13      MR. MUELLER:  I'm going to give Ms. Lecocq
14  a chance, in case she's --
15      MS. LECOCQ:  Unless I have really
16  misinterpreted this, I don't believe -- this is not a
17  subject that I -- Catalist and what it did, or what
18  our knowledge is, I think is just the knowledge of
19  the Secretary of State.  I don't believe that the
20  Attorney General's Office has any reason to know
21  about it.  And I don't see it in the topics, unless
22  I'm misconstruing these topics.
23      MR. MUELLER:  Well, I don't want to get
24  into too much argument on the record here.  But
25  certainly, the treatment of VRF, as compared to

42  (Pages 162 to 165)

Page 166

1  different entities that use, share, and even sell
2  voter data, certainly relates to the claims in our
3  case, including viewpoint discrimination and the
4  defenses raised by the parties in this case, one of
5  which is on appeal, about how we must show disparate
6  treatments as to us and other entities. So I would
7  say that there is a category that says, you know,
8  claims and defenses raised in the litigation. I
9  think this calls for -- and it's been raised several
10 times throughout this case. I don't think I'm
11 surprising you by asking you about it here. I
12 believe it's also in a discovery response. So to the
13 extent we've asked for testimony about discovery
14 responses, then I think we're there.
15         MS. LECOCQ: Mr. Dworak has certainly
16 reviewed the discovery responses. Do you know which
17 one?
18         MR. MUELLER: I think as early as
19 Interrogatory 1.
20    Q.   Interrogatory No. 1. Do we have a copy of
21 this? It says, "State whether you have conducted any
22 investigation or made any inquiry into the use or
23 sharing of voter data by Catalist, i360, or any other
24 commercial entity that has purchased voter data from
25 New Mexico" -- goes on.

Page 167

1         And then there is an answer from the
2  Attorney General's Office, which I don't want to read
3  out loud until I ask about it.
4         MS. LECOCQ: Sure. Let me just refresh his
5  recollection with this. Sorry, go ahead.
6         MR. MUELLER: Just to clarify, did he hand
7  you the supplemental responses or the original? Is
8  it the 3/8 or the 10/20? They're not different, but
9  it's just important.
10        MS. LECOCQ: This is response, so this is
11 the initial, not supplemental.
12        MR. MUELLER: I'll note that they're not
13 different. But I want to note that they're not
14 different.
15        MS. LECOCQ: That's fine.
16    Q.   Okay. So going back to my question, has
17 the Attorney General ever investigated -- let me
18 backtrack there. Is the Attorney General aware of
19 whether Catalist sells voter data that it receives
20 from the Secretary of State's Office?
21    A.   Not that I'm aware of.
22    Q.   And is that the office or is that you
23 speaking individually?
24    A.   That's me speaking on behalf of the office.
25    Q.   What about i360? Is the Attorney General

Page 168

1  aware of whether or not i360 sells voter data that it
2  receives from the New Mexico Secretary of State's
3  Office?
4    A.   No, not that I can recall that the office
5  generally is aware of any investigation or knowledge
6  of the details.
7    Q.   Same question with regard to Aristotle. Is
8  the Attorney General aware that it sells voter data
9  that it receives from the New Mexico Secretary of
10 State?
11   A.   The same answer, no.
12   Q.   Has the Attorney General ever investigated
13 any entity, other than VRF, for how it uses voter
14 data requests from the Secretary of State?
15        MS. LECOCQ: Objection. Go ahead.
16   A.   Yeah, I'm not aware of any referral that
17 would have resulted in any type of investigation of
18 that sort.
19   Q.   Do you have a copy of the supplemental
20 interrogatories? And we can mark that as Exhibit 15.
21        (Exhibit 15 marked.)
22   Q.   And I'll represent that this document --
23 thank you for marking that -- it is Defendant Raul
24 Torrez's First Supplemental Response to Plaintiff
25 Voter Reference Foundation's First Interrogatories,

Page 169

1  Requests for Production and Requests for Admission.
2  Do you agree with me that that is what this document
3  is?
4    A.   Yes.
5    Q.   And if you'd look at -- if you look at the
6  very last page, the certificate of service, do you
7  agree with me that these were served on -- or
8  produced to Voter Reference Foundation on March 8,
9  2023?
10   A.   Yes.
11   Q.   Directing your attention to Interrogatory
12 No. 1 -- that's on page 4 -- Interrogatory No. 1
13 says, "State whether you have conducted any
14 investigation or made any inquiry into the use or
15 sharing of voter data by Catalist, i360, or any other
16 commercial entity that has purchased voter data from
17 New Mexico."
18        Did I read that correctly?
19   A.   Did you say Interrogatory No. 4 or 1?
20   Q.   I said 1 on page 4.
21   A.   Yes, that's correct.
22   Q.   And then it says -- well, it says, "If
23 answered" -- skip that part. You'll note that there
24 is two objections made, but then a response is given
25 subject to that objection. Am I characterizing that

Page 170

1   correctly?
2       A.   Yes.
3       Q.   And that response says, "Without waiving,
4   and subject to, the foregoing general and specific
5   objections, defendant has not received a referral
6   from a state or county elections agency or a citizen
7   complaint concerning the above-referenced entities.
8   that defendant has not conducted an investigation or
9   inquiry into the above-referenced entities does not
10  preclude defendant from doing so."
11          Did I read that correctly?
12      A.   Yes.
13      Q.   You'll agree with me that this is a
14  supplemental response that, as we noted, was served
15  last week?
16      A.   Yes.
17      Q.   And I'll represent to you that the initial
18  response to this interrogatory was served on October
19  20, 2022.  Would you agree with me that the response
20  has not changed from October 20, 2022 to March 8,
21  2023?  And perhaps it would be helpful -- I want to
22  find it to show you.  On the requests that were
23  supplemented on March 8, it's noted that there is a
24  supplemental response.
25          So taking a step back, can we agree that

Page 171

1   there is no supplemental response provided to
2   Interrogatory No. 1?
3       A.   That's correct.
4       Q.   So the Attorney General's response to that
5   was the same on October 20, 2022 and March 8, 2023?
6       A.   Yes.
7       Q.   Are you aware that these entities were
8   specifically identified to the Secretary of State,
9   the Attorney General, and the Court at the
10  preliminary injunction hearings held last summer?
11      A.   I'm generally aware that -- I mean,
12  throughout this -- that they've been mentioned, and
13  these questions have been asked.
14      Q.   Does the Attorney General's Office consider
15  VRF's identification of those entities to be a
16  citizen complaint?
17          MS. LECOCQ:  Objection.
18      A.   Yeah, I think that would be -- what
19  constitutes a citizen's complaint, and what happens
20  from complaints or information received to us -- and
21  we generally know that just raising an allegation or
22  issue in an ongoing case or pleading would not
23  generally constitute any type of formal complaint
24  with our office.
25      Q.   Has the Secretary of State ever brought any

Page 172

1   of those three entities to the attention of the
2   Attorney General?
3       A.   Not that I'm aware of.  Although,
4   they're -- yeah, not that I'm aware of.  I mean --
5   and that's what our answer says, is that we haven't
6   had any referrals or complaints provided to our
7   office.  So I think that's consistent with that
8   answer.
9       Q.   What would it take Voter Reference
10  Foundation giving the AG about these entities for the
11  AG to be concerned that they are selling voter data?
12          MS. LECOCQ:  Objection.
13      A.   Again, I think a lot of that is very fact
14  specific.  And what complicates this is the ongoing
15  litigation.  Defenses raised in litigation are
16  treated a little bit differently, obviously, than a
17  complaint filed or referral from another state agency
18  or a complaint filed by a member of the public or any
19  entity through our complaint process.  So, I mean --
20  and that's how many complaints come through our
21  office.  They come through, you know, either a form
22  filled out on our website or by referral from another
23  government entity.
24          (Exhibit 16 marked.)
25      Q.   I'm going to hand you what I've marked

