IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **VOTER REFERENCE FOUNDATION, LLC**, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)   CASE NO: 1:22-cv-00222-JB-KK<br>) |
| **RAÚL TORREZ**, in his official capacity as New Mexico Attorney General, | )<br>)<br>)<br>) |
| And | )<br>) |
| **MAGGIE TOULOUSE OLIVER,** in her Official capacity as New Mexico Secretary of State, | )<br>)<br>)<br>) |
| Defendants. | ) |

**PLAINTIFF VOTER REFERENCE FOUNDATION, LLC'S
REPLY IN SUPPORT OF SECOND SUPPLEMENTAL
<u>BRIEF FOR SUMMARY JUDGMENT</u>**

Earlier this week, the Court held a bench trial in this matter, adducing facts that remain relevant to the arguments raised in this supplemental briefing, including facts which directly undermine Defendants' mootness argument. Plaintiff VRF maintains its position that it is entitled to summary judgment, and that Defendants' cross-motion should be denied, on all claims still at issue. However, the new facts that developed in the few weeks before trial, and especially the trial testimony itself, are relevant and should be considered by the Court to the extent it intends to rule on summary judgment before or along with its findings and conclusions on the issues that it tried. Plaintiff VRF is entitled to judgment in its favor, either under Rule 56 or on the trial record.

1

### VRF'S RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL FACTS

PPPP. Uncontroverted.

QQQQ. Uncontroverted.

RRRR. Uncontroverted.

SSSS. Uncontroverted.

TTTT. Uncontroverted.

UUUU. Uncontroverted.

VVVV. Uncontroverted.

WWWW. Controverted. Item 4 of VRF's June 15, 2023 IPRA request mirrored exactly the text of the NVRA's Public Disclosure Provision. Item 4 requested: "All records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." **P35**. That provision, as Defendants have now acknowledged by producing voter data in response to Item 4, covers voter data.

XXXX. Controverted to the extent that Defendants imply that VRF's June, 2023 request only calls for documents producible under IPRA or implies that those documents which may be producible are not coextensive with the NVRA's Public Disclosure Provision. Instead, VRF's request exactly mirrored the NVRA's Public Disclosure Provision. **P35.** A request that specifically copies the language of the Public Disclosure Provision of the NVRA, and that asks that documents responsive to the NVRA's Public Disclosure Provision be produced, necessarily implicates the NVRA. That the Defendants want to characterize their responses as having been made "under" IPRA does not matter, when their very responses acknowledge that the documents meet the definition of the Public Disclosure Provision of the NVRA.

YYYY. Uncontroverted.

ZZZZ. Uncontroverted.

AAAAA. Uncontroverted.

BBBBB. Uncontroverted.

**ARGUMENT**

I. **Defendants' positions in this litigation evidence a cat and mouse strategy necessitating a final declaratory judgment from this Court.**

Before addressing Defendants' various moving targets, it is important to address what Defendants ignore completely. In VRF's Second Supplemental Brief, Dkt. 155, VRF pointed out that in response to VRF's May 27, 2022 NVRA request, Defendants claimed the first set of requested records "do not exist." PE29. Only after this Court told Defendants that their continual denial of VRF's May 27 request was concerning and likely evidenced viewpoint discrimination did Defendants "realize" that 31,743 such records do actually exist and can be produced. SOF YYY, Uncontroverted. As VRF wrote, "[d]espite Defendants' assertions to the contrary at the time, those records existed when VRF made its May 27, 2022 request and should have been produced." Dkt. 155., at 13.

Critically, Defendants provide no other explanation for the complete contradiction between their statements to VRF and the actual factual record. This is not a question about what VRF's counsel promised, or an allegedly novel question of NVRA interpretation. Instead, it is a false statement that was silently corrected without excuse or explanation. It tells the Court all it needs to know about the cat and mouse game Defendants have played over the past year and half.

Defendants do attempt to explain other contradictions between their varying positions, but those explanations hold no water. First, Defendants attempt to dismiss their changing positions regarding VRF's promise not to publish New Mexico voter data. In doing so, Defendants accuse

3

VRF of using "slippery language" in their promise not to publish unless granted relief "in the federal litigation or in any other legal proceeding." Dkt. 163. at 7 (quoting VRF's May 27, 2022 NVRA Request). But Defendants do not explain what they find so "slippery" about this language. Instead, Defendants assert that they merely believed it to be "prudent" to wait until some other, unspecified resolution of VRF's claims. *Id*. VRF has been clear and up-front throughout this litigation, from its May 2022 request through multiple court appearances. Each time, VRF has repeatedly promised to bind itself by the direction of this Court.

