**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) ) ) | **CASE NO: 1:22-cv-00222-JB-KK** |
| Plaintiff, | ) ) | |
| **v.** | ) ) ) | |
| **RAUL TORREZ**, in his official capacity as New Mexico Attorney General, and **MAGGIE TOULOUSE OLIVER,** in her Official capacity as New Mexico Secretary of State, | ) ) ) ) ) ) | **PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendants. | ) ) | |

<u>**PLAINTIFF'S PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW**</u>

Following the bench trial held by this Court on October 16, 2023, Plaintiff Voter Reference Foundation, LLC respectfully submits these proposed findings of fact and conclusions of law supporting judgment in Plaintiff's favor and against Defendants.

Respectfully submitted this 9th day of November, 2023.

**HARRISON, HART & DAVIS, LLC**
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

**GRAVES GARRETT, LLC**
Edward D. Greim
*Admitted Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, MO 64105
Tel: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

*Counsel for Plaintiff VRF*

## TABLE OF CONTENTS

[PROPOSED] MEMORANDUM OPINION AND ORDER ........................................1

PROCEDURAL HISTORY ........................................................................................1

FINDINGS OF FACT ...............................................................................................4

    I.      Voter Reference Foundation & VoterRef.com .........................................4

    II.     The Defendant Secretary of State ............................................................7

    III.    The Defendant Attorney General .............................................................8

    IV.    Voter data in New Mexico .......................................................................9

         a.   New Mexico voter data is sorted within a single database: SERVIS ..........9

         b.   New Mexico conducts various programs and activities to ensure
the accuracy and currency of its voter list. ...................................................12

         c.   Defendants' position regarding the scope of the NVRA's Public
Disclosure Provision would render that provision useless. ............................15

         d.   New Mexico restricts and conditions access to its voter list and
other voter data, including data it admits is subject to disclosure
under the NVRA. .............................................................................................17

    V.     VRF's voter data requests to New Mexico and the denial of
those requests. .........................................................................................19

         a.   VRF's February 18, 2022 voter data request is denied. .........................19

         b.   On May 27, 2022, VRF gives notice to New Mexico that the
denial of the February request violated the NVRA and makes
new requests, which are denied for over a year. ............................................20

         c.   VRF requests additional voter data in October 2022 and is denied access. ....25

         d.   VRF makes an IPRA request to the Secretary that mirrors the
NVRA's Public Disclosure Provision and the Secretary produces
Voter data in response. ...................................................................................27

e.   Defendants maintained their refusal to produce *any* voter data to VRF from March 11, 2022 until August 30, 2023, when the Secretary finally offered some data to VRF after admonitions from This Court that failing to do so was further evidence of viewpoint discrimination. ................................................................................. 29

    i.   Defendants' reasoning for why it refrained from producing the data for over 15 months but was able to produce it in August 2023 is pretextual. ...................................................... 31

    ii.   Defendants' August 30th production concedes that the voter list is available to requestors under the NVRA. ................. 35

f.   VRF requests additional voter data in October 2023 and is denied access. ........ 36

VI.   VRF publishes New Mexico voter data it lawfully obtained from Local Labs on its Website, VoterRef.com, and Defendants respond by investigating VRF and threatening it with prosecution. ..................... 37

a.   VRF lawfully obtains New Mexico voter data from Local Labs. ................. 37

b.   VRF published the voter data on VoteRef.com for governmental and Election related purposes. ................................................................. 38

c.   VRF simultaneously conducted an internal analysis of the voter data, issued a press release about that analysis, and reached out to the Secretary to discuss the analysis. ............................................ 41

d.   The Secretary refers to VRF to the Attorney General for criminal investigation. ............................................................................... 43

e.   VRF learns from an article published by ProPublica that the Secretary thinks it is violating the law and has referred it for criminal investigation. ........ 45

f.   VRF Removes the New Mexico data from VoteRef.com and files this lawsuit. ............................................................................. 49

g.   VRF reposts New Mexico voter data on the Website following This Court's issuance of preliminary injunction allowing it to do so. ............... 50

VII.   Defendants engage in viewpoint discrimination and retaliate against VRF for its protected speech. ..................................................... 51

a.  The Secretary refers VRF to the Attorney General for investigation
    and potential prosecution. .................................................................51

b.  Defendants repeatedly accuse VRF of engaging in "misinformation,"
    which is simply a euphemism for speech with which the State disagrees. ..........52

c.  Defendants repeatedly deny VRF access to New Mexico voter data
    even when it makes the same promises as other requestors. ...................55

d.  Defendants have taken vague and inconsistent positions regarding
    the Data Sharing Ban and the scope of New Mexico law to single out VRF. .....56

e.  Defendants have feigned concern for other companies which *sell*
    New Mexico voter data to third parties, but have never taken any
    action to investigate those companies. .................................................61

VIII.  The Data Sharing Ban unjustifiably burdens First Amendment
       Protected speech and is not narrowly tailored. .................................64

a.  The Data Sharing Ban severely burdens First Amended protected
    speech, including core political speech, by proscribing almost all
    speech involving voter data. .............................................................66

    i.   The Data Sharing Ban is a severe burden on political
         speech by criminalizing speech that shares voter data
         and by extracting requestors' promises not to engage
         in speech as a condition to accessing data. .................................66

    ii.  the Data Sharing Ban is content-based. ..................................66

b.  The interests offered by the state to justify the Data Sharing Ban
    are not compelling and the speculative harms complained of are
    not related to VRF's posting of voter data. .........................................70

    i.   The asserted state interests. .................................................70

    ii.  Defendants fail to produce any evidence that VRF's
         past publication has, or future publication will, cause harm. ...............71

c.  The Data Sharing Ban is not narrowly tailored. .................................73

IX.   The Data Sharing Ban proscribes nearly all speech involving voter
      data in the name of non-compelling state interests that could be
      achieved via far less burdensome means. .........................................74

X.    Defendants' interpretation giving rise to the pre-HB4 Data Sharing
      Ban is not supported by New Mexico law and is vague. .......................... 77

      a.  Defendants' pre-HB4 interpretation of the law was unreasonable
          and intended to single out VRF. ....................................................... 77

      b.  Defendants advocated for an amendment to NMSA 1-4-5.5
          which made New Mexico law explicitly state what Defendants
          claimed it already sold. ..................................................................... 78

CONCLUSIONS OF LAW .................................................................................... 80

I.    This Court has jurisdiction over VRF's claims and venue is proper. ............... 80

II.   VRF has standing to pursue its claims. ............................................................ 81

      a.  VRF has standing to pursue its NVRA claims (Counts I & II) ............ 81

      b.  VRF has standing to pursue its First Amendment claims
          (Counts III & V-VII) .......................................................................... 82

III.  VRF prevails on its NVRA preemption (Count I) and NVRA
      violation (Count II) claims. ............................................................................ 84

      a.  Individual, identifiable voter data, including the voter list as
          Stored in SERVIS, are "records" which must be made available
          under the NVRA. ................................................................................. 85

      b.  The NVRA preempts the Data Sharing Ban (Count I). .......................... 89

          i.   The law of obstacle preemption. ................................................. 89

          ii.  The Data Sharing Ban stands as an obstacle to the
               achievement of the NVRA's goals and is preempted
               to the extent of the conflict. ...................................................... 91

      c.  Defendants violated the NVRA's Public Disclosure Provision
          by failing to provide the data VRF requested in February, May,
          and October 2022 (Count II). ............................................................. 95

          i.   VRF made three requests for New Mexico data under
               the NVRA, all of which the Secretary initially rejected. ............. 95

          ii.  VRF's NVRA violation claim is not moot. ................................. 96

IV.     Defendants impermissibly retaliated against VRF and engaged in
        viewpoint discrimination because of VRF's protected speech (Count III)..........99

    a.  The law of First Amendment retaliation and viewpoint discrimination...............100

    b.  VRF engaged in constitutionally protected activity by sharing
        New Mexico voter data online for election integrity purposes.........................102

    c.  Defendants' retaliatory actions chilled VRF's speech.................................103

        i.   Threat of prosecution...........................................................104

        ii.  Refusing to fulfill VRF's lawful requests.......................................105

    d.  Defendants retaliated and discriminated against VRF because it
        disagreed with VRF's protected speech and viewpoint...............................107

        i.   Defendants' repeated claims that VRF spread
             "misinformation."...............................................................107

        ii.  Defendants' refusal to produce voter data to VRF was
             because of, not in spite of, VRF's views........................................107

        iii. The Secretary's referral to VRF to the Attorney General,
             And the Attorney General's ensuing investigation, was
             because of, not in spite of, VRF's views........................................109

    e.  Defendants' retaliatory acts were substantially, if not entirely,
        an adverse response to VRF's protected speech and Defendants'
        disdain for that speech..............................................................111

V.      The Data Sharing Ban severely burdens VRF's First Amendment
        protected speech and cannot survive strict scrutiny (Count V)........................111

    a.  The law regarding the First Amendment................................................112

    b.  VRF need not show a right to access New Mexico voter data under the
        First Amendment, as its right of access is derived from the NVRA......................113

    c.  VRF's speech sharing the data receives  heightened First
        Amendment protection for three independent reasons..................................115

        i.   Speech about and including voter data, particularly when
             used by the public to police the voter rolls and evaluate the
             state's efforts in doing the same, is protected by the
             First Amendment.................................................................115

   ii. The Data Sharing Ban violates the First Amendment because it unconstitutionally conditions access to voter data on the surrender of First Amendment rights...........................117

   iii. The Use Restrictions discriminate against VRF based on the content of its speech...........................120

  d. The Use Restrictions and Data Sharing Ban cannot survive Strict scrutiny...........................121

   i. The Court will apply strict scrutiny...........................121

   ii. The Data Sharing Ban and Use Restrictions fail strict scrutiny...........................122

    1. Defendants were required to, but did not, demonstrate that the regulations further a compelling state interest and are narrowly tailored towards the interest...........................122

    2. The asserted interests which Defendants claim justify the Data Sharing Ban and Use Restrictions are not "compelling."...........................122

    3. Even if Defendants identified a compelling state interest, the restrictions at issue are not narrowly tailored...........................126

VI. The Data Sharing Ban is overbroad and prohibits substantially more speech than is necessary to achieve any legitimate purpose it advances (Count VI)...........................128

 a. Law regarding overbreadth challenges...........................128

 b. The Data Sharing Ban is unconstitutionally overbroad...........................130

VII. The Data Sharing Ban, as it existed prior to HB4, is void for vagueness (Count VII)...........................132

 a. Law regarding void for vagueness challenges...........................132

 b. VRF's vagueness claim is not moot...........................134

 c. The pre-HB4 Data Sharing Ban existed only in Defendants' mind and not in any New Mexico statute, regulation, or rule...........................135

 d. The pre-HB4 data sharing ban is impermissibly vague...........................137

VIII.   VRF is entitled to permanent injunctive relief consistent with this opinion. ........139

 a.   Standard for permanent injunctive relief. ............................................139

 b.   VRF is entitled to a permanent injunction. ...........................................139

  i.   VRF will suffer irreparable harm absent permanent injunctive relief. ....140

  ii.   The injury to VRF outweighs any harm that may be caused to
   Defendants and the public interest favors an injunction. ..........................141

IX.   VRF is entitled to declaratory relief (Count VIII). ...............................142

 a.   Standard for Court to award declaratory relief. ...................................142

 b.   The Court enters declaratory relief in favor of Plaintiff and
  against Defendants consistent with this opinion. ...................................143

[PROPOSED] JUDGMENT & ORDER ....................................................144

**[PROPOSED] MEMORANDUM OPINION AND ORDER**

**PROCEDURAL HISTORY**

On March 28, 2022, Plaintiff Voter Reference Foundation, LLC ("VRF") sued New Mexico Secretary of State Maggie Toulouse Oliver ("Secretary") and the New Mexico Attorney General ("Attorney General")[1] alleging that certain restrictions on the use of New Mexico voter data violated the First Amendment. **Dkt. 1,Verified Complaint for Declaratory and Injunctive Relief.** That same day, VRF moved for a preliminary injunction based on those theories.  It alleged irreparable harm due to its loss of First Amendment rights and the threats from Defendants that VRF may be prosecuted for sharing voter data on its website. **Dkts. 3-4, Motion for Preliminary Injunction and Suggestions in Support.** After briefing and multiple hearings on Plaintiff's motion, the Court entered a limited preliminary injunction on July 22, 2022 enjoining Defendants from prosecuting VRF for publishing the data it already had in its possession. Dkt. 51, Memorandum Opinion and Order Granting in Part Motion for Preliminary Injunction ("Mem. Op."). Defendants appealed that injunction and the Tenth Circuit stayed the decision on appeal. That appeal remains pending but has been abated pending a final judgment from this Court.

In the interim, on September 26, 2022, VRF filed an Amended Complaint, **Dkt. 74**, adding claims for violations of the National Voter Registration Act ("NVRA") arising from Defendants' repeated refusal to provide voter data to VRF. Following the close of discovery, the Parties filed cross-motions for summary judgment on April 14, 2023. **Dkts. 118-119 (Plaintiff's MSJ); 121 (Defendants' MSJ)**. After the close of briefing on those motions, the Court held a summary judgment hearing on June 14, 2023. **Dkt. 131.** The discussion at that hearing led the Court to order

---

[1] At the time VRF filed the case, Hector Balderas was the Attorney General. Mr. Balderas was replaced by Attorney General Raúl Torrez following the 2022 election. Mr. Torrez is substituted as defendant pursuant to Rule 25(d).

Defendants to file an exhaustive list of all documents which they would make available under the NVRA if their interpretation of that statute were correct.

Defendants filed their list on June 30, 2023. **Dkt. 133.** The list identified nine categories of voter data, but no specific documents. Plaintiff filed a response to Defendants' filing on July 7, 2023. **Dkt. 134.** Plaintiff also filed several notices of supplemental authority related to the NVRA issues, including an amicus brief from the U.S. Department of Justice in *Pub. Int. Legal Found., Inc., v. Bellows*, appeal pending, No. 23- 1361 (1st Cir. 2023) (docketed April 19, 2023), **Dkt. 137,** and a recent decision from Chief Judge Bremmer in *Pub. Int. Legal Found., Inc., v. Griswold*, Slip Op., 2023 WL 6376706 (D. Colo. September 29, 2023) interpreting the NVRA's Public Disclosure Provision. **Dkt. 156.** The Court finds these authorities helpful and persuasive.

On September 25, 2023, Plaintiff sought leave to file additional briefing on summary judgment, citing a recent change in Defendants' position. **Dkt. 154.** Specifically, on August 30, 2023, Defendants offered to produce the voter data VRF requested on May 27, 2022, the production of which had been a central dispute in this case since at least last summer. *See* **Ex. P1.** The Court granted leave. Plaintiff filed a supplemental brief, **Dkt. 155**, to which Defendants responded. **Dkt. 163.** Plaintiff filed a reply to Defendants' supplemental response. **Dkt. 167.** The Court intends to issue a separate opinion resolving the cross-motions for summary judgment.

On October 16, 2023, the Court held a bench trial. The Parties largely stipulated to the documentary record, including 44 joint exhibits. ***See*** **Dkt. 158**, Amended Joint Exhibit List. The Court refers to these joint exhibits as "JE#." Plaintiff offered a single exhibit, Ex. P1, which was offered and accepted into evidence with no objection from Defendants. Defendants offered a single exhibit, Ex. B, which was offered and accepted into evidence for the limited purpose of explaining

its impact on any action by the Secretary. **Trial Tr. 105:13-107:1**. The Court did not accept Ex. B for the truth of the matters asserted in the correspondence summarized in the Exhibit. *Id.*

The Parties likewise stipulated to dozens of facts relevant to this case. ***See*** **Dkt. 162.** Where necessary, the Court refers to these stipulations as "JS#."

The Parties designated certain testimony from the preliminary injunction hearings held in this matter on May 17 and June 15, 2022. ***See*** **Dkt. 160**. The Court accepts the designated testimony as if the same were offered at trial pursuant to Fed. R. Civ. P. 65(a)(2).

The Parties designated certain testimony from depositions taken in this matter for inclusion in the trial record. ***See*** **Dkt. 159**. Defendants lodged several objections to Plaintiff's deposition designations. ***Id.*** The Court has considered each of Defendants' objections and Plaintiff's responses to the same. After due consideration, and as detailed herein, the Court overrules Defendants' objections and accepts Plaintiff's deposition designations.

The Secretary's Elections Director, Mandy Vigil, was the only witness at trial, and she was called by both parties. The Court heard the witness's testimony and the argument of counsel. The trial lasted one day.

Following trial and preparation of the transcript therefrom, Plaintiff and Defendants each submitted proposed findings of fact and conclusions of law. The Court has carefully considered both sets of proposed facts, and accepts some of those facts, rejects some, and finds some facts that no party brought to its attention.

The Court sets forth its findings of fact, conclusions of law, and judgment below.

## FINDINGS OF FACT[2]

### I.     Voter Reference Foundation & VoteRef.com

1.    Plaintiff Voter Reference Foundation, LLC ("VRF") is a nonpartisan, nonprofit organization whose mission is to increase voter participation and transparency in elections at all levels so that the public can remain informed regarding electoral processes and ensure the integrity of elections across the country. **Dkt. 160, Designated Testimony from Transcript of May 17, 2022 Hearing on Plaintiff's Motion for Preliminary Injunction ("May 17 Tr."), 53:12-19; Dkt. 162, Joint Stipulation ("JS") 1.** Gina Swoboda is VRF's Executive Director. **JS 2.**

2.    VRF is dedicated to ensuring transparent, accurate, and fair elections in the United States of America and does so, in part, by making state voter registration information available on its website, VoteRef.com (the "Website"). **JS 1; May 17 Tr., 53:20-55:2 (Swoboda).** VRF believes that full transparency of election records and results is needed to restore faith in electoral processes, which in turn, will lead more people to vote as a result of their renewed confidence in the system. **May 17 Tr., 60:23-61:11 (Swoboda)**

3.    VRF's mission is accomplished through two distinct but related projects. The first project seeks to fulfill the ideal of citizen oversight of elections as envisioned by the National Voter Registration Act's ("NVRA") requirement that states "make available for public inspection…all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i)(1). To accomplish this goal, VRF endeavors to publicize voter registration information in every state so that citizens can verify the accuracy of the information by "crowdsourcing" its review. **May 17 Tr., 71:16-72:5 (Swoboda).** If a citizen notices that information about a voter is incorrect, they

---

[2] For the Court's convenience, Plaintiff provides citations to the trial record supporting the proposed findings of fact, where such citations are available.

are empowered to contact the relevant Secretary of State or election official to remedy the error. **May 17 Tr., 71:25-72:5 (Swoboda).**

4.   Toward these ends, VRF operates the Website, VoteRef.com. **JS 25; May 17 Tr., 54:15-55:2 (Swoboda).** The purpose of the Website is to provide public access to official government data pertaining to elections, including voter registration rolls. **May 17 Tr., 55:24-56:5 (Swoboda).** The public dissemination of this information is intended to increase voter participation and make the state's election processes more transparent. **May 17 Tr., 60:23-61:11 (Swoboda).**

5.   The Website typically provides any information made public by the state agency charged with maintaining the voter registration database if state law allows that information to be shared. **May 17 Tr., 54:15-55:2 (Swoboda).** For example, a user can typically view a voter's name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history. *Id.* Social security numbers, phone numbers, email addresses, and driver's license numbers, even if made available by the State, are not published on the Website.

6.   Those who access the Website can search by name or address for registered voters and they also will be able to peruse voting histories, a list of elections that voter participated in, as well as other important election data obtained via official sources. **May 17 Tr., 71:16-72:5 (Swoboda).**

7.   Citizens can check their own voting status, voting history, and those of their neighbors, friends, and others, and are thereby able to "crowdsource" the process of rectifying any errors. **May 17 Tr., 16:6-15; 70:16-71:10 (Swoboda)**. The public is enabled to check on the validity of the data by recognizing common errors in larger data sets; for example, citizens could examine the data for their precinct and recognize many voters were given placeholder birthdates. **May 17 Tr., 15:3-17 (Swoboda).** This also allows citizens to encourage others to vote, increasing overall voter participation. **May 17 Tr., 55:24-56:11 (Swoboda).**

8.   A close review of the data can show that it is wrong or was entered incorrectly. **Plaintiff's Verified First Amended Complaint ("FAC") [Dkt. 74] ¶13, Defendants' Answer to FAC ("Answer") [Dkt. 77] ¶13** (admitted). VRF encourages users of the Website to report these errors directly to the appropriate Secretary of State or clerk. **May 17 Tr., 71:25-72:5 (Swoboda).**

9.   VRF accomplishes its efforts to create and maintain the Website by requesting voter registration data from state agencies and then compiling and posting that data in a way that is easily accessible, searchable, and usable by the public. **May 17 Tr., 54:15-55:2; 55:3-4 (Swoboda).**

10. After it acquires raw voter data from a state, VRF's database analysts map the data that would otherwise be unusable by the public and put the data into a searchable, understandable format for the public to review and analyze. **May 17 Tr., 53:20-54:6 (Swoboda).**

11. In many states, access to the data is prohibitively expensive and members of the general public lack the knowledge to map the raw data in a manner that is usable. **May 17 Tr., 54:2-6 (Swoboda).**

12. VRF has, and intends to, post this data for the public to access and view free of charge so that the public can fulfill its oversight duties under the NVRA. **May 17 Tr., 53:12-19 (Swoboda)**; *see also* **FAC ¶67**; **Answer ¶67** (admitting no fee to access).

13. VRF currently has voter data for 32 states posted on the Website. **Trial Tr., 32:2-5** ("THE COURT: Well, they do that in about, I think, 32 states. I thought it was always higher. But they do it in most states; right? MR. HERRERA: Yes, Your Honor.").

14. VRF desires to access, post, distribute, and otherwise use publicly available New Mexico voter data on the Website in the future so that the public may become and remain informed regarding New Mexico's elections and voter registration rolls, and conduct the oversight envisioned in the NVRA. **May 17 Tr., 71:18-72:5 (Swoboda).**

6

15. VRF's actual and proposed use is limited to that voter information which is publicly available under New Mexico law, and it does not seek to disseminate or use any information prohibited from being disclosed by law, including voters' social security numbers, a voter's day and month of birth, or voters' telephone numbers if prohibited by voters. **May 17 Tr., 40:5-14; 50:10-15; 102:18-22 (Swoboda).**

16. VRF desires to update its website over time with new data from the Secretary. **May 17 Tr., 55:3-4 (Swoboda).**

## II.     The Defendant Secretary of State

17. Defendant Maggie Toulouse Oliver is the duly elected Secretary of State for the state of New Mexico and, in that capacity, is the chief election officer of the state. **JS 3**; **FAC ¶16, Answer ¶16 (admitted)**. Secretary Toulouse Oliver is sued in her official capacity only. **JS 4.**

18. The Secretary is responsible under state law for furnishing voter data to requesters and referring potential violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6, to the Attorney General for investigation and prosecution. **FAC ¶16, Answer ¶16 (admitted);** *see also* N.M. Stat. § 1-2-1.1(A); § 1-2-2; § 1-1-1.

19. Mandy Vigil provided testimony at deposition as the Secretary's 30(b)(6) representative. Ms. Vigil also provided testimony on behalf of the Secretary's Office at trial. Ms. Vigil is the Elections Director for the Secretary. **JS 5.** Her duties include compliance with the NVRA. **Trial Tr., 37:9-11 (Vigil).**

20. The Attorney General relies on the Secretary in deciding whether to investigate reports that voter data statutes have been violated, and does so in part because the Attorney General believes the Secretary is primarily responsible for interpreting and enforcing statutes relating to voter data.

Dkt. 159, Designated Testimony from Transcript of 30(b)(6) Deposition of Attorney General **Representative, Deputy Attorney General Joseph Dworak ("Dworak"), 16:21-17:4.**

## III.    The Defendant Attorney General

21. Defendant Raúl Torrez is the duly elected Attorney General of New Mexico and is empowered under state law to investigate and prosecute violations of the Election Code. **JS 6; FAC ¶14; Answer ¶14 (admitted).** The Attorney General is sued in his official capacity only. **JS 11.**

22. The Attorney General has repeatedly refused to state that it will not prosecute VRF for its prior posting of voter data online, including by stipulating to that point just before trial. **JS 7; JE30, AG's 3-8-23 First Supp. Responses to VRF First Discovery at RFA 4.**

23. By March 11, 2022, on advice from the Attorney General, the Secretary had taken the position that it would not respond to any requests for voter data from VRF. **JE9, 3-11-22 Email Exchange with Rostock, Vigil, and Pino regarding VRF 2-15-22 Request, Dkt. 44-16 filed 6/24/22[3]; Trial Tr. 54:13-21 (Vigil).** The Attorney General also provided legal advice to the Secretary before the Secretary denied VRF's requests for voter data on February 15, 2022, ███ ████████████ October 18, 2022 requests. **JS 60; JE9;** ███████████████ █ ██████████ ████

24. The Attorney General investigated VRF for its use of voter data and the publication of that voter data on the Website. **JS 8; Dworak, 84:8-18.**

---

[3] Pursuant to D.N.M.LR-Civ 10.7, the Court cites exhibits previously filed in this matter by noting the document name, docket number, and filing date following the identification of the exhibit.

[4]
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████

25. The Attorney General has supported the position throughout this litigation that VRF has violated New Mexico law, including by posting the voter data it received from Local Labs. **JS 9; Dworak, 51:24-52:8.**[5]

26. The Attorney General takes the same position as the Secretary as to the legality of VRF's actions. **JS 10; Dworak, 53:18-25; 54:19-24.**

**IV.     Voter data in New Mexico.**

27. Plaintiff's Amended Complaint includes claims for violation of the NVRA's Public Disclosure Provision, as well as a claim that the NVRA preempts New Mexico's restrictions on access to and use of voter data. **Dkt. 74.** The NVRA requires that states make available for public inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…" 52 U.S.C. § 20507(i) (the "Public Disclosure Provision").

**a.   New Mexico voter data is stored within a single database: SERVIS.**

28. As required by the Help America Vote Act, New Mexico maintains a single statewide voter registration database—SERVIS—that contains all voter registration information for New Mexico. **JS 12; Trial Tr. 37:15-38:1 (Vigil); Dkt. 159, Designated Testimony from Transcript of 30(b)(6) Deposition of Secretary of State Representative, Elections Director Mandy Vigil ("Vigil"), 19:22-20:4; JS 53;** *See* **Dkt. 159, Designated Testimony from Transcript of Deposition of Secretary's Chief Information Officer G. Rockstroh ("Rockstroh"), 10:18-11:15, 15:2-4.**

---

[5] Defendants object to the relevance of this testimony because "[t]he referral is no longer relevant to this case since it is no longer the potential source of any prior restraint. Any restriction on VRF's speech at this point is due to the amended status governing use of voter data." Dkt. 159, at 75. This question calls for the Attorney General's position on whether or not VRF has violated the New Mexico election code, which is relevant to VRF's claims regarding the Secretary of State's referral of VRF to the Attorney General for investigation and prosecution, and shows Defendants' basis to deprive VRF of New Mexico voter data. Defendants' objection is overruled.

29. SERVIS has fields for demographic information, party affiliation, and "activity" on the record, including voter credits and all updates to a voter registration record. **JS 13; Vigil, 20:5-21:1.** A "voter credit" is a record in SERVIS that indicates a voter has participated in an election. **JS 14; Vigil, 13:11-17.** Updates to a voter record are tracked and "logged" within SERVIS. ***Id.***

30. The Secretary's Office receives voter registration information from the Motor Vehicle Division and the online voter registration system. **Rockstroh, 12:3-7.**

31. Voter data in SERVIS is stored indefinitely. **JS 55; Rockstroh, 24:1-2.** Even after a voter is no longer "active" his or her data is still stored in the SERVIS system. **JS 55; Rockstroh, 24:15-19.**

32. SERVIS stores, among other things, voter credits which reflect data showing a voter has cast a vote in a given election, **Rockstroh, 14:6-12**, as well as when and how a voter registered. **Rockstroh, 20:10-13.**

33. Every discrete change to an individual's voter file is retained in SERVIS; the system does not simply reflect the most recent change. **Rockstroh, 27:17-25; 26:2-7.**

34. The Secretary's Office uses SERVIS to develop reports detailing different aspects of voter data, mostly coming from voter data requests or an Inspection of Public Records Act (IPRA) request. **Rockstroh, 16:5-7; 17:8-10.**

35. An authorized user can log into SERVIS and pick and choose what data he or she wants included in a report. **Rockstroh, 31:2-8.**

36. Users can set date ranges for voter data in SERVIS. **Rockstroh, 32:4-7.**

37. Reports from SERVIS do not exist prior to a user selecting settings in the system and generating a report for specific data. **Rockstroh, 31:13-16.**

38. SERVIS contains coding that automatically pulls specific data for 30-40 types of "canned" reports that are retrieved on a regular basis. **Rockstroh, 18:7-9.**

39. The "File Maintenance List" is a canned report available in SERVIS. **Rockstroh, 24:11-18.**

40. The Secretary's personnel are also able to use SERVIS to develop non-canned reports from the numerous data fields in the system. **JS 54; Rockstroh, 19:12-15.**

41. Even when personnel in the Secretary's office use SERVIS to develop non-"canned" reports, there is no additional charge from the vendor. **Rockstroh, 21:3-6.**[6]

42. Occasionally, if the Secretary's personnel are not able to develop a requested report, the Secretary's Office contacts the vendor for assistance. The Secretary does not incur any charge for this service. **Rockstroh, 21:10-17.**

43. Reports that are not "canned" can take up to multiple weeks to fulfill. **Rockstroh, 34:13-36:14.**

44. The Secretary's Office has never rejected requests for voter data on the basis that they require too much work to compile the specific data. **Rockstroh, 21:18-23.**

45. The Court finds that the Defendants have never argued that it is not feasible or that it is impossible to comply with VRF's voter data requests.

46. The data making up "[a] complete list by county precinct of any registered voters who cast a ballot in the November 3, 2020 general election" is contained in a "canned" report in SERVIS. **Rockstroh, 38:18-39:23.**

---

[6] Defendants object to Rockstroh Depo., 21:3-21:23 on the basis of relevance, arguing, "[t]here is no dispute in this case regarding the feasibility of producing the data nor about the costs associated with doing so." Dkt. 159, at 106. While the Court agrees there is no dispute as to this point, this testimony is relevant to show whether or not the Secretary was able to fulfill VRF's requests and that its inability to do so could not have provided a legitimate basis to deny VRF's requests. Therefore, Defendants' objection is overruled.

