# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

VOTER REFERENCE FOUNDATION, LLC,

      Plaintiff,

vs.                                                                    No. CIV 22-0222 JB/KK

RAÚL TORREZ, in his official capacity as New
Mexico Attorney general, and MAGGIE
TOULOUSE OLIVER, in her official capacity
as Secretary of State of New Mexico,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Plaintiff Voter Reference Foundation, LLC's Motion for Partial Summary Judgment, filed April 14, 2023 (Doc. 118)("Voter Reference MSJ"); and (ii) the Defendants' Motion for Summary Judgment, filed April 14, 2023 (Doc. 121)("Defendants' MSJ"). The Court held a hearing on June 14, 2023. See Clerk's Minutes, filed June 14, 2023 (Doc. 131). The primary issues are: (i) whether 52 U.S.C. § 20507(i), the Public Inspection Provision ("Public Inspection Provision") of the National Voter Registration Act, 52 U.S.C. §§ 20501-20511 ("NVRA"), preempts restrictions imposed by the Office of the New Mexico Secretary of State ("Secretary of State's Office") related to access to -- and sharing of -- New Mexico State voter data; (ii) whether the scope of the NVRA's Public Inspection Provision mandates the disclosure of voter data -- including voter registration information for New Mexico voters -- that Plaintiff Voter Reference Foundation, LLC ("Voter Reference") has requested from the Secretary of State's Office; (iii) whether the First Amendment to the Constitution of the United States provides a Constitutional right to access the voter data that Voter Reference requests; (iv) whether the Secretary of State's Office imposes unlawful conditions on access to voter data --

namely, restrictions on how voter data can be used and shared -- that violate the First Amendment; (v) whether the restriction that the Secretary of State's Office imposes against the sharing of voter data -- which the New Mexico Office of the Attorney General ("Attorney General's Office") enforces -- is unconstitutionally overbroad for First Amendment purposes; (vi) whether that same restriction -- which the Attorney General's Office enforces -- is unconstitutionally vague for First Amendment purposes; (vii) whether the New Mexico Secretary of State Maggie Toulouse Oliver ("Secretary Oliver") and the New Mexico Attorney General ("Attorney General")[1] unlawfully retaliated against Voter Reference by refusing to produce voter data, and by threatening Voter Reference with criminal prosecution on the basis of Voter Reference engaging in Constitutionally protected speech; (viii) whether Secretary Oliver and the Attorney General engaged in unconstitutional viewpoint discrimination by refusing to produce voter data to Voter Reference on the basis of Voter Reference's perceived political ideology; and (ix) whether the Court should enter a permanent injunction preventing the Attorney General from prosecuting Voter Reference for any alleged violations of New Mexico law for its past or future posting of State voter data.  For the reasons outlined in this opinion, the Court concludes: (i) Voter Reference is entitled to summary judgment in its favor on the question of NVRA preemption, because federal statutory law -- i.e., the NVRA's Public Inspection Provision -- preempts the State's usage and sharing restrictions on voter data, given that the NVRA's Public Inspection Provision confers a right to access voter data which conflicts with the restrictions which the Secretary of State's Office imposes; (ii) Voter

---

[1]Since this case was filed, the initially named Attorney General Defendant -- Hector Balderas -- is no longer the Attorney General of New Mexico; Raúl Torrez is the new Attorney General.  Pursuant to rule 25(d) of the Federal Rules of Civil Procedure, Raúl Torrez is now a named Defendant in this action.  However, because Attorney General Torrez was not in office during much of the underlying conduct in this dispute, throughout this opinion, the Court refers to the Attorney General Defendant as "Attorney General."

Reference is entitled to summary judgment in its favor regarding its claim of a statutory violation under the NVRA, because the NVRA's Public Inspection Provision mandates the disclosure of the State voter data which Voter Reference requests, given that the categories of voter data requested by Voter Reference fall within the scope of "all records" in the NVRA's Public Inspection Provision; (iii) Secretary Oliver and the Attorney General are entitled to summary judgment in their favor on Voter Reference's Count alleging a First Amendment violation, because the First Amendment does not provide a Constitutional right to access the voter data that Voter Reference requests as there is no general Constitutional right to access government information, and, consistent with First Amendment guarantees, the Court concludes that the Secretary of State's Office and the Attorney General may condition access to the voter data so long as those conditions are not viewpoint-discriminatory; (iv) Secretary Oliver and the Attorney General are entitled to summary judgment in their favor on Voter Reference's allegations of unconstitutional overbreadth, because the restrictions that the Secretary of State's Office imposes against the sharing of voter data are not unconstitutionally overbroad, as the data sharing ban does not proscribe any activity that the First Amendment protects; (v) Secretary Oliver and the Attorney General are entitled to summary judgment in their favor on Voter Reference's allegations of unconstitutional vagueness, because, as the Court construes Secretary Oliver's interpretation of the relevant State statutes, those interpretations are not unconstitutionally vague, even if they are incorrect; (vi) Secretary Oliver and the Attorney General are entitled to summary judgment on Voter Reference's allegations of unconstitutional retaliation in violation of the First Amendment, because Voter Reference cannot show, as a matter of law, that it engaged in Constitutionally protected activity that forms the basis of its First Amendment retaliation claim; (vii) Voter Reference, Secretary Oliver, and the Attorney General are not entitled to summary judgment on Voter Reference's allegations of viewpoint

discrimination in violation of the First Amendment, because genuine disputes of material fact exist as to whether Secretary Oliver and the Attorney General refused to disclose Voter Reference's requested voter data because of Voter Reference's perceived political ideology; and (viii) Voter Reference is entitled to summary judgment in its favor on the imposition of declaratory judgment declaring that Voter Reference may not be subject to State criminal prosecution on the basis of alleged violations of the State's usage and sharing restrictions on State voter data, because the NVRA's Public Inspection Provision preempts those restrictions.  Accordingly, the Court grants in part and denies in part the Voter Reference MSJ, and also grants in part and denies in part the Defendants' MSJ.

## FACTUAL BACKGROUND

The Court draws the factual background from the Plaintiff's Statement of Uncontroverted Facts and Suggestions in Support of Motion for Partial Summary Judgment, filed April 14, 2023 (Doc. 119)("Voter Reference MSJ Memo."); the Statement of Undisputed Material Facts in Defendants' MSJ; Plaintiff Voter Reference Foundation, LLC's Response to Defendants' Motion for Summary Judgment, filed May 12, 2023 (Doc. 125)("Voter Reference MSJ Response"); Defendants' Response to Plaintiff's Motion for Summary Judgement, filed May 12, 2023 (Doc. 126)("Defendants' MSJ Response"); Plaintiff Voter Reference Foundation, LLC's Reply in Support of Motion for Summary Judgment, filed May 26, 2023 (Doc. 127)("Voter Reference MSJ Reply"); Defendants' Reply in Support of Their Motion for Summary Judgment, filed May 26, 2023 (Doc. 128)("Defendants' MSJ Reply"); Plaintiff Voter Reference Foundation, LLC's Second Supplemental Brief on the Parties' Cross-Motions for Summary Judgment, filed September 25, 2023 (Doc. 155)("Voter Reference Second Suppl. Br."); Defendants' Response to Plaintiff's Second Supplemental Brief on the Parties' Cross-Motions for Summary Judgment, filed October 13, 2023 (Doc. 163)("Defendants' Second Suppl. Br. Resp."); and Plaintiff Voter Reference

Foundation, LLC's Reply in Support of Second Supplemental Brief for Summary Judgment, filed

October 18, 2023 (Doc. 167)("Voter Reference Second Suppl. Br. Reply").  Unless explicitly noted

otherwise, the parties do not dispute the facts in the text below.  Although the Court provides one

unified factual background section,[2] in applying the summary judgment standard, the Court will --

in its Analysis section -- "view each motion separately" and therefore separately consider the

relevant facts "in the light most favorable to the non-moving party, and draw all reasonable

inferences in that party's favor."  United States v. Supreme Court of New Mexico, 839 F.3d 888,

906-07 (10th Cir. 2016).

    **1.**    **The Parties.**

    Voter Reference is a foundation that operates the website VoteRef.com.  See Voter

Reference MSJ Memo. ¶¶ 1, 5, at 16[3] (asserting these facts)(citing Transcript of May 17, 2022,

Hearing at 53:12-19 (certified May 24, 2022), filed April 14, 2023 (Doc. 119-1)("May 17 Tr."); id.

at 54:15-55:2).[4]  VoteRef.com's purpose is to "provide public access to official government data

_____

[2]At the October 16, 2023, bench trial in this matter, the parties agreed to this unified factual background section approach.  See Transcript of Bench Trial at 164:5-166:16 (taken October 16, 2023), filed December 28, 2023 (Doc. 171)(Court, Allen, Greim).

[3]Many of the documents in this case have internal page numbers that do not correspond to the CM/ECF page numbers found at the top of the documents.  For the purpose of uniformity, the Court will use CM/ECF's pagination -- i.e., the blue numbers in the upper right-hand corner of each page -- to cite to the documents in this case.

[4]The Defendants purport to controvert Voter Reference MSJ Memo. ¶ 5, at 16, "in part," and state that they dispute the assertion "to the extent this [fact] is intended to state that publication of election records will, in fact, lead more people to vote."  Defendants' MSJ Response ¶ 3, at 2 (referenced in Defendants' MSJ Response ¶ 5, at 3).  The Defendants state that Voter Reference MSJ Memo. ¶ 1, at 16, is "[u]ncontroverted, but immaterial" and state that Voter Reference has testified that Voter Reference is "a foundation dedicated to publishing the voter rolls online for free forever to promote transparency and get the public engaged in understanding how the process works, and to try to do their public oversight duties under the National Voter Registration Act."  MSJ Response ¶ 1, at 1 (citing May 17 Tr. at 53:14-19).  Because the Defendants do not controvert specifically the facts in the text, however, the Court will deem these facts undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed

pertaining to elections, including voter registration rolls."  Voter Reference MSJ Memo. ¶ 5, at 16-17 (asserting this fact)(citing May 17 Tr. at 55:24-56:5).[5]  The public information made available on VoteRef.com varies from State to State, but generally involves information including a voter's name, date of birth or birth year, registration address, registration date, party affiliation, registration status, precinct, and voting participation history.  See Voter Reference MSJ Memo. ¶ 6, at 17 (asserting this fact)(citing May 17 Tr. at 54:15-55:2).[6]  Voter Reference obtains the information required to maintain this website by "requesting voter registration data from state agencies on a quarterly basis (either directly or through third party vendors) and then compiling and posting that

_____

unless specifically controverted.").  Additionally, the Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d 920, 924 n.2 (D.N.M. 2014)(Browning, J.)("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[5]The Defendants purport to controvert this fact, "in part," again taking issue with an implicit assumption -- on Voter Reference's part -- that "publication of election records will, in fact, lead more people to vote."  Defendants' MSJ Response ¶ 5, at 3 (citing Defendants' MSJ Response ¶ 3, at 2).  The Defendants do not deny, however, that Voter Reference's stated purpose in operating VoterRef.com is to "provide public access to official government data pertaining to elections, including voter registration rolls."  Defendants' MSJ Response ¶ 5, at 3.  Because the Defendants do not controvert specifically the fact in the text -- i.e., that the information given on the website varies by State but generally includes certain categories of information --  the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[6]The Defendants purport to controvert the Voter Reference MSJ Memo. ¶ 6, at 17, specifically the idea -- stated in Voter Reference MSJ Memo. ¶ 6, at 4 -- that VoteRef.com publishes information only when State law allows such disclosure.  See Defendants' MSJ Response ¶ 6, at 3.  The Defendants also purport to controvert the assertion that VoteRef.com publishes only the "year of birth" of registered voters; the Defendants instead contend that "VoteRef.com continues to publish the full birthdate of thousands of individuals."  Defendants' MSJ Response ¶ 6, at 3 (citing VoteRef.com (last visited October 17, 2023)).  Neither of these disputes, however, controvert specifically the fact in the text, and thus the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

data in a way that is easily accessible, searchable, and usable by the public."  Voter Reference MSJ

Memo. ¶ 10, at 17-18 (asserting this fact)(citing May 17 Tr. at 54:15-55:2; id. at 55:3-4).[7]  Voter

Reference's stated mission -- and, by extension, VoteRef.com project's mission -- "is to increase

voter participation and transparency in elections at all levels so that the public can remain informed

regarding electoral processes and ensure the integrity of elections across the country."  Voter

Reference MSJ Memo. ¶ 1, at 16 (asserting this fact)(citing May 17 Tr. at 53:12-19).[8]  Voter

Reference aims to publish the voter rolls of every State on its website, for free and forever, and

Voter Reference's work in this regard is "unprecedented," and "the first of its kind."  Defendants'

MSJ Response ¶ 247, at 27 (asserting this fact)(citing May 17 Tr. at 91:16-19)(Serafimova,

Swoboda).  See Voter Reference MSJ Reply ¶ C, at 13 (uncontroverted).

     Defendant Maggie Toulouse Oliver is the Secretary of State for the State of New Mexico,

an officer in the State executive branch, and she is responsible for -- among other things -- being

the State's chief election officer.  See Voter Reference MSJ Memo. ¶ 14, at 18 (asserting this

---

[7]The Defendants state that this fact is "[u]ncontroverted but immaterial."  Defendants'
Response ¶ 10, at 3.  The Defendants' assertion of immateriality does not dispute Voter
Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will
deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off.,
49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted
fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[8]Again, the Defendants state that this fact is "[u]ncontroverted but immaterial," and then
quote testimony from Tina Swoboda, Voter Reference's representative, that Voter Reference is "a
foundation dedicated to publishing the voter rolls online for free forever to promote transparency
and get the public engaged in understanding how the process works, and to try to do their public
oversight duties under the National Voter Registration Act."  MSJ Response ¶ 1, at 1 (citing to May
17 Tr. at 53:14-19).  Again, if necessary, the Court will address materiality in the Analysis, but
will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land
Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an
asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact
undisputed.

fact)(citing Plaintiff's Verified First Amended Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief ¶ 16, at 7, filed September 26, 2022 (Doc. 74)("First Amended Complaint"); and Defendants' Answer to Plaintiff's Verified First Amended Complaint at ¶ 1, at 3, filed October 11, 2022 (Doc. 77)("Answer to First Amended Complaint")).   See Defendants' Response ¶ 14, at 3 (uncontroverted); N.M.S.A § 1-2-1(A) ("The secretary of state is the chief election officer of the state.").   Defendant Raúl Torrez is the Attorney General for the State of New Mexico, an officer in the State executive branch who responsible for -- among other things -- "investigating and prosecuting violations of the Election Code[, N.M.S.A. §§ 1-1-1 to -26-6 (1969, as amended through 2023)]."   Voter Reference MSJ Memo. ¶ 17, at 19 (asserting this fact)(citing First Amended Complaint ¶ 14, at 6; and Answer to First Amended Complaint at ¶ 14, at 3).   See Defendants' MSJ Response ¶ 17, at 4 (uncontroverted); N.M.S.A. § 1-2-1.1(A) ("The attorney general shall, upon request of the secretary of state, provide legal advice, assistance, services and representation as counsel in any action to enforce the provisions of the Election Code."); N.M.S.A. § 1-2-2(D) ("The secretary of shall . . . report possible violations of the Election Code of which the secretary of state has knowledge to the district attorney or the attorney general for prosecution.").   The Secretary of State "is responsible under state law for furnishing voter data to requesters and referring potential violations of the Election Code, including the unlawful use of voter data under § 1-4-5.5 and § 1-4-5.6, to the Attorney General for investigation and prosecution."   Voter Reference MSJ Memo. ¶ 15, at 18 (asserting this fact)(citing First Amended Complaint ¶ 16, at 7; and Answer to First Amended Complaint at ¶ 16, at 3).   See Defendants' MSJ Response ¶ 15, at 4 (uncontroverted); N.M.S.A. §§ 1-2-1.1(A), 1-2-2(D).

2.      <u>Conduct Giving Rise to the Litigation</u>.

a.      <u>Local Labs Voter Data Request</u>.

In March of 2021, Mike Lippert, an individual affiliated with an entity called Local Labs, LLC ("Local Labs"), submitted a request for voter data from the Secretary of State's Office by submitting a "Voter Information Authorization" form.  Voter Reference MSJ Memo. ¶ 52, at 26 (asserting this fact)(citing Voter Information Authorization form at 1 (dated March 29, 2021), filed June 24, 2022 (Doc. 44-1)("Lippert Voter Information Authorization form")).  <u>See</u> Defendants' MSJ Response ¶ 15, at 4 (uncontroverted).  The Voter Information Authorization form submitted by Lippert requests "the name, physical address, mailing address, year of birth, party affiliation, precinct assignment, jurisdiction, registrant ID number, associated districts, voting history, and method of voting for each registered voter in the State of New Mexico."  Defendants' MSJ ¶ 19, at 7-8 (asserting this fact)(citing Lippert Voter Information Authorization form at 1).  <u>See</u> Voter Reference MSJ Response at 7 (undisputed).[9]  Local Labs and Voter Reference are separate entities.  <u>See</u> Defendants' MSJ ¶ 20, at 8 (asserting this fact)(citing May 17 Tr. at 66:3-15).  <u>See</u> Voter Reference MSJ Response at 7 (undisputed).[10]

---

[9]In the Voter Reference MSJ Response, Voter Reference addresses only the facts in Defendants' MSJ that it disputes, and accordingly, in the Voter Reference MSJ Response there are no specific numbered paragraphs for undisputed factual assertions.  Accordingly, the Court will cite to the page numbers in which Voter Reference skips the relevant paragraph number for the corresponding fact.  For example, page 7 of the Voter Reference MSJ Response includes factual disputes of ¶¶ 17, 18 and 21 of the Defendants' MSJ -- <u>i.e.</u>, if Voter Reference sought to dispute ¶ 19 of the Defendants' MSJ, presumably it would have done so on this page.  In any event, given the absence of a specific dispute as to this fact, the Court deems the facts in Defendants' MSJ ¶ 19, at 7-8 as undisputed.  <u>See</u> D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[10]As noted, in its MSJ Response, Voter Reference addresses only the facts in Defendants' MSJ that it disputes.  Given the absence of a specific dispute as to this fact, the Court considers the facts in Defendants' MSJ ¶ 20, at 8 as undisputed.  <u>See</u> D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

The version of the Voter Information Authorization form that Lippert completed and submitted in March, 2021, provides three different options for the requester to choose the purpose of the voter data request: "Governmental Use, Campaign Use, and Election Related."  Defendants' MSJ ¶ 22, at 8 (asserting this fact)(citing Lippert Voter Information Authorization form at 1).  See Voter Reference MSJ Response at 8 (undisputed).[11]  Beyond this description regarding the request's purpose, the Voter Information Authorization form contains no space on which to further elaborate how the data will be used.  See Voter Reference MSJ Memo. ¶ 53, at 26 (asserting this fact)(citing Lippert Voter Information Authorization form at 1).[12]  The Voter Information Authorization form submitted by Lippert selects the option for "Election Related" in indicating the request's purpose.  See Voter Reference MSJ Memo. ¶ 53, at 26 (asserting this fact)(citing Lippert Voter Information Authorization form at 1).[13]

---

[11]As noted, in its MSJ Response, Voter Reference addresses only the facts in Defendants' MSJ that it disputes.  Given the absence of a specific dispute as to this fact, the Court deems the facts in Defendants' MSJ ¶ 22, at 8 as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[12]The Defendants purport to "object[]" to this fact "to the extent [it] states a legal conclusion."  Defendants' MSJ Response ¶ 53, at 8.  This objection takes issue with the following sentence in ¶ 53 of the Voter Reference MSJ Memo.: "[the list of possible uses on the Voter Information Authorization form] comports with those uses permitted pursuant to N.M. Stat. § 1-4-5.5."  Voter Reference MSJ Memo. ¶ 53, at 26.  In the text above, the Court does not cite this assertion, and the Defendants do not specifically controvert the fact in the text.  Accordingly, the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[13]The Defendants purport to "object[]" to this fact "to the extent [it] states a legal conclusion."  Defendants' MSJ Response ¶ 53, at 8.  This objection takes issue with the following sentence in ¶ 53 of the Voter Reference MSJ Memo.: "[the list of possible uses on the Voter Information Authorization form] comports with those uses permitted pursuant to N.M. Stat. § 1-4-5.5."  Voter Reference MSJ Memo. ¶ 53, at 26.  In the text above, the Court does not cite this assertion, and the Defendants do not specifically controvert the fact in the text.  Accordingly, the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

At the bottom of the Voter Information Authorization form that Lippert completed and submitted in March, 2021, there is an attestation that reads:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).

> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

Voter Reference MSJ Memo. ¶ 54, at 26-27 (asserting this fact)(citing Lippert Voter Information Authorization form at 1). See Defendants' MSJ Response ¶ 54, at 8 (uncontroverted). Just below this attestation is a line titled "Signature of Requestor," which Lippert signed. Voter Reference MSJ Memo. ¶ 55, at 27 (asserting this fact)(citing Lippert Voter Information Authorization form at 1). See Defendants' MSJ Response ¶ 55, at 8 (uncontroverted). Local Labs paid the Secretary of State's Office $5,378.12 for the voter data requested on the Lippert Voter Information Authorization form. See Voter Reference MSJ Memo. ¶ 56, at 27 (asserting this fact)(citing Payment Receipt addressed to David Lippert (dated April 14, 2019), filed June 24, 2022 (Doc. 44-2)); Defendants' MSJ Response ¶ 56, at 8 (uncontroverted). The voter data requested by Lippert was provided by the Secretary of State's Office on April 13, 2021. See Defendants' MSJ ¶ 25, at 9 (asserting this fact)(citing Email from Gina Swoboda to Secretary Toulouse Oliver (dated December 14, 2021), filed June 24, 2022 (Doc. 44-14)). See Voter Reference MSJ Response at 8 (uncontroverted).[14]   Local Labs transferred the data that Lippert received pursuant to the Voter

_____

[14]As noted, in its MSJ Response, Voter Reference addresses only the facts in Defendants' MSJ that it disputes. Given the absence of a specific dispute as to this fact, the Court deems the facts in Defendants' MSJ ¶ 25, at 9 as undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Information Authorization form to Voter Reference following Voter Reference's payment to Local

Labs of $15,000.  See Defendants' MSJ ¶ 27, at 9 (asserting this fact)(citing May 17 Tr. at 73:18-

25; id. at 74:9-13).[15]

      **b.**      **Voter Reference's Analysis of the New Mexico Voter Data and Initial Contact with the Secretary of State's Office.**

      Voter Reference conducted its own internal analysis of the voter data received from Local

Labs, which involved "[Voter Reference] professionals comparing the total number of ballots cast

in an election to the number of voters with a credit in their vote history filed [sic] for having voted

in that election."  Voter Reference MSJ Memo. ¶ 65, at 26-27 (asserting this fact)(citing May 17

Tr. at 55:3-13).  See Defendants' MSJ Response ¶ 65, at 9 (uncontroverted).  Voter Reference states

that a discrepancy between these two numbers is "not necessarily indicative of fraud or malicious

activity," but when such discrepancies exist, Voter Reference "attempts to contact state officials

regarding the discrepancy and 'work backwards' to determine why there might be a difference."

Voter Reference MSJ Memo. ¶ 66, at 30 (asserting this fact)(citing May 17 Tr. at 55:14-23; id. at

58:20-59:20; id. at 98:17-101:2; VRF Website VoteRef.com Adds New Mexico Voter Rolls to

Nationwide Database at 1 (dated December 16, 2021), filed June 24, 2022 (Doc. 44-13)("Voter

Reference Press Release")).[16]  After conducting its analysis on the New Mexico voter data, Voter

---

[15]Voter Reference purports to dispute this fact, stating: "[Voter Reference] paid Local Labs $15,000 to acquire voter data on its behalf in New Mexico. [. . .] As part of its services, Local Labs paid the state $5,378.12 for the voter data it acquired."   The Court concludes that this representation does not differ from the Defendants' factual assertion, which states: "[Voter Reference] paid Local Labs $15,000 for its services, including the Voter Data."  Defendants' MSJ ¶ 27, at 9.  Perhaps Voter Reference takes issue with the potential implication in the Defendants' framing that Voter Reference paid $15,000 in addition to the $5,378.12.  The Court does not read the Defendants' assertion of fact to imply this added pay, and, accordingly the Court deems the fact that Voter Reference paid Local Labs $15,000 for some combination of data and services to be undisputed.

[16]The Defendants purport to dispute this fact, apparently on the grounds that this description implies that there is a discrepancy between these amounts in New Mexico's numbers.

Reference claimed to have identified a discrepancy of "about 3,800 votes, reflecting a difference between the number of voters listed as having voted in the 2020 general election (according to the voter list) and the number of ballots reported being case according to the New Mexico's [sic] official reports." Voter Reference MSJ Memo. ¶ 68, at 30 (asserting this fact)(citing Voter Reference Press Release at 1).[17]

On December 14, 2021, Voter Reference emailed the Secretary of State's Office to "discuss the identified discrepancy in an attempt to remedy the apparent difference in numbers, as [Voter Reference] had done in other states." Voter Reference MSJ Memo. ¶ 70, at 31 (asserting this fact)(citing Email from Gina Swoboda to Secretary Toulouse Oliver (dated December 14, 2021), filed June 24, 2022 (Doc. 44-14)("December 14, 2023, Email")). See Defendants' MSJ Response ¶ 70, at 9 (uncontroverted). In the December 14, 2023, Email, Voter Reference "invited a conversation regarding [Voter Reference]'s findings and methodology, including inviting the Secretary [of State's Office] to provide feedback on the same." Voter Reference MSJ Memo. ¶ 71,

---

See Defendants' MSJ Response ¶ 66, at 9. The Court does not read this general description of Voter Reference's purported internal analysis practices to imply that New Mexico's numbers necessarily contain a discrepancy between the total number of ballots cast in an election and the number of voters with a credit in their vote history file for having voted in that election. Importantly, the Defendants do not dispute that this internal analysis is Voter Reference's general practice, see Defendants' MSJ Response ¶ 65, at 9, and the Defendants also do not dispute specifically that it is Voter Reference's general practice -- in the event a discrepancy is found -- to "attempt[] to contact state officials regarding the discrepancy and 'work backwards' to determine why there might be a difference," Voter Reference MSJ Memo. ¶ 66, at 30. Because the Defendants do not controvert specifically this factual assertion, the Court will deem this fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[17]The Court notes again that the Defendants dispute the existence of any discrepancy in New Mexico's numbers in the manner Voter Reference describes. See Defendants' MSJ Response ¶ 66, at 9 (citing Deposition of Greg Rockstroh at 33:10-25 (dated March 20, 2023), filed April 14, 2023)(Doc. 119-13)). The uncontroverted fact here is that Voter Reference asserts that such a discrepancy exists.

at 31 (asserting this fact)(quoting December 14, 2023, Email at 1).  See Defendants' MSJ Response

¶ 71, at 9 (uncontroverted).  The email also stated:

> Please provide any feedback you have on these results, and if there is a factor
> or factors that we may be unaware of that would explain the discrepancies.
>
> Attached is a link to the voter history and voter registration data file provided
> by your office on April 13, 2021.  It is our understanding that the data you have
> provided does not include any voter who is in the Safe At Home program.  If that is
> inaccurate, please let us know.
>
> We would be pleased to have a call with you or your staff if that would
> provide a better format to review your assessment of the results.  If you have time
> and staff available, we would be grateful for the opportunity to meet with you by
> phone.

Voter Reference MSJ Memo. ¶ 71, at 31 (asserting this fact)(quoting December 14, 2023, Email at

1).  See Defendants' MSJ Response ¶ 71, at 9 (uncontroverted).  The Secretary of State's Office

did not respond to this email.  Voter Reference MSJ Memo. ¶ 72, at 31 (asserting this fact)(citing

May 17 Tr. at 61:21-62:10).  See Defendants' MSJ Response ¶ 72, at 9 (uncontroverted).

### c.   The ProPublica Article and Representations Made by the Secretary of State's Office to ProPublica.

Also on December 14, 2021, the Secretary of State's Office received information from

Megan O'Matz -- a journalist at a news outlet called ProPublica[18] -- that a public website operated

by Voter Reference was posting voter data related to registered voters in New Mexico.  See

Defendants' MSJ ¶ 35, at 10 (asserting this fact)(citing Email Chain between Megan O'Matz and

Alex Curtas at 7 (first Email dated December 14, 2021), filed June 24, 2022 (Doc. 44-20)("O'Matz-

Curtas Email Chain")).[19]  O'Matz sought comments and background for a story that she planned to

---

[18]ProPublica is an online, "independent, nonprofit newsroom . . . founded in 2007-2008."
About Us, ProPublica, https://www.propublica.org/about/ (last visited October 17, 2023).

[19]As noted, in its MSJ Response, Voter Reference addresses only the facts in Defendants'
MSJ that it disputes.  Given the absence of a specific dispute as to this fact, the Court deems the
facts in Defendants' MSJ ¶ 35, at 10 as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material

write.  See Voter Reference MSJ Memo. ¶ 94, at 34 (asserting this fact)(citing O'Matz-Curtas Email Chain at 7).[20]  O'Matz subsequently exchanged a series of emails -- over the course of nearly a month -- with Alex Curtas, the Secretary of State's Communications Director.  See Defendants' MSJ ¶ 40, at 11 (asserting this fact)(citing O'Matz-Curtas Email Chain at 1-7).[21]  The emails begin with O'Matz asking Curtas about Voter Reference's allegations of a discrepancy between the number of ballots reported cast in the 2020 election and the number of voters shown in the voter history.  See Voter Reference MSJ Memo. ¶ 95, at 35 (asserting this fact)(citing O'Matz-Curtas Email Chain at 7).[22]  Curtas responded to O'Matz' inquiry as follows:

> Simply put, VoteRef.com is misleading the public about New Mexico's voter rolls and are perpetuating misinformation. They reflect a lack of understanding about how the process of voter list maintenance works. These attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy and to the professionals who run our elections throughout the country.

---

facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[20]The Defendants state that this fact is "[u]ncontroverted but immaterial."  Defendants' Response ¶ 94, at 11.  The Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[21]As noted, in its MSJ Response, Voter Reference addresses only the facts in Defendants' MSJ that it disputes.  Given the absence of a specific dispute as to this fact, the Court deems the facts in Defendants' MSJ ¶ 40, at 11 as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[22]The Defendants state that this fact is "[u]ncontroverted but immaterial."  Defendants' Response ¶ 95, at 11.  The Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

Voter Reference MSJ Memo. ¶ 95, at 35 (asserting this fact)(quoting O'Matz-Curtas Email Chain at 5). [23]  Curtas also wrote to O'Matz that "we do not have a record of this group requesting voter data from our office directly, which brings into question how they obtained this data, if the data has not been manipulated, and if they are using it for a lawful purpose."  Voter Reference MSJ Memo. ¶ 98, at 36 (asserting this fact)(quoting O'Matz-Curtas Email Chain at 5). [24]  Curtas also stated in his email to O'Matz:

> Because accusations from political operatives like this are meant to impugn the integrity of our voter rolls, I'd also just want to note that our Office is confident that the processes and procedures already in place for voter list maintenance not only follow all state and federal guidelines and keep our voter rolls clean and up-to-date, but go above and beyond those requirements . . . All of these systems combine to ensure that voter information is up-to-date in New Mexico, resulting in our state having some of the "cleanest" voter records in the United States.

Voter Reference MSJ Memo. ¶ 100, at 36 (asserting this fact). [25]  O'Matz asked Curtas in a subsequent email: "Is there anything improper under New Mexico law about accessing the data this

---

[23]The Defendants state that this fact is "[u]ncontroverted but immaterial."  Defendants' Response ¶ 95, at 11.  The Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[24]The Defendants purport to dispute this fact "as to [Voter Reference's] description of this statement as an 'accusation.'"  Defendants' MSJ Response ¶ 98, at 12.  The Defendants proffer that this statement "was factually accurate."  Defendants' MSJ Response ¶ 98, at 12.  The Defendants do not dispute, however, that Curtas wrote these words to O'Matz in an email, and, because the Defendants do not controvert specifically this allegation, the Court will deem this fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[25]The Defendants state that the Voter Reference MSJ Memo. ¶ 100 is "[u]ncontroverted that the quoted material is accurate."  Defendants' MSJ Response ¶ 100, at 12.  Despite this apparent qualification, the Defendants do not explain whether they controvert anything specific about the factual allegation, and accordingly the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

way or posting it all online?  I appreciate any link to the relevant statute."  Voter Reference MSJ

Memo. ¶ 101, at 36 (asserting this fact)(quoting O'Matz-Curtas Email Chain at 4).[26]   O'Matz also

followed up -- before Curtas responded -- by asking the following question:

> I see that your law says the voter rolls can be used only for "Governmental or election and election campaign purposes only."  Unlawful use of lists is a 4th degree felony.
>
> The VoteRef folks say online: "The purpose of this website is to provide public access to official government data pertaining to elections, including voter registration rolls, with a goal of encouraging greater voter participation in all fifty states.  Our system of government is based upon citizen participation.  We believe the people, in effect, own this data and have a legal right to see it in an understandable and transparent form…
>
> Is this an acceptable use under New Mexico law?

Voter Reference MSJ Memo. ¶ 101, at 36-37 (asserting this fact)(quoting O'Matz-Curtas Email

Chain at 3-4).[27]  Curtas responded to O'Matz:

> On the legal issue: Our office believes this publication of voter data by VoteRef.com is in direct violation of the New Mexico Election Code.  We do not believe that posting New Mexican's [sic] private voting information online is legal use of this information. We will refer the use of this information by VoteRef.com to the New Mexico Attorney General for criminal investigation and prosecution.

---

[26]The Defendants state that this fact is "[u]ncontroverted but immaterial."  Defendants' Response ¶ 101, at 12.  The Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[27]The Defendants state that this fact is "[u]ncontroverted but immaterial."  Defendants' Response ¶ 101, at 12.  The Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

Voter Reference MSJ Memo. ¶ 102, at 37 (asserting this fact)(quoting O'Matz-Curtas Email Chain at 2).  See Defendants' MSJ Response ¶ 102, at 12 (uncontroverted).  O'Matz responded by asking: "Question -- can you elaborate on how the publication of voter data online may violate state law? (VoterRef likely will argue that they are using it for election and research purposes.)."  Voter Reference MSJ Memo. ¶ 103, at 37 (asserting this fact)(quoting O'Matz-Curtas Email Chain at 2).[28]

Curtas responded to O'Matz:

> The issue relates to the transfer and publication of the voter data.  This is the crux: We do not believe providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a "governmental purpose," "election related," or "election campaign purposes."
>
> I've attached our referral letter which lays it all out. Let me know if I can provide any clarification on this.

Voter Reference MSJ Memo. ¶ 104, at 37 (asserting this fact)(quoting O'Matz-Curtas Email Chain at 1-2)(all quotation marks in original).[29]  In the quoted portion of the email, Curtas focuses on the

---

[28]Regarding this fact, the Defendants state that it is: "[u]ncontroverted (but immaterial) that the quoted material is accurate."  Defendants' Response ¶ 103, at 12.  The Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  In addition, despite the "quoted material is accurate" qualification, the Defendants do not dispute specifically any fact in the Voter Reference MSJ Memo. ¶ 101.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Consequently, the Court deems the fact undisputed.

[29]The Defendants state that the Voter Reference MSJ Memo., ¶ 104 is "[u]ncontroverted that the quoted material is accurate," but "[c]ontroverted as to the characterization of the quoted material, which is not supported by the text itself."  Defendants' MSJ Response ¶ 104, at 12.  The Court addresses the Defendants' dispute with the "characterization of the quoted material" in the next footnote, but here the Court only quotes the email directly, which the Defendants do not specifically dispute.  Accordingly, the Court will deem the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

idea that "spreading misinformation" renders use of the data unlawful, and refers to the permissible purposes for voter data under the statute: governmental, election related, or election campaign related.  See Voter Reference MSJ Memo. ¶ 104, at 37 (asserting this fact)(quoting O'Matz-Curtas Email Chain at 1-2).[30]   O'Matz' article eventually was published on March 7, 2022, and was titled "Billionaire-Backed Group Enlists Trump-Supporting citizens to Hunt for Voter Fraud Using Discredited Techniques."   Voter Reference MSJ Memo. ¶ 94, at 34 (asserting this fact)(citing Billionaire-Backed Group Enlists Trump-Supporting citizens to Hunt for Voter Fraud Using Discredited Techniques (dated March 7, 2022), filed June 24, 2022 (Doc. 44-4)("ProPublica Article")).[31]  The final article contains statements -- some quoted -- attributed to Secretary Oliver:

> In New Mexico, Secretary of State Maggie Toulouse Oliver also said the undertaking is not an allowable use of voter data. By state law, she said, the rolls can only be used for governmental or campaign purposes.

> "Having voter registration data 'blasted out across the internet' violates state law limiting use of the voter rolls solely for campaign or government activities," she said.  In December, Toulouse Oliver's office referred the matter to the state attorney general for investigation and possible prosecution.

---

[30]Again, the Defendants state that the Voter Reference MSJ Memo. ¶ 104 is "[u]ncontroverted that the quoted material is accurate," but "[c]ontroverted as to the characterization of the quoted material, which is not supported by the text itself."  Defendants' MSJ Response ¶ 104, at 12.  Aside from this general statement, the Defendants do not explain how or why Voter Reference's "characterization" of the email is erroneous.  The Court reads the language of the email, and concludes that Voter Reference's characterization -- stating that the email "focuse[s]," at least in part, on the idea of "spreading misinformation" -- is not wrong or otherwise subject to dispute.  Accordingly, the Court concludes that the material in the text, which accurately describes the content of the email, presents no genuine issue of fact for trial under rule 56(c)(1) of the Federal Rules of Civil Procedure.

[31]The Defendants state that this fact is "[u]ncontroverted but immaterial."  Defendants' Response ¶ 94, at 11.  The Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact in the text undisputed.

Voter Reference MSJ Memo. ¶ 106, at 37-38 (asserting this fact)(quoting ProPublica Article at 10). See Defendants' MSJ Response ¶ 106, at 12 (uncontroverted). In a subsequent deposition, testifying on his own behalf, Curtas stated that he, as "spokesperson" for the Secretary of State's Office, wanted to "push back hard" against misinformation degrading New Mexico's elections. Voter Reference MSJ Memo. ¶ 113 at 39 (quoting Deposition of Hugh Alexander Curtas at 72:17-:22 (dated February 28, 2023), filed April 14, 2023 (Doc. 119-8)("Curtas Depo.")).[32] Curtas also stated that Voter Reference concerned him because it seemed to relate to a "larger kind of strategy of election denialism that focuses on voter list maintenance specifically." Voter Reference MSJ Memo. ¶ 114 at 39 (quoting Curtas Depo. at 72:23-73:12). [33]

d.    **Voter Reference Posts New Mexico Voter Data Online.**

On or about December 16, 2021, Voter Reference posted New Mexico voter information on VoteRef.com. See Voter Reference MSJ Memo. ¶ 68, at 30 (asserting this fact)(citing Voter Reference Press Release at 1; May 17 Tr. at 66:23-25). See Defendants' MSJ Response ¶ 68, at 9 (uncontroverted). In conjunction with this posting, Voter Reference also posted a press release which announced its finding regarding the 3,800-vote discrepancy between the number of ballots reported cast in the 2020 election and the number of voters shown in the voter history. See Voter

---

[32]The Defendants purport to dispute this fact, taking issue with the phrasing of Voter Reference's asserted fact, which states that it was the "Secretary" who wanted to "push back hard" against Voter Reference, and not simply Curtas -- who "was testifying in his individual capacity to his individual actions at work," and he was "not a designated 30(b)(6) representative" testifying on behalf of the Secretary of State's Office as a whole. Defendants' MSJ Response ¶ 113, at 13. The Court agrees that attributing these statements -- taken from Curtas' individual deposition as a fact witness -- to the Secretary of State is not entirely accurate, and thus the Court changes slightly Voter Reference's asserted fact to reflect what the record supports.

[33]The Defendants also purport to dispute this fact, for the same reasons as the previous fact. And for the same reasons as stated in the previous footnote, the Court changes slightly Voter Reference's asserted fact to reflect what the record supports.

Reference MSJ Memo. ¶ 68, at 30 (asserting this fact)(citing Voter Reference Press Release at 1).

See Defendants' MSJ Response ¶ 68, at 9 (uncontroverted).[34]  This press release also states:

> These discrepancies don't necessarily indicate fraud, but the differences between the voter list and the election canvass indicates, at the very least, issues with record keeping and points to the need to be more transparent and proactive about maintaining the voter rolls and reconciling ballots cast and voters having voted in every election.

Voter Reference MSJ Memo. ¶ 69, at 30-31 (asserting this fact)(quoting Voter Reference Press Release at 1).[35]

The New Mexico voter data posted on VoteRef.com contains a registered voter's name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history.  See Voter Reference MSJ Memo. ¶ 60, at 27 (asserting this fact)(citing May 17 Tr. at 40:5-14; id. at 50:10-15; id. at 102:18-22).[36]  The New Mexico voter data

---

[34]The Court notes again that the Defendants dispute the existence of any discrepancy in New Mexico's numbers in the manner described by Voter Reference.  See Defendants' MSJ Response ¶ 66, at 9.  The uncontroverted fact here is that Voter Reference alleges that such a discrepancy exists.

[35]In responding to the Voter Reference MSJ Memo. ¶ 69, the Defendants state: "Uncontroverted and immaterial that the press release stated this.  Controverted that there is evidentiary support for this conclusion."  The Court quotes the Voter Reference Press Release solely for the purpose of memorializing the statements made in that press release, and the Court does not deem the allegations of any discrepancy undisputed.  In addition, the Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact that the press release contained this statement undisputed.

[36]In responding to the Voter Reference MSJ Memo. ¶ 60, the Defendants state: "Uncontroverted as to New Mexico voter data."  Because the material in the text explicitly only refers the New Mexico voter data posted on VoteRef.com, and the Defendants do not dispute specifically any of the factual assertions in Voter Reference MSJ Memo. ¶ 60 regarding the New Mexico voter data, the Court will deem the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

posted on VoteRef.com does not include any voter's voter ID number, social security number, telephone number, or email address.  See Voter Reference MSJ Memo. ¶ 60, at 27 (asserting this fact)(citing May 17 Tr. at 40:5-14; id. at 50:10-15; id. at 102:18-22).[37]  Users of VoteRef.com agree to website's Terms of Service, which reads, in part:

> VoteRef.com and the services offered through VoteRef.com are only for election-related, non-commercial use . . . You may not use information on VoteRef.com for any purpose unrelated to elections.  You may not use information on VoteRef.com for commercial purposes.  "Commercial purposes" includes use in connection with advertising or promoting commercial products or services, or for the purpose of sale, resale, solicitation, or for any purpose in which the user can reasonably anticipate the receipt of monetary gain from direct or indirect use.  For example, you may not sell information obtained from VoteRef.com, or use it in connection with advertising or promoting commercial products or services, or solicitation.
>
> You may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law.  By way of example but not limitation, you may not: (a) act in a manner that negatively affects other users' ability to engage in real time exchanges; (b) alter, edit, or delete the materials on VoteRef.com, including the deletion of any trademark or copyright notices on VoteRef.com; (c) interfere with or disrupt VoteRef.com, VRF's servers, or networks (e.g., "flooding" or the sending of mass unsolicited messages) or otherwise harm VoteRef.com or other users; (d) intentionally or unintentionally violate any applicable local, state, national, or international law or any regulations having the force of law; (e) impersonate any person or entity or misrepresent your connection to any person or entity; (f) "stalk," harass, or otherwise advocate the stalking or harassing of another person; (g) collect or store personally identifiable information about other users in connection with the prohibited conduct and activities set forth herein; (h) reproduce, duplicate, copy, sell, trade, resell, or exploit for any commercial purposes, any portion of VoteRef.com; (i) attempt to override or circumvent any security measures of VoteRef.com or VRF's third party providers or access parts of VoteRef.com you are

---

[37]In responding to the Voter Reference MSJ Memo. ¶ 60, the Defendants state: "Uncontroverted as to New Mexico voter data."  Because the material in the text explicitly only refers the New Mexico voter data posted on VoteRef.com, and the Defendants do not dispute specifically any of the factual assertions in Voter Reference MSJ Memo. ¶ 60 regarding the New Mexico voter data, the Court will deem this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

> not authorized to visit; (j) engage in any unauthorized screen scraping, database scraping, or spidering, or collection of personally identifiable information, or use any other automated means to collect information from VoteRef.com; (k) use any software, tool, or other device (such as browsers, spiders, or avatars) to search VoteRef.com, other than the search functionality offered through VoteRef.com or other generally available web browsers . . .

Voter Reference MSJ Memo. ¶ 61, at 28 (asserting this fact)(citing First Amended Complaint ¶ 62, at 16-17; and Answer to First Amended Complaint at ¶ 62, at 9).  See Terms of Service, VoteRef.com, https://voteref.com/terms-of-service (last visited October 17, 2023); Defendants' MSJ Response ¶ 61, at 8 (uncontroverted).  When the voter data from New Mexico was posted on the website, there was also a State-specific disclaimer that appeared when a website user sought to view New Mexico voter data:

> The information on this website about this voter, including records of this voter's voting history, was provided to Voter Reference Foundation LLC ("VRF") by the New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15, 2021.  The information is publicly available here.  The information published here by VRF appears exactly as provided by the Bureau.  By publishing Bureau records verbatim, VRF does not state, represent, suggest, or imply that this voter voted or that this voter's ballot was not counted.  Additionally, the registration information of any voter who is in the Safe At Home program (hereinafter referred to as a "protected voter") must be removed from the publicly available voter list by the New Mexico Secretary of State. If you believe the information provided to VRF by the Bureau is inaccurate, or if you believe that you or any person listed on VoteRef.com is a protected voter whose protected information should not appear on VoteRef.com, please immediately contact the Bureau by emailing sos.elections@state.nm.us or calling 505-827-3600.  For assistance with the process of becoming a protected voter, click here (Safe At Home program).  Upon receipt of official documentation confirming your or any person's protected voter status sent to us at privacy@voteref.com, VRF will remove the protected information from VoteRef.com.

Voter Reference MSJ Memo. ¶ 62, at 28-29 (citing May 17 Tr. at 56:18-57:12; First Amended Complaint ¶ 63, at 17-18; and Answer to First Amended Complaint at ¶ 63, at 9).[38]  While the New

---

[38]The Defendants purport to controvert this factual assertion to some degree, stating: "Uncontroverted as to the disclaimer that appeared when a user clicks on an individual New Mexico voter's individual page.  But for states remaining on VoteRef.com, voter data is also

Mexico Voter data was posted on VoteRef.com, it was accessible to anybody -- provided that they agreed to the website's terms of service and state-specific disclaimer -- free of charge.  See Voter Reference MSJ Memo. ¶ 64, at 29 (citing First Amended Complaint ¶ 67, at 18; and Answer to First Amended Complaint at ¶ 67, at 10); May 17 Tr. at 95:19-21 (Swoboda); Defendants' MSJ Response ¶ 64, at 9 (uncontroverted).

     **e.**     **Criminal Referral.**

On December 20, 2021, Deputy Secretary of State Sharon Pino wrote a letter to the Attorney General referring Voter Reference for criminal investigation and prosecution pursuant to allegations that Voter Reference had violated State laws in the transfer and posting of New Mexico voter data. See Voter Reference MSJ Memo. ¶ 74, at 32 (citing Letter, Potential Criminal Transfer and Use Violation of Voter Data, from Sharon Pino to Anne Kelly (dated December 20, 2021), filed June 24, 2022 (Doc. 44-3)("Criminal Referral Letter")); Defendants' MSJ Response ¶ 74, at 10 (uncontroverted).  The Office of the Attorney General sent a copy of the Criminal Referral Letter to the Federal Bureau of Investigation.  See Defendants' MSJ ¶ 50, at 13 (asserting this fact)(citing Email from Anna Trujillo to FBI (dated January 26, 2022), filed June 24, 2022 (Doc. 44-3)).[39]

---

available, however, on a state-by-state basis, which data can be scrolled through without the display of this disclaimer."  Defendants' MSJ Response ¶ 62, at 9 (citing VoteRef.com).  Because the Defendants do not dispute that this disclaimer appeared on the website when New Mexico voter data was live, and that the disclaimer appeared when a user clicked on an individual New Mexico voter's page, the Court deems these facts as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[39]As the Court notes above, in its MSJ Response Voter Reference addresses only the facts in the Defendants' MSJ that it disputes.  Given the absence of a specific dispute as to this fact, the Court deems the facts in Defendants' MSJ ¶ 50, at 13, as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

The Criminal Referral Letter alleges that Voter Reference -- and Local Labs -- potentially violated provisions of the Election Code by partaking in "the transfer and publication of [] voter data [] in direct violation of the Election Code."  Criminal Referral Letter at 2.  See Defendants' MSJ ¶ 44, at 12 (asserting this fact).[40]  The Court includes the text of the letter -- which is addressed to Anne Kelly, Chief Deputy Attorney General, and signed by Sharon Pino, Deputy Secretary of State -- in full:

> Ms. Kelly:
>
> The SOS is referring a criminal matter for investigation and prosecution related to an illegal transfer and use of voter data information pursuant to NMSA 1978, Section 1-4-5.6.  It has come to our attention that a website maintained and operated by VoteRef.com has posted New Mexico voter data on its website obtained through a voter data request from out office.  The voter data can be found on the following website, [URL omitted].  The likely source of the voter data transfer is through David Michael Lippert at Local Labs, who was provided voter data in April of this year.  We have attached out office's communication with Mr. Lippert regarding his voter data request.  We believe that this data was illegally provided by Mr. Lippert or Local Labs to VoteRef.com and is being used against New Mexico state law.  Swift action is needed as voter data can quickly be manipulated and used to spread election misinformation.
>
> **Facts**
>
> On or about April 15, 2021, our office provided Mike Lippert voter data. [].  Mr. Lippert was provided the entire statewide voter file after he paid $ 5,378.12 and signed a Voter Information Authorization Form swearing, they "will not use or make available to others to use the requested material for purposes other than governmental, election, research, and campaign purposes under penalty of law."  [].  On or about December 15, 2021, our office was contacted regarding the publication of New Mexico voter data information on the website VoteRef.com.  After some investigation, we believe VoteRef.com obtained this voter data information illegally from Mr. Lippert or Local Labs and posted it online.  Upon inspection of VoteRef.com's website code, it includes Local Labs as a code contributor. [].
>
> **Criminal Violations**

---

[40]Voter Reference purports to controvert this fact, but for reasons described in the footnote that follows, the Court deems the content of the Criminal Referral Letter to be undisputed.

Pursuant to NMSA 1978, Section 1-4.5.5 (C): Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for <u>governmental or election and election campaign purposes</u> only and shall not be made available or used for unlawful purposes.  "Election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state, or local government.  § 1-4-5.5(E)(1).  "Governmental purpose" means noncommercial purposes relating in any way to the structure, operation, or decision-making of a federal, state, or local government.  § 1-4-5.5(E)(2).  We do not believe that providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a "governmental purpose," "election related," or "election campaign purposes."

Pursuant to NMSA 1978, Section 1-4-5.6(B), any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth-degree felony and upon conviction shall be find one hundred dollars ($100) for each and every line of voter information that was unlawfully used.  Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act [Chapter 1, Article 5 NMSA 1978].  § 1-4-5.6(C).  Additionally, NMSA 1978, Section 1-5-22(A), states and the Signed Authorization Form quotes that, "[u]nlawful disposition of the voter file consists of the willful selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or apart of the file by a data processor; a data processor's agent or employee; a state or county officer; or a state or county officer's deputy, assistant, employee or agent to anyone not authorized by the Voter Records System Act to have possession of the file."

### Conclusion

Our office believes the transfer and publication of the voter data is in direct violation of the Election Code.  We believe that both VoteRef.com and Local Labs have violated the prohibition against "providing" voter data by posting New Mexican's private voter information online, or in Local Labs [sic] case, providing the voter data to VoteRef.com.  We also believe that VoteRef.com and Local Labs have illegally "used" this voter data by publishing it on VoteRef.com.  If you need anything further from our office, please do not hesitate to contact us.

Criminal Referral Letter at 1-2 (citations to exhibits omitted in []; fourth alteration in original; [sic] added; other brackets in original).[41]  These allegations of criminal wrongdoing -- as the Criminal Referral Letter reflects -- are based in the following statutes:

_____

[41]While neither Voter Reference nor the Defendants quote the entirety of the Criminal

1-4-5.5.        **Requests for voter data, mailing labels or special voter lists.**

A.        The county clerk or secretary of state shall furnish voter data, mailing labels or special voter lists only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section; provided, however, all requesters shall be treated equally in regard to the charges and the furnishing of the materials.

B.        In furnishing voter data, mailing labels or special voter lists, the county clerk or secretary of state shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters.

C.        Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes.

D.        The secretary of state shall prescribe the form of the affidavit.

E.        As used in this section:

(1)        "election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;

(2)        "governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;

(3)        "mailing labels" means prepared mailing labels of selected voters arranged in the order in which requested and providing only the name and address of the voter;

(4)        "special voter list" means a prepared list of selected voters arranged in the order in which requested; and

---

Referral Letter in their motions for summary judgment, both refer to it, and there is no factual dispute about the Criminal Referral Letter's contents.  See Voter Reference MSJ Response ¶ 18, at 11 ("[T]he referral . . . speaks for itself."); Defendants' MSJ ¶ 44, at 12 through ¶ 46 at 13 (discussing the Criminal Referral Letter).  The Court includes the entirety of the Criminal Referral Letter in its Factual Background Section for the purpose of completeness.  Accordingly, the Court concludes that the Criminal Referral Letter's content is not in dispute, as neither party has called into question its authenticity as it appears in the record.

> (5)    "voter data" means selected information derived from the
> voter file.

Defendants' MSJ ¶ 1, at 2-3 (asserting this fact)(citing N.M.S.A. § 1-4.5.5).[42]  N.M.S.A. § 1-4-5.6,

at the time of the Criminal Referral Letter, read in its entirety:

> **1-4-5.6.    Unlawful use of voter data, mailing labels or special voter
> lists; penalties.**
>
> A.    Unlawful use of voter data, mailing labels or special voter lists
> consists of the knowing and willful use of such information for purposes prohibited
> by the Voter Records System Act [Chapter 1, Article 5 NMSA 1978].
>
> B.    Any person, organization or corporation or agent, officer,
> representative or employee thereof who commits unlawful use of voter data, mailing
> labels or special voter lists is guilty of a fourth degree felony and upon conviction
> shall be fined one hundred dollars ($100) for each and every line of voter
> information that was unlawfully used.
>
> C.    Each and every unlawful use of voter data, mailing labels or special
> voter lists constitutes a separate offense.

Defendants' MSJ ¶ 2, at 3-4 (asserting this fact)(citing N.M.S.A. § 1-4-5.6 (2011))(brackets in

original).[43]   The third State law statute that is relevant to the Defendant's theory of criminal

wrongdoing under the Election Code is N.M.S.A. § 1-5-22's penalty provision:

> **1-5-22.    Unlawful disposition of voter file; penalty.**
>
> A.    Unlawful disposition of voter file consists of the willful selling,
> loaning, providing access to or otherwise surrendering of the voter file, duplicates
> of the file or a part of the file by a data processor; a data processor's agent or
> employee; a state or county officer; or a state or county officer's deputy, assistant,

---

[42]As noted, in its MSJ Response, Voter Reference addresses only the facts in Defendants' MSJ that it disputes.  Given the absence of a specific dispute as to this fact, the Court deems the facts in Defendants' MSJ ¶ 1, at 2-3 as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[43]As noted, in its MSJ Response, Voter Reference addresses only the facts in Defendants' MSJ that it disputes.  Given the absence of a specific dispute as to this fact, the Court deems the facts in Defendants' MSJ ¶ 2, at 3-4 as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

employee or agent to anyone not authorized by the Voter Records System Act to
have possession of the file.

        B.     For purposes of this section, a file maintenance list shall be
considered a voter file or a part of a voter file.

        C.     Any data processor, officer, deputy, assistant, agent or employee
who commits unlawful disposition of a voter file is guilty of a fourth degree felony.

Defendants' MSJ ¶ 3, at 4 (asserting this fact)(citing N.M.S.A. § 1-5-22).[44]  The Defendants' legal

theory in the Criminal Referral Letter as to Voter Reference's potential wrongdoing is that -- on the

basis of N.M.S.A. § 1-4-5.5(C) -- voter data may be used for "governmental or election and election

campaign purposes only," N.M.S.A. § 1-4-5.5(C), and the Criminal Referral Letter states that the

Secretary of State "do[es] not believe providing the personal voter data on a private website that

intends to spread misinformation about the 2020 General Election meets the definition of

appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign

purposes.'"  Criminal Referral Letter at 2 (quoting N.M.S.A. § 1-4-5.5(C)).

        **f.**        **Voter Reference's February, 2022, Request for Voter Data.**

        On February 15, 2022, Voter Reference sent a request for voter data to the Secretary of

State, requesting

The total count, by county/precinct of any registered voters who cast a ballot in the
November 3, 2020, [sic] who have been subsequently placed in an inactive, canceled
deleted, removed (or any registration status other than active) or any voter that has
been removed or deleted from the voter rolls between November 3, 2020 and April
13, 2021.

Voter Reference MSJ Memo. ¶ 115, at 39 (citing Email from Voter Reference to "Election

Official," assigned to Patrick Rostock at 2 (dated February 15, 2022), filed June 24, 2022 (Doc. 44-

---

[44]As noted, in its MSJ Response, Voter Reference addresses only the facts in Defendants'
MSJ that it disputes.  Given the absence of a specific dispute as to this fact, the Court deems the
facts in Defendants' MSJ ¶ 2, at 3-4 as undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts
set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

16)("February 15 Voter Data Request")).   See Defendants' MSJ Response ¶ 115, at 13 (uncontroverted).   On March 10, 2022, Voter Reference had not received a response and sent a follow-up message asking for an update.   See Voter Reference MSJ Memo. ¶ 116, at 39 (citing February 15 Voter Data Request at 1).   See Defendants' MSJ Response ¶ 116, at 13 (uncontroverted).  Patrick Rostock -- a paralegal and custodian of records in the Secretary of State's Office -- forwarded this follow-up email to Mandy Vigil and Sharon Pino, stating in part: "Per Dylan's contact with the AG, we are not fulfilling records requests from VoteRef."  Voter Reference MSJ Memo. ¶ 117, at 39 (citing February 15 Voter Data Request at 1).   See Defendants' MSJ Response ¶ 117, at 13 (uncontroverted).   The voter data that Voter Reference requests in the February 15 Voter Data Request was not produced.  See Voter Reference MSJ Memo. ¶ 120, at 40 (citing Deposition of Mandy Vigil at 163:12-164:22 (dated February 27, 2023), filed April 14, 2023 (Doc. 119-5)("Vigil Depo.")).[45]

---

[45]The Defendants state that the Voter Reference MSJ Memo. ¶ 120, at 40, is

[u]ncontroverted that the Secretary's representative testified as follows: "Q: And has this policy ever changed at the secretary of state's office?  A: What policy?  Q: "Per [general counsel]'s contact with the AG, we are not fulfilling records request from Vote Ref?"  A: I don't think it was a policy, but certainly it is based on legal advice related to this case and our understanding of the use of the data that that's still the position we maintained."

Defendants' MSJ Response ¶ 120, at 13 (citing Vigil Depo. at 164:14-22)(quotation marks in original).  The Defendants take issue with Voter Reference's assertion -- in the Voter Reference MSJ Memo. ¶ 120, at 40 -- that "[t]he Secretary [of State] continues to maintain the decision it made in March 2022 that it will not fulfill VRF's voter data requests."  Voter Reference MSJ Memo. ¶ 120, at 40 (citing Vigil Depo. at 163:12-164:22).  The nub of this factual dispute -- to the extent one exists -- seems to be somewhat semantic around whether the Secretary of State's decision not to produce records in response to the February 15 Voter Data Request was a formal "decision" or "policy."  Because, however, there is no specific dispute whether the requested data was produced, the Court deems the fact in the text undisputed.

g.      **Voter Reference Removes Online Voter Data**.

On March 28, 2022, Voter Reference removed the New Mexico voter data from VoteRef.com "out of fear that it would be prosecuted based on the Secretary's interpretation of the law and her referral of VRF[46] to the AG for potential prosecution."  Voter Reference MSJ Memo. ¶ 130, at 41-42 (citing May 17 Tr. at 69:11-18 (Greim, Swoboda)).  See Defendants' MSJ Response ¶ 130, at 14 (uncontroverted).  The same day, Voter Reference filed its Verified Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief, filed March 28, 2022 (Doc. 1)("Initial Complaint"), seeking declaratory and injunctive relief against the Defendants under theories based on the First Amendment, the Fifth Amendment, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  See Voter Reference MSJ Memo. ¶ 130, at 41-42 (citing May 17 Tr. at 69:11-18 (Greim, Swoboda)).   See Defendants' MSJ Response ¶ 130, at 14 (uncontroverted).[47]  The same day that it filed its Initial Complaint, Voter Reference also filed its Motion for Preliminary Injunction, filed March 28, 2022 (Doc. 3)("PI Motion").[48]  During the time that the New Mexico voter data was posted online, both Voter Reference and the Secretary of State's Office received messages from individuals who expressed concern about their privacy and

---

[46]In the Voter Reference MSJ Memo., Voter Reference is referred to by the acronym VRF.

[47]Neither party specifically discusses the Initial Complaint in their undisputed fact sections. In the Voter Reference MSJ Memo. ¶ 130, at 41-42, Voter Reference states only that it removed the voter data from its website "just before this lawsuit was initially filed."  Voter Reference MSJ Memo. ¶ 130, at 41.  The Court cites to the First Complaint for the purposes of context and factual completeness, although it will discuss the legal background of the litigation in more detail below in the Procedural Background Section.

[48]Neither party specifically discusses the PI Motion in their undisputed fact sections, although Voter Reference discusses the Court's eventual Memorandum Opinion and Order on the PI Motion.  See Voter Reference MSJ Memo. ¶ 179, at 49.  Again, the Court will discuss the PI Motion, and its related Memorandum Opinion and Order, in further detail below in the Procedural Background section.  Here, the PI Motion is mentioned for context and completeness.

safety.  See Defendants' MSJ Response ¶ 245, at 27 (asserting this fact)(citing Collection of Emails and Phone Call Notes (various dates), filed May 12, 2023 (Doc. 126-1)("Phone Calls and Emails Re Voter Data Post"); Declaration of Mandy Vigil ¶ 5, at 2 (dated November 10, 2022), filed May 12, 2023 (Doc. 126-2)("Vigil Dec."); Collection of Emails to Voter Reference (various dates), filed May 12, 2023 (Doc. 126-3)("Emails to Voter Reference Re Voter Data Post").[49]

> ### h.    Voter Reference's May, 2022, NVRA Request, and the Secretary's Response.

On May 27, 2022, while the PI Motion was pending before the Court, Voter Reference sent a letter to the Secretary of State, with the subject "Notice of Violation of National Voter Registration

---

[49]Voter Reference purports to controvert this fact on the grounds that the Vigil Dec. "makes conclusory factual allegations" without attaching the actual complaints, and the "complaints" in the Phone Calls and Emails Re Voter Data Post and the Emails to Voter Reference Re Voter Data Post are "inadmissible hearsay" and/or "fail to demonstrate any concrete harm actually caused by VRF's posting of New Mexico voter data."  Voter Reference MSJ Reply ¶ A, at 11.  Voter Reference further asserts that many of the "complaints" in these documents do not come from New Mexico residents and also that many "exhibit the same hostility towards VRF's viewpoints that the Defendants have shown, hostility which is not proper to weigh against VRF."  Voter Reference MSJ Reply ¶ A, at 11 (citing Phone Calls and Emails Re Voter Data Post at 1).  The Court concludes that the domiciles and viewpoints of the individuals sending these complaints are not a proper basis on which to dispute the fact asserted in the text, which concerns only the question whether these entities received complaints.  As for the hearsay contention, Voter Reference states that these complaints are inadmissible, because the "Defendants rely on these notes for the truth of the matter asserted -- that is, that the unidentified third parties expressed the recited concerns on the phone."  Voter Reference MSJ Reply ¶ A, at 12.

The Court concludes that the statements in the Phone Calls and Emails Re Voter Data Post and the Emails to Voter Reference Re Voter Data Post are not hearsay, because they are not being used to prove the truth of the matters asserted in the statements.  Rather, the statements -- as a collection -- are being used to show that both Voter Reference and the Secretary of State's Office received messages from individuals who expressed concern about their privacy and safety.  The Defendants do not make impermissible use of the statements in the emails, such as, for example, by asserting as a fact that some New Mexico residents are concerned about Voter Reference's actions.  Instead, the permissible use that the Defendants make of these out-of-court statements is to show only that individuals have expressed to the Defendants such concern, which the Defendants can do irrespective whether the email-declarants are genuine and truthful in their expressions of concern.  Accordingly, the Court concludes that there is no material dispute as to this fact, and thus the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

Act & Request for Records."  Voter Reference MSJ Memo. ¶ 133, at 42 (citing Letter from Edward

D. Greim to Secretary Oliver (dated May 27, 2022), filed June 24, 2022 (Doc. 44-22)("NVRA

Letter")).[50]  In the NVRA Letter, Voter Reference "apprised the Secretary of her statutory duty to

make certain voter data available for public inspection pursuant to the NVRA."  Voter Reference

MSJ Memo. ¶ 135, at 42 (citing NVRA Letter).[51]   The NVRA Letter discusses and quotes a

particular provision of the NVRA which Voter Reference calls the "Public Inspection Provision,"

Voter Reference MSJ Memo. ¶ 29, at 21, which is codified at 52 U.S.C. § 20507(i)(1), and reads,

in full:

> Each State shall maintain for at least 2 years and shall make available for
> public inspection and, where available, photocopying at a reasonable cost, all
> records concerning the implementation of programs and activities conducted for the
> purpose of ensuring the accuracy and currency of official lists of eligible voters,

---

[50]The Defendants purport to dispute this fact, stating this this fact "presents only legal argument and legal conclusions."  Defendants' MSJ Response ¶ 133, at 15.  The Defendants take issue with part of the Voter Reference MSJ Memo. ¶ 133, at 42, that states that the NVRA Letter was sent "pursuant to [52 U.S.C.] § 20510(b)(1)."  Voter Reference MSJ Memo. ¶ 133, at 42   The Defendants "deny that this letter did, in fact, constitute an appropriate notice under the referenced statute."  Defendants' MSJ Response ¶ 133, at 15.  The Court agrees that whether the NVRA Letter is appropriate under the statute's requirements is a legal conclusion, and the Court will address that matter -- if at all -- in its Analysis Section.  The Defendants, however, "do not controvert that a letter so titled was sent on May 27, 2022."  Defendants' MSJ Response ¶ 133, at 15.  Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[51]The Defendants purport to dispute this fact, stating: "Controverted to the extent this SOF states that the May 27 letter 'again apprised the Secretary,' as this letter was VRF's first mention of the NVRA."  Defendants' MSJ Response ¶ 135, at 15 (source of quoted material not cited, but appears to come from the Voter Reference MSJ Memo. ¶ 135, at 42).  The Court agrees that Voter Reference's citations to the record do not support use of the word "again," as the citation does not include any information that Voter Reference had discussed the NVRA before the NVRA Letter.  Accordingly, in the text above, the Court has removed the word "again" from the quotation.  The Defendants state that, aside from this specific dispute, it is "[u]ncontroverted that the letter contained the remaining assertions, with which Defendants' [sic] do not agree."  Defendants' MSJ Response ¶ 135, at 15.  Accordingly, the Court deems the fact in the text to be undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

52 U.S.C. § 20507(i)(1).   See Voter Reference MSJ Memo. ¶ 29, at 21 (citing 52 U.S.C. § 20507(i)(1)).[52]   The NVRA Letter also states that the NVRA preempts the New Mexico State statutory provisions -- those that the Criminal Referral Letter cites -- and that "the Secretary's refusal to respond to VRF's February 15, 2022, request violates the NVRA's Public Inspection Provision."   Voter Reference MSJ Memo. ¶ 135, at 42 (citing NVRA Letter at 3).[53]   The NVRA

_____

[52]Neither Voter Reference nor the Defendants cite the entirety of 52 U.S.C. § 20507(i)(1) in their motions for summary judgment.  Voter Reference, however, cites a portion of the provision in the Voter Reference MSJ Memo. ¶ 29, at 21.  However, in the same asserted fact -- Voter Reference MSJ Memo. ¶ 29, at 21 -- Voter Reference also states that "[t]hose 'records [referenced in 52 U.S.C. § 20507(i)(1)] which must be made available pursuant to the NVRA include the 'file maintenance list' and 'voter data' as those terms are defined in N.M. Stat. § 1-5-2, as well as 'voter data' as that term is used in N.M. Stat. § 1-4-5.5."  Voter Reference MSJ Memo. ¶ 29, at 21.  The Defendants "[o]bject[]" to this asserted fact, stating: "This SOF presents only legal argument and legal conclusions and does not comport with Fed. R. Civ. P. 56 or local rule D.N.M.LR-Civ. 56.1(b).  It requires no response, but to the extent one is desired, Defendants' [sic] deny and controvert this statement. See generally Argument & Authorities infra."  Defendants' MSJ Response ¶ 29, at 5.  The Court agrees that the latter part of the asserted fact at Voter Reference MSJ Memo. ¶ 29, at 21, makes legal conclusions regarding the application of the NVRA.  The Court will address that issue in the Analysis section of this opinion.  For the purposes of the Factual Background section, however, the Court concludes that Voter Reference's assertions regarding the application of the 52 U.S.C. § 20507(i)(1) are not undisputed facts, and therefore declines to adopt them.  The Defendants' objection, however, does not cast doubt on the text of 52 U.S.C. § 20507(i)(1), and thus the Court deems that portion of Voter Reference's asserted fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, because the parties do not dispute the statute's text, the Court cites the provision in its entirety for the purpose of completeness.

[53]As noted in a previous footnote, the Defendants purport to dispute the fact in the text, but only on the ground that Voter Reference implies -- in the first sentence of the Voter Reference MSJ Memo. ¶ 135 -- that the NVRA Letter was not the first time that Voter Reference apprised the Secretary of State of her NVRA disclosure duties.  See Defendants' MSJ Response ¶ 135, at 15.  The Defendants state that, aside from this specific dispute, it is "[u]ncontroverted that the letter contained the remaining assertions, with which Defendants' [sic] do not agree."  Defendants' MSJ Response ¶ 135, at 15.  Accordingly, the Court deems the fact in the text to be undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Letter also requests that Secretary Oliver, "pursuant to [her] obligations under the NVRA, 52 U.S.C. § 20507(i) and New Mexico law, N.M. Stat. § 1-4-5.5," NVRA Letter at 4, provide the following voter data:

> 1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.
>
> 2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active. [sic]

Voter Reference MSJ Memo. ¶ 136, at 43 (asserting this fact)(citing NVRA Letter at 4).[54]  In the NVRA Letter, Voter Reference provides the Secretary of State with the following information how the requested data will be used:

> VRF's intended election use comprises two distinct projects. For its first project, just as VRF publishes voter data for many other states, and as it recently published voter data in New Mexico, VRF intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters online if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding.
>
> For its second project, VRF intends to analyze the records, information, and data provided in response to the above requests in order to engage in a discrepancy review of the New Mexico voter rolls.  VRF intends to publish this analysis online without disclosing the personal information of any individual voter.  VRF will

---

[54]The Defendants do not state that this fact is controverted or uncontroverted, instead stating only: "*See* Response to SOF 135, *supra*." Defendants' MSJ Response ¶ 136, at 15.  The Court discusses the referenced "SOF 135" in the previous two footnotes.  The Court understands that the Defendants do not agree with the quoted material, but do not dispute that the quoted material appears in the NVRA letter.  Accordingly, the Court deems the fact in the text to be undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

comply with this non-public-disclosure promise for the data it uses on its second project regardless of whether it prevails in the Federal Litigation.  And again, for the sake of clarity, no personal information of any individual voter will be published online unless VRF is granted relief in the Federal Litigation or in any other legal proceeding.

NVRA Letter at 4.  See Voter Reference MSJ Memo. ¶ 137, at 43 (citing NVRA Letter at 4).[55]

Voter Reference attaches to the NVRA Letter two completed Voter Information Authorization forms, one for each category of voter data requested in the NVRA Letter.  See Voter Reference MSJ Memo. ¶ 138, at 43 (asserting this fact)(citing NVRA Letter at 8-9).[56]  Gina Swoboda of Voter

---

[55]While neither Voter Reference nor the Defendants quote these two paragraphs of the NVRA Letter in their motions for summary judgment, both refer to them, and there is no factual dispute about the NVRA Letter's contents.  See Voter Reference MSJ Memo. ¶ 137, at 43 (summarizing the contents of the paragraphs quoted above); Defendants' MSJ ¶ 137, at 15 (disagreeing with Voter Reference's summary of the quoted paragraphs, but "[u]ncontroverted as to the remainder").  The Court agrees that Voter Reference's summarization of these paragraphs is not accurate.  For example, in the Voter Reference MSJ Memo. ¶ 137, at 43, Voter Reference states that: "VRF stated [in the NVRA Letter] that for the second project -- the internal review and analysis of the data -- no publication would occur regardless of the outcome of any litigation."  Voter Reference MSJ Memo. ¶ 137, at 43 (quoting NVRA Letter).  Voter Reference's cited material, which states, as it relates to the second project, that "no personal information of any individual voter will be published online unless VRF is granted relief in the Federal Litigation or in any other legal proceeding," NVRA Letter at 4, does not support the asserted fact.  Because the material in the record does not support Voter Reference's summarization, the Court does not adopt Voter Reference's proposed fact as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Instead, the Court includes the NVRA Letter's relevant text for the purposes of completeness and to ease the Defendants' concerns about how Voter Reference summarizes these paragraphs in the Voter Reference MSJ Memo. ¶ 137, at 43.  Accordingly, the Court concludes that the NVRA Letter's text is not in dispute, as no party has called into question the NVRA Letter's authenticity as it appears in the record.

[56]The Defendants state that this fact is "[u]ncontroverted that along with the letter in which VRF said it would publish online voter data in the event of a favorable preliminary injunction ruling it submitted affidavits swearing that it would never do so."  Defendants' MSJ Response ¶ 138, at 15-16.  The Court discusses this quasi-objection in more detail in the following footnote, but for now the Court notes that the Defendants do not object specifically to the fact that the NVRA Letter includes two signed Voter Information Authorization forms.  Accordingly, the Court deems the fact in the text to be undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Reference signed the two Voter Information Authorization forms attached to the NVRA Letter;

both state that the request's purpose is "Election Related," and both are signed under an attestation

that reads:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).

> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

NVRA Letter at 8-9.[57]  On June 16, 2022, the Secretary of State formally responded to the NVRA

Letter.  See Voter Reference MSJ Memo. ¶ 141, at 43-44 (asserting this fact)(citing Letter from

Dylan Lange to Edward Greim (dated June 16, 2022), filed April 14, 2023 (Doc. 119-11)("NVRA

Letter Response")).[58]  The NVRA Letter Response, reads in full:

---

[57]While neither Voter Reference nor the Defendants quote the attestation in the Voter Information Authorization forms attached to the NVRA Letter in their motions for summary judgment, both refer to it, and there is no factual dispute about the Voter Information Authorization form's contents.  See Voter Reference MSJ Memo. ¶ 138, at 43 (stating that "VRF provided completed affidavits for each of the separate requests"); Defendants' MSJ ¶ 138, at 15-16 (stating that Voter Reference "submitted affidavits" with the NVRA letter).  As noted in the previous footnote, the Defendants assert that these attestations indicate that Voter Reference is "swearing" that it would not "publish online voter data."  Defendants' MSJ Response ¶ 138, at 15-16.  As a factual matter, Voter Reference did not swear that it would not publish online voter data.  The Defendants try to make the attestation say something it does not say -- arguing that publishing voter data online does not fall within statutory meaning of the phrases "governmental, election, research and campaign purposes."  NVRA Letter at 8-9.  The Court rejected this argument in the Memorandum Opinion and Order at 137-59, filed July 22, 2022 (Doc. 51)("PI MOO").  The Court includes the attestation text for the purpose of completeness and to indicate the content of the statements Voter Reference submitted with the NVRA Letter.  Accordingly, the Court concludes that the text of the Voter Information Authorization form attestation is not in dispute.

[58]In response to this fact, the Defendants state that it is

[u]ncontroverted that the Secretary's office responded to the May 27 letter by letter dated June 16.  That letter speaks for itself and correctly points out that VRF's specific requests would have required the generation of new documents and

On May 27, 2022, our Office received your Notice of Violation of the National Voter Registration Act ("NVRA")("Notice").  In the Notice, you allege a violation of 52 U.S.C. § 20507(i)(1).  You allege that Voter Reference Foundation ("VRF") made a NVRA request for records via email on February 15, 2022. *See Exhibit. A of the Notice* Specifically, the email stated:

> "Dear Election Official,
>
> Please provide us with the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021."

The February 15 email was not a request for a record that is maintained by our Office; rather, it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to be aggregated and analyzed. Such an inquiry would require our Office to conduct research, aggregate data from multiple sources, generate a report, and potentially separate protected information from such report.  While under the NVRA our Office must allow for the inspection of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," this is not a requirement that compels an agency to create new records. 52 U.S.C. § 20507(i)(1).  Indeed, both state and federal courts have held as such regarding records request. See NMSA 1978, § 14-2-8(B) ("Nothing in the Inspection of Public Records Act shall be construed to require a public body to create a public record."); *Forsham v. Harris*, 445 U.S. 169, 186 (1980)("FOIA imposes no duty on the agency to create records.).  Therefore, your assertion that we violated the NVRA with respect to the February 15, 2022 email is incorrect.

In addition, in your Notice you have requested the following information:

> 1. A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted,

---

analyses, rather than just the production of existing records.

Defendants' MSJ Response ¶ 141, at 16.  In the text, the Court states only that the NVRA Response Letter was sent on June 16, 2022, in response to the NVRA Letter.  Because this fact is not specifically disputed by the Defendants, the Court deems it undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active).

As with the February 15 email referenced above, Item #1 is not a request for a record, as we do not maintain a list such as the one described therein.  As such, we consider both requests closed under the NVRA and, to the extent applicable, IPRA.

With respect to Item #2 and the Affidavit you submitted as required by New Mexico law, in the Notice, VRF states that it "intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding."  Notice at 4.  As you know from the Federal Litigation and otherwise, it is our position that publishing any New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability.  As such, we believe it prudent to delay production of this data at this time; we will either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal.  *See* NMSA 1978, § 1-20-15 ("Conspiracy to violate the Election Code consists of knowingly combining, uniting or agreeing with any other person to omit any duty or commit any act, the omission of which duty, or combination of such act, would by the provisions of the Election Code constitute a fourth degree felony.").

NVRA Letter Response at 1-2 (all punctuation as in original).[59]   As the NVRA Letter Response

makes clear, the Secretary of State's Office cited to Freedom of Information Act, 5 U.S.C. § 552,

and Inspection of Public Records Act, N.M.S.A. §§ 14-2-1 to 14-2-11, case law for the proposition

---

[59]While neither Voter Reference nor the Defendants quote the entirety of the NVRA Letter Response in their motions for summary judgment, both refer to it, and there is no factual dispute about the NVRA Letter Response's contents.  See Voter Reference MSJ Response ¶ 141, at 30-31; Defendants' MSJ ¶ 141, at 16 (stating that the NVRA Response Letter "speaks for itself").  The Court includes the entirety of the NVRA Letter Response in its Factual Background Section for the purpose of completeness.  Accordingly, the Court concludes that the NVRA Letter Response's content is not in dispute, as neither party has called into question its authenticity as it appears in the record.

that the February 15 Voter Data Request is not a proper request for records under the NVRA, because it would require the Secretary of State's Office to create a new record. See Voter Reference MSJ Memo. ¶ 141, at 43-44 (asserting this fact)(citing NVRA Letter Response).[60] The NVRA Letter Response also indicates that the same request for voter data made in the NVRA Letter is likewise not a proper request for voter data as it also requires the creation of a new record. See Voter Reference MSJ Memo. ¶ 141, at 43-44 (asserting this fact)(citing NVRA Letter Response).[61] The Attorney General provided legal advice to the Secretary of State in denying the requests for voter data in the NVRA Letter. See Voter Reference MSJ Memo. ¶ 142, at 44 (asserting this fact)(citing Transcript of June 15, 2023, Hearing on PI Motion at 93:11-20 (dated June 15, 2022), filed June 24, 2022 (Doc. 46)("June 15 Tr.")(Serafimova, Vigil)).[62] As the NVRA Letter Response

---

[60]In response to this fact, the Defendants state: "Uncontroverted that the Secretary's office responded to the May 27 letter by letter dated June 16. That letter speaks for itself and correctly points out that VRF's specific requests would have required the generation of new documents and analyses, rather than just the production of existing records." Defendants' MSJ Response ¶ 141, at 16. The Court concludes that this statement is not a specific dispute to Voter Reference's asserted fact. Accordingly, because the fact in the text is not disputed specifically by the Defendants, the Court deems it undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[61]In response to this fact, the Defendants state: "Uncontroverted that the Secretary's office responded to the May 27 letter by letter dated June 16. That letter speaks for itself and correctly points out that VRF's specific requests would have required the generation of new documents and analyses, rather than just the production of existing records." Defendants' MSJ Response ¶ 141, at 16. The Court concludes that this statement is not a specific dispute to Voter Reference's asserted fact. Accordingly, because the fact in the text is not disputed specifically by the Defendants, the Court deems it undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[62]The Defendants state that it is "[u]ncontroverted that the Attorney General provided legal advice to the Secretary in this matter." Defendants' MSJ Response ¶ 142, at 16 (no record citation provided). Accordingly, the Court deems the fact in the text undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

makes clear, Secretary Oliver did not deny the voter data request because of any defect in the Voter Authorization forms submitted by Voter Reference as attachments to the NVRA Letter.  <u>See</u> Voter Reference MSJ Memo. ¶ 154, at 46 (asserting this fact)(citing Vigil Depo. at 168:24-170:1).  <u>See</u> Defendants' MSJ ¶ 154, at 17 (uncontroverted).  One of the reasons that the Secretary of State's Office rejected this request is that it claimed that Voter Reference would post the voter data online.  <u>See</u> Voter Reference MSJ Memo. ¶ 155, at 46 (asserting this fact)(citing Vigil Depo. at 170::2-11); Defendants' MSJ ¶ 155, at 17 (uncontroverted).  And although the NVRA Letter states that, "no personal information of any individual voter will be published online unless VRF is granted relief in the Federal Litigation or in any other legal proceeding," NVRA Letter at 4, the Secretary of State's Office believed that Voter Reference might be using the term "personal information" in a "narrow" manner, which contributed to the Secretary of State's Office's concern.  Voter Reference MSJ Memo. ¶ 156, at 46 (citing Vigil Depo. at 172:23-174:7).[63]   Despite this concern, nobody from the Secretary of State's Office reached out to Voter Reference for clarification on what "personal information" meant in this context.  Voter Reference MSJ Memo. ¶ 156, at 46 (citing Vigil Depo. at 172:23-174:7).[64]  The Secretary of State's Office's position not to provide voter data to Voter Reference was not "revisited," even following representations, in court, of Voter Reference that it would not post voter data online absent court authority, and the decision not to revisit this

---

[63]The Defendants purport to controvert this fact "in part," Defendants' MSJ Response ¶ 156, at 17, on the basis that Voter Reference's representation of its "promise[]" not to share voter data was more "limited" than what Voter Reference's asserted fact suggests, Defendants' MSJ Response ¶ 156, at 17.  Here, the Court has attempted to avoid any misrepresentation by quoting directly from the NVRA Letter.  Aside from this issue, the Defendants state that the remainder of the fact in Voter Reference MSJ Memo. ¶ 156, at 46, is uncontroverted.  <u>See</u> Defendants' MSJ Response ¶ 156, at 17-18.

[64]<u>See</u> previous footnote, this portion of the fact in Voter Reference MSJ Memo. ¶ 156, at 46, is uncontroverted.  <u>See</u> Defendants' MSJ Response ¶ 156, at 17-19.

position was "based on guidance from . . . counsel."  Vigil Depo. at 175:5-10.  See Voter Reference MSJ Memo. ¶ 157, at 46 (citing Vigil Depo. at 174:21-175:14).[65]

### i.     The File Maintenance Report.

Pursuant to a New Mexico Statute, the Secretary of State is obliged to create a "file maintenance report."  Voter Reference MSJ Memo. ¶ 146, at 44 (asserting this fact)(citing Defendant Maggie Toulouse Oliver's Response to Plaintiff Voter Reference Foundation's First Interrogatories, Requests for Production, and Requests for Admission at 2, filed April 14, 2023 (Doc. 119-12)("Secretary of State First Interrogs. Resp.").[66]  The statute -- codified at N.M.S.A. § 1-5-14 -- reads:

> A.     At least once a month, the secretary of state shall have made from the state voter file a file maintenance report of additions, deletions and changes, if any, to each of the county registers. The file maintenance report shall indicate whether each entry listed is an addition, deletion or change to the county register.
>
> B.     A digital version of the file maintenance report shall be stored by the secretary of state for at least one year.

---

[65]Again, the Defendants controvert this asserted fact to the extent that it implies that Voter Reference "has ever stated that it would permanently refrain from posting individual voter data online."  Defendants' MSJ Response ¶ 157, at 8.  The Court concludes that this is not the obvious implication of this asserted fact, and the above-quoted portion of the NVRA Letter indicates that Voter Reference's promise not to publish the voter data online is clearly conditional: "no personal information of any individual voter will be published online unless VRF is granted relief in the Federal Litigation or in any other legal proceeding."  NVRA Letter at 4.

[66]In response to this fact, the Defendants dispute a part of the Voter Reference MSJ Memo. ¶ 146, at 44, which states that "[t]he Secretary previously admitted that it maintained a file maintenance report, but argued that VRF's request was not clear enough to indicate that it was requesting that report."  The Defendants controvert "the characterization of the Secretary's Response to Interrogatory 2, which stated that VRF had requested a compilation of information that was different than what a file maintenance list would show."  Defendants' MSJ ¶ 146, at 17 (no record citation provided).  The Defendants state, however, that the remainder of the Voter Reference MSJ Memo. ¶ 146, at 44, is "[u]ncontroverted."  Defendants' MSJ ¶ 146, at 17.  In the text above, the Court states only that a statute exists that mandates the existence of a statutory duty to create a maintenance report.  Because the Defendants do not dispute specifically this fact, the Court deems it undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

C.      Upon request, the secretary of state shall furnish an updated voter file to the state chair of each of the qualified political parties in the state. Upon request, the county clerk shall provide a file maintenance report or an updated voter file to the county chair of each of the qualified political parties in the county.

D.      File maintenance reports and updated voter files shall be provided in a manipulable digital format and shall not include the voter's social security number, codes used to identify the agency where the voter registered, the voter's day and month of birth, the voter's email address, or, if prohibited by the voter, the voter's telephone number.

N.M.S.A. § 1-5-14.[67]   In an interrogatory, Voter Reference asked the Secretary of State "whether

[it] maintain[s] a 'file maintenance list' as that term is defined under N.M.S.A. 1-5-2,[68] and, if so,

how that record differs from the record request by VRF in its May 27, 2022 request [i.e., the NVRA

Letter] for voter data."   Secretary of State First Interrogs. Resp. at 2.   See Voter Reference MSJ

Memo. ¶ 146, at 44 (citing Secretary of State First Interrogs. Resp. at 2).[69]   In response to this

interrogatory, the Secretary of State said:

_____

[67]While neither Voter Reference nor the Defendants quote N.M.S.A. § 1-5-14 in their motions for summary judgment, Voter Reference cites to the statute in the Voter Reference MSJ Memo. ¶ 146, at 44, and the Defendants do not dispute the fact that N.M.S.A. § 1-5-14 mandates that the Secretary of State "must create a 'file maintenance report' at least monthly which shows additions, deletions, and changes, if any, to each of the county registers."   Voter Reference MSJ Memo. ¶ 146, at 44 (citing Secretary of State First Interrogs. Resp.).   Because the statute's basic mandatory provision is not in dispute, the Court quotes the statute in the Factual Background Section for the purpose of completeness.

[68]N.M.S.A § 1-5-2 is the definitions section of the Voter Records System Act, N.M.S.A. §§ 1-5-1 to -31, and defines the term "file maintenance list to mean: "any prepared listing that reflects additions, deletions or changes to the voter file."   N.M.S.A. § 1-5-2(G).   "Voter file" -- in turn -- is defined as "all voter registration information required by law and by the secretary of state that has been extracted from the certificate of registration of each voter in the county, stored on data recording media and certified by the county clerk as the source of all information required by the Voter Records System Act."   N.M.S.A. § 1-5-2(N).

[69]Neither party quotes the text of this interrogatory, but both refer to it and there is no dispute as to the fact that Voter Reference asked this question.   See Voter Reference MSJ Memo. ¶ 146, at 44 (citing Secretary of State First Interrogs. Resp.); Defendants' MSJ Response ¶ 146, at 17 (discussing, but not citing, Secretary of State First Interrogs. Resp.).   As noted in a previous footnote, the Defendants controvert Voter Reference's characterization as to the response to this

The Secretary notes that discovery is ongoing and more facts may be ascertained that are currently unknown to The Secretary.   Accordingly, The Secretary reserves the right to supplement this response.

The Secretary objects to Interrogatory No. 2 as requiring a legal conclusion as to the distinction between a term defined under New Mexico statutes and the particular information requested in VRF's May 27, 2022 request for voter data.

Without waiving, and subject to, the foregoing General and Specific Objections, The Secretary maintains a "file maintenance list" as that term is defined under N.M.S.A. 1978, Sec. 1-5-2.  In its May 27, 2022 request for voter data, VRF requested

A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same

As defined in Sec. 1-5-2(G), a "file maintenance list" means "any prepared listing that reflects additions, deletions or changes to the voter file."  Whereas the information requested in VRF's May 27 request sought the creation of a record comprised of a highly specific subsets of voters limited to a specific period of time. Such a record was not previously created or maintained by The Secretary and thus cannot be provided for inspection by The Secretary.

Secretary of State First Interrogs. Resp. at 2 (capitalization as in original).[70]  The Secretary of State's

Office "does have list maintenance data that [it] would be able to produce if [it] received a legal

_____

interrogatory -- an issue which is discussed further in the next footnote, but the Court deems the text of the interrogatory itself undisputed.

[70]As noted, in the Voter Reference MSJ Memo. ¶ 146, at 44, Voter Reference summarizes this interrogatory response, stating that the Secretary of State "admitted that it maintained a file maintenance report, but argued that VRF's request was not clear enough to indicate that it was requesting that report."  Voter Reference MSJ Memo. ¶ 146, at 44 (citing Secretary of State First Interrogs. Resp.).  The Defendants controvert this characterization, stating that the response to the interrogatory "stated that VRF had requested a compilation of information that was different than what a file maintenance list would show."  Defendants' MSJ ¶ 146, at 17.  The Court carefully has reviewed the cited portion of the record -- which is cited in full in the text above -- and agrees with the Defendants that the text of the Secretary of State First Interrogs. Resp. does not support Voter Reference's characterization.  Voter Reference contends that the Secretary of State First Interrogs. Resp. "argue[s] that VRF's request was not clear enough to indicate that it was requesting that

request, and appropriate legal request." Voter Reference MSJ Memo. ¶ 147, at 45 (asserting this fact)(quoting Vigil Depo. at 28:24-19:1).   See Defendants' MSJ Response ¶ 148, at 17 (uncontroverted).  The Secretary of State's Office would "have to provide voter list maintenance data when someone makes a request under the NVRA."  Voter Reference MSJ Memo. ¶ 149, at 45 (asserting this fact)(quoting Vigil Depo. at 30:15-19).  See Defendants' MSJ Response ¶ 149, at 17 (uncontroverted).  It is Secretary Oliver's position that, "because voter list maintenance data under the NVRA is voter data for state law purposes, even NVRA requests must be accompanied by the required affidavit promulgated by the Secretary: 'Anytime a requester is asking us to receive voter data, state law requires that they complete an affidavit.'"  Voter Reference MSJ Memo. ¶ 150, at 45 (asserting this fact)(quoting Vigil Depo. at 30:20-31:4).  See Defendants' MSJ Response ¶ 150, at 17 (uncontroverted).  Moreover, as the NVRA Letter Response states, the Secretary of State's position is that "publishing *any* New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability."  Voter Reference MSJ Memo. ¶ 151, at 45 (asserting this fact)(quoting NVRA Letter Response at 2 (emphasis in original)).  See Defendants' MSJ Response ¶ 151, at 17 (uncontroverted).

---

report," but the Court does not see where the Secretary of State First Interrogs. Resp. makes any argument regarding lack of clarity.  Instead, as the Defendants argue, the Secretary of State First Interrogs. Resp. states that Voter Reference's request for data "sought the creation of a record comprised of a highly specific subsets of voters limited to a specific period of time," Secretary of State First Interrogs. Resp. at 2 -- i.e., a more specific subset of data than the file maintenance list showed -- and for this reason denied the request.  Accordingly, the Court does not adopt Voter Reference's asserted fact as undisputed.  See D.N.M. LR-Civ 56.1(b).  The Court emphasizes that it does not -- here -- make any conclusions regarding whether the reasons in the Secretary of State First Interrogs. Resp. for denying the request for voter data legally are sound.  Rather, the dispute over characterization concerns only the question of what the Secretary of State First Interrogs. Resp. says.  In any event, for the reasons stated in the previous footnote, the Court quotes the interrogatory response in its entirety and deems the content of the response undisputed.

j.      **SERVIS Database.**

The State of New Mexico contracts with a third-party vendor to store voter data in a database called SERVIS, and this database is housed on a server that is owned by the Secretary of State.  See Voter Reference MSJ Memo. ¶ 160, at 47 (asserting this fact)(citing Deposition of Greg Rockstroh at 10:18-11:15 (taken March 20, 2023), filed April 14, 2023)(Doc. 119-13)("Rockstroh Depo.");  id. at 15:2-4).[71]  See Defendants' MSJ Response ¶ 160, at 18 (uncontroverted).  The Secretary of State's Office receives voter registration information from the State of New Mexico Motor Vehicle Division, and the Secretary of State's online voter registration system.  See Voter Reference MSJ Memo. ¶ 161, at 47 (asserting this fact)(citing Rockstroh Depo. at 12:3-7).  See Defendants' MSJ Response ¶ 161, at 18 (uncontroverted).  The SERVIS system stores -- among other things -- voter credits which reflect data showing a voter has cast a vote in a given election, as well as how a voter registered.  See Voter Reference MSJ Memo. ¶ 162, at 47 (asserting this fact)(citing Rockstroh Depo. at 14:6-12; id. at 20:10-13).  See Defendants' MSJ Response ¶ 162, at 18 (uncontroverted). Even after a voter is no longer "active," the voter's data remains stored in the SERVIS system, where it remains indefinitely.  See Voter Reference MSJ Memo. ¶ 171, at 48 (asserting this fact)(citing Rockstroh Depo. at 23:15-19; id. at 24:1-2).  See Defendants' MSJ Response ¶ 162, at 18 (uncontroverted).   The Secretary of State's Office uses the SERVIS system to develop reports detailing different aspects of voter data, normally in response to voter data requests and or requests made under the New Mexico Inspection of Public Record Act, N.M.S.A. §§ 14-2-1 through -12

---

[71]The Court notes that the cited portion of the Rockstroh Depo. states that the database is called "SERVIAS," not "SERVIS."  Rockstroh Depo. at 11:3.  The parties agree, however, that the database is called SERVIS, and the Secretary of State's website confirms that spelling.  See New Mexico Secretary of State, State of New Mexico Voter Data Information Request, https://www.sos.state.nm.us/voting-and-elections/data-and-maps/ (last visited October 26, 2023)("SERVIS (State Elections Registration & Voting Integrity System) data may be purchased for data may be purchased for government and campaign purposes only.").

("IPRA").  See Voter Reference MSJ Memo. ¶ 163, at 47 (asserting this fact)(citing Rockstroh

Depo. at 16:5-7; id. at 17:8-10).  See Defendants' MSJ Response ¶ 163, at 18 (uncontroverted).

The SERVIS system can generate certain types of reports automatically upon the request of

an authorized user.  See Voter Reference MSJ Memo. ¶ 164, at 47 (citing Rockstroh Depo. at 31:2-

8).[72]  The reports that are capable of being automatically generated are called "canned reports," and

---

[72]The Court changes slightly Voter Reference's asserted fact to reflect what the record
supports.  Voter Reference's asserted fact reads: "An authorized user can log into SERVIS and
pick and choose what data he or she wants included in a report."  Voter Reference MSJ Memo.
¶ 164, at 47 (citing Rockstroh Depo. at 31:2-8).  The Defendants take issue with this asserted fact -
- stating that it is "[c]ontroverted in part."  Defendants' MSJ Response ¶ 164, at 18.  To explain,
the Defendants state:

> Mr. Rockstroh testified that SERVIS offers certain types of reports, using certain
> fields of data, that can be automatically produced upon user request.  Rockstroh
> Dep., ECF No. 119-13, 31:2-8.  VRF refers to these as "canned" reports.  See SOF
> 166.  But reports other than these canned reports cannot be auto-run by SERVIS
> and instead require IT personnel to individually work with raw data to create.  Id.
> at 26:9-27:1.

Defendants' MSJ Response ¶ 164, at 18 (internal citations in original).  The Court carefully has
reviewed the cited portions of the record and concludes that the cited portions of the Rockstroh
Depo. do not support fully Voter Reference's asserted fact, for substantially the same reasons as
those the Defendants discuss.  To understand why Voter Reference stretch the content of the
Rockstroh Depo., the Court provides some context to the deposition testimony Voter Reference
cites.

The Rockstroh Depo. states that there are certain report requests that are, in effect, pre-
programed in SERVIS.  See Rockstroh Depo. at 16:15-16; id. at 18:6-23.  Rockstroh refers to these
as "canned reporting that is available within SERVI[]S" and notes that such reports are easily
accessible on the "front end." Rockstroh Depo. at 16:15-16.  Some of these canned reports "came
just as part of the system from the vendor," while the Secretary of State programmed others in
response to information that "the office, in conjunction with county clerks . . . wanted on a regular
basis but were not included" in the canned reports that came with the system.  Rockstroh Depo. at
18:13-23.  Rockstroh guessed that there "are between 30 and 40 different canned reports in the
system." Rockstroh Depo. at 18:7-9.  Rockstroh stated that, as an example of the voter data that
can be accessed via a canned report, there is a canned report of "all . . . registered voters for a certain
county."  Rockstroh Depo. at 18:2-5.  These canned reports can be generated with a "click."
Rockstroh Depo. at 31:2-8.

This portion of the record does not support, however, Voter Reference's broader assertion -
- as stated in Voter Reference's asserted fact -- that an authorized user on SERVIS can "pick and
choose what data he or she wants included in a report."  Voter Reference MSJ Memo. ¶ 164, at 47

these reflect specific data sets that are retrieved on a regular basis.  See Voter Reference MSJ Memo.

¶ 166, at 47 (asserting this fact)(citing Rockstroh Depo. at 18:7-9).  See Defendants' MSJ Response

¶ 166, at 18 (uncontroverted).[73]  There are approximately thirty to forty different canned reports.

See Voter Reference MSJ Memo. ¶ 166, at 47 (asserting this fact)(citing Rockstroh Depo. at 18:7-

9).  See Defendants' MSJ Response ¶ 166, at 18 (uncontroverted).  The voter data that comprises

"[a] complete list by county/precinct of any registered voters who cast a ballot in the November 3,

2020 general election" is a canned report.  Rockstroh Depo. at 38:18-39:23.  See Voter Reference

MSJ Memo. ¶ 176, at 48 (asserting this fact)(citing Rockstroh Depo. at 38:18-39:23).[74]  The "file

maintenance list" -- referenced above, see Factual Background Section 2(i) supra, at 42-46 -- is also

a canned report.  See Voter Reference MSJ Memo. ¶ 172, at 48 (asserting this fact)(citing Rockstroh

Depo. at 24:11-18).[75]

---

(citing Rockstroh Depo. at 31:2-8).  Based on the Court's review of the Rockstroh Depo., only the canned reports can be generated in this manner.  The Rockstroh Depo. states that the generation of a report that is not a canned report takes "several days" and must be completed by IT staff, not just any authorized SERVIS user.  Rockstroh Depo. at 26:9-27:10.  Accordingly, the Court changes slightly Voter Reference's asserted fact to reflect what the record supports, and the Court does not adopt Voter Reference's proposed fact as undisputed.  See D.N.M. LR-Civ 56.1(b).

[73]For more background information on "canned reports," see the Court's discussion in the previous footnote.

[74]The Defendants state that this asserted fact is "[c]ontroverted to the extent this SOF implies that VRF's requests could be fulfilled by canned reports."  Defendants' MSJ Response ¶ 176, at 19.  The Court sees nothing in Voter Reference's asserted fact that hints at such an implication, and the Defendants also state that it is "[u]ncontroverted that this limited portion of VRF's request could be fulfilled using a canned report."  Defendants' MSJ Response ¶ 176, at 19. Regardless of its relationship to Voter Reference's requests for voter data, there is no dispute that a voter data set with the stated criteria is a "canned report."  Accordingly, because there is no specific dispute to the fact in the text, the Court deems that fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[75]The Defendants purport to controvert this fact, stating: "Controverted.  Mr. Rockstroh's next statement was that he was not familiar with the contents of such a report."  Defendants' MSJ

In addition to these canned reports, the Secretary of State's information technology personnel are capable of generating non-canned reports from the numerous data fields in the SERVIS system.  See Voter Reference MSJ Memo. ¶ 167, at 48 (asserting this fact)(citing Rockstroh Depo. at 19:12-15).  See Defendants' MSJ Response ¶ 167, at 18 (uncontroverted).  Such non-canned reports sometimes are requested and can take up to multiple weeks to fulfill.  See Voter Reference MSJ Memo. ¶ 175, at 48 (asserting this fact)(citing Rockstroh Depo. at 34:13-36:14).[76]

---

Response ¶ 172, at 19 (citing Rockstroh Depo. at 24:11-21).  The Court concludes that the Defendants have not disputed sufficiently this fact, because instead of explaining why the file maintenance list is not a canned report, they instead controvert whether Mr. Rockstroh was familiar with the contents of the report.  Accordingly, because there is no specific dispute to the fact in the text, the Court deems that fact undisputed. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[76]The Defendants purport to controvert portions of Voter Reference's asserted fact found at Voter Reference MSJ Memo. ¶ 175, at 48 (citing Rockstroh Depo. at 34:13-36:14).  The asserted fact reads in full: "The Secretary's staff run reports for other requesters of voter data that are not 'canned' reports and can therefore take up to multiple weeks to fulfill."  Voter Reference MSJ Memo. ¶ 175, at 48 (citing Rockstroh Depo. at 34:13-36:14).  The Defendants respond:

> Uncontroverted that the Secretary's staff has fulfilled requests for non-canned reports and those can take days or weeks to fulfill.  Controverted that the testimony cited supports the SOF or the implication that such non-canned reports are frequent or usual: "Q: And have you ever received a request like that before? A: Yes. Q: Okay. When was that? A: I don't recall. Q: In the last five years? A: Yes. Q: Do you know who made the request? A: No." Rockstroh Dep., ECF No. 119-13, 36:8-16.

Defendants' MSJ Response ¶ 175, at 19.  The Court has reviewed carefully the cited portion of the record and concludes that the Defendants have not disputed adequately Voter Reference's asserted fact.  The Court understands the asserted fact to have two components: (i) that the Secretary's staff -- at least sometimes -- runs reports for voter data that are not available via a "canned report"; and (ii) the generation of such non-canned reports can take up to multiple weeks to fulfill.  See Voter Reference MSJ Memo. ¶ 175, at 48 (citing Rockstroh Depo. at 34:13-36:14).  The Court concludes that the cited portion of the record supports both assertions.  See Rockstroh Depo. at 35:25-36:20 (stating that deponent has seen a request for a non-canned report in the last five years, and that those requests take "somewhat longer")  Accordingly, because the Defendants have not specifically disputed the facts in the text, the Court deems those facts undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

When the Secretary of State's information technology personnel are unable to generate a requested report, the Secretary of State's Office contacts the vendor for assistance. <u>See</u> Voter Reference MSJ Memo. ¶ 169, at 48 (asserting this fact)(citing Rockstroh Depo. at 21:10-17). <u>See</u> Defendants' MSJ Response ¶ 169, at 19 (uncontroverted). The vendor charges no fee for such assistance. <u>See</u> Voter Reference MSJ Memo. ¶ 169, at 48 (asserting this fact)(citing Rockstroh Depo. at 21:10-17). <u>See</u> Defendants' MSJ Response ¶ 169, at 19 (uncontroverted). The Secretary of State's Office never has rejected a request for voter data because the request requires too much work to generate a report for the requested data. Voter Reference MSJ Memo. ¶ 170, at 48 (asserting this fact)(citing Rockstroh Depo. at 21:18-23).[77]

Whether canned or non-canned, voter data reports that are obtained from the SERVIS database do not exist before a user selects settings in the system and generates a report for specific data. <u>See</u> Voter Reference MSJ Memo. ¶ 165, at 47 (asserting this fact)(citing Rockstroh Depo. at 31:13-16); Defendants' MSJ Response ¶ 165, at 18 (uncontroverted). Every discrete change to an individual's voter file is retained in SERVIS; the system does not reflect only the most recent change. <u>See</u> Voter Reference MSJ Memo. ¶ 173, at 48 (asserting this fact)(citing Rockstroh Depo. at 27:17-25; <u>id.</u> at 26:2-7); Defendants' MSJ Response ¶ 173, at 19 (uncontroverted). SERVIS users also can set date ranges for voter data. <u>See</u> Voter Reference MSJ Memo. ¶ 174, at 48 (asserting this fact)(citing Rockstroh Depo. at 32:4-7); Defendants' MSJ Response ¶ 174, at 19 (uncontroverted). A data report showing voters who voted in the 2020 General Election who since

---

[77]In response to this asserted fact, the Defendants state: "Uncontroverted that Mr. Rockstroh had no knowledge of such a denial." Defendants' MSJ Response ¶ 170, at 19. Because the Defendants do not controvert specifically the fact in the text, the Court deems it undisputed. <u>See</u> D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

have been placed in an inactive, canceled, deleted, or removed status may not appear in a canned report, but such a report is available, and a member of the Secretary of State's staff can pull the report from the SERVIS system.  See Voter Reference MSJ Memo. ¶ 177, at 49 (asserting this fact)(citing Rockstroh Depo. at 39:24-40:11); Defendants' MSJ Response ¶ 177, at 19 (uncontroverted).   Similarly, a data report that shows all voters who had been removed between two dates may not be a canned report, but such a report is available, and a member of the Secretary of State's staff could be pull the report from the SERVIS system.  See Voter Reference MSJ Memo. ¶ 178, at 49 (asserting this fact)(citing Rockstroh Depo. at 40:12-25); Defendants' MSJ Response ¶ 178, at 19 (uncontroverted).

### k.   Preliminary Injunction.

On July 22, 2022, the Court issued a preliminary injunction, enjoining the Defendants "from prosecuting Plaintiff Voter Reference Foundation, LLC, under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs."  Voter Reference MSJ Memo. ¶ 179, at 49 (asserting this fact)(quoting Memorandum Opinion and Order at 201, filed July 22, 2022 (Doc. 51)("PI MOO")).[78]  See Defendants' MSJ Response ¶ 179, at 19 (uncontroverted).  In the PI MOO, the Court expressly rejects the Defendants' legal theory upon which the Defendants had premised their policy that prohibits voter data from being shared, disseminated, distributed, published, or otherwise made available by a requestor to any third party.  See Voter Reference MSJ Memo. ¶ 180, at 49 (asserting this fact)(quoting PI MOO at 137-49).[79]  In the PI MOO, the Court

---

[78]The Court will discuss the PI MOO in further detail below in the Procedural Background section.  Here, the PI MOO is mentioned for context and completeness.

[79]The Defendants "[o]bject[]" to this asserted fact, stating: "This SOF presents only legal argument and other non-fact materials and does not comport with Fed. R. Civ. P. 56 or local rule 56.1. It requires no response, but to the extent one is desired, Defendants' [sic] refer to their Argument & Authorities, *infra*."  Defendants' MSJ Response ¶ 180, at 19.  The Court does not agree that this fact presents "only legal argument."  Defendants' MSJ Response ¶ 180, at 19.  The

also concludes that "New Mexico's Election Code does not prohibit Voter Reference -- or any organization -- from posting voter data online." See Voter Reference MSJ Memo. ¶ 181, at 49 (asserting this fact)(quoting PI MOO at 151).[80]  The PI MOO also holds that Voter Reference's internal analysis of aggregated voter data either is a governmental or is an election purpose under N.M.S.A. § 1-4-5.5.  See Voter Reference MSJ Memo. ¶ 182, at 49 (asserting this fact)(citing PI MOO at 150).[81]  The Court also held that Voter Reference's publication of voter data on the internet

---

Court reads the asserted fact as a description of the PI MOO, which of course contains many legal arguments, but the Court does not agree that a description of a legal argument is -- itself -- a legal argument.  The asserted fact describes something that happened in the past; it is, in some sense, an empirical fact.  The Defendants, of course, are entitled to disagree with this characterization of the contents of the PI MOO, but have not elected to controvert it.  Accordingly, because the Court concludes that Voter Reference's asserted fact is not making a legal argument, and because the Defendants do not controvert specifically the asserted fact, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[80]At the outset, the Court notes that the quoted material from the PI MOO appears on page 152, and not on page 151.  More substantively, the Defendants again "[o]bject[]" to this asserted fact on the grounds that the asserted fact "presents only legal argument and other non-fact materials and does not comport with Fed. R. Civ. P. 56 or local rule 56.1.  It requires no response, but to the extent one is desired, Defendants' [sic] refer to their Argument & Authorities, *infra*." Defendants' MSJ Response ¶ 181, at 20.  Perhaps even more than the previous asserted fact, the Court disagrees that this asserted fact presents "only legal argument." Defendants' MSJ Response ¶ 180, at 19.  The quoted material comes from the PI MOO and quotes a sentence that makes a legal conclusion.  The description or quoting of this legal conclusion is not -- itself -- a legal conclusion.  Accordingly, because the Court concludes that Voter Reference's asserted fact is not making a legal argument, and the Defendants do not controvert specifically the asserted fact, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[81]Again, the Defendants "[o]bject[]" to this asserted fact on the grounds that the asserted fact "presents only legal argument and other non-fact materials and does not comport with Fed. R. Civ. P. 56 or local rule 56.1.  It requires no response, but to the extent one is desired, Defendants' [sic] refer to their Argument & Authorities, *infra*." Defendants' MSJ Response ¶ 182, at 20.  Again, the Court concludes that this asserted fact does not present only legal argument.  The asserted fact quotes a portion of the record which supports the asserted fact, and -- as discussed above -- it is a description of a legal conclusion, but not a legal conclusion itself.  Accordingly, because the Court concludes that Voter Reference's asserted fact is not making a legal argument, and because the Defendants do not controvert specifically the asserted fact, the Court deems the fact in the text

is a "governmental purpose" for the purposes of N.M.S.A. § 1-4-5.5.  Voter Reference MSJ Memo.

¶ 183, at 49 (asserting this fact)(citing PI MOO at 150-51).[82]  In reliance on the Court's issuance of

the PI in the PI MOO, Voter Reference reposted the New Mexico voter data that it already possessed

on VoteRef.com.  See Voter Reference MSJ Memo. ¶ 184, at 50 (asserting this fact)(citing Vigil

Depo. at 123:12-19); Defendants' MSJ Response ¶ 184, at 20 (uncontroverted).

### l.   Voter Reference's October, 2022, Request for Voter Data, and the Secretary's Response.

On October 18, 2022, Voter Reference sent another request for voter data to the Secretary

of State, requesting -- among other things -- the same data that it had requested in the NVRA Letter.

See Voter Reference MSJ Memo. ¶ 185, at 50 (asserting this fact)(citing Letter from Dylan Lange

to Gina Swoboda (dated November 17, 2022), filed April 14, 2023 (Doc. 119-14)("Lange

November 17 Response Letter")[83]).  See Defendants' MSJ Response ¶ 185, at 20 (uncontroverted).

---

undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[82]The Defendants once again reprise their "legal argument" objection.  Defendants' MSJ Response ¶ 183, at 20.  For the same reasons as stated in the previous footnote, the Court overrules this objection and concludes that, because Voter Reference's asserted fact is not making a legal argument, and because the Defendants do not controvert specifically the asserted fact, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[83]Voter Reference does not cite to any portion of the record that contains an email or letter which is dated October 18, 2022, and requests voter data from the Secretary of State.  Instead, to support its asserted fact, Voter Reference cites to a letter that the Secretary of State's counsel sent in response to the October 18, 2022, request.  See Lange November 17 Response Letter.  The first sentence of the Lange November 17 Response Letter, however, supports Voter Reference's asserted fact.  The Lange November 17 Response Letter, which is addressed to Gina Swoboda of Voter Reference, reads: "On October 18, 2022, you requested the following records pursuant to the National Voter Registration Act of 1993, 52 U.S.C. § 20501, et seq., and specifically 52 U.S.C. § 20507(i)."  Lange November 17 Response Letter at 1.

On November 17, 2022, the Secretary of State's Office responded to this request, in a letter that

states, in full:

> On October 18, 2022, you requested the following records pursuant to the National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.*, and specifically 52 U.S.C. § 20507(i). This request is also being made under the New Mexico Public Records Law, NMSA 1978, § 14-2-1 to -12:
>
> > 1.      *Voter registration data for all voters, including each voter's classification or status (e.g., active, inactive, suspended, canceled, purged, etc.), down to the lowest geopolitical subdivision available (precinct, municipality, town, county, etc.), as it exists on November 8, 2022, or as close to this date as possible;*
> >
> > 2.      *Records reflecting the total ballots cast, statewide, in the November 8, 2022, general election;*
> >
> > 3.      *Voter registration data for all voters removed or canceled from any voter list (e.g. active list, inactive list, suspended list, purged list, deleted list, etc.) between September 24, 2022 and December 15, 2022;*
> >
> > 4.      *Voting history/credit data for each voter that voted in items 1-3 for the November 8, 2022, general election, including the method of voting (election day polling place, absentee, early, etc.), and the voting jurisdiction the vote occurred in, down to the lowest geopolitical subdivision available (precinct, municipality, town, county, etc.); and*
> >
> > 5.      *The unique voter ID or key identifier of each voter that voted in the November 8, 2022, general election*
>
> To begin with, request number 3, is a request for future data that does not/did not exist at the time of your request and we cannot fulfil [sic] requests in perpetuity. Additionally, the only request you have made that is not for voter data is request number 2. This information is located on our website at: https://electionresults.sos.state.nm.us/default.aspx. There is a drop-down option on the left-hand side that will lead you to the specific records you seek. These are not official results until they are certified.
>
> Additionally, we will refrain from producing any responsive voter data maintained by our office at this time due to numerous issues further detailed below. To begin with this decision is motivated by the fact that you will post any voter data provided on your website, which our office believes is a violation of law. You have not indicated that you will not post any voter data online, and based on your past

practice, we believe you will do so again.  Finally, on November 10, 2022, we filed a Motion to Stay the Preliminary Injection Pending Appeal, in Appellate Case 22-2101, and do not think it is appropriate to produce voter data until the Court has ruled on the motion.

To further clarify another point, you have not complied with NMSA 1978 Section 1-4-5.5 in requesting voter data, by not submitting the required affidavit.  The New Mexico District Court, in its Memorandum and Order stated that "the State may prohibit requesters from posting voter data online without violating the First Amendment, because there is no right of access to government data." *VoterRef v. Balderas*, 2:2-0222 at 194.  Therefore, in accordance with the Court Order and New Mexico state law, an affidavit for any production of voter data is required. To this end, we want to clarify that requests for voter data under state law are not governed by the Inspection of Public Records Act, rather they are specifically governed by Election Code.  Section 1-4-5.5 of the Election Code requires an affidavit to be completed before voter data is provided.

Therefore, due to the nature of your request, the ongoing litigation, your past practice of posting this data online, and the fact that such a request is not accompanied by the required affidavit, our office is unable to process your request at this time.  We of course will comply with any court order in the case relating to the production of records or otherwise.

Lange November 17 Response Letter at 1-2.[84]  As the Lange November 17 Response Letter makes clear, the Secretary of State's Office refused to produce the requested information that involves individual voter data.  See Voter Reference MSJ Memo. ¶ 186, at 50 (asserting this fact)(citing Lange November 17 Response Letter).[85]  The Lange November 17 Response Letter addresses

---

[84]While neither Voter Reference nor the Defendants quote the entirety of the Lange November 17 Response Letter in their motions for summary judgment, both refer to it, and there is no factual dispute about the Lange November 17 Response Letter's contents.  See Voter Reference MSJ Memo. ¶¶ 186-88, at 50; id. ¶ 190, at 37 (citing Lange November 17 Response Letter); Defendants' MSJ Response ¶ 186, at 20 (stating that the Lange November 17 Response Letter "speaks for itself").  Although the Defendants dispute characterizations that Voter Reference makes about the Lange November 17 Response Letter's content -- disputes which the Court discusses in subsequent footnotes -- the Court includes the entirety of the Lange November 17 Response Letter in its Factual Background Section for the purpose of completeness.  Additionally, the Court concludes that the Lange November 17 Response Letter's content is not in dispute, as neither party has called into question its authenticity as it appears in the record.

[85]The Court alters slightly the asserted fact to conform to the cited portion of the record.  Voter Reference MSJ Memo. ¶ 186, at 50, states, in relevant part, that, in the Lange November 17

specifically only two categories of requested information: those marked in the Lange November 17

Response Letter as categories 2 and 3. See Voter Reference MSJ Memo. ¶ 186, at 50 (asserting

this fact)(citing Lange November 17 Response Letter).[86]  The Lange November 17 Response Letter

_____

Response Letter, "the Secretary refused to produce the requested records." Voter Reference MSJ
Memo. ¶ 186, at 50 (citing Lange November 17 Response Letter). The Defendants purport to
controvert this factual assertion "in part," Defendants' MSJ Response ¶ 186, at 20, stating:

> The letter speaks for itself, and for the reasons explained in that letter, the Secretary
> was not in a position to fulfill any of the requests that involved individual voter
> data. But as to two specific requests, one was for future data not yet in existence
> and another was for publicly available information, and the letter gave specific
> instructions and a URL to assist VRF in locating that information on the Secretary's
> website. Uncontroverted as to the remainder.

Defendants' MSJ Response ¶ 186, at 20. Upon review of the cited portion of the record, which the
Court provides in full in the text, the Court concludes that it is not accurate to state that "the
Secretary refused to produce the requested records," Voter Reference MSJ Memo. ¶ 186, at 50
(citing Lange November 17 Response Letter), because at least one of the requests records was
already available for public viewing via the Secretary of State's website. A more accurate reading
of the cited record material is that the Secretary of State's Office refused to produce the requests
that involve individual voter data. Accordingly, the Court changes slightly Voter Reference's
asserted fact to reflect what the record supports, and the Court does not adopt Voter Reference's
proposed fact as undisputed on this point. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth
in the Memorandum will be deemed undisputed unless specifically controverted."). The fact in
the text is otherwise unchanged.

[86]Again, the Defendants purport to controvert this factual assertion "in part," Defendants'
MSJ Response ¶ 186, at 20, stating:

> The letter speaks for itself, and for the reasons explained in that letter, the Secretary
> was not in a position to fulfill any of the requests that involved individual voter
> data. But as to two specific requests, one was for future data not yet in existence
> and another was for publicly available information, and the letter gave specific
> instructions and a URL to assist VRF in locating that information on the Secretary's
> website. Uncontroverted as to the remainder.

Defendants' MSJ Response ¶ 186, at 20. The Court concludes that the Defendants have not
disputed specifically the notion that the letter "specifically took issue with two of VRF's five
requests for records," Voter Reference MSJ Memo. ¶ 186, at 50 (citing Lange November 17
Response Letter), and thus the Court deems the fact in the text undisputed, see D.N.M. LR-Civ
56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless
specifically controverted.").

also indicates that, regardless of the issues in those two requests, the Secretary of State's Office

would not -- absent a Court order -- produce any voter data to Voter Reference: "[The Secretary of

State's Office] will refrain from producing any responsive voter data maintained by our office due

to numerous issues further detailed below." Voter Reference MSJ Memo. ¶ 187, at 50 (citing Lange

November 17 Response Letter at 2).[87]   One reason that the Lange November 17 Response Letter

gives for refusing to produce individual voter data is that the Secretary of State's Office believed

that Voter Reference would publish the voter data online, because Voter Reference had not stated

explicitly that it would not publish the data online.  See Voter Reference MSJ Memo. ¶ 188, at 50

(asserting this fact)(citing Lange November 17 Response Letter).[88]   Another reason that the Lange

---

[87]The Defendants purport to controvert this factual assertion "in part," Defendants' MSJ Response ¶ 187, at 20, stating:

> The quote is accurate but incomplete. The letter reads: "[D]ue to the nature of your request, the ongoing litigation, your past practice of posting this data online, and the fact that such a request is not accompanied by the required affidavit, our office is unable to process your request at this time. We of course will comply with any court order in the case relating to the production of records or otherwise." ECF No. 119-14, at 2.

Defendants' MSJ Response ¶ 187, at 20.  The Court understands the Defendants to take issue with the completeness and accuracy of the portion of the Lange November 17 Response Letter that Voter Reference quotes in its asserted fact.  Upon review, the Court concludes that the asserted fact is not accurate, because the Lange November 17 Response Letter states that the Defendants would "comply with any court order in the case relating to the production of records or otherwise." Lange November 17 Response Letter at 2.  Accordingly, it is not accurate -- as Voter Reference's asserted fact indicates -- to assert that the Defendants stated in the Letter that they would "not produce *any* voter data to VRF." Voter Reference MSJ Memo. ¶ 187, at 50 (emphasis in original)(citing Lange November 17 Response Letter at 2).  Accordingly, the Court changes slightly Voter Reference's asserted fact to reflect what the record supports, and the Court does not adopt Voter Reference's proposed fact as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  The fact in the text is undisputed.

[88]The Defendants neither controvert this fact nor state that it is uncontroverted, instead stating: "*See* Response to SOF 187, *supra*." Defendants' MSJ Response ¶ 188, at 20.  The Court

November 17 Response Letter gives for refusing to produce individual voter data is that there was no affidavit submitted with the October 18, 2022, request for voter data. See Voter Reference MSJ Memo. ¶ 190, at 50 (asserting this fact)(citing Lange November 17 Response Letter).[89]  This fact was not a dispositive reason for the denial, however, as the Secretary of State admits that the request would have been denied even if the request for voter data had been accompanied by the affidavits. See Voter Reference MSJ Memo. ¶ 195, at 51 (asserting this fact)(citing Vigil Depo. at 198:6-8).[90] The Secretary of State has communicated in writing all of its reasons for denying Voter Reference's requests for voter data. See Voter Reference MSJ Memo. ¶ 191, at 51 (asserting this fact)(citing Response of Defendant Secretary of State Maggie Toulouse Oliver, in her Official Capacity, to Plaintiff Voter Reference Foundation's Second Interrogatories, Requests for Production, and Requests for Admission at 2-3 (undated), filed April 14, 2023 (Doc. 119-7)); Defendants' MSJ Response ¶ 191, at 21 (uncontroverted).

---

discussed the "Response to SOF 187" in the previous footnote, but as it relates to the fact that Voter Reference asserts in Voter Reference MSJ Memo. ¶ 188, at 50, the Court concludes that the Defendants have not controverted specifically the fact asserted in the text.  Moreover, the Court concludes that the Lange November 17 Response Letter supports the asserted fact.  Accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[89]In response to this asserted fact, the Defendants state: "Uncontroverted that in the Secretary's November 11, 2022, letter, Mr. Lange pointed out that VRF had not executed an affidavit for its most recent requests."  Defendants' MSJ Response ¶ 190, at 21.  This response is not an attempt to controvert the fact asserted in the text, and thus the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[90]In response to this asserted fact, the Defendants state: "Uncontroverted.  There was more than one reason to deny the October request."  Defendants' MSJ Response ¶ 195, at 21.  Because the Defendants do not controvert specifically the fact asserted in the text, the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

As reflected in the Lange November 17 Response Letter, the Secretary of State believed that Voter Reference would post any data that it received from the Secretary of State on its website, VoterRef.com.  See Voter Reference MSJ Memo. ¶ 192, at 51 (asserting this fact)(citing Vigil Depo. at 184:21-186:18).[91]  Relatedly, based on this alleged "knowledge that [the voter data] was going to be posted online," the Secretary of State chose not to produce any voter data until after the United States Court of Appeals for the Tenth Circuit ruled on the Defendants' motion to stay the litigation.  See Voter Reference MSJ Memo. ¶ 192, at 51 (asserting this fact)(citing Vigil Depo. at 190:6-191:13).[92]   See also Lange November 17 Response Letter at 2 ("Finally, on November

---

[91]The Defendants purport to controvert this factual assertion "in part," Defendants' MSJ Response ¶ 192, at 21, stating:

> The cited testimony references the Secretary's position that it was not "appropriate to produce voter data until the Court [of Appeals] has ruled on the motion," that VRF's posting of the data online was and would be unlawful, and that the Tenth Circuit could rule in favor of Defendants ("We believe that is a possibility."). [Vigil 30b6] 190:6-195:25.

Defendants' MSJ Response ¶ 192, at 21.  The Court concludes that the Defendants' partial dispute with the Voter Reference MSJ Memo. ¶ 192, at 51, does not controvert adequately the fact in the text.  Moreover, the Court sees support for the asserted fact in the cited material.  See Vigil Depo. at 184:21-186:18 (stating despite Voter Reference's assertions to the contrary, the Secretary of State feared Voter reference would post online because of Voter Reference's "past practice").  Accordingly, the Court deems that fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[92]The Defendants purport to controvert this factual assertion "in part," Defendants' MSJ Response ¶ 192, at 21, stating:

> The cited testimony references the Secretary's position that it was not "appropriate to produce voter data until the Court [of Appeals] has ruled on the motion," that VRF's posting of the data online was and would be unlawful, and that the Tenth Circuit could rule in favor of Defendants ("We believe that is a possibility."). [Vigil 30b6] 190:6-195:25.

Defendants' MSJ Response ¶ 192, at 21.  The Court concludes that the Defendants' partial dispute with the Voter Reference MSJ Memo. ¶ 192, at 51, does not controvert adequately the fact in the text.  Moreover, the Court sees support for the asserted fact in the cited material.  See Vigil Depo.

10, 2022, we filed a Motion to Stay the Preliminary Injection Pending Appeal, in Appellate Case 22-2101, and do not think it is appropriate to produce voter data until the Court has ruled on the motion.").  The Secretary of State believes that, "without a court order that prohibits the posting of data, VRF has demonstrated that its intention is to post the data." Voter Reference MSJ Memo. ¶ 197, at 51 (asserting this fact)(quoting Vigil Depo. at 190:3-5).  See Defendants' MSJ Response ¶ 197, at 21 (uncontroverted).   The Attorney General's Office agrees with the position the Secretary of State took.  See Voter Reference MSJ Memo. ¶ 198, at 52 (asserting this fact)(citing Deposition of Deputy Attorney General Joseph Dworak at 160:22-161:17 (taken March 13, 2023), filed April 14, 2023 (Doc. 119-2)("Dworak Depo.")); Defendants' MSJ Response ¶ 198, at 21 (uncontroverted).

m.      **Tenth Circuit Stay and MSJ Hearings.**

On December 28, 2022, a two-judge panel of the Tenth Circuit stayed the Court's preliminary injunction pending the outcome of the Defendants' appeal.  See Voter Reference MSJ Memo. ¶ 199, at 52 (asserting this fact)(citing Order (dated December 28, 2022), filed April 14, 2023 (Doc. 119-15)); Defendants' MSJ Response ¶ 199, at 21 (uncontroverted).  That day, Voter Reference removed the New Mexico voter data from its website.  See Voter Reference MSJ Memo. ¶ 199, at 52 (asserting this fact)(citing Vigil Depo. at 188:24-189:6); Defendants' MSJ Response ¶ 199, at 21 (uncontroverted).

---

at 190:6-191:13 (stating that the Secretary of State would not produce voter data for Voter Reference until after the Tenth Circuit ruled because of a "knowledge that it was going to be posted online").  Accordingly, the Court deems that fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

On June 14, 2023, the Court held hearings on the Voter Reference MSJ and the Defendants' MSJ.  See Clerk's Minutes, filed June 14, 2023 (Doc. 131).[93]  At the hearing, the Court directed the Defendants to file a supplemental brief detailing what they believe they must make available pursuant to the NVRA's Public Inspection Provision.  See Voter Reference Second Suppl. Br. ¶ TTT, at 3-4 (asserting this fact)(citing Transcript of Motion Proceedings at 34:10-15 (dated June 14, 2023), filed October 6, 2023 (Doc. 157)("MSJ Hearing Tr."); id. at 37:1-4); Defendants' Second Suppl. Br. Resp. ¶ TTT, at 2 (uncontroverted).

      **n.**       **Voter Reference's IPRA Request, and the Secretary's Response.**

The day after the hearing, on June 15, 2023, Voter Reference sent a letter addressed to the Custodian of Records at the Secretary of State's Office seeking records pursuant to IPRA.  See Voter Reference Second Suppl. Br. ¶ UUU, at 4 (asserting this fact)(citing Letter from Edward D. Greim to Custodian of Records, New Mexico Secretary of State (dated June 15, 2023), filed September 25, 2023 (Doc. 155-2)("IPRA Letter")); Defendants' Second Suppl. Br. Resp. ¶ UUU, at 2 (uncontroverted).  Specifically, the IPRA Letter seeks the following:

      1.      All requests the Secretary of State has received from any person for records which are available, or which the requestor claims must be made available, under the National Voter Registration Act.

      2.      Any non-privileged communications pertaining to the requests identified in paragraph 1 above, including but not limited to any communications between the Secretary's Office and the requestor.

      3.      All documents the Secretary of State has produced in response to any of the requests identified in response to paragraph 1, above.

      4.      All records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.

---

[93]The Court will discuss the MSJ Hearing in further detail below in the Procedural Background section.  Here, the hearing is mentioned for context and completeness.

Voter Reference Second Suppl. Br. ¶ UUU, at 4 (asserting this fact)(quoting IPRA Letter at 1).  See Defendants' Second Suppl. Br. Resp. ¶ UUU, at 2 (uncontroverted).  The IPRA letter did not include an executed affidavit or Voter Information Authorization form.  See Voter Reference Second Suppl. Br. ¶ VVV, at 4 (asserting this fact)(quoting IPRA Letter).[94]  Additionally, the IPRA Letter does not contain any promise that Voter Reference will refrain from posting the requested records on the internet.  See Voter Reference Second Suppl. Br. ¶ WWW, at 4 (asserting this fact)(quoting IPRA Letter).[95]  The fourth listed item of requested records in the IPRA Letter exactly mirrors the text of the NVRA's Public Inspection Provision.  See Voter Reference Second Suppl. Br. ¶ XXX, at 5 (asserting this fact)(citing 15 U.S.C. § 20507(i)(1)[96]); Defendants' Second Suppl. Br. Resp. ¶ XXX, at 2 (uncontroverted).

---

[94]In response to this asserted fact, the Defendants state: "Uncontroverted, but immaterial. Requests for records under the New Mexico Inspection of Public Records Act do not require affidavits. See NMSA 1978, § 14-2-8 (2009)."  Defendants' Second Suppl. Br. Resp. ¶ VVV, at 2. As noted above, the Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[95]In response to this asserted fact, the Defendants state: "Uncontroverted, but immaterial. Requests for records under the New Mexico Inspection of Public Records Act do not require attestations that a requestor of records will not publish the requested records."  Defendants' Second Suppl. Br. Resp. ¶ WWW, at 2 (citing N.M.S.A. § 14-2-8).  As noted above, the Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section.  See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently, the Court deems the fact undisputed.

[96]The Voter Reference Second Suppl. Br. ¶ UUU, at 4, mistakenly cites to 15 U.S.C. § 20507(i)(1).  The correct citation for the NVRA's Public Inspection Provision is 52 U.S.C. § 20507(i)(1).

Eight days later, on June 23, 2023, Charlotte Chinana -- the Deputy Elections Director for the Secretary of State -- sent an email to Mandy Vigil and Sharon Pino stating that the Secretary of State's Office has 31,743 records in response to the requests for records made in the NVRA Letter, which was sent over a year before, on May 27, 2022.  <u>See</u> Voter Reference Second Suppl. Br. ¶ YYY, at 5 (asserting this fact)(citing Email to Mandy Vigil, Peter Auh, and Sharon Pino from Charlotte Chinana (dated June 23, 2023), filed September 25, 2023 (Doc. 155-3)); Defendants' Second Suppl. Br. Resp. ¶ YYY, at 2 (uncontroverted).

     **o.**      **<u>Defendants' NVRA Brief</u>.**

On June 30, 2023, in response to the Court's request at the June 14, 2023, summary judgment hearing, the Defendants filed the Defendants' Supplemental Briefing on National Voter Registrations Act Records, filed June 30, 2023 (Doc. 133)("Defendants' NVRA Brief"), in which the Defendants outlined nine categories of records that they contend must be made available under the NVRA Public Inspection Provision: (i) List Maintenance Procedures; (ii) SOS Voter Cancellation Program; (iii) Same-Day Registration; (iv) Automatic Voter registration; (v) Online Voter Registration; (vi) Electronic Voter Registration Information Center (ERIC); (vii) Felon Registration Restoration; (viii) Voter Registration Agencies; and (ix) Voter Registration Agents. Voter Reference Second Suppl. Br. ¶ ZZZ, at 5 (asserting this fact)(citing Defendants' NVRA Brief).[97]

---

[97]The Defendants purport to controvert this fact

to the extent that Plaintiff characterizes Defendants' *Supplemental Briefing on National Voter Registration Act Records* ("Defendants' NVRA Brief") as being limited to a listing of nine categories.  The Court asked at the June 14, 2023 hearing that Defendants supply the Court with an "exhaustive" list of the types of records that are required to be produced by the NVRA.  Defendants brief was organized to reflect nine categories of documents that could be interpreted "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]"  52 U.S.C. §

In the Defendants' NVRA Brief, under each of these nine categories, the Defendants offer various "types of documents that may be obtained under the NVRA within those categories." Defendants' NVRA Brief at 2.   Under the first category -- List Maintenance Procedures -- the Defendants list the following "types of documents":

- Relevant state statutory provisions
- Relevant federal statutory provisions
- Administrative rules related to the following subjects:
  - Voter registration qualification requirements
  - Voter registration methods
  - Voter registration processing
    - Election administration duties
    - Voter registration application review process
    - Voter registration update process
    - Voter registration record process and maintenance
    - Voter records review/updates/corrections
    - Voter registration transfers
    - Voter registration cancelations
- Automatic voter registration
- Online voter registration
- Same day voter registration
- Felon registration restoration
- Agency voter registration
- Agency voter registration maintenance
- Voter cancellation process
- Voter record systems

---

20507(i)(1) (the inspection provision of the NVRA).   Under these categories, Defendants included the specific records that would be available to an individual requesting to inspect such records.  *See* [Doc. 133] at 2-6.  This Court did not request the exact, individual records in the Secretary's possession responsive to the NVRA be individually identified.

Defendants' Second Suppl. Br. Resp. ¶ ZZZ, at 2-3 (brackets in original).  The asserted fact in the text states that the Defendants provide nine categories of records that they contend are subject to the Public Inspection Provision of the NVRA.  The Court concludes that the Defendants have not controverted specifically this asserted fact, which is a general description of the contents of the Defendants' NVRA Brief, and thus the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  Moreover, in the text below, the Court includes the level of detail that the Defendants discuss by quoting substantial portions of the Defendants' NVRA Brief.

- •     Voter data maintenance
- •     Relevant vendor contracts
- •     Relevant vendor communications
- •     Relevant vendor bids
- •     Relevant requests for proposals
- •     Communication with election administrators
- •     Election administration training materials related to voter list maintenance
- •     Legislative materials related to voter list maintenance
  - o     Final legislation
  - o     Draft legislation
  - o     Legislative analysis/research
  - o     Legislative Fiscal Impact Reports

Defendants' NVRA Brief at 2-3.[98]   The Defendants state that this first category "includes documents relevant to Secretary of State programs and procedures to maintain accurate, up-to-date voter lists."  Defendants' NVRA Brief at 2.  Under the second category -- SOS Voter Cancelation Program -- the Defendants list the following "types of documents":

- •     County guidance
  - o     Required forms
- •     County communication
- •     County correspondence
- •     Email communication
- •     County training materials -- statutory focused
- •     County training materials -- system focused
- •     County training materials -- election board focused
- •     Voter communication
- •     Voter outreach materials
- •     Voter education materials
- •     Board of Registration Materials
  - o     Organized chronologically and by county
  - o     Board of Registration appointment materials

---

[98]Neither Voter Reference nor the Defendants quote the "types of documents" discussed in the NVRA Brief.  NVRA Brief at 2.  The parties do not dispute, however, the contents of the NVRA Brief, and the Court concludes that the contents of the NVRA Brief are undisputed.  The Court acknowledges that Voter Reference disputes -- of course -- the legal conclusions in the NVRA Brief, and by including text from the NVRA Brief in its factual background section, the Court is not suggesting that the Defendants' interpretation of the scope of the NVRA is correct.  The Court will discuss that issue in the Analysis section.  Here, the "types of documents" discussed in the NVRA Brief are included for the purposes of context and completeness.  NVRA Brief at 2.

- o        List of Board Members
- o        List of voters subject to voter cancellation
- o        Meeting minutes

Defendants' NVRA Brief at 3.  The Defendants state that this second category "includes documents relevant to Secretary of State procedures and policies that enable voters to cancel their registration with the Secretary of State or county clerks."  Defendants' NVRA Brief at 3.  Under the third category -- Same-Day Registration -- the Defendants list the following "types of documents":

- County guidance
  - o    Required forms
- County communication
- County correspondence
- Email communication
- County training materials -- statutory focused
- County training materials -- system focused
- County training materials -- election board focused
- Voter communication
- Voter outreach materials
- Voter education materials

Defendants' NVRA Brief at 3-4.  The Defendants state that this third category "includes documents relevant to Secretary of State procedures and policies that enable voters to register to vote on the same day that they cast a ballot."  Defendants' NVRA Brief at 3.  Under the fourth category -- Automatic Voter Registration -- the Defendants list the following "types of documents":

- County guidance
  - o    Required forms
- County communication
- County correspondence
- Email communication
- County training materials -- statutory focused
- County training materials -- system focused
- County training materials -- election board focused
- Voter communication
- Voter outreach materials
- Voter education materials

Defendants' NVRA Brief at 4.  The Defendants state that this fourth category "includes documents relevant to Secretary of State procedures and policies that automatically register New Mexico citizens to vote when conducting transactions with the New Mexico Motor Vehicle Division." Defendants' NVRA Brief at 4.   Under the fifth category -- Online Voter Registration -- the Defendants list the following "types of documents":

- County guidance
  - Required forms
- County communication
- County correspondence
- Email communication
- County training materials -- statutory focused
- County training materials -- system focused
- County training materials -- election board focused
- Voter communication
- Voter outreach materials
- Voter education materials

Defendants' NVRA Brief at 4.  The Defendants state that this fifth category "includes documents relevant to Secretary of State procedures and policies that allow voters to register to vote or update their voter registration through the State's online portal."  Defendants' NVRA Brief at 4.  Under the sixth category -- Electronic Voter Registration Information Center (ERIC) -- the Defendants list the following "types of documents":

- County guidance
  - Required forms
- County communication
- County correspondence
- Email communication
- County training materials -- statutory focused
- County training materials -- system focused
- County training materials -- election board focused
- Voter communication
- Voter outreach materials
- Voter education materials

Defendants' NVRA Brief at 5.  The Defendants state that this sixth category "includes documents relevant to Secretary of State procedures and policies concerning New Mexico membership in ERIC.  ERIC member states share information with one another in order to maintain more accurate, up-to-date voter rolls."  Defendants' NVRA Brief at 5.   Under the seventh category -- Felon Registration Restoration -- the Defendants list the following "types of documents":

- County guidance
  - Required forms
- County communication
- County correspondence
- Email communication
- County training materials -- statutory focused
- County training materials -- system focused
- County training materials -- election board focused
- Voter communication
- Voter outreach materials
- Voter education materials

Defendants' NVRA Brief at 5-6.   The Defendants state that this seventh category "includes documents relevant to Secretary of State procedures and policies that allow former felons to regain voting rights."  Defendants' NVRA Brief at 5 (footnote omitted).  Under the eighth category -- Voter Registration Agencies -- the Defendants list the following "types of documents":

- County guidance
  - Required forms
- County communication
- County correspondence
- Email communication
- County training materials -- statutory focused
- County training materials -- system focused
- County training materials -- election board focused
- Voter communication
- Voter outreach materials
- Voter education materials

Defendants' NVRA Brief at 6.  The Defendants state that this eighth category "includes documents relevant to Secretary of State procedures and policies that allow government agencies to serve as a

point of voter registration."  Defendants' NVRA Brief at 6.  Under the ninth and final category --

Voter Registration Agents -- the Defendants list the following "types of documents":

- County guidance
  - ○ Required forms
- County communication
- County correspondence
- Email communication
- County training materials – statutory focused
- County training materials – system focused
- County training materials – election board focused
- Voter communication
- Voter outreach materials
- Voter education materials

Defendants' NVRA Brief at 6.  The Defendants state that this ninth category "includes documents

relevant to Secretary of State procedures and policies to enable citizens to become qualified voter

registration agents to register others to vote."  Defendants' NVRA Brief at 6.

The Defendants' NVRA Brief does not state that the Secretary of State would make any

individual, identifiable voter records available under the NVRA.  See Voter Reference Second

Suppl. Br. ¶ AAAA, at 5 (asserting this fact)(citing NVRA Brief).[99]  The NVRA Brief also does

---

[99]The Defendants purport to controvert the Voter Reference Second Suppl. Br. ¶ AAAA, at 5, stating:

> Controverted.  Plaintiff characterizes its May 27, 2022 request as strictly a request under the NVRA. However, the request was accompanied by an affidavit swearing to abide by restrictions placed upon use of voter data as a condition of receiving voter data. That Plaintiff characterizes the request as performed pursuant to the NVRA is immaterial because the request met the requirements for receiving voter data under New Mexico law. Thus, it is not inconsistent with Defendants' position in this litigation that Defendants' NVRA Brief did not identify the voter data produced pursuant to Plaintiff's May 27, 2022 request.

Defendants' Second Suppl. Br. Resp. ¶ AAAA, at 3.  The asserted fact at Voter Reference Second Suppl. Br. ¶ AAAA, at 5, contains two sentences, and the Defendants' dispute deals with the second sentence.  The Court discusses this dispute in the next footnote.  The Defendants do not dispute specifically, however, the first sentence -- in the text above -- and thus the Court deems this portion of the asserted fact as undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the

not include or make reference to any of the records that the Secretary of State's office had identified, seven days previously, as responsive to the NVRA Letter.  See Voter Reference Second Suppl. Br. ¶ AAAA, at 5 (asserting this fact)(citing NVRA Brief).[100]  See also Email to Mandy Vigil, Peter Auh, and Sharon Pino from Charlotte Chinana (dated June 23, 2023), filed September 25, 2023 (Doc. 155-3).  In addition, the NVRA Brief does not state that the Secretary of State would make any aggregated voter records available under the NVRA, see Voter Reference Second Suppl. Br. ¶ BBBB, at 6 (asserting this fact)(citing NVRA Brief),[101] nor does the NVRA Brief include lists of

---

Memorandum will be deemed undisputed unless specifically controverted.").

[100]The Defendants purport to controvert the Voter Reference Second Suppl. Br. ¶ AAAA, at 5, stating:

> Controverted.  Plaintiff characterizes its May 27, 2022 request as strictly a request under the NVRA. However, the request was accompanied by an affidavit swearing to abide by restrictions placed upon use of voter data as a condition of receiving voter data. That Plaintiff characterizes the request as performed pursuant to the NVRA is immaterial because the request met the requirements for receiving voter data under New Mexico law. Thus, it is not inconsistent with Defendants' position in this litigation that Defendants' NVRA Brief did not identify the voter data produced pursuant to Plaintiff's May 27, 2022 request.

Defendants' Second Suppl. Br. Resp. ¶ AAAA, at 3.  The asserted fact at Voter Reference Second Suppl. Br. ¶ AAAA, at 5, states that, in the NVRA Brief, Voter Reference does not include or make reference to any of the records that the Secretary of State's office had identified, seven days previously, as responsive to the NVRA Letter.  The Court concludes that the Defendants have not controverted specifically this proposition, and accordingly the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").  The Court does not -- at this time -- suggest or assume any legal conclusions that might flow from this fact.  Instead, the Court does no more than deem undisputed a fact that is empirically true, namely, that the NVRA Brief does not specifically include or make reference to any of the records that the Secretary of State's office had identified, seven days previously, as responsive to the NVRA Letter.

[101]In response to this asserted fact, the Defendants state: "Uncontroverted, but immaterial." Defendants' Second Suppl. Br. Resp. ¶ BBBB, at 3.  As noted above, the Defendants' assertion of immateriality does not dispute Voter Reference's asserted fact.  If necessary, the Court will address materiality in the Analysis, but will deem the fact undisputed for the Factual Background section. See Walton v. N.M. State Land Off., 49 F. Supp. 3d at 924 n.2 ("[O]bjecting to an asserted fact as

the names and addresses of individuals to whom NVRA notices are sent, see Voter Reference

Second Suppl. Br. ¶ CCCC, at 6 (asserting this fact)(citing NVRA Brief); Defendants' Second

Suppl. Br. Resp. ¶ CCCC, at 3 (uncontroverted).

### p.      The Secretary of State Produces Some Voter Data.

On June 30, 2023, the same day that the Defendants filed their NVRA Brief, the Secretary

of State's Office made its first production in response to the IPRA Letter's voter data request.  See

Voter Reference Second Suppl. Br. ¶ DDDD, at 6 (asserting this fact)(citing Letter from Amy Baca-

Padilla to Edward Greim (dated June 30, 2023), filed September 25, 2023 (Doc. 155-4));

Defendants' Second Suppl. Br. Resp. ¶ DDDD, at 3 (uncontroverted).  On August 22, 2023, the

Secretary of State's Office made a second production in response to the IPRA Letter.  See Voter

Reference Second Suppl. Br. ¶ FFFF, at 6 (asserting this fact)(citing Excerpts of August 22

Production (undated)(Doc. 155-5));  Defendants'  Second  Suppl.  Br.  Resp.  ¶ FFFF,  at  3

(uncontroverted).  In the second production, the Secretary of State details which groups of produced

documents are responsive to each of the four categories of information that Voter Reference seeks

in the IPRA Letter.  See Voter Reference Second Suppl. Br. ¶ GGGG, at 6 (asserting this fact)(citing

Letter from Cassie Salazar to Edward Greim (dated August 22, 2023)(Doc. 155-6)); Defendants'

Second Suppl. Br. Resp. ¶ GGGG, at 3 (uncontroverted).  Specifically, in response to the fourth

category of requested documents in the IPRA Letter -- the category that mirrors the text of the

NVRA's Public Inspection Provision, see IPRA Letter at 1 -- the Secretary of State's Office

produces, among other things:

> •      Internal presentations containing screenshots of voter data, including an
>         individual's name, voter ID, last four digits of the voter's social security

---

immaterial in response to an asserted fact effectively deems the fact undisputed.").  Consequently,
the Court deems the fact undisputed.

number, date of birth, age, registration date, voter status, party, county, voter history, gender, driver's license number, and phone number.

- The "SOS Voter Registration Annual Counts," detailing the "counts" of registered and unregistered voters by county.

- Four counties' "Purge Lists" of inactive voters, containing the individual identifiable voter data of hundreds of voters, including their voter ID number, name, party, gender, registration date, city, source of registration, inactive date, and last voted date.

Voter Reference Second Suppl. Br. ¶ HHHH, at 6-7 (asserting this fact)(citing Excerpts of August 22 Production (undated)(Doc. 155-5)[102]).  See Defendants' Second Suppl. Br. Resp. ¶ HHHH, at 4 (uncontroverted).  In response to Voter Reference's IPRA Letter, the Secretary of State's Office produced individual, identifiable voter data.  Voter Reference Second Suppl. Br. ¶ IIII, at 6-7 (asserting this fact)(citing Excerpts of August 22 Production (undated)(Doc. 155-5)[103]).  See Defendants' Second Suppl. Br. Resp. ¶ IIII, at 4 (uncontroverted).  In the letter sent with the second round of records produced in response to Voter Reference's IPRA Letter, the Secretary of State's Office indicates that it believes requests 1-3 of the IPRA Letter are fulfilled, and that the fourth category of requested documents in the IPRA Letter -- the category that mirrors the text of the NVRA's Public Inspection Provision, see IPRA Letter at 1 -- remains open, see Voter Reference Second Suppl. Br. ¶ JJJJ, at 7 (asserting this fact)(citing Letter from Cassie Salazar to Edward

---

[102]As Voter Reference notes in the Voter Reference Second Suppl. Br. at 7 n.1, in the attached version of the Excerpts of August 22 Production found in the record Voter Reference has redacted the voter data.  Accordingly, it is difficult for the Court to evaluate whether the record citation supports the asserted fact found at Voter Reference Second Suppl. Br. ¶ HHHH, at 6-7. Nevertheless, given that the Defendants do not dispute the asserted fact, the Court deems the fact undisputed.

[103]See previous footnote.

Greim (dated August 22, 2023)(Doc. 155-6)); Defendants' Second Suppl. Br. Resp. ¶ JJJJ, at 4 (uncontroverted).

On August 30, 2023, the Defendants sent a letter to Voter Reference that offers to provide the New Mexico voter data which Voter Reference requests in its May 27, 2022, NVRA Letter. See Voter Reference Second Suppl. Br. ¶ KKKK, at 7 (asserting this fact)(citing Letter from Mark Allen to Edward Greim (dated August 30, 2023)(Doc. 155-7)("August 30 Letter")); Defendants' Second Suppl. Br. Resp. ¶ KKKK, at 4 (uncontroverted).  In the August 30 Letter, the Secretary of State's Office writes:

> We are providing this data now because of statements made in Court at hearing [sic] on our respective Motions for Summary Judgment (i.e., that VRF will not post New Mexico's voter data online except in the event of a final judgment stating that VRF has the right to do so and that New Mexico cannot lawfully prohibit it).
>
> [. . .]
>
> VRF's current stance -- that it will not post the data unless a court says it can lawfully do so -- is meaningfully different than its May 2022 stance -- that it would not post the data unless a court said it wouldn't get in trouble when it did so.

Voter Reference Second Suppl. Br. ¶ LLLL, at 7 (asserting this fact)(citing August 30 Letter at 1).[104]  With the August 30 Letter, the Defendants provided an invoice describing the data that is offered to Voter Reference: "1. Records for voters who were removed from the voter rolls between November 3, 2020, and April 13, 2021[; and] 2. Records for current active and inactive voters who are registered, including voter history for those who cast ballots in 2020."  Voter Reference Second

---

[104]The Defendants neither controvert nor accept as undisputed this asserted fact. Accordingly, because the Defendants do not dispute specifically the fact in the text, the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Suppl. Br. ¶ MMMM, at 8 (asserting this fact)(citing Invoice for Records, billed to Edward Greim (dated August 29, 2023)(Doc. 155-8)).[105]

On September 5, 2023, Voter Reference responded to the August 30 Letter, stating that it did not make any promises at the June 14, 2023, summary judgment hearing that it did not also make in writing in the NVRA Letter or at various other times throughout this litigation.  See Voter Reference Second Suppl. Br. ¶ NNNN, at 8 (asserting this fact)(citing Letter from Edward Greim to Mark Allen (dated September 5, 2023), filed October 5, 2023 (Doc. 155-9)("September 5

---

[105]The Defendants purport to controvert this asserted fact

to the extent that Plaintiff implies the invoice was all that accompanied the letter cited at Plaintiff's Fact KKKK (styled as Ex. P40).  The email from Mr. Allen to Plaintiff's counsel additionally included a link to New Mexico Department of Information Technology Kiteworks website, used for sharing large files of data, as well as instructions for accessing data through Kiteworks.  That link contained spreadsheets responsive to Plaintiff's May 27, 2022 request. Plaintiff has therefore had access to the data since August 30, 2023.

Defendants' Second Suppl. Br. Resp. ¶ MMMM, at 4 (citation to record in original).  The Court does not understand Voter Reference's asserted fact to imply that the invoice is the only thing that is attached to the August 30 Letter, as the Defendants suggest.  The asserted fact is quoted material from the invoice.  The Defendants do not dispute specifically that the invoice contains the quoted material, and, accordingly, the Court deems the fact in the text undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Letter")).[106]   The Defendants have not responded to the September 5 Letter.  See Voter Reference

Second Suppl. Br. ¶ NNNN, at 8 (asserting this fact)(no record material cited).[107]

---

[106]The Defendants

> controvert this fact to the extent that it implies that Defendants August 30, 2023
> letter suggested new statements. The statements made by Plaintiff's counsel --
> which provided greater assurances to Defendants by nature of making them in the
> presence of the Court -- did retract qualifications placed upon language
> accompanying previous requests for data. See [MSJ Hearing Tr.] at 121:10-14.

Defendants' Second Suppl. Br. Resp. ¶ NNNN, at 4 (contents of brackets added).  The Court
concludes that the Defendants have not disputed sufficiently Voter Reference's asserted fact.  Voter
Reference's asserted fact provides a description of the contents of the September 5 Letter, and the
Defendants have not disputed the accuracy of that description.  Accordingly, the Court deems that
description undisputed.   See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the
Memorandum will be deemed undisputed unless specifically controverted.").

[107]The Defendants state that portions of the Voter Reference Second Suppl. Br. ¶ NNNN,
at 8, are controverted.  To provide full context to this purported factual dispute, the Court first must
provide -- in full -- the asserted fact at issue.  Voter Reference's asserted fact states, in full:
"Defendants have not responded to VRF's September 5, 2023 letter and have not withdrawn their
offer to produce the NVRA records once payment is received."  Voter Reference Second Suppl. Br.
¶ NNNN, at 8 (no record material cited).  In response to this asserted fact, the Defendants state:

> Controverted to the extent that Plaintiff implies voter data was not provided
> in conjunction with Defendants' August 30, 2023 letter. Further controverted to the
> extent that Plaintiff implies the voter data was fulfilled pursuant to the NVRA.
> Plaintiff's May 27, 2022 request was made pursuant to both the National Voter
> Registration Act, as well as the New Mexico Election Code. The documents were
> produced pursuant to NMSA 1978, § 1-4-5.5. Uncontroverted that Defendants did
> not respond to Plaintiff's September 5, 2023 letter.

Defendants' Second Suppl. Br. Resp. ¶ OOOO, at 4.  The manner in which the Defendants
controvert this fact leads the Court to believe that there is some disagreement here: namely, whether
any New Mexico voter data accompanied the August 30 Letter.  In a previous assertion of
uncontroverted fact, Voter Reference states that the August 30 Letter "offer[s] to provide the New
Mexico voter data that VRF requested in its [NVRA Letter]," Voter Reference Second Suppl. Br.
¶ KKKK, at 7 (citing August 30 Letter), but it does not state that such voter data is provided therein.
In addition, as noted above, Voter Reference Second Suppl. Br. ¶ NNNN, at 8, states that
"Defendants . . . have not withdrawn their offer to produce the NVRA records once payment is
received," which seems to imply that Voter Reference has not received the voter data.  These
assertions of fact lead the Court to infer that Voter Reference's position is that it did not receive any
voter data with the August 30 Letter.  Voter Reference never makes this assertion explicitly, but its

q.      **Voter Reference's October, 2023, Request for Voter Data**.

On October 11, 2023, Voter Reference filed another request for voter data.  See Defendants'

Second Suppl. Br. Resp. ¶ ZZZZ, at 5 (asserting this fact)(citing Letter from Edward Greim to

Secretary Oliver (dated October 11, 2023), filed October 13, 2023 (Doc. 163-4)("October 11

Letter")); Voter Reference Second Suppl. Br. Reply ¶ ZZZZ, at 3 (uncontroverted).  The request

for voter data made in the October 11 Letter was made solely under the NVRA.  See Defendants'

Second Suppl. Br. Resp. ¶ AAAAA, at 6 (asserting this fact)(no record material cited)[108]; Voter

_____

assertions of fact do not make sense unless the Court makes this inference.

The Defendants, on the other hand, represent -- via their responses to Voter Reference's asserted facts -- that the August 30 Letter

> from Mr. Allen to Plaintiff's counsel additionally included a link to New Mexico Department of Information Technology Kiteworks website, used for sharing large files of data, as well as instructions for accessing data through Kiteworks.  That link contained spreadsheets responsive to Plaintiff's May 27, 2022 request.  Plaintiff has therefore had access to the data since August 30, 2023.

Defendants' Second Suppl. Br. Resp. ¶ MMMM, at 4.  Similarly, the Defendants' response to the asserted fact at Voter Reference Second Suppl. Br. ¶ NNNN, at 8, states that Voter Reference's asserted fact is "[c]ontroverted to the extent that Plaintiff implies voter data was not provided in conjunction with Defendants' August 30, 2023 letter."  Defendants' Second Suppl. Br. Resp. ¶ OOOO, at 4.

Based on the record before it, the Court cannot determine whether any voter data was provided by the Secretary of State's Office to Voter Reference in the August 30 Letter.  The Court cannot deem it undisputed that "no voter data accompanied the August 30 Letter" because Voter Reference has never asserted this fact.  Accordingly, the Court therefore must remain agnostic as to whether the August 30 Letter contained a link to voter data, as the Defendants suggest in their responses.  The Court thus modifies Voter Reference's asserted fact slightly to reflect this uncertainty: i.e., the Court removes the clause "and have not withdrawn their offer to produce the NVRA records once payment is received" from the Voter Reference Second Suppl. Br. ¶ NNNN, at 8.

[108]By failing to "refer with particularity to those portions of the record upon which the non-movant relies" in their Defendants' Second Suppl. Br. Resp., D.N.M. LR-Civ 56.1(b), the Defendants have not complied with D.N.M. LR-Civ 56.1(b).  Nevertheless, given that Voter Reference does not controvert this fact, and the record -- namely, the October 11 Letter -- supports the asserted fact, the Court deems the fact in the text undisputed.

Reference Second Suppl. Br. Reply ¶ AAAAA, at 3 (uncontroverted).  No affidavit accompanied the October 11 Letter.  See Defendants' Second Suppl. Br. Resp. ¶ BBBBB, at 6 (asserting this fact)(no record material cited)[109]; Voter Reference Second Suppl. Br. Reply ¶ BBBBB, at 3 (uncontroverted).

### 3.   **Relevant Terminology**.

For the purposes of this opinion, and to facilitate analysis of the arguments presented in the motions for summary judgment, the Court provides definitions of the following terms as they are used in the Voter Reference MSJ Memo.  To the extent that these terms are disputed, the Court notes and describes the disagreements in footnotes.

### a.   **Data Sharing Ban**.

Voter Reference uses the term "Data Sharing Ban" to refer to the Defendants' "policy and position that voter data cannot be shared, disseminated, distributed, published, or otherwise made available by a requester to any third party."  Voter Reference MSJ Memo. ¶ 39 at 23 (citing May 17 Tr. at 148:20-149:13 (Greim, Vigil); June 15 Tr. at 91:6-20 (Serafimova, Vigil)).[110]   The Defendants

---

[109]By failing to "refer with particularity to those portions of the record upon which the non-movant relies" in their Defendants' Second Suppl. Br. Resp., D.N.M. LR-Civ 56.1(b), the Defendants have not complied with D.N.M. LR-Civ 56.1(b).  Nevertheless, given that Voter Reference does not controvert this asserted fact, the Court deems the fact in the text undisputed.

[110]The Defendants purport to dispute this fact on the grounds the fact-as-stated suggests that such a ban arises only from the Defendants' policies and positions.  See Defendants' MSJ Response ¶ 39, at 5.  Instead, citing N.M.S.A. § 1-4-5.5, the Defendants suggest that this "Data Sharing Ban" arises from a statutory command, and "Defendants are bound to follow New Mexico law."  Defendants' MSJ Response ¶ 39, at 5.  The Court concludes that the basic fact in the text -- that the Defendants have a policy in which voter data cannot be shared by a requester to any third party -- is undisputed.  Whether this policy has its source in State statute is not a part of Voter Reference's asserted fact.  Accordingly, the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

locate this prohibition within a . . . construction of multiple statutes, reading the
language of § 1-4-5.6 to incorporate by reference language from § 1-5-22 such that
§ 1-4-5.6 prohibits any person, not just government employees and data processors,
from "selling, loaning, providing access to or otherwise surrendering of the voter
file, duplicates of the file or a part of the file . . ."

Voter Reference MSJ Memo. ¶ 44 at 24 (citing May 17 Tr. at 34:3-14 (Court, Serafimova); id. at

34:23-35:14 (Serafimova); id. at 36:10-11 (Serafimova); id. at 37:11-19 (Serafimova); id. at 50:25-

51:5 (Serafimova); June 15 Tr. at 228:4-16 (Serafimova)).[111]

_____

[111]The Defendants purport to dispute this asserted fact, stating:

Objection. This SOF presents only legal argument and legal conclusions and does
not comport with Fed. R. Civ. P. 56 or D.N.M.LR-Civ. 56.1(b). It requires no
response, but to the extent one is desired, Defendants' [sic] deny and controvert this
statement. *See generally* Argument & Authorities *infra*.

Defendants' MSJ Response ¶ 44, at 6.  The Court disagrees that Voter Reference's asserted fact
contains "only legal argument."  Defendants' MSJ Response ¶ 44, at 6.  To be sure, the asserted
fact offers a description of a legal theory, but such a description does not automatically render the
fact a "legal argument" or an impermissible "legal conclusion[]."  Defendants' MSJ Response ¶ 44,
at 6.  The Court concludes that Voter Reference's description of the Defendants' legal theory
underlying the "Data Sharing Ban" is accurate and supported by the cited portions of the record.
Accordingly, the Court deems the fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts
set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

Moreover, the Court notes that Voter Reference's description of the Defendants' "Data
Sharing Ban" accords with the Defendants' previous representations in the Defendants' Response
to Plaintiffs' Motion for Preliminary Injunction, filed April 14, 2022 (Doc. 13)("PI Response"), in
which Defendants argue that "any person or entity who knowingly and willfully sells, loans,
provides, access to (including on a website), or otherwise surrenders New Mexico voter data
obtained from the voter registration system -- regardless of its intended use -- is guilty of a fourth
degree felony punishable by fine."  PI Response at 9.

Now, in the Defendants' MSJ Response, the Defendants appear to disavow -- at least in part
-- their previous interpretation of the Data Sharing Ban, arguing:

VRF once again constructs a unique interpretation of what the law requires
and then asks the State to defend that construct.  Specifically, VRF argues that New
Mexico law enacts a total "Data Sharing Ban" that would prohibit not only
widespread publication of voter data but would also prevent a private citizen from
sharing her own data with another private citizen, an entity from sharing its own
summary or analysis of data with the public, or a volunteer canvasser from
discussing voter data if he might be overheard by a third party. *See* VRF MSJ (ECF
No. 124) at 95.  Of course such prohibitions "do[] not appear in any New Mexico

b.      **Use Restrictions.**

Voter Reference does not provide a clear definition of the term "Use Restrictions" in the

Voter Reference MSJ Memo. See Voter Reference MSJ Memo. ¶¶ 82-92, at 33-34 (describing

Voter Reference's understanding of how the Defendants apply the "Use Restrictions," but offering

no definition of the term).  Based on previous understandings of Voter Reference at earlier points

in this litigation, however, see, e.g., Plaintiffs' Suggestions in Support of Motion for Preliminary

Injunction at 10, filed March 28, 2022 (Doc. 4)("PI Memo."), the Court understands the term "Use

Restrictions" to refer to N.M.S.A. § 1-4-5.5(C)'s limitation that, under New Mexico law, "[e]ach

requester of voter data . . . shall sign an affidavit that the voter data . . . shall be used for

governmental or election and election campaign purposes only[112] and shall not be made available

---

statute, rule, regulation or administrative guidance." *Id.* at 97.  Such prohibitions
simply don't exist.  What is, and has always been, prohibited is posting to the
Internet, on a publicly available website, all New Mexico voter data in a non-
anonymized, non-aggregated form.  How New Mexico law might apply to myriad
hypothetical situations is not the question under the Fourteenth Amendment.
*Hill*[*v. Colorado*], 530 U.S. [703,] 732-33. Instead, the question is whether VRF
had "fair notice" that posting voter information to VoteRef.com was unlawful.

Defendants' MSJ Response at 58-59 (second and third brackets added).  As the previously quoted
portion of the Defendants' PI Response indicates, Voter Reference's understanding of the "Data
Sharing Ban" is not a "unique interpretation" of the law, Defendants' MSJ Response at 58, but
rather it is Defendants' own previously stated understanding of what State law requires.  See, e.g.,
PI Response at 9.  Voter Reference's description of the Defendants' position is also supported by
comments made elsewhere in the Defendants' MSJ Response: "The Secretary has interpreted this
statutory framework to permit sharing data within an entity or organization for use in furtherance
of a permissible purpose, but not to permit sharing outside of it for any purpose."  Defendants' MSJ
Response at 43.

[112]N.M.S.A. § 1-4-5.5(E) provides the following definitions of these statutory terms:

(1)      "election campaign purposes" means relating in any way to a
campaign in an election conducted by a federal, state or local government;

(2)      "governmental purposes" means noncommercial purposes relating

or used for unlawful purposes."  Accordingly, the term "Use Restrictions" refers to N.M.S.A. § 1-4-5.5(C)'s statutory limitation on use of voter data, and how the Defendants interpret those restrictions to apply to certain uses and not others.  Specifically, the Defendants believe that Voter Reference's "posting of New Mexico Voter Data online was not for a government or campaign purpose."  Voter Reference MSJ Memo. ¶ 82 at 33 (asserting this fact)(citing Vigil Depo. at 74:9-75:75:6).  See id. ¶ 84, at 33 (citing Dworak Depo. at 73:8-21); id. ¶ 85, at 33 (citing Dworak Depo. at 73:22-74:13); id. ¶ 86, at 33 (citing Dworak Depo. at 74:19-75:10); Defendants' MSJ Response ¶ 82, at 10 (uncontroverted); id. ¶ 84, at 10 (uncontroverted); id. ¶ 85, at 10 (uncontroverted); id. ¶ 86, at 10 (uncontroverted).

## PROCEDURAL BACKGROUND

As noted above, Voter Reference first brought suit in March, 2022, filing its Initial Complaint and its PI Motion.  See Initial Complaint at 1-32; PI Motion at 1-3.  Since that time, the PI Motion was granted in part and denied in part, and a two-judge panel of the Tenth Circuit stayed the PI.  See Order (dated December 28, 2022), filed April 14, 2023 (Doc. 119-15).  As litigation has proceeded, Voter Reference has made new arguments, and the posture of the dispute has shifted and evolved.  This section outlines those developments, beginning with a summary of the

---

in any way to the structure, operation or decision-making of a federal, state or local government;

. . .

(5)     "voter data" means selected information derived from the voter file.

N.M.S.A. § 1-4-5.5(E)(1), (2), (5).  "Election purposes" is undefined in the statute.

early stages of the litigation in the spring of 2022, before turning to the cross-motions for summary judgment, and the later supplements.

    1.    **The Initial Complaint**.

In its Initial Complaint, Voter Reference brings claims against the Defendants on five counts, for violations of the First and Fifth Amendments to the Constitution of the United States of America, U.S. Const. amends. I, V, pursuant to 42 U.S.C. § 1983, and for Declaratory Judgment pursuant to 28 U.S.C. § 2201.  See Initial Complaint ¶¶ 72-129, at 19-31.  First, Voter Reference asserts that publishing information constitutes protected speech under the First Amendment, see Initial Complaint ¶ 75, at 20 (citing Sorrell v. IMS Health Inc., 564 U.S. 552, 570 (2011)), and that the "ability to receive information is also a fundamental First Amendment right," Initial Complaint ¶ 76, at 20.  Voter Reference contends that "a law imposing criminal penalties on protected speech is a stark example of speech suppression," Initial Complaint ¶ 77, at 21, and that "[s]peech sharing non-confidential information about the voting history of New Mexico voters . . . sits at the zenith of First Amendment protection," Initial Complaint ¶ 78, at 21.  Voter Reference contends that New Mexico's Use Restrictions on voter data "cannot stand unless they survive strict scrutiny,"  Initial Complaint ¶ 79, at 21, and that "'speech restrictions based on the identity of the speaker are all too often simply a means to control content,'" Initial Complaint ¶ 80, at 21 (citing and quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340-41 (2010)("Citizens United")).

Voter Reference asserts that it is too difficult and expensive for individuals like Steinberg to get the same access to voter data as political campaigns without Voter Reference obtaining and disseminating the information.  See Initial Complaint ¶ 81, at 22.  By "criminalizing the dissemination of voter information, including via the Internet, the Use Restrictions do not leave open ample, comparable, and effective alternative channels for communication."  Initial Complaint ¶ 83, at 22.

Second, Voter Reference alleges that the use restrictions' "wholesale prohibition on distributing voter data and information except for very limited purposes preordained by the State operates as a presumptively invalid prior restraint on speech," Initial Complaint ¶ 89, at 23, and that the State bears a heavy burden to justify prior restraints, Initial Complaint ¶ 91, at 24 (citing Capital Cities Media, Inc. v. Toole, 463 U.S. 1303, 1305 (1983)). Voter Reference argues that the use restrictions "operate as a de facto licensing system," and that the Secretary of State is exercising improper discretion in granting or denying use requests, particularly when the State knows the identity of who is requesting the data. Initial Complaint ¶ 92, at 24. Voter Reference asserts that prior restraints on disseminating information "relevant to -- and perhaps critical of -- government activity is a core concern of the First Amendment." Initial Complaint ¶ 94, at 25 (citing Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 838 (1978)). Voter Reference asserts that New Mexico "cannot demonstrate that the Use Restrictions are justified without reference to the content of the prohibited speech," because they "only apply if the voter data is being shared with the public." Initial Complaint ¶ 95, at 25. Voter Reference argues that New Mexico cannot demonstrate that the use restrictions "serve a compelling governmental interest," Initial Complaint ¶ 96, at 26, and that, if the State exercises discretion based on the identity of the requester and that requester's political ideology, it "engages in viewpoint discrimination," Initial Complaint ¶ 97, at 26.

Third, Voter Reference asserts that the use restrictions -- including criminal penalties for unlawful use of voter data -- are "impermissibly vague both as written and as interpreted and enforced by the Secretary of State." Initial Complaint ¶ 108, at 28. Voter Reference argues that its intended use of voter data falls under the Election Code's term "'election' purposes," but that the Secretary of State understands the category of "election" purposes too narrowly, as being a

subcategory of "election campaign purposes." Initial Complaint ¶ 109, at 28 (no citation for quotation). Further, Voter Reference notes that "'election' lacks any definition within the statute," Initial Complaint ¶ 109, at 28 (source of quoted material not cited), and argues that "the uncertain meanings and interpretations of the state fail to provide sufficient guidelines for Plaintiffs and others to know what conduct is permissible and what is prohibited," resulting in a chilling effect on speech. Initial Complaint ¶¶ 110-111, at 28-29.

Fourth, Voter Reference argues that the use restrictions are "overbroad in that they regulate and prohibit substantially more protected speech than is necessary to accomplish any legitimate government interest[] furthered by the restrictions." Initial Complaint ¶ 115, at 29. Voter Reference argues that this concern is "especially strong where, as here, the statute imposes criminal sanctions." Initial Complaint ¶ 117, at 29 (citing Virginia v. Hicks, 539 U.S. 113, 119 (2003)). Voter Reference contends that the criminal sanctions cause speakers "to remain silent rather than communicate even arguably unlawful words, ideas, and images." Initial Complaint ¶ 117, at 30 (citing Dombrowski v. Pfister, 380 U.S. 479, 494 (1965)). Fifth, Voter Reference asks the Court to issue declaratory judgment in its favor, declaring the use restrictions to be in violation of the First Amendment, invalid prior restraints on speech, and unconstitutionally vague and overbroad. See Initial Complaint ¶¶ 125-128, at 31. Voter Reference states that it seeks a PI and permanent injunction "enjoining Defendants and all of their agents and employees from enforcing the Use Restrictions against Plaintiffs in violation of their constitutional rights." Initial Complaint ¶ 129, at 31.

2.    **The PI Motion, the PI Memo., the Response, the Reply, and the PI Motion Hearings.**

As noted above, on the same day as it filed its Initial Complaint, Voter Reference also filed its PI Motion. The PI Motion, in turn, was supported by an accompanying memorandum -- the

Plaintiffs' Suggestions in Support of Motion for Preliminary Injunction, filed March 28, 2022 (Doc. 4)("PI Memo.").   In the PI Motion, Voter Reference -- along with another then-Plaintiff named Holly Steinberg[113] -- stated that "New Mexico law prohibits the use and dissemination of voter information (who has voted, and in which elections) for all but a few limited purposes preapproved by the State," which they characterized as "a prohibition on speech."   PI Motion ¶ 1, at 1.   Voter Reference and Steinberg asserted that they had obtained, used, and disseminated voter information for "election purposes" to "increase voter participation and provide transparency regarding New Mexico elections."   PI Motion ¶ 1, at 1.   Accordingly, the Plaintiffs asked the Court to "issue a preliminary injunction prohibiting Defendants and all persons in active concert or participation with them . . . from taking any action" to:

> a.   prohibit Plaintiffs from disseminating or using voter information available under New Mexico law for purposes related to election integrity, election transparency, and increasing voter participation; or,
>
> b.   cite, prosecute, punish, or otherwise enforce the use restrictions in N.M. Stat. § 1-4-5.5 or any substantially similar restrictions against Plaintiffs, including by prosecuting Plaintiffs under N.M. Stat. § 1-4-5.6, as a result of Plaintiffs' use of the voter information.

PI Motion ¶ 4, at 2-3.

### a.   In the PI Memo., Voter Reference Forwards a Constitutional Theory to Support its Request for a PI.

This request was supported by the PI Memo., in which the Plaintiffs forwarded purely First Amendment arguments to support their request for a PI.   In broad terms, the Plaintiffs criticized what they referred to as the State of New Mexico's Use Restrictions,[114] which they contended

---

[113]In the now-operative Complaint -- the Plaintiff's Verified First Amended Complaint for Declaratory Judgment and Preliminary and permanent Injunctive Relief, filed September 26, 2022 (Doc. 74) -- Holly Steinberg is no longer a named Plaintiff in this matter.

[114]In the PI Memo. the Plaintiffs defined the term "Use Restrictions" as:

"directly restrict and criminalize protected speech."  PI Memo. at 15.  This argument was based

on an underlying premise that Voter Reference's "publication of voter information to encourage

voter participation and discussions about elections and election integrity is protected by the First

Amendment, as the creation and dissemination of information are speech within the meaning of

the First Amendment."  PI Memo. at 15. (citing Sorrell v. IMS Health Inc., 564 U.S. 552, 570

(2011)(citing Bartnicki v. Vopper, 532 U.S. 514, 527 (2001)).  On this basis, Voter Reference and

Steinberg then moved onto more specific arguments in relation to the PI test's four prongs: "(1) a

likelihood of success on the merits; (2) a likelihood that the moving party will suffer irreparable

harm if the injunction is not granted; (3) the balance of equities is in the moving party's favor; and

(4) the preliminary injunction is in the public interest."  PI Memo. at 20 (citing Verlo v. Martinez,

820 F.3d 1113, 1126 (10th Cir. 2016)).  Their focus, however, was largely on the first prong, as

they contended that, "[i]n the First Amendment context, 'the likelihood of success on the merits

will often be the determinative factor' because of the seminal importance of the interests at stake."

PI Memo. at 14 (quoting Verlo v. Martinez, 820 F.3d at 1126 (quoting Hobby Lobby Stores, Inc.

v. Sebelius, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd sub nom. Burwell v. Hobby Lobby Stores,

Inc., 573 U.S. 682 (2014))).

To support their argument as to the first prong of the PI test, the Plaintiffs made four

discrete First Amendment arguments.  First, the Plaintiffs asserted that they were likely to succeed

---

(1)    restrictions on a use of the data that is not for a specific candidate or ballot
measure campaign, but that is for election purposes; and

(2)    restrictions on a use of the data that is not by the government itself, but that
is by a private person for the purpose of publishing, reviewing, and
engaging in speech regarding the governmental operation of elections.

PI Memo. at 10.

on the merits of their First Amendment claims, because New Mexico's Use Restrictions "constitute direct restrictions on speech which cannot survive strict scrutiny." PI Memo. at 20. Second, the Plaintiffs argued that the Use Restrictions were "presumptively invalid prior restraints" on speech, because the speech in question is "conditioned upon the prior approval of public officials." PI Memo. at 22 (citing Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)). Third, the Plaintiffs argued that the Use Restrictions were constitutionally overbroad, because they "prohibit and deter substantially more speech than can be justified under the First Amendment." PI Memo. at 24. Last, the Plaintiffs argued that the Use Restrictions were "unconstitutionally vague" and that the Plaintiffs were "left to guess as to whether their proposed uses are unlawful," because the "statute purports to allow voter data to be 'used for governmental or election and election campaign purposes,' yet 'election' appears to have no independent meaning within the statute." PI Memo. at 27 (quoting N.M.S.A. §§ 1-4-5.5). On the basis of these four arguments, the Plaintiffs contended that they had demonstrated sufficiently that they were likely to succeed on the merits of their First Amendment claims, and thus the Court needed no consider the other prongs of the PI test. See PI Memo. at 22 (citing Verlo v. Martinez, 820 F.3d at 1126).

Nevertheless, the Plaintiffs also included brief arguments related to irreparable harm and the public interest factors. In short, as it pertains to irreparable harm, the Plaintiffs argued that "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" PI Memo. at 28-29 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)). Regarding the PI test's third and fourth prongs -- the balance of equities is in the moving party's favor and the preliminary injunction is in the public interest -- the Plaintiffs contended that the State's interest in "regulating how voter information may be used . . . does not trump the First Amendment rights of Plaintiffs and others who wish to use the voter information to engage in

constitutionally protected speech."  PI Memo. at 29.  The Plaintiffs asserted that "[t]he public interest almost universally favors the protection of constitutional rights," and "is served both by the exercise of First Amendment rights and the absence of infringements on those same rights." PI Memo. at 29.

### b.     The Defendants Articulate a Theory of the Statutory Protections for Voter Data Under New Mexico Law.

In response, the Defendants argue that the Plaintiffs do not meet the burden required to obtain a PI, particularly a "disfavored injunction that would disrupt the status quo and provide the full relief Plaintiffs could obtain on the merits."  Defendants' Response to Plaintiffs' Motion for Preliminary Injunction at 2, filed April 14, 2022 (Doc. 13)("PI Response").  In so doing, the Defendants -- for the first time in this litigation -- provide an articulation of their understanding of the voter information protections in New Mexico's Voter Records System Act, N.M.S.A. §§ 1-5-1 through 1-5-31.  First, they note that under the Voter Records System Act, the "Secretary of State maintains a centralized voter registration database containing a file for each registered voter in New Mexico."  PI Response at 2 (citing N.M.S.A. § 1-5-30(A)).  That voter file -- they posit -- includes each voter's name, gender, residence, municipality, post office, county of former registration, date of birth, political party affiliation, zip code, telephone number, driver's license or state identification number, and full social security number.  See PI Response at 2-3 (citing N.M.S.A. § 1-4-5.4(B); 1.10.35.8(A)(4) NMAC).  According to the Defendants, "[b]oth the integrity and privacy of voter files are protected by law," and election officials in the state are mandated to "take measures to minimize the risk of unauthorized disclosure, unauthorized acquisition, unauthorized access or other situation that would provide access to voter registration records outside what is allowable by law."  PI Response at 3 (quoting 1.10.35.10 NMAC).

In addition to this regulatory mandate to "take measures to minimize the risk of

unauthorized disclosure, unauthorized acquisition, unauthorized access or other situation that would provide access to voter registration records outside what is allowable by law," 1.10.35.10 NMAC, the Defendants also pointed to a statutory mandate that instructs that, "all employees with access to voter files are prohibited from allowing 'unauthorized access and unauthorized reproduction' of the voter files and may only provide copies to 'the secretary of state, the county clerk or their designated agents.'"  PI Response at 4 (quoting N.M.S.A. § 1-5-21(B), (C). Moreover, the Defendants also cite a statutory provision that prohibits all employees with access to voter files from "selling, loaning, providing access to or otherwise surrendering of the voter file, duplicates of the file or a part of the file . . . to anyone not authorized by the Voter Records System Act to have possession of the file."  PI Response at 4 (quoting N.M.S.A. § 1-5-22(A)).  The Defendants also argue that the unlawful destruction or alteration of voter files is statutorily prohibited.  PI Response at 4 (quoting N.M.S.A. §§ 1-5-23; 1-4-5(E)).  These regulations and statutes -- the Defendants suggest -- ensure that "[b]oth the integrity and privacy of voter files are protected by law."  PI Response at 3.

The Defendants acknowledge, however, that "New Mexico law does provide for the public disclosure of voter data," but that "such disclosures are highly limited and regulated." PI Response at 4.  The Defendants state that, under N.M.S.A. § 1-4-5.5, a county clerk or the Secretary of State shall furnish voter data "only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section," which includes -- the Defendants emphasize  -- that "[e]ach requester of voter data . . . shall sign an affidavit that the voter data . . . shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes."  PI Response at 4 (quoting N.M.S.A. § 1-4-5.5(C)). The Defendants then note that the statutory scheme provides that "'[e]ach and every unlawful use

of voter data[,]' defined as 'the knowing and willful use of such information for purposes prohibited by the Voter Records System Act[,]' is a fourth degree felony punishable by a $100 fine for each line of voter information unlawfully used." PI Response at 4 (quoting N.M.S.A. § 1-4-5.6).

The Defendants contend that the affidavit -- which is required to be submitted with requests for New Mexico voter data -- pays a significant role in the "highly limited and regulated" way that voter data can be disclosed.  PI Response at 4.  See id. at 5.  This mandatory affidavit, the Defendants state, "incorporate[es]" all the relevant statutory provisions, and ensures that "only persons or entities who actually submit the requisite affidavit may receive a copy of any New Mexico voter data derived from the voter registration system, and use of that data is limited to governmental and election or election campaign related purposes only."  PI Response at 5. Crucially, on the basis of this affidavit, in conjunction with Section 1-5-22(A)'s prohibitions on the "[u]nlawful disposition of [a] voter file," the Defendants argue that "any person or entity who knowingly and willfully sells, loans, provides, access to (including on a website), or otherwise surrenders New Mexico voter data obtained from the voter registration system -- regardless of its intended use -- is guilty of a fourth degree felony punishable by fine."  PI Response at 9.  In short, the Defendants' theory of the relevant New Mexico statutory scheme mandates: (i) that all requests for voter data under New Mexico law are accompanied by an affidavit that limits the use of the data to specific purposes; and (ii) that a requester who legally receives voter data may not share that data with third parties for any purpose.

After providing their theory of the State statutory protections for voter data, the Defendants turn to the facts of this matter.  The Defendants assert that Voter Reference "wishes to upload to its website New Mexico voter data for every registered voter in New Mexico," and that Steinberg

"wishes to have free and convenient access to New Mexico voter data via VRF's website," even though neither party "submitted a request to the Secretary of State or any county clerk for any voter data." PI Response at 6. The Defendants note that David Lippert, "in association with an entity called Local Labs," requested the data, paid the fee, and signed the affidavit. PI Response at 6. The Defendants contend that, "[b]ecause VRF never submitted a request for voter data under Section 1-4-5.5, its First Amendment claim does not implicate Subsection (C)'s restrictions on the use of such data ('Use Restrictions') as preconditions to obtaining the data." PI Response at 7. The Defendants assert instead that, because Voter Reference already obtained the data from Local Labs, "VRF's claim falls under Section 1-4-5.6, because that section prohibits the *publication* of voter data on the VRF (or any) website -- a prohibition that does not depend on the data's intended use separate from or subsequent to publication." PI Response at 7. The Defendants argue that, because N.M.S.A. § 1-4-5.6 "is constitutional as applied to VRF," the Court should deny the PI. PI Response at 7.

Turning to a PI's substantive and procedural requirements, the Defendants assert that the Plaintiffs are requesting a disfavored injunction, because their requested PI "'changes the status quo'" and "'grants all the relief that the moving party could expect from a trial win.'" PI Response at 8 (quoting Free the Nipple-Fort Collins v. City of Fort Collins, Colo., 916 F.3d 792, 797 (10th Cir. 2019)). The Defendants argue that, as a result of seeking a disfavored injunction, the Plaintiffs may not rely on the Tenth Circuit's "'modified-likelihood-of-success-on-the-merits standard' that permits a party to make a lesser showing of likely success where the balance of harms tips in its favor." PI Response at 8 (quoting O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 975-76 (10th Cir. 2004)(en banc)). In terms of the PI test's four prongs, the Defendants argue that the Plaintiffs are unlikely to prevail on their First Amendment claims, because "VRF has no First Amendment right to publish information obtained *unlawfully* from

government records."  PI Response at 9 (emphasis in original).  The Defendants reiterate that

N.M.S.A. § 1-4-5.6 "prohibits both Local Labs' presumptive sale of New Mexico voter data to VRF

and VRF's subsequent wholesale publication of that voter data on its website," and agree that its

"'prohibition on *disclosing* [New Mexico voter data] is a direct regulation of speech.'"  PI Response

at 9 (quoting <u>Dahlstrom v. Sun-Times Media, LLC</u>, 777 F.3d 937, 949 (7th Cir. 2015)(emphasis in

<u>Dahlstrom v. Sun-Times Media</u>)(alteration in PI Response only).  The Defendants assert that the

Court's standard of review "'hinges on whether the regulation is content based, which requires us

to apply strict scrutiny, or content neutral, which demands only an intermediate level of scrutiny.'"

PI Response at 9 (quoting <u>Dahlstrom v. Sun-Times Media, LLC</u>, 777 F.3d at 949).

The Defendants cite a case about the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721-

2725 ("DPPA"), for the proposition that "'[d]isclosures that are prohibited by virtue of the source,

rather than the subject matter are easily categorized as content neutral.'"  PI Response at 10

(quoting <u>Dahlstrom v. Sun-Times Media, LLC</u>, 777 F.3d at 949).  Analogizing voter information

to motor vehicle records, the Defendants argue that, like the DPPA, N.M.S.A. § 1-4-5.6 "is content

neutral because its public safety goals are unrelated to the content of the regulated expression."  PI

Response at 10.  <u>See</u> PI Response at 11.  The Defendants explain:

> Section 1-4-5.6's (and, by incorporation by reference, Section 1-5-22(A)'s)
> prohibition on disclosure of New Mexico voter data . . . only applies to voter data
> obtained from New Mexico's mandatory voter registration system and is
> completely agnostic to the dissemination of the very same information -- a voter's
> name, gender, address, party affiliation, voting history, etc. -- acquired from a
> different source, including directly from the voter.

PI Response at 11.  The Defendants contend that "[t]he New Mexico Legislature's goal of

protecting voter privacy in order to foster trust in the voter registration system, thereby increasing

voter registration . . . is evident from the multiple security and privacy restrictions in the Voter

Records System Act" and "is completely unrelated to the actual contents of any given voter file";

consequently, the prohibition on disclosure is "unrelated to the *message* communicated by voter data." PI Response at 11 (emphasis in original).   The Defendants argue that N.M.S.A. § 1-4-5.6's limitation is content-neutral and will "'withstand First Amendment scrutiny,'" because "'it furthers an important or substantial governmental interest'" which is "'unrelated to the suppression of free expression'" and is "'no greater than is essential to the furtherance of that interest.'"  PI Response at 11 (quoting Dahlstrom v. Sun-Times Media, LLC, 777 F.3d at 952).

The Defendants assert that N.M.S.A. § 1-4-5.6 "furthers at least four important state interests" that are "unrelated to the suppression of free expression":

- It ensures that only individuals who sign the requisite affidavit and, therefore, are made explicitly aware of the permissible uses of New Mexico voter data, have access to such data;

- It ensures payment of reasonable fees for the production of voter data, which fees subsidize the mandatory voter registration system;

- It encourages voter registration by ensuring voters that their voter data will only be disclosed on a need-to-know basis and under penalty of perjury, thereby fostering trust in the registration system by protecting registered voters from unwanted solicitations, harassment, and abuse; and

- Because voter data produced at any single moment represents a "snapshot" of the voter files as of that moment, whereas voter files may change in the future, thereby rendering the produced voter data no longer accurate, disseminating voter data may lead to disinformation, which would further erode voter confidence in the voter registration system.

PI Response at 11-12.  The Defendants quote Van Allen v. Cuomo, 621 F.3d 244, 249 (2d Cir. 2010), for the proposition that "'the state has a legitimate interest in encouraging new voter registration' and participation in the electoral process," and cite R.I. Ass'n of Realtors, Inc. v. Whitehouse, 51 F. Supp. 2d 107, 113 (D.R.I. 1999)(Torres, J.), for its recognition that the State has a "legitimate and substantial interest in protecting privacy rights of citizens by establishing appropriate limitations on access to or use of personal information citizens are compelled to furnish to government agencies."  PI Response at 12.

The Defendants argue that allowing disclosure and dissemination of voter data "outside the regulatory process would (i) take the data outside the protections afforded by the mandatory affidavit; (ii) result in no fees being paid to the State; (iii) expose registered voters to potential unwanted solicitations, harassment, and abuse; and (iv) eventually result in stale information being publically [sic] available."  PI Response at 12 (citing Fusaro v. Howard, 19 F.4th 357, 370 (4th Cir. 2021)).  The Defendants argue that its restrictions are "no greater than is essential to the furtherance of these interest[s]," because "*any* dissemination of New Mexico voter data outside the legislatively prescribed process would completely frustrate each of the State's important interests."  PI Response at 13 (emphasis in original).  The Defendants assert that Voter Reference can obtain the information it seeks by "polling New Mexico residents directly," and argue that, although it "would be less convenient than obtaining the information from the voter registration system," the First Amendment "does not protect convenience," and "the Legislature 'could decide not to give out [voter data] at all without violating the First Amendment.'"  PI Response at 13 (quoting L.A. Police Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 40 (1999)).

The Defendants argue that, even if Voter Reference seeks the same data on its own behalf, "VRF's act of obtaining such data from the Secretary of State with the intent to upload it on its website would still be illegal," because "VRF would be required to attest that it will not 'provide access to . . . voter information received as a result of this request.'"  PI Response at 13-14 (quoting Complaint ¶ 27, at 9).  The Defendants argue that, "[g]iven VRF's admitted intent to upload the data," attesting that it will not share the data with others "would be false" and, therefore, "the line of cases addressing the publication of information obtained *lawfully* does not control."  PI Response at 14 (emphasis in original).

Next, the Defendants argue that Steinberg's "First Amendment claim is premised on her

desire for free and . . . more convenient access to New Mexico voter data." PI Response at 14. The Defendants note that "Steinberg does not provide any authority that would suggest a First Amendment violation in this context," and that New Mexico law does not impose criminal liability on someone in Steinberg's position, that is, "someone who merely receives such data from a third [party] . . . but does not herself violate Section 1-4-5.6 by further distributing the data." PI Response at 14. The Defendants assert that Steinberg's claim is akin to an advisory opinion and is "not ripe," because she "never submitted a request for voter data," "'does not have the means or desire to independently pay for the data set,'" and does not intend to pay for the data set. PI Response at 14-15 (quoting PI Memo. at 9). The Defendants argue that the Plaintiffs are unlikely to prevail on their "prior restraint, void-for-vagueness, and overbreadth" challenges, because "the Use Restrictions have no bearing on VRF's claim that it has a constitutional right to *publish* New Mexico voter data on its website." PI Response at 15 (emphasis in original).

In terms of the PI test's remaining prongs, the Defendants assert that granting the PI "would be contrary to the public interest," because "trust in the voter registration system would be eroded" if "the voter data of each and every New Mexico registered voter [was] released on the internet." PI Response at 16. The Defendants also contend that it would be "practically impossible" to "claw . . . back" voter information once it is released, and "[t]rust in the voter registration system would be eroded." PI Response at 16. The Defendants argue in conclusion that "New Mexicans' statutorily recognized right to privacy in . . . personal information they are required by law to provide as a precondition to exercising their right to vote . . . should be protected until the case is decided conclusively on the merits." PI Response at 16-17.

      **c.**    **The PI Reply, and Voter Reference's Contrary Statutory Theory.**

In the Plaintiffs' Reply in Support of Motion for Preliminary Injunction, filed May 2, 2022 (Doc. 19)("PI Reply"), Voter Reference continues to press its First Amendment arguments in favor

of a preliminary injunction, while also offering a contrary reading of the relevant New Mexico statutes that govern the sharing and transfer of voter data.  Regarding the latter, Voter Reference accuses the Defendants of proffering an "errant reading of New Mexico law," PI Reply at 12, which imposes a blanket ban on the sharing of voter data by individuals or entities that request it, see PI Reply at 2.  Against the Secretary of State's reading of the relevant statutory law, Voter Reference offers its own account of how the statutory scheme fits together to allow voter data sharing so long as it is for a "permissible use."  PI Reply at 2.

Voter Reference begins by quoting Section 1-4-5.5(C): "Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used **for unlawful purposes**."  PI Reply at 2 (quoting Section 1-4-5.5(C))(emphasis PI Reply, but not in Section 1-4-5.5(C)).  Voter Reference contends that a fundamental problem with the Defendants' reading of Section 1-4-5.5 is the idea that this statutory "restriction only governs requesters' *private use*."  PI Reply at 3.  Indeed, as discussed above, the Defendants' theory of this statute is that the act of sharing voter data is itself an unlawful purpose, and thus a requester sharing voter data with a third party runs afoul of Section 1-4-5.5(C).  See PI Response at 9 ("[A]ny person or entity who knowingly and willfully sells, loans, provides, access to (including on a website), or otherwise surrenders New Mexico voter data obtained from the voter registration system -- regardless of its intended use -- is guilty of a fourth degree felony punishable by fine.").  Accordingly, on the Defendants' theory, Section 1-4-5.5(C)'s restriction only applies to ensure that the use of voter data is not used for unlawful purposes by the requester -- hence Voter Reference's characterization that statutory reading means that Section 1-4-5.5(C)'s "restriction only governs requesters' *private use*."  PI Reply at 3.

Voter Reference, on the other hand, argues for an alternative reading of Section 1-4-5.5(C), in which a requester of voter data may not "ma[k]e available or use[]" voter data for a purpose that is not a governmental or election and election campaign purpose, but that requester may disclose voter data to a third party -- so long as the third party uses the voter data for a governmental or election and election campaign purpose.  See PI Reply at 4.  The key point of disagreement in these interpretations -- what Voter Reference calls the "error[] which infects [the Defendants'] entire brief," PI Reply at 3 -- is whether Section 1-5-22(A)'s prohibitions on the "[u]nlawful disposition of [a] voter file" even applies to requesters of voter data.  On Voter Reference's reading of the statutes, Section 1-5-22(A) "clearly does not apply to requesters like VRF and political parties.  Instead, it applies only to disclosures 'by' particular categories of individuals: state and county workers, and 'data processors'[] (certain government contractors)."  PI Reply at 3 (quoting Section 1-5-22).  If Section 1-5-22(A) does not apply to requesters of voter data, then Voter Reference argues that nothing in the statutes can support the Defendants' assertion that "any person or entity who knowingly and willfully sells, loans, provides, access to (including on a website), or otherwise surrenders New Mexico voter data obtained from the voter registration system -- regardless of its intended use -- is guilty of a fourth degree felony punishable by fine."  PI Response at 9.

In the PI Reply, Voter Reference also outlines a recent change to the affidavit which accompanies requests for voter data under New Mexico law.  Voter Reference points out that the former version of the voter data form -- the one that Local Labs filled out in its initial Lippert Voter Information Authorization form -- "tracks the Election Law," PI Reply at 4 (citing Local Labs' Voter Data Request Form at 18, filed April 14, 2022 (Doc. 13)("Local Labs Form"), and Voter Data Request Form at 2, filed May 2, 2022 (Doc. 19-4)("Old Form")), but that the Voter Data Request

Form's new version does not track New Mexico's election law, <u>see</u> PI Reply at 4 (citing Voter Data Request Form at 2, filed March 28, 2022 (Doc. 1-2)("New Form")).  The Plaintiffs explain that, "in the Old Form, . . . [there are] three boxes to indicate how the data will be used: 'Governmental Use,' 'Campaign Use,' or 'Election Related,'" and that these options "track[] the text of section 1-4-5.5(C) ('governmental or election and election campaign purposes')."  PI Reply at 4 (quoting Old Form at 2 and N.M.S.A. § 1-4-5.5(C)).   Voter reference states that Local Labs checked the "'Election Related' box," PI Reply at 4 (citing Local Labs Form at 18), and notes that the "New Form eliminates the third box, removing 'Election Related' as a permissible category of content for data-related speech," PI Reply at 4 (citing New Form at 2).

Next, Voter Reference turns again to the merits of their argument for a PI, asserting that the Defendants injure Voter Reference by "excluding 'election-related' speech as a permissible use" of voter data.  PI Reply at 5.  The Plaintiffs assert that "New Mexico regulates private parties' access to, and sharing of, voter data by examining the proposed use of the data," "inhibits use of the data for commercial solicitation and harassment," but "allows for free speech in campaigns and in election-related communications by VRF and its citizen-associates like Ms. Steinberg."  PI Reply at 6.  The Plaintiffs argue that New Mexico does not ban a requester from "disclosing data to a client or other party," so long as "any such use . . . meet[s] the content-based criteria set forth in § 1-4-5.5(C)."  PI Reply at 6.  The Plaintiffs contrast their reading of the statutes with the Defendants' reading, critiquing their belief that "VRF's sharing of voter data for election-related purposes is a form of disclosure that is 'criminal.'"  PI Reply at 6 (quoting PI Response at 8).  The Plaintiffs note the Defendants' admission that "the prohibition on disclosure 'is a direct regulation of speech'" and assert that the Defendants' "ban on VRF's speech regarding the voter data" creates "no question" of "First Amendment injury."  PI Reply at 6 (quoting PI Response at 8).

The Plaintiffs next assert that Use Restrictions are content-based, because they "'target[] speech based on its communicative content.'"  PI Reply at 7 (quoting Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015)).   The Plaintiffs look to the Supreme Court of the United States of America's definition of content-based regulations in Reed v. Town of Gilbert, which requires courts to consider "'whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys,'" and whether facial distinctions are based on the speech's "'function or purpose.'"  PI Reply at 7 (quoting Reed v. Town of Gilbert, 576 U.S. at 163-64).  The Plaintiffs assert that, under Reed v. Town of Gilbert, N.M.S.A. § 1-4-5.5 is a content-based regulation, because it "uses 'function or purpose' to decide what speech is lawful," -- "data can be shared 'for **governmental** or **election** and **election campaign purposes only** and shall not be made available or used for unlawful purposes.'"  PI Reply at 7 (quoting N.M.S.A. § 1-4-5.5)(emphasis in PI Reply).  The Plaintiffs critique the Defendants' construction of the statute allowing use of voter data in an electoral campaign to "advocate for Secretary Oliver's reelection," but not allowing its use "to criticize the Secretary's maintenance of the voter rolls."  PI Reply at 8.

The Plaintiffs accuse the Defendants of "quietly retir[ing]" the Old Form and removing "election-related" as a stated permissible use after making a criminal referral to the New Mexico Attorney General in December 2021.  PI Reply at 8.   The Plaintiffs characterize the Defendants' listed State interests as "all but admit[ting] . . . animus," because the Plaintiffs assert that the Defendants get to decide who may access the data -- "progressive for-profit firms like Catalist" or VRF --  "textbook content or viewpoint-based regulation."  PI Reply at 8-9.  The Plaintiffs argue that the State's interest in "avoiding 'disinformation' veers even more blatantly into viewpoint discrimination," and assert that the Secretary of State substitutes "the statute's three permissible content categories with her own judgment on whether the requester is destined to engage in

'nefarious' speech."  PI Reply at 9 (quoting Press Release, New Mexico Secretary of State Toulouse Oliver Responds to Presidential Election Commission Request for New Mexican Voters Personal Data at 2 (dated June 30, 2017), filed March 28, 2022 (Doc. 1-3)("June 2017 Press Release")).  The Plaintiffs argue that the Use Restrictions are "content or viewpoint based, and must therefore pass strict scrutiny."  PI Reply at 9.

In addition, the Plaintiffs argue that the Use Restrictions fail strict scrutiny, because the Defendants have not shown that its interests are compelling or that the Use Restrictions are narrowly tailored.  See PI Reply at 10.    The Plaintiffs accuse the Defendants of "hid[ing] behind their false claim that VRF unlawfully obtained the information at issue and therefore no constitutional rights are implicated."  PI Reply at 10.  The Plaintiffs argue against the Defendants' four proffered State interests justifying the "prohibition on all disclosure" of voter data by stating that: (i) the Secretary's New Form undermines the first interest in "limiting access to those who are explicitly aware of the permissible uses of New Mexico voter data via the requisite affidavit," because it "imposes restrictions in excess of what the law allows and falsely suggests to signers that it is consistent with the law," and Voter Reference "requires its own users to agree to follow data usage restrictions"; (ii) "the generation of revenue is not a sufficiently compelling interest to impose this severe burden on Plaintiffs' First Amendment rights"; (iii) "encouraging voter registration by ensuring that voter data is disclosed only on a need to know basis under penalty of perjury" is "merely a mechanism[] to favor some speech to the detriment of others based on content or viewpoint" and N.M.S.A. § 1-5-5.6's prohibition on unlawful use already protects the information; and (iv) "avoiding 'disinformation' that might arise from the review of stale data" is also a pretext for content-based or viewpoint-based discrimination.  PI Reply at 10-11 (quoting PI Response at 11).

Finally, in lieu of discussing the PI test's remaining prongs, the Plaintiffs once again assert -- as they did in the PI Memo. -- that, "[i]n the First Amendment context, 'the likelihood of success on the merits will often be the determinative factor' because of the seminal importance of the interests at stake," PI Reply at 13 (quoting Verlo v. Martinez, 820 F.3d 1113, 1126 (10th Cir. 2016)), and argue that the "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" PI Reply at 13 (quoting Elrod v. Burns, 427 U.S. at 373). The Plaintiffs contend that "the public interest favors vindicating First Amendment freedoms." PI Reply at 13 (citing Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir.2005)). The Plaintiffs urge the Court to grant their PI should the Court agree that the Plaintiffs are "likely to prevail on any of their First Amendment theories." PI Reply at 13.

### d.      The PI Motion Hearings.

At the hearings, the parties largely restated the legal arguments made in their briefing. There were, however, several important exchanges between the parties and the Court that help to clarify the respective positions of the parties on several important issues. First, after Voter Reference presented its opening statement in support of its PI Motion, the Court queried Voter Reference to "explain the kind of errors . . . that Voter Reference wants VoteRef.com users to find in the voter data to ensure . . . 'election transparency and integrity.'" May Tr. at 10:18-22 (Court)(quoting Complaint ¶ 48, at 13). Voter Reference responded that "there are some . . . basic errors with dates of birth, address, people are listed as being on the voter rolls who shouldn't be on, they've passed away," May Tr. at 11:7-10 (Greim), but also errors related to "discrepancy," which Voter Reference explained as the difference between "everybody who has gone and cast a ballot on election day" and "the voter rolls," which "contain a designation for each person who did vote." May Tr. at 11:16-25 (Greim). Voter Reference explained that it "wants Secretaries of State and chief election officers to make public the reconciliation of those two numbers," May Tr. at

12:3-5 (Greim) -- i.e., it wants the Secretary of State to "show[] its work," May Tr. at 12:15 (Greim).  The Court asked Voter Reference whether it is "asking only for the data from election day," May Tr. at 12:19-20 (Court), to which they responded "No," and explained that the first data set they received was from April 2021, five months after election day, May Tr. at 12:21-25 (Greim).

The Court next asked Voter Reference how it seeks to "'rectify'" the errors that VoteRef.com users might find in the data.  May Tr. at 13:9-13 (Court)(quoting Initial Complaint ¶ 34, at 10).  The Plaintiffs explained the process by which VoteRef.com users get into the website, then stated that a potential user might first "check your own record, make sure your own information is correct," "[t]hen you might check your spouse and your family members."  May Tr. at 14:2-5 (Greim).

Next, the Court asked Voter Reference what the website's users are comparing this voter registration data to, see May Tr. at 14:20-21 (Court), and the Plaintiffs responded: "[I]t's just their own knowledge . . . . [I]f it's their own record, they know where they've lived, the know what their birthday is.  If it's a relative, they know the same thing," May Tr. at 14:23-15:2 (Greim).  Voter Reference added that users can "do a precinct pull" and they might see that a "110-year-old person voted," and "[y]ou don't have to be some kind of specialist."  May Tr. at 15:4-17 (Greim).

The Court then asked why Voter Reference did not apply for the data itself.  See May Tr. at 19:6-8 (Court).  Voter Reference responded that Local Labs "is a specialist in getting public records," "does this all over the country," and Voter Reference decided to go to Local Labs in early 2021 instead of "staffing up Voter Reference Foundation with lots of workers."  May Tr. at 19:9-15 (Greim).  Voter Reference emphasized that VoteRef.com has a "chain of custody document" that shows how Voter Reference acquired the data.  May Tr. at 19:18-21 (Greim).  The

Court asked whether users can download the data from VoteRef.com, see May Tr. at 20:13-14 (Court), and Voter Reference responded, "I think the answer is no[,] [b]ut that may be a question for one of the witnesses," May Tr. at 20:15-16 (Greim).    The Court asked how VoteRef.com ensures that "the data is not used to harass or intimidate voters," May Tr. at 20:19-20 (Court), and Voter Reference responded that, "once somebody has the data, you can't actually physically stop them from doing it.  We simply make them aware of the law, and make them agree, by clicking that they agree, and that's what gives them access."  May Tr. at 21-25 (Greim).  Voter Reference stated that they "don't have any other way of going out and following people or tracing backwards from instances of harassment," but added that they are not aware of "anyone using the data for some other nonelection-related purpose."  May Tr. at 20:25-21:4 (Greim).  The Court asked how VoteRef.com "ensure[s] that members of the public will not use the data for commercial purposes," May Tr. at 21:5-7 (Court), and Voter Reference responded that it is the same disclosure "in the same way the Secretary of State just has the affidavit from the requester," May Tr. at 21:12-14 (Greim).

The Court asked "[w]hat is your strongest Supreme Court and/or Tenth Circuit case that supports a First Amendment right to public access to this data," "[a]ssuming that the State is correct [and that] they don't have to give it to you?"  May Tr. at 22:13-19 (Court).  Voter Reference replied that "the First Amendment theory" which they are "going to mention here . . . only goes to the denial of access," and goes to "the prosecution and the threats for sharing the data, for using the data."  May Tr. at 23:1-6 (Greim).  The Plaintiffs continued:

> I think that the best argument that goes to the failure to share data is not that there is a First Amendment right to get the data.  Rather, there is a First Amendment right not to be blocked from getting the data, because an official disagrees with our political speech.  So that would sound in retaliation, First Amendment retaliation.

> And the Supreme Court case there -- and I freely [admit that] . . . this is not briefed -- would be . . . [Nieves v.] Bartlett, 139 S. Ct. 1715 (2019).

May Tr. at 23:11-23 (Greim). Voter Reference walked through the three prongs of that case's retaliation test, see May Tr. at 23:24-24:15 (Greim), and explained that "the First Amendment issue is not really the sharing of the data[,] [i]t's really our . . . speaking, sharing the data with other people," and that "[t]he retaliation is blocking us from being able to get it in the first place. Emails go unanswered[;] [t]hey just ignore VRF, on the theory that VRF is a malicious actor," May Tr. at 24:16-22 (Greim).

Voter Reference concluded by stating that its primary position is that, "at bottom, this is a content-based regulation of VRF," May Tr. at 30:25-31:1 (Greim), because "if you look at the actual referral . . . it's very obvious that the reason . . . that we were targeted was because of the content of our speech" and "if that's true . . . it doesn't matter that the statute itself, as they construe it, is content neutral," May Tr. 31:7-17 (Greim). Voter Reference noted that Reed v. Town of Gilbert, 576 U.S. 155 (2015), and Ward v. Rock Against Racism, 491 U.S. 781 (1989), "turned on . . . ordinances . . . that were content based," but that "the court made clear both times that that's not the only route to a content or viewpoint-based finding." May Tr. at 31:20-32:2 (Greim). The Plaintiffs stated that their secondary position is that, if the statutes are to be construed as the Defendants argue, "then, it's grossly overbroad." May Tr. at 32:4-6 (Greim). Voter Reference asserted that banning sharing of voter data for commercial purposes is "the plainly legitimate sweep of the sharing restriction," but "ban[ning] all other sharing . . . sweeps in a political party sharing it with a campaign," and "sweeps in Catalist, the progressive data collection firm, who is sharing it with their clients." May Tr. at 32:13-21 (Greim). Voter Reference added that "most of the use that now happens with this data is actually criminal under the Secretary of State's new interpretation," which is "an overbreadth problem" and presents "the same issue as the first

argument on content based [restrictions]." May Tr. at 32:22-33:1 (Greim). Voter Reference stated that the question is "[w]hat is the compelling state interest, and is the restriction narrowly tailored to meet that compelling state interest" and asserted that "the statute tells us what the state interest is" and is "not narrowly tailored." May Tr. at 33:6-13 (Greim). Voter Reference noted that their arguments on void for vagueness and prior restraint have been briefed, and stated that they would not go into those arguments at the hearing. See May Tr. at 33:16-18 (Greim).

Following these exchanges, the Court invited the Defendants to the Defendants to make their opening arguments in response to the PI Motion. See May Tr. at 33:25-34:1 (Court). The Court asked the Defendants to "[w]alk us through which statutory provisions make Voter Reference's use of the data unlawful." May Tr. at 34:6-8 (Court). The Defendants responded that N.M.S.A. § 1-4-5.6 "is a standalone fourth degree felony, which incorporates by reference [N.M.S.A. §] 1-5-22 -- not in its entirety -- but the purposes that [N.M.S.A. § 1-5-]22 prohibits," and "also incorporates by reference [N.M.S.A. §] 1-5-23, which says that altering voter data is illegal." May Tr. at 34:9-14 (Serafimova). The Defendants explained that "1-5 is . . . the Voter Records Systems Act" and is "a different article than 1-4-5.6, which is the statute that we are under." May Tr. at 34:15-17 (Serafimova). The Defendants argued that N.M.S.A. § 1-4-5.6 is a "standalone criminal provision" that incorporates by reference the definition of "unlawful use" from Article 5. May Tr. at 35:1-5 (Serafimova). The Defendants asserted that "Voter Reference has been misinterpreting the law" by connecting § 1-4-5.5's use of the word "purposes" with § 1-4-5.6's use of the word "purposes." May Tr. at 35:9-14 (Serafimova). The Defendants contended that Article 20 "creates criminal penalties for every violation of the election code for which a standalone criminal penalty is not provided" and that § 1-20-10 -- "defines false swearing as . . . making a false oath knowing that it is false." May Tr. at 35:15-21 (Serafimova). The Defendants

- 104 -

argued that § 1-4-5.5 is covered under Article 20's penalty for making a false affidavit, <u>see</u> May Tr. at 35:25-36:2 (Serafimova), and this section applies to Local Labs, "if we can prove that they made a false statement when they signed the affidavit," May Tr. at 36:3-5 (Serafimova). The Defendants explained that Local Labs, when it provided the data to Voter Reference, and Voter Reference, when it provided the data "to the world," "violated 1-5-5.6, which again, contains its own independent criminal penalty." May Tr. at 36:9-12 (Serafimova). The Defendants argued that, to interpret 1-5-5.6 "as either being the criminal penalty for [N.M.S.A. § 1-4-]5.5 or [§ 1-]5-22, doesn't make sense[,] [b]ecause those sections have their own criminal provisions that apply to them," and because that reading "ignores the plain language of 1-4-5.6, which says 'purposes prohibited under chapter 5.'" May Tr. at 36:12-18 (Serafimova).

The Defendants conceded that § 1-5-22's plain language applies only to a government employee or contractor, or to a data processor. <u>See</u> May Tr. at 38:23 (Court); <u>id.</u> at 39:1-6 (Serafimova). The Court asked how the Defendants move language from § 1-5-22 to "covering" Article 4 provisions in light of that concession. May Tr. at 39:9-13 (Court). The Defendants explained that "1-4-5.6 says, '[u]nlawful use of voter data,' which under (b) is a 4th degree felony, and under (b) applies to any person or organization, not data processor, not employee of the state." May Tr. at 39:14-18 (Serafimova). The Defendants read from § 1-4-5.6, stating: "'Unlawful use of voter data . . . consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act,'" and added that the Voter Records System Act is "Article 5 . . . where 22 resides." May Tr. at 39:18-23 (Serafimova).

The Court asked the Defendants whether a one-time purchase of voter data from the State Elections Registration and Voting Integrity System ("SERVIS") on the Secretary of State's website includes real-time updates to the data or whether it's a snapshot, <u>see</u> May Tr. at 40:5-15

(Court), and the Defendants responded that it is a snapshot, see May Tr. at 41:16-17 (Serafimova). The Defendants explained that SERVIS uses "several sources," including the New Mexico Motor Vehicle Department and the New Mexico Department of Health Vital Records and Health Statistics department to "make sure that the information is as up to date as possible." May Tr. at 41:11-15 (Serafimova).

The Court asked the Defendants whether any other States which have similar election codes to New Mexico's have not released voter data, see Tr. at 42:16-18 (Court), and the Defendants responded that "what I do know is that Pennsylvania asked Voter Ref to take down their information and Voter Ref did that, by claiming that it was unlawful for them to have it up," May Tr. at 42:19-22 (Serafimova). The Court asked whether the State "could prosecute individual VoteRef.com users who use the data for commercial purposes," May Tr. at 43:1-3 (Court), and the Defendants responded: "I don't believe we can[,] [a]nd that's the problem[;] [t]hat's why the State interest . . . is so significant," because "if we don't have someone who has signed an affidavit, if we don't have the affidavit, we can't limit them to the use restrictions," May Tr. at 43:4-10 (Serafimova). The Defendants stated that "our interpretation is 1-4-5.6 is crucial to actually making the . . . other provisions of the Elections Code constitutional, because it buttresses the overall interest, which is basically to promote trust in the system." May Tr. at 43:12-17 (Serafimova). The Defendants argued that this data "is information that voters are required to give to us in order to exercise their fundamental right to vote," and, so, "if they don't trust that we'll keep it as confidential and as secure as possible, then they will not give it to us, they will not participate, and the whole system unravels." May Tr. at 43:18-24 (Serafimova).

In response to the Court's question whether the Secretary of State has granted or denied access to voter data to any organizations that are similar to Voter Reference, see May Tr. at 44L1-

3 (Court), the Defendants stated that neither the Deputy Secretary of State nor the Director of Elections "have heard of Catalist or i360 outside of this proceeding," but, "whenever they receive information that indicated unlawful conduct, they have referred it to the Attorney General's Office," May Tr. at 44:5-15 (Serafimova).  The Defendants stated that "this is unprecedented," and noted that, "[a]s VRF has admitted numerous times, what they're doing is unique . . . [and] happening for the first time[,] . . . [s]o we haven't seen this situation before."  May Tr. at 44:19-23 (Serafimova).

        The Defendants argued that the "overarching" substantial or compelling government interest in withholding voter data from publication online "is to foster trust in the system, to encourage voters to register, and to vote."  May Tr. at 45:4-6 (Serafimova).  The Defendants asserted that "people would simply not register if they think that we will sell their data or will make it available to the world."  May Tr. at 45:8-10 (Serafimova).  The Defendants also noted that voters can "go to the Secretary of State website, enter [their] voter ID number, which . . . can [be] obtain[ed] from a different page on the website, and see [their] own voter history."  May Tr. at 45:12-15 (Serafimova).  The Defendants asserted that "[i]t is naïve for us to pretend that" peoples' "voter history or their party affiliation" "are not important privacy interests for people."  May Tr. at 45:22-25 (Serafimova).  The Defendants suggested that VoteRef.com could crowd source information by asking users to log in and share their own data with VoteRef.com, see May Tr. at 46:1-5 (Serafimova), or Voter Reference could "get mailing labels from [the Secretary of State] and then send a letter" asking voters to tell them their voter history so that they could use that information to find discrepancies.  May Tr. at 46:6-11 (Serafimova).  The Defendants predicted that, if people's private voter history is publicized online, "people will cancel their registrations to vote," May Tr. at 46:18-20 (Serafimova), if they do not want others to "know whether or not [they]

voted in the last election or where [they] live or [their] age or . . . address . . . or [their] party affiliation," May Tr. at 46:24-47:3 (Serafimova).  If people cancel their registration, then, "on election day, [they] can show up at a polling place, submit an affidavit, vote, and then turn around and cancel the [registration the] very next day," which "will create an incredible burden for the Secretary of State's Office" and "increase the likelihood of errors happening ten-fold at least." May Tr. at 47:4-9 (Serafimova).  The Court asked what the difference in terms of the State's interest between "an election campaign accessing and using this data" and "an election watchdog, such as Voter Reference," May Tr. at 47:12-15 (Court), to which the Defendants responded that "the campaign cannot put it on the website for everyone to see," but "they can . . . use it to target" potential voters.  May Tr. at 48:4-6 (Serafimova).

The Defendants objected to Voter Reference's use of a "brand-new theory of the case . . . which is First Amendment retaliation" and characterized the litigation so far as "a trial by ambush." May Tr. at 48:23-24 (Serafimova).  The Defendants emphasized that they are arguing "very important issues, [with] very important privacy interests at stake" and "they're changing their theory of the case the day of."  May Tr. at 49:1-3 (Serafimova).  The Defendants stated that this argument "should signal to the Court that they have very little likelihood of success on the merits." May Tr. at 49:4-6 (Serafimova).  The Defendants circled back to the Court's questions about data errors, and asserted that "no such errors have been found for New Mexico," noting that "over a dozen states . . . have disputed Vote Ref's methodology."  May Tr. at 49:12-14 (Serafimova).  The Defendants argued that "the discrepancy [which Voter Reference] speak[s] of is not really a discrepancy," because the number of people on the voter rolls change, for example, if a person is convicted between an election and the date of the data's snapshot.  May Tr. at 49:17-18 (Serafimova).  See id. at 49:19-24 (Serafimova).

Next, the Defendants asserted that the Secretary of State and the New Mexico Attorney General's Office have not changed their position on their interpretation of State law.  See May Tr. at 50:1-7 (Serafimova).  The Defendants responded to the Court's question about the differences between voter data and Motor Vehicle Data, stating that "[a] lot of it is the same" and that the "distinction is my party affiliation, my voting history."  May Tr. at 50:10-14 (Serafimova).  The Defendants asserted that Voter Reference's interest in having access to that data is much less than a voter's interest in keeping that information private, particularly if the voter is not willing to give Voter Reference their data.  See May Tr. at 50:16-20 (Serafimova).

Following these exchanges, the Court heard the parties' evidence.  Voter Reference called Tina Swoboda as its first witness.  See May Tr. at 51:9-10 (Court); id. at 51:11 (Greim).  Swoboda testified that she is the Executive Director of Voter Reference Foundation, see May Tr. at 52:18-19 (Swoboda), and that her duties include "manag[ing] the operations staff and the data staff, and . . . talk[ing] about the data," May Tr. at 52:21-22 (Swoboda).  Swoboda characterized Voter Reference as "a foundation dedicated to publishing the voter rolls online for free forever to promote transparency and get the public engaged in understanding how the process works, and to try to do their public oversight duties under the National Voter Registration Act."  May Tr. at 53:14-19 (Swoboda)(citing 52 U.S.C. § 20507(i)).  Swoboda asserted that Voter Reference does not "believe the public has meaningful access to the voter lists right now," because "[i]n many states they are prohibitively expensive," they are "huge files" and "[y]ou would have to be a database analyst to open the giant file[s]."  May Tr. at 53:25-54:4 (Swoboda).

Swoboda testified that VoteRef.com's terms and conditions are different for every State, and that VoteRef.com has "a disclaimer on every single voter detail page that cites the specific language of the state with regard to protections for people that are secured voters."  May Tr. at

57:7-12 (Swoboda).   Swoboda explained that there are "law enforcement officials, victims of domestic violence or stalking . . . whose records are protected and redacted [and whose] addresses must not be shown."  May Tr. at 57:17-22 (Swoboda).  Swoboda stated that, before VoteRef.com publishes a file, it "notif[ies] the chief election official" and asks whether there are any protected voters in that file so that their information may be redacted.  May Tr. at 57:22-58:5 (Swoboda). Swoboda asserted that, when she emailed New Mexico's Secretary of State with that request, there was no response.  See May Tr. at 58:10-19 (Greim, Swoboda).

Swoboda next explained Voter Reference's work reconciling discrepancies.  See May Tr. at 58:25-59:13 (Greim, Swoboda).   She testified that, usually, a discrepancy is "a recordkeeping issue," because "states do not run elections" -- "there is a chief designated by the Help America Vote Act . . . in every state," but "counties run elections," and, so, "when secretaries of state or state board of elections are certifying the data or providing access to the data, they're relying on the uploads they get from the counties."  May Tr. at 59:8-17 (Swoboda).  She continued: "So if some precinct wasn't uploaded by a county and then that county didn't upload it to the state, the numbers could be off."  May Tr. at 59:18-20 (Swoboda).  She gave the example of "Nevada, [where] they delete the record when someone moves from one county to another," and, when that deletion happens, "they're deleting the vote history."  May Tr. at 59:21-24 (Swoboda).  Swoboda stated that, when she finds a discrepancy, she contacts the chief election official and asks if she can meet or have a telephone call with them to "learn about their process," and "identify where the discrepancy is coming from."  May Tr. at 60:7-10 (Swoboda).

Swoboda testified that she posted the data for New Mexico on December 16, 2021, see May Tr. at 66:24-25 (Swoboda), and that it was up on VoteRef.com for "three months," May Tr. at 67:3-4 (Greim).   Swoboda explained that the New Mexico-specific terms and conditions

required users "[t]o only use the records for . . . election or governmental related purposes, and that they must not be used for any commercial purpose.  And then it defines all the various things that might conceivably fall under commercial purposes."  May Tr. at 67:11-15 (Swoboda). Swoboda testified that Voter Reference thought New Mexico allows Voter Reference's use of voter data, and that users could see the chain of custody for the data.  See May Tr. at 67:16-69:5 (Greim, Swoboda).

Swoboda stated that she first learned that the Secretary of States accused Voter Reference of criminal conduct through the ProPublica article, but never contacted Voter Reference directly to understand the purpose of the website, ask questions about it, or ask the data to be removed. See May Tr at 68:13-69:1 (Greim, Swoboda).  Swoboda testified that, although Voter Reference received no contact from the Secretary of State or the Attorney General, it removed New Mexico's data from its website until it could figure out how to comply with New Mexico law.  See May Tr. at 69:2-28 (Greim, Swoboda).  Swoboda stated that she is familiar with the organization, Catalist, which "acquire[s] voter registration data," has "a particular lean in their partisan view, and they use that data to contact voters to promote policies that they wish to advance," and sells or shares that data with their clients.  May Tr. at 70:7-14 (Swoboda).

In addition to Swoboda, Voter Reference also called Mandy Vigil, the State Elections Director to the stand.  See May Tr. at 125:5-16 (Greim, Vigil).  Vigil testified that in her role she "oversee[s] the administration of the Bureau of Elections," which is "responsible for assisting county clerk, election administration across the state with adhering to the Election Code."  May Tr. at 125:18-21 (Vigil).  Vigil testified that she reports to the Deputy Secretary of State, Sharon Pino, and Secretary Oliver.  See May Tr. at 126:4-8 (Greim, Vigil).  Vigil also testified that she "oversee[s] the process of applying for and making available voter data."  See May Tr. at 126:9-

11 (Greim, Vigil).  In this vein, Vigil confirmed that state law requires the Secretary of State's Office to "collect an affidavit" before it can respond to requests for voter data, and that the Office must also "log the requester, and maintain that log."  May Tr. at 128:13-15 (Vigil).

   **3.**       **The PI MOO.**

   The Court filed its PI MOO on July 25, 2022.  See PI MOO at 1.  The Court grants in part the PI Motion and orders that the Defendants are enjoined from prosecuting Voter Reference under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs.  In the PI MOO, the Court determines that Voter Reference has standing to pursue its claims, but that Holly Steinberg does not fulfill Article III's standing requirements.  See PI MOO at 159-65.  The Court also discusses its disagreement with the Secretary of State's interpretation of New Mexico's Election Code, and concludes that the state statutory scheme does not prohibit Voter Reference's use and publication of the New Mexico voter data.  See PI MOO at 137-159.  The Plaintiff's arguments regarding their First Amendment theories on viewpoint discrimination and prior restraint lead to the Court's decision to grant the PI in part.  See PI MOO at 178-97.  The Court concludes that the Election Code and the Secretary of State's voter data request forms are not constitutionally vague or overbroad, see PI MOO at 198-204; id. at 172-78, and the Court also concludes that Voter Reference is not required to secure a bond, see PI MOO at 209-10.

   As for the Court's disagreement with the Secretary of State regarding the Election Code, the Court concludes that the analysis of aggregated voter data by Voter Reference's staff's, as well as its publication of voter data, falls within Article 4 of the Election Code's statement of lawful purposes, because these are "governmental purposes" in the manner that N.M.S.A. § 1-4-5.5(E)(2) contemplates.  See PI MOO at 151-54.[115]  The Court reaches this conclusion because these two

_____

[115]In the alternative, the Court concludes that Voter Reference's use is an "election" purpose under Article 4 of the Election Code.  N.M.S.A. § 1-4-5.5(C).  See PI MOO 150 n.26.

purposes -- the analysis of aggregated voter data by Voter Reference's staff's, and its publication of the voter data on VoteRef.com -- conform with the statutory definition of "governmental purposes," as both are "noncommercial purposes" that oversee, and therefore "relat[e] . . . to the structure, operation or decision-making of" the Secretary of State's Office and its Elections Bureau.  N.M.S.A. § 1-4-5.5(E)(2).

Moreover, the Court rejects the Secretary of State's contention that § 1-5-22(A)'s prohibition on the "[u]nlawful disposition of [a] voter file" means that "any person or entity who knowingly and willfully sells, loans, provides, access to (including on a website), or otherwise surrenders New Mexico voter data obtained from the voter registration system -- regardless of its intended use -- is guilty of a fourth degree felony punishable by fine."  PI Response at 9.  See PI MOO at 147-49.  The Court reaches this conclusion in large part because it declines to read § 1-4-5.6(A)'s reference to the Voter Records System Act as incorporating Section 1-5-22's prohibitions, and also because § 1-5-22's plain language applies only to "data processors."  PI MOO at 148.  Accordingly, the Court concludes that the Election Code itself does not provide a basis for the Defendants' theory that all sharing of voter data -- no matter the purpose -- is unlawful.

The Court concludes, however, that an organization or individual may be liable for false swearing under N.M.S.A § 1-20-10[116] if that organization or individual signs a voter data request

---

[116]Section 1-20-10 reads:

> False swearing consists of taking any oath required by the Election Code [Chapter 1 NMSA 1978] with the knowledge that the thing or matter sworn to is not a true and correct statement.

> Whoever falsely swears is guilty of a fourth degree felony.

(Brackets in statute.)

authorization form with the intention of posting voter data online.  See PI MOO at 154-59.  The

Court reaches this conclusion, because it determines that, if an individual requester or

organizational requestor affirms -- via the voter request affidavit -- that he or she will "not use or

make available to others to use the requested material for purposes other than governmental,

election, research, and campaign purposes under penalty of law," and will not "sell[], loan[],

provid[e] access to or otherwise surrender[], duplicat[e] or alter[] . . . information," VRF Request

Form at 8, but does so with the intent to post that data online for the general public to access, the

requester must do so "with the knowledge that the thing or matter sworn to is not a true and correct

statement," N.M.S.A. § 1-20-10.

The Court noted that Voter's Reference's potential criminal liability under this statute,

however, would be contingent on the degree of scienter that the Attorney General would apply to

the statute:

> Without knowing what degree of scienter the Attorney General would apply
> to the false swearing statute, it [is] difficult to say whether requiring VoteRef.com
> users agree to Terms of Service limiting the voter data's use to "election-related,
> non-commercial" purposes,VoteRef.com, Terms of Service, would be a sufficient
> guarantee of the general public's use such that a requester can truthfully affirm that
> he or she will "not use or make available to others to use the requested material for
> purposes other than governmental, election, research, and campaign purposes under
> penalty of law," VRF Request Form at 8.  Other than agreeing to VoteRef.com's
> Terms of Service, Voter Reference has no ability to ensure that voter data is not
> used unlawfully, such as to harass or intimidate voters, or to use the data for
> commercial purposes.  See May Tr. at 20:19-21:14 (Court, Greim).

PI MOO at 156-57.  Moreover, for the reasons noted above -- involving the non-incorporation of

§ 1-5-22(A)'s prohibitions into Section 1-4-5.6(A)'s reference to the Voter Records System Act -

- the Court finds "no statutory basis" for the idea that voter data obtained in compliance with a

voter request form could be shared only internally within the requesting organization.  See PI MOO at 157-58.  The Court notes again that, although such a restriction on data sharing is in the voter request form -- in all of its various iterations -- that restriction is not in the relevant statutes, given that § 1-5-22(A) applies only to data processors and not to requesters.  See PI MOO at 157-58.

Beyond this statutory interpretation, the Court decision to grant the PI in part was because of the Plaintiffs' arguments regarding their First Amendment theories on viewpoint discrimination and prior restraint.  See PI MOO at 178-97.  In its analysis, the Court walks through the four PI requirements: (i) a substantial likelihood of success on the merits; (ii) irreparable harm to the movant if the injunction is denied; (iii) that the threatened injury outweighs the harms that the PI may cause the opposing party; and (iv) that the injunction, if issued, will not adversely affect the public interest.  See Aposhian v. Barr, 958 F.3d 969, 978 (10th Cir. 2020).

On the first prong, the Court finds that Voter Reference has a substantial likelihood of success on the merits of part of its claim for viewpoint discrimination and part of its prior restraint claim.  See PI MOO at 172.  Regarding viewpoint discrimination, the Court concludes that, to the extent that Voter Reference's constitutional challenge is based on the Secretary of State's lack of response to Voter Reference's request for voter data, Voter Reference has a substantial likelihood of success because of the viewpoint discriminatory nature of the Secretary of State's conduct of nonresponsiveness.  "Although Voter Reference does not have a First Amendment right of access to the voter data it seeks, once the State agrees to make its data publicly available, the State may not condition access to that data based on the requestor's viewpoint."  PI MOO at 180 (citing Los Angeles Police Dep't v. United Reported Pub. Corp., 528 U.S. 32, 40 (1990); Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819 (1995); Fusaro v. Cogan, 930 F.3d 241, 262 (4th Cir. 2019)).  In addition, the Court concludes that the Secretary of State's criminal referral of Voter

Reference is also an instance of viewpoint discrimination, because evidence in the record supports the notion that "the referral was because of, not merely in spite of, Voter Reference's views." PI MOO at 183.

Regarding the prior restraint, the Court finds that Voter Reference is substantially likely to succeed on the merits of their claim that the Secretary of State's referral of Voter Reference to the Attorney General for criminal prosecution and her public statements about the referral are an unconstitutional prior restraint on protected speech. See PI MOO at 186-94. The prior restraint conclusion is based on the Court's understanding that, although there is no First Amendment right to access government information, once an individual has obtained that information from a source other than the government, the publication of that information is protected speech and any restrictions thereon are subject to strict scrutiny. See PI MOO at 186-87 (citing Bartnicki v. Vopper, 532 U.S. 514, 527 (2001); Sorrell v. IMS Health Inc., 564 U.S. 552, 570 (2011)). The Court also concludes that, "[a]lthough a publicized criminal referral is not a typical type of prior restraint, such as a judicial injunction or administrative licensing scheme, . . . a publicized criminal referral can function as a prior restraint." PI MOO at 188 (citing Taylor v. Roswell Indep. Sch. Dist., 713 F.3d at 42 (10th Cir. 2013)). In short, the Court finds that because "Voter Reference is currently refraining from speech -- from publishing New Mexico's voter data that it already has in its possession -- out of fear of criminal prosecution, the criminal referral functions as a de facto prior restraint." PI MOO at 189. Subsequently, the Court applies strict scrutiny to analyze the prior restraint, and concludes that the government's purported interests in restricting the speech -- see PI MOO at 190-94 -- did not pass constitutional muster, and thus Voter Reference has shown a likely success on the merits on part of its prior restraint claim. See PI MOO at 194.[117]

_____

[117]The Court also rejects the notion that the Secretary of State's voter data request process

As for the second prong of the PI requirements, the Court concludes that Voter Reference will suffer irreparable harm if the injunction is denied on part of its claim for viewpoint discrimination and part of its prior restraint claim.  See PI MOO at 204-07.  To reach this conclusion, the Court observed that, "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."  PI MOO at 205 (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).   The Court concludes that the imminent threat of criminal prosecution to Voter Reference should it publish the voter data is "likely both a form of viewpoint discrimination and a form of prior restraint."  PI MOO at 206.

> Although the Secretary of State may, without running afoul of the First Amendment, condition voter data access on whether the requestor intends to publish the data, the First Amendment prohibits the Secretary of State or the Attorney General's Office from prosecuting or threatening to prosecute Voter Reference for publishing data that it already has.

PI MOO at 206.  Accordingly, because both the viewpoint discrimination claim and the prior restraint claim impinge on Voter Reference's First Amendment freedoms, the Court concludes that the second prong of the PI test is fulfilled.  See PI MOO at 204-07.

As for the third and fourth prong of the PI requirements -- the balance of equities and the threatened injury[118] -- the Court concludes that, given the weighty public interest in vindicating First Amendment freedoms, the balance weighs in favor of granting the PI.  See PI MOO at 208. The Court acknowledges that there "may be harm to the public interest from posting the data online, the First Amendment injury that occurs absent a narrow PI outweighs that harm."  PI MOO at 209.   The Court concludes by stating that Voter Reference need not secure a bond, because:

---

is an administrative licensing scheme.  See PI MOO at 194-98.

[118]The Court concludes that -- as in cases in which the party opposing a PI is the federal government -- here the third and fourth requirements for a PI "merge."  PI at 208 (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

(i) the State never requested one, (ii) persuasive authority that suggests that a bond is not required to obtain preliminary injunctive relief when a plaintiff is seeking to prevent a government entity from violating the First Amendment," Goyette v. City of Minneapolis, 338 F.R.D. 109, 121 (D. Minn. 2021)(Wright, J.), and (iii) "There is no evidence in the record that it will cost anything for the Defendants to comply with the injunction not to prosecute Voter Reference under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it received from Local Labs."  PI MOO at 210.   The Court Ordered:

> (i) the Plaintiffs' Motion for Preliminary Injunction, filed March 28, 2022 (Doc. 3), is granted in part; and (ii) Defendant Attorney General Balderas and Defendant Secretary of State Oliver are enjoined from prosecuting Plaintiff Voter Reference Foundation, LLC, under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs.

PI MOO at 210.

### 4.    Appeal and Motion to Stay PI.

The Defendants filed a Notice of Appeal signaling that they "hereby appeal" the PI MOO to the United States Court of Appeals for the Tenth Circuit.  See Notice of Appeal at 1, filed August 19, 2022 (Doc. 56).   Concurrently with the Notice of Appeal, the Defendants also filed the Defendants' Motion to Stay Preliminary Injunction Pending Appeal, filed August 19, 2022 (Doc. 57)("Motion to Stay PI"), in which they moved -- pursuant to rule 62(d) of the Federal Rules of Civil Procedure -- to stay the PI pending the Defendants' appeal.  See Motion to Stay PI at 1. In the Motion to Stay PI, the Defendants attempt to persuade the Court to exercise its judicial discretion to stay the appeal by discussing the "four factors" which should guide the use of such discretion:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;
>
> (2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies.

Motion to Stay PI at 2-3 (quoting Nken v. Holder, 556 U.S. 418, 434 (2009)).  The Defendants further argue that there is a "strong likelihood that the Order will be reversed on appeal, because: (i) "the Order enjoins the Attorney General from prosecuting Plaintiff Voter Reference . . . for potential violations of the New Mexico Election Code, even though Plaintiffs have never alleged, and the Court did not find, that the Attorney General has violated any of Plaintiffs' federal (or other) rights," Motion to Stay PI at 1-2; (ii)

> the Order violated the Attorney General's and the Secretary's due process rights by relying in part on a novel substantive theory of liability that was never advanced by Plaintiffs -- and, therefore, was never addressed by the Attorney General or the Secretary -- namely, that the Secretary's publicized referral of VRF and Local Labs to the Attorney General constituted a prior restraint in violation of the First Amendment[,]

Motion to Stay PI at 2; and (iii) "the Order erroneously concludes that the Secretary committed viewpoint discrimination in denying VRF's May 25, 2022 request for voter data," Motion to Stay PI at 2.  On these bases, the Defendants request the Court to stay the PI while the Defendants' appeal is pending.  See Motion to Stay PI at 13.  The Court held a hearing on the Motion to Stay PI on August 31, 2022, see Clerks' Minutes at 1 (dated August 31, 2022), filed August 31, 2022 (Doc. 64), and the Court denied the Motion to Stay PI the following day.  See Order at 1, filed September 1, 2022 (Doc. 65).

On December 28, 2022, the Tenth Circuit filed an Order from a two-judge panel granting the Defendants' motion to stay the PI MOO "pending the disposition of this appeal on the merits, or until further order of this court."  Order at 2, filed December 28, 2022 (Doc. 88)("Tenth Circuit Order").  The Tenth Circuit Order stated that the Tenth Circuit "conclude[s] that appellant have

- 119 -

satisfied their burden" as to each of the preliminary injunction factors, but otherwise offered no analysis.  Tenth Circuit Order at 2. See id. at 1 (quoting Nken v. Holder, 556 U.S. at 434).

  **5. The Amended Complaint.**

  While the PI MOO was on appeal at the Tenth Circuit, Voter Reference filed an Amended Complaint.  See Plaintiff's Verified First Amended Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief, filed September 26, 2022 (Doc. 74)("Amended Complaint").  The Amended Complaint contains only one Plaintiff -- Voter Reference -- and brings the following counts: (i) preemption of New Mexico's Access Ban and Data Sharing Ban by the NVRA, see Amended Complaint ¶¶ 119-37, at 30-35; (ii) the Access Ban violates the NVRA, see Amended Complaint ¶¶ 138-47, at 35-36; (iii) the Access Ban and the threat of criminal prosecution constitute First Amendment retaliation, see Amended Complaint ¶¶ 148-65, at 36-39; (iv) the Access Ban and the threat of criminal prosecution constitute prior restraint under the First Amendment, see Amended Complaint ¶¶ 166-86, at 39-44; (v) the Access Ban and the threat of criminal prosecution constitute a ban on core political speech in violation of the First Amendment, see Amended Complaint ¶¶ 187-205, at 44-49; (vi) the Data Sharing Ban is overbroad for First Amendment purposes, see Amended Complaint ¶¶ 206-13, at 49-51; (vii) the Data Sharing Ban is void for vagueness under the First and Fourteenth Amendments, see Amended Complaint ¶¶ 214-26, at 51-54; and (viii) declaratory judgment, see Amended Complaint ¶¶ 227-35, at 54-55.

  **6. The Voter Reference MSJ and the Voter Reference MSJ Memo.**

  Voter Reference filed the Voter Reference MSJ on April 14, 2023.  See Voter Reference MSJ at 1.  The same day, Voter Reference filed its supporting memorandum, the Voter Reference MSJ Memo.  See Voter Reference MSJ Memo. at 1.  After providing its Statement of Uncontroverted Fact, see Voter Reference MSJ Memo. at 16-60, and stating the legal standard for summary judgment, see Voter Reference MSJ Memo. at 61 (citing Fed. R. Civ. P. 56(a); Vitkus v.

Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); Cleveland v. Pol'y Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999)), Voter Reference makes an argument that it fulfills the requirements for Article III standing to bring its First Amendment and its NVRA claims.  See Voter Reference MSJ Memo. at 61-63.  Subsequently, Voter Reference dedicates the remainder of the Voter Reference MSJ Memo. to making six discrete arguments as to why it is entitled to summary judgment.  The Court describes each in turn.

> a.      **The NVRA Theories**.

Voter Reference's first argument is that it is entitled to summary judgment "on its NVRA [c]laims."  Voter Reference MSJ Memo. at 63.  These claims correspond to Counts I and II of the Amended Complaint.  See Amended Complaint ¶¶ 119-47, at 30-36.  Voter Reference begins its argument by asserting the broad proposition that the NVRA's Public Inspection Provisions -- codified at 52 U.S.C. § 20507(i)(1) -- "gives VRF the right to access and use individual, identifiable New Mexico voter information."  Voter Reference MSJ Memo. at 63.  On the basis of this proposition, Voter Reference argues that the Secretary of State's interpretation of New Mexico law violates the NVRA in two ways: (i) the Secretary of State's Use Restrictions and Data Sharing Ban are "object-preempted" by the NVRA, because they "unlawfully frustrate the mechanisms by which the NVRA accomplishes its goals," Voter Reference MSJ Memo. at 63, and (ii) the Secretary of State's refusal to honor Voter Reference's request for voter data is itself a violation of the NVRA's Public Inspection Provision, see Voter Reference MSJ Memo. at 63.

To support these arguments, Voter Reference begins by offering its interpretation of the NVRA's Public Inspection Provision.  Voter Reference states that the NVRA "requires states to make reasonable efforts to maintain the accuracy of their voter rolls, including removing the names of ineligible voters due to death or change of address."  Voter Reference MSJ Memo. at 63 (citing

52 U.S.C. § 20507(a)(4)).  Voter Reference asserts that all documents related to this "maintenance

function" are "records" that must be made available to the NVRA's Public Inspection Provision --

which applies to "all records concerning the implementation of programs and activities conducted

for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  Voter

Reference MSJ Memo. at 64 (quoting 52 U.S.C. § 20507(i)(1)).  Voter Reference then asserts that

the "file maintenance list" and the "voter data" -- as those terms are understood under New Mexico

law -- are therefore records that must be made available for public inspection under the NVRA.

Voter Reference MSJ Memo. at 64 (citing N.M.S.A. §§ 1-5-2, 1-4-5.5).  Voter Reference then cites

to a number of cases that it contends stand for the idea that individual voter registration information,

registration applications, and voter lists are "records" for the purposes of the NVRA.    Voter

Reference MSJ Memo. at 64 (citing Judicial Watch, Inc. v. Lamone, 399 F.Supp.3d 425, 439 (D.

Md. 2019)(Hollander, J.); Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331, 335-36 (4th

Cir. 2012)(Wilkinson, J.); Pub. Int. Legal Found., Inc. v. Bellows, 588 F.Supp.3d 124, 133 (D. Me.

2022)(Singal, J.); Pub. Int. Legal Found., Inc. v. Matthews, 589 F. Supp. 3d 932, 940 (C.D. Ill.

2022)(Myerscough, J.)).  Voter Reference offers a detailed case illustration of the United States

Court of Appeals for the Fourth Circuit's opinion in Project Vote/Voting for Am., Inc. v. Long, 682

F.3d 331, which Voter Reference reads as holding that the NVRA's Public Inspection Provision

required the State of Virginia to produce completed voter registration applications.    Voter

Reference MSJ Memo. at 64 (citing Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 333).

According to Voter Reference, this holding relied on four conclusions.  Voter Reference MSJ

Memo at 64.    First, the "process of reviewing voter registration applications is a

'program' . . . because it is carried out in the service of a specified end -- maintenance of voter rolls

-- and it is an 'activity' because it is a particular task . . . of Virginia election employees."  Voter

Reference MSJ Memo. at 64-65 (quoting Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 335).   Second, the "program" or "activity" of "evaluating voter registration application is 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,'" -- as the NVRA's Public Inspection Provision provides.  Voter Reference MSJ Memo. at 64-65 (quoting Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 335).   Third, because the voter registration applications are "the means by which an individual provides the information necessary for [Virginia] to determine his eligibility to vote," these records concern the implementation of a program or activity under the NVRA's Public Inspection Provision.  Voter Reference MSJ Memo at 65 (quoting Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 335-36).   Fourth, the Public Inspection Provision of the NVRA requires that "all" records be disclosed, Congress intended an "expansive meaning," and also Congress' use of the phrase "shall include" in 52 U.S.C. § 20507(i)(2), "sets 'a floor, not a ceiling,'" to the types of records that must be disclosed under § 20507(i)(1).   Voter Reference MSJ Memo. at 65 (quoting Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 336-37; citing Jones v. Southpeak Interactive Corp. of De., 777 F.3d 658, 671 (4th Cir. 2015)).   On the basis of this case illustration, Voter Reference analogizes that the voter records requested by Voter Reference in this case -- which consist of individual voter data, and an activity log that tracks changes made to the voter rolls -- are clearly "records" under the NVRA's Public Inspection Provision:

> Like the voter registration applications in *Long*, the voter list maintenance file and other corresponding data are "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters[.]" 52 U.S.C. § 20507(i)(1). The process of creating, updating, and auditing voter data "is a 'program'. . . because it is carried out in the service of a specified end -- maintenance of voter rolls -- and it is an 'activity' because it is a particular task . . . of [New Mexico] election employees." *Id.*, 682 F.3d at 335 (quotation omitted).

Voter Reference MSJ Memo. at 66 (all citations and brackets in original).   Against this legal

backdrop, Voter Reference turns to its preemption argument.

Voter Reference's preemption argument focuses initially on the Data Sharing Ban, arguing

that a prohibition on posing voter data online -- a prohibition rooted in the Data Sharing Ban --

presents an "unlawful obstacle to effectuating the NVRA's mandates."   Voter Reference MSJ

Memo. at 67.   Voter Reference argues that this conclusion remains true "[e]ven if New Mexico

were to amend its law to match Defendants' policy and practice,"[119] because such a law would

"violate the NVRA's *unqualified* right of public access."   Voter Reference MSJ Memo. at 67

(emphasis in Voter Reference MSJ Memo.).   Voter Reference argues that the Data Sharing Ban

"frustrate[s] one of the NVRA's main objectives: for citizens to access, analyze, and discuss the

data so that they can detect and remedy errors in the maintenance of voter rolls."   Voter Reference

MSJ Memo. at 67 (no material cited).

---

[119]Indeed, in the State of New Mexico's 2023 legislative session, the New Mexico Legislature passed House Bill 4, see House Bill 4, Voting Rights Protections, Final Version, https://www.nmlegis.gov/Sessions/23%20Regular/final/HB0004.pdf (last visited December 21, 2023), which made numerous changes to the Election Code, including an amended version of N.M.S.A. § 1-4-5.6, which now reads:

> A.     Unlawful use of voter data, mailing labels or special voter lists consists of:
>
> (1)     the knowing and willful selling, loaning, providing access to or otherwise surrendering of voter data, mailing labels or special voter lists by a person for purposes prohibited by the Election Code; or
>
> (2)     causing voter data, mailing labels or special voter lists or any part of the voter data, mailing label or special voter lists that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means.

N.M.S.A. § 1-4-5.6(A)(1)-(2).

Voter Reference describes obstacle preemption as, "one form of implied preemption under the Supremacy Clause." Voter Reference MSJ Memo. at 67 (citing Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373 (2000); Pharm. Rsch. & Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J., concurring)). Voter Reference also asserts that, "[i]mportantly, no presumption against preemption applies to Elections Clause legislation such as the NVRA." Voter Reference MSJ Memo. at 68 (citing Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1, 14 (2013)). To explain why, Voter Reference states that:

> The Elections Clause "empowers Congress to 'make or alter' state election regulations[,]" and therefore the "assumption that Congress is reluctant to pre-empt does not hold when Congress acts" under that Clause. Id. at 14. See also Harkless v. Brunner, 545 F.3d 445, 455 (6th Cir. 2008) (The rule "that Congress must be explicit when it encroaches in areas traditionally within a state's core governmental functions [ ] does not apply when Congress acts under the Elections Clause, as it did in enacting the NVRA") (citations omitted).

Voter Reference MSJ Memo. at 68. Pursuant to this non-presumption against preemption, Voter Reference states that the NVRA "preempts a range of state laws." Voter Reference MSJ Memo. at 68 (citing Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. at 11-13; Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1354 (11th Cir. 2005); Project Vote v. Blackwell, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006)(O'Malley, J.). It also contends, generally, that, "State limitations on non-profits' access to voter data are also preempted." Voter Reference MSJ Memo. at 68 (citing and discussing Jud. Watch, Inc. v. Lamone, 399 F. Supp. 3d 425, 445 (D. Md. 2019)(Hollander, J.)). Voter Reference explains that in Jud. Watch, Inc. v. Lamone, the United States District Court for the District of Maryland concluded that a Maryland law that "banned access [to voter data] for other states' residents," Voter Reference MSJ Memo. at 69 (citing Jud. Watch, Inc. v. Lamone, 399 F. Supp. 3d at 441-42), was preempted by the NVRA, because the requested voter data were "records" under the NVRA and their non-disclosure to the out-of-state requesters

"undermines" the NVRA's efficacy and is "an obstacle to the accomplishment of the NVRA's purposes," Voter Reference MSJ Memo. at 69 (quoting Jud. Watch, Inc. v. Lamone, 399 F. Supp. 3d at 445).

In this case, Voter Reference contends, the NVRA preempts both the Data Sharing Ban and the Use Restrictions. Voter Reference states that Congress "expressly stated the NVRA has four purposes," Voter Reference MSJ Memo. at 69:

> to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); to "enhance [] the participation of eligible citizens as voters in elections for Federal office," id. § 20501(b)(2); "to protect the integrity of the electoral process," id. § 20501(b)(3); and "to ensure that accurate and current voter registration rolls are maintained." Id. § 20501(b)(4).

Voter Reference MSJ Memo. at 69 (brackets and citation convention in original). Moreover, Voter Reference states, the NVRA's Public Inspection Provision exists to "assist the identification of both error and fraud in the preparation and maintenance of voter rolls." Voter Reference MSJ Memo. at 69 (quoting Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 339). On the basis of these authorities, Voter Reference contends that, "Any prohibition on Internet speech that shares the voter data (including any condition on access predicated on the requestor's surrender of the First Amendment right to engage in such speech), clearly contradicts Congress's stated objectives in the NVRA and creates many improper obstacles to its implementation." Voter Reference MSJ Memo. at 69. In support of this argument, Voter Reference states that: (i) non-governmental organizations like Voter Reference have "resources and expertise that few individuals can marshal," and thus can more readily perform the "NVRA's objective of empowering citizens to aid states in detecting errors in voter rolls," Voter Reference MSJ Memo. at 70; and (ii) even if the State of New Mexico provided publicly accessible voter data online for free, "it would still be necessary for citizens to

share and discuss the data with each other," which the Data Sharing Ban would still prohibit, Voter Reference MSJ Memo. at 70.

Next, Voter Reference moves on to its argument that -- regardless of preemption -- the Defendants in this case violated the NVRA by "failing to produce records in response to VRF's lawful request." Voter Reference MSJ Memo. at 71. This argument contends that the voter data sought by Voter Reference are "records" under the meaning of the NVRA's Public Inspection Provision, and thus the Secretary of State's Office violated the NVRA by failing to produce records in response to Voter Reference's requests in February, 2022, see Factual Background, Section 2(f) supra at 29-30, May, 2022, see Factual Background, Section 2(h) supra at 32-42, and October, 2022, see Factual Background, Section 2(l) supra at 53-60. Voter Reference contends that the Secretary of State's reasons for denying these requests for voter data were "pretextual" and "violate common sense and the NVRA." Voter Reference MSJ Memo. at 73. Voter Reference then goes through four rationales provided by the Secretary of State's Office for refusing to produce the requested data, including: (i) the "alleged fear that VRF would break promises" not to share the voter data online in the absence of a court order, Voter Reference MSJ Memo. at 73; (ii) the "pretext that the requested records 'do not exist,'" Voter Reference MSJ Memo. at 74; (iii) that "ongoing litigation" was a reason to deny the requests, Voter Reference MSJ Memo. at 76; and (iv) that Voter Reference did not attach affidavits to its October, 2022, request, purportedly in violation of N.M.S.A. § 1-4-5.5, see Voter Reference MSJ Memo. at 76. Voter Reference discusses and attempts to refute all of these rationales, arguing that all are pretextual and that the Secretary of State's Office violated the NVRA but failing to comply with the statute's Public Inspection Provision. See Voter Reference MSJ Memo. at 73-76.

b.      **The First Amendment Theories**.

Next, Voter Reference forwards its claims regarding the First Amendment.  The main argument is that the Defendants' Data Sharing Ban and Use Restrictions are "direct restrictions on core political speech," and accordingly those restrictions are "subject to strict scrutiny."  Voter Reference MSJ Memo. at 77.  According to Voter Reference, the restrictions fail that test.  As a secondary First Amendment Argument, Voter Reference also raises an argument under the unconstitutional conditions doctrine, because "New Mexico imposes the Use Restrictions and Data Sharing Ban as conditions on access to a benefit (i.e., voter data) made available by the state."  Voter Reference MSJ Memo. at 77.

First, Voter Reference forwards its arguments about the issue of a direct restriction on core political speech.  Voter Reference asserts that, as a "threshold matter," the Court should consider whether a "right to use" voter data for First Amendment purposes first requires a showing of a "*right to access*" that data in the first place.  Voter Reference MSJ Memo. at 77.  Voter Reference argues that it does not, stating:

> Because the NVRA and state law require that voter data be made available, VRF need not establish an independent right to access that information under the First Amendment. Once a state makes information, data, or records available to the public, the First Amendment limits how the government may restrict the public's subsequent use and sharing of that information, and also prevents the state from conditioning access in a manner which would violate the First Amendment.

Voter Reference MSJ Memo. at 77 (citing PI MOO at 176).  In short, Voter Reference argues, once a state makes voter data available, it "must comply in all respects with the First Amendment protections afforded to the use and dissemination of that information."  Voter Reference MSJ Memo. at 78 (citing Fusaro v. Cogan, 930 F.3d 241, 255-56 (4th Cir. 2019)).  As Voter Reference acknowledges, however, see Voter Reference MSJ Memo. at 78, this argument is contingent on the Court's conclusion that the NVRA and/or N.M.S.A. § 1-4-5.5 provide individuals with access to

voter data.  See Voter Reference MSJ Memo. at 78 (citing Meyer v. Grant, 486 U.S. 414, 425 (1988)).

Next, Voter Reference asserts that "[s]peech involving voter data is protected by the First Amendment, particularly when that data is required to be made available under State and Federal law." Voter Reference MSJ Memo. at 78.  Voter Reference frames the question presented as follows:

> Once it is established that VRF has a right to possess the data under the NVRA and § 1-4-5.5, the pivotal question is this: how does the First Amendment protect VRF's speech when it shares that data with those who choose to associate with VRF by accepting the terms and conditions of its website?

Voter Reference MSJ Memo. at 78.  Pertinent to its cause, Voter Reference notes that the "First Amendment safeguards speech and the dissemination of information on the Internet with the same vigor as the writings in a newspaper or a speaker in the town square."  Voter Reference MSJ Memo. at 79 (citing Reno v. Am. C.L. Union, 521 U.S. 844, 868 (1997); Sorrell v. IMS Health Inc., 564 U.S. 552, 570, 131 S. Ct. 2653, 2666, 180 L. Ed. 2d 544 (2011)).  Voter Reference the states that the First Amendment protects "both speaker and listener, as the ability to receive information is also a fundamental First Amendment right."  Voter Reference MSJ Memo. at 79 (citing Martin v. City of Struthers, Ohio, 319 U.S. 141, 143 (1943)).  Then, relying on the analysis of the Fourth Circuit in Fusaro v. Cogan, 930 F.3d at 250, Voter Reference contends that, "[s]peech about and including voter data, including individually identifiable data, is protected."  Voter Reference MSJ Memo. at 80.  Voter Reference also notes that although the government many infringe on First Amendment Protections in a myriad of ways, "a law imposing criminal penalties on protected speech is a stark example of speech suppression."  Voter Reference MSJ Memo. at 80 (citing Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819 (1995); Keller v. State Bar of California, 496 U.S. 1 (1990)).

Voter Reference then notes that, as it relates to New Mexico voter data, "New Mexico routinely makes voter data available to political parties and campaigns for inherently political means and even conditions access to the voter data, in part, on the data being used for election and election campaign purposes -- necessarily political objectives."  Voter Reference MSJ Memo. at 80.  Moreover, it notes that, because voter data "cannot be divorced from its wholly political nature, the dissemination of that data is protected under the First Amendment."  Voter Reference MSJ Memo. at 80.  Voter Reference contends that its website -- VoteRef.com -- is political speech, and it contains voter data, commentary, as well as a "a call to action for citizens to contact state officers charged with maintaining the voter rolls if errors were identified."  Voter Reference MSJ Memo. at 81.  Voter Reference asserts that this type of speech "sits at the zenith of First Amendment protections," because it concerns discussions regarding voting, elections, and the processes and integrity of elections.  Voter Reference MSJ Memo. at 81 (citing Fusaro v. Cogan, 930 F.3d at 250; Meyer v. Grant, 486 U.S. at 421).  Despite this heightened protection, Voter Reference argues, the Data Sharing Ban and the Use Restrictions make the sharing of this information more difficult and expensive, especially for those "individuals who are not affiliated with a political party or candidate or ballot measure campaign, and therefore cannot receive that campaigns' access to the data."  Voter Reference MSJ Memo. at 81.  Voter Reference then states that the internet is the only viable means to conduct the political speech that Voter Reference wishes to communicate, due to "the volume of voter data" it wishes to share.  Voter Reference MSJ Memo. at 82.  The medium of the internet also aids Voter Reference's aim to "crowd-source the analysis of the data, so that interested citizens can associate with VRF and with each other to analyze and engage in political speech regarding the data."  Voter Reference MSJ Memo. at 82.  Owing to these notions, Voter Reference states that,

> Thus, in criminalizing the dissemination of voter data, including via the Internet, the Use Restrictions and Data Sharing Ban do not leave open ample, comparable, and

effective alternative channels for communication. The Use Restrictions and Data Sharing Ban also infringe on and abridge VRF's speech by limiting the size of the audience that can be reached, as Defendants threaten prosecution based on the theory that dissemination to the "general public" is unlawful.

Voter Reference MSJ Memo. at 82.

To assess the constitutionality of these restrictions on speech, Voter Reference asserts, the Court must apply strict scrutiny.  See Voter Reference MSJ Memo. at 85.  Voter Reference argues for the application of strict scrutiny to assess the Data Sharing Ban and the Use Restrictions because they: "(1) burden core political speech and (2) are based on the identity of the speaker and the use for which the speaker puts the voter data."  Voter Reference MSJ Memo. at 85 (citing Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340-41 (2010); Meyer v. Grant, 486 U.S. at 425).  Citing the Court's opinion in Griffin v. Bryant, 30 F. Supp. 3d 1139, 1189 (D.N.M. 2014)(Browning, J.), Voter Reference notes that, under strict scrutiny, it is the government's burden to "demonstrate that the regulation furthers a compelling state interest and is narrowly tailored."  Voter Reference MSJ Memo. at 86.  Voter Reference also notes that, in the Frist Amendment context, government restrictions on protected conduct are not given a presumption of constitutionality.  See Voter Reference MSJ Memo. at 86 (citing Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo., 744 F.2d 739, 746 (10th Cir. 1984)(Holloway, J.)).

Voter Reference contends that although it is the government's burden to demonstrate the constitutionality of their restrictions under this standard, Voter Reference nonetheless describes why it will be unable to so do.  See Voter Reference MSJ Memo. at 86-91.  First, Voter Reference states that the State's asserted interests are not "compelling."  Voter Reference MSJ Memo. at 86. To demonstrate, Voter Reference lists the Defendants' asserted interests, and then argues why none of these interests are constitutionally compelling.  See Voter Reference MSJ Memo. at 87.  The

- 131 -

purported government interests that underlie the Data Sharing Ban and the Use Restrictions, according to Voter Reference, are:

1.    They ensure that only individuals who sign the requisite affidavit and, therefore, are made explicitly aware of the permissible uses of New Mexico voter data, have access to such data;

2.    They ensure payment of reasonable fees for the production of voter data, which fees subsidize the mandatory voter registration system;

3.    They encourage voter registration by ensuring voters that their voter data will only be disclosed on a need-to-know basis and under penalty of perjury, thereby fostering trust in the registration system by protecting registered voters from unwanted solicitations, harassment, and abuse; and,

4.    Because voter data produced at any single moment represents a "snapshot" of the voter files as of that moment, whereas voter files may change in the future, thereby rendering the produced voter data no longer accurate, disseminating voter data may lead to disinformation, which would further erode voter confidence in the voter registration system.

Voter Reference MSJ Memo. at 87 (citing PI Response at 11-12).  Voter Reference notes that, "[l]ast summer, the Court examined each of these purported justifications for the challenged restrictions and held that they were not compelling."  Voter Reference MSJ Memo. at 87 (citing PI MOO at 191).  Voter Reference then cites the PI MOO in greater detail as to each specific interest, and ultimately conclude that none of these interests are "compelling" for the purposes of First Amendment strict scrutiny analysis.  See Voter Reference MSJ Memo. at 87-90.

Voter Reference then asserts that, "[e]ven if Defendants identified a compelling state interest, the restrictions at issue are not narrowly tailored."  Voter Reference MSJ Memo. at 90.  Citing McCraw v. City of Oklahoma City, 973 F.3d 1057, 1073 (10th Cir. 2020), Voter Reference states that the applicable standard to determine if a restriction is narrowly tailored for strict scrutiny purposes is to assess whether the restriction furthers a compelling interest which could

be achieved less effectively absent the regulation, and . . . [does] not burden substantially more speech than is necessary to further the government's legitimate

interests. Although a regulation need not be the least restrictive or least intrusive means of furthering this interest, the First Amendment requires a close fit between ends and means to ensure speech is not sacrificed for efficiency.

Voter Reference MSJ Memo. at 90.  Under this standard, Voter Reference asserts, the Data Sharing Ban and the Use Restrictions fail strict scrutiny.  Voter Reference states that the Data Sharing Ban, "in particular," is not narrowly tailored because it "seeks to achieve the above claimed interests by completely banning the sharing of the most valuable information about elections -- the voter data itself."  Voter Reference MSJ Memo. at 91.  Voter Reference also contends there are less burdensome means to accomplish the purported goals of the government is restricting the sharing of data, for example: "the State itself could provide that information to the public," or the State could, "ask requesters to keep a list of people that use the data, . . . so that if harassment, stalking, or solicitation occurs, it could track the culprits."  Voter Reference MSJ Memo. at 91.  As for the Use Restrictions, Voter Reference asserts that this restriction fails "for similar reasons," and again states that the Secretary of State's Office offers non-persuasive rational for its interpretation of the statutory terms "governmental," or "election" related.  Voter Reference MSJ Memo. at 91 (source of quoted material not cited, but presumably N.M.S.A. § 1-4-5.5).  In sum, Voter Reference states that the Data Sharing Ban and the Use Restrictions fail strict scrutiny because these restrictions are not based on a government interest that is sufficiently "compelling" for First Amendment purposes, and even if they were, the restrictions are not narrowly tailored.  See Voter Reference MSJ Memo. at 86-91.

As noted above, Voter Reference also asserts a separate First Amendment theory in its Voter Reference MSJ Memo., arguing that the Data Sharing Ban is "constitutionally infirm" because it is violative of the "unconstitutional conditions doctrine."  Voter Reference MSJ Memo. at 82-83.  This doctrine, Voter Reference asserts, mandates that, "the government may not deny a benefit to a

person on a basis that infringes his constitutionally protected . . . freedom of speech[.]"  Voter Reference MSJ Memo. at 83 (quoting United States v. Am. Libr. Ass'n, Inc., 539 U.S. 194, 210 (2003)(Rehnquist, J., plurality opinion)).  On the basis of this doctrine, Voter Reference contends that the Data Sharing Ban is unconstitutional because, "as applied by Defendants, access to voter data that would otherwise be made publicly available is conditioned on the requestor's surrender of First Amendment rights, including specifically the right to share information on the Internet."  Voter Reference MSJ Memo. at 82.  This government action, Voter Reference Argues, is repugnant to the First Amendment because it makes the assertion of a right conditional "on acceptance of a content-based rule that is not drawn to serve the State's asserted interest."  Voter Reference MSJ Memo. at 84 (citing and discussing Sorrell v. IMS Health Inc., 564 U.S. 552, 574 (2011)).  See Voter Reference MSJ Memo. at 84-85.  In sum, Voter Reference's First Amendment theories are based on: (i) alleged direct restrictions on core political speech, which Voter reference contends cannot survive strict scrutiny, and (ii) the unconstitutional conditions doctrine.

**c.      Overbreadth Theory Regarding The Data Sharing Ban.**

Voter Reference next argues that the Data Sharing Ban is constitutionally overbroad.  See Voter Reference MSJ Memo. at 84-85.  Voter Reference begins by stating that the Data Sharing Ban is the "antithesis of the NVRA," Voter Reference MSJ Memo. at 92, because, "[w]hile the NVRA champions sunlight, transparency, and citizen involvement, the Data Sharing Ban embraces state control over citizen speech regarding the Secretary's maintenance of New Mexico voter rolls."  Voter Reference MSJ Memo. at 92.  More specifically to the question of constitutional overbreadth, Voter Reference states that the Data Sharing Ban "prohibits substantially more protected speech than is necessary to accomplish any compelling government interest it furthers," and therefore is unconstitutional.  Voter Reference MSJ Memo. at 92.  In conducting the overbreadth analysis, Voter Reference urges that, when "the challenged restriction does not come directly from the language of

the statute itself, but rather the policy of the agencies charged with enforcing the restriction, the Court should focus its overbreadth analysis on the challenged policy."  Voter Reference MSJ Memo. at 92.  Next, Voter Reference states that the Court should "consider whether the Data Sharing Ban proscribes 'a substantial amount of protected expressive activity' judged relative to any plainly legitimate purpose served by the Ban."  Voter Reference MSJ Memo. at 93 (quoting United States v. Williams, 553 U.S. 285, 297 (2008)).  Voter Reference contends that this analysis is not based only on the number of possible unconstitutional applications of a restriction, but also on the amount of discretion that the restriction affords to the government in applying the restriction. See Voter Reference MSJ Memo. at 93.

Voter Reference states that, when the Court analyzes Voter Reference's overbreadth challenge in the PI MOO, the Court focuses on "whether Voter Reference has a First Amendment right to access the voter data."  Voter Reference MSJ Memo. at 93 (quoting PI MOO at 175).  Voter Reference states that now, based on Voter Reference's focus on the NVRA and State law theories of access, "[t]he Court need not determine whether VRF has a right to those records under the First Amendment where these statutory access rights exist."  Voter Reference MSJ Memo. at 93.  On this basis, Voter Reference asserts:

> Having established this statutory right to access, the Court's inquiry properly focuses on (1) construing the Data Sharing Ban based on the positions and actions taken by Defendants and (2) determining whether the Ban proscribes "a substantial amount of protected expressive activity" judged relative to any plainly legitimate purpose it serves.

Voter Reference MSJ Memo. at 93 (source of quoted material not cited).  Voter Reference also points out that, like with its other First Amendment theories, it is the Defendants' burden to prove the constitutionality of their conduct, and that -- by discussing the constitutionality of the restrictions

- 135 -

-- Voter Reference "does not assume Defendants' burden here by addressing these points in its opening brief."  Voter Reference MSJ Memo. at 93 n.12.

Against this backdrop, Voter Reference argues that the Data Sharing Ban is constitutionally overbroad.  See Voter Reference MSJ Memo. at 94.  Voter Reference describes the Data Sharing Ban as "an absolute prohibition on the sharing of voter data between a requester and any other person, regardless of whether the sharing is for an otherwise permissible -- that is, governmental or election related -- purpose."  Voter Reference MSJ Memo. at 94 (citing Voter Reference MSJ Memo. ¶¶ 39-51 at 23-26).  Voter Reference states that, even if there are important state interests that call for limiting the sharing of voter data in some instances, the scope of the Data Sharing Ban is akin to "attack[ing] a problem which may call for a scalpel by employing a machete."  Voter Reference MSJ Memo. at 94.  Voter Reference contends that -- as the Court previously noted in its PI MOO -- the correct analysis for an overbreadth claim is not restricted to "an examination of whether the Ban deters VRF's speech in particular, but whether it proscribes a substantial amount of protected speech, even by parties not before the Court."  Voter Reference MSJ Memo. at 94 (citing PI MOO at 112).

Here, Voter Reference contends, the scope of the Data Sharing Ban goes far beyond "any legitimate sweep of a statute dedicated to ensuring that voter data is not used for commercial or nefarious purposes."  Voter Reference MSJ Memo. at 95.  To illustrate why, Voter Reference lists a variety of hypothetical situations of data-sharing -- all of which are presented as innocuous or harmless -- that the Data Sharing Ban would presumably criminalize:

> the Ban proscribes sharing between two individual citizens who wished to discuss data they had each separately obtained and paid for; sharing between an academic who had used the data to write a paper regarding the voter registration system, and another academic at a different institution who wanted to use the original data set to validate the research; sharing between a political party and a candidate it supports, but who is not affiliated with the party; sharing of a voter's information by a

> canvasser with close family members or other members of his or her household; sharing by a political data compilation/analysis firm and its political clients; and, of course, sharing via publication on the Internet.

Voter Reference MSJ Memo. at 94 (citing Voter Reference MSJ Memo. ¶ 40 at 23).  According to Voter Reference, this incongruency -- between the broad scope of the Data Sharing Ban and the purported state interests it seeks to protect -- renders the Data Sharing Ban overbroad for constitutional purposes.  See Voter Reference MSJ Memo. at 94-95.

### d.    Void For Vagueness Theory Regarding Data Sharing Ban.

Next, Voter Reference mounts its vagueness claim against the Data Sharing ban, stating that "[r]equestors and users of voter data are entitled to fair notice regarding how that data may be used and shared, and also have rights to not have a vague policy weaponized against them via discriminatory enforcement."  Voter Reference MSJ Memo. at 95.  Voter Reference asserts that the prohibition of vagueness in criminal statutes is rooted in the Fourteenth Amendment, see Voter Reference MSJ Memo. at 95, and states that, "[a] statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."  Voter Reference MSJ Memo. at 96 (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)).  Voter Reference notes that the void for vagueness doctrine "embodies the concept of fair notice," and also asserts -- quoting Smith v. Goguen, 415 U.S. 566, 573 (1974) -- that, "[w]hen a criminal statute's vagueness exerts a 'chilling effect' on First Amendment liberties, the void-for-vagueness doctrine 'demands a greater degree of specificity than in other contexts.'"  Voter Reference MSJ Memo. at 96 (quoting Smith v. Goguen, 415 U.S. at 573).  In addition, Voter Reference quotes Grayned v. City of Rockford, 408 U.S. 104, 110 (1972), for the proposition that, when a court is assessing the vagueness of a statute, it looks to: "the words of the ordinance itself, to the interpretations the court below has given to analogous statutes, *and,*

*perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it*." Voter Reference MSJ Memo. at 96 (quoting Grayned v. City of Rockford, 408 U.S. at 110)(emphasis in Voter Reference MSJ Memo., but not in Grayned v. City of Rockford).  For Voter Reference, the emphasized language from Grayned v. City of Rockford, is important here, because it asserts that the Defendants' interpretation of the statute that purportedly supports Data Sharing Ban is not obviously found in the text of the statute itself, and thus the Court must look to the Defendants' interpretation of the statute as the focus of its analysis.  See Voter Reference MSJ Memo. at 96 (citing Fusaro v. Howard, 19 F.4th at 357; Butcher v. Knudsen, 38 F.4th 1163, 1170 (9th Cir. 2022)).

After outlining the applicable law, Voter Reference begins with an argument that "Defendants' theory regarding the source of the Data Sharing Ban requires illogical, incoherent, and inconsistent statutory interpretation and is pretextual."  Voter Reference MSJ Memo. at 97.  Voter Reference states that the fact that the Data Sharing Ban is not found in any State law, and "did not even exist in writing until it was concocted as a defense to liability in this case."  Voter Reference MSJ Memo. at 97.  Voter Reference then outlines the Defendants' theory of the Data Sharing Bans' statutory origin, see Voter Reference MSJ Memo. at 97-98, and notes that the Court found such a theory implausible in its PI MOO, Voter Reference MSJ Memo. at 98 (citing PI MOO at 137; id. at 148).  Voter Reference then acknowledges that the PI MOO did not conclude that the Voter Sharing Ban was unconstitutionally vague, but states that "since that decision, Defendants' wavering positions, including purported exceptions to the Ban, underscore the Ban's vagueness." Voter Reference MSJ Memo. at 99.

Voter Reference also asserts that the Defendants' own changing interpretations of the statutes that allegedly mandate the Data Sharing Ban is a further indication of the unconstitutional

vagueness of the Data Sharing Ban.  See Voter Reference MSJ Memo. at 99-100.  Voter Reference

argues that Defendants have revealed a number of exceptions to the Data Sharing Ban -- exceptions

that Voter Reference describes as "ad hoc," Voter Reference MSJ Memo. at 99 -- including a

theory, which Voter Reference describes as novel, which suggests that "the level of 'control' of

the data is at least partially determinative of whether the data is shared lawfully."  Voter Reference

MSJ Memo. at 99 (quoting Voter Reference MSJ Memo. ¶ 207 at 54).  Voter Reference contends

that this new theory, along with Defendants' "unpredictable and sometimes changing list of

exceptions, is a recipe for arbitrary enforcement."  Voter Reference MSJ Memo. at 100.

Last, Voter Reference argues that the New Mexico's Legislature's amendment of N.M.S.A.

§ 1-4-5.6, see supra note 119, supports Voter Reference's void for vagueness theory.  See Voter

Reference MSJ Memo. at 100-01.  This is because, Voter Reference contends, the Legislature's

amendment of § 1-4-5.6 "to match some of the positions taken by Defendants in this litigation,"

betrays the initial ambiguity of the statute.  Voter Reference MSJ Memo. at 100-01.  AS Voter

Reference puts it, "If Defendants' position in this litigation regarding the Data Sharing Ban had

been correct as a matter of statutory interpretation, there would have been no need for the

Legislature to amend the law in this manner."  Voter Reference MSJ Memo. at 101.  According to

Voter reference, this legislative action is therefore additional support for its void for vagueness

claims.  See Voter Reference MSJ Memo. at 101.

### e.      The First Amendment Retaliation and Viewpoint Discrimination Theories.

Next, Voter Reference states that, "Defendants retaliated against VRF based on their own

animus towards VRF's perceived political ideology and protected speech by refusing to deliver the

properly requested voter data and by threatening VRF with criminal prosecution for engaging in

protected speech."  Voter Reference MSJ Memo. at 102.  Voter Reference begins with its retaliation

argument, noting that, "[t]he First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right."  Voter Reference MSJ Memo. at 102 (citing <u>Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois</u>, 391 U.S. 563, 574 (1968)).  Voter Reference then states that, to demonstrate First Amendment retaliation, a plaintiff must show:

> (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

Voter Reference MSJ Memo. at 102-03 (quoting <u>Van Deelen v. Johnson</u>, 497 F.3d 1151, 1155-56 (10th Cir. 2007)(Gorsuch, J.)).

As for the first prong of this test, Voter Reference cites earlier portions of the Voter Reference MSJ Memo. for the proposition that its speech is protected under the First Amendment. As for the second prong, Voter Reference asserts that its injury -- being forced "to stop disseminating New Mexico voter information for fear of prosecution and to seek judicial protection," Voter Reference MSJ Memo. at 103 -- is real and substantial, and has chilled Voter Reference's constitutionally protected speech, Voter Reference MSJ Memo. at 103.  As for the third and final prong, Voter Reference explains that the Defendants' retaliatory adverse actions toward Voter Reference in this case come in two forms: (i) the threat of criminal prosecution, and (ii) refusing to fulfill Voter Reference's requests for voter data.  <u>See</u> Voter Reference MSJ Memo. at 103-04.  Voter Reference then explains how each of these adverse actions was "substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."  <u>Van Deelen v. Johnson</u>, 497 F.3d at 1155-56.

As for the criminal prosecution, Voter Reference provides the following account.  First, when Voter reference initially posted the New Mexico voter data on its website and issued a news release about its findings, a reporter from ProPublica contacted the Secretary of State's Office.  See Voter Reference MSJ Memo. at 103; Factual Background, Section 2(c) supra at 14-20.  A representative from the Secretary of State's Office made various statements to that reporter to the effect that Voter Reference was spreading misinformation and attempting to "impugn the integrity of our voter rolls," see Factual Background, Section 2(c) supra at 18-20, and later stated that he wanted to "push back hard" against Voter Reference and its mission, Factual Background, Section 2(c) supra at 18-20, which the Spokesperson from the Secretary of State's Office associated with a "larger strategy of election denialism," Factual Background, Section 2(c) supra at 18-20.  See Voter Reference MSJ Memo. at 103.  Voter Reference then asserts that, in response to its speech, the Secretary of State sent a letter to the Attorney General referring Voter Reference for criminal prosecution.  See Voter Reference MSJ Memo. at 103; Factual Background, Section 2(e) supra at 24-29.  In sum, Voter Reference states that the "threat of prosecution is indisputable," and "[t]he fact that this threat was made in direct response to VRF's protected speech is proved by the myriad facts in this case, including the Defendants' own statements."  Voter Reference MSJ Memo. at 104.  This, Voter Reference contends, is sufficient to demonstrate a retaliatory adverse action for purposes of the First Amendment.  See Voter Reference MSJ Memo. at 104.

Regarding Voter Reference's other claimed adverse action -- the Defendants' refusal to fulfill Voter Reference's requests for voter data -- Voter Reference contends that "Defendants freely and repeatedly admitted this decision is directly motivated by VRF's protected speech."  Voter Reference MSJ Memo. at 104 (citing Lange November 17 Response Letter at 2).  Voter Reference asserts that it has requested voter data from the Secretary of State's Office three times,

see Voter Reference MSJ Memo. at 104, and even though Voter Reference has "promised ad nauseum that it will not publish New Mexico voter data absent a court order allowing it to do," Voter Reference MSJ Memo. at 105, the Secretary of States continues to withhold the requested voter data, see Voter Reference MSJ Memo. at 105.  Voter Reference concludes this argument by stating:

> It is, again, indisputable that the Secretary has refused to give VRF access to new, up to date voter data. And the only plausible construction of the facts in this case, including communications from the Secretary to VRF, compel this Court to conclude that Defendants are refusing to fulfill VRF's requests for voter data because of VRF's engagement in First Amendment-protected speech.

Voter Reference MSJ Memo. at 105.

Voter Reference then moves onto its arguments concerning illegal viewpoint discrimination.  Voter Reference states that the Defendants' "various discriminatory actions have caused three separate effects: disparate treatment of VRF compared to other requesters of New Mexico voter data; the refusal to fulfill VRF's lawful requests for voter data; and the Secretary's referral of VRF to the AG."  Voter Reference MSJ Memo. at 106.  Building on the fundamental First Amendment premise that "the government may not regulate speech based on its substantive content or the message it conveys," Voter Reference MSJ Memo. at 106 (quoting Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 828 (1995)), Voter Reference contends that, "[t]o succeed on a viewpoint discrimination claim, a plaintiff must show that the defendant 'acted with a viewpoint discriminatory purpose,'" Voter Reference MSJ Memo. at 106 (quoting Pahls v. Thomas, 718 F.3d 1210, 1230 (10th Cir. 2013)(Holmes, J.)), and -- specifically -- "a plaintiff must show: (i) defendants' actions caused viewpoint discrimination; and (ii) that defendants' actions were taken because of, not merely in spite of, plaintiff's views," Voter Reference MSJ Memo. at 106 (citing Pahls v. Thomas, 718 F.3d at 1230-31).

On the basis of this law, Voter Reference first mounts its viewpoint discrimination argument regarding the Secretary of State's refusal to produce the voter data that Voter Reference requested.  First, Voter Reference states that, "[t]he Secretary has admitted multiple times its refusal is based on VRF's protected speech."  Voter Reference MSJ Memo. at 107 (citing Voter Reference MSJ Memo. ¶¶ 151-53, at 45-46; id. ¶¶ 156-58, at 46-47; id. ¶ 188, at 50; id. ¶¶ 191-98, at 50-52).  See Factual Background, Section 2(h) supra at 31-42; id at 38-39; Factual Background, Section 2(l) supra at 53-60.  Voter Reference then cites the PI MOO, asserting that the Court has already concluded that "the Secretary conditioned its decision not to respond to or fulfill VRF's requests on VRF's viewpoint -- specifically the 'misinformation' of a discrepancy existing in the data."  Voter Reference MSJ Memo. at 107 (citing PI MOO at 180-82; source of quoted material not cited).  Voter Reference also states that the Secretary of State's purported non-discriminatory reason for not honoring the voter data requests -- namely, its interpretation of the Election Code -- has also been squarely rejected by the Court in the PI MOO, and "Defendants cannot even bring themselves to articulate a single, coherent theory of the violation."  Voter Reference MSJ Memo. at 107.  Voter Reference also cites a portion of the PI MOO which states that, "[t]he Secretary of State has conditioned its decision not to respond to Voter Reference's data request on Voter Reference's viewpoint -- specifically, the fear that giving the data to Voter Reference may reveal that the Secretary of State is lax about maintaining the State's voter data."  Voter Reference MSJ Memo. at 108 (quoting PI MOO at 180).  The viewpoint that is being discriminated against, according to Voter Reference, is "the viewpoint that the Secretary's data is flawed."  Voter Reference MSJ Memo. at 108.  Voter Reference asserts that, "[t]here is no rational explanation for the Secretary's refusal absent a discriminatory purpose."  Voter Reference MSJ Memo. at 108.

Next, Voter Reference states that, similarly, the Secretary of State's Office engaged in viewpoint discrimination when it referred Voter reference to the Attorney General for criminal prosecution. It cites the Criminal Referral Letter, see Factual Background, Section 2(e) supra at 24-29, and states that the Secretary of State's Office was motivated to make the initial referral "by a view that VRF's public statements about the data were misinformation, and that if VRF was not prosecuted, it would foster additional misinformation." Voter Reference MSJ Memo. at 108. It also states that, "[w]hat is more, VRF is the only entity that had ever been accused or investigated for a criminal violation under the Data Sharing Ban, even though numerous commercial entities that may well sell voter data continually and consistently request the state's voter data." Voter Reference MSJ Memo. at 109. On this basis, Voter Reference asserts that the criminal referral was made "because of, not merely in spite of, VRF's views." Voter Reference MSJ Memo. at 109 (citing PI MOO at 182).

### f.    Request for Permanent Injunctive Relief.

Voter Reference's final argument as to why it is entitled to summary judgment is that it is entitled by law to a permanent injunction, "preventing its prosecution for past and future posting of voter data and preventing Defendants from continuing to retaliate against it." Voter Reference MSJ Memo. at 109. Voter Reference bases its request for this injunctive relief on the test for permanent injunctions that is provided by the Tenth Circuit: "(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." Voter Reference MSJ Memo. at 109 (quoting Sw. Stainless, LP v. Sappington, 582 F.3d 1176, 1191 (10th Cir. 2009)). As for the first prong, Voter Reference states that it "incorporates . . . by reference" all of the arguments on the merits that it has made throughout the Voter Reference MSJ Memo. As for the second prong, Voter Reference states that

it will de facto suffer irreparable harm if it is successful on any of its First Amendment theories, because "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionabl[y] constitutes irreparable injury." Voter Reference MSJ Memo. at 110 (quoting Elrod v. Burns, 427 U.S. at 373)(brackets added to remedy a typo in the Voter Reference MSJ Memo. at 110). Voter Reference adds that, "[a]dditionally, unlike the posture of this case last summer at the preliminary injunction stage, VRF now asks the Court to remedy both the violations of the NVRA and the viewpoint discrimination exhibited by the Secretary in denying VRF's requests for voter data." Voter Reference MSJ Memo. at 110. Voter Reference does not further develop why these novel arguments mean that it is more likely to suffer irreparable harm.

As for the third prong of the test for a permanent injunction's issuance, Voter Reference contends that its injury outweighs any harm to the public interest, in part because, "Vindicating First Amendment freedoms is clearly in the public interest." Voter Reference MSJ Memo. at 111 (quoting Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1237 (10th Cir. 2005)). It adds that -- if the Court has already reached this point in the analysis -- it has possibly already decided that the State's interests failed strict scrutiny analysis and, "[t]hough preventing Defendants from prosecuting VRF is no small matter, in exceptional circumstances such as these a district court may offer injunctive relief to prevent a State from prosecuting someone if prosecuting would violate that person's constitutional rights." Voter Reference MSJ Memo. at 111 (citing Wooley v. Maynard, 430 U.S. 705, 710-13 (1977); Steffel v. Thompson, 415 U.S. 452, 475 (1974)).

To conclude its arguments in favor of a permanent injunctive relief, Voter Reference states:

Defendants' protestations of harm to the public are speculative and unsupported by any actual evidence that any voter has de-registered because of VRF's speech. SOF ¶¶234, 237. Defendants present no concrete evidence that VRF's speech erodes public confidence in New Mexico elections, that VRF manipulated or misrepresented any voter data, SOF ¶¶241, or that anyone has been harassed, stalked, or solicited as a result of VRF's speech. SOF ¶¶233; 239. Defendants'

reliance on a small number of complaints from citizens that dislike VRF's method of making already-public data available is insufficient to overcome the interests of VRF and the public in conveying and receiving the data -- interests Congress itself recognized under the NVRA. Because VRF is entitled to judgment as a matter of law on the above claims and the equities weigh in its favor, it is also entitled to permanent injunctive relief.

Voter Reference MSJ Memo. at 111 (citation convention in original).

### 7.   **The Defendants' MSJ Response**.

The Defendants filed their response to the Voter Reference MSJ on May 12, 2023.  See Defendants' MSJ Response at 1.  Defendants' responsive arguments are divided into five sections, which largely -- but not entirely -- track Voter Reference's arguments in its Voter Reference MSJ Memo.  Each of the five arguments is discussed in turn below.

Before the Defendants undertake their five responsive arguments, however, the Defendants' MSJ Response provides some general interpretive principles that guide their analyses.  First, the Defendants state that any right to "access" of voter data should be assessed differently from the State's attempts to "regulate the *use*" of such data.  Defendants' MSJ Response at 28-29 (emphasis in Defendants' MSJ Response).  This distinction is important to the Defendants, who concede that "VRF does have a statutorily defined right of access to certain records under the NVRA," Defendants' MSJ Response at 29, but contend that this right to access in not "unqualified," and also that "the NVRA does not provide a right to use voter data in any particular manner -- and certainly not in the manner that VRF proposes," Defendants' MSJ Response at 29.  Second, the Defendants also note at the outset their position that the First Amendment is "not a source of any additional access rights" than those already provided by the NVRA.  Defendants' MSJ Response at 29.  Moreover, the Defendants argue that Voter Reference's desired use of the voter data is not protected speech, and that, even if it is, "the State's regulation of this conduct would survive any level of

scrutiny regardless."  Defendants' MSJ Response at 29.   On this basis of this introduction, the Defendants make their five responsive arguments to the Voter Reference MSJ.

        **a.**     **Preemption and the NVRA.**

      Against Voter Reference's preemption argument, the Defendants contend that obstacle preemption is "a disfavored and narrow preemption doctrine," that asks whether "a state law impedes the 'purposes and objectives' of a federal law."  Defendants' MSJ Response at 30 (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992)).  The Defendants assert that, "VRF does not, and cannot, argue that New Mexico's protection of citizen data from online publication actually prevents the NVRA from furthering its dual purposes of encouraging voter participation and ensuring a valid electoral process."  Defendants' MSJ Response at 30.  Instead, Defendants argue that what Voter Reference is really saying is that the online publication of the voter data would "further enhance[]" the purposes of the NVRA -- which is not a sufficient basis on which obstacle preemption can be based.  Defendants' MSJ Response at 30.  In essence, the Defendants state that even if the Court were to agree that publishing the New Mexico voter data online would function to further the legislative purposes of the NVRA, "[o]bstacle preemption exists to remedy situations where state law effectively prevents a federal law from achieving its aims in the first instance; it is not an appropriate finding where state law merely prohibits conduct that could, theoretically, make a functioning federal statute marginally more effective than it already is."  Defendants' MSJ Response at 30 (citing Am. Ass'n of People with Disabilities v. Herrera, 690 F. Supp. 2d 1183, 1225 (D.N.M. 2010)(Browning, J.)("Herrera").

      In addition, the Defendants craft an argument based on the distinction between right of access and right of use.  See Defendants' MSJ Response at 31.   In short, the argument is that while the NVRA governs the right to access certain voter data, the allegedly-preempted State statutes

govern the right of use of that voter data.  Under this argument, "the laws occupy two separate spheres: access to information and use of information."  Defendants' MSJ Response at 31 (citing Voter Reference MSJ Memo. at 67).

Last, the Defendants argue that this Court has already confronted a similar question in Herrera, in which the Court considered, "arguments that New Mexico laws intended to prevent voter fraud could negatively impact voter participation in frustration of the NVRA."  Defendants' MSJ Response at 31.  The Court, by the Defendants' telling, "dispatched this concern with the observation that neither one of the NVRA's overarching purposes may be so quickly subordinated to the other," Defendants' MSJ Response at 31-32 (citing Herrera, 690 F. Supp. 2d at 1226), and that "there is 'no indication in the text of the NVRA that it was intended to supersede or frustrate state voting laws,'" Defendants' MSJ Response at 32 (quoting Herrera, 690 F. Supp. 2d at 1226).  The Defendants state that the Court concluded that, "where any alleged negative impact was "debatable" and where the New Mexico law at issue was consistent with at least one of the NVRA's stated purposes, the disfavored doctrine of obstacle preemption should not apply."  Defendants' MSJ Response at 32 (citing Herrera, 690 F. Supp. 2d at 1226).  Voter Reference's "only answer," by the Defendants' lights, is "a nonbinding opinion from the District of Maine, which is currently on appeal to the First Circuit."  Defendants' MSJ Response at 32 (referring to Pub. Int. Legal Found., Inc. v. Bellows, No. 1:20-CV-00061-GZS, 2023 WL 2663827 (D. Me. Mar. 28, 2023)(Singal, J.)).  To conclude, the Defendants argue that "where the challenged state laws seek to protect and promote voter participation -- without any harm to election integrity -- VRF cannot establish, let alone as undisputed fact, that obstacle preemption prohibits New Mexico from regulating the use of its voter data."  Defendants' MSJ Response at 32.

### b.    The NVRA's Scope; and Why Voter Reference's Requests for Voter Data Do Not Comport with The NVRA.

Next, the Defendants confront Voter Reference's allegations that the Defendants' conduct violated the NVRA.  See Defendants' MSJ Response at 32-38.  The Defendants do so by first outlining their theory of what the NVRA's Public Inspection Provision -- codified at 52 U.S.C. § 20507(i)(1) -- requires.  See Defendants' MSJ Response at 32-34.  Then, the Defendants offer three reasons why -- under this interpretation of the NVRA -- Voter Reference's requests for voter data under the NVRA were properly denied.  See Defendants' MSJ Response at 35-38.

The Defendant's statutory interpretation of the NVRA's Public Inspection Provision is avowedly "more limited" than the interpretation proffered by Voter Reference.  Defendants' MSJ Response at 32.  The Defendants begin with the plain language of the Public Inspection Provision, emphasizing the following language: "Each State shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the *implementation of programs and activities* conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  Defendants' MSJ Response at 33 (quoting § 20507(i)(1))(emphasis in Defendants' MSJ Response, but not in § 20507(i)(1)).  The Defendants not that the emphasized language is nowhere defined in the NVRA, and that the Tenth Circuit has yet to weigh in on its meaning.  See Defendants' MSJ Response at 33.  The Defendants cite and discuss two cases from the Fourth Circuit which have discussed the meaning of the phrase: Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections, 996 F.3d 257, 260 (4th Cir. 2021)(Keenan, J.), and the previously discussed Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331.  The Defendants read these cases to mean that, "what constitutes a record concerning the implementation of programs and activities will vary by state based on the state's election laws and programs."  Defendants' MSJ Response at 33.  The Defendants take issue with Voter Reference's reading of Project Vote/Voting for Am., Inc. v. Long,

682 F.3d 331, and that assert that <u>Project Vote/Voting for Am., Inc. v. Long</u> stands for the proposition that "identifiable voter information may, in some situations, be included within NVRA records of state-specific programs and activities where the state's voter program of maintaining a voter list entails the review of records containing the voter information," but that more generally, "the presence or absence of this voter information is incidental to -- and not a defining feature of -- the disclosure requirement's scope."  Defendants' MSJ Response at 33 (citing <u>Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections</u>, 996 F.3d at 265-66).  The Defendants also rely on <u>Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections</u>, 996 F.3d at 255-56, for the idea that, even if certain voter data falls within the scope of the NVRA's Public Inspection Provision, it may still be "withheld or redacted to protect confidential or sensitive data." Defendants' MSJ Response at 33 (citing <u>Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections</u>, 996 F.3d at 265-66).  The Defendants also cite to a case out of the United States District Court for the Southern District of Mississippi for the concept that: "[t]he NVRA establishes a uniform code for voter registration and removal.  The Court declines to adopt Plaintiffs' interpretation of the NVRA Public Disclosure Provision in a manner that would turn it into a *post*-election discovery device for detecting voter fraud."  Defendants' MSJ Response at 33 (quoting <u>True the Vote v. Hosemann</u>, 43 F. Supp. 3d 693, 722 (S.D. Miss. 2014)(Atlas, J.)).

The Defendants next craft a statutory construction argument, stating:

If Congress had intended . . . for the NVRA to require disclosure of entire voter databases it could have said so.  This it did not do.  And, in addition to the specific exemptions in Section 20507(i)(1), Section 20507(i)(2) clarifies that records for inspection "shall include lists of the names and addresses of all persons to whom [change-of-address] notices are sent." If *all* names and addresses of *all* registered voters were always open to public inspection under the NVRA, then this limited clarification -- that *some* names and addresses of certain registered voters are open to inspection -- would be at best surplusage and, more probably, facially inconsistent language. *See Navajo Nation v. Dalley*, 896 F.3d 1196, 1215 (10th Cir. 2018) (explaining "preference for avoiding surplusage constructions").

Defendants' MSJ Response at 34 (emphasis in Defendants' MSJ Response).  On the back of this statutory construction argument, the Defendants that the "programs and activities" described by the Public Inspection Provision are "much more limited than what VRF argues or what it has requested from New Mexico."  Defendants' MSJ Response at 34 (citing Navajo Nation v. Dalley, 896 F.3d 1196, 1208 n.6 (10th Cir. 2018)).  The Defendants are less-than-clear about forwarding their own substantive theory about what this phrase means, but they do state that the NVRA mandates only "*inspection* if existing compliance records," and "does not mandate the *creation* of addition reports, explanations, or data analyses, such as Plaintiff requested here."  Defendants' MSJ Response at 34 (citing 52 U.S.C. § 20507(i)(1); Forsham v. Harris, 445 U.S. 169, 186 (1980)).  The Defendants assert that Voter Reference "has not made any attempt to connect its records requests to any state programs or activities about which it wants information."  Defendants' MSJ Response at 34.  The Defendants describe Voter Reference's requests under the NVRA as mere "repackage[ing of] its state-law voter data requests under the label of an NVRA request without any meaningful attempt to conform its requests to the NVRA."  Defendants' MSJ Response at 34.

After proffering its analysis of the NVRA's Public Inspection Provision, the Defendants provide three reasons why the Secretary of State's Office properly denied Voter Reference's requests for voter data.  See Defendants' MSJ Response at 34-38.  First, the Defendants reiterate the argument made in the NVRA Letter Response, stating that "Plaintiff's requests were not 'for a record that is maintained by [the Secretary's] Office; rather, it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to be aggregated and analyzed.'"  Defendants' MSJ Response at 34 (quoting NVRA Letter Response at 1).  The Defendants assert that neither the February 15 Voter Data Request, see Factual Background, Section 2(f) supra at 29-30, nor the May NVRA Letter, see Factual Background,

Section 2(h) <u>supra</u> at 31-42, constitute a request for data that concerns "New Mexico's implementation of programs or activities to keep its voter lists accurate includes the creation of the requested data," as the NVRA requires.  Defendants' MSJ Response at 35.  Instead, Defendants argue, "VRF relies on the contention that '[d]ocuments related to this maintenance function' of updating voter rolls 'must be made available for public inspection,' VRF MSJ (ECF No. 124) at 51, a standard broader than the NVRA's statutory language."  Defendants' MSJ Response at 35 (quoting Voter Reference MSJ Memo. at 64).  The Defendants further argue that the Defendants' hypothetical capacity to produce the documents requested under the NVRA does not mean that such hypothetical documents are required to be disclosed under the NVRA: succinctly put, the Defendants argue that Voter Reference "confuses technical capability with legal obligation, and the plain language of the NVRA simply does not require what VRF demands."  Defendants' MSJ Response at 36.

The second basis on which the Defendants assert that the Secretary of State's Office properly denied Voter Reference's requests under the NVRA is that Voter Reference's

> own request letter disclosed that it intended to "publish the requested information online," in violation of New Mexico law, assuming that it obtained a preliminary injunction preventing New Mexico from enforcing its own laws (and without any assurance that VRF would wait for a final judgment or resolution of any appeal).

Defendants' MSJ Response at 36 (source of quoted material not cited). The Defendants again assert that they have the right to lawfully regulate the "uses" of New Mexico voter data, and that therefore they could also lawfully withhold the voter data from an entity who "promised to use it for illegal purposes."  Defendants' MSJ Response at 36 (citing <u>Holt v. Howard</u>, 806 F.3d 1129, 1132 (8th Cir. 2015)).  To support this argument, the Defendants also cite to a case from the Supreme Court of New Mexico, <u>State ex rel. Riddle v. Oliver</u>, 2021-NMSC-018, ¶ 36, 487 P.3d 815, 828, which holds that the Secretary of State is "duty-bound to follow the Election Code," and thus could not have

released voter data to a user who sought to violate that Code via an illegal use.  Defendants' MSJ

Response at 36 (quoting State ex rel. Riddle v. Oliver, 2021-NMSC-018, ¶ 36, 487 P.3d at 828).

The Defendants also contend that they did not "disbelieve[]" Voter Reference's "promise not to

publish voter information on its website absent a court order,"  Defendants' MSJ Response at 37

(quoting Voter Reference MSJ Memo. at 72), but rather took that promise in context:

> all that VRF promised was to hold off on publication until it received a preliminary
> order (which has since been stayed on appeal), pending this Court's opportunity to
> conduct a full trial on the merits and issue any final order. And that promise came
> in the same sentence as this one: "VRF intends to publish the requested information
> online for election related purposes." ECF 44-22 at 4. Thus, it was no violation to
> withhold records under these unique circumstances, where fulfilling the request
> could make the Secretary complicit in a state plan to violate state law after any
> NVRA production.

Defendants' MSJ Response at 37.

A third reason that the Defendants provide for why the Secretary of State's Office properly

denied Voter Reference's requests under the NVRA is that Voter Reference "has not actually

complied with the NVRA's pre-suit notice provisions."  Defendants' MSJ Response at 37.  The

Defendants explain that the NVRA, "permits private parties 'who [are] aggrieved by a violation' of

the NVRA to 'provide written notice of the violation,' after which the state will have some period

of time to correct the violation (20 or 90 days, depending on election timing)."  Defendants' MSJ

Response at 37 (quoting 52 U.S.C. § 20510).  The Defendants argue that the NVRA Letter, see

Factual Background, Section 2(h) supra at 31-42, which was sent on May 27, 2022, was the "first

NVRA request," as no prior communications or requests -- whether from Voter Reference or Local

Labs -- "specifically addressed NVRA issues."  Defendants' MSJ Response at 37.  Defendants state

that, following the NVRA Letter, the Defendants sent the NVRA Letter Response on June 16, 2022,

see Factual Background, Section 2(h) supra at 31-42, but "no written notice of violation followed,"

as the Defendants assert is required by the statute.  Defendants' MSJ Response at 38.

> Plaintiff made no further attempt to narrow its requests for records, withdraw its stated intention to misuse any records, or explain why the Secretary's June 16 response was a violation of the NVRA. As a result, Plaintiff was not entitled to add the NVRA claims to its Amended Complaint, and the Court has yet one more reason to dispose of those claims now.

Defendants' MSJ Response at 38.  The Defendants then cite to True the Vote v. Hosemann, 43 F. Supp. 3d at 713-17, which they assert stands for the proposition that that NVRA notice requirements are mandatory and serve an important purpose, and that lack of compliance creates a procedural bar against NVRA related actions.   Defendants' MSJ Response at 38 (citing True the Vote v. Hosemann, 43 F. Supp. 3d at 713-17).

### c.        First Amendment Theories.

Next, the Defendants move onto Voter Reference's theories for relief due to direct violations of First Amendment.[120]   In terms of pages, this section is where the Defendants place their greatest analytical emphasis of the Defendants' MSJ Response.   See Defendants' MSJ Response at 38-56.  The argument proceeds in four parts.  First, the Defendants claim that Voter Reference has no right to access the New Mexico voter data -- i.e., that neither any statute nor the First Amendment provides such a right to access.   See Defendants' MSJ Response at 38-41. Second, the Defendants argue that the State's restrictions on the permissible use of voter data under State law are permissible under the First Amendment.   See Defendants' MSJ Response at 41-44. Third, the Defendants argue that even if Voter Reference's sought use of the voter data is protected speech, New Mexico's proscription against publishing voter data would still pass constitutional muster.  See Defendants' MSJ Response at 44-53.  Last, the Defendants argue that their enforcement

---

[120]Overbreadth and vagueness are addressed in the next section of the Defendants' MSJ Response.  See Defendants' MSJ Response at 56-64.

of these restrictions was not retaliatory or discriminatory.  See Defendants' MSJ Response at 53-56.

To support the proposition that Voter Reference does not have a statutory or constitutional right to access the voter data, the Defendants state that the First Amendment does not "create a 'guarantee of a right of access to all sources of information within government control.'" Defendants' MSJ Response at 39 (quoting Houchins v. KQED, Inc., 438 U.S. 1, 9 (1978); and citing Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001); Capital Cities Media, Inc. v. Chester, 797 F.2d 1164, 1168 (3d Cir. 1986)).  According to the Defendants, the fact that the "subject matter" of the voter data "could implicate core political speech and matters of public importance does not obligate states or their subdivisions to provide access under the First Amendment."  Defendants' MSJ Response at 39.  The Defendants also cite a case from the Tenth Circuit, in which the Defendants assert that the Tenth Circuit declined to extend First Amendment right to access to certain documents held by a city government, instead holding that "while the city may have an obligation to provide the documents under state open records laws or other such statutes, the First Amendment does not compel disclosure to citizens."  Defendants' MSJ Response at 39 (citing Shero v. City of Grove, Okl., 510 F.3d 1196, 1202 (10th Cir. 2007)).  The Defendants also forward an argument to the effect that the grant of a greater power includes the grant of a lesser power, and on this basis assert that, "where a state has the power to hold entirely private sensitive data that its voters have entrusted to it, it also has the lesser power to grant access to that data on non-discriminatory conditions."  Defendants' MSJ Response at 39.  See id. at 39-40 (citing Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 144 (1982); Kavalin v. White, 44 F.2d 49, 51 (10th Cir. 1930); United States v. O'Neil, 11 F.3d 292, 296 (1st Cir. 1993); Republican Party of Minn. v. White, 536 U.S. 765, 788 (2002)).

The Defendants also assert that "because access to voter data is not guaranteed by the First Amendment, the State's election to condition access on an entity's agreement not to post the data on the internet is not an unconstitutional condition."  Defendants' MSJ Response at 40 (citing Fusaro v. Cogan, 930 F.3d at 256-57).  The Defendants also state that the Use Restrictions and the Data Sharing Ban "do not constitute a content- or viewpoint- based restraint on data requestors' speech or leave requestors without ample alternatives to engage in free expression."  Defendants' MSJ Response at 40.  Moreover, the Defendants contend that, "Plaintiffs assert that the restrictions are viewpoint- or content-based but do not actually explain how the prohibitions are not content-neutral."  Defendants' MSJ Response at 40 (citing Voter Reference MSJ Memo. at 83-84; PI MOO at 194-98).  The Defendants explain that their "conditional" grant of voter data does not "contemplate the content of any other speech that requestors might make based on their own analysis, summarization, or opinions of the data," and these conditionals do not impose any prohibition "on requestors sharing their opinions about or analyses of New Mexico data, or even anonymized aggregations of the data."  Defendants' MSJ Response at 41.  The Defendants conclude this portion of their brief by stating:

> The conditional grant of access to the voter file permits those seeking to engage the public with a powerful, voluminous resource built by state and county election officials. This resource provides ample, robust opportunities for direct voter engagement. The mere condition that the resource itself not be shared beyond those entities who request it from the state, and in so doing agree not to share the data improperly, does not give rise to a First Amendment claim.

Defendants' MSJ Response at 41.

Next, the Defendants outline their argument why Voter Reference's publication of the voter data online violates the State's permissible restrictions on the use of that voter data.  The Defendants provide an account how Voter Reference violated New Mexico law in its "collection and publication of voter data."  Defendants' MSJ Response at 41-42.  In short, the Defendants observe

that, when Local Labs obtained the voter data from the Secretary of State's Office, Local Labs signed an affidavit in which it swore that it would not "use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law."  Defendants' MSJ Response at 42 (quoting Lippert Voter Information Authorization form at 1).  The affidavit that Local Labs signed also states: "Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplication, or alteration of information as stated in the Voter Records System Act."  Defendants' MSJ Response at 42 (quoting Lippert Voter Information Authorization form at 1).  After signing this affidavit and obtaining the voter data, Local Labs provided that data to Voter Reference, and the latter "published the New Mexico voter rolls in their entirety on their website, including their name, address, birth year, registered party, and last election in which they voted."  Defendants' MSJ Response at 42.

The Defendants asserts that this conduct was unlawful because it violated the Secretary of State's Office's interpretation of the statutory framework found in N.M.S.A. §§ 1-4-5.5(C), 1-4-5.6(A), 1-4-5.6(B) and 1-5-22(A).  See Defendants' MSJ Response at 42.  The Defendants maintain that these statutes -- when viewed together -- "permit sharing data within an entity or organization for use in furtherance of a permissible purpose, but [do] not [] permit sharing outside of it for any purpose."  Defendants' MSJ Response at 43.  The Defendants also maintain that this interpretation has significant longevity, stating that this statutory understanding "has been in place for at least twelve years and across two administrations."  Defendants' MSJ Response at 43.  The Defendants also contend that these statutes "prohibit publishing data for general availability on the internet."  Defendants' MSJ Response at 43.  The Defendants assert, moreover, that the recent passage of House Bill 4, see supra note 119, signals that the New Mexico Legislature has "affirmed" this

statutory interpretation, Defendants' MSJ Response at 43.  The Defendants conclude by again asserting that they are constitutionally permitted to "condition its grant of access to voter file information upon agreement of the requestor not to publish that data," Defendants' MSJ Response at 43, and that Voter Reference violated the conditions imposed, either by using an "agent, Local Labs, to falsely attest that it would not share the data it received," or, alternatively, by purchasing "data from a third party to intentionally bypass state requirements,"  Defendants' MSJ Response at 43-44.

Whatever the means employed to obtain the data, the Defendants contend that when Voter Reference then violated the Election Code by publishing the voter data online, as this "publication permitted any person with internet access to bypass the affidavit requirement in the New Mexico Election Code, thus nullifying a safeguard designed to ensure the privacy and safety of New Mexico voters."  Defendants' MSJ Response at 44.   The Defendants conclude that, "[b]ecause the State was permitted to condition its access to the data on a sworn statement to refrain from such actions, VRF's publication of voter data was not a constitutionally protected activity. Therefore, the entirety of VRF's First Amendment claims should fail as a matter of law."  Defendants' MSJ Response at 44.

Following from this argument, the Defendants then pose an alternative argument, namely, that even if Voter Reference's conduct were protected speech, the Defendants' regulation of that speech would remain constitutionally permissible.  See Defendants' MSJ Response at 44-53.   In large part, this argument relies on the notion that the State's regulations on the use of voter data serve "the compelling and concrete interest of protecting the safety and wellbeing of registered voters, safeguarding their fundamental right to vote, and ensuring that voters should not have to choose between participating in democracy and being safe in their homes."  Defendants' MSJ

- 158 -

Response at 44.  The Defendants contend that the correct analysis for assessing the constitutional appropriateness of the State's regulations -- assuming Voter Reference's conduct is constitutionally protected -- is the "the sort of constitutional balancing outlined by the Supreme Court in Anderson v. Celebrezze, 460 U.S. 780 (1983), and Burdick v. Takushi, 504 U.S. 428 (1992)."  Defendants' MSJ Response at 44.  But even if the Court applies strict scrutiny, the Defendants assert, the Defendants'' compelling state interests are narrowly tailored and give "opportunities for other forms of speech," and thus would also survive that analysis.  Defendants' MSJ Response at 45.

The Defendants assert that their interest in protecting voter safety and preventing a chilling effect on election participation is compelling under either standard of scrutiny.  See Defendants' MSJ Response at 45.  Specifically, the Defendants argue that "public safety and the prevention of crime are significant government interests justifying some modest restriction on otherwise constitutionally protected activity," Defendants' MSJ Response at 45 (citing Schenk v. Pro-Choice Network of W. N.Y., 519 U.S. 357, 376 (1997); United States v. Salerno, 481 U.S. 739, 750 (1987)), and also state that the State has a significant interest in "preserving access to the fundamental right to vote," Defendants' MSJ Response at 45 (citing Burson v. Freeman, 504 U.S. 191, 198-99 (1992)).  The Defendants also state the both the Supreme Court and the Tenth Circuit "have recognized a well-established privacy interest in one's home and home address," Defendants' MSJ Response at 45-46 (citing Forest Guardians v. U.S. Fed. Emergency Mgmt. Agency, 410 F.3d 1214, 1220 (10th Cir. 2005)(Baldock, J.)).  Relatedly, the Defendants also argue that disclosing voter's home address will have a "chilling effect" on election participation, and discuss evidence in the record that reasonably leads to this conclusion.  Defendants' MSJ Response at 46 (citing June 15 Tr. at 180:22-182:2 (Pino, Serafimova); id. at 185:1-186:12 (Court, Greim, Pino, Serafimova); Defendants' MSJ Response ¶ 245, at 27).  See Factual Background, Section 2(g) supra at 30-31.

The Defendants also state that, "VRF's website, if permitted to publish voter data, would be an effective tool for individuals intending to harass or harm elected officials, judges, prosecutors, public employees, or any other member of the public."  Defendants' MSJ Response at 47.

The Defendants also argue, relatedly, that, "prohibiting publication of voter data furthers the state interest of increased electoral participation."  Defendants' MSJ Response at 48.  The Defendants assert that while Voter Reference has provided no evidence to support its underlying theory that the publishing the voter data online increases or fosters voter participation in some way, the Defendants "have produced evidence that VRF's publication of voter rolls will result in some voters canceling their registrations."  Defendants' MSJ Response at 48 (citing Defendants' MSJ Response ¶¶ 245-46, at 27).  See Factual Background, Section 2(g) supra at 30-31.  The Defendants conclude their argument regarding compelling interest by discussing Americans for Prosperity Found. v. Bonta, 141 S. Ct. 2373 (2021), and contending that this case stands for the proposition that "compelled disclosure of political activity may chill the exercise of protected constitutional rights."  Defendants' MSJ Response at 48.  The Defendants state that in Americans for Prosperity Found. v. Bonta, the Supreme Court held that, "California's law compelling nonprofits to disclose donors to the state attorney general's office failed exacting scrutiny because such disclosure would chill speech (in the form of reduced monetary donations to the plaintiff entities)," Defendants' MSJ Response at 48 (citing Americans for Prosperity Found. v. Bonta, 141 S. Ct. at 2388), and that this holding was reached because the law was facially invalid based "based on its mere 'risk of a chilling effect,'" Defendants' MSJ Response at 48 (quoting Americans for Prosperity Found. v. Bonta, 141 S. Ct. at 2389).  The Defendants emphasize that the risk in this case, as in Americans for Prosperity Found. v. Bonta, is "chilling democratic participation."  Defendants' MSJ Response at 48.  The Defendants state that, "If the interest in preventing a chilling effect on participatory democracy is

so great that it requires facially invalidating California's state statute, then surely the protection of

that interest under New Mexico's duly enacted laws warrants treatment as a compelling state

interest."  Defendants' MSJ Response at 48-49.

Next, the Defendants argue that, "if the Court finds that both New Mexico's regulation and

VRF's desired conduct touch upon participation in free elections, then the Court should proceed to

balance these interests under the *Anderson-Burdick* analysis."  Defendants' MSJ Response at 49.

The Defendants argue that this "more flexible standard," Defendants' MSJ Response at 49 (quoting

Burdick v. Takushi, 504 U.S. 428, 434 (1992)), applies when considering first Amendment

challenges to state election laws.  Defendants' MSJ Response at 49 (citing Burdick v. Takushi, 504

U.S. at 434).   In fashioning this test, the Defendants assert, the Supreme Court has noted that,

"[w]hile the regulation of elections necessarily implicates fundamental rights, 'the state's important

regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.'"

Defendants' MSJ Response at 49 (quoting Anderson v. Celebrezze, 460 U.S. at 788).   The

Defendants quote from Anderson v. Celebrezze the following description of the relevant standard:

> [A court] must first consider the character and magnitude of the asserted injury to
> the rights protected by the First and Fourteenth Amendments that the plaintiff seeks
> to vindicate. It then must identify and evaluate the precise interests put forward by
> the State as justifications for the burden imposed by its rule. In passing judgment,
> the Court must not only determine the legitimacy and strength of each of those
> interests; it also must consider the extent to which those interests make it necessary
> to burden the plaintiff's rights.

Defendants' MSJ Response at 49 (quoting Anderson v. Celebrezze, 460 U.S. at 789)(brackets in

original).  The Defendants point out that this Court, in Herrera, applied this standard to assess New

Mexico's third-party voter registration law, see Defendants' MSJ Response at 49 (citing Herrera,

690 F. Supp. 2d at 1211-13), and they also state that, "[a]t least two courts have applied the

*Anderson-Burdick* test to cases involving state election laws concerning limitations on availability

- 161 -

of voter data," Defendants' MSJ Response at 49 (citing <u>Libertarian Party of Indiana v. Marion Cnty.</u> <u>Bd. of Voter Registration</u>, 778 F. Supp. 1458, 1462-63 (S.D. Ind. 1991)(Barker, J.); <u>Fusaro v.</u> <u>Cogan</u>, 930 F.3d 241, 244 (4th Cir. 2019)).

Applying this standard to the present case, the Defendants argue that "the state's regulatory interests in protecting the safety, privacy, and participation of New Mexico voters . . . heavily outweigh any incidental burden to VRF." Defendants' MSJ Response at 52. This is particularly true, according to the Defendants, because, in this case "alternative options for speech are . . . numerous," Defendants' MSJ Response at 51, namely:

> VRF has obtained a copy of the voter file and may be able to do so again after the instant litigation concludes. The voter file is a powerful tool for conducting political speech. Possession of the voter file leaves VRF with the opportunity to perform statistical analysis; recruit likeminded volunteers; go door-to-door in support of their cause; phone bank; conduct a direct-mail campaign; target their outreach based upon party affiliation, age, and voting history; or combine the voter file with commercially available consumer data for improved communication options. This is to say nothing of the opportunities for mass communication: television, radio, digital, and print advertising.

Defendants' MSJ Response at 51.

The Defendants also assert that, even if the Court applies strict scrutiny, the State's restrictions will pass constitutional muster because, "the State maintains a compelling interest in the safety and welfare of its citizens and in their free participation in elections," and given that online publication of voter data would put voters in harm's way, "the prohibition against publication of the voter file is the only way to protect against all of these simultaneously," and -- therefore -- is narrowly tailored. Defendants' MSJ Response at 52. The Defendants reject Voter Reference's proffered alternative methods at ensuring voter safety, because such alternatives "would not prevent people from using this personal information to stalk, harass, intimidate, or solicit voters at their homes." Defendants' MSJ Response at 52.

Finally, the Defendants argue against Voter Reference's contentions that the Defendants acted in a retaliatory or discriminatory manner in the enforcement of the State restrictions.  See Defendants' MSJ Response at 53-56.  The upshot of this argument is the assertion that the Defendants' allegedly discriminatory and retaliatory actions -- i.e., the criminal referral and the denials of voter data requests -- "were motivated solely by enforcement of New Mexico's constitutionally valid Election Code and out of an immediate concern for protecting voters from an unprecedented intrusion of their privacy by posting voter data online."  Defendants' MSJ Response at 53.  They were not, the Defendants argue, motivated by any desire to retaliate against Voter Reference for its comments or critical analysis of the Secretary of States' Office; and nor were these actions a result of discriminatory animus towards Voter reference based on viewpoint.  See Defendants' MSJ Response at 53.

Answering Voter Reference's more specific allegations regarding unconstitutional retaliation, the Defendants assert that Voter Reference is unable of demonstrating retaliation because it cannot show "but for" causation between the Defendants' actions and: (i) Voter Reference's viewpoint; or (ii) Voter Reference's "criticism of the Secretary."  Defendants' MSJ Response at 53-54.  Next, the Defendants state that Voter Reference is unable to establish viewpoint discrimination because it is unable to show that a similarly situated party with a different viewpoint was "treated more favorably."  Defendants' MSJ Response at 54.  The Defendants note, citing Voter Reference's own representations, that Voter Reference's project of posting voter data for free online was "unprecedented" and "the first of its kind," Defendants' MSJ Response at 55 (quoting Defendants' MSJ Response ¶ 247, at 27), see Factual Background, Section 1 supra at 7, and for this reason, "VRF cannot identify a single party with different viewpoints who has published New Mexico voter data on a publicly available website whom Defendants have not referred for criminal

- 163 -

prosecution or to whom Defendants have denied requests for voter data," and, "[t]his is because no

such party exists."   Defendants' MSJ Response at 55.  In fact, the Defendants point out, Secretary

Oliver "readily provided access" to voter data to her election adversary and the Republican Party

when she was competing in a particularly vitriolic campaign, Defendants' MSJ Response at 55, and

also regularly "fulfill[s] voter data requests to individuals from across the ideological spectrum,"

Defendants' MSJ Response at 56.  The Defendants state that, "[t]he Office provided voter data to

candidates critical of New Mexico election administration and, specifically, of Toulouse Oliver

herself."  Defendants' MSJ Response at 56.  On this basis, the Defendants conclude:

> VRF cannot reasonably assert that it was a viewpoint-discriminatory interest
> motivating Defendants' actions. On the contrary, the only motive for the Secretary
> denying subsequent requests for voter data was as a response to an unprecedented
> publication of the entire state voter file in attempt to enforce New Mexico's laws
> and protect the privacy and safety of New Mexico voters.

Defendants' MSJ Response at 56.

### d.    Vagueness and Overbreadth Theories.

In responding to Voter Reference's vagueness and overbreadth arguments, the Defendants

assert at the outset that such theories are moot due to the New Mexico Legislature's recent passage

of House Bill 4, see supra note 119, which provides "sufficient reason to dispose of these particular

claims," Defendants' MSJ Response at 56.  On this argument, the Defendants contend that the

"Eleventh Amendment dictates that VRF can seek only prospective injunctive relief from

Defendants, meaning that only those laws that can now or in the future be enforced against VRF

may support a claim for relief in this case."  Defendants' MSJ Response at 57 (citing Collins v.

Daniels, 916 F.3d 1302, 1315 (10th Cir. 2019)).  House Bill 4, the Defendants assert, makes clear

that "a very specific type of activity -- i.e., causing voter data 'to be made publicly available on the

internet or through other means' -- is unlawful."  Defendants' MSJ Response at 57 (source of quoted

material not cited, but presumably from House Bill 4).  This proscription, by the Defendants'

account, is neither vague nor overbroad.  As for Voter Reference's argument that it could still be prosecuted for its past conduct against the former version of the statute, the Defendants state that "VRF's *past* posting of voter data necessarily cannot be chilled; it has already occurred." Defendants' MSJ Response at 57 (citing Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1089 (10th Cir. 2006)).

Even without this mootness argument, however, the Defendants still assert that the Court should follow its rulings in the PI MOO and refuse to enter judgment for Voter Reference on its overbreadth and vagueness claims.  See Defendants' MSJ Response at 56-57 (citing PI MOO at 172-78; id. at 198-204).  As for vagueness, the Defendants state that the relevant focus of the analysis is "the question is whether VRF had 'fair notice' that posting voter information to VoteRef.com was unlawful," Defendants' MSJ Response at 59 (source of quoted material not cited), not how "New Mexico law might apply to myriad hypothetical situations," Defendants' MSJ Response at 59.  On this question, the Defendants again provide their interpretation of N.M.S.A. §§ 1-4-5.5, 1-4-5.6, and 1-5-22.  See Defendants' MSJ Response at 59-60.  In making this argument, the Defendants contend that the statutory category of "governmental purposes" -- found in § 1-4-5.5 -- "is not so broad as to encompass the actions of private entities or citizens who are merely taking an interest in government."  Defendants' MSJ Response at 60 (citing Harrington v. Atteberry, 1915-NMSC-058, ¶ 40, 21 N.M. 50, 153 P. 1041).  Moreover, the Defendants argue that "the challenged laws do not contain any terms that call for subjective judgment and enforcement." Defendants' MSJ Response at 61.  The Defendants also disagree with Voter Reference's argument that House Bill 4 actually supports Voter Reference's vagueness theory, stating that it is not true that, "just because a statute has been made more clear, that the statute originally was so vague as to

be unconstitutional."  Defendants' MSJ Response at 61-62 (citing Dr. John's, Inc. v. City of Roy, 465 F.3d 1150, 1158 (10th Cir. 2006)).

As for overbreadth, the Defendants state that, when assessing such a challenge, "there must be more than just one possible misapplication of the statute to reach a determination of overbreadth; there must, instead, be a realistic danger the statute will significantly compromise recognized First Amendment protections of parties not before the Court."  Defendants' MSJ Response at 62 (citing Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 800-01 (1984)).  According to the Defendants, a logical precondition to this question, then, is whether Voter Reference has a First Amendment right "to publish the voter data for restrictions" in the first place. Defendants' MSJ Response at 63.  As discussed above, see supra Procedural Background Section 7(c), at 154-64, the Defendants assert that, "there is no general right under the First Amendment to access government information," Defendants' MSJ Response at 63 (citing Houchins v. KQED, Inc., 438 U.S. at 14; Fusaro v. Cogan, 930 F.3d at 250).  Therefore, according to Defendants, there can be no overbreadth claim.  See Defendants' MSJ Response at 63.  Even if the "overbreadth doctrine applied to the Election Code," the Defendants contend, "the challenged statutes are not overbroad," because

> the Secretary's actual interpretation and enforcement of relevant statutes only conditions receipt of voter data on refraining from (i) use of voter data for unlawful purposes as defined in Section 1-4-5.5 or (ii) intentional sharing of specific voter data with persons separate from and outside of the organization that requested and received the data.

Defendants' MSJ Response at 63.

### e.    Request for a Permanent Injunction.

Last, the Defendants contends that Voter Reference is not entitled to a permanent injunction.  Although the Defendants agree with Voter Reference that the controlling test for a permanent injunction is the one provided by Sw. Stainless, LP v. Sappington, 582 F.3d at 1191,

they argue that, "[f]or all the reasons shown above, Plaintiff has not proven 'actual success on the merits,'" Defendants' MSJ Response at 63 (source of quoted material not cited, but presumably <u>Sw. Stainless, LP v. Sappington</u>), and also, "VRF has failed to address the very real threat to public interests and harm to the State of New Mexico that will result if it receives its requested injunction," Defendants' MSJ Response at 63.  Accordingly, the Defendants argue that a permanent injunction in favor of Voter Reference is unwarranted.

### 8.        <u>The Voter Reference MSJ Reply</u>.

Before responding to the specific arguments raised in the Defendants' MSJ Response, the Voter Reference MSJ Reply begins by highlighting four "key admissions" which Voter Reference asserts that the Defendants make in the Defendants' MSJ Response.  Voter Reference MSJ Reply at 19.  <u>See id.</u> at 19-23.  These "key admissions" are: (i) that the Defendants admit that the "voter file is a powerful tool for conducting political speech," Voter Reference MSJ Reply at 19 (quoting Defendants' MSJ Response at 51); (ii) that "[t]he Secretary claims to comply with state law requiring her to create a 'file maintenance list' by maintaining the requisite data in a raw file, yet argues that raw data need not be produced to comply with the NVRA," Voter Reference MSJ Reply at 20 (source of quoted material not cited, but presumably Defendants' MSJ Response ¶ 217, at 24); (iii) that the Defendants now admit that their restrictions "prohibit the publication of *truthful, accurate* voter data," Voter Reference MSJ Reply at 22 (emphasis in Voter Reference MSJ Reply); and (iv) that the Defendants again admit that their decision not to provide Voter reference with the voter data that it requested was "retaliation for VRF's posting of data online," Voter Reference MSJ Reply at 22.

Next, Voter Reference responds to the Defendants' assertions regarding preemption.  Voter Reference takes issue with the Defendants' access-versus-use distinction, <u>see supra</u> Procedural Background Section 7(a), at 147-48, arguing that this "distinction dissolves . . . because New

Mexico prohibits *access* when recipients fail to toe the line regarding officials' current views on what *uses* are acceptable."  Voter Reference MSJ Reply at 23 (emphasis in Voter Reference MSJ Reply).  In support of this proposition, Voter Reference states that, the "Defendants indisputably connect access with use by denying VRF access to the data because of VRF's intended use and publication of the data."  Voter Reference MSJ Reply at 24 (citing Defendants' MSJ Response ¶ 118, at 13).  After attacking the access-versus-use distinction, Voter Reference argues that the Defendants' reliance on the Court's decision in <u>Herrera</u> is misplaced largely because the provision of the NVRA at issue in that case invited state regulation of election procedures, whereas the Public Inspection Provision of the NVRA, "***does*** mandate disclosure of certain voter records . . . and it chose ***not*** to provide for state limitations on such disclosure."  Voter Reference MSJ Reply at 24. <u>See</u> <u>id.</u> at 24-25 (distinguishing <u>Herrera</u>).  A more pertinent case, according to Voter Reference, is <u>Pub. Int. Legal Found., Inc. v. Bellows</u>, No. 1:20-CV-00061-GZS, 2023 WL 2663827 (D. Me. Mar. 28, 2023)(Singal, J.), in which the Honorable Judge George Z. Singal of the United States District Court for the District of Maine, held that a State provision which prohibited the disclosure of statewide voter registration lists was preempted by the NVRA.  Voter Reference MSJ Reply at 26 (citing and discussing <u>Pub. Int. Legal Found., Inc. v. Bellows</u>, 2023 WL 2663827, at *7).  Voter Reference concludes its argument regarding the preemption claim by stating that all of the Defendants' other arguments against preemption are policy arguments which are "for Congress, not for a court," Voter Reference MSJ Reply at 26, and that "Congress has already spoken to the importance of voter record transparency," Voter Reference MSJ Reply at 28.

Moving on to its claim regarding an NVRA violation, Voter Reference begins by arguing against the Defendants narrower interpretation of the NVRA's Public Inspection Provision, arguing instead that "[t]here is no dispute" that the provision is "broad."  Voter Reference MSJ Reply at 29

(quoting Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections, 996 F.3d at 264).  Voter

Reference contends that

> Those "records" which must be made available pursuant to the NVRA include the
> "file maintenance list" and "voter data" as those terms are defined in NMSA § 1-5-
> 2, as well as "voter data" as that term is used in NMSA § 1-4-5.5, because these are
> "records concerning the implementation of programs and activities conducted for
> the purpose of ensuring the accuracy and currency of official lists of eligible voters."

Voter Reference MSJ Reply at 29 (citing Judicial Watch, Inc. v. Lamone, 399 F.Supp.3d at 439;

Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 335-36 (4th Cir. 2012); Pub. Int. Legal

Found., Inc. v. Bellows, 588 F.Supp.3d at 133 (D. Me. 2022); Pub. Int. Legal Found., Inc. v.

Matthews, 589 F. Supp. 3d at 940)(source of quoted material not cited, but presumably 52 U.S.C.

§ 20507(i)(1)).  Voter Reference also contends that, although the Defendants "feign[] ignorance"

over what might constitute "programs and activities" for the purpose of the Public Inspection

Provision, "New Mexico law details these programs and activities in which the Secretary and other

government officials are statutorily required to engage."  Voter Reference MSJ Reply at 30.  Voter

Reference then provides a list of such programs and activities, admitting that its list is "certainly

not exhaustive."  Voter Reference MSJ Reply at 30.  See id. at 30-31.  The statutes that Voter

Reference cites includes provisions like N.M.S.A. § 1-4-1.1(C), which requires the Secretary of

State to confer with the Department of Motor Vehicles and the "federal commissioner of social

security" to match database information to voter registration, or N.M.S.A. § 1-4-22, which allows

the Secretary of State to "file and present to the district court a verified petition alleging, on

information and belief, that certain persons registered, named in the petition, are not qualified

electors in the precincts named in the petition."  See Voter Reference MSJ Reply at 30-31 (citing

these and other statutes).  Voter Reference states that records of programs and activities, along with

"the voter data which necessarily comprises most or all of these functions . . . must be made

publicly available under the NVRA."   Voter Reference MSJ Reply at 31 (citing 52 U.S.C. § 20507(i)(1)).

Voter Reference also states that voter data is "essential, not merely incidental," to the records that the NVRA's Public Inspection Provision references, Voter Reference MSJ Reply at 31, and argues that to construe the statute otherwise would mean that citizens would need to "simply take their government at its word that their information is correct," a result that would "in no way accomplish[] the goals of the NVRA," Voter Reference MSJ Reply at 32.  Voter Reference also attacks the Defendants' "sensitive information" argument, and argues that <u>True the Vote v. Hosemann</u>, 43 F. Supp. 3d 693, is distinguishable from the present case on factual grounds.  <u>See</u> Voter Reference MSJ Reply at 32.   As for the Defendants' argument that 52 U.S.C. § 20507(i)(2)'s language limits 52 U.S.C. § 20507(i)(1), Voter Reference states that this same argument has been rejected elsewhere, and the reasoning from those rejections is persuasive.  <u>See</u> Voter Reference MSJ Reply at 32 (citing and discussing <u>Pub. Int. Legal Found., Inc. v. Matthews</u>, 589 F. Supp. 3d at 941).  Voter Reference also states that the Defendants' argument that Voter Reference's requests required the "creation" of records is unfounded "both on the law and the facts," Voter Reference MSJ Reply at 33, because: (i) "States cannot refuse NVRA requests simply because the state would have to "create" a new record from existing data," Voter Reference MSJ Reply at 33 (citing <u>Project Vote, Inc. v. Kemp</u>, 208 F. Supp. 3d 1320, 1336 (N.D. Ga. 2016)(Duffey, Jr., J.); and <u>Pub. Int. Legal Found. v. Chapman</u>, 595 F. Supp. 3d 296, 306 (M.D. Pa. 2022), <u>decision clarified on reconsideration sub nom.</u> <u>Pub. Int. Legal Found. v. Schmidt</u>, No. 1:19-CV-622, 2023 WL 2778692 (M.D. Pa. Feb. 28, 2023)(Conner, J.)); and (ii) because, despite the Defendants' attempt to "muddy the waters of what is considered a 'report' involving the SERVIS database and what is a 'record' pursuant to the NVRA," Voter Reference MSJ Reply at 34, the undisputed facts concerning the

SERVIS database, see Factual Background, Section 2(j) supra at 46-51, indicate that while "there are no 'existing' reports . . . the database includes some set algorithms ('canned reports') to collect the same 'records,'" Voter Reference MSJ Reply at 35 (citing Voter Reference MSJ Memo. ¶¶ 166-67, at 47-48).

Voter Reference also argues that the "data requested in the February 15, 2022 request falls within the NVRA's Public Inspection Provision." Voter Reference MSJ Reply at 35. In support of this argument, Voter Reference contends that the Defendants' argument that the records requested in Voter Reference's February, 2022, request for voter data, see Factual Background, Section 2(f) supra at 29-30, called for a "count" and not a "record" is "erroneous and disingenuous," Voter Reference MSJ Reply at 35. Voter Reference also restates its argument that the Defendants' other excuses for not producing the voter data are pretextual and unavailing. See Voter Reference MSJ Reply at 36. Finally, Voter Reference argues that the Defendants waived any argument regarding the NVRA's pre-suit notice requirement, but also states that, even if there is no waiver, Voter Reference nonetheless provided proper notice. See Voter Reference MSJ Reply at 36. Voter Reference states that the Defendants waived the notice argument by not properly responding to Voter Reference's allegation regarding pre-suit notice in the Amended Complaint, see Voter Reference MSJ Reply at 37 (citing Amended Complaint ¶ 23, at 9), and also that the Defendants conceded that the pre-suit notice was proper during discovery, see Voter Reference MSJ Reply at 37 (citing Voter Reference MSJ Memo. ¶ 134, at 42). Voter Reference also states that, even absent waiver, the Defendants cite "no support for the contention that a request which falls under the NVRA must include magic words in order for the Secretary to recognize her duty under federal law," and that "the data requested in the February 15, 2022, request falls within the purview of the NVRA." Voter Reference MSJ Reply at 38.

Voter Reference next moves onto its First Amendment claims, where it spends most of its reply arguing that the Anderson-Burdick analysis is inapplicable to this case, and that the Data Sharing Ban and the use restrictions cannot survive strict scrutiny.  See Voter Reference MSJ Reply at 39-47.  First, Voter Reference confirms its position that its right to access the voter data at issue in this case emanates from the NVRA, and not the First Amendment.  See Voter Reference MSJ Reply at 39.  It then argues against the application of the Anderson-Burdick analysis, because "[t]he fact that an election law burdens a fundamental right is necessary but not sufficient to trigger *Anderson-Burdick*; the law also must regulate 'the mechanics of the electoral process.'"  Voter Reference MSJ Reply at 40 (quoting McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 345 (1995)).  Instead, Voter Reference argues, the restrictions at issue here are aim at regulating speech, and thus strict scrutiny should apply.  See Voter Reference MSJ Reply at 40-41.  Voter Reference also argues that the two cases cited by the Defendants in which courts applied the Anderson-Burdick analysis to restrictions on the availability of voter data are distinguishable, see Voter Reference MSJ Reply at 41-42 (citing and discussing Libertarian Party of Indiana v. Marion Cnty. Bd. of Voter Registration, 778 F. Supp. At 1462-63; and Fusaro v. Cogan, 930 F.3d at 244), and Voter Reference also distinguishes this Court's use of the Anderson-Burdick analysis in Herrera, see Voter Reference MSJ Reply at 42-43.  After arguing that strict scrutiny applies, Voter Reference restates its arguments about why the Defendants' restrictions cannot survive strict scrutiny.  See Voter Reference MSJ Reply at 45-47.

Voter Reference then addresses the Defendants' arguments regarding overbreadth and vagueness.  See Voter Reference MSJ Reply at 47-51.  First, it argues against the Defendants' contention of mootness following House Bill 4, stating that its "claims challenging the Defendants' now-codified policy apply with equal force to the new version of section 1-4-5.6."  Voter Reference

MSJ Reply at 47.  Voter Reference acknowledges that sometimes "the repeal or amendment of a statute can moot a challenge to that statute," Voter Reference MSJ Reply at 48 (citing Citizens for Responsible Gov't State Pol. Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000)), but that this mooting does not occur

> when a party has already acted in a way that would trigger the unlawful enforcement of the now obsolete version of the statute.  In that case, the party has a significant, legally cognizable interest in not being prosecuted under an unlawful statute. Indeed, the purpose of invalidating an unconstitutional statute is to "prevent[] future prosecutions under a constitutionally defective standard."

Voter Reference MSJ Reply at 48 (quoting Massachusetts v. Oakes, 491 U.S. 576, 584 (1989)).  In short, Voter reference contends it is still under threat of prosecution -- and this the controversy remains live -- "because VRF already engaged in the activity which Defendants argue is unlawful under the pre-amendment statute by publishing New Mexico voter data on its website."  Voter Reference MSJ Reply at 48.  Beyond this mootness argument, Voter Reference contends that the Defendants' remaining argument on vagueness is premised on a theory that was rejected by the Court in the PI MOO, see Voter Reference MSJ Reply at 48-49 (citing PI MOO at 158), and that the Defendants' overbreadth argument "rests on the erroneous assumption that sharing voter data is never protected by the First Amendment," Voter Reference MSJ Reply at 49.  Voter Reference contends that the Defendants are trying to shift improperly the burden to Voter Reference to prove that the Use Restrictions and Data Sharing Ban are overbroad,  the assert, instead, that, "[b]ecause the NVRA requires that the State make the requested information available and the Data Sharing Ban prohibits nearly all speech involving that data once it is made available, the Defendants have not met their burden of demonstrating that the Ban is not overbroad."  Voter Reference MSJ Reply at 51.

Next, on First Amendment retaliation, Voter Reference assert that the Defendants "concede that their repeated refusals to deny VRF access to voter data were motivated by VRF's protected speech, establishing First Amendment retaliation."   Voter Reference MSJ Reply at 51.   This concession, according to Voter Reference, comes from the Defendants' admission that "their repeated decisions to refuse to provide voter data to VRF are a result of VRF's past speech sharing voter data online."  Voter Reference MSJ Reply at 51 (citing Defendants' MSJ Response ¶ 118, at 13).  Based on this concession, and Voter Reference's argument that, "[s]haring the voter data was protected speech and was not prohibited by New Mexico law," Voter Reference MSJ Reply at 51 (citing Voter Reference MSJ Memo. at 91-93), Voter Reference concludes that, "Defendants' withholding of a government benefit -- access to voter data -- is directly motivated by VRF's First Amendment protected speech," Voter Reference MSJ Reply at 51.  Voter Reference disagrees with the Defendants' arguments to the contrary, concerning no First Amendment protection and an allegedly non-retaliatory reason for the decision to not provide the voter data.  See Voter Reference MSJ Reply at 51-52.

Voter Reference then responds to the Defendants' arguments concerning viewpoint discrimination.  See Voter Reference MSJ Reply at 52-56.  Voter Reference contends that its publication of the voter roll discrepancies, see Factual Background, Section 2(d) supra at 20-24, "triggered the events giving rise to this case," including the criminal referral and the repeated denials of Voter Reference's requests for voter data, Voter Reference MSJ Reply at 52-53.  Voter Reference asserts that, "the Secretary's hostility towards VRF's perceived criticism of her office is well documented," and that, "[t]he Secretary based her referral of VRF to the AG in part on her concern regarding spreading 'misinformation' and her concern that spreading 'misinformation' violated New Mexico law."  Voter Reference MSJ Reply at 53 (citing Voter Reference MSJ Memo.

¶¶ 88-89, at 33).  Voter Reference also argues that the Defendants attempt to impose a new requirement of claims of viewpoint discrimination by contending that Voter Reference "must show a similarly situated organization with a different viewpoint that was treated more favorably than VRF, or else it cannot succeed in demonstrating that Defendants acted with a viewpoint discriminatory purpose."  Voter Reference MSJ Reply at 54 (citing Defendants' MSJ Response at 54-56).  Voter Reference claims that Defendants "have failed to identify any case law in this proceeding or their appeal to the Tenth Circuit applying this requirement to a First Amendment viewpoint discrimination case."  Voter Reference MSJ Reply at 54.  Voter Reference points out that the Court has already found that Voter Reference has a likelihood of success on the merits of its viewpoint discrimination claim.  Voter Reference MSJ Reply at 55-56 (citing PI MOO at 180-84).

Finally, Voter Reference contends it is entitled to a permanent injunction, because it is entitled to success on the merits of all its claims.  See Voter Reference MSJ Reply at 56.  Voter Reference also claims that, despite the Defendants arguments to the contrary, Voter Reference identified in the Voter Reference MSJ Memo. the threat to public interest and harm to the State of New Mexico that would result if it does not receive its requested injunction.  See Voter Reference MSJ Reply at 56 (citing Voter Reference MSJ Memo. at 111).

### 9.    **The Defendants' MSJ.**

As with the Defendants' MSJ Response, a central theme of the Defendants' MSJ is the distinction between a right to access voter data and a right to use voter data.  See Defendants' MSJ at 3-4.  In their introduction, the Defendants summarize:

> Because there is no independent constitutional right to access government data, because the NVRA does not grant an unconditional right to access and publish all voters' personal information, because New Mexico's laws are clearly worded and narrowly tailored, and because Defendants' interpretations and applications of New

Mexico law have been content- and viewpoint-neutral, Plaintiff cannot prove its claims against Defendants.

Defendants' MSJ at 4.  This argument is provided in six sections, which the Court discusses in turn.

       **a.**     **The NVRA Claims.**

The Defendants begin by asserting that Voter reference "made just one relevant NVRA request[] of the Secretary, by letter dated May 27, 2022."  Defendants' MSJ at 20.  See Factual Background, Section 2(h) supra at 31-42.  The Defendants state that this request was denied because, "the requests would require the creation of new documents and analyses not already in existence and that Plaintiff had expressly stated its plans to use the information in ways that would violate state law."  Defendants' MSJ at 21 (citing Defendants' MSJ ¶ 63, at 17).  On the basis of these "undisputed facts," the Defendants state that the question before the court is a "purely legal" one.  Defendants' MSJ at 21.

After framing the question in this manner, the Defendants provide their theory of the scope and meaning of the NVRA's Public Inspection Provision.  See Defendants' MSJ at 21-26.  The Defendants theory is substantially the same as the interpretation provided in the Defendants' MSJ Response.  See Procedural Background Section 7(b) supra, at 149-54.  In essence, the Defendants believe that the NVRA's Public Inspection Provision is not "unqualified," Defendants' MSJ at 21, but subject to various restrictions.  See Defendants' MSJ at 21-26.  The Defendants restate their statutory construction arguments interpreting 52 U.S.C. § 20507(i)(1), see Defendants' MSJ at 22-23, and also assert that the evaluation of what constituted a "program or activity" under the Public Inspection Provision is state-specific, i.e., it is understood "by looking to state law and specific practices," and therefore, "what will constitute a record concerning the implementation of programs and activities could vary from state to state, and program to program."  Defendants' MSJ at 22 (citing Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections, 996 F.3d 257, 266 (4th

Cir. 2021)).  The Defendants also restate their contention that the Public Inspection Provision only requires the "*inspection*" of relevant records, and not the "*creation*" thereof, see Defendants' MSJ at 23 (emphasis in Defendants' MSJ), and also state that the access provided by the NVRA must be read in conjunction with state and federal law that is intended to protect privacy and confidential information, see Defendants' MSJ at 24 (citing Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections, 996 F.3d at 259).

Next, the Defendants argue that the NVRA does not preempt New Mexico's laws that regulate the permissible uses of voter data.  See Defendants' MSJ at 26-30.  The arguments in support of this proposition are largely identical to those forwarded in Defendants' MSJ Response. See Procedural Background Section 7(a) supra, at 149-49.  The Defendants also state, as they did in the Defendants MSJ Response, that there are two reasons that Voter Reference's May request for voter data was denied: (i) that the requests "were not 'for a record that is maintained by [the Secretary's] Office; rather, it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to aggregated and analyzed,'" Defendants' MSJ at 31 (citing Defendants' MSJ ¶ 64, at 17-18), and (ii) that -- by Voter Reference's own admission -- Voter Reference sought to publish the requested information online, which the Defendants argue is a violation of State law, see Defendants' MSJ at 31-32.  The Defendants also contend that Voter Reference did not comply with the pre-suit notice provisions in the NVRA.  See Defendants' MSJ at 33-34.  For these reasons, the Defendants argue that they are "entitled to judgment in their favor on Counts I and II of the Amended Complaint."  Defendants' MSJ at 30.

### b.    The Retaliation and Viewpoint Discrimination Claims.

With respect to the claims of unconstitutional retaliation, the Defendants state that: (i) Voter Reference did not engage in conduct that is protected by the First Amendment; and (ii) that Voter Reference cannot show any retaliatory motive.  See Defendants' MSJ at 35-39.  The

arguments in this portion of the Defendants' MSJ are nearly identical to the arguments forwarded in the Defendants' MSJ Response.  <u>See</u> Procedural Background Section 7(c) <u>supra</u>, at 154-63.  The Defendants' arguments on viewpoint discrimination are likewise similar to those found in the Defendants' MSJ Response, <u>see</u> Procedural Background Section 7(c) <u>supra</u>, at 154-63, including assertions that Secretary Oliver fulfilled voter data requests to many individuals and entities with a broad range of viewpoints, including those with viewpoints "ideologically" contrary to Secretary Oliver.  Defendants' MSJ at 42.  The Defendants broadly conclude that, "Plaintiff's publication of the voter file does not constitute protected First Amendment speech.  Thus, this action cannot serve as the basis of a claim for First Amendment retaliation and Plaintiff's claim must fail.  Further, Defendants acted with no discriminatory purpose, but merely sought to enforce New Mexico law." Defendants' MSJ at 43.

> ### c.    <u>New Mexico's Limitations on Access to Voter Data are Constitutional</u>.

Next, the Defendants forward a broad argument that -- on the facts of this case -- they are insulated from allegations of First Amendment violations because the restrictions that the State has imposed on access to New Mexico voter data are constitutionally permissible.  <u>See</u> Defendants' MSJ at 43.  This argument -- which is likewise familiar from the Defendants' MSJ Response -- is structured as follows: because neither the Constitution, the NVRA, nor any State statute "require[s] that states make their voter files unconditionally available in their entirety to all citizens," Defendants' MSJ at 43, <u>see id.</u> at 44-45, and when a State has a certain authority or power it "may exercise that authority in a more limited or conditional manner as well," Defendants' MSJ at 45 (citing citing <u>Merrion v. Jicarilla Apache Tribe</u>, 455 U.S. at 144), and the "sharing and use restrictions do not constitute a content- or viewpoint-based restraint on data requestors' speech, nor do they leave requestors without ample alternatives to engage in free expression," Defendants' MSJ

at 46, therefore, New Mexico's policy choice to limit access to voter data in the manner chosen is constitutional, <u>see</u> Defendants' MSJ at 45-46.

       **d.**       **Overbreadth Claims.**

      The Defendants construe Voter Reference's overbreadth challenge to concern the Data Sharing Ban, both facially and as applied to Voter Reference's activities. <u>See</u> Defendants' MSJ at 47. The Defendants assert that, to prevail on an overbreadth challenge, "[t]here must be more than just an impermissible application of the statute to reach a determination of overbreadth; there must be a realistic danger the statute will significantly compromise recognized First Amendment protections of parties not before the Court." Defendants' MSJ at 48 (citing <u>Members of City Council of City of Los Angeles v. Taxpayers for Vincent</u>, 466 U.S. at 800-01). As the "first step" in their overbreadth analysis, the Defendants restate their statutory interpretation of the requirements of N.M.S.A §§ 1-4-5.5, 1-4-5.6, and 1-5-22, which they read to mean that, "an entity or individual may access voter data for specific purposes, and may not use that data for any purpose deemed unlawful or share that data with anyone outside the entity who has requested it." Defendants' MSJ at 49 (citing Defendants' MSJ ¶¶ 5-8, at 6-7). The Defendants further contend that their statutory interpretation is supported by House Bill 4, <u>see supra</u> note 119, which "codifies" the Defendants' interpretation of these statutes. Defendants' MSJ at 49. The Defendants then state their general contention that, "[t]he challenged statutes are not overbroad because there is no general First Amendment right to access government information." Defendants' MSJ at 50. Following from this premise, the Defendants argue that the New Mexico statutes at issue in the Data Sharing Ban "do not restrain any amount of protected speech because access to this information is not a right under the First Amendment." Defendants' MSJ at 52 (citing <u>Houchins v. KQED, Inc.</u>, 438 U.S. at 14).

e.        **Vagueness Claims**.

In discussing Voter Reference's claims of unconstitutional vagueness, the Defendants state

that a statute "may be considered vague when it is so ambiguous that a party cannot tell what action

is permitted and what is proscribed."  Defendants' MSJ at 53 (citing Nat'l Ass'n for Advancement

of Colored People v. Button, 371 U.S. 415, 433 (1963)).  The Defendants state that the statutes at

issue in the Data Sharing Ban -- N.M.S.A §§ 1-4-5.5, 1-4-5.6, and 1-5-22 -- do not "contain any

terms that call for subjective judgment and enforcement," Defendants' MSJ at 55, but rather they

> outline the manner in which a party may obtain voter data ("sign an affidavit
> swearing it will be used for permitted purposes") and then specifically outline the
> impermissible purposes, both in the statute and by referencing Article 5 ("willful
> selling, loaning, providing access to or otherwise surrendering of the voter file. . . to
> anyone not authorized by the Voter Records System Act to have possession of the
> file.").

Defendants' MSJ at 56 (quoting and citing N.M.S.A §§ 1-4-5.5, 1-4-5.6, and 1-5-22).   The

Defendants also argue that the Court denied a preliminary injunction in part on vagueness grounds

in ETP Rio Rancho Park, LLC v. Grisham, 522 F. Supp. 3d 966, 1038 (D.N.M. 2021)(Browning,

J.), and that the statutes here are similarly clear.  Defendants' MSJ at 56.

f.        **Mootness Following House Bill 4**.

Last, the Defendants argue, in a manner familiar from the Defendants' MSJ Response, that

House Bill 4 renders moot any vagueness arguments regarding the statutory schemes that underlie

the Data Sharing Ban.  See Defendants' MSJ at 57-59.  In this formulation of the argument, the

Defendants emphasize that the "narrow," Defendants' MSJ at 57, exception to the mootness

doctrine from when a form of wrongdoing is "'capable of repetition yet evading review,'"

Defendants' MSJ at 58 (quoting Marks v. Colorado Dep't of Corr., 976 F.3d 1087, 1093 (10th Cir.

2020)), is inapplicable here because given the amended statute, there can be no reasonable

expectation that the same controversy will recur involving Voter Reference, Defendants' MSJ at 58-59.

### 10.     The Voter Reference MSJ Response.

In its Voter Reference MSJ Response, Voter Reference responds to the Defendants' MSJ in much the same way as it did when responding to the Defendants' MSJ Response.  See Procedural Background Section 8 supra, at 167-175.  As it pertains Voter Reference's claim for an NVRA violation, Voter Reference argues that the scope of the Public Inspection Provision is "broad" -- contrary to the Defendants' narrower construction -- and also assert that Voter Reference made three lawful NVRA requests -- not one, as the Defendants assert.  See Voter Reference MSJ Response 41-47.  On preemption, Voter Reference restates its position that "Defendants' Use Restrictions and Data Sharing Ban unlawfully obstruct a key objective of the NVRA" -- namely, those objectives listed in 52 U.S.C. § 20501(b).  See Voter Reference MSJ Response 57-60 (citing 52 U.S.C. § 20501(b)(1)-(4)).  Voter Reference also restates its position that its right to access the New Mexico voter data emanates from the NVRA, and not from the First Amendment, see Voter Reference MSJ Response 60-61, but that Voter Reference's publication of the voter data and criticism of the Secretary of State are protected forms of speech under the First Amendment, see Voter Reference MSJ Response 61-62.  Voter Reference then criticizes the Defendants for not providing -- in the Defendants' MSJ -- any standard by the Court should conduct its constitutional scrutiny analysis: "Despite Defendants' admission that the challenged regulations directly restrict protected speech, Defendants do not identify any level of scrutiny which they claim is applicable, nor do they address the state interests purportedly supporting the challenged restrictions or whether those restrictions are appropriately tailored."  Voter Reference MSJ Response at 63.  Voter Reference argues, as it consistently has, that the Use Restrictions and Data Sharing Ban cannot survive strict scrutiny.  See Voter Reference MSJ Response at 64-67.

On retaliation, Voter Reference contends that it lawfully obtained the New Mexico voter data from Local Labs, and the Secretary of State's Office then referred Voter Reference for criminal prosecution and denied access to voter data because of Voter Reference's Protected speech. See Voter Reference MSJ Response at 67-71. Voter Reference also asserts that -- as the Court already recognized in the PI MOO -- there is abundant evidence of viewpoint discrimination, despite the Defendants' contentions that they were simply applying the law in a non-discriminatory manner. See Voter Reference MSJ Response at 71-75 (citing PI MOO at 180-82). On overbreadth, Voter Reference argues that the "Defendants are not entitled to summary judgment on the First Amendment overbreadth claim because there are disputes of material fact regarding the scope of the Data Sharing Ban and the Ban is overbroad." Voter Reference MSJ Response at 76. Similarly, on vagueness, Voter Reference argues that, "Defendants are not entitled to summary judgment on VRF's vagueness claim because their amorphous interpretations of the Use Restrictions and Data Sharing Ban fail to give notice as to what they claim is prohibited, chilling protected speech in the process." Voter Reference MSJ Response at 79.

   **11.    The Defendants' MSJ Reply.**

In reply, the Defendants first take aim at Voter Reference's interpretation of the NVRA's scope. They assert that, in all other cases in which courts found that, "voter data constituted an NVRA record," the court "evaluated specific state law and practices and how the requested data fit within those state programs." Defendants' MSJ Reply at 40 (citing Pub. Int. Legal Found., Inc. v. N. Carolina State Bd. of Elections, 996 F.3d at 266; Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 335-36). The Defendants assert that Voter Reference has not undertaken such analysis here, but instead, "asserts circularly that its requests were for NVRA records because they were for NVRA records." Defendants' MSJ Reply at 40 (citing Voter Reference MSJ Response at 42-47). The Defendants also reassert their contention that many of Voter Reference's requests for voter

data are not requests for "records" under the NVRA because the requests instead seek analyses: "the total count, organized by precinct, of registered voters who (i) voted on November 3, 2020, and then (ii) moved into any status other than active after voting on November 3, plus the number of voters who had 'been removed or deleted from the voter rolls' during a specific five-month range." Defendants' MSJ Reply at 41 (source of quoted material not cited, but presumably February 15 Voter Data Request at 2). According to the Defendants, "[n]ot only does this request something other than an existing NVRA record, but it is unclear how this information would constitute a record of New Mexico's voter roll maintenance programs." Defendants' MSJ Reply at 41. In short, the Defendants contend that, "VRF is seeking much more than what the NVRA provides access to, and it seeks to use the federal statute as a hammer when it is denied." Defendants' MSJ Reply at 41.

Next, the Defendants state again their related argument that the NVRA permits only the "*inspection*" of existing records, and does not "mandate the *creation* of additional reports, explanations, or data analyses. Defendants' MSJ Reply at 41-42 (emphasis in Defendants' MSJ Reply). The Defendants also reprise their argument that, "New Mexico has the right to limit the legal uses of its own government data." Defendants' MSJ Reply at 42. In support of their argument against preemption, the Defendants again rely on the Court's decision in Herrera. See Defendants' MSJ Reply at 43. The Defendants also reassert that the Secretary of State's Office "treated the NVRA requests appropriately," Defendants' MSJ Reply at 44, and criticizes Voter Reference's waiver theory regarding the NVRA's pre-suit notice obligations. Defendants' MSJ Reply at 45.

On the First Amendment claims, the Defendants contend that, Voter Reference "concedes most of its First Amendment claim, and cannot support the remainder." Defendants' MSJ Reply at 45. Namely, the Defendants note that Voter Reference has conceded that it has "no First Amendment right to access" the New Mexico voter data. Defendants' MSJ Reply at 45. Following

from this concession, the Defendants then contend that Voter Reference's First Amendment claims -- which, accordingly, must stem from something other than a First Amendment right to access the voter data -- rely on a misreading of Justice Ginsburg's concurrence in <u>Los Angeles Police Dep't v. United Reporting Pub. Corp.</u>, 528 U.S. 32, 43 (1999)(Ginsburg, J., concurring).  <u>See</u> Defendants' MSJ Reply at 46-47.  More specifically, the Defendants state that, contrary to Voter Reference's reading, Justice Ginsburg's concurrence in <u>Los Angeles Police Dep't v. United Reporting Pub. Corp.</u>

> did not go so far as to suggest that the partial, voluntary sharing of information confers a First Amendment right to do whatever one wants with the information. Instead, the concurrence that VRF cites, in fuller context, states that "[i]t does not appear that the selective disclosure of address information . . . impermissibly burdens speech" and that while the state must not distribute this voluntary benefit on discriminatory bases, it "is free to support some speech without supporting other speech."

Defendants' MSJ Reply at 46-47 (quoting <u>Los Angeles Police Dep't v. United Reporting Pub. Corp.</u>, 528 U.S. at 43).  The Defendants state again that a State cannot "grant a right or benefit on discriminatory bases, no matter the voluntary nature of that grant," but assert that the situation here is far different, and that New Mexico's conditions on access voter data do not offend the constitution.  Defendants' MSJ Reply at 47.

The Defendants then assert that, even if Voter Reference has engaged in conduct that is protected by the Frist Amendment, New Mexico's regulation on voter data survives constitutional scrutiny.  <u>See</u> Defendants' MSJ Reply at 47-55.  Much like their arguments on this score that appear in the Defendants' MSJ Response, the gist of Defendants' argument is: (i) <u>Anderson</u>-<u>Burdick</u> analysis is the applicable standard to apply when assessing the constitutionality of New Mexico's State election laws, <u>see</u> Defendants' MSJ Reply at 49-50; and (ii) even if the Court were to apply strict scrutiny, New Mexico's restrictions pass this test because the State is able to show compelling

interests, see Defendants' MSJ Reply at 50-54, and also that the State's restrictions are narrowly tailored to serve those compelling interests, see Defendants' MSJ Reply at 54-55.

The Defendants then assert that, because Voter Reference cannot show that its conduct is protected under the First Amendment, it cannot show that it was retaliated against for its First Amendment activity.  See Defendants' MSJ Reply at 55-56.  The Defendants also contend that Voter Reference's theory of First Amendment retaliation has "slowly shifted" over the course of this litigation, noting that Voter Reference originally alleged that it was retaliated against because of its "perceived political ideology," Defendants' MSJ Reply at 55 (citing Voter Reference MSJ Memo. at 102), it now alleges that it has been retaliated against for "the protected activity of 'publishing voter data online,'" Defendants' MSJ Reply at 55 (quoting Voter Reference MSJ Response at 67).  In either case, the Defendants argue, "there is no causal link between VRF's viewpoint or ideology and Defendants' conduct, and no retaliation claim may proceed on that theory."  Defendants' MSJ Reply at 55.  With regards to Voter Reference's claim of viewpoint discrimination, the Defendants state that,

> Reduced to its logical essence, VRF's viewpoint discrimination claim is that unless and until a state correctly identifies and prosecutes every single person who violates its laws, it may not constitutionally prosecute any single person who is caught violating its laws.  Of course, disparate treatment of similarly situated persons may give rise to a claim of discrimination.  But VRF has not identified similarly situated persons whom Defendants treated differently.

Defendants' MSJ Reply at 55.  The Defendants assert that they have not singled out Voter Reference for particular treatment on the basis on any constitutionally impermissible reason, rather, it has singled out Voter Reference because it has engaged in conduct that no other entity or data requestor has: publishing voter data "in a globally accessible internet format," which the Defendants assert is contrary to the laws of New Mexico.  Defendants' MSJ Reply at 56.  Because Voter Reference was subject to a criminal referral for this reason -- and Voter Reference's subsequent requests for voter

data were denied for this reason -- the Defendants contend that Voter Reference is unable to demonstrate any viewpoint discrimination.  See Defendants' MSJ Reply at 56-57.  The Defendants conclude the Defendants' MSJ Reply by restating their arguments, in a manner similar to the Defendants' MSJ, see Procedural Background Section 9(d)-(f) supra, at 178-81, regarding overbreadth and vagueness.

12.     **The MSJ Hearing.**

The Court held a hearing on the cross-motions for summary judgment on June 14, 2023. See Clerk's Minutes, filed June 14, 2023 (Doc. 131).  On the merits of the NVRA violation issue, the Court opened by stating its inclination that it "lean[s] toward the State" on the issue, and that, "[i]t seems to me that the language we're talking about here doesn't really cover voter rolls and voter history."  MSJ Hearing Tr. at 13:22-25 (Court).  The parties argued their positions, with the Defendants rehashing their access-versus-use distinction, see MSJ Hearing Tr. at 17:25-18:4 (Schremmer), and that, because the NVRA does not entitle Voter Reference to all voter data without qualifications, the State can "impose reasonable regulations on the data that it has used its governmental powers to collect," MSJ Hearing Tr. at 17:13-20 (Schremmer).  The Court then queried Voter Reference on its more expansive interpretation of the Public Inspection Provision, and stated, "when I read the language from the statute, what comes to mind is a policy or handbook or something that says how we're going to do this; not here's what we have actually done."  MSJ Hearing Tr. at 23:4-8 (Court).  Voter Reference pushed back against this interpretation, stating, "if all you have to do is turn over the handbook that says: This is what we want to do, then we won't know whether they're actually doing it."  MSJ Hearing Tr. at 24:17-20 (Greim).  The Court then asked the Defendants, "[i]f I adopt your narrower interpretation of the statute . . . , what is it that they get?" MSJ Hearing Tr. at 31:7-9 (Court), to which the Defendants replied, "frankly, I am not

- 186 -

sure," MSJ Hearing Tr. at 31:10-11 (Schremmer).  The Defendants explained that, "because we have not had the opportunity to analyze serious requests that are matched to programs and activities," the Defendants have never had to formulate the state-specific material that would be subject to disclosure under the NVRA's Public Inspection Provision.  MSJ Hearing Tr. at 31:19-32:3 (Schremmer).  The Court -- expressing its "concern[]" regarding this self-confessed ignorance, MSJ Hearing Tr. at 32:4-8 (Court) -- ordered the Defendants to tell the Court "what documents . . . the Secretary of State thinks falls within" its interpretation of the Public Inspection Provision by way of "a letter, or a short brief or something," MSJ Hearing Tr. at 35:16-17 (Court). The Court advised the Defendants to "be exhaustive" on this task.  MSJ Hearing Tr. at 42:20 (Court).

On the First Amendment issues, the Defendants pointed out that all parties agree that Voter Reference has no First Amendment right to access the voter data that they wish to publish on the internet, and thus, they argue, Voter Reference's argument would be

> equivalent to the military opening White Sands Missile Range and then telling you: You can drive down this highway to the Trinity Site, but don't take pictures for the next five miles.  And you say: Yes, sir, and then you do it anyway, and you post it online because the First Amendment allows you to speak about government behavior.  That is not what the First Amendment allows here.

MSJ Hearing Tr. at 46:5-12 (Schremmer).  To this, the Court responded that its concern was not this issue, but rather the idea that Voter Reference is being treated differently from other entities that also promise not to publish the voter data -- in short, the viewpoint discrimination issue. See MSJ Hearing Tr. at 46:13-55:12 (Court, Schremmer).  The crux of the discussion on this issue dealt with the content of Voter Reference's promise -- made in the NVRA Letter, see Factual Background Section 2(h) supra, at 31-42 -- that Voter Reference "will only publish the personal information of voters online if VRF is granted relief in" this case, or "or in any other legal proceeding."  NVRA

Letter at 4.  See MSJ Hearing Tr. at 46:13-55:12 (Court, Schremmer)(discussing the meaning of this promise).  In the Court's view, this promise amounts to the same promise that the Secretary of State's Office asks all requesters of voter data to make, and thus the Secretary of State's Office's refusal to provide Voter Reference with its requested data is likely based on its viewpoint.  See MSJ Hearing Tr. at 51:13-16 (Court).  The Defendants argued that Voter Reference was not "doing to same thing as everybody else," MSJ Hearing Tr. at 51:18 (Schremmer) -- because it is the only entity publishing the voter data online in its entirety -- and that they understood Voter Reference's promise in the NVRA Letter to say: "we won't publish this unless we get relief from the Court, in terms of your ability to prosecute us . . . Not: Unless we get affirmative permission, by way of a final judgment that tells us this doesn't violate the law."  MSJ Hearing Tr. at 50:8-16 (Schremmer). The Defendants then stated that, "if Mr. Greim stands up here and tells us they will not, under any conditions, publish identifiable voter data online, that's a different case."  MSJ Hearing Tr. at 53:11-14 (Schremmer).   Voter Reference stated that, as it had "said multiple times," it "would not publish this information without an order of this Court."  MSJ Hearing Tr. at 56:11-15 (Greim).

In arguing the First Amendment issues, Voter Reference discussed Meyer v. Grant, 486 U.S. 414, 425 (1988), see MSJ Hearing Tr. at 59:5-61:10 (Greim), and the unconstitutional conditions doctrine, see MSJ Hearing Tr. at 61:11-64:15 (Greim).  Voter Reference also restated its arguments against the use of the Anderson-Burdick framework as an analysis of constitutional scrutiny, but rather that strict scrutiny should be used.  See MSJ Hearing Tr. at 67:12-71:9 (Greim). The Court then asked Voter Reference whether, in light of House Bill 4, how this lawsuit would assist the aims of Voter Reference in posting the voter data online, which the statute prohibits: "you still want to use this lawsuit in the face of that statue to do what you've done twice before? . . . tell me how I get there."   MSJ Hearing Tr. at 117:24-118:3 (Court).  Ultimately, Voter Reference

clarified that its aim is to have the law declared unconstitutional, either via preemption or the First Amendment.  See MSJ Hearing Tr. at 118:23-120:4 (Court, Greim).

      13.      **The Supplemental Briefing, and Notice of Supplemental Authority**.

      Following the MSJ Hearing, the parties both filed additional briefs in an effort to support their positions.  First is the Defendants' NVRA Brief, which was filed by the Defendants in response to the Court's request at the MSJ Hearing.  See MSJ Hearing Tr. at 35:16-17 (Court).  The contents of the Defendants' NVRA Brief are discussed in detail above.  See Factual Background, Section 2(o) supra at 63-71.  Voter Reference responds to the Defendants' NVRA Brief with the Plaintiff Voter Reference Foundation, LLC's Response to Defendants' Supplemental briefing on National Voter Registration Act Records, filed July 7, 2023 (Doc. 134)("NVRA Brief Response").  In the NVRA Brief Response, Voter Reference accuses the Defendants of failing to respond to the Court's inquiries because the "Defendants' Brief does not identify a single actual document which the Secretary offers to produce under the NVRA's Public Inspection Provision," but rather offers only "*categories*" that identify "*types*" of documents that "could potentially be related to the listed function."  NVRA Brief Response at 2 (emphasis in NVRA Brief Response).  Voter Reference contends that the Defendants' position on this score is, "contrary to the plain language and purpose of the NVRA, and the overwhelming weight of authority interpreting and applying the Public Inspection Provision," and further contends that, "[n]ot a single case has ever adopted anything like Defendants' view of the law."  NVRA Brief Response at 3.  More specifically, Voter Reference claims that, "[e]very federal court to decide this issue disagrees with Defendants' position, and requires the disclosure of voter data, either on the applications themselves or on lists compiled from the applications."  NVRA Brief Response at 4.  Voter Reference then offers a reading of Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 334-35, which Voter Reference argues is the "key case" in interpreting the NVRA's Public Inspection Provision, NVRA Brief Response at 4-5, and

puts particular emphasis on that case's discussion of the transparency-versus-voter privacy question:

> We do not think appellants' privacy concerns unfounded. By requiring public disclosure of personal information,[ ] Section 8(i)(1) may conceivably inhibit voter registration in some instances. However, this potential shortcoming must be balanced against the many benefits of public disclosure. It is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls. State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible. Without such transparency, public confidence in the essential workings of democracy will suffer.
>
> It is not the province of this court, however, to strike the proper balance between transparency and voter privacy. That is a policy question properly decided by the legislature, not the courts, and Congress has already answered the question by enacting NVRA Section 8(i)(1), which plainly requires disclosure of completed voter registration applications. Public disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections.

NVRA Brief Response at 5 (quoting Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 339-40)(footnote omitted). Voter Reference also discusses other cases -- the previously discussed Judicial Watch, Inc. v. Lamone, 399 F.Supp.3d 425; Pub. Int. Legal Found., Inc. v. Bellows, 588 F.Supp.3d 124; and Pub. Int. Legal Found., Inc. v. Matthews, 589 F. Supp. 3d 932 -- which Voter Reference states stand for the proposition that, "the NVRA requires disclosure of 'all' records 'concerning' the actual 'implementation' of 'programs and activities' for ensuring the 'accuracy and currency' of voter lists," and that, "[w]hile manuals and descriptions of processes might describe the programs and activities the Secretary hopes to implement, the key records concerning those programs' actual 'implementation' is the lists themselves, which are what ultimately show whether the programs and activities did ensure the lists' accuracy and currency." NVRA Brief Response at 5 (source of quoted material not cited, but presumably 52 U.S.C. § 20507(i)(1)).

Citing to interrogatories, Voter Reference also contends that the Secretary of State's Office previously has stated that that it would produce raw voter data in response to an NVRA request:

> The Secretary states that the only database in the Secretary's possession is the voter file they maintain pursuant to statute; all registration or other updates are done at the county level. If the Secretary receives a request for information related to this data pursuant to the National Voter Registration Act, the Secretary's staff can run a report in response to that specific request from the raw data. The Secretary is not in possession of any specific documents responsive to this request.

NVRA Brief Response at 7 (quoting Response of Defendant Secretary of State Maggie Toulouse Oliver, in her Official Capacity, to Plaintiff Voter Reference Foundation's Third Interrogatories and Requests for Production ("Third Interrogatories") response to Request for Production No. 14 at 3, filed July 7, 2023 (Doc. 134-1)).  Voter Reference also states that, despite the willingness of the Secretary of State's Office in the Defendants' NVRA Brief to produce policy manuals and procedure guides, the Secretary of State's Office had earlier -- in response to Voter Reference's interrogatories --  stated that it "does not maintain 'written procedures' for processing voter data requests under New Mexico Law or the National Voter Registration Act, 'other than what is required of the Secretary pursuant to the National Voter Registration Act . . . and the New Mexico Inspection of Public Records Act.'"  NVRA Brief Response at 7-8 (quoting Third Interrogatories, response to Request for Production No. 16 at 4).  Voter Reference also notes that the New Mexico Administrative Code contemplates the creation of various records that the Defendants' NVRA Brief does not identify.  See NVRA Brief Response at 10-12.  Voter Reference concludes the NVRA Brief Response by accusing the Defendants of "pack[ing]" the Defendants' NVRA Brief with "fluff and filler which distracts from the true issues the Court asked the Defendants to address."  NVRA Brief Response at 12.

Next, Voter Reference filed the Plaintiff Voter Reference, LLC's Notice of Supplemental Authority, filed August 3, 2023 (Doc. 137)("Notice of Supplemental Authority").  In the Notice of

Supplemental Authority, Voter Reference notes that both of the parties in this case have cited and discussed two opinions from the United States District Court for the District of Maine in a case captioned Pub. Int. Legal Found., Inc. v. Bellows, one with the cite, 588 F.Supp.3d 124 (D. Me. 2022), and the other with the cite, 664 F. Supp. 3d 153 (D. Me. 2023).  See Notice of Supplemental Authority at 1.  Voter Reference states that, in the more recent of these two decisions, the district court held on summary judgment that, "(1) Maine's prohibition on publishing voter data on the internet was preempted by the NVRA and (2) the plain text of the NVRA requires the disclosure of statewide voter registration lists."  Notice of Supplemental Authority at 1-2 (citing Pub. Int. Legal Found., Inc. v. Bellows, 664 F. Supp. 3d at 161-67).  Voter Reference then states that the Maine Secretary of State appealed that summary judgment decision to the United States Court of Appeals for the First Circuit, and attaches -- as supplemental authority -- an amicus brief by the United States Department of Justice that was written for that appeal "in support of the plaintiff," and which argues, "as VRF has argued in this case, that individually identifiable voter data constitute 'records' pursuant to § 20507(i)(1), . . . and that the 'NVRA preempts any condition on Section 8(i)'s disclosure right -- including restrictions on using and disseminating voter data -- when it would interfere with the statute's purposes.'"  Notice of Supplemental Authority at 2 (quoting Brief for the United States as Amicus Curiae in Support of Plaintiff-Appellee Urging Certification or Affirmance on the Issues Addressed Herein at 6-7, United States Court of Appeals for the First Circuit, No. 23-1361, filed August 3, 2023 (Doc. 137)[121]).  Voter Reference concedes that the Department of Justice's interpretation of the NVRA's Public Inspection Provision is "not binding authority," but maintains that the interpretation is, nevertheless, "pertinent and instructive," and

---

[121]This brief is not attached as a separate attachment to the Notice of Supplemental Authority, but rather is found at pages 4-43 of that document.  See Notice of Supplemental Authority at 4-43.

relevant to the Court's consideration of the issues in this case.  Notice of Supplemental Authority at 2.

The Department of Justice's amicus brief broadly supports Voter Reference's position in this litigation.  The Department of Justice notes that federal law contains not only the NVRA's Public Inspection Provision, but also the Help America Vote Act, Pub L. No. 107-252, 116 Stat. 1666 (52 U.S.C. §§ 20901-21145), which requires each State to create "a single, uniform, official, centralized, interactive computerized statewide voter registration list," which "shall serve as the single system for storing and managing the official list of registered voters throughout the State." Notice of Supplemental Authority at 14 (quoting 52 U.S.C. § 21083(a)(1)(A)).  The Department of Justice argues that this list must be disclosed under the NVRA's Public Inspection Provision, because, "[s]tatutory text, context, and purpose establish that Section 8(i) covers records concerning both voter registration and list-maintenance activities, including voter registration lists such as the Voter File."  Notice of Supplemental Authority at 17.  See id. at 18-29.  The Department of Justice's brief also argues that Judge Singal correctly determined that the NVRA partially preempted Maine State statutory law, which imposes certain conditions on the use of voter data.  See Notice of Supplemental Authority at 32-41.

Next, Voter Reference filed the Voter Reference Second Suppl. Br.  See Voter Reference Second Suppl. Br. at 1.  In the Voter Reference Second Suppl. Br., Voter Reference asserts that, "[s]ince the Court heard the parties' arguments on their cross-motions for summary judgment," the "Defendants have made two key admissions that bear directly on the motions, and which should support judgment in Plaintiff VRF's favor."  Voter Reference Second Suppl. Br. at 1.  The facts underlying these "key admissions" are outlined above, in the Factual Background of this opinion. See Factual Background Section 2(n)-(q) supra, at 61-77.  The main legal contentions of the Voter

Reference Second Suppl. Br. are that the Defendants' production of certain voter data in response to Voter Reference's IPRA request, see Factual Background Section 2(n) supra, at 61-63, renders many of the Defendants' legal positions throughout this litigation as incoherent, and also provides further evidence of the Defendants' unconstitutional discriminatory conduct.  See Voter Reference Second Suppl. Br. at 1-2.

More specifically, Voter Reference argues that the production of voter data in response to Voter Reference's IPRA request is "wholly inconsistent" with the Defendants' prior statements regarding why the data could not initially be provided, Voter Reference Second Suppl. Br. at 8, because the IPRA request used the same language as is found in the NVRA's Public Disclosure Provision, and thus the production of voter data pursuant to this request "concedes what Defendants have attempted to avoid saying out loud: the NVRA makes individual, identifiable voter information available to the public,"  Voter Reference Second Suppl. Br. at 9.   That said, however, Voter Reference asserts that the production of voter data pursuant to the IPRA request is not entirely complete, and thus even though the production illustrates an inconsistency in the Defendants' legal analysis, "Defendants still are not in compliance with the NVRA."  Voter Reference Second Suppl. Br. at 10.

Moreover, Voter Reference states that the IPRA request was accompanied by neither an affidavit nor any promise not to post the voter data online, which the Defendants have argued previously is an absolute requirement to produce voter data under New Mexico law.  See Voter Reference Second Suppl. Br. at 10-11.  According to Voter Reference,  this "inconsistency reveals the requirement of an affidavit to be exactly what VRF has said all along: merely pretext with which to discriminate against VRF or other disfavored requesters."  Voter Reference Second Suppl. Br. at 10 (citing Voter Reference MSJ Memo. at 82).   Moreover, Voter Reference argues that the

Defendants' assertion that the voter data is now being disclosed because of statements made during the summary judgment hearing is further indication of pretest, because the same promises not to publish voter data online had been made previously.  See Voter Reference Second Suppl. Br. at 13-14 (outlining previous promises not to publish voter data).  Voter Reference also argues that the production is contrary to various assertions made earlier in this litigation, because the Defendants had previously told Voter Reference that "the records in paragraph 1 of VRF's May 27 request simply *did not exist*, after the summary judgment hearing, they suddenly have decided the records do exist, and have no problem offering them to VR," and thus, "[d]espite Defendants' assertions to the contrary at the time, those records existed when VRF made its May 27, 2022 request and should have been produced."  Voter Reference Second Suppl. Br. at 13.

Last, Voter Reference contends that the "Defendants' recent production does not cure their continued violation of the NVRA or their discrimination based on VRF's viewpoint."  Voter Reference Second Suppl. Br. at 14.  This is because, while the production of voter data pursuant to the IPRA request "does grant VRF access to some of the data it requested, a large portion of the requested data is left out."  Voter Reference Second Suppl. Br. at 15.  Voter Reference asserts that, moreover, the production of certain voter data does not change the Defendants' discriminatory policy, because the manner of the disclosure

> does not itself signify any change in the Secretary's discriminatory policy. Instead, the letter contorts VRF's positions regarding publishing the data and states the only change is VRF's positions: "***In light of the new statements***, the Secretary's Office can lawfully provide the data requested in VRF's affidavits and is happy to do so." Ex. P40.  The nonsensical logic of the Secretary's reasoning aside, it is clear the Secretary has not retreated from the position that voter data need not be made available under the NVRA -- even if her recent IPRA production undercuts that position.

Voter Reference Second Suppl. Br. at 15 (emphasis and citation convention in original).  Finally, Voter Reference argues that, even if the Defendants' have ceased their discriminatory conduct, the

Court may still take judicial action, because "'[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'"  Voter Reference Second Suppl. Br. at 15 (quoting City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 (1982)).

The Defendants respond with the Defendants' Second Suppl. Br. Resp.  See Defendants' Second Suppl. Br. Resp. at 1-10.  The Defendants assert that their response to the IPRA request

> reaffirm[s] the positions that Defendants have consistently taken throughout this litigation: The NVRA does not create an unqualified right of access to voter data in total; New Mexico has lawfully conditioned its access to data based upon an agreement to refrain from sharing or publishing that data; and the NVRA provides access to records concerning the implementation of programs and activities relating to voter registration.

Defendants' Second Suppl. Br. Resp. at 6.  Most specifically, the Defendants dedicate much of their brief to arguing that Voter Reference's pre-summary judgment hearing promises not to post voter data were substantially different from the promises made at the hearing, and thus the Defendants were justified when they "reconsidered their stance of declining to fulfill voter data requests during the pendency of the litigation."  Defendants' Second Suppl. Br. Resp. at 7.  Moreover, the Defendants assert that the IPRA request -- pursuant to which they disclosed voter-related information to Voter Reference -- "sought records rather than voter data."  Defendants' Second Suppl. Br. Resp. at 8.  In response to the IPRA request, which the Defendants characterize as "extraordinarily broad," the Secretary of State's Office "produced over 1300 responsive pages worth of records," some of which are, "legitimately within the scope of both the NVRA and IPRA," and "contained discrete amounts of voter data."  Defendants' Second Suppl. Br. Resp. at 8.  The Defendants also attest that the "purge lists" -- a State statutorily defined category of records, see N.M.S.A. § 1-4-38(B) -- are specifically subject to IPRA, and thus the production of that information was required to be disclosed even in the absence of an affidavit or other assurances

about not posting the data online.  Defendants' Second Suppl. Br. Resp. at 8.  In other words, the

Defendants assert that, "[b]ecause neither IPRA nor the NVRA compel the Secretary to procure an

affidavit prior to production, it is immaterial that the Secretary did not require an affidavit in order

to obtain these records."  Defendants' Second Suppl. Br. Resp. at 8 (citing N.M.S.A. § 14-2-8, 52

U.S.C. § 20507(i), and N.M.S.A. § 1-4-5.5(C)).  Finally, the Defendants contend that Voter

Reference's claims of unconstitutional viewpoint discrimination and retaliation are moot under Ex

parte Young, 209 U.S. 123 (1908), because since "the requested data has been conveyed, Plaintiff

has no additional prospective relief available."  Defendants' Second Suppl. Br. Resp. at 9.

The Voter Reference Second Suppl. Br. Reply responds to the Defendants' contentions,

reiterates its previous arguments, and discusses testimony from the bench trial held in this case.  See

Voter Reference Second Suppl. Br. Reply at 3-11.  First, Voter Reference returns to a point from

the Voter Reference Second Suppl. Br. which it contends was not responded to, namely, that the

Defendants had previously told Voter Reference that "the records in paragraph 1 of VRF's May 27

request simply *did not exist*, after the summary judgment hearing, they suddenly have decided the

records do exist, and have no problem offering them to VR," and thus, "[d]espite Defendants'

assertions to the contrary at the time, those records existed when VRF made its May 27, 2022

request and should have been produced."  Voter Reference Second Suppl. Br. at 13.  In the Voter

Reference Second Suppl. Br. Reply, Voter Reference contends that the Defendants have provided

no explanation for this change, arguing that the previous representation -- that no records existed -

- "is a false statement that was silently corrected without excuse or explanation."  Voter Reference

Second Suppl. Br. Reply at 3.

Next, Voter Reference attacks the Defendants' explanations for what Voter Reference sees

as the Defendants' various shifting positions.  See Voter Reference Second Suppl. Br. Reply at 3-

7.  First, Voter Reference points out that, despite relying on Voter Reference's new statements at the summary judgment hearing to justify the disclosure of the voter data, the Defendants have "never settled on a particular statement at the summary judgment hearing that constituted VRF's supposed 'change.'"  Voter Reference Second Suppl. Br. Reply at 4 (source of quoted material not cited).  In addition, on the argument related to the disclosure of the "purge lists," Voter Reference points out that the IPRA request, see Factual Background Section 2(n) supra, at 61-63, requested "*any and all documents that exactly match the Public Disclosure Provision of the NVRA*."  Voter Reference Second Suppl. Br. Reply at 5 (emphasis in Voter Reference Second Suppl. Br. Reply).  But in response to this request, the Secretary of State's Office "produced what VRF has argued all along must be produced: voter data."  Voter Reference Second Suppl. Br. Reply at 6.

> Further, the Secretary specifically stated that this production was in response to VRF's request using the exact language of the NVRA. It does not matter (and actually helps VRF) that the Secretary also believes these voter records -- with full names and addresses -- had to be produced under IPRA.  That is because the Purge List made available through IPRA as records of the "boards of registration" under § 1-4-38 contain only voter data.  But a *separate* statute, § 1-4-28, actually details the "program" or "activity" of voter list maintenance under the NVRA.  By connecting voter data under § 1-4-38 to its corresponding "program" or "activity" for ensuring the accuracy and currency of voter rolls in § 1-4-28, Defendants concede that the *data* used and created by a "program" or "activity" under the NVRA is a "record" for purposes of the Public Disclosure Provision.

Voter Reference Second Suppl. Br. Reply at 6.  Last, Voter Reference argues that its claims are not moot.  See Voter Reference Second Suppl. Br. Reply at 7-11.  Voter Reference contends that the Defendants bear the burden of proving mootness, and that the Defendant's burden "is even greater when the defendants claims to moot the case by voluntarily ceasing its offending conduct."  Voter Reference Second Suppl. Br. Reply at 6 (citing Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 221 (2000)(per curiam)).  Moreover, Voter Reference argues that "[v]oluntary cessation of unlawful conduct will not moot a case unless 'it is absolutely clear that the allegedly wrongful behavior could

not reasonably be expected to recur.'"  Voter Reference Second Suppl. Br. Reply at 8 (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 189, (2000).  Voter Reference notes that the Defendants "have not actually made all of the data VRF requested available," Voter Reference Second Suppl. Br. Reply at 8, and therefore there remains a danger that the Defendants will continue to withhold voter data from Voter Reference in violation of law.  In short, Voter Reference asserts that "the parties' dispute continues regardless of Defendants' ambiguous eleventh-hour concession."  Voter Reference Second Suppl. Br. Reply at 11.

In the midst of this second round of supplemental briefing, Voter Reference also filed the Plaintiff Voter Reference Foundation, LLC's Second Notice of Supplemental Authority, filed October 5, 2023 (Doc. 156)("Second Notice of Supplemental Authority").  In the Second Notice of Supplemental Authority, Voter Reference points the Court to a "recently decided case," Pub. Int. Legal Found., Inc. v. Griswold, No. 21-CV-03384, 2023 WL 6376706, at *1 (D. Colo. September 29, 2023)(Brimmer, C.J.), in which the Honorable Philip A. Brimmer, Chief United States District Judge for the District of Colorado, "stated the 'NVRA's disclosure provision should be construed in favor of broad disclosure.'"  Second Notice of Supplemental Authority at 2 (quoting Pub. Int. Legal Found., Inc. v. Griswold, 2023 WL 6376706, at *4.  Voter Reference contends that, "[t]he similarities in the facts, law, and arguments between Griswold and the present case necessitate its consideration."  Second Notice of Supplemental Authority at 2.

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting

<u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991)(alteration in <u>Herrera</u>

<u>v. Santa Fe Pub. Schs.</u>)).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)("<u>Celotex</u>").

>   Before the court can rule on a party's motion for summary judgment, the
>   moving party must satisfy its burden of production in one of two ways: by putting
>   evidence into the record that affirmatively disproves an element of the nonmoving
>   party's case, <u>or by directing the court's attention to the fact that the non-moving</u>
>   <u>party lacks evidence on an element of its claim, "since a complete failure of proof</u>
>   <u>concerning an essential element of the nonmoving party's case necessarily renders</u>
>   <u>all other facts immaterial.</u>" <i>Celotex</i>, 477 U.S. at 323-25.  On those issues for which
>   it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings
>   and designate specific facts to make a showing sufficient to establish the existence
>   of an element essential to his case in order to survive summary judgment." <i>Cardoso</i>
>   <i>v. Calbone</i>, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets
>   omitted).

<u>Plustwik v. Voss of Nor. ASA</u>, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9,

2013)(Sam, J.)(emphasis added).  "If the <i>moving</i> party will bear the burden of persuasion at trial,

that party must support its motion with credible evidence -- using any of the materials specified in

Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial."  <u>Celotex</u>, 477

U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[122]  Once the movant meets this burden,

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine

issue for trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 324; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256

(1986)("<u>Liberty Lobby</u>").

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the

defendant, even without any competent evidence itself, may secure summary judgment by pointing

---

[122]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme
Court, dissented in <u>Celotex</u>, this sentence widely understood to be an accurate statement of the
law.  <u>See</u> 10A Charles Allen Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 2727,
at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent
both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how
the standard was applied to the facts of the case.").

out the plaintiff's lack of competent evidence.  See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor).  A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence.  See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

### 1.       The Genuine Dispute Standard.

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.").  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for

summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  Likewise, "[i]n responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.

> "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat'l Bank of Ariz. v.] Cities Service[.] 391 U.S. [253], 288-[89 (1968)("Cities Service")] . . . . If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . .

[(1967)](per curiam), or is not significantly probative, <u>Cities Service</u>, [391 U.S.] . . . at 290, . . . summary judgment may be granted."

<u>Liberty Lobby</u>, 477 U.S. at 249.  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)(quoting <u>Cities Service</u>, 391 U.S. at 289).

### 2.    <u>Material Facts.</u>

The summary judgment "standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 247-48. A fact is "material" if it "might affect the outcome of the suit under governing law."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248.  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. at 586-587 (footnote omitted).

### 3.    <u>General Analytical Principles.</u>

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  <u>Liberty Lobby</u>, 477 U.S. at 254.  Third, the court

must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party. See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970))). Fourth, the court cannot decide any credibility issues. See Liberty Lobby, 477 U.S. at 255.

### 4.    The Sham-Affidavit Rule.

The Tenth Circuit has stated that "[t]here is authority for the proposition that in determining whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir.1986)(citing 10B Wright & Miller, supra, § 2738, at 473-74; 6 James Wm. Moore, Moore's Federal Practice ¶ 56.22[1], at 56-1325 to 56-1326 (1985 ed.)). There are situations, however, where courts "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." Franks v. Nimmo, 796 F.2d at 1237 (citing Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1462 (9th Cir. 1985); Biechele v. Cedar Point, Inc., 747 F.2d 209, 215 (6th Cir. 1984); Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657-58 (11th Cir. 1984); Camfield Tires, Inc. v. Michelin Tire Corp., 719 F.2d 1361, 1364 (8th Cir. 1983); Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969)). The policy underlying these decisions is the "conclusion that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." Franks v. Nimmo, 796 F.2d at 1237.

> To determine whether a contradicting affidavit seeks to create a sham fact issue, [the Tenth Circuit] ha[s] looked to three factors: whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on

> newly discovered evidence; and (3) the earlier testimony reflects confusion which
> the affidavit attempts to explain."

Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 973 (10th Cir. 2001)(quoting Rios v. Bigler, 67 F.3d 1543, 1551 (10th Cir. 1995)). In Ralston v. Smith & Nephew Richards, Inc., the Tenth Circuit concludes that the district court did not abuse its discretion in excluding later contradictory declarations in rendering its summary judgment ruling. See 275 F.3d at 973. The Tenth Circuit notes that there is no question that the declarant was cross-examined in his deposition, "that he had access to the pertinent evidence at the time of his deposition," and "that there was nothing in the earlier deposition testimony reflecting any level of confusion or uncertainty concerning" the declarant's testimony "requiring clarification or explanation." 275 F.3d at 973. See Gose v. Bd. of Cnty. Comm'rs of Cnty. of McKinley, 778 F. Supp. 2d 1191, 1196 (D.N.M. 2011)(Browning, J.)(applying and distinguishing Ralston v. Smith & Nephew Richards, Inc.).

### 5.    Cross-Motions for Summary Judgment.

In the Tenth Circuit, the rule for cross-motions for summary judgment has long been that, "[c]ross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another." Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979)(citing Sec. & Exch. Comm'n v. Am. Commodity Exch., Inc., 546 F.2d 1361, 1365 (10th Cir. 1976)). As Wright & Miller note, moreover, in ruling on a cross-motion for summary judgment, "[t]he fact that both parties simultaneously are arguing that there is no genuine dispute of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." 10A Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 2720 (4th ed. 2023)("Wright & Miller"). One important reason why this rule is true is because:

> The fact that one party fails to satisfy that burden on his own Rule 56 motion does
> not automatically indicate that the opposing party has satisfied its burden and

should be granted summary judgment on the other motion.  The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.  Both motions must be denied if the court finds that there is a genuine dispute of material fact.  But if there is no genuine dispute and one or the other party is entitled to prevail as a matter of law, the court will render judgment.

10A Wright & Miller, supra at § 2720 (footnotes omitted).

## LAW REGARDING STATUTORY CONSTRUCTION

When interpreting statutes, the Court must start with the plain language.  See, e.g., Been v. O.K. Indus., Inc., 495 F.3d 1217, 1227 (10th Cir. 2007)("We review issues of statutory construction de novo, 'interpret[ing] the words of the statute in light of the purposes Congress sought to serve.'" (quoting Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233 (10th Cir. 2006)))(brackets in Been v. O.K. Indus., Inc., but not in Wright v. Fed. Bureau of Prisons).  "It is well established that 'when the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms.'" Lamie v. U.S. Trustee, 540 U.S. 526, 534 (2004)(quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A., 530 U.S. 1, 6 (2000)).  See In re Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 643 (1978)(noting that a court may not disregard the statute's plain language unless a literal application of the statutory language "would lead to absurd results . . . or would thwart the obvious purpose of the statute").  "Courts 'indulge a strong presumption that Congress expresses its intent through the language it chooses.  Therefore, when the terms of a statute are clear and unambiguous, our inquiry ends and we should stick to our duty of enforcing the terms of the statute as Congress has drafted it.'"  United Kingdom Ministry of Defence v. Trimble Navigation Ltd., 422 F.3d 165, 171 (4th Cir. 2005)(quoting Sigmon Coal Co. v. Apfel, 226 F.3d 291, 305 (4th Cir. 2000)).  See Public Lands Council v. Babbitt, 167 F.3d 1287, 1314 (10th Cir. 1999)(Seymour, C.J.)("In examining . . . [statutory] language, we assume that the words chosen by Congress are employed

in their ordinary sense and accurately express Congress' [] legislative purpose.").  Moreover, a Congressional statute might be "awkward, and even ungrammatical," but this fact alone "does not make it ambiguous on the point at issue" to a degree that "requires [a court] to consult legislative history" to determine its meaning.  Lamie v. U.S. Tr., 540 U.S. at 533-34.

## LAW REGARDING FEDERAL PREEMPTION

Article VI, clause 2, of the Constitution of the United States of America provides that the United States of America's laws "shall be the Supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2. Consistent with the Supremacy Clause, the Supreme Court has "long recognized that state laws that conflict with federal law are 'without effect.'"  Altria Group, Inc. v. Good, 555 U.S. 70, 75 (2008)("Altria II")(quoting Maryland v. Louisiana, 451 U.S. 725, 746 (1981)).  The Supreme Court has summarized the following situations in which preemption is likely to be found:

> Pre-emption may be either expressed or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.  Absent explicit pre-emptive language, we have recognized at least two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. 88, 98 (1992).  Although these parameters serve as a general guide to the preemption doctrine, as the Supreme Court has noted, the doctrine is marked by a somewhat evasive quality, and is often defined by expressions -- pervasiveness, obstacle to the accomplishment of, etc. -- that do not provide "an infallible constitutional test or an exclusive constitutional yardstick.  In the final analysis, there can be no one crystal clear distinctly marked formula."  Hines v. Davidowitz, 312 U.S. 52, 67 (1941).

Moreover, the object of a preemption challenge can be a particular application of a statute: as the Supreme Court has noted, "there is little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 386 (1992)(Scalia, J.).

## 1.    **Express Preemption.**

As noted, preemption may be express or implied.  See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98.  When faced with express preemption -- where a statute expressly states that it preempts certain areas of state law -- a court must determine the scope of the preemption that Congress intended.  See Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996)("[T]he purpose of Congress is the ultimate touch-stone in every pre-emption case").  "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose."  Altria II, 555 U.S. at 77.  When the preemption clause's text is susceptible to more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption."  Bates v. Dow Agrosciences, LLC, 544 U.S. 431, 449 (2005).  Preemption arguments are analyzed under rule 12(b)(6), 12(c), or 56.  See Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013); Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012).[123]

--------

[123]There is a conflict among the Courts of Appeals regarding which rule governs a district court's review of preemption arguments.  The United States Court of Appeals for the Fifth Circuit has noted that preemption is not a jurisdictional question, so rule 12(b)(1) is inappropriate.  See Fisher v. Halliburton, 667 F.3d 602, 609 (5th Cir. 2012).  Instead, it has held:

> Federal preemption is an affirmative defense that a defendant must plead and prove.  Unless the complaint itself establishes the applicability of a federal-preemption defense -- in which case the issue may properly be the subject of a Rule 12(b)(6) motion -- a defendant should ordinarily raise preemption in a Rule 12(c) motion for judgment on the pleadings or a Rule 56 motion for summary judgment.

Fisher v. Haliburton, 667 F.3d at 609.  See Harris v. Kellog Brown & Root Servs., Inc., 724 F.3d 458, 464 n.1 (3d Cir. 2013)("[T]he appropriate procedural device for reviewing the § 2680(j) preemption argument is not a motion pursuant to Rule 12(b)(1), but rather a motion under either

Determining express preemption's scope entails scrutinizing the statutory text in light of two presumptions.  First,

> [i]n all pre-emption cases, and particularly in those in which Congress has legislated . . . in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.

Medtronic, Inc. v. Lohr, 518 U.S. at 485.  Second, "[t]he purpose of Congress is the ultimate touchstone in every pre-emption case."  Medtronic, Inc. v. Lohr, 518 U.S. at 485.

---

Rule 12(b)(6) or for summary judgment.").  The United States Court of Appeals for the Sixth Circuit has explained that preemption "does not normally concern the subject-matter jurisdiction of a court to hear a claim, which is what is relevant to the resolution of a Rule 12(b)(1) motion." Trollinger v. Tyson Foods, Inc., 370 F.3d 602, 608 (6th Cir. 2004).  See Boler v. Earley, 865 F.3d 391, 400 n.3 (6th Cir. 2017)("We have not found other comparable cases using a Rule 12(b)(1) motion to address statutory preemption of § 1983 claims; it appears that the district court incorrectly addressed this issue as jurisdictional.").  "Rather, the doctrine generally concerns the merits of the claim itself."  Trollinger v. Tyson Foods, Inc., 370 F.3d at 608.  See Metro. Edison Co. v. Pa. Pub. Utility Com'n, 767 F.3d 335, 362 (3d Cir. 2014)(noting that "pre-emption arguments do not ordinarily raise issues of subject matter jurisdiction," but that "'[d]octrines of federal pre-emption . . . may in some contexts be controlling' over 'the general rule of finality of jurisdictional determinations'" (quoting Durfee v. Duke, 375 U.S. 106, 114 (1963))).

The United States Court of Appeals for the Ninth Circuit, however, has affirmed a case's dismissal on preemption grounds under rule 12(b)(1) without comment as to the appropriateness of that rule to preemption arguments.  See Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S., 497 F.3d 972, 975 (9th Cir. 2007).  The United States Court of Appeals for the Seventh Circuit also has dismissed a claim under rule 12(b)(1) on preemption grounds, but only where the federal law preempted the State law claim, and the federal law did not provide a private right of action.  See Slaney v. Int'l Amateur Athletic Fed'n, 244 F.3d 580, 594-96 (7th Cir. 2001).  The Tenth Circuit has not taken a definitive position on the issue.  In Ryan v. Donley, 511 F. App'x 687 (10th Cir. 2013), the Tenth Circuit affirmed a district court's dismissal of a Whistleblower Protection Act, 5 U.S.C. §§ 1201-09, claim pursuant to rule 12(b)(1), noting that "there can be no such claim, due to preemption by the Civil Service Reform Act, [5 U.S.C. § 2302]."  Ryan v. Donley, 511 F. App'x at 690.  Dismissal for lack of subject matter under rule 12(b)(1) in that case is proper, however, because the Civil Service Reform Act's "preemption" means that the Whistleblower Protection Act does not provide a private right of action, so there is no federal-question jurisdiction.  In other contexts, the Tenth Circuit has affirmed a district court's dismissal of a claim under the preemption doctrine via rule 12(b)(6).  See Thornton v. Tyson Foods, Inc., 28 F.4th 1016, 1021 (10th Cir.), cert. denied, 143 S. Ct. 118, 214 L. Ed. 2d 31 (2022).

> Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it.   Also relevant, however, is the structure and purpose of the statute as a whole, as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law.

Medtronic, Inc. v. Lohr, 518 U.S. at 486.  More recently, the Supreme Court vacated a stay of a district court's injunction of a nationwide eviction moratorium, because the Director of the Centers for Disease Control and Prevention ("CDC") lacked the statutory authority to renew the moratorium.  Ala. Ass'n of Realtors v. HHS, 141 S. Ct. 2485, 2489 (2021).  In March, 2020, "Congress passed the Coronavirus Aid, Relief, and Economic Security Act, [Pub. L. 116-136, 134 Stat. 281, ("CARES Act"),] to alleviate burdens caused by the burgeoning COVID-19 pandemic." Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2486.  Part of the CARES Act "imposed a 120-day eviction moratorium for properties that participated in federal assistance programs or were subject to federally backed loans." Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2486.  The moratorium expired in July, 2020, and, although Congress did not renew it, the CDC extended the moratorium three times until its expiration on July 31, 2021.  See Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2486-87 (citing Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 86 Fed. Reg. 8020 (February 3, 2021); 86 Fed. Reg. 16,731 (March 31, 2021); 86 Fed. Reg. 34,010 (June 28, 2021)).   The CDC "relied on § 361(a) of the Public Health Service Act[,] [42 U.S.C. §§ 201-300aaa-13,] for authority to promulgate and extend the eviction moratorium." Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2487.  The Supreme Court concluded that "[r]egulations under this authority have generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease," Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2487, and that the "downstream connection between eviction and the interstate spread of disease is markedly different from the direct targeting of disease that characterizes the

measures identified in the statute," Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2488. The
Supreme Court concluded that "the sheer scope of the CDC's claimed authority under § 361(a)
would counsel against the Government's interpretation," and held that "[w]e expect Congress to
speak clearly when authorizing an agency to exercise powers of 'vast "economic and political
significance."'" Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2489 (quoting Utility Air Regulatory
Group v. EPA, 573 U.S. 302, 324 (2014)(quoting FDA v. Brown & Williamson Tobacco Corp.,
529 U. S. 120, 160 (2000))). Furthermore, the Supreme Court explained that the moratorium
"intrudes into an area that is the particular domain of state law: the landlord-tenant relationship,"
Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2489 (citing Lindsey v. Normet, 405 U. S. 56, 68-69
(1972)), and that "'[o]ur precedents require Congress to enact exceedingly clear language if it
wishes to significantly alter the balance between federal and state power and the power of the
Government over private property,'" Ala. Ass'n of Realtors v. HHS, 141 S. Ct. at 2489 (quoting
United States Forest Service v. Cowpasture River Preservation Assn., 140 S. Ct. 1837, 1849-50
(2020)).

> **2.      Implied Conflict Preemption: Impossibility and Obstacle Preemption.**

Implied conflict preemption is found when it is impossible for a private party to comply
with both state and federal requirements, see English v. Gen. Elec. Co., 496 U.S. 72, 78-79 (1990),
or where state law "stands as an obstacle to the accomplishment and execution of the full purposes
and objectives of Congress," Hines v. Davidowitz, 312 U.S. at 67. Obstacle preemption is one
form of implied preemption. See Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 373
(2000)(holding that preemption is appropriate where the challenged State law "stands as an
obstacle to the accomplishment and execution of the full purposes and objectives of Congress");
Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644, 679 (2003)(Thomas, J.,
concurring)("Obstacle pre-emption turns on whether the goals of the federal statute are frustrated

by the effect of the state law."). The Supreme Court has instructed that, in obstacle preemption cases, "there is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it." P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp., 485 U.S. 495, 503 (1988). See Gade v. Nat'l Solid Wastes Mgmt. Assoc., 505 U.S. at 98. A reviewing court must still "examine the explicit statutory language and the structure and purpose of the statute." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 138 (1990).

In 2000, the Supreme Court decided Geier v. Am. Honda Motor Co., 529 U.S. 861 (2000), which held, in a five-to-four decision, that a federal regulation which permitted, but did not require, airbags to be installed in passenger vehicles preempted claims that a car was defective because it lacked an airbag. See 529 U.S. at 874. The majority found: "The rule of state tort law for which petitioners argue would stand as an 'obstacle' to the accomplishment of [the federal regulation's] objective. And the statute foresees the application of ordinary principles of pre-emption in cases of actual conflict. Hence, the tort action is pre-empted." 529 U.S. at 886. The Honorable John Paul Stevens, former Associate Justice of the Supreme Court of the United States, in dissent, expressed a desire to eliminate obstacle preemption. See 529 U.S. at 907-08 (Stevens, J., dissenting). He argued that the presumption against preemption

> [s]erves as a limiting principle that prevents federal judges from running amok with our potentially boundless (and perhaps inadequately considered) doctrine of implied conflict pre-emption based on frustration of purposes -- i.e., that state law is pre-empted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

529 U.S. at 907-08 (Stevens, J., dissenting).

The Supreme Court has begun to back away from finding implied preemption based on an alleged conflict with the purposes underlying federal regulations. In 2003, the Supreme Court issued a unanimous decision in Sprietsma v. Mercury Marine, 537 U.S. 51 (2002), rejecting

implied conflict preemption of state law claims that a boat engine was defective, because it lacked

a propeller guard.  See 537 U.S. at 70.  The Supreme Court considered and rejected an argument

that the Coast Guard's decision not to adopt a regulation requiring propeller guards impliedly

preempted state-law claims, which inflicted liability for lack of a propeller guard.  See Sprietsma

v. Mercury Marine, 537 U.S. at 65.  It explained:

> The decision in 1990 to accept the subcommittee's recommendation to take no
> regulatory action left the law applicable to propeller guards exactly the same as it
> had been before the subcommittee began its investigation.  Of course, if a state
> common-law claim directly conflicted with a federal regulation promulgated under
> the Act, or if it were impossible to comply with any such regulation without
> incurring liability under state common law, pre-emption would occur.  This,
> however, is not such a case.

Sprietsma v. Mercury Marine, 537 U.S. at 65.  In addition, in Williamson v. Mazda Motor of Am.,

Inc., 562 U.S. 323 (2011), the Supreme Court revisited a different section of the same federal

regulation that was at issue in Geier v. Am. Honda Motor Co., this time holding -- unlike the

airbag-related holding in Geier v. Am. Honda Motor Co. -- that the federal regulation, which gave

automobile manufacturers a choice between lap-and-shoulder seatbelts and simple lap seatbelts,

did not preempt a California State tort suit that, "if successful, would deny manufacturers a choice

of belts for rear inner seats by imposing tort liability upon those who choose to install a simple lap

belt."  Williamson v. Mazda Motor of Am., Inc., 562 U.S. at 326.  Despite the apparent similarity

between Williamson v. Mazda Motor of Am., Inc. and Geier v. Am. Honda Motor Co., which the

Supreme Court spends much of the Williamson v. Mazda Motor of Am., Inc. opinion discussing,

see 562 U.S. at 328-336, the Court's divergent outcome is the result of the Supreme Court's

conclusion that the choice of seatbelt style is not a "significant objective" of the regulation -- a

conclusion that is reached on the basis of an analysis of the regulation, its history, the agency's

explanations of the regulation:

> In *Geier,* then, the regulation's history, the agency's contemporaneous explanation, and its consistently held interpretive views indicated that the regulation sought to maintain manufacturer choice in order to further significant regulatory objectives. Here, these same considerations indicate the contrary. We consequently conclude that, even though the state tort suit may restrict the manufacturer's choice, it does not "stan[d] as an obstacle to the accomplishment . . . of the full purposes and objectives" of federal law. *Hines,* 312 U.S., at 67, 61 S.Ct. 399. Thus, the regulation does not pre-empt this tort action.

Williamson v. Mazda Motor of Am., Inc., 562 U.S. at 336. In a concurring opinion, the Honorable Sonia Sotomayor, Associate Justice of the Supreme Court of the United States, sought to emphasize the Supreme Court's "rejection of an overreading of *Geier*," namely, "the proposition that any time an agency gives manufacturers a choice between two or more options, a tort suit that imposes liability on the basis of one of the options is an obstacle to the achievement of a federal regulatory objective and may be pre-empted." Williamson v. Mazda Motor of Am., Inc., 562 U.S. at 337 (Sotomayor, J., concurring). Justice Sotomayor opines that, instead,

> the mere fact that an agency regulation allows manufacturers a choice between options is insufficient to justify implied pre-emption; courts should only find pre-emption where evidence exists that an agency has a regulatory objective -- *e.g.,* obtaining a mix of passive restraint mechanisms, as in *Geier* -- whose achievement depends on manufacturers having a choice between options.

Williamson v. Mazda Motor of Am., Inc., 562 U.S. at 338 (Sotomayor, J., concurring).

In Altria II, the Supreme Court again considered the implied preemption doctrine and rejected the defendants' obstacle-preemption argument that the Federal Cigarette Labeling and Advertising Act [15 U.S.C. § 1331-1341,]("FCLAA") preempted a similar state act, Maine's Unfair Practices Act, Me. Rev. Stat. Ann., Tit. 5, § 207 (2008). See Altria II, 555 U.S. at 90-91. In Altria II, the plaintiffs filed suit against defendant cigarette manufacturers for deceptively marketing their Marlboro and Cambridge Light cigarettes as containing lower tar and nicotine to convey that their light cigarettes were less harmful than regular cigarettes. See Altria II, 555 U.S.

at 73.  The Supreme Court concluded that the FCLAA, which forbids state law from requiring or prohibiting language with respect to cigarette advertising and promotion, presented no obstacle to the plaintiffs' lawsuit, because the federal law ultimately regulated warning labels, and did not regulate false or misleading statements.  See Altria II, 555 U.S. at 82-83.  The Supreme Court also considered whether a Federal Trade Commission ("FTC") guidance statement, which noted that "a factual statement of the tar and nicotine content . . . would not violate the FTC Act," impliedly preempted the Plaintiffs' claims.  Altria II, 555 U.S. at 87.  The Supreme Court contemplated and rejected the cigarette manufacturers' argument that the FTC's statement "authorized them to use descriptors" such as "light or low tar," because the FTC statements did not require that cigarette manufacturers disclose their tar and nicotine yields, and the United States "Government itself disavows any policy authorizing the use of light and low tar descriptors."  Altria II, 555 U.S. at 88.  Moreover, the Supreme Court determined that an FTC consent order that prevents the cigarette manufacturers from using "light" and "low tar" descriptors, unless they are accompanied "by a clear and conspicuous disclosure of the cigarettes' tar and nicotine content," does not preempt the plaintiffs' claims, because "the decree only enjoined conduct," and "a consent order is in any event only binding on the parties to the agreement."  Altria II, 555 U.S. at 589 n.13.  The Supreme Court concluded, thus, that federal law and regulations did not preempt the plaintiffs' state law claims. See Altria II, 555 U.S. at 90.

In Wyeth v. Levine, 555 U.S. 555 (2009), six Justices of the Supreme Court, including the Honorable Stephen Breyer and the Honorable Anthony Kennedy, who joined in the majority decision in Geier v. Am. Honda Motor Co., rejected the plaintiff's two implied preemption arguments -- impossibility preemption and obstacle preemption.  See Wyeth v. Levine, 555 U.S. at 581.  The Supreme Court held that

> it is not impossible for Wyeth to comply with its state and federal law obligations and that Levine's common-law claims do not stand as an obstacle to the accomplishment of Congress' purposes in the [Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. §§ 301, 321, 331-337, 341-350, 361-364, and 381-399; 21 C.F.R. § 201.80(e)("FDCA")].

Wyeth v. Levine, 555 U.S. at 581.  In so ruling, Justice Stevens, writing for the majority, narrowly limited Geier v. Am. Honda Motor Co. to its facts, noting that the decision in that case is based on the substantive regulation's "complex and extensive" history at issue.  Wyeth v. Levine, 555 U.S. at 566.  The Supreme Court rejected obstacle preemption, stating: "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70-year history."  Wyeth v. Levine, 555 U.S. at 609.  Justice Stevens quoted the explanation of the Honorable Sandra Day O'Connor, former Associate Justice of the Supreme Court of the United States, in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 (1989): "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them."  Wyeth v. Levine, 555 U.S. at 575 (quoting Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. at 166-67).

Of particular import for the current status of implied obstacle preemption is the concurring opinion of the Honorable Clarence Thomas, Associate Justice of the Supreme Court of the United States, in Wyeth v. Levine:

> I write separately, however, because I cannot join the majority's implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court's "purposes and objectives" pre-emption jurisprudence.  Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law.  Because implied pre-emption doctrines that wander

far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.

Wyeth v. Levine, 555 U.S. at 583 (Thomas, J., concurring in the judgment).  Justice Thomas continued:

> Under the vague and potentially boundless doctrine of purposes and objectives pre-emption . . . the Court has pre-empted state law based on its interpretation of broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law . . . .  Congressional and agency musings, however, do not satisfy the Art. I, § 7 requirements for enactment of federal law and, therefore, do not pre-empt state law under the Supremacy Clause.

Wyeth v. Levine, 555 U.S. at 587.  Justice Thomas emphasized that, when analyzing the federal statutes' or regulations' preemptive effect, "[e]vidence of pre-emptive purpose must be sought in the text and structure of the provision at issue" to comply with the Constitution.  Wyeth v. Levine, 555 U.S. at 588 (citing CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993)).[124]  See also Kansas v. Garcia, 140 S. Ct. 791, 807-08 (2020)(Thomas, J., concurring)("I write separately to reiterate my view that we should explicitly abandon our 'purposes and objective' pre-emption jurisprudence," which "impermissibly rests of on judicial guesswork about 'broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not contained within the text of federal law.'" (quoting Wyeth v. Levine, 555 U.S. at 590 (Thomas, J., concurring)));  Williamson v. Mazda Motor of Am., Inc., 562 U.S. at 342 (Thomas, J.,

---

[124]Justice Thomas, writing for the five-to-four majority in PLIVA, Inc. v. Mensing, 564 U.S. 604 (2011), concluded, however, that federal law preempted inconsistent state laws on generic drug labeling, because it was impossible to comply with both federal law and the states' law.  See PLIVA, Inc. v. Mensing, 564 U.S. at 617-18.  The Supreme Court sought to reconcile Wyeth v. Levine, however, recognizing that the respective statutory schemes in each case are distinguishable.  See PLIVA, Inc. v. Mensing, 564 U.S. at 626 ("It is beyond dispute that the federal statutes and regulations that apply to brand-name drug manufacturers are meaningfully different than those that apply to generic drug manufacturers.").

concurring)(criticizing the majority's distinguishing of <u>Williamson v. Mazda Motor of Am., Inc.</u> and <u>Geier v. Am. Honda Motor Co.</u>, stating: "The dispositive difference between this case and *Geier* -- indeed, the only difference -- is the majority's 'psychoanalysis' of the regulators.")(quoting <u>United States v. Pub. Utilities Comm'n of Cal.</u>, 345 U.S. 295, 319, 73 S. Ct. 706, 719, 97 L. Ed. 1020 (1953)).

Moreover, the Supreme Court has put renewed emphasis on the presumption against preemption. <u>See</u> <u>Bates v. Dow Agrosciences, LLC</u>, 544 U.S. 431, 449 (2005). "In areas of traditional state regulation, [the Supreme Court] assume[s] that a federal statute has not supplanted state law unless Congress has made such an intention clear and manifest." <u>Bates v. Dow Agrosciences, LLC</u>, 544 U.S. at 449. If confronted with two plausible statutory interpretations, the court has "a duty to accept the reading that disfavors pre-emption." <u>Bates v. Dow Agrosciences, LLC</u>, 544 U.S. at 449. <u>See</u> <u>Wyeth v. Levine</u>, 555 U.S. at 565; <u>Cipollone v. Liggett Grp., Inc.</u>, 505 U.S. 504, 518 (1992)(plurality opinion). In <u>Arizona v. United States</u>, 567 U.S. 387 (2012), the Supreme Court once again emphasized the importance of clear Congressional intent when applying obstacle preemption. <u>See</u> 567 U.S. at 398-99. The Supreme Court invalidated provisions of an Arizona immigration law that would penalize aliens who sought, or engaged in, unauthorized employment, because it "would interfere with the careful balance struck by Congress with respect to unauthorized employment of aliens." <u>Arizona v. United States</u>, 567 U.S. at 406. With the Honorable Elena Kagan, Associate Justice of the Supreme Court, taking no part in the consideration or decision of the case, writing for a five-to-three majority, which included the Honorable John G. Roberts, Chief Justice of the Supreme Court, the Honorable Ruth Bader Ginsburg, Associate Justice of the Supreme Court, the Honorable Sonia Sotomayor, Associate Justice of the Supreme Court, and Justice Breyer, Justice Kennedy wrote: "The correct instruction

to draw from the text, structure, and history of [the Immigration Reform and Control Act of 1986, 8 U.S.C. § 1101 ('IRCA')] is that Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment." Arizona v. United States, 567 U.S. at 406. The Supreme Court ruled that Congressional intent is clear; Congress considered and rejected penalizing aliens who sought unauthorized employment. See Arizona v. United States, 567 U.S. at 405. Federal immigration law therefore preempted the Arizona law that would have penalized aliens seeking unauthorized employment, because it would have created a penalty that Congress clearly and intentionally omitted. See Arizona v. United States, 567 U.S. at 407.

In Kansas v. Garcia, 140 S. Ct. 791 (2020), the Supreme Court held that IRCA does not preempt Kansas identity theft statutes under which three undocumented aliens were convicted for fraudulently using another person's Social Security number. See Kansas v. Garcia, 140 S. Ct. at 797. Justice Alito, writing for the majority, distinguishes the Supreme Court's holding in Arizona v. United States that IRCA preempts state laws which make it a crime for "an alien to work without authorization." Kansas v. Garcia, 140 S. Ct. at 798 (citing Arizona v. United States, 567 U.S. at 403-407). The Supreme Court reasons that IRCA's preemption provision "applies only to the imposition of criminal or civil liability on *employers* and those who receive a fee for recruiting or referring prospective employees," but "does not mention state or local laws that impose criminal or civil sanctions on employees or applicants for employment." Kansas v. Garcia, 140 S. Ct. at 802 (italics in original). After finding no express or field preemption, the Supreme Court concluded that the Kansas statutes did not conflict with federal law, because "[i]t is certainly possible to comply with both IRCA and the Kansas statutes." Kansas v. Garcia, 140 S. Ct. at 806. It distinguishes its decision from Arizona v. United States:

> In *Arizona*, the Court inferred that Congress had made a considered decision that it was inadvisable to criminalize the conduct in question. In effect, the Court

concluded that IRCA implicitly conferred a right to be free of criminal (as opposed to civil) penalties for working illegally, and thus a state law making it a crime to engage in that conduct conflicted with this federal right.

Nothing similar is involved here. In enacting IRCA, Congress did not decide that an unauthorized alien who uses a false identity on tax-withholding forms should not face criminal prosecution. On the contrary, federal law makes it a crime to use fraudulent information on a W-4.

Kansas v. Garcia, 140 S. Ct. at 806 (citing Arizona v. United States, 567 U.S. at 404-07; 26 U.S.C.

§ 7205). The Supreme Court explained that the overlap of state and federal criminal laws do not

constitute conflict preemption:

The mere fact that state laws like the Kansas provisions at issue overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption. From the beginning of our country, criminal law enforcement has been primarily a responsibility of the States, and that remains true today. In recent times, the reach of federal criminal law has expanded, and there are now many instances in which a prosecution for a particular course of conduct could be brought by either federal or state prosecutors. Our federal system would be turned upside down if we were to hold that federal criminal law preempts state law whenever they overlap, and there is no basis for inferring that federal criminal statutes preempt state laws whenever they overlap. Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests.

Kansas v. Garcia, 140 S. Ct. at 806 (2020).

The Tenth Circuit has recognized federal preemption of state law in three categories: (i) when a federal statute expressly preempts state law ("express preemption"); (ii) where Congress intends to occupy a field ("field preemption"); and (iii) to the extent that a state law conflicts with a federal law ("conflict preemption"). Colo. Dep't of Pub. Health & Env't, Hazardous Materials & Waste Mgmt. Div. v. United States, 693 F.3d 1214, 1222 (10th Cir. 2012)("Colorado Department"). See Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d 1021, 1099 (D.N.M. 2017)(Browning, J.), aff'd 863 F.3d 1226 (10th Cir. 2017). As the defendant in Colorado Department, the United States invoked only conflict preemption to dismiss Colorado's claims

against it.  See Colorado Department, 693 F.3d at 1222.  "To avoid conflict preemption, '"it is not enough to say that the ultimate goal of both federal and state law is the same. . . . A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal."'"  Colorado Department, 693 F.3d at 1224 (quoting Chamber of Commerce v. Edmondson, 594 F.3d 742, 769 (10th Cir. 2010)(quoting Int'l Paper Co. v. Ouellette, 479 U.S. 481, 494 (1987)(alterations, citation omitted))).  In Colorado Department, the State of Colorado created a schedule for the United States to follow in the destruction of hazardous waste stored in the State in an attempt to prohibit the storage of hazardous waste within the State.  See Colorado Department, 693 F.3d at 1223.  The Tenth Circuit held that the State statute creating this schedule conflicted with a federal statute, which mandated a deadline for the destruction of the materials.  See Colorado Department, 693 F.3d at 1224.  The Tenth Circuit reasoned that allowing the State of Colorado to set a deadline for the destruction of the materials would impede the flexibility with which Congress had intended in its deadline.  See Colorado Department, 693 F.3d at 1224. Because the Colorado deadline would interfere with the method that Congress had intended for the waste's disposal, the Tenth Circuit concluded that the state law is in conflict with the federal law and, therefore, that the federal law preempts Colorado's schedule.  See Colorado Department, 693 F.3d at 1224.

In Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1118, the Court concluded that Congress clearly intended the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701-2721 ("IGRA"), to "'expressly preempt the field in the governance of gaming activities on Indian lands.'"  233 F. Supp. 3d at 1118 (quoting S. Rep. No. 100-446, at 6-7 (1988)).  Because "even express commands of preemption should be narrowly interpreted in light of the 'presumption against the pre-emption of state police power regulations,'"  Pueblo of Pojoaque v. New Mexico,

233 F. Supp. 3d at 1119 (quoting Medtronic, Inc. v. Lohr, 518 U.S. at 485), however, "the context of IGRA's enactment suggests that Congress did not intend to preempt state regulation of off-reservation gaming activities," and therefore, New Mexico retained its police power to regulate non-Indian third parties outside Indian lands, Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1119-21.  Turning to implied preemption, the Court concluded that Congress did not intend to "completely preempt the field" of gaming regulation, because it did not "abrogate[] states' ability to promulgate their own gaming laws and regulations," but rather, "left them intact."  Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1127.  The Court similarly concluded that conflict preemption was not at issue, because it is not impossible for "third-party state licensee to comply with both IGRA and New Mexico law," and New Mexico's gaming regulations do not "pose an obstacle to the accomplishment of IGRA's objectives."  Pueblo of Pojoaque v. New Mexico, 233 F. Supp. 3d at 1127-28.

### 3.      Implied Preemption: Field Preemption.

All three "types of preemption -- 'conflict,' 'express,' and 'field,' . . . work in the same way: Congress enacts a law that imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted."  Murphy v. NCAA, 138 S. Ct. 1461, 1480 (2018)(citing English v. Gen. Elec. Co., 496 U.S. at 78-79)(no citation for quotations).   "Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law."  Hines v. Davidowitz, 312 U.S. at 67 (citing Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)).

> Field preemption occurs when federal law occupies a "field" of regulation "so comprehensively that it has left no room for supplementary state legislation." *R. J. Reynolds Tobacco Co.* v. *Durham County*, 479 U. S. 130, 140, 107 S. Ct. 499, 93 L. Ed. 2d 449 (1986).  In describing field preemption, we have sometimes used the same sort of shorthand employed by Congress in express preemption provisions.

*See, e.g.*, *Oneok, Inc.* v. *Learjet, Inc.*, 575 U. S. ___, ___, 135 S. Ct. 1591, 191 L. Ed. 2d 511, 517 (2015)("Congress has forbidden the State to take action in the *field* that the federal statute pre-empts").  But in substance, field preemption does not involve congressional commands to the States. Instead, like all other forms of preemption, it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law.  *See Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372, n. 6, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000).

> The Court's decision in *Arizona* v. *United States*, 567 U. S. 387, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012), shows how this works. Noting that federal statutes "provide a full set of standards governing alien registration," we concluded that these laws "reflect[ ] a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.*, at 401, 132 S. Ct. 2492, 183 L. Ed. 2d 351. What this means is that the federal registration provisions not only impose federal registration obligations on aliens but also confer a federal right to be free from any other registration requirements.

Murphy v. NCAA, 138 S. Ct. 1461, 1480-81 (2018).

### 4.   Federal Preemption and the Elections Clause.

It is generally understood that the Supremacy Clause "sits at the epicenter of every preemption question," Brown v. United Airlines, Inc., 720 F.3d 60, 63 (1st Cir. 2013)(Selya, J.), and indeed is the Constitutional source from which the preemption doctrine "is derived," Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. at 108.  This general notion notwithstanding, preemption functions differently when the federal law in question was passed pursuant to Article I's Elections Clause.  See Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1, 13-15 (2013).  In Arizona v. Inter Tribal Council of Arizona, Inc., the Honorable Antonin Scalia, Associate Justice of the Supreme Court, explained that the preemption doctrine's "presumption against pre-emption" is inapplicable in circumstances involving "Elections Clause legislation." 570 U.S. at 13-14.  Justice Scalia explains that this presumption against preemption -- which he calls a "rule of construction" -- is based on "an assumption about congressional intent: that 'Congress does not exercise lightly' the 'extraordinary power' to 'legislate in areas traditionally regulated by the States.'" 570 U.S. at 13 (quoting Gregory v. Ashcroft, 501 U.S. 452, 460 (1991)).  This rationale does not extend,

however, to legislation passed under the Elections Clause, because that Constitutional provision,

"empowers Congress to 'make or alter' state election regulations," and, therefore, "[w]hen

Congress legislates with respect to the 'Times, Places and Manner' of holding congressional

elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States."

Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. at 14 (quoting Art. I, § 4, cl. 1)(emphasis

in Arizona v. Inter Tribal Council of Arizona, Inc.).   "Because the power the Elections Clause

confers is none other than the power to pre-empt, the reasonable assumption is that the statutory

text accurately communicates the scope of Congress's pre-emptive intent."   Arizona v. Inter Tribal

Council of Arizona, Inc., 570 U.S. at 14.

Following from the principle articulated in Arizona v. Inter Tribal Council of Arizona, Inc.,

the Tenth Circuit has articulated an analytical framework to apply in preemption cases involving

Elections Clause legislation.   See Fish v. Kobach, 840 F.3d 710, 726-29 (10th Cir. 2016).   In Fish

v. Kobach, the Tenth Circuit undertakes an analysis of Arizona v. Inter Tribal Council of Arizona,

Inc., as well as of two earlier Supreme Court cases dealing with questions of preemption involving

Elections Clause legislation -- Ex parte Siebold, 100 U.S. 371, 382-84 (1879), and Foster v. Love,

522 U.S. 67, 69-73 (1997) -- and concludes:

> Guided by these cases, it is clear to us that the Elections Clause requires that
> we straightforwardly and naturally read the federal and state provisions in question
> as though part of a unitary system of federal election regulation but with federal law
> prevailing over state law where conflicts arise.   We do not finely parse the federal
> statute for gaps or silences into which state regulation might fit.   We refrain from
> doing so because were states able to build on or fill gaps or silences in federal
> election statutes . . . they could fundamentally alter the structure and effect of those
> statutes.

Fish v. Kobach, 840 F.3d at 729.   The Tenth Circuit derives this interpretive framework not only

from the Supreme Court cases cited, but also from a case from the United States Court of Appeals

for the Ninth Circuit, which states that a court making this determination should "consider the state

and federal laws as if they comprise a single system of federal election procedures," and, "[i]f Congress addressed the same subject as the state law, we consider whether the federal act has superseded the state act, based on a natural reading of the two laws and viewing the federal act as if it were a subsequent enactment by the same legislature."  Gonzalez v. Arizona, 677 F.3d 383, 394 (9th Cir. 2012), aff'd sub nom. Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. 1 (2013).  See Fish v. Kobach, 840 F.3d at 726 (citing and quoting Gonzalez v. Arizona extensively, calling its analysis "a persuasive synthesis of the method of statutory construction required when a congressional enactment under the Elections Clause allegedly conflicts with state election regulations").  In sum, the Tenth Circuit's analytical framework for assessing preemption in cases involving Elections Clause legislation involves Fish v. Kobach's "unitary system" approach.  840 F.3d at 729.  See Fish v. Schwab, 957 F.3d 1105, 1137 (10th Cir. 2020)(reiterating the use of this analytical framework).

## LAW REGARDING THE NVRA

The NVRA, which Congress enacted in 1993, is based on congressional findings that it is the duty of Federal, State, and local governments to promote the exercise of the "fundamental right" to vote for United States citizens, and that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities."  52 U.S.C. § 20501(a).  See also Fish v. Kobach, 840 F.3d at 720 ("Congress crafted and passed the NVRA against a backdrop of lackluster voter registration and political participation.").  In addressing these findings, the NVRA requires, among other things, that the States provide a system for voter registration by mail, see 52 U.S.C. § 20505, a system for voter registration at various state offices (including those that provide "public assistance" and those that provide services to people with disabilities), see 52 U.S.C. § 20506, and a system for voter

registration on a driver's license application, see 52 U.S.C. § 20504.  The NVRA specifies various

details how these systems must work, including, for example, the type of information that States

can require on a voter registration form.  See 52 U.S.C. §§ 20504 (c)(2), 2508(b).  It also imposes

requirements about when and how States may remove people from the voter rolls.  See 52 U.S.C.

§ 20507(a)(3)-(4).  The NVRA adds that it does not "supersede, restrict or limit the application of

the Voting Rights Act of 1965," and that it does not "authorize or require conduct that is prohibited

by the Voting Rights Act of 1965."  52 U.S.C. § 20510(d).

     **1.**     **The NVRA's Objectives**.

The NVRA has four stated objectives:

     **(1)**     to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

     **(2)**     to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

     **(3)**     to protect the integrity of the electoral process; and

     **(4)**     to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b).  The NVRA is concerned not only with enhancing voter registration and

participation, but also with protecting the electoral process' overall integrity and the accuracy of

voter registration rolls.  See Crawford v. Marion Cnty. Election Bd., 553 U.S. 181, 192

(2008)(Stevens, J.)(plurality opinion)("In the [NVRA], Congress established procedures that

would both increase the number of registered voters and protect the integrity of the electoral

process."); Am. Ass'n of People with Disabilities v. Herrera, 690 F. Supp. 2d 1183, 1205 (D.N.M.

2010)(Browning, J.).

     **2.**     **The Public Inspection Provision**.

The NVRA's Section 8 is titled "Requirements with respect to administration of voter

registration." 52 U.S.C. § 20507.  <u>See</u> National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 82.  Within Section 8 is subsection (i), the Public Inspection Provision, which is formally titled "Public disclosure of voter registration activities."  52 U.S.C. § 20507(i).  This provision, which is in the original 1993 NVRA and has never been amended,[125] reads:

> **(1)**     Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> **(2)**     The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i).  <u>See</u> National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 82.  The legislative committee reports provide little guidance or specifics on the intended meaning of the Public Inspection Provision, and do not contain any further elaboration about the terms and phrases used therein.  For example, House Report 103-9, in its description and discussion of the bill, describes the Public Inspection Provision using largely the same terms as the provision itself:

> Subsection (i) provides that each State shall maintain for two years all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of addresses on the official list of eligible voters.  The records must be made available for public inspection and, where available, photocopying at reasonable costs.  The records shall include lists of names and addresses of all persons to whom notices were sent and information concerning whether or not each person has responded to the notice as of the date of inspection.

---

[125]Congress amended a separate subsection of Section 8 of the NVRA -- subsection (b) -- in 2002 as part of the Help America Vote Act of 2002.  <u>See</u> Pub L. No. 107-252, Title IX, 116 Stat. 1728 ("Section 8(b)(2) of the National Voter Registration Act of 1993 (42 U.S.C. 1973gg-6(b)(2)) is amended by . . . .").

H.R. Rep, No. 103-9, at 19 (1993).  See H.R. Rep. No. 103-66, at 21 (1993)(Conf. Rep.)(same);

S. Rep. No. 103-6, at 35 (1993)(same).

Although the Public Inspection Provision forms part of the original NVRA, the provision

was not subject to any substantive judicial interpretation for the first nearly two decades of its

existence.   In 2010, however, a plaintiff nonprofit 501(c)(3) organization called Project

Vote/Voting for America Inc. filed a complaint for declaratory and injunctive relief in the United

States District Court for the Eastern District of Virginia, alleging that the defendants -- the

Secretary of the Virginia State Board of Elections, as well as the General Registrar of Norfolk,

Virginia -- had violated the NVRA's Public Inspection Provision, owing to the defendants' refusal

to disclose

> 'for inspection and copying the completed voter registration applications of any
> individual who timely submitted an application at any time from January 1, 2008,
> through October 31, 2008, who was not registered to vote in time for the November
> 4, 2008 general election,' and also other documents, 'such as documents identifying
> the reasons the applications were rejected.'

Project Vote/Voting For Am., Inc. v. Long, 752 F. Supp. 2d 697, 699 (E.D. Va. 2010)(Smith,

J.)(quoting complaint).   As justification for their refusal to disclose the voter registration

applications, the defendants stated that "'the completed voter registration application of any

individual is not a part of the record of the implementation of programs and activities conducted

for the purposes of ensuring the accuracy and currency of official lists of eligible voters covered

by [the Public Inspection Provision].'"   Project Vote/Voting For Am., Inc. v. Long, 752 F. Supp.

2d at 700 (quoting the record).

In a pair of opinions that the Honorable Rebecca Beach Smith, United States District Judge

for the Eastern District of Virginia issued, Judge Smith first denied the defendants' motion to

dismiss, concluding that "the common and ordinary meaning of the terms of the Public Disclosure

Provision encompass voter registration applications, as these records concern 'the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,'" Project Vote/Voting For Am., Inc. v. Long, 752 F. Supp. 2d at 708 (quoting 52 U.S.C. § 20507(i)(1)), and later granted summary judgment for the plaintiff, concluding that the Public Inspection Provision "grants the plaintiff access to completed voter registration applications with the voters' SSNs redacted for inspection and photocopying," Project Vote/Voting For Am., Inc. v. Long, 813 F. Supp. 2d 738, 743 (E.D. Va. 2011)(Smith, J.).  The main statutory analysis to support these conclusions is elaborated most extensively in the opinion deciding the motion to dismiss, in which Judge Smith undertakes a plain meaning statutory analysis of the Public Inspection Provision, dividing her analysis into sections that interpret the common and ordinary meaning the provision, its meaning in the NVRA context, and also determines the provision's plain meaning alongside the NVRA's broader statutory purpose.  See 752 F. Supp. 2d at 705-11.  In the course of this analysis, Judge Smith concludes that, pursuant to the statute's plain meaning, "a program or activity covered by the Public Disclosure Provision is one conducted to ensure that the state is keeping a 'most recent' and errorless account of which persons are qualified or entitled to vote within the state." 752 F. Supp. 2d at 706 (quoting Current, Webster's Third New International Dictionary 557 (2002)).  Judge Smith also notes that, voter registration applications must fall under the Public Inspection Provision, because "'official lists of eligible voters' would be inaccurate and obsolete if eligible voters were improperly denied registration." 752 F. Supp. 2d at 706 (quoting 52 U.S.C. § 20507(i)(1)).  Moreover, in assessing the scope of the Public Inspection Provision, Judge Smith observes:

> The term "concern" means "to relate or refer to," to "be about," or "to have an influence on." Webster's Third New International Dictionary 470 (2002). The term "implementation" means the act of "carry[ing] out" or "accomplish[ing]" or "giv[ing] practical effect to and ensur[ing] . . . actual fulfillment by concrete

measures." *Id.* at 1134-35. Accordingly, records which relate to carrying out voter registration procedures are subject to the Public Disclosure Provision's requirements.

Project Vote/Voting For Am., Inc. v. Long, 752 F. Supp. 2d at 707 (emphasis and brackets in

Project Vote/Voting For Am., Inc. v. Long).  Judge Smith also notes that Congress' use of the

phrase "all records" in 52 U.S.C. § 20507(i)(1) signals the statute's broad application, and states

that "[t]he records which Congress did not want to be encompassed by the term 'all' were

specifically identified in the exceptions to the Public Disclosure Provision, and voter registration

applications do not fall within either of those exceptions."  752 F. Supp. 2d at 708 (quoting 52

U.S.C. § 20507(i)(1)).  Judge Smith also states that the Public Inspection Provision did not relate

only to programs and activities related to procedures for the removal of voters -- as the defendants

had contended -- and also rejects the defendants' contention that "making voter registration

applications available to the public would discourage voter participation because it would involve

a release of an applicant's personal and confidential information."  752 F. Supp. 2d at 710.  On

this latter point, Judge Smith notes that "[t]here is no indication in the statute that entire voter

registration applications should be kept confidential," 752 F. Supp. 2d at 710, but nevertheless

held that "a person's SSN is precluded from disclosure, as disclosure of that information would

undermine the purposes of the statute," 752 F. Supp. 2d at 711.  See True the Vote v. Hosemann,

43 F. Supp. 3d 693, 739 (S.D. Miss. 2014)(Atlas, J.)(concluding that, "the NVRA Public

Disclosure Provision does not require the disclosure of unredacted voter registration documents,

including voter registrant birthdates").  Judge Smith reaffirms this statutory analysis in the opinion

granting Project Vote's motion for summary judgment, noting that the defendants' argument on

summary judgment "does not persuade the court to abandon its prior ruling."  Project Vote/Voting

For Am., Inc. v. Long, 813 F. Supp. 2d at 742.  The defendants appealed Judge Smith's summary

judgment ruling to the United States Court of Appeals for the Fourth Circuit.  See Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331, 334 (4th Cir. 2012).

The Fourth Circuit affirmed Judge Smith, holding that she had "correctly interpreted Section 8(i)(1)." Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 333. In an opinion that the Honorable J. Harvie Wilkinson III, United States Circuit Judge for the Court of Appeals for the Fourth Circuit, authored, the Fourth Circuit notes generally that the Public Inspection Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." 682 F.3d at 334-35. Like Judge Smith, Judge Wilkinson concludes that the process of reviewing voter registration applications is both a "program" and an "activity" for the purposes of the Public Inspection Provision: "This process of review is a 'program' because it is carried out in the service of a specified end -- maintenance of voter rolls -- and it is an 'activity' because it is a particular task and deed of Virginia election employees." 682 F.3d at 335 (quoting 52 U.S.C. § 20507(i)(1)). Moreover, Judge Wilkinson continues, "the 'program' and 'activity' of evaluating voter registration applications is plainly 'conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters,'" and, "[i]t is unclear what other purpose it would serve." 682 F.3d at 335 (quoting 52 U.S.C. § 20507(i)(1)). Additionally, the process of reviewing voter registration applications ensures that the voter roll itself remains "free from error," and, "[i]ndeed, voter lists are not 'accurate' or 'current' if eligible voters have been improperly denied registration or if ineligible persons have been added to the rolls." Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 335 (quoting Project Vote/Voting For Am., Inc. v. Long, 752 F. Supp. 2d at 706).

Next, Judge Wilkinson notes that the voter registration applications are "clearly 'records

concerning the implementation of' this 'program[] and activit[y],'" because these applications contain all the relevant information by which the State determines a person's eligibility to vote, and, "[w]ithout verification of an applicant's citizenship, age, and other necessary information provided by registration applications, state officials would be unable to determine whether that applicant meets the statutory requirements for inclusion in official voting lists." Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 335-36 (first and second brackets in original)(quoting 52 U.S.C. § 20507(i)(1)).   Judge Wilkinson also observes that 52 U.S.C. § 20507(i)(1)'s use of the word "all" in "all records" indicates a broadening effect on its object:

> As this court has recognized, "the use of the word 'all' [as a modifier] suggests an expansive meaning because 'all' is a term of great breadth."   Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen, 152 F.3d 283, 290 (4th Cir. 1998).   Given that the phrase "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" unmistakably encompasses completed voter registration applications, such applications fall within Section 8(i)(1)'s general disclosure mandate.

Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 336 (brackets in original).  Judge Wilkinson also disagrees with the argument that 52 U.S.C. § 20507(i)(2)[126] limits 52 U.S.C. § 20507(i)(1)'s scope, noting that "[c]ourts have repeatedly indicated that 'shall include' is not equivalent to 'limited to.'"   Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 337 (quoting Nat'l Fed'n of the Blind v. F.T.C., 420 F.3d 331, 338 (4th Cir. 2005)).  The Fourth Circuit also disagrees with the appellants' notion that the district court's interpretation of the NVRA causes the statute to conflict

---

[126]As noted above, 52 U.S.C. § 20507(i)(2) reads:

> **(2)**      The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i)(2).

with other federal statutory schemes that deal with voting.  See Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 337-339.

To conclude his analysis, Judge Wilkinson discusses the appellants' concerns related to privacy.  The Fourth Circuit first affirmed the district court's ruling to redact the Social Security Numbers, before responding to the appellants' argument that, "'information other than applicants' SSNs, such as responses to requests regarding criminal history, mental incompetency, and even home addresses, phone numbers, and birth dates implicate real privacy interests.'"  682 F.3d 331, 339 (quoting appellants' brief).  To this argument, Judge Wilkinson reasons:

> We do not think appellants' privacy concerns unfounded.  By requiring public disclosure of personal information, Section 8(i)(1) may conceivably inhibit voter registration in some instances.  However, this potential shortcoming must be balanced against the many benefits of public disclosure.  It is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls.  State officials labor under a duty of accountability to the public in ensuring that voter lists include eligible voters and exclude ineligible ones in the most accurate manner possible.  Without such transparency, public confidence in the essential workings of democracy will suffer.

682 F.3d at 339 (footnote omitted).  To conclude, Judge Wilkinson notes that the "appellants ask us to revisit issues already resolved by the Congress," and that, "[i]t may or may not be that Section 8(i)(1) is the most effective means of promoting the NVRA's stated purposes," but that, "this debate belongs in the legislative arena, not the courts."  Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 340.  The Fourth Circuit, accordingly, affirmed Judge Smith's summary judgment grant.  See 682 F.3d at 340.  Subsequent courts to consider these and other parallel issues have generally followed the principles in Judge Wilkinson's opinion.  See also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections, 996 F.3d 257, 266 (4th Cir. 2021)(concluding that the North Carolina State Board of Election's efforts to identify noncitizen voting registrants is a "program" or "activity" that is within the Public Inspection Provision's scope);  Pub. Int. Legal Found., Inc.

v. Dahlstrom, No. CIV 22-0001, 2023 WL 3498044, at *1 (D. Alaska May 17, 2023)(Gleason,

J.)(concluding that, pursuant to the NVRA's Public Inspection Provision, "the Alaska Division of

Elections . . . must disclose data and records about deceased or potentially deceased registered

voters"); Pub. Int. Legal Found., Inc. v. Way, No. CIV 22-02865, 2022 WL 16834701, at *9

(D.N.J. November 9, 2022)(Wolfson, C.J.)(concluding that "informal instructions, including email

correspondence, and hand-written notes could concern the procedure and parameters for decision-

making related to the accuracy and currency of eligible voter lists," and therefore fall within the

scope of the NVRA's Public Inspection Provision, but that a "technical manual" for the program

that administers New Jersey's computerized statewide voter registration list is not a "record" under

the Public Inspection provision); Greater Birmingham Ministries v. Merrill, No. CIV 22-0205,

2022 WL 5027180, at *3 (M.D. Ala. October 4, 2022)(Thompson, J.)(concluding that records

"concerning people removed from Alabama's voter rolls because of a disqualifying felony

conviction, or denied registration because of a disqualifying felony conviction, fall within the

scope of the NVRA's public-inspection provision").

      In Project Vote/Voting for Am., Inc. v. Long, the Fourth Circuit held that voter registration

applications fall under the NVRA's Public Inspection Provision, and this conclusion rests, in large

part, on the importance of these applications to "ensuring the accuracy and currency of official

lists of eligible voters." 52 U.S.C. § 20507(i)(1).   See Project Vote/Voting for Am., Inc. v. Long,

682 F.3d at 335-36.   In other contexts, however, this conclusion begs the broader question of

whether the "official lists of eligible voters" themselves fall under the Public Inspection

Provision's scope.  52 U.S.C. § 20507(i)(1).  All United States District Courts that have addressed

this question have answered in the affirmative.  See Pub. Int. Legal Found., Inc. v. Matthews, 589

F. Supp. 3d 932, 941 (C.D. Ill. 2022)(Myerscough, J.)(concluding that, "the phrase 'all records,'

as used in the Public Disclosure Provision, necessarily includes the statewide voter registration list" (quoting 52 U.S.C. § 20507(i)(1)); <u>Pub. Int. Legal Found., Inc. v. Bellows</u>, 588 F. Supp. 3d 124, 133 (D. Me. 2022)(Singal, J.)(concluding that "the Voter File is a 'record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' within the meaning of the Public Disclosure Provision and thus is subject to disclosure under the NVRA" (quoting 52 U.S.C. § 20507(i)(1)); <u>Jud. Watch, Inc. v. Lamone</u>, 399 F. Supp. 3d 425, 438-42 (D. Md. 2019)(Hollander, J.)(concluding that a voter list is a "record" which is subject to disclosure under the NVRA's Public Inspection Provision); <u>True the Vote v. Hosemann</u>, 43 F. Supp. 3d at 723 (concluding that, "the Voter Roll is a 'record' and is the 'official list[] of eligible voters' under the NVRA Public Disclosure Provision," and that, therefore, "[t]he process of compiling, maintaining, and reviewing the voter roll is a program or activity performed by Mississippi election officials that ensures the official roll is properly maintained to be accurate and current" (quoting 52 U.S.C. § 20507(i)(1)).

In early 2024, moreover, the United States Court of Appeals for the First Circuit became the first Court of Appeals to consider the question whether the Public Inspection Provision applies to a State's voter file in its entirety.  <u>See Pub. Int. Legal Found., Inc. v. Bellows</u>, 92 F.4th 36 (1st Cir. 2024)("<u>Bellows</u>").  In <u>Bellows</u>, the First Circuit reviewed the United States District Court for the District of Maine's grant of summary judgment in favor of a nonprofit organization's request for Maine's voter registration list, in which the district court concludes: (i) that the Public Inspection Provision applies to Maine's Voter File,[127] and also (ii) that the NVRA preempts a

_____

[127]The term "Voter File" as discussed in <u>Bellows</u>,

captures the following information for each registered voter eligible to vote in Maine as of the date the Voter File is generated:

Maine State law provision that limited the disclosure of certain voter information.  See Bellows, 92 F.4th at 41.  See also Pub. Int. Legal Found., Inc. v. Bellows, 588 F. Supp. 3d at 133.  The First Circuit affirmed the district court, and, in an opinion that the Honorable Gustavo Gelpí, United States Circuit Judge for the United States Court of Appeals for the First Circuit, authored, provided an in-depth analysis of the Public Inspection Provision's scope.

In Bellows, the First Circuit notes that, pursuant to a provision in the post-NVRA Help America Vote Act, Pub L. No. 107-252, § 303, 116 Stat. 1708 (2002)(codified at 52 U.S.C. § 21083)("HAVA"), the States must maintain, "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).  See Bellows, 92 F.4th at 42.  Pursuant to this mandate, Maine created a computer-based system called the Central Voter Registration system ("CVR"), which "contains personal information about every registered voter in Maine, including nearly all the information that a voter provides in his or her registration form, such as name, address, party affiliation, and date of birth, as well as other information inputted by municipal registrars, such as voter participation history."  Bellows, 92 F.4th at 42.  The CVR software is capable of creating reports from its database, one of which is the Voter File, which contains the "name, residence address, mailing address, year of birth,

---

> [T]he voter's name, residence address, mailing address, year of birth, enrollment status, electoral districts, voter status, date of registration, date of change of the voter record if applicable, voter participation history, voter record number and any special designations indicating uniformed service voters, overseas voters or township voters.

92 F.4th at 42 (quoting Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(B)).

enrollment status, electoral districts, voter status, date of registration, date of change of the voter record if applicable, voter participation history, voter record number and any special designations indicating uniformed service voters, overseas voters or township voters," for all individuals eligible to vote in the State of Maine on the day that the voter file is generated in the CVR. Bellows, 92 F.4th at 42 (quoting Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(B)). The plaintiff in Bellows, a nonprofit voting integrity organization called Public Interest Legal Foundation, Inc., sought to obtain a copy of the Voter File under the NVRA's Public Inspection Provision, but that request was denied owing to a Maine State law that only allows disclosure of the Voter File to "'[a] political party, or an individual or organization engaged in so-called 'get out the vote' efforts directly related to a campaign or other activities directly related to a campaign," and that prohibits the requester from using that data "for any purpose that is not directly related to activities of a political party, 'get out the vote' efforts directly related to a campaign or other activities directly related to a campaign." Bellows, 92 F.4th at 43 (quoting Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(B)(1)).

Public Interest Legal Foundation sued for violations of the NVRA's Public Inspection Provision. See Bellows, 92 F.4th at 43. While cross-motions for summary judgment were pending in the district court, the Maine Legislature added a new provision to the relevant statutory scheme, creating a provision -- Exception J -- which states that "'[a]n individual or organization that is evaluating the State's compliance with its voter list maintenance obligations may[] . . . purchase . . the [Voter File] from the [CVR] by making a request to the Secretary of State.'" Bellows, 92 F.4th at 43 (quoting Me. Rev. Stat. Ann. tit. 21-A, § 196−A(1)(J)). Other provisions, however, condition this allowance; the other provisions state that a person seeking voter information under Exception J may not

> > (1)      Sell, transfer to another person or use the voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations; or
>
> > (2)      Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(J)(1)-(2).  See Bellows, 92 F.4th at 43-44.  Following this enactment, Public Interest Legal Foundation amended its complaint to assert, among other things, that Exception J "was preempted by the NVRA," and also that the NVRA preempts the fines which Exception J imposed.  Bellows, 92 F.4th at 44.

The First Circuit first concludes that the Voter File is subject to disclosure under the NVRA's public disclosure provision.  See 92 F.4th at 45-49.  In a similar manner to the Fourth Circuit in Project Vote/Voting for Am., Inc. v. Long, 682 F.3d 331, the First Circuit reaches this conclusion largely on the basis of a plain language statutory analysis, but also considers the interplay among the NVRA, and other federal laws related to voting and voter registration.  For example, in considering what "programs and activities" fall under the NVRA's Public Inspection Provision, the First Circuit notes that other federal laws -- like the HAVA -- mandate many such programs and activities; the HAVA contains provisions which require a State's election system to "'include provisions to ensure that voter registration records in the State are accurate and are updated regularly,'" Bellows, 92 F.4th at 45 (quoting 52 U.S.C. § 21083(a)(4))(emphasis in Bellows, but not in 52 U.S.C. § 21083(a)(4)), as well as provisions that require State election officials to "perform list maintenance" on the computerized voter lists "on a regular basis . . . in a manner that ensures that . . . the name of each registered voter appears in the computerized list," Bellows, 92 F.4th at 45 (quoting 52 U.S.C. § 21083(a)(2)(A), (a)(2)(B)(i))(emphasis in Bellows, but not in 52 U.S.C. § 21083(a)(2)(B)).  The First Circuit notes that Maine State law also contains

similar provisions, and, accordingly, "both federal and state law require Maine election officials

to create and update voter registration records in the CVR," and that, "[b]y their very nature,

these activities . . . fall within Section 8(i)(1)."  Bellows, 92 F.4th at 46.

The First Circuit next addresses "whether the Voter File 'concern[s] the implementation

of' Maine's voter list registration and maintenance activities."  Bellows, 92 F.4th at 47 (quoting

52 U.S.C. § 20507(i)(1)).  Here, the First Circuit notes that, "[s]imilar to its synonym 'regarding,'

the term 'concerning' used 'in a legal context generally has a broadening effect, ensuring that the

scope of a provision covers not only its subject but also matters relating to that subject.'"  Bellows,

92 F.4th at 47 (quoting Patel v. Garland, 596 U.S. 328, 339 (2022))(emphasis in Bellows, but not

in Patel v. Garland).  Moreover, the First Circuit notes, "[t]o 'implement,' on the other hand, means

to 'carry out' or to 'accomplish.'"  Bellows, 92 F.4th at 47 (quoting Implement, Merriam-Webster

Online Dictionary, https://www.merriam-webster.com/dictionary/implement (last visited Feb. 7,

2024)).  On the basis of these definitions, the First Circuit concludes that the Voter File "plainly

relates" to Maine's statutorily mandated activities in creating and updating voter registration

records.  Bellows, 92 F.4th at 47.  The First Circuit reaches this conclusion because the Voter File

is an electronic report that the CVR generates, and thus,

> as of the date it is generated, the Voter File reflects the additions and changes made
> by Maine election officials in the CVR pursuant to federal and state law as part of
> Maine's voter list registration and maintenance activities.  The Voter File can thus
> be characterized as the output and end result of such activities.

92 F.4th at 47.  As the "output and end result" of such activities, the First Circuit reasons, the Voter

File "plainly" concerns the activities.  92 F.4th at 47.  To narrow this broad interpretation of the

word "concerning," according to the First Circuit, "adds limitations to Section 8(i)(1) where

Congress did not," and, moreover, a "narrow construction of Section 8(i)(1) overlooks the

sweeping language that Congress adopted, which makes 'all records concerning the

implementation of Maine's voter list registration and maintenance activities subject to disclosure." Bellows, 92 F.4th at 48 (quoting 52 U.S.C. § 20507(i)(1))(emphasis in Bellows, but not in 52 U.S.C. § 20507(i)(1)).  The First Circuit observes that, "[s]imilar to the word 'any,' the word 'all' reflects a 'broadly inclusive intent,' giving Section 8(i)(1) an expansive meaning." Bellows, 92 F.4th at 48 (quoting United States v. Dion, 37 F.4th 31, 35 (1st Cir.), cert. denied, 143 S. Ct. 387 (2022)).  In short, according to the First Circuit, because accurate and current voter rolls are, logically, the ultimate aim -- or "end result," Bellows, 92 F.4th at 47 -- of all statutorily mandated activities in creating and updating voter registration records, the voter rolls themselves are also subject to disclosure under the Public Inspection Provision, because these rolls unavoidably "concern[]" the implementation of those activities.  52 U.S.C. § 20507(i)(1).

The First Circuit in Bellows also holds that the NVRA preempts Exception J's restrictions on the use and publication of the Voter File.  See 92 F.4th at 51-56.  As noted, a Voter File requester seeking to evaluate the Voter File to ensure "the State's compliance with its voter list maintenance obligations," may not:

> (1)     Sell, transfer to another person or use the voter information or any part of the information for any purpose that is not directly related to evaluating the State's compliance with its voter list maintenance obligations; or
>
> (2)     Cause the voter information or any part of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

Me. Rev. Stat. Ann. Tit. 21-A, § 196-A(1)(J)(1)-(2).  The First Circuit concludes that the first of these restrictions -- § 196-A(1)(J)(1) -- is preempted, because, by its plain language, it prohibits a requester from "'using the Voter File to evaluate another state's compliance with its voter list maintenance obligations' or from 'using the Voter file to enforce the NVRA when the basis for

such action was the evaluation (via Maine's Voter File) of <u>another</u> state's voter list maintenance

obligations.'"  <u>Bellows</u>, 92 F.4th at 53 (source of quoted material not cited, but presumably the

district court's order)(emphasis in <u>Bellows</u>).  The First Circuit holds that this restriction "'stands

as an obstacle to the accomplishment and execution'" of the NVRA's stated purposes of protecting

the integrity of the election process.  <u>Bellows</u>, 92 F.4th at 54 (quoting <u>Arizona v. United States</u>,

567 U.S. at 399).

    As for the prohibition on internet publication, the First Circuit also holds that the NVRA

preempts this restriction.  <u>See</u> <u>Bellows</u>, 92 F.4th at 54-56.  To begin, the First Circuit observes that

52 U.S.C. § 20507(i)(1)'s mandate that the relevant records be "'ma[d]e available for <u>public</u>

<u>inspection</u>' . . . evinces Congress's belief that public inspection, and thus public release, of Voter

File data is necessary to accomplish the objectives behind the NVRA."  <u>Bellows</u>, 92 F.4th at 54

(quoting 52 U.S.C. § 20507(i)(1))(emphasis in <u>Bellows</u>, but not in 52 U.S.C. § 20507(i)(1)).  The

First Circuit continues: "Indeed, the analysis and subsequent dissemination of Voter File data to

the public is necessary if members of the public, or organizations such as PILF, are ever to identify,

address, and fix irregularities in states' voter rolls by exercising their private right of action under

the NVRA."  <u>Bellows</u>, 92 F.4th at 54 (citing <u>Project Vote/Voting for Am., Inc. v. Long</u>, 682 F.3d

at 339).

    The First Circuit disagrees with the appellant's contentions that the internet publication

ban furthers the NVRA's purposes by "'provid[ing] assurance to Mainers that registering to vote

will not expose their personal data to [] inappropriate uses" as well as "safeguard[ing] Maine voters

from . . . invasions of privacy.'"  <u>Bellows</u>, 92 F.4th at 55 (source of quoted material not cited, but

presumably from appellants' brief).  The First Circuit concludes that the correct balance between

disclosure and privacy is the province of Congress, and that, "even if the Publication Ban does

further the NVRA's objective of enhancing the participation of eligible citizens as voters, it nonetheless creates an obstacle to the accomplishment and execution of the <u>full</u> purposes and objectives of Congress as stated in 52 U.S.C. § 20501(b)(1)-(4)."   <u>Bellows</u>, 92 F.4th at 55 (emphasis in <u>Bellows</u>).   The First Circuit notes, moreover, that "[t]he NVRA itself makes knowingly and willfully intimidating, threatening, or coercing any person exercising any right under the statute punishable by a fine and up to 5 years' imprisonment," 92 F.4th at 55 (citing 52 U.S.C § 20511), and thus,

> far from suggesting that the Voter File must not be publicly released, these statutes impose their own set of restrictions on the dissemination of personal information and protections against potential voter intimidation that, when read in tandem with the NVRA, seek to address the privacy concerns posed by public disclosure of the Voter File.

<u>Bellows</u>, 92 F.4th at 55-56.   The First Circuit therefore holds that the NVRA preempts Exception J's restrictions on the use of the Voter File.   <u>Bellows</u>, 92 F.4th at 56.

## LAW REGARDING THE FIRST AMENDMENT

The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press."   U.S. Const. amend. I.   The First Amendment secures the "freedom of expression upon public questions."   <u>New York Times Co. v. Sullivan</u>, 376 U.S. 254, 269 (1964). According to the Honorable Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary." <u>Whitney v. California</u>, 274 U.S. 357, 375 (1927).   The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be the secret of liberty."   <u>Whitney v. California</u>, 274 U.S. at 375.   They firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile."   <u>Whitney v.</u>

California, 274 U.S. at 375.   Justice Brandeis noted, moreover, that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates. See Whitney v. California, 274 U.S. at 375.   Robust public discussion, in his view, is a "political duty" and is a "fundamental principle of the American government."   Whitney v. California, 274 U.S. at 375.   Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people."   Roth v. United States, 354 U.S. 476, 484 (1957).

Like most Constitutional guarantees, the First Amendment, however, is not an absolute bar on government intervention.   In effect, "no law" does not in practice mean "no law."   U.S. Const. amend. I.   See Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)(stating that, "'as a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content," but "this principle, like other First Amendment principles, is not absolute")(quoting Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65 (1983)); Dennis v. United States, 314 U.S. 494, 503 (1951)(noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to other values and considerations").   Although the First Amendment speaks in absolutist terms, courts long have recognized that governments constitutionally can restrict speech and the press under certain conditions.   See Holder v. Humanitarian Law Project, 561 U.S. 1, 26-29 (2010).   The Honorable Oliver Wendell Holmes, Associate Justice of the Supreme Court, notes in his oft-quoted example: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic."   Schenck v. United States, 249 U.S. 47, 52 (1919).   Indeed, not all speech is protected speech, and our First Amendment jurisprudence has developed various categorizations of

protection based on the speech.   See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); Miller v. California, 413 U.S. 15, 23 (1973)("This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment.").  This categorization is a borne from a recognition that "not all speech is of equal First Amendment importance." Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985).  The extent to which the government may limit access to information or restrict speech "depends on the nature of the forum." Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)(concluding that certain content-neutral time, place, and manner restrictions are constitutional).

The First Amendment's speech and press protections, moreover, limit both state and federal government action.   See Gitlow v. New York, 268 U.S. 652, 666 (1925); Near v. Minnesota, 283 U.S. 697, 628 (1931).  The First Amendment regulates "government regulation of private speech" and not government speech or purely private speech regulations.  Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467 (2009).  The First Amendment does not compel either the government or private persons to supply information.  See Shero v. City of Grove, 510 F.3d 1196 (10th Cir. 2007).  See In re Santa Fe Natural Tobacco Co. Mkting & Sales Practices and Products Liab. Litig., 388 F. Supp. 3d 1087, 1168-73 (D.N.M. Dec. 21, 2017)(Browning, J.).

### 1.   The First Amendment, Information Within Government Control, and Newsgathering.

In the Tenth Circuit, the "general" rule is that "there is no constitutional right, and specifically no First Amendment right, of access to government records." Lanphere & Urbaniak v. State of Colo., 21 F.3d 1508, 1511 (10th Cir. 1994)(Houchins v. KQED, Inc., 438 U.S. 1, 7

(1978)(plurality opinion), <u>and</u> <u>United States v. Hickey</u>, 767 F.2d 705, 709 (10th Cir. 1985)).  <u>See</u>

<u>Smith v. Plati</u>, 258 F.3d 1167, 1178 (10th Cir. 2001)("It is well-settled that there is no general First

Amendment right of access to all sources of information within governmental control." (quoting

<u>Houchins v. KQED, Inc.</u>, 438 U.S. at 9)).  This general rule is said to flow from the Supreme Court's

plurality[128] opinion in <u>Houchins v. KQED, Inc.</u>, 438 U.S. at 7.  As outlined in greater detail below,

however, in subsequent cases from the Supreme Court -- including <u>Richmond Newspapers, Inc. v.</u>

<u>Virginia</u>, 448 U.S. 555 (1980), <u>Globe Newspaper Co. v. Superior Court for Norfolk Cnty.</u>, 457

U.S. 596 (1982), and <u>Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty.</u>, 478 U.S.

1 (1986) -- the Supreme Court recognizes, at least to some extent, a right of access to certain

government records.  <u>See, e.g.</u>, <u>Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.</u>, 457 U.S.

at 603 ("The Court's recent decision in *Richmond Newspapers* firmly established for the first time

that the press and general public have a constitutional right of access to criminal trials.").  As

Archibald Cox observed in his forward to the Harvard Law Review in 1980, these cases can be

challenging to reconcile:

> [N]urturing a body of law requires more attention than Chief Justice Burger's
> opinion in *Richmond Newspapers* gives to fitting new decisions into the body of
> precedent.  The opinion makes no effort to square the ruling with the rationale of
> *Pell v. Procunier* and *Saxbe v. Washington Post Co.*  Nor does it refer to the Chief
> Justice's own opinion just two years before in *Houchins v. KQED, Inc.*  Surely,

---

[128]On the subject of the plurality nature of the Supreme Court's opinion in <u>Houchins v.</u>
<u>KQED, Inc.</u>, the Tenth Circuit has noted:

> Although *Houchins* is a plurality opinion of a seven-member Court joined
> by three members, Justice Stewart concurred in the judgment and wrote that "[t]he
> First and Fourteenth Amendments do not guarantee the public a right of access to
> information generated or controlled by government" and he "agree[d]
> substantially" with what the plurality opinion said on that topic. 438 U.S. at 16, 98
> S.Ct. 2588 (Stewart, J., concurring in the judgment).

<u>Shero v. City of Grove, Okl.</u>, 510 F.3d 1196, 1202 n.3 (10th Cir. 2007).

some effort to explain the relation between the decision in *Richmond Newspapers* and those earlier cases was required.

Archibald Cox, Foreword: Freedom of Expression in the Burger Court, 94 Harv. L. Rev. 1, 26 (1980)(footnoted omitted). See El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir. 1992)(Selya, J.)(stating that "[t]he very best" that can be said for the Supreme Court's right-to-access jurisprudence is that "the constitutional issues are fuliginous"). Adding to the uncertainty, plurality decisions in this area abound: only seven Justices participated in Houchins v. KQED, Inc., and Justice Burger's judgment of the court is a three-Justice plurality opinion, and Richmond Newspapers, Inc. v. Virginia produced seven opinions by eight Justices, with Chief Justice Burger again announcing the judgment with an opinion that two other Justices joined.

Given this uncertainty, it is hardly surprising that Courts of Appeals have struggled with conceptualizing the relationship between the Richmond Newspapers, Inc. v. Virginia line of cases and Houchins v. KQED, Inc. For example, in Detroit Free Press v. Ashcroft, 303 F.3d 681 (6th Cir. 2002), the Sixth Circuit held that "the line of cases from *Richmond Newspapers* to *Press-Enterprise II*[, 478 U.S. 1 (1986),] recognize that there is in fact a *limited* constitutional right to *some* government information and also provide a test of general applicability for making that determination." Detroit Free Press v. Ashcroft, 303 F.3d at 700 (emphasis in Detroit Free Press v. Ashcroft). The Sixth Circuit rejected the United States' argument that the issue is "governed by the more deferential standard articulated in *Houchins v. KQED, Inc.*" on the grounds that Houchins v. KQED, Inc. concerned the First Amendment's "press clause, . . . a First Amendment clause distinct from the speech clause," and also that "*Houchins* represented a plurality opinion of the Court, and as such, the conclusion that the First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by the government was neither

accepted nor rejected by a majority of the Court." Detroit Free Press v. Ashcroft, 303 F.3d 681, 694 (6th Cir. 2002)(footnoted omitted).

Nevertheless, as noted above, in the Tenth Circuit, Houchins v. KQED, Inc.'s rule that "there is no constitutional right, and specifically no First Amendment right, of access to government records," is the "general" one. Lanphere & Urbaniak v. State of Colo., 21 F.3d at 1511. The Tenth Circuit has limited the Richmond Newspapers, Inc. v. Virginia line of cases to apply "in relation to the Sixth Amendment right to a fair and public trial," Lanphere & Urbaniak v. State of Colo., 21 F.3d at 1512, and stating that, "[u]nder this precedent . . . a First Amendment right of access inheres only in limited situations where 'a tradition of accessibility implies the favorable judgment of experience[], . . and where 'public access plays a significant positive role in the functioning of the particular process in question,'" Lanphere & Urbaniak v. State of Colo., 21 F.3d at 1512 (quoting Press-Enter. Co. v. Superior Ct. of California for Riverside Cnty., 478 U.S. 1, 8 (1986)). See Smith v. Plati, 258 F.3d 1167, 1178 n.10 (10th Cir. 2001)(noting that, because the claims at issue "do not involve a claim of denied coverage of a criminal trial in particular, or any trial proceeding in general," the Richmond Newspapers, Inc. v. Virginia line of cases is not "particularly relevant").

As for newsgathering, while newsgathering has some First Amendment protection, its protection does not include necessarily a right to access all news-worthy information. The Supreme Court has noted that, although "there is an undoubted right to gather news 'from any source by means within the law,'" that right is limited, by its terms, to the ability to gather information from sources that are legally available to the public. Houchins v. KQED, Inc., 438 U.S. at 10-12 (quoting Branzburg v. Hayes, 408 U.S. 665, 681-82 (1972)). "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." Branzburg v. Hayes, 408 U.S. at 684. First Amendment

- 247 -

protection of newsgathering, which ensures that the government does not "violate the First Amendment by deterring news sources from communicating information," does not provide a right of access beyond the public's general access to a particular source. Houchins v. KQED, Inc., 438 U.S. at 10-12 (citing Branzburg v. Hayes, 408 U.S. at 680). Thus, there is "no basis for the claim that the First Amendment compels others -- private persons or governments -- to supply information."[129] Houchins v. KQED, Inc., 438 U.S. at 10-11.

The Supreme Court has also found that an international passenger who asserted that the Secretary of State's refusal to validate his passport to travel to Cuba violated his First Amendment right to "travel abroad" so as to acquaint himself "first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies," had not suffered a First Amendment violation. Zemel v. Rusk, 381 U.S. 1, 16-17 (1965). The Supreme Court explained:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right. The right to speak and publish does not carry with it the unrestrained right to gather information.

---

[129]As the Tenth Circuit has noted:

[T]he "Supreme Court has recognized that the First Amendment guarantees access to government records pertaining to criminal proceedings if (1) there has been a tradition of access to the information and (2) public access benefits the functioning of the particular process in question. See, e.g., Press–Enter. Co. v. Superior Court, 478 U.S. 1, 8 . . . (1986)(finding a conditional right of access to California pre-trial criminal proceedings). Cf. Journal Pub. Co. v. Mechem, 801 F.2d 1233, 1236-37 (10th Cir.1986)(applying a similar analysis to coverage of certain aspects of a civil trial)."

Smith v. Plati, 258 F.3d 1167, 1178 n.10 (10th Cir. 2001).

Zemel v. Rusk, 381 U.S. at 16-17.  As noted, according to the Tenth Circuit, it is "well-settled that there is no general First Amendment right of access to all sources of information within governmental control."  Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)(citing Houchins v. KQED, Inc., 438 U.S. 1, 9 (1978)).  "This applies equally to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the public."  Smith v. Plati, 258 F.3d at 1178 (citing Houchins v, KQED, Inc., 438 U.S. at 11; Pell v. Procunier, 417 U.S. 817, 834 (1974); Saxbe v. Wash. Post Co., 417 U.S. 843, 850 (1974); Branzburg v. Hayes, 408 U.S. at 684-85; and Zemel v. Rusk, 381 U.S. at 17).  See Okla. Hosp. Ass'n v. Okla. Pub. Co., 748 F.2d 1421, 1425 (10th Cir. 1984)("Thus, the Supreme Court has recognized that, whatever the extent of protection warranted newsgathering, it is no greater than the right of the general public to obtain information." (citing Pell v. Procunier, 417 U.S. at 834)).

2.      **Access to Court Proceedings and the First Amendment.**

The First Amendment does not mention explicitly a right of access to court proceedings. See U.S. Const. amend. I.  Nevertheless, the Supreme Court has extended a public right of access to criminal trials pursuant to the First Amendment.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. 596, 602-04 (1982).  The Supreme Court states:

> [W]e have long eschewed any "narrow, literal conception" of the First Amendment's terms . . . for the Framers were concerned with broad principles, and wrote against a background of shared values and practices.  The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment Rights.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 603-04 (quoting NAACP v. Button, 371 U.S. 415, 430 (1963)).  See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 579-80, 591 n.16 (1980).  The Supreme Court has emphasized that the right of access to criminal trials is important, because "the criminal trial has historically been open to the press and general

public," and because such public access "plays a particularly significant role in the functioning of the judicial process and the government as a whole."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 605-06.  Accordingly,

> Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process.  And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process -- an essential component in our structure of self-government.  In sum, the institutional value of the open criminal trial is recognized in both logic and experience.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  Because one of the First Amendment's "major purpose[s]" is to "protect the free discussion of governmental affairs," the Supreme Court recognizes a right of access to criminal trials.  Mills v. Alabama, 384 U.S. 214, 218 (1966).  By protecting this right, the First Amendment "serves to ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government." Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 604.  The Supreme Court cautions, however, that, "although the right of access to criminal trials is of constitutional stature, it is not absolute."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606. Still, the standard that the government must meet to garner closure is hefty, requiring satisfaction of strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606-07.

The First Amendment does not protect an absolute right to access court documents or court proceedings.  See Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. 1, 11-12 (1986); Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  The right is not absolute, because, as the Supreme Court notes, it takes "little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted

openly." Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8.  "[T]he right to inspect and copy judicial records is not absolute." Nixon v. Warner Commc'n, Inc., 435 U.S. 589, 598 (1978).  The Supreme Court states: "Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes." Nixon v. Warner Commc'n, Inc., 435 U.S. at 598.  Consequently, there is a "qualified" "right of public access" if two "considerations of experience and logic" are met. Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 10.  First, a judicial proceeding or record must "have historically been open to the press and general public." Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8.  Second, public access must play a "significant positive role in the functioning of the particular process in question." Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8.  The right of access is qualified, but the presumption of access may be overcome "'only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 9 (quoting Press-Enterprise Co v. Superior Ct. of Calif., Riverside Cnty., 464 U.S. 501, 510 (1984)).  See United States v. Gonzales, 150 F.3d 1246, 1256 (10th Cir. 1998)).  This test is known as the "experience and logic" test.  See Lanphere & Urbaniak v. Colo., 21 F.3d 1508, 1512 (10th Cir. 1994).

The "experience and logic" test does not afford the press a special right of access to court or government documents not available to the public.  See Lanphere & Urbaniak v. Colo., 21 F.3d 1511.  The Tenth Circuit twice has assumed without deciding that the "experience and logic" test applies to non-criminal court records and proceedings.  See United States v. McVeigh, 119 F.3d 806, 812 (10th Cir. 1997); United States v. Gonzales, 150 F.3d at 1256.  Making that assumption,

however, the Tenth Circuit reiterated that there is "not yet any definitive Supreme Court ruling on whether there is a constitutional right of access to court documents and, if so the scope of such a right." United States v. McVeigh, 119 F.3d at 812.

The "experience and logic" test does not require disclosure of a criminal defendant's address or telephone number. Lanphere & Urbaniak v. Colo., 21 F.3d at 1512. In Lanphere & Urbaniak v. Colo., the Tenth Circuit concluded that a First Amendment right of access exists only in "limited situations" where a "'tradition of accessibility implies the favorable judgment of experience' . . . and where 'public access plays a significant positive role in the functioning of the particular process in question.'" Lanphere & Ubraniak v. Colo., 21 F.3d at 1512 (quoting Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8). Allowing access to documents that contain a defendant's "address and/or phone number," especially when those documents are sought for that reason specifically, would stretch the First Amendment's principles "well beyond their current bounds." See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512. The Tenth Circuit, therefore, notes specifically that it "declines" to find a First Amendment right to access to court documents which contain a criminal defendant's address or telephone number. See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512. See also United States v. Jager, No. CR-1531 JB, 2011 WL 13285416, at *4 (D.N.M. June 23, 2011)(Browning, J.)("[T]he 'interests of personal privacy' of the innocent third parties is 'sufficiently compelling to overcome the presumption of access.'" United States v. Jager, No. CR-1531 JB, 2011 WL 13285416, at *4 (D.N.M. June 23, 2011)(Browning, J.)(quoting United States v. Sattar, 471 F. Supp. 2d 380, 388 (S.D.N.Y. Nov. 21, 2006)(Koeltl, J.)).

Similarly, the "experience and logic" test does not mandate press access to suppressed evidence. United States v. McVeigh, 119 F.3d at 812-13. Assuming without deciding that the

"experience and logic" test applies beyond the criminal context, the Tenth Circuit determined that, although there is a "qualified right of access" to a suppression motion, that right "does not extend to the evidence actually ruled inadmissible in such a hearing." United States v. McVeigh, 119 F.3d at 813. The public's interest in understanding court proceedings is the guiding principle. See United States v. McVeigh, 119 F.3d at 813. The Tenth Circuit reasoned that accessing suppressed evidence is "not necessary to understand the suppression hearing, so long as the public is able to understand the circumstances that gave rise to the decision to suppress." United States v. McVeigh, 119 F.3d at 813. Moreover, the Tenth Circuit noted that disclosing suppressed evidence would harm the criminal process, because it would expose the "public generally, as well as potential jurors, to incriminating evidence that the law has determined may not be used to support a conviction." United States v. McVeigh, 119 F.3d at 813. A district court's decision to seal only "those portions of the motion and exhibit that contain materials . . . ruled inadmissible," therefore, did not run afoul of the First Amendment, because "both the press and the public had ample opportunity to understand the circumstances surrounding" the inadmissible material. United States v. McVeigh, 119 F.3d at 813-14.

The First Amendment does not require that the press have access to Criminal Justice Act, 18 U.S.C. § 3006A, ("CJA") materials, including "CJA-related vouchers, backup documentation, motions, orders, and hearing transcripts." United States v. Gonzales, 150 F.3d 1246, 1253 (10th Cir. 1998). When the Albuquerque Journal contended that it has a First Amendment right to access CJA materials, the Tenth Circuit applied the "experience and logic" test, and concluded that neither history nor logic supported the Albuquerque Journal's contention. United States v. Gonzales, 150 F.3d at 1256-61. First, there is "no history, experience or tradition of access" requiring the "release at any time of backup documentation, motions, orders, and hearing transcripts regarding requests

for CJA assistance." United States v. Gonzales, 150 F.3d at 1258.  Second, public access to these records does not "play a *significant role* in the functioning of the CJA process" and would, in fact, play "a *negative* role."   United States v. Gonzales, 150 F.3d at 1259 (emphasis in original). Further, the Tenth Circuit concluded that there is no common-law right of access to CJA materials, because the CJA statutory scheme would supersede any common-law right.  See United States v. Gonzales, 150 F.3d at 1263.

Neither the Supreme Court nor the Tenth Circuit has decided that Press-Enterprise Co's "experience and logic" test applies to civil complaints.  Moreover, if restriction on public access to a government document or record is not a complete bar, but instead resembles a "time, place, and manner" restriction, then a court does not apply strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 607 n.17.  Time, place, and manner restrictions on press access to court documents are constitutional where they are "content-neutral, narrowly tailored, and necessary to preserve the court's important interest in the fair and orderly administration of justice."  Courthouse News Serv. v. Planet, 947 F.3d 581, 585 (9th Cir. 2020). See Ward v. Rock Against Racism, 491 U.S. at 791 (concluding that content-neutral time, place, and manner restrictions are constitutional if they are narrowly tailored to serve a significant government interest, and leave open ample room for the information to be communicated other ways).

Where the "experience and logic" test is satisfied -- and, therefore, there is a First Amendment right to access -- there is a necessary "right to timely access."  Courthouse News Serv. v. Planet, 947 F.3d at 594.  The right to timely access does not swallow the entire time, place, and manner analysis.  See Courthouse News Serv. v. Planet, 947 F.3d at 594.  As a result, a right to access timely information does not entitle the press to "immediate, pre-processing access to newly

filed complaints." Courthouse News Serv. v. Planet, 947 F.3d at 594.  See Courthouse News Serv.

v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021)(concluding that the First Amendment "does not

require perfect or instantaneous access").  The qualified right "attaches when the complaint is

filed," but does "not entitle the press to immediate access to those complaints."  Courthouse News

Serv. v. Planet, 947 F.3d at 585.  The Ninth Circuit states:

> Even in this era of electronic filing systems, instantaneous public access to court
> filings, especially complaints, could impair the orderly filing and processing of
> cases with which clerk's offices are charged.  After all, litigants are not uploading
> their complaints to the internet; they are filing them with a court, making them
> subject to judicial administration.  The First Amendment does not require courts,
> public entities with limited resources, to set aside their judicial operational needs to
> satisfy the immediate demands of the press.

Courthouse News Serv. v. Planet, 947 F.3d at 596.  The qualified right of access does "not require

perfect or instantaneous access," because it leaves room for courts to delay access when "same-

day access would be impracticable."  Courthouse News Serv. v. Schaefer, 2 F.4th at 328.  Neither

"inconsequential delays" nor delays caused by "extraordinary circumstances" infringe the

qualified right of access.  Courthouse News Serv. v. Schaefer, 2 F.4th at 328.  Rather, the First

Amendment requires newly filed civil complains be available "as expeditiously as possible."

Courthouse News Serv. v. Schaefer, 2 F.4th at 329.  For example, "overnight delay in access to

complains filed during the last ninety minutes of the court's public hours" does not violate the First

Amendment.  Courthouse News Serv. v. Planet, 947 F.3d at 599.

### 3.    First Amendment Retaliation.

The Tenth Circuit has noted that, "[a]ny form of official retaliation for exercising one's

freedom of speech, including prosecution, threatened prosecution, bad faith investigation, and

legal harassment, constitutes an infringement of that freedom." Lackey v. Cnty. of Bernalillo, 166

F.3d 1221, at *3 (10th Cir. 1999)(unpublished)(citing Smart v. Bd. of Trustees of Univ. of Illinois,

34 F.3d 432, 434 (7th Cir. 1994), and Reps. Comm. for Freedom of Press v. Am. Tel. & Tel. Co.,

593 F.2d 1030, 1064 (D.C. Cir. 1978)).  In Worrell v. Henry, 219 F.3d 1197 (10th Cir. 2000), the

Tenth Circuit draws on case law from the United States Court of Appeals for the Eighth Circuit to

announce the elements for a First Amendment retaliation claim against a defendant who is not the

plaintiff's employer:[130]

> (1) that the plaintiff "was engaged in constitutionally protected activity"; (2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."

Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000)(quoting Lackey v. Cnty. of Bernalillo,

166 F.3d 1221, at *3).  See Worrell v. Henry, 219 F.3d at 1212 (discussing approvingly Helvey v.

City of Maplewood, 154 F.3d 841, 844 (8th Cir. 1998)).

---

[130]In cases involving allegations of First Amendment retaliation when the plaintiff is a public employee, courts undertake balancing pursuant to Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois, 391 U.S. 563, 568 (1968), which is the test that ensures that, for public employees, "[e]mployee speech is protected only if the employee's interest in free expression outweighs the employer's interest in restricting the speech."  Worrell v. Henry, 219 F.3d 1197, 1206 (10th Cir. 2000)(citing Lytle v. City of Haysville, Kan., 138 F.3d 857, 863 (10th Cir. 1998)). As noted by the Tenth Circuit in Van Deelen v. Johnson, 497 F.3d 1151, 1156 (10th Cir. 2007), notes:

> Because of the government's need to maintain an efficient workplace in aid of the public's business, the Supreme Court has long recognized that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."

497 F.3d at 1156 (quoting Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois, 391 U.S. at 568).

### LAW REGARDING PRIOR RESTRAINTS ON SPEECH

"[P]rior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." Neb. Press Ass'n v. Stuart, 427 U.S. 539, 559 (1976). "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." N.Y. Times v. United States, 403 U.S. 713, 714 (1971). Prior restraints are viewed as more invidious than after the fact speech restrictions, yet it can be difficult to determine: (i) when a speech restriction is a prior restraint; and (ii) what standard of judicial review judges should apply to speech restrictions once they have determined that the restriction is a prior restraint.

### 1.      Prior Restraint Defined.

In the abstract, prior restraints are contrasted against restrictions that provide for subsequent punishment.   Dean Erwin Chemerinsky provides the following guidance in his hornbook:

> It is too broad to say that a prior restraint is a government action that prevents speech from occurring. All laws outlawing speech would constitute prior restraints by this definition.  Nor is the traditional distinction between censorship before speech and after the fact punishments sufficient.   All punishment for speech -- whether under prior restraints or other laws -- occurs after the expression takes place.  All government actions regulating speech -- whether prior restraints or not -- exist before the speech occurs.
>
> The clearest definition of prior restraint is as an administrative system or a judicial order that prevents speech from occurring. . . .

Erwin Chemerinsky, Constitutional Law: Principles and Policies § 11.2.3.1, at 949-50 (3d ed. 2006).

The best way to determine whether a given speech restriction is a prior restraint is to consider the reasons for the heightened skepticism towards prior restraints in the first place and determine whether the speech restriction in question implicates those reasons.   It is not

immediately obvious why prior restraints are disfavored.  In many ways, front-end suppression of speech seems preferable to back-end penal or even monetary sanctions.  If the speech is ultimately to be restricted anyway, it seems to comport more with due process for the speaker to have the opportunity to argue his case and ascertain the legality of his speech before speaking, and prior restraints are more conducive to front-end First Amendment analyses.  Speech restrictions that provide for subsequent punishment, on the other hand, force the speaker to risk punishment to even challenge the speech restriction; if the speaker speaks and is punished, and the courts subsequently uphold the speech restriction against a First Amendment challenge, then the speaker cannot avoid punishment because the restricted speech has already been said.  The uncertainty attendant to subsequent punishment speech restrictions thus leads to a chilling effect whereby would-be speakers are intimidated from engaging in constitutionally-protected speech, because -- lacking a definitive front-end ruling from the courts -- they fear that their speech may be proscribed by the speech restriction and unprotected by the First Amendment.  See Lamont v. Postmaster Gen., 381 U.S. 301, 307-10 (1965).  The Supreme Court has recognized the dangers of speech restrictions that subsequently punish -- these considerations played a key role in the formation of the overbreadth and void-for-vagueness doctrines -- but they still reserve special suspicion for prior restraints.

Some of this animus is historical, carried over from judicial opposition to the English Crown's licensing system for publications.  See 4 William Blackstone, Commentaries *151-152 ("[T]he liberty of the press is, indeed essential to the nature of a free state; but this consists in laying no previous restraints upon publication, and not in freedom from censure for criminal matter when published.").  Other reasons remain viable today:

> A system of prior restraint is in many ways more inhibiting than a system of subsequent punishment: It is likely to bring under government scrutiny a far wider

range of expression; it shuts off communication before it takes place; suppression by a stroke of the pen is more likely to be applied than suppression through a criminal process; the procedures do not require attention to the safeguards of the criminal process; the system allows less opportunity for public appraisal and criticism; the dynamics of the system drive toward excesses, as the history of all censorship shows.

Thomas Emerson, The System of Freedom of Expression 506 (1970).

Perhaps the most compelling rationale for the distinction between prior restraints and subsequent punishment is the collateral bar rule. The collateral bar rule provides that when a specific individual is restrained from expression -- as by an injunction or the denial of a permit, not through the enforcement of laws applicable to everyone in the general public -- he must challenge the restraint directly, without first violating it. The collateral bar rule appears to be based upon the conception that, while citizens need not obey an unconstitutional law, they must respect the judiciary's decision whether that law is constitutional. In Walker v. City of Birmingham, 388 U.S. 307 (1967), an Alabama state court enjoined a group of civil rights protestors, including Dr. Martin Luther King, Jr., from, "among other things, participating in or encouraging mass street parades or mass processions without a permit as required by a Birmingham ordinance." 388 U.S. at 309. The protestors defied the injunction, holding a large march on the city streets, and were arrested and convicted of contempt of court. See 388 U.S. at 311-12. Both the Supreme Court of Alabama and the Supreme Court of the United States refused to rule on the constitutionality of the Birmingham ordinance upon which the injunction was based, instead holding that the only question that mattered was whether the protestors had violated a facially valid injunction issued by a court of proper jurisdiction. 388 U.S. at 312-13, 320-21. The Supreme Court of the United States held that the protestors could not challenge the constitutionality of the ordinance, because they had not been arrested for violation of the ordinance itself, but rather for violation of a court order fashioned to prevent violations of the ordinance. None of the elements of contempt of court

implicated the First Amendment.  See 388 U.S. at 318.  Moreover, because the prior restraint -- the injunction -- could be challenged directly at the time of its issuance without the protestors having to first violate it to gain standing, the protestors' actions evinced disrespect not only for the possibly unconstitutional ordinance, but for the judiciary's as-yet untested willingness and ability to evaluate the ordinance's constitutionality.[131]  See 388 U.S. at 316-19.  As the divided Supreme Court wrote:

> This case would arise in quite a different constitutional posture if the petitioners, before disobeying the injunction, had challenged it in the Alabama courts, and had been met with delay or frustration of their constitutional claims. But there is no showing that such would have been the fate of a timely motion to modify or dissolve the injunction.  There was an interim of two days between the issuance of the injunction and the Good Friday march.  The petitioners give absolutely no explanation of why they did not make some application to the state court during that period.  The injunction had issued ex parte; if the court had been presented with the petitioners' contentions, it might well have dissolved or at least modified its order in some respects.  If it had not done so, Alabama procedure would have provided for an expedited process of appellate review.  It cannot be presumed that the Alabama courts would have ignored the petitioners' constitutional claims. . . .
>
> . . . .
>
> The rule of law that Alabama followed in this case reflects a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion.  This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets.  One may sympathize with the petitioners' impatient commitment to their cause.  But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.

Walker v. City of Birmingham, 388 U.S. at 318-19, 320-21 (footnotes omitted).

---

[131]The petitioners made their distrust of the state judiciary clear at a press conference after the injunction was issued.  "At the press conference one of the petitioners stated: 'That they had respect for the Federal Courts, or Federal Injunctions, but in the past the State Courts had favored local law enforcement, and if the police couldn't handle it, the mob would.'"  Walker v. City of Birmingham, 388 U.S. at 310 (quotation unattributed).

The collateral bar rule stands today.  As long as an injunction is issued pursuant to proper procedure and is not "transparently invalid or ha[ving] only a frivolous pretense to validity," it must be obeyed and challenged directly, not defied; contempt of court trials are not appropriate vehicles to challenge the statutes that underlie the violated court orders.  The Supreme Court has also applied the collateral bar rule to licensing schemes, although the rule is relaxed in this context: when a litigant has been denied a license and defies that denial by participating in the licensed expression anyway, he may challenge the licensing scheme, as a whole, as unconstitutional; but he may not challenge his particular denial or restriction as an unconstitutional application of a facially constitutional licensing scheme.  Compare Poulos v. New Hampshire, 345 U.S. 395, 409 (1953)(holding that a where a facially valid licensing scheme had resulted in the denial of a permit to perform a religious service in a public park, the denial must be attacked directly, not by way of violation and collateral attack), with Shuttlesworth v. City of Birmingham, 394 U.S. 147, 151 (1969)(holding that where a licensing scheme is facially invalid for lack of procedural safeguards or unbridled discretion, "a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license").

The collateral bar rule cuts off citizens' ability to speak in the face of prior restraints, even if the citizen is confident and correct that the restraint is unconstitutional.  Prior restraints, thus, have the effect of absolutely suppressing speech, with no opportunity for after-the-fact vindication by the speaker, at least until they are challenged and overturned.  If the prior restraint is never challenged -- for example, if the restrained individual lacks the resources to fight the government in court -- then it acts to permanently prevent the restricted speech from entering the marketplace of ideas.

Courts have been most likely to find that a speech restriction is a prior restraint when the collateral bar rule would apply to a violation of the restriction.  "In practice, most prior restraints involve either an administrative rule requiring some form of license or permit before one may engage in expression, or a judicial order directing an individual not to engage in expression, on pain of contempt."  Rodney Smolla, Smolla and Nimmer on Freedom of Speech § 15:1 (2014). These two forms of prior restraint share another invidious feature, in addition to the applicability of the collateral bar rule: they are individualized decisions, in which the identity of the speaker, and often the exact content of the message, are known in advance of the creation of the prior restraint.

2.      **The Standard of Judicial Review Applicable to Prior Restraints.**

"Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity."  Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963).  Prior restraints must be narrowly tailored to be the least restrictive means for achieving a significant government interest.  See California v. Yamasaki, 442 U.S. 682, 702 (1979); Carroll v. President & Comm'rs of Princess Ann, 393 U.S. 175, 183 (1968)("[Prior restraints] must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order.").   In evaluating the constitutionality of prior restraints, courts "must ask . . . whether the challenged provisions of the injunction burden no more speech than necessary to serve a significant government interest." Madsen v. Women's Health Ctr., 512 U.S. 753, 765 (1994).  Although this standard is very close to strict scrutiny, it does not require that the prior restraint serve a "compelling state interest," but merely a significant one.[132]  Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45

---

[132]The Tenth Circuit has said that significant government interests "include public safety, accommodating competing uses . . . , controlling the level and times of noise, and similar interests."

(1983)(reciting the strict scrutiny standard).  This standard is the minimum scrutiny applied to all prior restraints; if the content of the restriction -- not merely its manner of enforcement as a prior restraint -- itself triggers strict scrutiny, then strict scrutiny applies.  See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. at 45 (holding that strict scrutiny applies to a prior restraint enforcing a content-based restriction on speech in a traditional public forum).  Holding otherwise would result in the perverse outcome that a prior restraint would be subjected to lower scrutiny than an otherwise identical speech restriction providing for subsequent punishment.

This standard, which retains the tailoring aspect of strict scrutiny while softening the government interest prong, is a sensible one to apply to prior restraints.  The concern with prior restraints is not so much with their core substantive content, but with their scope, with their preemptive nature, and with the individualized manner of their enforcement.  The requirement of narrow tailoring and least restrictive means mirrors and amplifies the standard for overbreadth challenges, which are often unavailable for prior restraints because of the collateral bar rule.  On the other hand, if a narrow, easily delineable category of speech clearly unprotected by the First Amendment is to be restricted, whether the restriction may be justified only on the basis of a compelling state interest or may be justified by any significant state interest, should not turn on whether the restriction operates before or after the speech occurs.

The Supreme Court has elaborated on the scrutiny courts should apply to prior restraints in a few specific contexts, notably, prior restraints in the name of national security and prior restraints to protect the fairness of criminal trials.

---

First Unitarian Church of Salt Lake City v. Salt Lake City Corp., 308 F.3d 1114, 1132 (10th Cir. 2002).

### a.    The Troopship Exception: Restraints on News Publications Justified by National Security.

The national security context appears to be the setting in which prior restraints may be most often found constitutional, but the Supreme Court has emphasized that the courts are not to be deferential to the government merely because national security is raised as a justification.  See New York Times v. United States, 403 U.S. 713 (1971)(per curiam).  The Supreme Court first countenanced the idea of a troopship exception in Near v. Minnesota, 283 U.S. 697, 716 (1931).  That case involved a court order enjoining the publication of libelous material, but the Supreme Court, after striking down the injunction as unconstitutional, outlined the potential exception: "No one would question but that a government might prevent actual obstruction to its recruiting service or the publication of the sailing dates of transports or the number and location of troops."  283 U.S. at 716.

This exception was first analyzed in New York Times v. United States.  See 403 U.S. at 714.  In that case, the Supreme Court refused the United States of America's request for an injunction enjoining the New York Times and the Washington Post from publishing a classified government study entitled History of U.S. Decision-Making Process on Viet Nam Policy, a.k.a. the Pentagon Papers.  See 403 U.S. at 714.  The United States had argued that publication of the document would jeopardize the ongoing war efforts.  See Brief for the United States, 1971 WL 167581, at *13-20.  Although the per curiam opinion was short and fact-specific, several Justices wrote separately to outline their views on the appropriate standard for prior restraints.  The Honorable Hugo L. Black and the Honorable William O. Douglas, Associate Justices of the Supreme Court, concurred, strongly implying that no prior restraint on news publication would ever be acceptable:

> I adhere to the view that the Government's case against the Washington Post should have been dismissed and that the injunction against the New York

Times should have been vacated without oral argument when the cases were first presented to this Court.  I believe that every moment's continuance of the injunctions against these newspapers amounts to a flagrant, indefensible, and continuing violation of the First Amendment.  Furthermore, after oral argument, I agree completely that we must affirm the judgment of the Court of Appeals for the District of Columbia Circuit and reverse the judgment of the Court of Appeals for the Second Circuit for the reasons stated by my Brothers DOUGLAS and BRENNAN.  In my view it is unfortunate that some of my Brethren are apparently willing to hold that the publication of news may sometimes be enjoined.  Such a holding would make a shambles of the First Amendment.

Our Government was launched in 1789 with the adoption of the Constitution.  The Bill of Rights, including the First Amendment, followed in 1791.  Now, for the first time in the 182 years since the founding of the Republic, the federal courts are asked to hold that the First Amendment does not mean what it says, but rather means that the Government can halt the publication of current news of vital importance to the people of this country.

403 U.S. at 714-15 (Black, J., concurring, joined by Douglas, J.).  Justice Douglas wrote separately to add: "It should be noted at the outset that the First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech, or of the press.'  That leaves, in my view, no room for governmental restraint on the press."  403 U.S. at 720 (Douglas, J., concurring)(quoting U.S. Const. amend. I).

The Honorable William J. Brennan, Associate Justice of the Supreme Court, was only slightly more amenable to prior restraints, setting forth a standard of scrutiny so strict that it might more aptly be characterized as an exception to a blanket rule against them: "[O]nly governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order."  403 U.S. at 726-27 (Brennan, J., concurring).  The Honorable Potter Stewart, the Honorable Byron R. White, and the Honorable Thurgood Marshall, Associate Justices of the Supreme Court, were more tepid in their categorical opposition to prior restraints, relying heavily on the United States' lack of statutory authorization for the

injunction -- the United States' relied on the executive's inherent power to justify the injunction. See 403 U.S. at 730-31 (White, J., concurring, joined by Stewart, J.); 403 U.S. at 740 (Marshall, J., concurring).  Three Justices dissented, and would have allowed the injunction, and, of course, none of the Justices from that era are on the Supreme Court today.  Given that the Supreme Court has not returned to this issue, the Court cannot know with certainty the scope of the troopship exception or the showing to demand from the government, except that it is safe to conclude that the government must shoulder a heavy burden.

### b.    Gag Orders: Prior Restraints to Protect Fair Trials for Criminal Defendants.

The Supreme Court has outlined a three-prong test for evaluating gag orders -- injunctions issued to prevent the press from publishing information relating to an ongoing or forthcoming trial -- that results in their almost never being found constitutional.  See Neb. Press Ass'n v. Stuart, 427 U.S. 539 (1976).  A gag order may only be entered for the benefit of the defendant, not the prosecution, and the defendant must show that: (i) without a prior restraint, publicity would "impair the defendant's right to a fair trial" by irrevocably tainting the jury pool, 427 U.S. at 562-63; (ii) "measures short of an order restraining all publication [will not] insure[] the defendant a fair trial," 427 U.S. at 563; and (iii) it is likely that an injunction will effectively secure a fair trial for the defendant, see 427 U.S. at 565.  Although this test does not initially appear all that rigorous, Dean Chemerinsky writes that it is tantamount to an absolute ban on gag orders.  See Chemerinsky, supra, § 11.2.3.3, at 962.  Attempts to satisfy the first prong are undermined by a number of high-publicity prosecutions that resulted in acquittals, including the O.J. Simpson case, the McMartin Preschool case,[133] and the rape trial of William Kennedy Smith.  See Chemerinsky, supra,

---

[133]Wikipedia describes the case as follows:

The McMartin preschool trial was a day care sexual abuse case of the 1980s.

§ 11.2.3.3, at 962.  Satisfaction of the second prong is stymied largely by the availability of changes in venue and the conducting of extensive voir dire.  The third prong tends to catch those few cases that survive the first two, as any case in which media coverage is so extensive and invidious as to be unfixable by voir dire and change of venue would likely still be stymied by publicity from sources outside the jurisdiction of the enjoining court.  Chemerinsky, supra, § 11.2.3.3, at 962.  Dean Chemerinsky also notes that "three Justices -- Brennan, Stewart, and Marshall -- took the position that prior restraints never would be justified to protect a defendant's right to a fair trial, and a fourth, Justice White, expressed 'grave doubt' that such a prior restraint ever would be justified."  Chemerinsky, supra, § 11.2.3.3, at 962 n.183 (citations omitted).

**LAW REGARDING FIRST AMENDMENT OVERBREADTH CHALLENGES**

An overbreadth challenge is a facial challenge to a speech-restricting statute on First Amendment grounds, and, if successful, it results in the invalidation of the entire statute.  To succeed, the challenged statute must regulate substantially more expression than the First Amendment allows governments to regulate.  See Schad v. Borough of Mt. Ephraim, 452 U.S. 61 (1981).  The party challenging the statute need not have been engaged in constitutionally protected expression to have standing to challenge the law; even if the law is constitutional as applied to the challenging party, if the law is found to be overbroad, it is invalid in its entirety.  See Village of

---

Members of the McMartin family, who operated a preschool in California, were charged with numerous acts of sexual abuse of children in their care.  Accusations were made in 1983.  Arrests and the pretrial investigation ran from 1984 to 1987, and the trial ran from 1987 to 1990.  After six years of criminal trials, no convictions were obtained, and all charges were dropped in 1990.  When the trial ended in 1990 it had been the longest and most expensive criminal trial in American history.  The case was part of day care sex abuse hysteria, a moral panic over alleged Satanic ritual abuse in the 1980s and early 1990s.

McMartin Preschool Trial, Wikipedia, http://en.wikipedia.org/wiki/McMartin_preschool_trial.

Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 634 (1980)("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." (citations omitted)).  There are, thus, two aspects of an overbreadth challenge that set it apart from other facial challenges: the substantive aspect and the standing aspect.

### 1.  The Substantive Aspect: Inverting the Usual Rule for Facial Challenges.

Outside of the First-Amendment context, for a party to succeed in facially challenging a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[134]  United States v. Salerno, 481 U.S. 739, 745 (1987).  Overbreadth is not quite

---

[134]The Tenth Circuit and leading commentators contend that the formulation in United States v. Salerno, 481 U.S. 739, 745 (1987), is neither normatively desirable nor -- more importantly for the Court's purposes -- descriptively accurate.

> [I]n City of Chicago v. Morales, [527 U.S. 41, 55 n.22 (1999),] a plurality of the Court asserted that "[t]o the extent that we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court, including Salerno itself."
>
> . . . .
>
> Salerno's language thus is accurately understood not as setting forth a test for facial challenges, but rather as describing the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.  In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the Ward test, or reasonableness review), it can no longer be constitutionally applied to anyone -- and thus there is "no set of circumstances" in which the statute would be valid.  The relevant constitutional test, however, remains the proper inquiry.

Doe v. City of Albuquerque, 667 F.3d 1111, 1125-26, 1127 (10th Cir. 2012)(emphasis in original)(referring to Ward v. Rock Against Racism, 491 U.S. 781 (1989), which held that, even in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, as long as the restrictions are narrowly tailored to serve a significant governmental interest, the restrictions leave open ample alternative channels for communicating the information, and the restrictions are justified without reference to the content of the regulated speech).  See Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 936-49 (2011)(examining empirical evidence and concluding that the Supreme Court regularly facially invalidates laws, and ignores the purported standard when it does); Richard H.

the 180-degree reverse of this standard -- which would be that a law is unconstitutional if it proscribes any constitutionally protected speech -- but instead invalidates only those laws whose "overbreadth is substantial." Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. at 574. The usual burden of proof in attacking the constitutionality of a statute is switched in the First Amendment context, so that the government "bears the burden of establishing its constitutionality," ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated, see Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012)("[A]s a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to . . . ordinances. However, this presumption does not apply when the challenged statute infringes upon First Amendment rights." (omission in original)(citations omitted)(internal quotation marks omitted)).

An example of a successful overbreadth challenge occurred in Schad v. Borough of Mt. Ephraim. In that case, a club that featured nude dancing challenged a city ordinance that purported

---

Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1322-23, 1342-43 (2000); Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev 235, 239-42 (1994)("[T]he Salerno opinion cites no direct authority to support its truly draconian standard."). If the standard in United States v. Salerno were taken seriously, virtually no statute would ever be invalidated. A statute criminalizing male-male sexual relations would be constitutional, because it could validly be applied to nonconsensual male-male sexual relations. See Lawrence v. Texas, 539 U.S. 558 (2003)(striking down a male-male sodomy law without ever using the term "facial challenge" or reciting any recognizable standard of the same). It is not clear how this standard even could be applied to Equal Protection challenges, invidious purpose challenges, procedural rights challenges, or challenges that a law falls outside of the federal government's enumerated powers; how it can be squared with void-for-vagueness doctrine; or whether and how it affects severability analysis. See Citizens United v. Fed. Election Comm'n, 558 U.S. at 331("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

to ban all live entertainment in commercial zones.[135]  See 452 U.S. at 63-64.  Although the Supreme Court has since determined that the First Amendment does not protect nude dancing, see Barnes v. Glen Theatre, Inc., 501 U.S. 560 (1991), the ordinance banned a substantial swath of activities -- such as "plays, concerts, musicals, dance," and athletic events -- that the First Amendment protected, Schad v. Borough of Mt. Ephraim, 452 U.S. at 66.  The Supreme Court did not do as they might have done in non-First Amendment settings and narrowly interpret the ordinance to ban only constitutionally unprotected speech, but rather stuck the ordinance down entirely as overbroad.  See 452 U.S. at 66.

"[T]he overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  Broadrick v. Oklahoma, 413 U.S. 601, 615-16 (1973).  In Broadrick v. Oklahoma, the Supreme Court upheld a state law, patterned on the federal Hatch Act of 1939, 5 U.S.C. §§ 7321-7326, that barred government employees from engaging in partisan political activities.  See 413 U.S. at 615-16.  On its face, the statute could be construed to ban forms of expression, like wearing partisan buttons and displaying partisan bumper stickers on vehicles, that both parties agreed the First Amendment protected.[136]  See 413 U.S. at 615-16.  The

---

[135]The Borough of Mt. Ephraim argued that the zoning ordinance constituted a "reasonable time, place, and manner restriction."  452 U.S. at 74.  The Supreme Court replied that, "[t]o be reasonable, time, place, and manner restrictions not only must serve significant state interests but also must leave open adequate alternative channels of communication.  Here, the Borough totally excludes all live entertainment . . . ."  452 U.S. at 75-76 (citations omitted)(citing Grayned v. City of Rockford, 408 U.S. 104, 116 (1972)).

[136]Government employees do not receive the same level of First Amendment protection from adverse employment actions, e.g., firings that citizens do from adverse government action, e.g., penal or civil sanctions, discrimination on the basis of speech (content-based speech regulation), compelled speech, or the conditioning of a benefit.  See Erwin Chemerinsky, Constitutional Law: Principles and Policies § 11.2.4.1, at 969; id. § 11.3.8.1, at 1112.  Government employees are protected from adverse employment actions only on the basis of speech if: (i) the speech is "on a matter of public concern," Connick v. Myers, 461 U.S. 138, 146 (1983); and (ii) the government's needs, "as an employer, in promoting the efficiency of the public services it

State Personnel Board, the body charged with enforcing the statute and disciplining noncompliant employees, had, however, internally interpreted the statute to ban only unprotected speech, and the disciplined plaintiff-employees had not been engaged in protected speech, but merely sought to invalidate the law on the basis of the theoretical unconstitutional applications.  See 413 U.S. at 615-16.  The Supreme Court held that the statute was "not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."  413 U.S. at 615-16.

As to where the line is between insubstantial overbreadth and substantial overbreadth, the Supreme Court has stated:

> The concept of substantial overbreadth is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.  On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself -- the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.

> "The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine.  While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation."  New York v. Ferber, 458 U.S. 747, 772 (1982).  In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.

Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 800-01 (1984)(footnote omitted)(citations omitted).

When assessing whether an overbroad statute is likely to chill third parties from engaging in protected expression, courts should assess not only whether the number of unconstitutional

---

performs through its employees," Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), do not -- when balanced against the speech rights of the employee -- justify the speech restriction.

potential applications of the statute is significant relative to the overall number of applications, but the level of interpretive discretion given to those in charge of its enforcement, and the likelihood of capricious enforcement.  In City of Houston v. Hill, 482 U.S. 451 (1987), the Supreme Court struck down as overbroad a city ordinance making it a crime "for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty."  482 U.S. at 455 (quoting Code of Ordinances, City of Houston, Tex. § 34-11(a) (1984)).  The Supreme Court held that the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," 482 U.S. at 465, and "criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement," 482 U.S. at 466.  The Supreme Court explained:

> As the Court observed over a century ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large."  United States v. Reese, 92 U.S. (2 Otto) 214, 221 (1876).
>
> . . . .
>
> The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals -- those chosen by the police in their unguided discretion -- are arrested.  Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," NAACP v. Button, 371 U.S. 415, 433 (1963), the ordinance is susceptible of regular application to protected expression.

City of Houston v. Hill, 482 U.S. at 465-67 (citations to the record omitted).  The Court presumes that, assuming the same level of overbreadth, the threat of criminal sanctions produces a stronger chilling effect than that of civil monetary sanctions, directions to cease and desist, or exposure to civil liability.

Some commentators have suggested that, when considering whether a statute's overbreadth is substantial, courts should take into account the importance of the protected speech being restricted or chilled.  See Richard Fallon, Jr., Making Sense of Overbreadth, 100 Yale L.J.

853, 894 (1991).  Under this view, a statute that chills a swath of political speech should be more readily facially invalidated than one that chills sexual, frivolous, or even artistic speech -- the latter statute being more amenable to as-applied challenges.  Although the Supreme Court has not endorsed this view explicitly, it has held that "the overbreadth doctrine does not apply to commercial speech."  Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982).

## 2.    The Standing Aspect: The Near Abolition of Prudential Standing Factors.

A non-First Amendment, non-overbreadth facial challenge to a given statute is always more difficult to mount than an as-applied challenge to the same statute.  See United States v. Salerno, 481 U.S. at 745.  This is so because an as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case.  A facial challenge, on the other hand, requires this showing[137] and also requires that there exists "no [other, theoretical] set of circumstances" in which the law could be constitutionally applied.  United States v. Salerno, 481 U.S. at 745.  A successful as-applied challenge is, thus, a necessary, but not sufficient, ingredient to a successful facial challenge.  The Supreme Court has attributed the relative difficulty of facial and as-applied challenges to the Case or Controversy Clause, U.S. Const. art. III, § 2, cl. 1, specifically its standing requirement[138]:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be

---

[137]A logical consequence of there being "no set of circumstances" wherein the law would be constitutional is that the manner in which the government applied the law in the challenger's case must also be unconstitutional.

[138]Standing is not the only reason that facial challenges are disfavored.  Other cases say that "[f]acial adjudication carries too much promise of 'premature interpretation of statutes' on the basis of barebones records."  Sabri v. United States, 541 U.S. 600, 609 (2004)(alterations omitted)(quoting United States v. Raines, 362 U.S. 17, 22 (1960)).

applied unconstitutionally to others, in other situations not before the Court.  A closely related principle is that constitutional rights are personal and may not be asserted vicariously.  These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court.

Broadrick v. Oklahoma, 413 U.S. at 610 (citations omitted).

The respective relative difficulty between mounting facial and as-applied challenges is almost, but not entirely, reversed in the context of a First Amendment overbreadth challenge.  In the First Amendment context, it is not necessary to have a viable as-applied challenge to succeed on a facial challenge.  Put another way, "where the claim is that a statute is overly broad in violation of the First Amendment, . . . [there is] no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity."  Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. 947, 957 (1984). Even if the challenger engaged in constitutionally unprotected, validly penalized speech, if he can establish that the statute penalizes a substantial swath of protected speech, then he will prevail in getting the statute invalidated not only as it relates to the constitutionally protected speech of others, but to his own unprotected speech as well.  For example, if a statute criminalized "demeaning, threatening, or inflammatory words," a challenger arrested for using "fighting words" in a bar -- unprotected speech which may be validly criminalized under Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) -- could challenge the law on behalf of third parties who might risk arrest for constitutionally protected demeaning or inflammatory words, see Goading v. Wilson, 405 U.S. 518 (1972)(invalidating a Georgia law making it a crime for "[a]ny person [to], without provocation, use . . . opprobrious words or abusive language, tending to cause a breach of the peace").

The relaxation of the usual standing rules in the overbreadth context, moreover, goes further than simply allowing an individual to whom the law is constitutionally applied to sue on the basis of unconstitutional applications. The challenged law need not have been applied against the challenger at all; as long as the barebones requirements of Article III standing are met,[139] the elements of prudential standing are presumed satisfied in an overbreadth challenge.[140] In <u>Secretary of State of Maryland v. Joseph H. Munson Co.</u>, the Supreme Court allowed a professional fundraising company to bring suit challenging a state statute that prohibited charities from soliciting funds unless at least seventy-five percent of their revenue was used for charitable purposes. <u>See</u> 467 U.S. at 949. The Supreme Court held that the plaintiff had standing, even though the law had not been and -- as the company was not a charity -- could not be applied against it:

> [T]he Secretary's most serious argument against allowing Munson to challenge the statute is that there is no showing that a charity cannot bring its own lawsuit. Although such an argument might defeat a party's standing outside the First

---

[139]Establishing Article III standing requires three components: (i) an injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical,"; (ii) causation between the injury in fact and the conduct complained of, such that the injury is fairly traceable to the challenged action; and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. at 560-61 (Scalia, J.)(quoting <u>Allen v. Wright</u>, 468 U.S. 737, 756 (1984); <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990); <u>Simon v. E. Kentucky Welfare Rts. Org.</u>, 426 U.S. 26, 38, 41-42 (1976)).

[140]A leading commentator offers a possible justification for the virtual abandonment of standing doctrine in the context of overbreadth challenges that also explains the concept of "taxpayer standing" for suits brought under the Establishment Clause: the grammar of the Constitution's text. Nicholas Q. Rosenkranz, <u>The Subjects of the Constitution</u>, 62 Stan. L. Rev. 1209, 1250-57, 1257-63 (2010). The thrust of the argument is that, while all the other provisions of the Bill of Rights are written in passive voice, the First Amendment provides that "Congress shall make no law . . . ." U.S. Const. amend. I. <u>See</u> Rosenkranz, <u>supra</u>, at 1250. Professor Rosenkranz suggests that, while the Constitution contemplates that, for example, Fourth Amendment harm occurs at the point when an unreasonable search occurs, First Amendment injury occurs when Congress passes the infringing law. <u>See</u> Rosenkranz, <u>supra</u>, at 1255.

Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech.  To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and "'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" Broadrick v. Oklahoma, 413 U.S. at 612 (quoting Dombrowski v. Pfister, 380 U.S. 479, 486 (1965)).

The fact that, because Munson is not a charity, there might not be a possibility that the challenged statute could restrict Munson's own First Amendment rights does not alter the analysis.  Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society -- to prevent the statute from chilling the First Amendment rights of other parties not before the court.  Munson's ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake.  The crucial issues are whether Munson satisfies the requirement of "injury-in-fact," and whether it can be expected satisfactorily to frame the issues in the case. If so, there is no reason that Munson need also be a charity.  If not, Munson could not bring this challenge even if it were a charity.

The Secretary concedes that the Art. III case-or-controversy requirement has been met and the Secretary has come forward with no reason why Munson is an inadequate advocate to assert the charities' rights.  The activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents.  We see no prudential reason not to allow it to challenge the statute

Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. at 957-58 (citations omitted).

In Griffin v. Bryant, No. CIV 13-0799 JB/GBW, 2014 WL 3377705 (D.N.M. June 18, 2014)(Browning, J.), the Court found that a plaintiff had standing to challenge a municipality's rule prohibiting statements criticizing the municipality's employees or governing body.  Even though the plaintiff had not been penalized for violating the municipality's rule, because the rule likely affected his speech, he had suffered a sufficient injury in fact to establish standing.  See Griffin v. Bryant, 2014 WL 3377705, at *28.

## LAW REGARDING A STATUTE BEING VOID FOR VAGUENESS

"Facial invalidation is, manifestly, strong medicine that has been employed by the Court

- 276 -

sparingly and only as a last resort." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 580 (1998)(quotation marks omitted). "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment." United States v. Williams, 553 U.S. 285, 304 (2008). "A statute can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." Hill v. Colorado, 530 U.S. 703, 732 (2000)(citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)). See United States v. Williams, 553 U.S. at 304 (describing a vague statute as failing "to provide a person of ordinary intelligence fair notice of what is prohibited, or [as being] so standardless that it authorizes or encourages seriously discriminatory enforcement."); Mini Spas, Inc. v. South Salt Lake City Corp., 810 F.2d 939, 942 (10th Cir. 1987)("A statute violates due process if it is so vague that a person of common intelligence cannot discern what conduct is prohibited, required, or tolerated."). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." United States v. Williams, 553 U.S. at 306. The Supreme Court has noted that "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." United States v. Williams, 553 U.S. at 304 (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)).

"A federal court evaluating a vagueness challenge to a state law must read the statute as it is interpreted by the state's highest court." United States v. Gaudreau, 860 F.2d 357, 361 (10th Cir. 1988). In evaluating the Constitutional validity of state statutes, the Supreme Court has stated that "every presumption is to be indulged in favor of the validity of a statute [ .]" Mugler v.

Kansas, 123 U.S. 623, 661 (1887). The Supreme Court of New Mexico, in discussing the presumption of Constitutional validity that attaches to acts of the New Mexico legislature, has stated:

> A strong presumption of constitutionality underlies each legislative enactment, and we will not void a statute where a constitutional construction is reasonably supported by the statutory language. See State v. Fleming, 2006-NMCA-149, 149 P.3d 113; Ortiz v. Taxation & Revenue Dep't, 1998-NMCA-027, 954 P.2d 109.  In construing a regulation or statute, "this Court has a duty to affirm the legislation's validity and constitutionality if reasonably possible." Old Abe Co. v. N.M. Mining Comm'n, 1995-NMCA-134, 908 P.2d 776, 789–90.  A statute is only unconstitutional "if it is so vague that persons of common intelligence must guess at its meaning and would differ in its application." City of Albuquerque v. Sanchez, 1992-NMCA-038, 832 P.2d 412, 418.   However, "absolute or mathematical certainty is not required in the framing of a statute." State ex rel. Bliss v. Dority, 1950-NMSC-066, 225 P.2d 1007, 1017.

Bishop v. Evangelical Good Samaritan Soc'y, 2009-NMSC-036, ¶ 16, 212 P.3d 361, 366-67.  In some cases, however, the Supreme Court has noted that it could not remedy a constitutionally imprecise state statute.   See Hynes v. Mayor & Council of Oradell, 425 U.S. 610, 622 (1976)("Even assuming that a more explicit limiting interpretation of the ordinance could remedy the flaws we have pointed out -- a matter on which we intimate no view -- we are without power to remedy the defects by giving the ordinance constitutionally precise content.").

In determining whether a federal statute is unconstitutionally vague, the Supreme Court has also noted that a strong presumption of validity attaches to Congress' enactments and has consistently construed a challenged statute narrowly rather than condemn it as unconstitutionally vague. See Skilling v. United States, 561 U.S. 358, 405 (2010)("It has long been our practice, however, before striking a federal statute as impermissibly vague, to consider whether the prescription is amenable to a limiting construction."); United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32 (1963)(stressing, in response to a vagueness challenge, "[t]he strong presumptive validity that attaches to an Act of Congress"). In Skilling v. United States, the

Supreme Court looked to Congress' intent in passing the honest-services doctrine, and limited the

construction of the honest-services doctrine to reach bribes and kickbacks, as Congress intended,

stating:

> [T]here is no doubt that Congress intended § 1346 to reach *at least* bribes and
> kickbacks. Reading the statute to proscribe a wider range of offensive conduct, we
> acknowledge, would raise the due process concerns underlying the vagueness
> doctrine. To preserve the statute without transgressing constitutional limitations,
> we now hold that § 1346 criminalizes only the bribe-and-kickback core of the pre-
> *McNally* case law.

561 U.S. at 408.

In Grayned v. City of Rockford, 408 U.S. 104 (1972), the Supreme Court stated that, when

assessing whether a statute is vague, it looks to "the words of the ordinance itself, to the

interpretations the court below has given to analogous statutes, and, perhaps to some degree, to the

interpretation of the statute given by those charged with enforcing it." 408 U.S. at 110 (internal

quotations omitted). For example, in Minority Television Project Inc. v. F.C.C., No. C-06-02699,

2007 WL 4570293, at *1 (N.D. Cal. December 21, 2007)(Laporte, J.), aff'd, 475 F. App'x 671

(9th Cir. 2012), on reh'g en banc, 736 F.3d 1192 (9th Cir. 2013), and aff'd, 736 F.3d 1192 (9th

Cir. 2013), the Honorable Elizabeth D. Laporte, United States District Judge for the Northern

District of California, found it premature to dismiss a facial challenge of void for vagueness until

the plaintiffs introduced evidence of the Federal Communication Commission's ("FCC")

enforcement decisions applying the statute in question -- a prohibition against certain paid

promotional advertisements. See 2007 WL 4570293, at *9.   When the plaintiffs submitted

evidence of the FCC's enforcement, Judge Laporte found the statute was not unconstitutionally

vague, explaining:

> Assuming that the Court may "perhaps to some degree" consider the FCC's
> interpretation of the statute in evaluating whether the statute is vague, see Grayned
> v. City of Rockford, 408 U.S. 104, 110 (1972), as Plaintiff urges the Court to do,
> arguable inconsistencies in a statute's application in a handful of cases do not

condemn a statute. If such limited inconsistencies rendered statutes unconstitutionally vague, the majority of statutes would probably not survive a vagueness challenge. Rather, "uncertainty at a statute's margins will not warrant facial invalidation if it is clear what the statute proscribes 'in the vast majority of its intended applications.'" California Teachers Ass'n, 271 F.3d at 1151(quoting Hill v. Colorado, 530 U.S. 703, 733 (2000)(rejecting vagueness challenge)(quotation marks omitted)). As in Grayned, the words of the statute here are marked by "flexibility and reasonable breadth, rather than meticulous specificity," and "it is clear what the ordinance as a whole prohibits." 408 U.S. at 110 (quoting Esteban v. Central Missouri State College, 415 F.2d 1077, 1088 (8th Cir. 1969)).

Minority TV Project Inc. v. FCC, 649 F.Supp.2d 1025, 1047 (N.D.Cal. 2009). The Supreme Court in Grayned v. City of Rockford noted: "Condemned to the use of words, we can never expect mathematical certainty from our language." 408 U.S. at 110. The Supreme Court rejected a facial vagueness challenge to an ordinance that implicated First Amendment rights and prohibited certain demonstrations "adjacent" to schools that "disturb[ ] or tend[ ] to disturb the peace or good order of such school session or class thereof," finding that it was "clear what the ordinance as a whole prohibits," even though the statute at issue did not specify the prohibited quantum of disturbance. 408 U.S. at 109-11 ("Although the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted.").

Numerous statutes have withstood facial vagueness challenges even though they contained arguably ambiguous language. See Hill v. Colorado, 530 U.S. at 732 (rejecting vagueness challenge to ordinance making it a crime to "approach" another person, without that person's "consent," to engage in "oral protest, education, or counseling" within specified distance of health-care facility); Boos v. Barry, 485 U.S. 312, 332 (1988)(rejecting vagueness challenge to ordinance interpreted as regulating conduct near foreign embassies "when the police reasonably believe that a threat to the security or peace of the embassy is present"); Cameron v. Johnson, 390 U.S. 611, 616 (1968)(rejecting vagueness challenge to ordinance prohibiting protests that "unreasonably

interfere" with access to public buildings); <u>Kovacs v. Cooper</u>, 336 U.S. 77, 79 (1949)(rejecting vagueness challenge to sound ordinance forbidding "loud and raucous" sound amplification).

## ANALYSIS

The Court grants the Voter Reference MSJ in part and denies it in part.  The Court also grants the Defendants' MSJ in part and denies it in part.  The Court undertakes its analysis in seven sections, each of which corresponds to a count in Voter Reference's Amended Complaint.[141]   In Section I of the analysis, the Court considers the cross-motions' arguments on Count II of the Amended Complaint, <u>see</u> Amended Complaint ¶¶ 138-147, at 35-36, which alleges that the Defendants violated the NVRA by refusing to comply with the Public Inspection Provision.  On Count II, the Court grants the Voter Reference MSJ and denies the Defendants' MSJ, because the Court concludes that there is no genuine issue of disputed material fact regarding the Defendants' violation of the NVRA's Public Inspection Provision by failing to disclose the voter data that Voter Reference requests.  Next, in Section II of its analysis, the Court considers the allegation in Count I of the Amended Complaint, <u>see</u> Amended Complaint ¶¶ 119-137, at 30-35, that the NVRA's Public Inspection Provision preempts the State's Data Sharing Ban and the Use Restrictions.  On this issue, the Court likewise grants the Voter Reference MSJ and denies the Defendants' MSJ, because the Court concludes that there is no genuine issue of disputed material fact that bears on the preemption question, and the Court concludes that, as a matter of law, the NVRA's Public Inspection Provision preempts the Data Sharing Ban and the Use Restrictions.

---

[141]The Amended Complaint alleges eight counts, but Voter Reference has voluntarily dismissed its allegation of prior restraint, <u>see</u> Transcript of Bench Trial at 5:2-13 (taken October 16, 2023), filed December 28, 2023 (Doc. 171)(Court, Greim), and neither party makes arguments regarding prior restraint in their respective summary judgment motions.  Accordingly, the Court does not discuss Count IV of the Amended Complaint, <u>see</u> Amended Complaint ¶¶ 166-186, at 39-44, and dismisses it without prejudice.

Following these NVRA-related conclusions, the Court considers Voter Reference's First Amendment arguments.[142]   In Section III on its analysis, the Court considers the cross-motions' arguments on Count V of the Amended Complaint, which challenges the Constitutionality of the Data Sharing Ban and the Use Restrictions as "restrictions on constitutionally protected, core political speech,"  Amended Complaint ¶ 197, at 47, and also challenges the State's restrictions on the grounds that they "distinguish[] among different speakers, allowing speech by some but not others,"  Amended Complaint ¶ 197, at 47 (quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340 (2010)).  On Count V's allegations, the Court grants in part and denies in part the Defendants' MSJ, and denies the Voter Reference MSJ.  The Court grants the Defendants' MSJ in part, because -- consistent with its earlier ruling in the PI MOO -- the Court concludes that, for First Amendment purposes, the Data Sharing Ban and the Use Restrictions are Constitutional, as those restrictions are facially viewpoint-neutral limitations on access to information in government control, and are not restrictions on speech.[143]   Accordingly, the Court denies the Voter Reference MSJ on this issue.  The Court, however, denies both cross-motions for summary judgment on the question whether the Defendants engaged in viewpoint discrimination, because genuine disputes of material fact exist whether the Defendants refused to provide Voter Reference with its requested

---

[142]Voter Reference acknowledges that the First Amendment claims "cover[] the same ground" as the NVRA Preemption claim in the sense that both theories seek to strike down the Data Sharing Ban and the Use Restrictions, and allow Voter Reference to publish the New Mexico voter data on the internet.  Transcript of Bench Trial at 7:9-17 (taken October 16, 2023), filed December 28, 2023 (Doc. 171)(Greim).   Despite granting these forms of relief on statutory grounds, for the sake of completeness, and in the event Voter Reference seeks relief that is only available under its Constitutional theories, the Court analyzes Voter Reference's First Amendment claims.

[143]This conclusion, of course, does not affect the Court's NVRA-related conclusion that federal law preempts the Data Sharing Ban and the Use Restrictions.

voter data because its perceived political ideology.[144]

Next, in sections IV and V of its analysis, the Court considers Voter Reference's claims of unconstitutional overbreadth and vagueness, Counts VI and VII of the Amended Complaint, respectively.  See Amended Complaint ¶¶ 206-213, at 49-51 (overbreadth); id. ¶¶ 214-226, at 51-54 (vagueness).  On these Counts, the Court concludes -- again, consistent with its previous rulings in the PI MOO -- that the Data Sharing Ban is neither unconstitutionally overbroad nor void for vagueness.  As for overbreadth, the Court concludes that the Data Sharing Ban is not overbroad, because the restrictions that it imposes are within the State's purview, given that there is no general First Amendment right to information in the government's control.  The Data Sharing Ban, moreover, is not void for vagueness, because its terms are reasonably clear such that a reasonable person would be aware of what conduct it proscribes.  Accordingly, the Court grants summary judgment in favor of the Defendants on Counts VI and VII of the Amended Complaint and denies the Voter Reference MSJ as to the overbreadth and vagueness arguments.

Section VI of the Court's analysis considers Voter Reference's First Amendment retaliation claim, as alleged as Count III in the Amended Complaint.  See Amended Complaint ¶¶ 148-165, at 36-39.  The Court grants the Defendants' MSJ as to Count III.  Although the Court concludes that part of Voter Reference's claim of viewpoint discrimination may proceed under the auspices of Voter Reference's general First Amendment claim, see Analysis Section III infra, at 310-19, the

---

[144]Voter Reference's allegation of unconstitutional viewpoint discrimination spans both Counts III and V in its Amended Complaint.  Compare Amended Complaint ¶ 149, at 36, with Amended Complaint ¶ 197, at 47.  For reasons described below, the Court concludes that the central viewpoint discrimination claim in this case -- that the Defendants refused to provide Voter Reference with its requested voter data because of its perceived political ideology -- is conceptualized best as part-and-parcel of its core First Amendment allegation in Count V, and not as part of Count III's allegation of unconstitutional retaliation.  See infra, at 317-19.

Court concludes that the Defendants are entitled to summary judgment on Voter Reference's allegation of First Amendment retaliation, because Voter Reference cannot show, as a matter of law, that it engaged in Constitutionally protected activity that could form the basis of its retaliation claim.  The Court reaches this conclusion, because Voter Reference has no First Amendment right to receive the requested information in the government's control, and the restrictions that the State imposes on that information are Constitutionally valid.   Accordingly, the Court grants the Defendants' MSJ on Count III of the Amended Complaint and denies the Voter Reference MSJ on this issue.

Last, in Section VII of its analysis, the Court grants in part and denies in part the Voter Reference MSJ on Count VIII's request for a declaratory judgment preventing the Defendants from pursuing criminal prosecution against Voter Reference based on past and future alleged violations of the Data Sharing Ban and Use Restrictions.  See Amended Complaint ¶¶ 227-235, at 54-55.  The Court denies the Voter Reference MSJ insofar as it requests a declaratory judgment stating that the Data Sharing Ban and Use Restrictions violate the First Amendment.  The Court grants, however, the Voter Reference MSJ insofar as it requests the Court to declare that the NVRA's Public Inspection Provision preempts the Data Sharing Ban and Use Restrictions, and thus the Defendants are without power to pursue criminal prosecution against Voter Reference based on past and future alleged violations of these State restrictions.  The Court elaborates these conclusions below.

I.   **VOTER REFERENCE IS ENTITLED TO SUMMARY JUDGMENT ON ITS NVRA VIOLATION CLAIM, BECAUSE UNDISPUTED FACTS DEMONSTRATE THAT THE SECRETARY OF STATE'S OFFICE DID NOT COMPLY WITH THE NVRA'S PUBLIC INSPECTION PROVISION WHEN IT DID NOT DISCLOSE <u>THE RELEVANT VOTER DATA UPON REQUEST</u>.**

Although extensive facts and shifting legal arguments have complicated this lawsuit, this case's central dispute is straightforward, and it stems from the Defendants' refusal to disclose voter data that Voter Reference requests.  <u>See</u> Factual Background Section 2(f)-(l) <u>supra</u>, at 29-60.  The basic legal question as it pertains to Voter Reference's allegation of an NVRA violation is whether federal law mandates that the requested material be disclosed under the NVRA.  The Court answers this question in the affirmative and therefore concludes that Voter Reference is entitled to summary judgment in its favor with respect to the allegations in Count II of its Amended Complaint.  <u>See</u> Amended Complaint ¶¶ 138-147, at 35-36; Voter Reference MSJ Memo. at 71-76.  Consequently, the Court denies the Defendants' MSJ with respect to this issue.  <u>See</u> Defendants' MSJ at 20-26; <u>id.</u> at 30-34.

To explain these conclusions, the Court undertakes its analysis in three parts.  First, the Court reviews and describes the voter data that Voter Reference requests.  Second, the Court analyzes the NVRA's Public Inspection Provision and considers what "records" that provision envisages.  52 U.S.C. § 20507(i).  Last, the Court compares the requested records to the scope of the NVRA's Public Inspection Provision and concludes that Secretary Oliver's refusal -- undertaken with the support of the Attorney General, <u>see</u> Factual Background Section 2(h) <u>supra</u>, at 40 -- to disclose the voter data that Voter Reference requests constitutes a violation of the NVRA's Public Inspection Provision.  In making this conclusion, the Court also considers -- but ultimately disagrees with -- contentions that the Defendants make regarding the scope of the Public Inspection Provision.

## A.      THE REQUESTED MATERIAL, AND THE SECRETARY OF STATE'S RESPONSE.

Although the Court provides a fulsome description of this case's undisputed material facts in the Factual Background Section above, see Factual Background Section 2 supra, at 9-77, for the purposes of this analysis the Court outlines the relevant facts as they pertain to the NVRA violation issue.  In February, 2022, Voter Reference sent a request for voter data to the Secretary of State, requesting

> The total count, by county/precinct of any registered voters who cast a ballot in the November 3, 2020, [sic] who have been subsequently placed in an inactive, canceled deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021.

Factual Background Section 2(f) supra, at 29-30.  The Secretary of State's Office never produced in response to this request.  See Factual Background Section 2(f) supra, at 29-30.  Next, in May, 2022, Voter Reference sent a letter to Secretary Oliver, with the subject "Notice of Violation of National Voter Registration Act & Request for Records."  Factual Background Section 2(h) supra, at 31-32.  See NVRA Letter at 1.  In that letter, Voter Reference states: "This letter serves as statutory notice to the New Mexico Secretary of State and the State of New Mexico that they are in violation of the National Voter Registration Act ('NVRA'), specifically its public inspection provision, 52 U.S.C. § 20507(i)(1)."  NVRA Letter at 1.  See Factual Background Section 2(h) supra, at 31-33.  The NVRA Letter also states that "the Secretary's refusal to respond to VRF's February 15, 2022, request violates the NVRA's Public Inspection Provision." Factual Background Section 2(h) supra, at 31-34 (quoting NVRA Letter at 3).  In addition to providing Secretary Oliver with this notice of its allegations of an NVRA violation, Voter Reference also requests the following voter data:

> 1.      A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been

subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

2.      Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active. [sic]

Factual Background Section 2(h) supra, at 35 (quoting NVRA Letter at 4).

The Secretary of State's Office promptly responded to the NVRA Letter with the NVRA Letter Response.  See Factual Background Section 2(h) supra, at 37-42.  In the NVRA Letter Response, the Secretary of State's Office contends that the February, 2022, request for voter data "was not a request for a record that is maintained by our Office," but rather, "it sought the total count of registered voters during a period of time to be identified with multiple data points that would have needed to be aggregated and analyzed."  Factual Background Section 2(h) supra, at 37 (quoting NVRA Response Letter at 1).  For this reason, the NVRA Letter Response concludes that Voter Reference's "assertion that we violated the NVRA with respect to the February 15, 2022 email is incorrect."  Factual Background Section 2(h) supra, at 37 (quoting NVRA Response Letter at 1-2).  The NVRA Letter Response also states that, accordingly, the first requested category of voter data in the NVRA Letter also is not appropriate under the Public Inspection Provision.  See Factual Background Section 2(h) supra, at 37-38 (quoting NVRA Response Letter at 2).  As for the second category of requested records -- the "Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active. [sic]," Factual Background Section 2(h) supra, at 34 (quoting NVRA Letter at 4) -- the NVRA Response Letter states:

With respect to Item #2 and the Affidavit you submitted as required by New Mexico law, in the *Notice*, VRF states that it "intends to publish the requested information online for election related purposes, but it will only publish the personal information

> of voters if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding." *Notice* at 4. As you know from the Federal Litigation and otherwise, it is our position that publishing *any* New Mexico voter data on a website is a violation of the New Mexico Election Code that carries criminal liability. As such, we believe it prudent to delay production of this data at this time; we will either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal. *See* NMSA 1978, § 1-20-15 ("Conspiracy to violate the Election Code consists of knowingly combining, uniting or agreeing with any other person to omit any duty or commit any act, the omission of which duty, or combination of such act, would be the provisions of the Election Code constitute a fourth degree felony.").

Factual Background Section 2(h) supra, at 38-39 (quoting NVRA Response Letter at 2)(emphasis in NVRA Response Letter).

On June 30, 2023 -- 399 days after Voter Reference sent the NVRA Letter -- the Secretary of State's Office produced some voter data to Voter Reference in response to a separate Voter Reference request for voter data made under the New Mexico State sunshine law. See Factual Background Section 2(n)-(p) supra, at 61-76. In addition, on August 30, 2023, the Defendants sent a letter to Voter Reference that offers to provide the New Mexico voter data which Voter Reference requests in its May 27, 2022, NVRA Letter. See Factual Background Section 2(p) supra, at 71.

### B. THE PUBLIC INSPECTION PROVISION'S SCOPE.

As discussed above, see Law Regarding the NVRA supra, at 225-42, the NVRA's Public Inspection Provision reads:

> **(1)** Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> **(2)** The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i).  Neither this provision nor the NVRA's statutory scheme as a whole provides

definitions for many of the Public Inspection Provision's key terms, in particular, "records," and

"programs and activities."

The NVRA provides a means of civil enforcement via a private right of action:

**(b)    Private right of action**

> **(1)**    A person who is aggrieved by a violation of this chapter may provide written notice of the violation to the chief election official of the State involved.

> **(2)**    If the violation is not corrected within 90 days after receipt of a notice under paragraph (1), or within 20 days after receipt of the notice if the violation occurred within 120 days before the date of an election for Federal office, the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation.

> **(3)**    If the violation occurred within 30 days before the date of an election for Federal office, the aggrieved person need not provide notice to the chief election official of the State under paragraph (1) before bringing a civil action under paragraph (2).

52 U.S.C. § 20510.  As it applies to this case, the "violation of this chapter" at issue is whether the

voter data requested by Voter Reference that the Secretary of State refused to produce falls under

the statutory meaning of "records" in the context of the Public Inspection Provision.  52 U.S.C.

§ 20507(i)(1).

To interpret properly the term "records" in the Public Inspection Provision context, the

Court undertakes a plain language analysis of that provision.  At the outset, the Court notes that

the word "records" is meaningful only in relation to whatever is the subject or content of those

records.  In the Public Inspection Provision, the "records" at issue are "all records concerning the

implementation of programs and activities conducted for the purpose of ensuring the accuracy and

currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1).  First, as it pertains to the

word "all," the Court agrees with the First Circuit's analysis in <u>Bellows</u> that, "[s]imilar to the word 'any,' the word 'all' reflects a 'broadly inclusive intent,' giving Section 8(i)(1) an expansive meaning." 92 F.4th at 48 (quoting <u>United States v. Dion</u>, 37 F.4th at 35). "[A]ll records" means what it says -- it is a basic quantifier that indicates an inclusive scope to the term to which it is attached. Next, the Court concludes that the key preposition in the Public Inspection provision -- "concerning" -- also suggests broad statutory reach. Concerning, used in this manner, means "relating to." Concerning, <u>Merriam-Webster Online Dictionary</u>, https://www.merriam-webster.com/dictionary/concerning. <u>See</u> Concern, <u>New American Oxford Dictionary</u> (3rd ed. 2010)("relate to; be about"). Similar to its prepositional first-cousin -- "regarding" -- concerning, when used in a legal context, "'generally has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject.'" <u>Patel v. Garland</u>, 596 U.S. 328, 339 (2022)(quoting <u>Lamar, Archer & Cofrin, LLP v. Appling</u>, 584 U.S. 709, 710 (2018). <u>See</u> <u>Lamar, Archer & Cofrin, LLP v. Appling</u>, 584 U.S. at 710 (noting that "this Court has typically read the phrase 'relating to' . . . expansively")(source of quoted material not cited). Accordingly, the preposition "concerning" ensures that "all records" covered by the Public Inspection Provision are not only records of the "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i)(1), but also "matters relating to that subject," <u>Patel v. Garland</u>, 596 U.S. at 339.

Framed by "all" and "concerning" -- an inclusive quantifier and an expansive preposition -- the Court now considers the meaning of the subject itself: the "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The Court first observes that the NVRA contains references to "programs" that the NVRA mandates. <u>See</u> 52 U.S.C. § 20507(a)(4) (mandating that each State shall "conduct a general

program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters"); 52 U.S.C. § 20507(c) (outlining "Voter removal programs").  The Public Inspection Provision is not, however, by its plain language, confined to only these NVRA-mandated programs: the provision states "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1).  It does not say: "National Voter Registration Act programs and activities," or "programs and activities under this Act."  The provision's "programs and activities," therefore, must reference programs and activities more broadly; the only limitation is that those programs or activities are "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."  52 U.S.C. § 20507(i)(1).

Accordingly, the category of "programs and activities" is relatively capacious; it is not confined solely to those programs that the NVRA references.  Indeed, as the First Circuit notes in Bellows, federal law in the HAVA -- a separate statutory scheme to the NVRA -- requires States to "to conduct activities for the purpose of ensuring the accuracy and currency of the state's official lists of eligible voters."  92 F.4th at 45.  See Law Regarding the NVRA supra, at 225-42.  Such activities fall under the Public Inspection Provision's definition of "programs and activities."  State law implementations of federal law requirements -- or the State's own programs and activities that relate to ensuring the accuracy or currency of voter lists -- also are included within the Public Inspection Provision's definition of "programs and activities."  52 U.S.C. § 20507(i)(1).

Having concluded that "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" refers to a broad range of programs and activities that arise from State and/or federal law, and having concluded that the terms "all" and "concerning" are inclusive and expansive in the context of the statute, the Court concludes that

"all records" which "concern[]" the "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" also necessarily must include the list of eligible voters itself.  52 U.S.C. § 20507(i)(1).  This conclusion rests, in part, on the expansive meaning of the preposition "concerning" and the inclusive meaning of the word "all," as discussed above.  52 U.S.C. § 20507(i)(1).  This conclusion also rests, moreover, on the Public Inspection Provision's structure, and the NVRA's objectives.

As noted previously, see Law Regarding the NVRA supra, at 225-27, the NVRA lists its objectives in the statute itself, which are: (i) "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office"; (ii) "to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office"; (iii) "to protect the integrity of the electoral process"; and (iv) "to ensure that accurate and current voter registration rolls are maintained."  52 U.S.C. § 20501(b).  With these objectives in mind, the Court will not interpret the Public Inspection Provision in a manner that isolates a State's voter list from disclosure under that provision.  The Court reaches this conclusion because, if the statute's general purposes indicate a Congressional desire to ensure accuracy and currency of voter registration rolls, and protect the electoral process' integrity by way of the NVRA, it is implausible that Congress would provide a transparency provision of that statutory framework which does not include a means by which to check -- or, "ensure," 52 U.S.C. § 20501(b) -- whether the State is effectively implementing the "programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," or whether the State is properly maintaining the lists.  52 U.S.C. § 20507(i)(1).  Such an interpretation would prevent the Public Inspection Provision from effectively forwarding the objectives -- indeed, the end result -- of the

statutory framework of which it is a part.

As Judge Gelpí notes in Bellows, the voter file -- which, in that case, includes a "voter's name, residence address, mailing address, year of birth, enrollment status, electoral districts, voter status, date of registration, date of change of the voter record if applicable, voter participation history, voter record number and any special designations indicating uniformed service voters, overseas voters or township voters," 92 F.4th at 42 (quoting Me. Rev. Stat. Ann. tit. 21-A, § 196-A(1)(B)) -- is a reflection of "the additions and changes made by Maine election officials . . . pursuant to federal and state law as part of Maine's voter list registration and maintenance activities," and, accordingly, "[t]he Voter File can thus be characterized as the output and end result of such activities," and therefore "plainly relates to the carrying out of Maine's voter list registration and maintenance activities and is thereby subject to disclosure under Section 8(i)(1)." 92 F.4th 36, at *6.

The Court agrees with this analysis, which accords with the Court's plain language interpretation of the Public Inspection Provision. By interpreting the Public Inspection Provision in this manner, the Court follows all other courts who have considered the issue whether voter lists are subject to disclosure under the Public Inspection Provision. See Bellows, 92 F.4th at 49 ("Maine's Voter File is a 'record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' and is thus subject to disclosure under Section 8(i)(1)." (quoting 52 U.S.C. § 20507(i)(1)); Pub. Int. Legal Found., Inc. v. Matthews, 589 F. Supp. 3d 932, 941 (C.D. Ill. 2022)(Myerscough, J.)("[T]he phrase 'all records,' as used in the Public Disclosure Provision, necessarily includes the statewide voter registration list." (quoting 52 U.S.C. § 20507(i)(1)); Pub. Int. Legal Found., Inc. v. Bellows, 588 F. Supp. 3d 124, 133 (D. Me. 2022)(Singal, J.)("[T]he Voter File is a 'record[]

concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters' within the meaning of the Public Disclosure Provision and thus is subject to disclosure under the NVRA." (quoting 52 U.S.C. § 20507(i)(1)); Jud. Watch, Inc. v. Lamone, 399 F. Supp. 3d 425, 438-42 (D. Md. 2019)(Hollander, J.)(concluding that a voter list is a "record" that is subject to disclosure under the NVRA's Public Inspection Provision); True the Vote v. Hosemann, 43 F. Supp. 3d 693, 723 (S.D. Miss. 2014)(Atlas, J.)(concluding that, "the Voter Roll is a 'record' and is the 'official list[] of eligible voters' under the NVRA Public Disclosure Provision," and, therefore, "[t]he process of compiling, maintaining, and reviewing the voter roll is a program or activity performed by Mississippi election officials that ensures the official roll is properly maintained to be accurate and current" (quoting 52 U.S.C. § 20507(i)(1)).

Although the Court's analysis to this point has focused on the key language at issue in 52 U.S.C. § 20507(i)(1), nothing in the remaining language of the Public Inspection Provision calls the Court's conclusions into question. First, 52 U.S.C. § 20507(i)(1)'s final clause contains an explicit exception that "records relate[d] to a declination to register to voter or to the identity of a voter registration agency through which any particular voter is registered" are not subject to mandatory disclosure under the Public Inspection Provision. These exceptions to the Public Inspection Provision's general disclosure requirements reflect a Congressional decision that, for these excepted records, the "proper balance between transparency and voter privacy" struck in favor of voter privacy.[145]  Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 339.

_____

[145]Materials in the legislative record shed some light on the specific source of this concern:

There was also concern that information not be made public as to what voters registered at a particularly agency, such as a welfare or unemployment office. Therefore, these records may not contain any information relating to a declination

Moreover, the existence of these exceptions also informs the Court's interpretation of the rest of 52 U.S.C. § 20507(i)(1), through the interpretive cannon of <u>expressio unis est exclusio alterius</u> -- roughly, the expression of one is the exclusion of others.  See <u>Saavedra v. Lowe's Home Centers, Inc.</u>, 748 F. Supp. 2d 1273, 1297 (D.N.M. 2010)(Browning, J.)("Where Congress has included certain means of recovery, the doctrine of <u>expressio unis est exclusio alterius</u> discourages judicial recognition of additional means.").  That is, the listing of the specific exceptions to disclosure under the Public Inspection Provision reenforces the Court's conclusion that the statute is otherwise inclusive.  See <u>N.L.R.B. v. SW Gen., Inc.</u>, 580 U.S. 288, 302 (2017)(Roberts, C.J.)("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health.").

Finally, despite the Defendants' assertion to the contrary, <u>see</u> Defendants' MSJ at 22-23, 52 U.S.C. § 20507(i)(2) in no way limits the scope of material subject to disclosure under 52 U.S.C. § 20507(i)(1).  As noted above, the Public Inspection Provision's second subsection states:

> The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i)(2).  Subsection (d)(2)'s notices are part of the process by which the NVRA allows a State to remove names from the voter rolls due to a change of address.  See 52 U.S.C. § 20507(d).  Specifically, § 20507(d)(1) provides that, "[a] State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that

---

to register or the identity of a voter registration agency through which any particular voter is registered, or a list of those persons registered through a particular agency.

S. Rep. No. 103-6, at 35 (1993).

the registrant has changed residence unless the registrant" has either: (i) confirmed in writing that

he or she has moved to different jurisdiction, 52 U.S.C. § 20507(d)(1)(A); or (ii) has failed to

respond to the mailed change-of-address notice -- the contents of which are described in 52 U.S.C.

§ 20507(d)(2) -- and also

> has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

52 U.S.C. § 20507(d)(1)(B)(ii).  In short, the "notices described in subsection (d)(2)," referenced

in the Public Inspection Provision's second subsection, are part of a specific NVRA-mandated

framework that provides specific guidelines which States must follow before they may remove

individuals from the voter rolls on the grounds that those individuals have changed residences.  In

the Public Inspection Provision, Congress seeks to ensure that "lists of the names and addresses of

all persons to whom notices described in subsection (d)(2) are sent," as well as information whether

those individuals responded, are part of the "records" that must be disclosed under the Provision.

52 U.S.C. § 20507(i).

The Court does not interpret this mandate to say -- expressly or implicitly -- that the

"records" subject to disclosure under 52 U.S.C. § 20507(i)(1) must not include names and

addresses.  Put another way, the Court concludes that 52 U.S.C. § 20507(i)(2)'s requirement

regarding the names and addresses of individuals to whom notices are sent does not limit the scope

of records disclosable under 52 U.S.C. § 20507(i)(1).  Here, there is no <u>expressio unis est exclusio</u>

<u>alterius</u>; rather, 52 U.S.C. § 20507(i)(2) ensures that a particular "record" must be within the larger

category of records that 52 U.S.C. § 20507(i)(1) describes.  As the First Circuit notes, 52 U.S.C.

§ 20507(i)(2) does not say that "only" the records covered by 52 U.S.C. § 20507(i)(2) shall have

names and addresses; rather, it makes use of the phrase "shall include" in reference to the already

mentioned "records."   Bellows, 92 F.4th at 48.   This phrasing contemplates expansion, not

limitation: "'The word "includes" is usually a term of enlargement, and not of limitation, and

conveys the conclusion that there are other items includable, though not specifically enumerated.'"

Bellows, 92 F.4th at 48 (quoting 2A Norman J. Singer & J.D. Shambie Singer, Sutherland

Statutory Construction § 47:7 (7th ed. 2023)).   For one reason or another, Congress chose to single

out this specific "record" for particularized treatment under the Public Inspection Provision -- to

ensure specifically that one particular "record" is included in the more general category of records

that 52 U.S.C. § 20507(i)(1) describes.   The Court concludes, however, that this fact does not limit

the scope of that more general category of records.

### C.   THE DEFENDANTS VIOLATED THE NVRA BY NOT DISCLOSING VOTER REFERENCE'S REQUESTED VOTER DATA RECORDS.

The voter data records that Voter Reference requested in February, 2022, and May, 2022,

fall within the general statutory category of "all records concerning the implementation of

programs and activities conducted for the purpose of ensuring the accuracy and currency of official

lists of eligible voters."   52 U.S.C. § 20507(i)(1).   The first category of records that Voter

Reference requested is:

> A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

Factual Background Section 2(h) supra, at 31-42 (quoting NVRA Letter at 4).   New Mexico law

requires the Secretary of State to compile such a list "[a]t least once a month."   See Factual

Background Section 2(i) supra, at 42-46 (quoting N.M.S.A. § 1-5-14).   The State statute that

imposes this requirement -- N.M.S.A. § 1-5-14 -- is titled "File maintenance reports; voter file

updates."   See State v. Gutierrez, 2023-NMSC-002, ¶ 42, 523 P.3d 560, 569 (Bacon, C.J.)(noting

that "a 'title is quite properly to be considered a part of an act, particularly where it is a constitutional requirement that every act have a title, as is true in this state'")(quoting State ex rel. State Corp. Comm'n v. Old Abe Co., 1939-NMSC-046, ¶ 27, 43 N.M. 367, 94 P.2d 105, 110).  See State v. Gutierrez, 2023-NMSC-002, ¶ 42, 523 P.3d at 569 n.2 ("We find no compelling reason to view the proper use of a section's *heading* differently from that of a statutory *title*.")(emphasis in State v. Gutierrez).  A State statutory mandate that involves voter "[f]ile maintenance" and "updates" that are to be undertaken at regular monthly intervals is -- under any definition -- a "program[ or] activit[y] conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).  The failure of the Secretary of State's Office to disclose this data upon Voter Reference's request, therefore, is a violation of the NVRA's Public Inspection Provision.  In the NVRA Letter, Voter Reference provides the Secretary of State's Office its "statutory notice" that this action violated the NVRA.  NVRA Letter at 1.  This violation was not corrected within ninety days of the receipt of the NVRA Letter, and thus "the aggrieved person" -- Voter Reference, in this case -- is entitled to "bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation." 52 U.S.C. § 20510(b)(2).

The Court also concludes that the Secretary of State's Office also violated the NVRA with respect to the second category of requested voter data, namely: "2. Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active [sic]."  Factual Background Section 2(h) supra, at 34.  As is discussed above, the Court, concurring with all other federal courts that have considered this issue, concludes that a current list of a State's registered voters -- the core voter roll -- is a "record[] concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1).  Such a list

is -- as the Court has discussed -- a reflection of "the additions and changes made by [State] election officials . . . pursuant to federal and state law as part of [a State's] voter list registration and maintenance activities," and, accordingly, the voter roll is properly "characterized as the output and end result of such activities," Bellows, 92 F.4th at 47, and therefore "concern[s] the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters," 52 U.S.C. § 20507(i)(1).   Indeed, as discussed above, see Law Regarding the NVRA supra, at 240, federal law in the HAVA requires each State to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list" which is "defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State."   52 U.S.C. § 21083(a)(1)(A).   The HAVA also requires "[t]he appropriate State or local election official" to "perform list maintenance with respect to the computerized list on a regular basis" in accordance with the HAVA, the NVRA, and State law.  52 U.S.C. § 21083(a)(2)(A).  The voter list is the result of these legally mandated activities, which are logically undertaken with the aim of "ensuring the accuracy and currency of official lists of eligible voters."   52 U.S.C. § 20507(i)(1).  Accordingly, the Court concludes that "[c]urrent voter registration data, including voter history, for all active . . . voters," Factual Background Section 2(h) supra, at 34, is a "record[]" for the purposes of the NVRA's Public Inspection Provision, 52 U.S.C. § 20507(i)(1).

Voter Reference also seeks, in this same request, "[c]urrent voter registration data, including voter history, for all . . . inactive, suspended, and cancelled status voters (including any registration status other than active [sic]." Factual Background Section 2(h) supra, at 34.  As for these particular records, the Court notes that it is not clear that the HAVA-mandated voter

registration list -- or the core voter rolls maintained on the SERVIS database as a "canned report," see Factual Background Section 2(j) supra, at 46-52 -- would necessarily include voter registration information for "inactive, suspended, and cancelled status voters."   See Factual Background Section 2(h) supra, at 34.   Accordingly, the Court concludes that this part of the request falls within the scope of the NVRA's Public Inspection Provision only to the extent that it calls for voter data included in the file maintenance report which State law requires, see Factual Background Section 2(i) supra, at 41-44; N.M.S.A. § 1-5-14, in records concerning the NVRA's processes that govern removal of names from the voting rolls, see 52 U.S.C. § 20507(d), or in a "canned report" on the SERVIS database, see Factual Background Section 2(j) supra, at 46-52.   Regarding the first of these, however, the Court notes that N.M.S.A. § 1-5-14 only requires that "[a] digital version of the file maintenance report shall be stored by the secretary of state for at least one year," N.M.S.A. § 1-5-14(B), and thus it is possible that voter data concerning file maintenance report activities -- which presumably would cover voter information for individuals who have "inactive, suspended, and cancelled" voter statuses, Factual Background Section 2(h) supra, at 34 -- that are greater than one year old may not be available for disclosure.

In any event, the Court concludes that the Secretary of State's refusal to produce any voter data in response to Voter Reference's second category of requested information is a violation of the NVRA.   For reasons discussed in detail above, see Law Regarding the NVRA supra, at 234-42; Analysis Section I(B) supra, at 288-97, the Court concludes that a complete, current, state-wide voter roll -- which the State must maintain pursuant to federal law, see 52 U.S.C. §§ 21083(a)(1)(A), (a)(2)(A) -- is subject to disclosure under the NVRA's Public Inspection Provision.   Accordingly, the Secretary of State's Office statutorily was bound to produce that voter data in response to Voter Reference's request in the May, 2022, NVRA Letter.   See Factual

Background Section 2(h) supra, at 31-42.  The Secretary of State's Office's refusal to produce the records is a violation of the NVRA.

As for this second category of requested information, the Court disagrees with Secretary Oliver's contention that "no written notice of violation followed" the alleged NVRA violation, as 52 U.S.C. § 20510(b)(1) requires.  Defendants' MSJ Response at 38.  At this point in the litigation, the Defendants fully were aware that Voter Reference sought this data, in part, pursuant to the NVRA's Public Inspection Provision.  See Factual Background Section 2(h) supra, at 31-42.  For one, Voter Reference already alleged the Defendants to be in violation of the NVRA following the February, 2022, data request.  See Factual Background Section 2(f) supra, at 29-30.  Moreover, the Amended Complaint, filed in September, 2022, alleges that the Defendants have violated the NVRA, in part, by failing to disclose the voter data requested in May, 2022.  See Amended Complaint ¶¶ 138-147, at 35-36. In addition, Voter Reference and the Defendants argued in depth at the hearing on the motions for summary judgment whether the voter roll falls within the NVRA's Public Inspection Provision.  See MSJ Hearing Tr. at 18:13-22:7 (Court, Greim); id. at 15;12-18:4 (Schremmer).  In this way, the Defendants were on notice regarding Voter Reference's theory that the Defendants' refusal to disclose the core voter roll data constituted an NVRA violation, and there is no reason to believe that the Defendants would have disclosed the data if Voter Reference had sent some other notice of the alleged violation.

In this regard, the Court follows the Sixth Circuit's example, which has held that formal notice under the NVRA is not required when the party alleged to be in violation of the statute has otherwise "made clear its refusal to comply with the Act," such that judicial insistence on formal notice would "amount[] to requiring performance of futile acts."  Ass'n of Cmty. Orgs. for Reform Now v. Miller, 129 F.3d 833, 838 (6th Cir. 1997).  To support this conclusion, the Sixth Circuit

notes that "[t]he language and legislative history of [the NVRA notice requirement] indicate that Congress structured the notice requirement in such a way that notice would provide states in violation of the Act an opportunity to attempt compliance before facing litigation." Ass'n of Cmty. Orgs. for Reform Now v. Miller, 129 F.3d at 838.  If a party has "already made clear its refusal to comply with the Act," the notice requirement's purposes have been fulfilled, i.e., that party has no intention "to attempt compliance before facing litigation."  129 F.3d at 838.  The same is true here. To require Voter Reference to provide additional notice to the Defendants of its allegation of an NVRA violation based on the Defendants' refusal to disclose the voter roll would "amount[] to requiring performance of futile acts." Ass'n of Cmty. Orgs. for Reform Now v. Miller, 129 F.3d at 838.

In sum, the Court concludes that the Defendants violated the NVRA by refusing to disclose the voter data that the NVRA Letter requests.  See Factual Background Section 2(h) supra, at 31-42.  For the reasons provided above, the Defendants must disclose -- pursuant to the NVRA's Public Inspection Provision -- both categories of records that Voter Reference requests in the NVRA Letter.  Because the Defendants have not disclosed these records, Voter Reference is entitled to summary judgment on its claims of an NVRA violation, and the Secretary of State's Office must disclose both categories of records to Voter Reference pursuant to the NVRA's Public Inspection Provision.

## II.     VOTER REFERENCE IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR ON THE QUESTION OF NVRA PREEMPTION, BECAUSE THE USE RESTRICTIONS AND THE DATA SHARING BAN CONFLICT WITH RIGHTS THAT THE NVRA'S PUBLIC INSPECTION PROVISION CONFERS.

The Court turns next to whether Voter Reference is entitled to summary judgment on Count I of its Amended Complaint, which alleges that the NVRA's Public Inspection Provision preempts the Use Restrictions and the Data Sharing Ban.  See Amended Complaint ¶¶ 119-137, at 30-35;

Factual Background Section 3(a)-(b) supra, at 77-80 (defining the terms "Use Restrictions" and "Data Sharing Ban").  This argument's crux is that, owing to the broad scope of the NVRA's Public Inspection Provision, the Defendants' restrictions on the release of voter data -- in the form of the Use Restrictions and Data Sharing Ban -- stand in conflict with the broad disclosure requirements that federal law mandates.  See Voter Reference MSJ Memo. at 67-70; Hines v. Davidowitz, 312 U.S. at 67 (noting that state law is preempted when that law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress").  For the reasons that follow, the Court agrees that the NVRA preempts the Use Restrictions and the Data Sharing Ban, and thus Voter Reference is entitled to summary judgment on Count I of its Amended Complaint.

To frame properly the discussion of the preemption issue, the Court outlines the scope of Voter Reference's alleged preemption.  In the Amended Complaint and the Voter Reference MSJ Memo., Voter Reference argues only that the NVRA preempts the Data Sharing Ban and the Use Restrictions.  See Amended Complaint ¶¶ 119-37, at 30-35; Voter Reference MSJ Memo. at 67-70.  As described above, the Data Sharing Ban refers to the Defendants' interpretation of New Mexico law which mandates that a requester cannot share, disseminate, distribute, publish, or otherwise make available requested voter data to any third party.  See Factual Background, Section 3(a) supra, at 77-79.  See also Defendants' MSJ Response at 43 ("The Secretary has interpreted this statutory framework to permit sharing data within an entity or organization for use in furtherance of a permissible purpose, but not to permit sharing outside of it for any purpose.").  The Use Restrictions also refer to a statutory interpretation that the Defendants offer, specifically the Defendants' interpretation of N.M.S.A. § 1-4-5.5(C).  See Factual Background, Section 3(b) supra, at 79-80.  Section 1-5-5.5(C) states that "[e]ach requester of voter data . . . shall sign an affidavit

that the voter data . . . shall be used for governmental or election and election campaign purposes only[146] and shall not be made available or used for unlawful purposes."  N.M.S.A. § 1-5-5.5(C). The Defendants interpret this statutory mandate to prohibit Voter Reference's posting of voter data online, because such posting is not -- under the Defendants' interpretation -- a "governmental or election and election campaign purpose[]."  N.M.S.A. § 1-4-5.5(C).  See Factual Background, Section 3(b) supra, at 79-80.  This interpretation -- that online posting of State voter data does not fall under the scope of the permissible uses of voter data as the statute outlines that term -- is what is the term "Use Restrictions" means.

Voter Reference's preemption argument is limited to the question whether the NVRA preempts these interpretations of State law.  The inquiry is not whether the NVRA preempts the statutes on which this interpretation relies.  This analytical difference is subtle, but important. Although federal preemption analysis often involves a State statute, see Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. at 91, a State regulation, see United States v. Locke, 529 U.S. 89, 94 (2000), or even a State-level administrative adjudicative order, see Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland, 535 U.S. 635, 638 (2002), the Supreme Court also has indicated that a non-

---

[146]N.M.S.A. § 1-4-5.5(E) provides the following definitions of these statutory terms:

　　　　(1)　　"election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;

　　　　(2)　　"governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;

. . .

　　　　(5)　　"voter data" means selected information derived from the voter file.

N.M.S.A. § 1-4-5.5(E)(1), (2), (5).  "Election purposes" is undefined in the statute.

binding legal interpretation may be subject to preemption analysis, see Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992)("Morales").

In Morales, the National Association of Attorneys General had adopted a set of guidelines called the Air Travel Industry Enforcement Guidelines ("Guidelines").  504 U.S. at 379.  These Guidelines, by their own description, did "not purport to 'create any new laws or regulations' applying to the airline industry; rather, they claim to 'explain in detail how existing state laws apply to air fare advertising and frequent flyer programs.'" 504 U.S. at 379 (quoting Guidelines).  In short, the Guidelines announced an interpretive theory of how general-purpose State consumer protection statutes could apply to regulate the airline industry's advertising practices.  See 504 U.S. at 379-80. The National Association of Attorneys General then sent out an "advisory" memorandum to "the major airlines" announcing its belief that certain practices being undertaken by the airlines violated States' consumer protection laws and later sent notices of intent to sue to some major airline companies.  504 U.S. at 379-80.

The airline companies sued instead, arguing that "state regulation of fare advertisements is pre-empted by" a provision in the Airline Deregulation Act, 49 U.S.C. § 41713(b).  Morales, 504 U.S. at 380.  The Supreme Court agreed, concluding that the Airline Deregulation Act's express preemption clause preempts the Guidelines' interpretation of the general consumer protection statutes.  See Morales, 504 U.S. at 391.  In making that conclusion, the Supreme Court contended with the attorney general-petitioner's argument that the Airline Deregulation Act could not preempt the consumer protection laws, because "only state laws specifically addressed to the airline industry are pre-empted, whereas the ADA imposes no constraints on laws of general applicability," i.e., that the statutes themselves could not be preempted because they were facially unrelated to the conduct regulated.  Morales, 504 U.S. at 386.  The Supreme Court disagreed with this contention,

stating that such an approach would, among other things, "creat[e] an utterly irrational loophole," because "there is little reason why state impairment of the federal scheme should be deemed acceptable so long as it is effected by the particularized application of a general statute." 504 U.S. at 386. This principle ensures that State action in the form of interpretive policy is not shielded from federal preemption solely because that interpretation arises from statutes that are not -- in and of themselves -- generally preempted.

In addition, as noted, in cases involving the NVRA, presumptions against preemption do not apply, because "the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." Arizona v. Inter Tribal Council of Arizona, Inc., 570 U.S. at 14. Accordingly, in the Tenth Circuit, courts apply the Fish v. Kobach framework of preemption analysis:

> [T]he Elections Clause requires that we straightforwardly and naturally read the federal and state provisions in question as though part of a unitary system of federal election regulation but with federal law prevailing over state law where conflicts arise. We do not finely parse the federal statute for gaps or silences into which state regulation might fit. We refrain from doing so because were states able to build on or fill gaps or silences in federal election statutes . . . they could fundamentally alter the structure and effect of those statutes.

Fish v. Kobach, 840 F.3d at 729. With these principles in mind, the Court considers the preemption arguments in turn, first analyzing the Data Sharing Ban, and then turning to the Use Restrictions.

A.     **THE NVRA PREEMPTS THE DATA SHARING BAN, BECAUSE THE FEDERAL STATUTE EVINCES A CONGRESSIONAL INTENT TO PROMOTE BROAD PUBLIC DISCLOSURE TO FURTHER THE NVRA'S STATED PURPOSES.**

As the Court discussed above, see Section I(B) supra, at 288-97, the NVRA's Public Inspection Provision requires certain "records" to be made "available for public inspection and, where available, photocopying." 52 U.S.C. § 20507(i)(1). The Defendants contend that this

statutory provision applies only to "access" voter data, while the Data Sharing Ban is concerned with regulating a "separate sphere[]" of conduct, namely, the "*use* of information."  Defendants' MSJ at 27 (emphasis in Defendants' MSJ).  Accordingly, the Defendants assert that, given the two laws' distinct purposes, NVRA cannot preempt the Data Sharing Ban.  In the context of the NVRA's Public Inspection Provision, the Court disagrees with this access-versus-use distinction.  Viewed as a whole, the NVRA's text, structure, and purposes indicate a Congressional desire to create uniformity in voter registration processes, to expand voter participation, and to ensure the electoral process' integrity.  See 52 U.S.C. § 20501(b).  More specifically, the NVRA's Public Inspection Provision indicates a Congressional belief that disclosure of certain voter records is part of these objectives' fulfillment.  See Bellows, 92 F.4th at 54 (observing that the Public Inspection Provision's mandate that the relevant records be "'ma[d]e available for public inspection' . . . evinces Congress's belief that public inspection, and thus public release, of Voter File data is necessary to accomplish the objectives behind the NVRA" (quoting 52 U.S.C. § 20507(i)(1))(emphasis in Bellows)).  Indeed, as the Fourth Circuit has noted, there are "many benefits of public disclosure," and among them is the "self-evident" fact that "disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls," and that, "[w]ithout such transparency, public confidence in the essential workings of democracy will suffer."  Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 339.  In short, if disclosure and error identification are of central importance to accomplishing the NVRA's goals, it would be anomalous if Congress would seek to guarantee only "access" to data, without also ensuring the "use" of such data to be shared among the public.  Defendants' MSJ at 27.  The Court concludes that such an interpretation of the NVRA's Public Inspection Provision is strained.

A more inclusive and uniform understanding is also consistent with the Public Inspection Provision's plain language. The provision mandates that the States "shall make available for public inspection and, where available, photocopying," the covered records. 52 U.S.C. § 20507(i)(1). This text indicates that Congress seeks to provide individuals -- members of the "public" -- with a right to obtain access to the covered voter records on equal footing, and it follows that each individual likewise has a right to use those records in a manner that accords with the NVRA's objectives.

Having reached these conclusions regarding the Public Inspection Provision's scope and purpose, as well as the right that the federal statute confers, the Court considers whether this federal law preempts the State's Data Sharing Ban. Under the Fish v. Kobach framework, the relevant question is whether the Data Sharing Ban, read "as though part of a unitary system of federal election regulation," Fish v. Kobach, 840 F.3d at 729, presents a conflict with the NVRA's Public Inspection Provision. The Court concludes that, reading these laws in concert as if they formed part of one "unitary system," Fish v. Kobach, 840 F.3d at 729, the Data Sharing Ban's strict and circumscribed limits on party-to-party disclosure impose restrictions in tension with the broad and uniform aims of public disclosure which animate the NVRA's Public Inspection Provision. The purpose of the NVRA's broad public disclosure, as the Court has discussed, is to further the statute's broader goals of creating uniformity in voter registration processes, expanding voter participation, and ensuring electoral process integrity. See 52 U.S.C. § 20501(b). As the First Circuit reasons in Bellows, the Public Inspection Provision "evinces Congress's belief that public inspection, and thus public release, of Voter File data is necessary to accomplish the objectives behind the NVRA." Bellows, 92 F.4th at 54. This public inspection is central -- not just a side effect -- to the NVRA's purposes, the First Circuit continues, because, "[i]ndeed, the analysis and subsequent

dissemination of Voter File data to the public is necessary if members of the public, or organizations such as [appellees], are ever to identify, address, and fix irregularities in states' voter rolls by exercising their private right of action under the NVRA." Bellows, 92 F.4th at 54.  The Court agrees with this analysis and concludes that the Data Sharing Ban presents a conflict with the right conferred by the Public Inspection Provision, because it severely burdens the circulation of voter data among the public.  The Data Sharing Ban largely deprives individuals and entities of the ability to engage with disclosed records in such a way that facilitates identification of voter registration-related irregularities and thereby severely limits the extent to which the Public Inspection Provision can contribute meaningfully to furthering the NVRA's objectives.  Read as though part of the same "unitary system," the NVRA's Public Inspection Provision and the Data Sharing Ban conflict with one another, and, pursuant to the interpretive framework in Fish v. Kobach, 840 F.3d at 729, the Court concludes that the former preempts the latter.

**B.    THE NVRA PREEMPTS THE USE RESTRICTIONS, BECAUSE THE FEDERAL STATUTE EVINCES A CONGRESSIONAL INTENT TO PROMOTE BROAD PUBLIC DISCLOSURE TO FURTHER THE NVRA'S STATED PURPOSES.**

For similar reasons, the Court likewise concludes that the NVRA's Public Inspection Provision preempts the Use Restrictions.  As the previous subsection describes, the NVRA's Public Inspection Provision plays an important role in ensuring that States are performing their mandated duties as federal law directs, as it provides the public with a means to obtain records by which accuracy and compliance with those duties can be assessed.  Accordingly, to the extent that the Use Restrictions present an obstacle to the fulfillment of the Public Inspection Provision's purposes, the Use Restrictions are preempted.  As pertains specifically to this case, given that the Defendants interpret "governmental or election and election campaign purpose" as not including sharing requested voter data on the internet, the NVRA's Public Inspection Provision preempts

that interpretation.   See Factual Background Section 3(b) supra, at 79-80.   As the Court has discussed above, broad transparency rights -- via disclosure and dissemination pursuant to the Public Inspection Provision -- are integral to furthering the NVRA's aims in creating uniformity in voter registration processes, expanding voter participation, and ensuring electoral process integrity.   See 52 U.S.C. § 20501(b).   The Defendants' underinclusive interpretation of "governmental or election and election campaign purpose" significantly undercuts these aims by imposing additional restrictions on voter data use -- e.g., the prohibition on internet publication -- that render detection of inaccuracies and fraud more difficult.   See Bellows, 92 F.4th at 51-56; Jud. Watch, Inc. v. Lamone, 399 F. Supp. 3d at 445.  The Court concludes that the NVRA's Public Inspection Provision preempts the Use Restrictions.

III.    **THE COURT GRANTS IN PART AND DENIES IN PART THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON VOTER REFERENCE'S COUNT ALLEGING A FIRST AMENDMENT VIOLATION, BECAUSE, ALTHOUGH THE DATA SHARING BAN AND THE USE RESTRICTIONS DO NOT VIOLATE THE FIRST AMENDMENT, GENUINE DISPUTES OF MATERIAL FACT EXIST WHETHER THE DEFENDANTS SUBJECTED VOTER REFERENCE TO <u>VIEWPOINT DISCRIMINATION</u>.**

In the Amended Complaint's Count V, Voter Reference alleges that the "Use Restrictions and Data Sharing Ban are direct restrictions on constitutionally protected, core political speech." Amended Complaint ¶ 197, at 47.   Count V also contends that the First Amendment prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others," Amended Complaint ¶ 197, at 47 (quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340 (2010)).  In the Voter Reference MSJ Memo., Voter Reference asserts that, even if it has no Constitutionally protected right to access the voter data pursuant to the First Amendment, once Voter Reference possesses that data -- obtained legally through statutory means -- the First Amendment requires that any burdens and conditions imposed on the use of that data must pass strict scrutiny.   See Voter Reference MSJ Memo. at 78-91.  A central premise of this contention --

which the Defendants dispute, see Defendants' MSJ at 43-44 -- is that, "even if a state could permissibly refuse to withhold *all* voter data,[] once that state makes the information available, it must comply in all respects with the First Amendment protections afforded to the use and dissemination of that information."  Voter Reference MSJ Memo. at 78 (citing Fusaro v. Cogan, 930 F.3d at 255-56).  The Defendants, by contrast, assert that, given the general premise that there is no First Amendment right to information within government control, it follows that, "because there is no right to obtain voter data, conditional access to such data is constitutional."  Defendants' MSJ at 45.  This assertion flows from the principle that, "[w]here a government possesses an authority or power, it necessarily follows that the government may exercise that authority in a more limited or conditional manner as well."  Defendants' MSJ at 45 (citing Merrion v. Jicarilla Apache Tribe, 455 U.S. 130, 144 (1982)).

At the outset, the Court notes that both of these arguments begin from the premise that there is no First Amendment-based right to information within government control.  The Court agrees that this premise is correct as a matter of law.  See Law Regarding the First Amendment supra, at 245-49.  As outlined above, in the Tenth Circuit, the "general" rule is that "there is no constitutional right, and specifically no First Amendment right, of access to government records."  Lanphere & Urbaniak v. State of Colo., 21 F.3d 1508, 1511 (10th Cir. 1994)(citing Houchins v. KQED, Inc., 438 U.S. at 7; United States v. Hickey, 767 F.2d 705, 709 (10th Cir. 1985)).  See Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)("It is well-settled that there is no general First Amendment right of access to all sources of information within governmental control." (quoting Houchins v. KQED, Inc., 438 U.S. at 9)).  Accordingly, the Court agrees with the basic premise of the arguments that Voter Reference and the Defendants articulate in their respective motions for summary judgment.

Beyond this point of agreement, however, the parties' respective analyses diverge.  Voter Reference contends that the Court should apply strict scrutiny to the State's restrictions on the use of voter data that has been received pursuant to statute, see Voter Reference MSJ Memo. at 78-91, while the Defendants rely on the idea that the State may, without offending the First Amendment, lawfully condition access to information which the State has no constitutional right to disclose in the first place, so long as those conditions are not unlawful viewpoint-based restrictions, see Defendants' MSJ at 46.  As it did in the PI MOO, the Court agrees with the Defendants' analysis on this point.  As the PI MOO states, because there is no general First Amendment right to access of information within government control, see Lanphere & Urbaniak v. Colorado, 21 F.3d at 151, "[s]ubject to otherwise impermissible restrictions, such as content- and speaker-based restrictions, the Secretary of State is within its purview to curb the right of access to government information," and, accordingly, consistent with the First Amendment, "the Secretary of State can prohibit access to voter information to a party who will share it outside of the requesting organization or that will post that data on the internet."  PI MOO at 177.

In the PI MOO, the Court reaches this conclusion, because, as the Defendants note in the Defendants' MSJ, "if there is no right to access information, a State can control the access that they provide based on policy considerations, because the greater power -- the ability to not allow anyone access to the data -- necessarily includes the lesser power -- the ability to control who receives the data."  PI MOO at 179 (citing Am. Ass'n of People with Disabilities v. Herrera, 580 F. Supp. 2d 1195, 1214 (D.N.M. 2008)(Browning, J.)).  The Court concludes that its earlier analysis is correct.  The greater power of a total ban includes the lesser power of disclosure with restrictions.  As an additional point, if the government has the power -- consistent with the Constitution -- to keep its information out of the public's hands entirely, it logically would be anomalous if any restrictions

on information that the government chooses to disclose would, de facto, be subject to the Constitutional system's most exacting form of scrutiny.[147]  Instead, the Court notes, as it did in the PI MOO, that the State's decision to allow access in its control is entitled to "deference as a policy matter."  PI MOO at 177.  See Fusaro v. Cogan, 930 F.3d at 256 ("[T]he judgment of the Maryland legislature regarding the release of government information is entitled to substantial deference, particularly where § 3-506 is part of a complex scheme to regulate elections.").  In this way, the restrictions at issue here are best conceptualized as restrictions on access to information within government control and not as restrictions on speech.  See McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 344-46 (1995)(distinguishing between "a regulation of pure speech," and election-related restrictions that are one step removed from pure speech);  Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. 32, 42 (1999)(Ginsburg, J., concurring)("I join the Court's opinion, which recognizes that California Government Code § 6254(f)(3) is properly analyzed as a

---

[147]The Honorable Ruth Bader Ginsburg, late-Associate Justice of the Supreme Court, makes a similar observation in her concurring opinion in Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. 32 (1999).  There, Justice Ginsburg writes:

> Throughout its argument, respondent assumes that § 6254(f)(3)'s regime of selective disclosure burdens speech in the sense of reducing the total flow of information.  Whether that is correct is far from clear and depends on the point of comparison.  If California were to publish the names and addresses of arrestees for everyone to use freely, it would indeed be easier to speak to and about arrestees than it is under the present system.  But if States were required to choose between keeping proprietary information to themselves and making it available without limits, States might well choose the former option.  In that event, disallowing selective disclosure would lead not to more speech overall but to more secrecy and less speech.  As noted above, this consideration could not justify limited disclosures that discriminated on the basis of viewpoint or some other proscribed criterion.  But it does suggest that society's interest in the free flow of information might argue for upholding laws like the one at issue in this case rather than imposing an all-or-nothing regime under which "nothing" could be a State's easiest response.

528 U.S. at 43-44 (Ginsburg, J., concurring).

restriction on access to government information, not as a restriction on protected speech."); Travis

v. Reno, 163 F.3d 1000, 1007 (7th Cir. 1998)(Easterbrook, J.)("Peering into public records is not

part of the 'freedom of speech' that the first amendment protects." (source of quoted material not

cited, but presumably U.S. Const. amend. I)).[148]

---

[148]The Court concludes that the Data Sharing Ban and the Use Restrictions are viewpoint-neutral restrictions on access to information within government control and not restrictions on speech. Therefore, in accordance with the "general" rule that "there is no constitutional right, and specifically no First Amendment right, of access to government records," Lanphere & Urbaniak v. State of Colo., 21 F.3d at 1511, those restrictions cannot form the basis of a First Amendment claim, unless access is conditioned on some "otherwise impermissible restrictions" such as a viewpoint or political affiliation, PI MOO at 177.  See Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. at 43 (Ginsburg, J., concurring)("California could not, for example, release address information only to those whose political views were in line with the party in power.").

In Fusaro v. Cogan, the Fourth Circuit reaches a different conclusion, namely, that the restriction on access to voter data in that case is subject to First Amendment scrutiny.  930 F.3d at 250.  Despite acknowledging that, "[o]n its face, Fusaro's request for a copy of the [voter] List falls under the general rule of Houchins . . . [and t]hus, there is generally no First Amendment claim based on the government's denial of access to such information," 930 F.3d at 250, the Fourth Circuit nevertheless subjects the restrictions to First Amendment scrutiny, based on three rationales: (i) the requested voter list "is closely tied to political speech, which generally receives the strongest First Amendment protection," (ii) the restriction at issue in the case imposes "content- and speaker-based conditions on access to and use of the List," and (iii) "Supreme Court precedent indicates that suspect conditions on access to government information may be subject to First Amendment scrutiny."  930 F.3d at 250.

The Court disagrees, at least in part, with the Fourth Circuit's analysis on this question.  First, the Court notes that, to the extent that the Fourth Circuit relies on the fact that the requested information "is closely tied to political speech, which generally receives the strongest First Amendment protection," 930 F.3d at 250, that rationale is hard to square with the general rule that there is no First Amendment right to access information within the government's control, see Law Regarding the First Amendment supra, at 250-53.  Indeed, a great deal of the information within the government's control is closely tried to political speech, but that itself does not create a right to access that information.  The Supreme Court notes in Houchins v. KQED, Inc.: "The public importance of conditions in penal facilities and the media's role of providing information afford no basis for reading into the Constitution a right of the public or the media to enter these institutions."  438 U.S. at 9.  The Supreme Court also acknowledged that it "is . . . true that with greater information, the public can more intelligently form opinions about prison conditions."  438 U.S. at 8.  These considerations, however, do not give rise to a Constitutional right to access that information, or mean that First Amendment scrutiny must necessarily be applied to restrictions on access.  Accordingly, simply noting that the information-sought-to-be-accessed is of great political importance, or "closely tied to political speech," Fusaro v. Cogan, 930 F.3d at 250, is not sufficient

to defeat the general rule in Houchins v. KQED, Inc., which the Tenth Circuit follows, see Lanphere & Urbaniak v. Colorado, 21 F.3d at 1511.  See Matthew L. Schafer, Does Houchins v. KQED, Inc. Matter?, 70 Buff. L. Rev. 1331, 1487-90 (2022)(critiquing Fusaro v. Cogan's approach as an "ineffectual . . . workaround" to Houchins v. KQED, Inc.'s general rule).

As for the Fourth Circuit's other rationales for applying First Amendment scrutiny to the restrictions on access to government information in Fusaro v. Cogan, the Court notes its agreement with the Fourth Circuit that viewpoint-based restrictions on access to information within government control are Constitutionally impermissible.  See PI MOO at 177.  It does not follow, however, that non-viewpoint-discriminatory restrictions on access to information within the government's control should be subjected to First Amendment scrutiny.  As for the Fourth Circuit's assertion that "Supreme Court precedent indicates that suspect conditions on access to government information may be subject to First Amendment scrutiny," Fusaro v. Cogan, 930 F.3d at 250, the Court agrees with the Fourth Circuit's assertion that, in Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. 32, "the writings of eight justices indicate that some conditions on the disclosure of government information can run afoul of the Free Speech Clause, giving rise to a viable constitutional claim," Fusaro v. Cogan, 930 F.3d at 253.  The Court points out, however, that the hypothetically impermissible "conditions" the Justices describe in their various opinions in Los Angeles Police Dep't v. United Reporting Pub. Corp. discuss impermissible viewpoint-discrimination concerns.  See 528 U.S. at 43 (Ginsburg, J., concurring)("California could not, for example, release address information only to those whose political views were in line with the party in power."); id. at 46 (Stevens, J., dissenting)("[I]f the State identified the disfavored persons based on their viewpoint, or political affiliation, for example, the discrimination would clearly be invalid.").  In sum, the Court does not agree that the Supreme Court broadly has indicated that "suspect conditions on access to government information may be subject to First Amendment scrutiny."  Fusaro v. Cogan, 930 F.3d at 250.  Rather, the Supreme Court has indicated that restrictions based on viewpoint or political ideology are subject to First Amendment scrutiny.  For these reasons, the Court concludes that there should not be traditional First Amendment scrutiny applied to restrictions on access to voter data within the government's control, so long as a requester's viewpoint or political affiliation do not motivate those restrictions.

Even if the Court were to follow Fusaro v. Cogan's lead, to the extent that these restrictions are subject to some degree of First Amendment protection, that protection is not strict scrutiny, but rather -- as the Fourth Circuit concludes in Fusaro v. Cogan, 930 F.3d at 256-264 -- "the balancing of interests test required by the Anderson-Burdick framework."  Fusaro v. Cogan, 930 F.3d at 263.  See Anderson v. Celebrezze, 460 U.S. 780, 782-86 (1983); Burdick v. Takushi, 504 U.S. 428, 430-32 (1992).  The Fourth Circuit in Fusaro v. Cogan "borrow[ed]," 930 F.3d at 258, this analytical framework -- which the Supreme Court developed in cases dealing with Constitutional challenges to ballot access -- to analyze Maryland's restrictions on access to voter data.  This framework requires the following analysis:

Constitutional challenges to specific provisions of a State's election laws therefore cannot be resolved by any "litmus-paper test" that will separate valid from invalid restrictions.  Storer[v. Brown], 415 U.S. [724], at 730 . . . .  Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation.  It must first consider the character and magnitude of the

asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Anderson v. Celebrezze, 460 U.S. at 789.  Although the Court concludes that New Mexico's restrictions on access to voter data are not subject to First Amendment scrutiny, the Court notes that, in the alternative, even under the analytical framework that Anderson v. Celebrezze provides, the Data Sharing Ban and the Use Restrictions are Constitutional.  Even if those restrictions infringe on a data requester's First Amendment rights, the "the character and magnitude of the asserted injury to the right[]" is not enough to override the restriction's legality.  Anderson v. Celebrezze, 460 U.S. at 789.  While the State's restrictions prohibit the sharing of the actual underlying data, they do not prohibit speech about that data, or conclusions drawn therefrom.  For example, if an organization publishes a news story about its conclusions regarding the New Mexico voter data, and if an individual who reads the story wants to verify the conclusions, that individual could request the data and undertake this project.  In this way, limitations on sharing are more akin to time, place, or manner restrictions than they are to direct restrictions on core political speech. Cf. McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 344-46 (1995)(distinguishing between "a regulation of pure speech" and Anderson-Celebrezze election-related restrictions that are one step removed from pure speech).  Moreover, as the Fourth Circuit puts it, "the release of government information . . . is fundamentally a policy question" to which courts offer deference.  Fusaro v. Cogan, 930 F.3d at 263.  In addition, the Data Sharing Ban and the Use Restrictions, on their face, do not discriminate on the basis of a data requester's political viewpoint, which is a Constitutional "red line" in disclosure-of-government-information cases.  Fusaro v. Cogan, 930 F.3d at 261 ("In the limited available precedents where conditions on access to voter information were deemed improper, the critical flaw in the challenged regulation has been that it was not politically neutral." (citing Libertarian Party of Indiana v. Marion Cnty. Bd. of Voter Registration, 778 F. Supp. 1458, 1459 (S.D. Ind. 1991)(Barker, J.); Socialist Workers Party v. Rockefeller, 314 F. Supp. 984, 996 (S.D.N.Y.)(Tenney, J.), aff'd, 400 U.S. 806 (1970)).  See Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. at 43.

On the analysis' other side, State interests support the Constitutional burden that the Data Sharing Ban and the Use Restrictions impose.  For example, the State's Data Sharing Ban ensures that State receives its fee to access the voter data from each individual requester, which in turn helps to subsidize the voter registration system.  There also is a valid State interest in its citizens' voter data privacy.  As explained above, by enacting the NVRA with its Public Inspection Provision, Congress -- in attempting to strike the balance between privacy concerns and transparency -- chose in favor of transparency.  See Law Regarding the NVRA supra, at 233; id at 241-42; Project Vote/Voting for Am., Inc. v. Long, 682 F.3d at 339 (acknowledging a State interest in privacy, but noting that the NVRA mandates transparency, and, "[i]t is not the province [of courts] to strike the proper balance between transparency and voter privacy").  This Congressional choice, however, does not mean that a State does not have an interest in privacy that deserves

Based on these conclusions, the Court denies the Voter Reference MSJ on Count V's contention that the Use Restrictions and Data Sharing Ban are unconstitutional "direct restrictions on constitutionally protected, core political speech."  Amended Complaint ¶ 197, at 47.  The Data Sharing Ban and the Use Restrictions do not offend, on their face, the First Amendment.  Accordingly, as to this issue, the Court grants summary judgment in the Defendants' favor.  There is, however, one part of Voter Reference's Count V First Amendment allegations that survives summary judgment and may proceed to trial: Voter Reference's allegation that the Defendants engaged in unconstitutional viewpoint discrimination by refusing to grant Voter Reference access to the requested voter data based on Voter Reference's perceived political ideology.  Although Voter Reference generally has framed this argument as part of its retaliation claim, the general thrust of this allegation spans both Counts III and V in its Amended Complaint.  Compare Amended Complaint ¶ 149, at 36, with Amended Complaint ¶ 197, at 47.

The Court concludes that genuine disputes of material fact exist whether the Defendants acted with a viewpoint-discriminatory purpose in refusing to provide Voter Reference with access to the voter data.  See Pahls v. Thomas, 718 F.3d 1210, 1230 (10th Cir. 2013)("In § 1983 and Bivens[149] actions, a claim of viewpoint discrimination in contravention of the First Amendment requires a plaintiff to show that the defendant acted with a viewpoint-discriminatory purpose."

---

weight in a First Amendment analysis.

    In sum, the Court concludes that these State interests are sufficient to support the burden that New Mexico's restrictions impose for the purposes of the Anderson v. Celebrezze analysis. See 460 U.S. at 789.  Even if the restrictions must be subject to some degree of Constitutional scrutiny, the Court concludes that the restrictions at issue in this case are Constitutional on their face.

    [149]A Bivens action is the federal analogue to a 42 U.S.C. § 1983 claim; it is a private right of action for damages against federal officers for violations arising directly under the Constitution. See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 396-97 (1971).

(citing Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009); Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Collegians for a Constructive Tomorrow-Madison v. Regents of Univ. of Wis. Sys., 820 F. Supp. 2d 932, 951 n.20 (W.D. Wis. 2011)(Adelman, J.)).  On this issue, the Court concludes that there is sufficient evidence in the record to support a conclusion in either sides' favor. Evidence exists that would lead a reasonable mind to conclude that the Defendants singled out Voter Reference for disparate treatment, because the Defendants viewed Voter Reference as a "political operative[]" who intends to "spread misinformation."  Factual background Section 2(c) supra, at 14-20.  On the other hand, there also is evidence in the record to suggest that the Defendants withheld the voter data because of their interpretation of New Mexico statutory law, and thus viewpoint-neutral reasons explain the withholding.  See Factual Background Section 2(e) supra, at 24-29.  At the summary judgment stage, the Court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Accordingly, on the question of viewpoint discrimination, the Court denies both motions for summary judgment.

To conclude, on Count V of the Amended Complaint, the Court grants in part and denies in part the Defendants' MSJ, and denies the Voter Reference MSJ.  The Court grants the Defendants' MSJ in part, because -- consistent with its earlier ruling in the PI MOO -- the Court concludes that, for First Amendment purposes, the Data Sharing Ban and the Use Restrictions are Constitutional, as those restrictions are viewpoint-neutral limitations on access to information in government control and are not restrictions on speech.  Accordingly, the Court denies the Voter Reference MSJ on this issue.  The Court, however, denies both cross-motions for summary judgment on the question whether the Defendants engaged in viewpoint discrimination, because

genuine disputes of material fact exist whether the Defendants refused to provide Voter Reference

with its requested voter data because of its perceived political ideology.

IV.   **SECRETARY OLIVER AND THE ATTORNEY GENERAL ARE ENTITLED TO SUMMARY JUDGMENT IN THEIR FAVOR ON VOTER REFERENCE'S ALLEGATIONS OF UNCONSTITUTIONAL OVERBREADTH, BECAUSE THE RESTRICTIONS THAT THE SECRETARY OF STATE'S OFFICE IMPOSES AGAINST THE SHARING OF VOTER DATA ARE NOT UNCONSTITUTIONALLY OVERBROAD, AS THE DATA SHARING BAN DOES NOT PROSCRIBE ANY ACTIVITY THAT THE FIRST AMENDMENT PROTECTS.**

In Count VI of the Amended Complaint, Voter reference alleges that the "Data Sharing Ban

is overbroad in that it regulates and prohibits substantially more protected speech than is necessary

to accomplish any legitimate government interested [sic] furthered by the restriction."  Amended

Complaint ¶ 207, at 50.  The Data Sharing Ban, as discussed above, see Factual Background

Section 3(a) supra, at 77-79, is a restriction that the Secretary of State's Office imposes on the

sharing of voter data.  This restriction prohibits the sharing of voter data between a requester and

any third party.  See Factual Background Section 3(a) supra, at 77-79.  Voter Reference contends

that this restriction is overbroad in violation of the First Amendment, because "the Ban prohibits

substantially more protected speech than is necessary to accomplish any compelling government

interest it furthers."  Voter Reference MSJ Memo. at 92.  The Defendants counter with the

proposition that, because "[t]here is no general right under the First Amendment to access

government information; therefore, there can be no overbroad restriction on obtaining that

information."  Defendants' MSJ at 50 (citing Houchins v. KQED, Inc., 438 U.S. at 11).

In the PI MOO, the Court followed the analytical path that the Defendants suggest,

concluding that Voter Reference's claim of unconstitutional overbreadth was not likely to succeed

on the merits, because, "[h]aving decided that there is no right to access the voter data information

-- for Voter Reference or for anyone else," the Court concludes that the Data Sharing Ban is not

overbroad because it does not unconstitutionally proscribe any protected speech.  PI MOO at 177-78.  The Court noted, in the PI MOO, that, "[w]hile the Data Sharing Ban may curb whom the Secretary of State allows to access voter information -- namely, anyone who will not share it outside of their organization -- this restriction is within the Secretary of State's purview."  PI MOO at 177-78.  The Court reaffirms this conclusion here, as it accords with the conclusion the Court reaches in the previous section, namely, that Secretary Oliver's restrictions on the use of voluntarily disclosed government information are not unconstitutional.  Accordingly, the Court grants the Defendants' MSJ as to Voter Reference's claim of unconstitutional overbreadth, and denies the Voter Reference MSJ as to the same.

## V.   SECRETARY OLIVER AND THE ATTORNEY GENERAL ARE ENTITLED TO SUMMARY JUDGMENT IN THEIR FAVOR ON VOTER REFERENCE'S ALLEGATIONS OF UNCONSTITUTIONAL VAGUENESS, BECAUSE, AS THE COURT CONSTRUES SECRETARY OLIVER'S INTERPRETATION OF THE RELEVANT STATE STATUTES, THOSE INTERPRETATIONS ARE NOT UNCONSTITUTIONALLY VAGUE, EVEN IF THEY ARE INCORRECT.

In Count VI of the Amended Complaint, Voter Reference contends that the Data Sharing Ban -- a violation of which leads to criminal sanctions -- is impermissibly vague, because its central "prohibition" does not "appear[] anywhere in New Mexico statute," Amended Complaint ¶ 220, at 52, and thus Secretary Oliver and the Attorney General's "uncertain meanings and interpretations . . . fail to provide sufficient guidelines for Plaintiff and others to know what conduct is permissible and what is prohibited."  Amended Complaint ¶ 221, at 53.  The Defendants argue that the Data Sharing Ban -- which the Defendants assert is mandated by harmonious readings of various State statutes, see Factual Background Section 3(a) supra, at 77-79 -- is "laid out specifically in the statutes," and there is "no room for ambiguity or subjective interpretation," Defendants' MSJ at 53.

As noted above, see Law Regarding a Statute Being Void for Vagueness supra at 277-81, as a general principle, for a law that regulates First Amendment speech to survive a void for vagueness challenge, a reasonable person must be able to understand which speech the law prohibits and which it allows.  See Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)("[W]e insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.").  "A statute can be impermissibly vague for either of two independent reasons.  First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.  Second, if it authorizes or even encourages arbitrary and discriminatory enforcement."   Hill v. Colorado, 530 U.S. 703, 732 (2000)(citing Chicago v. Morales, 527 U.S. 41, 56-57 (1999)).  Vagueness in laws, therefore, is a concern on various levels: the danger of selective prosecution, arbitrary prosecution by law enforcement, and the idea that a vague law offends basic notions of fairness in a society governed by laws.  See Kolender v. Lawson, 461 U.S. 352, 358 (1983).

Unconstitutionally vague laws that infringe on First Amendment freedoms are of particular concern.  This concern is manifested by a distinct, sui generis analytical approach: whereas generally, when a statutory provision is attacked on void-for-vagueness grounds, the statute's constitutionality must be determined strictly based on the statute's application to the case's particular facts, see United States v. Powell, 423 U.S. 87, 92 (1975)(reiterating that "'[i]t is well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand'")(quoting United States v. Mazurie, 419 U.S. 544, 550 (1975))), in the First Amendment context, the void-for-vagueness doctrine "demands a greater degree of specificity than in other contexts" and the statute is tested for vagueness on its face, and not as applied to the case's facts, Smith v. Goguen, 415 U.S. at 573.

See United States v. Nat'l Dairy Corp., 372 U.S. at 36.  Once it is determined, however, that a statute will be evaluated on its face because of its First Amendment restrictions, the criteria for measuring the statute's validity under the vagueness doctrine are the same as in a non-First Amendment context: fair warning and adequate guidelines.  See Smith v. Goguen, 415 U.S. at 573; FCC v. Fox TV Stations, Inc., 567 U.S. 239, 253-54 (2012)("When speech is involved, rigorous adherence to [a statute's] requirements is necessary to ensure that ambiguity does not chill protected speech.").

Consistent with its rulings in the PI MOO, the Court concludes that the Data Sharing Ban is not unconstitutionally vague.  See PI MOO at 200-04.  Although the Court concludes, as it did in the PI MOO, that the Data Sharing Ban is rooted in an incorrect reading of New Mexico law, see PI MOO at 143-154, the restriction itself is reasonably clear, and, on its face, does not invite arbitrary or selective prosecution.   Purportedly rooted in N.M.S.A.§ 1-5-22(A), as well as N.M.S.A. § 1-4-5.5(C) and in the "affidavit" described therein, the Data Sharing Ban's central restriction is reflected in the § 1-4-5.5(C) voter data request affidavits at issue in this case, which read: "Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978)."  Lippert Voter Information Authorization Form at 1.  See Factual Background Section 2(a) supra, at 9-12; Voter Information Authorization (undated), filed June 24, 2022 (Doc. 44-9)(a more recent version of the affidavit with the same language).  Again, although the Court concludes that this restriction is not a correct reading of the applicable State statutes, see PI MOO at 143-154, the Court concludes that this command is simple enough that a reasonable person would know what conduct would leave him or her vulnerable to criminal prosecution, and -- on its face -- it is not "so standardless that it

authorizes or encourages seriously discriminatory enforcement," United States v. Williams, 553

U.S. 285, 304 (2008).  Accordingly, the Court grants the Defendants' MSJ as to Voter Reference's

claim  of  unconstitutional  vagueness  and  denies  the  Voter  Reference  MSJ  regarding

unconstitutional vagueness.

**VI.   THE DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON VOTER REFERENCE'S ALLEGATIONS OF UNCONSTITUTIONAL RETALIATION IN VIOLATION OF THE FIRST AMENDMENT, BECAUSE VOTER REFERENCE CANNOT SHOW, AS A MATTER OF LAW, THAT IT ENGAGED IN CONSTITUTIONALLY PROTECTED ACTIVITY THAT FORMS THE BASIS OF ITS RETALIATION CLAIM.**

Count III of Voter Reference's Amended Complaint alleges a particular First Amendment

violation, namely, a First Amendment retaliation claim.  See Amended Complaint ¶¶ 148-165, at

36-39.  As the Amended Complaint describes, the Defendants have engaged in unconstitutional

retaliation in two ways: (i) that Secretary Oliver has "refused to convey voter data to Plaintiff and

conditioned [her] decision not to respond to VRF's request based on VRF's viewpoint and planned

speech," and (ii) Secretary Oliver and the Attorney General "have worked in concert to threaten

Plaintiff with prosecution, again based on VRF's viewpoint and planned speech."   Amended

Complaint ¶ 155, at 37.  As discussed above, see Law Regarding the First Amendment supra, at

255-57, a First Amendment retaliation claim "against a defendant who is neither an employer nor

a party to a contract with the plaintiff" has three elements: (i) that the plaintiff was engaged in

Constitutionally protected activity; (ii) the defendant's actions caused the plaintiff to suffer an

injury that would "chill a person of ordinary firmness from continuing to engage in that activity";

and  (iii)  the  plaintiff's  exercise  of  the  Constitutionally  protected  activity  was  a  substantial

motivation for the defendant's adverse action.  Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir.

2000)(quoting Lackey v. Cnty. of Bernalillo, 166 F.3d 1221, at *3).  The Court concludes that the

Defendants  are  entitled  to  summary  judgment  on  Count  III's  allegations  of  unconstitutional

retaliation, because, as a matter of law, Voter Reference cannot show that it engaged in Constitutionally protected conduct to satisfy the first prong of Worrell v. Henry's test.  See 219 F.3d at 1212.  As discussed above, however, see Analysis Section III supra, at 310-19, the Court allows one part of Voter Reference's retaliation claim to proceed as part of Count V's First Amendment allegations.  The Court explains these conclusions in turn.

As discussed above, the Court concludes that the Data Sharing Ban and the Use Restrictions on voter data are not violative of the First Amendment.  See Analysis Section III supra, at 310-19.  These State-imposed limitations are restrictions on access to State information and not restrictions on speech.  Moreover, the greater power of a total ban on access and use of this State information necessarily must include the lesser power of disclosure with restrictions, so long as those restrictions do not offend core Constitutional principles, such as limiting disclosure to parties who have certain viewpoints or political allegiances.

These conclusions preclude a subsequent determination that Voter Reference was engaged in Constitutionally protected activity which could form the basis of its First Amendment retaliation claims.  See Worrell v. Henry, 219 F.3d at 1212.  The Amended Complaint states that the Defendants retaliated against Voter Reference "based on VRF's viewpoint and planned speech," Amended Complaint ¶ 155, at 37, and, more generally, that the "Defendants' actions are substantially motivated by Plaintiff's exercise of its First Amendment rights," Amended Complaint ¶ 164, at 39.  The Court agrees, as discussed above, that the Defendants cannot condition access to voter data based on viewpoint or political ideology.  See Analysis Section III, supra, at 310-19.  Accordingly, to the extent that Voter Reference's retaliation claim is based on this principle, the Court allows this claim to go forward, but views that claim as part of Count V's allegation of a First Amendment violation rather than as part of Count III's retaliation claim.  See

Analysis Section III supra, at 325-26.   Viewpoint discrimination aside, however, the Court concludes that Voter Reference cannot show any Constitutionally protected activity to anchor its First Amendment retaliation claim.   As discussed, the Court concludes that, for First Amendment purposes, the Data Sharing Ban and the Use Restrictions are Constitutional, and Voter Reference has no First Amendment right to access the requested data.   Accordingly, viewpoint discrimination aside, no First Amendment retaliation claim can lie on the fact that Voter Reference did not receive the requested voter data, or that the Data Sharing Ban prohibited Voter Reference from posting its voter data on the internet.   Because these limitations do not violate the First Amendment, Voter Reference cannot show any "constitutionally protected activity" at the heart of its retaliation claim. Worrell v. Henry, 219 F.3d at 1212 (quoting Lackey v. Cnty. of Bernalillo, 1999 WL 2461, at *3). Accordingly, with the exception of the viewpoint discrimination allegation, which the Court allows to proceed under Count V, the Court grants summary judgment in favor of the Defendants on Count III's claim of unconstitutional retaliation.   The Court therefore denies the Voter Reference MSJ on Count III.

**VII.   VOTER REFERENCE IS ENTITLED TO SUMMARY JUDGMENT IN ITS FAVOR, IN PART, ON ITS REQUEST FOR DECLARATORY JUDGMENT THAT VOTER REFERENCE MAY NOT BE SUBJECT TO STATE CRIMINAL PROSECUTION ON THE BASIS OF ALLEGED VIOLATIONS OF THE STATE'S USAGE AND SHARING RESTRICTIONS ON STATE VOTER DATA, BECAUSE THE NVRA'S PUBLIC INSPECTION PROVISION PREEMPTS THOSE RESTRICTIONS.**

In the Amended Complaint, Voter Reference's final claim -- Count VIII -- is for declaratory judgment, requesting that "a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and rule 57 of the Federal Rules of Civil Procedure, declaring the Use Restrictions to be in violation of the First Amendment," Amended Complaint ¶ 234, at 54, and also asks the Court to "maintain its preliminary injunction and issue a permanent injunction enjoining Defendants and all of their agents and employees from enforcing the Use Restrictions against Plaintiff in violation of its

constitutional rights," Amended Complaint ¶ 235, at 55.  In the Voter Reference MSJ Memo., Voter Reference's request is slightly broader, namely, for "permanent injunctive relief preventing its prosecution for past and future posting of voter data."  Voter Reference MSJ Memo. at 109. The Court grants Voter Reference's motion for summary judgment on Count VIII in part and denies it in part.  The Court denies the motion for summary judgment insofar as it requests the Court to declare that the Use Restrictions violate the First Amendment, see Amended Complaint ¶ 234, at 54, or that the Court must enjoin enforcement of the Use Restrictions on the basis of "constitutional rights," Amended Complaint ¶ 235, at 55.  The Court grants Voter Reference's request for summary judgment, however, insofar as the Amended Complaint's Count VIII requests the Court to declare that the Defendants may not prosecute Voter Reference based on its past or future posting of New Mexico voter data.  See Voter Reference MSJ Memo. at 109.  As the Court describes above, the NVRA's Public Inspection Provision preempts both the Use Restrictions and the Data Sharing Ban.  See Analysis Section II supra, at 302-310.  Because federal law preempts the Use Restrictions and the Data Sharing Ban, the Defendants are deprived of their authority to enforce these laws, whether for past or future conduct.  See Valiente v. Swift Transportation Co. of Arizona, LLC, 54 F.4th 581, 585-87 (9th Cir. 2022).  Accordingly, the Court, pursuant to 28 U.S.C. § 2201 and rule 57, declares that the NVRA's Public Inspection Provision preempts the Use Restrictions and the Data Sharing Ban.

To conclude its analysis, the Court recounts the status of each of Voter Reference's claims, in the order that they appear in the Amended Complaint.  On the Amended Complaint's Count I, which alleges that the NVRA' Public Inspection Provision preempts the Data Sharing Ban and the Use Restrictions, the Court grants summary judgment in favor of Voter Reference, and concludes that the NVRA's Public Inspection Provision preempts the Data Sharing Ban and the Use

Restrictions.  See Analysis Section II supra, at 302-310.  On the Amended Complaint's Count II, which alleges a NVRA violation, the Court grants summary judgment in Voter Reference's favor, and concludes that the Defendants violated the NVRA by refusing to comply with the NVRA's Public Inspection Provision.  See Analysis Section I supra, at 285-302.  On the Amended Complaint's Count III, which alleges a First Amendment claim, the Court grants summary judgment in the Defendants' favor -- with the caveat that part of Voter Reference's viewpoint discrimination claim may proceed under Count V -- because Voter Reference cannot show, as a matter of law, what Constitutionally protected speech forms the basis of its retaliation claim.  See Analysis Section VI supra, at 319-20.  Count IV, which alleges prior restraint in violation of the First Amendment, is dismissed without prejudice.  See Analysis supra, at 281 n.141.  On Count V, which alleges general First Amendment free speech violations, the Court grants in part and denies in part the Defendants' MSJ, because, although the Data Sharing Ban and the Use Restrictions do not violate the First Amendment, genuine disputes of material fact exist whether the Defendants subjected Voter Reference to viewpoint discrimination.  See Analysis Section II supra, at 302-310.  On Count VI, which alleges that the Data Sharing Ban and the Use Restrictions are unconstitutionally overbroad in violation of the First Amendment, the Court grants summary judgment in the Defendants' favor, because the restrictions that the Secretary of State's Office imposes do not proscribe any activity that the First Amendment protects.  See Analysis Section IV supra, at 319-20.  On Count VII, which alleges that the Data Sharing Ban and the Use Restrictions are void for vagueness, the Court grants summary judgment in the Defendants' favor, because Secretary Oliver's interpretation of the relevant State statutes are not unconstitutionally vague, even if they are incorrect.  See Analysis Section V supra, at 320-23.  Last, on Count VIII, the Court grants summary judgment to Voter Reference in part, concluding that, although the Court does not grant

Voter Reference its relief based on its Constitutional theories, the Court declares that Voter Reference may not be subject to State criminal prosecution on the basis of alleged violations of the Data Sharing Ban or the Use Restrictions, because the NVRA's Public Inspection Provision preempts those restrictions.  See Analysis Section VII supra, at 325-26.

**IT IS ORDERED** that: (i) Plaintiff Voter Reference Foundation, LLC's Motion for Partial Summary Judgment, filed April 14, 2023 (Doc. 118)("Voter Reference MSJ"), is granted in part and denied in part; (ii) the Voter Reference MSJ is granted on Count I and Count II of the Plaintiff's Verified First Amended Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief filed September 26, 2022 (Doc. 74)("Amended Complaint"); (iii) 52 U.S.C. § 20507(i), the Public Inspection Provision ("Public Inspection Provision") of the National Voter Registration Act, 52 U.S.C. §§ 20501-20511 ("NVRA"), preempts the State's Data Sharing Ban and the Use Restrictions; (iv) Secretary Oliver and the Attorney General violated the Public Inspection Provision by refusing to timely produce voter data in response to Voter Reference's February, 2022, and May, 2022, voter data requests; (v) Voter Reference is entitled to reasonable attorney's fees, litigation expenses, and costs accrued in its prosecution of claims made under the National Voter Registration Act, 52 U.S.C. §§ 20501-20511 ("NVRA"); (vi) the Voter Reference MSJ is denied on the Amended Complaint's Counts III, V, VI, and VII; (vii) the Amended Complaint's Count IV is dismissed without prejudice; (viii) the Voter Reference MSJ is granted in part on the Amended Complaint's Counts VIII; (ix) the NVRA preempts the State's Use Restrictions and the Data Sharing Ban, and, therefore, Voter Reference cannot be subject to criminal prosecution based on allegations of past or future violations of the Use Restrictions and the Data Sharing Ban; (x) the Defendants' Motion for Summary Judgment, filed April 14, 2023 (Doc. 121)("Defendants' MSJ"), is granted in part and denied in part; (xi) the Defendants' MSJ is

granted in part on the Amended Complaint's Count V; (xii) the Amended Complaint's Count V, alleging unconstitutional viewpoint discrimination in violation of the First Amendment, may proceed to trial; (xiii) the Defendants' MSJ is denied on the Amended Complaint's Count I, II, and VIII; (xiv) the Defendants' MSJ is granted on the Amended Complaint's Counts III, VI, and VII, and those Counts are dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Carter B. Harrison IV
Harrison & Hart, LLC
Albuquerque, New Mexico

-- and --

Edward Dean Greim
Matthew Richard Mueller
Jackson Tyler
Graves Garrett Greim LLC
Kansas City, Missouri

  *Attorneys for the Plaintiffs*

Raúl Torrez
 New Mexico Attorney General
Jeff Dan Herrera
Mark Walsh Allen
 Assistant Attorneys General
New Mexico Office of the Attorney General
Santa Fe, New Mexico

  *Attorneys for the Defendants*