# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

VOTER REFERENCE FOUNDATION, LLC,

   Plaintiff,

vs.            No. CIV 22-0222 JB/KK

RAÚL TORREZ, in his official capacity as New
Mexico Attorney General, and MAGGIE
TOULOUSE OLIVER, in her official capacity
as Secretary of State of New Mexico,

   Defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

   **THIS MATTER** comes before the Court on a one-day bench trial ("Bench Trial") in this

matter.  See Clerk's Minutes at 1, filed October 16, 2023 (Doc. 176)("Clerk's Minutes").  The Court

held the Bench Trial on October 16, 2023.  See Clerk's Minutes at 1.  The primary issue is whether

Defendant New Mexico Secretary of State Maggie Toulouse Oliver and Defendant the New Mexico

Attorney General[1] (collectively, "Defendants") acted with a viewpoint-discriminatory purpose in

refusing to provide Plaintiff Voter Reference Foundation, LLC ("Voter Reference") with access to

the voter data that Voter Reference requested from the Office of the New Mexico Secretary of State

("Secretary of State's Office").  After reviewing carefully the parties' presentations during the

bench trial, the briefing, and the relevant legal authority, the Court concludes that Defendants

---

[1]Since this case was filed, the initially named Attorney General Defendant -- Hector
Balderas -- is no longer the Attorney General of New Mexico; Raúl Torrez is the new Attorney
General.  Pursuant to rule 25(d) of the Federal Rules of Civil Procedure, Raúl Torrez is now a
named Defendant in this action.  Because, however, General Torrez was not in office during much
of the underlying conduct in this dispute, throughout this opinion, the Court refers to the Attorney
General Defendant as the "Attorney General."

violated Voter Reference's rights under the First Amendment to the Constitution of the United States by acting with viewpoint discriminatory purpose in withholding publicly available State voter data from Voter Reference.  Having now ruled on all Counts in the Plaintiff's Verified First Amended Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief, filed September 26, 2022 (Doc. 74)("Amended Complaint"), for the reasons described below, the Court: (i)  enjoins the Defendants from engaging in any future viewpoint discrimination against Voter Reference related to Voter Reference's requests for State voter data; and (ii) enjoins the Defendants, their agents, employees, and all persons acting in active concert or participation with them, from enforcing the Use Restrictions and Data Sharing Ban against Voter Reference, its agents, and others similarly situated.  Final Judgment to follow.

## FINDINGS OF FACT

Rule 52(a)(1) of the Federal Rules of Civil Procedure reads: "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  See Otero v. Mesa Cnty. Valley Sch. Dist. No. 51, 568 F.2d 1312, 1316 (10th Cir. 1977)("Findings of fact by a trial court should be sufficient to indicate the factual basis for the court's general conclusion as to ultimate facts."). The Court finds the following facts by a preponderance of the evidence.  See Century Sur. Co. v. Shayona Inv., LLC, 840 F.3d 1175, 1177 (10th Cir. 2016).  In assessing the credibility of witness testimony, the Court -- in its fact-finding capacity -- evaluates the witnesses' possible bias, personal interests, memory, clarity, prior discrepancies in testimony, perceived honesty, degree of personal knowledge, and other permissible factors.  See Talcott v. United States, No. CIV 19-0141, 2022 WL 18141792, at *1 (D. Wyo. January 5, 2022)(Skavdahl, C.J.)("When acting as the trier-of-fact, the trial court must determine which of the witnesses it finds credible, which of the

permissible competing inferences it will draw, and whether the party having the burden of proof has satisfactorily proven its case.").

The Court bases its Findings of Fact on the evidence that the parties presented during the Bench Trial.  In preparation for the Bench Trial, the parties stipulated to the admission of various exhibits and prior testimony.  See Amended Joint Exhibit List & Parties' Exhibit Lists, filed October 6, 2023 (Doc. 158)("Joint Ex. Lists"); Joint Trial Deposition Designations and Objections, filed October 6, 2023 (Doc. 159)("Joint Depo. Designations"); Joint Designation of Prior Hearing Testimony, filed October 6, 2023 (Doc. 160)("Joint Prior Test. Designations"); Joint Stipulations for October 16, 2023 Bench Trial, filed October 6, 2023 (Doc. 162)("Joint Stipulations").  At the Bench Trial, the Court heard the live testimony of one witness -- Mandy Vigil, the State Elections Director at the Secretary of State's Office -- whom both Voter Reference and the Defendants called. See Transcript of Bench Trial Proceedings, Commencing on October 16, 2023 at 36:14-81:20 (Court, Allen, Clerk, Greim, Herrera, Vigil)(taken October 16, 2023), filed December 28, 2023 (Doc. 171)("Trial Tr."); id. at 82:7-130:9 (Court, Allen, Greim, Herrera, Vigil).  On November 9, 2023, the parties submitted their respective Findings of Fact and Conclusions of Law.  See Plaintiff's Proposed Findings of Fact and Conclusions of Law, filed November 9, 2023 (Doc. 169)("Pl.'s FOFs"); Defendants' Proposed Findings of Fact and Conclusions of Law, filed November 9, 2023 (Doc. 170)(Defs.' FOFs").

### 1.    **The Parties.**

1.    Voter Reference is a non-profit organization that is "dedicated to increasing voter participation in elections while protecting election integrity."  Joint Stipulations ¶ 1 at 1.

2.    As part of its organizational efforts, Voter Reference is "dedicated to publishing [State] voter rolls online for free forever to promote transparency and get the public engaged in

understanding how the process works." Transcript of Motion Proceedings, Commencing May 17, 2022 at 53:14-17 (Swoboda)(taken May 17, 2022), filed May 27, 2022 (Doc. 35)("May 17 Tr.").[2]

3.       To accomplish these aims, Voter Reference operates a website called "VoterRef.com." May 17 Tr. at 55:1 (Swoboda). See Joint Stipulations ¶ 25 at 4.

4.       The public information made available on VoteRef.com varies from State to State, but generally includes a voter's name, date of birth or birth year, registration address, registration date, party affiliation, registration status, precinct, and voting participation history. See May 17 Tr. at 54:15-55:2 (Swoboda).

5.       In addition to its voter registration database, Voter Reference's staff -- its "data director" and "assistant data director" -- aggregate voter data they receive from the Secretary of State's Office, and post that total number alongside the election "turnout number, the total ballots cast from the official records submitted to the [Election Assistance Commission ('EAC')] by the state or posted on their website or on their canvass." May 17 Tr. at 70:24-71:7 (Swoboda).

6.       On VoteRef.com, Voter Reference "post[s] those exact two data points, and . . . post[s] the documentation it came from," but "[t]he public is not given access to that data." May 17 Tr. at 71:8-10 (Swoboda).

---

[2]In the Joint Prior Test. Designations, the parties designate portions of testimony from the May 17, 2022, and June 15, 2022, preliminary injunction hearings in this matter as "part of the trial record." Joint Prior Test. Designations at 1. See Fed. R. Civ. P. 65(a)(2) ("Even when consolidation is not ordered, evidence that is received on the [preliminary injunction] motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."). In these Findings of Fact, all citations to testimony from the May 17, 2022, and June 15, 2022, preliminary injunction hearings are portions of testimony that the parties have designated as part of the trial record. See Joint Prior Test. Designations at 1-4.

7.      When there exists a discrepancy between these two data points, Voter Reference's Executive Director contacts the chief election official of the State and asks if she can meet or have a telephone call with them to "learn about their process" and "identify where the discrepancy is coming from."  May 17 Tr. at 60:7-10 (Swoboda).

8.      Gina Swoboda is Voter Reference's Executive Director.  See Joint Stipulations ¶ 2 at 1; May 17 Tr. at 52:17-19 (Greim, Swoboda).

9.      Secretary Oliver is the Secretary of State for the State of New Mexico and, in that capacity, is the State of New Mexico's chief election officer.  See Joint Stipulations ¶ 3, at 1.

10.     Secretary Oliver is "responsible for ensuring the integrity of elections in New Mexico, protecting the privacy of voter data, furnishing voter data to requesters, and referring potential violations of the Election Code[, N.M.S.A. §§ 1-1-1 to -26-6 (1969, as amended through 2024)("Election Code")] to the Attorney General for prosecution."  Joint Stipulations ¶ 3, at 1-2.

11.     Secretary Oliver is sued in her official capacity.  See Joint Stipulations ¶ 4, at 2.

12.     Vigil is the State Elections Director at the Secretary of State's Office.  See Joint Stipulations ¶ 5 at 2; Trial Tr. at 36:17-19 (Vigil).

13.     In her role as State Elections Director at the Secretary of State's Office, Vigil oversees "the process of applying for and making available voter data."  May 17 Tr. at 126:9-11 (Greim, Vigil).

14.     Sharon Pino is the Deputy Secretary of State of the State of New Mexico.  See Transcript of Motion Proceedings, commencing June 15, 2022 at 123:10-11 (Greim, Pino)(taken June 15, 2022), filed June 24, 2022 (Doc. 46)("June 15 Tr.").

15.     In her role as Deputy Secretary of State of the State of New Mexico, Pino "run[s] the office, help[s] make any decisions, policy decisions or otherwise, direct[s] projects, [and] oversee[s] all of the directors of the office."  June 15 Tr. at 123:13-16 (Pino).

16.     General Torrez is the Attorney General of New Mexico, and is empowered under State law to investigate and prosecute violations of the Election Code.  See Joint Stipulations ¶ 6, at 2.

17.     The Attorney General has "refused to state that it will not prosecute [Voter Reference] for its prior posting of voter data online," Joint Stipulations ¶ 7, at 2, and the Attorney General has investigated Voter Reference "for its use of voter data and the publication of that voter data on" VoterRef.com, Joint Stipulations ¶ 8, at 2.

18.     The Attorney General "takes the same position" as Secretary Oliver as to the legality of Voter Reference's actions.  Joint Stipulations ¶ 10, at 2.

19.     The Attorney General is sued in his official capacity.  See Joint Stipulations ¶ 11, at 2.

**2.     New Mexico's Voter Registration Data Laws, and Common Uses of Voter Data.**

20.     The New Mexico Election Code, N.M.S.A. §§ 1-1-1 to 1-26-6 ("Election Code"), makes certain voter registration available to requestors for limited purposes.  See May 17 Tr. at 126:9-23 (Greim, Vigil).

21.     The Election Code provides:

    A.     The county clerk or secretary of state shall furnish voter data, mailing labels or special voter lists only upon written request to the county clerk or the secretary of state and after compliance with the requirements of this section; provided, however, all requesters shall be treated equally in regard to the charges and the furnishing of the materials.

B.    In furnishing voter data, mailing labels or special voter lists, the county clerk or secretary of state shall not provide data or lists that include voters' social security numbers, codes used to identify agencies where voters have registered, a voter's day and month of birth or voters' telephone numbers if prohibited by voters.

C.    Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes.

D.    The secretary of state shall prescribe the form of the affidavit.

N.M.S.A. § 1-4-5.5. <u>See</u> <u>Lamar v. Micou</u>, 114 U.S. 218, 223 (1885)("The law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice, without plea or proof."); <u>United States v. Coffman</u>, 638 F.2d 192, 194 (10th Cir. 1980)("That the courts are allowed to take judicial notice of statutes is unquestionable.").

22.    The Election Code includes definitions for some of the statute's terms:

(1)    "election campaign purposes" means relating in any way to a campaign in an election conducted by a federal, state or local government;

(2)    "governmental purposes" means noncommercial purposes relating in any way to the structure, operation or decision-making of a federal, state or local government;

(3)    "mailing labels" means prepared mailing labels of selected voters arranged in the order in which requested and providing only the name and address of the voter;

(4)    "special voter list" means a prepared list of selected voters arranged in the order in which requested; and

(5)    "voter data" means selected information derived from the voter file.

N.M.S.A. § 1-4-5.5(E).

23.    The Election Code makes certain use of voter data unlawful.  With respect to unlawful uses of New Mexico voter data, before July 1, 2023, the Election Code stated:

A.    Unlawful use of voter data, mailing labels or special voter lists consists of the knowing and willful use of such information for purposes prohibited by the Voter Records System Act [Chapter 1, Article 5 NMSA 1978].

B.    Any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth degree felony and upon conviction shall be fined one hundred dollars ($100) for each and every line of voter information that was unlawfully used.

C.    Each and every unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense.

N.M.S.A. § 1-4-5.6 (2022).

24.    With respect to unlawful uses of New Mexico voter data, since July 1, 2023, the Election Code states:

A.    Unlawful use of voter data, mailing labels or special voter lists consists of:

(1)    the knowing and willful selling, loaning, providing access to or otherwise surrendering of voter data, mailing labels or special voter lists by a person for purposes prohibited by the Election Code; or

(2)    causing voter data, mailing labels or special voter lists or any part of the voter data, mailing label or special voter lists that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means.

B.    Any person, organization or corporation or agent, officer, representative or employee thereof who commits unlawful use of voter data, mailing labels or special voter lists is guilty of a fourth degree felony and upon conviction shall be fined one hundred

- 8 -

dollars ($100) for each line of voter information that was unlawfully used.

C.      Each unlawful use of voter data, mailing labels or special voter lists constitutes a separate offense.

N.M.S.A. § 1-4-5.6 (2022).

25.      It is the Defendants' position, based on their analysis of these statutes, that voter data cannot be shared, distributed, published, or otherwise made available by a requester to any third party.  See May 17 Tr. at 148:20-149:14 (Greim, Vigil); June 15 Tr. at 91:6-20 (Serafimova, Vigil); Trial Tr. at 102:8-17 (Herrera, Vigil).

26.      Requests for State voter data are common, and often come from State political parties, "campaigns, . . . candidates or parties that are participating in the current election."  Trial Tr. at 91:4-18 (Herrera, Vigil).

27.      Requests also come from entities and organizations across the political spectrum. See Joint Stipulations ¶¶ 63-64, at 9.

**3.      The N.M.S.A. § 1-4-5.5 Affidavit's Evolution.**

28.      As noted, see FOF ¶ 21, at 6-7, N.M.S.A. § 1-4-5.5(C) states: "Each requester of voter data, mailing labels or special voter lists shall sign an affidavit that the voter data, mailing labels and special voter lists shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes."  N.M.S.A. § 1-4-5.5(C).

29.      An old version of the Secretary of State's Voter Data Request Form prompts the requester to check one of five boxes indicating the data request's purpose: "Governmental Use,"

"Campaign Use," "Election Related," "Research Purposes," or "Other."  Voter Data Request Form

at 1, filed June 24, 2022 (Doc 44-8)("Old Request Form").[3]

      30.     The Old Request Form's signed authorization reads:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§1-5-1 through 1-5-31 NMSA 1978).

> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

Old Request Form at 1.

      31.     The Secretary of State's Office revised the Voter Data Request Form on February

10, 2022, and omits the option to check the box entitled, "Election Related," and prompts

applicants to check the box for either "Campaign Use" or "Governmental Use."  Voter Data

Request Form at 1, filed June 24, 2022 (Doc. 44-9)("Feb. 10 Request Form").[4]

      32.     The Feb. 10 Request Form includes an authorization which requires the requester

to initial and sign below the following statement:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).

> I hereby swear that the requestor will not: (INITIAL EACH)

---

[3]The Court admitted the Old Request Form at trial as Joint Exhibit 16.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

[4]The Court admitted the Feb. 10 Request Form at trial as Joint Exhibit 17.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

_____ sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.

_____ alter voter information received as a result of this request.

_____ use voter information for any purpose other than those authorized on this form.

_____ use voter information for any commercial purposes.

Feb. 10 Request Form at 1.

33.     On February 14, 2022, the Secretary of State's Office again altered the Voter Data Request Form.  See Voter Data Request Form at 1 (revised February 14, 2022), filed June 24, 2022 (Doc. 44-10)("Feb. 14 Request Form").[5]

34.     Like the Feb. 10 Request Form, the Feb. 14 Request Form requires a requester to check one of only two "purposes" behind the request, either: "Campaign Use" or "Governmental Use."  There is no option for "election" use.  Feb. 14 Request Form at 1.

35.     Unlike the Feb. 10 Request Form, and in addition to checking one of two boxes, the Feb. 14 Request Form prompts the applicant to "provide a description of your intended use of voter data."  Feb. 14 Request Form at 1.

36.     Like the Feb. 10 Request Form, the Feb. 14 Request form includes an authorization which requires the requester to initial and sign below the following statement:

Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).

I hereby swear that the requestor will not: (INITIAL EACH)

_____

[5]The Court admitted the Feb. 14 Request Form at trial as Joint Exhibit 15.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

- 11 -

_____ sell, loan, provide access to, or otherwise surrender voter information received as a result of this request.

_____ alter voter information received as a result of this request.

_____ use voter information for any purpose other than those authorized on this form.

_____ use voter information for any commercial purposes.

Feb. 14 Request Form at 1.

37.     The Secretary of State's Office has never denied access to voter data to a requester who has filled out the proper affidavit form.  See May 17 Tr. at 128:16-18 (Greim, Pino); June 15 Tr. at 92:8-11 (Serafimova, Vigil).