Page 173

1   as -- pretty poorly -- as Exhibit 16.  Once you've
2   had a chance to review it, can you tell me if you've
3   seen this document before?
4       A.   No, I don't believe I've ever seen this.
5       Q.   Just on its face, can you tell me what this
6   document purports to be?
7       A.   I mean, having never seen it before, it's a
8   little hard for me to do that.  But it just says it's
9   a "Declaration of Records Custodian of Aristotle
10  International, Inc.," and there are a number of --
11  looks like screen shots or -- yeah, screen shots --
12  from some websites.
13      Q.   And if we look at the second page of the
14  declaration, will you agree with me that it is signed
15  by a J. Blair Richardson, Jr., who at least purports
16  to be general counsel for this entity?
17      A.   Yeah, that's what it says.
18      Q.   Okay.  I want to draw your attention to
19  attachment number 2.  On page 1, it identifies
20  attachment 2 as, "Aristotle's Test
21  Voterlistsonline.com sales order and agreement used
22  for Aristotle customers wishing to purchase access to
23  New Mexico voter data."
24          Did I read that description on page 1
25  correctly?

44  (Pages 170 to 173)

Page 174

1    A.  Yes.
2    Q.  So if we turn to attachment 2 --
3        MR. MUELLER:  And I am going to note that
4    this part should be designated "Confidential"
5    pursuant to the confidentiality order, protective
6    order.
7    Q.  Have you been able to find attachment 2?
8    A.  Yes.
9    Q.  And you'll agree with me at the top it
10   says, "Aristotle Now You Know," identifies their
11   contact information, and then says, "Aristotle Sales
12   Order and agreement"?
13   A.  Yes.
14   Q.  If you look down under the kind of darkened
15   bar, you'll see it says, "Voterlistsonline.com
16   Access; quantity, 1; unit, months; sales price,
17   $1,000." Did I read that correctly?
18   A.  Yes.
19   Q.  If you go down under Product Details &
20   State Data Restrictions, it reads,
21   "Voterlistsonline.com Access."  Then it says,
22   "Voterlistsonline.com Access" again.  "Aristotle will
23   provide client with open access to the specific areas
24   listed using Aristotle's Voterlistsonline.com service
25   for the period listed below.  Client will have access

Page 175

1    to all available updates obtained by Aristotle during
2    the term of this contract."
3        Did I read that correctly?
4    A.  Yes.
5    Q.  It goes on to say, "This contract includes
6    access and ability to download files containing all
7    standard fields available on Voterlistsonline.com for
8    those geographic areas included within this
9    contract."
10       Did I read that correctly?
11   A.  Yes.
12   Q.  Then, if you skip the next paragraph, it
13   then says, "Client will have access to NM statewide
14   file."
15       Did I read that correctly?
16   A.  Yes.
17   Q.  Okay.  If you go down a little further, it
18   says, "New Mexico:  (Political Use Only)."
19       Do you see where I'm at, at the bottom of
20   the page?
21   A.  Yes.
22   Q.  "The following apply to the extent required
23   by applicable law.  Section 1-4-5.5 of the New Mexico
24   Election Code:  I hereby swear that New Mexico voter
25   data, mailing labels and special voter lists shall be

Page 176

1    used for governmental, election and election campaign
2    purposes only, and shall not be made available or
3    used for commercial or unlawful purposes."
4        Did I read that correctly?
5    A.  Yeah.
6    Q.  Would you agree with me that this contract
7    purports to be a contract selling access to New
8    Mexico voter data?
9        MS. LECOCQ:  Objection.
10   A.  Yeah, I mean, I can't -- I don't know
11   anything about this, the validity of this, where it
12   came from.  I mean, it purports that.  But I've never
13   seen this before.
14   Q.  Sure.  But we can at least agree that it
15   says, "Client will have access to New Mexico
16   statewide file," and it lists a sales price of
17   $1,000?  We can agree to both of those things?
18   A.  Yeah.
19   Q.  Does this raise any concern with the
20   Attorney General that an entity is selling New Mexico
21   voter data?
22       MS. LECOCQ:  Objection.
23   A.  Without knowing the context of this, the
24   timing, what conditions are placed on it, whether or
25   not they have New Mexico data, how much is being

Page 177

1    used, who it's being used by, all of those
2    fact-specific questions, I could not say that our
3    office has a concern.
4        I certainly have -- we would have
5    questions.  And also, importantly, the Secretary of
6    State's Office, who understands this area of law, is
7    charged with, you know, overseeing the use of
8    election data, I would certainly want to know what
9    they think about it.
10   Q.  Does the disclaimer that we read at the
11   bottom of -- disclaimer is my own word -- the
12   paragraph that we read at the bottom of this document
13   about "political use only" in referring to 1-4-5.5,
14   make Aristotle's sale of this data lawful?
15       MS. LECOCQ:  Objection.
16   A.  Yeah, I mean, I can't draw a conclusion on
17   whether or not this is lawful or not without, again,
18   addressing the number of questions that I had, and
19   points from the prior question.  I mean, I can't say
20   that putting some text, and having somebody check a
21   box, by itself, is sufficient to absolve any legal
22   issues that might be raised.
23   Q.  We talked earlier about control of the
24   data.  If this contract is legally binding, does this
25   adequately -- does Aristotle adequately maintain

Page 178

```
 1    control of the data by entering into a binding
 2    contract with the person to whom it sells the data to
 3    only use it for permissible purposes?
 4          MS. LECOCQ:  Objection.
 5          A.  Yeah, I mean, I can't speculate, having
 6    never seen any of this before.  And it, you know, not
 7    being presented in part of any of the analysis that
 8    we've done, opine from our office on whether or not
 9    this contract would permit an entity from sharing or
10    selling such data under our state laws.
11          Q.  Does the purpose for which the buyer of
12    this voter data puts the voter data, once they
13    receive it, affect the analysis of whether Aristotle
14    is violating New Mexico law?
15          MS. LECOCQ:  Objection.
16          A.  Again, I can't speculate as to liability on
17    such a hypothetical, without having reviewed it
18    first.  It certainly raises a lot of questions that
19    we'd have to review closely.
20          Q.  I mean, I suppose we're looking at a
21    document here, where this entity is selling New
22    Mexico voter data.  So, again, I'm not sure this is a
23    hypothetical.  This is -- we're looking at a document
24    and this is what is happening.
25          So I'm just simply asking:  Does the
```

Page 179

```
 1    purpose towards which the buyer puts the data affect
 2    whether Aristotle is lawfully selling the data?
 3          MS. LECOCQ:  Objection.
 4          A.  Again, I could answer this if this was
 5    something that we were aware of before in our office.
 6    But I can't, you know, on the spot give positions
 7    that our office would take, or opinions our office
 8    would have, on something our office has never seen
 9    before.  And obviously, there is more to whatever
10    this is than a piece of paper or a website.  And,
11    yeah, it's just not possible for me to opine.
12          Q.  Is being presented with this document a
13    sufficient motivator for the Attorney General to look
14    into Aristotle or any of these other entities?
15          MS. LECOCQ:  Objection.
16          A.  I can say that the Attorney General's
17    Office takes its responsibility in upholding state
18    law seriously.  And actions that we may take, you
19    know, are dependent upon what information that we
20    have.  And with something like this, where there is
21    another state agency implicated, it necessarily needs
22    to involve them.
23          So I could say generally that it's
24    something that the office takes note of, and is
25    mindful of, and we'll certainly consider moving
```