What is more, despite being challenged to do so, Defendants have never settled on a particular statement at the summary judgment hearing that constituted VRF's supposed "change."[1] The parties and Court all have the transcript. Rather than quoting line and verse, Defendants simply mischaracterize VRF's statements without any citations at all. In their briefing, Defendants implied that the question for them (unexpressed to anyone at the time) turned on whether there was a "final judgment." Defendants complain that VRF "merely" promised not to publish the data unless it received a court order permitting it do so, whereas Defendants really wanted a promise that VRF would not exercise its rights under any preliminary injunction, and would voluntarily sit on its rights (even absent a stay) until the conclusion of all appeals and final judgment on the return of an appellate mandate. VRF would never make such a promise, and it did not make such a promise at the summary judgment hearing—yet that is what Defendants' briefing now claims they heard, and what they say allows them to make a production. *See* Dkt. 163, at 7-8.

Defendants changed course at trial. The transcript will show that their sole witness claimed to have no concern with VRF posting the data during an appeal and before final judgment, so long

---

[1] Though they fail to address it in their summary judgment briefing, at trial, Defendants stated that the supposedly "new promise" made by plaintiff's counsel was that VRF would not post voter data online "without an order from the Court saying it can do so." This is no different than the promise that VRF made in its May 27, 2022 letter, P24, and repeated at the various stages of this case.

4

as VRF first procures an order from the court allowing it to post.[2] VRF attempted to explore this changed position from the witness. But Defendants also refused to allow the witness to testify to what her attorneys had told her was the "new" position. Will Defendants change their position yet again in post-trial briefing or on appeal? There is no way of knowing when or how the cat and mouse game will end. That is part of the reason why, despite Defendants' arguments to the contrary, the Court should and must reach the merits of Plaintiff's claims and declare its rights and Defendants' duties under the NVRA and the First Amendment. Without such a declaration, Plaintiff fears that it will find itself back in court to seek additional relief.

II.   **Defendants' production of voter data reveals their true positions.**

Defendants' explanation of their production of voter data in response to VRF's June 15, 2023 IPRA request is likewise porous. Defendants' briefing claims that the "Purge Lists" of voter data included in their August 22, 2023 IPRA production were only "incidentally" produced. Dkt. 163, at 9. Defendants imply that the only reason the Secretary made the Purge Lists available is because they are specifically subject to IPRA. *Id.* (referencing NMSA § 1-4-38). This argument would be availing if VRF's request had referenced § 1-4-38 (which covers board of registration records) or had simply asked for board of registration records. But VRF did not reference that statute. Instead, VRF made an IPRA request calling for the Secretary to produce *any and all documents that exactly match the Public Disclosure Provision of the NVRA*. *See* SOF UUU. This was not some trick. It was meant to force the Secretary to produce the actual documents she identified in her Supplemental Brief in this Court, which supposedly outlined the universe of documents which VRF could obtain under the Public Disclosure Provision.

---

[2] Indeed, VRF, in response to Defendants' August 30, 2023 Letter, clarified that its promise remained ***the same.*** *See* SOF NNNN. Defendants have not responded to that letter or retracted their offer of voter data.

What happened next was shocking, but in retrospect it presaged the collapse of Defendants' position at trial. Rather than simply producing the documents she had listed in her June Supplemental Brief, the Secretary produced what VRF has argued all along must be produced: voter data. Further, the Secretary specifically stated that this production was in response to VRF's request using the exact language of the NVRA. It does not matter (and actually helps VRF) that the Secretary also believes these voter records—with full names and addresses—had to be produced under IPRA. That is because the Purge List made available through IPRA as records of the "boards of registration" under § 1-4-38 contain only voter data. But a *separate* statute, § 1-4-28, actually details the "program" or "activity" of voter list maintenance under the NVRA. By connecting voter data under § 1-4-38 to its corresponding "program" or "activity" for ensuring the accuracy and currency of voter rolls in § 1-4-28, Defendants concede that the *data* used and created by a "program" or "activity" under the NVRA is a "record" for purposes of the Public Disclosure Provision. This further supports the principle that data used and created by other of New Mexico's programs and activities for the purposes of ensuring the accuracy and currency of the voter rolls fall within the bounds of the NVRA. This includes, for example:

> NM Stat § 1-4-24 (County clerk shall cancel certificates of registration for: death of the voter; a felony conviction of the voter; at the request of the voter; or at the direction of the board of registration.);
>
> § 1-4-25 (The death of a voter shall be ascertained by obituary notices or probate records or by comparison of registration records with monthly certified lists of deceased residents filed with the secretary of state. The state registrar of vital statistics shall file monthly with the secretary of state certified lists of deceased residents over the age of eighteen, sorted by county, regardless of the place of death. The secretary of state must send this information to county clerks, who must cancel any deceased resident's certificate of registration.);
>
> § 1-4-27 (The secretary of state maintains monthly in the voter registration electronic management system the eligibility status of persons convicted of felonies to register to vote. The corrections department, NM sentencing commission, and

the administrative office of the courts must deliver information as necessary for the secretary of state to carry out the provisions of this section.);

§ 1-4-32 (When a registration is cancelled, the county clerk removes, endorses, and files the original certificate of registration according to the secretary of state's procedures. These cancelled certificates are retained for six years and may be destroyed after the six-year period.).

As Defendants' briefing made clear, and as their witness at trial repeatedly made clear, the data related to all of these programs is available under the NVRA because (1) these are list maintenance activities (2) they are conducted for maintaining the accuracy and currency of the list, and (3) the only way to know whether the activities are being carried out is via access to the voter list itself.

### III. VRF's claims are not moot.

Finally, Defendants argue that VRF's Retaliation and Viewpoint Discrimination claims are moot because Defendants have made the data requested in VRF's May 27, 2022 request available. This assertion fails for several reasons.

"'Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction.'" *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir.2005). "'The crucial question is whether granting a present determination of the issues offered will have some effect in the real world.'" *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir.2005) (emphasis added) (quoting *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir. 2000)).

Although the plaintiff bears the burden of demonstrating standing, the defendant bears the burden of proving mootness. *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000). The defendant's burden is even greater when the defendant claims

to moot the case by voluntarily ceasing its offending conduct. *See id*. Courts recognize that defendants "should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Unified Sch. Dist. No. 259*, 491 F.3d at 1149 (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n. 1, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001)). Thus, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000).

Voluntary cessation of unlawful conduct will not moot a case unless "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. at 189. A defendant contending that a plaintiff has no cause of action because of the defendant's new behavior "must meet a 'heavy burden' of demonstrating that there is no reasonable expectation that the alleged wrongs will be repeated. *Blinder, Robinson & Co. v. SEC*, 692 F.2d 102, 106-07 (10th Cir. 1982) (quoting *W.T. Grant Co*., 345 U.S. 629, 633 (1953)). Thus, "[w]hen defendants are shown to have settled into a continuing practice ... courts will not assume that it has been abandoned without clear proof. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when ... there is probability of resumption." *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952) (citation omitted).

Turning to Defendants' wrongful conduct, Defendants have not actually made all of the data VRF requested available. As Defendants acknowledge, they still have failed to make the data VRF requested in its October 18, 2022 available and will not do so unless VRF signs an affidavit

surrendering its speech rights relative to that data.[3] Though Defendants initially articulated several, pretextual reasons to deny this request, Defendants now boil it down to the affidavit issue, not an argument that the requested data is outside the scope of the NVRA. *See* Dkt. 163, at 7. But of course, the Secretary has already stated that Defendants would not produce the records *even if* VRF had submitted an affidavit. **SOF 195**. So, on one hand, Defendants state the only thing keeping VRF from the data it requested on October 18, 2022 is an affidavit, but on the other hand, the Secretary states not even an affidavit will compel the Secretary to make this data available. This in and of itself necessitates this Court's action to declare VRF's rights.