47. The data showing voters who voted in the 2020 election who have since been placed in an inactive, canceled, deleted, or removed status may not be a "canned" report, but is available in SERVIS and can be obtained by the Secretary's staff. **Rockstroh, 39:24-40:11.**

48. Data illustrating "[a]ny voter that has been removed between [] two dates" may not be a "canned" report, but is available in SERVIS and can be obtained by the Secretary's staff. **Rockstroh, 40:12-25.**

49. Separate from SERVIS, the Secretary provides an online portal[7] to the voter registration database, and anyone with the name and birthdate of a voter can enter the information to access real-time voter information. **Vigil, 134:8-23.** The portal does not require any affirmation by the user that they are using the portal only to look up their own information, or that the information is not being looked up or used for an improper purpose. **Vigil, 135:15-136:2.** The Secretary has no way of knowing whether individuals use the database to learn others' private information. **Vigil, 135:10-14.**

  **b. New Mexico conducts various programs and activities to ensure the accuracy and currency of its voter list.**

50. All of the data from voter registration certificates is entered into SERVIS. **Trial Tr., 38:17-20 (Vigil).** Entry and amendment of the data from voter registration certificates and applications occurs at the county level. **Trial Tr., 38:21-39:5 (Vigil).**

51. New Mexico conducts various programs and activities to ensure the accuracy and currency of the voter list. **Trial Tr., 39:12-22 (Vigil).**

52. One of those activities is the cancellation of voter registrations under NMSA § 1-4-28 for voters who are unable to vote due to change of residence. **Trial Tr., 39:12-40:2 (Vigil).** That activity results in the creation of so-called "purge" or "cancellation" lists from the SERVIS

---

[7] Available at https://voterportal.servis.sos.state.nm.us/WhereToVote.aspx?AspxAutoDetectCookieSupport=1

database. **Trial Tr., 40:2-6 (Vigil).** The County Boards of Registration then vote to remove voters included in those lists. **Trial Tr., 40:7-9 (Vigil).** The voters who are removed per the Boards' votes are then supposed to be removed from active status in SERVIS. **Trial Tr., 40:10-12 (Vigil).**

53. List maintenance activities are conducted in various ways. The Secretary may receive data which causes her office to flag an update to a voter file, including when voters pass away, move out of state, or go through a process of re-enfranchisement after a felony conviction. Information related to these various changes is received into SERVIS and then reviewed for an update to the record. **Trial Tr., 40:16-25 (Vigil).**

54. Every time a change is made to the record, it is supposed to be updated in SERVIS. **Trial Tr., 41:1-5 (Vigil).** Those changes are reflected in a file maintenance report. **Trial Tr., 41:6-8 (Vigil).** The file maintenance report helps ensure that the voter files are accurate. **Trial Tr., 41:9-11 (Vigil).** The Secretary must create the "file maintenance report" at least monthly. NMSA § 1-5-14.

55. On direct examination from Plaintiff's counsel, Vigil testified that the Secretary conducts various programs and activities which are reflected, at least in part, in the file maintenance report. **Trial Tr., 41:12-43:1 (Vigil).** These include:

> a. The voter cancellation program, *id.* **at 41:14-15;**
> b. Within that program, there is a requirement for a statewide election mailer to be sent out ahead of each general election. Then, depending on the response or lack of response or returned mail, a record may be flagged as needing attention, *id.* **at 41:16-22;**
> c. There are different activities in which the voter may remove themselves from being within that program, *id.* **at 41:22-24;**
> d. If there is an issue with the address, they would be canceled after two general elections, *id.* **at 42:1-4;**
> e. New Mexico is also a member of ERIC, the Electronic Registration Information Center, *id.* **at 42:6-7;**
> f. As a member of ERIC, the State receives and provides data to conduct comparisons across member states, *id.* **at 42:8-10.** Through ERIC, New Mexico may receive information that a voter moved across state or county lines or that they submitted

their own cancellation. ***id.* at 42:10-13.** The State also uses ERIC data to look for duplicate entries. ***id.* at 42:13-15;**

    g.  New Mexico also engages in same day voter registration which provides an opportunity for real time file maintenance to occur, ***id.* at 42:16-19;**

    h.  New Mexico receives data from other agencies like the Department of Health, Vital Statistics, the Department of Corrections, and County Clerks who review obituaries. ***id.* at 42:22-43:1**.

56. On cross-examination from Defendants' Counsel, Vigil largely repeated this list and reiterated that these "end list maintenance activities" are programs implemented by the Secretary to ensure the accuracy of the voter rolls, **Trial Tr., 69:12-70:20, 71:10-73:16 (Vigil).** These activities include:

    a.  The program under the NVRA described on direct with Plaintiff's counsel, ***id.,* 69:17-19;**

    b.  ERIC exchange with voter databases and motor vehicle divisions in other states, ***id.,* 69:20-25;**

    c.  Same-day registration, which allows the Secretary to get records updated in real time, ***id.,* 70:1-3;**

    d.  Information from state agencies, including the Department of Health and Department of Corrections, ***id.,* 70:4-6;**

    e.  Voters updating or canceling their registration on their own, ***id.,* 70:7-9;**

    f.  Mailer to all voters in the state, depending on the response, may be additional flags on their record. ***id.,* 71:18-72:5.** If the voter does not either update their registration or vote within two election cycles, then they will be placed on a voter cancellation list and submitted to a board of registration for review and cancellation. ***Id.***

    g.  County offices may do their own outreach in addition to the required mailer, ***id.,* 70:9-20;**

    h.  Monthly updates from the Department of Health and Department of Corrections that provide updates if someone passed away or committed a felony, ***id.,* 72:20-24;**

    i.  Special elections by mail can prompt flags for review at later time, ***id.,* 73:8-16.**

57. All of these programs and activities are carried out to maintain the accuracy and currency of New Mexico's voter list. **Trial Tr., 43:2-5 (Vigil).** New Mexico maintains file maintenance data in SERVIS for at least a year. **Trial Tr., 43:18-25 (Vigil)**

58. The final proof that any change was actually made is the SERVIS database itself. **Trial Tr., 45:6-46:1 (Vigil).**

59. Based on the uncontroverted testimony it heard in open court and its review of the evidence, this Court finds as a matter of fact that New Mexico's voter list is a record of all of New Mexico's "programs" and "activities" conducted for the purpose of ensuring the accuracy and currency of the list.

60. Based on the uncontroverted testimony heard it in open court and its review of the evidence, this Court finds as a matter of fact that in New Mexico, there is no method or record other than review of the voter list itself which allows the public to evaluate whether public officials are actually fulfilling their list maintenance obligations.

61. Based on the uncontroverted testimony it heard in open court and its review of the evidence, this Court finds as a matter of fact that without access to the voter list itself, it is impossible for the public to perform its oversight functions under the NVRA.

62. Additionally, based on this same uncontroverted testimony and evidence, the Court finds as a matter of fact that New Mexico's voter list is a record concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.

**c. Defendants' position regarding the scope of the NVRA's Public Disclosure Provision would render that provision useless.**

63. At the June 2023 summary judgment hearing, the Court directed Defendants to file a supplemental brief detailing precisely what they believe to be made available pursuant to the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i):

> The Court: I think it's your obligation to tell me what documents – even if their request is faulty, I think you've got to tell me what documents the Secretary of State thinks falls within the narrow definition, and would produce if requested.
>
> [. . .]

The Court: . . . I'd be as exhaustive as possible. What is it – you know, don't just give me examples, really bottom out over there, what it is that they do to comply the [N]VRA.

*Id.* **at 34:10-15; 37:1-4.**

64. At the same time, the Court shared its view that anything that the Secretary included on the list—that is, anything that must be made available under the NVRA—could be posted online by VRF.

65. On June 30, 2023, though this Court instructed Defendants to be "exhaustive" in their list of documents made available under the NVRA, Defendants filed a supplemental brief listing nine "categories" of records Defendants claim they would make available under the NVRA, including:

- List maintenance Procedures;
- SOS Voter Cancelation Program;
- Same-Day Registration;
- Automatic Voter Registration;
- Online Voter Registration;
- Electronic Voter Registration Information Center (ERIC);
- Felon Registration Restoration;
- Voter Registration Agencies; and
- Voter Registration Agents.

**Dkt. 133 ("Defendants' NVRA Brief").**

66. Defendants' NVRA Brief does not include list maintenance or voter data, but does include list maintenance as an activity. **Trial Tr., 46:16-23.** Ms. Vigil testified at trial that the Secretary does not believe that the data itself needs to be produced under the NVRA. *Id.*

67. Defendants' NVRA Brief did not state that the Secretary would make any individual, identifiable voter records available under the NVRA. **Dkt. 133.**

68. Defendants' NVRA Brief did not state that the Secretary would make any aggregated voter records available under the NVRA. *Id.*

69. The NVRA, 52 U.S.C. § 20507(i)(2), explicitly requires states to make available the names and addresses of individuals to whom NVRA notices are sent. Defendants' NVRA Brief did not include lists of the names and addresses of individuals to whom NVRA notices are sent. *Id.*

70. On July 7, 2023, VRF filed its Response to Defendants' NVRA Brief. VRF's response pointed out that Defendants failed to identify any actual documents they would produce under the NVRA, that the categories identified were underinclusive, and that Defendants' list conflicted with previous admissions they made regarding the availability of voter data. **Dkt. 134.** It also identified caselaw holding that individual, identifiable voter records are subject to disclosure pursuant to the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1). *Id.*

71. Based on this evidence, the Court finds as a matter of fact that Defendants' own representations to the Court about which documents fall within the Public Disclosure Provision describe a far narrower set of materials than the documents it actually maintains that fall within that Provision.

### d. New Mexico restricts and conditions access to its voter list and other voter data, including data it admits is subject to disclosure under the NVRA.

72. The Bureau of Elections is in charge of responding to requests for data, and Mandy Vigil is the Director of Elections. **JS 15; Vigil, 25:5-20.** Voter data requests are handled by Ms. Vigil's staff within the Bureau of Elections. **Trial Tr., 83:24-84:8 (Vigil).** She is responsible for the process, procedures, and development of how those requests are administered. *Id.*

73. The Secretary admits that the office would, for example, "have to provide voter list maintenance data when someone makes a request under the NVRA." **Vigil, 30:15-19;** *see also* **Vigil, 28:14-29:1** (the Secretary "does have list maintenance data that we would be able to produce if we received a legal request, an appropriate legal request.").

74. Ms. Vigil repeatedly testified, in fact, that the NVRA requires the production of almost all of the data on the SERVIS system. **Trial Tr., 50:23-51:13 (Vigil)**; **49:1-6 (Vigil)** (most data on SERVIS, if requested correctly, must be produced to the public under the NVRA). The Secretary admits that it "does have list maintenance data that we would be able to produce if we received a legal request, an appropriate legal request." **Vigil, 28:14-29:1.**

75. However, Vigil maintained that the state believes it can impose various requirements on requesters, even when the NVRA requires production. For example, the State may require the requestor to pay the required fee and execute an affidavit limiting how that data may be used. ***Id.*; *see also* Trial Tr. 51:6-13 (Vigil)** (Secretary does not contend that this data is outside of the NVRA, just that the state maintains the right to require various things of that requestor to obtain the data); **Trial Tr. 49:1-6**. Under this view, "[a]nytime a requester is asking us to receive voter data, state law requires that they complete the affidavit." **Vigil, 30:20-31:4.**

76. The Court finds as a matter of fact that the affidavit requirement, which forces requesters to swear that they will limit the use of the data, is a restriction on access to the data. Without the forced promise in the affidavit, requesters cannot get access to data that the NVRA would require New Mexico to produce.

77. The Court finds as a matter of fact that the promises Defendants extract from data requesters with the affidavit are content-based. In other words, the affidavits use the content of requesters' proposed speech as a basis for denying access to data that the NVRA requires Defendants to produce. Further, the affidavits require requesters to surrender First Amendment speech rights in exchange for access to data that the NVRA requires Defendants to produce. The basis for finding that the affidavit imposes a content-based restriction and requires the surrender of speech in exchange for access to data is set forth in Section VIII(A)(2) of these Findings of Fact.

**V.      VRF's voter data requests to New Mexico and the denial of those requests.**

78. As part of its mission described above, VRF has repeatedly requested voter data and related records from the Secretary of State.

a.  **VRF's February 18, 2022 voter data request is denied.**

79. On February 15, 2022, VRF sent a request for voter data to the Secretary for "the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021." **JS 38; JE9.**

80. VRF's request was assigned to Patrick Rostock, a paralegal and custodian of records in the Secretary's office. VRF, having not received a response, emailed on March 10, 2022 asking for an update. **JS 38; JE 9; May 17 Tr., 79:24-80:12; June 15 Tr., 48:23-49:6**.

81. Rostock forwarded that email to Mandy Vigil, and Sharon Pino stating, in part: "Per Dylan's contact with the AG, *we are not fulfilling records requests from VoteRef*." **JS 39; JE9.**

82. The Attorney General advised the Secretary regarding whether it should fulfill VRF's voter data request. *Id.* While the Secretary did not respond to VRF, based on advice received from the Attorney General, Defendants decided internally they would not fulfill *any* requests from VRF. **JE9; June 15 Tr., 49:7-52:9.** The Secretary's office did not communicate this decision to VRF. **June 15 Tr., 51:25-52:4.**

83. The Secretary claims there is no reason for the denial of the request other than what was conveyed to VRF in writing in conjunction with the denial. **Ex. JE27,** ROG 6 to SOS.

84. The Secretary maintained this position—that it would not fulfill *any* request to VRF no matter if VRF complied with every facet of New Mexico law—until at least August 30, 2023. The

Secretary did not communicate to VRF any change in the decision it had made in March 2022 that it would not fulfill VRF's voter data requests until August 30, 2023, just days before the then-scheduled trial date. **JS 41.**

 **b. On May 27, 2022, VRF gives notice to New Mexico that the denial of the February request violated the NVRA and makes new requests, which are denied for over a year.**

85. On May 27, 2022, VRF sent a "Notice of Violation of National Voter Registration Act & Request for Records" (the "Notice") to the Secretary pursuant to § 20510(b)(1) ("A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved."). **JS 48; JE18.**

86. The Secretary does not deny that VRF's notice was proper under the NVRA. ***See* JE29, SOS 2-24-23 Responses to VRF Third Discovery,** ROG 11 to SOS.

87. In the Notice, VRF again apprised the Secretary of her statutory duty to make certain voter data available for public inspection pursuant to the NVRA. **JE18.** The Notice stated New Mexico's restrictions on public disclosure of certain types of voter data are preempted by the NVRA and that the Secretary's refusal to respond to VRF's February 15, 2022 request violates the NVRA's Public Disclosure Provision. ***Id.***

88. Finally, the Notice again requested the Secretary comply with the NVRA, including by providing data in response to new requests raised in the May 27th letter:

 1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

 2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active.

*Id.*; JS 49.

89. The Notice further stated that VRF intended to use the requested data for each of its two distinct election related projects. *Id.* For the first project—the publication of data on the Website—VRF assured the Secretary that it would not post the personal information of voters on the Website unless it was granted judicial relief allowing it to do so. *Id.*, p. 4. VRF stated that for the second project—the internal review and analysis of the data—no publication would occur regardless of the outcome of any litigation. *Id.*

90. VRF provided completed affidavits for each of the separate requests. *Id.*; JS 50.

91. Despite VRF's compliance with the requirements for making such a request and its assurance regarding how the requested data would be used, the Secretary refused to provide the requested documents. **JS 51; FAC ¶85, 159**; **Answer ¶85, 159 (admitted).**

92. The Court finds as a matter of fact that VRF's assurances in its May 27th Letter were sufficiently clear for Defendants to understand that VRF would refrain from publishing any voter data it received until a court issued an order allowing it to do so. That point was and has remained sufficiently clear to the Court since it came to the Court's attention at the June 15, 2022 preliminary injunction hearing.

93. On June 15, 2022, a day before the Secretary rejected VRF's May 27 request, when asked about the Office's proposed response, Ms. Vigil testified that, despite the fact that VRF did not intend to publish voter data absent relief from a court, on advice of counsel, the Secretary's Office would not release data to VRF. **June 15 Tr., 57:25-59:18.**

94. On June 16, 2022, the Secretary's office formally responded, indicating that it would not produce the requested records. **JS 52; JE19;** *see also* **FAC ¶160.** Citing FOIA and IPRA case law, the Secretary contended that the February 15, 2022, request for changes to the voter file was not a request for records under the NVRA because it would have required the Secretary to create a new

record. **JE19.** The Secretary likewise dismissed the identical portion of the May 27th request as requiring the creation of a new record. *Id.*

95. The Attorney General participated in the Secretary's denial. The day before the denial, on June 15, 2022, the Attorney General elicited testimony from its own client (that is, form the Secretary through Mandy Vigil), that the Attorney General had advised the Secretary to reject the May 2022 request. **June 15 Tr., 93:11-20**.

96. The Attorney General revealed in its own questioning that by June 15, the Secretary had actually pulled data in response to what the Attorney General characterized as a "lengthy request," even though the Secretary's witness had not seen it yet. **June 15 Tr., 94:2-6**.

97. The Attorney General then had its own witness, Mandy Vigil, reveal that the supposed reason for the refusal of the Secretary to produce would have been the Attorney General's claimed view that complying with VRF's NVRA request would have placed the Secretary in a "criminal conspiracy" with VRF under New Mexico law. **June 15 Tr., 95:7-21**.

98. Vigil confirmed the Attorney General's involvement in the denial, testifying that denials of VRF's requests for voter data were approved by Mandy Vigil, Dylan Lange, and the attorney general's office. **Vigil, 154:22-155:8**. Olga Serafimova at the Attorney General's office gave the Secretary advice about rejecting VRF's requests. **Vigil, 157:14-21**. Sharon Pino, Deputy Secretary of State, was also involved. **Vigil, 158:4-11**. Dylan Lange's response rejecting VRF's request was reviewed and approved by both Sharon Pino and Mandy Vigil, and by Olga Serafimova on behalf of the Attorney General, before it was sent. **Vigil, 180:17-181:15**.

99. Defendants never contested the feasibility of providing the requested data to VRF. The Secretary's Chief Information Officer admitted that the Secretary had the capacity to provide the reports that VRF requested. **Rockstroh, 24:11-18.** Rockstroh also testified that the Secretary

provided reports to other requesters that, like VRF's, required it to provide data for subsets of voters over a specific period of time. ***Id.*, 34:13-36:14.**

100.     The Secretary also denied the second part of VRF's request (for current voter registration data for all voters) based on its "position that publishing *any* New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability." **JE19,** p. 2. The Secretary claimed it was "prudent to delay production of this data at this time" stating that it will "either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal." *Id.* The Secretary also cited a New Mexico statute criminalizing any conspiracy to violate the Election Code. *See **Id.*** (citing NMSA 1978, § 1-20-15).

101.     These requests were denied despite the written and explicit assurances of VRF that it would not publish voter data absent a judicial order allowing it to do so. ***Id.*; *see also* JE18; Aug 31 Tr., 10:22-24**.

102.     Further, VRF promised not to publish the data needed for its "second project" at all, even if it prevails in this Court. **JE18**. The Secretary's claim that it was "prudent" to deny even that request provides no explanation of any kind, nor does it cite any legal authority for refusing to honor VRF's request. **JE19.**

103.     When the Secretary rejected VRF's request for voter data, it did not do so because there was any defect in the submitted affidavits. **Vigil, 168:24-170:1.**

104.     Despite the letter's assurances that VRF would not post any voter data online without a court order allowing it to do so, the Secretary rejected the May 27th requests because it claimed to be concerned that VRF would post the voter data online anyway. **Vigil, 170:2-11**.

105.     The statements that the Secretary claimed to have caused concern were Greim's promises that VRF would publish its analysis "without disclosing the personal information of any

voter," and that "again, for the sake of clarity, no personal information of any individual voter will be published online unless VRF is granted relief in the federal litigation." **Vigil, 172:23-174:7**. The Secretary claimed to be concerned because the Office did not know what Greim meant by "personal information," and thought he might actually have been threatening that VRF would publish personal information because he was secretly using a very narrow definition. *Id*.

106.    No one from the Secretary's office ever reached out to Greim to discuss this concern, or clarify the "personal information" issue before rejecting the request. **Vigil, 174:8-20**.

107.    If the Secretary's office were ever genuinely confused, Plaintiff's counsel made clear, at least by the Court's August 31, 2022 hearing on Defendants' Motion to Stay, that it would not post the requested data online without a Court order allowing it to do so. **8-31-22 Tr., at 27:9-22** ("So our point was that, look, none of the data that shows the name of a voter, their personal information, is going to be up there without an order of the Court. That's the simple thing. I can't believe that not everyone understood that…") (Greim). Even after the Secretary allegedly learned about this statement at the August 2022 hearing, Ms. Vigil testified at the February 2023 30(b)(6) deposition that "we have not revisited this" because counsel told the Secretary not to do so. **Vigil, 174:21-175:17**.

108.    After the Secretary was again told at deposition in February 2023 VRF's position that it would not post personal voter data online, the Secretary continued to claim, "I don't know" whether VRF will post the data online, and that "there's a concern." **Vigil, 178:21-179:20**. The Secretary's Office could not say in February 2023 what VRF could ever do to alleviate the Secretary's purported concern and have its requests processed. **Vigil, 179:21-180:16.**

**c.   VRF requests additional voter data in October 2022 and is denied access.**

109.      On October 18, 2022, VRF sent an additional document request to the Secretary requesting, among other things, the same data it requested on May 27, 2022. **JS 57; JE20.**

110.      In a denial letter authored by the Secretary's General Counsel, Dylan Lange, the Secretary refused to produce the requested records. **JS 58; JE 20.** The Secretary specifically took issue with two of VRF's five requests for records. **JE 20.**

111.      Regardless of the issues claimed with those two requests, the Secretary went on to say that it would not produce *any* voter data to VRF under any circumstances, regardless of what VRF promised to do or refrain from doing: "… we will refrain from producing any responsive voter data maintained by our office due to numerous issues further detailed below." *Id.*

112.      First, the Secretary explained it would not produce any voter data because it believed VRF would publish the data online and VRF did not explicitly say that it would not post the data online. *Id.*

113.      The Attorney General was a participant in this decision even though it believed VRF's counsel. **JS60.** Though the Attorney General advised the Secretary on the response to this request and agreed with the denial, the Attorney General's position is that VRF's counsel promised in May 2022 that voter information would not be posted online without a court order. **Dworak, 156:10-15**.[8]

114.      Returning to the October 2022 denial letter, the Secretary's next reason for denial was that VRF did not submit a new affidavit. **JE20.**

---

[8] Defendants object to the cited testimony on the grounds of foundation and relevance, but also admit "[t]he question and answer encapsulate the heart of the dispute in this case[.]" Dkt. 159, at 78. Because, as Defendants concede, the cited testimony regards the "heart" of the dispute, it is certainly relevant. Therefore, Defendants' objection is overruled.

115.     The Secretary stated that there were no other reasons for the October 2022 denial; the only reasons for the denial were whatever information was conveyed to VRF in writing in conjunction with the denial. **JS 59.**

116.     The Secretary testified that it continued to be concerned on November 17, 2022, that VRF would post any data it received online, despite the representations of VRF's counsel in writing and in open court. **Vigil, 184:21-186:18**. The Secretary determined that based on its supposed "knowledge that it [voter data] was going to be posted online," it would not produce voter data until after the Court of Appeals litigation regarding the stay had concluded. **Vigil, 190:6-191:13**. The Secretary claimed to believe that the stay litigation might result in an affirmative decision that VRF could never post data online. **Vigil, 194:25-195:25**.

117.     The Secretary claimed that in rejecting VRF's October 2022 request in November 2022, it was following ordinary practice in rejecting an entire request if any part of it asked for data the Secretary does not have. **Vigil, 182:17-184:3**.

118.     The Secretary states that the lack of an affidavit is "absolutely" a reason for rejecting an NVRA request. **Vigil, 197:8-20**.[9] The Secretary simultaneously admits that the October request would have been rejected even if an affidavit were submitted. **Vigil, 198:6-8**.

119.     In February 2023, the Secretary could not state when it would stop considering VRF's "past practice" of posting data online as a reason to reject new VRF voter data requests. **Vigil, 187:11-15**.

120.     The Secretary also testified that the office holds it against VRF that after allegedly "promising" not to post data in May 2022, VRF posted data in reliance on this Court's preliminary

---

[9] Defendants object to the form of the following question: "So is the lack of an affidavit one of the reasons for rejecting the request?" Dkt. 159, at 5; Vigil Depo., at 197:18-20. Defendants did not object to the form of this question during the deposition, and so any objection to form is now waived. Moreover, the question is clear. Therefore, the objection is overruled.

injunction decision in July 2022; the office has decided that this data point "is a very clear indication of the intention of the use of the data." **Vigil, 187:21-188:23**. The Secretary gives no credit to VRF for taking down the data again after the Court of Appeals stay order, "because it's a court order, not out of respect for state law or our position or our policy." **Vigil, 188:24-189:6**.

121.    The Secretary has not made the data request in VRF's October 18, 2022 NVRA request available to VRF. **JS 67.**

122.    The Attorney General advised the Secretary in its refusal to provide data in response to the October 2022 request, and agrees with the position the Secretary took. **JS 60.**

**d.  VRF makes an IPRA request to the Secretary that mirrors the NVRA's Public Disclosure Provision and the Secretary produces voter data in response.**

123.    On June 15, 2023, VRF sent a request for records to the Secretary of State's Office pursuant IPRA. That request sought the following documents from September 1, 2021, to present:

> 1. All requests the Secretary of State has received from any person for records which are available, or which the requestor claims must be made available, under the National Voter Registration Act.

> 2. Any non-privileged communications pertaining to the requests identified in paragraph 1 above, including but not limited to any communications between the Secretary's Office and the requestor.

> 3. All documents the Secretary of State has produced in response to any of the requests identified in response to paragraph 1, above.

> *4. All records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.*

**JE34, VRF's 6-16-2023 IPRA Request (emphasis added).**

124.    Item 4 of VRF's June 15, 2023 IPRA request exactly mirrors the text of the NVRA's Public Disclosure Provision (the "NVRA Item"). *See* 52 U.S.C. § 20507(i)(1).

*125.*    VRF's June 15, 2023 IPRA request did not contain an executed affidavit or Voter Information Authorization form of any sort. *Id.*

126.     VRF's June 15, 2023 IPRA request did not contain any promise that VRF would not post the records produced in response to the request on the Internet. *Id.*

127.     On June 30, 2023, the same day Defendants' NVRA Brief was filed, the Secretary made its first production in response to VRF's June 15, 2023 IPRA request (the "First Production"). **JE36.**

128.     The Secretary made a second production in response to VRF's June 15, 2023 IPRA request on August 22, 2023 (the "Second Production"). **JE37.** In the Secretary's Second Production, it detailed which groups of documents were responsive to each of VRF's four items. *Id.*

129.     Specifically in response to VRF's NVRA Item—the request that directly mirrored the language of the NVRA's Public Disclosure Provision—the Secretary produced, among other things:

- Internal presentations containing screenshots of voter data, including an individual's name, voter ID, last four digits of the voter's social security number, date of birth, age, registration date, voter status, party, county, voter history, gender, driver's license number, and phone number;
- The "SOS Voter Registration Annual Counts," detailing the "counts" of registered and unregistered voters by county.;
- Four counties' "Purge Lists" of inactive voters, containing the individual identifiable voter data of hundreds of voters, including their voter ID number, name, party, gender, registration date, city, source of registration, inactive date, and last voted date.

*Id.*

130.     The Secretary produced voter data in response to VRF's NVRA Item.

131.     The Court finds that by producing voter data in response to VRF's NVRA Item, the Secretary conceded that the voter data produced were "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."

28

132.     In a letter accompanying the Second Production, the Secretary indicated that while she believes Items 1-3 are fulfilled, the NVRA Item still remains open. *See* **JE38**.

**e.  Defendants maintained their refusal to produce *any* voter data to VRF from March 11, 2022 until August 30, 2023, when the Secretary finally offered some data to VRF after admonitions from this Court that failing to do so was further evidence of viewpoint discrimination.**

133.     At the June 14, 2023 hearing on the Parties' cross-motions for summary judgment, the Court expressed its concern that Defendants continued to discriminate against VRF by refusing to make voter data available to VRF after it promised not to publish New Mexico voter data online:

> The Court: So for you not to give them the documents seems to me that you're just singling out this group because they're not going to publish it either. They're making the same promises everybody else is.
>
> [. . .]
>
> The Court: But I guess I'm troubled by that. Because if they're saying: We're not going to do anything if the Court denies our PI – which I did – I guess I don't understand why you're singling them out.
>
> [. . .]
>
> The Court: I just think you have problems here.
>
> Ms. Schremmer: Understood.
>
> The Court: I mean, I just think they're making the same assurances that everybody else is making. . . . But I do think you've singled them out, when they make the same promise as everybody else. And I think it's because it's what they want to do with it, not what they're going to do. They made promises, just like everybody else, that they won't do it.
>
> [. . .]
>
> The Court: And I don't think you can deny a group, which you don't like, when they're doing the same thing everybody else is.

**Dkt. 157, Transcript of Hearing on Parties' Cross Motions for Summary Judgment at 49:9-13; 50:3-7; 50:24-51:11; 51:13-15.**

134.     On August 30, 2023—two and a half months after the hearing and just weeks before this matter was scheduled to go to trial—Defendants sent a letter to VRF offering to provide the New Mexico voter data VRF requested in its May 27, 2022 request. **Ex. P1; JS 65.**

135.     In the August 30, 2023 Letter, Defendants state:

> We are providing this data now because of statements made in Court at hearing on our respective Motions for Summary Judgment (i.e., that VRF will not post New Mexico's voter data online except in the event of a final judgment stating that VRF has the right to do so and that New Mexico cannot lawfully prohibit it).
>
> [. . .]
>
> VRF's current stance—that it will not post the data unless a court says it can lawfully do so—is meaningfully different than its May 2022 stance—that it would not post the data unless a court said it wouldn't get in trouble when it did so.

**Ex. P1.**

136.     Defendants also provided an invoice, describing the data Defendants now offer VRF:

1. Records for voters who were removed from the voter rolls between November 3, 2020, and April 13, 2021.

2. Records for current active an inactive voters who are registered, including voter history for those who case ballots in 2020.

**JE43, 8-30-23 Invoice from SOS to VRF.**

137.     The invoice lists two different items; the first is "records for voters who were removed from the voter rolls between November 3, 2020, and April 13, 2021." **JE43; Trial Tr. 61:2-8 (Vigil).** The invoice identifies roughly 31,000 records that meet that category. **JE43; Trial Tr., 61:9-11 (Vigil).** The second item is records for current active and inactive voters who are registered, including voter history for those who cast ballots in 2020. **JE43; Trial Tr., 61:12-17 (Vigil).** The invoice identifies roughly 1.3 million records that fit that category. **JE43; Trial Tr.,**

**61:18-19 (Vigil).** The total cost for both categories is \$5,376.71. **JE43; Trial Tr., 61:20-22 (Vigil).**

138.     The two categories of records identified in the invoice correspond with the records requested in VRF's May 27th Request (**JE18**). **Trial Tr., 62:16-63:24 (Vigil).** In the Secretary's June 16th response to the May 27th request (**JE19**), the Secretary had stated that there were no records responsive to the first request. **Trial Tr., 63:25-65:16 (Vigil).** The Secretary's explanation for why 31,000 documents were suddenly available in response to the first request was that the Secretary acquired "some clarity as to the data." **Trial Tr. 65:4-11 (Vigil).** But Ms. Vigil never explained what "clarity" her office obtained, whether from VRF or any other source, and her own counsel avoided the topic.

139.     For these reasons, and as more fully set forth below, the Court finds Ms. Vigil's explanation illogical and unconvincing. The inescapable inference is that the Secretary abandoned its prior objections just before trial in order to avoid a finding of viewpoint discrimination, and not based on any newly-discovered information or any last-minute clarification from Plaintiff's counsel.