38.     Even if a requester uses an outdated form, the Secretary of State's Office has never denied access to voter data to a requester who has filled out the proper affidavit form.  June 15 Tr. at 92:12-14 (Serafimova, Vigil).

**4.      The Voter Data Request Log.**

39.     The Voter Records System Act, N.M.S.A. §§ 1-5-1 to 1-5-13, requires the Secretary of State to "maintain the official state voter file based on county registers" and to "provide access to the file to the county clerks."  N.M.S.A. § 1-5-3(B).

40.     The Secretary of State "shall prescribe any rules, forms and instructions necessary to implement procedures required by the Voter Records System Act and federal law," and "maintain a log, which shall be public, containing all transactions regarding requests for current registration lists of state voters."  N.M.S.A. § 1-5-3(B).

41.     "The log shall indicate the requesting party, the date of the request, the date of fulfilling the request, charges made and any other information deemed advisable by the secretary of state."  N.M.S.A. § 1-5-3(B).

42.     The Secretary of State's 2021 and 2022 Voter Data Request Log shows numerous requests for voter data from political parties such as the Democratic Party of New Mexico, the Republican Party of New Mexico, the Libertarian Party of New Mexico, and from organizations such as Local Labs, Catalist, L2 Inc., Data Targeting, and i360.  See Voter Data Request Log at 1-2, filed June 24, 2022 (Doc. 44-11)("Voter Data Request Log");[6] Joint Stipulations ¶ 63, at 9.

43.     Catalist submitted a request for statewide voter data and voter history on January 15, 2021.  See Voter Data Request Log at 2.[7]

44.     L2 Inc. submitted a request for statewide voter data and voter history on January 25, 2021, and January 28, 2021.  See Voter Data Request Log at 2.

45.     Data Targeting submitted a request for Congressional District 1's voter history from 1990-2020 on May 27, 2021.  See Voter Data Request Log at 2.

46.     i360 submitted a request for statewide voter data and voter history on March 16, 2021.  See Voter Data Request Log at 2.

---

[6]The Court admitted the Voter Data Request Log at trial as Joint Exhibit 21.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 3.

[7]Although the Court lacks a solid basis in the trial record to make a finding of fact about Catalist's political affiliation, the Court notes that it earlier found that Catalist is a self-described "progressive" data trust, which "provides its 'data only to Democrats and progressives, and only for civic engagement purposes, not for commercial for-profit uses . . . without threat of this data asset being bought sold, or traded for commercial or for-profit purposes.'"  See Memorandum Opinion and Order, FOF ¶ 58, at 16-17, filed July 22, 2022 (Doc. 51)("PI MOO")(quoting Catalist, Who We Are, https://catalist.us/).  Moreover, an exchange between Voter Reference's counsel and Vigil from the June 15, 2022, Preliminary Injunction hearing -- an exchange that is in the trial record -- contains a question of Voter Reference's counsel labeling Catalist a "well-known progressive company."  June 15 Tr. at 34:25-35:8 (Greim, Vigil).  In addition, to the Court's knowledge, there is no dispute that Catalist is an entity that leans to the left politically.

47.     The Voter Data Request Log states "N/A" in the "Total Cost for Records" column where the requester is a political party requesting statewide voter data.  Voter Data Request Log at 1-2.

48.     These entities sought -- and received -- New Mexico voter data by filling out the which N.M.S.A. § 1-4-5.5 requires.  See Joint Stipulations ¶ 63, at 9.

49.     The Total Cost for Records listed in the Voter Data Request Log varies according to the number of records requested.  See Voter Data Request Log at 1-2.

**5.     The Initial Data Request.**

50.     On March 29, 2021, David Michael Lippert, an individual affiliated with an entity called Local Labs, LLC ("Local Labs"), submitted a request for voter data from the Secretary of State's Office.  Joint Stipulations ¶ 16, at 3.  See May 17 Tr. at 66:10-25 (Greim, Swoboda); Voter Data Request Log at 2.

51.     Local Labs and Voter Reference are separate entities.  See May 17 Tr. at 66:10-22 (Greim, Swoboda).

52.     Lippert requested the name, physical address, mailing address, year of birth, party affiliation, precinct assignment, jurisdiction, registrant ID number, associated districts, voting history, and method of voting for each registered voter in the State of New Mexico.  See Joint Stipulations ¶ 17, at 3.

53.     In conjunction with that request, Lippert executed a voter data request form and affidavit, which N.M.S.A. § 1-4-5.5(C) and the Secretary of State's Office require for such requests, and paid $5,378.12 to the Secretary of State's Office.  See Joint Stipulations ¶ 18-19, at 3.

54.     On the version of the voter data request form that Local Labs used, the requester has the option to choose from one of three purposes for the request: Governmental Use, Campaign Use, and Election Related Use.  See Joint Stipulations ¶ 20, at 3.

55.     Aside from these three categories, the data requester does not need to provide any further information regarding how the data will be used.  See Joint Stipulations ¶ 20, at 3.

56.     The voter data request form executed by Lippert indicated that he was requesting the voter information for election related purposes.  See Joint Stipulations ¶ 21, at 3.

57.     The bottom of the voter data request form executed by Lippert contains an attestation which states:

> Unlawful use of the information requested on this form shall consist of willful selling, loaning, providing access to or otherwise surrendering, duplicating or alteration of information as stated in the Voter Records System Act (§ 1-5-1 through 1-5-31 NMSA 1978).
>
> I hereby swear that the requestor will not use or make available to others to use the requested material for purposes other than governmental, election, research and campaign purposes under penalty of law.

Joint Stipulations ¶ 22, at 3.

58.     Lippert did not make any representations to the Secretary of State's Office regarding the use or sharing of the requested voter data other than what is on the form affidavit that he signed.  See Joint Stipulations ¶ 23, at 4.

59.     The Secretary of State's Office provided the voter data that Lippert requested on April 13, 2021.  See Joint Stipulations ¶ 24, at 4.

60.     Local Labs provided the requested voter data to Voter Reference.  See May 17 Tr. at 66:16-22 (Greim, Swoboda).

6.      **Initial Online Posting, Criminal Referral, and ProPublica Article.**

61.     On December 14, 2021, Voter Reference emailed the Secretary of State's Office to discuss an apparent discrepancy that Voter Reference had identified between registered voters with ballots cast and total ballots cast.  See Email from Gina Swoboda to Secretary Toulouse Oliver (dated December 14, 2021), filed June 24, 2022 (Doc. 44-14)("December 14, 2023, Email")).[8]

62.     Voter Reference did not receive a response to this email from Secretary Oliver or from anyone at the Secretary of State's Office.  See May 17 Tr. at 62:8-10 (Greim, Swoboda).

63.     Also on December 14, 2021, the Secretary of State's Office received information from Megan O'Matz -- a journalist at a news outlet called ProPublica[9] -- that a public website operated by Voter Reference was posting voter data related to registered voters in New Mexico.  See Email Chain between Megan O'Matz and Alex Curtas at 7 (first Email dated December 14, 2021), filed June 24, 2022 (Doc. 44-20)("O'Matz-Curtas Email Chain").[10]

64.     In the email exchange between O'Matz and a spokesperson from the Secretary of State's Office, the spokesperson states that "VoteRef.com is misleading the public about New Mexico's voter rolls and are perpetuating misinformation," and that Voter Reference's efforts are "attempts by political operatives to cast doubt on the 2020 elections are an affront to our democracy

---

[8]The Court admitted the December 14, 2023, Email, at trial as Joint Exhibit 4.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

[9] ProPublica is an online, "independent, nonprofit newsroom . . . founded in 2007-2008." About Us, ProPublica, https://www.propublica.org/about/ (last visited August 7, 2024).

[10]The Court admitted the O'Matz-Curtas Email Chain at trial as Joint Exhibit 8.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

and to the professionals who run our elections throughout the country."  O'Matz-Curtas Email Chain at 5.

65.    O'Matz asked Curtas whether the Secretary of State's Office "ha[d] any correspondence with [Voter Reference] about their findings or methodology," O'Matz-Curtas Email Chain at 8, and Curtas responded: "No, our Office has not been contacted by this group to discuss their findings; likely because that would not serve their intended goal of spreading misinformation," O'Matz-Curtas Email Chain at 6.

66.    Voter Reference, had, in fact, reached out to the Secretary of State's Office to discuss their findings.  See December 14, 2023, Email at 1; FOF ¶ 61, at 16.

67.    In December, 2021, Voter Reference "made available to the public the voter information acquired by Local Labs via [VoterRef.com] for every registered voter in New Mexico, including name, registration address, registration date, year of birth, party affiliation, registration status, precinct, and voting participation history."  Joint Stipulations ¶ 26, at 4.

68.    VoteRef.com did not publish the social security number, voter ID number, telephone number, or email address of any New Mexico voter.  See Joint Stipulations ¶ 27, at 4.

69.    In conjunction with this posting, Voter Reference posted a press release which announced its findings regarding the 3,800-vote discrepancy between the number of ballots reported cast in the 2020 election and the number of voters shown in the voter history.  See VRF Website VoteRef.com Adds New Mexico Voter Rolls to Nationwide Database at 1 (dated December 16, 2021), filed June 24, 2022 (Doc. 44-13)("Voter Reference Press Release").[11]

---

[11]The Court admitted the Voter Reference Press Release at trial as Joint Exhibit 3.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

70.     This press release also states:

These discrepancies don't necessarily indicate fraud, but the differences between the voter list and the election canvass indicates, at the very least, issues with record keeping and points to the need to be more transparent and proactive about maintaining the voter rolls and reconciling ballots cast and voters having voted in every election.

Voter Reference Press Release at 1.

71.     Users of VoteRef.com agree to website's Terms of Service, which reads, in part:

VoteRef.com and the services offered through VoteRef.com are only for election-related, non-commercial use . . . You may not use information on VoteRef.com for any purpose unrelated to elections.  You may not use information on VoteRef.com for commercial purposes.  "Commercial purposes" includes use in connection with advertising or promoting commercial products or services, or for the purpose of sale, resale, solicitation, or for any purpose in which the user can reasonably anticipate the receipt of monetary gain from direct or indirect use. For example, you may not sell information obtained from VoteRef.com, or use it in connection with advertising or promoting commercial products or services, or solicitation.

. . . .

You may not use VoteRef.com to take any action that could harm VRF or any third party, interfere with the operation of VoteRef.com, or use VoteRef.com to violate any law. By way of example but not limitation, you may not: . . . (b) alter, edit, or delete the materials on VoteRef.com, including the deletion of any trademark or copyright notices on VoteRef.com; . . . (d) intentionally or unintentionally violate any applicable local, state, national, or international law or any regulations having the force of law; (e) impersonate any person or entity or misrepresent your connection to any person or entity; (f) "stalk," harass, or otherwise advocate the stalking or harassing of another person; (g) collect or store personally identifiable information about other users in connection with the prohibited conduct and activities set forth herein; (h) reproduce, duplicate, copy, sell, trade, resell, or exploit for any commercial purposes, any portion of VoteRef.com; (i) attempt to override or circumvent any security measures of VoteRef.com or VRF's third party providers or access parts of VoteRef.com you are not authorized to visit; (j) engage in any unauthorized screen scraping, database scraping, or spidering, or collection of personally identifiable information, or use any other automated means to collect information from VoteRef.com; (k) use any software, tool, or other device (such as browsers, spiders, or avatars) to search VoteRef.com, other than the search functionality offered through VoteRef.com or other generally available web browsers . . . .

- 18 -

Joint Stipulations ¶ 28, at 4-5.

72.     When a user viewed a particular voter's information, they were simultaneously

shown a state specific disclaimer regarding the data, and, when the New Mexico data was live, the

New Mexico disclaimer stated:

> The information on this website about this voter, including records of this voter's
> voting history, was provided to Voter Reference Foundation LLC ("VRF") by the
> New Mexico Secretary of State's Bureau of Elections ("Bureau") on April 15,
> 2021.  The information is publicly available here.  The information published here
> by VRF appears exactly as provided by the Bureau.  By publishing Bureau records
> verbatim, VRF does not state, represent, suggest, or imply that this voter voted or
> that this voter's ballot was not counted. Additionally, the registration information
> of any voter who is in the Safe At Home program (hereinafter referred to as a
> "protected voter") must be removed from the publicly available voter list by the
> New Mexico Secretary of State.  If you believe the information provided to VRF
> by the Bureau is inaccurate, or if you believe that you or any person listed on
> VoteRef.com is a protected voter whose protected information should not appear
> on VoteRef.com, please immediately contact the Bureau by emailing
> sos.elections@state.nm.us or calling 505-827-3600.   For assistance with the
> process of becoming a protected voter, click here (Safe At Home program).  Upon
> receipt of official documentation confirming your or any person's protected voter
> status sent to us at privacy@voteref.com, VRF will remove the protected
> information from VoteRef.com.

Joint Stipulations ¶ 29, at 5.

73.     On December 20, 2021, Deputy Secretary Pino wrote a letter to the Attorney

General referring Voter Reference for criminal investigation and prosecution pursuant to

allegations that Voter Reference had violated State laws in the transfer and posting of New Mexico

voter data.  See Joint Stipulations ¶ 31, at 6; Letter, Potential Criminal Transfer and Use Violation

of Voter Data, from Sharon Pino to Anne Kelly (dated December 20, 2021), filed June 24, 2022

(Doc. 44-3)("Criminal Referral Letter").[12]

---

[12]The Court admitted the Criminal Referral Letter at trial as Joint Exhibit 5.  See Trial Tr.
at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

74.     Voter Reference was subject to a criminal referral because it posted the New Mexico voter data online -- thereby making the data available to the general public -- which the Secretary of State's office believed was contrary to the New Mexico Election Code.  See Joint Stipulations ¶ 32, at 6.

75.     The Criminal Referral Letter also states: "We do not believe that providing this personal voter data on a private website that intends to spread misinformation about the 2020 General Election meets the definition of appropriate use as either for a 'governmental purpose,' 'election related,' or 'election campaign purposes.'"  Criminal Referral Letter at 2 (source of quoted material not cited, but presumably N.M.S.A. § 1-4-5.5(C)).

76.     Deputy Secretary Pino made the decision to make the criminal referral of Voter Reference, and Secretary Oliver reviewed and approved that decision.  See Joint Stipulations ¶ 33, at 6.

77.     On February 9, 2022, Secretary Oliver posted a public Facebook message -- titled "RUMOR vs. REALITY" -- in which she declared that "New Mexico has some of the cleanest voter rolls in the nation," and that suggestions that voter rolls are not "regularly cleaned" is "a pernicious bit of misinformation that leads people to question the outcomes of our elections." Facebook, Office of the New Mexico Secretary of State, Post at 1 (dated February 9, 2022), filed May 17, 2022 (Doc. 32-6)("Secretary Facebook Post").[13]

78.     O'Matz' ProPublica article was published on March 7, 2022, titled: "Billionaire-Backed Group Enlists Trump-Supporting Citizens to Hunt for Voter Fraud Using Discredited

_____

[13]The Court admitted the Secretary Facebook Post at trial as Joint Exhibit 13.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

Techniques."   Billionaire-Backed Group Enlists Trump-Supporting citizens to Hunt for Voter

Fraud Using Discredited Techniques (dated March 7, 2022), filed June 24, 2022 (Doc. 44-

4)("ProPublica Article").[14]

79.     The ProPublica Article contains statements -- some quoted -- attributed to Secretary

Oliver:

> In New Mexico, Secretary of State Maggie Toulouse Oliver also said the
> undertaking is not an allowable use of voter data. By state law, she said, the rolls
> can only be used for governmental or campaign purposes.
>
> "Having voter registration data 'blasted out across the internet' violates
> state law limiting use of the voter rolls solely for campaign or government
> activities," she said. In December, Toulouse Oliver's office referred the matter to
> the state attorney general for investigation and possible prosecution.

ProPublica Article at 10.

80.     Secretary Oliver made the statements that the ProPublica Article attributed to her.

See Joint Stipulations ¶ 35, at 6.

81.     On March 8, 2022, Secretary Oliver posted a tweet with a link to the ProPublica

Article, which calls the article an "[i]mportant, in-depth piece" about a "coordinated cross-country

attempt to impugn the integrity of our voter rolls," and states that the organization in the ProPublica

Article -- Voter Reference -- "posted #NM voter data online, violating the Election Code."  Twitter,

Secretary of State Post at 2 (dated March 8, 2022), filed May 17, 2022 (Doc. 32-2)("Secretary

Tweets").[15]

---

[14]The Court admitted the ProPublica Article at trial as Joint Exhibit 7.  See Trial Tr. at
81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

[15]The Court admitted the Secretary Tweets at trial as Joint Exhibit 12.  See Trial Tr. at
81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

7.  **February, 2022, Request for Voter Data, and Removal of Voter Data From VoteRef.com.**

82.  On February 15, 2022, Voter Reference sent a request for voter data to the Secretary of State's Office, requesting

> the total count, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020, election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021.

Email from Voter Reference to "Election Official," assigned to Patrick Rostock at 2 (dated February 15, 2022), filed June 24, 2022 (Doc. 44-16)("February 15 Voter Data Request").[16]  See Joint Stipulations ¶ 38, at 6-7.