Page 180

```
 1    forward in conversations that we have with the other
 2    state agency.
 3          Q.  Is the Attorney General's Office less
 4    concerned by the sale of voter data by these
 5    commercial entities that it is by what VoteRef was
 6    doing with the data?
 7          MS. LECOCQ:  Objection.
 8          A.  Yeah, it's impossible to state any opinion
 9    that our office would have, not having any of this
10    information prior to today.  So I can't opine on
11    that.
12          But, again, certainly the Secretary of
13    State's Office would need to be engaged in
14    understanding this issue and exploring the issue, and
15    determining what steps they may take, with or without
16    our office.
17          Q.  Did the Attorney General's Office know who
18    Aristotle was before today?
19          MS. LECOCQ:  Objection.
20          A.  So, having refreshed my memory, these
21    entities were mentioned in discovery.  So, I mean, at
22    least that knowledge.  I'm not aware of any -- you
23    know, as I stated before, there is nothing formal, no
24    formal complaints, or any of that action.  But
25    certainly our knowledge, just by reference to these
```

Page 181

```
 1    entity's names.
 2          Q.  Has the Attorney General's Office had any
 3    contact with Aristotle, let's say, in the last two
 4    years?
 5          A.  Not that I'm aware of.  And, you know, that
 6    wasn't part of any review or research I did in
 7    preparation for today.
 8          (Exhibit 17 marked.)
 9          Q.  I'm handing you what's been marked as
10    Exhibit 17.  Have you seen this document or some
11    iteration of this document before?
12          A.  Yes.
13          Q.  And what is this?
14          A.  This is a draft of House Bill 4, introduced
15    during this legislative session, 2023.
16          Q.  Has the Attorney General's Office -- I
17    don't want privileged information here -- but has the
18    Attorney General's Office been involved in drafting
19    this proposed amendment?
20          A.  Not that I'm aware of, no.
21          Q.  Did the Attorney General's Office make any
22    suggestions regarding the proposed amendments to
23    Sections 1-4-5.5 and 1-4-5.6?
24          A.  Not other than our normal process of
25    providing fiscal impact reports through the
```

Page 182

1   legislative session, which we do -- at this count
2   it's about 560 different bills.  So this is one of
3   560 that have come into our office in the past 51
4   days.
5       Q.   Does the Attorney General's Office have an
6   understanding of what House Bill 4 proposes to change
7   with regard to -- let's say specifically Sections
8   1-4-5.5 and 5.6?
9       A.   I'm sorry, can you ask that question again?
10      Q.   Sure.  Does the Attorney General's Office
11  have an understanding of what this bill proposes with
12  regard to 5.5 and 5.6?
13      A.   So the office, generally -- the volume --
14  and I have to put context into this, because it
15  affects the way I answer and explain -- answer your
16  question and explain bill analyses -- our office --
17  right now, I'm overseeing the bill analysis for our
18  office, which includes requests from the Legislative
19  Finance Committee analysts -- which there is a number
20  of them, and they request fiscal impact reports --
21  which aren't just fiscal impact -- it's also any
22  types of issues.  And they ask them often of many
23  agencies for every bill, amendments, and
24  substitutions.  Not all, but many.  My estimate is
25  that we get about 75 percent of the bills introduced

Page 183

1   with a request for a fiscal impact report to our
2   office.
3       And so, by the time we receive a request,
4   we have 24 hours, generally, to return the fiscal
5   impact.  They're assigned to, I think, about 40
6   attorneys throughout the office, based off of some
7   subject matter, experience; sometimes, it's
8   completely random, too.  And the attorney then has 18
9   hours to complete the analysis, submit it.  And it
10  usually goes through one, sometimes two, reviews
11  before being released back to the Legislative Finance
12  Committee.
13      So our office being aware of a bill, these
14  attorneys and someone who reviews it will generally
15  be aware of it.  But the time constraints on our
16  office's ability, you know, to get into the weeds on
17  bills, there aren't many that I can say the office,
18  as an entity, is familiar with.  Some attorneys that
19  do the fiscal impact reports are aware of it.
20      But, can I say that the Attorney General,
21  or even the executive team, understands all the
22  details of every single bill?  No, they don't.  It's
23  not possible, literally possible, for that to happen,
24  given that we receive over 100 of these a week, on
25  top of everyone's normal workload.

Page 184

1   I know that's a long answer.  I hope that
2   helps put it in context.
3       Q.   Does the Attorney General's Office support
4   the proposed amendments to 5.5 and 5.6?
5       MS. LECOCQ:  If you want to declare -- I
6   don't know if you want me to show him where they are
7   in this bill?  Because it's a huge bill.
8       MR. MUELLER:  I mean, we're on page 4 and 5
9   of this document.
10      MS. LECOCQ:  Okay.
11      Q.   Page 4 starts with 1-4-5.5.
12      A.   Excuse me, what page is it?
13      Q.   Page 4.
14      A.   Page 4.  Would you like me to answer the
15  question?
16      Q.   Yes.
17      A.   So I'm not aware of our office taking a
18  formal position publicly in support of this.  I can
19  ==say, generally, this helps address the issue, and==
20  ==we'd be supportive of, because it helps clarify --==
21  ==just like dozens of other bills in the session, they==
22  ==help to clarify terms that are not always clear; they==
23  ==might be ambiguous and conflicting.==
24      Q.   Does the Attorney General have any
25  understanding as to whether these proposed amendments

Page 185

1   were motivated, in whole or in part, by VRF's
2   lawsuit?
3       A.   I'm not aware of that.  That might be a
4   better question for the Secretary of State, because
5   they're the subject matter expert in these statutes
6   that are being amended.
7       Q.   Okay.  If we look at the proposed amendment
8   to 5.5 C -- which is the second to the last paragraph
9   on page 4 -- I'm just going to read through this and
10  annotate as I go.  So C says, "Each requester of
11  voter data, mailing labels or special voter lists
12  shall sign an affidavit that the voter data, mailing
13  lists, or special voter lists shall sign an affidavit
14  that the voter data, mailing lists shall be used for
15  governmental or" -- and then this amendment proposes
16  to remove "election and."  The original has "election
17  campaign purposes only."  This amendment would add,
18  "shall not be transferred, copied, shared or conveyed
19  to any person outside the requesting party's agency
20  or organization, shall not be made accessible by the
21  general public on the internet or through other
22  means."  And then the original has "and shall not be
23  made available for use for unlawful purposes."
24      Did I fairly characterize that?
25      A.   Yes.