Moreover, even if the Court were to conclude the August 30 Letter moots VRF's NVRA Violation claim, the Court should conclude there is an exception to that mootness. First, Defendants' extreme delay in making any records available to VRF has caused those records to become stale. The Secretary has argued that voter data is misinformation as soon as it is made available because of potential changes to the voter file. The Secretary has likewise argued (at trial and in briefing) that analyses of outdated data are themselves misinformation, even if those analyses are posted without the data itself. If this is so, the issue is exacerbated when the Secretary waits over a year to make data available. Certainly, there have been relevant changes to the voter file between May 27, 2022 and August 30, 2023. If Defendants are allowed to delay production of records for so long, their usefulness for accomplishing VRF's purposes under the NVRA is greatly diminished. And the likelihood that Defendants turn around and argue that VRF is spreading misinformation by using this data is enhanced. This delay is its own violation.

---

[3] To the extent Defendants argue that they have substantially complied with the law by producing the data requested on May 27, 2022, that argument is misguided. *See Project Vote, Inc., v. Kemp*, 208 F.Supp.3d 1320, 1349 (N.D. Ga. 2016) (substantial compliance with records request does not moot a challenge to the deficiency of the response).

Second, Defendants' conduct falls under the doctrine of voluntary cessation. Defendants have the burden to show it is "clear" they will not continue the challenged conduct. Yet Defendants' actions show the opposite. First, the Secretary has chosen not to take VRF at its word for over a year—even when the Court called attention to this issue. There is no telling what issue Defendants will contrive to deprive VRF of voter data in the future. Second, Defendants waited over a year to offer any voter data to VRF, rendering that particular data stale. Third, the Secretary's reasoning for suddenly offering some voter data to VRF is rooted in an obvious mischaracterization of VRF's promises, despite all of those promises being in the record. Defendants are still not dealing forthrightly with the Court or with VRF when making representations about their own legal reasoning, plans, and intentions. Fourth, the Secretary's letter came on the eve of trial and only after the Court made clear it would not issue a summary judgment ruling before trial—a last ditch effort to moot VRF's claims before VRF would have an ability to respond. *See Fish v. Kobach*, 309 F.Supp.3d 1048, 1097 (D. Ks. 2018) (Clear attempt to avoid reaching the merits of a case does not moot the merits of the claim). Fifth, Defendants state they have and will continue to provide data to VRF on the same conditions as everyone else, but this is a red herring. The Secretary has not provided VRF with access to data on the same conditions as all other requesters because no other requester has been threatened with prosecution, refused access to data for over a year, been forced to commence litigation, and only provided with the data when Defendants are satisfied with promises allegedly made by counsel in court.

Sixth, the Defendants' August 30 production letter pointedly refused to state that New Mexico was producing the data under the NVRA and pointedly refused to recognize that the NVRA compelled its disclosure, regardless of New Mexico law. Then at trial, Defendants' sole witness clearly testified that Defendants were indeed making the data available under the NVRA.

But at oral argument, the Defendants' counsel tried to walk back the admissions of their only witness by claiming that Defendants' position remains that only the minimal materials listed in the June Supplemental Brief must be disclosed. Defendants continually appear to give way, but retreat and double back repeatedly, sometimes within the same day. Whether a game of cat and mouse or pure confusion, no one can know what Defendants will do tomorrow, let alone next year.

Finally, of course, there is the key problem: Defendants still maintain that they are complying with the NVRA when they force VRF to sign away its First Amendment rights to share the data, whether online or with any other person or entity. As VRF showed at length in its briefing, this condition on access is unconstitutional and is also preempted by the NVRA under the doctrine of obstacle preemption.

In short, the parties' dispute continues regardless of Defendants' ambiguous eleventh-hour concession. In cases where a defendant's action moots a legal claim, the defendant has the "heavy" burden of proving the challenged conduct will not continue. *Blinder, Robinson & Co. v. SEC*, 692 F.2d 102, 106-07 (10th Cir. 1982) (quoting *W.T. Grant Co.*, 345 U.S. 629, 633 (1953)). Defendants' own actions prove otherwise.

Dated: October 18, 2023                                   Respectfully submitted,

**GRAVES GARRETT, LLC**
*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

**HARRISON, HART & DAVIS, LLC**
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Edward D. Greim, certify that on October 18, 2023, a copy of foregoing was filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following via email:

Mark Allen
Jeff D. Herrera
mallen@nmag.gov
jherrera@nmag.gov
Office of the New Mexico Attorney General
408 Galisteo Street
Santa Fe, NM 87501

／s/ *Edward D. Greim*
Edward D. Greim
Counsel for Plaintiff