> **i.  Defendants' reasoning for why it refrained from producing the data for over 15 months but was able to produce it in August 2023 is pretextual.**

140.     Ms. Vigil testified at trial that the Secretary has received three voter data requests from VRF during this litigation: in May 2022, October 2022, and October 2023. **Trial Tr., 92:14-93:25 (Vigil).** The Secretary only provided data in response to the May 2022 request. *Id.* That data was provided in August 2023. *Id.*

141.     The May 2022 request was accompanied by an affidavit. **Trial Tr., 93:8-10 (Vigil).** The October 2022 and October 2023 requests were not accompanied by affidavits. **Trial Tr., 93:11-16 (Vigil).**

142.     The Secretary originally declined to provide the data to VRF because it did not provide a complete affidavit and the Secretary was concerned that it would publish the data online. **Trial Tr., 93:17-25 (Vigil).**

143.     The Secretary claims to have changed its position regarding providing voter data during the litigation after there were new assurances made to the Court by Plaintiff's counsel at the summary judgment hearing that the information would not be published unless VRF was explicitly allowed to do so by court order. **Trial Tr., 94:9-18 (Vigil).** The Secretary considered this supposed promise to the Court to be significant, because "it holds weight" and the Secretary believes there would be consequences if the promise were broken. **Trial Tr., 94:19-25 (Vigil).**

144.     The change in position was a collaboration between the Secretary's Office and legal counsel. **Trial Tr., 55:13-17 (Vigil).** The Secretary claims that her change in position was brought about by Plaintiff's counsel's assurance that VRF would not publish the data absent an order of the Court. **Trial Tr., 55:18-56:2 (Vigil).** It is the Secretary's position that VRF never made that promise prior to June 2023. **Trial Tr., 56:3-5 (Vigil).**

145.     Vigil testified that there was a change in Plaintiff's counsel's assertion to the Court regarding VRF's promise not to post voter data during the pendency of the litigation. **Trial Tr., 121:4-11 (Vigil).** Vigil learned of this new promise from Defense counsel, including Mr. Herrera and Ms. Schremmer. ***Id.* at 121:12-23 (Vigil).** Vigil was not made aware of any similar promises made in open court prior to June 2023. ***Id.* at 121:24-122:3 (Vigil).**

146.     Plaintiff's counsel queried Ms. Vigil for the exact words that Defense counsel told her that they heard Plaintiff's counsel say in June 2023 which caused their position to change. **Trial Tr., 122:4-13**. Defense counsel objected on the basis of attorney-client privilege. **Trial Tr., 122:14-15 (Allen)**. As the Court pointed out at trial, it was willing to sustain the objection, but

because this was an effort by Defendants to use the privileged advice offensively (to explain their change in position, while simultaneously preventing Plaintiff's from cross-examining Ms. Vigil on the topic), it would draw a strong adverse inference. *Id.* **at 122:16-123:24 (Court).** Defense counsel stood by their objection. *Id.* **(Allen).** Thus, the Court is left to draw its own conclusion regarding Defendants' change in position, as well as Ms. Vigil's credibility in testifying on the topic.

147.     The Secretary understands that VRF fully intends to publish the data online if it gets an order from the Court allowing it to do so. **Trial Tr., 56:22-56:23 (Vigil).** The Secretary likewise understands that if VRF prevails on summary judgment or at trial, VRF intends to publish the data. **Trial Tr., 57:1-5 (Vigil).** The Secretary understands that VRF might publish the data even if Defendants file an appeal. **Trial Tr., 57:6-10 (Vigil).**

148.     On September 5, 2023, VRF responded to Defendants' letter, clarifying that it did not make any promises at the June 14, 2023 summary judgment hearing that it did not also make in writing in the May 27th request or at various other times throughout this litigation. **JE44.**

149.     Defendants have not responded to VRF's September 5, 2023 letter and have not withdrawn their offer to produce the NVRA records once payment is received.

150.     Ms. Vigil testified at trial that if VRF were to provide affidavits and pay the fees for the October 2022 and October 2023 requests, the Secretary's office would provide it the voter data it requests. **Trial Tr., 96:2-7 (Vigil).** Vigil testified that the only things distinguishing the May 2022 request from the October requests at this point is (1) the lack of an affidavit, (2) the lack of payment, and (3) the lack of an assurance that it will not be immediately posted online. **Trial Tr., 96:7-15 (Vigil).**

151.     Defendants' explanation for why they changed positions appears to be pretext.

152.     VRF's promise not to publish any voter data absent a court order allowing it to do so was sufficiently clear from its May 2022 letter.

153.     That same promise was reiterated by VRF's counsel throughout this case, well prior to June 2023.

154.     The Court understood VRF's promise. In its July 2022 Memorandum Opinion and Order, it stated:

a.  "…the Secretary of State's indication that it will not honor Voter Reference's May 27, 2022, request, despite Voter Reference's assurances that it will not publish voter's personal information without a Court order, constitutes impermissible viewpoint discrimination." Mem. Op. at 181;

b.  "Voter Reference, however, maintains that, although it will publish current voter registration data for election-related purposes, it will not publish voters' personal information without a Court order saying that it can publish it. *See* June 15 Tr. at 55:22-56:1 (Greim). The Secretary of State's decision not to take Voter Reference at its word that it will not use the data contrary to the Secretary of State's interpretation of N.M.S.A. § 1-4-5.5, therefore, causes impermissible viewpoint discrimination. Because the Secretary of State offers no other justification for the denial, the Secretary of State appears to draw a distinction between Voter Reference and any other requestor who alleges that they will not use the data contrary to the Secretary of State's interpretation of N.M.S.A. § 1-4-5.5. Absent any other reason to single out Voter Reference, the available evidence shows that the Secretary of State 'acted with discriminatory purpose.'" *Id.*;

c.  "The Secretary of State will not grant Voter Reference's May 27, 2022, data request, because the Secretary of State believes that Voter Reference will publish the data, even when Voter Reference says it will not publish voters' personal information without a Court order. *See* June 15 Tr. at 55:20-56:9 (Greim, Vigil)." *Id.* at 29, FOF ¶120.

155.     It is more likely than not that Defendants changed course because the Court warned them that continued refusal to do so was further evidence of viewpoint discrimination.

156.     The alternative explanation offered by Defendants—that Plaintiff's promise not to publish was initially unclear but that clarity was provided at the summary judgment hearing—is not credible.

ii.      **Defendants' August 30ᵗʰ production concedes that the voter list is available to requestors under the NVRA.**

157.     Defendants stipulated that they produced the requested data pursuant to New Mexico state law, not the NVRA, and that Defendants did not believe that the data is subject to the NVRA's Public Disclosure Provision. **JS 66.** However, at trial, Ms. Vigil changed position and testified that the data was being made available to VRF under the NVRA. **Trial Tr., 65:17-22 (Vigil).** The data was provided, Vigil claimed, because VRF provided the "appropriate mechanism," that is, the affidavit. **Trial Tr., 66:1-9 (Vigil).** The Secretary likewise required the additional promise of Plaintiff's counsel before the data would be provided. **Trial Tr., 66:10-13 (Vigil).**

158.     Vigil then contradicted her earlier testimony on cross from her own counsel, answering "no" to the question: "but the NVRA does not provide access to the entire voter file?" **Trial Tr. 76:16-18 (Vigil).**

159.     On redirect, Plaintiff's counsel once against queried Ms. Vigil whether the voter database was producible under the NVRA. **Trial Tr., 77:9-79:22 (Vigil).** Counsel asked, "Is there any data in the voter data file that is not producible under the NVRA?" Ms. Vigil responded: "I think that there are generally some items that we maintain in the database that are protected." **Trial Tr., 78:10-14 (Vigil).**

160.     Ms. Vigil went on to explain herself, stating that email addresses, phone numbers, social security numbers, driver's license numbers, and all of the birthdate but the year of birth are protected. **Trial Tr., 78:18-25 (Vigil).**

161.     Ms. Vigil agreed that VRF had not requested any of these categories of purportedly protected information, **Trial Tr., 79:1-8 (Vigil);** *see also* **Trial Tr., 116:6-15**, and that no VRF request was denied on the basis that it requested such information. **Trial Tr., 117:14-17 (Vigil).**

162.     Vigil also agreed that VRF has never argued that limitations on access to those data sets are preempted by the NVRA. **Trial Tr., 116:16-20 (Vigil).**

163.     In response to questioning from counsel regarding the availability of certain data under the NVRA, Ms. Vigil agreed that residential addresses, voter history, and changes to the voter file would be produced in a "voter data request." **Trial Tr., 79:9-22 (Vigil).**

164.     Though the availability of records under the NVRA is primarily a question of law, the Court notes that Defendants' argument primarily focuses on the state's ability to condition access to materials available under the NVRA, including the voter list. At trial, Defendants seemingly abandoned any argument that the voter list is not within the ambit of the NVRA's Public Disclosure Provision.

**f.   VRF requests additional voter data in October 2023 and is denied access.**

165.     The uncontroverted testimony from Ms. Vigil at trial established that VRF made a request for voter data in October 2023 (just before trial), that the request was denied, and that the request would not be fulfilled without an executed affidavit. **Trial Tr., 92:19-93:16.**

166.     Based on the foregoing testimony and evidence, this Court finds as a matter of fact that the Defendant Secretary, acting in concert with and upon the advice of the Defendant Attorney General, failed to provide voter data in response to several VRF voter data requests that called for data producible under the NVRA. These included the February 2022, May 2022, October 2022, and October 2023 requests.

167.     This Court further finds as a matter of fact that the Defendants denied access to VRF based on its failure to complete affidavits, or to otherwise promise, that VRF would not engage in speech sharing the data. This Court further finds as a matter of fact that the Defendants did not deny access to VRF for any reason that would have been permissible under the NVRA.

168.     Finally, this Court finds as a matter of fact that with respect to each of the four requests, VRF either provided timely notice of the NVRA violation before amending this action to assert NVRA claims, or that notice would have been futile because Defendants had clearly embarked on a policy of denying requests for failure to comply with the affidavit requirement or to otherwise provide satisfactory promises that VRF would not engage in data-sharing speech.

**VI.   VRF publishes New Mexico voter data it lawfully obtained from Local Labs on its Website, VoteRef.com, and Defendants respond by investigating VRF and threatening it with prosecution.**

**a.   VRF lawfully obtains New Mexico voter data from Local Labs.**

169.     On March 29, 2021, the Secretary received a request for voter information Listing David Michael Lippert and Local Labs under "Information of Requestor." **JS 16.** Lippert requested the name, physical address, mailing address, year of birth, party affiliation, precinct assignment, jurisdiction, registration ID number, associated districts, voting history, and method of voting for each registered voter in the state of New Mexico. **JS 17.** Lippert signed the Voter Data Authorization form for the data which Local Labs eventually acquired for VRF. **JE1; JS 18.**

170.     On the version of the voter data request form used by Local Labs, LLC, the requester had the option to choose from one of three purposes for the request: Governmental Use, Campaign Use, and Election Related Use; beyond this, Local Labs had to provide no narrative regarding how the data would be used. **JS 20; JE 1.** This comports with those uses permitted pursuant to N.M. Stat. § 1-4-5.5. Lippert selected "Election Related." **JS 21; JE 1.** He identified his name and that he was making the request on behalf of Local Labs. **JE 1.**

171.     The bottom of the form contained an attestation which states:

Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplication, or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).

> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

**JS 22; JE 1.**

172.     Lippert signed on the "signature of Requestor" line just below this authorization.

**JE 1.**

173.     Lippert did not make any representations to the Secretary's Office regarding the use or sharing of the requested voter data other than what was included on the affidavit he signed.

**JS 23.** The Court finds that Lippert did not represent that the voter data would not be shared at all; instead, he represented that the voter data would not be shared for purposes prohibited by New Mexico law.

174.     In conjunction with its request, Local Labs paid $5,378.12 to the Secretary. **JS 19.** The Secretary issued Local Labs a payment receipt, showing it had paid that amount for the data.

**JE2, Local Labs Receipt from SOS, Dkt. 44-2 filed 6/24/22.**

175.     The voter data was provided to Local Labs by the Secretary on April 13, 2021. **JS 25.**

176.     At some point after that, Local Labs provided the data to VRF. At this point, Local Labs had not violated any part of its affidavit.

b.   **VRF published the voter data on VoteRef.com for governmental and election related purposes.**

177.     On December 16, 2021, VRF published the New Mexico voter data it received from Local Labs on its Website, VoteRef.com. **JS 26; JE3.**

178.     The data on the Website included: name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history and no

voter's voter ID number, social security number, telephone number, or email address was posted

on the Website. **JS 26; May 17 Tr., 40:5-14; 50:10-15; 102:18-22.**

179.      No voter's voter ID number, social security number, telephone number, or email

address was posted on the Website. **JS 27.**

180.      Before accessing this data on the Website, a user was required to agree to the

Website's Terms of Service which state, in relevant part:

> VoteRef.com and the services offered through VoteRef.com are only for election-related, non-commercial use… You may not use information on VoteRef.com for any purpose unrelated to elections. You may not use information on VoteRef.com for commercial purposes. "Commercial purposes" includes use in connection with advertising or promoting commercial products or services, or for the purpose of sale, resale, solicitation, or for any purpose in which the user can reasonably anticipate the receipt of monetary gain from direct or indirect use. For example, you may not sell information obtained from VoteRef.com, or use it in connection with advertising or promoting commercial products or services, or solicitation.
>
> . . .
>
> You may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law. By way of example but not limitation, you may not: … (b) alter, edit, or delete the materials on VoteRef.com, including the deletion of any trademark or copyright notices on VoteRef.com; … (d) intentionally or unintentionally violate any applicable local, state, national, or international law or any regulations having the force of law; (e) impersonate any person or entity or misrepresent your connection to any person or entity; (f) "stalk," harass, or otherwise advocate the stalking or harassing of another person; (f) collect or store personally identifiable information about other users in connection with the prohibited conduct and activities set forth herein; (h) reproduce, duplicate, copy, sell, trade, resell, or exploit for any commercial purposes, any portion of VoteRef.com; (i) attempt to override or circumvent any security measures of VoteRef.com or VRF's third party providers or access parts of VoteRef.com you are not authorized to visit; (j) engage in any unauthorized screen scraping, database scraping, or spidering, or collection of personally identifiable information, or use any other automated means to collect information from VoteRef.com; (k) use any software, tool, or other device (such as browsers, spiders, or avatars) to search VoteRef.com, other than the search functionality offered through VoteRef.com or other generally available web browsers…

**JS 28.**

181.     When a user viewed a particular voter's information, they were simultaneously shown a state specific disclaimer regarding the data. When the New Mexico data was live, the New Mexico specific disclaimer stated:

> The information on this website about this voter, including records of this voter's voting history, was provided to Voter Reference Foundation LLC ("VRF") by the New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15, 2021. The information is publicly available here. The information published here by VRF appears exactly as provided by the Bureau. By publishing Bureau records verbatim, VRF does not state, represent, suggest, or imply that this voter voted or that this voter's ballot was not counted. Additionally, the registration information of any voter who is in the Safe At Home program (hereinafter referred to as a "protected voter") must be removed from the publicly available voter list by the New Mexico Secretary of State. If you believe the information provided to VRF by the Bureau is inaccurate, or if you believe that you or any person listed on VoteRef.com is a protected voter whose protected information should not appear on VoteRef.com, please immediately contact the Bureau by emailing sos.elections@state.nm.us or calling 505-827-3600. For assistance with the process of becoming a protected voter, click here (Safe At Home program). Upon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com.

**JS 29.**

182.     The New Mexico voter data was made available by VRF on the Website at no charge, subject to the user's agreement to the terms outlined above. **JS 30.**

183.     Until VRF's New Mexico data was removed from the Website, that data was accompanied by "chain of custody" disclosures showing that Local Labs requested the data that VRF had posted and the date on which the data was requested. **May 17 Tr., 67:19-68:5**. It even showed the emails between Local Labs and the Secretary regarding requesting and transmitting the data. *Id.* Any user of the website could access the chain of custody information. *Id.*

    **c. VRF simultaneously conducted an internal analysis of the voter data, issued a press release about that analysis, and reached out to the Secretary to discuss the analysis.**

184.    VRF maintains two related, but distinct projects. **May 17 Tr., 54:15-55:23 (Swoboda).** The first project, described above, is to share voter data online with citizens. ***Id.*, 54:15-55:2 (Swoboda).** The second project is accomplished in-house without the need to publish the data online. ***Id.*, 70:20-71:10 (Swoboda).** This second project involves VRF election professionals comparing the total number of ballots cast in an election to the number of voters with a credit in their vote history file for having voted in that election. ***Id.*, 55:3-55:13 (Swoboda).**

185.    Though not necessarily indicative of fraud or malicious activity, there are sometimes discrepancies between the two numbers. **JE3; May 17 Tr., 55:14-23; 58:20-59:20, 98:17-101:2 (Swoboda).** When there are, VRF attempts to contact state election officials regarding the discrepancy and "work backwards" to determine why there might be a difference. **May 17 Tr., 59:21-60:22 (Swoboda).** VRF then publishes the "audit trail" so that citizens can understand how and why voter registrations are removed from the voter list. ***Id.*, 55:14-23, 56:6-11 (Swoboda).**

186.    VRF's Executive Director testified that through this process, VRF has identified discrepancies in other states and worked with state officials to explain the difference. VRF originally identified a discrepancy in the state of Colorado but, working with Colorado's Secretary, they were able to reduce the discrepancy by 11,000 votes. **May 17 Tr., 60:14-22 (Swoboda).**

187.    On or about December 16, 2021, as part of its election integrity efforts, VRF posted New Mexico voter information on VoteRef.com. **May 17 Tr., 66:23-25 (Swoboda)**.

188.    In conjunction with the posting of that information, VRF issued a press release announcing the publication of the information and identifying a "discrepancy" of about 3,800

votes, reflecting a difference between the number of voters listed as having voted in the 2020 general election (according to the voter list) and the number of ballots reported being cast according to the New Mexico's official reports. **JE3.** VRF's press release stated: "These discrepancies don't necessarily indicate fraud, but the differences between the voter list and the election canvass indicates, at the very least, issues with record keeping and points to the need to be more transparent and proactive about maintaining the voter rolls and reconciling ballots cast and voters having voted in every election." ***Id.***

189.     On December 14, 2021, prior to posting the New Mexico data, VRF emailed the Secretary's office to discuss the identified discrepancy in an attempt to remedy the apparent difference in numbers, as VRF has done in other states. **JE4; May 17 Tr., 60:5-22 (Swoboda)** (process reduced discrepancy in Colorado).

190.     That email invited a conversation regarding VRF's findings and methodology, including inviting the Secretary to provide feedback on the same. **JE4.** The email identified "a discrepancy between registered voters with ballots cast (RVBC) and total ballots cast (TBC) of 3,844. This number represents more ballots cast than registered voters who have credit for voting. *Id.* The email further stated:

> Please provide any feedback you have on these results, and if there is a factor or factors that we may be unaware of that would explain the discrepancies.
>
> Attached is a link to the voter history and voter registration data file provided by your office on April 13, 2021. It is our understanding that the data you have provided does not include any voter who is in the Safe At Home program. If that is inaccurate, please let us know.
>
> We would be pleased to have a call with you or your staff if that would provide a better format to review your assessment of the results. If you have time and staff available, we would be grateful for the opportunity to meet with you by phone.

191.     The Secretary did not respond. **May 17 Tr., 61:21-62:10; FAC ¶77; Answer ¶77.**

192.     The Secretary's communications director thereafter accused VRF of not trying to reach out to discuss this very data "likely because it would not serve their intended goal of spreading misinformation." **JE8.**

**d.  The Secretary refers VRF to the Attorney General for criminal investigation.**

193.     Instead of responding to VRF's letter, the Secretary, on December 20, 2021, wrote a letter to the Attorney General referring VRF for criminal investigation and prosecution, alleging VRF unlawfully transferred and published the voter data. **JS 31; JE5, VRF Referral.**

194.     The Secretary never received a complaint about VRF. **Vigil, 54:24-55:6**. Instead, it received a contact from ProPublica, an investigative news agency. *Id.*

195.     The decision to make the criminal referral of VRF was made by Sharon Pino, and that decision was reviewed and approved by the Secretary. **JS 33; Vigil, 52:23-53:13.**

196.     The general counsel, Dylan Lange, drafted the criminal referral letter, and its ultimate signatory, Sharon Pino, and Mandy Vigil reviewed drafts. **Vigil, 57:3-22**.

197.     Deputy Secretary of State Sharon Pino signed and submitted the referral to the Attorney General on behalf of the Secretary based on VRF's use and posting of the voter data it requested and obtained through Local Labs. **JE5.** Before the referral, the Secretary did not undertake a "specific analysis relating to each item" in New Mexico's statutory test for permissible uses, and "it was determined holistically it was not permissible under state law." **Vigil, 79:11-80:5**.

198.     The Secretary's Office did look at VRF's website before it made the criminal referral, but did not look to see what users of the website had to agree to before looking at the data. **Trial Tr., 107:22-108:5; 109:6-110:7 (Vigil).** The Secretary did not consider what terms users of the website had to agree to before making the referral. **Trial Tr., 109:20-23 (Vigil).** The pre-

referral analysis did not depend on the relationship formed between VRF and the users of the website. **Trial Tr., 109:24-110:7 (Vigil); Vigil, 102:13-18.** The Secretary's analysis for making a referral did not depend on whether visitors to VRF's website first had to agree to use the data for permissible purposes before receiving access. **Vigil, 99:22-101:16.**[10]

199.     The Secretary cannot say that, before making a referral, it knew that VRF required users to agree that they would only use the data for permissible purposes. **Vigil, 105:7-11.**

200.     The Secretary believed that the transfer and publication of the voter data was a violation of the Election Code. **JS 32; Vigil, 55:17-24.** The Secretary also believed that "publishing" the data "on VoteRef.com" was an illegal use of the data. **JS 32; Vigil, 56:8-13.**

201.     Defendants' position is that Local Labs' transfer of the data to VRF was itself unlawful, in part because VRF paid money to Local Labs to acquire the data for it. **JE5; June 15 Tr., 225:5-13**. The Attorney General testified that in its view, resale of the data "certainly violates the intent as well as the process" of the law, at least for Local Labs. **Dworak, 130:20-131:16**. The Attorney General supports the Secretary's position that Local Labs committed false swearing by transferring data to VRF. ***Id.*, 70:7-21.**[11]

202.     Vigil testified at trial that she stands by the referral to this day. **Trial Tr., 110:21-25 (Vigil).**

███  ██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

---

[10] Defendants object to the testimony included in Vigil Depo., at 100:1, 100:12, and 101:3 on the basis of relevance, arguing that no agreement exists because it is a "click through" and "VRF has not raised as a defense to violations of the election code that the click-through shields them from criminal liability, nor have Defendants insinuated as much." Dkt. 159, at 3. This testimony is relevant, however, to the state's interest in withholding voter data from VRF. Therefore, the objection is overruled.

[11] Defendants object to this testimony, arguing that the Attorney General's legal conclusions are irrelevant. Dkt. 159, at 75. Whether or not the Attorney General believes Local Labs violated New Mexico law is relevant to the Defendants' purported basis for denying VRF access to New Mexico voter data. The objection is overruled.

e. **VRF learns from an article published by ProPublica that the Secretary thinks it is violating the law and has referred it for criminal investigation.**

204.     Before referring VRF, the Secretary never told it that its use of the voter data on its Website might violate New Mexico law. **May 17 Tr., 68:13-19; FAC ¶86, Answer ¶86.**

205.     The person at the Secretary of State's Office who found out that Local Labs and VRF are connected is Lauren Hutchison. **JS 37.** Her inquiry was prompted by information the Office learned during the media inquiry by ProPublica in December 2021. *Id.* ProPublica reporter Megan O'Matz contacted the Secretary for comment and background on a story she was writing. **JE8.** O'Matz's email exchanges and eventual phone call with Secretary Toulouse Oliver were incorporated into an article published on March 7, 2022, entitled "Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited Techniques." **JE7.** The article focused almost entirely on VRF and its Website, generally in a critical manner. *Id.*

206.     Before publishing the article, the O'Matz exchanged emails over the course of nearly a month with Alex Curtas, Communications Director for Secretary Toulouse Oliver. **JE8.** The exchange began on December 14, 2021, with O'Matz asking Curtas about the discrepancy (identified in the VRF Dec. 16, 2021 Press Release, **JE3)** including inquiring about any potential explanations for the discrepancy and whether VRF reached out to the Secretary to discuss its methodology and findings. *Id.* After some exchanges, Curtas responded to the inquiry:

> Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are *perpetuating misinformation*. They reflect a lack of understanding about how the process of voter list maintenance works. These attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country.

*Id.* (emphasis added). The "discrepancy," Curtas charged, was simply VRF's own lack of understanding regarding how voter rolls are maintained. *Id*.

207.     In response to ProPublica's question about whether VRF had reached out to the Secretary's Office before publishing its statement, Curtas falsely stated that VRF had not contacted the Secretary's Office, "likely because that would not serve their intended goal of spreading misinformation." *Id*; *see also* **JE4** (showing VRF contacted the Secretary's office to share its findings and discuss analysis two days before email).

208.     When the Secretary's counsel asked her own witness why the Secretary's office had not responded to VRF, Ms. Vigil suggested that it was because VRF's request "kind of came in simultaneously" with ProPublica's request, and the requests caused the Secretary's office to "look at the data." **June 15 Tr., 102:15-103:1**.

209.     Curtas made other accusations against VRF. In responding to O'Matz for her story on December 16, 2021, he added, "we do not have a record of this group requesting voter data from our office directly, which brings into question how they obtained this data, if the data has not been manipulated, and if they are using it for a lawful purpose." **JE8**.

210.     Later testimony, however, reflected that the Defendants did not and do not have any reason to believe that VRF manipulated any voter data received from the Secretary. **June 15 Tr., 127:25-128:15.** Further, the evidence showed that, following its ordinary practice, VRF's New Mexico data tab on its Website did disclose where and when VRF obtained the data: it disclosed the email chain by which Local Labs had requested the data for VRF, and any viewer of the website could click through to see it. *See* **¶183, above.**

211.     In concluding his December 16 email for O'Matz's ProPublica story, Curtas defended New Mexico's voter roll maintenance process from a perceived affront from VRF:

> Because accusations from political operatives like this are meant to impugn the integrity of our voter rolls, I'd also just want to note that our Office is confident that the processes and procedures already in place for voter list maintenance not only follow all state and federal guidelines and keep our voter rolls clean and up-to-date, but go

above and beyond those requirements… All of these systems combine to ensure that voter information is up-to-date in New Mexico, resulting in our state having some of the "cleanest" voter records in the United States.

**JE8.**

212.     O'Matz followed up shortly thereafter asking: "Is there anything improper under New Mexico law about accessing the data this way or posting it all online? I appreciate any link to the relevant statute." Before Curtas responded, O'Matz followed up again:

> Alex, I see that your law says the voter rolls can be used only for "Governmental or election and election campaign purposes only." Unlawful use of lists is a 4th degree felony.
>
> The VoteRef folks say online: "The purpose of this website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states. Our system of government is based upon citizen participation. We believe the people, in effect, own this data and have a legal right to see it in an understandable and transparent form…
>
> Is this an acceptable use under New Mexico law?

*Id.*

213.     Curtas responded on December 17th, stating:

> On the legal issue: Our office believes this publication of voter data by VoteRef.com is in direct violation of the New Mexico Election Code. We do not believe that posting New Mexican's private voting information online is legal use of this information. We will refer the use of this information by VoteRef.com to the New Mexico Attorney General for criminal investigation and prosecution.

*Id.*

214.     O'Matz responded with a pointed question about the Secretary's position: "Question – can you elaborate on how the publication of voter data online may violate state law? (VoteRef likely will argue that they are using it for election and research purposes.)" *Id.*

215. Four days later, Curtas responded:

> The issue relates to the transfer and publication of the voter data. *This is the crux*: "We do not believe providing this personal voter data on a private website *that intends to spread misinformation about the 2020 General Election meets the definition of*

*appropriate use as either for a "governmental purpose," "election related," or "election campaign purposes."*

I've attached our referral letter which lays it all out. Let me know if I can provide any clarification on this.

*Id.* (emphasis added). Curtas again focused on the idea that "spreading misinformation" renders use of the data unlawful and focuses the analysis on the permissible purposes—governmental, election related, or election campaign related—under the statute. *Id.*

216.     Curtas and O'Matz continued to communicate to set up a phone call with Secretary Toulouse Oliver and O'Matz to further discuss the issues involved. *Id.*

217.     The ProPublica Article was published on March 7, 2022. **JE 7.**

218.     The ProPublica article attributed several quotes to the Secretary (which the parties stipulated are attributable to her, **JS 35**) focusing on the use of the data, including:

In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is *not an allowable use of voter data.* By state law, she said, *the rolls can only be used for governmental or campaign purposes.*
…
"Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said. In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

**JE7** (emphasis added).

219.     The day after the Article was published, the Secretary shared it on her official Twitter account accusing VRF of "attempt[ing] to impugn the integrity of our voter rolls" and again accusing VRF of "violating the Election Code." **FAC ¶89; Answer ¶89 (admitted).** The Tweets made from the Office of the Secretary of State's Twitter account (@NMSecOfState) identified in JE12 were authorized by the Secretary to be made on behalf of the Secretary of State's Office. **JS 45.**

220.     Deputy Secretary of State and Chief of Staff Sharon Pino "runs the office," helps make any decisions, directs projects, oversees all directors, and reports directly to the Secretary. **June 15 Tr., 123:12-16**. In her hearing testimony, she echoed the Secretary's March 2022 comments that VRF's use was not for governmental or campaign purposes. Pino testified that at the time of her written criminal referral to the AG in December 2021—which, as discussed below, unequivocally accused VRF of operating "a private website that intends to spread misinformation about the 2020 General Election"—she had a factual basis for everything in the letter. ***Id.,* 133:18-21, 138:4-10**. Second, Pino testified that in her view, "misinformation" is not for a "governmental purpose" (***id.,* 135:14-136:20**) or "election purpose" (***id.*, 137:1-138:3**).

### f.   VRF Removes the New Mexico data from VoteRef.com and files this lawsuit.

221.     VRF removed the New Mexico voter data from its website on March 28, 2022— just before this lawsuit was initially filed—out of fear that it would be prosecuted based on the Secretary's interpretation of the law and her referral of VRF to the AG for potential prosecution. **JS 43; May 17 Tr., 69:11-18.**

222.     The Court finds as a matter of fact that because VRF was unaware of the Secretary's referral until the ProPublica article was published, it was VRF's knowledge of the Secretary's criminal referral to the AG, and the impending threat of investigation, which led VRF to initially remove the date from the Website, refrain from engaging in political speech, and to seek recourse from this Court.

223.     The Court finds as a matter of fact that VRF's fear of prosecution was objectively reasonable. It heard nothing from either the Secretary or Attorney General regarding its posting of voter data, but was subjected to unanticipated public statements from the Secretary indicating that it was violating the law and was under investigation for doing so.