83.  The February 15, 2022, request for voter data was assigned to Patrick Rostock, a paralegal and records custodian in the Secretary of State's Office.  See Joint Stipulations ¶ 39, at 7; February 15 Voter Data Request at 2.

84.  On March 10, 2022, Voter Reference had not received a response and sent a follow-up message asking for an update.  See Joint Stipulations ¶ 39, at 7; February 15 Voter Data Request at 1.

85.  Rostock forwarded that email to Vigil, and Deputy Secretary Pino stating, in part: "Per Dylan's contact with the AG, we are not fulfilling records requests from VoteRef."  February 15 Voter Data Request at 1.  See Joint Stipulations ¶ 40, at 7.

---

[16]The Court admitted the February 15 Voter Data Request at trial as Joint Exhibit 9.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

86.     The Attorney General advised Secretary Oliver not to fulfill Voter Reference's requests for voter data.

87.     The "Dylan[]" in this email refers to Dylan Lange, at that time the General Counsel of the Secretary of State's Office.  February 15 Voter Data Request at 1.  See Trial Tr. at 89:11-12 (Vigil)(stating that, "at that time," Dylan Lange was the General Counsel of the Secretary of State's Office).

88.     Voter Reference's February 15, 2022, request does not include a signed affidavit, which N.M.S.A. § 1-4-5.5 requires.  See May 17 Tr. at 80:1-25 (Serafimova, Swoboda).

89.     The voter data that Voter Reference requests in the February 15 Voter Data Request was not produced.  See Deposition of Mandy Vigil at 163:12-164:22 (dated February 27, 2023), filed April 14, 2023 (Doc. 119-5)("Vigil Depo.").[17]

90.     Moreover, Voter Reference never received any response of any kind from the Secretary of State's Office.  See June 15 Tr. at 49:7-52:5 (Greim, Vigil).

91.     This lack of response is very unusual, because generally the Secretary of State's Office responds to everyone who communicates with their office.  See June 15 Tr. at 49:7-52:5 (Greim, Vigil).

92.     The Secretary of State's Office did not tell Voter Reference to resubmit their request with the properly signed affidavit, which N.M.S.A. § 1-4-5.5 requires.  See June 15 Tr. at 49:7-52:5 (Greim, Vigil).

93.     Voter Reference removed the New Mexico voter data from VoterRef.com on March 28, 2022 -- just before filing this lawsuit -- out of fear that the Attorney General would

---

[17]The parties designate this portion of the Vigil Depo. for the Court's consideration in the bench trial.  See Joint Depo. Designations at 4.

prosecute Voter Reference based on Secretary Oliver's interpretation of State law and her referral of Voter Reference to the Attorney General for potential prosecution.  See Joint Stipulations ¶ 43, at 7.

94.    Voter Reference continues to seek voter data from the Secretary of State's Office. See Joint Stipulations ¶ 44, at 7.

**8.    Voter Reference's May, 2022, Voter Data Request, and the Secretary's Response.**

95.    On May 27, 2022, while Voter Reference's Motion for Preliminary Injunction, filed March 28, 2022 (Doc. 3)("PI Motion"), was pending before the Court, Voter Reference sent a letter to the Secretary of State, with the subject "Notice of Violation of National Voter Registration Act & Request for Records."  Letter from Edward D. Greim to Secretary Oliver (dated May 27, 2022), filed June 24, 2022 (Doc. 44-22)("May 27 Request Letter").[18]

96.    The May 27 Request Letter requests that Secretary Oliver, "pursuant to [her] obligations under the NVRA,[19] 52 U.S.C. § 20507(i) and New Mexico law, N.M. Stat. § 1-4-5.5," provide the following voter data:

1.    A complete list, by county/precinct, of any registered voters who cast a ballot in the November 3, 2020 General Election, who have been subsequently placed in an inactive, canceled, deleted, removed (or any registration status other than active) status, or any voter that has been removed or deleted from the voter rolls between November 3, 2020 and April 13, 2021, including total count of same.

2.    Current voter registration data, including voter history, for all active, inactive, suspended, and cancelled status voters (including any registration status other than active. [sic]

---

[18]The Court admitted the May 27 Request Letter at trial as Joint Exhibit 18.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

[19]National Voter Registration Act, 52 U.S.C. §§ 20501-20511 ("NVRA").

May 27 Request Letter at 4.  <u>See</u> Joint Stipulations ¶ 44, at 8.

97.      In the May 27 Request Letter, Voter Reference provides Secretary Oliver with the

following information how the requested data will be used:

> VRF's intended election use comprises two distinct projects. For its first project, just as VRF publishes voter data for many other states, and as it recently published voter data in New Mexico, VRF intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters online if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding.

> For its second project, VRF intends to analyze the records, information, and data provided in response to the above requests in order to engage in a discrepancy review of the New Mexico voter rolls. VRF intends to publish this analysis online without disclosing the personal information of any individual voter. VRF will comply with this non-public-disclosure promise for the data it uses on its second project regardless of whether it prevails in the Federal Litigation. And again, for the sake of clarity, no personal information of any individual voter will be published online unless VRF is granted relief in the Federal Litigation or in any other legal proceeding.

May 27 Request Letter at 4.

98.      In conjunction with the May 27 Request Letter's voter data requests, Voter

Reference completed affidavits for the two separate categories of requested material.  <u>See</u> Joint

Stipulations ¶ 50, at 8; May 27 Request Letter at 8-9.

99.      These completed affidavits are signed by Swoboda.  <u>See</u> May 27 Request Letter at

8-9.

100.      These affidavits are properly completed.  <u>See</u> Vigil Depo. at 169:9-24.[20]

---

[20]The parties designate this portion of the Vigil Depo. for the Court's consideration in the bench trial.  <u>See</u> Joint Depo. Designations at 4.

101.    At the June 15, 2022, preliminary injunction hearing, Voter Reference again stated that it will not post the requested New Mexico voter data online unless Voter Reference "is granted relief in this case or any other legal proceeding."  June 15 Tr. at 58:12-25 (Greim, Vigil).

102.    Despite Voter Reference's compliance with the requirements for making such a request and its assurance regarding how the requested data would be used, Secretary Oliver refused to provide the requested documents.  See Joint Stipulations ¶ 51, at 8.

103.    This refusal is described in Lange's June 16, 2022, response to the May 27 Request Letter.  See Letter from Dylan Lange to Edward Greim (dated June 16, 2022), filed April 14, 2023 (Doc. 119-11)("May 27 Request Response").[21]

104.    As for the first category of requested voter data in the May 27 Request Letter, see FOF ¶ 97, at 25, the May 27 Request Response states: "As with the February 15 email referenced above, Item #1 is not a request for a record, as we do not maintain a list such as the one described therein. As such, we consider both requests closed under the NVRA and, to the extent applicable, IPRA."  May 27 Request Response at 2.

105.    As for the second category of requested voter data in the May 27 Request Letter, see FOF ¶ 97, at 25, the May 27 Request Response states:

> With respect to Item #2 and the Affidavit you submitted as required by New Mexico law, in the Notice, VRF states that it "intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding." *Notice* at 4.  As you know from the Federal Litigation and otherwise, it is our position that publishing *any* New Mexico voter data on a website is a violation of the New Mexico Election Code that carries

_____

[21]The Court admitted the May 27 Request Response at trial as Joint Exhibit 19.  See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 2.

criminal liability.  As such, we believe it prudent to delay production of this data at this time; we will either fulfill the request or formally deny it based on the outcome of the Federal Litigation, including any appeal.  *See* NMSA 1978, § 1-20-15 ("Conspiracy to violate the Election Code consists of knowingly combining, uniting or agreeing with any other person to omit any duty or commit any act, the omission of which duty, or combination of such act, would by the provisions of the Election Code constitute a fourth degree felony.").

May 27 Request Response at 2 (emphasis in May 27 Request Response).

106.    The Secretary of State's Office also explains its treatment of Voter Reference on the basis of the fact that "no other entity . . . is posting anything online or distributing it."  Trial Tr. at 120:8-10 (Vigil).

107.    Given the promises made by Voter Reference that it would not publish the requested New Mexico voter data on its website absent a court order, these proffered explanations for not producing the data are pretextual, and based on animus towards Voter Reference's viewpoint.

**9.    Voter Reference Reposts New Mexico Voter Data, Voter Reference's October 2022, Voter Data Request, the Secretary's Response, and the Tenth Circuit's Stay.**

108.    In reliance on the Court's issuance of the preliminary injunction, see Memorandum Opinion and Order, filed July 22, 2022 (Doc. 51)("PI MOO"), Voter Reference republished the New Mexico voter data that it already possessed on VoteRef.com, see Joint Stipulations ¶ 56, at 9.

109.    On October 18, 2022, Voter Reference sent an additional document request to the Secretary of State's Office, requesting, among other things, the same data it requested in the May 27 Request Letter.  See Joint Stipulations ¶ 57, at 9.

110.     This request is not accompanied by the affidavit which N.M.S.A. § 1-4-5.5 requires for requestors of voter data.  See Letter from Dylan Lange to Gina Swoboda at 2 (dated November 17, 2022), filed April 14, 2023 (Doc. 119-14)("Lange November 17 Response Letter").[22]

111.     In the Lange November 17 Response Letter, authored by Lange, Secretary Oliver refused to produce the requested records.  See Lange November 17 Response Letter at 2; Joint Stipulations ¶ 58, at 9.

112.     The Lange November 17 Response Letter states, in part:

> Additionally, we will refrain from producing any responsive voter data maintained by our office at this time due to numerous issues further detailed below. To begin with this decision is motivated by the fact that you will post any voter data provided on your website, which our office believes is a violation of law.  You have not indicated that you will not post any voter data online, and based on your past practice, we believe you will do so again.

Lange November 17 Response Letter at 2.

113.     Secretary Oliver states that there is no reason for the denial of the request other than the information was conveyed to Voter Reference in writing in conjunction with the denial.  See Joint Stipulations ¶ 59, at 9.

114.     The Attorney General advised Secretary Oliver in her refusal to provide data in response to the October 2022 request, and agrees with the position the Secretary took.  See Joint Stipulations ¶ 60, at 9.

---

[22]The Court admitted the Lange November 17 Response Letter at trial as Joint Exhibit 20. See Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 3.

115.     On December 28, 2022, a two-judge panel of the United States Court of Appeals for the Tenth Circuit stayed the Court's preliminary injunction pending the outcome of Defendants' appeal.  See Joint Stipulations ¶ 61, at 9.

116.     Voter Reference removed the New Mexico voter data from VoteRef.com the same day.  See Joint Stipulations ¶ 62, at 9.

### 10.     Voter Reference's June 15, 2023, Request for Voter Data, and the Secretary's Response.

117.     On June 15, 2023, Voter Reference sent a request for voter data to the custodian of records for the Secretary of State's Office, seeking voter data records pursuant to New Mexico's sunshine statute, the Inspection of Public Records Act, N.M.S.A. §§ 14-2-1 to -12 (1947, as amended through 2023)("IPRA").  See Letter from Edward D. Greim to Custodian of Records, New Mexico Secretary of State at 1 (dated June 15, 2023), admitted at trial as Joint Exhibit 34 ("June 15 IPRA Letter"); Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 4.

118.     In the June 15 IPRA Letter, Voter Reference seeks four categories of records:

1.      All requests the Secretary of State has Received from any person for records which are available, or which the requestor claims must be made available, under the National Voter Registration Act.

2.      Any non-privileged communications pertaining to the requests identified in paragraph 1 above, including but not limited to any communications between the Secretary's Office and the requestor.

3.      All documents the Secretary of State has produced in response to any of the requests identified in response to paragraph 1, above.

4.      All records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.

June 15 IPRA Letter at 1.

119.     The June 15 IPRA Letter is not accompanied by the affidavit which N.M.S.A. § 1-4-5.5 requires for requestors of voter data.  See June 15 IPRA Letter at 1-3; Pl.'s FOFs ¶ 125, at 35.[23]

120.     The June 15 IPRA Letter does not contain any promise that Voter Reference will not post the records produced in response to the request on the internet.  See June 15 IPRA Letter at 1-3; Pl.'s FOFs ¶ 126, at 36.

121.     On June 30, Amy Baca-Padilla, an Election Operation and Systems Analyst at the Secretary of State's Office, responded to the June 15 IPRA Letter, acknowledging Voter Reference's request under the IPRA, and stating: "Attached are three-hundred and fifty-nine (359) pages of records in the form of seven (7) PDF attachments."  Letter from Amy Baca-Padilla to Edward D. Greim at 1 (dated June 30, 2023), admitted at trial as Joint Exhibit 36 ("June 30 IPRA Response"); Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 4.

122.     In the June 30 IPRA Response, the Secretary of State's Office stated that, "Pursuant to NMSA 1978, § 14-2-10,[24] our office has determined the remainder of your request to be

---

[23]The internal pagination of the Pl.'s FOFs does not match the blue CM/ECF pagination at the tope of the document.  For consistency and uniformity, the Court uses the CM/ECF page numbers when citing specific pages in the document.

[24]N.M.S.A. § 14-2-10 reads:

If a custodian determines that a written request is excessively burdensome or broad, an additional reasonable period of time shall be allowed to comply with the request. The custodian shall provide written notification to the requester within fifteen days of receipt of the request that additional time will be needed to respond to the written request. The requester may deem the request denied and may pursue the remedies available pursuant to the Inspection of Public Records Act if the custodian does not permit the records to be inspected in a reasonable period of time.

excessively burdensome and broad," and therefore, "the office will need additional time to search for records and to respond."  June 30 IPRA Response at 1.

123.    The June 30 IPRA Response states that the Secretary of State's Office "will provide an updated response on or before July 15, 2023."  June 30 IPRA Response at 1.

124.    On August 16, 2023, the Secretary of State's Office wrote a letter to Voter Reference stating that it is "continuing to work on fulfilling your request," and states that the Secretary of State's Office ""will provide an updated response on or before August 31, 2023." Letter from Cassie Salazar to Edward D. Greim at 1 (dated August 16, 2023), admitted at trial as Joint Exhibit 37; Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 4.

125.    On August 22, 2023, the Secretary of State's Office produced more records in response to the June 15 IPRA Letter, stating:

> Our office has provided nine hundred and twenty-eight (928) pages of records responsive to your request in four (4) separate PDF's [sic].  By disclosing this information, the Secretary of State has complied with the Inspection of Public Records Act and now considers [Voter Reference's] request fulfilled for items 1-3 on your IPRA request.

Letter from Cassie Salazar to Edward D. Greim at 1 (dated August 22, 2023), admitted at trial as Joint Exhibit 38; Trial Tr. at 81:1-2 (Court)(admitting into evidence Joint Exhibits 1 through 44); Joint Ex. Lists at 4.

---

N.M.S.A. § 14-2-10.

11.   **The Secretary Produces Voter Data in Response to Voter Reference's May, 2022, Voter Data Request.**

126.   On August 30, 2023, Secretary Oliver produced the data which Voter Reference requested -- approximately fifteen months earlier -- in the May 27 Request Letter.   See Joint Stipulations ¶ 65, at 9.

127.   In the letter explaining this disclosure, Mark W. Allen, Assistant Attorney General, writes:

> Dear Mr. Greim:
>
> Please find enclosed the New Mexico voter data requested in VRF's previously executed affidavits, along with an invoice for the statutory voter data fees.
>
> We are providing this data now because of statements made in Court at hearing on our respective Motions for Summary Judgment (i.e., that VRF will not post New Mexico's voter data online except in the event of a final judgment stating that VRF has the right to do so and that New Mexico cannot lawfully prohibit it).   We are satisfied that these statements retract the qualifications previously placed on VRF's use of voter data in its affidavits.   The decision to provide this data was made by the Secretary's Office immediately following the Summary Judgment Hearing on June 14, 2023.   However, in the confusion occasioned by Kelsey Schremmer's departure, I failed to ensure this data was provided to you.
>
> As the Secretary's Office has consistently maintained, it cannot provide voter data to VRF on conditions different than what New Mexico law requires of the Office and of all other requestors.   This includes the requirement of an affidavit stating that the data will not be used in unlawful ways.   VRF's current stance -- that it will not post the data unless a court says it can lawfully do so -- is meaningfully different than its May 2022 stance -- that it would not post the data unless a court said it wouldn't get in trouble when it did so.   In light of the new statements, the Secretary's Office can lawfully provide the data requested in VRF's affidavits and is happy to do so.   If there is anything else you would like to discuss following the hearing, please don't hesitate to reach out.

Letter from Mark W. Allen to Edward D. Greim at 1 (dated August 30, 2023), admitted at trial as Plaintiff's Exhibit 1 ("August 2023 Disclosure Letter"); Trial Tr. at 60:7-8 (Court)(admitting into evidence Plaintiff's Exhibit 1).   See Joint Ex. Lists at 6.

128.    This explanation for the belated disclosure is implausible.

129.    The May 27 Request Letter contains all the required affidavits to obtain State voter data.  <u>See</u> FOF ¶¶ 98-100, at 25.