Page 186

1  Q.  If New Mexico law already prohibits posting
2  voter data on the internet, why is this amendment
3  necessary?
4      MS. LECOCQ:  Objection.
5  **A.  Yeah, I can't speak to the intent of the**
6  **sponsors, the legislators.  That would be a question**
7  **for a member of the legislature.**
8      **But I will just say -- and I mentioned this**
9  **before -- that there are many statutes that need**
10 **housekeeping.  And some of that -- you know, terms**
11 **that are insistent, terms that are duplicative, terms**
12 **that aren't defined.  And I see this as addressing an**
13 **issue that -- you know, obviously we're arguing over**
14 **these terms, and this would clarify, to help avoid**
15 **that ambiguity, and better clarify the requirements**
16 **of the statute.**
17 Q.  Okay.  I want to then turn your
18 attention -- if you look at the bottom of page 5, it
19 begins the amendments to Section 1-4-5.6.
20     And in the definition of "Unlawful use of
21 voter data, mailing labels, or special voter lists,
22 consists of -- this is Subsection A -- it says, "the
23 knowing and willful."  The amendment purports to
24 strike the words "use of such information for
25 purposes prohibited by the Voter Records System Act,"

Page 187

1  and to add:  "Selling, loaning, providing access to
2  or otherwise surrendering of voter data, mailing
3  labels or special voter lists by a person for
4  purposes prohibited by the Election Code."
5      Did I fairly characterize that section?
6  **A.  Yes.**
7  Q.  Does that language that this would add on
8  lines 2 to 4 of page 6 sound familiar to you?
9      MS. LECOCQ:  Objection.
10 **A.  I mean, have I read that word for word?  I**
11 **can't -- I don't know if I have or not.  I mean, some**
12 **of those points I know we're addressing here.**
13 Q.  I think you have a copy of 1-5-22 in front
14 of you, if you need to refresh your recollection on
15 this.  But I'll ask:  Is that the same language
16 that's currently in Section 1-5-22?
17 **A.  I'll say yes.**
18 Q.  I'm going to move -- sorry, if you want a
19 chance to --
20 **A.  No, no, that's fine, go ahead.**
21 Q.  I just want to move to line 6 on page 6.
22 There is a (2) in parentheses that says -- this is an
23 addition from the amendment, "causing voter data,
24 mailing labels or special voter lists or any part of
25 the voter data, mailing labels or special lists that

Page 188

1  identifies, or that could be used to identify, a
2  specific voter or the voter's name, mailing or
3  residential address to be made publicly available on
4  the internet or through other means."
5      Did I read that section correctly?
6  **A.  Yes.**
7  Q.  Does the Attorney General agree that
8  violations of these provisions both, as they are
9  currently written, and as would be amended, are
10 crimes under New Mexico law?
11     MS. LECOCQ:  Objection.
12 **A.  I mean, our office hasn't taken a position**
13 **on these proposed -- that I'm -- the fiscal impact**
14 **reports they include a note that they're not formal**
15 **positions of our office.  But, I mean, these are in**
16 **the same section as, you know, describing the fourth**
17 **degree felonies.  So I think that can be presumed.**
18 **But our office hasn't taken any kind of formal**
19 **position on it.**
20 Q.  You'll agree with me that lines 12 through
21 17 do say that the unlawful use of voter data is a
22 fourth degree felony; and upon conviction, the
23 violator shall be fined $100 for each line of the
24 information that was unlawfully used?
25 **A.  Yeah, I mean, that's where my conclusion**

Page 189

1  comes from.
2  Q.  So there is a criminal penalty there for
3  someone that violates that statute, both as written,
4  as it would be written if this amendment passes?
5  **A.  Yes.**
6  Q.  I just want to go back to 1-4-5.5 that we
7  just looked at, on page 4.  Is a violation of 1-4-5.5
8  a crime?
9      MS. LECOCQ:  Objection.
10 **A.  I know that this is being -- this is part**
11 **of the issue that's being raised on appeal, and I**
12 **believe that our office has taken a position that it**
13 **is or could be.  And I think that can be resolved by**
14 **the court, if there was a determination by the court.**
15     MR. MUELLER:  Okay.  I would like to
16 propose a four-minute break.  I'm going to talk with
17 Jackson real quick, see if we have anything to clean
18 up.  And if not, we'll be done.
19     MS. LECOCQ:  Great.  We'll just step out.
20     (A discussion was held off the record.)
21     MR. MUELLER:  Okay.  We can go back on the
22 record.  And if Erin agrees, I would like to ask a
23 question about the document that you gave me.  And we
24 can do it --
25     MS. LECOCQ:  Under Attorneys' eyes.

48  (Pages 186 to 189)

Page 194

1        IN THE UNITED STATES DISTRICT COURT
2          FOR THE DISTRICT OF NEW MEXICO
3   VOTER REFERENCE FOUNDATION, LLC,
4          Plaintiff,
5     vs.      NO:  22-CV-0222 JB/KK
6   RAUL TORREZ, in his official capacity as
    New Mexico Attorney General, et al.,
7
8          Defendants.
9        REPORTER'S CERTIFICATE
10  I, JENNIFER BEAN, New Mexico CCR #94, DO HEREBY
    CERTIFY that on March 13, 2023, the Deposition
11  of JOSEPH DWORAK was taken before me at the
    request of, and sealed original thereof retained
12  by:
13  Attorney for the Plaintiff
14  MR. MATT MUELLER
    GRAVES GARRETT, LLC
15  1100 Main Street, Suite 2700
    Kansas City, MO  64105
16
    I FURTHER CERTIFY that copies of this Certificate
17  have been mailed or delivered to all Counsel,
    and parties to the proceedings not represented
18  by counsel, appearing at the taking of the
    Deposition.
19
    I FURTHER CERTIFY that examination of this transcript
20  and signature of the witness was required by the
    witness and all parties present.  On_____ a
21  letter was mailed or delivered Ms. Erin Lecocq
    regarding obtaining signature of the witness,
22  and corrections, if any, were appended to the
    original and each copy of the Deposition.
23
24
25

Page 195

1
2   I FURTHER CERTIFY that the recoverable cost of the
    original and one copy of the Deposition,
3   including exhibits, to MR. MATT MUELLER is
    $_____.
4   I FURTHER CERTIFY that I did administer the oath to
    the witness herein prior to the taking of this
5   Deposition; that I did thereafter report in
    stenographic shorthand the questions and answers
6   set forth herein, and the foregoing is a true
    and correct transcript of the proceeding had
7   upon the taking of this Deposition to the best
    of my ability.
8
    I FURTHER CERTIFY that I am neither employed by nor
9   related to nor contracted with (unless excepted
    by the rules) any of the parties or attorneys in
10  this case, and that I have no interest
    whatsoever in the final disposition of this case
11  in any court.
12
13
    _____
14      Jennifer Bean, FAPR, RMR, RDR, CRR
    BEAN & ASSOCIATES, INC.
15  NM Certified Court Reporter #94
    License Expires: 12/31/23
16
    (8018N) JB
17  Date taken:  March 13, 2023
    Proofread by:  LR
18
19
20
21
22
23
24
25

Page 196

1   VOTER REFERENCE v. RAUL TORREZ, et al.
2     WITNESS SIGNATURE/CORRECTION PAGE
3   If there are any typographical errors to your
      deposition, indicate them below:
4
5   PAGE  LINE
6   _____ Change to _____
7   _____ Change to _____
8   _____ Change to _____
9   _____ Change to _____
10  Any other changes to your deposition are to be listed
      below with a statement as to the reason for such
11    change.
12  PAGE  LINE  CORRECTION       REASON FOR CHANGE
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  I, JOSEPH DWORAK, do hereby certify that I have read
      the foregoing pages of my testimony as
20    transcribed and that the same is a true and
      correct transcript of the testimony given by me
21    in this deposition on March 13, 2023, except for
      the changes made.
22
      _____
23      JOSEPH DWORAK
24  (8018N) JB

| Greg Rockstroh March 20, 2023 | | Defendants' Objections | Plaintiff's Response |
|---|---|---|---|
| 4:23 | 5:4 | | |
| 6:24 | 9:24 | | |
| 10:18 | 11:15 | | |
| 12:3 | 12:7 | | |
| 14:6 | 14:12 | | |
| 15:2 | 15:4 | | |
| 16:5 | 16:7 | | |
| 17:8 | 17:10 | | |
| 18:7 | 18:9 | | |
| 19:12 | 19:15 | | |
| 20:10 | 20:13 | | |
| 21:3 | 21:6 | Relevance: | This testimony concerns the process the Secretary of State's office must go through to create reports in the SERVIS database, which is relevant to show that Defendants' reasoning for denying VRF's requests for New Mexico voter data are pretextual. Specifically, this testimony illustrates that the Secretary of State's office is capable of creating the requested reports and will incur no special fees or other hardships associated with creating the reports. Accordingly, there is no basis to deny VRF's request. |
| 21:10 | 21:17 | | |
| 21:18 | 21:23 | There is no dispute in this case regarding the feasibility of producing the data nor about the costs associated with doing so. | |
| 24:1 | 24:2 | | |
| 24:11 | 24:18 | | |
| 26:2 | 26:7 | | |
| 27:17 | 27:25 | | |
| 31:2 | 31:8 | | |
| 31:13 | 31:16 | | |
| 32:4 | 32:7 | | |
| 34:13 | 36:14 | | |
| 38:18 | 39:23 | | |
| 39:24 | 40:11 | | |
| 40:12 | 40:25 | | |

17



# PohlmanUSA®
## Court Reporting and Litigation Services

---

Greg Rockstroh

March 20, 2023

---

Voter Reference Foundation, LLC

vs.