224.     VRF filed this action because if it obtains a favorable ruling, it wants to resume posting, distributing, and otherwise using the New Mexico voter data on the Website so that the public may become and remain informed regarding the State's elections and voter registration rolls. **May 17 Tr. 61:4-11**.

225.     VRF continues to seek data from New Mexico. **JS 44.**

**g.  VRF reposts New Mexico voter data on the Website following this Court's issuance of a preliminary injunction allowing it to do so.**

226.     On July 22, 2022, this Court issued a preliminary injunction, enjoining Defendants "from prosecuting Plaintiff Voter Reference Foundation, LLC, under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs." *See* **Mem. Op (Dkt. 51) at p. 210**.

227.     The Court expressly rejected the Defendants' legal theory upon which the Data Sharing Ban is premised. ***Id.*, 137-149** ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act. *See* May Tr. at 39:14 -23 (Serafimova).").

228.     The Court held that VRF's publication of voter data on the internet is for a "governmental purpose" under § 1-4-5.5. ***Id.*, 150-151**. The Court further characterized its holding as a conclusion that "New Mexico's Election Code does not prohibit Voter Reference –or any organization—from posting voter data online." ***Id.*, 151**.

229.     The Court held that VRF's internal analysis of aggregated voter data is either a governmental or election purpose under § 1-4-5.5. ***Id.*, 150**.

230.     In reliance on this Court's issuance of the preliminary injunction, VRF republished the New Mexico voter data it already possessed on VoteRef.com. **JS 56.**

231.    On December 28, 2022, a two-judge panel of the Tenth Circuit stayed this Court's preliminary injunction pending the outcome of Defendants' appeal. **JS 61**; *see also* Order Granting Stay in *Voter Reference Foundation, LLC, v. Torrez, et al.*, 22-2101 (10th Cir. Dec. 28, 2022).

232.    VRF removed the New Mexico voter data from its Website the same day. **JS 62.**

233.    VRF has not reposted any New Mexico voter data on the Website since December 28, 2022.

**VII.    Defendants engage in viewpoint discrimination and retaliate against VRF for its protected speech.**

   **a.    The Secretary refers VRF to the Attorney General for investigation and potential prosecution.**

234.    The Secretary referred VRF to the Attorney General for criminal investigation and potential prosecution. **Ex. P14.** The Secretary has not withdrawn that referral, **JS 42; June 15 Tr., 69:5-6,** and the Attorney General asserts its right and duty to investigate and prosecute VRF. **JS7; JS42.**

235.    The Attorney General opened a criminal investigation and began actively investigating VRF after it received the referral. **Dworak, 84:8-18.** The Attorney General is not aware of any entity other than VRF having been investigated for its use of voter data. **Dworak, 168:12-18.**

236.    Additionally, on January 26, 2022, Anna Trujillo of the Attorney General's Office sent a copy of the VRF Referral (**JE5**) to the FBI. **JE6, Email to FBI, Dkt. 44-23 filed 6/24/22**; **Ex. P4,** RFA 2.

237.    The Attorney General communicated with other state attorneys general regarding VRF, its investigation of VRF, and this litigation. **Ex. JE27,** RFA 3; **JE10** (exchanges with California Secretary of State's and Attorney General's offices); **JE 11** (exchanges with

Washington Attorney General's office). The New Mexico and California Attorneys General even exchanged emails and held conference calls to discuss this litigation, including sharing briefs and orders which Defendants then relied on in their briefing. **JE10.**

238.     The Secretary believes the criminal investigation of VRF remains pending. **Vigil, 65:23-25**. At deposition on February 27, 2023, the Secretary's office continued to maintain that "[i]nvestigation by the attorney general is ongoing…" ***Id.*, 84:13-85:11**.

239.     The Court is not aware of any charges being filed against VRF, but Defendants continue to hold out the threat of prosecuting VRF for its past publication of the data it received from Local Labs.

### b. Defendants repeatedly accuse VRF of engaging in "misinformation," which is simply a euphemism for speech with which the State disagrees.

240.     The Secretary believed VRF was spreading misinformation about voting and elections. **Dkt. 159, Designated Testimony from Transcript of Deposition of Alex Curtas ("Curtas"), 52:7-53:9.**

241.     Among other things, the Secretary's Office believed the misinformation VRF is spreading is that there are discrepancies within New Mexico's voter data—maintained by the Secretary. **Curtas, 53:6-9.**

242.     The Secretary sought to "push back hard" against VRF's speech which it characterized as misinformation. **Curtas, 72:17-22.** It is part of the Secretary's Office mission to "push back hard" against VRF's speech which it characterizes as misinformation. *Id.*

243.     The Secretary's Office associated VRF's speech with a "larger strategy of election denialism" encompassing organizations other than VRF. **Curtas, 72:23-73:12.**

244.     The Secretary's referral raised concerns regarding how VRF was using the data, specifically that the use amounted to "spreading misinformation." **JE5 VRF Referral.**

245.     The Secretary believes that sharing out of date voter data creates a potential for confusion and misinformation. **Trial Tr., 113:9-13 (Vigil).** The Secretary believes that it is essential for the public to understand the list maintenance process in order to avoid confusion and misinformation. **Trial Tr., 113:14-22 (Vigil).** The Secretary believes that the public could understand the data "with the appropriate information. **Trial Tr. 113:23-114:1 (Vigil).**[12] But even if VRF publishes information about where it got the data and when it got the data, the Secretary maintains that publishing the data could still constitute misinformation because "including dates alone, with no other context, is not sufficient." **Trial Tr., 114:2-8 (Vigil).**

246.     Vigil testified that the data shared on VRF's website was concerning because the analysis did not compare "equivalent data." **Trial Tr., 115:13-20 (Vigil).** "…[D]oing a comparison of two items that don't—that aren't the same, and then doing some analysis definitely has the potential to spread misinformation." **Trial Tr., 115:20-116:1 (Vigil).** Ms. Vigil further testified that posting the date the data was received is insufficient, at least in part, because there was an attempt to compare the number of voters that participated in a specific election to other data that had changed. **Trial Tr., 127:22-128:16 (Vigil).** Vigil testified that the average voter would not understand the comparison, even with the dates, without more context. **Trial Tr., 128:17-129:1 (Vigil).**

247.     The Secretary believes the problem of voters confusing past data with the current data is not fixed if the voter data also includes an explanation of when the data file was received, because "the average voter, typically…isn't as educated on this process. You know, we work to educate them, but I don't think they're going to understand the complexities if there's someone

---

[12] Defendants object to the testimony in Vigil Depo. at 114:6 claiming the cited testimony calls for speculation and is irrelevant. Dkt. 159, at 3. The referenced question asks for the Secretary's knowledge of the legality of other entities' use of voter data which is relevant to proving that the Secretary's reasons for denying VRF's requests for New Mexico voter data are pretextual. As such, the objection is overruled.

who is making a claim of a discrepancy without context." **Vigil, 128:19-129:6.** Thus, the mere fact of publishing an old file, even if accompanied by a disclosure that it was obtained on a certain date, "invites and provides a potential of misinformation." **Vigil, 129:7-17.** The Secretary's position is that posting when and how the data was received isn't enough to correct the misinformation. **Vigil, 129:24-130:4.**

248.     The potential for misinformation is one of the reasons the Secretary opposes online sharing of voter data. **Trial Tr. 114:14-23 (Vigil).** But the Secretary has also stated that publication of the data on the Internet alone, even if completely accurate, constituted misinformation. ***See* Ex. JE27,** ROG 7 to SOS. Indeed, the Secretary believes VRF engaged in disinformation even when, in response to the District Court's preliminary injunction allowing VRF to repost the data, it reposted the data with inaccurate information explaining it. **Vigil, 123:12-124:16; 124:24-125:13.**

249.     The Attorney General supports the Secretary's position that VRF's publication of voter data is election misinformation. **Dworak, 68:11-18.**[13]

250.     The Court finds as a matter of fact that the animus of the Secretary of State against VRF's election-related speech, including its criticism of the Secretary's list maintenance efforts and the identification of a discrepancy, was the reason for its denial of access to the data, and was the reason for its criminal referral of VRF. The Court finds that the Attorney General, in sharing the view that VRF engaged in election misinformation and in advising the Secretary not to produce data, and in initiating an investigation, shared in and was motivated by the same animus as the Secretary.

---

[13] Defendants object to this testimony based on relevance, arguing that the Attorney General's "view of misinformation is of no relevance to this case." Dkt. 159, at 75. This testimony concerns the Attorney General's position regarding whether VRF's speech constitutes misinformation which is relevant to show the Defendants' basis for denying VRF voter data and investigating VRF for criminal violation of the election code. The objection is overruled.

### c. Defendants repeatedly deny VRF access to New Mexico voter data even when it makes the same promises as other requestors.

251.     Defendants denied VRF's February 2022 request for voter data, taking the position that they would not fulfill requests from VRF under any circumstances for the foreseeable future.

252.     Defendants denied VRF's May 27, 2022 request, despite its assurances that no voter data would be posted online absent a court order and VRF's inclusion of the requisite affidavits.

253.     Defendants denied VRF's October 18, 2022 request for voter data because it did not include an affidavit or a promise not to post the data online.

254.     Defendants denied VRF's October 2023 request for voter data because it did not include an affidavit.

255.     At least with regard to the May 27, 2022 request, VRF made the same promises that any other requestor of voter data is asked to make, while reserving its right to avail itself of any relief ordered by a court.

256.     VRF's requests were continually denied despite making these same promises as all other requestors.

257.     No VRF voter data request was fulfilled until VRF not only provided the required affidavits, but also had its counsel represent in this Court multiple times the same thing that VRF promised in its May 27 request: that the data would not be posted online unless a court allowed VRF to do so.

258.     In this regard, VRF had to comply with additional requirements not asked of any other requestor of voter data.

259.     Even the voter data that was ultimately produced was not provided on the same terms as it is provided to all other requestor.

260.     Defendants' decision not to provide voter data to VRF, even after its express assurances and provision of the requisite affidavits, was motivated by their opposition to VRF's speech and viewpoint.

**d. Defendants have taken vague and inconsistent positions regarding the Data Sharing Ban and the scope of New Mexico law to single out VRF.**

261.     The Defendants each initially took the position that the Data Sharing Ban applied uniformly to ban all sharing of the data, including VRF's speech sharing the data over the internet, based on their statutory interpretation.

262.     However, after Plaintiffs mounted an overbreadth attack on the Data Sharing Ban, the Defendants changed their interpretation of its reach. First, the Attorney General testified that he can no longer draw the conclusion the Defendants advanced in their argument and briefing at the preliminary injunction: that § 1-4-5.6 incorporates the prohibitions of § 1-5-22(a) to make VRF's publication of data unlawful. **Dworak, 144:7-16.**

263.     The Defendants have restated their construction of the law to suggest that the Data Sharing Ban only applies in cases just like VRF's—when an entity publishes voter data online to the "general public." **JE33, Feb. 21, 2023 Email from E. Lecocq to E. Greim** (clarifying earlier discovery response and stating "[b]oth the AG and the SOS believe that "sharing data" outside one's organization, or publishing that data to make it available for the *general public*, constitutes a violation of New Mexico Law. *This is not just the act of sharing data, but rather disseminating that information to the general public*.") (emphasis added).

264.     The Attorney General suggested after the close of discovery that under his view of the Ban, not all use of the internet is "disseminating to the general public," but refused to take a position about what sort of protection or password is sufficient to make "internet publication"

sufficiently private to not be deemed "disseminating" to the general public. **Dworak, 128:16-129:14**.[14]

265.    Defendants' supplemental response to one of VRF's discovery requests also reflected an amorphous standard: "'Publishing online' could be construed to mean anything from making an internal list of registered voters for use in an internal website, or a secured website, or maintaining that information on an internal website for others to access internally, such as on Google Drive, or sending mass emails to voters as part of a campaign. The AG believes this type of 'publishing,' used within the context of permissible government or election campaign use, is acceptable, whereas 'publishing' to the general public is not." **JE33.**

266.    In the same email, Defendants stated, in their "Answer" to a clarification of Request for Admission 3: "As stated above, the definition of publication might be straightforward, but the question is who is able to access that information, as it depends on whether it's published on a secure website or a website accessible only by certain people. To that extent, the clarification that it is published to members of the public helps with that distinction, and that would not change the Secretary's admission to that RFA. The Secretary believes that publishing voter data to the general public constitutes a violation of NM law." **JE33.**

267.    The Attorney General's Office testified that its standard is that sharing could occur after all, so long as "there is not a risk of that information being used for unlawful purposes." **Dworak, 128:24-129:14.** The Attorney General believes a case-by-case analysis would be required to determine whether someone has violated the law by publishing the data to the general

---

[14] Defendants object to the cited testimony on the grounds that it is irrelevant because "Neither the denial of voter data nor the statute as written at the time of the deposition have any relevance to this litigation any longer. VRF is not entitled to retrospective relief on these issues." Dkt. 159, at 77. While N.M.S.A. § 1-4-5.5 has been amended since the beginning of this litigation, its interpretation is still relevant to the possible future prosecution of VRF for pre-amendment conduct. Therefore, Defendants' objection is overruled. Defendants' identical objections to Dworak Depo., 130:20-131:16 and 144:7-144:16 are likewise overruled.

public, but believes that it generally depends on who has access to the data and if control over the data's use is maintained.. **Dworak, 128:16-129:14.**

268.     The Attorney General believes it might violate the law to transfer the data for election research, governmental, or campaign purposes, if the transferor lost control of the data. **Dworak, 72:4-19.**[15]

269.     The Attorney General's analysis of whether VRF's posting of the data on the internet is unlawful does not depend on whether any person has actually used the data for an impermissible purpose. **Dworak, 100:11-18**.

270.     The Attorney General's position is that posting or publishing data on the internet may not be unlawful, depending on whether the data is published in a way to ensure its use is limited for lawful purposes, or that could allow it to be used for unlawful purposes. **Dworak, 128:16-129:14.**

271.     Further, the Attorney General was not prepared to say whether an individual accessing the data on VRF's website is an unlawful use. **Dworak, 100:11-18**.

272.     Likewise, the Secretary does not know whether, under current law (that is, after the state directly banned sharing the data on the internet), an entity would violate the ban on sharing data "outside of the organization" if it retained an independent contractor to analyze data. **Vigil, 88:17-89:24.**[16]

---

[15] Defendants object to this testimony on the grounds that it is irrelevant because the Secretary has recently disclosed voter data to VRF. Dkt. 159, at 76. To the contrary, this testimony is relevant to show the Attorney General's interpretation of state law and does not depend on whether the Secretary has made certain voter data available. Thus, the objection is overruled. Defendants' identical objection to Dworak Depo., at 74:14-75:10 is also overruled.

[16] Defendants raise a relevance objection to the testimony included at Vigil Depo., at 89:18. Dkt. 159, at 2. The Court overrules the objection because the testimony in this excerpt concerns hypothetical situations which shed light on the Secretary of State's positions regarding the sharing of voter data, which are highly relevant to VRF's First Amendment claims because they make it more probable that the Secretary's reasons for denying VRF's requests for New Mexico voter data are pretextual. Additionally, the Secretary's answers to these questions are relevant to VRF's vagueness and overbreadth claims because they show the breadth of and exceptions to the Data Sharing Ban. Defendants also object to the cited testimony in ¶ 273 on the same grounds. That objection is likewise overruled.

273.     The Secretary claims to no longer know whether, under current law, an entity would violate the ban on sharing data "outside of the organization" if it shared the data on the Internet with a customer via a secure connection. **Vigil at 97:19-98:11.**

274.     The Secretary believes political party volunteers count as "within the organization" of the political party if the volunteers are considered "staff," but otherwise has no "particular legal definition" of the line between criminal and legal conduct. **Vigil, 106:24-107:6.** The Secretary would need "additional review" to know whether political parties commit a crime by giving a walking list to door-to-door walkers who are unpaid college students who are not employees. **Vigil,113:23-114:13.** At trial, Vigil testified that a candidate can receive voter data from their own political party and that such sharing would not count as "outside the organization." **Trial Tr., 125:4-9 (Vigil)**. This would extend to the staff of the candidate, *id.* **at 125:10-16 (Vigil)**, as well as door to door walkers working on behalf of the party, *id.* **at 125:17-21 (Vigil).** Vigil testified that the State does not impose any limits on the number of people that can be associated with a party who can access the party's data, because it is considered sharing within the organization. *Id.* **at 125:22-126:8 (Vigil).**

275.     The Secretary relies wholly on the affidavit submitted by groups to ensure that they are using it lawfully, and does nothing to investigate whether their volunteers or other connected individuals actually meet the Secretary's definition of "within the organization." Only if it is made aware of a violation will the Secretary investigate. **Vigil,109:11-110:6.** The Secretary does not require the requester to identify any individuals who actually receive the data. **Vigil, 145:23-146:4.**

276.     With respect to the question of whether Defendants view a particular volunteer as part of the organization for purposes of the Data Sharing Ban, "each scenario" has "facts that need

to be evaluated" and "would need to go to our counsel for an analysis to determine if it's lawfully part of [an] organization or not." **Vigil, 110:7-111:6.**

277.     The Secretary will not commit that "being within an organization" is "limited to employees." **Vigil, 112:1-5.** The Secretary cannot say whether it matters that the individuals are paid, whether the individuals "need to have an agreement with the organization" of some kind because "[W]e have not outlined all of those logistical details," and "every scenario would require some analysis to determine if it's within the bounds of the statute or not." **Vigil, 113:6-22.**

278.     The Secretary has also taken conflicting positions on its own records and on its ability to produce them.

279.     For example, it has provided conflicting testimony regarding whether it keeps a "file maintenance list" as that term is defined under New Mexico law and whether it could produce said list to VRF. **Compare ROG 2 in Ex. JE25** (admitting Secretary maintains a "file maintenance list") **with RFP 15 in Ex. JE29** (denying that Secretary keeps a file maintenance list).

280.     Further, Defendants' counsel indicated at trial that voter data received in response to an IPRA request *can* be posted online without repercussion because "IPRA simply does not have any sort of protection for reports that are produced under IPRA." **Trial Tr., 24:10-17, 25:2-7**. But Defendants' cursory analysis is not tethered to New Mexico law. After HB4, NMSA § 1-4-5.6 provides no exceptions to its internet-publication prohibition:

A.     Unlawful use of voter data, mailing labels or special voter lists consists of:

. . .

(2) causing voter data, mailing labels or special voter lists or any part of the voter data, mailing label or special voter lists that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means.

Defendants present no reasoning as to why § 1-4-5.6 would not apply to voter data received under IPRA, yet would apply to voter data received in a different manner. Indeed, the Court finds that the text of § 1-4-5.6 does exempt from application data received outside of the Secretary's voter data request regime.

281.     In short, the Court finds as a matter of fact that the Defendants have made changing interpretations of the Data Sharing Ban as it applied pre-amendment (that is, the passage of HB4), and the Data Sharing Ban and explicit internet publication ban after amendment. The Court finds that the Defendants have offered no convincing explanation for these differing interpretations, and that they provide further evidence that the Defendants' denial of access, criminal referral, and criminal investigation are in fact motivated by Defendants' hostility to VRF's election-related speech.

**e. Defendants have feigned concern for other companies which *sell* New Mexico voter data to third parties, but have never taken any action to investigate those companies.**

282.     Other companies, such as Aristotle, Catalist and i360, have obtained voter data from the Secretary by filling out the prescribed affidavit. **JS 63.**

283.     VRF has repeatedly informed the Defendants of its belief that these other entities were *selling* New Mexico voter data. **May 17 Tr., 93:16-24, 94:8-21, 44:4-11**, **June 15 Tr., 180:12-21; 205:4-12; 238:2-14; FAC ¶¶175, 193**; **Dkts. 84-87** (notices of subpoenas to Aristotle, Catalist, i350, and TargetSmart). Elections Director Vigil made promises on the record that the Secretary would look into these entities. **June 15 Tr., 238:9-14.**

284.     The Court's order granting preliminary injunction also noted that Catalist and i360 were selling voter data to clients: "The Secretary of State's interpretation of the Election Code criminalizes requesters such as Catalist, i360, Data Targeting, and L2 Inc., *who apply for voter*

*data and then sell it to clients outside their own organization.*" **Mem. Op., 158-9** (emphasis added).

285.     In September 2022, after the Court's preliminary injunction order, VRF again asked Defendants whether they had conducted any investigation into Catalist, i360, or any other commercial entity that purchased data from the Secretary, but when Defendants responded in mid-October, they again said they had not. *See* **Ex. JE25,** ROG 1 to SOS**;** *See* **Ex. JE24,** ROG 1 to AG**.**

286.     Since Vigil's testimony promising to look into at least Catalist in the summer of 2022, the Secretary has done nothing to investigate whether Catalist and Aristotle, groups that sell New Mexico voter data to customers for a fee, are violating the law. **Vigil, 116:6-117:3.**

287.     At trial, Vigil testified that she remembered discussion of several for profit entities that sell voter data, including Catalist and i360. **Trial Tr., 119:16-21 (Vigil).** Vigil agreed that when Plaintiff's counsel asked about these entities at the preliminary injunction hearing, she agreed to look into those organizations. **Trial Tr., 119:22-120-4 (Vigil).** Despite this representation, Vigil claims the Secretary has not looked into any of these organizations because the Secretary has limited resources and Vigil does not have actual knowledge of those entities posting the data online. **Trial Tr., 120:5-10 (Vigil).**

288.     At a March 2023 deposition, the AG claimed to be unaware of Catalist, i360, or Aristotle, or whether these entities sell any data that they receive from the Secretary's office. **Dworak, 167:16-168:11.**[17] The AG made the same response to an interrogatory seeking this

---

[17] Defendants object to the cited testimony on the basis of relevance. However, this testimony concerns whether the Attorney General has criminally investigated other similarly situated entities as VRF. This line of questioning is relevant to whether or not Defendants maintain a consistent interpretation of the New Mexico election code and whether they enforce that election code consistently, or discriminatorily in order to deprive VRF of New Mexico voter data under that pretext. Therefore, the objection is overruled.

information in October 2022—that the AG had not received a referral or complaint, and had not conducted an investigation. **Dworak, 170:17-171:6**. The AG cannot state what it would take for the office to consider VRF's claims during the litigation that these other entities are violating the law as the AG interprets it. **Dworak, 172:9-23**.[18]

290.    The Secretary "has not evaluated" whether, under current law, a political campaign that shares voter data with paid political consultants constitutes "sharing within organization." **Vigil, 108:4-17.**

291.    Nothing is stopping the Secretary from investigating any political party for sharing voter data with their paid political consultants who are not part of a campaign.

---

[18] Defendants object to the cited testimony on the basis of relevance and foundation, arguing that the witness, as a Rule 30(b)(6) witness, "is not charged with knowing how every independent Assistant AG would view any particular facts with regard to a potential investigation." Dkt. 159, at 79. To the contrary, the cited testimony is relevant to show whether the Attorney General discriminated against VRF by singling them out for criminal investigation. Additionally, the witness was not being asked for the knowledge of every individual assistant attorney general, but, as a 30(b)(6) witness, was required to answer the question as the office of the Attorney General. Therefore, Defendants' objection is overruled.

292.     Based on all of the foregoing testimony and evidence, the Court finds that the Defendants' failure to make any inquiry into sellers of voter data is further evidence of Defendants' retaliation against VRF, and their motivation to punish VRF for its online speech. Defendants argue that they have received no official complaint regarding Catalist, i360, etc.—only the documents, evidence, and statements of counsel and the Court in this case. But Defendants criminally referred and threatened prosecution against VRF based on contact from a nonprofit news outlet that, as noted above, Defendants admitted also did not make a complaint. Defendants' assertion that VRF was investigated because it posted data online, whereas for-profit sellers sell the data without knowledge of what their customers will do with the data, is not a credible reason to fail to even investigate other entities. Eighteen months have passed since the first time this issue was raised, and Defendants have made no showing that their investigation of VRF has somehow sapped their resources, making any other violations of the law incapable of investigation and beyond their enforcement powers. In conclusion, this Court finds as a matter of fact that the differential treatment of VRF as compared to for-profit data resellers is further evidence of Defendants' retaliation against VRF for their speech.

## VIII.   The Data Sharing Ban unjustifiably burdens First Amendment protected speech and is not narrowly tailored.

293.     Even prior to the passage of HB4 (discussed below), Defendants maintained a policy and position that voter data cannot be shared, disseminated, distributed, published, or otherwise made available by a requestor to any third party, including via publication on the internet. **JS 34; May 17 Tr., 148:20-149:13; June 15 Tr., 91:6-20; Trial Tr., 119:3-8.** Plaintiff has referred to this policy throughout this litigation as the "Data Sharing Ban."

294.     Pre-House Bill 4 (which amended the law to explicitly prohibit internet sharing), Defendants located this prohibition within a peculiar construction of multiple statutes, reading the

language of § 1-4-5.6 to incorporate by reference language from § 1-5-22 such that § 1-4-5.6 prohibits *any person*, not just government employees and data processors, from "selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file…". **May 17 Tr., 34:3-14** (admitting Defendants' theory is that 1-4-5.6 incorporates by reference § 1-5-22—not in its entirety—but the purposes that subsection 22 prohibits); ***id., 34:23-35:14*** ("purposes" when used in § 1-4-5.6 refers to purposes prohibited by Article 5, not "purposes" in § 1-4-5.5); ***id.*, 36:10-11** ("…Local Labs, by providing the data to VRF, and VRF by providing it to the world on the website violated § 1-5-5.6.); ***id., 37:11-19*** ("…[I]t is the Attorney General's position, as a party in this case, that if there is any criminal liability on the table, it is not for violating the so-called use restrictions under § 1-4-5.5(c). It is for providing--otherwise providing access or otherwise surrendering or selling or lending the voter data under § 1-4-5.6); ***id.*, 50:25-51:5** (same); **June 15 Tr., 228:4-16** (§ 1-4-5.6 incorporates § 1-5-22).

295.     Before HB4 was passed, the Data Sharing Ban was enforced in two ways. First, as the Court has already found, the Defendants interpreted New Mexico statutes as prohibiting any speech that shared voter data, with only limited exceptions for intra-entity transfers. Second, the Defendants attempted to extract promises from voter data requesters, either via form affidavits or otherwise, that as a condition of access to the data, they would forego speech that shared voter data. These two enforcement mechanisms are both prongs of the Data Sharing Ban.

296.     As discussed in further detail below, HB4 explicitly codified the proscriptions on sharing voter data which Defendants claim have always implicitly existed in the Voter Records System Act. After HB4, the Data Sharing Ban continued to consist of both pre-HB4 prongs. This included (1) the prior statutory interpretation that all speech sharing the data (again, with the limited intra-entity transfer exception) is an independent crime, now expressly including internet

speech; and (2) the prior system of demanding that requesters surrender their right to engage in speech sharing the data via promises extracted through affidavits or other means.

      **a.** **The Data Sharing Ban severely burdens First Amended protected speech, including core political speech, by proscribing almost all speech involving voter data.**

            **i.** **The Data Sharing Ban is a severe burden on political speech by criminalizing speech that shares voter data and by extracting requesters' promises not to engage in speech as a condition to accessing data.**

297.      The Data Sharing Ban prohibits any speech between two private parties that share voter data, with a potential exception for sharing "within" a group that Defendants deem to be a single "entity." Speech that shares voter data is sharing information that is essential for the conduct and integrity of elections, and critical for the conduct of elections. A complete ban on this speech between two private parties (subject to the narrow and vague intra-entity exception) will completely ban VRF's planned speech, and will ban or severely burden a variety of other forms of political, election-related speech. This Court therefore finds as a matter of fact that the Data Sharing Ban imposes severe burdens on core political speech.

298.      This Court also finds as a matter of fact that the same is true for the new internet-specific ban that New Mexico enacted alongside its older Data Sharing Ban, as detailed below.

299.      The Data Sharing Ban also extracts concessions from requesters as a condition to accessing data: that they promise not to engage in any data-sharing speech at all (subject to the narrow exception mentioned above), or, under the new internet-specific ban, that they promise not to engage in any data-sharing speech on the internet at all. This, too, is a severe burden on speech.

            **ii. The Data Sharing Ban is content based.**

300.      The Defendants' affidavit requirement is intended to implement New Mexico law providing that anyone requesting New Mexico voter data must provide an attestation regarding

how he or she will use the information. § 1-4-5.5(C); **JE 1, 15-17**. According to Ms. Vigil's testimony, the affidavit requires that the requestor acknowledge that they understand that they are receiving the data for a specific lawful purpose and that they cannot use it outside of those purposes, including by publishing on the internet. **Trial Tr., 86:9-22 (Vigil).**

301.     One purpose of the affidavit is to impose other state-created limitations on the production of data that would otherwise be available under the NVRA. For example, New Mexico imposes limitations based on the purpose for which requesters intend to use the data. Under that limitation, Defendants only recognize "governmental" and "election campaign" as permissible purposes for use of voter data. **Dworak, 19:25-20:12;[19] JE15; JE17.**

302.     The Secretary's Office claims that it only processes requests accompanied by the affidavit form promulgated by the office, the Voter Information Authorization form**. Dkt. 160, Designated Testimony from Transcript of June 15, 2022 Hearing on Pltfs. Mtn. for Prel. Inj. ("June 15 Tr."), 47:10-50:8.** The Voter Information Authorization form has changed several times, particularly between 2021 and 2023, though the Secretary maintains that even older forms are still accepted. **June 15 Tr. at 89:16-20 (Vigil).** Some of the changes of the form reflect changes to the permissible purposes for which requesters can use data they have requested under the NVRA or state law.

303.     For example, **Exhibit JE15** is one of the most-recently updated versions of the request form that must be submitted to receive the voter information, which was amended on February 14, 2022. It requires a requester to check one of two "purposes" behind the request,

---

[19] Defendants object to this testimony on the grounds that it is irrelevant and calls for a legal conclusion. Dkt. 159, at 74. To the extent Defendants object to the form of the question on the basis it "calls for a legal conclusion," that objection has been waived because Defendants did not specify the basis for their objection during the deposition, stating only: "Objection." Dworak Depo., at 20:2. Even so, the question calls for the application of facts to law which is not objectionable. Further, this testimony is relevant to establish the Attorney General and Secretary of State's basis to deny VRF access to New Mexico voter data, which is integral to VRF's claims in this case. Therefore, Defendants' objection is overruled.

either: "Campaign Use" or "Governmental Use." *Id.* There is no option for "election" use. *Id.* The

Secretary designed the form, which was then approved by the Elections Director, along with a

legal review by the Secretary's General Counsel or the Deputy Secretary of State. **May 17 Tr.,**

**131:23-132:6.**

304.     The form includes an authorization which states:

> Unlawful use of the information requested on this form shall consist of willful selling,
> loaning, providing access to or otherwise surrendering, duplicating or alteration of
> information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA
> 1978). I hereby swear that the requestor will not: (INITIAL EACH)
>
> _____ sell, loan, provide access to, or otherwise surrender voter information received as
> a result of this request.
> _____ alter voter information received as a result of this request.
> _____ use voter information for any purpose other than those authorized on this form.
> _____ use voter information for any commercial purposes.