130.    The affidavits attached to the May 27 Request Letter are properly filled out.  <u>See</u> FOF ¶¶ 98-100, at 25.

131.    Moreover, the May 27 Request Letter states that "VRF intends to publish the requested information online for election related purposes, but it will only publish the personal information of voters online if VRF is granted relief in *Voter Reference Foundation, et al. v. Balderas, et al.*, case number 1:22-CV-00222 in the United States District Court for the District of New Mexico (the "Federal Litigation") or in any other legal proceeding."  FOF ¶ 97, at 25.

132.    Counsel for Voter Reference reaffirmed this promise in open court.  <u>See</u> FOF ¶ 101, at 26.

133.    In addition, the May 27 Request Letter states that Voter Reference seeks to use the requested voter data for analysis purposes that do not relate to publishing individual voter data on the internet.  <u>See</u> FOF ¶ 97, at 25.

134.    The Secretary of State's office has never failed to fulfill a request for voter data that was properly executed.  <u>See</u> FOF ¶ 37, at 12.

135.    The Defendants believe that Voter Reference's viewpoint constitutes "misinformation."  <u>See</u> FOF ¶¶ 64-65, at 16-17; FOF ¶¶ 79-81, at 20-21.

136.    The Defendants singled out Voter Reference for unique treatment on the basis of their viewpoint.

137.    The Defendants' conduct towards Voter Reference was because of -- and not in spite of -- Voter Reference's viewpoint.

138.    The Secretary of State's Office has not withdrawn its criminal referral of Voter Reference, and the Attorney General asserts its right to investigate and prosecute Voter Reference. See Joint Stipulations ¶ 42, at 7.

## PROCEDURAL BACKGROUND

Voter Reference -- along with then-Plaintiff Holly Steinberg[25] -- initiated this suit by bringing claims against the Defendants on five counts, for violations of the First and Fifth Amendments to the Constitution of the United States of America, U.S. Const. amends. I, V, pursuant to 42 U.S.C. § 1983, and for Declaratory Judgment pursuant to 28 U.S.C. § 2201.  See Verified Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief ¶¶ 72-129, at 19-31, filed March 28, 2022 (Doc. 1)("Initial Complaint").  In the Initial Complaint, Voter Reference and Steinberg allege, among other things, that the Defendants' restrictions on voter data access -- which are rooted in the Defendants' interpretation of the New Mexico Election Code -- violate the First Amendment as "direct restrictions on speech," Initial Complaint ¶ 79, at 21, and also function as a prior restraint on political speech, see Initial Complaint ¶¶ 88-101, at 23-27.  As part of its First Amendment claims in the Initial Complaint, Voter Reference asserts that the Defendants' application of the State voter data laws is a "'restriction[] distinguishing among different speakers, allowing speech by some but not others.'"  Initial Complaint ¶ 79, at 21 (quoting Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 340-41 (2010)).  The Initial Complaint also asserts: "To the extent that the State and its agents exercise their claimed discretion based on the identity of the requester, including their actual or perceived political ideology, the State engages

---

[25]In the now-operative Complaint -- the Plaintiff's Verified First Amended Complaint for Declaratory Judgment and Preliminary and permanent Injunctive Relief, filed September 26, 2022 (Doc. 74) -- Holly Steinberg is no longer a named Plaintiff in this matter.

in viewpoint discrimination."  Initial Complaint ¶ 97, at 26.  The same day that it filed its Initial

Complaint, Voter Reference also filed its Motion for Preliminary Injunction, filed March 28, 2022

(Doc. 3)("PI Motion").

After full briefing and two hearings, the Court filed its PI MOO on July 22, 2022.  In the PI

MOO, the Court grants in part the PI Motion and orders that the Defendants are enjoined from

prosecuting Voter Reference under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already

received from Local Labs.  See PI MOO at 210; FOF ¶ 61, at 15.  Relevant here, in assessing Voter

Reference's likelihood of success on the merits on its viewpoint discrimination claims, Court

concludes in the PI MOO that Voter Reference is likely to succeed on the merits of part of its

viewpoint discrimination claim.  See PI MOO at 178-85.  Specifically, the Court concludes:

> [T]o the extent the Plaintiffs challenge the Secretary of State's lack of response to
> Voter Reference's request for voter data, the Plaintiffs likely are to succeed on their
> viewpoint discrimination claim.  The Secretary of State's actions caused viewpoint
> discrimination.  Although Voter Reference does not have a First Amendment right
> of access to the voter data it seeks, once the State agrees to make its data publicly
> available, the State may not condition access to that data based on the requestor's
> viewpoint.  See Los Angeles Police Dep't v. United Reported Pub. Corp., 528 U.S.
> [32,] 40 [(1999)]; Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. [819,]
> 829 [(1995)] (noting that, once a State opens a platform for speech, "the State must
> respect the lawful boundaries it has itself set"); Fusaro v. Cogan, 930 F.3d [241,]
> 262 [(4th Cir. 2019)].  The Secretary of State has conditioned its decision not to
> respond to Voter Reference's data request on Voter Reference's viewpoint --
> specifically, the fear that giving the data to Voter Reference may reveal that the
> Secretary of State is lax about maintaining the State's voter data.

PI MOO at 180.  To support this conclusion, the Court notes that the Secretary of State's sole

justification for not providing Voter Reference with its properly requested voter data is that "Voter

Reference plans to publish voter's personal information" on the internet, which -- in the

Defendants' view -- is "in violation of N.M.S.A. § 1-4-5.5."  PI MOO at 181 (citing June 15 Tr. at

55:20-56:9 (Greim, Vigil)).  The Court concluded, however, that this justification is not persuasive,

given that Voter Reference had, at the time of the PI MOO, already promised that it would not publish individual New Mexico voter personal information without a Court order saying that it can publish that information.  See PI MOO at 181.  Cf. FOF ¶¶ 127-36, at 33-34.  The Court states:

> The Secretary of State's decision not to take Voter Reference at its word that it will not use the data contrary to the Secretary of State's interpretation of N.M.S.A. § 1-4-5.5, therefore, causes impermissible viewpoint discrimination.  Because the Secretary of State offers no other justification for the denial, the Secretary of State appears to draw a distinction between Voter Reference and any other requestor who alleges that they will not use the data contrary to the Secretary of State's interpretation of N.M.S.A. § 1-4-5.5.  Absent any other reason to single out Voter Reference, the available evidence shows that the Secretary of State "acted with discriminatory purpose."  Ashcroft v. Iqbal, 556 U.S. [662,] 676 [(2009)].  Voter Reference's "perspective" is the "rationale" for the Secretary of State's decision.  Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. at 829.  Voter Reference, therefore, is likely to succeed on the merits of its viewpoint discrimination claim regarding the Secretary of State's decision not to honor Voter Reference's May 27, 2022, request for voter data under N.M.S.A. § 1-4-5.5.

PI MOO at 181-82.  The Court, however, did not order a preliminary injunction on this issue, because the "Plaintiffs do not ask the Court to remedy the Secretary of State's decision not to honor Voter Reference's request for data," and "even if they did and the Court granted such an injunction, it would result in Voter Reference having two copies of almost identical data," because Voter Reference already had obtained recently the New Mexico voter data from Local Labs.  PI MOO at 205-206.  See FOF ¶ 60, at 15.  The Court granted the PI Motion, however, on two of Voter Reference's claims: (i) Voter Reference's viewpoint discrimination claim against Secretary Oliver for her criminal referral; and (ii) Voter Reference's First Amendment prior restraint claim insofar as Voter Reference challenges Secretary Oliver's threat of prosecution if Voter Reference publishes the voter data online.  See PI MOO at 172-204.  The Court describes this preliminary injunction as a "narrow PI," PI MOO at 209, but orders that "Defendant Attorney General Balderas and Defendant Secretary of State Oliver are enjoined from prosecuting Plaintiff Voter Reference

Foundation, LLC, under N.M.S.A. §§ 1-4-5.5 or 1-4-5.6 for publishing data it already received from Local Labs," PI MOO at 210.

The Defendants filed a Notice of Appeal signaling that they "hereby appeal" the PI MOO to the United States Court of Appeals for the Tenth Circuit. See Notice of Appeal at 1, filed August 19, 2022 (Doc. 56). Concurrently with the Notice of Appeal, the Defendants also filed the Defendants' Motion to Stay Preliminary Injunction Pending Appeal, filed August 19, 2022 (Doc. 57)("Motion to Stay PI"), in which they move -- pursuant to rule 62(d) of the Federal Rules of Civil Procedure -- to stay the PI pending the Defendants' appeal. See Motion to Stay PI at 1. In the Motion to Stay PI, the Defendants attempt to persuade the Tenth Circuit to exercise its judicial discretion to stay the appeal by discussing the "four factors" which should guide the use of such discretion:

(1)     whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

(2)     whether the applicant will be irreparably injured absent a stay;

(3)     whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4)     where the public interest lies.

Motion to Stay PI at 2-3 (quoting Nken v. Holder, 556 U.S. 418, 434 (2009)). The Defendants further argue that there is a "strong likelihood that the Order will be reversed on appeal," because: (i) "the Order enjoins the Attorney General from prosecuting Plaintiff Voter Reference . . . for potential violations of the New Mexico Election Code, even though Plaintiffs have never alleged, and the Court did not find, that the Attorney General has violated any of Plaintiffs' federal (or other) rights," Motion to Stay PI at 1-2; (ii)

the Order violated the Attorney General's and the Secretary's due process rights by relying in part on a novel substantive theory of liability that was never advanced by Plaintiffs -- and, therefore, was never addressed by the Attorney General or the Secretary -- namely, that the Secretary's publicized referral of VRF and Local Labs to the Attorney General constituted a prior restraint in violation of the First Amendment[,]

Motion to Stay PI at 2; and (iii) "the Order erroneously concludes that the Secretary committed viewpoint discrimination in denying VRF's May 25, 2022 request for voter data," Motion to Stay PI at 2. On these bases, the Defendants request the Court to stay the PI while the Defendants' appeal is pending. See Motion to Stay PI at 13. The Court held a hearing on the Motion to Stay PI on August 31, 2022, see Clerks' Minutes at 1 (dated August 31, 2022), filed August 31, 2022 (Doc. 64), and the Court denied the Motion to Stay PI the following day, see Order at 1, filed September 1, 2022 (Doc. 65).

On December 28, 2022, the Tenth Circuit filed an Order from a two-judge panel granting the Defendants' motion to stay the PI MOO "pending the disposition of this appeal on the merits, or until further order of this court." Order at 2, filed December 28, 2022 (Doc. 88)("Tenth Circuit Order"). The Tenth Circuit Order states that the Tenth Circuit "conclude[s] that appellant have satisfied their burden" as to each of the preliminary injunction factors, but otherwise offers no analysis. Tenth Circuit Order at 2. See id. at 1 (quoting Nken v. Holder, 556 U.S. at 434). That day, Voter Reference removed the New Mexico voter data from its website. See Vigil Depo. at 188:24-189:6.[26]

While the PI MOO was on appeal at the Tenth Circuit, Voter Reference filed an Amended Complaint. See Amended Complaint at 1. Voter Reference's Amended Complaint brings the

---

[26]The parties designate this portion of the Vigil Depo. for the Court's consideration in the bench trial. See Joint Depo. Designations at 4.

following counts: (i) preemption of New Mexico's Access Ban and Data Sharing Ban[27] by the National Voter Registration Act, 52 U.S.C. §§ 20501-20511 ("NVRA"), see Amended Complaint ¶¶ 119-37, at 30-35; (ii) the Access Ban violates the NVRA, see Amended Complaint ¶¶ 138-47, at 35-36; (iii) the Access Ban and the threat of criminal prosecution constitute First Amendment retaliation, see Amended Complaint ¶¶ 148-65, at 36-39; (iv) the Access Ban and the threat of criminal prosecution constitute prior restraint under the First Amendment, see Amended Complaint ¶¶ 166-86, at 39-44; (v) the Access Ban and the threat of criminal prosecution constitute a ban on core political speech in violation of the First Amendment, see Amended Complaint ¶¶ 187-205, at 44-49; (vi) the Data Sharing Ban is overbroad for First Amendment purposes, see Amended Complaint ¶¶ 206-13, at 49-51; (vii) the Data Sharing Ban is void for vagueness under the First and Fourteenth Amendments, see Amended Complaint ¶¶ 214-26, at 51-54; and (viii) declaratory judgment, see Amended Complaint ¶¶ 227-35, at 54-55.  Thereafter, the parties filed cross-motions for summary judgment.  See Plaintiff Voter Reference Foundation, LLC's Motion for Partial Summary Judgment, filed April 14, 2023 (Doc. 118); Defendants' Motion for Summary Judgment, filed April 14, 2023 (Doc. 121).  The Court held a hearing on June 14, 2023.

---

[27]The terms "access ban" and "data sharing ban" are terms used to describe the Defendants' position and policy related to the sharing of voter data under New Mexico law.  The "access ban" -- sometimes called the "use restrictions" -- refers to N.M.S.A. § 1-4-5.5(C)'s limitation that, under New Mexico law, "[e]ach requester of voter data . . . shall sign an affidavit that the voter data . . . shall be used for governmental or election and election campaign purposes only and shall not be made available or used for unlawful purposes."  See FOF ¶ 21, at 6.  Accordingly, the term "Access Ban" refers to N.M.S.A. § 1-4-5.5(C)'s statutory limitation on use of voter data, and how the Defendants interpret those restrictions to apply to certain uses and not others.  See May 17 Tr. at 134:11- 136:11 (Greim, Vigil).  The term "data sharing ban" refers to the Defendants' position that voter data cannot be shared, distributed, published, or otherwise made available by a requester to any third party.  See May 17 Tr. at 148:20-149:13 (Greim, Vigil); June 15 Tr. at 91:6-20 (Serafimova, Vigil); FOF ¶ 25, at 8.

See Clerk's Minutes, filed June 14, 2023 (Doc. 131).  In its Memorandum Opinion and Order on the cross-motions for summary judgment, the Court grants in part and denies in part both motions, granting summary judgment in Voter Reference's favor on the Amended Complaint's Counts I and II, and granting summary judgment in the Defendants' favor on the Amended Complaint's Counts III, VI, and VII.  See Voter Reference Found., LLC v. Torrez, No. CIV 22-0222 JB/KK, 2024 WL 1347204, at *150 (D.N.M. March 29, 2024)(Browning, J.).[28]  Significantly, in Memorandum Opinion and Order on the cross-motions for summary judgment, the Court concludes that federal law -- the NVRA -- preempts that Data Sharing Ban and the Use Restrictions, see 2024 WL 1347204, at *141-44, and that the Defendants violated the NVRA by not providing Voter Reference with access to the voter data that Voter Reference requests, see 2024 WL 1347204, at *133-41.

On Count V -- Voter Reference's First Amendment claim, see Amended Complaint ¶¶ 166-86, at 39-44 -- the Court grants summary judgment to the Defendants in part, because the Court concludes that Secretary Oliver's interpretation of State statutory voter data "restrictions . . . are best conceptualized as restrictions on access to information within government control and not as restrictions on speech," Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *145, and therefore these restrictions "do not offend, on their face, the First Amendment," Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *146.  The Court also concludes, however, that one portion the Amended Complaint's Count V could proceed to trial: "Voter Reference's allegation

---

[28]Voter Reference voluntarily dismissed Count IV its allegation of prior restraint, see Trial Tr. at 5:2-13 (Court, Greim).  Accordingly, in in Memorandum Opinion and Order on the cross-motions for summary judgment, the Court dismisses the Amended Complaint's Count IV without prejudice.  See Voter Reference Found., LLC v. Torrez, No. CIV 22-0222 JB/KK, 2024 WL 1347204, at *131 n.141, *150.

that the Defendants engaged in unconstitutional viewpoint discrimination by refusing to grant

Voter Reference access to the requested voter data based on Voter Reference's perceived political

ideology." Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *146.  On this question,

the Court states:

> [G]enuine disputes of material fact exist whether the Defendants acted with a viewpoint-discriminatory purpose in refusing to provide Voter Reference with access to the voter data.  See Pahls v. Thomas, 718 F.3d 1210, 1230 (10th Cir. 2013)("In § 1983 and Bivens[] actions, a claim of viewpoint discrimination in contravention of the First Amendment requires a plaintiff to show that the defendant acted with a viewpoint-discriminatory purpose." (citing Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)); Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989); Collegians for a Constructive Tomorrow-Madison v. Regents of Univ. of Wis. Sys., 820 F. Supp. 2d 932, 951 n.20 (W.D. Wis. 2011)(Adelman, J.)).  On this issue, the Court concludes that there is sufficient evidence in the record to support a conclusion in either sides' favor.  Evidence exists that would lead a reasonable mind to conclude that the Defendants singled out Voter Reference for disparate treatment, because the Defendants viewed Voter Reference as a "political operative[]" who intends to "spread misinformation."  Factual Background Section 2(c) supra, at 14-20.  On the other hand, there also is evidence in the record to suggest that the Defendants withheld the voter data because of their interpretation of New Mexico statutory law, and thus viewpoint-neutral reasons explain the withholding.  See Factual Background Section 2(e) supra, at 24-29.  At the summary judgment stage, the Court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Accordingly, on the question of viewpoint discrimination, the Court denies both motions for summary judgment.

Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *146.  Accordingly, this portion of

the Amended Complaint's Count V is set for a bench trial.  See Talcott v. United States, 2022 WL

18141792, at *1 ("When acting as the trier-of-fact, the trial court must determine which of the

witnesses it finds credible, which of the permissible competing inferences it will draw, and whether

the party having the burden of proof has satisfactorily proven its case.").

**LAW REGARDING STANDING**

A federal court may hear cases only where the plaintiff has standing to sue.  See Summers v. Earth Island Institute, 555 U.S. 488, 492-93 (2009).   The plaintiff bears the burden of establishing standing.  See, e.g., Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 104 (1998).  The plaintiff "must 'allege . . . facts essential to show jurisdiction.  If [they] fai[l] to make the necessary allegations, [they have] no standing.'"  FW/PBS v. City of Dallas, 493 U.S. 215, 231 (1990)(quoting McNutt v. Gen. Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936))(brackets in FW/PBS v. City of Dallas, but not in McNutt v. Gen. Motors Acceptance Corp. of Indiana).  Moreover, where the defendant challenges standing, a court must presume lack of jurisdiction "unless 'the contrary appears affirmatively from the record.'"  Renne v. Geary, 501 U.S. 312, 316 (1991)(quoting Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 546 (1986)).  "It is a long-settled principle that standing cannot be 'inferred argumentatively from averments in the pleadings,' but rather 'must affirmatively appear in the record.'"  Phelps v. Hamilton, 122 F.3d 1309, 1326 (10th Cir. 1997)(quoting FW/PBS v. City of Dallas, 493 U.S. at 231).

 "Article III of the Constitution limits the jurisdiction of federal courts to Cases and Controversies."  San Juan Cnty., Utah v. United States, 503 F.3d 1163, 1171 (10th Cir. 2007)(en banc).  See U.S. Const. art. III, § 2.  "[A] suit does not present a Case or Controversy unless the plaintiff satisfies the requirements of Article III standing."  San Juan Cty., Utah v. United States, 503 F.3d at 1171.  To establish standing, a plaintiff must show three things: "(1) 'an injury in fact that is both concrete and particularized as well as actual or imminent'; (2) a causal relationship between the injury and the challenged conduct; and (3) a likelihood that the injury would be redressed by a favorable decision."  Protocols, LLC v. Leavitt, 549 F.3d 1294, 1298 (10th Cir. 2008)(quoting Wyoming ex rel. Crank v. United States, 539 F.3d 1236, 1241 (10th Cir. 2008)).

"Standing is determined as of the time the action is brought."   Smith v. U.S. Court of Appeals, for the Tenth Circuit, 484 F.3d 1281, 1285 (10th Cir. 2007)(quoting Nova Health Sys. v. Gandy, 416 F.3d 1149, 1154 (10th Cir. 2005)(Ebel, J.)).   In Smith v. U.S. Court of Appeals, for the Tenth Circuit, the Tenth Circuit rejected a plaintiff's standing to challenge the Colorado appellate courts' practice of deciding cases in non-precedential, unpublished opinions, which the plaintiff asserted allowed courts to affirm incorrect decisions without interfering with official, "published" law.   484 F.3d at 1285.   The Tenth Circuit noted that the plaintiff had recently taken his State appeal and, therefore,

> was in no position to challenge the adequacy of state appellate review in cases culminating in unpublished opinions unless he could show that he would in fact receive such review from the state court of appeals (and from the state supreme court as well, if it took the case on certiorari).

484 F.3d at 1285.

By contrast, in Nova Health Sys. v. Gandy, the Tenth Circuit concluded that abortion providers had standing to challenge an Oklahoma parental-notification law on the grounds that they were in imminent danger of losing patients because of the new law.   See 416 F.3d 1154. Although determining that there was standing, the Tenth Circuit was careful to frame the issue as whether, "as of June 2001 [the time the lawsuit was filed]," Nova Health faced any imminent likelihood that it would lose some minor patients seeking abortions.   416 F.3d at 1155.   Moreover, while focusing on the time of filing, the Tenth Circuit allowed the use of evidence from later events -- prospective patients lost because of the notification law after the lawsuit began -- to demonstrate that the plaintiff faced an imminent threat as of the time of filing.   See 416 F.3d at 1155.

In construing the standing doctrine, the Court has determined that an attorney running for office as a Court of Appeals of New Mexico judge lacked standing when that attorney alleged that

the New Mexico attorney disciplinary counsel harmed his chances of election when the counsel published a summary suspension petition about him. See League of United Latin American Citizens v. Ferrera, 792 F. Supp. 2d 1222, 1233-39 (D.N.M. 2011)(Browning, J.). It so concluded, because the suspension petition's facts "were already known to voters" through the aggressive campaign tactics of the attorney's election rival, so the harm was not "fairly traceable to the Defendant's action." 792 F. Supp. 2d at 1238-39. The Court has, however, determined that a woman had standing to challenge a New Mexico criminal statute's constitutionality, even though the state had not yet filed charges against the woman, because the district attorney had not attested that he would not bring charges under the challenged statute. See Payne v. Wilder, 2017 WL 2257390, at *38 (D.N.M. January 3, 2017)(Browning, J.). The Court reasoned that an injury in fact existed, despite the lack of a charge, because the district attorney's refusal to foreswear a prosecution demonstrated a "credible threat of prosecution." Payne v. Wilder, 2017 WL 2257390, at *38. In addition to the cases listed above, the Court has adjudicated standing issues many times. See, e.g., Abraham v. WPX Production Productions, LLC, 184 F. Supp. 3d 1150, 1197 (D.N.M. 2016)(Browning, J.)(concluding that oil-well royalty owners had standing to assert a breach of the implied duty to market under New Mexico and Colorado law); Northern New Mexicans Protecting Land Water and Rights v. United States, 161 F. Supp. 3d 1020, 1042 (D.N.M. 2016)(Browning, J.)(concluding that an association lacked standing to sue on behalf of its members, because the relief sought was damages); Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Service, 140 F. Supp. 3d 1123, 1170-75 (D.N.M. 2015)(Browning, J.)(concluding that livestock association whose members had ancestral ties to grazing land in Northern New Mexico had standing to bring a NEPA claim); Alto Eldorado Partners v. City of Santa Fe, 2009 WL 1312856, at *21, 25 (D.N.M. March 11, 2009)(Browning, J.)(concluding that a developer did not

have standing to challenge a city ordinance, because the ordinance would only affect him if he "lost his current permits," which, at the time of the lawsuit, he had not lost)

## LAW REGARDING MOOTNESS

Article III, Section 2 of the Constitution of the United States limits the federal courts' jurisdiction to actual cases and controversies. See U.S. Const. art. III § 2. "Federal courts are without authority to decide questions that cannot affect the rights of litigants in the case before them." Ford v. Sully, 773 F. Supp. 1457, 1464 (D. Kan. 1991)(O'Connor, C.J.)(citing North Carolina v. Rice, 404 U.S. 244, 246 (1971)). See Johansen v. City of Bartlesville, 862 F.2d 1423, 1426 (10th Cir. 1988); Johnson v. Riveland, 855 F.2d 1477, 1480 (10th Cir. 1988)). "To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Arizonans for Official English v. Arizona, 520 U.S. 43, 67 (1997). See Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1121 (10th Cir. 2010). Accordingly, if a case is moot, or becomes moot during any stage of the case, the court does not have jurisdiction to hear the case. A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)(citing Powell v. McCormack, 395 U.S. 486, 496 (1969)). "Before deciding that there is no jurisdiction, the district court must look at the way the complaint is drawn to see if it is drawn so as to claim a right to recover under the Constitution and the laws of the United States." Bell v. Hood, 327 U.S. 678, 682 (1946). Jurisdiction is not dependent on whether the plaintiff will succeed in his cause of action; jurisdiction is determined before the cause of action's details, both in law and fact, are considered. See Bell v. Hood, 327 U.S. at 682.

The Tenth Circuit recognized a distinction between mootness and standing in Lucero v.

Bureau of Collection Recovery, Inc.:

> Like Article III standing, mootness is oft-cited as a constitutional limitation on federal court jurisdiction. *E.g.*, *Building & Constr. Dep't v. Rockwell Int'l Corp.*, 7 F.3d 1487, 1491 (10th Cir. 1993)("Constitutional mootness doctrine is grounded in the Article III requirement that federal courts only decide actual, ongoing cases or controversies."); *see* Matthew I. Hall, *The Partially Prudential Doctrine of Mootness*, 77 Geo. Wash. L. Rev. 562, 571 (2009)(citing footnote 3 in *Liner v. Jafco, Inc.*, 375 U.S. 301 . . . (1964), as the first occasion in which the Supreme Court expressly derived its lack of jurisdiction to review moot cases from Article III). But although issues of mootness often bear resemblance to issues of standing, their conceptual boundaries are not coterminous. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189-92 . . . (2000). Indeed, the Supreme Court has historically recognized what are often called "exceptions" to the general rule against consideration of moot cases, as where a plaintiff's status is "capable of repetition yet evading review," *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 . . . (1911), or where a defendant has ceased the challenged action but it is likely the defendant will "return to his old ways" - - the latter often referred to as the voluntary cessation exception, *United States v. W.T. Grant Co.*, 345 U.S. 629, 632 . . . (1953); *see also, e.g.*, *City of Erie v. Pap's A.M.*, 529 U.S. 277 . . . (2000). These exceptions do not extend to the standing inquiry, demonstrating the contours of Article III as it distinctly pertains to mootness. *Friends of the Earth, Inc.*, 528 U.S. at 191, 120 . . . .

Lucero v. Bureau of Collection Recovery, Inc., 639 F.3d at 1242-43. Nevertheless, the doctrines

are closely related. As the Supreme Court has explained recently, "[a]t all stages of litigation, a

plaintiff must maintain a personal interest in the dispute," and "[t]he doctrine of standing generally

assesses whether that interest exists at the outset, while the doctrine of mootness considers whether

it exists throughout the proceedings." Uzuegbunam v. Preczewski, 141 S. Ct. 792, 796

(2021)(Thomas, J.). See Henry P. Monaghan, Constitutional Adjudication: The Who and When,

82 Yale L.J. 1363, 1384 (1973)("Mootness is . . . the doctrine of standing set in a time frame: The

requisite personal interest that must exist at the commencement of the litigation (standing) must

continue throughout its existence (mootness).").

A claim may become moot if "(i) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (ii) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Cnty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979). The burden of establishing mootness is a heavy one. See Cnty. of Los Angeles v. Davis, 440 U.S. at 631. Courts are permitted to take into account the relative likelihood of the events which a party asserts keep the dispute from becoming moot. See Golden v. Zwickler, 394 U.S. 103, 109 (1969)("We think that under all the circumstances of the case the fact that it was most unlikely that the Congressman would again be a candidate for Congress precluded a finding that there was 'sufficient immediacy and reality' here."). A case can become moot based on intervening events, such as settling the case, see U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship, 513 U.S. 18, 25 (1994)("Where mootness results from settlement, the losing party has voluntarily forfeited his legal remedy by the ordinary processes of appeal . . . ."), or becoming a resident of the State whose residency laws one is challenging, see Sosna v. Iowa, 419 U.S. 393, 399 (1975)("If appellant had sued only on her own behalf, both the fact that she now satisfies the one-year residency requirement and the fact that she has obtained a divorce elsewhere would make this case moot and require dismissal.").

In comparison, while mootness, a statute of limitations, or some other legal doctrine may eventually bar a suit, one cannot lose standing once one has it. See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. at 190-92, ("Furthermore, if mootness were simply 'standing set in a time frame,' the exception to mootness that arises when the defendant's allegedly unlawful activity is 'capable of repetition, yet evading review,' could not exist."). In addition, pursuant to Supreme Court and Tenth Circuit precedent, a case is not moot even if the only relief available to the plaintiff is nominal damages for a past wrong. See Uzuegbunam v. Preczewski,

141 S. Ct. at 796. As the Honorable Michael W. McConnell, then-United States Circuit Judge for the Tenth Circuit wrote: "It may seem odd that a complaint for nominal damages could satisfy Article III's case or controversy requirements, when a functionally identical claim for declaratory relief will not.[] But this Court has squarely so held." Utah Animal Rts. Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1257 (10th Cir. 2004)(citing Comm. for First Amend. v. Campbell, 962 F.2d 1517, 1526 (10th Cir. 1992)(Baldock, J.)). In short, "a claim for nominal damages precludes dismissal of [a] case on mootness grounds." Utah Animal Rts. Coal. v. Salt Lake City Corp., 371 F.3d at 1262 (McConnell, J., concurring[29]).

---

[29]Judge McConnell concurs in his own majority opinion to express his view that Tenth Circuit precedent on this issue is incorrect, and to urge "that either an *en banc* [Tenth Circuit] court or the Supreme Court should hold that a case that is otherwise nonjusticiable on account of mootness is not saved by the mere presence of a prayer for nominal damages." Utah Animal Rts. Coal. v. Salt Lake City Corp., 371 F.3d at 1263. Judge McConnell acknowledges that his view is contrary to Tenth Circuit precedent, as well as the "distinguished commentator[s]" Wright and Miller, but states "that the proposition that a claim for nominal damages automatically precludes mootness is inconsistent with fundamental principles of justiciability." Utah Animal Rts. Coal. v. Salt Lake City Corp., 371 F.3d at 1263. This issue did eventually reach the Supreme Court in the aforementioned Uzuegbunam v. Preczewski, but an eight-Justice majority in that case held that an award of nominal damages can, on its own, redress a completed injury and thus a plaintiff's Constitutional claim for nominal damages precludes dismissal of the case on mootness grounds. See 141 S. Ct. at 796-97. Judge McConnell's view has a prominent defender at the Supreme Court, however; the Honorable John Roberts, Chief Justice of the United States, in his dissent in Uzuegbunam v. Preczewski, calls Judge McConnell's Utah Animal Rts. Coal. v. Salt Lake City Corp. concurrence "insightful," and agrees with Judge McConnell's position regarding the incompatibility of the nominal-damages-saves-justiciability rule with Article III of the Constitution. 141 S. Ct. at 808 (Roberts, C.J., dissenting). Chief Justice Roberts expresses his concern that a rule holding that nominal damages alone can save a case from mootness "turn[s] judges into advice columnists," because those judges can decide cases in which they cannot grant the plaintiff any effectual relief -- turning Hamilton's "least dangerous branch" into "the least expensive source of legal advice." Uzuegbunam v. Preczewski, 41 S. Ct. at 804, 807 (Roberts, C.J., dissenting). Chief Justice Roberts also states:

> The best that can be said for the Court's sweeping exception to the case-or-controversy requirement is that it may itself admit of a sweeping exception: Where a plaintiff asks only for a dollar, the defendant should be able to end the case by giving him a dollar, without the court needing to pass on the merits of the plaintiff's

claims.  Although we recently reserved the question whether a defendant can moot a case by depositing the full amount requested by the plaintiff, *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 166 . . . (2016), our cases have long suggested that he can, *see, e.g., California v. San Pablo & Tulare R. Co.*, 149 U.S. 308, 313-314 . . . (1893).  The United States agrees, arguing in its brief in "support" of the petitioners that "the defendant should be able to end the litigation without a resolution of the constitutional merits, simply by accepting the entry of judgment for nominal damages against him."  Brief for United States as *Amicus Curiae* 29.  The defendant can even file an offer of judgment for one dollar, rendering the plaintiff liable for any subsequent costs if he receives only nominal damages.  *See* Fed. Rule Civ. Proc. 68(d).  This is a welcome caveat, and it may ultimately save federal courts from issuing reams of advisory opinions.  But it also highlights the flimsiness of the Court's view of the separation of powers.  The scope of our jurisdiction should not depend on whether the defendant decides to fork over a buck.

141 S. Ct. at 808 (Roberts, C.J., dissenting).  The Court understands these criticisms, which the Chief Justice powerfully expresses with some punchy turns of phrase.  The Court, however, as an inferior court, is bound to apply faithfully Supreme Court and Tenth Circuit precedent, which indicates that nominal damages, on their own, can render a Constitutional claim justiciable even in the absence of other forms of relief.  See Uzuegbunam v. Preczewski, 141 S. Ct. at 796-97; Utah Animal Rts. Coal. v. Salt Lake City Corp., 371 F.3d at 1257; Comm. for First Amend. v. Campbell, 962 F.2d at 1526.