Raul Torrez, et al.

 1                    (Witness sworn.)

 2            MS. SCHREMMER:  Sorry to interrupt here.

 3      I just wanted to -- hold on.  I need to mute my

 4      mic here.  We're in the same room.  I just

 5      wanted to get some clarity.  You mentioned the

 6      videographer.  Are we recording this

 7      deposition?

 8            MR. GREIM:  No, we're not.  It just shows

 9      up on my screen as videographer, but it's just

10      the person running the call.  We're not

11      recording it.

12            MR. HOLMES:  I was getting ready to hop

13      off the line as we speak.  I was just waiting

14      until you guys get started and settled in.

15            MS. SCHREMMER:  Okay.  Thank you for the

16      clarification.  I'm going to mute this mic.

17                  GREGORY ROCKSTROH,

18      having been first duly sworn to tell the truth,

19      the whole truth, and nothing but the truth,

20      testified as follows:

21      DIRECT EXAMINATION,

22      QUESTIONS BY MR. EDWARD D. GREIM:

23  Q.   All right.  Well, this is to the witness.

24       Could you please state for us your full name

25       and your address?

1   **A.**   **Gregory James Rockstroh, 420-A Old Las Vegas**

2       **Highway, Santa Fe, New Mexico, 87505.**

3   **Q.**   Okay.  And your last name is spelled

4       R-O-C-K-S-T-R-O-H?

5   **A.**   **Correct.**

6   Q.   Very good.  Well, my name is Eddie Greim, and

7       I'll be asking you questions for a pretty short

8       time today here.  I think we'll go probably

9       about 60 minutes.  If we go over, it will be

10      only a few minutes beyond that, okay?

11   **A.**   **Sure thing.**

12   Q.   Mr. Rockstroh, have you had your deposition

13      taken before?

14   **A.**   **No, I have not.**

15   Q.   Okay.  Well, just, I'll do some ground rules

16      with you here.  I'll ask you a question, and

17      I'll just ask you to make sure you understood

18      it, and then I'll ask for an answer.  It's a

19      little tricky when it's remote.  And so I want

20      you to tell me right away if you didn't hear it

21      correctly or didn't understand it.  Is that

22      fair?

23   **A.**   **That is, yes.**

24   Q.   Okay.  And this goes for all depositions, but

25      especially when we do it remotely, you'll need

1      to answer every question with a yes or a no for

2      the court reporter.  Okay?

3   **A.   Yes.**

4   Q.   Okay.  Every now and then Mr. Herrera there,

5      who is defending the deposition, may make an

6      objection of some kind.  And if he does that, I

7      may go back and I may re-ask the question,

8      because it may be that he's identified a flaw

9      in the way I've asked it where when we print it

10     out it's not going to be clear, you know, what

11     question it is you were answering.  And so if

12     he objects, I may go back and I may ask it, but

13     I very likely will just turn to you and say,

14     "I'd like to have an answer, please," and then

15     you'll just need to answer.  Does that make

16     sense?

17  **A.   Yes.**

18  Q.   Okay.  Now, he may, every now and then, you

19     know, make an objection and say attorney-client

20     privilege and instruct you not to answer.

21     We'll deal with that at the time.  But I --

22     given our subject matter today, I doubt we're

23     going to get there.  We'll see.

24          Okay.  Well, with that aside, let's

25     charge into this.  Could you tell us your

1         education?

2    A.   Yes.  I have a bachelor's in business

3         administration from the College of Santa Fe.

4    Q.   Okay.  What training do you have in information

5         technology?

6    A.   My business administration degree was a

7         specialty in management of information

8         systems, and I've worked in technology since

9         1998.

10   Q.   Since that time, have you received any other

11        training or certificates in information

12        systems?

13   A.   I've not received -- I've not earned any

14        certificates in the recent past.  They would

15        all predate my degree, which was 2007.

16   Q.   Okay.  Tell us -- let's just go from 2007 to

17        the present, just tell us your work history.

18   A.   Sure.  In 2007 I was hired by the Department of

19        Information Technology as an application

20        developer III, I think.  I worked there for

21        approximately 18 months.  I then was hired at

22        the New Mexico Aging and Long-Term Services

23        Department as a business analyst.  I helped

24        implement a case management, and then moved

25        progressively through the ranks at the Aging

1          and Long-Term Services Department.   Ultimately
2          I served there for a relatively short time as
3          chief information officer.
4               And then in 2015 I came over to the
5          secretary of state again as an application
6          developer.   Worked predominately as business
7          analyst and project manager, and then became --
8          I was -- became the chief information officer
9          acting, when the chief information officer left
10         in August of, I think, 2019.   And I've -- and
11         was subsequently hired permanently in that role
12         in that 2021.   So my date might be off.   I
13         think it was August of 2020, I apologize.
14    Q.   Who -- how many people report to you as the CIO
15         in the SOS's office?
16    A.   My direct reports are currently four.
17    Q.   Okay.   And are there other people under them,
18         or do you have a total of four plus yourself in
19         your department?
20    A.   The department is ten people total.   I have a
21         deputy, and anybody who does not report to me
22         reports to the deputy chief information
23         officer.
24    Q.   I don't have this as an exhibit, but we found a
25         Facebook post from the official secretary of

1      state Facebook account that identifies you as

2      the "Election Security Program Manager."  Does

3      that name ring a bell to you?

4   A.  Yes, sir.

5   Q.  Okay.  Are you still the election security

6      program manager today?

7   A.  No, I am not.

8   Q.  Okay.  When did you serve in that role?

9   A.  I served in that role from 2018 until I was

10     named as the acting CIO in approximately August

11     of 2020.

12  Q.  What were your duties as the election security

13     program manager?

14  A.  That it was -- it was an expansion position

15     created from -- it was created in reaction to

16     the election activities that had gone on in

17     2016 and 2018.  And the goals of it were

18     largely to stay abreast of federal resources

19     that were available and state resources that

20     were available in the fields of cyber security,

21     and to make those available to county offices

22     where elections are run.  And to same -- to

23     similar extent, to stay on top of cyber

24     security at the secretary of state.

25  Q.  Let me ask you, Mr. Rockstroh, did you take

1      some time to prepare for your deposition today?

2  **A.   Minimal.  You know, a minimal amount of time,**

3  **yes.**

4  Q.   Okay.  Was that today or last week sometime?

5  **A.   Last Friday, I believe, and then a shorter**

6  **amount today just in reference to some exhibits**

7  **that were received.**

8  Q.   Very good.  And we'll turn to those in just a

9       couple of minutes here.  Did you review

10      anything other than the exhibits that we sent

11      ahead in preparation for your deposition today?