**JE 15 (Feb. 14 form).** The form requires the requestor's signature just below this. *Id.*

305.     The version of the form signed by Local Labs, in contrast, permitted governmental,

campaign, and election related uses, just as the statute does. **JE1, Lippert Form, Dkt. 44-1 filed**

**6/24/22.** The latest form therefore differs from earlier versions of the form, including the version

signed by Local Labs, the entity that actually shared voter data with VRF.

306.     Earlier versions of the form allowed the data to be "transferred" so long as it was

for a permissible purpose. *See* **JE1 Lippert Form** (same); **JE16**. Neither of those versions

required the transferor to retain control over the transferee's use of the data, to stand as a guarantor

of the transferee's use of the data, or to exact promises or other undertakings from the transferee

to ensure the transferee used it for the intended purposes. *Id.*

307.     Plaintiff argued throughout this litigation that Defendants intentionally misapplied

the law to state that VRF's proposed use of the voter data is not a permissible use under the statute:

governmental, election, or election campaign. Plaintiff labels these additional hurdles the "Use Restrictions."

308.     The Secretary believes that VRF's posting of the data was not a permissible use because it was not for a governmental, election, or campaign purpose. **Trial Tr., 112:1-8 (Vigil).**

309.     The Secretary believes VRF's posting of the data on the internet was not for a governmental purpose because it is not a governmental entity. **Vigil, 75:22-76:9**. The Secretary refuses to say whether VRF's analysis of the data, independent of VRF's public posting, qualifies as a governmental use, and claims it still "would need some review." **Vigil, 76:10-78:19.**[20] The Attorney General agrees that VRF's use was not a governmental purpose. **Dworak, 73:8-21.**[21]

310.     The Attorney General takes the same position as the Secretary on the question of whether VRF's use of the data is election related. **Dworak, 73:22-74:13.** The Attorney General maintains that public posting on a website is not for a research or campaign purpose. **Dworak, 74:19-75:10.** The Attorney General takes these positions both as a party and the Secretary's counsel. **Dworak, 74:14-18.**

311.     VRF's proposed use of the data, including publishing online to crowdsource the accuracy of the lists and the internal discrepancy analysis to evaluate the functioning of the Secretary's Office, is a governmental use under NMSA 1-4-5.5

312.     Even if a use would otherwise be considered lawful, once that use crosses the threshold to become "misinformation," the Defendants consider them to be unlawful, as the

---

[20] Defendants object to this designation on the basis that "misstates prior testimony." Dkt. 159, at 2. The Court overrules this objection because the question was clear and provided Mrs. Vigil an opportunity to respond and accurately state her position if it was in fact different than asserted by Plaintiff's counsel.

[21] Defendants object to this designation on the basis that it is irrelevant because "[t]he testimony reiterates the litigation position articulated by the office in the pleadings[.]" Dkt. 159., at 76. The cited testimony is relevant to show Defendants' basis for conspiring to not fulfill VRF's requests for voter data and for criminal investigation. Therefore, the Court overrules the objection. To the extent Defendants claim the testimony is cumulative, that objection is likewise overruled.

Secretary made clear in her criminal referral, and which the Attorney General accepted in opening up an investigation. **JE5** ("We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 general election meets the definition of appropriate use as either a governmental purposes, election related, or election campaign purposes."). **Trial Tr., 111:16-112:13 (Vigil)**

   **b.  The interests offered by the state to justify the Data Sharing Ban are not compelling and the speculative harms complained of are not related to VRF's posting of voter data.**

   **i.  The asserted state interests.**

313.    Defendants relied upon four proffered interests which they claim support the Data Sharing Ban and Use Restrictions:

   - "limiting access to those who are explicitly aware of the permissible uses of New Mexico voter data via the requisite affidavit;"
   - Revenue generation;
   - Encouraging voter participation; and,
   - Preventing misinformation.

**Dkt. 13 at p. 8.**

314.    One reason the Secretary wants to prohibit the sharing of voter data outside of an organization is to require requesters to come directly to the Secretary for the data, and thereby generate revenue. **Vigil, 143:9-24.**

315.    Other than these interests, the state has no other interest in requiring users of the data in signing a form directly with the Secretary. **Vigil, 152:21-24.**

316.    The Secretary created a new program, by statute, to make certain public officials' home addresses confidential after an incident occurred in which an elected official was "targeted." **Trial Tr., 99:15-100:1 (Vigil);** *id*, **118:7-14 (Vigil).**

317.    The Secretary agrees that VRF has never challenged the Safe at Home Program or argued that it is preempted by the NVRA. **Trial Tr., 117:18-118:1 (Vigil).**

ii.    **Defendants fail to produce any evidence that VRF's past publication has, or future publication will, cause harm.**

318.    The Attorney General has no information that VRF has manipulated or misrepresented voter data. **Dworak, 98:18-99:14**. The Secretary also lacks any facts or documents showing that VRF manipulated or tried to manipulate New Mexico voter data. **Trial Tr., 127:6-8 (Vigil); Vigil, 140:19-22; Ex. JE25,** ROG 4 to SOS (no facts or documents relating to VRF's manipulation of or attempt to manipulate New Mexico voter data).

319.    Deputy Secretary of State Sharon Pino likewise testified that she had no evidence that VRF had ever manipulated voter data that it had posted, but testified that in her own view and the view of her office, if data were used in such a way that it could *potentially* be manipulated, even if by a third party who is not the requestor, its use falls outside the statutorily permitted purposes. **June 15 Tr., 138:21-139:15** (Pino).

320.    The Attorney General has no information that any person has used the VRF data to stalk or harass anyone, or for any unlawful purpose. **Dworak, 100:1-101:16**. The Secretary likewise did not produce any evidence of any person being subjected to unwanted solicitation, harassment, or abuse, because VRF shared voter data with the public on VRF's website**. Vigil, 136:8-138:9; Ex. JE25,** ROG 3 to SOS. Even at trial, the Secretary's witness testified that the Secretary has no evidence that any person was contacted, harassed, or commercially solicited because of VRF's posting of the data. **Trial Tr., 124:6-10 (Vigil).**

321.    The Secretary does not claim, and presented no evidence, that its one example about an elected official being targeted is due to either to VRF's posting of the data, or to anyone else's posting. **Trial Tr., 124:11-17 (Vigil).**

322.    The Secretary has no information that anyone used VRF's website to engage in misinformation about elections. **Vigil, 138:12-17.**

323.     The Secretary has no information that any voter has canceled their voter registration because of VRF's publication of voter data on its website. **Trial Tr., 127:9-12 (Vigil); Vigil,140:23-141:5.** The Attorney General also doesn't know how many people, if any, have canceled voter registrations because of the online posting of the data. **Dworak, 106:9-12.**[22]

324.     The Secretary has no information about citizens who contacted her office about concerns with VRF other than what was provided during discovery. **Vigil, 72:17-73:1.** The evidence showed that only a handful of in-state residents contacted her office, and of those, almost all of the citizen contacts occurred after the Secretary mounted local media campaigns attacking VRF, warning voters about VRF, or criticizing VRF's obtaining a preliminary injunction in this case.

325.     The Secretary has no information that particular users of VRF's website were misinformed when accessing the data and disclosures on VRF's website. **Vigil, 130:12-19.** The Secretary's only "evidence" that any voter has been "misinformed" by VRF's posting is the complaints offered as part of Defendants' Exhibit B. **Trial Tr., 126:9-21.** As noted above, the Court did not accept this exhibit into evidence for the truth of the matters asserted in the correspondence reflected therein.

326.     The harms identified by Defendants to justify the Data Sharing Ban and Use Restrictions are entirely speculative and were not supported by competent evidence.

327.     Neither Defendant presented admissible evidence that the claimed harms were real or palpable.

---

[22] Defendants object to the foundation and relevance of the cited testimony. Dkt. 159, at 77. The question cited asks for the Attorney General's knowledge and is relevant to prove whether New Mexico citizens have actually canceled their voter registration as feared by Defendants. Thus, the objection is overruled.

328.     Neither Defendant presented admissible evidence that VRF's online publication of voter data led to any of the speculative harms identified.

### c.   The Data Sharing Ban is not narrowly tailored.

329.     It is Defendants' burden to demonstrate that the Data Sharing Ban is narrowly tailored. They have not done so.

330.     The Defendants claim the Data Sharing Ban is an attempt to address some speculative potential harms. However, the Data Sharing Ban is a complete ban on sharing the most valuable information about the state's elections: the voter data itself.

331.     The main reason the Secretary claims to want to enforce the Data Sharing Ban is that it allows the Secretary to keep a record of individuals who requested the data, so that it can use that information as a tool for enforcement "if we do see an instance of stalking or harassment or intimidation." **Vigil, 144:1-24.**

332.     To advance the same goal without completely banning a category of speech, the State could, but simply does not, ask requesters to keep a list of people that use their data, so that if harassment, stalking, or solicitation occurs, the State could contact the requesters, obtain lists of those with whom the data was shared, and track the culprits. The Secretary cannot state why its interest in knowing who has accessed the data is not fully vindicated by simply having requesters keep a record of the individuals with whom it shares the data. **Vigil, 146:5-149:2.**

333.     The Secretary believes the current affidavit is also needed to satisfy the state's interest in ensuring that the recipients of the data understand what they're supposed to do and not do with the data. **Vigil, 151:4-12.** The Secretary believes that its interest in educating the public is not fully vindicated by having the initial recipients require that their own recipients agree to the specific provisions of New Mexico law, because the Secretary's form promotes uniformity and

consistency. **Vigil, 151:13-152:20.** However, as the Secretary admitted, its own forms have changed in material ways, and failing to use the Secretary's current form is not a reason to reject a request. **Vigil, 168:24-169:24.**

334.    If it wanted citizens to be informed regarding the law and the data, the State itself could provide that information to the public, rather than banning speech on the grounds that it constitutes "misinformation" and insisting on the use of forms that do not accurately reflect the current state of the law.

335.    The Secretary could also expand the Safe at Home Program under New Mexico law to protect individuals most at risk of stalking, harassment, etc., but has chosen not to do so. A complete ban on speech is not a reasonable substitute for targeted protective measures to address the harms the State posited, even if the State never proved the existence of those harms.

## IX.    The Data Sharing Ban proscribes nearly all speech involving voter data in the name of non-compelling state interests that could be achieved via far less burdensome means.

336.    At the preliminary injunction hearing(s), Plaintiff's counsel propounded a number of hypotheticals to the Secretary's Elections Director and Deputy Secretary of State. The responses to those hypotheticals revealed that the Defendants absolutely prohibit the sharing of voter data between a requestor and any other person, regardless of whether the sharing is for a governmental, election, or election campaign purpose. This would include sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for (**June 15 Tr. at 33:13-34:16**); sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic who wanted to question or validate the data (**id. at 32:6-33:9**); sharing between a political party and a candidate it supports, but who is not affiliated with the party (**id. at 91:1-5, 91:17-20**); sharing of a voter's information by a canvasser

with close family members or other members of his or her household (*id.* **at 30:17-31:20**); sharing

by a political data compilation/analysis firm and its political clients (*id.* **at 34:17-24**); and sharing

via publication on the internet (*id.* **at 91:12-16**).

337.     After all of this, upon the methodical direct examination by her own counsel, Olga

Serafimova of the Attorney General's Office, Vigil testified, "Yes," when asked whether she

would "unequivocally" find a violation of New Mexico law if a data vendor like Catalist sold or

shared New Mexico voter data files to third parties, whether for profit or based on an ideological

connection. **June 15 Tr., 73:24-74:11 (Vigil).**

338.     Vigil continued, led by the Attorney General's counsel, reaffirming that even one

academic sharing his own voter file with another academic, regardless of the purpose or content

of the papers, would be a violation of the law. **June 15 Tr., 74:24-75:15 (Vigil).**

339.     Defendants adhered to this view despite its odd results. Defendants maintained that

a voter list could be obtained by a single party official signing a single affidavit, but widely

disseminated among a variety of organizations and individuals, including candidate campaign

committees at all levels (so long as the candidate is affiliated with the party), candidate campaign

and party workers, and even volunteers. **June 15 Tr., 29:2-30:4.** Defendants also allow sharing

within a family, and even though that might violate the ban, it would not be enforced. **June 15 Tr.,**

**31:4-12.**

340.     The Defendants have agreed that § 1-5-22 on its face does not apply to VRF, as it

is not a government employee, contractor, or data processor. **May 17 Tr., 38:23-39:6**.

341.     Defendants further opine that the voter file can be shared "within" an organization

that requests it. **Trial Tr., 102:8-10 (Vigil).** But sharing it "beyond the organization that requested

it" runs afoul of the statutes. **Trial Tr., 102:11-14 (Vigil).** Sharing "beyond the organization"

constitutes an improper purpose. **Trial Tr., 102:15-17 (Vigil);** *see also* **June 15 Tr., 230:5-12**; *id.*, **238:21-23** ("If an organization requests the information…it can never be shared externally.").

342.      The plain language of the relevant statutes does not distinguish between inter- and extra-organizational sharing.

343.      Defendants took the position that their interpretation was the only way to view the law to effectively police use of the data. "But, again, the only way for 5.6 to be effective is if it prohibits all sharing outside of the regulatory process, because otherwise, it creates a gap that we cannot prosecute, we cannot control." **June 15 Tr., 235:2-5**.

344.      The Attorney General agrees with the Secretary's pre-House Bill 4 interpretation of § 1-4-5.6. **Aug. 31 Tr., 13:18-14:1**.

345.      Based on all of the above evidence, this Court finds as a matter of fact that the Data Sharing Ban, as it existed before House Bill 4, prohibits a large swath of speech that shares voter data. That swath of banned speech is substantial compared to any legitimate sweep of a narrower law that might, for example, prohibit the sharing of data for commercial, harmful, or unlawful purposes.

346.      Defendants admit that they apply the ban to any communication of the data over the Internet, without qualification as to who could see the data or the purpose of the publication. **JE27, SOS 1-19-23 Responses to VRF Second Discovery,** RFA 3 to SOS.

347.      Sometime after the Secretary's admission in RFA 3, Defendants changed the conduct they claimed was prohibited by the ban and their theory of what the law prohibited.  Both Defendants also supported the passage of HB4 (discussed below) to address the ambiguities raised by the issues being litigated in this case. **Dworak, 186:12-16 (**"I see this as addressing an issue that- you know, obviously we're arguing over these terms, and this would clarify, to help avoid

that ambiguity, and better clarify the requirements of the statute."); **184:19-23** ("I can say, generally, this helps address the issue, and we'd be supportive of, because it helps clarify-just like dozens of other bills in the session, they help to clarify terms that are not always clear; they might be ambiguous and conflicting").[23]

348.     Still, even if this Court were to consider in isolation only the express ban on internet speech that shares voter data—that is, the amendment in House Bill 4—that, too, bans a wide swath of speech that is substantial compared to the legitimate sweep of any prohibition on the sharing of data. The new, post-House Bill 4 internet ban prohibits all speech that shares the data on the Internet, even for political and election-related reasons, for the supposed purpose of prohibiting speech that shares the data merely for commercial, harmful, or even unlawful purposes. The amount of speech that is banned is far broader than the amount of speech that could be prohibited as, perhaps, the participation in a harmful or criminal scheme.

## X.     Defendants' interpretation giving rise to the pre-HB4 Data Sharing Ban is not supported by New Mexico law and is vague.

### a.     Defendants' pre-HB4 interpretation of the law was unreasonable and intended to single out VRF.

349.     In ruling on Plaintiff's motion for a preliminary injunction last summer, this Court expressly rejected the legal theory upon which Defendants' pre-HB4 Data Sharing Ban was premised. *See* **Memorandum Opinion and Order ("Mem. Op."), Dkt. 51 dated 6/22/22 at p. 137-149** ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A)

---

[23] Defendants object to the cited testimony, claiming it is no longer relevant because "[t]he former law is no longer relevant to this litigation." Dkt. 159, at 79-80. To the contrary, this testimony concerns the "clarity" of N.M.S.A. § 1-4-5.5 and its recent amendments via HB 4 which is in turn relevant to VRF's claim that the law is vague and overbroad. Therefore, the objection is overruled. Defendants' identical objection to Dworak Depo., 186:12-186:16 is likewise overruled.

incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act. *See* May Tr. at 39:14 -23 (Serafimova).").

350.    The Court further characterized its holding as a conclusion that "New Mexico's Election Code does not prohibit Voter Reference –or any organization—from posting voter data online." ***Id.,* 151.**

351.    The Court also held that VRF's internal analysis of aggregated voter data is either a governmental or election purpose under § 1-4-5.5. ***Id.,* 150.**

352.    The Court also held that VRF's publication of voter data on the internet is for a "governmental purpose" under § 10405.5. ***Id.,* 150-51.**

> **b. Defendants advocated for an amendment to NMSA 1-4-5.5 which made New Mexico law explicitly state what Defendants claimed it already said.**

353.    House Bill 4, signed by the Governor on March 30, 2023 and chaptered as 2023 New Mexico Laws Ch. 84, amended section § 1-4-5.6 to codify the Data Sharing Ban.

354.    Effective July 1, 2023, this section 1-4-5.6(A). now reads:

> A. Unlawful use of voter data, mailing labels or special voter lists consists of:
> (1) the knowing and willful selling, loaning, providing access to or otherwise surrendering of voter data, mailing labels or special voter lists by a person for purposes prohibited by the Election Code; or
>
> (2) causing voter data, mailing labels or special voter lists or any part of the voter data, mailing label or special voter lists that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means.

NM LEGIS 84 (2023), 2023 New Mexico Laws Ch. 84 (H.B. 4),

355.    The Secretary's Office considered internet publication an improper use under the iterations of NMSA 1-4-5.5, 1-4-5.6, and 1-5-22 prior to the amendment of 1-4-5.6 in the summer of 2023. **Trial Tr., 101:24-102:4 (Vigil).** The Secretary believes that the amendment to 1-4-5.6

"really just codified and clarified an already existing position and a way of handling the data."

**Trial Tr., 102:2-4 (Vigil).**

356.    Despite believing that the law as written prior to the amendment already prohibited this conduct, both the Secretary and Attorney General advocated for the legislation "clarifying" that internet publication of voter data was an "improper use."

357.    This Court finds as a matter of fact that a reasonably prudent person would not know from the text of the statutes allegedly comprising the original Data Sharing Ban that it did in fact ban all inter-entity speech that shares the data, including internet speech.

358.    Defendants continue to hold out the threat of prosecuting VRF under the version of 1-4-5.6 in effect at the time that VRF posted the voter data on VoteRef.com.

**CONCLUSIONS OF LAW**

The voter data VRF requested from the Secretary must be made available under the NVRA's Public Disclosure Provision. Because federal law mandates that that data be made available, Defendants' restrictions on access to and use of that data are preempted by the NVRA (Count I), and the Defendants violated the NVRA by not providing the data when VRF requested it (Count II). Defendants also engaged in a pattern of retaliation against VRF because of its protected speech and viewpoint (Count III). Adding to these issues, the Data Sharing Ban and Use Restrictions violate the First Amendment and fail strict scrutiny (Count V) and are overbroad (Count VI). Additionally, the pre-HB4 Data Sharing Ban is void for vagueness (Count VII).  On these bases, the Court orders Defendants to produce the requested data to VRF on the same terms applied to other requestors and enjoins them from prosecuting VRF for its past or future posting of voter data.

Based on careful consideration of the Findings of Fact and applicable law, the Court makes the following conclusions of law:

## I.      This Court has jurisdiction over VRF's claims and venue is proper.

No party has contested this Court's jurisdiction. The Court has jurisdiction over this case pursuant to each of the following: (i) 52 U.S.C. § 20510, as Plaintiff is an "aggrieved party" under the NVRA; (ii)  42 U.S.C. § 1983, as the action is brought to remedy the deprivation of rights, privileges, or immunities secured by the Constitution; (iii) 28 U.S.C. § 1331, as the action arises under the First, Fifth, and Fourteenth Amendments to the United States Constitution; (iv) 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; and (v) 28 U.S.C. § 2202 in that it seeks to secure permanent injunctive relief.

No party has contested venue. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391(b) in that Defendants are situated within this judicial district.

## II.    VRF has standing to pursue its claims.

### a.    VRF has standing to pursue its NVRA claims (Counts I & II)

VRF has standing to bring its claims under the NVRA. Defendants do not contest VRF's standing to bring its NVRA claims.

VRF has been "aggrieved" by the Secretary's decision to not provide it with "records" covered by the NVRA's Public Disclosure Provision (52 U.S.C. § 20507(i)), a decision the Secretary made on the advice of the Attorney General and with his support. *See* 52 U.S.C. § 20510(b); **FOF ¶¶23, 82, 93**. VRF is also "aggrieved" by the State's Data Sharing Ban which, as discussed below, stands as an obstacle to the purposes of the NVRA and is preempted. *See* FAC, Count I. VRF asserts its own rights under the NVRA.

At one point in this litigation, Defendants contended that VRF failed to satisfy the pre-suit notice requirement under 52 U.S.C. § 20510(b). Defendants did not advance this argument at trial. The Court concludes that VRF complied with the NVRA's pre-suit notice requirement by sending its "Notice of Violation," **JE 18,** on May 27, 2027. **FOF ¶¶85-90.** That notice apprised the Defendants that VRF was accusing them of violating the NVRA both by impermissibly impeding the NVRA's objectives via the Data Sharing Ban, and that Defendants continued refusal to respond to VRF's voter data requests constituted additional violations. *Id.* VRF waited the requisite period before amending its complaint to include the NVRA claims. *See* 52 U.S.C. § 20510(b)(2)-(3); *see also* Dkt. 74, First Amended Complaint, filed September 26, 2022.

The Court likewise recognizes that no notice, or continuous sequence of notices repeating the same alleged violations, is required where a violation of the NVRA is ongoing and systematic.

*See Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1043 (9th Cir. 2015). Similarly, there is no need for a party to repeatedly notify a violating party of their own violation where the violating party does not intend to comply with the NVRA. *See Ass'n of Cmty. Organizations for Reform Now v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997). A requirement to the contrary would be nothing more than an exercise in futility. Because Defendants made clear their ongoing intention not to fulfill VRF's lawful requests for records made pursuant to the NVRA and their position that the records requested were not provided for by the NVRA, the Court concludes that VRF satisfied its notice obligation with the May 27, 2022 Notice of Violation, *see* **JE18**, and was not required to continue to send notices thereafter apprising Defendants that the same conduct identified as a violation of the NVRA in the May 27th Notice constituted a violation every time the Defendants repeated that same conduct.

The injury caused by the violation—the Secretary's failure to produce records subject to the NVRA's Public Disclosure Requirement based on advice of the Attorney General—can be redressed by an order from this Court requiring production of the requested records and enjoining Defendants from denying future requests based on the same pretextual excuses at issue here.

**b.  VRF has standing to pursue its First Amendment claims (Counts III & V-VII).**

Last summer, this Court determined that VRF has standing to pursue its First Amendment claims. *See* July 22, 2022, Memorandum Opinion and Order (Dkt. 51) ("Mem. Op.") at p. 159-163 (finding VRF satisfied Article III and prudential standing requirements to bring First Amendment claims). Defendants have not challenged VRF's standing to bring its First Amendment claims, and the facts and evidence presented since only reinforce the Court's prior conclusion that VRF has standing.

VRF's protected speech has been chilled by Defendants' actions. The Secretary referred VRF to the Attorney General for criminal investigation and potential prosecution. **FOF ¶¶193-**

**197, 218, 234.** The chill on VRF's speech forced it to remove the New Mexico portion of the Website. Mem. Op. at 162; **FOF ¶¶221-224**. When this Court's injunction removed that chill, VRF reposted the data, **FOF ¶¶226-230**, but removed it again after the injunction was stayed. **FOF ¶¶231-232**. VRF intends to re-engage in that speech, including re-posting voter data, if it prevails. **FOF ¶14.**

VRF's injury is fairly traceable to Defendants' conduct, including the Secretary's referral of VRF to the Attorney General, **FOF ¶¶193-197, 218, 234**, the Attorney General's ensuing investigation, **FOF ¶235**, and the continued retaliation against VRF by both Defendants, including the continued threat of prosecution for VRF's past posting, **FOF ¶234**, and Defendants' repeated refusal to provide VRF with New Mexico voter data (or, more recently, its agreement to provide some of the data but only if VRF agrees to forego its speech rights). **FOF ¶¶79-122.**

The threat of prosecution remains in effect. Defendants continue to argue that VRF cannot engage in online speech sharing voter data, and consistently refuse every chance to foreswear prosecution. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1035 (6th Cir. 2022) (discussing provision of "affidavit foreswearing prosecution" to plaintiff to mitigate its fears); *New Hampshire Right to Life Pol. Action Comm. v. Gardner*, 99 F.3d 8, 17 (1st Cir. 1996) ("[D]efendants have not only refused to disavow [the statute], but their defense of it indicates that they will some day enforce it.").[24] VRF's speech will continue to be chilled until and unless this Court grants relief.

---

[24] However, even "an attorney general's non-binding promise not to prosecute does not eliminate plaintiffs' standing" because "the Attorney General or his successors might change their mind." *Rhode Island Med. Soc. v. Whitehouse*, 66 F. Supp. 2d 288, 303 (D.R.I. 1999); *see Stenberg v. Carhart*, 530 U.S. 914, 940 (2000) ("[O]ur precedent warns against accepting as 'authoritative' an Attorney General's interpretation of state law when 'the Attorney General does not bind the state courts or local law enforcement authorities.'" (citation omitted)).

Additionally, so long as Defendants continue to endorse and enforce the Data Sharing Ban—both the pre-HB4 version and the version now enshrined in § 1-4-5.6—VRF is prohibited from engaging in speech protected by the First Amendment.

As for the prudential standing factors, VRF asserts its own rights to access voter data and to speak on the Internet using that same data, free of Defendants' retaliation, viewpoint discrimination, and burdensome restrictions. Moreover, VRF does not assert a generalized grievance; VRF itself seeks to access and post the voter data and, in fact, has posted the voter data during those periods in which it was free from fear of criminal prosecution. Yet the Defendants' combined efforts to investigate, prosecute, and retaliate against VRF violates its First Amendment rights. *See Bd. of Cnty. Commissioners of Sweetwater Cnty. v. Geringer,* 297 F.3d 1108, 1112 (10th Cir. 2002)*.* Finally, VRF's grievance falls within the zone of interests advanced by the NVRA and protected by the First Amendment. Defendants' interpretation and application of New Mexico law unlawfully denies access to voter records and unconstitutionally infringes on VRF's protected speech using that data. *See Geringer*, 297 F.3d at 1112.

Consistent with the above discussion, the Court finds that VRF has standing to bring the First Amendment and NVRA claims alleged in the FAC.

## III.    VRF prevails on its NVRA preemption (Count I) and NVRA violation (Count II) claims.

The operative question in resolving VRF's NVRA claims is whether § 20507(i) of the NVRA, which requires public disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," applies to individual, identifiable voter data, requested by VRF. The Court concludes it does. Two results flow from that conclusion. First, Defendants' Data Sharing Ban (again, this Ban includes two prongs, both the independent ban on sharing of the data, and the

affidavit or other requirements that requesters surrender their speech rights as a condition of voter

data access) are preempted by the NVRA because they constitute an unlawful obstacle to the

mechanisms by which the NVRA accomplishes its goals. Second, by refusing to fulfill VRF's

requests for voter data, the Secretary has repeatedly failed to comply with the NVRA's Public

Disclosure Provision.

> **a. Individual, identifiable voter data, including the voter list as stored in SERVIS, are "records" which must be made available under the NVRA.**

In order to resolve both of VRF's NVRA claims, the Court must first determine whether

the voter data VRF requested are "records" within the meaning of the NVRA. The Court concludes

that it is.

The NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1), requires states to

maintain for two years "all records concerning the implementation of programs and activities

conducted for the purpose of ensuring the accuracy and currency of official lists of eligible

voters[.]" The Public Disclosure Provision is designed to "ensure that election officials are

fulfilling their list maintenance duties" and ensure that the records provided thereunder are

"available to any member of the public." *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist.

LEXIS 103617, at *12 (S.D. Fla. Mar. 30, 2018). It "convey[s] Congress's intention that the public

should be monitoring the state of the voter rolls and the adequacy of election officials' list

maintenance programs. Accordingly, election officials must provide full public access to all

records related to their list maintenance activities, including their voter rolls." *Id.* at *12-13.

New Mexico's voter data, including the voter list as stored in SERVIS, are "records" within

the scope of the NVRA's Public Disclosure Provision. *See Judicial Watch, Inc. v. Lamone,* 399

F.Supp.3d 425, 439 (D. Md. 2019) (individual voter registration information "records"); *Project

Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335-36 (4th Cir. 2012) (registration applications

are "records"); *Pub. Int. Legal Found., Inc. v. Bellows*, 588 F.Supp.3d 124, 133 (D. Me. 2022)(same); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 940 (C.D. Ill. 2022) (voter list is "record"); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 723 (S.D. Miss. 2014); *Ill. Conservative Union v. Illinois*, No. 20 C 5542, 2021 U.S. Dist. LEXIS 102543, at \*5 (N.D. Ill. June 1, 2021); *Bellitto v. Snipes*, No. 16-cv-61474, 2018 U.S. Dist. LEXIS 103617, at \*13 (S.D. Fla. Mar. 30, 2018). The weight of authority on this issue heavily counsels in favor of this outcome. As Defendants' counsel admitted, no federal court in the country has adopted the position for which Defendants advocate. **Trial Tr. 20:11-17.**

The prevailing analysis on this issue is best laid out in *Long*, in which the Commonwealth of Virginia refused the request of a non-profit organization similar to VRF to produce voter registration applications. 682 F.3d at 333. On summary judgment, the district court concluded the NVRA's Public Disclosure Provision entitled the plaintiff to access. *Id*. It relied on four determinations. *Id*. First, "the process of reviewing voter registration applications is a 'program' . . . because it is carried out in the service of a specified end—maintenance of voter rolls—and it is an 'activity' because it is a particular task . . . of Virginia election employees." *Id*. at 335.

Second, "the 'program' and 'activity' of evaluating voter registration applications is 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'" *Id*. "[T]he process of reviewing voter registration applications keeps official voter lists both 'accurate'—free from error—and 'current'—most recent…By registering eligible applicants and rejecting ineligible applicants, state officials ensure that the state is keeping a 'most recent' and errorless account of which persons are qualified or entitled to vote within the state." *Id*.

Third, the Court observed that "the registration applications requested by Project Vote are clearly 'records concerning the implementation of' this 'program[ ] and activit[y].'" *Id.* at 335-

36 (quoting 42 U.S.C. § 1973gg-6(i)(1), *as amended*, 52 U.S.C. § 20507(i)(1)) (alterations in original). The applications are "'the means by which an individual provides the information necessary for [Virginia] to determine his eligibility to vote.'" *Id.* at 336 (citation omitted).

Finally, the Court observed that the Public Disclosure Provision "'very clearly requires that *all* records be disclosed.'" *Id.* at 336 (emphasis in original; citation omitted); *see* 52 U.S.C. § 20507(i)(1). It explained that "'the use of the word all [as a modifier] suggests an expansive meaning because all is a term of great breadth.'" *Id.* (quotation marks omitted) (alteration in original) (citation omitted). Moreover, it held that the phrase, "shall include," as used in § 20507(i)(1) of the NVRA, "sets 'a floor, not a ceiling'" as to the sorts of "records" that must be disclosed. *Id.* at 336-37 (citation omitted); *see also Jones v. Southpeak Interactive Corp. of De.*, 777 F.3d 658, 671 (4th Cir. 2015) ("term 'shall include' sets a floor, not a ceiling" and "[c]ourts have repeatedly indicated that 'shall include' is not equivalent to 'limited to'") (quoting *Long*, 682 F.3d at 337).