Moreover, even writing on a clean slate, the Court would side with the views the eight-Justice majority expresses in Uzuegbunam v. Preczewski.  The Court agrees with Justice Thomas' observations in the Uzuegbunam v. Preczewski majority, in which he notes that -- as a historical matter -- common law courts before and after the ratification of the Constitution reasoned that "*every* legal injury necessarily causes damage."  141 S. Ct. at 798.  It follows that nominal damages, "[d]espite being small . . . are certainly concrete," in part because they can "'affec[t] the behavior of the defendant towards the plaintiff.'"  141 S. Ct. at 801 (quoting Hewitt v. Helms, 482 U.S. 755, 761 (1987)).  The Court agrees with these observations, which accord with the Court's more general sense that judicial vindication of Constitutional rights -- even when a violation of those rights does not give rise to sizable compensatory damages -- is an important interest that is central to the Constitutional function of the federal judiciary and our system of government.  See Carey v. Piphus, 435 U.S. 247, 266 (1978)(Powell, J.)("By making the deprivation of such rights actionable for nominal damages without proof of actual injury, the law recognizes the importance to organized society that those rights be scrupulously observed.").  On this note, the Court observes that the Civil Rights Act of 1871, 17 Stat. 13 -- the Act which contains 42 U.S.C. § 1983, the general use civil rights enforcement statute -- contains a jurisdiction conferring provision, 28 U.S.C. § 1343(3), which contains no amount in controversy requirement.  Significantly, at the time, the general federal-question jurisdiction statute contained an amount in controversy requirement.  See Erwin Chemerinsky, Federal Jurisdiction § 8.1, at 524-25 (8th ed. 2021)("The absence of any amount in controversy requirement in § 1343(3) made that statute important at a time when the general federal question jurisdiction statute had  a minimum amount requirement.").

_____

This history indicates that, at the time Congress enacted its first general purpose civil rights statute, Congress intended that civil rights litigants had a path to the federal courthouse, no matter how small their claim. While this historical evidence is not conclusive on the question of justiciability, it suggests -- albeit indirectly -- that Congress seeks to allow the federal judiciary to adjudicate Constitutional claims without regard to their monetary value.

As for the question whether a defendant could end a nominal damages suit -- without a merits resolution -- by accepting an entry of a judgment for nominal damages against it, the Court notes that the Supreme Court has not ruled explicitly on this issue. See Campbell-Ewald Co. v. Gomez, 577 U.S. 153, 166 (2016), as revised (Feb. 9, 2016)("We need not, and do not, now decide whether the result would be different if a defendant deposits the full amount of the plaintiff's individual claim in an account payable to the plaintiff, and the court then enters judgment for the plaintiff in that amount."). In addition, Justice Thomas, in his Campbell-Ewald Co. v. Gomez concurrence, argues that such a procedure would have been unavailable at the common law. See 577 U.S. at 171 (Thomas, J., concurring)("At common law, a plaintiff was entitled to 'deny that [the tender was] sufficient to satisfy his demand' and accordingly 'go on to trial.'" (quoting Raiford v. Governor, 29 Ala. 382, 384 (1856)). The Court also agrees with the author of a recent Harvard Law Review note on the topic, which observes that "it is not clear that there is a logical distinction between the rejection of an offered payment, as occurred in Campbell-Ewald, and the rejection of a tendered payment, as might occur in the hypothetical the Campbell-Ewald Court reserved." Leading Case, Article III -- Standing -- Nominal Damages -- Uzuegbunam v. Preczewski, 135 Harv. L. Rev. 323, 331-32 (2021).

While an interesting -- largely academic -- issue, at the retail, trial court level, there rarely is any mootness in a common sense use of that term in any case for nominal damages. Most cases are litigated vigorously, because the Defendant does not want -- for a host of reasons -- to settle the claim or have judgment entered against it. By any definition, such claims are not moot. Moreover, the Chief Justice and Professor McConnell's proposed rule cannot be applied in a principled, neutral manner. If one dollar presents a moot case, it is not clear whether a ten-dollar case, a hundred-dollar case, or a thousand-dollar case presents a moot case. As Eubulides of Miletus famously wondered, how many individual grains of sand make a heap? In the case of nominal damages and mootness, the Court is concerned that a finding of mootness may depend on whether the court lies or dislikes the plaintiff's case.

Finally, the interesting hypothetical of a defendant mooting a plaintiff's case by making an offer of judgment or sending over a dollar does not happen much, and, in any case, requires acceptance. Most defendants -- particularly public officials and entities -- do not want a judgment entered against them, and do not want to be seen as paying any money. Such actions by the voters as an admission or concession of guilt. Moreover, the plaintiff for does not have to accept the offer of judgment or the payment, and if the plaintiff does not, the State official or entity takes a potential hit without any benefit. Being cute comes with a risk and a cost. See Payne v. Tri-State Careflight, LLC, CV 14-1044, 2016 WL 9738302, at *21-23 (D.N.M. July 12, 2016)(Browning, J.)(discussing mootness and offers of judgment in the class action context).

The Court has concluded that a due process claim is not moot where the plaintiff does not receive the precise remedy he has requested.  See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1235-36 (D.N.M. 2011)(Browning, J.)("Salazar").  In Salazar, a city bus driver brought a due process claim against the City of Albuquerque after being fired from his job.  See 776 F. Supp. 2d at 1223.  Although the employee was later reinstated, the Court determined that his due process claim was not moot, because he had asked for more than just reinstatement; he had also asked for punitive and back-pay damages.  See 776 F. Supp. 2d at 1235-36.  The Court has also determined that a claim is not necessarily moot even when a State court has previously dismissed the claim for lack of prosecution and for failure to appear, because there was still time for the plaintiff to seek reconsideration of the decision or an appeal.  See Nieto v. Univ. of N.M., 727 F. Supp. 2d 1176, 1191 (D.N.M. 2010)(Browning, J.).

## LAW REGARDING 42 U.S.C § 1983 CLAIMS

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  Section 1983 creates only the right of action and it does not create any substantive rights; substantive rights must come from the Constitution or from a federal statute. See Nelson v. Geringer, 295 F.3d 1082, 1097 (10th Cir. 2002)("[S]ection 1983 'did not create any substantive rights, but merely enforce[s] existing constitutional and federal statutory rights . . . .'" (second alteration added by Nelson v. Geringer)(quoting Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1197 (10th Cir. 1998))).  Section 1983 authorizes an injured person to assert a claim for

relief against a person who, acting under color of state law, violated the claimant's federally protected rights.  To state a claim upon which relief can be granted under § 1983, a plaintiff must allege: (i) a deprivation of a federal right; and (ii) that the person who deprived the plaintiff of that right acted under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).  The Court has noted:

> [A] plaintiff "must establish (1) a violation of rights protected by the federal Constitution or created by federal statute or regulation, (2) proximately caused (3) by the conduct of a 'person' (4) who acted under color of any statute, ordinance, regulation, custom[,] or usage, of any State or Territory or the District of Columbia.

Schaefer v. Las Cruces Pub. Sch. Dist., 716 F. Supp. 2d 1052, 1063 (D.N.M. 2010)(Browning, J.)(second alteration in original)(quoting Martinez v. Martinez, No. CIV 09-0281, 2010 WL 1608884, at *11 (D.N.M. March 30, 2010)(Browning, J.)).

The Supreme Court has explained that, in alleging a § 1983 action against a government agent in his or her individual capacity, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. 662 676 (2009).  Consequently, there is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 676 ("Because vicarious liability is inapplicable to Bivens[30] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty.

---

[30]In Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)("Bivens"), the Supreme Court held that a violation of the Fourth Amendment of the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  Bivens, 403 U.S. at 389.  Thus, in a Bivens action, a plaintiff may seek damages when a federal officer acting in the color of federal authority violates the plaintiff's constitutional rights.  See Bivens, 403 U.S. at 389.  See also Ashcroft v. Iqbal, 556 U.S. at 675-76 (stating that Bivens actions are the "federal analog" to § 1983 actions).

Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  Entities cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 689 (1978).  Thus, supervisors can be held liable only for their own unconstitutional or illegal policies, and not for their employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

The Tenth Circuit recognizes that non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012); Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006).  The Tenth Circuit also recognizes that Ashcroft v. Iqbal limited, but did not eliminate, supervisory liability for government officials based on an employee's or subordinate's constitutional violations.  See Garcia v. Casuas, No. CIV 11-0011, 2011 WL 7444745, at *25-26 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  The language that may have altered the landscape for supervisory liability in Ashcroft v. Iqbal is: "Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  In Dodds v. Richardson, the Honorable Neal M. Gorsuch, then-United States Circuit Judge for the Tenth Circuit, stated:

> Whatever else can be said about Iqbal, and certainly much can be said, we conclude the following basis of § 1983 liability survived it and ultimately resolves this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which "subjects, or causes to be subjected" that plaintiff "to the deprivation of any rights . . . secured by the

Constitution . . . ."

Dodds v. Richardson, 614 F.3d at 1199 (quoting 42 U.S.C. § 1983).  Then-Judge Gorsuch noted, however, that "Iqbal may very well have abrogated § 1983 supervisory liability as we previously understood it in this circuit in ways we do not need to address to resolve this case."  Dodds v. Richardson, 614 F.3d at 1200.  It concluded that Ashcroft v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis."  Dodds v. Richardson, 614 F.3d at 1200.  More specifically, the Tenth Circuit recognized that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"  Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

The specific example that the Tenth Circuit used to illustrate this principle is Rizzo v. Goode, where the plaintiff sought to hold a mayor, a police commissioner, and other city officials liable under § 1983 for constitutional violations that unnamed individual police officers committed.  See Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).  The Tenth Circuit noted that the Supreme Court in that case found a sufficient link between the police misconduct and the city officials' conduct, because there was a deliberate plan by some of the named defendants to "crush the nascent labor organizations."  Dodds v. Richardson, 614 F.3d at 1200 (quoting Rizzo v. Goode, 423 U.S. at 371).

## LAW REGARDING THE FIRST AMENDMENT

The First Amendment states: "Congress shall make no law . . . abridging the freedom of speech, or of the press."  U.S. Const. amend. I.  The First Amendment secures the "freedom of expression upon public questions."  New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964).

According to the Honorable Louis Brandeis, Associate Justice of the Supreme Court, "[t]hose who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberate forces should prevail over the arbitrary." Whitney v. California, 274 U.S. 357, 375 (1927).  The Constitution's Framers "valued liberty both as an end and as a means," and "believed liberty to be the secret of happiness and courage to be the secret of liberty."  Whitney v. California, 274 U.S. at 375.  They firmly believed that the "freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth," because, without them, "discussion would be futile."  Whitney v. California, 274 U.S. at 375.  Justice Brandeis noted, moreover, that the values that the First Amendment protects are essential to the operation of the democracy that the Constitution creates. See Whitney v. California, 274 U.S. at 375.  Robust public discussion, in his view, is a "political duty" and is a "fundamental principle of the American government."  Whitney v. California, 274 U.S. at 375.  Constitutional protections of freedom of expression and of the press, therefore, are "fashioned to assure unfettered interchange of ideas for the bringing out of political and social changes desired by the people."  Roth v. United States, 354 U.S. 476, 484 (1957).

Like most Constitutional guarantees, the First Amendment, however, is not an absolute bar on government intervention.  In effect, "no law" does not in practice mean "no law."  U.S. Const. amend. I.  See Ashcroft v. Am. Civil Liberties Union, 535 U.S. 564, 573 (2002)(stating that, "'as a general matter, the First Amendment means that government has no power to restrict expression because of its messages, its ideas, its subject matter, or its content," but "this principle, like other First Amendment principles, is not absolute" (quoting Bolger v. Youngs Drug Products Corp., 463 U.S. 60, 65 (1983))); Dennis v. United States, 314 U.S. 494, 503 (1951)(noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of

speech must, on occasion, be subordinated to other values and considerations").  Although the First Amendment speaks in absolutist terms, courts long have recognized that governments Constitutionally can restrict speech and the press under certain conditions.  See Holder v. Humanitarian Law Project, 561 U.S. 1, 26-29 (2010).  The Honorable Oliver Wendell Holmes, Associate Justice of the Supreme Court, notes in his oft-quoted example: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theater and causing a panic."  Schenck v. United States, 249 U.S. 47, 52 (1919).  Indeed, not all speech is protected speech, and our First Amendment jurisprudence has developed various categorizations of protection based on the speech.  See Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."); Miller v. California, 413 U.S. 15, 23 (1973)("This much has been categorically settled by the Court, that obscene material is unprotected by the First Amendment.").  This categorization is borne from a recognition that "not all speech is of equal First Amendment importance."  Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758 (1985).  The extent to which the government may limit access to information or restrict speech "depends on the nature of the forum."  Cornelius v. NAACP Legal Def. and Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  See Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989)(concluding that certain content-neutral time, place, and manner restrictions are constitutional).

The First Amendment's speech and press protections, moreover, limit both state and federal government action.  See Gitlow v. New York, 268 U.S. 652, 666 (1925); Near v. Minnesota, 283 U.S. 697, 628 (1931).  The First Amendment limits "government regulation of private speech" and not government speech or purely private speech regulations.  Pleasant Grove

City, Utah v. Summum, 555 U.S. 460, 467 (2009).  The First Amendment does not compel either the government or private persons to supply information.  See Shero v. City of Grove, 510 F.3d 1196 (10th Cir. 2007).  See In re Santa Fe Natural Tobacco Co. Mkting & Sales Practices and Products Liab. Litig., 388 F. Supp. 3d 1087, 1168-73 (D.N.M. Dec. 21, 2017)(Browning, J.).

> ### 1.   The First Amendment, Information Within Government Control, and Newsgathering.

In the Tenth Circuit, the "general" rule is that "there is no constitutional right, and specifically no First Amendment right, of access to government records."  Lanphere & Urbaniak v. State of Colo., 21 F.3d 1508, 1511 (10th Cir. 1994)(Houchins v. KQED, Inc., 438 U.S. 1, 7 (1978)(plurality opinion), and United States v. Hickey, 767 F.2d 705, 709 (10th Cir. 1985)).  See Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)("It is well-settled that there is no general First Amendment right of access to all sources of information within governmental control." (quoting Houchins v. KQED, Inc., 438 U.S. at 9)).  This general rule is said to flow from the Supreme Court's plurality[31] opinion in Houchins v. KQED, Inc., 438 U.S. at 7.  As outlined in greater detail below, however, in subsequent cases from the Supreme Court -- including Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555 (1980), Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457

---

[31]On the subject of the plurality nature of the Supreme Court's opinion in Houchins v. KQED, Inc., the Tenth Circuit has noted:

> Although *Houchins* is a plurality opinion of a seven-member Court joined by three members, Justice Stewart concurred in the judgment and wrote that "[t]he First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by government" and he "agree[d] substantially" with what the plurality opinion said on that topic. 438 U.S. at 16, 98 S.Ct. 2588 (Stewart, J., concurring in the judgment).

Shero v. City of Grove, Okla., 510 F.3d 1196, 1202 n.3 (10th Cir. 2007).

U.S. 596 (1982), and Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S.

1 (1986) -- the Supreme Court recognizes, at least to some extent, a right of access to certain

government records.  See, e.g., Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty., 457 U.S.

at 603 ("The Court's recent decision in *Richmond Newspapers* firmly established for the first time

that the press and general public have a constitutional right of access to criminal trials.").  As

Archibald Cox observed in his forward to the Harvard Law Review in 1980, these cases can be

challenging to reconcile:

> [N]urturing a body of law requires more attention than Chief Justice Burger's
> opinion in *Richmond Newspapers* gives to fitting new decisions into the body of
> precedent.  The opinion makes no effort to square the ruling with the rationale of
> *Pell v. Procunier* and *Saxbe v. Washington Post Co.*  Nor does it refer to the Chief
> Justice's own opinion just two years before in *Houchins v. KQED, Inc.*  Surely,
> some effort to explain the relation between the decision in *Richmond Newspapers*
> and those earlier cases was required.

Archibald Cox, Foreword: Freedom of Expression in the Burger Court, 94 Harv. L. Rev. 1, 26

(1980)(footnoted omitted).  See El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 494 (1st Cir.

1992)(Selya, J.)(stating that "[t]he very best" that can be said for the Supreme Court's right-to-

access jurisprudence is that "the constitutional issues are fuliginous").  Adding to the uncertainty,

plurality decisions in this area abound: only seven Justices participated in Houchins v. KQED, Inc.,

and Justice Burger's judgment of the court is a three-Justice plurality opinion, and Richmond

Newspapers, Inc. v. Virginia produced seven opinions by eight Justices, with Chief Justice Burger

again announcing the judgment with an opinion that two other Justices joined.

   Given this uncertainty, it is hardly surprising that Courts of Appeals have struggled with

conceptualizing the relationship between the Richmond Newspapers, Inc. v. Virginia line of cases

and Houchins v. KQED, Inc.  For example, in Detroit Free Press v. Ashcroft, 303 F.3d 681 (6th

Cir. 2002), the Sixth Circuit held that "the line of cases from *Richmond Newspapers* to *Press-*

*Enterprise II*[, 478 U.S. 1 (1986),] recognize that there is in fact a *limited* constitutional right to *some* government information and also provide a test of general applicability for making that determination." Detroit Free Press v. Ashcroft, 303 F.3d at 700 (emphasis in Detroit Free Press v. Ashcroft). The Sixth Circuit rejected the United States' argument that the issue is "governed by the more deferential standard articulated in *Houchins v. KQED, Inc.*" on the grounds that Houchins v. KQED, Inc. concerned the First Amendment's "press clause, . . . a First Amendment clause distinct from the speech clause," and also that "*Houchins* represented a plurality opinion of the Court, and as such, the conclusion that the First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by the government was neither accepted nor rejected by a majority of the Court." Detroit Free Press v. Ashcroft, 303 F.3d 681, 694 (6th Cir. 2002)(footnoted omitted).