12  **A.   No.**

13  Q.   And I'm not going to count your attorneys

14      within this question, but did you interview

15      anyone or talk to anyone to prepare for your

16      deposition?

17  **A.   No.**

18  Q.   Are you familiar with a New Mexico, and I'm

19      not -- I may have not use the exact term here.

20      But are you familiar with a database maintained

21      by New Mexico that contains voter registration

22      data?

23  **A.   Yes.**

24  Q.   Is there a particular name or acronym for

25      database?

1   A.   Yes.

2   Q.   What is it?

3   A.   SERVIAS, S-E-R-V-I-A-S.

4   Q.   Okay.  And I'm just going to talk about the

5        architecture here for a second.  And

6        that's a -- by the way, that's a term I barely

7        know the meaning of.  But I'm just going to ask

8        you, first of all, is there a particular server

9        where the data in SERVIAS is housed?

10  A.   Can you clarify "data"?

11  Q.   Well, let's back up.  Let's -- maybe you should

12       tell us what data is in SERVIAS.

13  A.   SERVIAS consists of discrete files that are

14       stored, mostly PDF-type images, and then also

15       more traditional database.

16  Q.   And where does the information in the database

17       come from?  How does it get there?

18  A.   When you say how does the data get there, what

19       are you -- I mean, what are you asking, I

20       guess?

21  Q.   Let me -- okay.  Let me ask you a different

22       question.  What are the sources of the data in

23       the database?  Let's start with that.

24  A.   The sources of the data in the database,

25       there's manual entry by secretary of state

```
 1              personnel, as well as county personnel.
 2              There -- and that's the predominant -- that's
 3              predominant data entry.  The system receives
 4              voter registrations from motor vehicles
 5              division, and it also receives voter
 6              registrations from the secretary of state's
 7              online voter registration system.
 8    Q.   Okay.  And so if a voter -- I'm just going to
 9         take one of those.  Let's start with the
10         secretary of state online system.  If a voter
11         registers using the online system, does the
12         data automatically populate in the database or
13         is manual data entry still required?
14    A.   The data is automatically transferred into the
15         database for SERVIAS.  From there, it has to be
16         processed by a county election official,
17         otherwise it just hangs around in an input cue.
18    Q.   Is the same thing true of the DMV data, does
19         that come in automatically but then have to be
20         processed by somebody else?
21    A.   That is correct.
22    Q.   And, again, is it the county election official
23         who processes the data to make it part of the
24         database?
25    A.   That is correct, yes.
```

1    Q.    And if any changes are made as a result -- I'm

2          sorry, if any changes to the SERVIAS database

3          are made as a result of the ERIC reports, those

4          are made by the county clerks, right?

5    **A.    Yes.**

6    Q.    Now, I understand that -- well, let me ask you

7          this:  Does the SERVIAS database also reflect

8          data showing when a voter has cast a vote in an

9          election?

10   **A.    Yes.**

11   Q.    And I understand that's called a credit?

12   **A.    Yes, or voter credit.**

13   Q.    Okay.  How does the voter credit get added to

14         the database?

15   **A.    Voter credit can come from manual entry,**

16         **typically by a county clerk.  It can also come**

17         **from data exchange where the system interacts**

18         **with a ballot-on-demand system that is**

19         **provided -- operated by the county election**

20         **officials.**

21   Q.    So let me go back -- now that we have a little

22         better sense of what the data is in -- in there

23         and how it gets added, let me ask you:  Where

24         is the data stored?  Or let me -- let me strike

25         that.

```
 1              Where is the database hosted?
 2    A.   The database is hosted in the state data center
 3         on a server owned by the secretary of state,
 4         owned and operated.
 5    Q.   What are your responsibilities -- and let me
 6         back up.
 7              What are the responsibilities of your
 8         office with respect to the maintenance of the
 9         SERVIAS database?
10    A.   I understand more from the technical aspect,
11         the maintenance and upkeep requirements for the
12         systems in a more general sense at the office
13         level.  I don't have a great deal of
14         interactions or -- I've got an understanding,
15         but not a great deal of interaction or
16         influence on that, if that makes sense.
17    Q.   Sure.  I mean, let's drill down.  I'm not going
18         to go too deep into this.  But you mentioned
19         there are some technical aspects to your work
20         with the database.  Could you tell us what
21         those are?
22    A.   Yes, sir.  You know, the IT division is
23         responsible for ongoing contract maintenance
24         with the support vendor, that we grant access
25         to the hosting infrastructure to the IT staff,
```

1     we're responsible for the backup, monitoring,

2     and protection of those -- of those systems.

3  Q.  Okay.  Let me ask you now:  Do you occasionally

4     have to pull reports from the database?

5  A.  My staff do pull reports that are not easily

6     available in the front end as requested by the

7     Bureau of Elections.

8  Q.  What do you mean that they're not easily

9     available in the front end?  What did you --

10    I'm sure there's some technical answer there,

11    but tell us, if you can.

12 A.  That SERVIAS has reporting features built into

13    it that occasionally we get questions for

14    system data that isn't fulfilled by -- that's

15    not fulfilled by the canned reporting that is

16    available within SERVIAS, and then we will

17    attempt to answer those questions directly from

18    the back end.

19 Q.  So can you give me an example of a canned

20    report that's available from SERVIAS?

21 A.  Yes.  There is a precinct parts and district

22    report that would describe the districts -- the

23    election districts within a specific county,

24    and then the precinct parts that are associated

25    with each of those districts.

```
 1   Q.   Okay.  Let me ask you -- and I assume that

 2        there are several -- you could give us several

 3        other examples like that of canned products

 4        that can be easily pulled from SERVIAS?

 5   A.   Yes.

 6   Q.   Now, if somebody wants one of those canned

 7        products, how is it accessed?

 8   A.   Those products would normally come through

 9        voter data requests or an inspection of public

10        records request.

11   Q.   Okay.  And then does -- I assume that that

12        request comes to someone within the secretary

13        of state's office, is that right?

14   A.   Yes.

15   Q.   And does that -- is that person a staffer who

16        reports to you?

17   A.   No.

18   Q.   Okay.  Somebody within the Bureau of Elections?

19   A.   Yes.

20   Q.   And do those individuals, then, have the

21        ability to directly access SERVIAS and pull

22        those canned products on their own?

23   A.   Yes.

24   Q.   They don't need to go to your staff, normally,

25        to pull those canned products off, right?
```

1    **A.    Yes.**

2    Q.    What if someone asked for a voter list or a

3          list of all, you know, registered voters for a

4          certain county, is that a canned product?

5    **A.    Yes.**

6    Q.    About how many canned products are there?

7    **A.    I'm going to guess here a little bit, but I**

8          **would say there are between 30 and 40 different**

9          **canned reports in the system.**

10   Q.    Who decided what reports would be canned?  I

11         mean, in other words, who came up with the idea

12         for those 30 or 40 reports?