The discussion in *Long* is persuasive here and counsels in favor of disclosure. First, New Mexico's "end list maintenance activities" are "programs" under the NVRA because they are carried out in the service of a specified end—maintenance of voter rolls—and are "activities" because they are a particular task of New Mexico election employees. **FOF ¶¶50-62**. Second, as the Secretary conceded at trial, these "programs" and "activities" are carried out for the purpose of maintaining the accuracy and currency of New Mexico's voter list. *Id*.

Third, the individual, identifiable voter data produced by these various programs and activities are "records concerning the implementation of" the same. After all, the list contains the information on which New Mexico election officials rely to monitor, track, and determine voter eligibility. **FOF ¶¶57-58**. The uncontested evidence at trial established that the only meaningful

mechanism for the public to engage in oversight—that is, to determine if the Secretary is actually performing the list maintenance required of her—is to view the voter list itself. **FOF ¶¶58, 60-62.** Anything short of viewing the data in SERVIS itself would be akin to seeing the answer to a math problem without the problem itself, or the work needed to arrive at the answer.

In regard to the fourth consideration, the Court agrees with the analysis in *Long* that the use of the word "all" in § 20507(i)(1) indicates Congressional intent to cover a multitude of "records" of relevant programs and activities, including, but certainly not limited to, individual, identifiable voter data.

Thus, the voter data VRF requested falls within the category of "records" which must be made available by the State upon request pursuant to the NVRA's Public Disclosure Provision.

The Court pauses here to address a concern raised for the first time at trial by Defendants: that a finding of preemption would require the production of all data appearing within SERVIS, including Social Security numbers and full dates of birth. But, VRF has never requested that data, and until trial Defendants had never given any indication that they believed VRF had made that request. **FOF ¶15, 178-179; Trial Tr. 79:1-8.** Indeed, even at trial, Defendants did not explicitly argue that they had changed their interpretation of VRF's request to construe them to ask for Social Security numbers, full dates of birth, etc. **Trial Tr. 79:1-8; 116:2-15.** Further, VRF has never argued that Social Security numbers or voter dates of birth are necessary to its mission or that they must be produced along with other data within SERVIS. **Trial Tr. 116:16-117:17.** Nor has VRF argued that state laws restricting the production of this data to voter data requesters are preempted by the NVRA, *id.*, or that the State's Safe at Home Program is preempted. **Trial Tr. 117:18-118:1.**

For all of these reasons, the Court does not construe VRF's NVRA requests as seeking all discrete data fields available in SERVIS. The Court likewise limits the scope of this ruling to the

discrete fields of voter data that New Mexico is not explicitly prohibited from making available to requesters under New Mexico law.

### b.  The NVRA preempts the Data Sharing Ban (Count I).

Having concluded that the data requested by VRF must be made available under the NVRA, the Court must now consider the effect of that conclusion on the Defendants' Data Sharing Ban. The Court concludes that the Ban creates an unlawful obstacle to Congress's intended function of the NVRA and is thus preempted to the extent of that conflict.

### i.  The law of obstacle preemption.

Article VI, clause 2 of the Constitution provides that the laws of the United States "shall be the Supreme Law of the Land; ... any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Consistent with the Supremacy Clause, the Supreme Court of the United States has "long recognized that state laws that conflict with federal law are 'without effect.'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 75 (2008) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). The Supreme Court has summarized the situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.  Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Gade v. Nat'l Solid Wastes Mgmt. Assoc.*, 505 U.S. 88, 98, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (citations omitted).

Obstacle preemption is one form of implied preemption under the Supremacy Clause. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (preemption appropriate where

challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Pharm. Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 679 (2003) (Thomas, J., concurring) ("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated by the effect of the state law.").

Although there is generally a presumption against preemption, that presumption does not apply to Elections Clause[25] legislation such as the NVRA. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013). The Elections Clause "empowers Congress to 'make or alter' state election regulations[,]" and therefore the "assumption that Congress is reluctant to pre-empt does not hold when Congress acts" under that Clause. *Id.* at 14. *See also Harkless v. Brunner*, 545 F.3d 445, 455 (6th Cir. 2008) (The rule "that Congress must be explicit when it encroaches in areas traditionally within a state's core governmental functions [ ] does not apply when Congress acts under the Elections Clause, as it did in enacting the NVRA.") (citations omitted).

Against this background, the NVRA preempts a range of state laws. *See Inter Tribal*, 570 U.S. at 11-13 (NVRA preempts state laws requiring proof of citizenship by requiring states to "accept and use" the federal registration form); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (Georgia law limiting who can accept voter registrations was preempted by NVRA's provision regarding mailed applications); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (Ohio requirements for registration workers preempted).

Relevant to this case, obstacle preemption may also invalidate state-imposed limitations on non-profits' access to voter data. *See Judicial Watch, Inc. v. Lamone*, 399 F.Supp.3d 425, 445 (M.D. 2019). In *Lamone*, Judicial Watch, an advocacy group dedicated to "promoting

---

[25] "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators." U.S. Const. Art. I, § 4, cl. 1.

transparency, integrity, and accountability in government" requested voter records from the state of Maryland. *Id*. at 429. Judicial Watch planned to "analyze[] all responses and disseminate[] both its findings and the requested records to the American public to inform it about 'what the government is up to.'" *Id*. (citation omitted). The data included voter registration records, listing a voter's name, date of birth, address, current voter registration status, the reason for the most recent change in status, and the source of the change. *Id*. at 432. Maryland's Board of Elections denied Judicial Watch's request because state law banned access for other states' residents. *Id*. at 431-32. Judicial Watch sued, and on summary judgment, the court first held that individual, identifiable voter records are "records" subject to the NVRA's Public Disclosure Requirement, just as the Court holds here. *Id*. at 441-42. Second, it held the Maryland law "undermines Section 8(i)'s efficacy," is "an obstacle to the accomplishment of the NVRA's purposes" and is therefore preempted by the NVRA. *Id*. at 445.

> ### ii.  The Data Sharing Ban stands as an obstacle to the achievement of the NVRA's goals and is preempted to the extent of the conflict.

In this case, VRF challenges the Data Sharing Ban as an obstacle to the accomplishment of the NVRA's purposes. Defendants assert the Data Sharing Ban prohibits requesters of voter data from sharing that data on the Internet and, in turn, cite VRF's past posting on the Internet and conditional plans to post in the future[26] to justify not fulfilling *any* VRF request for voter data. But the Data Sharing Ban applied by Defendants is a pretextual interpretation of New Mexico law and exists nowhere in statute. *See* Mem. Op. at 157 ("[d]espite its appeal, however, the Court can find no statutory basis for this interpretation."). Even after New Mexico amended its law to match Defendants' pre-HB4 policy and practice, the resulting statutory ban on all speech involving voter

---

[26] VRF has repeatedly and explicitly assured Defendants and the Court that it will not post New Mexico voter data online absent a court order allowing it to do so. **FOF ¶¶89, 101, 104, 107, 152.**

data, including internet speech, violates the NVRA's unqualified right of access to certain records concerning voter list maintenance:

(i) Public disclosure of voter registration activities

(1) *Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i) (emphasis added).

Congress expressly stated the NVRA has four purposes: to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance [] the participation of eligible citizens as voters in elections for Federal office," *id.* § 20501(b)(2); "to protect the integrity of the electoral process," *id.* § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(4). Section 20507(i)(1) of the NVRA provides for the disclosure of voter registrations in order to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." *Project Vote*, 682 F.3d at 339.

The Data Sharing Ban conditions access to records available under the Public Disclosure Provision on the requestor's surrender of rights to speak with that data, or share or disseminate that data, even in instances where such speech, sharing, or dissemination furthers the purposes of the NVRA. The Court concludes that, in doing so, the Data Sharing Ban frustrates one of the NVRA's main objectives: allowing citizens to access, analyze, and discuss the data so that they

can detect and remedy errors in the maintenance of voter rolls. Blocking citizen-to-citizen speech discussing the data manifestly defeats the purpose of public access in the first place and creates an unlawful obstacle to effectuating the NVRA's mandates. Any prohibition on Internet speech that shares the voter data (including any condition on access predicated on the requestor's surrender of the First Amendment right to engage in such speech), even when that speech advances the explicit purposes of the NVRA, clearly contradicts Congress's stated objectives in the NVRA, and creates many improper obstacles to its implementation.

Of note here, organizations like VRF "have the resources and expertise that few individuals can marshal. By excluding such organizations from access to voter registrations, the State law undermines Section [20507(i)(1)'s] efficacy." *Lamone*, 399 F.Supp.3d at 445. VRF has resources that individual citizens do not: it can purchase statewide data, which typically costs thousands of dollars per state. **FOF ¶¶11, 137** (New Mexico charged VRF $5,376.71 for the data responsive to its May 2022 request). VRF also has the expertise and resources to convert the large and difficult-to-use data files produced by most states into a format that ordinary citizens can meaningfully use, and presents that complex data in an easy-to-access medium. **FOF ¶¶ 9-12**.

The NVRA's objective of empowering citizens to aid states in detecting errors in voter rolls would be entirely defeated if states could require what Defendants seems to envision: that each individual citizen wishing to analyze state data must (because he cannot obtain it from a fellow citizen sharing his interest in the voter rolls) individually invest the enormous amounts of time and money that VRF commits to obtaining and formatting statewide data. And even once that laborious undertaking is complete, the individual cannot share their analysis or conclusions if doing so involves sharing voter data itself—the very proof that would be needed to understand any such analysis and verify its outcomes.

Even if the Secretary provided free, user-friendly portals to their data and, like VRF, performed all the work formatting their entire data file, it would still be necessary for citizens to share and discuss the data with each other. Detecting error requires citizens to compare the state's official data with their own personal knowledge regarding friends, neighbors, relatives, and community events. Citizens are much more effective, and their knowledge grows exponentially, when they can share their analyses—and the underlying data—with each other. In contrast, if citizens must operate in a cone of silence, with each person limited to isolated communications with a government election administrator, they cannot effectively combine their knowledge, experience, and analysis, and will be relegated to occasionally providing their own confidential "tips" directly to a bureaucrat. This, too, defeats the objectives of the NVRA.

To the extent that HB4, the recently signed legislation amending § 1-4-5.6, codifies Defendants' Data Sharing Ban and Use Restrictions by making it unlawful to "caus[e] voter data…that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means," **FOF ¶¶353-354,** that legislation is also preempted by the NVRA for the same reasons stated above. As previously mentioned, a Maine statute with near-identical language was recently found to be preempted by the NVRA. *See Bellows*, at *3, WL 2663827 (holding "[t]he [NVRA's] Public Disclosure Provision's disclosure mandate, meanwhile does not allow a state to impose these restrictions."). In so holding, the *Bellows* court invalidated Maine's amended statute which forbid anyone to:

(1) Sell, transfer to another person or us eth voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations; or
(2) Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but

not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

*Id*. at *3.

The Court finds the analysis in *Bellows* instructive in this case and concludes § 1-4-5.6, as amended, is preempted by the NVRA.[27]

### c. Defendants violated the NVRA's Public Disclosure Provision by failing to provide the data VRF requested in February, May, and October 2022 (Count II).

As shown above, the NVRA's Public Disclosure Requirement mandates public disclosure of individual, identifiable voter information—including the voter data requested by VRF that is stored in SERVIS—as "records" "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." § 20507(i)(1). The Court concludes VRF is accordingly entitled to the voter data it requested, including the New Mexico voter list, under the plain text of the NVRA. In failing to provide that data when requested, the Secretary violated the NVRA.

#### i. VRF made three requests for New Mexico Voter data under the NVRA, all of which the Secretary initially rejected.

VRF requested the voter list and other voter data subject to disclosure under the NVRA on three separate occasions. **FOF ¶¶79-84 (Feb. 15, 2022); ¶¶85-108 (May 27, 2022); ¶¶109-122 (Oct. 18, 2022)**. As the Court has found as matters of fact, the Secretary denied each of these requests. *Id.* The Secretary had the ability and obligation to process these requests and have processed similar requests for others, but still the Secretary refused to fulfill VRF's requests.

---

[27] On the preemption issue, the amicus brief of the Department of Justice in *Bellows* is particularly instructive, as the Attorney General is charged with enforcing the NVRA. 52 U.S.C. 20510(a). In its brief the Department of Justice agreed with the district court's conclusion that Maine's "Dissemination Ban" is preempted by the NVRA. *See* Dkt. 137.

Instead, the Secretary (relying on the advice of the Attorney General) concocted various nonsensical excuses which are belied by both the facts and the law.

In doing so, the Secretary violated the NVRA and VRF is entitled to judgment as a matter of law on Count II.

### ii.   VRF's NVRA violation claim is not moot.

Though Defendants have not explicitly argued that their belated production in response to the May 27, 2022 request from VRF moots VRF's claim for an NVRA violation under Count II of the Amended Complaint, the Court must address the continuing justiciability of that claim.

"'Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction.'" *Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir.2005) (quoting *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir.1996)). "'Without a live, concrete controversy, we lack jurisdiction to consider claims no matter how meritorious.'" *Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir.2008) (quoting *Mink v. Suthers*, 482 F.3d 1244, 1253 (10th Cir.2007)).

Declaratory judgment actions must be sustainable under the same mootness criteria that apply to any other lawsuit. *See Unified Sch. Dist. No. 259, Sedgwick Cnty., Kan. v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1147 ("Actions seeking a declaratory judgment must comport with the same mootness principles as any other suit." (internal quotation marks omitted)). "It is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff." *Cox v. Phelps Dodge Corp.*, 43 F.3d 1345, 1348 (10th Cir.1994) (cleaned up) (superseded by statute on other grounds). "'The crucial question is whether granting a present determination of the issues offered will have some effect in the real

world.'" *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir.2005) (emphasis added) (quoting *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir.2000)).

Although the plaintiff bears the burden of demonstrating standing, the defendant bears the burden of proving mootness. *Adarand Constructors, Inc. v. Slater*, 528 U.S. 216, 221, 120 S.Ct. 722, 145 L.Ed.2d 650 (2000). The defendant's burden is even greater when the defendant moots the case by voluntarily ceasing its offending conduct. *See id*. Courts recognize that defendants "should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Unified Sch. Dist. No. 259*, 491 F.3d at 1149 (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n. 1, (2001)). Thus, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 190 (2000).

Voluntary cessation of unlawful conduct will not moot a case unless "it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id*. at 189. A defendant contending that a plaintiff has no cause of action because of the defendant's new behavior "must meet a 'heavy burden' of demonstrating that there is no reasonable expectation that the alleged wrongs will be repeated. *Blinder, Robinson & Co. v. SEC*, 692 F.2d 102, 106-07 (10th Cir. 1982) (quoting *W.T. Grant Co*., 345 U.S. 629, 633 (1953)). Thus, "[w]hen defendants are shown to have settled into a continuing practice ... courts will not assume that it has been abandoned without clear proof. It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when ... there is probability of resumption." *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952) (citation omitted).

In cases relating to the production of records, voluntary cessation may be triggered by an extreme delay in compliance (*Valdez v. Herrera*, 2010 WL 11465061 (D. Nm. December 21, 2010)), a clear attempt to avoid reaching the merits of a case (*Fish v. Kobach*, 309 F.Supp.3d 1048, 1097 (D. Ks. 2018)), and merely partial compliance with records requests (*Project Vote, Inc., v. Kemp*, 208 F.Supp.3d 1320, 1349 (N.D. Ga. 2016)).

The Court concludes that VRF's NVRA violation claim is not moot. First and foremost, VRF's October 18, 2022 request is still outstanding. That request sought very specific voter data subject to the NVRA. **FOF ¶109**. The Secretary has indicated she still will not produce that data. **FOF ¶118**. Thus, the Court is still left in the position to resolve the issue of whether the data included in that request is made available pursuant to the NVRA. To the extent the Secretary has "substantially complied," that is not enough to moot VRF's claim. *Kemp*, 208 F.Supp.3d at 1349.

Moreover, even if the Court were to conclude the August 30 Letter would otherwise moot VRF's NVRA Violation claim, the Court concludes the Secretary's (partial) voluntary cessation of her unlawful conduct excepts any mootness. Defendants have the burden to show their it is "clear" they will not continue the challenged conduct. *Laidlaw*, 528 U.S. at 190. Defendants' actions, however, clearly point in the opposite direction.

First, as has already been described at length, the Defendants have chosen not to take VRF at its word for over a year, even when the Court called attention to this issue. The Defendants' claimed basis for a last-minute change of position just before trial—that VRF's counsel provided qualitatively stronger assurances in June 2023 at the summary judgment hearing—is not credible as a matter of fact. It suggests that the Defendants' true motivation for the change was to moot one or more of VRF's claims. The ease with which the Defendants have toggled between legal

positions suggests that the Secretary could just as easily revert to their past practice of unlawfully and pretextually denying VRF's requests in the future.

Second, Defendants waited over a year to offer *any* voter data to VRF, rendering that particular data stale. **FOF ¶¶133-135** (no voter data provided in response to any request until August 30, 2023, over ten months since VRF's last request was made).

Third, as noted just above, the Secretary's letter came on the eve of trial—a last ditch effort to moot VRF's claims before VRF would have an ability to respond. *See Kobach*, 309 F.Supp.3d at 1097.

Fourth, Defendants state they have and will continue to provide data to VRF on the same conditions as everyone else, but this is a red herring. The Secretary has not provided VRF with access to data on the same conditions as all other requesters because no other requester has been threatened with prosecution, refused access to data for over a year, and been forced to commence litigation in order to obtain data. Finally, the Secretary's provision of data continues to depend on VRF's promise not to engage in speech sharing the data with others. Thus, VRF's injury remains.

In short, in cases where a defendant's action moots a legal claim, the Defendant has the "heavy" burden of proving the challenged conduct will not continue. *Blinder, Robinson & Co.*, 692 F.2d at 106-07. But Defendants' own actions prove otherwise. This is particularly true when it appears, as it does here, that a defendant's actions were a litigation tactic to attempt to avoid a loss on the merits. Plaintiff VRF is entitled to judgment in its favor on Count II.

### IV.   Defendants impermissibly retaliated against VRF and engaged in viewpoint discrimination because of VRF's protected speech (Count III).

Defendants retaliated against VRF as a reaction against VRF's protected speech: the sharing and discussion of voter data online for purposes of promoting election integrity and participation. This retaliation, an action that on the facts of this case is also a specific form of

viewpoint discrimination, manifested itself in two ways: (i) Defendants' refusal to deliver the voter data properly requested by VRF; and (ii) Defendants' continued threats of criminal prosecution. Consequently, Defendants chilled, and continue to chill, VRF's protected speech in violation of the First Amendment.

### a.   The law of First Amendment retaliation and viewpoint discrimination.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. CONST. amend. I. The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right. *See Pickering v. Board of Educ.*, 391 U.S. 563, 574 (1968) (noting that retaliatory acts are "a potent means of inhibiting speech"). By engaging in retaliatory acts, public officials place informal restraints on speech "allow[ing] the government to 'produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (alterations in original) (citation omitted); *see also Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions").

If an official takes adverse action against someone based on that forbidden motive, and "non-retaliatory grounds are in fact insufficient to provoke the adverse consequences," the injured person may generally seek relief by bringing a First Amendment claim. *Ibid.* (citing *Crawford-El v. Britton*, 523 U.S. 574, 593 (1998); *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 283–284 (1977)). The plaintiff must show: "(a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007).

The same principles that prohibit retaliation underlie the more general prohibition against viewpoint discrimination. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. The First Amendment prohibits the government from preferring one form of private speech over another. *See id*. Government discrimination against speech "because of its message is presumed to be unconstitutional." *Id*. "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id*. at 829. Consequently, viewpoint discrimination is a "particularly 'egregious form'" of content-based restriction. *Pahls v. Thomas*, 718 F.3d 1210, 1229 (10th Cir. 2013) (quoting Rosenberger, 515 U.S. at 829). Additionally, once a state agrees to make its voter data publicly available—or whereas here, federal law requires data be made publicly available—the state may not condition access to that data based on the requestor's viewpoint. *See Sorrell*, 564 U.S. at 574; *Fusaro*, 930 F.3d at 256.

To succeed on a viewpoint discrimination claim, a plaintiff must show that the defendant "acted with a viewpoint discriminatory purpose." *Pahls*, 718 F.3d at 1230. More specifically, a plaintiff must show: (i) defendants' actions caused viewpoint discrimination; and (ii) that defendants' actions were taken because of, not merely in spite of, plaintiff's views. *Id.* at 1230-31.

As discussed below, Defendants' decision to criminally refer VRF for prosecution and to investigate that theory of violation, and their decision to deny VRF access to voter data, was precisely because of VRF's speech, and in particular because Defendants viewed VRF as engaging in misinformation. Defendants had no legal basis to prosecute VRF or to deny access to voter data as the law existed before the amendment of HB4, and even after HB4, cannot deny VRF equal access to data.

### b.  VRF engaged in constitutionally protected activity by sharing New Mexico voter data online for election integrity purposes.

VRF's speech sharing New Mexico voter data online, **FOF ¶187**, and disseminating a press release that was critical of the Secretary's list maintenance efforts, **FOF ¶¶188-191.**, are both protected by the First Amendment.

Speech about and including voter data, including individually identifiable data, is protected:

> … three important considerations compel our conclusion that § 3-506 implicates interests that are protected by the First Amendment. First, the List is closely tied to political speech, which generally receives the strongest First Amendment protection… the List is a valuable tool for political speech… And, in addition to the List's obvious practical utility to political expression, § 3-506 all but ensures that the List will be used to further such speech. More specifically, § 3-506(c) makes it a misdemeanor to use the list 'for any purpose not related to the electoral process.' Thus, the text of § 3-506 reinforces the connection between the List and political speech. In these circumstances, we are obliged to hesitate before placing such a regulation beyond judicial scrutiny…"

*Fusaro v. Cogan*, 930 F.3d 241, 250 (4th Cir. 2019) (citations omitted)

Here, VRF's Website itself, including the voter data on the Website, was and is core political speech. *See Meyer*, 486 U.S. at 421 (any effort to seek "political change," even if it does not involve overtly persuading a citizen that one's views are correct, is core political speech). The State's complete ban on sharing voter data silences core political speech by banning the sharing of the underlying data necessary to effectively engage in that speech. *See id*. at 424 (striking down Colorado's ban on payments to petition circulators because even though it did not eliminate every avenue of communication, it banned the most effective means of speech, and "the First Amendment protects appellees' right not only to advocate their cause, but also to select what they believe to be the most effective means for so doing.").

Speech sharing information about the voting history of New Mexico voters, particularly when used in the manner contemplated by VRF, sits at the zenith of First Amendment protection. *See Fusaro*, 930 F.3d at 250. Discussions regarding voting, elections, electoral processes, and election integrity are issues in which the public does and should have a high level of interest. Compare *Meyer*, 486 U.S. at 421 (protection was at its "zenith" for speech regarding trucking deregulation).

Additionally, it is beyond debate that a speaker's speech or dissemination of written material criticizing the government is protected by the First Amendment. "Expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown,* 447 U.S. 455, 467, (1980)). The strongest protection of the First Amendment's free speech guarantee goes to the right to criticize government or advocate change in governmental policy. "[E]xpression of dissatisfaction with the policies of this country [is] situated at the core of our First Amendment values." *Texas v. Johnson,* 491 U.S. 397, 411 (1989). Criticism of official policy or action is the kind of speech that a state would be most keen to suppress.

For all of these reasons, as a matter of law, VRF's speech using the data enjoys strong First Amendment protection.

### c.  Defendants' retaliatory actions chilled VRF's speech.

Defendant's actions have caused VRF to suffer a real and substantial injury which has chilled VRF's constitutionally protected speech. Most notably, VRF was forced to stop disseminating New Mexico voter information for fear of prosecution and to seek judicial protection. **FOF ¶¶221-224.** Defendants' adverse actions in this case take two forms: threatening VRF with prosecution for its Constitutionally protected speech and refusing to fulfill VRF's lawful requests for voter data.

### i. Threat of prosecution.

After VRF posted New Mexico voter data on its website and issued a news release announcing the results of its analysis and finding a potential discrepancy in the data, the Secretary was contacted by a reporter from ProPublica. **FOF ¶¶194, 205.** In communications with that reporter, the Secretary repeatedly stated VRF was spreading misinformation. **FOF ¶¶206-215.** The Secretary also accused VRF of attempting to "impugn the integrity of [New Mexico's] voter rolls. **FOF ¶¶211, 219.** The Secretary wanted to "push back hard" against VRF's protected speech because it deemed that speech was misinformation. **FOF ¶242.** The Secretary's Press Director even stated it is the Secretary's *mission* to "push back hard" against misinformation. *Id.* The Secretary also associated VRF with what it perceives as a "larger strategy of election denialism." **FOF ¶243.**

In response to VRF's speech, the Secretary sent a letter to the Attorney General referring VRF for prosecution. **FOF ¶¶193-202.** In the referral, the Secretary states the referral is based on VRF's posting of voter data online and the Secretary's belief that doing so violated the New Mexico election code. **FOF ¶200.** This Court has already recognized that the Election Code (before the passage of HB4) did not actually prohibit VRF's speech. Mem. Op. at 143, 152, 154. Nevertheless, the AG has refused to state it will not prosecute VRF for VRF's past conduct under this faulty and pretextual interpretation of the election code. **FOF ¶22.** In fact, the AG has engaged with other law enforcement agencies and attorneys general regarding investigating and prosecuting VRF. **FOF ¶¶236-237.**

Defendants' threat of prosecution is indisputable. The fact that this threat was made in direct response to VRF's protected speech is amply established by the factual record, including the Defendants' own statements. Defendants' motive is also clear: to produce a result which it could not command directly, in violation of the First Amendment. This threat of prosecution is

real and substantial and has caused VRF to cease its First Amendment-protected speech for fear of being prosecuted. **FOF ¶¶221-224.**

Even though the Court rejects the merits of the underlying legal arguments under which Defendants threatened VRF, threatening a speaker with prosecution is one of the strongest and clearest ways in which an enforcement agency can silence that speaker. VRF acted reasonably in taking the Defendants at their word that they believed VRF broke New Mexico law and were investigating it for that reason. It was reasonable for VRF to refrain from continuing to engage in what it believed to be protected speech after being faced with such threats.

### ii.   Refusing to fulfill VRF's lawful requests.

VRF made three separate requests for New Mexico voter data. **FOF ¶¶79-84 (Feb. 15, 2022); ¶¶85-108 (May 27, 2022); ¶¶109-122 (Oct. 18, 2022)**. The Secretary refused to fulfill the October 18 request, **FOF ¶¶109-122,** and refused to respond at all to the February 15 request. **FOF ¶¶79-84.** ████████████████████████████████████ **FOF ¶¶81** (advice regarding February 2022 request)**; 93** (advice regarding May 2022 request) **122** (advice regarding October 2022 request). For over 15 months, the Secretary also refused to fulfill the May 27th request, but finally agreed to do so after the Court noted at the summary judgment hearing in this matter that her continued failure to respond constituted further and ongoing viewpoint discrimination. **FOF ¶¶133-134.**

Defendants freely and repeatedly admitted that their decisions not to fulfill VRF's voter data requests—as required by New Mexico law and the NVRA— was directly motivated by VRF's protected speech, the prior posting online:

> To begin with this decision [to not fulfill VRF's requests for data] is motivated by the fact that will post any voter data provided on your website[.] You have not indicated that you will not post any voter data online, and based on our past practice, we believe you will do so again.
> [. . .]

> Therefore, due to . . . your past practice of posting this data online, . . . our office is unable to process your request at this time.

**JE20**. Defendants reiterated this point at trial in an attempt to justify their actions. The Secretary also holds it against VRF that it again posted New Mexico voter data on VoteRef.com after this Court granted a preliminary injunction allowing it to do so. **FOF ¶120.**

Even after VRF promised repeatedly for over a year that it would not publish New Mexico voter data online absent a court order allowing it to do so, **FOF ¶¶89, 101, 104, 107, 152,** Defendants claim they chose not to believe VRF and continued to withhold voter data from it for at least 15 months. This change of position occurred only after the Court noted that Defendants position appeared to be a "forever ban" on VRF's receipt of voter data.

Defendants continue to contend that VRF's protected speech, publishing New Mexico voter data on its website, violated the pre-HB4 version of state law. **FOF ¶202** (Secretary stood by referral at trial). This Court has already concluded, to the contrary, that New Mexico's election code did not prohibit VRF's use and publication of voter data, Mem. Op. at 143; 152; 154, and that the Secretary and AG worked together to create a solely pretextual restriction that would deny VRF access to voter data. *Id.* at 183-4. This has not stopped Defendants from concocting new interpretations of the Elections Code to single out VRF, as they now contend that VRF must have maintained a certain level of "control" over the data it received. **FOF ¶268.** This is yet another interpretation that has no basis in the text of New Mexico law.

It is indisputable that, with one exception just before the trial, the Secretary has refused to give VRF access to new, up to date voter data. On the one occasion the Secretary did provide the requested data, she did so after this litigation had nearly run its course.

### d. Defendants retaliated and discriminated against VRF because it disagreed with VRF's protected speech and viewpoint.

#### i. Defendants' repeated claims that VRF spread "misinformation."

The most transparent evidence of Defendants' viewpoint discrimination is their insistence that their actions towards VRF were justified because VRF was engaging in "misinformation." But it is clear from the evidence in this case that "misinformation" as used by Defendants does not mean fraud or deceit. Rather, it simply means that Defendants disagree with what VRF was saying. Particularly, Defendants disagreed with VRF's position that there was a discrepancy in New Mexico's voter data and VRF's position that the Secretary was not adequately maintaining the rolls. **FOF ¶¶ 192, 206-207, 215, 220, 240-251.**

If the First Amendment means anything, it must mean that the State cannot regulate speakers based on the State's preference or disdain for the views which the speaker espouses. Discrimination against speech *because of* its message is presumptively unconstitutional. *See Rosenberger*, 515 U.S. at 828. And here, it is precisely the content of the message—the identification of a discrepancy and the perceived affront to the Secretary's list maintenance efforts—that Defendants continue to pursue VRF in the name of quashing "misinformation."

#### ii. Defendants' refusal to produce voter data to VRF was because of, not in spite of, VRF's views.

As previously established, VRF made multiple lawful requests for voter data. **FOF ¶¶79-84 (Feb. 15, 2022); ¶¶85-108 (May 27, 2022); ¶¶109-122 (Oct. 18, 2022).** The Secretary repeatedly refused to fulfill those requests on advice of the Attorney General, **FOF ¶¶81, 93, 122,** and only provided data in response to one of the three requests after over a year of litigation before this Court. **FOF ¶¶133-136.** The Secretary has admitted multiple times its refusal is based on VRF's protected speech. **JE 20; FOF ¶¶112, 120, 142.** VRF has a right to the data under the

NVRA. *See* 52 U.S.C. § 20507(i). But even if this Court were to not recognize this right under the NVRA, VRF still maintains the right under New Mexico state law, *see* NMSA § 1-4-5.5(A), and once a State agrees to make its data publicly available, the State may not condition access to that data based on the requestor's viewpoint. *See Sorrell*, 564 U.S. at 574; *Fusaro*, 930 F.3d at 256.