Nevertheless, as noted above, in the Tenth Circuit, Houchins v. KQED, Inc.'s rule that "there is no constitutional right, and specifically no First Amendment right, of access to government records," is the "general" one. Lanphere & Urbaniak v. State of Colo., 21 F.3d at 1511. The Tenth Circuit has limited the Richmond Newspapers, Inc. v. Virginia line of cases to apply "in relation to the Sixth Amendment right to a fair and public trial," Lanphere & Urbaniak v. State of Colo., 21 F.3d at 1512, and stating that, "[u]nder this precedent . . . a First Amendment right of access inheres only in limited situations where 'a tradition of accessibility implies the favorable judgment of experience[], . . and where 'public access plays a significant positive role in the functioning of the particular process in question,'" Lanphere & Urbaniak v. State of Colo., 21 F.3d at 1512 (quoting Press-Enter. Co. v. Superior Ct. of Cal. for Riverside Cnty., 478 U.S. 1, 8 (1986)). See Smith v. Plati, 258 F.3d 1167, 1178 n.10 (10th Cir. 2001)(noting that, because the claims at issue "do not

involve a claim of denied coverage of a criminal trial in particular, or any trial proceeding in general," the Richmond Newspapers, Inc. v. Virginia line of cases is not "particularly relevant").

As for newsgathering, while newsgathering has some First Amendment protection, its protection does not include necessarily a right to access all news-worthy information. The Supreme Court has noted that, although "there is an undoubted right to gather news 'from any source by means within the law,'" that right is limited, by its terms, to the ability to gather information from sources that are legally available to the public. Houchins v. KQED, Inc., 438 U.S. at 10-12 (quoting Branzburg v. Hayes, 408 U.S. 665, 681-82 (1972)). "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." Branzburg v. Hayes, 408 U.S. at 684. First Amendment protection of newsgathering, which ensures that the government does not "violate the First Amendment by deterring news sources from communicating information," does not provide a right of access beyond the public's general access to a particular source. Houchins v. KQED, Inc., 438 U.S. at 10-12 (citing Branzburg v. Hayes, 408 U.S. at 680). Thus, there is "no basis for the claim that the First Amendment compels others -- private persons or governments -- to supply information."[32] Houchins v. KQED, Inc., 438 U.S. at 10-11.

---

[32]As the Tenth Circuit has noted:

[T]he "Supreme Court has recognized that the First Amendment guarantees access to government records pertaining to criminal proceedings if (1) there has been a tradition of access to the information and (2) public access benefits the functioning of the particular process in question. See, e.g., Press–Enter. Co. v. Superior Court, 478 U.S. 1, 8 . . . (1986)(finding a conditional right of access to California pre-trial criminal proceedings). Cf. Journal Pub. Co. v. Mechem, 801 F.2d 1233, 1236-37 (10th Cir.1986)(applying a similar analysis to coverage of certain aspects of a civil trial)."

Smith v. Plati, 258 F.3d at 1178 n.10.

The Supreme Court has also found that an international passenger who asserted that the Secretary of State's refusal to validate his passport to travel to Cuba violated his First Amendment right to "travel abroad" so as to acquaint himself "first hand with the effects abroad of our Government's policies, foreign and domestic, and with conditions abroad which might affect such policies," had not suffered a First Amendment violation.  Zemel v. Rusk, 381 U.S. 1, 16-17 (1965). The Supreme Court explained:

> There are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow.  For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.  The right to speak and publish does not carry with it the unrestrained right to gather information.

Zemel v. Rusk, 381 U.S. at 16-17.  As noted, according to the Tenth Circuit, it is "well-settled that there is no general First Amendment right of access to all sources of information within governmental control."  Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)(citing Houchins v. KQED, Inc., 438 U.S. at 9).  "This applies equally to both public and press, for the press, generally speaking, do not have a special right of access to government information not available to the public."  Smith v. Plati, 258 F.3d at 1178 (citing Houchins v, KQED, Inc., 438 U.S. at 11; Pell v. Procunier, 417 U.S. 817, 834 (1974); Saxbe v. Wash. Post Co., 417 U.S. 843, 850 (1974); Branzburg v. Hayes, 408 U.S. at 684-85; and Zemel v. Rusk, 381 U.S. at 17).  See Okla. Hosp. Ass'n v. Okla. Pub. Co., 748 F.2d 1421, 1425 (10th Cir. 1984)("Thus, the Supreme Court has recognized that, whatever the extent of protection warranted newsgathering, it is no greater than the right of the general public to obtain information." (citing Pell v. Procunier, 417 U.S. at 834)).

### 2.    **Access to Court Proceedings and the First Amendment.**

The First Amendment does not mention explicitly a right of access to court proceedings.

See U.S. Const. amend. I.  Nevertheless, the Supreme Court has extended a public right of access

to criminal trials pursuant to the First Amendment.  See Globe Newspaper Co. v. Superior Court

for Norfolk Cnty., 457 U.S. 596, 602-04 (1982).  The Supreme Court states:

> [W]e have long eschewed any "narrow, literal conception" of the First
> Amendment's terms . . . for the Framers were concerned with broad principles, and
> wrote against a background of shared values and practices.  The First Amendment
> is thus broad enough to encompass those rights that, while not unambiguously
> enumerated in the very terms of the Amendment, are nonetheless necessary to the
> enjoyment of other First Amendment Rights.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 603-04 (quoting NAACP

v. Button, 371 U.S. 415, 430 (1963)).  See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555,

579-80, 591 n.16 (1980).  The Supreme Court has emphasized that the right of access to criminal

trials is important, because "the criminal trial has historically been open to the press and general

public," and because such public access "plays a particularly significant role in the functioning of

the judicial process and the government as a whole."  Globe Newspaper Co. v. Superior Court for

Norfolk Cnty., 457 U.S. at 605-06.  Accordingly,

> Public scrutiny of a criminal trial enhances the quality and safeguards the integrity
> of the factfinding process, with benefits to both the defendant and to society as a
> whole. Moreover, public access to the criminal trial fosters an appearance of
> fairness, thereby heightening public respect for the judicial process.  And in the
> broadest terms, public access to criminal trials permits the public to participate in
> and serve as a check upon the judicial process -- an essential component in our
> structure of self-government.  In sum, the institutional value of the open criminal
> trial is recognized in both logic and experience.

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  Because one of the

First Amendment's "major purpose[s]" is to "protect the free discussion of governmental affairs,"

the Supreme Court recognizes a right of access to criminal trials.  Mills v. Alabama, 384 U.S. 214,

218 (1966).  By protecting this right, the First Amendment "serves to ensure that the individual

citizen can effectively participate in and contribute to our republican system of self-government."

Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 604.  The Supreme Court

cautions, however, that, "although the right of access to criminal trials is of constitutional stature,

it is not absolute."  Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.

Still, the standard that the government must meet to garner closure is hefty, requiring satisfaction

of strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606-

07.

      The First Amendment does not protect an absolute right to access court documents or court

proceedings.  See Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. 1,

11-12 (1986); Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 606.  The

right is not absolute, because, as the Supreme Court notes, it takes "little imagination to recognize

that there are some kinds of government operations that would be totally frustrated if conducted

openly."  Press-Enterprise Co. v. Superior Ct. of Cal. for Riverside Cnty., 478 U.S. at 8.  "[T]he

right to inspect and copy judicial records is not absolute."  Nixon v. Warner Commc'n, Inc., 435

U.S. 589, 598 (1978).  The Supreme Court states: "Every court has supervisory power over its own

records and files, and access has been denied where court files might have become a vehicle for

improper purposes."  Nixon v. Warner Commc'n, Inc., 435 U.S. at 598.  Consequently, there is a

"qualified" "right of public access" if two "considerations of experience and logic" are met.  Press-

Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 10.  First, a judicial

proceeding or record must "have historically been open to the press and general public."  Press-

Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8.  Second, public access

must play a "significant positive role in the functioning of the particular process in question."

Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8.  The right of access

is qualified, but the presumption of access may be overcome "'only by an overriding interest based

on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 9 (quoting Press-Enterprise Co v. Superior Ct. of Calif., Riverside Cnty., 464 U.S. 501, 510 (1984)). See United States v. Gonzales, 150 F.3d 1246, 1256 (10th Cir. 1998)). This test is known as the "experience and logic" test. See Lanphere & Urbaniak v. Colo., 21 F.3d 1508, 1512 (10th Cir. 1994).

The "experience and logic" test does not afford the press a special right of access to court or government documents not available to the public. See Lanphere & Urbaniak v. Colo., 21 F.3d 1511. The Tenth Circuit twice has assumed without deciding that the "experience and logic" test applies to non-criminal court records and proceedings. See United States v. McVeigh, 119 F.3d 806, 812 (10th Cir. 1997); United States v. Gonzales, 150 F.3d at 1256. Making that assumption, however, the Tenth Circuit reiterated that there is "not yet any definitive Supreme Court ruling on whether there is a constitutional right of access to court documents and, if so the scope of such a right." United States v. McVeigh, 119 F.3d at 812.

The "experience and logic" test does not require disclosure of a criminal defendant's address or telephone number. Lanphere & Urbaniak v. Colo., 21 F.3d at 1512. In Lanphere & Urbaniak v. Colo., the Tenth Circuit concluded that a First Amendment right of access exists only in "limited situations" where a "'tradition of accessibility implies the favorable judgment of experience' . . . and where 'public access plays a significant positive role in the functioning of the particular process in question.'" Lanphere & Ubraniak v. Colo., 21 F.3d at 1512 (quoting Press-Enterprise Co. v. Superior Ct. of Calif. for Riverside Cnty., 478 U.S. at 8). Allowing access to documents that contain a defendant's "address and/or phone number," especially when those documents are sought for that reason specifically, would stretch the First Amendment's principles

"well beyond their current bounds."  See Lanphere & Urbaniak v. Colo., 21 F.3d at 1512.  The

Tenth Circuit, therefore, notes specifically that it "declines" to find a First Amendment right to

access to court documents which contain a criminal defendant's address or telephone number.  See

Lanphere & Urbaniak v. Colo., 21 F.3d at 1512.  See also United States v. Jager, No. CR-1531,

2011 WL 13285416, at *4 (D.N.M. June 23, 2011)(Browning, J.)("[T]he 'interests of personal

privacy' of the innocent third parties is 'sufficiently compelling to overcome the presumption of

access.'"  United States v. Jager, No. CR-1531, 2011 WL 13285416, at *4 (D.N.M. June 23,

2011)(Browning, J.)(quoting United States v. Sattar, 471 F. Supp. 2d 380, 388 (S.D.N.Y. Nov. 21,

2006)(Koeltl, J.)).

Similarly, the "experience and logic" test does not mandate press access to suppressed

evidence.  United States v. McVeigh, 119 F.3d at 812-13.  Assuming without deciding that the

"experience and logic" test applies beyond the criminal context, the Tenth Circuit determined that,

although there is a "qualified right of access" to a suppression motion, that right "does not extend

to the evidence actually ruled inadmissible in such a hearing."  United States v. McVeigh, 119

F.3d at 813.  The public's interest in understanding court proceedings is the guiding principle.  See

United States v. McVeigh, 119 F.3d at 813.  The Tenth Circuit reasoned that accessing suppressed

evidence is "not necessary to understand the suppression hearing, so long as the public is able to

understand the circumstances that gave rise to the decision to suppress."  United States v.

McVeigh, 119 F.3d at 813.  Moreover, the Tenth Circuit noted that disclosing suppressed evidence

would harm the criminal process, because it would expose the "public generally, as well as

potential jurors, to incriminating evidence that the law has determined may not be used to support

a conviction."  United States v. McVeigh, 119 F.3d at 813.  A district court's decision to seal only

"those portions of the motion and exhibit that contain materials . . . ruled inadmissible," therefore,

did not run afoul of the First Amendment, because "both the press and the public had ample opportunity to understand the circumstances surrounding" the inadmissible material.  United States v. McVeigh, 119 F.3d at 813-14.

The First Amendment does not require that the press have access to Criminal Justice Act, 18 U.S.C. § 3006A, ("CJA") materials, including "CJA-related vouchers, backup documentation, motions, orders, and hearing transcripts."  United States v. Gonzales, 150 F.3d 1246, 1253 (10th Cir. 1998).  When the Albuquerque Journal contended that it has a First Amendment right to access CJA materials, the Tenth Circuit applied the "experience and logic" test, and concluded that neither history nor logic supported the Albuquerque Journal's contention.  United States v. Gonzales, 150 F.3d at 1256-61.  First, there is "no history, experience or tradition of access" requiring the "release at any time of backup documentation, motions, orders, and hearing transcripts regarding requests for CJA assistance."  United States v. Gonzales, 150 F.3d at 1258.  Second, public access to these records does not "play a *significant role* in the functioning of the CJA process" and would, in fact, play "a *negative* role."   United States v. Gonzales, 150 F.3d at 1259 (emphasis in original).  Further, the Tenth Circuit concluded that there is no common-law right of access to CJA materials, because the CJA statutory scheme would supersede any common-law right.  See United States v. Gonzales, 150 F.3d at 1263.

Neither the Supreme Court nor the Tenth Circuit has decided that Press-Enterprise Co's "experience and logic" test applies to civil complaints.  Moreover, if restriction on public access to a government document or record is not a complete bar, but instead resembles a "time, place, and manner" restriction, then a court does not apply strict scrutiny.  See Globe Newspaper Co. v. Superior Court for Norfolk Cnty., 457 U.S. at 607 n.17.  Time, place, and manner restrictions on press access to court documents are constitutional where they are "content-neutral, narrowly

tailored, and necessary to preserve the court's important interest in the fair and orderly administration of justice." Courthouse News Serv. v. Planet, 947 F.3d 581, 585 (9th Cir. 2020). See Ward v. Rock Against Racism, 491 U.S. at 791 (concluding that content-neutral time, place, and manner restrictions are constitutional if they are narrowly tailored to serve a significant government interest, and leave open ample room for the information to be communicated other ways).

Where the "experience and logic" test is satisfied -- and, therefore, there is a First Amendment right to access -- there is a necessary "right to timely access." Courthouse News Serv. v. Planet, 947 F.3d at 594. The right to timely access does not swallow the entire time, place, and manner analysis. See Courthouse News Serv. v. Planet, 947 F.3d at 594. As a result, a right to access timely information does not entitle the press to "immediate, pre-processing access to newly filed complaints." Courthouse News Serv. v. Planet, 947 F.3d at 594. See Courthouse News Serv. v. Schaefer, 2 F.4th 318, 328 (4th Cir. 2021)(concluding that the First Amendment "does not require perfect or instantaneous access"). The qualified right "attaches when the complaint is filed," but does "not entitle the press to immediate access to those complaints." Courthouse News Serv. v. Planet, 947 F.3d at 585. The Ninth Circuit states:

> Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged. After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration. The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

Courthouse News Serv. v. Planet, 947 F.3d at 596. The qualified right of access does "not require perfect or instantaneous access," because it leaves room for courts to delay access when "same-day access would be impracticable." Courthouse News Serv. v. Schaefer, 2 F.4th at 328. Neither

"inconsequential delays" nor delays caused by "extraordinary circumstances" infringe the qualified right of access. <u>Courthouse News Serv. v. Schaefer</u>, 2 F.4th at 328. Rather, the First Amendment requires newly filed civil complains be available "as expeditiously as possible." <u>Courthouse News Serv. v. Schaefer</u>, 2 F.4th at 329. For example, "overnight delay in access to complaints filed during the last ninety minutes of the court's public hours" does not violate the First Amendment. <u>Courthouse News Serv. v. Planet</u>, 947 F.3d at 599.

## CONCLUSIONS OF LAW

1.      The sole claim before the Court is the portion of the Amended Complaint's Count V in which Voter Reference alleges that the Defendants violated the First Amendment when they acted with viewpoint-discriminatory purpose in refusing to provide Voter Reference with access to the voter data that Voter Reference requests. <u>See</u> Amended Complaint ¶ 197, at 47; <u>Voter Reference Found., LLC v. Torrez</u>, 2024 WL 1347204, at *146.[33]  On the basis of the Court's

---

[33]The Court concludes that this claim is justiciable. At the outset of the litigation, the Court concluded that Voter Reference has standing to pursue its claims, <u>see</u> PI MOO at 159-64, and the Court must continue to assess whether Voter Reference maintains a personal interest in this dispute. <u>See</u> <u>Uzuegbunam v. Preczewski</u>, 141 S. Ct. at 796 ("At all stages of litigation, a plaintiff must maintain a personal interest in the dispute. The doctrine of standing generally assesses whether that interest exists at the outset, while the doctrine of mootness considers whether it exists throughout the proceedings."). The Court concludes that this claim is not moot, as the viewpoint discrimination claim remains before the Court, and the Court is yet to provide the permanent injunctive relief that Voter Reference requests. <u>See</u> Amended Complaint ¶ c, at 55; <u>Rezaq v. Nalley</u>, 677 F.3d 1001, 1008 (10th Cir. 2012)("The crux of the mootness inquiry in an action for prospective relief is whether the court can afford meaningful relief that 'will have some effect in the real world.'" (quoting <u>Rio Grande Silvery Minnow v. Bureau of Reclamation</u>, 601 F.3d 1096, 1110 (10th Cir. 2010))). Moreover, the Secretary of State's Office has not withdrawn its criminal referral of Voter Reference, and the Attorney General asserts its right to investigate and prosecute Voter Reference. <u>See</u> FOF ¶ 137, at 34. Accordingly, the dispute remains live, and the Court's permanent injunctive relief will have significant real-world consequences.