13   **A.    Some of -- some of the reports came as just**

14         **part of the system from the vendor, you know,**

15         **so a vendor when they build a system make best**

16         **guess as to, you know -- and they're good**

17         **guesses; they work in the space.  But they make**

18         **best guess.  And then the office, in**

19         **conjunction with county clerks, would have**

20         **specified other things that were not -- that**

21         **they wanted on a regular basis but were not**

22         **included in an already covered easily by a**

23         **canned report.**

24   Q.    Now, does the secretary of state's office,

25         under its contract with the vendor, pay a

```
 1          certain charge for each report that is pulled

 2          off of the canned reports?

 3    A.    No.

 4    Q.    So are the canned reports covered, I guess,

 5          under a fixed fee under that contract?

 6    A.    I think I would describe it as just the license

 7          fee for the software.

 8    Q.    Okay.  Now, I take it that there are other

 9          reports -- and we may come back to this.  I

10          think we may be done with the idea of canned

11          reports.

12                I take it there are other ways to pull

13          data off the SERVIAS database that are not

14          simply choosing a canned report, right?

15    A.    Correct, yes.

16    Q.    And can you give me an example?  I know you may

17          have to be creative, but maybe you can actually

18          remember an example of a request that -- for

19          data, that was recently made that was not a

20          canned report.  Can you think of one?

21                MR. HERRERA:  Objection.

22    A.    So the question is just an example of a type of

23          report that might need to be pulled from other

24          means?

25          BY MR. GREIM:
```

```
 1   Q.   Right.

 2   A.   Recently we pulled -- we pulled a report

 3        regarding MVD, motor vehicles division,

 4        registrations that were -- it was a -- it was a

 5        custom report regarding MVD and whether or not

 6        a customer chose to register to vote at the MVD

 7        office.

 8   Q.   So let me just -- we'll both -- take us a

 9        little bit further.  It's not that important,

10        but I want to understand.  So somewhere within

11        the SERVIAS database, it tells you how that

12        person registered, is that right?

13   A.   Yes.

14   Q.   And it probably tells you when they registered,

15        too, correct?

16   A.   Yes.

17   Q.   And so someone asks you to pull a report of

18        everyone who registered within a certain time

19        frame, how many of those were registrations

20        through the MVD offices?

21   A.   It's close.

22   Q.   Okay.

23   A.   But, yes, that would be a good example as well.

24   Q.   Now, do you -- does the secretary of state's --

25        let's use the example I gave.  I guess it
```

```
 1          wasn't -- I didn't quite meet your example, but

 2          it qualifies, so we'll stick with that.

 3                    Would the secretary of state's office

 4          incur a special charge from the vendor for

 5          having that data pulled?

 6   A.     No -- no.

 7   Q.     Okay.  Who -- let me ask you this:  Who goes in

 8          to pull the data when there is a special

 9          request like that?

10   A.     Our SOS application developer would be the

11          first point, and if he's unable to figure it

12          out, he would escalate it to the support vendor

13          for assistance.

14   Q.     Does the support vendor at least charge you an

15          hourly rate or something for those kind of

16          requests?

17   A.     Not -- no.

18   Q.     Are there ever voter requests for data -- or

19          let me just say:  Are there ever requests for

20          voter data that come from the general public

21          that the secretary of state's office refuses

22          because they require too much data work?

23   A.     To the best of my knowledge, no.

24   Q.     Let me step away from this topic for a minute

25          because there's something I forgot to ask you.
```

1    A.    **The system does not have any -- the system**
2          **keeps data for eternity right now.**
3    Q.    What about if somebody dies, are they also kept
4          in there?  I mean, I know they're not being
5          kept as an active voter.  But if someone dies,
6          are they kept in there along with a column
7          showing that they -- on such and such a date
8          their record was changed to show that they were
9          dead?
10   A.    **Yes.**
11   Q.    Okay.  I'm going to ask you about a -- I'm
12         going to ask you about something called a file
13         maintenance list.  Have you heard that term
14         before?
15   A.    **Yes.**
16   Q.    What do you understand that to mean?
17   A.    **My understanding is that is a canned report**
18         **used by county staff.**
19   Q.    What does the report reflect?
20   A.    **Without the report, I couldn't really comment,**
21         **other than generalities.**
22   Q.    Okay.  Well, let's stick with generalities.  I
23         don't -- I'm not here to drill down all the
24         way.  We'll just find out some other way.  But
25         generally speaking, is it a list that shows

```
 1          BY MR. GREIM:
 2     Q.   To the voter record, okay.
 3               It doesn't just keep track of the very
 4          last one?  It goes back in time to show other
 5          changes that were made?
 6               MR. HERRERA:  Objection.
 7     A.   Yes.
 8          BY MR. GREIM:
 9     Q.   How often is it that your staff is called upon
10          to generate what -- I'm just going call it a
11          non-canned report, pursuant to a request that's
12          made?
13     A.   Again, a guesstimate, and it depends on --
14          tends to be cyclical around elections, but I
15          would say monthly.
16     Q.   About once a month on average?
17     A.   Yes.
18     Q.   And when one of those requests comes in, I
19          mean, I know they're all different, but how
20          long does it take someone from your staff to
21          work on that and pull the data?
22     A.   Often I would say several days.
23     Q.   And there -- now, I'm not a computer science
24          person at all, but I assume they're writing
25          code or something like that?
```

1    A.    Correct, yes.

2    Q.    Now, is that several days of just working

3          straight through or it might take several days

4          from the time they get the assignment to the

5          time it's completed?

6    A.    From a receipt of assignment until completed.

7    Q.    But maybe they're working on other projects at

8          the same time, it's not that that matter took,

9          say, 40 hours on average?

10   A.    Correct.

11             (WHEREUPON, Deposition Exhibit 1 was

12         marked for identification.)

13   BY MR. GREIM:

14   Q.    I'm going to have you, if you could, look at

15         Exhibit 1.  And if you have it like I have it,

16         it's on letter-sized paper and so the printing

17         is rather small.

18   A.    Yes.

19   Q.    Okay.  Now, this was produced to us by the

20         secretary of state's office.  Do you know who

21         prepared this report within the secretary of

22         state's office?

23   A.    I do not.

24   Q.    And have you seen a report like this before you

25         looked at this document in preparation for the

1            they could review the reporting tools.

2       Q.   I see.  So let's break away for a second.  I

3            want to ask you about that.  It sounds like

4            there's an interface for SERVIAS after you log

5            in and there's probably certain things you can

6            click to generate the canned reports, is that

7            right?

8       A.   Yes.

9       Q.   And the application then goes into the database

10           and pulls out the data using that formula to

11           generate the canned report, is that right?

12      A.   Yes.

13      Q.   That report doesn't already exist.  It's just

14           that there is a system in place for pulling

15           that particular data together, right?

16      A.   Yes.

17      Q.   Okay.  Final question and then we'll quit --

18           you know, we'll quit trying here.  But if you

19           go down to the table section still on the first

20           page, fourth from the bottom is Judith Gordon,

21           February 24, 2021, you'll see she wanted voter

22           data for Sandoval County, precinct 132, with

23           history for general primary municipal elections

24           2016 to 2020.  Is that a canned report?

25      A.   With data -- with history, yes.

```
 1    Q.    Okay.

 2    A.    Produced from similar -- you set it up a little

 3          bit and it hit go.

 4    Q.    So when you say you "set it up a little bit,"

 5          you maybe enter in ranges and things into the

 6          SERVIAS interface?

 7    A.    Yes.

 8                MS. SCHREMMER:  Hey, Eddie?

 9                MR. GREIM:  Yeah.

10                MS. SCHREMMER:  When you're done with

11          this exhibit, can we take a comfort break?

12                MR. GREIM:  Yeah.  Why don't we go ahead

13          and do it right now?

14                MS. SCHREMMER:  Okay, thanks.

15                MR. GREIM:  Okay.  We'll go off the

16          record for about ten minutes, come back on, and

17          I expect we have about 30 minutes left at the

18          very most.

19                (WHEREUPON, at this time a brief recess

20          was taken.)

21                MR. HERRERA:  Eddie, Greg has a

22          clarification from his previous testimony he

23          wants to clear up.

24                MR. GREIM:  Okay.

25                THE WITNESS:  In our last example, we
```

```
 1        BY MR. GREIM:
 2   Q.   Okay.  And so your testimony, then, is that
 3        what Ms. Gordon asked for technically could not
 4        be provided?
 5             THE WITNESS:  Can I see --
 6             MS. SCHREMMER:  Oh, I'm sorry.
 7   A.   As asked, it can be provided by the system.
 8        BY MR. GREIM:
 9   Q.   It can be?
10   A.   Yes.
11   Q.   Okay.  And so is it a canned report?
12   A.   Yes.
13   Q.   So the fact that, you know, this was asked for
14        in February of '21, and by this time there
15        might be people who have gone to jail or
16        whatever since 2016, did not keep the secretary
17        of state from responding to the report -- to
18        the request, right?
19   A.   It says it was issued on February 24th of 2021,
20        so, yes.
21   Q.   Right.  Okay.  Let me stay with you on this a
22        little bit.  The people who voted in 2016, in
23        the general primary municipal elections in
24        2016, who may have left Sandoval County by
25        2021, would still actually be in the database,
```

1          right?