Here, as this Court already found, the Secretary conditioned its decision not to respond to or fulfill VRF's requests on VRF's viewpoint—specifically the "misinformation" of a discrepancy existing in the data. Mem. Op. at 180-82. In an attempt to fashion a non-discriminatory reason for its refusal to fulfill VRF's requests, the Secretary argues VRF's use of the data violated New Mexico law. **JE5**. This attempt fails.

This Court has already concluded VRF's use of the data does not violate the Election Code (at least, pre-HB 4) and, as already analyzed above, Defendants cannot even bring themselves to articulate a single, coherent theory of the violation under the old law. Additionally, even if this Court were to entertain Defendants' pretextual interpretation of the Election Code, Defendants' animus still shows through in that even after VRF repeatedly promised not to post the data—thus curing any purported violation of the old or post-amendment election code—the Secretary still refused to fulfill the data requests. **FOF ¶¶89, 101, 104, 107, 152.** Importantly, this Court concluded in 2022: "the Secretary of State's indication that it will not honor Voter Reference's May 27, 2022, request, despite Voter Reference's assurances that it will not publish voter's personal information without a Court order, constitutes impermissible viewpoint discrimination." Mem. Op. at 180-81.

The Defendants' actions were retaliatory and discriminatory in that VRF could not obtain data to which it is legally entitled because of its viewpoint. This is not a case where the government

accidentally causes discrimination. The evidence, including the Secretary's own statements, prove Defendants acted solely *because of* VRF's views. This Court already concluded as much:

> [T]o the extent the Plaintiffs challenge the Secretary of State's lack of response to Voter Reference's request for voter data, the Plaintiffs likely are to succeed on their viewpoint discrimination claim. The Secretary of State's actions caused viewpoint discrimination. . . . [O]nce the State agrees to make its data publicly available, the State may not condition access to that data based on the requestor's viewpoint. . . . The Secretary of State has conditioned its decision not to respond to Voter Reference's data request on Voter Reference's viewpoint -- specifically, the fear that giving the data to Voter Reference may reveal that the Secretary of State is lax about maintaining the State's voter data.

Mem. Op. at 180. This, in turn, leaves only one conclusion: the Secretary's refusals were solely based on her animus towards VRF's viewpoint, specifically, the viewpoint that the Secretary's data is flawed or that citizen oversight is needed. There is no rational explanation for the Secretary's refusal absent this discriminatory purpose.

### iii.   The Secretary's referral of VRF to the Attorney General, and the Attorney General's ensuing investigation, was because of, not in spite of, VRF's views.

Similarly, the Secretary engaged in retaliation and discrimination by referring VRF to the Attorney General for investigation and potential prosecution. The Secretary was motivated to make the initial referral by a view that VRF's public statements about the data were misinformation, and that if VRF was not prosecuted, it would foster additional misinformation. The criminal referral itself asserted the theory that "[w]e do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign purposes.'" **JE5; FOF ¶215, 312.**

Here, the facts show that the Secretary initially referred the matter to the Attorney General because of a disagreement with what the Secretary claimed was VRF's "misinformation" about

her operation of the state's voter data system. **FOF ¶¶ 192, 206-207, 215, 220, 240-251.** Further, the AG, with knowledge of the Secretary's motivation, then proceeded to investigate VRF for violation of the Data Sharing Ban and Use Restrictions. **FOF ¶235.** It did this even though, as this Court has already concluded, the statutes cited by Defendants do not support either restriction. Mem. Op. at 137-154. Tellingly, VRF is the only entity that had ever been accused or investigated for a criminal violation under the Data Sharing Ban, even though numerous commercial entities that may well sell voter data continually and consistently request the state's voter data. *Id.*

Additionally, as the Court has already found, the Attorney General lacked probable cause for any finding that VRF had violated New Mexico law—as it existed before HB4—by receiving voter data or by sharing it online. *See* Mem. Op. at 137; *id.* at 148 ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act…"); *id.* at 153 ("…New Mexico's Election Code does not address whether voter data can be made "accessible by the general public on the Internet or through other means…"). The plain text of New Mexico's election law simply did not prohibit the sharing of data so long as it was for election, campaign, or governmental purposes, and it did not prohibit the sharing of the data on the internet.

In sum, Defendants' motivation for the referral was because of, not merely in spite of, VRF's views. Mem. Op. at 182. Defendants' version of events requires drawing numerous tenuous inferences from evidence that, on its face, supports a different conclusion. *See* Mem. Op. at 183-84. ("[T]he extant evidence suggests that the Secretary of State caused viewpoint discrimination by referring Voter Reference and Local Labs for investigation. . . . Moreover, the evidence suggests that the referral was because of, not merely in spite of, Voter Reference's views.").

Defendants engaged in impermissible retaliation and viewpoint discrimination against VRF and VRF is entitled to relief to both redress the past discrimination and enjoin any future discrimination against it.

> **e.   Defendants' retaliatory acts were substantially, if not entirely, an adverse response to VRF's protected speech and Defendants' disdain for that speech.**

Defendants' admissions, and the only plausible construction of the facts in this case, compel this Court to conclude that Defendants threatened VRF with prosecution and refused to fulfill VRF's requests for voter data because of VRF's engagement in First Amendment-protected speech and because of VRF's viewpoint, and that they will continue to do so absent VRF's promise to silence itself. This Court has already recognized as much at the preliminary injunction stage. *See* Mem. Op. at 180. Defendants' refusal to comply with the law has caused substantial injury to VRF. VRF cannot continue its protected speech without new and up-to-date data from the Secretary.

For the reasons stated herein, this Court concludes that Defendants impermissibly retaliated and discriminated against VRF for its viewpoint and speech in violation of the First Amendment.

## V.   The Data Sharing Ban severely burdens VRF's First Amendment protected speech and cannot survive strict scrutiny (Count V).

Once it is established that VRF has a right to access New Mexico voter data, including its voter list, under the NVRA, the pivotal question is this: how does the First Amendment protect VRF's speech when it shares that data with those who choose to associate with VRF for election and election integrity related activities by accepting the terms and conditions of its website?

VRF argued, and Defendants admitted, that the regulations at issue are direct restrictions on speech protected by the First Amendment. *See* Def.'s Response to Mtn. for Prel. Inj. [Dkt. 13]

at p. 8. Because the Data Sharing Ban and Use Restrictions are direct restrictions on core political speech, they are subject to strict scrutiny. They fail that test.

At minimum, as shown below, the First Amendment protects VRF from (1) unreasonable burdens on core political speech regarding elections; (2) from unconstitutional conditions on VRF's rights; and (3) content-based restrictions on its access to data and speech that shares the data. [28] The Use Restrictions and Data Sharing Ban fail strict scrutiny through all three lenses.

### a.   The law regarding the First Amendment.

The First Amendment commands, "Congress shall make no law [. . .] abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The speech and petition protections of the First Amendment have been incorporated against the states. *See Gitlow v. New York*, 268 U.S. 652 (1925). The First Amendment safeguards speech and the dissemination of information on the Internet with the same vigor as the writings in a newspaper or a speaker in the town square. *See Reno v. ACLU,* 521 U.S. 844, 868 (1997); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) (citing *Bartnicki v. Vopper,* 532 U.S. 514, 527, (2001) ("[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category, as distinct from the category of expressive conduct.").

"The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983), and "[t]he First Amendment reflects 'a profound

---

[28] VRF is also protected, of course, from regulations that are overbroad (Part VI) and vague (Part VII), and from viewpoint discrimination and retaliation (Part IV).

national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation omitted).

The Constitution protects both speaker and listener, as the ability to receive information is also a fundamental First Amendment right. *See Martin v. City of Struthers, Ohio,* 319 U.S. 141, 143, (1943) (First Amendment "embraces the right to distribute literature, and necessarily protects the right to receive it."). Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957).

A state may violate the protections of the First Amendment in many ways, *e.g., Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819 (1995); *Keller v. State Bar of Cal.,* 496 U.S. 1 (1990), but a law imposing criminal penalties on protected speech is a stark example of speech suppression.

**b. VRF need not show a right to access New Mexico voter data under the First Amendment, as its right of access is derived from the NVRA.**

The Court addresses one threshold matter before taking up VRF's First Amendment claims: whether a challenge to state restrictions on private citizens' First Amendment *right to use* voter data requires the plaintiff to first prove a generalized First Amendment *right to access* that data. The answer is no.

As addressed above, the NVRA's Public Disclosure Provision requires the state of New Mexico to make its voter list available, especially for the types of tasks performed by VRF and users of the Website. *See* Section III(a). Because the NVRA requires that voter data, including the voter list, be made available, VRF need not establish an independent right to access that information under the First Amendment. Once a state is required by federal law to make certain information, data, or records available to the public, the First Amendment limits how the state may

restrict the public's subsequent use and sharing of that information, and also prevents the state from conditioning access in a manner which would violate the First Amendment. *See* Mem. Op. at p. 176 ("The Fourth Circuit also notes that, once a State chooses to provide a process allowing for the right to access voter information, there are 'limits to its freedom to decide how that benefit will be distributed.' *Fusaro v. Cogan*, 930 F.3d at 256 (quoting *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. at 43 (Ginsburg, J., concurring))).

Thus, even if a state could permissibly refuse to withhold *all* voter data,[29] once the state does or is required to make the information available, it must comply in all respects with the First Amendment protections afforded to the use and dissemination of that information. *See Fusaro*, 930 F.3d at 255–56 ("Thus, Maryland could have decided not to release its voter registration list without violating the First Amendment… But when the Maryland legislature decided to make the List publicly available, it could not condition access to the List on any basis whatsoever….") (internal citations and quotations omitted). *See also Meyer v. Grant*, 486 U.S. 414, 425 (1988) (the state's power to ban initiative petitions entirely does not imply a power to burden initiative petition speech once it has allowed the initiative process). Following *Fusaro* and *Meyer*, then, this Court need not resolve whether VRF has a *First Amendment* right to access voter data; it need only recognize VRF's statutory right under the NVRA (52 U.S.C. §20507(i)) and NMSA § 1-4-5.5.

---

[29] *See Los Angeles Police Dep't*, 528 U.S. at 40 ("This is not a case in which the government is prohibiting a speaker from conveying information that the speaker already possesses…California could decide not to give out arrestee information at all without violating the First Amendment.")

**c. VRF's speech sharing the data receives heightened First Amendment protection for three independent reasons.**

**i. Speech about and including voter data, particularly when used by the public to police the voter rolls and evaluate the state's efforts in doing the same, is protected by the First Amendment.**

Speech about and including voter data, including individually identifiable data, is protected. As the *Fusaro* court noted:

> … three important considerations compel our conclusion that § 3-506 implicates interests that are protected by the First Amendment. First, the List is closely tied to political speech, which generally receives the strongest First Amendment protection… the List is a valuable tool for political speech… And, in addition to the List's obvious practical utility to political expression, § 3-506 all but ensures that the List will be used to further such speech. More specifically, § 3-506(c) makes it a misdemeanor to use the list 'for any purpose not related to the electoral process.' Thus, the text of § 3-506 reinforces the connection between the List and political speech. In these circumstances, we are obliged to hesitate before placing such a regulation beyond judicial scrutiny…"

*Id.*, 930 F.3d at 250 (citations omitted).

The Website itself, including the voter data on the Website, was and is core political speech. *See Meyer*, 486 U.S. at 421 (any effort to seek "political change," even if it does not involve overtly persuading a citizen that one's views are correct, is core political speech). The State's complete ban on sharing voter data silences core political speech by banning the sharing of the underlying data necessary to effectively engage in that speech. *See id.* at 424 (striking down Colorado's ban on payments to petition circulators because even though it did not eliminate every avenue of communication, it banned the most effective means of speech, and "the First Amendment protects appellees' right not only to advocate their cause, but also to select what they believe to be the most effective means for so doing.").

Speech sharing information about the voting history of New Mexico voters, particularly when used in the manner contemplated by VRF, sits at the zenith of First Amendment protection.

*See Fusaro*, 930 F.3d at 250. Discussions regarding voting, elections, electoral processes, and election integrity are issues in which the public does and should have a high level of interest. Compare *Meyer*, 486 U.S. at 421 (protection was at its "zenith" for speech regarding trucking deregulation).

New Mexico routinely makes voter data available to political parties and campaigns for inherently political means and even conditions access to the voter data, in part, on the data being used for election and election campaign purposes—necessarily political objectives. *See* N.M.S.A § 1-4-5.5 (limiting use of voter data to governmental, election, and election campaign purposes); § 1-5-14 (requiring Secretary to provide updated voter file or file maintenance report to state and county chairs of qualified political parties). Because voter data cannot be divorced from its wholly political nature, the dissemination of that data is protected under the First Amendment. Until Defendants' threats, VRF posted voter data on the Website along with commentary regarding how ordinary citizens can use and review the data and a call to action for citizens to contact state officers charged with maintaining the voter rolls if errors were identified. **FOF ¶181.**

The Use Restrictions and Data Sharing Ban make it more difficult, more expensive, and essentially impossible for VRF to disseminate meaningful information regarding New Mexico's elections, including the State's efforts and success in maintaining accurate and up to date voter rolls. They also impose massive costs on individuals who are not affiliated with a political party or candidate or ballot measure campaign, and therefore cannot receive that campaigns' access to the data. **FOF ¶138** (VRF charged more than $5,000 for voter data it requested); **¶274** (sharing outside of political party or campaign limited by law).

Due to the volume of voter information which VRF wishes to share—including data on millions of voters—it is virtually impossible to distribute through non-Internet means. Further, it

is the very accessibility of the data on the Internet that draws interested listeners and political associates to VRF's speech and motivates them to engage in their own speech. Having the data accessible on the Internet also sends its own message: that this is the public's data, and that it is and should be transparent. VRF argues that it hopes that thousands or even millions of concerned citizens who share its interest in election transparency, participation, and integrity will view, analyze, and discuss the data. VRF's plan is to crowd-source the analysis of the data, so that interested citizens can associate with VRF and with each other to analyze and engage in political speech regarding the data. **FOF ¶311.** Yet the Defendants state that it is precisely the use of the Internet to bring the data to ordinary citizens and to facilitate speech among non-campaign-insiders that renders VRF's use and sharing unlawful.

Thus, in criminalizing the dissemination of voter data, including via the Internet, the Use Restrictions and Data Sharing Ban do not leave open ample, comparable, and effective alternative channels for communication. The Use Restrictions and Data Sharing Ban also infringe on and abridge VRF's speech by limiting the size of the audience that can be reached, as Defendants threaten prosecution based on the theory that dissemination to the "general public" is unlawful.

> ii. **The Data Sharing Ban violates the First Amendment because it unconstitutionally conditions access to voter data on the surrender of First Amendment rights.**

The Data Sharing Ban is further constitutionally infirm because, as applied by Defendants, access to voter data that would otherwise be made publicly available is conditioned on the requestor's surrender of First Amendment rights, including specifically the right to share information on the Internet. The Use Restriction suffers from the same infirmity to the extent that Defendants deny access to otherwise available voter data because they believe VRF will engage in spreading misinformation, that is, speech with which Defendants disagree.

117

Under the "unconstitutional conditions doctrine," "the government may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech[.]" *United States v. American Library Assn., Inc*., 539 U.S. 194, 210 (2003) (cleaned up). Here, citizens' ability to view and then engage in speech that shares the data in the voter rolls is an essential First Amendment right. Speech among citizens that shares data about who has voted, when, and where—the information at issue here—sits at this "highest rung" and is entitled to special protection. *Connick*, 461 U.S. at 145. As explained above, the NVRA requires that states make this data available. *See* 52 U.S.C. § 20507(i)(1).

The NVRA's treatment of voter lists as records that must be available to the public advances the First Amendment rights of requesters who wish to use the records for election purposes and to petition their government to undertake steps to maintain accurate voter rolls. That is because such lists are not simply collections of data, compiled for commercial or administrative use. Rather, voter lists are inherently political and are a tool for political speech and association. *See Fusaro,* 930 F.3d 241, 251 (4th Cir. 2019); *see also Green Party of N.Y. v. N.Y. State Bd. of Elections*, 389 F.3d 411, 420 (2d Cir. 2004) (recognizing that political parties use voter registration lists for "activities essential to their exercise of First Amendment rights"). Indeed, the Secretary's form contemplates that the data will be used for activities of which the First Amendment is most protective, including campaigning, elections, and evaluating the functioning of the government.

VRF desires, and has attempted, to exercise its benefit of access to New Mexico voter data, a benefit guaranteed by the NVRA and state law. No state, including New Mexico, can impair or withhold that benefit by conditioning it on recipients' surrender of their First Amendment-protected rights to engage in speech with their fellow citizens in which the data is shared for permissible and protected purposes. That surrender particularly stings here, where the very purpose

118

of the data-sharing speech is to enable citizens to petition the government to ensure that the voter rolls are accurate and that elections are being properly and securely run—a goal that, in turn, will increase confidence and participation in elections.

The Supreme Court has specifically recognized that states cannot condition a First Amendment right "on acceptance of a content-based rule that is not drawn to serve the State's asserted interest." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 574 (2011). In *Sorrell*, the Court considered a Vermont law that imposed content-and-speaker based restrictions on the sale, disclosure, and use of prescriber-identifying information. *Id.* at 563-64. The Court concluded that the First Amendment protected this speech and that because the law "is designed to impose a specific, content-based burden on protected expression . . . [i]t follows that heightened judicial scrutiny is warranted." *Id.* at 565; *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 658 (1994) (strict scrutiny applies to regulations reflecting "aversion" to "disfavored speakers"). Similarly, the Fourth Circuit notes that, once a state chooses to provide a process allowing for the right to access voter information, there are "'limits to its freedom to decide how that benefit will be distributed.'" *Fusaro v. Cogan*, 930 F.3d at 256 (quoting *Los Angeles Police Dep't.*, 528 U.S. at 43 (Ginsburg, J., concurring)). More specifically, once a state chooses to provide access to certain information, it can control the manner in which it does so, but only subject to content and viewpoint-based restrictions. *See Fusaro*, 930 F.3d at 256-57.

As in *Sorrell*, Defendants have instituted an unconstitutional catch-22 in which a requester must decide which to give up: the records to which he is entitled, or his constitutional right to speak and associate with his fellow citizens about those very records to ensure that the system that generated them is fair and accurate, and, perhaps, to provide criticism if they are not. The Data Sharing Ban and Use Restrictions are extreme versions of the *Sorrell* restriction that apply not only

to commercial use, but any use that *fails to ensure* that there is no commercial or otherwise unlawful use downstream. New Mexico cannot condition access to statutorily available government records by requiring requestors to agree to refrain from exercising their First Amendment rights. The First Amendment does not tolerate such a high price tag.

### iii. The Use Restrictions discriminate against VRF based on the content of its speech.

The Use Restrictions, as codified in § 1-4-5.5, only allow speech involving and using voter data if that speech is for very limited uses: governmental or election campaign purposes. Defendants construe the former to mean use by the government only, never private actors. They construe the latter to be limited primarily to political parties and candidates. And they read out the third category of permissible use—election related—entirely, claiming that election and election campaign are really synonymous. These interpretations, which defy the text and definitions of the statutes themselves, appear to be further attempts to single out VRF rather than genuine, reasonable legal interpretations.

Alarmingly, speech which would otherwise be permissible becomes unlawful when the State deems that speech to cross the threshold into "misinformation." **Trial Tr. 113:9-13;** *see also* ***id.*** **at 141:16-142:3** (noting Court's observation that Defendants' position is that posting is not for governmental purpose if it can mislead viewers). As addressed above, however, when Defendants use the term "misinformation," they are referring to speech with which they disagree. Using the "misinformation" label to delineate between permissible and impermissible uses causes viewpoint-based discrimination dressed as content-based discrimination.

### d.   The Use Restrictions and Data Sharing Ban cannot survive strict scrutiny.

Because the Data Sharing Ban and Use Restrictions directly restrict constitutionally protected, core political speech, they cannot stand unless they survive strict scrutiny. Neither pass muster.

### i.   The Court will apply strict scrutiny.

The Court must apply strict scrutiny to the Data Sharing Ban and Use Restrictions because they (1) substantially burden core political speech; (2) are unconstitutional conditions; and (3) are based on the identity of the speaker and the use for which the speaker puts the voter data.

> [P]olitical speech must prevail against laws that would suppress it, whether by design or inadvertence. **Laws that burden political speech are subject to strict scrutiny**, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest…**Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints**. Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others."
>
> **Speech restrictions based on the identity of the speaker are all too often simply a means to control content**. Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. **By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice**. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.

*Citizens United v. FEC*, 558 U.S. 310, 340-41 (2010) (internal quotations and citations omitted) (emphasis added). *See also Meyer*, 486 U.S. at 425 (where the state imposes a substantial burden on core political speech, courts apply scrutiny that is "well nigh insurmountable").

### ii.  The Data Sharing Ban and Use Restrictions fail strict scrutiny.

#### 1.  Defendants were required to, but did not, demonstrate that the regulations further a compelling state interest and are narrowly tailored towards that interest.

Under strict scrutiny, the burden shifts to the defendant to demonstrate that the regulations at issue further a compelling state interest and are narrowly tailored. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 774–75 (2002); *Griffin v. Bryant*, 30 F. Supp. 3d 1139, 1189 (D.N.M. 2014) (Browning, J.) ("Strict scrutiny places the burden on the government to identify a compelling interest…and show that the restriction is the least restrictive alternative for achieving that interest…"). In the First Amendment context, the challenged restrictions are not given the ordinary presumption of constitutionality. *See Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo.*, 744 F.2d 739, 746 (10th Cir. 1984)

#### 2.  The asserted interests which Defendants claim justify the Data Sharing Ban and Use Restrictions are not "compelling."

The State must demonstrate that the restrictions at issue serve compelling interests. An interest is only compelling if it addresses an actual concrete problem—"[m]ere speculation of harm does not constitute a compelling state interest." *Consol. Edison Co. of New York, Inc. v. Pub. Serv. Comm'n of New York,* 447 U.S. 530, 543 (1980); *see also Turner Broadcasting Sys., Inc.,* 512 U.S. at 644 (plurality) ("[The government] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."). An interest aimed at suppressing particular ideas is never a "compelling" interest. *See Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("…[i]nfringements on that right may be justified by regulations adopted to serve compelling state interests, *unrelated to the suppression of ideas*, that cannot be achieved through means significantly less restrictive of associational freedoms.") (emphasis added).

Defendants did not meet this burden.

Defendants identified four interests which they claim justify the restrictions imposed by the Use Restrictions and the Data Sharing Ban:

1. They ensure that only individuals who sign the requisite affidavit and, therefore, are made explicitly aware of the permissible uses of New Mexico voter data, have access to such data;
2. They ensure payment of reasonable fees for the production of voter data, which fees subsidize the mandatory voter registration system;
3. They encourage voter registration by ensuring voters that their voter data will only be disclosed on a need-to-know basis and under penalty of perjury, thereby fostering trust in the registration system by protecting registered voters from unwanted solicitations, harassment, and abuse; and,
4. Because voter data produced at any single moment represents a "snapshot" of the voter files as of that moment, whereas voter files may change in the future, thereby rendering the produced voter data no longer accurate, disseminating voter data may lead to disinformation, which would further erode voter confidence in the voter registration system.

*See* Def.'s Response to Mtn. for Prel. Inj. [Dkt. 13] at pp. 11-12. In the summer of 2022, the Court examined each of these purported justifications for the challenged restrictions and held that they were not compelling. *See* Mem. Op. at 191 (applying strict scrutiny to prior restraint claim).

Despite having another year to adduce new evidence, Defendants produced nothing that warrants a different conclusion.

As to the first stated interest, the Court concludes that the educational value to affidavit signers is not compelling enough to satisfy strict scrutiny. *See also* Mem. Op. at 191. (finding educational interest to be legitimate and important, but holding that state failed to present evidence that it is compelling). Though the forms certainly provide some information about New Mexico voter data, the evidence demonstrates that the forms which the Secretary will accept do not accurately outline New Mexico law. **FOF ¶¶ 302** (all forms, even older, outdated ones, still accepted by Secretary). A requester using a prior form would think that "research" was a permissible purpose, **FOF ¶¶ 171, JE16** (allowing requestor to select research, election, or "other"

for purpose of request), or that the data could be shared with third parties for lawful purposes. *See* **JE1** (form signed by Local Labs contemplated that requestor could make voter data available to others to use for permissible purposes). Yet Defendants would disavow both principles. The affidavits' provision of outdated information does not serve a compelling educational interest.

"As to the second State interest, the Court agrees with the Plaintiffs that '[m]ere revenue generation . . . is not a compelling interest that can only be achieved by a complete ban on the sharing of data,' and notes that '[t]he State provided no evidence whatsoever with respect to this interest.'… [A]lthough revenue generation may be a legitimate State interest, it is not a compelling interest." Mem. Op. at 192. Though it is hard to conceive of a situation in which the State's interest in revenue generation could be so compelling as to justify a ban on speech, the Court need not decide if that could ever be the case, for Defendants have not produced any evidence that their interest in forcing each and every requester of voter data to pay them for that data is compelling.

On the third asserted interest, the Court concludes that the interest in fostering trust in the voter registration process and protecting voters from "solicitations, harassment, and abuse" could be an important interest. *Id.* at 193. However, based on the lack of evidence presented by Defendants indicating that VRF's posting has or will cause such problems, Defendants have not demonstrated that the interest is compelling. *See also* Mem. Op. at 193-4 ("in the absence of any evidence that posting the voter data has or will cause such problems, these concerns do not rise to the level of compelling interests…The voter data was posted online for around three months, and there is no evidence in the record that posting the data caused any of the problems about which the Secretary of State is concerned.").

Defendants must, but have not, presented any evidence that the Court's concern regarding this third interest came to fruition. In fact, Defendants have specifically been unable to produce

any evidence that VRF's posting of voter data on the Internet led a single New Mexico citizen to cancel their voter registration. **FOF ¶323.** Nor do Defendants have any evidence that voters were solicited, harassed, or abused as a result of VRF's posting. **FOF ¶320.** Nor have Defendants produced any evidence that VRF has misrepresented or manipulated any voter data in its possession, including the data that was made available to the public. **FOF ¶¶318-319, 322.** The alleged harm to voters remains speculative and metaphysical rather than an "actual concrete problem."

Finally, the Court concludes that the fourth asserted interest—avoiding "disinformation"— not only fails to arise to the level of a compelling interest, but also veers dangerously close to blatant viewpoint discrimination in its own right. Whether Defendants use the term "misinformation" or "disinformation," it is apparent that they are simply trying to label speech with which they disagree, like the existence of a "discrepancy" in New Mexico's 2020 voter data as identified by VRF. **FOF ¶¶ 192, 206-207, 215, 220, 240-251.** But the First Amendment vigorously protects against restrictions on speech that are aimed at preventing a speaker from sharing a viewpoint simply because the government disagrees with what the speaker has to say. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 295 (1984) ("The principal inquiry in determining content neutrality…is whether the government has adopted a regulation of speech because of disagreement with the message it conveys."); *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163–64 (2015) ("Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.…Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict

scrutiny.") (citations omitted); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982) ("Our Constitution does not permit the official suppression of *ideas*."). To the extent Defendants' argument admits that the Use Restrictions and Data Sharing Ban are being used to silence speech with which the state disagrees, such as the existence of a "discrepancy," Defendants have proved Plaintiff's case for it. *See* Mem. Op. at 184 ("The Plaintiffs also argue that a concern for misinformation motivated the Secretary of State's decision, which necessarily constitutes viewpoint discrimination…These assertions, grounded in the record, together support a finding of a discriminatory purpose.").

In conclusion, Defendants have failed to identify, or present evidence of, a compelling state interest advanced by either the Data Sharing Ban or the Use Restrictions.

### 3. Even if Defendants identified a compelling state interest, the restrictions at issue are not narrowly tailored.

Because the Court concludes that none of the interests asserted by Defendants are compelling, it need not consider whether the regulations are narrowly tailored, for even a narrowly tailored regulation does not satisfy strict scrutiny unless it advances a compelling interest.[30] Nevertheless, the Use Restrictions and Data Sharing Ban also fail strict scrutiny for lack of narrow tailoring.

It is Defendants' burden to demonstrate that the challenged restrictions are narrowly tailored. *See Griffin*, 30 F. Supp. 3d at 1189. To satisfy its burden, Defendants must demonstrate that the challenged regulations further a compelling interest which would "be achieved less effectively absent the regulation, and…[do] not burden substantially more speech than is necessary to further the government's legitimate interests. Although a regulation need not be the

---

[30] If the asserted state interests are anything less than "compelling," the Court need not undergo a narrow tailoring analysis, as the regulation cannot survive strict scrutiny. *See Cooper v. Dillon*, 403 F.3d 1208, 1217 (11th Cir. 2005); *California First Amend. Coal. v. Lungren*, No. C 95-0440-FMS, 1995 WL 482066, at *6 (N.D. Cal. Aug. 10, 1995).

least restrictive or least intrusive means of furthering this interest, the First Amendment requires a close fit between ends and means to ensure speech is not sacrificed for efficiency." *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1073 (10th Cir. 2020) (internal citations omitted). "The government may attempt to suppress speech not only because it disagrees with the message being expressed, but also for mere convenience. Where certain speech is associated with particular problems, silencing the speech is sometimes the path of least resistance. But by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily sacrificing speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (internal citations and quotations omitted).

The Data Sharing Ban in particular fails narrow tailoring because it seeks to achieve the interests asserted above by completely banning (whether via the internet or otherwise) the sharing of the most valuable information about elections—the voter data itself. The State could achieve the asserted interests through less burdensome means. If it wanted citizens to be informed regarding the law and the data, the State itself could provide that information to the public, rather than banning speech on the grounds that it constitutes "misinformation" and insisting on the use of forms that do not accurately reflect the current state of the law. The State could, but does not, ask requesters to keep a list of people that use the data, **FOF ¶332,** so that if harassment, stalking, or solicitation occurs, it could track the culprits. Instead, its solution is to maintain a chokehold on the data itself. Further, the state could expand its Safe at Home program to protect those it believes are most vulnerable, but it has not done so.

The Use Restrictions fail for similar reasons. Defendants still will not commit to VRF's use being permitted under the statute, despite this Court's finding that it is. **FOF ¶308**. Defendants continue to claim that "governmental" use can only mean use *by the government*, **FOF ¶309**, and

that even though "election" related is included in the statute, it is not an independently permissible use. **FOF ¶301.** Defendants further claim that a use that is otherwise permissible becomes unlawful if it crosses some unknown and unknowable threshold into the realm of what the State deems to be "misinformation." **Trial Tr. 113:9-13;** *see also id.* **at 141:16-142:3.** There is no reason to believe—and no factual showing has been made—that allowing non-campaigns and non-government bodies to use the data to test the maintenance and accuracy of the system will seriously harm privacy in ways that are not already inherent in the State's current practice of making the data widely available to its favored speakers.

For the reasons stated above and herein, the Use Restrictions and Data Sharing Ban violate VRF's First Amendment rights and cannot survive strict scrutiny.