The Court notes, however, that it cannot provide Voter Reference with the nominal damages that it requests, because that relief is barred by the Eleventh Amendment. In the Amended Complaint, Voter Reference states that it "seeks to recover nominal damages and secure equitable relief under an Act of Congress, specifically 42 U.S.C. § 1983, which provides a cause of action for

Findings of Fact made in its fact-finding capacity, see FOF ¶¶ 1-138, at 3-34, the Court concludes that the Defendants violated Voter Reference's right under the First Amendment to be free from viewpoint discrimination in the disclosure of voter data.  Accordingly, the Court enters judgment in Voter Reference's favor on the remaining portion of the Amended Complaint's Count V.

      2.     The Amended Complaint's Count V is brought under 42 U.S.C. § 1983.  See Amended Complaint ¶¶ 187-205, at 44-49.  "The elements necessary to establish a § 1983 . . . violation 'will vary with the constitutional provision at issue.'"  Pahls v. Thomas, 718 F.3d 1210,

---

the protection of civil rights."  Amended Complaint ¶ 11(c), at 5.  As the Court explains above, see Law Regarding Mootness, supra, at 47-49, a claim for nominal damages generally precludes dismissal of a case on mootness grounds, see Uzuegbunam v. Preczewski, 141 S. Ct. at 796.  Here, however, Voter Reference's request for nominal damages is barred by the Eleventh Amendment, because both Defendants in this case are sued in their official capacity only.  See FOF ¶ 11, at 5; id. ¶ 19, at 6; Edelman v. Jordan, 415 U.S. 651, 663 (1974); Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989).  Although the Eleventh Amendment "by its terms does not bar suits against a State by its own citizens," the Supreme Court has "consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."  Edelman v. Jordan, 415 U.S. at 662-63.  The Eleventh Amendment, accordingly, prohibits suits against official-capacity defendants, "because, . . . 'a judgment against a public servant in his official capacity imposes liability on the entity that he represents'" -- i.e., the State.  Kentucky v. Graham, 473 U.S. 159, 169 (1985)(quoting Brandon v. Holt, 469 U.S. 464, 471 (1985)).  Although the monetary liability imposed by nominal damages is per se small, the Court is unaware of any legal authority that makes application of the Eleventh Amendment's bar contingent upon the amount of liability incurred by the State.  Accordingly, the Eleventh Amendment no less bars a claim for nominal damages against a non-consenting state than it does a claim for non-nominal damages against a non-consenting state.  New Mexico has not consented: Voter Reference identifies no basis to conclude that the State of New Mexico has consented to such nominal damages suits as its suit.  Statements of counsel in the record, in fact, indicate that the State of New Mexico views this suit as a suit only for injunctive relief, and has not consented to a damages suit.  See Transcript of Summary Judgment Proceedings on June 14, 2023, at 85:22-86:1 (taken June 14, 2023), filed October 6, 2023 (Doc. 157)("I do think it's important to remember that, you know, this is for prospective injunctive relief only.  That's how we are here representing a state entity in federal court, despite the Eleventh Amendment.")(Schremmer).  Accordingly, the Court cannot provide Voter Reference with its requested nominal damages for past unconstitutional conduct.  As discussed above, however, the viewpoint discrimination claim is not moot, because the Court has yet to provide Voter Reference with the injunctive relief that it requests.  See Rezaq v. Nalley, 677 F.3d at 1008.

1225 (10th Cir. 2013)(quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  In all cases, however, "[t]he two elements of a Section 1983 claim are (1) deprivation of a federally protected right by (2) an actor acting under color of state law."  Schaffer v. Salt Lake City Corp., 814 F.3d 1151, 1155 (10th Cir. 2016)(citing D.T. by M.T. v. Indep. Sch. Dist. No. 16 of Pawnee Cnty., Okl., 894 F.2d 1176, 1186 (10th Cir. 1990)).  Moreover, "common to all § 1983 . . . claims is the requirement that liability be predicated on a violation traceable to a defendant-official's 'own individual actions.'" Pahls v. Thomas, 718 F.3d at 1225 (quoting Ashcroft v. Iqbal, 556 U.S. at 676).

3.    The "federally protected right" at issue in this case is a First Amendment viewpoint discrimination claim.  See Amended Complaint ¶ 197, at 47.  This claim is rooted in an allegation that Voter Reference's access to information within government control was restricted by the Defendants on the basis of Voter Reference's viewpoint.  See Amended Complaint ¶¶ 187-197, at 44-47.  In the Tenth Circuit, the "general" rule is that "there is no constitutional right, and specifically no First Amendment right, of access to government records."  Lanphere & Urbaniak v. State of Colo., 21 F.3d 1508, 1511 (10th Cir. 1994)(citing Houchins v. KQED, Inc., 438 U.S. at 7; United States v. Hickey, 767 F.2d 705, 709 (10th Cir. 1985)).  See Smith v. Plati, 258 F.3d 1167, 1178 (10th Cir. 2001)("It is well-settled that there is no general First Amendment right of access to all sources of information within governmental control." (quoting Houchins v. KQED, Inc., 438 U.S. at 9)); Travis v. Reno, 163 F.3d 1000, 1007 (7th Cir. 1998)(Easterbrook, J.)("Peering into public records is not part of the 'freedom of speech' that the first amendment protects." (source of quoted material not cited, but presumably U.S. Const. amend. I)).  Once the government makes information available to some, however, it cannot condition the receipt of the voluntarily disclosed government information on a requester's viewpoint.  See Los Angeles Police Dep't v. United Reporting Pub. Corp., 528 U.S. at 43 (Ginsburg, J., concurring)("California could not, for example,

release address information only to those whose political views were in line with the party in power."); id. at 46 (Stevens, J., dissenting)("[I]f the State identified the disfavored persons based on their viewpoint, or political affiliation, for example, the discrimination would clearly be invalid."); Fusaro v. Cogan, 930 F.3d 241, 253 (4th Cir. 2019)(observing that, in Los Angeles Police Dep't v. United Reporting Pub. Corp., "the writings of eight justices indicate that some conditions on the disclosure of government information can run afoul of the Free Speech Clause, giving rise to a viable constitutional claim").  A claim of viewpoint-discriminatory treatment in this context follows the general parameters of a First Amendment viewpoint discrimination claim. As the Supreme Court has noted, "[v]iewpoint discrimination is . . . an egregious form of content discrimination," and "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." Rosenberger v. Rector & Visitors of Univ. of Virginia, 515 U.S. 819, 829 (1995).  Moreover, as the Tenth Circuit has noted, "In § 1983 and *Bivens* actions, a claim of viewpoint discrimination in contravention of the First Amendment requires a plaintiff to show that the defendant acted with a viewpoint-discriminatory purpose."  Pahls v. Thomas, 718 F.3d at 1230 (citing Ashcroft v. Iqbal, 556 U.S. at 676).  This requirement is "demanding," Pahls v. Thomas, 718 F.3d at 1230, and demands "more than 'intent as volition or intent as awareness of consequences.'"  Ashcroft v. Iqbal, 556 U.S. at 676 (quoting Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. 256, 279 (1979)).  Rather, this purpose requirement necessitates that a plaintiff show that the decisionmaker undertook "a course of action 'because of, not merely in spite of, [the action's] adverse effects upon an identifiable group.'"  Ashcroft v. Iqbal, 556 U.S. at 676 (quoting Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. at 279)(brackets in Ashcroft v. Iqbal, but not in Pers. Adm'r of Massachusetts v. Feeney).

4.      Under this case's facts, the Court concludes that Voter Reference meets this "demanding" standard.  Pahls v. Thomas, 718 F.3d at 1230.  Voter Reference proves by a preponderance of the evidence that the Defendants -- acting under color of State law, see FOF ¶¶ 9-19, at 5-6 -- refused to honor Voter Reference's request for voter data "'because of, not merely in spite of,'" Voter Reference's viewpoint, Ashcroft v. Iqbal, 556 U.S. at 676 (quoting Pers. Adm'r of Massachusetts v. Feeney, 442 U.S. at 279).  More specifically, the Court concludes that the Defendants acted with "viewpoint-discriminatory purpose" when the Defendants withheld -- for over fifteen months, see FOF ¶ 126, at 32 -- voter data that Voter Reference had properly requested, see Pahls v. Thomas, 718 F.3d at 1230; FOF ¶¶ 128-37, at 33.  As the Court's findings of fact outline in detail, on May 27, 2022, Voter Reference made a formal request for New Mexico voter data accompanied by the affidavits that the New Mexico Election Code require.  See FOF ¶¶ 95-106, at 24-27.  Despite acknowledging that Voter Reference had correctly requested the voter data, see FOF ¶ 100, at 25, the Defendants refused to produce the voter data, see FOF ¶ 102, at 26, informing Voter Reference that the Secretary of State's Office believed it "prudent to delay production of this data at this time," FOF ¶ 105, at 27.  This withholding is without precedent -- no other requester of New Mexico voter data has been denied access to voter data after submitting the properly completed affidavits.  See FOF ¶ 37, at 12, FOF ¶ 134, at 33; FOF ¶¶ 42-49, at 13-14.

5.      The Defendants' sole purported rationale for withholding the voter data that Voter Reference requests -- and thus subjecting Voter Reference to singular treatment -- is that the Defendants believed that Voter Reference would publish the requested voter data online, which the Defendants believe is a violation of State law.  FOF ¶ 105, at 26-27.  Cutting against this proffered rationale for withholding the requested voter data, however, are Voter Reference's

repeated promises --- in writing and in open court though counsel -- that it will not publish individual New Mexico voter data online without a court order stating that it can do so.  See FOF ¶¶ 97, 101, at 25, 26.   In its Findings of Fact, the Court finds that the Defendant's rationale for withholding the voter data that Voter Reference requests is pretextual.  See FOF ¶ 107, at 27.  The Defendants' true rationale for withholding the data is the Defendants' belief that Voter Reference disseminates "misinformation" via its website, VoteRef.com.  See FOF ¶¶ 64-65, 75, 77, 135, at 16-17, 20, 33.  The Defendants subjected Voter Reference to individual treatment on the basis of the Defendants' animus towards Voter Reference's viewpoint -- specifically, the fear that giving the data to Voter Reference may reveal that the Secretary of State is lax about maintaining the State's voter data.  See FOF ¶¶ 135-37, at 33; FOF ¶¶ 42-49, at 13-14.  The Defendants' singular treatment of Voter Reference was undertaken because of, and not merely in spite of, this viewpoint. See Ashcroft v. Iqbal, 556 U.S. at 676; Pahls v. Thomas, 718 F.3d at 1230.

6. Moreover, the Court concludes that this conduct resulted from Secretary Oliver and the Attorney General's own individual actions.  See Pahls v. Thomas, 718 F.3d at 1225.  Secretary Oliver is responsible for fulfilling all requests for voter data under the New Mexico Election Code, and the Attorney General advised Secretary Oliver not to fulfill Voter Reference's requests for Voter Data.  See FOF ¶ 9-10, 86, 114, at 5, 23, 28.

7. Accordingly, the Court rules in Voter Reference's favor on the remaining portion of the Amended Complaint's Count V.

8. Having ruled on all claims in Voter Reference's Amended Complaint, the Court now considers Voter Reference's requests for a permanent injunction.

9. As a remedy for the viewpoint discrimination violation, the Court enjoins the Defendants from engaging in any future viewpoint discrimination against Voter Reference related

to Voter Reference's requests for State voter data.  See Pl.'s FOFs at 119 (requesting the Court "enjoin any future discrimination against" Voter Reference).  "For a party to obtain a permanent injunction, it must prove: '(1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.'" Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d 818, 822 (10th Cir. 2007)(quoting Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1180 (10th Cir. 2003)).

10.    Here, as to the viewpoint discrimination injunction, the Court finds that Voter Reference has proven these elements.  First, Voter Reference has succeeded on the merits of its viewpoint discrimination claim.   Second, an instance of viewpoint discrimination is harm of Constitutional magnitude, and given this case's facts and circumstances, and the history of specific, individualized treatment of Voter Reference in manner unique to all other entities, see FOF ¶¶ 1-138, at 3-34, the Court concludes that the irreparable viewpoint-discriminatory harm is likely to recur absent an injunction.  Third, the Court concludes that this harm outweighs any harm that the Defendants will incur -- especially given the Court's declaration on preemption, which deprives the Defendants of their purported reason for withholding the voter data.  See Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *141-44; FOF ¶ 105, at 26-27.  Fourth, public interest in securing the statutory guarantees of federal law regarding the transparency of elections, see 52 U.S.C. § 20501(b); Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *102-10, and ensuring that Voter Reference may promote this transparency free from viewpoint discrimination, is a boon to the public, and furthers the objectives of federal law.  In short, this injunction will not affect adversely the public interest.

11.     Accordingly, the Court enjoins the Defendants from engaging in any future viewpoint discrimination against Voter Reference related to Voter Reference's requests for State voter data.

12.     In addition, the Court also grants a permanent injunction related to the Court's prior ruling on Voter Reference's NVRA claims.  See Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *133-44.  In the Amended Complaint, Voter Reference requests the Court grant a permanent injunction to "enjoin Defendants, their agents, employees, and all persons acting in active concert or participation with them, from enforcing the Use Restrictions and Data Sharing Ban against Plaintiff, its agents, and others similarly situated."  Amended Complaint ¶ (c), at 55.  Considering again the requirements for a permanent injunction, see Prairie Band Potawatomi Nation v. Wagnon, 476 F.3d at 822, the Court concludes that Voter Reference has proved the elements required for a preliminary injunction with respect to the preemption-related permanent injunction.  First, Voter Reference has succeeded on the merits on the Amended Complaint's Counts I and II.  Second, Secretary Oliver has not withdrawn her criminal referral of Voter Reference, and the Attorney General asserts its right to investigate and prosecute Voter Reference, thus irreparable harm exists.  See FOF ¶ 137, at 34.  Third, the Court concludes that this harm outweighs any harm that the Defendants will incur -- especially given the Court's declaration on preemption.  See Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *141-44.  Fourth, public interest in securing the statutory guarantees of federal law regarding the transparency of elections, see 52 U.S.C. § 20501(b); Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *102-10, ensures that this injunction will not adversely affect the public interest.

13.     Accordingly, the Court enters an injunction permanently enjoining Defendants, their agents, employees, and all persons acting in active concert or participation with them, from

enforcing the Use Restrictions and Data Sharing Ban against Voter Reference, its agents, and others similarly situated.

 **IT IS ORDERED** that: (i) the Court grants judgment for Voter Reference Foundation, LLC ("Voter Reference"), and against the Defendant New Mexico Secretary of State Maggie Toulouse Oliver and Defendant the New Mexico Attorney General, on the remaining portion of Count V of the Plaintiff's Verified First Amended Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief, filed September 26, 2022 (Doc. 74)("Amended Complaint"), and finds that the Defendants engaged in unconstitutional viewpoint discrimination against Voter Reference in violation of the First Amendment to the Constitution of the United States; (ii) the Court enjoins the Defendants from engaging in any future viewpoint discrimination against Voter Reference related to Voter Reference's requests for State voter data; (iii) pursuant to the Court's Memorandum Opinion and Order on the motions for summary judgment, Voter Reference Found., LLC v. Torrez, 2024 WL 1347204, at *133-44, where the Court concludes that Voter Reference is entitled to judgment as a matter of law on the Amended Complaint's Counts I (NVRA preemption) and II (NVRA violation), the Court enjoins the Defendants, their agents, employees, and all persons acting in active concert or participation with them, from enforcing the Use Restrictions and Data Sharing Ban against Voter Reference, its agents, and others similarly situated; (iv) Voter Reference is awarded reasonable attorney's fees and costs; and (v) the Court will enter Final Judgment.

         _____

         UNITED STATES DISTRICT JUDGE

*Counsel:*

Carter B. Harrison IV
Harrison & Hart, LLC
Albuquerque, New Mexico

-- and --

Edward Dean Greim
Matthew Richard Mueller
Jackson Tyler
Graves Garrett Greim LLC
Kansas City, Missouri

    *Attorneys for the Plaintiffs*

Raúl Torrez
  New Mexico Attorney General
Jeff Dan Herrera
Mark Walsh Allen
  Assistant Attorneys General
New Mexico Office of the Attorney General
Santa Fe, New Mexico

    *Attorneys for the Defendants*