2     A.   Yes.

3     Q.   But if they left Sandoval County, their current

4          status might show as what, inactive?

5     A.   No, their status would still be active.  It

6          would just be in a different county and they

7          would not reflect on this report.  So if I

8          lived in precinct 132 in Sandoval County and I

9          voted in the 2016 -- any of those elections,

10         and then I moved to Santa Fe and you run

11         this -- and you ask us to run this report in

12         2021, I would not be reflected in that canned

13         report as a participant from precinct 132 in

14         that election because I don't live in precinct

15         132 any longer.

16    Q.   But the database still shows -- even though not

17         as your current address, it still shows your

18         Sandoval County address, correct?  It's still

19         in there somewhere?

20    A.   Yes.

21    Q.   It's just that the way the canned report is set

22         up, it's going to begin with your current

23         county of registration?

24    A.   Yes.

25    Q.   Now, couldn't a query be run for every person

1       showing a Sandoval County registered address in

2       the 2016 elections?

3   A.  **Not from a canned perspective.**

4   Q.  Right.  It would require somebody on your staff

5       maybe talking to the vendor to pull that data

6       into a special report?

7   A.  **Yes.**

8   Q.  And have you ever received a request like that

9       before?

10  A.  **Yes.**

11  Q.  Okay.  When was that?

12  A.  **I don't recall.**

13  Q.  In the last five years?

14  A.  **Yes.**

15  Q.  Do you know who made the request?

16  A.  **No.**

17  Q.  Do you recall how long it took to fulfill the

18      request?

19  A.  **No.  It would be a complicated -- it would be**

20      **one that took somewhat longer.**

21  Q.  Was there an extra charge levied on the

22      recipient or, I guess, the requester?

23  A.  **I don't know.**

24  Q.  Would there still be a record of that request

25      and the time it took to send them the data?

1   end, you'd see that I signed it.  It's a

2   request for data and a notice of violation of

3   the National Voter Registration Act.  It's

4   dated May 27, 2022.  And I take it you've seen

5   this before just now, because you at least

6   maybe saw it before our deposition today?

7   **A.   Yes.**

8   Q.   Had you seen it before then?

9   **A.   No, today is the first I'd ever seen it.**

10   Q.   Okay.  Well, let's turn to page 4.  And I'm

11   going to show you -- there are two requests on

12   the top of page 4.  And I want to focus on the

13   first one, which is little bit longer.  And I

14   just want you to see in writing, I'll read it

15   into the record, but you would forget it

16   quickly, so I think having it in front of you

17   will help as I ask you about it.

18        The request is for, and I'm going to

19   quote, "A complete list, by county/precinct, of

20   any registered voters who cast a ballot in the

21   November 3, 2020 general election, who have

22   been subsequently placed in an inactive,

23   canceled, deleted, removed (or any registration

24   status other than active) status," then it has

25   a comma, and says, "or any voter that has been

1        removed or deleted from the voter roles between

2        November 3, 2020 and April 13, 2021, including

3        the total counts of the same."

4             So that's what I'm going to ask you about

5        now.  This was the request that I actually sent

6        in about -- you know, almost a year ago.  So I

7        think, you know, the structure of this request

8        is sort of divided in half.  After the word

9        "status" in the middle, it switches over to

10       something else.  So I'm going to focus on the

11       first part of the request and then we'll expand

12       out, okay?

13   A.   Okay.

14   Q.   So the first part of the request probably can

15       be viewed in two different -- has two different

16       parts as well.  You'll see the very first part

17       wants to know a complete list, by

18       county/precinct, of any registered voters who

19       cast a ballot in the last general election.  So

20       if we stop right there -- I know there's more,

21       but if we stop right there, is that a canned

22       report?

23   A.   Yes.

24   Q.   But then, of course, it goes on.  You can't

25       just stop with the canned report.  It says,

```
 1          "...of those people who have been subsequently

 2          placed in an inactive, canceled, deleted,

 3          removed (or anything other than active)

 4          status."

 5               And so my question is:  With that

 6          addition, is it still a canned report?

 7    A.    I'm not sure.  I would need to look at the

 8          system.

 9    Q.    Is it a report that, even if not canned, could

10          be pulled from the system?

11    A.    Yes.

12    Q.    Okay.  Then we're going to continue.  Then it

13          says "or."  And so now we're going to go to

14          something different.  "...any voter that has

15          been removed or deleted from voter roles

16          between..." the two dates.

17               And so let me ask you:  Is that a canned

18          report?

19    A.    I'm not sure.

20    Q.    And, again, you would need to look at the

21          system interface to know that?

22    A.    Yes.

23    Q.    But could that report be pulled from the system

24          even if it's not canned?

25    A.    Yes.
```

```
 1        STATE OF INDIANA    )

 2                            ) SS:

 3        COUNTY OF JOHNSON    )

 4

 5                        CERTIFICATE

 6

 7            I, Valerie Fillenwarth, RPR, a Notary

 8        Public in and for the County of Johnson, State

 9        of Indiana, maintaining an office in Johnson

10        County, Indiana, do hereby certify the

11        following:

12

13            That the witness herein, GREGORY

14        ROCKSTROH, was first duly sworn to tell the

15        truth, the whole truth and nothing but the

16        truth in the foregoing deposition;

17

18            That all testimony was taken down in

19        stenographic notes and afterward reduced to

20        typewritten form under my direction and then

21        presented to counsel for the purpose of

22        obtaining the deponent's signature;

23

24            That I recorded and transcribed any and

25        all objections made by counsel and the reasons
```

```
1      therefore; and

2

3           That I am not a relative or employee,

4      attorney or counsel of any of the parties, nor

5      a relative or employee of such attorney or

6      counsel, nor am I financially interested in

7      this action.

8

9           IN WITNESS HEREOF, I have hereunto set my

10     hand and affixed my Notarial Seal this 29th day

11     of March 2023.

12

13

14

15                    Valerie Fillenwarth,

16                    Valerie Fillenwarth, RPR

17                    Notary Public

18                    (Electronically signed)

19

20

21

22

23     Commission Number:  NP0669434

24     County of Residence:  Johnson

25     My Commission Expires on:  June 22, 2023
```

Respectfully submitted,

**GRAVES GARRETT, LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

**HARRISON, HART & DAVIS, LLC**
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

*Counsel for Plaintiff*


*/s/ Mark W. Allen*
Mark W. Allen
Jeff Dan Herrera
Assiostant Attorneys General
Office of the New Mexico Attorney General
408 Galisteo St.
Santa Fe, NM 87501
Tel.: (505) 490-4060
Fax: (505) 490-4881
mallen@nmag.gov
jherrera@nmag.gov

*Counsel for Defendants*