VRF is entitled to judgment in its favor on Count V.

## VI.   The Data Sharing Ban is overbroad and prohibits substantially more speech than is necessary to achieve any legitimate purpose it advances (Count VI).

The Data Sharing Ban, a violation of which is a class IV felony and subjects the violator to a fine of $100 for each line of voter data unlawfully used, is substantially and unconstitutionally overbroad. Requestors and users of voter data are entitled to fair notice regarding how that data may be used and shared, and also have rights to not have a vague policy weaponized against them via discriminatory enforcement.

### a.   Law regarding overbreadth challenges.

"The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). "[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The concern that an overbroad statute deters protected speech is especially strong

where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). The severity of criminal sanctions may well cause speakers, including Plaintiff, to remain silent rather than communicate even arguably unlawful words, ideas, and images. See, *e.g., Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965).

"The first step in overbreadth analysis is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). The Court's role is somewhat unique here, as when VRF originally filed this case, the Data Sharing Ban did not arise from the language of any statute, but rather, was a policy interpretation by the Defendants. During this litigation, that policy interpretation was codified in § 1-4-5.6 via HB4 and Defendants claim the pre-HB4 Data Sharing Ban and post-HB4 Data Sharing Ban are identical. To the extent the codified Data Sharing Ban is overbroad, the pre-HB4 Data Sharing Ban—which, again, Defendants claim is identical to the statutory ban—is likewise overbroad, and vice versa.

Second, the Court must consider whether the Data Sharing Ban proscribes "a substantial amount of protected expressive activity" judged relative to any plainly legitimate purpose served by the Ban. *Williams*, 553 U.S. at 297. When assessing whether an overbroad statute is likely to chill protected speech, courts should assess not only whether the number of potential unconstitutional applications of the statute is significant, but also the level of interpretive discretion given to those in charge of its enforcement, and the likelihood of capricious enforcement.  In July 2022, the Court hinged its analysis of this second prong on the issue of "whether Voter Reference has a First Amendment right to access the voter data." Mem. Op. at p. 175. However, as addressed in Section IV(a) above, VRF's First Amendment claims are focused on its rights to share and disseminate data after it is in VRF's possession. VRF's right to access that data in the first instance stems from both the NVRA and New Mexico law. The Court need not determine whether VRF

has a right to those records under the First Amendment where these statutory access rights exist. And once the statutory access rights exist, the First Amendment attaches to protect any speech that makes use of the documents, records, and information made available by statute. *See* Mem. Op. at p. 176.

In the face of an overbreadth challenge, it is Defendants' burden to prove the challenged regulation is constitutional, rather than plaintiff's burden to prove that it is not. *See ACORN*, 744 F.2d at 746.

Having established that VRF has a federal, statutory right to access the requested voter data, the Court's inquiry properly focuses on determining whether the Ban—both as it existed prior to HB4 and as it exists now codified in new § 1-4-5.6—proscribes "a substantial amount of protected expressive activity" judged relative to any plainly legitimate purpose it serves. The Court concludes that it does proscribe a wide swath of protected expression, and is therefore overbroad.

### b.  The Data Sharing Ban is unconstitutionally overbroad.

Under the first step of the overbreadth analysis, the Court construes the challenged regulation; here, the Data Sharing Ban. The Data Sharing Ban is an absolute prohibition on the sharing of voter data between a requester and virtually any other person, regardless of whether the sharing is for an otherwise permissible—that is, governmental or election related—purpose, or even if the data is shared for a purpose that advances federal policy, like the purposes for which the NVRA was enacted. **FOF ¶293**. The Ban applies even if the recipient could have obtained the voter data directly from the Secretary. Post-HB4, this articulation of the Data Sharing Ban remains in effect, with an additional prohibition on speech sharing the voter data online for any reason at all.

Even if there are important state interests which may be served by restricting the sharing of voter data in some instances, a complete Ban attacks a problem which may call for a scalpel by

employing a machete. Importantly, as the Court has previously noted, *see* Mem. Op. at 112, the overbreadth analysis is not limited to an examination of whether the Ban deters VRF's speech in particular, but whether it proscribes a substantial amount of protected speech, even by parties not before the Court. The Court already articulated the Ban's impact on VRF's own speech, finding that it necessarily prohibits VRF from using the data to engage in "election"-related and governmental uses as otherwise permitted by New Mexico law. Mem. Op. at 150.

As to other parties, the Ban proscribes sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for; sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic at a different institution who wanted to use the original data set to validate the research; sharing between a political party and a candidate it supports, but who is not affiliated with the party; sharing of a voter's information by a canvasser with close family members or other members of his or her household; sharing by a political data compilation/analysis firm and its political clients; and, of course, sharing via publication on the Internet. **FOF ¶336.** Further, it completely prohibits any speech that shares the data online, even if that speech is not for commercial, harmful, or unlawful purposes that could potentially be circumscribed by law.

This reach—a near total ban on speech that involves the sharing of data, much of which constitutes core political speech[31]—is far broader than any legitimate sweep of a statute dedicated to ensuring that voter data is not used for commercial or nefarious purposes. Because of the overbreadth of the Data Sharing Ban and the uncertainty as to the boundary between that which is

---

[31] *See* Mem. Op. at 117-18 ("Some commentators have suggested that, when considering whether a statute's overbreadth is substantial, courts should take into account the importance of the protected speech being restricted or chilled… Under this view, a statute that chills a swath of political speech should be more readily facially invalidated than one that chills sexual, frivolous, or even artistic speech—the latter statute being more amenable to as-applied challenges…") (internal citations omitted).

permissible and that which is prohibited, Plaintiff and others like it have refrained and will refrain from engaging in speech protected by the First Amendment out of fear of prosecution. In conclusion, then, the Data Sharing Ban violates the First Amendment under the doctrine of overbreadth.

## VII.   The Data Sharing Ban, as it existed prior to HB4, is void for vagueness (Count VII).

VRF initial complaint argued not only overbreadth, but also that the Data Sharing Ban that existed pre-HB4 was void for vagueness. In the First Amendment context, vagueness and overbreadth are two sides of the same coin, and the two sorts of challenges are often conceived of as "alternative and often overlapping" theories. *Jordan v. Pugh*, 425 F.3d 820, 827 (10th Cir. 2005) (McConnell, J.) As explained above, the Data Sharing Ban has now been codified in a revised version of § 1-4-5.6. Though VRF does not argue that the *post-HB4* version of § 1-4-5.6 is vague, it maintains its claim that the pre-HB4 Ban was unconstitutionally vague and that Defendants should be enjoined from prosecuting VRF for its past posting under that vague statute. The Court concludes that VRF's vagueness claim directed at the pre-HB4 Data Sharing Ban is not moot and that the pre-HB4 Ban is void for vagueness.

### a.   Law regarding void for vagueness challenges.

The government violates the Fourteenth Amendment by depriving citizens of life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or is so standardless that it invites arbitrary enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357–358 (1983). The prohibition of vagueness in criminal statutes "is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law," and a regulation that flouts it "violates the first essential of due process." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

"A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000) (*citing Chicago v. Morales,* 527 U.S. 41, 56–57 (1999)); *see also Mini Spas, Inc. v. South Salt Lake City Corp.,* 810 F.2d 939, 942 (10th Cir. 1987). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams,* 553 U.S. at 306; *see also Giaccio v. Pennsylvania*, 382 U.S. 399, 402-403 (1966) ("It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.")

The doctrine embodies the concept of fair notice, *Williams*, 553 U.S. at 304, and simultaneously guards against arbitrary or discriminatory law enforcement by prohibiting regulations that "impermissibly delegate[] basic policy matters" to policemen, judges, prosecutors, and juries for "resolution on an ad hoc and subjective basis . . . ." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). When a criminal statute's vagueness exerts a "chilling effect" on First Amendment liberties, the void-for-vagueness doctrine "demands a greater degree of specificity than in other contexts…" *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

In *Grayned,* 408 U.S. 104, the Supreme Court stated that, when assessing whether a statute is vague, it looks to "the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, *and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it*." 408 U.S. at 110 (internal quotations omitted) (emphasis added). Here, where the interpretation of the statute given by those charged with enforcing it is

plainly unsupported by the language of the statute itself, as this Court previously held, the Court's vagueness analysis should evaluate the interpretation of the statute(s) given by Defendants, rather than the language of the statute itself. *See Fusaro*, 19 F.4th 357 (evaluating as-applied First Amendment vagueness challenge to term "related to the electoral process" as applied to plaintiff); *Butcher v. Knudsen*, 38 F.4th 1163, 1170 (9th Cir. 2022) (evaluating as-applied First Amendment vagueness challenge to term "de minimis" created by rule of commissioner's delegated authority).

### b.  VRF's vagueness claim is not moot.

Defendants at one point argued that VRF's vagueness claim was moot, though, again, they did not advance this argument at trial. Because of the Defendants' refusal to state they will not prosecute VRF for its pre-HB4 speech, Plaintiff's vagueness claim remains necessary to protect it from prosecution for this prior, now-completed speech.  Defendants' argument to the contrary simply misapprehends VRF's requested relief. VRF's *vagueness claim* seeks to prevent any *future* prosecution for its *past* posting of voter data on VoteRef.com under the vague, pre-amendment statute that would apply to VRF's past conduct. Am. Comp., Dkt. 74 at p. 55.

Moving forward, *outside of VRFs' vagueness claim*, HB4 solidifies rather than remedies the First Amendment injury of VRF and others who continue to wish to engage in speech over the Internet that shares and discusses the data to which they are entitled under the NVRA. New Mexico has simply removed any doubt that it wants to (1) ban core political speech; (2) attach unconstitutional conditions to groups' access to voter data which distinguish among speakers and uses of the data; and (3) enact overbroad bans on online speech. Indeed, as the Court has concluded above, all of these claims have greater clarity—and are resolved in VRF's favor—under the plain text of HB4.

### c. The pre-HB4 Data Sharing Ban existed only in Defendants' mind and not in any New Mexico statute, regulation, or rule.

The most telling indication that the pre-HB4 Data Sharing Ban is impermissibly vague is that the Ban does not appear in any New Mexico statute, rule, regulation, or administrative guidance. Mem. Op. at 143, 152, 154. It did not exist in writing until it was asserted as a defense to liability in this case.

To arrive at Defendants' interpretation of New Mexico law, an interpretation from which the pre-HB4 Data Sharing Ban sprang forth, two statutes from different articles of New Mexico law must be read in conjunction. First, Defendants read the prior version of § 1-4-5.6 which stated "Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act." Rather than the word "purposes" referring to the purposes expressly outlined in the immediately preceding statute, § 1-4-5.5, Defendants claimed that "purposes" referred to any purpose prohibited by Article 5, the Voter Records System Act. Defendants' position next required that this language in § 1-4-5.6 incorporated by reference the language from § 1-5-22(A) which states:

> Unlawful disposition of voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System Act to have possession of the file.

Defendants acknowledged that § 1-5-22 does not apply to anyone other than a "data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent…" **FOF ¶340.** Yet, under Defendants' theory, when § 1-5-22 is transmuted through the lens of § 1-4-5.6, the prohibitions on "selling, loaning, [and] providing access" under § 1-5-22 applied to *any person* in possession of voter data, not just the specific

parties listed in § 1-5-22. **FOF ¶294.** When reading these statutes in conjunction, Defendants

ignored the explicit, independent penalty for violating § 1-5-22(a) found in § 1-5-22(c):

> Any data processor, officer, deputy, assistant, agent or employee who commits
> unlawful disposition of a voter file[32] is guilty of a fourth degree felony.

Under Defendants' pre-HB4 theory and policy, when § 1-5-22(a) is violated by someone other

than one of the parties listed in the statute (for example, VRF), that liability stems from the criminal

penalty under § 1-4-5.6(b) rather than the criminal penalty laid out in § 1-5-22(c). Though a person

reading § 1-5-22 could easily determine whether or not they are a "data processor; a data

processor's agent or employee; a state or county officer; or a state or county officer's deputy,

assistant, employee or agent," and thus whether that statute applies to them, Defendants theory

requires them to discern that the prohibition in § 1-5-22(A) is broadened to include all persons

because § 1-5-22 and § 1-4-5.6 work hand in glove to do so.[33]

The Court questioned Defense counsel at length in the summer of 2022 regarding the

genesis of the Data Sharing Ban and, in its Order that followed, expressly rejected Defendants'

argument that the Ban finds textual support in New Mexico statute. *See* Mem. Op. at 137; *id.* at

148 ("The Court disagrees with the Secretary of State's contention that § 1-4-5.6(A) incorporates

the use restrictions in §§ 1-5-22 and 1-5-23 of the Voter Records System Act…"). Though the

Court refrained from finding that the Data Sharing Ban is vague based on the information available

when it issued its July 2022 decision on the preliminary injunction motion, since that decision,

Defendants' wavering positions, including purported exceptions to the Ban, underscore the Ban's

vagueness. Additionally, when asked about the "incorporation by reference" theory at deposition

---

[32] "Unlawful disposition of voter file" is defined under § 1-5-22(A).
[33] Section 1-4-5.6 does not reference § 1-5-22 and § 1-5-22 does not reference § 1-4-5.6.

in March 2023, the Attorney General was unwilling to endorse that legal analysis, yet still maintains that VRF's prior posting was unlawful.

### d. The pre-HB4 data sharing ban is impermissibly vague.

The Data Sharing Ban is impermissibly vague. Referring to the recent amendments to section 5.6, the AG's 30(b)(6) representative admitted that the theory underlying the Data Sharing Ban is ambiguous. **FOF ¶347.** Though Defendants argue that HB4 merely "clarified" but did not "change" the law in New Mexico, that only supports the vagueness claim. If Defendants' position in this litigation regarding the Data Sharing Ban had been correct as a matter of statutory interpretation, there would have been no need for the Legislature to amend the law while litigation was pending. This Court cannot assume that the legislature acted in a way that is meaningless, as would have been the case if HB4 had not changed New Mexico law. *See State v. Nick R.*, 147 N.M. 182, 188 (2009) ("[The New Mexico Supreme Court] has long held that [courts interpreting New Mexico law] must avoid construction of statutory amendments that 'would render the change unnecessary and meaningless.'" (quoting *State v. Romero*, 73 N.M. 109, 115 (1963)); *see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 57-8 (2006) (refusing to interpret Solomon Amendment in a way that would negate its recent revision and render that revision "a largely meaningless exercise.").

Aside from the textual issues that existed and the attempts to address those issues via HB4, Defendants have revealed that there were and perhaps are a number of unwritten exceptions to the Ban. These ad hoc exceptions to the blanket ban which they purport to apply to VRF further exacerbate the old statute's vagueness. For example, the Attorney General testified at deposition that the level of "control" the requestor maintained over the data was at least partially determinative of whether the data was shared lawfully. **FOF ¶268.** The Ban allowed a political campaign to share data with a volunteer for a canvass, but VRF could not share data with a

volunteer helping to verify the accuracy of the data itself. **FOF ¶339.** Similarly, Defendants indicated for the first time after the close of discovery that whether the data is posted online to the "general public" would be material to determining whether the Ban was violated, though neither Defendant could or would define the term "general public," and neither Defendant cited any source in New Mexico law which illuminated that material fact. **FOF ¶¶263-267.** The generic, undefined nature of this apparently material term further contributes to the Ban's vagueness. *See* Mem. Op. at 153 ("…New Mexico's Election Code does not address whether voter data can be made "accessible by the general public on the Internet or through other means…").

As noted above, the vagueness doctrine requires fair notice so that (1) people can comply with the law and (2) those charged with enforcing the law do not do so in an arbitrary manner. The Ban fails both criteria. It does not appear in any New Mexico statute. Defendants' original contorted theory of interpretation seems to have been abandoned by at least the Attorney General (**FOF ¶262**), and required "clarification" by the Legislature via HB4. Further, the Attorney General's new theory of enforcement based on degrees of "control" of data, and both officeholders' unpredictable and sometimes changing list of exceptions, is a recipe for arbitrary enforcement.

The vagueness of the Defendants' pre-HB4 Data Sharing Ban has caused VRF and others to refrain from engaging in First Amendment protected activities because the uncertain and unclear policies and positions of the Defendants, including the Ban itself, fail to provide sufficient guidelines for VRF and others to know what conduct is permissible and what is prohibited. This chilling effect is both real and substantial, as VRF has refrained and continues to refrain from exercising its First Amendment rights out of fear of additional investigation and potential prosecution for doing so. The indeterminacy of the Data Sharing Ban in fact chilled VRF's speech,

as it had to remove the section of its Website devoted to New Mexico out of fear of criminal prosecution. **FOF ¶¶221-224.** Absent a decision from this Court protecting VRF's rights, that speech will continue to be silenced, particularly because Defendants have refused to state they will not prosecute VRF for its past posting of voter data and, in fact, stipulated to the opposite. **FOF ¶22.**

Because of Defendants' refusal to state they will not prosecute VRF for its pre-amendment speech, the Court's intervention on Plaintiff's vagueness claim remains necessary to protect it from prosecution for this prior, now-completed speech. Because the pre-HB4 Data Sharing Ban is vague, it cannot be enforced against VRF.

**VIII.   VRF is entitled to permanent injunctive relief consistent with this opinion.**

### a.   Standard for permanent injunctive relief.

To attain a permanent injunction, a plaintiff must demonstrate: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction if issued, will not adversely affect the public interest." *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009).

### b.   VRF is entitled to a permanent injunction.

VRF is entitled to permanent injunctive relief consistent with this opinion, including relief: (a) preventing its prosecution for past and future posting of voter data; (b) preventing Defendants from continuing to retaliate and discriminate against it; and (c) ordering Defendants to comply with the NVRA and fulfill VRF's voter data requests on the same terms as all other requestors.

Because the first factor for permanent injunctive relief—success on the merits—is the subject of the entirety of this opinion to this point, the Court does not repeat the merits analysis

here. Additionally, the Court notes that in granting VRF a limited preliminary injunction in the summer of 2022, the Court weighed the second, third, and fourth factors and found preliminary injunctive relief appropriate. Mem. Op. at 190-94. Once again, those three factors weigh in favor of permanent injunctive relief.

### i. VRF will suffer irreparable harm absent permanent injunctive relief.

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'" *Heideman v. S. Salt Lake City*, 348 F.3d at 1189 (quoting *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Awad v. Ziriax*, 670 F.3d 1111, 131 (10th Cir. 2012) ("[W]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). VRF is suffering irreparable injury due to (i) threats of prosecution and (ii) refusals to give VRF access to data unless it promises not to engage in speech sharing that data.   *See* Mem. Op. at 206 (First Amendment prohibits threat of prosecution for publishing data already in VRF's possession); *Id.* at 207 ("Any ongoing threat of prosecution for publishing the data Voter Reference received from Local Labs constitutes irreparable injury…").

Additionally, unlike the posture of this case at the preliminary injunction stage, VRF now asks the Court to remedy both the violations of the NVRA and the retaliation and viewpoint discrimination exhibited by the Secretary in denying VRF's requests for voter data. *See* Mem. Op. at 205-6 ("Although the Secretary of State's decision not to honor Voter Reference's May 27, 2022, request for data constitutes impermissible viewpoint discrimination, the Plaintiffs do not ask the Court to enjoin the Secretary of State to honor their request…"). Those injuries are real, palpable, and continuing.

ii. **The injury to VRF outweighs any harm that may be caused to Defendants and the public interest favors an injunction.**

VRF's injury outweighs any harm to the public interest that a permanent injunction may cause. "Vindicating First Amendment freedoms is clearly in the public interest." *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1237 (10th Cir. 2005); *Legacy Church, Inc. v. Kunkel*, 455 F. Supp. 3d 1100, 1164-54 (D.N.M. 2020) (Browning, J.). As explained above, VRF will suffer irreparable injury without an injunction.

Additionally, the Court already determined that the asserted state interests are not compelling under the strict scrutiny analysis outlined above. Though preventing Defendants from prosecuting VRF is no small matter, in exceptional circumstances such as these a district court may offer injunctive relief to prevent a State from prosecuting someone where, as here, prosecution would violate that person's constitutional rights. *See Wooley v. Maynard*, 430 U.S. 705, 710-13 (1977); *Steffel v. Thompson*, 415 U.S. 452, 475 (1974).

Finally, Defendants' protestations of harm to the public are speculative and unsupported by any actual evidence that any voter has de-registered because of VRF's speech. **FOF ¶323.** Defendants present no concrete evidence that VRF's speech erodes public confidence in New Mexico elections, that VRF manipulated or misrepresented any voter data, **FOF ¶¶318-319**, or that anyone has been harassed, stalked, or solicited as a result of VRF's speech. **FOF ¶320.** Defendants' protestations of potential harms and speculative concerns are insufficient to overcome the interests of VRF and the public in conveying and receiving the data—interests Congress itself recognized under the NVRA.

Because VRF prevails on its First Amendment and NVRA claims, and the equities weigh in its favor, it is entitled to permanent injunctive relief consistent with this opinion.

IX.     **VRF is entitled to declaratory relief (Count VIII).**

a.   **Standard for Court to award declaratory relief.**

"A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply proclaim liability from a past act." *Lawrence v. Kuenhold*, 271 Fed. Appx. 763, 766 (10th Cir.2008) (citing *Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1266 (10th Cir.2004) (McConnell, J., concurring); *Francis E. Heydt Co. v. United States*, 948 F.2d 672, 676–77 (10th Cir.1991)). The Tenth Circuit has stated that a district court should consider the following factors when deciding whether to entertain a request for declaratory relief:

> [1] whether a declaratory action would settle the controversy; [2] whether it would serve a useful purpose in clarifying the legal relations at issue; [3] whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata; [4] whether use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and [5] whether there is an alternative remedy which is better or more effective.

*State Farm Fire & Casualty Co. v. Mhoon*, 31 F.3d 979, 983 (10th Cir.1994). Granting declaratory relief is discretionary. *St. Paul Fire & Marine Ins. Co. v. Runyon*, 53 F.3d 1167, 1168 (10th Cir. 1995) ("[T]he question of whether this power should be exercised in a particular case is vested in the sound discretion of the district courts.") (internal citation omitted).

Although a request for declaratory relief often accompanies a request for injunctive relief, they are separate remedies to be considered independently. *Steffel v. Thompson*, 415 U.S. 452, 467 (1974). A declaratory judgment lacks the enforcement mechanisms of an injunction but still binds the parties, and a public official who loses a declaratory judgment claim is expected to correct his or her unlawful conduct. *Poe v. Gerstein*, 417 U.S. 281, 282 (1974).

**b. The Court enters declaratory relief in favor of Plaintiff and against Defendants consistent with this opinion.**

VRF is entitled to declaratory relief in addition to the injunctive relief awarded herein.

Under the first two factors, the Court concludes that granting declaratory relief would settle the controversies raised in this case by altering the legal positions of the parties. A declaratory judgment would serve a useful purpose in clarifying the legal relations at issue by resolving the primary issues in this case, the resolution of which will govern the future relationship between the Parties. Those issues include: (a) the availability of voter data under the NVRA; (b) the State's ability to condition access to that voter data; and (c) whether the State's purported attempts to regulate the commercial and nefarious use of voter data comport with VRF's First Amendment rights. The Court recognizes the particular necessity of declaratory relief related to VRF's NVRA claims as they relate to access to New Mexico voter data. Specifically, the Court finds that VRF will continue to request New Mexico voter data under the NVRA and that Defendants will continue to refuse to provide it unless VRF promises to silence its speech sharing the data, thus intensifying a controversy regarding what must be produced pursuant to the NVRA which must be resolved.

Under the third factor, the Court has no reason to believe that VRF is seeking declaratory relief merely for procedural fencing or as a race to *res judicata*. Rather, the Court notes that VRF seeks to vindicate and adjudicate rights that are germane to its purpose for existing.

Fourth, the requested declaratory judgment would not increase friction between federal and state courts or improperly encroach upon state jurisdiction, as the issues resolved in this case are based in federal statutory and constitutional law.

Finally, under the fifth factor, an alternative remedy would not be better or more effective. Here, VRF does not seek damages and injunctive relief, though warranted, will not determine the Defendants' duties under the law as raised in this action. Indeed, in conjunction with a well-tailored

injunction which provides enforcement of VRF's rights, declaratory relief is a proper and effective remedy in this case. Because declaratory and injunctive relief are independent, if not related, remedies, the ultimate viability of one does not rise and fall with the viability of the other. *See Steffel*, 415 U.S. at 462-63 (holding the Fifth Circuit erred when determining that because injunctive relief would not be appropriate, it followed that declaratory relief was also inappropriate). Accordingly, even if the Court's injunctive relief is altered post-judgment, it does not simultaneously vacate the Court's declaratory relief, and vice versa.

## [PROPOSED] JUDGMENT & ORDER

After due consideration of the evidence presented to this Court, the argument of counsel, and applicable law, the Court enters judgment for Plaintiff Voter Reference Foundation, LLC and against Defendants on Counts I, II, III, V, VI, VII, and VIII of Plaintiff's First Amended Complaint.  It is **ORDERED, ADJUDGED, AND DECLARED** that:

A.  On Count I:

    a.  New Mexico's voter list as requested by VRF (which does not include Social Security numbers, full dates of birth, and other data which New Mexico law does not allow to be distributed upon voter request), is a "record concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" which must be made available for public inspection pursuant to the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1).

    b.  Defendants' requirement that, in order to obtain the voter list or any data from the list, a requestor must sign an affidavit agreeing not to share or disseminate that data, even if for purposes authorized by the NVRA, conflicts with the NVRA and is

preempted. New Mexico may not require requestors to surrender their rights to share and disseminate voter data which must be made available under the NVRA as a precondition to receiving that data from the state and is enjoined from doing so.

    c.   The Data Sharing Ban, including the proscriptions in 1-4-5.6 which prohibit all sharing of voter data by requesters, including via the Internet, conflict with the purposes and objectives of the NVRA's Public Disclosure Provision and are preempted. VRF, and others similarly situated, may publish voter data online so long as it is for a purpose contemplated by the NVRA, and VRF's current purposes are contemplated by the NVRA.[34]

B.  On Count II, the Court holds that Defendants violated the NVRA's Public Disclosure Provision by refusing to produce the records requested by VRF on February 18, 2022, May 27, 2022, and October 18, 2022, and enters declaratory and injunctive relief that VRF is entitled to those records, that future requests shall not be denied for the same or similar reasons, and that future requests shall be fulfilled on the same terms as all other requestors.

C.  On Count III, the Court holds and declares that the Defendants retaliated and engaged in viewpoint discrimination against VRF for engaging in First Amendment protected speech, and under 28 U.S.C. §§ 2201- 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, enters declaratory relief to that effect. Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with Defendants who receive actual notice of

---

[34] Because VRF never sought or attempted to publish social security numbers, driver's license numbers, email addresses, phone numbers, or full date of birth, the Court expresses no opinion regarding whether that data need be made available under the NVRA or if VRF might have a right to post that data if it must be made available. The injunctive relief awarded herein is tailored to the actual controversy before the Court, though the Court expresses its skepticism that access to and publication of these particular data points is necessary to achieving any purpose contemplated by the NVRA.

this order shall not take any steps to investigate, threaten, cite, charge, prosecute, or punish VRF or its agents, employees, officers, or those in privity with them, under the Use Restrictions or Data Sharing Ban, including but not limited to N.M. Stat 1-4-5.5, 1-4-5.6, or 1-5-22, for VRF's posting of any voter data on its website or elsewhere prior to March 30, 2023. Further, Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with Defendants who receive actual notice of this order shall not take any steps to deny VRF access to New Mexico voter data on the same terms as that data is provided to other requestors.

D.   On Count V, the Court holds and declares that the Use Restrictions and Data Sharing Ban (including New Mexico's amendments to the law under HB4 which ban sharing of the data via the internet) restrict core political speech and that each regulation fails to satisfy strict scrutiny. Under 28 U.S.C. §§ 2201- 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, the Court enters declaratory relief to this effect and enjoins Defendants from denying VRF future access to New Mexico voter data on the basis of the Use Restrictions and/or Data Sharing ban. Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with Defendants who receive actual notice of this order shall not take any steps to investigate, threaten, cite, charge, prosecute, or punish VRF or its agents, employees, officers, or those in privity with them, under the Use Restrictions or Data Sharing Ban, including but not limited to N.M. Stat 1-4-5.5, 1-4-5.6, or 1-5-22, for VRF's posting of any voter data on its website or elsewhere prior to March 30, 2023.

E.   On Count VI, the Court holds and declares that the Data Sharing Ban and Use Restrictions (including New Mexico's amendments to the law under HB4 which ban sharing of the data via the internet) are unconstitutionally overbroad, and under 28 U.S.C. §§ 2201- 2202, Fed.

R. Civ. P. 65, and 42 U.S.C. § 1983, enters declaratory relief to this effect. Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with Defendants who receive actual notice of this order shall not take any steps to investigate, threaten, cite, charge, prosecute, or punish VRF or its agents, employees, officers, or those in privity with them, under the Use Restrictions or Data Sharing Ban, including but not limited to N.M. Stat 1-4-5.5, 1-4-5.6, or 1-5-22, for VRF's posting of any voter data on its website or elsewhere prior to March 30, 2023.

F.  On Count VII, the Court holds and declares that the pre-amendment Data Sharing Ban is unconstitutionally vague, and under 28 U.S.C. §§ 2201- 2202, Fed. R. Civ. P. 65, and 42 U.S.C. § 1983, awards declaratory relief to that effect. Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with Defendants who receive actual notice of this order shall not take any steps to investigate, threaten, cite, charge, prosecute, or punish VRF or its agents, employees, officers, or those in privity with them, under the Use Restrictions or Data Sharing Ban, including but not limited to N.M. Stat 1-4-5.5, 1-4-5.6, or 1-5-22, for VRF's posting of any voter data on its website or elsewhere prior to March 30, 2023.

G.  It is further ordered that within fourteen days of this order, Plaintiff shall submit any application for attorneys' fees and costs under 42 U.S.C. § 1988, 52 U.S.C. § 20510(c), or other applicable law. Defendants shall file any response in opposition within fourteen days of Plaintiff's application. Plaintiff may file a reply within seven days of Defendants' response in opposition.

Respectfully submitted this 9th day of November, 2023.

GRAVES GARRETT, LLC

*/s/ Edward D. Greim*
Edward D. Greim
Missouri Bar No. 54034
*Admitted Pro Hac Vice*
GRAVES GARRETT LLC
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
Fax: (816) 222-0534
edgreim@gravesgarrett.com

HARRISON, HART & DAVIS, LLC
Carter B. Harrison IV
924 Park Avenue SW, Suite E
Albuquerque, NM 87102
Tel: (505) 369-6599
Fax: (505) 341-9340
carter@harrisonhartlaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, Edward D. Greim, certify that on November 9, 2023, a copy of Plaintiffs' Proposed Findings of Fact and Conclusions of Law was filed with the Clerk of the Court using the CM/ECF system, which sent notification to the following via e-mail:

Mark Allen
Jeff D. Herrera
mallen@nmag.gov
jherrera@nmag.gov
Office of the New Mexico Attorney General
408 Galisteo Street
Santa Fe, NM 87501

*/s/ Edward D. Greim*
Edward D. Greim
Counsel for Plaintiff VRF